## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
AUG 11 2016
ARTHUR JOHNSTON
BY _____ DEPUTY

THE UNITED STATES OF AMERICA,  )
                                          )
     Plaintiff,                          )
                                          )
v.                                            )
                                            )       **COMPLAINT**
                                            )       **Civil Action No:** 3:16cv622
THE STATE OF MISSISSIPPI,      )                     CWR
                                            )                      FKB
     Defendant.                      )
                                            )

## INTRODUCTION

1.     The United States brings this action against the State to enforce the rights of adults with mental illness to receive services in the most integrated setting appropriate to their needs.  The State discriminates against adults with mental illness by administering and funding its programs and services for these individuals in a manner that has resulted in their repeated, prolonged, and unnecessary institutionalization in state-run psychiatric hospitals, and placed them at serious risk of such institutionalization, in violation of Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12131-12134.

2.     Every day, hundreds of adults with mental illness are unnecessarily and illegally segregated in Mississippi's state-run psychiatric hospitals or are at serious risk of entering these institutions.  They enter and remain in these isolating institutions because the State of Mississippi ("the State") has failed to provide them sufficient community-based mental health services.

3.     While confined in these institutions, adults with mental illness are unnecessarily cut off from non-disabled family and friends and others in the community.

4.     By virtue of their institutionalization, these adults with disabilities are deprived of meaningful opportunities to choose friends, work, or make choices about their day to day activities, such as what and when to eat, when to make a phone call, and where to go on a walk.

5.     These individuals experience the type of "[u]njustified isolation" that the Supreme Court held "is properly regarded as discrimination based on disability." Olmstead v. L.C., 527 U.S. 581, 597 (1999).

6.     Title II of the ADA prohibits the unjustified segregation of persons with disabilities, see 42 U.S.C. § 12132; Olmstead, 527 U.S. at 597, and requires states and other public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (2010).

7.     Life in an institution leads not only to stigma and isolation, but also regression, learned helplessness, and physical harm.  It is well-recognized that integrated, community-based services enhance and support recovery from mental illness.

8.     In 2003, the President of the United States put together a committee tasked with studying the nation's mental health service delivery system and making recommendations that would enable adults with serious mental illness to live, work, learn, and participate fully in their communities.  The committee concluded that "[m]ore individuals could recover from even the most serious mental illnesses if they had access in their communities to treatment and supports that are tailored to their needs."  New Freedom Commission on Mental Health, Achieving the Promise:  Transforming Mental Health Care in America, Final Report 5, Pub. No. SMA03-3831 (2003).

9.    In the community, individuals have the opportunity to learn and practice skills that enable independence.  Further, people typically prefer to live in the community, and are more motivated to engage in treatment in their homes.

10.    The State of Mississippi has long recognized that it unnecessarily relies on institutions and fails to provide sufficient services to enable adults with mental illness to live in the community.

11.    In 2008, the Mississippi Legislature's Joint Committee on Performance Evaluation and Expenditure Review ("PEER") found that "[a]lthough the mental health environment in the United States has dramatically changed from an institution-based system to a community-based system in recent years, Mississippi's mental health system has not reflected the shift in service delivery methods."  Joint Legislative Committee on PEER, Report to the Miss. Legislature No. 511, Planning for the Delivery of Mental Health Services in Mississippi:  A Policy Analysis 1 (2008).  A year ago, the same Committee recommended that "[t]he Department of Mental Health and Mississippi State Hospital should gather the appropriate data sets regarding the mental health needs of the hospital, the communities, and the state in order for the department to articulate its community-based services strategy, design its implementation process, and reallocate its resources."  Joint Legislative Committee on PEER, Report to the Miss. Legislature No. 593, Staffing of Psychologists at the Mississippi State Hospital in a Changing Mental Health Service Delivery Environment 1 (2015).

12.    Mississippi continues to concentrate its State spending on mental health on institutional care.

13.    In fiscal year 2015, the Mississippi Department of Mental Health spent $202.5 million on its state hospitals, which include the Mississippi State Hospital, North Mississippi State Hospital,

East Mississippi State Hospital, and South Mississippi State Hospital.  It provided about $25 million in grants for intensive community-based services that could be used to divert people from hospitals and support those individuals in the community that year.

14.     Community-based mental health services include psychiatric services, individual and group therapy, intensive case management, crisis services, peer support services, Assertive Community Treatment, supported employment, and permanent supported housing.

15.     These community-based services for adults with mental illness already exist within Mississippi's mental health service system, but they are not provided uniformly throughout the State's system and even where they are available, they are not available in sufficient quantities to meet the need.

16.     If administered appropriately, these community-based services would be both cost-effective and capable of meeting the needs of adults with mental illness.

17.     The United States seeks to vindicate the rights of adults with mental illness in Mississippi's state-run psychiatric hospitals, and those at serious risk of entry into these institutions.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action under Title II of the ADA, 42 U.S.C. § 12133, and 28 U.S.C. §§ 1331, 1345.  The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202.  The United States has the authority to seek a remedy for violations of Title II of the ADA, 42 U.S.C. §§ 12133-12134; 28 C.F.R. §§ 35.170-174, 190(e).

19.     The United States is authorized to initiate this action pursuant to the Civil Rights of Institutionalized Persons Act of 1980 ("CRIPA"), 42 U.S.C. § 1997.

20.     The Attorney General has certified that all pre-filing requirements specified in 42 U.S.C. § 1997b have been met.  The Certificate of the Attorney General is appended to this Complaint as Attachment A and is incorporated herein.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), given that a substantial part of the acts and omissions giving rise to this action occurred in the Southern District of Mississippi.

**PARTIES**

22.     Plaintiff is the United States of America.

23.     Defendant, State of Mississippi, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. pt. 35.

24.     The State of Mississippi owns and operates four psychiatric hospitals, which are institutions under the meaning of 42 U.S.C. § 1997(1).  The State administers and funds services for adults with mental illness through various agencies and departments.

25.     Mississippi's Division of Medicaid manages the State's Medicaid program, which includes coverage of mental health services to Medicaid-enrolled adults with mental illness.

26.     Mississippi's Department of Mental Health is the state agency responsible for providing mental health services to the citizens of Mississippi.

27.     As part of its mental health system, the Department of Mental Health provides state-funded, state-run psychiatric residential services for adults with mental illness at four psychiatric hospitals and one residential center.

28.     The Department of Mental Health also regulates, oversees, and provides funding for

community-based mental health services for adults with mental illness.

29.     The Mississippi Home Corporation was created by the Mississippi Home Corporation

Act of 1989 to address affordable housing needs in Mississippi.  The Mississippi Home

Corporation is Mississippi's designated Housing Finance Agency and is responsible for

developing private and public partnerships throughout the State to increase affordable housing

stock, including for adults with mental illness.  The Mississippi Home Corporation is responsible

for implementing the State's integrated permanent supported housing program.  See House Bill

No. 1563 (2015).


## STATUTORY AND REGULATORY BACKGROUND

30.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive national

mandate for the elimination of discrimination against individuals with disabilities[.]"  42 U.S.C.

§ 12101(b)(1).  It found that "historically, society has tended to isolate and segregate individuals

with disabilities, and, despite some improvements, such forms of discrimination against

individuals with disabilities continue to be a serious and pervasive social problem[.]"  42 U.S.C.

§ 12101(a)(2).  It further found that "discrimination against individuals with disabilities persists

in . . . institutionalization . . . and access to public services[,]" 42 U.S.C. § 12101(a)(3), and that

"individuals with disabilities continually encounter various forms of discrimination, including

outright intentional exclusion . . . , segregation, and relegation to lesser services, programs,

activities, benefits, jobs, or other opportunities[.]" 42 U.S.C. § 12101(a)(5).

31.     Congress concluded that "the Nation's proper goals regarding individuals with

disabilities are to assure equality of opportunity, full participation, independent living, and

economic self-sufficiency for such individuals" and "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."  42 U.S.C. § 12101(a)(7)-(8) (2008).

32.     For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

33.     Title II of the ADA prohibits discrimination on the basis of disability by public entities. This encompasses the State of Mississippi, its agencies, and its community mental health system, because a "public entity" includes any state or local government, as well as any department, agency, or other instrumentality of a state or local government, and it applies to all services, programs, and activities provided or made available by public entities, such as through contractual, licensing, or other arrangements.  42 U.S.C. § 12131(1) and § 12132.

34.     Congress directed the Attorney General to issue regulations implementing Title II of the ADA.  42 U.S.C. § 12134.  The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The preamble discussion explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible[.]"  28 C.F.R. pt. 35, App. B (2011).

35.     Regulations implementing Title II of the ADA further prohibit public entities from utilizing "criteria or methods of administration" "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3); accord 45 C.F.R. § 84.4(b)(4) (Rehabilitation Act).

36.     In Olmstead, the Supreme Court affirmed that Title II prohibits the unjustified segregation of individuals with disabilities.  The Court explained that its holding "reflects two evident judgments."  527 U.S. at 600.  "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  Id.  "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  Id. at 601.

37.     Under Olmstead, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities.  Id. at 607.

38.     CRIPA permits the United States to initiate action to vindicate the rights of individuals confined to psychiatric institutions, owned, operated, or managed by a State, who have been deprived of their statutory rights.  See 42 U.S.C. § 1997.

## FACTUAL ALLEGATIONS

### A.  State Hospitals are Segregated, Institutional Settings

39.     Mississippi operates four costly, publicly-funded psychiatric hospitals located throughout the State:  the Mississippi State Hospital, North Mississippi State Hospital, East Mississippi State Hospital, and South Mississippi State Hospital (collectively "the State Hospitals").

40.     The State Hospitals are segregated, institutional settings that do not enable individuals living there to interact with non-disabled persons to the fullest extent possible.  While confined in these institutions, individuals are deprived of meaningful opportunities, such as the opportunity to choose friends, participate in employment, or make choices about activities, food, or living arrangements.

41.     Individuals residing in the State Hospitals live in close quarters with other persons with disabilities.  They are assigned to small hospital rooms, often with roommates they did not choose.

42.     The State Hospitals provide little opportunity for individuals with disabilities to interact with individuals without disabilities, apart from Hospital staff.

43.     Individuals living in the State Hospitals have very little autonomy over their daily lives. Most aspects of their daily lives are regimented and limited by rigid rules and inflexible practices.  These rules and practices include rights restrictions, structured meal times, limits on the ability to have visitors, and limits on travel outside the facilities.  As a result, most aspects of their daily lives are controlled by the institutions, and they have little autonomy, privacy, or meaningful opportunities to participate in the community.

44.     Physically, the State Hospitals are isolated from the general community—they are secluded on large tracts of land and cut off from towns, restaurants, stores, and public transportation, enjoyed by the broader community.

45.     For instance, the Mississippi State Hospital, established in 1855 and originally known as the Mississippi State Lunatic Asylum, is located on a 350-acre campus in Whitfield, Mississippi, the site of a former state penal colony.  The campus consists of over 130 buildings and has its own campus police department.

46.     The Mississippi State Hospital employs approximately 1,750 employees.

47.     The East Mississippi State Hospital, located in Meridian, employs approximately 1,130 employees.  It was founded in 1882 and was originally known as the East Mississippi State Insane Asylum.

48.     The North Mississippi State Hospital, located in Tupelo, and South Mississippi State Hospital, located in Purvis, were built recently.  The North Mississippi State Hospital opened in 1999 and the South Mississippi State Hospital in 2000.  Each of those hospitals employs over 100 full-time staff to cover its 50 beds.


**B.  Thousands of Mississippians Cycle in and out of State Hospitals Each Year**

49.     Thousands of adults with mental illness in Mississippi needlessly cycle in and out of the State Hospitals each year because they do not receive the supports they need in the community.

50.     These individuals receive care in a hospital setting away from family, friends, and other natural supports, then return to their communities where they often get no or insufficient treatment, their symptoms get worse, they experience a crisis, and they return to the hospital.

51.     Not including forensic beds, the State Hospitals have about 500 adult psychiatric beds. Collectively, they serve approximately 3,300 adults per year.

52.     The average length of stay in the shorter-term units of the State Hospitals is 43 days.

53.     Many individuals who are admitted to a State Hospital are first held at a local acute psychiatric hospital, crisis stabilization unit, jail, or holding facility while awaiting a placement at a State Hospital, lengthening the overall time spent in an institutional setting.

54.     Repeat admissions to the shorter-term units of the State Hospitals are common.

55.     For example, over 55% of the 206 adults in the shorter-term units at the Mississippi State Hospital on a randomly selected day in 2014 had previously been admitted two or more times, and more than 11% had previously been admitted more than *ten* times.

56.     One twenty-seven year old man admitted to the Mississippi State Hospital on a randomly selected day in March 2015 had *22 prior admissions* to the Hospital.  Individuals with persistent needs cycle through the State Hospitals over and over again, to say nothing of admissions to local emergency rooms, private psychiatric hospitals, and jails.

57.     Readmissions typically result from insufficient services in the community and inadequate coordination between treating professionals in facilities and those who support the individuals when they are in the community.

58.     The State often fails to ensure that there is a plan for providing services and supports in the community that will meet the individual's needs and prevent readmission to the State Hospitals.  Community mental health centers are core providers supporting people with mental illness when they return to the community, yet they often are not involved in treatment and discharge planning.  Other than scheduling a follow-up appointment for the individual at the local provider, there is typically minimal coordination between the State Hospital and the local provider.

**C. Individuals in the Mississippi State Hospital's Longer-Term Units Remain There for Years**

59.     Over 100 individuals were institutionalized in the Mississippi State Hospital longer-term units in fiscal year 2014.

60.     The average length of stay that year for individuals in the Mississippi State Hospital longer-term units was over seven years. One individual was admitted to the Mississippi State Hospital in 1959, at the age of twenty, and remained there over fifty years, at least until 2015.

61.     Individuals dually-diagnosed with mental illness and an intellectual or developmental disability may spend years in a State Hospital due to the lack of community-based services to meet their needs.

62.     While the State has reduced the number of longer-term beds at the State Hospitals, it has simultaneously transferred many individuals to other long-term, segregated settings, including other State-run facilities, nursing facilities, and personal care homes. It has also discharged individuals from the State Hospitals to homelessness and other unstable environments.

63.     Some of the individuals who had been institutionalized at the Mississippi State Hospital have been placed in a nursing facility on the same grounds as a State Hospital.

64.     Other individuals were discharged to the Central Mississippi Residential Center, a State-funded residential behavioral health program for adults with mental illness that looks much like the State Hospitals. The Center consists of multiple buildings on an isolated campus in Newton, Mississippi with a capacity to serve 68 individuals at a given time. The average length of stay at the Center is 545 days; however, several individuals have lived at the Center for five years or more, many of whom already spent much of their lives in a State Hospital.

65.     Mississippi's State Hospitals fail to offer appropriate treatment and discharge planning necessary to successfully transition individuals to the community. Discharge plans are

frequently boilerplate and disconnected from the skills individuals need in order to live in the community.

**D. Mississippi's Administration of its Service System has Caused Unnecessary Segregation of Individuals in State Hospitals and Placed Others at Serious Risk of Unnecessary Institutionalization**

66.     Through the Mississippi Division of Medicaid and Department of Mental Health, the State determines what services will be provided, where services will be available, how services will be funded, who will be eligible for services, how service quality will be evaluated, and what providers are permitted to offer the services.

67.     The Mississippi Department of Mental Health funds and operates the State Hospitals.

68.     The Mississippi Department of Mental Health and Division of Medicaid plan, contract, fund, regulate, and oversee the community mental health system that provides community-based alternatives to the State Hospitals.

69.     The State offers community-based mental health services primarily through fourteen regional community mental health centers ("CMHCs").  The CMHCs are the principal service providers with whom the Mississippi Department of Mental Health and Division of Medicaid contract to furnish a range of community-based mental health and substance abuse services to persons with disabilities, including mental illness.  The Mississippi Department of Mental Health is responsible for certifying, monitoring, and assisting the CMHCs.

70.     The CMHCs are required to offer certain mental health services, including psychiatric services, individual and group therapy, community-based support services, crisis services, and peer support services.  Some CMHCs also offer more intensive services, like Assertive Community Treatment, supported employment, and residential services.  In addition, the

Department of Mental Health pays the CMHCs to conduct pre-screening evaluations to determine whether individuals are eligible for admission to a State Hospital.

71.     The Mississippi Department of Mental Health and Division of Medicaid exercise control over the availability and quality of community mental health services in the State.

72.     The Mississippi Department of Mental Health certifies each CMHC prior to its selection as the designated provider, promulgates operational standards for all CMHCs, conducts reviews of CMHC operations, awards grant funds to support specific community services, and requires financial and performance reporting.

73.     The Mississippi Division of Medicaid establishes the Medicaid services that will be available, defines the purpose of those services, defines limits on those services, engages in utilization control, and determines the rates for those services.

74.     Numerous policies, practices, and actions by the State, including the Mississippi Department of Mental Health and Division of Medicaid, have led to the unnecessary segregation of individuals with mental illness in State Hospitals and placed many other individuals with mental illness at serious risk of institutionalization.  Despite being aware that it unnecessarily relies on an institutional model to serve individuals with mental illness, the State continues to discriminate against people with mental illness by failing to provide sufficient, integrated community-based mental health services consistent with their individual needs.  It has done so primarily by:  (1) failing to provide sufficient community-based mental health services throughout the State and (2) concentrating funding in its State Hospitals rather than community-based services.

       i.     <u>The State fails to provide sufficient community-based mental health services throughout the State.</u>

75.     The State recognizes that community-based services, including psychiatric services, individual and group therapy, intensive case management, crisis services, peer support services, Assertive Community Treatment, supported employment, and permanent supported housing promote positive outcomes and prevent hospitalizations among persons with serious mental illness. See, e.g., Mississippi Department of Mental Health, Think Recovery Newsletter 1, 6-7 (2015), *available at* http://www.dmh.ms.gov/wp-content/uploads/2015/09/MS-Recovery-Newsletter-Summer-2015.pdf (last visited January 13, 2016).   Individuals with mental illness living in the community may need one or more of these community-based services at any given time to avoid unnecessary hospitalization.   Yet the State fails to sufficiently provide community-based mental health services, particularly in certain geographic areas of the State, leaving thousands of people who are in the State Hospitals or at serious risk of entering those Hospitals without the ability to access needed community-based treatment.

76.     In fiscal year 2015, nearly 5,500 individuals were screened for non-forensic admission and about 3,300 were ultimately placed in a State Hospital.  More individuals could be diverted from costly, segregated institutional placement at the State Hospitals if the State increased the availability of community-based services.

77.     Crisis services are a critical part of a successful community mental health system because effective crisis professionals can divert individuals from institutionalization and link them quickly to needed community-based services.  For instance, mental health clinicians offering mobile crisis services go into the community to meet individuals at the site of a crisis and offer interventions to prevent hospitalization.  Crisis professionals can also work closely with law enforcement to help divert individuals from arrest and incarceration or civil commitment.

78.     The State acknowledges that "[w]ithout mobile crisis intervention, someone experiencing a mental health crisis may end up in a hospital, inpatient psychiatric program, a holding facility or even a jail." Mississippi Department of Mental Health, Mississippi Profile 9 (2015), *available at* http://www.dmh.ms.gov/wp-content/uploads/2015/03/Mississippi-Profile-Winter-and-Spring-2015.pdf (last visited January 13, 2016).

79.     The State, however, is not ensuring that these critical face-to-face interventions are uniformly available to individuals in crisis across the State.  While one CMHC reported over 3,000 face-to-face mobile crisis interventions in fiscal year 2015, another CMHC, with a nearly identical regional population, reported fewer than 50 face-to-face interventions all year.

80.     Assertive Community Treatment ("ACT") is another critical community-based mental health service that is not sufficiently available in Mississippi.  It is an intensive team-based treatment model that provides multidisciplinary, flexible treatment and support to people with mental illness to increase integration and prevent hospitalizations. Substance Abuse and Mental Health Services Administration, Assertive Community Treatment:  Building Your Program 5, Pub. No. SMA08-4344 (2008).

81.     The State recognizes the importance of ACT in helping individuals with serious mental illness remain stable in the community and avoid unnecessary institutionalization.  A Mississippi Department of Mental Health press release about the State's ACT program stated, "[i]n the four years DMH has had [ACT] teams operating, they have been extraordinarily successful in helping individuals in recovery by ensuring they can stay and participate in the communities of their choice."  Further elaborating on the success of the program, the Department of Mental Health Executive Director, Diana Mikula, stated, "Recovery not only benefits the individual, it benefits the entire community. . . .  Evidence-based programs such as [ACT] Teams are essential to keep

individuals in the community and help them continue on their road to recovery." Mississippi

Department of Mental Health, Mississippi Expands Program of Assertive Community Treatment

Teams, *available at* http://www.dmh.ms.gov/mississippi-expands-program-of-assertive-

community-treatment-teams/ (last visited January 13, 2016).

82.     In spite of this recognition, the State only offers ACT services in about half of its

fourteen community mental health regions statewide, and the existing teams serve a very small

number of individuals.

83.     In fiscal year 2015, the State served only 189 people with ACT through its eight ACT

teams, despite the overwhelming need for the service.

84.     ACT teams are designed to serve between 80 and 100 individuals each, so the existing

teams could serve between 640 and 800 individuals while implementing the service with fidelity

to the evidence-based model.  Due to poor implementation of the service, the teams remain

underutilized.

85.     The absence of ACT capacity is particularly palpable in the Jackson area.  Hinds and

Rankin counties, covering the Jackson metropolitan area, send more people to State Hospitals for

treatment than any other counties in Mississippi; in fiscal year 2015, 307 people from Hinds

County and 206 people from Rankin County were served in the State Hospitals.  Together, the

two counties account for about 17% of the people served in the State Hospitals, yet neither

county had an ACT team until 2015.

86.     An ACT team was established in Hinds County in 2015, but because it only served 17

individuals, it had little impact on reducing the number of State Hospital admissions.  No ACT

team serves Rankin County.

87.    The State has begun to establish a certified peer support program through which individuals who have lived with mental illness assist others with mental illness to increase resiliency, manage symptoms, build community living skills, and work toward recovery in order to live integrated lives in the community and avoid hospitalization.  The State recognizes that peer support can be just as valuable as other professional treatment services for people with mental illness.  See Mississippi Department of Mental Health, Think Recovery Newsletter 1 (2015), *available at* http://www.dmh.ms.gov/wp-content/uploads/2015/09/MS-Recovery-Newsletter-Summer-2015.pdf (last visited January 14, 2016).

88.    Peer support services are not sufficiently available throughout the State, however.  In fact, two of the CMHC regions each employ only a single peer support specialist.  Over 450,000 people live in the 14 counties served by those CMHCs.

89.    Permanent supported housing is another service that enables people with serious mental illness to avoid hospitalization.  As its name implies, permanent supported housing is (1) permanent, meaning "tenants may live in their homes as long as they meet the basic obligations of tenancy[;]" (2) supportive, meaning "tenants have access to the support services that they need and want to retain housing;" and (3) housing, meaning "tenants have a private and secure place to make their home, just like other members of the community, with the same rights and responsibilities."  Substance Abuse and Mental Health Services Administration, Permanent Supportive Housing:  Building Your Program 1, Pub. No. SMA-10-4509 (2010).

90.    The State has recognized the need for permanent supported housing as an effective evidence-based service for individuals with serious mental illness that enables people to live integrated lives in the community and avoid institutionalization.  See Technical Assistance

Collaborative, A Statewide Approach for Integrated Supportive Housing in Mississippi 1-3

(2014); House Bill No. 1563 (2015).

91.     The State acknowledges, however, that sufficient permanent supported housing is not

available in Mississippi to meet the needs of persons with mental illness.  The State calculates

that over 7,000 people are candidates for permanent supported housing, and that it would need to

provide at least 2,900 slots to meet the national rate of permanent supported housing availability.

Still, the State has provided funding for what they estimate will support only 200 permanent

supported housing slots for fiscal years 2015 and 2016.  See House Bill No. 1563 (2015).

92.     The insufficiency of community services coupled with inadequate State Hospital

discharge planning places people at serious risk of readmission to a State Hospital.  Individuals

are frequently discharged from a State Hospital without sufficient community supports in place

and to inappropriate housing, such as homeless shelters.  For instance, in fiscal year 2014, at

least 56 individuals were discharged to homelessness.

93.     Mississippi's failure to develop a sufficient, high-quality supply of community-based

services and failure to conduct adequate discharge planning from its State Hospitals to the

community forces individuals with mental illness to obtain necessary services at inappropriate

and costly venues, such as emergency rooms, jails, and psychiatric hospitals.

       ii.     The State fails to fund sufficient community-based services and instead focuses

              funding on institutional settings.

94.     The State's reliance on institutional care is reflected in its spending.

95.     In spite of a challenging fiscal environment, the State has continued to concentrate

funding on costly institutional care at State facilities when it could provide appropriate, less

expensive services in the community and share the cost of many of those services with the federal government.

96.    Virtually all of the costs of the State facilities are paid for with State general funds. When the State provides community alternatives through its Medicaid program, however, the federal government provides matching funds; the federal government pays for 73% of all Medicaid expenditures in Mississippi.  Federal Medicaid dollars are not available to fund inpatient psychiatric services for adults under 65 in the State Hospitals, but would be available to all Medicaid beneficiaries receiving eligible community-based services.

97.    In fiscal year 2015, the Mississippi Department of Mental Health spent $202.5 million on the State Hospitals.  In addition to the State Hospitals, the State has concentrated resources in its 68-bed Central Mississippi Residential Center.  In fiscal year 2015, the State spent $5.8 million to operate the Center.

98.    The State reports that the cost for one individual in the State Hospitals is over $470 per day, on average.  Based on the CMHC Billing Guidelines, the approximate cost to the State (minus the federal portion) to serve Medicaid eligible individuals with the most intensive needs who instead receive ACT in the community is approximately $30 per day. And many individuals served at the State Hospitals will not need the most intensive and most expensive community-based services in order to avoid unnecessary hospitalizations.

99.    The Mississippi Legislature's Joint Committee on Performance Evaluation and Expenditure Review committee reported in 2008 that, generally, institution-based services cost more per client than community-based services and that the State's focus on institution-based care "represents a much more expensive service delivery model than does community-based

care." Joint Legislative Committee on PEER, Report to the Miss. Legislature No. 511, <u>Planning for the Delivery of Mental Health Services in Mississippi: A Policy Analysis</u> 55 (2008).

100.    The State's recent spending on new facilities at the East Mississippi State Hospital is another example of its significant investment in the State Hospitals. In the last two years, the State has funded several new buildings at East Mississippi State Hospital, with the newest ones currently under construction. In 2014, the State opened a new $7 million dining facility. The State is currently spending $14 million to build a brand-new 60-bed unit and a central mechanical building.

101.    Even though the State modified its Medicaid State Plan in 2012 to make some critical community-based mental health services Medicaid reimbursable, including mobile crisis, ACT, and peer support, these services are still not being offered in sufficient quantity. For instance, in fiscal year 2014, Medicaid only reimbursed providers for serving 60 people with ACT and 533 people with peer support. Yet offering these Medicaid reimbursable services makes economic sense given the federal government's matching funds.

102.    Mississippi could serve individuals with mental illness in the community by maximizing existing resources—both by redirecting spending from segregated, institutional settings to community-based programs and by fully implementing the State's Medicaid State Plan services.

**E. Mississippi is Aware That it Unnecessarily Relies on Institutional Settings and has not Taken the Action Needed to Remedy the Violations of Law**

103.    The State has long been aware of the failures of its mental health system. In recent years, Mississippi has recognized, and reported on, the State's significant reliance on institutional care to serve persons with disabilities, including mental illness.

104.     In 2008, the Mississippi Legislature's PEER Committee issued a comprehensive report

that concluded that the Board of Mental Health had not focused on developing adequate

community-based programs and reallocating resources to meet the emergent needs of persons

with mental illness in Mississippi.  Joint Legislative Committee on PEER, Report to the Miss.

Legislature No. 511, Planning for the Delivery of Mental Health Services in Mississippi:  A

Policy Analysis 54-56 (2008).  The PEER committee concluded that Mississippi was out-of-step

with national trends and was failing to meet the needs of persons with disabilities in integrated

community settings.  Id. at 1 ("Although the mental health environment in the United States has

dramatically changed from an institution-based system to a community-based system in recent

years, Mississippi's mental health system has not reflected the shift in service delivery

methods.").

105.     The PEER committee recognized that, due to the ADA and the Olmstead decision, "the

state will be forced to move toward providing more community-based care in the near future."

Id.  The PEER committee concluded that the State was not in a good position to address

outstanding issues because the Mississippi Board of Mental Health "has not aggressively sought

plans for reallocation of resources to meet emerging needs in addition to efforts to seek

additional funding to meet those needs . . . [thus,] allowing the development of community-

oriented programs to fall behind."  Id.

106.     In June 2014, the PEER committee again found that the State has missed opportunities to

provide community-based services.  In a report related to the closure of the Mississippi State

Hospital's Community Services Division, the PEER committee noted that the Department of

Mental Health redirected resources from the closure of community-based programs into the State

Hospitals, thus "forgo[ing] the opportunity to redirect the resources yielded from closure of the

[community services] division into providing community-based mental health care."   Joint

Legislative Committee on PEER, Report to the Miss. Legislature No. 584, A Review of the

Closure of the Mississippi State Hospital's Community Services Division viii (2014).

107.    In a May 2015 report, the PEER committee again reiterated that "Mississippi will be

forced to move toward providing more community-based mental health care in the near future"

and recommended that "[t]he Department of Mental Health and Mississippi State Hospital

should gather the appropriate data sets regarding the mental health needs of the hospital, the

communities, and the state in order for the department to articulate its community-based services

strategy, design its implementation process, and reallocate its resources."  Joint Legislative

Committee on PEER, Report to the Miss. Legislature No. 593, Staffing of Psychologists at the

Mississippi State Hospital in a Changing Mental Health Service Delivery Environment 1 (2015).

108.    As early as 2001, the State acknowledged the need for significant change in its Olmstead

Plan.  The Olmstead Plan, developed in conjunction with various stakeholders, was entitled

Mississippi Access to Care ("MAC"), and was submitted to the Mississippi Legislature on

September 30, 2001.  Mississippi Access to Care Plan (2001), available at

https://www.medicaid.ms.gov/wp-content/uploads/2013/12/MAC_2001Plan.pdf (last visited

January 14, 2016).  The overall stated purpose of the Plan was to "create an individualized

service and support system that enables individuals with disabilities to live and work in the most

integrated setting of their choice.  It is our vision that all Mississippians with disabilities will

have the services and supports necessary to live in the most appropriate and integrated setting

possible."  Id. at 9.

109.    Among the many changes that the Plan identified as necessary to realize this vision were

the development of community housing alternatives for over 1,000 adults with serious mental

illness, the expansion of the State's supported employment program, and the expansion of intensive case management. Id. at 22, 28, 39.

110.    The first and only implementation report explained that while some agencies were attempting to implement the reforms identified in the State's Olmstead Plan, the State had not funded the Plan and this made full implementation impossible.  MAC Implementation Report #1 5 (2003).

111.    After ten years in which the State did not engage in any meaningful Olmstead planning, the State launched MAC 2.0 in 2013.  MAC 2.0 is apparently an umbrella for workgroups related to specific federal grant programs.

112.    This MAC 2.0 initiative has not resulted in a revised Olmstead Plan.  See Mississippi Division of Medicaid, Mississippi Access to Care (MAC) 2.0, *available at* https://www.medicaid.ms.gov/mississippi-access-to-care-mac-2-0/ (last visited January 14, 2016).

113.    The Department of Mental Health's current strategic plan also recognizes that expansion of community-based services and supports is critical.  The strategic plan is aimed at "moving toward a community-based service system."  Mississippi Board of Mental Health, FY16-FY18 DMH Strategic Plan 1.

114.    The goals in the current plan highlight the continued need for reform.  The plan calls for providing supports in the community "to prevent out-of-home placements[;]" ensuring access to crisis services to "divert individuals from more restrictive environments such as jail, hospitalizations, etc.[;]" providing adults with serious mental illness access to "appropriate and affordable housing[;]" and using peer support to "assist individuals in regaining control of their lives and their own recovery process[.]" Id. at 8.

115.    Nearly fifteen years after developing the State's <u>Olmstead</u> Plan, the State still is not meeting its obligations under the ADA to serve adults with serious mental illness in the most integrated setting appropriate.

**F.  Individuals with Mental Illness in State Hospitals Or at Serious Risk of Hospitalization are Persons with Disabilities Who are Qualified to Receive Services in More Integrated Settings and Do Not Oppose It**

116.    Individuals admitted to or at serious risk of entry into State Hospitals have mental illnesses, such as schizophrenia, bipolar disorder, depression, and others, that substantially limit one or more major life activities, including personal care, working, concentrating, thinking, and sleeping.  They are therefore persons with disabilities for purposes of the ADA.

117.    A vast majority of the individuals with mental illness in the State Hospitals and those at serious risk of entry into those hospitals are qualified to receive mental health services in the community and can be served in more integrated settings.

118.    People in the State Hospitals and those at serious risk of entry into those hospitals are similar to people with mental illness who receive services in the community.  They have similar diagnoses and needs as people who live successfully in more independent community-based settings with the types of supports and services that currently exist in the State's community mental health system.

119.    Persons with mental illness at the State Hospitals would not oppose moving to and receiving services in integrated settings if appropriate community-based services were available and if individuals had a realistic opportunity to do so.

120.    Individuals in the State Hospitals routinely request to leave the facility and return to their own communities.

### G. The State Can Provide Services in Integrated Settings by Reasonably Modifying Its Mental Health Services System

121.    The State can provide services in integrated community settings to people with mental illness who are currently held in State Hospitals and to people with mental illness at serious risk of entry into State Hospitals through reasonable modifications to its mental health services system.

122.    The types of services needed to support people with mental illness in community-based settings already exist in Mississippi's community-based mental health service system.

123.    However, these services are not sufficiently provided to meet the needs of persons who are unnecessarily institutionalized or those at serious risk of institutionalization.

124.    With reasonable modifications, including expansion of the capacity to provide existing services, reallocation of funds from institutions, and maximization of the State's Medicaid program, Mississippi's community mental health system would be able to meet the needs of people with mental illness in State Hospitals or at serious risk of being placed in a State Hospital.

### H. The United States' Investigation

125.    After receiving an allegation of discrimination, in 2011, the United States investigated the State of Mississippi's compliance with Title II of the ADA.  On December 22, 2011, the United States issued its findings and conclusions in a letter to the Governor, concluding that the State fails to provide services to adults with mental illness in the most integrated setting appropriate to their needs as required by the ADA and Olmstead.  Letter from United States Department of Justice, Civil Rights Division to The Honorable Haley R. Barbour (Dec. 22, 2011).[1]  The letter

---

[1] The United States also made findings related to children with serious mental health conditions and adults and children with intellectual and/or developmental disabilities.  This Complaint does not address the United States' claims with regard to these other populations.

reported in detail the findings of the United States' investigation, provided the State notice of its

failure to comply with the ADA, and outlined the steps necessary for the State to meet its

obligations pursuant to federal law.

126.    Nonetheless, the State continues to fail to ensure that adults with mental illness are served

in the most integrated setting appropriate to their needs, or that their discharge planning needs

are met in order to transition successfully into community settings.

127.    The United States engaged in multiple rounds of negotiations with the State beginning in

the spring of 2012.  The United States has determined that compliance cannot be secured by

voluntary means.  Judicial action is, therefore, necessary to remedy the violations of law

identified in the United States' letter and to vindicate the rights of the adults with mental illness

in or at serious risk of institutionalization in State Hospitals.


## COUNT I

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

## 42 U.S.C. §§ 12131 et seq.

128.    The allegations of Paragraphs 1 through 127 of this Complaint are hereby realleged and

incorporated by reference.

129.    Defendant, State of Mississippi, is a public entity subject to Title II of the ADA, 42

U.S.C. § 12131(1).

130.    The State violates the ADA by administering the State's mental health service system in a

manner that denies qualified adults with mental illness the benefits of the State's mental health

services, programs, or activities in the most integrated setting appropriate to their needs and by

failing to reasonably modify the State's mental health services system to avoid discrimination against adults with mental health disabilities.  42 U.S.C. § 12132; 28 C.F.R. 35.130.

131.    The State's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. pt. 35.

132.    The acts and omissions alleged in Paragraphs 1 through 127 constitute a pattern or practice and infringe upon the legal rights of individuals residing in or confined to institutions in Mississippi, constituting resistance to their full enjoyment of their rights, privileges, or immunities secured or protected by the ADA, and depriving persons in institutions of such rights, privileges, or immunities.

## PRAYER FOR RELIEF

The Attorney General is authorized under 42 U.S.C. §§ 1997 and 12131 et. seq. to seek equitable and declaratory relief.

WHEREFORE, the United States of America prays that the Court:

A. Grant judgment in favor of the United States on its Complaint and declare that the Defendant has violated Title II of the ADA, 42 U.S.C. §§ 12131 et. seq.;

B. Enjoin Defendant from:

   1. discriminating against adults with mental illness in Mississippi by failing to provide services, programs, or activities in the most integrated setting appropriate to their needs;

   2. failing to provide appropriate, integrated community services, programs, or activities to adults with mental illness in Mississippi, consistent with their individual needs, to

avoid placing these individuals at serious risk of institutionalization in State Hospitals; and

3.  taking appropriate action necessary to remedy the violation of Title II of the ADA.

C.  Issue a declaratory judgment that Defendant has violated Title II of the ADA by failing to make reasonable modifications to services, programs, or activities for adults with mental illness to enable them to obtain the services, programs, and activities they require to reside in the most integrated setting appropriate to their needs;

D.  Order such other appropriate relief as the interests of justice may require.

This 11th day of August , 2016

Respectfully submitted,

FOR THE UNITED STATES:

_Loretta E. Lynch_
LORETTA E. LYNCH
Attorney General
United States

_Gregory K. Davis_
GREGORY K. DAVIS
United States Attorney
Southern District of Mississippi

_Vanita Gupta_
VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section

REGAN RUSH
Deputy Chief, Special Litigation Section

_Mitzi Dease Paige_
MITZI DEASE PAIGE
Assistant United States Attorney
MS Bar No. 6014
United States Attorney's Office
Southern District of Mississippi
501 E. Court Street, Ste. 4.430
Jackson, MS  39201
Telephone: (601) 973-2840
Facsimile: (601) 965-4409
mitzi.paige@usdoj.gov

_Elizabeth C. Kelley_
ELIZABETH C. KELLEY
ADRIENNE MALLINSON
DEENA FOX
Trial Attorneys
VA Bar No. 80255
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - PHB
Washington, DC  20530
Telephone: (202) 514-0460
Facsimile: (202) 514-6903
Beth.Kelley@usdoj.gov

## CERTIFICATE OF THE ATTORNEY GENERAL

I, Loretta E. Lynch, Attorney General of the United States, certify that with regard to the foregoing Complaint, <u>United States v. State of Mississippi</u>, I have complied with all subsections of 42 U.S.C. § 1997b(a)(1). I certify as well that I have complied with all subsections of 42 U.S.C. § 1997b(a)(2). I further certify, pursuant to 42 U.S.C. 1997b(a)(3), my belief that this action by the United States is of general public importance and will materially further the vindication of rights, privileges, or immunities secured or protected by laws of the United States.

In addition, I certify that I have the "reasonable cause to believe," set forth in 42 U.S.C. § 1997a, to initiate this action, and that all prerequisites to the initiation of this suit under 42 U.S.C. §§ 1997a and 1997b have been met.

Pursuant to 42 U.S.C. § 1997a(c), I have personally signed the foregoing Complaint. Pursuant to 42 U.S.C. § 1997b(b), I am personally signing this Certificate.

Signed this 4th day of August, 2016, at Washington, D.C.


LORETTA E. LYNCH
Attorney General of the United States