EXHIBIT C

**Expert Report of Katherine Burson**

**Introduction**

I was hired by the Department of Justice and asked to conduct a review of individuals who have been in one of Mississippi's state hospitals, and provide my opinion on: whether each individual would have avoided or spent less time in a State Hospital if he/she had been provided reasonable community-based services; whether the individual opposed receiving community-based services; and if this person was not currently in a State Hospital, whether the individual is at serious risk of institutionalization in a State Hospital. I was also asked to identify service recommendations for each individual.

After completing this process it is my opinion that all of the 28 individuals would have avoided or spent less time in a State Hospital if they had been provided reasonable community-based services. Twenty-two out of 25, or 88 percent, of those interviewed who were not currently in a State Hospital remained at serious risk for institutionalization in a State Hospital. And, none of the individuals opposed receiving community-based rather than hospital-based mental health services. The findings suggest a mental health system that relies heavily on institution-based care and undermines recovery by failing to provide reasonable community services. The result is that people with serious mental health conditions are deprived of the opportunity to develop meaningful and productive lives in their communities.

**Expert Qualifications**

I am a registered and licensed occupational therapist who has specialized in serving people with serious mental illnesses. In the mental health field, an occupational therapist analyzes the factors that influence an individual's ability to do what they need and want to do (i.e., to perform and participate in daily occupations) and then helps them achieve those goals. These factors include one's physical and mental illnesses, environment, context, task demands, expectations and the interactions amongst these. Any of these factors are potential points of intervention. I bring this perspective and occupational analysis skill to my opinions of whether someone would be able to live in the community and what services or supports are needed to prevent institutionalization in a hospital or nursing facility.

I am also a Certified Psychiatric Rehabilitation Practitioner. This is a cross-disciplinary certification demonstrating mastery of core principles, skills, and knowledge necessary to positively change the lives of individuals with serious mental illnesses by promoting hope, self-determination, empowerment, and recovery.

Much of my career has focused on reducing the need for institutional care. To do so, I have focused on helping people stay in the community and on helping people with complex needs move out of institutions. I have extensive experience with community-based programs, nursing facilities, private hospitals and state hospitals, and understand the important role of each in enabling community integration, especially when they align

their goals toward helping people live full and productive lives in the community. I was very involved in Illinois' *Olmstead* efforts. I was responsible for *Money Follows the Person*, a federal funding initiative to move people out of nursing facilities into integrated community living. In this capacity, I participated in clinical conferences and case reviews, made individual-related service delivery suggestions, and guided the overall program both clinically and from a policy and procedural standpoint. I was also involved in assessing and addressing rehabilitation needs of *Williams*[1] and *Colbert*[2] class members, focusing on individuals with complex needs who wanted to move into the community, but were deemed by community mental health providers to be too difficult to serve with their current service array.

Much of my practice has focused on serving the most difficult individuals in integrated settings. I brought evidence-based supported employment to Illinois, built stakeholder support, and drove its expansion. I became the Illinois Department of Mental Health's (DMH) designated lead on all evidence-based practices. I was responsible for coordinating DMH's First Episode Psychosis Program roll out, including developing and overseeing referral and outreach, technical assistance implementation, outcome reporting, ongoing development, and expansion. I helped develop a supported education program within a community college. I also helped develop the mental health workforce across the continuum of care addressing client engagement and ways to alter the environment (e.g., physical space, support networks, materials, expectations, policies, practices) to improve access, performance, and participation for those who were not responding well to current clinical and programmatic practices.

I have extensive experience collaborating with others to enable community integration. My partners have included consumers of mental health services and their family members, employers, community colleges, universities, community mental health providers, state hospital staff, nursing facility staff, a community program for the homeless, a community re-entry program for persons with justice involvement, and state agency leadership (State Medicaid Authority, Division of Vocational Rehabilitation, Division of Alcohol and Substance Use, Department on Aging, Department of Corrections, Cook County Jail).

**Methodology**

As a member of the Clinical Review Team, I was asked to interview a sample of persons who had been hospitalized in one of Mississippi's State Hospitals; review the medical records of these same persons; and summarize my findings. I also interviewed family members and Community Mental Health Center (CMHC) staff when there was opportunity. My findings were to include my opinion with regard to four questions about each individual:

1. Would the individual have avoided or spent less time in a State Hospital if he/she had been provided reasonable community-based services?

---

[1] *Williams et al. v. Rauner et al.*, 1:05-cv-04673 (N.D. Ill.).
[2] *Colbert et al. v. Rauner et al.*, 1:07-cv-04737 (N.D. Ill.).

2

Confidential – Subject to Protective Order

2. If not in a State Hospital at the time of the interview, is the person at serious risk of institutionalization in a State Hospital?
3. Is this person opposed to receiving community-based services?
4. Whether the person is appropriate for and would benefit from integrated, community-based services, and if so, what are the particular services?

Before the Clinical Review Team conducted interviews, we worked collaboratively to develop an interview guide. The guide was intended be an inquiry framework, not a specific list of questions to be asked and answered. The framework prompted exploration of the individual's hospital experience, their life in the community, and the community mental health services they received. It also invited individuals to share their interests and hopes, and their perspective on the challenges they encounter and what might help them navigate those challenges, including service preferences.

The next step was to establish inter-rater reliability amongst Clinical Review Team members relative to the answers of the three questions. To do this, a sample of 52 people were collaboratively interviewed by at least two members of the clinical review team. I participated in 16 two-person interviews as either primary or secondary interviewer. Then, after reviewing the medical records, the two interviewers independently answered the four questions. These answers were shared and when there was disagreement, the rationale was discussed. Raters were asked to record their independent ratings and agree on a final rating. We were also asked to discuss our service recommendations for these individuals.

I spent four weeks in Mississippi in the Jackson, Gulfport, Meridian, and Starkville areas, interviewing a total of 37 individuals from the randomized sample. I served as the primary interviewer for 28 of these individuals, whose reports are attached below. I interviewed people at Mississippi State Hospital, East Mississippi State Hospital, Jaquith Nursing Facility, in their own homes, in personal care homes, family homes, and at other community locations, and one individual in Walthall County Jail. Every interviewee gave consent to be interviewed. When possible, I also conducted collateral interviews with family members and community mental health providers to gain additional perspective on the person, their needs, and the care they received.

**Materials Reviewed**

General background materials were provided and reviewed, including the most recent Mississippi Department of Mental Health Annual Report and the State's service definitions. I also reviewed information regarding the CHOICE program (Mississippi's supported housing program). The Clinical Review Team Lead, Robert E. Drake, MD, provided a summary of research findings on mental health practices relative to their effects on hospitalization and a guide to medication prescribing standards. I also reviewed the provided State Hospital and community mental health records for each interviewee. A complete list of considered documents can be found in Attachment B.

**Standards**

The standards I applied in the formulation of my opinions took into consideration Dr. Drake's research; the State's service definitions; my experience working with similar individuals; my knowledge of evidence-based and informed practices; my experience modifying service system practices to better serve individuals with complex needs in the community; my experience driving clinical practice and cultural change within inpatient, outpatient, nursing facility, and community mental health settings; and my experiences collaborating with consumers and family members in Illinois' public mental health sector. I also considered person-level factors that correlate with high-risk of hospitalization and my knowledge of community-based services that consistently reduce hospitalization, as well as community-based services that probably reduce hospitalization, but have been insufficiently researched. When reflecting on the individuals reviewed, I compared them to others I have known with similar illnesses, circumstances, and patterns of behavior (e.g., symptoms; histories; social networks; challenges; patterns of engagement; performance and participation in roles, responsibilities, self-care, relationships, and community life).

My standards were as follows:

- **Would Not Oppose:** I found a person "would not oppose" community-based services based on what the individual said during the interview, the individual's hospital experience, what was supported by the record, and whether the person had accessed or expressed a desire to access community-based rather than hospital-based services.
- **Appropriate for the Community:** I determined whether a person was "appropriate for the community" by considering the available medical records, interviews, and examining whether their needs and symptomology could be safely met and maintained in the community.
- **Would benefit from community services:** I determined whether a person "would benefit from community services" by drawing on my own experience and knowledge of services and supports for individuals with mental illness, Dr. Drake's research, and the Mississippi Department of Mental Health service standards.
- **Avoid or spend less time**: My opinions that a person could have avoided or spent less time in the hospital were based on the circumstances that led to the person being committed and admitted to the State Hospital and the circumstances that led to the person being discharged from the State Hospital, drawing on my own experience transitioning and maintaining individuals in the community.
- **Serious risk of readmission to a State Hospital**. I considered a person at serious risk of readmission to a State Hospital by looking at the person's history, current services, current living situation, any risk factors that would heighten the possibility of hospitalization, and my knowledge of the consequences to individuals who do not receive appropriate services.

**Findings from Reviewed Individuals**

My opinions about the individuals in my group are described within. Here, I offer the following global opinions:

*Community Services are Lacking in their Breadth, Potency, and Frequency*

> **Community services are lacking in their breadth, potency, and frequency. Core services shown to reduce hospitalizations and promote recovery are not sufficiently available.** All treatment plans included medication evaluation and management every one to three months. Individual Therapy is provided either "as needed" (which usually means it never occurs) or once a month. People with more intense needs may receive community support once or twice a month. But, due to engagement and staffing challenges, these services most often occur even less frequently than this. The focus of services is almost entirely on medication adherence. PACT is not available to most who need it, and the reason PACT is indicated for so many appears in part related to the lack of engagement and sufficiency of community services that has led to repeated hospitalization. No one in my sample was receiving supported employment, yet most interviewees indicated they wanted to work. It would be appropriate for individuals who want to work to also receive benefits counseling to coordinate continued access to income and health insurance, but none of these individuals had received that support. Permanent Supported Housing was insufficiently available. The over-reliance on personal care homes and living with one's family thwarted recovery. This is because many individuals with mental illness prefer living alone where they do not have to feel like a patient (as they might in a personal care home with other patients) or someone with an illness all the time. Some individuals do better when they do not have to conform to expectations and demands from others while at home. Further, if the person is living with their family, those family members might act quicker to try to hospitalize their loved one if they are not educated on understanding mental illness (as it was often with the individuals I reviewed). Very few people received integrated substance use disorder and mental health treatment, though this was frequently indicated. Crisis supports designed to prevent hospitalization were often not available and, if they were, unfamiliar to families and thus not used. The amount of face-to-face contact seldom changed during times of high risk for re-hospitalization, such as transitioning out of a CSU or hospital, or at the first signs of increased substance use, medication non-adherence, or deteriorating role performance. Services specifically targeted to young adults were absent. Most people wanted to develop friendships, but outside of a PSR/Clubhouse (which participants described as more like a day treatment program) or one PACT team that provided peer activities, hands on help with this was not apparent. There was no mention of drop-in-centers, support in getting to AA/NA meetings, or facilitated socialization just for the sake of making friends with similar interests, including friends who do not have mental illnesses.

*Individuals Are Admitted to the State Hospitals When They Do Not Need To Be*

> Some people were admitted to the State Hospital even when they were no longer a danger to themselves or others, and thus no longer met criteria for inpatient hospitalization. When people were court committed to the Crisis Stabilization Unit (CSU) or another hospital while waiting for a State Hospital bed, they were transferred to the State Hospital when a bed became available even if they had already stabilized. The reason for admissions was sometimes written as "court ordered," rather than a description of symptoms warranting an inpatient level of care.

*Even Short-Term Hospitalization Is Harmful*

> **There is insufficient recognition of the impact of short and long-term institutionalization on people's lives.** People shared how being hospitalized made them "feel like less of a person," "it's like going to jail over-and-over again," "I was trapped there, thought I'd lose my mind," "it's a sad place," "I could never figure out about the rules" and they were "jabbing the needles into me," "Sometimes you feel relieved because everything is done for you." Repeated and prolonged hospitalization place people at high risk to lose their resiliency and result in diminished self-confidence in their ability to navigate community roles and responsibilities like managing health, diet, independent living, work, school, relationships, and community involvement. Prolonged and repeated hospitalizations can and often do lead to functional decline or learned helplessness.

*People Are Hospitalized for Longer Than Necessary, and Placed at Risk of Future Reinstitutionalization, Because of a Failure of Service Planning and Coordination*

> **Treatment planning is formulaic, seldom individualized, not person-centered, and seldom involves shared decision-making.** This is true in both the hospital and in the community. In the CMHCs, most people get the same treatment at the same frequency. Treatment plans, approaches, and intensity seldom vary by clinical need. In the hospital, persons did not receive individualized behavioral plans, even when the usual behavioral management/level system was not working. In both the hospitals and CMHCs, little information is gathered about what is important to the person and what is gathered is not incorporated into treatment plans or the engagement process. Most people have the same treatment plan repeatedly, even if it has never proven effective at reducing hospitalization or is no longer advancing their recovery. Some shared decision making does occur around medication preferences.

> **Hospital discharge planning starts too late, is not collaborative, and does not address factors contributing to repeated hospitalization.** Discharge planning at the hospitals did not start until the person was deemed ready to be discharged by staff, and criteria set for readiness was expressed in treatment plan goals written to expect stability for three to four consecutive weeks prior to discharge consideration. When placement was an issue, this resulted in a longer than necessary hospitalization. Family members requested longer lengths of stay. Discharge plans generally consist

of a follow-up appointment at the community mental health center and instructions to take medications and abstain from alcohol and drugs. This plan does not change, even when it has repeatedly failed for an individual. Very little consideration is given to what services and supports might be needed to break the hospitalization cycle, or how to facilitate engagement with the community mental health provider. There is no collaboration between the hospital, community providers, the individual receiving services, and their families, even for those at high-risk for repeated admissions or those being discharged from long-term hospitalization.

**Little to no effort is put into engagement.** Engagement (or participation) is the process through which a person sees the treatment they are receiving as relevant to their needs or wants. It is also influenced by ease of access and the relative value of treatment as compared to an alternative. When treatment is difficult to access (e.g., inconvenient, requires unavailable transportation, the person is too impaired to follow, costs too much) or not seen as valuable, adherence is compromised. Engagement is foundational to good outcomes. Engagement strategies were found to be formulaic. Even for high risk individuals and individuals with histories of non-adherence, outreach usually consists of a phone call or two, sometimes weeks after a missed appointment. Individualized services would vary this protocol especially when someone's needs are greater to prevent hospitalization. Instead, regardless of history, the onus of engagement in treatment is put on the individual in need of care, and they are expected to want what is offered. In the interviews, many people who were not engaged in treatment said they would accept help doing things that were important to them, like getting a job. What was important to them was never offered, and treatment was viewed as not very helpful.

**There is an over-reliance on families for placement and treatment engagement, yet evidence-based family education and support is largely absent, and inappropriateness of family placement is not considered.** In the State Hospitals, there was no family involvement in treatment, even though the most common discharge plan was to live with family. And, even when family tensions were known to be high or the situation was problematic, frequently efforts were made to convince the family to take their relative back at discharge. This appeared largely related to challenges in finding placement. In the community, families were left with little to no support. Several family members reported that the mental health centers were not helpful in a crisis. Several family members complained that the mental health system was not helping their loved one.

**Access to services was also impacted by out-of-pocket costs and the time it takes to sort out insurance issues and obtain insurance approval of services.** Overall, the individuals with mental illness in Mississippi who I met, and their families, are isolated from their communities and left without hope. In some cases, the lack of appropriate services and service coordination, in combination with often frequent institutionalization, has resulted in needless debilitation.

7

Confidential – Subject to Protective Order

*Lack of a Recovery-Oriented Culture of Care*

>  **The overall culture of care is custodial rather than recovery-oriented.** This is demonstrated in the language used, the near absence of recovery-oriented practices, the reliance on institutional care over community-based services, and treatment plans that focus almost exclusively on medication "compliance" and behavioral control. "Stability" is the desired treatment outcome, rather than a full life with the same adult roles, responsibilities, and participation in community life available to those without serious mental illnesses.
>
>  **The hospital was described as a place to control behavior, rather than an environment that facilitates recovery.** Interviewees repeatedly described the hospital as being like a prison or jail. They shared stories about "guards" who belittled and retaliated against patients, who put people in the "hold." People who could not or did not follow the rules were viewed as misbehaving rather than sick, and were punished. People did not feel listened to. The culture was described as trauma-inducing rather than trauma-informed or trauma-healing. I saw little evidence of individualized behavioral plans or treatment approaches for those who failed to follow the rules.

A numerical breakdown of findings amongst the 28 reviews follows:

Three people were in a State Hospital at the time of the interview. Of these, I found three would not oppose community services, especially when compared to hospitalization. All three were appropriate for the community and would have benefited from the most frequently recommended services as referenced above. And, all three would have avoided or spent less time in a State Hospital.

Twenty-five people were living in the community at the time of the interview. In my opinion, all 25 of these individuals would have avoided less or spent time in a State Hospital had reasonable community-based services been available. I found 22 of those I interviewed in the community to remain at serious risk for institutionalization in a State Hospital. All 25 of these individuals would not oppose community services. And, all were appropriate for and would benefit from integrated community-based services targeted toward their individual needs and desires.

The individual narratives are presented below, starting on page 10.

My attached curriculum vitae lists all publications I have authored in the past ten years and all expert testimony I have given in the last four years (of which there is none). My compensation is $200 per hour, plus expenses. My compensation is not dependent on the outcome of this litigation.

Signed this 30th day of July, 2018

*Katherine A. Burson*
Katherine A. Burson

**Attachment A: Curriculum Vitae**

**Attachment B: Documents Considered**