EXHIBIT D

Expert Report of Beverly Bell-Shambley

I. **Introduction**

The purpose of this report is to describe the methodology applied for interviewing and evaluating individuals who have received treatment in one of Mississippi's State Hospitals during the prescribed period of time. I was provided names of individuals who I would interview, with the interviews focusing on their account and perceptions of their hospital experience and the services they received, as well as their ideas about what services would be helpful in maintaining recovery in the community. In addition to interviewing the clients, when possible, I conducted collateral interviews with family members and service providers. I reviewed records of their hospitalizations in State Hospitals as well as records from community hospitals and of services provided by Community Mental Health Centers (CMHCs).

I analyzed the interview data and data from record reviews to determine for each individual: 1) whether the individual would have avoided or spent less time at the State Hospital had he/she been provided reasonable community-based services; 2) whether the individual is opposed to receiving community-based services or to continuing to receive those services in the community instead of a State Hospital; and 3) whether the individual is appropriate for and would benefit from community-based services and what type of services.

I interviewed 25 individuals and conducted a collateral interview and record review for one deceased individual. Of those individuals, it was my opinion that all of them could have avoided hospitalization or spent less time in State Hospitals if they had received reasonable and appropriate community-based services. It was also my opinion that none of the 25 individuals interviewed was opposed to receiving community-based services, though for at least one individual, this conclusion is inferred from her history as she did not offer responses to questions. I considered all 25 individuals to be appropriate for community-based services at the time of the interview.

II. **Qualifications**

I completed my doctoral training in Clinical Psychology at the University of Georgia. I am a licensed clinical psychologist, a certified forensic examiner, and a licensed nursing home administrator in the State of Alabama. While attending graduate school, I worked weekends at a group home and volunteered as a crisis hotline counselor in Athens, GA. I began my career with the Alabama Department of Mental Health (ADMH) in 1985 as a Staff Psychologist at the State's forensic hospital, with primary duties of participating as a member of a multidisciplinary treatment team, providing therapeutic interventions, and completing evaluations of individuals' adjudicative competence and mental state at the time of the alleged offense. The goal of treatment as well as of the evaluations was to assist in preparing individuals to return to their communities to proceed with their lives. I transferred to Bryce Hospital in 1988 to assume the role of the Director of Neuropsychology Services. In 1994, I was promoted to the position of Clinical Director at Taylor Hardin Secure Medical Facility and served in that capacity for six years. From 2001 to 2003, I was the Administrator for S.D. Allen Nursing Facility, a nursing

1

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

home operated by the Alabama Department of Mental Health. I was instrumental in the closing of the three nursing homes operated by ADMH and in transitioning consumers to placements in the community. In 2003, I became the Facility Director of the Mary Starke Harper Geriatric Psychiatry Center. In August 2007, I was appointed as the Director of Mental Illness Facilities for the Alabama Department of Mental Health, with the role of supervising the operation of all state hospitals under the Mental Illness Division.

In July 2012, I was appointed as the Associate Commissioner for the Mental Health and Substance Abuse Service Division. In 2016, I retired from the Alabama Department of Mental Health after a 31-year career.

Throughout my career, the focus has been on the betterment of the system and patient care, both in the hospitals and the community. In my last four years, prior to retiring as Associate Commissioner, I helped to oversee multiple complex transformation efforts that set the foundation for major systems changes. These include, but are not limited to, to following:

- State Psychiatric Hospital Transformation:
    - Since 2012, my Division spearheaded efforts to transform psychiatric inpatient hospital care and shift care away from large institutional state psychiatric hospitals to smaller, community-based psychiatric inpatient settings closer to the individual in need of treatment. This allowed for consumers to receive care closer to their home, with more direct involvement from their family, while also allowing for a more coordinated approach to mental and medical health care. This was a complex undertaking, completed with much coordination, determination, and purpose. Through these efforts, three long-standing state hospitals were closed.

- Community Integration and Expansion:
    - To close state psychiatric hospitals, it was vital that the community mental health system be positioned to increase its capacity and serve the influx of new consumers. It was my responsibility to bring professionals from the hospitals and community together to develop and implement a synchronized effort, one that proved critical to the system transformation. That effort laid the foundation for combining two very distinct and separate mental health systems into an integrated mental health system of care. This was no small feat and demanded countless hours of planning, restructuring, training, and careful attention to the mission at hand. It was important that leadership maintain focus and persistence even as those who did not want such cultural and systematic change advocated at the local and state level to keep it from happening. We were able to realign funding and resources to ensure that the needed services and resources shifted to the community and away from institutional settings.

- Recovery and Supports:

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

- Under my leadership, we continued to engage and embrace mental health consumer and family advocacy groups at the local and state level. Their voices and experiences were necessary to help shape the evolving transformation of Alabama's mental health system of care. The provider network was pressed to expand their cultural mindset from a medical model to a recovery model. Under my administration, ADMH expanded community-based service capacity, particularly in the areas of supported employment and integrated housing, and increased the number of certified peer support specialists. More broadly, the system was re-aligned to promote a recovery-oriented approach to care.

- Health Care Reform:
    - To fully achieve holistic care, we realized the importance of working with other healthcare partners and professionals to try to bridge mental health and medical health care. We worked cooperatively with the State Medicaid agency in the initial development of a "Health Home," a statewide program that strives to integrate mental health consumers into the medical health system. As statistics have shown, individuals with mental illness die on average 25 years earlier than other individuals, typically not because of their mental illness but due to co-morbid medical/physical illnesses.[1] Direct participation with a "Health Home" provides health care to individuals with mental illness who might not otherwise have access.
    - We also sought to ensure better health care and outcomes for consumers with mental illness by leading the movement to initiate Managed Care in Alabama for the first time. To ensure that this process did not undermine the transformation efforts described above, we worked closely with the agencies involved, and I served as a voting member of the State-level, legislatively mandated Medicaid Quality Assurance Committee. In that role, I worked to assure that quality measures for mental health and substance use disorders were built into the standard treatment approaches for medical conditions such as diabetes, heart condition, and asthma. I was also appointed to serve on the Governor's Health Care Task Force.

Aside from my work with the Department of Mental Health, I have maintained a small part-time private practice in Psychology since the late 1980s, providing direct services to individuals in the community.

---

[1] National Association of State Mental Health Program Directors Council. (2006). *Morbidity and Mortality in People with Serious Mental Illness.* Alexandria, VA: Parks, J., et al. https://www.nasmhpd.org/sites/default/files/Mortality%20and%20Morbidity%20Final%20Report%208.18.08.pdf. *See also* Walker ER, McGee RE, Druss BG. Mortality in Mental Disorders and Global Disease Burden Implications: A Systematic Review and Meta-analysis. JAMA Psychiatry. 2015 Feb 11. doi: 10.1001/jamapsychiatry.2014.2502

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

### III. Methodology

I conducted this review in conjunction with five other clinical experts, all working under the guidance of Dr. Robert Drake.

Prior to beginning the interviews and record reviews, I participated in training at the Department of Justice's office in Washington, DC that provided information on the purpose of the project and the methodology for the Sample Review, including an interview tool developed by Dr. Drake with input from the clinical expert team. I conducted reviews for 26 individuals (one individual was deceased — that review entailed a telephone interview with her father and review of hospital and CMHC records). Interviews occurred in 2018 on the following dates and in locations surrounding the identified cities: Feb. 6-10 – Jackson, MS; Feb 12-16 – Natchez, MS; March 12-16 – Greenwood, MS; March 26-30 – West Point, MS; April 8-10 – Gulfport, MS. Four individuals were interviewed at Mississippi State Hospital. One individual was interviewed at Lauderdale County Detention Center. The remainder were interviewed at their homes or other community locations. In addition to interviews with the individuals, where possible, I conducted interviews, either in person or telephonically, of the individuals' family members and community-based service providers. Of the 25 interviews I conducted, five were completed in conjunction with another clinical expert to establish interrater reliability.[2]

Prior to beginning the interviews, the purpose was explained and individuals were informed that their participation was voluntary and that they could choose not to participate or could at any time choose to end the interview. I received an outline of the content that the interview was to cover, which I used as a guide; however, each item on the outline was not presented verbatim and all items were not asked of each individual, for various reasons.

### IV. Materials Reviewed

I reviewed State Hospital Records (MSH, NMSH, EMSH, and SMSH), CMHC records, records from Crisis Stabilization Units (CSUs), and community hospital records. I also reviewed the Mississippi Department of Mental Health's Operational Standards and research by Dr. Drake regarding identifying risk factors for hospitalization and interventions to reduce hospitalization among people with serious mental illness. A complete list of the materials I considered is attached to this report.

### V. Standards

    a. Does not oppose

---

[2] ███████████████████████████ (Bob Drake); and ██████████ (Daniel Byrne and Judith Baldwin).

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

I made determinations about whether individuals opposed receiving community-based services in all but two cases by directly asking them and by reviewing their records. One client was not responsive to questions, and thus I made this determination based purely on my review of her records. Another client was deceased, and thus I did not form an opinion on this question for that individual.

      b. Is appropriate for and would benefit from community services

I made determinations about whether individuals were appropriate to live in the community through direct questions about their community and hospital experience, review of hospital and community records, and information from collateral interviews. I considered whether there were any needs, symptoms, or behaviors that could not be managed with reasonable services in an appropriate community setting, relying on my 33 years of experience as a clinician providing services to clients similarly situated to individuals in this review, my knowledge of community-based services, and my review of relevant research and the Mississippi DMH operational standards for community services.

      c. Would have avoided or spent less time in a State Hospital with access to reasonable community-based services

In making determinations about whether an individual would have avoided or spent less time in a State Hospital had access to reasonable community-based services been available, I drew from my experience as a clinician and my experience making decisions regarding services for clients similarly situated to the individuals in this review. I also relied on review of relevant literature, referenced in the attached list of materials considered. The research on evidenced-based practices with individuals who have serious mental illness has shown that the implementation of programs such as diversion services, mobile crisis services, assertive community treatment, management of medications, mental health therapies, supported employment, supported housing, and transition services are effective in reducing hospitalizations and shortening hospital lengths of stay.

      d. Serious risk of readmission to a State Hospital

I determined whether an individual was at serious risk of readmission to a State Hospital by considering the individual's history of hospitalization and the effectiveness of any past or present community-based services. I also considered the following risk factors for institutionalization developed by Dr. Robert Drake: medication non-adherence; number of previous hospitalizations and lengths of stay; the presence of a co-occurring substance use disorder; whether the individual had stable and safe living conditions and family/friends support; the individual's usual behavior when symptoms are not in remission (suicide ideation, homicide ideation, command auditory hallucination, aggression, self-injurious behavior, verbal threats, substance use, homelessness, etc.). I made this determination only for the individuals who, at the time of the interview, were not in a State Hospital.

    **VI.    Findings from Reviewed Individuals**

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

a. Individual Findings

Of the 26 individuals reviewed, four were in a State Hospital at the time of interview. Of those four, all were appropriate for and would benefit from community-based services, none opposed community-based services, and all would have avoided or spent less time in a State Hospital had they had access to reasonable community-based services. All four would be appropriate for placement in a small group home with access to integrated day activities and community mental health services.

Of the 22 individuals not in a State Hospital at the time of interview, all would have avoided or spent less time in a State Hospital with access to reasonable community-based services. I found that all (with the exception of the deceased individual) were not opposed to receiving community-based services. 18 out of 21 individuals (86%) were at serious risk for institutionalization in a State Hospital and were not receiving community-based services adequate to attenuate the risk.

As noted, I concluded that all 25 individuals interviewed were appropriate for and would benefit from reasonable community-based services.

Specifically, I found that 19 of 25 individuals (73%) were appropriate for and would benefit from Substance Use Disorder (SUD) treatment and support for maintaining sobriety. In general, about half of individuals with serious mental illness have a co-occurring SUD; it is important to address both conditions with an integrated approach.

Four individuals (16%) had a co-occurring intellectual or development disability. Three of these four individuals have had extended hospitalizations and remain in the State Hospitals, a setting not intended for addressing the needs for individuals with intellectual disability and where staff generally do not have the specialized training for addressing the needs of this population.

I also concluded that 19 of 25 individuals (76%) were appropriate for and would benefit from Program of Assertive Community Treatment (PACT), a comprehensive community-based mental health delivery model for providing treatment, support, resources and rehabilitative services to individuals with SMI. It does not appear that any of the individuals were receiving PACT services.

I found that all 25 individuals could benefit from mobile crisis services or crisis residential services. Mobil crisis services involve a team of trained individuals who provide an immediate response to mental health crises where they occur in the community.

24 individuals (96%) could benefit from mental health therapy such as cognitive behavioral therapy, psychoeducational, and social skills training therapies, which are effective in reducing symptoms and rates of readmissions to hospitals.

Of 25 clients interviewed, four were in the hospital, one was living in a CMHC-operated group home, one in a hotel, 11 with family members, one in a group home, one in a personal care home

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

(PCH), and one in jail. Five were living independently in their own homes. I found that 13 individuals (52%) needed permanent supported housing (PSH) or a group home placement, but lacked access to it. PSH provides access to scattered-site housing where the individual lives autonomously with some form of outreach case management, and small group homes provide a supervised residential placement along with ancillary services.

      b. Key Themes

I drew the following conclusions and observations about Mississippi's adult mental health service system from this review:

- Inconsistencies in the availability of evidence-based practices across the state. Interviews with certain CMHCs indicated that they do not have PACT, Supported Employment, or Supported Housing. There are rural areas that are greatly in need of services.
- Most individuals did not receive Diversion Services in an effort to avoid the most recent state hospitalization. For those who did receive services at a CSU or community hospital, frequently the goal appeared to be to hold or treat them until a bed was available at the State Hospital rather than treating aggressively so they can be returned to the community.
- There is inadequate utilization of transition services and coordination of care to assist in the consumers' transition from the State Hospital into the community. The records most often only indicate that a follow-up/aftercare appointment has been scheduled with the CMHC. From interviews with some of the CMHCs, I learned it is often not a confirmed appointment with a specific person, but rather a time during days when the CMHC has walk-ins. Appropriate transition services should be person-centered and recovery-focused. The consumer, family members as identified by the consumer, and community providers should be engaged in discharge planning as soon as possible after admission to assist in facilitating a speedy discharge and to assure that the individual's needs and wants are prioritized, that there is a payor source, and that the individual has access to acceptable housing and other needed resources and services immediately upon discharge.
- While some of the individuals acknowledged improvement after treatment in the State Hospital, most believed they stayed longer than was necessary.
- A number of the individuals were in their twenties and one was young as 15-years-old when they had their initial State Hospital admission. We know that a degree of stigma is associated with seeking mental health treatment in general, and certainly the stigma and potential trauma associated with an involuntary commitment to a State Hospital could have a profound effect on an individual's self-esteem and recovery.
- Non-adherence with medication was a contributing factor to most of the symptom presentation and behaviors that led to commitment. Medication compliance is often a focus of treatment, however often times there appears to be less of a focus on what factors are contributing to noncompliance, factors such as access to the prescribed medication and noxious side effects of the medications.
- Concern about the adequacy of a recovery-oriented environment in personal care homes. It is unclear whether the responsible State entities are monitoring compliance with

7

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

applicable standards and taking remedial action when PCH providers are out of compliance.
- Families report being dissatisfied with the inadequate information they receive about their family members' condition and treatment when they are in the State Hospital. Families are often not engaged in the planning process beyond being notified when their family members are being discharged. Family education and support both in discharge planning and in community-based services would be beneficial to each individual's recovery.

I have not authored any publications within the past ten years. I have not testified as an expert, either in a deposition or at trial, in any cases within the past four years. My compensation is $200 per hour, plus expenses. My compensation is not dependent on the outcome of this litigation.

Signed this 29th day of July, 2018

*Beverly Bell-Shambley*
Beverly Bell-Shambley

**Attachment: Individual narratives**

**Attachment: Curriculum Vitae**

**Attachment: Documents reviewed**



Data Sources

1. Interview with ▓▓▓▓▓ on 3/15/18.
2. Review of hospital records from Mississippi State Hospital (MSH), of his admission from 11/▓▓/16 thru 11/▓▓/16.
3. Review of records from Region 1 Community Mental Health Center.

▓▓▓▓▓ was interviewed in a meeting room at the apartment complex where he resides. Mr. ▓▓▓▓▓ presented with a quiet, calm demeanor and was cooperative with the interview.

Review of Hospitalizations



CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER


16
CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER


CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER



Summary Assessment

I believe that Mr. ▓▓▓▓ would have avoided or spent less time in the hospital if reasonable community-based services were available. If mobile crisis services and in-home interventions had been tried prior to his being taken into custody, his most recent hospitalization might have been avoided. Both Mr. ▓▓▓▓ and his ▓▓▓▓▓▓▓ might have benefited from having mental health personnel engage them in conversation about the behavior leading to the hospitalization, discuss what could happen to lessen the likelihood of his having conflicts with people in his environment, and to provide the opportunity for de-escalation.  Further, had he received appropriate medication services, this hospitalization might have been avoided.  It is unclear what prevented him from stabilizing at the crisis program where he received services prior to being transported to MSH.  It also seems to be the case that stabilization was obtained within a week of his admission to MSH, and while it seems that the decision was made for a longer period of monitoring to assure his stability on the medication regimen, his length of stay in the hospital could possibly have been abbreviated.  Increased communication and coordination of care with the community provider might have provided greater assurance to the State Hospital prescriber that services, including medication monitoring, would be continued in the community and increased the prescriber's willingness to move Mr. ▓▓▓▓ toward discharge sooner.

Mr. ▓▓▓▓ is not opposed to living in the community and receiving appropriate mental health services in the community.  In my opinion, Mr. ▓▓▓▓ is at serious risk of institutionalization in a State Hospital because he is not receiving appropriate community-based services.  Noncompliance with psychotropic medication is a significant risk factor for re-hospitalization.  Mr. ▓▓▓▓ has concerns about whether his medication is contributing to his complaints with his feet and is at risk for discontinuing the medication if he does not receive medication management and monitoring, as well as integrated primary care services to evaluate the etiology and condition of his feet.  He also seems to be fearful and apprehensive that interaction with others may result in his behavior being misinterpreted and lead to his being committed to the hospital; thus he is more isolated, and his quality of life is restricted.  Mr. ▓▓▓▓ is appropriate for and would benefit from peer support services and community services that support his full integration in social, educational, volunteer and employment opportunities, which would likely decrease the risk of re-hospitalization.  His ▓▓▓▓ and ▓▓▓▓▓▓▓ involvement in family psychoeducational programs would also likely decrease risk.  Although Mr. ▓▓▓▓ appears to be doing well living independently in the community at present, he is viewed as being at serious risk for future hospitalizations if he does not receive more intensive community services to address some of his concerns about his medications, his physical health, and to assist him with greater social integration into his community.

On my review, Mr. ▓▓▓▓ is appropriate for and would benefit from the following integrated community-based services:  effective case management; integrated MH/primary care services; medication management services; patient/family psychoeducational programs; mental health therapy;

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

supported employment; and peer support services.  Given his SMI diagnosis, history of substance use disorder, significant difficulty maintaining consistent employment, and significant difficulty performing activities of daily living, Mr. ▇▇▇▇▇▇ would be appropriate for PACT, which encompasses most of these services.

Findings

1. At the time of the interview, Mr. ▇▇▇▇▇▇ was **not** in a State Hospital.

2. Mr. ▇▇▇▇▇▇ **would have avoided or spent less time** in a State Hospital if he had been provided reasonable community-based services.

3. Mr. ▇▇▇▇▇▇ **is** at serious risk of institutionalization in a State Hospital.

4. Mr. ▇▇▇▇▇▇ **would not be opposed** to receiving community-based services or to continue to receive those services in the community instead of a State Hospital.

5. Mr. ▇▇▇▇▇▇ is **appropriate for and would benefit from** the following integrated community-based services:  case management; integrated MH/primary care services; medication management services; patient/family psychoeducational programs; mental health therapy; supported employment; peer support services; most of these services/interventions are included in PACT.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Data Sources

1. Interview with Mr. ▮▮▮ on 4/9/18.
2. Interview with his ▮▮▮ on 4/9/18.
3. Review of hospital records from South Mississippi State Hospital (SMSH), Purvis, MS for his admission from 5/▮/15 to 5/▮/15 and his admission from 7/▮/17 to 9/▮/17.
4. Review of records from his treatment at Singing River Health System from 4/▮/15 to 5/▮/15 (included in the records from SMSH), 6/▮/17 to 6/▮/17, and 7/▮/17 to 7/▮/17.
5. Review of his CMHC records from Singing River Services, Region XIV.
6. Review of his CMHC records from Pine Belt Mental Healthcare Resources.



▮▮▮ was interviewed in his ▮▮▮ home. His ▮▮▮, was interviewed in her home earlier on the same day. Ms. ▮▮▮ along with her ▮▮▮ Mr. ▮▮▮ were in the home in another room at the time of the interview. Mr. ▮▮▮ appeared anxious and agitated and was not responsive to most questions. He seemed guarded and distrustful, showing increasing agitation with questioning, and the interview was terminated early.

Review of Hospitalizations



40

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER



Review of Community Living and Services



CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER


CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Summary Assessment

Mr. ▮▮▮ is a young man with a history of hospitalizations and community mental health services for symptoms of mental illness. At the time of the interview, he was symptomatic with paranoia and agitation. He had not been taking the prescribed medication, and it seemed to be the case that the medication may not have been available for him to take.

With sufficient community-based services, such as crisis intervention services (including brief crisis residential programming), effective and comprehensive PACT services (in contrast to the services Mr. ▮▮▮ actually received), effective case management, medication monitoring, and Peer Support Services, it is most likely that Mr. ▮▮▮ could have avoided hospitalization. The records from SMSH suggest that once in the treatment setting, he is compliant and responsive to treatment. There was no indication that he presented symptoms or behaviors beyond what could have been managed in the community, and it seems that had appropriate diversion services been employed, the hospitalizations would have been avoided. Likewise, it is my opinion that his length of stay in the hospital was not warranted. Notes in his record at Singing River Hospital in July of 2017 indicate that he had improved and was stable; he could have been discharged back into the community without having to go to the State Hospital.

Mr. ▮▮▮ is at serious risk for future state hospitalizations if he is not stabilized on an effective and appropriate medication regimen and if he does not receive more intensive community services. Medication non-adherence is associated with significant risk of hospitalization. At the time of the interview, he had not been compliant with medication and was experiencing agitation, paranoia, suspiciousness and hallucinations. It also seemed to be the case that because of the cost, he may not have had medication available to take. His ▮▮▮▮▮▮▮▮ said that a judge had recently agreed to send him to MSH; therefore, the possibility of his being committed is imminent. Mr. ▮▮▮ was agitated and suspicious that his ▮▮▮▮▮▮▮▮ was trying to get him hospitalized, and the potential for conflict between them also contributes to his risk of hospitalization.

On my review, Mr. ▮▮▮ is appropriate for, and would benefit from, the following integrated community-based services: medication education, assistance and monitoring. Mr. ▮▮▮ needs to be educated on how the medication works and the importance of continuing to take it even when he feels fine. It seems that receiving longer acting injectable antipsychotic medication in the right dosage for him would be more effective in assuring compliance. He also needs assistance with paying for or otherwise having access to his medications. PACT services, administered consistent with the State's operational standards, would be most effective in assisting him in avoiding hospitalization, as he would have a team of professionals that would be familiar with his needs and be available to respond as needed, 24 hours a day, 7 days a week. PACT services are individualized and carried out where the service and support are needed, rather than in an office or hospital setting. Having access to crisis residential programs would be of benefit to allow respite when there is tension within the household. Mr. ▮▮▮ has expressed interest in living independently in his own place, and participation in permanent supported housing and supported employment would be beneficial. Mr. ▮▮▮ could benefit from involvement in Peer Support Services and participation in group therapy or a support group of people of similar age and interests, once stabilized on medication.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Findings

1. At the time of the interview, Mr. ▮ was **not** in a State Hospital.
2. Mr. ▮ **would have avoided or spent less time in** a State Hospital if he had been provided reasonable community-based services.
3. Mr. ▮ **is** at serious risk of institutionalization in a State Hospital.
4. Mr. ▮ **would not be opposed** to receiving community-based services or to continue to receive those services in the community instead of a State Hospital.
5. Mr. ▮ is **appropriate for and would benefit from** the following integrated community-based services: PACT, crisis intervention services including brief crisis residential services, permanent supported housing, and family therapy.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER