EXHIBIT G

Expert Report of
Daniel Byrne

## I. Introduction

The Department of Justice hired me to conduct a review of adults with mental illness who have received services in one of Mississippi's State Hospitals within the last few years. The purpose of the review was to determine for sampled individuals whether prior State Hospital stays could have been avoided or shortened with reasonable community-based mental health services; whether the individual – if not in a State Hospital – remained at serious risk of returning to a State Hospital absent reasonable community-based mental health services; whether the individual opposed community living; and whether the individual was appropriate for, and could benefit from, community-based mental health services. This report sets forth my opinions and reasons for those opinions.

## II. Expert Qualifications

I am a licensed independent clinical social worker with 37 years of experience overseeing and providing mental health services to individuals with significant mental health disabilities. During my career, I have directly provided mental health services to individuals in publicly operated psychiatric hospitals as well as integrated community service settings; supervised the delivery of mental health services in community and inpatient settings; and trained other mental health professionals on the appropriate delivery of quality mental health services.

I have provided community-based services to adults and children with mental illness with a full range of diagnoses, symptoms, and needs. In my experience, individuals with serious mental illness, just like individuals without mental illness, want to control their own lives, have families, have meaningful relationships, have paid employment that offers a stable income and enjoyment, and contribute to their communities. Through my decades of experience, I have found that for most people with severe mental illness, these goals are achievable with the assistance of quality, evidence-based community mental health services.

I have successfully served individuals with severe mental illness and symptoms in the community. This includes people with mood disorders (e.g. Bipolar Affective Disorder and Major Depressive Disorder), psychotic disorders (e.g. Schizophrenia), trauma, personality disorders (e.g. Borderline Personality Disorder), and anxiety disorders. I have successfully served in the community people who have experienced lengthy and episodic periods of homelessness, criminal justice involvement, and repeated evictions. Many of these individuals

1

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

had difficulty maintaining meaningful social relationships and a history of being unable to provide for their basic needs of food, clothing, and shelter because of their mental illness. I have helped these people maintain productive and fulfilling lives in their communities, avoid unnecessary hospital admissions, and move from public hospitals to the community after years of institutionalization.

My graduate level professional education began at Howard University School of Social Work, where I was awarded a full scholarship by the National Health Service Corps to study medical social work. After graduation, I had the opportunity to work at the Lobatse Psychiatric Hospital in Lobatse, Botswana as a Social Service Officer. In 1981, I was commissioned in the United States Public Health Service (USPHS) and served as a Health Services Officer at clinics in Florida and at Saint Elizabeths Hospital in Washington, D.C. Saint Elizabeths Hospital is a public psychiatric hospital founded in 1852. It is comparable to and functions like a State Hospital.

While working at Saint Elizabeths Hospital, my first position was in the Office of Outplacement Services where staff members determined the appropriateness for community placement of referred patients who were approaching discharge and candidates for outplacement to community settings. I was directly involved in making those determinations, which were based upon review of the records, coordination with the treatment team, and discussions with patients and their families.

After leaving USPHS, I began working for a private Federal contractor, Mediflex HBO at Saint Elizabeths. I was the manager of the Benefits Assistance Unit, the business office entity that ensured benefits identification, acquisition, and maintenance for patients who were, for the most part, scheduled to be discharged from the Hospital and reside in community settings.

Assuring that patients had a source of income and public insurance benefits (Medicaid and Part B Medicare) was essential for successful transition from the Hospital to the community. In the event of decompensation in a community setting, persons were able to access Medicaid supported mobile and site-based crisis services for clinical stabilization, diverting them from hospitalization. Enrollment in Medicaid also enabled the District of Columbia to draw down federal Medicaid dollars for their community-based services.

At Saint Elizabeths Hospital, I supervised child and adolescent services, served as the Chief Social Worker at the Child and Adolescent Services Administration, and Forensic Supervisory Social Worker at the District youth detention center, Oak Hill, in suburban Maryland. Additionally, I worked as a quality improvement officer at Saint Elizabeths where service planning, service provision, and program evaluation were assessed, and recommendations formulated for overall improvement. Finally, my last position at the Hospital was Risk Manager. This position involved investigations of serious reportable incidents, allegations of abuse,

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

seclusion and restraint violations, patient safety concerns, health care fraud allegations, formulations of corrective actions, and mitigation of all identified risks. It also included infection control and polypharmacy concerns.

While working at the Department of Mental Health Core Services Agency as the Acting Director of Quality Improvement, I supervised staff who reviewed content and quality of services provided by our Assertive Community Treatment (ACT) teams and other providers of ACT services. We reviewed these services to determine whether they followed the applicable standards and whether they achieved the recovery goals of the services, including reducing hospital admissions, diverting unnecessary inpatient admissions, and fostering community integration.

We measured quality of the ACT teams based on the outcomes they achieved in individuals' lives and against national fidelity standards for ACT teams. Quality ACT teams successfully maintained people in community settings, with few inpatient psychiatric admissions (in Saint Elizabeths or other settings). The ACT teams achieved this by using a person-centered treatment model that focused on the person's recovery goals; proactively monitoring people on a regular basis and reacting quickly to address indications of destabilization; and addressing the person's needs related to supportive housing, benefits assistance, and employment, social and recreational activities. These successful ACT teams served people in the community who had been institutionalized for years, or institutionalized repeatedly, had ongoing symptoms, and episodically severe symptoms. Before they started receiving ACT, many of these people were thought to be "treatment resistant" in that they refused treatment, were disinclined to take medication, and lacked insight into their mental illness. We also examined the content and quality of intensive community support services, including case management functions, for efficacy and efficiency using federal and state metrics. I was subsequently promoted to Risk Manager at the Department of Mental Health and reviewed, mitigated, and improved identified clinical risks, using continuous quality improvement principles.

My final position at the Department of Mental Health was a promotion to be Director of Quality improvement for the entire Department. This encompassed Saint Elizabeths Hospital, the D.C. Core Services Agency, and the Mental Health Authority. I oversaw audits of clinical services and financial costs associated with the provision of those services. The Department performed the audits on providers in its network, based on applicable federal Medicaid statutes and District of Columbia laws. The audits were of all clinical services, including supported housing, supported employment, ACT, community support services, medication-somatic services, rehabilitation day services, diagnostic assessment, and counseling-psychotherapy services.

As DMH Director of Quality Improvement, I worked with District and Saint Elizabeths Hospital leaders to address and resolve the ADA *Olmstead* violations and professionally inadequate care

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

identified by the Department of Justice relative to individuals at the Hospital. After I retired from government, I served as a consultant to the DMH and trained clinical staff members (on the civil and forensic divisions) on person centered treatment planning, an element identified in the plan of correction for the Hospital. Person centered treatment planning is a collaborative process between the individual and the mental health clinicians that maximizes the individual's own strengths, and focuses on the individual's capabilities, preferences, and goals. It fosters recovery and creates "buy in" from the individual on the treatment plan, which encourages treatment adherence and increased community tenure. It is the professional standard for mental health treatment planning both in the community and inpatient care.

I also have significant experience working with community provider organizations. From August 2014 through January 2015, I was the Interim CEO of Capital Community Services, a District of Columbia, Department of Mental Health certified core services agency that provided ACT and community support services. While Interim CEO, I conducted clinical audits and analyses of the ACT teams and provided recommendations for improvement. Additionally, I provided clinical consultation to the ACT Teams and in-service instruction on documentation, dually diagnosed consumers, compliance, national ACT fidelity metrics, and trauma-informed clinical interventions.

From February 2015 through May 2016, I worked as a consultant to the ACT Program at Green Door, a community mental health provider in Washington, D.C. While working with the ACT teams, I designed and implemented metrics to assess utilization of psychiatric and nursing services, access to and utilization of supported housing, access to and utilization of primary care providers, and provision of community-based medication delivery services. I provided clinical consultation daily at ACT team meetings and I delivered in-service instruction on clinical documentation, Medicaid and Medicare compliance, national ACT fidelity metrics, revenue cycle, trauma-informed interventions, dually diagnosed persons in care, and community- based crisis intervention. From January 2010 to October 2010, I served as an interim Chief Clinical Officer at a community-based behavioral health agency with four hospitals in South Bend, Indiana. This CMHC offered an array of community-based services including case management, community support teams, therapies, psychiatric services, crisis services, and inpatient mental health treatment for adults and children.

I am a clinical social worker, currently licensed in the District of Columbia and Florida. Additionally, I am a board-certified diplomate in clinical social work, a national clinical credential, as well as a member of the Academy of Certified Social Workers, also a national credential. I have extensive training in psychodynamic psychotherapy and was in private practice in Washington D.C. for many years.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

### III. Methodology

I conducted this review in conjunction with five other clinical experts who were overseen by Dr. Robert Drake. It is my understanding that Dr. Drake received the assistance of a statistician who drew a random, representative sample of adults with mental illness who received psychiatric services in one of Mississippi's four State Hospitals. I completed 35 reviews of individuals selected in the sample and willing to participate in this review. Narratives and opinions related to each individual reviewed are included as an attachment.

I interviewed all these individuals following an interview tool prepared by Dr. Drake with input from the members of the clinical review team. It is my understanding that the Department of Justice arranged interviews of people currently in a State Hospital through counsel for the State of Mississippi. It is also my understanding that – for individuals not currently residing at a State Hospital – the Department of Justice contacted individuals in the sample to explain the purpose of the review and facilitate the interview between the individual and myself. When individuals could not be reached by mail or phone, I accompanied Department of Justice staff on visits to individuals' last known address to attempt to contact them.

I traveled to Mississippi five times and interviewed individuals in the Jackson, Hattiesburg, Natchez, McComb, Oxford, and Tupelo regions. Of the 35 interviews, three interviews were conducted at Mississippi State Hospital, one at Pearl River County Jail, and the remainder at individuals' homes and other community locations. Three interviews were conducted by phone at the request of the individuals. Two individuals were deceased, and interviews were conducted with family members at their homes. Department of Justice staff accompanied me for each of the interviews. These staff explained the purpose of the visit and requested the individual's consent to participate. Most persons interviewed were courteous, responded to the questions as best as they could, and offered many helpful suggestions on system improvements. There were a few interviewees, for differing reasons, who needed a briefer interview, and I respected those wishes.

In addition to interviews with the individuals, I completed collateral interviews where possible with family members about their loved one's experiences with the hospital system as well as experiences with the community-based behavioral health care providers. I also participated in several phone conferences with staff from CMHCs, which provided an opportunity for me to ask for further detail on the care of individuals in my group. For all the interviews, I used qualitative interviewing, which is a professional standard for clinical social workers and throughout the mental health field.

I also reviewed clinical records and other documents provided by the State of Mississippi and the CMHCs regarding the 35 individuals I reviewed. These clinical records included State

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Hospital records as well as CMHC community service records. The records, combined with the interviews, enabled me to form an opinion on the questions presented.

Of the 35 reviews I completed, five were completed in conjunction with another clinical expert[1] to ensure interrater reliability and consistency among reviewers, and I participated in an additional five interviews (not included in the 35 here) as a secondary interviewer and developed independent opinions regarding those five reviews. Each of the interviewers made independent ratings on the key questions and in all ten we had 100% agreement. Dr. Drake also held regular conference calls with all experts to discuss concerns and issues arising during the review to ensure consistency across the review.

### IV. Materials Reviewed

I reviewed some background materials regarding the Mississippi mental health system. I reviewed the Mississippi Department of Mental Health standards and a PowerPoint regarding the Mississippi CHOICE supported housing program and research provided by Dr. Bob Drake. For each interviewee, I reviewed the clinical records provided to me by DOJ. A list of documents considered is attached.

### V. Standards

From the interviews and record reviews described above, I was able to assess individuals' needs and preferences. This information then allowed me to form opinions regarding each individual reviewed.

a. Does not oppose

I determined whether the individual opposes community-based rather than hospital-based services by using questions designed to elicit their service and residential preferences. Most individuals made their preferences clear. I also reviewed records that often provided insight into the person's desire for community-based living or hospital-based services. In instances where individuals had a conservator or guardian, I also interviewed the guardian to elicit their preferences. Between the records and the interviews, I was able to determine from the individual (and where applicable, the guardian) whether the individual opposes community-based care rather than hospital-based services.

b. Is appropriate for and would benefit from community services

I determined whether or not the individual was appropriate for and would benefit from community services, basing my opinion on my decades of experience with similarly situated

---

[1]  (Beverly Bell-Shambley); (Carol Vanderzwaag).

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

individuals and my understanding of the types of evidence-based services that are likely best able to meet their needs. I also assessed which particular mental health services are appropriate for the individual.

In forming the opinions regarding which services the individual was appropriate for and would benefit from, I considered the person's treatment history as documented in the records and through available collateral interviews. In the interview with the individual, I asked questions designed to understand the person's goals for community living and service needs.

I also reviewed and used the Mississippi Department of Mental Health standards, particularly the standards for Programs for Assertive Community Treatment (PACT) (Mississippi's ACT service), Community Support Services (Mississippi's current home-based support service), and Supported Employment as well as information regarding the CHOICE program (Mississippi's supported housing program). I used these documents to guide further my opinions regarding the services that individuals would benefit from receiving.

The individuals I reviewed have similar mental health treatment needs, community-living support needs, and symptomatology as the individuals who I have served for decades. My experience, the materials reviewed, and the interviews enabled me to form opinions regarding appropriateness for the community and the particular services that would benefit the individuals I reviewed.

c.  Would have avoided or spent less time in a State Hospital with access to reasonable community-based services

I determined whether the individual would have avoided or spent less time in State Hospitals in Mississippi, again based on my decades of experience working with individuals with similar needs and illnesses both in the community and in a hospital setting. I considered the reasons why individuals were admitted to the State Hospitals, the community services they were receiving prior to their admission (if any), and the course of treatment in the State Hospital. I again pulled from all available sources of information, including reviewing the records and interviews.

As set forth above and in my curriculum vitae, attached, I have experience serving people with severe mental illness with services specifically designed to help them achieve stability and recovery, maintain community living, and avoid admissions to inpatient facilities when possible. I also have experience determining when individuals are appropriate for transition from an inpatient setting and conducting effective transition planning. Based on my experience, the interviews, and the records reviewed, I formed opinions regarding whether individuals would have avoided or spent less time in a State Hospital with access to reasonable community-based services.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

d.  Is at serious risk of institutionalization in a State Hospital

Finally, I determined whether the individual reviewed was at serious risk of institutionalization (short or long-term) in a State Hospital at the time of the interview. This determination was made only for those individuals reviewed who were not in a State Hospital at the time I interviewed them. In making these determinations, I again pulled from my own experience as a clinical social worker. I considered the individual's history of hospitalization, the presence and efficacy of any evidence-based community services, and known risk factors for institutionalization identified by Dr. Robert Drake from the literature: presence of a co-occurring substance use disorder, medication non-adherence, co-occurring medical disorder, unstable housing, lack of family/social supports, aggressive behavior, and preference for hospital residence. Based on the above, I formed opinions regarding whether individuals were at serious risk of institutionalization in a State Hospital.

### VI. Findings from Reviewed Individuals

a.  Overall Findings

*The unavailability of evidence-based community-based services and lack of necessary intensity of available services leads to unnecessary State Hospital admissions.*

Many of the evidence-based community behavioral health services that reduce symptomatology and enhance functioning, such as PACT and permanent supported housing, were not available in most areas of the State.

Generally, community-based services were underpowered in that they lacked the intensity necessary to sustain the person in the community. They were often not calibrated to the client's level of need, and not person centered. Payment for services, even apparently some individuals with Medicaid, posed a barrier to services.

For most individuals with mental illness whose symptoms are worsening, there are multiple opportunities for community-based services to rapidly react, intensify services, and stabilize. For the people I reviewed in Mississippi, the necessary services were not available, and those opportunities were lost. These people were admitted to the State Hospital because of those lost opportunities.

*State Hospital lengths of stay for acute stays appeared to be longer than necessary.*

This is true both when looking at the State Hospital stays alone and considering the hospitalization that preceded the State Hospital admission. Upon admission to the State Hospitals, many individuals had already undergone days if not weeks of treatment in another facility, including crisis stabilization units, inpatient psychiatric units at local hospitals, and jail holding facilities. Sometimes the precipitating symptoms had resolved prior to State Hospital

8

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

admission. Delays in discharge were often due to unavailability of community-based services and extended beyond when the person's needs could be met in the community with appropriate services.

*Transitions from the State Hospital to the community did not promote successful community tenure and instead reinforced preventable State Hospital readmissions.*

To successfully transition persons receiving inpatient care to community providers, inpatient facilities should encourage active participation of community providers in inpatient treatment and discharge planning activities. Joint planning and coordination by inpatient and community-based providers, including family members and advocates, better prepares the patient, family members, and the receiving community provider to effect a thoughtful transition from the hospital back to the community, with services and supports in place and poised to activate.

In Mississippi, transition planning and coordination among family members, State Hospital staff members, and community-based clinical staff members were sparse or non-existent, and even basic diagnostic formulations were often confusing and inaccurate. As such, persons are discharged from the State Hospitals – highly structured 24 hour facilities – to the community with little or no support. The result, predictably, is destabilization and a return to the State Hospital. A client's return to the hospital from the community was often viewed as an unfortunate but inevitable event for a person with mental illness, rather than as a treatment failure for all entities involved in the person's care.

b.  Do not oppose

I found that 100% of the individuals reviewed for this opinion (N:33)[2] would not oppose community-based services over State Hospital care. My experience working with persons with serious mental illness in the community and in inpatient settings is consistent with this finding. People with serious mental illness have goals similar to people without mental illness, including self-determination, privacy, and control over their own lives. These goals are inconsistent with institutional living.

c.  Is appropriate for and would benefit from community- based services

I found that 100% of the individuals reviewed for this opinion (N:33) were appropriate for and would benefit from community-based services. The needs, severity of the symptomatology, and histories of individuals I reviewed in Mississippi are consistent with individuals I have successfully treated in integrated, community-based settings with the appropriate services and supports.

The particular and combination of services that each person is appropriate for and would benefit from varied as discussed in the narratives below. Those services frequently included

---

[2] Of the thirty-five total individuals reviewed, two were deceased.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

evidence-based practices that have demonstrated success in maintaining people in the community and include PACT, permanent supported housing, supported employment, and access to mobile or other crisis services, as well as effective diversion and transition from hospital-based settings. I have seen these services prevent avoidable admissions to hospitals and successfully maintain people in the community who had lived years in institutions and others who had repeated and frequent hospital admissions.

Many people I reviewed in Mississippi were appropriate for and would benefit from PACT, but only two were receiving it. Others were not receiving, but were appropriate for, intensive home-based support services. These services are flexible in intensity based on the individual's changing needs. The services should primarily be provided in the person's own home or another natural location in the community instead of a clinic to facilitate engagement and encourage participation. Intensive home-based support services should include crisis support, therapy, psychoeducation, family psychoeducation, socialization services, and assistance with housing, benefits, and other basic needs. It can be offered as a team-based approach or individual clinicians. However, to be effective, it must be available in sufficient intensity based upon the individual's changing needs. For example, if the person has immediate needs for assistance in housing, benefits, or a significant grieving event, the service intensity should power up to meet the person's need and may necessitate daily check-ins for a period of time. This service may also be provided to individuals transitioning from a PACT team that no longer need the ongoing multi-disciplinary and intensive service of PACT, but still need more proactive service engagement than office-based clinical services.

Consistent with my experience working with people with serious mental illness, there was a high rate of co-occurring substance use disorder among the people I reviewed in Mississippi, which further exacerbates their mental illness. Others had co-occurring intellectual and developmental disabilities. Both of those co-occurring conditions require specifically tailored service interventions, but with the appropriate services, these individuals can be successfully supported in the community.

d. Would have avoided or spent less time in a State Hospital with access to reasonable community-based services

I found that 100% of the individuals reviewed (N:35) would have avoided or spent less time in a State Hospital with access to reasonable community-based services. For many individuals reviewed, the unavailability of community services, including crisis services, predictably resulted in State Hospital admissions. As individuals showed symptoms of decompensation, family members and individuals themselves turned to law enforcement or commitment for lack of alternative options. Once admitted, people tended to stay longer than necessary, often because of the lack of community options.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

e.  Serious risk of institutionalization in a State Hospital

I found that 86% of the individuals reviewed (N:30)[3] were at serious risk of institutionalization in a State Hospital at the time of the interview. Many of the individuals I reviewed had frequent and recent hospital and crisis events, active symptomology, and lacked access to the mental health services that would be effective in preventing the cycle that previously led to their State Hospital admissions. Many also had co-occurring substance use disorder. The lack of family psychoeducation meant that family members found contact with law enforcement and/or commitment to a State Hospital to be the only viable options, further increasing individuals' risk of re-institutionalization.

I have not authored any publications within the past ten years. I have not testified as an expert, either in a deposition or at trial, in any cases within the past four years. My compensation is $200 per hour, plus expenses. My compensation is not dependent on the outcome of this litigation.

Signed this 30 day of July, 2018

*Daniel Byrne* (signature)
Daniel Byrne

**Attachment: Individual narratives**

**Attachment: Curriculum Vitae**

**Attachment: Documents considered**

---

[3] Of the thirty-five individuals reviewed, two were deceased and three were in the State Hospital at the time of the interview.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER