EXHIBIT I

# Expert Report of Carol VanderZwaag

## I. Introduction

I conducted an assessment of individuals who had been hospitalized in Mississippi's State Hospitals between 2015 and 2017 in order to determine whether they were appropriate for and would benefit from community-based services, whether they opposed receiving community-based services, and whether by virtue of receiving appropriate community-based services they would have avoided or spent less time in a State Hospital. In addition, I made a determination as to whether they were at serious risk of readmission to a State Hospital without appropriate community-based services. The large majority of the individuals whom I interviewed and for whom I reviewed medical records did not oppose community-based services, had not been receiving appropriate community-based services that could decrease their risk of readmission to a State Hospital, and had or were spending more time in a State Hospital than necessary had appropriate community-based services been available to them.

## II. Expert Qualifications

I have a medical degree from Mount Sinai School of Medicine and completed my psychiatric residency training at New York Hospital, Payne Whitney Clinic in New York, and Duke University in North Carolina. I have been Board Certified in Psychiatry since 1992 and have practiced psychiatry for 27 years. My practice experience has been as a clinician and medical director in the Psychiatric Rehabilitation Unit of a North Carolina state psychiatric hospital, a clinician for a community mental health clinic, a medical director and clinician for an agency that provided Assertive Community Treatment and Community Support Services, and a Clinical Professor of Psychiatry at University of North Carolina School of Medicine where I was the Associate Medical Director for Community Services in the Center for Excellence in Community Mental Health and the psychiatrist for a large Assertive Community Treatment (ACT) team. I have recently assumed the role of Deputy Chief Medical Officer for a four hundred bed state psychiatric hospital where I help plan, implement, and monitor care on the adult admission, screening and assessment, and forensic units.

I have 18 years of experience as an ACT psychiatrist. My clinical focus has been treating and advancing the recovery of individuals with severe mental illness with particular expertise in the areas of schizophrenia, severe mood disorders, post-traumatic stress disorder, dually diagnosed substance use disorder (SUD)/mental illness (MI)) and dually diagnosed MI/Intellectual and Developmental Disabilities (IDD). In all of my practice settings, I have been tasked with providing assessment, service planning, and treatment aimed at advancing the health, well-being, and independence of the individual seeking services. I have participated in the start-up and growth of two high-fidelity ACT teams and participated in the development of a new North Carolina Medicaid service (ACT Step Down), which provides a community-based alternative to traditional office care for individuals who are improved and transitioning from ACT services. I am trained to evaluate fidelity to the model of ACT using the TMACT (Tool for the

1

Measurement of Assertive Community Treatment) and have provided training for ACT psychiatric and nursing staff throughout the state of North Carolina and in Virginia. The ACT team with which I was recently associated serves as a training site for other teams in North Carolina and Virginia, providing both one-on-one technical assistance and shadowing opportunities to improve practice. My practice was closely linked to programs within UNC that include supported employment (IPS-SE), Critical Time Intervention (CTI), intensive case management, mental health court, and traditional office-based services. Through my ACT work, I have had extensive experience with providing Integrated Dual Disorder Treatment (IDDT) to individuals with both mental health and substance use disorders. I also have extensive experience providing housing supports, including locating, obtaining, and maintaining individual leases in scattered-site housing. My ACT work has included extensive interfacing with jails, local hospitals, facility-based crisis facilities, shelters, primary and specialty care clinics, courts, social service agencies, and a host of community programs that serve as natural supports for the individuals that we served. My ACT practice was based entirely in community settings, often in individual homes where I provided assessment, psychiatric treatment (medication services and individual therapy), case management, and psychiatric rehabilitation supports.

### III. Methodology

I conducted an in-person interview with 27 individuals using a semi-structured interview tool which queried about hospital stays, community mental health care, community and family life, work history, attitude towards care (including relevant experiences of being in the State Hospital), and recovery goals. One additional individual was deceased at the time of my review, so I interviewed a family member by phone and conducted a review of the State Hospital and Community Mental Health Center (CMHC) records only. I traveled to Mississippi four times and interviewed individuals at Mississippi State Hospital (MSH), East Mississippi State Hospital (EMSH), and in their homes and other community locations in the Jackson, Meridian, and Delta regions. I reviewed State Hospital records for each individual and, where available, CMHC records as well. Individuals provided consent (at a minimum verbally, but they were offered the chance to provide written consent) at the time of the interview after the nature of the inquiry was explained. When possible, I conducted collateral interviews with family members (after obtaining consent from the individual). Of the 27 interviews I conducted, six were completed in conjunction with another clinical expert to establish interrater reliability.[1]

### IV. Materials Reviewed

I reviewed the available State Hospital and CMHC records for each individual that I interviewed. I also reviewed the Mississippi Department of Mental Health's Operational Standards for Program of Assertive Community Treatment (PACT), Community Support Services, and

---

[1] ▮▮▮▮▮▮▮▮▮▮ (Katherine Burson); ▮▮▮▮▮▮▮▮▮▮ (Daniel Byrne); and ▮▮▮▮▮▮▮▮ (Harry Findley).

2

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Supported Employment; a summary of Mississippi's supported housing program, CHOICE; and a list of known risk factors for institutionalization developed by Dr. Robert Drake from the literature. A complete list of materials considered is attached.

V.      **Standards**

The individual and collateral interviews and record reviews were designed to provide the information necessary to make a determination of several key questions.

First: Does the individual oppose or not oppose living in the community? This seeks to answer the question as to whether the individual prefers to receive services in an institution or has a preference for living in a more integrated setting. I made this determination by asking each individual about his/her preferences and reviewing the available State Hospital and CMHC records.

Second: Is the individual appropriate for and could they benefit from mental health services and supports available in a community setting, taking in to account their unique needs and preferences as well as the reasonableness of the services required to sustain their community tenure? This standard assumes that there is an array of services available and that individuals are offered services at a frequency and intensity and of a nature that is based on the assessment of individual need, preference, and expectation of benefit. Evidenced-based practices such as Assertive Community Treatment, IDDT, supported employment, supported housing, CBT (Cognitive Behavioral Therapy) for psychosis, and DBT (Dialectical Behavioral Therapy) are examples of reasonable community services that would be expected to help individuals achieve sustained community tenure. In making this determination, I relied on my knowledge of community-based mental health services and my extensive clinical experience providing those services to clients similarly situated to the individuals in this review.

Third: Had the individual been offered and had they been receiving appropriate community-based services, would they have avoided hospital admissions or would they have spent less time in the hospital during a given admission? This standard seeks to answer whether hospital admissions could be avoided and lengths of stay reduced not only through the availability of appropriately targeted and administered effective outpatient services, but also through the uniform availability of crisis and diversion services aimed at sustaining an individual through times of relapse or conflict in the most integrated environment. Mobile crisis units, respite services, Assertive Community Treatment teams, and law enforcement trained in crisis intervention are examples of crisis and diversion services that can help individuals avoid unnecessary hospital admissions. In addition, once an individual has been admitted to a hospital, then the availability of both appropriate outpatient services and appropriate living environment to return to can greatly reduce the length of stay for many individuals.

Fourth: Is the individual at serious risk of readmission to a State Hospital? This standard requires an assessment of the individual risk of readmission based on past hospital admissions,

3

diagnosis (including co-occurring disorders), housing stability, history of aggression, and history of medication adherence. Individuals who are poorly engaged in outpatient treatment (either missing appointments or struggling to maintain adherence) are at serious risk of readmission. Individuals who are using substances, have unstable housing, or experience disorganization as a result of their mental illness are more likely to exhibit poor engagement with treatment. Outpatient services that are mobile and include assertive engagement, medication assistance, integrated substance use disorder treatment, housing supports, and crisis response are most likely to reduce the individual risk of readmission. In making this determination, I considered the available medical records, relied on my extensive clinical experience, and drew on the known risk factors for institutionalization developed by Dr. Drake.

## VI. Findings from Reviewed Individuals

I interviewed 27 individuals and reviewed relevant mental health records for 28. One individual was deceased. Six individuals were inpatient at MSH at the time of the interview. One individual was an inpatient at EMSH at the time of the interview. One individual was residing at Central Mississippi Residential Center (CMRC) at the time of the interview. Two individuals were residing at Kemper County Group Home (KCGH) at the time of the interview. Two individuals were in Scott County Jail at the time of the interview. One individual was in Central Mississippi Correctional Facility at the time of the interview. One individual was in the State Veterans' Administration Nursing Home in Jackson at the time of the interview. Three individuals were residing in Personal Care Homes at the time of the interview. One individual was staying at a shelter in Jackson at the time of the interview. Four individuals were living independently in their own homes at the time of the interview. The remaining six individuals were living with family members.

Only 36 percent of the individuals were residing in environments that offered them privacy and the freedom to make independent choices about whom to associate with, when to sleep, what to eat, what to do, and where to go. One out of the 27 individuals for whom an in-person interview was possible was opposed to living in the community; 26 did not oppose living in the community. One individual was receiving PACT services, was living independently, and was employed part-time. 14 percent (4/28) of the reviewed individuals had a co-occurring IDD diagnosis. 64 percent (18/28) had a co-occurring SUD suspected. The number of prior State Hospital admissions ranged from 0 to 42. Most individuals reviewed had been offered standard office-based services through the CMHCs or VA system, including medication services with a psychiatric care provider, office-based nursing services, and individual therapy.

There was very little evidence in the records that I reviewed that individual therapy was provided on a sustained enough basis or with enough frequency and penetration to significantly impact the outcomes of the population reviewed. The lack of proactive service engagement as well as system-related issues (availability, staff tenure) appeared to impact this finding. Due to their symptomatology, some individuals with mental illness are reluctant to engage in treatment on their own initiative.

4

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

CSS (Community Support Services) were offered to most if not all of the individuals reviewed, but few of the individuals reviewed took advantage of this service, and there was again evidence that it was not implemented with the appropriate degree of frequency and penetration to impact the targeted population's outcomes. My review of CMHC records revealed that when individuals were not engaged in services identified on their treatment plans (for example missing appointments) there was no evidence of an alteration in the plan, such as instituting assertive engagement interventions aimed at re-establishing contact or addressing the reasons for non-engagement.

Effective discharge planning should begin at the time of admission and should be aimed at returning the individual to their preferred home environment with their appropriately targeted community mental health services as soon as the crisis has subsided. Discharges are delayed when outpatient services are inadequate or when the individual does not have an appropriate living situation to return to. Services such as supported housing and Assertive Community Treatment are particularly effective in reducing the number of days individuals spend confined in institutional settings by providing continuity before and after an admission.

PACT (the term used for ACT in Mississippi) was largely missing in the communities that were home to the individuals that I reviewed. Where PACT was available, there is some limited evidence that it was targeted toward the appropriate population, but, even then, there are problems with penetration of the service. Evidence of supported employment and supported housing services was very limited. Only one out of 28 individuals was employed at the time of this review. That individual was receiving services from a PACT team. Only one out of four individuals living independently was receiving housing supports from a mental health provider (again, an individual who was receiving PACT services); the remaining three were reliant on family to support any needs to sustain permanent housing that they could not meet on an individual basis. Of the 64 percent of individuals with co-occurring SUD reviewed, I encountered limited assessment and very limited treatment offered in an integrated (evidence-based) fashion. There was an over-reliance on recommendation as opposed to intervention. For instance, most individuals were urged to abstain and to attend AA or NA. There was very little evidence that this encouragement was heeded or provided benefit to the individuals receiving it. One individual credited AA/NA with helping her achieve abstinence.

Of the four individuals with a co-occurring IDD diagnosis, one was deceased (she died at EMSH), one was living with his parents, and the remainder were still institutionalized. A review of the State Hospital records for these individuals identified several key areas of concern. First, there was an over-reliance on psychopharmacology to address behaviors—often stated as point of fact in the records. The institutions provided little to no non-pharmacologic behavior modification program apart from the routine structures and reinforcers offered to the non-IDD population and targeted to address that group's needs. There was an absence of individualized assessment and treatment planning to address problem behaviors, and as a result, a number of individuals received or were receiving excessive medication without a sufficient reduction in

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

target behaviors to facilitate a successful transition to the community.  This excess reliance on medication to treat behavior further exacerbated the problem of extended hospital stays by creating medical concerns and functional declines that severely limited the options for successful community placement.  There was strong evidence of a shared belief that individuals with IDD could not live independently with supports.  Discharge planning seemed targeted to finding group homes or personal care homes (intended and staffed for a non-IDD population), rather than tailored supervised living situations or supported independent living situations.  Attempts at discharge to congregate living situations not designed for the IDD population were universally unsuccessful in the individuals that I reviewed, yet there was no modification of the discharge plans on subsequent admissions, despite the evidence of the failures.  As a result, individuals spent excessive periods of time in a State Hospital waiting for acceptance into a congregate living situation that could be expected to not meet their needs based on their previous history.  Interestingly, many of the congregate living situations seemed to have figured this out, such that a number of the individuals were now waiting in a State Hospital with no chance of discharge placement because they were repeatedly turned down by outpatient residential providers.

There was evidence that many individuals were admitted to a State Hospital due to poor engagement in outpatient treatment (missed CMHC appointments, violation of outpatient commitment orders, medication non-adherence).  The medication practices at the State Hospitals, particularly MSH, could be expected to exacerbate the problem of poor outpatient adherence to treatment.  Individuals were offered a fairly limited array of medications at high doses and with dosing that must be taken multiple times per day.  The conditions of lacking choice, experiencing side effects, and facing real-world barriers to maintaining a complicated dosing schedule all contribute to the possibility that someone will discontinue treatment.  Clozapine, an antipsychotic medication that is more effective than others for individuals with treatment refractory psychotic disorders, appeared to be underutilized, although the State Hospital population would be expected to be one for which clozapine is a reasonable treatment option.  Instead, many individuals were prescribed multiple antipsychotics simultaneously, at dosages outside of the usual practice standards, rather than being offered a trial of clozapine.  Substance use was also a frequent contributor to hospital readmission.

The limited engagement with traditional outpatient services (medication management, individual therapy, case management) complicated by substance use or a history of poor medication adherence in a population with psychotic disorders should be justification for the provision of more intensive and comprehensive outpatient mental health services, such as ACT.  ACT services focus extensively on assertive engagement interventions that significantly decrease the chance that individuals will drop out of outpatient treatment.  At least 21 of the 28 individuals I reviewed met medical necessity criteria for ACT services, yet only one was receiving this service.  The one individual who was receiving PACT was living independently and was employed.

There is an overwhelming need for more ACT/PACT services, particularly in more rural areas where it seems largely absent. In general, I found it hard to ascertain what number of admissions or what length of stay in the State Hospital would provide the impetus for the State Hospital or CMHC to alter the treatment plan or discharge plan enough to impact the risk of readmission. Each new admission appeared, as a whole, to increase the likelihood that the length of stay would increase over prior admissions. This seems to represent a failure around discharge planning (particularly a push to move people into congregate living situations after a number of admissions, a practice which is not acceptable or indicated for the vast majority of individuals with mental illness), and a failure to coordinate inpatient and outpatient care so that outpatient providers make it a priority to limit the number of days per admission by offering the flexibility of supports needed to address the individual's needs at various levels of acuity. Such flexibility prior to admissions would also reduce the likelihood that hospital admission is necessary. Mobile crisis services, respite, facility-based crisis, and other diversion services appear to be underutilized or not available. As a result individuals appear to be caught in a cycle of limited utilization of basic outpatient services, crisis, commitment, temporary jailing while waiting for a State Hospital bed, hospital admission, and referral to congregate living. Each new turn through the cycle moves individuals further from their preferred living environment and can manifest eventually in a loss of skills and function that perpetuate the cycle further. There is a lack of robust, recovery-oriented services that promote independence, improve community tenure, and sustain the individual's connection to family and community. ACT, supported employment, supported housing, IDDT, mobile crisis, respite, individualized IDD supports, and better penetration of assertive case management could help address the excessive use of State Hospital that are utilized routinely rather than as a third or fourth alternative for those with the highest level of identified need.

I have not authored any publications within the past ten years. I have not testified as an expert, either in a deposition or at trial, in any cases within the past four years. My compensation is $200 per hour, plus expenses. My compensation is not dependent on the outcome of this litigation.

Signed this 29th day of July, 2018

*Carol VanderZwaag* (signature)

Carol VanderZwaag


Attachment: Individual narratives

Attachment: Curriculum Vitae

Attachment: Documents reviewed

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER