IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>STATE OF MISSISSIPPI,<br><br>*Defendant.* | CIVIL ACTION NO.<br>3:16-CV-00622-CWR-FKB |

**UNITED STATES' RESPONSE MEMORANDUM IN OPPOSITION TO STATE'S**
***DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY OF UNITED STATES'**
**CLIENT REVIEW TEAM**

Discrimination in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, occurs when a State institutionalizes, or places at serious risk of institutionalization, an individual with disabilities who would benefit from and does not oppose community-based services. *Olmstead v. L.C.*, 527 U.S. 581, 603, 607 (1999); *Steimel v. Wernert*, 823 F.3d 902, 913-14 (7th Cir. 2016).

In this case, the United States has designated six experts (the "Client Review Team") who will offer testimony that Mississippians with mental illness would benefit from and do not oppose community-based services, and are nonetheless institutionalized or placed at serious risk of institutionalization in Mississippi's four State Hospitals because they do not receive those very services. The experts' opinions confirm that discrimination is ongoing and widespread in Mississippi. Individuals do not receive community-based services from which they would benefit and which they do not oppose receiving. Because they do not receive community-based treatment for their mental illnesses, those individuals deteriorate until commitment to a State

Hospital is justified, and once committed the individuals spend more time in an institutional setting than they otherwise would.

The State moves to exclude these opinions, ECF No. 147 ("Motion") on the basis of three arguments. First, the State argues that Mississippi law prohibits the State Hospitals from exercising any discretion in admitting patients, but the United States does not dispute this point of Mississippi law and the United States' experts do not offer opinions inconsistent with it. Mem. in Support of *Daubert* Motion at 3-4 ("Brief"), ECF No. 148. Second, the State argues that the opinions are unreliable because they are based on a flawed methodology, but the State fails to identify any actual methodological flaw. Brief at 5-7. Third, the State misreads the United States' Complaint to argue that opinions related to individuals dually diagnosed with mental illness and an intellectual and/or developmental disability ("IDD") are irrelevant. Brief at 7. Because all of the State's arguments are without merit, the motion should be denied.

### I. The United States' Client Review Team[1]

Over the course of a five-month period in early 2018, six experts[2] retained by the United States conducted a review of 154 individuals who were in Mississippi State Hospital ("MSH"), East Mississippi State Hospital ("EMSH"), North Mississippi State Hospital ("NMSH"), and/or South Mississippi State Hospital ("SMSH," collectively the "State Hospitals") pursuant to an order of civil commitment at some point between October 13, 2015 through October 13, 2017. Drake Report at 1-2.[3]

---

[1] The State refers to this team as the Clinical Review Team.

[2] Dr. Judith Baldwin, Dr. Beverly Bell-Shambley, Katherine Burson, Daniel Byrne, Dr. Robert Drake, and Dr. Carol VanderZwaag.

[3] The State designated five psychiatrists employed at the State Hospitals: Dr. Joseph Harris (SMSH), Dr. James Lamousin (SMSH), Dr. Ken Lippincott (NMSH), Dr. Robert Maddux (MSH), and Dr. Roy Reeves (SMSH). The State also designated psychiatrists Dr. Benjamin Root, Dr. Mark Webb, Dr. Susan Younger, Dr. Philip Meredith,

Each member of the Client Review Team answered four questions[4] about each person reviewed:

1. Would the individual have avoided or spent less time in a State Hospital if he/she had been provided reasonable community-based services?
2. Is the individual at serious risk of institutionalization in a State Hospital?
3. Would the individual be opposed to receiving community-based services?
4. If the individual is appropriate for and would benefit from community-based services, what services would the individual need?

Question 1 explores two closely related issues: first, if a person had been receiving appropriate community-based services, could that person have avoided the mental health crisis that precipitated commitment to a State Hospital (and could similar future crises be avoided)? Second, if an individual had received appropriate community-based services, could that person have spent less time in a State Hospital once committed? This aspect of the question considers whether the individual languished needlessly in the State Hospital waiting for necessary community-based services.[5] Question 1 does not purport to assess whether, at the moment of commitment, the individual met Mississippi's statutory criteria.

---

and Dr. William Wilkerson. These 10 experts offered opinions about the same group of 154 individuals reviewed by the Client Review Team.

[4] The State's Motion addresses only questions 1 and 4. However, the State's Motion is styled as one seeking to exclude the Client Review Team entirely. As demonstrated in this brief, the State's Motion should be denied in full. However, if the Court is inclined to grant the State's Motion, exclusion is appropriate only as to the particular portions of the Client Review Teams' opinions challenged in the State's Motion.

[5] The Medical Director of the Department of Mental Health agrees that there are individuals in the State Hospitals who are there only because the community-based supports that would meet their needs are not available to them. Maddux Dep. (May 7, 2018) 147:11-15 ("It's quite frequent" that individuals remain at Mississippi State Hospital because there is no discharge destination) (Ex. A).

Question 4 identifies the particular services from which the individual would benefit, if the person would indeed benefit from such services. This question is tailored to identifying effective services that address individual needs. The experts did not opine on a particular level of services that would be necessary for each recommended service to meet statewide need. Instead they identified what services the clients in the sample would benefit from.

## II. Admissibility of Expert Testimony

Expert testimony is admissible at trial if it is relevant and reliable. *United States v. Brown*, 871 F.3d 352, 357 (5th Cir. 2017) (citing *Rushing v. Kansas City Southern Ry.*, 185 F.3d 496, 507 (5th Cir. 1999) ("the heart of *Daubert* is relevance and reliability")). Expert testimony is relevant when it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)). Expert testimony is reliable for purposes of admissibility if the testimony is "scientifically valid" and the "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 243-44 (quoting *Daubert*, 509 U.S. at 592-93). The Court has significant flexibility in assessing reliability, and expert testimony is reliable when based on "personal observations, professional experience, education and training," even if it cannot be reduced to empirical validation. *United States v. Simmons*, 470 F.3d 1115, 1122-23 (5th Cir. 2006) (citing *Pipitone*, 288 F.3d at 247); *see also Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 677-78 (5th Cir. 2015).

As the State acknowledges, Brief at 2, challenges to the "bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)). This is especially so in a non-jury trial, where "the safeguards provided for in *Daubert*

4

are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000); *see also Whitehouse Hotel LP v. Commissioner of Internal Revenue*, 615 F.3d 321, 330 (5th Cir. 2010) ("there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence"). "It is better to allow vigorous cross-examination, presentation of contrary evidence and careful weighing of the burden of proof to test shaky but admissible evidence than to exclude expert evidence altogether." *Enniss Family Realty I, LLC v. Schneider Nat'l Carriers, Inc.*, 916 F. Supp. 2d. 702, 713 (S.D. Miss. 2013) (quoting *Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 2008 WL 1930681, at *2 (E.D. La. Apr. 29, 2008) (alterations omitted)).

### III. The Client Review Opinions Are Admissible

#### A. Question 1 is Relevant Because it Goes to the Question of Whether the State Discriminates Against Individuals with Mental Illness

Question 1 addresses whether an individual has experienced discrimination in violation of Title II by asking whether the person spent time in a State Hospital because of an absence of appropriate community-based services. The State's argument that Question 1 is irrelevant by operation of state law rests on a fundamental misreading of Question 1. Brief at 3-4. The State misreads Question 1 as addressing whether the chancery court erred in committing the person.

The Client Review Team does not offer the opinion that the State Hospitals should have disputed the findings of the chancery courts and denied admission to the individuals reviewed.[6]

---

[6] Even so, the Client Review Team did note several instances where the documentation available to them suggested the criteria in fact might not have been met. *See, e.g.*, Bell-Shambley Report at 43 ("Notes in his record at Singing River Hospital in July of 2017 indicate that he had improved and was stable; he could have been discharged back into the community without having to go to the State Hospital.") (Ex. D).

These are observations shared by the State's experts. *See, e.g.* Lamousin Dep. 52:9-16 ("there are times when people would come in to the [Crisis Stabilization Unit] and they've been there for a while and they've gotten better. And, you know, they come in [to SMSH] and you wonder why they meet criteria – do they meet criteria or not. But they'll come in well enough to where they could have been sent outpatient and they will be sent to us.") (Ex. E);

5

Rather, the Team identified interventions that, if implemented appropriately, likely would have prevented the individual's symptoms becoming so acute that inpatient stabilization was justified. *See, e.g.*, Byrne Report at 8 ("For most individuals with mental illness whose symptoms are worsening, there are multiple opportunities for community-based services to rapidly react, intensify services, and stabilize. For the people I reviewed in Mississippi, the necessary services were not available, and those opportunities were lost. These people were admitted to the State Hospital because of those lost opportunities.") (Ex. G); Bell-Shambley Dep. at 163:11-164:2 (for one individual, connection to "more intensive community services…perhaps could have resolved the conflict or removed her from the situation of the conflict between [her family] such that there would not have been the need to proceed on with filing a petition for commitment.") (Ex. H); Bell-Shambley Report at 18 ("if mobile crisis services and in home interventions had been tried prior to his being taken into custody, his most recent hospitalization might have been avoided") (Ex. D). Question 1 also addressed whether connection to community-based services could shorten an individual's stay in a State Hospital. *See, e.g.*, VanderZwaag Report at 3 ("once an individual has been admitted to a hospital, then the availability of both appropriate outpatient services and appropriate living environment to return to can greatly reduce the length of stay for many individuals") (Ex. I).

      This opinion is indisputably relevant to the question at the heart of this lawsuit: whether Mississippians with mental illness are forced to undergo treatment in State Hospitals due to a lack of community-based mental health services.

---

Merideth Report at Attachment 4 pgs. 23-27 (identifying admissions where "at the time of treatment, a state hospital was not the least restrictive treatment setting available for the patient") (Ex. F).

In contrast, the State's experts did address the question the State now argues is irrelevant: whether the individuals in the sample met commitment criteria at the time of admission. *See, e.g.*, State's Designation of Non-Retained Expert Witnesses (Sept. 28, 2018) (Maddux, Lippincott, Reeves, Lamousin, and Harris to offer testimony that "at the time of each individuals' admission to [a State Hospital], each individual was appropriate for admission.") (Ex. J). They concluded that many, but not all, the individuals in the sample met the commitment criteria when they were committed or admitted. *See, e.g.*, Meredith Report (Ex. F). They did not address the question of whether community-based services offered before the commitment process was initiated could have prevented the admission or reduced its length. *See, e.g.*, Maddux (Nov. 28, 2018) Dep. 67:23-68:2 (Maddux not offering opinions about community-based services the individuals did or did not receive) (Ex. K).

### B. Answers to Question 4 are Reliably Based on Empirical Research and the Team's Skills, Knowledge, and Expertise

Question 4 asked whether an individual was appropriate for and would benefit from community-based services and, if so, what services. The State argues the Team's answers to Question 4 are unreliable because the methodology used to reach those opinions was "designed to produce the outcome desired by" the United States. Brief at 3, 6. But what the State identifies as a flaw – a purported "admission" that "the answer to the question of whether an individual is appropriate for and would benefit from community-based services will always be 'yes,'" Brief at 1 – is not a flaw at all but rather the reality that the weight of research, as well as the Client Review Team's collective decades of experience in providing services to individuals with mental illness, demonstrates the efficacy of community-based services.

Together, the members of the Client Review Team have spent decades assessing individuals with mental illness to identify needed services, providing community-based mental

7

health services, working in state hospitals, transitioning individuals with mental illness into community-based integrated settings, and researching the efficacy of community-based services. Each member of the Client Review Team assessed Question 4 by considering the individual's needs, the expert's lengthy experience treating similarly-situated individuals and broad knowledge of community-based mental health services, Mississippi's own standards for community-based services, and research identifying particular types of services with measurable impacts on hospitalization. *See, e.g.*, Baldwin Report at 9-10 (Ex. L); Bell-Shambley Report at 5 (Ex. D); Burson Report at 4 (Ex. C); Byrne Report at 6-7 (Ex. G); Drake Report at 5 (Ex. M); VanderZwaag Report at 3 (Ex. I). An expert's knowledge, skill, training, and experience are explicit considerations in assessing the admissibility of an expert's opinion, particularly in an area of soft science like human services. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). The State has not identified any deficiency with respect to any of the Client Review Team's knowledge, skill, training, or experience that would support exclusion.

In support of its argument to exclude the answers to Question 4 the State refers to a single case: a decision noting the requirement that expert evidence involving an "extrapolation or leap from an accepted scientific premise to an unsupported one [] be reasonable and scientifically valid." Brief at 6 (quoting *McElroy v. Evanston Ins. Co.*, 14-180, 2016 WL 2726859, at *2 (S.D. Miss. May 6, 2016) (alterations omitted)). And the State selectively quotes from the experts' depositions to suggest that the Client Review Team believes a State Hospital is never appropriate, but ignores sworn statements from those same depositions acknowledging the need for inpatient stabilization. *See, e.g.*, VanderZwaag Dep. 11:1-16 (Dr. VanderZwaag acknowledges individuals in state hospitals sometimes cannot "live in the community") (Ex. N); Baldwin Dep. 145:25-146: 3 ("there are points in time where integrated community-based

8

services are not going to help the person right at that moment, that they need a higher level of care.") (Ex. O); Burson Dep. 121:6-15 (acknowledging there are times when individuals "need[] to be in the hospital") (Ex. P); Byrne Dep. 37:10-38:11 (individual might require inpatient stay if the individual is "totally decompensated," needs their "psychiatric medications either stopped, started, or readjusted," or "is exhibiting dangerous or violent behavior") (Ex. Q); Drake Dep. 101:19-102:12 (describing a prior patient he "was pretty certain [] was never going to get out of the hospital") (Ex. R). Even if the State had accurately described the Client Review Team's knowledge of when inpatient stabilization is needed, the State fails to identify any "extrapolation or leap" taken by any member of the Client Review Team, let alone a leap that is not reasonable or scientifically valid. Brief at 6-7. Nor does the State explain how the methodology utilized by the Client Review Team was "designed" to "reach [the] result" that all individuals with a mental illness would benefit from community-based services. Brief at 7.

The "design" with which the State takes issue is apparently that the Client Review Team members know, based on research and their own experience, community-based services are effective and beneficial.[7] Evidence of the benefits of community-based services, and their efficacy, is well researched and documented. *See generally* Drake Report at at 9-15 (summarizing research regarding efficacy of certain evidence-based practices) (Ex. M).[8] The

---

[7] Alternatively, the State may be arguing that, because individuals with mental illness will "always" benefit from community-based services, Brief at 1-2, this issue is not in dispute and expert testimony is therefore unnecessary. Even if there is no dispute on this question as a general proposition, the particular services that the Client Review Team members identified as beneficial to the sample members provide helpful context to the Team members' other findings, in particular the finding that with appropriate services the individual would have avoided or spent less time in a State Hospital, and should not be excluded as unnecessary.

[8] The State and the State's experts agree that individuals benefit from the community-based services at issue in this litigation. *See, e.g.*, MS-00004797 ("Evidence-based programs such as PACT Teams are essential to keep individuals in the community and help them continue on their road to recovery.") (Ex. S); Day Dep. 192:17-19 (PACT is effective at avoiding hospitalization) (Ex. T); Vaughn Dep. 28:2-20 (identifying services that promote community-based living) (Ex. U); Allen Dep. 35:8-22 (same) (Ex. V); Lamousin Dep. 27:19-29:25 (identifying medication, therapy, case management, family therapy, and housing as services and interventions that can support individuals with mental illness) (Ex. E); Maddux (Nov. 28, 2018) Dep. 32:5-10 (describing effectiveness of mobile

9

State's complaint is that the Client Review Team reached conclusions consistent with that evidence. This complaint turns the *Daubert* inquiry – which considers whether the expert "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho*, 526 U.S. at 152, – on its head by imputing improper bias or methodology in following the weight of the evidence. Moreover, the Client Review Team members submitted extensive expert reports and sat for depositions at which each member identified the reasons why the member concluded that an individual would benefit from a given service.

If the State contends that a Client Review Team member incorrectly concluded that an individual in the sample was appropriate for and would benefit from particular community-based services, it can cross-examine the Team member on that point or present contrary evidence. Similarly, if the State contends that a Client Review Team member has incorrectly assessed the empirical evidence regarding the efficacy of community-based services, or incorrectly applied the Team member's own experience and knowledge of the efficacy of those services, it can present contrary evidence and cross-examine the Team member on those points. Neither of those attacks, however, are material for a *Daubert* motion, because neither of those attacks addresses whether the Team members "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152; *see also Primrose*, 382 F.3d at 562.

---

crisis team in preventing suicide attempts for an individual) (Ex. K); *id.* at 55:25-56:7 (particular individual might be a good candidate for PACT); Geller Report at 11 ("every person in every state hospital in the USA *could* be treated outside the hospital") (Ex. W). Most of the individuals in the sample were interviewed in the community. It is hardly unreasonable for the Client Review Team members to conclude that those individuals would benefit from services intended to maintain them in their community settings.

10

The State offers one final red herring point in support of its reliability argument. That the Client Review Team members agreed that "no state determines what community-based services it needs to offer based on the methodology [the Client Review Team] used in this case," Brief at 7, has no bearing on whether the Team used a reliable methodology. Question 4 does not address the issue of how much of a given community-based service the State should provide, but rather it addresses which community-based services a particular person in the sample would benefit from. The individual reviewers on the Client Review Team were not charged with opining on the needed scale of service expansion.[9] That the team members did not do what they were not asked to do is not a basis for excluding testimony about what they did do.

### C. Opinions Related to Individuals with Mental Illness and Intellectual/Developmental Disabilities Are Relevant

In 2011, the United States informed the State of Mississippi that it had found that Mississippi violated the ADA with respect to adults and children with mental illness, and adults and children with IDD. Findings Letter at 1 (Ex. X); Compl. ¶ 125 n.1. Although the Department of Mental Health and Division of Medicaid share primary responsibility for mental health and IDD services, the IDD and mental health service systems operate independently. *See, e.g.*, DMH FY18 Annual Report, MS-145984c (Ex. B). The operative complaint addresses the mental health service system for adults. Compl. ¶ 125 n.1. That the United States is not alleging discrimination in the operation of the IDD service system, Compl. ¶ 125 n.1, does not negate the fact that some individuals dually diagnosed with mental illness and IDD are impermissibly institutionalized, or placed at serious risk of institutionalization, in State Hospitals. Individuals with mental illness who are institutionalized in or at serious risk of institutionalization in State

---

[9] Nonetheless, looking at the aggregate findings across the client review is instructive as an indication of what services are needed across the State and the relative prevalence of the need for those services.

Hospitals are the subject of this litigation, irrespective of whatever additional diagnoses they have, be they IDD, substance-use disorders, medical conditions, or otherwise. *See, e.g.*, Compl. ¶ 61 (referencing individuals dually diagnosed with MI and IDD).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the State's Motion.

Dated: January 21, 2019.

| | |
|---|---|
| D. MICHAEL HURST, JR.<br>United States Attorney<br>Southern District of Mississippi | ERIC S. DREIBAND<br>Assistant Attorney General<br>Civil Rights Division |
| MITZI DEASE PAIGE [MS BAR 6014]<br>CANDACE MAYBERRY<br>Assistant United States Attorneys<br>501 E. Court Street, Suite 4.430<br>Jackson, MS 39201<br>Telephone: (601) 973-2840<br>mitzi.paige@usdoj.gov<br>candace.mayberry@usdoj.gov | STEVEN H. ROSENBAUM<br>Chief<br><br>REGAN RUSH<br>Deputy Chief<br><br>/s/ *Mathew Schutzer*<br>MATHEW SCHUTZER [NY Bar 5136007]<br>JORGE CASTILLO<br>DEENA FOX<br>PATRICK HOLKINS<br>ASHLEY MCDONALD<br>LINDSEY WEINSTOCK<br>Trial Attorneys<br>Special Litigation Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W. - PHB<br>Washington, DC  20530<br>Telephone: (202) 616-3179<br>Mathew.schutzer@usdoj.gov |

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2019, I electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to all counsel of record.

*/s/ Mathew Schutzer*
Mathew Schutzer