EXHIBIT 3

*Confidential Information, Subject to Protective Order*

## Expert Report of Melodie Peet

# Purpose and Scope of Report

This report summarizes my expert opinion regarding the State of Mississippi's administration, funding, and oversight of its mental health system. Specifically, I was asked whether the State's services are sufficient to prevent unnecessary institutionalization in State Hospitals, and if not, what changes, if any, the State can make to achieve that goal.

# Summary of Opinion

Mississippi can serve people in the most integrated setting as required by the Americans with Disabilities Act, but currently it does not do so. Mississippi continues to rely heavily on State Hospitals to serve adults with mental illness, a strategy that other states abandoned decades ago.

People with serious mental illness, including people who have spent lengthy periods in State Hospitals, can lead productive, stable lives in the community with necessary supports. Mississippi does not currently provide sufficient community-based services, leaving the State Hospitals as the only options. Mississippi can make changes to its system to serve people in the most integrated settings appropriate. To accomplish that goal, the State must shift and maximize funding, expand critical community-based services and make them available throughout the State, establish strong coordination and collaboration across the system, provide robust oversight and technical assistance, and use data to continuously refine and improve its system for serving adults with mental illness.

*Confidential Information, Subject to Protective Order*

# Contents

Purpose and Scope of Report ................................................................................................... 1

Summary of Opinion .................................................................................................................. 1

Background and Experience ...................................................................................................... 4

Methodology ............................................................................................................................... 5

Overview of Mississippi's Mental Health System ................................................................... 5

Mental Health Systems with Effective Community-Based Care Reduce Reliance on State Hospitals ...................................................................................................................................... 7

    Community-Based Mental Health Care Changed the Role of State Hospitals .......................... 8

    Mississippi Acknowledges the Changed Landscape of Mental Health Treatment ................... 9

Key Community-Based Services Can Reduce Reliance on Hospital Placements ....................... 10

    Crisis Services ........................................................................................................................ 11

    PACT and Intensive Case Management .................................................................................. 12

    Peer Support ............................................................................................................................ 13

    Supported Employment ........................................................................................................... 14

    Permanent Supported Housing ................................................................................................ 14

Mississippi State Hospitals ...................................................................................................... 14

Impact of Institutional Placement in State Hospitals ............................................................... 15

People with Mental Illness, Like People without Disabilities, Prefer to Live in the Community 17

Mississippi Continues to Rely Heavily Upon Segregated Institutional Care for People with Mental Illness ............................................................................................................................ 18

    Availability of Community-Based Services is Insufficient and Inconsistent .......................... 19

    Mississippi Has Long Known it Must Shift Resources to the Community .............................. 24

    Mississippi Has Not Executed an Effective Plan to Shift Resources and Reduce Reliance on Hospitalization ........................................................................................................................ 24

    Mississippi Does Not Effectively Coordinate Admissions and Discharges to Prevent Hospitalization and Readmission ............................................................................................. 26

    Mississippi Has A Relatively Low Level of Investment in Its Community-Based System ..... 28

    Mississippi Has Maintained A Relatively High Number of State Hospital Beds .................... 29

DMH and DOM Could Exercise Their Authority to Shape an Effective Community-Based Mental Health System ............................................................................................................... 31

Providing Services in the Community Is Typically Less Expensive for States than Relying on Institutional Care and this Holds True in Mississippi ............................................................... 32

    State Hospital Costs and Financing ......................................................................................... 32

*Confidential Information, Subject to Protective Order*

Community Services Costs and Financing.................................................................................... 32

Conclusion ........................................................................................................................................ 35

*Confidential Information, Subject to Protective Order*

## Background and Experience

In my 40 year career in mental health, I have worked both as a provider of services and as a state mental health administrator.  My resume is attached as Appendix A and includes any publications I have authored within the last 10 years.  After completing a Master's Degree in Public Health with a focus on Mental Health Administration at Yale, I spent ten years in Connecticut as an administrator at community mental health centers.  During that time, I oversaw the development and expansion of community-based services still used today and I partnered in downsizing state hospitals.

I then served as the Deputy Commissioner of the Connecticut Department of Mental Health, focusing on community systems development.  In that role, I focused on expansion of community-based services, including supportive housing, and on continuing to decrease reliance on state hospitals.  To support community services, we transferred funds from the hospital system to the community.

From 1995 to 1999, I was the Commissioner of Mental Health, Developmental Services, and Substance Abuse Administration in Maine.  As Commissioner, I oversaw a substantial increase in community-based services.  Key elements of this effort included establishing key community-based mental health services statewide, the creation of feedback loops between the community and my office, and ensuring that offices and agencies involved with the provision of publicly funded mental health services understood that they were responsible for every person with a mental illness in their assigned region.  The expansion of community services was funded primarily through a transfer of resources to support community services from state hospitals as demand for services decreased.

Between 2000 and 2010, my work focused primarily on children's mental health.  As the Deputy Commissioner of the Department of Children and Families in Massachusetts, my efforts were targeted to integrating the work of the Departments of Mental Health and Child Welfare.  In Connecticut, as CEO of a state hospital, my efforts centered on trying to move the hospital from its identity as an isolated stand-alone institution, to becoming a partner with Regional Service Systems.

In recent years, I have worked as the director of a large non-profit organization delivering services to people with mental illness and intellectual disabilities.

The length and breadth of my career, combined with my experience managing systems grappling with balancing institutional and community-based care, gives me an expert perspective from which to offer opinions on Mississippi's mental health services.

Within the last four years, I have not testified as an expert, either in a deposition or at trial, in any cases.  I am being compensated at a rate of $175 per hour, plus expenses.  My compensation is not dependent on the outcome of this litigation.

*Confidential Information, Subject to Protective Order*

# Methodology

To formulate my opinions, I reviewed professional literature, State documents, and deposition transcripts.  A list of information I considered is attached at Appendix B.  I also met in person and by phone with representatives of Community Mental Health Center regions 3, 7, 8, 9, 11, 14, and 15, CHOICE housing providers Open Doors and MUTEH, consumers and staff at the Opal Smith Drop in Center, staff and people receiving services at the Stewpot shelter in Jackson, a chancery court clerk, and a group of advocates.  I also visited East Mississippi State Hospital (EMSH) and the Central Mississippi Residential Center (CMRC).  I then applied my experience and generally accepted standards in the field of mental health administration to the facts and data I considered.

# Overview of Mississippi's Mental Health System

In Mississippi two State agencies have primary responsibility for designing, funding, and overseeing the public mental health system: The Department of Mental Health (DMH) and the Division of Medicaid (DOM).  DMH "administers and operates state behavioral health programs" and is responsible for "certifying, monitoring, and assisting the regional community mental health centers."[1]  DOM designs and administers the State's Medicaid program.[2]

Currently Mississippi operates four State Hospitals serving adults: North Mississippi State Hospital, South Mississippi State Hospital, East Mississippi State Hospital, and Mississippi State Hospital.[3]  Excluding forensic beds, the hospitals had 447 adult psychiatric beds in FY 2017 and served 3,216 people.[4]  The State also operates the Central Mississippi Residential Center, which had 68 beds and served 89 people in FY 2017.[5]

Admission to the State Hospitals is achieved through the civil commitment process.[6]  The civil commitment statute in Mississippi provides that people may be committed if the "the patient is a person with mental illness" and the court finds after "careful consideration of reasonable alternative dispositions" that there is "no suitable alternative to judicial commitment."[7]  Of course, the availability of services will impact the court's assessment of whether there is a "suitable alternative."[8]

---

[1] DMH, Annual Report FY2017, 2 [http://www.dmh.ms.gov/wp-content/uploads/2017/09/DMH-FY17-Annual-Report.pdf].

[2] DOM, About [https://medicaid.ms.gov/about/].

[3] DMH, Behavioral Health Programs [http://www.dmh.ms.gov/who-we-are/psychiatric-hospitals/].

[4] DMH, Fast Facts FY2017, 3-6 [http://www.dmh.ms.gov/wp-content/uploads/2017/09/Fast-Facts-FY17-Final.pdf] (including acute psychiatric, continuing treatment, medical surgical beds).

[5] DMH, *supra* note 3; DMH, *supra* note 4, at 6-7.

[6] *See* Miss. Code Ann. § 41-21-61 *et seq*.

[7] Miss. Code Ann. § 41-21-73.

[8] Depending on the county, after a judge orders a civil commitment, the person who was committed may await a State Hospital bed in the local jail or return home until there is a bed available. Call with Chancery Court Clerk, May 1, 2018.

*Confidential Information, Subject to Protective Order*

Community mental health services are designed, funded, and overseen by DMH and DOM and primarily provided by fourteen regional Community Mental Health Centers (CMHCs).[9]  Both DMH and DOM have established standards for the community mental health services they fund and oversee.[10]  In addition to providing office-based services like therapy and psychiatry, the CMHCs provide mobile services including case management and crisis services.  Some also provide more intensive ongoing mobile services and/or operate crisis stabilization units for acute care.

Funding for behavioral health services is primarily managed and distributed by DMH and DOM. DMH funds services at the State Hospitals and at the CMRC using almost exclusively State resources.  In FY 2017 the State allocated almost $189 million for the State Hospitals[11] and $7 million to the CMRC.[12]  DMH also funds CMHC services through grants.  In FY 2017 DMH granted community providers $26.9 million in State funds for adult community mental health services.[13]  DMH also distributed $4.7 million in federal grants to support community mental health services.[14]

DOM also provides Medicaid reimbursement for some mental health services.  Under federal Medicaid rules, DOM can and does reimburse providers for community mental health services that are included in the State's Medicaid service array and provided to people enrolled in Medicaid.[15]  DOM also pays for inpatient psychiatric stays at general community hospitals for people enrolled in Medicaid.[16]  However, for the most part, Medicaid does not pay for stays in freestanding psychiatric hospitals, including the State Hospitals.[17]  In Mississippi, people who qualify for Supplemental Security Income due to a disability, such as mental illness, are eligible

---

[9] DMH, Community Mental Health Centers [http://www.dmh.ms.gov/service-options/community-mh-centers/].

[10] DMH, Operational Standards for Mental Health, Intellectual/Developmental Disabilities, and Substance Use Disorders Community Service Providers [http://www.dmh.ms.gov/wp-content/uploads/2016/08/Final-Master-2016-Operational-Standards-for-Distribution-6-17-16.pdf]; DOM, Administrative Code, Title 23: Medicaid Part 206 Mental Health Services [https://medicaid.ms.gov/wp-content/uploads/2014/10/AdminCode-Part_206.pdf].

[11] This funding includes funding for non-adult services at the State Hospitals and two nursing homes on the campuses of State Hospitals.  Mississippi State Hospital Budget request for Fiscal Year Ending June 30, 2019 [http://www.lbo.ms.gov/PublicReports/DownloadReportFile?ReportId=52648]; East Mississippi State Hospital Budget request for Fiscal Year Ending June 30, 2019 [http://www.lbo.ms.gov/PublicReports/DownloadReportFile?ReportId=52586]; South Mississippi State Hospital Budget request for Fiscal Year Ending June 30, 2019 [http://www.lbo.ms.gov/PublicReports/DownloadReportFile?ReportId=52924]; North Mississippi State Hospital Budget request for Fiscal Year Ending June 30, 2019 [http://www.lbo.ms.gov/PublicReports/DownloadReportFile?ReportId=52802].

[12] Central Mississippi Residential Center Budget request for Fiscal Year Ending June 30, 2019 [http://www.lbo.ms.gov/PublicReports/DownloadReportFile?ReportId=52679].

[13] DMH, *supra* note 1 at 24.

[14] *Id.*

[15] State Plan Amendment 2012-003, Rehabilitative Services [https://medicaid.ms.gov/wp-content/uploads/2014/01/SPA2012-003.pdf]; DOM, *supra* note 10.

[16] DOM, *supra* note 10 at 5.

[17] *See* 42 U.S.C. § 1396d (a)(29)(B).

*Confidential Information, Subject to Protective Order*

for Medicaid.[18]  Most Medicaid beneficiaries in Mississippi now have their care coordinated by a managed care provider, though a subset of beneficiaries continue to receive services through a traditional fee for service model.[19]

DOM establishes billing rates for services for community-based mental health services.[20]  DOM also establishes caps on the number of units that an individual may receive under fee-for-service Medicaid.[21]  Because Medicaid is a federal-state partnership, the federal government contributes a share of the cost of Medicaid services.  The share paid for by each state varies, with Mississippi receiving the highest federal participation rate in the country at 75.65% in FY 2018, meaning that the federal government pays more than three dollars for every one dollar Mississippi pays for Medicaid services.[22]  In FY 2017, Mississippi budgeted $30 million for its State share of the Medicaid cost for community mental health services.[23]

Supported housing for people with mental illness in Mississippi is primarily funded and administered through Mississippi Home Corporation (MHC).  Between fiscal years 2015 and 2018, MHC spent $3.8 million on the supported housing program, called CHOICE.[24]

## Mental Health Systems with Effective Community-Based Care Reduce Reliance on State Hospitals

State hospitals, historically called asylums or mental institutions, have existed in the United States since the late 18th century, and for nearly 200 years, the state hospital was the primary option for the treatment of persons with serious mental illness.[25]  In 1955, the peak census year

---

[18] DOM, Eligibility Policy and Procedures Manual, March 2018, 101.02.02, 105 [https://medicaid.ms.gov/wp-content/uploads/2017/10/Chapter-101.pdf].

[19] State Plan Amendment, supra note 15; DOM, Medicaid's Coordinated Care Program Continues to Evolve and Expand [https://medicaid.ms.gov/medicaids-coordinated-care-program-continues-to-evolve-and-expand/].

[20] DOM establishes rates for fee for service participants in Medicaid.  Those rates provide a floor for managed care organization reimbursements.  *See* Fee Schedule for Community/Private Mental Health Centers, Effective July 1, 2018 [https://medicaid.ms.gov/wp-content/uploads/2014/03/CommunityMentalHealthCenter.pdf].

[21] *Id.*  The caps do not operate as hard limits for people receiving care through managed care organizations.

[22] Kaiser Family Foundation, Federal Medical Assistance Percentage FY 2018 [https://www.kff.org/medicaid/state-indicator/federal-matching-rate-and-multiplier/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D].

[23] Recalculation for Anna using FY17 revised [MS-00115749].

[24] CHOICE FEB 2018 Summary [MHC-00017482].

[25] NIH, U.S. National Library of Medicine, Early Psychiatric Hospitals & Asylums, Jan. 18, 2017, [https://www.nlm.nih.gov/hmd/diseases/early.html#1752].

*Confidential Information, Subject to Protective Order*

for these institutions, there were more than 550,000 people residing in these facilities.[26] At that time there was not a solid evidence base for effective community-based mental health treatment. Central to the earliest identity of state hospitals was the element of isolation. State hospitals were intentionally placed in remote locations away from home and families, and operated as "total institutions," which means that all aspects of life were conducted in the same place and under a single authority, and each phase of the member's daily activity was carried out in the immediate company of a large batch of others, all of whom were treated alike and required to do the same thing together, with all phases of the day's activities tightly scheduled.[27]

## Community-Based Mental Health Care Changed the Role of State Hospitals

The mental health clinical landscape began to change in the 1950s and 1960s. Particularly with the advent of new medications and community-based therapeutic choices, people who were previously relegated to state hospitals were being served successfully in the community[28] With the growing recognition that institutionalization caused harm, there was a significant shift in the role of state hospitals. In support of the newly developed community-based services, the Community Mental Health Act of 1963 (CMHC Act) provided for grants to the states for construction of an envisioned 1500 community mental health centers nationwide.[29]

Subsequent to the passage of the CMHC Act, state hospitals began a process of rapid transformation in both size and function. In 1950, there were 322 state and county psychiatric hospitals in the United States, which hospitalized over 500,000 people per year.[30] By 2005, there were fewer than 225 state and county psychiatric hospitals left, serving about 50,000 people, a tenth of the numbers served in the 1950s.[31] The focus in state hospitals turned to psychiatric illnesses and away from serving people with alcohol disorders, organic brain syndrome, drug disorders, developmental disabilities, and the elderly.[32]

The CMHC Act was the first of many laws, regulations, and court decisions at the federal level that recognized the effectiveness of community services and their ability to decrease reliance on

---

[26] Lutterman, T. & Mandersheid, R., Trends in Total Psychiatric Inpatient and Other 24-Hour Mental Health Residential Treatment Capacity, 1970-2014, NASMHPD Commissioners Meeting (July 31, 2017), (slide 10) [https://www.nasmhpd.org/sites/default/files/2%20NRI-2017%20NRI%20Meeting--Distribution%20of%20Psychiatric%20Inpatient%20Capacity%2C%20United%20States_0.pdf].

[27] Goffman, Erving, *Asylums: Essays on the Social Situation of Mental Patients and Other Inmates* (1961).

[28] *See* Fisher, William H., Geller, Jeffrey., and Pandiani, J., (2009) "The Changing Role of the State Psychiatric Hospital", *Health Affairs*, Vol. 28, No. 3, Page 7, [https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.28.3.676].

[29] 42 U.S.C. § 2689. This was repealed and replaced with the legislation providing the federal community mental health block grant, 42 U.S.C. §§ 300x *et seq.*

[30] Lutterman, *supra* note 26.

[31] *Id.*

[32] Lutterman, T., Shaw, R., Fisher, W. & Manderscheid, R. (August 2017) "Trend in Psychiatric Inpatient Capacity, United States and Each State," 5 [https://www.nri-inc.org/media/1319/tac-paper-10-psychiatric-inpatient-capacity-final-09-05-2017.pdf].

*Confidential Information, Subject to Protective Order*

institutional care.  The establishment of Medicaid in 1965 provided federally funded insurance to people with disabilities, including mental illnesses.  Within Medicaid, Congress created a financial disincentive to the use of state hospitals—the Institution for Mental Disease Exclusion Rule precludes Medicaid matching payments for persons between 21 and 64 years old who are in state hospitals, nursing facilities, or other institutions primarily engaged in providing diagnosis and treatment of care of persons with mental illness.[33]  Federal Mental Health Block Grant funds for inpatient services are also dedicated to community services.[34]  And the Americans with Disabilities Act (ADA), the associated regulations, and the Supreme Court's Olmstead decision establish the right to receive services in the most integrated setting, a right that relies on the availability of community-based alternatives to hospitalization.[35]

As mental health policy and service utilization tilted away from institutions to community services, so did funding patterns in most areas of the country.  During the 35 years between 1981 and 2015, state hospital spending increased by 143% nationally, while community mental health expenditures increased by 1,427%.[36]

The rights established by federal law and the incentives established through funding policy have moved mental health systems across the country toward community services as a preferable alternative to institution-based care and they have led to an evolution in the functioning of state hospitals.  The state hospitals shifted from self-contained providers, to specialized providers playing a limited role in an integrated service continuum.[37]  State hospitals moved from total institutions where people lived, to being a small component of the service array used in extraordinary circumstances and for very brief periods.  As explained below, the Mississippi State Hospitals have not yet made this transition.  DMH has not created a unified system of care across the hospitals and community mental health centers.  The result is a fragmented treatment experience for people receiving services that undermines their progress towards recovery.

## Mississippi Acknowledges the Changed Landscape of Mental Health Treatment

Eventually recognizing the changed approach to care for people with disabilities, in 2001 the Mississippi legislature mandated that the State agencies develop a plan to serve people with disabilities in the most integrated setting appropriate.[38]  A report by the legislature's Performance Evaluation and Expenditure Review (PEER) committee in 2008 reiterated the need to shift to a community-based service system for people with mental illness—a move already made by other states.[39]  Since that time, DMH has engaged in strategic planning and has incorporated goals related to the expansion of community-based services in its strategic plans.

---

[33] Parks, Joe, and Radke, Alan, (July 2014) "The Vital Role of State Psychiatric Hospitals", NASMHPD Technical Report 18, 9.

[34] Lutterman, *supra* note 32 at 9.

[35] *Id.*

[36] *Id.* at 51.

[37] Parks, supra note 33 at 23-26.

[38] Mississippi Access to Care, Sept. 30, 2001, 3 [MS-00013155].

[39] Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), Planning for the Delivery of Mental Health Services in Mississippi (2008) cover page [USDOJ-0000336].

*Confidential Information, Subject to Protective Order*

The first goal of DMH's current strategic plan is "[t]o increase access to community-based care and supports for adults and children with mental illness and/or substance use disorders through a network of service providers that are committed to a person-centered and recovery-oriented system of care."[40]

## Key Community-Based Services Can Reduce Reliance on Hospital Placements

Extensive research demonstrates that persons who have been patients at state hospitals can be effectively served in the community. Virtually all individuals once served in the state hospital can be served in the community when: (1) comprehensive services are available; (2) there is a public health approach to managing care across all locations of service; and (3) there is a recovery framework in the system of care.

Key services that reduce the need for hospitalizations include (1) crisis services, (2) Assertive Community Treatment (also called ACT or PACT), (3) intensive case management, (4) peer support, (5) supported employment, and (6) permanent supported housing. These services can be provided in conjunction with traditional office-based therapy and medication management. In many studies over long periods of time, the findings have been consistent: former hospital patients can transition to successful community living with the support of community-based services.[41] Over the past 25 years, multiple studies in the U.S. and abroad have validated the significant impact that PACT teams have had on reducing hospital admissions and overall bed days.[42] Similarly, strong research over the last three decades chronicles the ways that mental health systems around the world have implemented crisis response programs that are ever more adept at resolving psychiatric emergencies without resorting to hospital admissions.[43] More recent research also identifies the beneficial impact of supported employment and peer support services in allowing people to live stable lives in their communities.[44] Leadership in

---

[40] Mississippi Board of Mental Health, FY2019-FY2021 Strategic Plan, Mississippi Board of Mental Health, 9 [http://www.dmh.ms.gov/wp-content/uploads/2018/06/FY19-FY21-DMH-Strategic-Plan-Final.pdf].

[41] McGraw, J., Bond, G., Dretan, L., et al (2006) "A multisite study of Client Outcomes in Assertive Community Treatment", *Psychiatric Services*, 1995, 46:696-701; Olfson, M. (1990) Assertive Community Treatment: An Evaluation of the Experimental Evidence", *Hospital and Community Psychiatry*, 1999, 41:634-641; Bond, G., Miller, L., Krumwred, R., et all, "Assertive Case Management in Three CMHCs: A Controlled Study", *Hospital and Community Psychiatry, 1988*, 39:422-418.

[42] Clausen, et al. (2016) "Hospitalisation of Severely Mentally Ill Patients With and Without Problematic Substance Use before and During Assertive Community Treatment: An Observational Cohort Study," *BMC Psychiatry* 16:125.

[43] *See* NASMHPD, Assessment #3: Crisis Services' Role in Reducing Avoidable Hospitalization (2017); Substance Abuse and Mental Health Services Administration, "Crisis Services: Effectiveness, Cost Effectiveness, and Funding Strategies," HHS Publication No. (SMA)-14-4848.

[44] Luciano, A. et al, (October 2016) "Hospitalization Risk Before and After Employment Among Adults with Schizophrenia, Bipolar Disorder, or Major Depression," *Psychiatric Services*, 67:10; Hoffmann, H., Jackel, D., Glauser, S., Mueser, K. T., & Kupper, Z. (2014), "Long-term effectiveness of supported employment: 5-year follow-up of a randomized controlled trial," *Am J Psychiatry*, 171(11), 1183-1190; Chien, W. T., & Thompson, D. R. (2013) "An RCT With Three-Year Follow-Up of Peer Support Groups

*Confidential Information, Subject to Protective Order*

Mississippi's mental health service system also recognizes that increasing utilization of these community-based services will reduce the need for hospitalizations[45] and DMH and DOM regulations incorporate many of these effective services.[46]

## Crisis Services

Even with effective ongoing supports, crises will arise that require an immediate, intensive response to help individuals stabilize in their communities and avoid hospitalizations. An effective crisis response system that diverts people from hospitalizations includes crisis hotlines, walk-in crisis services, mobile crisis teams, and crisis stabilization beds.

> *Crisis hotlines* often provide the first point of contact with the mental health system for individuals experiencing a psychiatric emergency. Emergency hotlines should operate 24 hours a day, 365 days a year and provide screening, triage, assessment, and information and referral services. Warm lines are intended to provide social support to persons who are not in crisis. They are often staffed by peer workers who can make access to care less daunting for people who need assistance.[47]

> *Walk-in crisis services* operate on the "urgent care" model that is prevalent in medical care settings. People can come to a center without an appointment and be seen quickly. Typically, they provide screening and assessment, brief treatment, and linkage to ongoing services.[48]

> *Mobile crisis teams* have been an essential anchor of psychiatric emergency systems for over 40 years. Typically, they are available 24 hours a day to respond to people in their communities. Team members go to homes, schools, emergency rooms, or wherever a person is in crisis. Usually, these teams are staffed by licensed clinicians, with physician backup, and they may also include a peer support specialist. They are skilled at de-escalating crises and making clinical determinations regarding the need for hospital admission. Once the presenting incident is resolved, the teams play an important role in connecting people to options for ongoing services.[49]

> Mississippi has recognized the value of mobile crisis, explaining: "Without mobile crisis intervention, an individual experiencing a crisis may be inappropriately and unnecessarily placed in a jail, holding facility, hospital, or inpatient treatment program."[50]

---

for Chinese Families of Persons With Schizophrenia," *Psychiatric Services*, 64(10), 997-1005; Dixon, L. B., Holoshitz, Y., & Nossel, I. (2016), "Treatment engagement of individuals experiencing mental illness: review and update," *World Psychiatry*, 15(1), 13-20.

[45] Allen Deposition, 26, 35.

[46] *See* State Plan Amendment 2012-003, *supra* note 15; DOM, *supra* note 10.

[47] *See* Substance Abuse and Mental Health Services Administration, *supra* note 43 at 11.

[48] Technical Assistance Collaborative, A Community-Based Comprehensive Psychiatric Crisis Response Services: An Informational and Instructional Monograph, April 2005, 9.

[49] *Id.* at 9-10.

[50] DMH, *supra* note 1 at 4.

*Confidential Information, Subject to Protective Order*

*Crisis residential, crisis apartments, or respite services* provide a structured, safe environment where individuals may go to recover from a psychiatric emergency if they need to be out of their home environment for a short period of time, but do not meet clinical criteria for hospitalization.  Depending on the model, staffing can include clinicians, paraprofessionals, peer support staff, or a mix of all three.  After resolution of the crisis, staff connect the individual to ongoing services.[51]

*Crisis Stabilization Units* (CSUs) serve people who are experiencing an acute crisis and need 24-hour supervision and treatment for a brief period.  While similar to traditional inpatient care, these programs are focused on crisis resolution and rapid return home.[52]  The typical length of stay in CSUs is less than 5 days.[53]  As with mobile crisis and crisis respite services, connecting individuals with ongoing support is a key element of crisis stabilization unit operations.  DMH has explained that with the current CSU structure, "[a]n individual can now receive services before they decompensate to the point of meeting commitment criteria."[54]

Assembling crisis services as a comprehensive response system closely aligned with ongoing services, provides an essential safety net that allows people with significant mental illnesses to live successfully in the community.  When determining whether a person who is in crisis and may pose a risk to himself or others can be treated in a less restrictive alternative, Mississippi's CMHC clinicians and chancery courts are constrained by the available resources.  Where alternatives to hospitalization are available, they can rely on those options in many cases.  My review found that the bones of a crisis service system exist in Mississippi, but key elements of the system, such as mobile crisis and crisis residential services, must be strengthened and expanded.

## PACT and Intensive Case Management

PACT and Intensive Case Management are also core elements that minimize or eliminate the need for hospitalization.  PACT services are provided by a multi-disciplinary treatment team that has near daily contact with those receiving its services.  It is an evidence-based practice (i.e. a practice that has been extensively studied and whose results have been demonstrated) that is used to support people who have not been successful using traditional services.  Teams include psychiatrists, nurses, peers with lived experience, employment support specialists, and clinicians, so that they can address all areas of a client's life.[55]  Some areas of the country have also established specialized PACT teams to serve rural regions.[56]  Intensive case management is a

---

[51] Technical Assistance Collaborative, *supra* note 48 at 10-11.

[52] *See* Technical Assistance Collaborative, *supra* note 48 at 11; Substance Abuse and Mental Health Services Administration, *supra* note 43 at 9-10.

[53] Technical Assistance Collaborative, *supra* note 48 at 11.  In Mississippi average lengths of stay in CSUs are currently more than 9 days.

[54] Mississippi Works to Improve Crisis Services, Press Release, May 5, 2014 [MS-00053133].

[55] Substance Abuse and Mental Health Services Administration, *supra* note 43 at 5-6, 14.

[56] Koch, Hannah, *Supporting Evidence-Based and Promising Practices: Assertive Community Treatment Fidelity and Rural Considerations*, SAMHSA, March 20, 2018 [https://www.nri-inc.org/media/1414/olmstead2018_ebp_koch_revised.pdf].

*Confidential Information, Subject to Protective Order*

flexible, mobile service provided by one person or a small team that assists people to make connections, maintain their medication use, and remain stable in their homes and communities.[57]

Having a consistent connection with an individual or a team provides essential relational connections for persons trying to break a crisis driven pattern of repeated hospitalizations and brief community stays. Case managers or PACT team members will have opportunities to de-escalate crises and avoid disruptive inpatient stays. As people learn more about the cycles of their illness through psychoeducation, they are better able to predict when they will need intensified supports and can communicate this to their PACT Team or case manager. PACT team members and case managers may also engage an individual's loved ones in psychoeducation to teach coping skills and strategies for managing mental illness. PACT services are provided at an as-needed level of intensity. Generally, people require more intensive services when initially discharged, but less so over time (with increases to correspond with acute need), often transitioning from PACT to a different, less intensive, model of service delivery.[58]

Intensive case management provides varying level of support over time to individuals who need assistance building skills to manage the challenges of life. A provider comes to the person's home or community and works with the individual to address needs and develop skills. With regular support, people are often able to maintain stability and integrate into their communities, identifying meaningful activities and natural supports. While some people may need only intermittent or monthly contact, others, particularly those with a history of hospitalization, likely need more frequent support.

DMH and DOM leadership recognize that PACT and case management can reduce hospitalizations.[59] Nonetheless, as explained below, PACT is available in select regions in extremely limited quantities, and case management is not provided intensively.

## Peer Support

Peer supports are another important element that yields successful outcomes in community living.[60] Peer support specialists are people with lived experience of mental illness and recovery who can offer support from a position of empathy and understanding. They give hope to people who are struggling with developing new and better responses to the challenge of living with a serious mental illness. Peers are often included as members of mobile crisis teams and can also be paired with an Intensive Case Manager to increase the support for an individual. Peer drop-in centers that offer more informal opportunities to engage with peers, receive support, and build community are another way to use the skills and wisdom that peers afford.

---

[57] *See* Charles Rapp and Richards Goscha (2004) "The Principles of Effective Case Management of Mental Health Services," *Psychiatric Rehabilitation Journal,* Vol 27, No. 4, 319-333.

[58] Huz, S., et al. (June 2017) "Time in Assertive Community Treatment: A Statewide Quality Improvement Initiative to Reduce Length of Participation," *Psychiatric Services* 68:6.

[59] Day Deposition, 192, 224-25; Fleming Deposition, 112; Toten Deposition, 41.

[60] *See* HHS, Office of Disability, Aging and Long-Term Care Policy (2015), An Assessment of Innovative Models of Peer Support Services in Behavioral Health to Reduce Preventable Acute Hospitalization and Readmission; Chien, W. T., *supra* note 44 at 997-1005; Dixon, L. B., *supra* note 44 at 13-20.

*Confidential Information, Subject to Protective Order*

Describing the role of peer support, DMH has explained, "[Peer support specialists] contribute something unique. They are living proof that recovery is possible. CPSSs share lived experiences and are willing to share their stories to benefit others."[61]  Yet, as described explored below, in some regions very few people receive this critical service.

## Supported Employment

Supported employment is an evidence-based practice that supports individuals to find and maintain paid, competitive employment.[62]  Work can promote stability and connection to the community.  DMH explained the value of supported employment, noting that, "Integration is an essential part of a person's recovery, and employment can be an essential part of integration. Employment offers not only independence and a source of income, but opportunities for interaction with all kinds of people, learning experiences in numerous areas and a greater chance for integration with the community as a whole."[63]  Nonetheless, as explained below, supported employment is offered only in four pilot regions and is funded exclusively through State grants.

## Permanent Supported Housing

Permanent supported housing, consisting of safe and affordable housing and the support services that enable people to remain stable in those homes, is the foundation to successful community living for many individuals living with a psychiatric disability.  Permanent supported housing providers assist people with a range of activities such as locating housing, working with landlords, supporting employment or obtaining benefits, and facilitating connections with clinicians and other services. People in permanent supported housing choose their own roommates, or choose not to have a roommate.[64]  Having a stable living situation that is not tied to compliance with a proscribed treatment regime is a key precursor to recovery and often eliminates crises that result in hospitalizations.[65]  However, as I describe below, it is currently not serving people in all counties and some mental health providers are not even aware of the program.

## Mississippi State Hospitals

Mississippi's State Hospitals are heavily regimented places where individuals are not allowed to make basic choices about their daily activities and associations.  For example, at EMSH,

[61] Certified Peer Support Specialist Provider Toolkit, page 4 [MS-00007067]; Day Deposition at 258.
[62] *See* Drake, R., et al. (2016) "Individual Placement And Support Services Boost Employment For People With Serious Mental Illnesses, But Funding Is Lacking," *Health Aff (Millwood)*, 35(6), 1098-1105; Hoffmann, H., *supra* note 44 at 1183-1190.
[63] DMH, Strategic Plan Highlights, FY15 Third Quarter [MS-00008774].
[64] *See* Rog, D. et al. (2014) "Permanent Supportive Housing: Assessing the Evidence," *Psychiatric Services, 65*(3), 287-294.
[65] *See* NASMHPD, Assessment #4: The Role of Permanent Supportive Housing in Determining Psychiatric Inpatient Bed Capacity (2017).

*Confidential Information, Subject to Protective Order*

admission to the Hospital begins with a full body search and search of belongings.[66]  In-person visits and phone communication with family, friends, or other people who do not live in the Hospitals are tightly controlled: "[Residents] may place telephone calls on courtesy telephones according to the unit schedule, and the privilege level of the [resident]."[67]  Individuals cannot choose their own roommates,[68] and all activities, including meals, snacks, sleeping, waking, TV-watching, and recreational activities are conducted according to schedules that the Hospitals create and impose unit-wide.[69]  State Hospitals also institute level-systems, in which patients wear colored arm-bands that indicate whether an individual can have visitors and whether they may wear personal items such as watches and wedding rings.[70]

My visit to East Mississippi State Hospital in February of 2018 reinforced the impression created by my policy review.  Every room looked exactly the same: two beds, two small dressers, the same quilts, no decorations on the walls.  Signs indicated that "[a]ctivity rooms are locked." Unit schedules did not leave much time for individual treatment.  When asked about patient choice among activities, one of the unit managers responded, "They all get the same thing."  In a visually impactful illustration of the way EMSH patients are stigmatized, persons being admitted to the hospital are transported in sheriff's vehicles, often in handcuffs. When going into the community on recreational trips, they are transported in vehicles with "Eastern Mississippi State Hospital" prominently displayed on the doors.

The State acknowledges, and my review confirms, that the State Hospitals are institutions.[71]

## Impact of Institutional Placement in State Hospitals

Psychiatric inpatient hospitalization can provide necessary therapeutic support under limited circumstances, but these benefits come with considerable risks that include:

---

[66] East Mississippi State Hospital (EMSH), Admissions Policy (301-13), 3B(1) [MS-00018427].

[67] EMSH, Telephone Use By Individuals Receiving Services, 3B [MS-00018564]. *See also* EMSH, Visitors Policy, [MS-00018566] (restricting time of visits & limiting to individuals 12 and older); South Mississippi State Hospital (SMSH), Patient Orientation Information [MS-00021997], 6 (no visitors under age 12 without special orders from a psychiatrist, one incoming one outgoing call per day, 5 min per call); North Mississippi State Hospital (NMSH), Patient Orientation Information, [MS-00021841], 7 (Phone Usage rules and restrictions); Mississippi State Hospital (MSH), Program Manual, 2016 [MS-00019304], 58 (phone policy allowing 5 minute phone calls according to unit schedules).

[68] EMSH, Room Assignments Policy, 3B [MS-00018559].

[69] MSH, Building 39 Global Schedule 2017 [MS-00019250]; MSH, Building 45 Global Schedule [MS-00019252]; NMSH, Programming and Activities Schedules [MS-00021844]; NMSH, Patient Orientation Information [MS-00021841], 7 (describing meal times, sleep/wake schedule, and restrictions on television watching); SMSH, Patient Orientation Information [MS-00021997], 6 (meal schedule), 7 (bed & waking times); EMSH, Unit schedules at [MS-00018442], [MS-00018445], [MS-00018451], [MS-00018454]; EMSH, meal times schedule at [MS-00018463].

[70] MSH, Medical Psychiatry Unit Program Manual 2016, Appendix B, 22 [MS-00019309] (describing armband level system); SMSH, Patient Orientation Information, 4-5 [MS-00021997] (Level System with Armbands described); NMSH, Patient Orientation Information, 1, 3 [MS-00021841] (Level System with Armbands, privilege of wearing wedding ring and watch).

[71] Stipulation signed by the Parties on April 3, 2018.

*Confidential Information, Subject to Protective Order*

- Loss of control over one's own life
- Stigma
- Loss of basic human rights
- Physical injury
- Psychological trauma
- Potential retraumatization
- Segregation away from one's family, home, social network, and source of income.

The potential for these consequences varies depending on the person's underlying condition, the environment on the hospital unit; the degree to which the individual is involved in his or her treatment decisions; the training and attitudes of staff; and the degree to which a person remains connected to his or her prior life while hospitalized. Most of these outcomes are risks regardless of the duration of an inpatient stay.

Authorities in the field since the 1960s have confirmed the above. In Erving Goffman's seminal work on institutions and their impact on people, he identifies disabilities as "attributes that are deeply discrediting" and further notes that because of this, people with disabilities are marginalized, mistreated, and stigmatized by society.[72] The harms caused by institutional settings are collectively known as "institutionalization syndrome," which is "the syndrome first recognized and described in inpatient psychiatric facilities, which is now used to describe a set of maladaptive behaviors that are evoked from the pressures of living in any institutionalized setting."[73] Patients become habituated to the routines, structures, and lack of control that are central to life in state hospitals. They become deskilled and fearful about resuming their lives in the community.

Nationally, since most long stay patients left the hospitals during the 70's and 80's, there are relatively few people left who are victims of this consequence of long-term hospital stay, Mississippi, however, continues to use the State Hospital for very long-term stays of 180 days or more, with 8%, or 319 of the 3,952 individuals who were in a Mississippi State Hospital between October of 2015 and October of 2017 experiencing a stay of more than 180 days.[74] For these individuals, the development of passive dependent "sick role" behavior associated with institutionalization, is an on-going risk.

As our understanding has grown regarding the impact of traumatic events on an individual's well-being, there has been a parallel rise in awareness of the importance of listening to the voices of mental health consumers regarding what they experience as helpful versus harmful in their

---

[72] Goffman, E., *Notes on the Management of Spoiled Identity*, (1963), 3. *See also* Chow, W. & Priebe, S. (2013) "Understanding Psychiatric Institutionalization: A Conceptual Review," *BMC Psychiatry*, 13:169, 9-10.

[73] Johnson, M. and Rhodes, R., (Spring 2007) "Institutionalization: A Theory of Human Behavior and the Social Environment," *Advances in Social Work*, Vol. 8 No. 1, 219.

[74] Descriptive Statistics, Expert Report of Todd MacKenzie.

*Confidential Information, Subject to Protective Order*

interface with the treatment system.[75]  The experiences that people receiving services have shared with me over the years evoke the concept of "sanctuary trauma," a term coined to define the experience of individuals who turn to social systems for help, only to find themselves traumatized or retraumatized by those very institutions.[76]

In an important study of consumer self-reports about their experiences on inpatient units, Karen J. Cusack, et al, interviewed 57 individuals who had used the public psychiatric hospitals that were part of the South Carolina DMH system.[77]  Forty-seven percent reported experiencing a DSM IV-defined traumatic event while in the hospital.  The most frequent events were witnessing physical assaults (22%) and experiencing a physical assault (18%).[78]  Summarizing the results of the study, the authors stated, "This study provides initial empirical support for concerns raised by consumer and advocacy groups that the psychiatric setting can be a frightening and/or dangerous environment.  In general, the results of this study indicate that mental health consumers have experienced a number of traumatic, humiliating, or distressing events during their hospitalization.  In addition, results indicate that consumers are adversely affected by these experiences."[79]

The findings of this study and the other research noted above are aligned with feedback I received from trauma survivors and mental health providers when I was Commissioner of Mental Health in Maine.  People who used public mental health systems wanted alternatives to hospitalization.

## People with Mental Illness, Like People without Disabilities, Prefer to Live in the Community

Available studies show that people with mental illness nearly universally prefer to live in integrated community settings rather than in institutions.  One article reviewed the findings of eight studies that surveyed consumers about their experiences of community re-entry following inpatient care and their preferences for hospital versus community living.[80]

The reviewed studies surveyed a total of 415 clients with severe disabilities and extended periods of hospitalization.  They lived in the U.S., the United Kingdom, and Canada.  When asked about their preference for community versus hospital living, 98% stated a clear preference for the community.  Reasons for this choice included the freedom, autonomy, mobility, privacy, safety, and proximity to friends and family that community living afforded.  Conversely, participants identified the disadvantages of hospitalization as becoming stigmatized and rejected, and the loss

---

[75] Cusak, K., et al., (May 2003) "Trauma Within the Psychiatric Setting: A Preliminary Empirical Report." *Administration and Policy in Mental Health*, Vol. 30:5, 454 [http://psychrights.org/articles/psychiatrictrauma.pdf].
[76] *Id.*
[77] *Id.* at 455.
[78] *Id.* at 457.
[79] *Id.* at 458.
[80] Davidson, L. et al., (1996) "Hospital or Community Living? Examining Consumer Perspectives on Deinstitutionalization," *Psychiatric Rehabilitation Journal*, Vol. 19:3, 51-55.

*Confidential Information, Subject to Protective Order*

of autonomy, privacy and dignity.  Given choice, people want to live in communities, surrounded by people that they choose, engaging in activities that are gratifying to them.

During the course of my career, regardless of the position, it has been my practice to talk to as many service recipients as possible, to try to ascertain their satisfaction with the services I was involved with providing.  I do not recall a service recipient who told me they preferred hospital to community living.  The same was true of my time in Mississippi.  During a meeting in March of 2018 with individuals who had used the state hospitals in Mississippi, people expressed a strong preference for community living as opposed to institutional care.  Some of their comments in this regard were:

- "Being homeless is better than being in a State Hospital"
- "People don't feel safe" [in the State Hospitals]
- "You are herded around like cattle" [in the State Hospitals][81]

The client review in this case similarly found that nearly all the sampled clients were open to receiving services in the community rather than at State Hospitals.[82]

My opinion was also confirmed by state officials who acknowledge the general preference for community living. In her deposition on March 29, 2018, Veronica Vaughn, then-Director of Adult Services for the Mississippi Department of Mental Health, addressed the issue of whether consumers prefer community living to being in the hospital.  In response to a question about whether a person would choose a community-based living arrangement over an institutional one, Ms. Vaughn responded, "I would expect them to choose the community."[83]  In response to the question, "Why would you think that a person would choose a community-based living arrangement over an institutional one?" Ms. Vaughn responded, "More freedom …it's not ideal to live in a hospital."[84]

## Mississippi Continues to Rely Heavily Upon Segregated Institutional Care for People with Mental Illness

Though Mississippi has long known that it over-relies on State Hospitals and must shift resources to the community, it has been slow to do so.  To make the necessary shift to a community-based system of care, Mississippi needs a clear vision for its community-based system, a long-term plan for realizing the vision with clear, measurable targets, effective strategies for building the community system, and strong leadership advocating for, in some cases, difficult changes.  In my experience, when service planning it is important to consider data, such as clinical evidence of need, utilization, billing, stakeholder input, cost, human capital, and available resources.  Mississippi has not taken the necessary steps to achieve a community-based system of care.

---

[81] Meeting at Opal Smith Peer Drop In Center.
[82] Email from Robert E Drake, July 25, 2018 [USDOJ-0011092].
[83] Vaughn Deposition, 29.
[84] *Id.* at 29-30.

*Confidential Information, Subject to Protective Order*

## Availability of Community-Based Services is Insufficient and Inconsistent

Since at least 2010,[85] Mississippi has funded scattered evidence-based programs essential to reducing the use of State Hospitals, but they are not available in sufficient quantity to meet existing need, and the State has failed to ensure geographic access to these services throughout the State.  A state's role in administering mental health services includes designing the service array to include necessary services, creating structures to manage the delivery, funding services, ensuring those services are available throughout the state in sufficient quantities, and providing technical assistance and oversight to manage the quality of services.

The State has been aware of the limited availability of key community-based services and lack of coverage across geographic regions of the state for many years.  For example, in a FY 2013 strategic planning exercise, the State identified inconsistencies in service availability across the state, and the implementation of evidence-based services pilot programs in isolated areas of the state as weaknesses in its community mental health system.[86]  Similarly, in 2014, the PEER Committee issued a report to the State Legislature which examined the decision by DMH and the Mississippi State Hospital to redirect resources from the hospital's Community Services Division back to inpatient care.[87]  Recognizing the inadequacy of community-based services, the report urged the State to "follow the mandates of state law," and provide core mental health services to those who need them, ensuring that such services are, "accessible and delivered preferably in the communities where these citizens live."[88]

Despite years of attention, progress toward ensuring that community mental health services are available to all has been slow.  By its own measure, DMH found that in FY 2017, 39% of the State's population continued to lack access to community based mental health services.[89]  Further, at his recent deposition, former Adult Community Services Bureau Director Andrew Day confirmed that none of the community-based services are available throughout the State.[90]

To the extent that the state fails to offer the critical array of services to people at risk of entering a State Hospital, it will continue to rely upon the restrictive setting of the State Hospital.  Medical Director Robert Maddux explained that "it's quite frequent" that an individual remains in the hospital because a discharge destination has not been identified.[91]  Currently many key services are available only in pockets of the State and/or are provided in very limited quantities.  For example, the State has developed eight PACT teams, leaving many regions without any PACT services.[92]  Similarly only four of fourteen CMHC regions have supported employment

---

[85] Charts Data for Meeting with Governor, 7.17, 3 [MS-00015033].
[86] DMH, SWOT 2, Weaknesses, 3 [MS-00014902].
[87] PEER, A Review of the Closure of the Mississippi State Hospital's Community Services Division, 2014 [USDOJ-0000338].
[88] *Id.* at 51.
[89] DMH, FY18 Performance Measures, 1 [MS-00017889].
[90] Day Deposition, 69.
[91] Maddux Deposition, 147.
[92] DMH, *supra* note 89 at 1.

*Confidential Information, Subject to Protective Order*

for people with mental illness,[93] and the CHOICE permanent supported housing program does not serve individuals in every region.[94]  Making these critical services available to people who are in or at risk of entering a State Hospital is central to reducing the State's reliance on institutionalization.

Examples of the insufficiencies in the current service array follow.

      1.   Crisis Services

Mobile crisis has been a Medicaid billable service in the State since 2012 and all community mental health center regions also receive grants for this service.

Nonetheless, the service is provided unevenly.  I learned from a former mental health center employee in one region that because of where the mobile crisis team is based within the region, it only responds to crises in one of the covered counties.[95]  The disparate service availability is also demonstrated by the data on the number of people who received any mobile crisis service by region.  In all of 2017 one CMHC region provided only 17 after-hours mobile crisis responses and only 170 mobile crisis responses total, while another region provided 381 after-hours mobile responses and 7,552 total.[96]  One region provided only 22% of its crisis responses face to face.[97]  And all the regions I spoke with primarily offer "mobile" crisis services at their offices during normal business hours.[98]  In effect, many regions are primarily providing walk-in crisis services in place of mobile teams.  Mobile, face-to-face crisis response is a critical, front-line service that can reduce inpatient utilization and should be expanded.

The State is not maximizing the Medicaid reimbursement for this service and is instead supporting the service almost exclusively with State grant dollars.[99]  In fiscal year 2017 the State reported that 15,668 people received face-to-face mobile crisis services, but in calendar year 2017 the two Medicaid managed care companies paid for a total of 817 people to receive the crisis response service.[100]  Billing varied widely by CMHC region—in 2017 two regions received no managed care funds for this service.[101]  This was especially surprising because the crisis response database shows 7,012 mobile crisis contacts with people on Medicaid.[102]  While some State funding will always be necessary to pay for start-up costs and crisis services to those

---

[93] DMH, Community Expansion Funds, 2016, 2 [USDOJ-0000889].
[94] Meeting with MUTEH; Mississippi's Annual Affordable Housing Conference 2018, All Aboard: Reaching the Special Needs Population, Map of Counties Served, 20 [USDOJ-0008426].
[95] Call with Chancery Court Clerk, May 1, 2018.
[96] Mobile Crisis Response Team Data Report, Southwest MS Mental Health Complex [USDOJ-0011208]; Mobile Crisis Response Team Data Report, Region 8 Mental Health Services [USDOJ-0011170].
[97] Mobile Crisis Response Team Data Report, Singing River Services [USDOJ-0011247].
[98] CMHC Interviews.
[99] DMH, *supra* note 1 at 4.
[100] *Id.*; Berkeley Research Group, Analyses for Systems Expert [USDOJ-0008432]; Email from Berkeley Research Group, July 26, 2018.
[101] *See* Berkeley Research Group, Analyses for Systems Expert [USDOJ-0008432].
[102] Mobile Crisis Response Team Data Report, Summary [USDOJ-0010910].

*Confidential Information, Subject to Protective Order*

who are uninsured, it appears that the State is not requiring or incentivizing providers to maximize Medicaid reimbursement for crisis response.

Crisis residential services and stabilization units likewise are available only in parts of the State, although regions without crisis residential are currently growing that service.[103]   The State has recognized that, like mobile crisis services, crisis residential services decrease reliance on inpatient care, explaining that CSUs "offer time-limited residential treatment services designed to serve adults with severe mental health episodes that if not addressed would likely result in the need for inpatient care."[104]   Over 3,100 people were served in the eight existing CSUs in FY 2017, with average lengths of stay of 9.53 days.[105]   Like the mobile crisis service, these also are primarily, unnecessarily funded by DMH grants despite being Medicaid reimbursable.[106]   The two Medicaid managed care companies paid for only 433 people to receive the crisis residential service in 2017.[107]   Maximizing Medicaid reimbursement for crisis services, among others, could increase State funds available for additional community-based services.  And reducing lengths of stay in CSUs would increase availability of beds to divert additional people from State Hospitals.

### 2.   PACT and Intensive Case Management

In Mississippi, there are currently eight PACT teams.  The teams are based in Greenwood, Vicksburg/Yazoo, Hattiesburg, Gulfport/Biloxi, Jackson, DeSoto, Tupelo, and Meridian and served a total of 387 people in fiscal year 2017.[108]   Though one of the tasks of PACT team members is to assist people receiving PACT services with enrolling in benefits, the two Medicaid managed care companies paid for PACT services for only 123 people in 2017.[109]   There was also variation in billing across the regions who provide PACT, with one region only receiving payment for 4 PACT recipients.[110]   This is particularly surprising because PACT is provided to people with severe symptoms who have not benefitted from traditional outpatient treatment[111] and who therefore are more likely to be eligible for Medicaid than the general population of individuals with mental illness.  Also surprising was the lack of intensity of service for those who were receiving PACT; the average number of units of PACT that people receiving the services from one of the managed care organization was 48 units per year, while the average number of units for the other one was 165.[112]   While some PACT recipients certainly taper their

---

[103] Allen Deposition at 42-43; DMH Executive Staff Meeting, April 18, 2018 [MS 00144800].

[104] DMH, *supra* note 1 at 17; *See also* Day Deposition at 103, 192.

[105] *Id.*; DMH, *supra* note 4 at 9.

[106] *See id.*

[107] Berkeley Research Group, *supra* note 101.

[108] DMH, *supra* note 1 at 5.

[109] Berkeley Research Group, *supra* note 101.

[110] *Id.*

[111] DMH, *supra* note 10 at 205.  There are ways for the State to do this without discouraging CMHCs from providing PACT to the uninsured.  For example, the State could require the teams to provide evidence for each grant funded PACT recipient that they are seeking Medicaid eligibility or that there is a reason the individual is ineligible for Medicaid.

[112] Berkeley Research Group, *supra* note 101.  Because the amounts paid by both managed care organizations is similar, it may be that one of the managed care organizations uses 15 minute increments as the "unit" for measurement, while the other organization counts the units in hours.

intensity of service over time, it is surprising that Medicaid paid for so few units for the average recipient.

Not only has the State failed to maximize Medicaid reimbursement for PACT, the State has also failed to utilize all the PACT resources that are currently in place.  In total the eight existing teams could serve up to 640 people, but three years after the newest team formed they are nowhere near capacity.  Given that 743 people had multiple State Hospital placements between 2015 and 2017, it is difficult to understand why so few people are receiving the limited PACT services currently available.[113]  The State does not appear to be incentivizing referrals to the service either, given the low goals for referrals in the State Hospital goals submitted to the Legislative Budget Office.[114]

Intensive case management could be provided in Mississippi through the Community Support Service, though it is not currently provided as an intensive service.  While the maximum number of units a person can currently receive under fee-for-service Medicaid in Mississippi is 400 15-minute increments per year,[115] in 2017 the average number of units one managed care organization actually paid for was 15 and the average for the other managed care organization was 65.[116]  In effect, case management is provided as a monthly check, insufficient support for many people who have experienced mental health crises and institutionalizations.

### 3. Peer Support

Peer support was established in Mississippi in 2012 and there are now 159 certified Peer Support Specialists.[117]  Nonetheless, in two regions fewer than five people received peer support through managed care in 2017.[118]

### 4. Supported Employment

In Mississippi, this service has been offered through grants in four regions since 2015.  In fiscal year 2017, 116 people achieved paid competitive employment through the supported employment service.[119]  While this is currently a Medicaid service for people with intellectual disabilities in Mississippi, the State is funding the service for people with mental illness exclusively using federal grants and State dollars.  DMH leadership indicated that they hoped to work with DOM to fund the service through Medicaid in the future, but have yet to do so.[120]

---

[113] Descriptive Statistics, Expert Report of Todd MacKenzie.

[114] *See* LBO Program Performance Indicators and Measures, 11-17 [MS-00012444].

[115] Medicaid, Billing Guidelines for Community Mental Health Services [https://medicaid.ms.gov/wp-content/uploads/2014/03/CommunityMentalHealthCenter.pdf].

[116] Berkeley Research Group, *supra* note 101.  Again, the organizations may be counting units differently, with one using 15-minute units and the other using one-hour units.

[117] DMH, *supra* note 1 at 7.

[118] Berkeley Research Group, *supra* note 101.

[119] DMH, *supra* note 4 at 9.

[120] Hutchins Deposition, 148-49.

### 5.   Permanent Supported Housing

After engaging the Technical Assistance Collaborative to assist the State in designing a Permanent Supported Housing Program,[121] in 2016 Mississippi launched its CHOICE Program.[122]  Through CHOICE, the State provides supported housing through a combination of subsidies and housing supports to people with serious mental illness, particularly those who are transitioning from a State Hospital.  As of March 2018, however, CHOICE had housed only 311 people, though Mississippi Home Corporation leadership has estimated that the number of units that would bring Mississippi in line with national trends is 2,600 units.[123]  The average annual cost of serving a person on CHOICE is $8,015 per person.[124]  While the program is technically available statewide, there are some regions where no one is receiving the service.[125]  Leadership at one mental health center I spoke with were not even aware that the program was available.[126]

The CHOICE program was established as a bridge subsidy with the goal of transitioning subsidy recipients onto a federal housing voucher, into a long term affordable housing placement, or into independence within one year.  While that is a laudable goal and many people will be able to transition off the voucher in that time, some people will need longer term assistance and will be unable to access a federal voucher.  Increasing flexibility in the program to meet the needs of the small group that continues to need a subsidy after one year is critical to achieve the goal of maintaining people in the community.

### 6.   Insufficient Core Service Array

The State should redefine the essential core services and determine needed additional capacity for each service category.

The inconsistency of service provisions across regions is enabled by DMH's requirements for Community Mental Health Centers (CMHCs).  Each CMHC is required to provide the following "core" adult mental health services in every county of the CMHC's catchment area: Outpatient Therapy; Community Support Services; Psychiatric/Physician Services; Crisis Response Services; Psychosocial Rehabilitation; Inpatient Referral; Pre-Evaluation Screening for Civil Commitment (required only for centers operated by regional commissions est. under MCA Section 41-19-31 et seq.); Peer Support Services; Targeted Case Management Services; and Support for Recovery/Resiliency Oriented Services.[127]

On the one hand, DMH does not currently consider key services such as PACT and supported employment to be core services for adult mental health, so CMHCs are not required to provide them.  On the other hand, the State includes PACT services as a rehabilitative service under its

---

[121] MAC, Housing Report, April 2014 [MS-00001223].
[122] Mississippi CHOICE NCSHA Presentation, 2 [MHC-00013231].
[123] Mokry Deposition, 71, 139-42.
[124] Mississippi CHOICE *supra* note 122 at 8-9; Mokry Deposition, 165-66.
[125] Reaching the Special Needs Population, *supra* note 94.
[126] Meeting with Region 15 CMHC Leadership.
[127] DMH, Operational Standards, July 2016, 11 [http://www.dmh.ms.gov/wp-content/uploads/2016/06/Final-2016-Operational-Standards.pdf].

*Confidential Information, Subject to Protective Order*

Medicaid State Plan[128] and Medicaid rules require that State Plan services be available statewide.[129]  Because neither DOM nor DMH has ensured that all CMHCs in the State provide PACT services, PACT coverage is patchy and currently offered by only 8 of 14 CMHCs (and even then, sometimes only in part of the region served by the CMHC).[130]

The State has long been aware of the need to expand core services to ensure statewide coverage of the services that are most effective at reducing the need for hospitalizations.  In 2013, DMH conducted a survey of community mental health services stakeholders as part of a legislatively established Best Practices Committee.[131] The results indicated that the providers, consumers, and family members who interact with Mississippi's community mental health system want to see the expansion of core services to include PACT, supported employment services, transportation, permanent supported housing, and additional crisis services.  Nonetheless, the core service array remains inadequate.

## Mississippi Has Long Known it Must Shift Resources to the Community

Ten years ago, the PEER Committee report reaffirmed the need, identified in the MAC Plan, to focus resources on serving people in the community.[132]  Summarizing its findings, the PEER Committee stated, "Although the mental health environment in the United States has dramatically changed from an institution based system to a community system in recent years, Mississippi's mental health system has not reflected the shift in service delivery methods."[133] Addressing the funding issue, it continued, "The board [of mental health] has not aggressively sought plans for reallocation of resources to meet emerging needs, in addition to efforts to seek additional funding to meet those needs."[134]

In response, the Department of Mental Health incorporated the goal of shifting funds from the hospitals to the community in its first strategic plan in 2010.[135]  However, the State failed to actually shift any funds from the State Hospitals to community services until 2018, nearly two years after the Department of Justice filed this lawsuit, ten years after the PEER report, and nearly twenty years after the development of the MAC plan.[136]  And the community services remain under-funded.

## Mississippi Has Not Executed an Effective Plan to Shift Resources and Reduce Reliance on Hospitalization

During the 2001 Regular Session, the Mississippi Legislature passed House Bill 929, which provided for the development of a comprehensive Olmstead Plan to address the needs, service

---

[128] Medicaid, State Plan, 17 [https://medicaid.ms.gov/wp-content/uploads/2014/01/SPA2012-003.pdf].
[129] 42 CFR 431.50.
[130] Charts Data for Meeting with Governor, 7.17, 3 [MS-00015033].
[131] DMH, Summary of Findings, [MS-00017178].
[132] PEER, *supra* note 39 at cover page.
[133] *Id.*
[134] *Id.*
[135] Mississippi Board of Mental Health & DMH, FY2010-2020 Strategic Plan, 3 [USDOJ-0001457].
[136] Bailey Deposition, 25-26; Allen Deposition, 40.

options, and service settings for persons with disabilities.[137]   The goal was to have community-based services available by June 30, 2011, for all persons for whom such services were deemed appropriate.[138]

The plan, called the Mississippi Access to Care (MAC) Plan, identified changes needed to create a service delivery system that allows individuals with disabilities to live and work in the most integrated setting of their choice, including data collection and transition from an institutional care model.[139]

The State issued a report on progress toward implementing the MAC Plan in 2003, indicating that the plan had not been implemented.[140]   The State's PEER committee again reported that the State had not implemented its Olmstead Plan as of 2008.[141]   When asked at his June 2018 deposition if the State has an Olmstead plan, the current Deputy Executive Director of the Department of Mental Health testified, "I've never seen one."[142]

In recent years the State has established MAC 2.0, a committee run by the Division of Medicaid.[143]   In 2016 that committee released a report on community services that the Department of Mental Health and Division of Medicaid were providing.[144]   However, the report did not lay out any plan or next steps for meeting the stated goal of serving people in the most integrated setting appropriate.[145]

Apart from this limited Olmstead planning, the Department of Mental Health has engaged in a regular strategic planning process since 2010.   However, the strategic plans do not serve as effective tools for moving the system.   Many of the dozens of objectives, outcomes, and strategies included in the plans lack specific, measurable targets.[146]   For those objectives without measurable targets, the program leader responsible for the goal simply determines whether, in their judgement, the State is "on track" to meet the objective for progress reports.[147]   And there are no guidelines for selecting the targets that do exist.[148]   These facts reduce the utility of the plan as a measure of success.   Worse, in the past where a specific target for reducing readmissions by 2% was included and then the State did not meet the target, rather than problem

---

[137] Mississippi Access to Care, 3 [MS-00013155].

[138] *Id.* at 8.

[139] *Id*. at 13-17.

[140] Mississippi Access to Care, Implementation Report #1, May 30, 2003, 1 [MS-00013151].

[141] PEER, *supra* note 39 at 32.

[142] Allen Deposition, 164.

[143] Mississippi Access to Care, Plan Update, May 12, 2016 [MS-00001234] [hereinafter, MAC 2.0 Update].   In fact, DMH leadership could not even clearly articulate what MAC 2.0 was.   Vaughn Deposition, 18.

[144] MAC 2.0 Update [MS-00001234].

[145] *Id.*

[146] Mississippi Board of Mental Health, *supra* note 40 at.11-18.

[147] Bailey Deposition, 92-93.

[148] Bailey Deposition, 80; Hutchins Deposition, 184-87.

*Confidential Information, Subject to Protective Order*

solving and continuing work to meet the goal, DMH removed the target from future plans.[149]
Overall, the plan fails to set out a clear vision for what the mental health system should look like
and fails to identify the key, measurable metrics that will indicate whether the State has realized
the vision.

## Mississippi Does Not Effectively Coordinate Admissions and Discharges to Prevent Hospitalization and Readmission

DMH's structure, policies, and budgeting do not support an integrated system designed to meet
the mental health needs of its citizens. To prevent unnecessary hospitalizations, hospitals and
community providers must work as a unified, well-managed system of care, not as monolithic
entities, each pursuing a clinical course that is unrelated to others. A public health approach is
designed around one agency taking responsibility for the care of its clients throughout their
treatment. Case management and care planning are continuous and a unified treatment team
designs the care for an individual. When there is a single point of responsibility, providers
cannot "pass the buck" as the person receiving care moves through the system.

Once a single responsible entity has been identified, incentives, including additional funds for
community providers, can be built into the system to prevent hospitalizations. If, in spite of
efforts to divert a person from the hospital, the individual is ultimately admitted, the responsible
entity ensures that the hospital team is informed about the treatment plan and the events that
precipitated admission. They work in partnership with the hospital staff to ensure that the
inpatient clinical work is targeted to specific goals in the ongoing treatment plan, and that the
individual is returned to the community as quickly as possible. Entity staff continue to work
with the individual and identify any changes that are necessary to services the individual will
receive in the community. They then prepare services that are needed before discharge and
begin to support the person immediately after they leave the hospital. With clear accountability
vested in one entity, people can be diverted or quickly discharged from inpatient care and can
avoid the proverbial cracks in the system.

The structure within DMH does not facilitate integrating State Hospitals with community
providers. This was starkly highlighted in the deposition of the director of the East Mississippi
State Hospital, who testified that he views the role of the Hospitals in the transition process as
being "to get [patients] in contact with the community mental health center as a good, you know,
'here they are.' You know, 'we've stabilized them, this is the medication that they're on.'"[150]
Another indication of this lack of integration is that oversight for the State Hospitals and
community providers is assigned to two different Bureaus.[151] Budgeting for mental health
services is done individually for each Hospital, with a separate lump sum budget for the
community services that DMH funds.[152] And while the CMHCs are required to screen people

---

[149] *Compare* Mississippi Board of Mental Health, FY2017-FY2019 Strategic Plan, 10
[http://www.dmh.ms.gov/wp-content/uploads/2016/07/FY17-FY19-DMH-Strategic-Plan-Final.pdf] *with*
DMH, End of Year Progress Report FY16-FY18, 1 [USDOJ-0001475].
[150] Carlisle Deposition, 151.
[151] DMH, Organizational Chart FY2019, 2 [MS-00145436].
[152] *See* LBO, Consolidated Budget Request FY2019, 9-3, 9-8, 9-14, 9-15 [MS-00012444].

*Confidential Information, Subject to Protective Order*

for admission to the State Hospitals,[153] they are not required to participate in discharge planning and are not compensated for participating to the extent that they do.[154]  In fact, in 2017 only 20% of Mississippi State Hospital patients were visited by a CMHC representative before discharge.[155]

Mississippi's coordination between State Hospitals and community providers both on admission and in preparation for discharge fails to promote quick return and effective reintegration into the community.  State Hospital staff do not work to divert people from Hospitals, even when they have no beds available.  One social worker testified at her deposition that she does not work with CMHCs or courts to identify alternatives to commitment.  She explained, "My work with them starts once they are admitted. Nothing prior."[156]

Currently, while community providers are required to screen people prior to civil commitment, they are not routinely included in the intake process when people enter the Hospitals.[157]  Because the outpatient treatment plan is not used as a basis for hospital treatment, Hospital clinicians are deprived of the insight that their community providers can offer.  Even though community providers and the State Hospitals both submit data about clients into the State's Central Data Repository, the Hospitals cannot use it to determine whether a person who is admitted was previously receiving community services.[158]  This may delay the successful treatment and resolution of a crisis.  Further, Hospital clinicians, unconnected with the realities of the community-based providers, often start patients on medications that are unavailable or unaffordable in the community.[159]  Upon release, if the person cannot afford the medication, he will stop taking it soon after discharge, decompensate, and end up back in the hospital.  And until a few months ago, when individuals receiving Medicaid entered a State Hospital, their benefits were terminated, rather than being suspended, resulting in delays to accessing services upon discharge.[160]  Coordination of treatment for those who enter a State Hospital could reduce lengths of stay and decrease the chance of readmission.

Mississippi is also failing to conduct effective discharge planning with warm hand-offs to ensure that people who leave the Hospitals are connected to the services they need immediately.  For example, the Social Services Director at East Mississippi State Hospital explained that the Hospital's role in coordinating care at discharge is "limited."[161]  Hospital staff merely "make the

---

[153] DMH, *supra* note 10 at 11 (Rule 3.1.A.1.g).

[154] CMHC Interviews; *see also* Fleming Deposition, 190-91.

[155] MSH, Strategic Plan Report FY2017, 11 [MS-00019983].

[156] Newbaker Deposition, 34.

[157] CMHC Interviews.

[158] Jones Deposition, 35 ("Q. Can a State hospital use information from the CDR to determine whether a person has received services from a CMHC before being admitted to the State hospital? A. Not at this time.")

[159] CMHC Interviews.

[160] Interagency Agreement Between the Division of Medicaid in the Office of the Governor State of Mississippi and the Mississippi Department of Mental Health (Eligibility), April 23, 2018 [MS-00144829].

[161] Newbaker Deposition, 182.

referral to the community mental health center."[162]  The only coordination they do after discharge is collecting information on whether the referred patient attended his appointment.[163]  Outpatient clinicians are not included in discharge planning, and at times, are not notified of discharges until they have already occurred.[164]

Taking a systems approach to managing care, in place of siloed services, can prevent admissions, reduce lengths of stay in Hospitals, and reduce the likelihood of readmissions.

## Mississippi Has A Relatively Low Level of Investment in Its Community-Based System

Mississippi's heavy reliance on State Hospitals is reflected in the proportion of the State's mental health spending that is invested in State Hospitals as compared to community services.  Across the country, states have drastically reallocated funds, focusing funding on community services.  States often expand community-based services and reduce hospital beds, moving resources to the community before and as units close.  That is the approach that I took as a state mental health administrator to ensure that people who are no longer served in the state hospital system are receiving sufficient supports to avoid institutionalization.  Unfortunately, while the State Hospital budgets in Mississippi were reduced in recent decades as beds closed, that money was cut from the DMH budget rather than being shifted to the community.[165]

While it still invests a relatively low proportion of State funds in community services, Mississippi has continued to invest significant resources in new State Hospital buildings.  After building North and South Mississippi State Hospitals, the State invested in new units at Mississippi State Hospital, and East Mississippi State Hospital is currently undergoing a complete rebuilding at a cost of at least 31 million dollars.[166]  Rather than consolidating with other State Hospitals because of deteriorating building conditions at East Mississippi State Hospital, the State invested in new construction that was still ongoing when I visited.

Previously, the Legislative PEER Committee report had found,

> Although Mississippi's expenditures for community-based services for mental illness have increased, the rate of increase has been much slower than the nationwide rate of increase.  In FY 1983, 31% of Mississippi's expenditures were for community-based care.  By FY 2005, community-based services had increased to 44%, but this increase is a much smaller rate or increase than the national average.  From FY 1983 to FY 2005, the nationwide average for expenditures for community-based services for mental illness had increased from 35% to 70%. In FY 2005, Mississippi had yet to follow the national trend set fifteen years ago [in 1993], of devoting the majority of its mental health expenditures to community-based service."[167]

---

[162] *Id.*
[163] *Id.* at 188-89; *See also* Wuichet Deposition, 84-85.
[164] CMHC Interviews.
[165] DMH, Letter from Edwin LeGrand to Angela Ladner, December 8, 2010 [MS-00015331].
[166] *Id.*
[167] PEER, *supra* note 39 at 29.

*Confidential Information, Subject to Protective Order*

An examination of fiscal expenditures for mental health services in the United States shows that Mississippi is out of step with the rest of the country in the way that it apportions its service dollars.  In Fiscal Year 2015, State Mental Health Authority expenditures totaled more than 43 billion for the 50 states, the District of Columbia and Puerto Rico.  Including the federal Medicaid matching funds for community-based care, nationally 75% of the expenditures were for community services; 22% for state psychiatric hospitals; and 2.4% for administration, research and training.[168]  The average percentage of state expenditures supporting state hospitals was 28%.[169]  In Mississippi, only 61% of the State Mental Health Authority (DMH) expenditures were spent on community-based services and 37% went to support the State Hospitals.[170]

Though they are indicative of the mismatch between Mississippi's spending and its stated priorities, the numbers above disguise the true concentration of Mississippi's institutional spending.  The calculations above include the generous federal contributions to Mississippi's Medicaid services.[171]  For 2017, Mississippi calculated that, excluding the federal Medicaid contributions, only 35.65% of its mental health spending went to community-based services.[172]

In my experience managing the mental health systems in two states, I learned that the reallocation of resources is the key strategic challenge to successfully growing community systems of care.  Resources are finite in every state and it will always be a challenge to find additional resources to devote to the funding of community programs.  But, generally, those resources go farther outside the gates of the state hospital.  Necessary reforms are possible because programs like PACT, Crisis Stabilization Units, and Mobile Crisis Teams can replace much of the role historically played by state hospitals.  As noted above, whenever the State moves dollars from a State Hospital that does not receive Medicaid reimbursement to community services that are covered under Medicaid, those dollars generate four times the buying power.  Part of the challenge for departments of mental health is the need to educate key stakeholders, including legislators, about their ability to reduce reliance on hospitals by building up community services.  The State is well-positioned to expand community services by shifting resources and maximizing federal contributions to the system.

## Mississippi Has Maintained A Relatively High Number of State Hospital Beds

Since 1950, state hospital beds nationally have been cut to less than 10% of the peak number.[173]  As of 2014, there were about 20,000 people in state and county psychiatric hospitals across the

---

[168] NRI SMHA Expenditures FY 2015 Table 7 [USDOJ-0008429].

[169] *Id.*

[170] *Id.*

[171] Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2017 Through September 30, 2018, Federal Register, Vol. 81, No. 220, [https://www.federalregister.gov/documents/2016/11/15/2016-27424/federal-financial-participation-in-state-assistance-expenditures-federal-matching-shares-for].

[172] Recalculation for Anna using FY17 Revised [MS-00119098].

[173] Lutterman & Manderscheid, *supra* note 26 at slide 10; Lutterman, T., et al. (Sept. 7, 2010) Funding and Characteristics of State Mental Health Agencies, HHS Pub No (SMA) 09-4424.

*Confidential Information, Subject to Protective Order*

country.[174]  Despite some bed closures at its State Hospitals since 2000, Mississippi had over 18 beds per 100,000 State residents in 2014, among the highest in the country.[175]  The fact that Mississippi State Hospital still has nearly 100 continuing care beds and a medical surgical unit is particularly noteworthy and unusual.  In fact, the Medical Director of DMH testified at his deposition that over a year ago he had consulted with Hospital clinicians and determined "if the appropriate settings were available in the community for [the continuing care] population, that 50 percent or better of these patients could be served in the community."[176]  Across the country, long term treatment beds are typically reserved for difficult forensic cases, while individuals who have complex medical needs arise while  in a state hospital are usually transferred to a community hospital to have those needs addressed.

While some acute psychiatric capacity is necessary, my experience in other states shows that states need fewer beds when effective crisis and community-based services are available.  Even Mississippi now seems to acknowledge that it can continue to reduce its inpatient capacity.  When asked at his deposition if he believes that an "increase of community-based services will decrease reliance on the State hospitals," DMH Deputy Executive Director Steven Allen answered, "Yes."[177]  For the first time this year, the DMH strategic plan includes a goal of decreasing admissions by 10%.[178]  While an important start, DMH leadership acknowledged that this was selected because it was deemed a very achievable goal—"a low benchmark"—for the first year and not a long term goal.[179]  Mississippi should continue to move resources to the community to support the expansion of intensive services, which will enable it to decrease its State Hospital beds.

The shifts in capacity nationally accompanied a changed approach to mental health treatment.  A report by the National Association of Mental Health Program Directors in 2017 found that "the state mental health [agencies] … have drastically reorganized their approach[] to providing care over the past 44 years, shifting resources and workforce to focus on delivering community-based outpatient services that have included intensive evidence-based services, such as Assertive Community Treatment (ACT), designed to reduce the need for intensive inpatient services."

Fear of insufficient psychiatric inpatient capacity has recently been a theme in the media and has been evident in Mississippi.[180]  In my experience, this fear is proven to be unfounded when effective community-based services are available.

---

[174] This does not include forensic patients who are in the hospital for competency restoration or because they have been found not guilty by reason of insanity.  Lutterman & Manderscheid, *supra* note 26 at slide 19.

[175] *Id.* at slide 31.

[176] Maddux Deposition, 32.

[177] Allen Deposition, 26.

[178] Mississippi Board of Mental Health, *supra* note 40 at 11.

[179] Allen Deposition, 29

[180] DMH, *supra* note 165.

*Confidential Information, Subject to Protective Order*

## DMH and DOM Could Exercise Their Authority to Shape an Effective Community-Based Mental Health System

DMH and DOM do not use the tools at their disposal to create the community-based mental health system they say they want.  As a service administrator, I used tools including data, regulation, funding incentives, and coordination across agencies to move strategically toward an effective community-based service system.

The two agencies conduct limited data analysis and data sharing.  To the extent that they do collect and share data, the agencies do not use that data to drive decisions.[181]  In fact, while DOM regularly provides data to DMH on Medicaid utilization, no one at DOM reviews that data to guide its actions and DMH leadership also does not review the data.[182]  DOM also collects robust data sets on its behavioral health services from its managed care organizations, but does not use that information to drive its mental health service system.[183]  While DMH has occasionally run analyses of how much money it allocates to institutions as compared to community services, those assessments are often completed in response to an external request rather than as a regular management tool.[184]  Further, Hospital leadership does not use the data they collect for strategic planning on issues such as readmission to guide program development and decision-making.[185]

DMH and DOM both take a limited view of their authority, in spite of the powers that they actually have.[186]  DMH does not require providers to take steps that could increase provision of services, such as maximizing Medicaid enrollment and billing, fully enrolling their PACT teams, referring clients for CHOICE, and participating in discharge planning from State Hospitals. These are the types of requirements that I would have imposed on providers in my time as a state mental health administrator.

---

[181] *See* Jones Deposition, 48-49, 69-70.
[182] Toten Deposition, 22-23; Hutchins Deposition, 45; *see also* Allen Deposition, 77-78.
[183] Toten Deposition, 109.
[184] *See* Allen Deposition, 69; Bailey Deposition, 217-18; Breland Deposition, 137.
[185] Carlisle Deposition, 146.
[186] *See* Allen Deposition, 45, 61. "They have an executive director, they have a board. It's their agency. And I don't feel like I can tell them what to and what not to do."

*Confidential Information, Subject to Protective Order*

# Providing Services in the Community Is Typically Less Expensive for States than Relying on Institutional Care and this Holds True in Mississippi

## State Hospital Costs and Financing

Serving people in the community is typically less expensive for states than serving those individuals in hospitals because of the high cost of hospital care and because federal funds can be leveraged to support community services.

As is the case elsewhere, the per diem costs for hospital care in Mississippi are much higher than for community care.   In FY 2017, according to the State's calculations, per diem costs for the State Hospitals ranged from $419-$522 per person per day.[187]   Using these numbers, cost for a full year in the State Hospitals ranges from $152,935 to $190,530.   Based on the State's reported average lengths of stay and costs per day for acute beds in 2017, the average costs for acute stays in the State Hospitals were as follows:

| Hospital | Average Length of Stay | Cost Per Day | Average Cost |
|----------|------------------------|--------------|--------------|
| EMSH | 40 days | $522 | $20,880[188] |
| MSH | 38 days | $422 | $16,036[189] |
| NMSH | 32 days | $419 | $13,408[190] |
| SMSH | 24 days | $466 | $11,184[191] |

These represent costs for one stay of average length in the acute psychiatric units at the State Hospitals, as reported by the State.  However, this does not take into account the fact that during the two-year period reviewed, October 2015 - October 2017, 743 patients had more than one admission, with 82 individuals having four or more admissions during the two year period.[192] These people would have cost the State more than the cost of an average stay.  This also does not take into account the differences in the cost per stay between units at a given hospital and the different sizes of those units.   Because State Hospitals generally do not receive Medicaid funds, these stays are financed almost entirely with state dollars.

## Community Services Costs and Financing

---

[187] Interrogatory Responses [MS-ROGS-00000127, MS-ROGS-00000162].
[188] Interrogatory Responses [MS-ROGS-00000127]. Note that this is an average of the 47-day average length of stay in the male receiving unit and the 23-day average length of stay in the female receiving unit.  This is a straight average though there was heavier male representation, so it is a low estimate.
[189] Interrogatory Responses [MS-ROGS-00000144].
[190] Interrogatory Responses [MS-ROGS-00000162].
[191] Interrogatory Responses. [MS-ROGS-00000166].
[192] Descriptive Statistics, Expert Report of Todd MacKenzie.

*Confidential Information, Subject to Protective Order*

States have successfully used a variety of strategies to finance the expansion of community-based services.  The largest shift in the past 50 years has been an increased reliance on Medicaid funding for mental health services.  When state hospitals were the primary providers of mental health services, state and local dollars funded care.  After the policy shift towards community care in the 1960's and the establishment of Medicaid, there has been a steady shift of funding, from states to the Federal Government.[193]  In Mississippi, the federal government pays 75.65% of each dollar spent on Medicaid services for Medicaid beneficiaries.[194]  Mississippi's Federal Medical Assistance Percentage (FMAP) is the highest in the nation.[195]  Therefore, state dollars can buy more services when used to leverage federal Medicaid funding for community services.

To effectively leverage federal Medicaid dollars, individuals who are eligible for Medicaid must be enrolled.  It is particularly challenging for individuals with serious mental illness to successfully navigate the Medicaid and social security disability application process.  The support of a person's treatment professional in that process can make the difference between expedited approval or years of appeals.  By ensuring that individuals have the benefits assistance they need, often provided by case managers, community support specialists, and hospital-based social workers, the State can draw down federal funding for community-based services.

The State has nonetheless emphasized State grants for key services like PACT and crisis services.  Rather than using data on Medicaid billing to assess the ability to reduce grants for Medicaid billable services like PACT, DMH has provided the same grant funding year after year.[196]  State grant dollars have not been used as startup funds and to fill gaps for the uninsured, but have instead been ongoing, primary funding streams.

Instead, services could be paid for through Medicaid for eligible individuals.  PACT, for example, which is the highest intensity service provided in the community, has a Medicaid rate of $27.50 per 15 minute unit in Mississippi, with a maximum number of 1600 units, or 400 hours of PACT service per year.[197]  For Medicaid recipients, the federal government matching payment would cover 75%, or $33,000 of the $44,000 annual cost of PACT services if the maximum number of units were provided. The State would contribute $11,000 in state dollars for a full year of services.  During 2017, Mississippi's Medicaid managed care providers paid for 123 individuals to receive PACT services.[198]  While it is troubling that only 123 individuals were provided PACT through Medicaid managed care, because it would seem to suggest an under-

---

[193] Kaiser Family Foundation, "Mental Health Financing in the United States: A Primer", April 2011, 8 [https://kaiserfamilyfoundation.files.wordpress.com/2013/01/8182.pdf]; Health Affairs, "Accomplishments and Challenges in Medicaid Mental Health", Oct. 2008, 22 (5), 76 [https://www.healthaffairs.org/doi/10.1377/hlthaff.22.5.73].
[194] Kaiser Family Foundation, Federal Medical Assistance Percentage FY 2018 [https://www.kff.org/medicaid/state-indicator/federal-matching-rate-and-multiplier/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D].
[195] *See id.*
[196] *See* DMH, Program Performance Indicators and Measures FY2019, 11-2 [MS-00012444].
[197] AMA, Fee Schedule, 2 [https://medicaid.ms.gov/wp-content/uploads/2014/03/CommunityMentalHealthCenter.pdf]; AMA, Administrative Code, 27 https://medicaid.ms.gov/wp-content/uploads/2014/10/AdminCode-Part_206.pdf].
[198] *See* Berkeley Research Group, *supra* note 101.

*Confidential Information, Subject to Protective Order*

utilization of services or under enrollment in Medicaid, at the rate of $27.50 per hour, the State share to provide these services to all these individuals came to $137,401.[199]

The cost-differentials seen with PACT services are typical for all key community-based mental-health services.  For example, for individuals not needing the full array or intensity of services offered through PACT, community support services might be used to provide intensive case management, possibly in conjunction with other services like therapy, medication management, and peer support.  Community support services cost $14.88 per 15-minute unit, and are limited to 400 units per year.[200]  For Medicaid recipients using the maximum units of service, the federal government matching payment would cover 75%, or $4,464 of the $5,952 annual cost of community support services. The State would contribute only $1,488 in state dollars for a full year of services.

Another key service, mobile crisis, also known in Mississippi as "crisis response services" provides 24/7 assessment, stabilization, and treatment of a person in mental health crisis, and is aimed at preventing hospitalization.[201]  Crisis response services cost between $21.88 and $30.00 per 15-minute unit depending upon whether the response is by phone or in-person, and are limited to 224 units per year.[202] For Medicaid recipients using the maximum units of service, the federal government matching payment would cover 75%, or $5,040 of the $6,720 annual per person cost of crisis response services. The State would contribute only $1,680 in state dollars for the maximum number of crisis response services afforded in one year.  During 2017, Mississippi's Medicaid managed care providers paid for crisis response services for 817 individuals.[203]  The State share to provide these services to all 817 individuals came to $41,965.[204]  Once again, the low rate of service utilization for crisis services is surprising given that these services are fundamental to keeping individuals out of hospitals, and are so much less expensive than putting people into State hospitals.

The State has recently recognized that even relatively expensive community-based services are a cost effective way to serve people with mental illness who have remained in the Hospital for lengthy periods and are challenging to serve in the community.  Recently, the State began transitioning some individuals from the continuing stay unit of Mississippi State Hospital to small staffed homes at a cost of over $200 per person per day.[205]  Currently the full cost is borne by the State, but DMH is exploring opportunities to use a Medicaid waiver to support this population in the community.[206]

---

[199] *See id.*
[200] AMA, Fee Schedule, 3 [https://medicaid.ms.gov/wp-content/uploads/2014/03/CommunityMentalHealthCenter.pdf]; AMA, Administrative Code, 21 https://medicaid.ms.gov/wp-content/uploads/2014/10/AdminCode-Part_206.pdf].
[201] AMA, Administrative Code, 18 [https://medicaid.ms.gov/wp-content/uploads/2014/10/AdminCode-Part_206.pdf].
[202] AMA, Fee Schedule, 3 [https://medicaid.ms.gov/wp-content/uploads/2014/03/CommunityMentalHealthCenter.pdf].
[203] *See* Berkeley Research Group, *supra* note 101; Email from Berkeley Research Group, July 26, 2018.
[204] *See* Berkeley Research Group, *supra* note 101.
[205] Allen Deposition, 96-99.
[206] *Id.* at 91, 96-98.

*Confidential Information, Subject to Protective Order*

## Conclusion

It is possible for Mississippi to accomplish its stated goal of serving people in the most integrated setting as required by the Americans with Disabilities Act.  In order to do so, the State will need to realign and maximize funding, expand critical community-based services and make them available throughout the State, establish strong coordination and collaboration across different components of the system, provide robust oversight and technical assistance, and use data to continuously refine and improve the service system.

*Melodie Peet*        7/30/18

Melodie Peet                        Date