EXHIBIT 4

**Expert Report of**

**Robert E. Drake, MD, PhD**

**Table of Contents**

Introduction ............................................................................................................1

Executive Summary ...............................................................................................1

Expert Qualifications ............................................................................................2

Specific Aims: 1-4 .................................................................................................4

Methods: Aims 1-4 ...............................................................................................5

Findings: Aims 1-4 ...............................................................................................7

Conclusion ...........................................................................................................23

References ............................................................................................................23

Attachment 1: Sample Members

Attachment 2: Individual Findings

Attachment 3: Curriculum Vitae

Attachment 4: Documents Considered

## Introduction

I was asked by the U.S. Department of Justice to conduct a review of individuals who have been in State Hospitals in Mississippi in order to answer four specific questions about that group.

1. Would the individual have avoided or spent less time in a State Hospital if he/she had been provided reasonable community-based services?
2. Is this individual at serious risk of institutionalization in a State Hospital?
3. Would the individual be opposed to receiving reasonable community-based services?
4. If the individual is appropriate for and would benefit from community-based services, what services would the individual need?

## Executive Summary

Our interview team of six mental health experts interviewed and studied the hospital and outpatient records of a representative sample of 154 adults who had been in state psychiatric

hospitals in Mississippi at least once between October 2015 and October 2017.  Some were still in the hospital when we interviewed them in 2018.  The interviewers wrote summaries and answered the four questions posed above.

We determined that nearly all of the 154 patients would have spent less time in a state hospital if they had been provided reasonable community-based services. Most were at serious risk for continued hospitalization or readmission.  Nearly all were not opposed to receiving reasonable community-based services.  Of those who would benefit from community-based services, we specified the services.

In our judgment, Mississippi offers a hospital-based mental health system with minimal evidence of current, evidence-based community services.  Most patients are admitted to state hospitals and stay longer than needed because they do not receive evidence-based services in the community and are discharged to suboptimal living situations.  The mental health system's goal for most patients is stabilization rather than recovery -- medication compliance rather than opportunities for a meaningful life.  Reasonable community-based services, such as assertive community treatment, crisis services, transition services, family psychoeducation, integrated dual disorders treatment, shared decision making, supported employment, trauma-informed care, problem-solving therapy, and other evidence-based practices that enhance functioning, improve quality of life, and reduce the need for hospitalization, are scarce or non-existent.

## Expert Qualifications

I have been studying serious mental disorders and deinstitutionalization for 45 years.  As an MD-PhD student and medical intern at Duke University (1971-79), I completed a PhD in psychology, did extra clinical rotations in psychiatry, completed a psychology internship in adolescent psychology, and completed a medical internship in psychiatry and pediatrics.  During these formative years, I also volunteered at Butner State Hospital, the Durham YMCA, and a Durham housing project.  My research and dissertation addressed deinstitutionalization through a qualitative study of Butner State Hospital adult patients aimed at understanding their experiences and preferences living in the hospital and in the community during the early years of deinstitutionalization in North Carolina.

During my years at Cambridge Hospital and Harvard Medical School (1979-84), I completed a psychiatry residency, a post-doctoral research fellowship, two years as a community mental health center doctor, and two years as a doctor and co-director of Ambulatory Community Services, which provided three assertive community treatment teams in Cambridge and Somerville, Massachusetts.  My training and subsequent clinical work included working at Westchester State Hospital and Metropolitan State Hospital during the peak of deinstitutionalization in Massachusetts.  Our assertive community treatment teams were actively helping patients to move from institutions to live successfully in the community.  My research

during these years included understanding hospitalizations, homelessness, and suicide among patients with serious mental disorders.  I also led a seminar for clinical staff on serious mental disorders and community-based treatment.

In 1984, I moved to New Hampshire to become medical director of West Central Services, one of New Hampshire's 10 regional community mental health centers, and teach at Dartmouth Medical School.  I was actively involved with treating patients as the only community psychiatrist for the Hanover-Lebanon area, supervised psychiatry residents and psychology interns, and developed a seminar for residents on community mental health.  My colleagues and I at West Central Services also started a research group on schizophrenia, which has continued for 34 years.  Our initial research focused on the emerging problem of co-occurring substance use disorders among people with serious mental disorders.

In 1987, the Director of Mental Health for New Hampshire asked me to lead a research and planning function for the state, which became the New Hampshire-Dartmouth Psychiatric Research Center.  Our center has always been a multi-disciplinary group that has prioritized hiring people with lived experience of serious mental disorders.  Our first project, after visiting the 10 state community mental health centers to understand their needs, was to develop plans to institute assertive community treatment teams with special expertise in treating co-occurring substance use disorders, across the state.  Federal agencies and private foundations funded the project in 1988, and for several years I met with all of the teams monthly for training and case reviews.  I also continued to treat patients with serious mental disorders and conduct research on case management, housing, substance use disorder, HIV and hepatitis infections, and other issues related to serious mental disorders, but in 1990 I retired from the role of medical director of West Central Services to concentrate on my state role.  In the 1990s, the National Alliance on Mental Illness rated New Hampshire as the best state mental health system in the U.S.  We also developed the Individual Placement and Support (IPS) model of supported employment for people with serious mental disorders during the 1990s and conducted the first two randomized controlled trials of the model, one in New Hampshire and one with people who were homeless and mentally ill in Southeast Washington, DC.

By 2000, our research group was working with mental health systems in several states, and we were asked to take on new challenges.  First, we created toolkits on evidence-based practices for the Substance Abuse and Mental Health Services Administration and conducted a related national project in several states to demonstrate that evidence-based practices could be implemented with high fidelity in routine mental health centers across the country (McHugo et al., 2007).  Second, a private foundation asked us to develop a national program to extend supported employment in different areas of the country.  This effort continues today and has gradually expanded to 23 states and four other countries as the International IPS Learning Community.  We provide online training, technical assistance, data collection and analysis, and an annual meeting for all of these participants (Becker, Drake, & Bond, 2014; Bond, Drake,

Becker, & Noel, 2016a, 2016b).  Third, another private foundation approached us to develop a private service model for young adults with serious mental illness and co-occurring substance use disorder.  We helped them to develop, implement, and evaluate the WestBridge Community Services programs in New Hampshire and Florida, which continue as highly successful programs today (Luciano et al., 2014; Noel, Woods, Routhier, & Drake, 2016).  In the early 2000s, we conducted the Social Security Administration's Mental Health Treatment Study (2005-2010), a randomized controlled trial of several evidence-based practices for over 2,000 patients in 23 community mental health centers around the U.S. (Drake et al., 2013).  In 2017, we started another large randomized controlled trial of evidence-based, community practices for 3,000 mental health patients in 30 cities around the U.S. (https://www.ssa.gov/disabilityresearch/supported_employment.html).

In summary, I have had over four decades of experience as a clinician, researcher, teacher, and consultant to local, state, and national mental health programs.  I have co-authored or edited more than 20 books on community mental health and evidence-based practices, and authored or co-authored over 500 articles in scholarly journals on these subjects.  My goal has always been to improve mental health services for people with the most severe disorders.

I am being compensated at the rate of $250.00 per hour for work performed in this matter, in addition to the costs of travel and other incidental expenses.  My compensation is not dependent on the outcome of the case.  My curriculum vitae is attached to this report and contains a list of all publications authored in the last ten (10) years. I have not testified as an expert at deposition or trial in the last four (4) years.

## Specific Aims

Our overall goal in this DOJ project was to evaluate a representative sample of patients who were hospitalized in Mississippi State Hospitals between October 2015 and October 2017 and determine: (1) Would these patients have avoided or spent less time in the hospital if reasonable community-based services had been available? (2) Are the patients at serious risk of further or future hospitalization in a State Hospital? (3) Would they be opposed to receiving reasonable community-based services? and (4) What community-based services are they appropriate for and would benefit them?

To answer these questions, we had four specific aims:

**Aim 1: to identify a representative sample of patients.**

**Aim 2: to identify reasonable community-based services that are available in a community-based mental health system and reduce reliance on hospitalizations.**

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

**Aim 3: to evaluate as many patients as possible in our sample to answer the four questions above.**

**Aim 4: to aggregate and summarize the data across all evaluated patients.**

**Methods**

**Aim 1. Sample**.  To review a representative sample of adults who were civilly committed to a State Hospital in Mississippi between October 2015 and October 2017, and whose primary treatment unit was a psychiatric unit, we selected a stratified random sample of admissions based on length of stay and region of the state.  The sampling process ensured that our results would be generalizable to the population of people who had been in Mississippi's State Hospitals between October 2015 and October 2017 (many were still in hospitals at interview).  The court capped our access to patient records at 300 records in total.  An academic biostatistician, Dr. Todd MacKenzie, developed the plan for sampling, power analysis, and attrition.  His report is separate.

**Aim 2. Community-Based Services.**  Community mental health and evidence-based practices are my areas of expertise.  To ensure that the review incorporated research from across the field, my research colleague, Stephanie Acquilano, and I reviewed research on community-based services that had appeared since our last book on this topic (Thornicroft et al., 2011).  Using this research, we identified key community-based services that are available in a community-based mental health system and reduce reliance on hospitalizations.

**Aim 3. Evaluations**.  A team of six[1] experienced clinical interviewers assessed every sample patient who was reached and agreed to be interviewed using several sources of data: state hospital records, community mental health center records, face-to-face interviews with the patients, and in some cases interviews with their family members, guardians, or community providers.

I led the interview team in developing a semi-structured, qualitative interview to focus on the patient's experiences in the hospital and in the community.  To develop the interview, I prepared a review of research studies on hospital and community experiences.  I then developed an interview and refined it over the course of several discussions with the other clinical review experts.  Recognizing that the patients in our target population had a large range of demographics, clinical diagnoses, service experiences, and supports, the interview was purposely flexible and open-ended.  As a researcher, I have been designing and using similar interviews for several decades.

We met for two days as a team in January 2018, in Washington, DC.  We discussed my

---

[1] A seventh review team member also conducted interviews but was unable to complete his reviews in time for this report.

review of the evidence-based services that reduce reliance on hospitalization and the proposed interview.  Then we trained on and tested the interview process and content, while making further refinements.

Semi-structured, qualitative interviews and thematic analysis are common techniques in medical research, particularly when the goal is to understand the interviewee's framework of meaning.  These research techniques have been used for many years to understand the values, experiences, and living preferences of people with serious mental illness, which are often highly idiosyncratic.  For example, a patient of mine with schizophrenia had been repeatedly hospitalized for disruptive and psychotic behavior on the subway, with state hospital clinicians repeatedly attributed his outbursts to medication non-adherence.  But in an open-ended interview, the patient described the experience of his father's violent drinking episodes and his thought that the most direct way to get out of the house and back to the safety of the hospital was a mild assault on a stranger on the subway.

To check on the reliability and validity of interviews, we conducted 42 of our initial interviews in Mississippi in pairs or groups of three, with one interviewer conducting the interview and the others taking notes.  Paired interviewers then made independent ratings on the key questions to examine inter-rater agreement.  Agreement between raters was very high, with only one instance of initial disagreement on a key question, which was discussed and resolved.  The interviewers subsequently increased the validity of interviews using the technique of triangulation, which refers to using more than one source of data to improve accuracy.  In this situation, we attempted to make sure that hospital records, community mental health center records, and interview data agreed.  When discrepancies occurred, we used the two sources that agreed.  For example, when a patient denied using illicit drugs but the hospital and community mental health center records documented drug use, we concluded that the patient did use illicit drugs.  Both of these techniques – paired interviews and triangulation – are commonly used in social science research.

**Aim 4. Thematic Analysis**.  To develop a thematic analysis of the patient evaluations, I first grouped 154 draft interview summaries according to our sampling groups: short-term hospitalization (0-20 days), intermediate-term hospitalization (20-60 days), long-term hospitalization (60-180 days), and very long-term hospitalization (over 180 days). I next read interview summaries to become familiar with the corpus of interview data.  During this process, I underlined key findings and took notes to document core content related to the following domains: experiences of hospitalization, community services, supports needed, and perspectives on community living.  I then reviewed the notes to identify main ideas, concepts, and patterns in the data to summarize and characterize the main findings.  This technique, called thematic analysis, is a standard technique for examining qualitative interviews to discern ideas or themes that recur across interviews.  In addition, I held weekly phone calls with the expert team to discuss themes and findings in the review.  To check further on my own potential bias, my

research colleague, Stephanie Acquilano, reviewed a random subset of 16 evaluations (four from each group) using a similar process, and we compared themes with very high agreement.  Ms. Acquilano also reviewed finalized interview summaries to ensure consistency with the results.

**Findings**

**Aim 1. Sample.  Utilization of Mississippi State Hospitals.**

A stratified random sample of admissions based on length of stay and region of the state was selected.  Dr. Todd MacKenzie, an experienced biostatistician, developed the plan for sampling, power analysis, and attrition.  He conducted the sampling and subsequently compared the interviewed non-interviewed members of the sample as a further analysis of representativeness.  The sampling process and subsequent analyses ensured that our results would be generalizable to the population of people who had been in Mississippi's State Hospitals between October 2015 and October 2017 (many were still in hospitals at interview).  See Dr. MacKenzie's report for details.

**Aim 2. Reasonable Community-Based Mental Health Care.**

**Deinstitutionalization and Community-Based Care.**  Mental health care in the U.S. began to shift from institution-based care to community-based care in the 1950s.  The number of state hospital beds in the U.S. has decreased from more than 550,000 in the 1950s to around 40,000 in 2014 (Pinals & Fuller, 2017).  In New Hampshire, for example, the single state psychiatric hospital, New Hampshire Hospital, had 2,700 beds in 1955 but only 120 beds by the 1990s, when its state mental health system was considered a national model of excellent mental health care (Commission to Develop a Comprehensive State Mental Health Plan, 2008).  The rise and investment in community-based alternatives in New Hampshire at the time reduced the need for inpatient beds.

Why did this national transformation occur?  Several factors are often cited in the U.S.: criticisms of abuse and poor care in public mental hospitals, the serendipitous discovery of more effective medications, federal policies, changes in public perception, and individual states' desires to reduce costs from mental hospitals.  More fundamentally, deinstitutionalization represented a human rights issue.  Just as developed countries around the world outlawed slavery, serfdom, and other forms of owning human beings in the mid-nineteenth century, they rejected the dehumanizing idea that people with mental disorders should be locked up without rights and separated from society in the mid-twentieth century.  Humanitarian, clinical, legal, administrative, and scientific efforts converged, as nearly all developed countries adopted the belief that people with mental disorders deserved and could benefit from greater independence, more humane treatment, and greater opportunities to participate in community life.  My research and clinical experience over four decades have supported deinstitutionalization:  People with severe mental illness can be treated in the community more effectively than in an institution.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Prior to this shift, newspaper articles, movies, and books had documented widespread abuses and negative outcomes in state mental hospitals.  The classic academic text on the institutional era, Erving Goffman's 1961 book entitled Asylums (Goffman, 1961), described in detail how the authoritarian control exerted by hospital staff resulted in the common syndrome of hopeless acquiescence, passive compliance, and erosion of skills and personality among patients -- a condition that became known as hospitalism, disculturation, or institutionalism.  At the same time, Ken Kesey's popular 1962 novel, One Flew Over the Cuckoo's Nest (Kesey, 1962), presented these ideas to the public.  Science enabled deinstitutionalization by the accidental discovery that medications such as chlorpromazine (approved in 1954) helped many patients by reducing the torment of hallucinations and delusions.  These medications, initially called "major tranquilizers," later became known as antipsychotics.  Psychiatrists were more willing to discharge patients because many responded, at least partially, to the antipsychotics.  Legal settlements emphasizing patients' rights and government policies, such as the Community Mental Health Centers Act of 1963 and the creation of Medicaid to pay for outpatient mental health care in the 1960s, hastened deinstitutionalization in the U.S.

In the midst of deinstitutionalization, one central step was the shift from merely living in the community to pursuing recovery.  In the 1970s, deinstitutionalization involved finding housing, usually with families or in group homes, and providing hospital-like services in the community.  In fact, the first major innovation in community-based care, the Program for Assertive Community Treatment, was initially called a "hospital without walls" (Stein & Test, 1980).  By the 1990s, however, it became clear that the great majority of people with mental illness wanted to pursue active, meaningful lives in their communities, not just stable tenure out of the hospital.  As Patricia Deegan, a famous psychologist with a serious mental illness, described the experience, her psychiatrist told her that being sedated and smoking cigarettes in front of a TV all day but staying out of the hospital was a success, but to her it was failure.  She reduced medications, went back to school for a PhD, and has worked full time for many years to advocate for higher expectations for patients (Deegan, 1988, 1996).

Concepts and models of community-based services began to change and be tested in the 1980s and 1990s.  The central conceptual change was to recognize the importance of person-centered care:  Patients living in the community had individual hopes, preferences, and goals; they were in most cases competent to express and pursue these ideas; and they prospered when offered services that matched their preferences and goals.  The notion that people with serious mental disorders, despite symptoms, could lead active, productive, satisfying lives in the community evolved into the "recovery" movement.  **Recovery in mental health has come to signify** not cure or the elimination of symptoms but rather **finding a meaningful life in the community, often in spite of symptoms**.  For example, the President's New Freedom Commission Report on mental health care (New Freedom Commission on Mental Health, 2003) defined recovery as living, learning, working, and socializing in the community.  In other words, recovery involves active participation in community life.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Over the past 40 years, researchers on community-based services have developed a range of interventions (described below) that help people to live as independently as possible and pursue their goals in the community.  These services are now called evidence-based practices.

As community services and community hospitals have evolved over the last 60 years, the role of the State Hospital has been debated and redefined.  Hospital stays have shortened and the harms of even brief hospitalizations – for example, temporary loss of hope, self-esteem, and community activities – have become apparent.  We now recognize that the number of needed inpatient beds depends on the quality and quantity of outpatient services.  People with mental illness do well and are more satisfied in the community only if they have access to needed treatments, supports, friends, and opportunities.

Deinstitutionalization has its critics.  Many states have closed hospitals but failed to set up community-based services simultaneously.  Other states established community-based services but failed to sustain them when budget crises appeared.  These failures have undoubtedly contributed to incarceration, homelessness, and readmissions among people with serious mental illness, but many other factors, such as waves of drug crises (crack cocaine, methamphetamine, and opioids), severe penalties for drug offenders, erosion of low-income housing stock, and lack of housing supports have also been implicated in the problems of mass incarceration and homelessness in the U.S.  The problem of cyclical readmissions relates directly to the relative paucity of community-based services in many regions.

**Evidence-based practices.**  "Evidence-based" signifies that an intervention is supported by more than one randomized controlled trial conducted by different investigators and not countervailed by opposing evidence.  These interventions are proven by research to help people with serious mental disorders to manage illnesses, avoid unnecessary hospitalizations, achieve community integration, and enhance recovery.  They foster specific goals: for example, supported housing helps people secure and maintain safe, affordable housing; medication assistance based on shared decision-making helps them use medications effectively with minimal side effects; and supported employment helps them obtain and maintain competitive jobs.  Most evidence-based practices emphasize the patients' personal choices rather than staff preferences, focus on patients' strengths rather than deficits, and individually tailor the service package.  Although the goals of evidence-based practices often involve community functioning rather than hospital reduction, most evidence-based practices also decrease the need for hospitalization (reviewed below).

Supported employment illustrates the nature of evidence-based practices.  Most people with serious mental illnesses living in the community want to have a competitive job (about 70% across surveys).  In supported employment, an employment specialist helps them secure a job of choice by individualizing job development and then providing individualized supports to enhance success on the job.  For example, one young man with paranoia wanted to work with

animals and not be around people.  His employment specialist helped him find a weekend job at a veterinary clinic bathing, feeding, and walking the animals, and worked with him on the initial weekends to make sure he understood and could do all of the tasks.  He gradually expanded his hours, made friends at the clinic, and did not return to the hospital.  Research on supported employment (26 randomized controlled trials) shows that about 55% of participants find competitive employment within one year (more than twice as effective as other vocational programs) (Drake, Bond, Goldman, Hogan, & Karakus, 2016).  Patients who become employed report several benefits, including a daily structure, more income, and greater self-esteem; they tend to use hospitals and mental health services less.

**Medications**.  Medications remain a cornerstone of community mental health because they help patients to manage disturbing symptoms and, if used properly, can **decrease re-hospitalizations by about 50%**.  But medications have several limitations.  Many patients do not take their medications, often because of disturbing side effects.  Many use alcohol and other drugs that counter the effectiveness of medications.  Many have little or no response to medications.  Many cannot afford the medications.  Moreover, clinicians often fail to follow guidelines that optimize effectiveness and minimize side effects.  Community-based interventions can counter each of these problems.

Interventions that increase medication adherence, such as changing medications and doses to decrease side effects and tailoring the medication regimen to the individual's daily routines and habits, can be delivered in the community (Velligan et al., 2010).  To cite a few examples, newer medications have less troublesome side effects, patients can participate in choosing medications through shared decision-making, assertive community treatment teams sometimes deliver medications daily, and case managers help patients to post medication reminders in their homes.  Use of long-acting injectable medications and clozapine can also increase effectiveness and reduce hospitalizations (Leucht et al., 2017a).

Many patients do not respond to current medications, but there are constructive strategies for serving those patients outside the hospitals including trying alternative medications and psychosocial interventions.  For example, only about half of patients with schizophrenia spectrum disorders have "at least a minimal" response to antipsychotic medications, meaning at least a 20% reduction in symptoms (Leucht et al., 2017b).  The half who have less than a minimal response (non-responders) often receive higher than recommended doses of antipsychotics or more than one antipsychotic concurrently (polypharmacy).  But high doses and polypharmacy are contraindicated by guidelines because they increase the harmful side effects like cognitive slowing, weight gain, diabetes, and severe movement disorders without consistent improvements in symptom control.  In addition to excessive doses and polypharmacy, other contraindicated practices include long-term use of benzodiazepines such as Klonopin and Ativan, which are addictive.  Positive recommendations include offering patients cognitive behavioral treatments for psychosis and for substance use; monitoring effectiveness and side effects and

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

using newer medications that cause fewer side effects rather than long-term benzodiazepines; using standardized scales to promote measurement-based care; and offering Clozaril to patients with psychosis who do not respond to two trials of antipsychotic medications.

Co-occurring alcohol and drug use disorders, which interfere with medication adherence and effectiveness, are treatable problems and usually do not require institutional care.  Effective treatments, such as integrated dual disorders treatment, are long-term (most people recover from these disorders over months and years rather than weeks) and must necessarily address environmental risk factors, such as friends who use drugs.  Treatments include dual diagnosis groups for people at different stages of recovery; cognitive behavioral treatment for substance use; and effective medications such as Naltrexone or Suboxone for alcohol use disorder or opioid use disorder.  Treatment is best delivered in the community because people must learn to be sober in their usual living environment.  Hospital-based learning does not transfer to the community well (one of the early insights of assertive community treatment).  People with co-occurring disorders typically reduce and eliminate substance use in the context of acquiring meaningful jobs and sober friends (Mueser, Noordsy, Drake, & Fox, 2003).

In addition, the presence of psychiatric symptoms and medication non-response should not necessarily lead to hospitalization, particularly in a State Hospital, because other medications and psychosocial interventions are often effective and can be tried in the community.  People with psychiatric symptoms can and do live safely in the community.  In fact, many are competitively employed, and symptoms do not correlate with employment success.  Clinical standards require avoidance of inpatient care except in cases of acute and imminent dangerousness (rather than increased symptoms or non-adherence), and even then, community-based crisis services successfully divert many admissions.

**Crisis Services**.  Community-based services should emphasize prevention.  People who are living in the community and pursuing their goals are less likely to experience crises that lead to hospitalization.  When crises do occur, evidence-based crisis services aim to prevent unnecessary hospitalizations.  They include crisis hotlines, mobile crisis teams, crisis apartments, walk-in crisis centers, police Crisis Intervention Teams, diversion courts, and other services to defuse crises and prevent hospitalizations.  For example, mobile crisis teams, which exist in many states, include mental health professionals and practitioners who are available 24 hours a day to reach out to people experiencing a mental health crisis in homes, schools, or other locations.  They are trained to provide face-to-face de-escalation wherever the individual is located, and they may offer access to a psychiatrist, a crisis residence, a counselor, or supports for several days.

Crisis services often involve alternatives to hospitalization such as combinations of crisis housing and supports.  For example, a crisis alternative may be a few beds in the mental health center, staffed for full-time supports and daily visits by a psychiatrist.  Research studies have

shown that alternatives to hospitalization are, in most cases, comparable or preferable to hospitalization (Bond et al., 1989; Gudeman, Dickey, Evans, & Shore, 1985; Sledge, Tebes, Rakfeldt, & Davidson, 1996).

A variety of **crisis diversion services can reduce hospitalizations by approximately 50%** (National Institute for Health and Care Excellence, 2016).

**Transition Services**.  Transition services (discharge planning from inpatient care) reduce readmissions by ensuring that people are discharged as quickly as possible and receive needed services soon after discharge (National Institute for Health and Care Excellence, 2016).  When patients are admitted to a psychiatric hospital, transition services ensure that discharge plans are developed and implemented rapidly, that community service providers are involved, and that patients who are leaving institutions are directly linked with needed community services by face-to-face contacts (called a "warm handoff").  Transition service models include rapid and specific discharge planning, transitional case management, critical time intervention (a standardized model of temporary case management to ensue someone has housing and service connections when they leave the hospital), hospital liaisons, and other interventions.  For example, in transitional case management, a nurse may have contacts with the family and community providers in the hospital, make sure that discharge plans are realistic (such as simple medication regimens), accompany the patient to initial meetings in the community, and follow up for the first month after discharge.

Research shows that transition services facilitate discharge and reduce readmissions (National Institute for Health and Care Excellence, 2016).  In one study, for example, just ensuring a **meeting with a psychiatrist within 30 days of discharge reduced readmissions of all patients by 22% and of high-risk patients by 29%** (Kurdyak et al., 2017).  Effectiveness of transitions requires that hospital policy minimizes lengths of stay and that a reasonable community-based service system is available.

**Permanent Supported Housing.**  Most adults with serious mental illness want to live independently rather than with parents or in a group home.  Living with parents who do not understand mental illness can actually be stressful and lead to hospitalization, which was the impetus for developing family psychoeducation programs.  Furthermore, most adults with mental illness prefer to live alone rather than with other patients.  In light of these well-known factors, permanent supported housing programs combine some form of access to scattered-site housing with some form of outreach supports by case managers (Padgett, Henwood, & Tsemberis, 2016).  Access to housing is typically based on client choice and is free of conditions, meaning that people do not have to agree to treatment, medications, and other clinical participation before entering housing.  Case managers work with clients and landlords to ensure that the housing situation is safe and permanent.  Once the clients are housed, case managers (or assertive community treatment teams) encourage participation in other interventions, such as mental

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

health or addiction treatments.

Research shows that in this model the great majority of clients (typically more than 90%) are able to maintain apartments, and most gradually enter treatment.  The mechanism appears to be that safe housing and a trusting relationship combine to assure people that the service system is trying to help them with their goals.  According to a recent review, permanent supported housing programs consistently **reduce hospitalization by approximately 33%** (Rog et al., 2014).

**Assertive Community Treatment.**  Assertive community treatment involves an intensive, multidisciplinary, team-based program that delivers comprehensive services to a cohort of patients, who typically have been non-adherent or non-responsive to treatments and have experienced multiple hospitalizations.  Assertive community treatment teams should include doctors and nurses to help with medications, side effect management, and medical comorbidities; case managers to help with practical matters such as family psychoeducation, problem-solving, and supported housing; therapists to help with counseling for problems including trauma and substance use; supported employment specialists to help with education and jobs; and peer specialists to help with engagement and social connections.  The team provides services, including crisis services, as needed, with 24-hour availability, 7 days a week. The goal is always to enhance community living and avoid institutionalization.  Because many patients with serious mental illness are also vulnerable to incarceration or homelessness, assertive community treatment has also been used for these groups.

Assertive community treatment consistently **reduces hospitalizations, on average by approximately 41%** (McDonagh et al., 2017).  The intervention also reduces the length of hospitalizations (Mueser, Bond, Drake, & Resnick, 1998).

Assertive community treatment may appear to be needed for a large majority of patients because their lives have involved dissatisfaction in the community, non-adherence with heavy medications, and substance use leading to cyclical hospitalizations.  Yet when these patients begin to recover, many do well with less intensive, community-based services.  For example, patients who are competitively employed steadily reduce outpatient and inpatient service use over 10 years (Bush, Drake, Xie, McHugo, & Haslett, 2009).  Currently, many patients on assertive community treatment are being transitioned into much less intensive services (Finnerty et al., 2015; Keet, 2016).

**Family Psychoeducation**.  Starting in the 1970s, interventions to help families support a relative with schizophrenia or some other serious mental disorder developed rapidly.  Several of these interventions, like other evidence-based practices, are detailed in manuals for therapists (McFarlane, Dixon, Lukens, & Lucksted, 2003).  The common themes include education to help families understand mental illness and treatments, teaching specific techniques for managing difficult situations, and meeting with other families for support.  **Family psychoeducation**

**reduces hospitalizations by about 22%** (Pharoah, Mari, Rathbone, & Wong, 2010).  A recent development in this field is that experienced families have become involved in delivering the training through family-to-family interventions (Dixon et al., 2011; Dixon et al., 2001).

     **IPS Supported Employment**.  Most patients with serious mental disorders would like to work in competitive jobs, and over the past 30 years an effective intervention to help them succeed has been developed, extensively tested, and disseminated in most U.S. states and other developed countries.  Individual Placement and Support (IPS) is a specific model of supported employment that was developed for people with serious mental disorders (Bond, 2004).  The intervention is unique in helping people become independent from (rather than more dependent on) the mental health system because people are engaged for several hours per week in constructive activities that help them to increase income, self-esteem, social integration, and other recovery outcomes.  Although the main outcome is employment, many studies of IPS supported employment also show **reductions in hospitalization** (Luciano et al., 2016).

     **Psychotherapy.**  Specific and effective treatments for depression, anxiety, psychosis, borderline personality disorder, aggression, and post-traumatic stress disorder are available.  These treatments require therapist training but are quite effective in reducing symptoms, self-harm behaviors, and other problems that may otherwise lead to unnecessary hospitalizations.  For example, specific trauma therapy can reduce symptoms for patients who have serious mental disorders and also underlying trauma (Mueser et al., 2008).

     **Integrated Dual Disorders Treatment**.  About half of patients with serious mental illness have or have had co-occurring substance use disorders.  These co-occurring disorders can lead to medication non-adherence, disruptive behavior, family problems, and legal system involvement.  But they are treatable.  Effective, community-based treatments, called integrated dual disorders treatment, have evolved since the 1980s (Mueser et al., 2003).  The interventions involve building skills, supports, and other more satisfying activities in the community, and using evidence-based medication management for people with substance use disorder.  Over a few years, most patients stop using substances and decrease hospital use (Drake, Luciano, et al., 2016; Xie, Drake, McHugo, Xie, & Mohandas, 2010).

     **Peer supports.**  One key to community integration and recovery is increasing social connections in the community**.**  People with lived experience with mental illness, often called peers, can be involved in developing social connections in many ways, including through drop-in centers that help people find others with similar interests (supported socialization), and by working as members of assertive community treatment teams (Corrigan, 2006).  Peer supports can also help with education, support, outreach, and many other activities, and are especially valuable for patients who are difficult to engage in treatment (Dixon, Holoshitz, & Nossel, 2016).  Peer support, a broad term applying to many approaches, is strongly endorsed by professionals and patient advocates.  A recent randomized controlled trial showed that peer

support can help patients to achieve functional outcomes and reduce hospitalization (O'Connell et al., 2018).

**Summary**.  A community-based, recovery-oriented system emphasizes evidence-based services – interventions and models of care that are proven to help patients function better, achieve higher quality of life, and reduce use of hospitals and emergency services. Successful implementation of these services requires training, because many clinicians must learn new skills and some may need to learn new attitudes of optimism and high expectations.  Community mental health centers in general may need a culture shift, particularly if programs have existed in a hospital-based, stabilization-oriented system and clinicians do not have the experience of seeing very symptomatic patients improve dramatically, take charge of their lives, and reduce their dependence on the mental health system.

Reasonable community-based services should include crisis services, transition services, supported housing, medication management based on guidelines for prescribing current medications, shared decision-making, assertive community treatment, family psychoeducation, supported employment, specific psychotherapies, integrated treatment for co-occurring disorders, linkage with primary care, and peer supports.  These services fit naturally together and are readily combined in the assertive community treatment model, in which multi-disciplinary teams deliver individualized packages to each patient. Assertive community treatment coupled with permanent supportive housing (where needed) provides the most robust package of services for these individuals.  Over time, even those who need the most robust combination of services typically will not need such intensive services and can be transitioned to less intensive, unbundled services.  Implementing evidence-based services promotes recovery and successful community tenure for those who would otherwise be caught in the process of cycling admissions – the hallmark of a failed system.

**Aim 3. Evaluations**.

To summarize the entire group of patient evaluations, we considered separately each of the sampling groups of admissions based on length of stay, starting with the short-stay admissions.  I reviewed patients in each group and identified common themes.  My colleague Stephanie Acquilano reviewed four randomly selected patients in each group and independently identified themes.  We then discussed each group separately, to achieve consensus on the themes.  We agreed on themes and language.  I have included below the themes that we both identified as prominent.

Short-Stay Admissions (0-20 days).

Most of the short-stay patients (X1 of Y = Z1%) had multiple hospitalizations of varying lengths, in community hospitals and state hospitals.  Readmissions were attributed to medication non-adherence and, sometimes, alcohol and drug use, leading to increases in psychosis and/or

disruptive behaviors.  An illustrative 46-year old patient in Jackson was experiencing psychiatric and substance use disorders.  He was living in a personal care home but had experienced five hospitalizations and transfers to different homes over six months.  He received little community-based psychiatric care or substance use disorder treatment.  In fact, although he had missed several medication appointments, he drew attention from neither the head of the personal care home nor the mental health center prior to his recent hospitalizations.

We identified several themes for this group:

- Nearly all of these patients wanted to be more integrated in the community – to live on their own, to work, and to have meaningful relationships.
- Prior to hospitalization, few patients received any evidence-based interventions in the community that would have helped them avoid hospitalizations.  Even services called Program for Assertive Community Treatment (PACT) appeared to be targeting medication compliance more than community integration and recovery.
- Patients went through a string of institutions – crisis center, local hospital, jail, and so on – en route to the state hospital, so that many episodes were actually longer than 20 days.  The experiences were traumatic for many, especially in jails.  The crisis centers and other institutions appeared to be pathways to the state hospital rather than community-based services aimed at averting hospitalization.
- Co-occurring substance use disorders and post-traumatic stress disorders were common but untreated.
- Patients frequently found the hospital to be unpleasant, punitive, and disempowering.
- Most discharge plans focused on psychiatric stabilization and medication compliance.  They did not include goals that were important to patients.
- Medication non-adherence was a critical issue, but non-adherence was consistently blamed on the patient's failure to follow directions rather than on high doses, multiple medications, polypharmacy, severe side effects, and inability to pay for medications.
- Most patients had enduring relationships with family members who wanted to be helpful but had never received family psychoeducation or other supports.  Families often believed that their only recourse, when symptoms and disruptive behavior reappeared, was calling the police and committing their relatives to the hospital.

Another group of patients with short hospital stays were people with brief, self-limited conditions such as substance-induced psychosis.  These patients were not dangerous.  Most had symptoms that were resolved by the time they got to the state hospital.  They likely could have been treated with crisis services or in local hospitals.  Some of these patients needed addiction

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

treatments rather than mental hospitalization.  Many of these patients did not need the state hospitals at all.

Intermediate-Stay Admissions (20-60 days).

Because over half of all inpatients nationwide have lengths of stay under 30 days (Eckart, 2010), we consider this group as intermediate-stay admissions.  Again, most of these patients had had multiple admissions and cycled in-and-out of hospitals.  They were diagnosed with long-term psychotic disorders and often with co-occurring substance use disorders.  They followed a cyclical pattern of medication non-adherence (often complicated by substance use), increase in symptoms and behavior problems, and return to the state hospital.  Some patients were simply discharged from the community mental health center because they did not show up for appointments, indicating that they needed outreach, which may have engaged them.  When they did receive services, the services did not help them to develop skills for managing their illnesses and finding meaningful lives in the community.  Some had 50 or more hospitalizations without ever receiving evidence-based services, such as assertive community treatment and permanent supported housing, in the community.  Some of these multiple-admission patients had recently received assertive community treatment after years of instability (one was 74 years old) and were doing well.  But most of them received only medications and occasional (e.g., monthly) meetings with a case manager.

All of the themes identified above were relevant for these patients as well.  Additional themes included:

- Patients were often kept in the hospital for long intervals because of a lack of community-based supportive housing and other services.  Families were exhausted and discouraged by trying to take care of their relatives without help.
- Group homes were declined by patients or unavailable.  Preferred arrangements, such as supported housing, were not offered.
- Long hospital stays were also related to slow planning and lack of collaboration between inpatient and outpatient teams.

The single-admission patients tended to be similar to multiple-admission patients diagnostically: long-term psychotic diagnoses, often complicated by co-occurring substance use disorders.  These patients were typically very unstable with few supports in the community before their single admissions, and they were typically discharged to unstable living situations without needed community-based supports.  As with the first group, they did not receive standard evidence-based community services.  For most of them, assertive community treatment would have been an optimal vehicle for delivering a package of needed evidence-based practices.

There were a few exceptions where individuals would not need these types of ongoing community mental health services.  For example, one patient had severe mid-life depression (she was 58 years old) after a series of losses.  Why she was admitted to a state hospital was unclear.  After discharge, she continued to be depressed in the community and wanted to change her medications and receive psychotherapy, but did not receive these services.  A small number of single-admission patients may have had self-limited disorders, such as substance-induced psychosis, and did well after admission without follow-up visits and without any services.

Long-Stay Admissions (60-180 days).

Patients in this group had quite long stays in a state hospital.  As a general rule, only patients with extremely dangerous behavior patterns, such as patterns of setting several fires or serious violence, should stay in a state hospital for such lengthy admissions.

In this subgroup, nearly all of the patients had long histories of multiple admissions for serious mental illness, co-occurring substance use disorder, and disruptive (not violent) behaviors.  Their lengthy stays in the hospital were due to medication non-responsiveness and lack of community housing.  Most lived with family members who were receiving little help and were exhausted by taking care of them or lived in community care homes that did not meet their needs.  For example, one family expressed that they could not take their daughter home again but ultimately agreed when the hospital was unable to find another housing situation.

While in the community, these patients were good candidates for evidence-based interventions.  Again, assertive community treatment would have been an optimal vehicle for delivering a package of individualized, evidence-based practices for most of these individuals.  These patients did not typically get recovery-focused services like assertive community treatment in the community, however.  As with the first two groups, their services and treatment plans had been essentially aimed at stabilization, not recovery.  In other words, the patients were directed upon discharge to take their medications and avoid disruptions in the family home or personal care home.  The plans assumed that smoking, watching television, and eating would meet their needs, as long as they took their medications.  They were not receiving help to build meaningful lives outside of the family home or personal care home.  Many had substantial work histories and wanted to work, but were not receiving supported employment.  Many wanted friends, but were not receiving socialization services.  All of the themes identified above were relevant for these patients also.

The exceptions to the above description were as follows. A few patients had developed dementia and were eventually transferred to nursing homes. Their long stays were related to difficulty finding and arranging nursing home placements. These patients could have benefitted from, but were not offered home and community-based services, as is true for many dementia patients. A few individuals received supports from family and friends and had remarkably good outcomes. For example, one patient had been inappropriately housed and treated in a residential program for people with intellectual disabilities. Because he had an assertive guardian, he was transferred to a more appropriate small group home, was receiving community-based services, and was doing quite well. Another patient had been "godmothered" by the wife of the pastor at her church. The godmother, who essentially became an effective case manager, helped her to find a pleasant house near the church, apply successfully for disability benefits, meet people in the church, and learn skills for community living. She had received none of these services from the community mental health center.

Very Long-Stay Admissions (180 plus days).

Few patients stay in a state hospital for more than six months. In most states, those who do stay longer than six months are forensic patients who were charged with a very serious crime, such as sexual assault or homicide, but could not stand trial because of mental illness or be released without extensive judicial review.

In the Mississippi sample of extremely long-stay patients, nearly all had multiple hospitalizations over many years and were difficult to discharge because community providers (families or group home leaders) did not want to take them back. Most of these patients had long-term psychotic disorders, often complicated by substance use and non-adherence in the community and by medication non-responsiveness in the hospital. But very few of these patients had been charged with serious crimes in the community. Few patients in the sample who were in the state hospital at the time of the review had histories of committing or being charged with a very serious crime. Most of the very long-stay patients were not violent but instead exhibited difficult behaviors, such as yelling, threatening, or kicking walls, during psychotic relapses. A more typical patient was a 51-year old man currently residing in a personal care home in Jackson. He had fixed delusions that did not respond to medications. His goal was to "buy the Willy Wonka chocolate factory." Yet he was not dangerous, threatening, or criminally involved.

As outlined above, these patients needed but did not receive during their tenures in the community the evidence-based services that may have prevented hospitalizations. All of the themes outlined above applied to these patients as well.

Some exceptions were: Several patients had co-occurring serious mental disorders and intellectual and developmental disabilities. These patients often went through cycles of control struggles with staff because the hospital behavioral management plans were ineffective but were

not changed.  These patients needed to live in small settings, with perhaps one or two other patients, and continuous supports by mental health and developmental disabilities staff.  Several other patients had severe trauma histories, long-histories of self-destructive behaviors, and carried diagnoses of borderline or other personality disorders.  However, they did not receive post-traumatic stress disorder diagnoses and, more importantly, did not receive trauma-informed care and specific treatments for post-traumatic stress disorder.

**Aim 4. Aggregate Findings.**

   **Patients returning to the community from state hospitals are not connected to permanent supported housing and other recovery-oriented, community-based services that would prevent future hospitalizations.**  Patients in Mississippi state hospitals are generally discharged to families, personal care homes, or homelessness because a robust system of permanent supported housing -- generally preferred by patients, families, and research studies because they are effective in supporting recovery  -- has not been developed.  Many patients have neither supportive families nor ability/willingness to live in a congregate setting.  Most would do well in supported housing.  Families that do want to help (we met many caring families in their homes) are not given the information, education, training, and support that are routine in family psychoeducation programs.

   Once patients return to the community, the mental health teams should help them develop satisfying, meaningful lives, in many cases in spite of having to live with residual symptoms, and manage their illnesses – this is the meaning of "recovery."  For people with serious mental disorders (like for the rest of us), a satisfying, meaningful life usually involves constructive activities like employment, friendships, hobbies, and involvement in community activities, in the context of safe housing and needed medical care.  Evidence-based practices have been developed to help people achieve these functional outcomes leading to increased community tenure.  Supported housing, supported education, supported employment, supported socialization, peer support, and other interventions help people to recover.

   Recovery does not involve overmedication with multiple medications and side effects, isolation in the parental home, living in segregated settings with other people who have mental illness, watching television all day, and lack of constructive activities in the community.  Yet in Mississippi, this kind of life is what is offered to people with serious mental disorders.  Is it any wonder that patients stop their medications, use alcohol and drugs, relapse, and return to the hospital?  People invest in managing their illnesses only when they have a life that they value.

   Mississippi has a mental health system based on controlling symptoms rather than developing meaningful lives.  People are considered defective and treated with high doses of medications, caregivers focus on medication compliance rather than helping people use medications to minimize side effects and promote functioning, and people have few positive

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

reasons to manage their illnesses.  The system produces exactly what it is designed for – cyclical readmissions rather than people moving on with their lives by reducing their involvement in the mental health system.

Many patients with serious mental disorders have comorbid complications: developmental disabilities, substance use disorders, and post-traumatic stress disorders.  Specific, community-based interventions exist for these complications (such as medical care homes and primary care embedded in community mental health centers), but we observed little evidence that they were available to patients in the community in Mississippi.

Our reviewers frequently identified assertive community treatment as a vehicle that could provide individualized service packages to people in the sample.  As described above, assertive community treatment teams should include doctors and nurses to help with medications, side effect management, and medical comorbidities; case managers to help with practical matters such as family psychoeducation, problem-solving, and supported housing; therapists to help with counseling for problems including trauma and substance use; supported employment specialists to help with education and jobs; and peer specialists to help with engagement and social the connections.  In Mississippi, our reviewers found that Program for Assertive Community Treatment teams visit patients in the community regularly to reinforce medication compliance but do not consistently provide other essential recovery services.

**State Hospitals in Mississippi are used for people who can be appropriately and more effectively served in the community.**  Based on this review, my opinion is that Mississippi basically offers a hospital-based, stabilization-focused system of care with minimal resources directed at evidence-based services in the community.  Hospital and community services aim to control symptoms, not to promote recovery.  The result is numerous preventable hospitalizations. This pattern has historical precedent.  Early in the era of deinstitutionalization, mental health systems used medications and case management to keep people from returning to the hospital; the goal was to increase community tenure.  People were discharged to families, group homes, nursing homes, and other group living facilities with strong directives to take their medications for the rest of their lives.  But people were dissatisfied with a life of sitting, watching television, and smoking, usually burdened by the sedating effects of heavy medications.  Most patients stopped the medications in order to feel better, and many discovered that alcohol and other drugs ameliorated their symptoms and helped them to feel better, at least briefly.  They of course relapsed at a high rate and were readmitted to the hospital.  Many patients went through this process of "cycling" or "revolving-door" hospital use.  Mississippi remains mired in this early phase of deinstitutionalization.

People with mental disorders are often sent to state hospitals in Mississippi for medication non-adherence, disruptive but not dangerous behaviors, episodes of increased

symptoms, substance use, or management difficulties simply because well known, effective community services do not exist across the state. Those with serious mental disorders, such as schizophrenia spectrum disorders, are often readmitted many times (some with more than 40 hospitalizations) because they do not have adequate services in the community.

**Treatment and discharge planning at state hospitals in Mississippi do not involve the necessary participants and processes to ensure speedy, effective transitions.** Discharge planning should involve patients, family members, and community providers from the beginning of hospital admissions. This helps to ensure continuity of care, realistic hospital treatment goals, concrete discharge planning, and shorter hospital tenure. But in Mississippi we encountered numerous examples where none of these stakeholders were involved in early or late discharge planning. Instead, the hospital clinicians or discharge committee decided when the patient was clinically ready for discharge and called the family to pick up the patient, called the community mental health center to set up an appointment, or just discharged the patient with contact information to make an appointment. No evidence-based processes of planning for discharge or ensuring transitions of care were in place. In fact, many patients never made the transition to community mental health center care after discharge, and others were discharged on medications that could not be accessed in the local community.

**Medication and over-medication practices contribute to lengthy stays in the state hospitals.** Once patients are admitted to the hospital, patients tend to receive high doses of medications, polypharmacy (such as two or more antipsychotic medications), and lengthy stays in the hospital because they do not respond with complete remission of symptoms and because adequate community residences, treatments, and supports are unavailable in the community. Most of these patients are not dangerous and pose little threat to anyone in the community. Many of these patients do not respond well to medications. Adding higher doses and more antipsychotic medications (polypharmacy) may calm them, by increasing sedation, but these interventions also increase the more harmful side effects like weight gain, diabetes, and movement disorders. These dangerous prescribing practices do not generally increase efficacy. Yet in Mississippi we saw many patients on Haldol at very high doses (30-40 mg rather than the recommended 10-15 mg) plus additional antipsychotic medications and long-term benzodiazepines (also dangerous and not recommended) to control side effects. Instead of resorting to polypharmacy and medications with significant, harmful side effects, nearly all patients with residual symptoms can be managed safely in the community. Psychosocial interventions, such as cognitive behavior therapy for psychosis, can help to control symptoms, and many patients can learn to control symptoms using their own idiosyncratic strategies.

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

## Conclusion

The government of Mississippi is responsible for humanizing mental health care in Mississippi by shifting from a system focused on symptom control in institutional settings to one that emphasizes community-based recovery.  The state must create the needed services and supports to help people with mental disorders live in the most integrated setting and pursue meaningful lives.  This will require leadership, financial management, supported housing development, training programs, empowering patients and families, and system monitoring.

## References

Becker, D. R., Drake, R. E., & Bond, G. R. (2014). The IPS supported employment learning collaborative. *Psychiatr Rehabil J, 37*(2), 79-85. doi:10.1037/prj0000044

Bond, G. R. (2004). Supported employment: evidence for an evidence-based practice. *Psychiatr Rehabil J, 27*(4), 345-359.

Bond, G. R., Drake, R. E., Becker, D. R., & Noel, V. (2016a). The IPS Learning Community: A Longitudinal Study of Sustainment, Quality, and Outcome. *Psychiatr Serv, 67*(8), 864-869. doi:10.1176/appi.ps.201500301

Bond, G. R., Drake, R. E., Becker, D. R., & Noel, V. (2016b). Sustaining Individual Placement and Support (IPS) services: the IPS Learning Community. *World Psychiatry, 15*(1), 81-83. doi:10.1002/wps.20294

Bond, G. R., Witheridge, T. F., Wasmer, D., Dincin, J., McRae, S. A., Mayes, J., & Ward, R. S. (1989). A Comparison of Two Crisis Housing Alternatives to Psychiatric Hospitalization. *Psychiatric Services, 40*(2), 177-183. doi:10.1176/ps.40.2.177

Bush, P. W., Drake, R. E., Xie, H., McHugo, G. J., & Haslett, W. R. (2009). The long-term impact of employment on mental health service use and costs for persons with severe mental illness. *Psychiatric Services, 60*(8), 1024-1031.

Commission to Develop a Comprehensive State Mental Health Plan. (2008). *Fulfilling The Promise: Transforming New Hampshire's Mental Health System*. Retrieved from http://www.endowmentforhealth.org/uploads/resources/id69/MHC_Report.pdf

Corrigan, P. W. (2006). Impact of consumer-operated services on empowerment and recovery of people with psychiatric disabilities. *Psychiatric Services, 57*(10), 1493-1496.

Deegan, P. E. (1988). Recovery: The lived experience of rehabilitation. *Psychosocial Rehabilitation Journal, 11*(4), 11.

Deegan, P. E. (1996). *There's a Person In Here*. Paper presented at the The Sixth Annual Mental Health Services Conference of Australia and New Zealand (September 16, 1996); available at https://www.patdeegan.com/pat-deegan/lectures/conspiracy-of-hope, Brisbane, Australia.

Dixon, L. B., Holoshitz, Y., & Nossel, I. (2016). Treatment engagement of individuals experiencing mental illness: review and update. *World Psychiatry, 15*(1), 13-20. doi:10.1002/wps.20306

Dixon, L. B., Lucksted, A., Medoff, D. R., Burland, J., Stewart, B., Lehman, A. F., . . . Murray-Swank, A. (2011). Outcomes of a randomized study of a peer-taught family-to-family education program for mental illness. *Psychiatric Services, 62*(6), 591-597.

Dixon, L. B., Stewart, B., Burland, J., Delahanty, J., Lucksted, A., & Hoffman, M. (2001). Pilot study of the effectiveness of the family-to-family education program. *Psychiatric Services, 52*(7), 965-967.

Drake, R. E., Bond, G. R., Goldman, H. H., Hogan, M. F., & Karakus, M. (2016). Individual Placement And Support Services Boost Employment For People With Serious Mental Illnesses, But Funding Is Lacking. *Health Aff (Millwood), 35*(6), 1098-1105. doi:10.1377/hlthaff.2016.0001

Drake, R. E., Frey, W., Bond, G. R., Goldman, H. H., Salkever, D., Miller, A., . . . Milfort, R. (2013). Assisting Social Security Disability Insurance beneficiaries with schizophrenia, bipolar disorder, or major depression in returning to work. *Am J Psychiatry, 170*(12), 1433-1441. doi:10.1176/appi.ajp.2013.13020214

Drake, R. E., Luciano, A. E., Mueser, K. T., Covell, N. H., Essock, S. M., Xie, H., & McHugo, G. J. (2016). Longitudinal Course of Clients With Co-occurring Schizophrenia-Spectrum and Substance Use Disorders in Urban Mental Health Centers: A 7-Year Prospective Study. *Schizophr Bull, 42*(1), 202-211. doi:10.1093/schbul/sbv110

Eckart, G. (2010). *State Psychiatric Hospitals: History and Trends*. Presentation to the Commission on Mental Health; September 7, 2010. Retrieved from http://www.iccmhc.org/sites/default/files/resources/State%20Psychiatric%20Hospitals-CMH%202010%20%282%29.pdf

Finnerty, M. T., Manuel, J. I., Tochterman, A. Z., Stellato, C., Fraser, L. H., Reber, C. A., . . . Miracle, A. D. (2015). Clinicians' perceptions of challenges and strategies of transition from assertive community treatment to less intensive services. *Community Ment Health J, 51*(1), 85-95. doi:10.1007/s10597-014-9706-y

Goffman, E. (1961). *Asylum*. Garden City, NY: Double Day Anchor Books.

Gudeman, J. E., Dickey, B., Evans, A., & Shore, M. F. (1985). Four-year assessment of a day hospital-inn program as an alternative to inpatient hospitalization. *Am J Psychiatry, 142*(11), 1330-1333. doi:10.1176/ajp.142.11.1330

Keet, R. (2016). Doing more than ACT: The Dutch FACT model, flexible assertive community treatment. *European Psychiatry, 33*, S481-S482. doi:https://doi.org/10.1016/j.eurpsy.2016.01.1765

Kesey, K. (1962). *One flew over the cuckoo's nest*. New York, NY: New American Library.

Kurdyak, P., Vigod, S. N., Newman, A., Giannakeas, V., Mulsant, B. H., & Stukel, T. (2017). Impact of Physician Follow-Up Care on Psychiatric Readmission Rates in a Population-Based Sample of Patients With Schizophrenia. *Psychiatric Services*, appi.ps.201600507. doi:10.1176/appi.ps.201600507

Leucht, S., Leucht, C., Huhn, M., Chaimani, A., Mavridis, D., Helfer, B., . . . Davis, J. M. (2017a). Sixty Years of Placebo-Controlled Antipsychotic Drug Trials in Acute Schizophrenia: Systematic Review, Bayesian Meta-Analysis, and Meta-Regression of Efficacy Predictors. *Am J Psychiatry*, appiajp201716121358. doi:10.1176/appi.ajp.2017.16121358

Leucht, S., Leucht, C., Huhn, M., Chaimani, A., Mavridis, D., Helfer, B., . . . Davis, J. M. (2017b). Sixty Years of Placebo-Controlled Antipsychotic Drug Trials in Acute Schizophrenia: Systematic Review, Bayesian Meta-Analysis, and Meta-Regression of Efficacy Predictors. *Am J Psychiatry, 174*(10), 927-942. doi:10.1176/appi.ajp.2017.16121358

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Luciano, A. E., Bryan, E. L., Carpenter-Song, E. A., Woods, M., Armstrong, K., & Drake, R. E. (2014). Long-Term Sobriety Strategies for Men With Co-occurring Disorders. *Journal of dual diagnosis, 10*(4), 212-219. doi:10.1080/15504263.2014.961884

Luciano, A. E., Metcalfe, J. D., Bond, G. R., Xie, H., Miller, A. L., Riley, J., . . . Drake, R. E. (2016). Hospitalization Risk Before and After Employment Among Adults With Schizophrenia, Bipolar Disorder, or Major Depression. *Psychiatric Services, 67*(10), 1131-1138. doi:10.1176/appi.ps.201500343

McDonagh, M., Dana, T., Selph, S., Devine, E., Cantor, A., Bougatsos, C., . . . Haupt, D. (2017). *Treatments for Schizophrenia in Adults: A Systematic Review. Comparative Effectiveness Review No. 198*. (AHRQ Publication No. 17(18)-EHC031-EF). Rockville, MD: Agency for Healthcare Research and Quality.

McFarlane, W. R., Dixon, L., Lukens, E., & Lucksted, A. (2003). Family psychoeducation and schizophrenia: a review of the literature. *J Marital Fam Ther, 29*(2), 223-245.

McHugo, G. J., Drake, R. E., Whitley, R., Bond, G. R., Campbell, K., Rapp, C. A., . . . Finnerty, M. T. (2007). Fidelity outcomes in the National Implementing Evidence-Based Practices Project. *Psychiatr Serv, 58*(10), 1279-1284. doi:10.1176/ps.2007.58.10.1279

Mueser, K. T., Bond, G. R., Drake, R. E., & Resnick, S. G. (1998). Models of community care for severe mental illness: a review of research on case management. *Schizophr Bull, 24*(1), 37-74.

Mueser, K. T., Noordsy, D. L., Drake, R. E., & Fox, L. (2003). *Integrated Treatment for Dual Disorders: A Guide to Effective Practice*. New York, NY: Guilford Press.

Mueser, K. T., Rosenberg, S. D., Xie, H., Jankowski, M. K., Bolton, E. E., Lu, W., . . . Wolfe, R. (2008). A randomized controlled trial of cognitive-behavioral treatment for posttraumatic stress disorder in severe mental illness. *J Consult Clin Psychol, 76*(2), 259-271. doi:10.1037/0022-006x.76.2.259

National Institute for Health and Care Excellence. (2016). *Transition between inpatient mental health settings and community or care home settings. Clinical Guideline*. United Kingdom: Author.

New Freedom Commission on Mental Health. (2003). Achieving the promise: Transforming mental health care in America. *Final report (Pub No. SMA-03-3832). Bethesda, MD: US Department of Health and Human Services*.

Noel, V., Woods, M., Routhier, J., & Drake, R. (2016). Planning Treatment and Assessing Recovery in Participants With Dual Diagnosis: Preliminary Evaluation of a New Clinical Tool. *Journal of dual diagnosis, 12*(1), 55-62. doi:10.1080/15504263.2016.1146555

O'Connell, M. J., Sledge, W. H., Staeheli, M., Sells, D., Costa, M., Wieland, M., & Davidson, L. (2018). Outcomes of a Peer Mentor Intervention for Persons With Recurrent Psychiatric Hospitalization. *Psychiatric Services, 69*(7), 760-767. doi:10.1176/appi.ps.201600478

Padgett, D., Henwood, B., & Tsemberis, S. (2016). *Housing First: Ending Homelessness, Transforming Systems, and Changing Lives (1st Ed)*. New York, NY: Oxford University Press.

Pharoah, F., Mari, J. J., Rathbone, J., & Wong, W. (2010). Family intervention for schizophrenia. *Cochrane Database of Systematic Reviews*(12). doi:10.1002/14651858.CD000088.pub3

Pinals, D. A., & Fuller, D. A. (2017). *Beyond Beds: The Vital Role of a Full Continuum of Psychiatric Care*. Retrieved from Alexandria, VA:

Rog, D. J., Marshall, T., Dougherty, R. H., George, P., Daniels, A. S., Ghose, S. S., & Delphin-Rittmon, M. E. (2014). Permanent Supportive Housing: Assessing the Evidence. *Psychiatric Services, 65*(3), 287-294. doi:10.1176/appi.ps.201300261

Sledge, W. H., Tebes, J., Rakfeldt, J., & Davidson, L. (1996). Day hospital/crisis respite care versus inpatient care, part I: clinical outcomes. *Am J Psychiatry, 153*(8), 1065.

Stein, L. I., & Test, M. (1980). Alternative to mental hospital treatment: I. conceptual model, treatment program, and clinical evaluation. *Arch Gen Psychiatry, 37*(4), 392-397. doi:10.1001/archpsyc.1980.01780170034003

Thornicroft, G., Szmukler, G., Mueser, K.T., & Drake, R.E. (Eds.). (2011). *Oxford Textbook of Community Mental Health*.  New York, NY: Oxford University Press.

Velligan, D. I., Weiden, P. J., Sajatovic, M., Scott, J., Carpenter, D., Ross, R., & Docherty, J. P. (2010). Strategies for addressing adherence problems in patients with serious and persistent mental illness: recommendations from the expert consensus guidelines. *J Psychiatr Pract, 16*(5), 306-324. doi:10.1097/01.pra.0000388626.98662.a0

Xie, H., Drake, R. E., McHugo, G. J., Xie, L., & Mohandas, A. (2010). The 10-year course of remission, abstinence, and recovery in dual diagnosis. *Journal of Substance Abuse Treatment, 39*(2), 132-140. doi:https://doi.org/10.1016/j.jsat.2010.05.011

Attachment 1: Sample Members

Attachment 2: Individual Findings

Attachment 3: Curriculum Vitae

Attachment 4: Documents Considered

CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

Submitted by:

Robert E. Drake

July 30, 2018
Date