# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff,* v. STATE OF MISSISSIPPI, *Defendant.* | CIVIL ACTION NO. 3:16-CV-00622-CWR-FKB |

## UNITED STATES' RESPONSE MEMORANDUM IN OPPOSITION TO STATE'S MOTION FOR SUMMARY JUDGMENT (REASONABLE MODIFICATIONS)

The United States claims that the State of Mississippi ("the State") unnecessarily requires thousands of adults with mental illness to receive services in State-run psychiatric hospitals ("State Hospitals"), or places them at serious risk of such institutionalization, in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134. Compl., ¶ 1, ECF No. 1. The State could make reasonable modifications to its mental health service system to meet the needs of these individuals in integrated community settings. *Id.*, ¶¶ 121, 124.

The State moves for summary judgment on the ground that the United States cannot satisfy an element of its ADA claim—that reasonable modifications to the State's mental health service system are available to remedy the State's ongoing violations of the ADA. Mem. in Supp. of MSJ, 1 ("Mem."), ECF No. 146. The State argues that the United States must identify *not only* the reasonable modifications it seeks, *but also* the amount of additional community-based services Mississippi needs and the cost of implementing those services. *Id.* at 1, 9. That argument reflects a fundamental misreading of the ADA.

1

To satisfy the reasonable modification element, the United States need only suggest the existence of a plausible accommodation.[1] *Frederick L. v. Dep't. of Pub. Welfare*, 364 F.3d 487, 492 n.4 (3d Cir. 2004); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003). The United States has produced more than enough evidence to meet that burden. The United States has identified the specific modifications to the State's service system it seeks to prevent the unnecessary institutionalization of adults with mental illness in Mississippi. And it has adduced evidence showing that the modifications are reasonable. The necessary community services already exist, to varying degrees, in the State's service system and are less costly than institutional services. The State's insistence that the United States also put forth evidence of the quantity of community-based services Mississippi needs to add and the total cost of the modifications has no legal basis. Accordingly, the Court should deny the State's motion.

**I.     Summary Judgment Standard**

Under Rule 56, summary judgment may be granted "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing whether a dispute to any material fact exists, the court should consider all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citations omitted).

**II.    Statutory and Regulatory Background**

Congress enacted the ADA in 1990 to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination

---

[1] The terms "modification" and "accommodation" are used interchangeably in this brief.

against individuals with disabilities continue to be a serious and pervasive social problem." *Id.* at § 12101(a)(2). It concluded that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." *Id.* at § 12101(a)(7).

The ADA prohibits public entities from discriminating against individuals on the basis of disability in their programs, services, and activities. *Id.* at § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). Public entities include any state or local government, or any department, agency, or other instrumentality of state or local government. *Id.* at § 12131(1).

As directed by Congress, 42 U.S.C. § 12134, the Attorney General issued regulations implementing the ADA. *Id.* at § 12134; 28 C.F.R. § 35.190(a) (2010). Those regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[2] 28 C.F.R. § 35.130(d) (2016). As a public entity, the State has an affirmative obligation to avoid discrimination on the basis of disability by reasonably modifying its policies, practices, or procedures when the modifications are necessary to avoid discrimination, unless it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* at § 35.130(b)(7). Congress recognized that "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion." *Tennessee* v. *Lane*, 541 U.S. 509, 531 (2004). Therefore, "[r]equiring public entities to make changes to rules, policies, practices,

---

[2] "The most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B, at 690 (2015).

or services is exactly what the ADA does." *Hindel v. Husted*, 875 F.3d 344, 349 (6th Cir. 2017 (citations omitted).

Nearly twenty years ago, the Supreme Court ruled that unjustified segregation of individuals with disabilities by public entities constitutes unlawful discrimination under Title II of the ADA and its implementing regulation. *Olmstead v. L.C.*, 527 U.S. 581, 582 (1999). The Court explained that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* at 600. Under *Olmstead*, public entities are required to provide community-based services when: (a) such services are appropriate to the needs of the individual; (b) the affected persons do not oppose community-based treatment; and (c) community-based services "can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities." *Id.* at 607. This mandate applies not only to individuals who are currently residing in institutions, but also to individuals who are at serious risk of institutional placement. *Steimel v. Wernert*, 823 F.3d 902, 913-14 (7th Cir. 2016).

At the same time, the State need not make modification to ensure the provision of services in the most integrated setting if it can show, as an affirmative defense, that the modifications would "fundamentally alter" the nature of the services provided. 28 C.F.R. 35.130(b)(7). The fundamental alteration determination is "a specific, fact-based inquiry[,] . . . taking into account [the public entity's] efforts to comply with the integration mandate with respect to the population at issue and the fiscal impact of the requested relief, including the impact on the State's ability to provide services for other individuals with mental illness." *Disability Advocates, Inc. v. Paterson* ("*DAI*"), 653 F. Supp. 2d 184, 192 (E.D.N.Y. 2009)

4

(construing *Olmstead*, 527 U.S. at 603-04)).  To prove this affirmative defense, the State first must show that it has developed and is implementing a comprehensive and effective plan to serve adults with mental illness in the community.  *Olmstead*, 527 U.S. at 584; *Frederick L. v. Dept. of Pub. Welfare* ("*Frederick L II*"), 422 F.3d 151, 157 (3d Cir. 2005) ("[A] comprehensive working plan is a necessary component of a successful 'fundamental alteration' defense."); *Pa. Prot. and Advocacy, Inc. v. Dept. of Pub. Welfare*, 402 F.3d 374, 381 (3rd Cir. 2005) ("[T]he only sensible reading of the integration mandate consistent with the Court's *Olmstead* opinion allows for a fundamental alteration defense only if the accused agency has developed and implemented a plan to come into compliance with the ADA.").

### III.    The United States Has Identified its Proposed Reasonable Modifications

The ADA requires that a plaintiff articulate a reasonable modification.  *Frederick L.*, 364 F.3d at 492 n.4 (plaintiff has burden of "articulating a reasonable accommodation" that would allow institutionalized persons with disabilities to avoid unnecessary institutionalization); *Henrietta D.*, 331 F.3d at 280 (quoting *Burkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)) (once the plaintiff suggests "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant").  If the public entity chooses to assert its affirmative defense, it has the burden of establishing that the requested relief would fundamentally alter the nature of its services, programs, or activities.  *Olmstead*, 527 U.S. at 603-06; *Frederick L.*, 364 F.3d at 492, n.4; *Henrietta D.*, 331 F.3d at 280-81.

The Supreme Court in *Olmstead* did not call for the level of detail the State now argues is required.  *Olmstead*, 527 U.S. at 604.  The plaintiffs in Olmstead were two individuals with

disabilities who sued the State of Georgia under Title II for unnecessarily segregating them in institutions. *Id.* at 593-94. The Court accepted, for purposes of establishing the existence of a reasonable modification, the possibility that the plaintiffs could be treated in community-based settings. *Id.* at 606-07. The Court did not require the plaintiffs to precisely identify the services they would require, let alone the quantity of services needed or the total cost of implementing those services. *Id.* In fact, the Court made clear that *the State* is the entity that bears the burden of demonstrating that the identified modification would be so extreme as to amount to a fundamental alteration. *Id.* (State could assert fundamental alteration affirmative defense by showing, among other things, that it had a "waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated").

Since *Olmstead*, courts have commonly found that plaintiffs satisfied the reasonable modification element of their prima facie burden by showing that a plausible accommodation is available. *See, e.g.*, *DAI*, 653 F. Supp. 2d at 192 (finding that adding permanent supported housing units was a reasonable modification for purposes of plaintiff's prima facie showing); *Henrietta D.*, 331 F.3d at 280-81 (holding that the injunctive relief ordered by the district court—enforcement of a state law ensuring qualified persons with HIV/AIDS access to certain broadly defined services and benefits—was a "prima facie reasonable accommodation"); *United Spinal Ass'n v. Bd. of Elections in New York*, 882 F. Supp. 2d 615, 626-27 (S.D.N.Y. 2012), *aff'd sub nom. Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014) (in granting plaintiff's motion for summary judgment, finding that the plaintiff's proposed modifications—including broad changes to policies and procedures to ensure polling-site accessibility for persons with physical disabilities—were reasonable); *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 298 (D. Conn. 2008) (holding that requiring the state to

6

assess class members for community placement was a reasonable modification); *Radaszewski v. Maram*, 383 F.3d 599, 611-12 (7th Cir. 2004) (stating that expanding existing private duty nursing service limit under waiver program was a reasonable modification); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1284 (M.D. Fla. 2010) (stating that expanding existing waiver slots to prevent the plaintiff's unnecessary institutionalization was a reasonable modification). Plaintiffs in these cases and others have not been required to describe, as part of their prima facie burden, the quantity of services sought as a reasonable modification or exactly how much those services would cost. *See DAI*, 653 F. Supp. 2d at 192; *Henrietta D.*, 331 F.3d at 280-81; *United Spinal Ass'n*, 882 F. Supp. 2d at 626; *Messier*, 562 F. Supp. 2d at 298; *Radaszewski*, 383 F.3d at 611-12; *Haddad*, 784 F. Supp. 2d at 1284.

The United States has identified the reasonable modifications it is seeking in this case. In response to the State's interrogatories, the United States explained that to remedy ongoing violations of Title II the State must modify its policies, practices, and procedures by:

(1) Ensuring the provision of quality community-based services necessary to successfully support and promptly transition adults with mental illness in State Hospitals into community-based settings where appropriate, and prevent unnecessary State Hospital readmissions. These community-based services include, based on the need of the particular individual, psychiatric services, individual, family, and group therapy, intensive case management (which can be provided through Mississippi's Community Support Service), crisis services, peer support services, Assertive Community Treatment (referred to as PACT in Mississippi), supported employment, and permanent supported housing. In order to provide these community-based services as an effective alternative to State Hospital treatment, the State would need to modify its policies, practices, and procedures to increase the amount and availability of these community-based services throughout the State including by 1) continually collecting and using data and information necessary to identify gaps in the availability and utilization of services; 2) ensuring adequate funding for these community-based services; and (3) ensuring adequate and effective provider capacity.

(2) Ensuring that individuals admitted to State Hospitals receive appropriate and effective discharge planning to prevent unnecessarily prolonged State Hospital admission and unnecessary re-admissions to the State Hospital after discharge. An effective discharge planning process is a collaborative process with the

> hospital-based provider, community-based provider, the individual, and others as appropriate, which identifies the services and supports, and the intensity of those services and supports, necessary to successfully support the person in a community-based setting and prevent unnecessary readmissions; arranges for those services to actually be provided to the person; and facilitates an immediate connection to those services upon discharge so that there is no gap in services.
>
> (3) Effectively identifying, screening, and assessing adults with mental illness in all settings on a regular basis to determine their appropriateness for community-based services, and providing the appropriate services as described in paragraph 1 above.

United States' 2nd Suppl. Resp. to State's 1st Set of Interrog., 3-4 (Ex. 1).

The United States' response names the specific community-based mental health services the State must develop or expand as well as necessary changes to the State's policies and procedures—reasonable modifications squarely in line with those sought in other Title II cases. *See, e.g.*, *Olmstead*, 138 F. 3d at 904; *DAI*, 653 F. Supp. 2d at 192; *Henrietta D.*, 331 F.3d at 280-81; *United Spinal Ass'n*, 882 F. Supp. 2d at 626. The State characterizes that response as a "long answer with no specifics,"[3] but does not explain how exactly the United States has failed to "identify" the reasonable modifications it seeks in this case.[4]

Against the weight of this authority, the State argues that to satisfy the reasonable modification element it is not enough for plaintiffs to articulate a plausible accommodation. According to the State, the United States must also specify "the quantity of community-based services Mississippi should allegedly add to its mental health system" and "the cost of the modifications [the United States] is seeking." Mem. at 9, 3-10. The State cites no legal authority for that assertion.

---

[3] Writing in support of its Motion, the State reproduced paragraph 1 of the United States' second supplemental response to the State's interrogatory concerning reasonable modifications, but failed to include the rest of the response (paragraphs 2 and 3). *Compare* Mem. at 4, *with* United States' 2nd Suppl. Resp. to State's 1st Set of Interrog., 3-4 (Ex. 1).

[4] The State effectively conceded that the United States' interrogatory response is sufficient by not objecting to that response or moving to compel a more detailed answer during discovery.

The State's argument rests on a foundational misreading of the burden-shifting scheme in the ADA. The United States is not required to prove how much of each community-based service Mississippi needs to add or what that would cost the State. *See Frederick L.*, 364 F.3d at 492, n.4; *Henrietta D.*, 331 F.3d at 280; 28 C.F.R. § 35.130(b)(7). Once the United States has articulated a plausible accommodation, the State, if it chooses, has the burden of showing that those modifications would fundamentally alter the nature of its mental health system, including by proffering evidence of the fiscal impact of the requested relief. *See id.; DAI*, 653 F. Supp. 2d at 192; *Pa. Prot. and Advocacy, Inc.*, 402 F.3d at 379.

Furthermore, in placing on the United States the burden of prescribing the specific costs and programmatic changes necessary to achieve compliance with the ADA, the State disrupts the ADA's careful balance between ensuring non-discrimination and preserving the public entity's control over its programs.[5] By design, the ADA gives public entities the latitude and flexibility they legitimately require in the administration of their programs and services. *Tennessee*, 541 U.S. at 532 ("As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways."). The United States has suggested several viable approaches the State could use to implement the requested modifications to its adult mental health service system, including re-allocation of funds from institutions and maximization of the State's Medicaid program.[6] *See* Peet Report at 31-34 (Ex. 3). The State can choose, for

---

[5] Similarly, in crafting injunctive relief following a finding of liability against a state, courts "must give appropriate consideration to principles of federalism, as 'remedies that intrude unnecessarily on a state's governance of its own affairs should be avoided.'" *DAI*, 653 F. Supp. 2d at 312 (quoting *Schwartz v. Dolan*, 86 F.3d 315, 319) (2d Cir. 1996)).

[6] As the United States' systems expert, Melodie Peet, testified in her deposition, there is "no formula" for determining when a state has sufficient community-based services to meet the needs of its adults with mental illness. Peet Dep. at 21:5-9 (Ex. 2). However, she went on to explain that:

example, not to maximize federal Medicaid contributions, so long as it still effectively implements the necessary reasonable modifications. The State's own strategic decisions naturally will dictate the amount of any given community-based service that it needs to add and the total cost of the reforms.[7]

Finally, the State's fixation on what it incorrectly believes are gaps in the United States' prima facie case obscures the evidence of why reasonable modifications to the State's mental health service system are necessary. It is not true, as the State suggests, that Dr. Robert Drake, the United States' lead clinical review expert, "made no determination regarding whether Mississippi is offering sufficient community-based services." Mem. at 6. Based on the clinical review team's assessment of a statistically significant sample of 154 adults who were in State Hospitals over a two-year period, Dr. Drake concluded that Mississippi operates a "hospital-based mental health system with minimal evidence of current, evidence-based community services." Drake Rep. at 2 (Ex. 4). Specifically, Dr. Drake found that "[r]easonable community-based services, such as assertive community treatment, crisis services, transition services, family psychoeducation, integrated dual disorders treatment, shared decision making, supported employment, trauma-informed care, problem-solving therapy, and other evidence-based practices that enhance functioning, improve quality of life, and reduce the need for hospitalization, are scarce or non-existent." *Id.* Dr. Drake in no way contradicted those findings in his deposition testimony, including the excerpts the State cited in its brief. Mem. at 6-7 (citing

---

> "In my experience, what you have to do is, you know, put the infrastructure in place, the basics that are, you know, really seen as the core elements of a community-based system, and then monitoring utilization and continue to adapt and expand the services based on that utilization."

*Id.* at 21:20-22:3.

[7] For example, as the United States' expert, Melodie Peet, has testified, the State may choose to tailor certain community-based services to the needs of each CMHC region, Peet Dep. at 55:20-57:9 (Ex. 2), which in turn may affect the number of service providers needed to avoid unnecessarily institutionalizing adults with mental illness.

10

Drake Dep. at 39:18-21, 44:12-15, 82:8-21, 86:1-5, 174:4-17) (Ex. 5)). That testimony simply acknowledges that Dr. Drake did not form opinions about the *quantity* of community-based services needed in Mississippi or other states, which, as demonstrated above, the United States need not show.

## IV.   The United States' Proposed Modifications are Reasonable

Ample evidence demonstrates that the United States' proposed modifications are reasonable within the context of the State's adult mental health service system. The types of community-based services needed for adults with mental illness already exist in patchwork fashion across Mississippi. In addition to expanding community-based services as an alternative to State Hospital treatment, the State must ensure that individuals admitted to State Hospitals receive effective discharge planning to prevent needless State Hospital re-admissions and effectively screen, identify, and assess individuals at serious risk of institutionalization.[8] United States' 2nd Suppl. Resp. to State's 1st Set of Interrog., 3-4 (Ex. 1). By making these reasonable modifications to its adult mental health service system, the State can serve in integrated settings thousands of individuals with mental illness currently in State Hospitals or at serious risk of such institutionalization.

### a. Expanding community-based services that already exist in Mississippi and that the State agrees are effective is a reasonable modification of the State's mental health service system.

For years, the State has funded and administered scattered community-based services that help adults with mental illness avoid hospitalization and maintain stability in their homes and communities. Program of Assertive Community Treatment (PACT), mobile crisis response, and

---

[8] The State does not acknowledge, let alone challenge, the United States' proposed reasonable modifications relating to effective discharge planning and screening procedures.

11

community support services,[9] among other core community-based interventions, already exist in Mississippi, though often in limited supply or only in parts of the state. Peet Report at 20-23 (Ex. 3). The State cannot credibly argue that extending these same services statewide to individuals who need them to avoid unnecessary hospitalizations is anything but a reasonable modification of its service system. *See, e.g.*, *Messier*, 562 F. Supp. 2d at 345; *Radaszewski*, 383 F.3d at 611-12; *Haddad*, 784 F. Supp. 2d at 1284. Indeed, under the Medicaid Act, the State *already* must provide services included in the Medicaid state plan to Medicaid-eligible individuals when medically necessary. 42 U.S.C. § 1396a(a)(8) (2018); 42 CFR §§ 431.50, 435.930 (2012); Toten Dep. at 77:12-23 (Ex. 7); Windham Dep. at 144:12-23 (Ex. 8).

The State's own admissions and data show that the modifications sought in this case are reasonable. The Mississippi Department of Mental Health ("DMH") found that 39% of Mississippi's population lacked access to *any* community-based mental health care in FY 2017.

---

[9] Assertive Community Treatment, referred to as Program of Assertive Community Treatment (PACT) in Mississippi, is an intensive, team-based mental health service targeting individuals who are heavy utilizers of inpatient services and have significant difficulty meeting basic survival needs without additional support. DMH Standards at 205, 207-8, USDOJ-0000818 (Ex 6). PACT teams provide assistance like 24-7 crisis assessment and intervention; symptom assessment and management; medication prescription, administration, and monitoring; and assistance with activities of daily living, including support to help people gain the skills required to find safe and affordable housing, perform in-home activities (cooking, laundry, grocery shopping), and carry out personal hygiene and grooming tasks. *Id.* at 211-214.

Community support services (CSS) are in-home services and supports that promote "the individual's ability to succeed in the community, to identify and access needed services, and to show improvement in school, work, family, and community participation." *Id.* at 111. Services include medication monitoring, crisis prevention, assistance with accessing services and pursuing recovery goals, and family psychoeducation. *Id.*

Mobile crisis response is an intensive, team-based service designed to provide support to individuals experiencing a mental health crisis at their homes and other community locations. *Id.* at 95. Without mobile crisis response, "the individual experiencing the crisis may be inappropriately and unnecessarily placed in a jail, holding facility, hospital, or inpatient treatment facility." *Id.* Mobile crisis response teams "play an important role in connecting people to options for ongoing services." Peet Report at 11 (Ex. 3).

The State has included PACT, CSS, and mobile crisis response, among other core community-based interventions, as rehabilitative services in its Medicaid state plan. 2012 Mississippi Medicaid State Plan Amendment at 17, https://medicaid.ms.gov/wp-content/uploads/2014/01/SPA2012-003.pdf (last visited Jan. 20, 2019).

DMH FY 2018 Performance Measures at 1, MS-00017889 at 1 (Ex. 9). PACT, for instance, is not offered in 68 of Mississippi's 82 counties.[10] "Programs of Assertive Community Treatment," MS DMH, http://www.dmh.ms.gov/service-options/community-mh-centers/ (last visited Jan. 20, 2019). Where PACT is available, the State has not maximized its utilization,[11] despite its admission that the demand for the service is "overwhelming." State's Answer at ¶ 83, ECF No. 3. Community support services and mobile crisis response, though in theory available statewide, are provided unevenly and often without sufficient intensity to sustain high-risk individuals in the community and prevent unnecessary hospitalizations. Peet Report at 20-22 (Ex. 3). State officials and experts acknowledge that individuals are in State Hospitals because the services that would support them in the community are not available in Mississippi, Maddux Dep. at 31:24-32:9; 148:21-149:12 (Ex. 12); Harris Dep. at 26:5-18, 31:2-8 (Ex. 13), and that by expanding these community-based services the State will decrease reliance on State Hospitals. Allen Dep. at 26:14-17 (Ex. 14); Chastain Dep. 96:5-11 (Ex. 15); Carlisle Dep. 83:17-21 (Ex. 16); Maddux Dep. 149:5-150:8 (Ex. 12).

Moreover, the State agrees that those services are effective in preventing unnecessary hospitalizations, *id.*, and that all Mississippians should have access to them in their communities. DMH FY17-19 Strategic Plan at 4, USDOJ-0001474 (Ex. 22). DMH leadership has repeatedly acknowledged that evidence-based practices like PACT and mobile crisis reduce the need for hospitalization. *See, e.g.*, Day Dep. at 167:15-23, 192:17-19, 193:3-7 (Ex. 17); Allen Dep. at 35:8-12 (Ex. 14); Bailey Dep. at 18:12-19:17 (Ex. 18). Edward LeGrand, the former Executive

---

[10] The State is in the process of implementing a second PACT team in CMHC Region 4 to serve the four counties in Region 4's catchment area where the service is not already available. Hutchins Dep. 110:20-111:10 (Ex. 10). Even with that addition, PACT still will not be available in 64 of Mississippi's 82 counties.

[11] Based on DMH guidelines, the State's eight PACT teams could serve as many as 640 people. DMH Operational Standards at 205 (Ex. 6). Only 384 people received PACT services in FY 2018. DMH Annual FY 2018 Report at 5, MS-00145984c (Ex. 11).

Director of DMH, described PACT as "essential" to keeping individuals in the community and on "the road to recovery." MS-00004797 at 1 (Ex 19). In their depositions, Andrew Day and Veronica Vaughn, both former directors of DMH's Division of Adult Community Services, testified that PACT is an effective service and recommended expanding it, in some form, to areas of the state where it is not available. Day Dep. at 192:17-193:7 (Ex. 17); Vaughn Dep. at 39:7-21 (Ex. 20).

More broadly, DMH has trumpeted its commitment to "transform[ing]" Mississippi's mental health system and has set targets in its annual strategic plans for expanding existing community-based services, including PACT and crisis services. *See* DMH Strategic Plan for FY 2019–2021 at 3, 13, http://www.dmh.ms.gov/wp-content/uploads/2018/06/FY19-FY21-DMH-Strategic-Plan-Final.pdf (last visited Jan. 20, 2019). Yet, DMH has consistently failed to reach even the modest goals it has set for itself. *See* Vaughn Dep. at 114:4-16 (DMH failed to meet its target of opening a Crisis Stabilization Unit in each CMHC region in FY16) (Ex. 20); Allen Dep. at 183:12-21 (DMH failed to meet its FY12 target of creating a community support ("mini-PACT") team in each CMHC region) (Ex. 14); Bailey Dep. at 196:6-21 (DMH failed to meet its target of funding six supported employment sites in FY17) (Ex. 18); MS-00145948d at 6 (DMH FY18 End-of-Year Progress Report) (DMH failed to meet its target of increasing utilization of PACT by 25%) (Ex. 35); *compare* DMH FY2016-FY2018 End of Year Progress Report at 1, USDOJ-0001475 (Ex. 21) (DMH failed to meet its target of reducing readmissions to DMH behavioral health programs by 2%), *with* DMH FY2017-FY2019 Strategic Plan at 10, USDOJ-0001474 (Ex. 22) (removing that 2% target). The State can hardly now claim that actually implementing this promised transformation would be unreasonable.

### b. Community-based services are a cost-effective alternative to treatment in the State Hospitals, further demonstrating the reasonableness of the proposed modifications.

The cost to the State of providing even the *most intensive* community-based service (PACT) to a Medicaid-eligible individual *for an entire year* is less than what it spends, on average, on a single stay in a State Hospital. In FY 2017, the State spent on average between $11,184 and $19,314 per acute stay in the State Hospitals, with average lengths of stay ranging from 24 days to 40 days, depending on the hospital. MS-00023197 (EMSH) (Ex. 23), MS-ROGS-144 (MSH) (Ex. 24), MS-ROGS-162 (NMSH) (Ex. 25), and MS-ROGS-166 (SMSH) (Ex. 26). The cost to the State of providing State Hospital treatment for the full year ranged from $152,935 to $190,533 per person, depending on the hospital. *Id.* Because the State Hospitals do not receive Medicaid funds for acute psychiatric care,[12] those stays are financed almost entirely with state dollars. Toten Dep. 156:10-15 (Ex. 7); Windham Dep. at 110:24-111:1 (Ex. 8); *see, e.g.*, MSH FY18 LBO Report, Special Funds Narrative, http://www.lbo.ms.gov/PublicReports (last visited Jan. 20, 2019) (MSH "receives no federal funds").

By contrast, the cost of providing PACT in Mississippi to Medicaid-eligible individuals for a full year is $44,000 per person,[13] assuming the maximum number of units are billed. O'Brien Report at 13 (Ex. 27).[14] Because Mississippi receives a 75% federal Medicaid match,[15] the highest in the nation, the State's share of that cost is just $11,163. *Id.*

---

[12] The Medicaid Institutions for Mental Diseases ("IMD") exclusion prohibits the use of federal Medicaid financing for care provided to patients in mental health facilities larger than 16 beds. 42 U.S.C. § 1396d(a)(29)(B).

[13] Over time, many individuals who are currently appropriate for PACT may require less intensive and less expensive community-based services. *See* Drake Report at 13 (Ex. 4).

[14] The United States is withdrawing its designation of the Peet Report (Ex. 3) and the O'Brien Report (Ex. 27) as confidential.

[15] Medicaid is a state-federal partnership that serves as the nation's primary health care program for the poor. The costs of each state's Medicaid services are split between the federal and state governments based on a matching rate

Despite that strong incentive, the State fails to effectively leverage available Medicaid resources that would allow it to expand community-based mental health services in a cost-effective manner. The State does not require that CMHCs bill Medicaid for any service that is Medicaid reimbursable before drawing on grant funds. Hutchins Dep. at 151:3-152:6 (Ex. 10); Breland Dep. at 94:11-14 (Ex. 28); *see* Vaughn Dep. at 105:6-11 ("I've not heard that [maximizing Medicaid funding for adult community services] is a priority" for DMH) (Ex. 20). For example, even though individuals who are eligible for PACT in Mississippi generally are also eligible for Medicaid, *see* Day Dep. 202:19-203:5 (Ex. 17), Medicaid processed claims for only 198 individuals to receive the service in FY 2017—barely more than half of the total number of PACT recipients that year. *Compare* USDOJ-0008432 (Ex. 29) at Page 2 ("Magnolia"), Row 123 and Page 5 ("United"), Row 124 (Berkeley Research Group Analyses for Systems Expert) *and* MS-00145980 (Ex. 30) at Page 1, Row 58 (Medicaid fee-for-service claims data), *with* DMH FY 2017 Annual Report at 5, USDOJ-0006168 (387 individuals served) (Ex. 31). The CMHCs that provide PACT instead rely disproportionately on state-funded DMH grants to finance the service,[16] preventing DMH from re-allocating those grant dollars toward developing additional community-based services. Day Dep. at 202:19-203:17 (Ex. 17); Allen Dep. at 159:17-160:8 (Ex. 14).

---

called the federal medical assistance percentage (FMAP). CRS FMAP Report, at 2, https://fas.org/sgp/crs/misc/R43847.pdf (last visited Jan. 20, 2019). Mississippi receives the highest FMAP in the country, 75.67%, meaning that the federal government pays more than three dollars for every one dollar the State spends on Medicaid services. *Id.* at 4-5.

[16] *Compare* MS-00043898 (Ex. 32) at Page 4, Row 120 (total amount of DMH grant funding for PACT in FY17), *with* MS-00145581 (Ex. 33) at Page 4 ("Service"), Column E, Row 101 (total amount paid for PACT by Magnolia/Cenpatico in 2017) (filed under seal); MS-00145583 (Ex. 34) at Page 471-72 ("Interrogatory 8_A_2017"), Column D, Row 42 (total amount paid for PACT by United Health Care in 2017) (filed under seal); and MS-00145980 (Ex. 30) at Tab 1 ("2017- 1 2 3"), Column D, Row 58 (total amount paid for PACT fee-for-service claims by the Mississippi Division of Medicaid ("DOM")).

By making reasonable modifications to its service system—specifically including the expansion of integrated, community-based services as an effective alternative to State Hospitals—the State can deliver on its promise and obligation to serve adults with mental illness in the most integrated settings appropriate to their needs.

## V.  Conclusion

The United States has met its burden of showing that reasonable modifications are available to remedy the State's unnecessary institutionalization of adults with mental illness. The Court should deny the State's Motion.

Dated: January 21, 2019

| | |
|---|---|
| D. MICHAEL HURST, JR.<br>United States Attorney<br>Southern District of Mississippi | ERIC S. DREIBAND<br>Assistant Attorney General<br>Civil Rights Division |
| MITZI DEASE PAIGE [MS BAR 6014]<br>CANDACE MAYBERRY<br>Assistant United States Attorneys<br>501 E. Court Street, Suite 4.430<br>Jackson, MS 39201<br>Telephone: (601) 973-2840<br>mitzi.paige@usdoj.gov<br>candace.mayberry@usdoj.gov | STEVEN H. ROSENBAUM<br>Chief<br><br>REGAN RUSH<br>Deputy Chief<br><br>/s/ *Patrick Holkins*<br>PATRICK HOLKINS<br>JORGE CASTILLO<br>DEENA FOX<br>PATRICK HOLKINS<br>ASHLEY MCDONALD<br>MATHEW SCHUTZER<br>LINDSEY WEINSTOCK<br>Trial Attorneys<br>Special Litigation Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W. - PHB<br>Washington, DC  20530<br>Telephone: (202) 305-6630<br>Patrick.Holkins@usdoj.gov |

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 21, 2019, I electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to all counsel of record.

                                            */s/ Patrick Holkins*
                                            Patrick Holkins