**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 3:16-CV-00622-CWR-FKB |
| STATE OF MISSISSIPPI, | |
| *Defendant.* | |

**UNITED STATES' RESPONSE MEMORANDUM IN OPPOSITION TO STATE'S
MOTION FOR SUMMARY JUDGMENT FOR LACK OF STANDING
TO SUE UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT**

Over two years ago, Mississippi conceded in its Answer that the United States has

authority to sue to enforce Title II of the Americans with Disabilities Act ("Title II" of the

"ADA") under Title II itself and under the Civil Rights of Institutionalized Persons Act

("CRIPA"). Ans. ¶¶ 18-19 (Dkt. 3). Now, however, Mississippi moves for summary judgment

and dismissal contending that Congress did not provide the Attorney General with authority to

bring a cause of action under Title II, while ignoring the Attorney General's authority under

CRIPA. Miss. Mot. for Summ. J. (Dkt. 142). The State's statutory standing argument does not

implicate the Court's jurisdiction, but rather is a merits argument that Mississippi has conceded

and waived. *See* Section III *infra*. On this basis alone, the Court can and should deny the

Motion.

If the Court addresses the merits of the Title II question, it will find that Mississippi's

argument relies on a distorted reading of Title II, dismisses statutory purposes and context, and

disregards the almost unanimous consensus of federal courts that have addressed this issue. The

Attorney General has authority under the ADA to enforce Title II. Mississippi is wrong, as is the

1

solitary out-of-circuit district court decision upon which it principally relies. *See* Section IV *infra*.

Mississippi requests dismissal of the case, Miss. Mot. for Summ. J. ¶ 3, p. 2, but in no instance is that relief appropriate. Even if the Court declines to find a waiver of statutory standing argument, and even if the Court decides that Title II does not provide authority to sue, the United States still has authority to seek a remedy by virtue of CRIPA. 42 U.S.C. § 1997 *et seq.*; *see United States v. Erie County*, 724 F. Supp. 2d 357, 365-66 (W.D.N.Y. 2010). In its Complaint, the United States asserted its authority to sue for violations of Title II under CRIPA. Compl. ¶ 19 (Dkt. 1). Mississippi has conceded this, *see* Ans. ¶ 19, and rightfully did not contradict its pleadings in its Motion for Summary Judgment. Any contrary argument is waived, *see* Section III *infra* (discussing waiver), and the State may not raise the argument in its reply. *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.").

The State, alternatively, moves for a stay pending the outcome of a nonbinding decision on the Title II issue that is not dispositive of this case. The requested stay is against the interests of justice because it would cause significant prejudice to the United States and to Mississippi residents suffering because of the State's violations of Title II, while denying the stay would not unduly prejudice the State. *See* Section V *infra*. The Court should deny the Motion to Stay Proceedings.

## I.      STATEMENT OF UNDISPUTED MATERIAL FACTS

On August 11, 2016, the United States sued to vindicate the rights of adults with mental illness in Mississippi who have suffered, and those at serious risk of suffering, unnecessary institutionalization, in violation of Title II of the ADA. *See generally* Compl. On October 11,

2016, Mississippi filed its Answer. *See* Ans. Discovery closed on December 21, 2018. *See* Text

Order (Dec. 16, 2018). On December 21, 2018, Mississippi moved for summary judgment to

dismiss the Title II claim, but did not challenge the United States' authority to seek Title II

remedies pursuant to CRIPA. *See* Miss. Mem. in Supp. of Mot. for Summ. J. 1 (Dkt. 143)

(hereinafter "MSJ Mem."). In the alternative, Mississippi moved for a stay pending the

resolution of an Eleventh Circuit case related to the Attorney General's standing to sue under

Title II, but not under CRIPA. *Id.* 6-7.

## II.     SUMMARY JUDGMENT STANDARD

Under Rule 56, the Court may grant summary judgment "if there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). When assessing whether a dispute as to any material fact exists, the court should consider

all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving

party. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citations

omitted).

## III.    MISSISSIPPI ADMITTED THAT THE ATTORNEY GENERAL HAS AUTHORITY TO SUE UNDER TITLE II AND WAIVED ITS ARGUMENTS TO THE CONTRARY.

The State seeks dismissal of this action on the basis that Title II of the ADA does not

authorize the Attorney General to sue, yet in its Answer filed over two years ago, the State

admitted the Attorney General's authority. Ans. ¶ 18. Mississippi has never amended its

Answer, but rather engaged in two years of intensive discovery (unrelated to statutory standing)

without ever questioning whether the United States has standing under Title II to sue. After

nearly 60 depositions, production of over 20 expert reports, and ongoing involvement of the

Court, the State raises its statutory standing argument for the first time, without any explanation

for the delay.  Mississippi has waived that argument, and its Motion should be denied.

Mississippi asks the Court to decide whether Congress has authorized the Attorney

General to sue under Title II, MSJ Mem. at 2-5, authority sometimes called statutory standing.[1]

Statutory standing—unlike Article III standing—does "not implicate subject-matter jurisdiction."

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014); *accord*

*Handshoe v. Perret*, 270 F. Supp. 3d 915, 927 (S.D. Miss. 2017) ("Whether a plaintiff lacks

standing under a governing federal statute implicates prudential or statutory standing, and

'statutory standing is not indicative of Article III jurisdictional standing.'") (quoting *Camsoft

Data Sys., Inc. v. Southern Electronics Supply, Inc.*, 756 F.3d 327, 332 (5th Cir. 2014)).  Rather,

the issue "is a merits question."  *Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 497

(5th Cir. 2018) (quoting *Blanchard 1986, Ltd. v. Park Plantation*, LLC, 553 F.3d 405, 409 (5th

Cir. 2008)).  A challenge to statutory standing may be waived.  *See Bd. of Mississippi Levee

Comm'rs v. U.S. E.P.A.*, 674 F.3d 409, 417 (5th Cir. 2012) (holding same and finding statutory

standing argument waived); *see, e.g.*, *Markle Interests, L.L.C. v. United States Fish & Wildlife

Serv.*, 827 F.3d 452, 462-64 (5th Cir. 2016), *vacated and remanded on other grounds*, No. 17-74,

2018 WL 6272043 (U.S. Dec. 3, 2018) (same).  The State has done so here.

Mississippi waived its ability to challenge the Attorney General's authority to sue under

Title II by explicitly conceding such authority exists from the outset of this case.  The United

States alleged the following in its Complaint:

---

[1] Courts have recognized that "'statutory standing' is somewhat of a misnomer because the concept is not jurisdictional."  *Crystaphase Prod., Inc. v. Criterion Catalysts & Techs., LP*, No. 3:17-CV-00265, 2018 WL 4266237, at *10 (S.D. Tex. Aug. 20, 2018), *report and recommendation adopted,* No. 3:17-CV-00265, 2018 WL 4257916 (S.D. Tex. Sept. 6, 2018) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)).

> 18.     This Court has jurisdiction over this action under Title II of the ADA, 42
> U.S.C. § 12133, and 28 U.S.C. §§ 1331, 1345.  The Court may grant the relief
> sought in this action pursuant to 28 U.S.C. §§ 2201-2202.  The United States has
> the authority to seek a remedy for violations of Title II of the ADA, 42 U.S.C.
> §§ 12133-12134; 28 C.F.R. §§ 35.170-174, 190(e).

Compl. ¶ 18.  In its Answer the State confirmed, "The allegations in paragraph 18 of the

Complaint are admitted."  Ans. ¶ 18.  This waived any argument to the contrary.  *See, e.g.*,

*Geoffrion v. Nationstar Mortg. LLC*, 182 F. Supp. 3d 648, 670 n.12 (E.D. Tex. 2016); *MHANY*

*Mgmt. Inc. v. Incorporated Village of Garden City*, 985 F. Supp. 2d 390, 411 (E.D.N.Y. 2013)

(failure to file Rule 12 motion to dismiss on authority to sue grounds waived argument); *see also*

*Lockwood v. Wolf Corp.*, 629 F2d 603, 611 (9th Cir. 1980) (holding allegation admitted in the

pleadings suffices to establish an element of plaintiff's claim).  The State's Answer—which it

has not, and cannot now, amend[2]—effectuated a waiver of the statutory standing argument.

The State's intentional and knowing waiver through its explicit admission of the Attorney

General's authority to sue is bolstered by the State's unexplained and unjustifiable delay of over

two years in raising this pure question of law.  Courts regularly hold that a party waives

threshold statutory standing challenges raised only after the parties and the court have exhausted

considerable resources in bringing the matter well past threshold questions.  *See, e.g.*, *Int'l Meat*

*Traders, Inc. v. H & M Food Sys.*, 70 F.3d 836, 840 (5th Cir. 1995) (at summary judgment,

holding real party-in-interest argument was "waived effectively because of its tardiness");

*Encompass Office Sols., Inc. v. Conn. Gen. Life Ins. Co.*, No. 3:11-CV-02487-L, 2017 WL

3268034, at *13 (N.D. Tex. July 31, 2017) (at summary judgment, holding defendant waived

---

[2] The deadline to amend pleadings passed over a year ago on November 13, 2017.  Case Mgmt. Order 4
(Dkt. 39).  It is too late now to seek such an amendment.  *See Mathieson v. Am. Media, Inc.*, No. 05-
80823-CIV, 2006 WL 8433675, at *4 (S.D. Fla. Aug. 25, 2006) (holding a party may not amend its
pleadings through summary judgment argument, adding, "'Pleadings . . . bind unless withdrawn or altered
by amendment.'") (quoting *Sinclair Refining Co. v. Tompkins*, 117 F.2d 596, 298 (5th Cir. 1941)).

statutory standing argument defendant did not enforce contract term that may have defeated

statutory authority in pre-trial dealings and defendant "waited an additional two years after this

action was filed . . . before asserting" the argument); *Geoffrion*, 182 F. Supp. 3d at 670 n.12

(argument waived when not raised until after plaintiff's case in chief). Here, Mississippi waited

over two years *after expressly conceding* the Attorney General's authority, Ans. ¶ 18 (filed Oct.

11, 2016), and *after* two years of contentious litigation. *See, e.g.*, Order (Dec. 6, 2016) (Dkt. 22)

(granting State's motion to consolidate); Order (Mar. 19, 2017) (Dkt. 131) (vacating

consolidation order); Order (Oct. 12, 2018) (Dkt. 128) (resolving discovery dispute). No

intervening change in law explains this belated shift in position. The only case that supports the

State's Title II argument—an outlier among courts to address this question—was decided the

month *before* the State filed its Answer. *Compare C.V. v. Dudek*, 209 F. Supp. 3d 1279 (S.D.

Fla. Sept. 20, 2016) (hereinafter *Dudek II*) *with* Ans. (filed Oct. 11, 2016).

In sum, Mississippi admits the Attorney General has authority under Title II to sue. At

no point in the last two years has the State suggested it was intending to contradict the binding

concessions made in its pleadings. Had Mississippi timely raised this challenge years ago, the

issue could have been decided before the parties and the Court spent considerable time and

money conducting discovery and prosecuting disputes (none of which bears on the merits of this

argument). The State waived its statutory standing claim through its admissions and its failure to

diligently prosecute this now belated argument.

## IV.    THE ATTORNEY GENERAL HAS AUTHORITY UNDER THE ADA TO ENFORCE TITLE II

Should it reach the question, this Court should deny Mississippi's Motion because the

text, purposes, and legislative history of Title II all demonstrate that the Attorney General has

authority to bring a civil action to enforce Title II.

In enacting Title II's enforcement section,[3] Congress ratified and incorporated into Title II the longstanding administrative and judicial interpretations of the Attorney General's authority to enforce Title VI of the Civil Rights Act of 1964 ("Title VI") and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act").  When Congress enacted the ADA in 1990, the law was clear that the "remedies, procedures, and rights" available to persons under Section 505 of the Rehabilitation Act and Title VI included a federal administrative enforcement process that may culminate in the Attorney General filing a lawsuit in federal court.  Accordingly, by importing the "remedies, procedures, and rights" language into Title II's enforcement provision, 42 U.S.C. § 12133, Congress ratified and incorporated the longstanding interpretation that those "remedies, procedures, and rights" include the possibility of enforcement actions filed by the Attorney General.  *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).  This construction makes perfect sense given that one of Congress's core purposes in enacting the ADA was to "ensure that the Federal Government plays a central role in enforcing the standards established . . . on behalf of individuals with disabilities."  42 U.S.C. § 12101(b)(3).  The statute's legislative history also unequivocally confirms Congress's intent to give the Attorney General a cause of action to enforce Title II.

A.      **Section 12133 Provides The Attorney General Authority To Enforce Title II By Incorporating and Ratifying The Longstanding Enforcement Authority Established By Title VI And The Rehabilitation Act.**

"[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."  *Lorillard* v. *Pons*, 434 U.S. 575,

---

[3] The Title II enforcement provision, in its entirety, states: "The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."  42 U.S.C. § 12133.

581 (1978); *see also Bragdon,* 524 U.S. at 645 ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."). That general rule controls the outcome here: Congress intended the Attorney General to have the same enforcement powers with respect to Title II—including the power to file civil actions—that regulations and judicial decisions, by 1990, had uniformly interpreted the Attorney General to have with respect to Title VI and the Rehabilitation Act.

To enforce the ADA's anti-discrimination provision, Title II states that the "remedies, procedures, and rights" of Section 505 of the Rehabilitation Act are those that Title II "provides to any person alleging discrimination." 42 U.S.C. § 12133 (citing 29 U.S.C. § 794a). Section 505 is the enforcement provision for Section 504 of the Rehabilitation Act, which prohibits disability discrimination by public and private programs or activities that receive federal financial assistance. 29 U.S.C. § 794(a). Section 505, in turn, incorporates the "remedies, procedures, and rights" of Title VI. 29 U.S.C. § 794a(a)(2) (citing 42 U.S.C. § 2000d *et seq.*, among other references). Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. Title VI's "remedies, procedures, and rights" are set out in Section 602 of the Civil Rights Act of 1964, which provides that compliance may be effected by (1) administrative termination of federal funds to a recipient, or (2) "by any other means authorized by law." 42 U.S.C. § 2000d-1. Implementing regulations issued both in 1964 and afterward, and later ratified by Congress, adopted a federal administrative complaint process that could result in enforcement, including a lawsuit, by the Attorney General. Thus, as explained in more detail below, "remedies, procedures, and rights" available to victims of discrimination under Title II, the Rehabilitation Act, and Title VI include an enforcement action by the Attorney General.

1. *The "remedies, procedures, and rights" available to victims of discrimination in violation of Title VI and the Rehabilitation Act include the prospect of an enforcement action brought by the Attorney General.*

From its enactment in 1964, the prospect of the Attorney General bringing an enforcement action under Title VI was part of the "remedies, procedures, and rights" available to a person alleging discrimination. Title VI's enforcement procedures are detailed in its implementing regulations, adopted shortly after the statute was passed. These regulations provide persons who believe that they have been the victims of unlawful discrimination an opportunity to file complaints with federal agencies, which then conduct investigations. *See, e.g.*, 29 Fed. Reg. 16,301 (Dec. 4, 1964) (codified at 45 C.F.R. § 80.7(b)-(c)) (issued by the Department of Health, Education and Welfare (HEW)); *see also* 31 Fed. Reg. 10,267 (July 29, 1966) (codified at 28 C.F.R. § 42.107(b)-(c)) (issued by DOJ). If unsuccessful at resolving the complaint informally, the agency may refer the matter to DOJ to bring "appropriate proceedings" (including lawsuits) against Title VI violators. 45 C.F.R. §§ 80.7(d), 80.8(a); 28 C.F.R. §§ 42.107(d), 42.108(a). As the DOJ Guidelines for Enforcement of Title VI make clear, "court enforcement" against noncompliant recipients of federal financial assistance is an "alternative course[] of action" that federal agencies should consider before terminating federal funding. Such "appropriate court action" includes the "initiation of, or intervention or other participation in, a suit for other relief designed to secure compliance." 31 Fed. Reg. 5292 (Apr. 2, 1966) (codified at 28 C.F.R. § 50.3(c)(I)(A)-(B)); *see also* 28 C.F.R. §§ 2.411(a), 42.412(b) (DOJ regulations coordinating Title VI enforcement). The Fifth Circuit has recognized the regulations as "strong evidence of Congress' understanding" of Title VI. *United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607, 613 n.13 (5th Cir. 1980).

Persons alleging discrimination under the Rehabilitation Act also have the prospect of an Attorney General enforcement action as part of their available "remedies, procedures, and

9

rights." While there was no explicit enforcement provision when Section 504 was first enacted

in 1973, HEW issued regulations in 1977 that, with the oversight and approval of Congress,

incorporated its Title VI complaint and enforcement procedures. *Consolidated Rail Corp. v.*

*Darrone*, 465 U.S. 624, 634 & n.15 (1984). In so doing, HEW created an administrative

enforcement process for the Rehabilitation Act that could culminate in a DOJ enforcement

lawsuit. *See* 42 Fed. Reg. 22,685, 22,694-22,695 (May 4, 1977) (codified at 45 C.F.R. § 84.61)

(incorporating HEW's Title VI regulations, including 45 C.F.R. §§ 80.7-80.8). HEW then issued

regulations that directed agencies to follow the same enforcement and hearing procedures they

used for Title VI. 43 Fed. Reg. 2137, § 85.5(a)(1) (Jan. 13, 1978) (codified at 28 C.F.R.

§ 41.5(a)(1)); *see also* 28 C.F.R. § 42.530 (incorporating Title VI procedures into DOJ

Rehabilitation Act compliance procedures).

The 1977 regulations are "of particular significance" because HEW was the agency

responsible for coordinating the implementation and enforcement of Section 504. *See Bragdon*,

524 U.S. at 632. The Supreme Court recognized they "particularly merit deference" because

HEW drafted them with congressional committee participation, and "Congress itself endorsed

the regulations in their final form." *See Darrone*, 465 U.S. at 634 & n.15.[4] In 1978, Congress

amended the Rehabilitation Act to add Section 505, which expressly incorporates the "remedies,

procedures, and rights set forth in title VI of the Civil Rights Act of 1964." Pub. L. No. 95-602,

§ 120(a), 92 Stat. 2983 (1978) (codified at 29 U.S.C. § 794a(a)(2)). That provision "was

intended to codify the [1977 HEW] regulations . . . governing enforcement of § 504" as "a

specific statutory requirement." *Darrone*, 465 U.S. at 635 & n.16 (citing S. Rep. No. 890, 95th

Cong., 2d Sess. 19 (1978)). In other words, in enacting Section 505, Congress made available to

---

[4] HEW's coordination role was reassigned to DOJ in 1980. *See* Exec. Order 12,250, 45 Fed. Reg. 72995
(Nov. 2, 1980).

victims of disability discrimination an administrative enforcement process that may lead to a DOJ enforcement action.

By the time Congress enacted the ADA in 1990, every court to consider the matter (of which we are aware), including the United States Court of Appeals for the Fifth Circuit, had recognized that the Attorney General could file lawsuits against violators of Title VI or the Rehabilitation Act. *See, e.g.*, *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984), *cert. denied*, 469 U.S. 1189 (1985); *Marion Cty. Sch. Dist.*, 625 F.2d at 612-13, *cert. denied*, 451 U.S. 910 (1981); *National Black Police Ass'n v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983), *cert. denied*, 466 U.S. 963 (1984); *Adams v. Richardson*, 480 F.2d 1159, 1161 n.1, 1164 (D.C. Cir. 1973) (*en banc*); *United States v. Louisiana*, 692 F. Supp. 642, 649 (E.D. La. 1988), *vacated on other grounds*, 751 F. Supp. 606 (E.D. La. 1990); *United States v. Texas*, 321 F. Supp. 1043, 1057 n.18 (E.D. Tex. 1970), *aff'd*, 447 F.2d 441 (5th Cir. 1971); *United States v. Tatum Indep. Sch. Dist.*, 306 F. Supp. 285, 288 (E.D. Tex. 1969). Contrary to Mississippi's argument, *Marion Cty. Sch. Dist.* does not limit the Attorney General's authority to enforce Title VI in court to the enforcement of contractual rights. MSJ Mem. 6. In fact, *Marion Cty. Sch. Dist.* holds the Attorney General retains several "means of action" to enforce Title VI, and expressly relies, in part, on the above-cited implementing regulations to reach this ruling. 625 F.2d at 612-13& n.13. Moreover, the Fifth Circuit made clear four years after *Marion Cty. Sch. Dist.* that an administrative "agency seeking to enforce antidiscrimination provisions of Section 504" may file a federal enforcement action and is not limited to administrative remedies. *Baylor Univ. Med. Ctr.*, 736 F.2d at 1050.

2. *Congress ratified and incorporated into the ADA the longstanding interpretation that "remedies, procedures, and rights" include the possibility of enforcement actions filed by the Attorney General.*

In 1990, when Congress incorporated into Title II of the ADA the "remedies, procedures, and rights" of Section 505 of the Rehabilitation Act, which, in turn, incorporated the "remedies, procedures, and rights" of Title VI, *see* 42 U.S.C. § 12133 (Title II); 29 U.S.C. § 794a(a)(2) (Rehabilitation Act); 42 U.S.C. § 2000d-1 (Title VI), Congress adopted a federal administrative enforcement scheme that included the prospect of a DOJ lawsuit. To that end, and at Congress's direction, 42 U.S.C. §12134(a)-(b), DOJ issued regulations that establish a similar federal administrative enforcement scheme for Title II as those used to enforce Title VI and the Rehabilitation Act. *See* 28 C.F.R. §§ 35.170-35.174, 35.190. If, after an investigation, the agency believes that an administrative complaint alleging disability discrimination under Title II has merit, it will attempt to negotiate a resolution with the public entity that is the alleged violator.[5] 28 C.F.R. §§ 35.172, 35.173; *see also* 28 C.F.R. § 35.190(e) (authorizing DOJ to investigate Title II complaints it receives). If those efforts are unsuccessful and a violation has been found, the agency shall refer the matter to DOJ for the possible filing of a lawsuit. 28 C.F.R. § 35.174.

Mississippi argues that the Attorney General cannot sue to enforce Title II because the Attorney General is not a "person alleging discrimination" under Section 12133. MSJ Mem. 2-3. But, Title II does not authorize the Attorney General to file enforcement suits by equating the Attorney General with a "person alleging discrimination." Rather, Title II provides "persons" alleging discrimination the "remedies, procedures, and rights"—including the prospect of an

---

[5] Here DOJ received a complaint of discrimination, prompting DOJ to investigate and, on December 22, 2011, issue its findings and conclusions in a letter to the Governor, concluding that the State has failed to provide services to adults with mental illness in the most integrated setting appropriate to their needs as required by the ADA. *See* Compl. ¶ 125.

Attorney General enforcement action—that are provided to persons under the Rehabilitation Act and Title VI. Indeed, Congress made clear that the bundle of "remedies, procedures, and rights" of Section 505 are those that Title II "*provides* to any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133 (emphasis added). To "provide" is "to supply or make available." Merriam-Webster, https://www.merriam-webster.com/dictionary/provide (definition of "provide") (last visited Jan. 8, 2019). In other words, Congress "made available" to persons alleging discrimination under Title II the package of "remedies, procedures, and rights" given to persons under Section 505, which includes enforcement actions by the Attorney General. This interpretation comports with the nearly identical language of Section 505(a)(2), which provides that the "remedies, procedures, and rights" set forth in Title VI "shall be available" to any aggrieved person. 29 U.S.C. § 794a(a)(2).[6]

Congress intended the federal government to play "a central role in enforcing the standards established in [the ADA, including Title II] on behalf of individuals with disabilities." 42 U.S.C. § 12101(b)(3). Because Congress enacted Title II specifically to prohibit disability discrimination by public entities that do *not* receive federal financial assistance, the remedy of funding termination is unavailable and the prospect of a federal lawsuit animates the entire administrative scheme. *See* 42 U.S.C. §§ 12101(a)(3), (b)(1) and (3), 12132; *see also Shotz* v. *City of Plantation*, 344 F.3d 1166, 1174 (11th Cir. 2003). For more than 25 years, the Attorney General has taken "appropriate action," 28 C.F.R. § 35.174, by bringing lawsuits in federal court and entering into settlements to remedy public entities' violations of Title II.[7] Given Congress'

---

[6] The State cites *Director, Office of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995), for the proposition that Congress must make clear that the Attorney General has authority to sue. MSJ Mem. 3. But nothing in that decision bars Congress from establishing the Attorney General's enforcement authority by incorporating statutes by reference, as it did in Title II.

[7] Examples of such enforcement are available online, among other places. *See* DOJ, Information & Technical Assistance on the ADA, *ADA Enforcement: Cases 2006-Present*,

explicit goal of *expanding* the reach of the Rehabilitation Act, it would make little sense to construe Title II to create a *weaker* enforcement mechanism than those available under the Rehabilitation Act and Title VI. As the Supreme Court recognized in *Barnes v. Gorman*: "The ADA could not be clearer that the 'remedies, procedures, and rights,"' of Title II "are the same as the 'remedies, procedures, and rights set forth in' § 505(a)(2) of the Rehabilitation Act" and Title VI. 536 U.S. 181, 189 n.3 (2002); 42 U.S.C. § 12201(a) (the ADA should not be construed to provide less protection than the Rehabilitation Act).

Bolstering this understanding are the 2008 amendments to the ADA, occurring after 18 years of enforcement activities by the Attorney General. While Congress amended several provisions of the ADA, it did not amend Title II's enforcement provision, Section 12133. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) (quoting *Lorillard*, 434 U.S. at 580). In the absence of a "clear expression" of congressional intent to overturn these settled administrative and judicial interpretations, this Court should "continue to read" Section 12133 as authorizing the Attorney General to sue under Title II. *Forest Grove Sch. Dist.*, 557 U.S. at 240.

Accordingly, every court to have considered the question has recognized the Attorney General's authority to sue under Title II except for the one district court decision on which Mississippi relies. *See United States v. Harris Cty.*, No. 4:16-CV-2331, 2017 WL 7692396, at *1 (S.D. Tex. Apr. 26, 2017); *United States v. Virginia*, No. 3:12CV59-JAG, 2012 WL 13034148, at *2 (E.D. Va. June 5, 2012) (rejecting argument that United States lacks standing to

---

https://www.ada.gov/enforce_current.htm#TitleII (last visited Jan. 15, 2019) & *ADA Enforcement: Cases 1999-2005*, https://www.ada.gov/enforce_current.htm#TitleII (last visited Jan. 15, 2019).

enforce Title II and stating that "the United States has the authority to initiate legal action to enforce Title II of the ADA"); *Smith v. City of Phila.*, 345 F. Supp. 2d 482, 489-90 (E.D. Pa. 2004) (dismissing private individual's Title II claim but retaining jurisdiction over United States' Title II claim because United States has "separate and independent basis for jurisdiction under Title II of the ADA and Section 504 of the Rehabilitation Act"); *United States v. City & Cnty. of Denver*, 927 F. Supp. 1396, 1399-1400 (D. Colo. 1996) (finding that the Department of Justice had met the requirements necessary to bring a Title II claim); *see also, e.g.*, *United States v. N. Ill. Special Recreation Ass'n*, No. 12-cv-7613, 2013 WL 1499034, at *5 (N.D. Ill. Apr. 11, 2013) (denying motion to dismiss United States' Title II complaint alleging that public athletic association discriminates against individuals with epilepsy); *United States v. City of Baltimore*, 845 F. Supp. 2d 640, 653 (D. Md. 2012) (granting Department of Justice's motion for summary judgment on Title II claim).  Even an earlier ruling by a different district judge in the *Dudek* matter found such authority.  *A.R. ex rel. Root v. Dudek*, 31 F. Supp. 3d 1363, 1371 (S.D. Fla. 2014).

Mississippi relies exclusively on District Judge Zloch's opinion in *Dudek II*, 209 F. Supp. 3d at 1281, and its flawed analysis that no other court has accepted.  *See* MSJ Mem. 3-7.  A recent Texas district court expressly rejected *Dudek II*, holding that "the plain language of the ADA, its legislative history, and the implementing regulations clearly establish that the United States has authority to bring lawsuits under Title II of the ADA."  *Harris Cty.*, 2017 WL 7692396, at *1.  This Court should not accept Mississippi's invitation to extend the errors of *Dudek II*, but rather recognize the Attorney General's authority to sue under Title II in accord with every other court to have considered the issue.

**B.    The ADA's Legislative History Confirms That Congress Intended The Attorney General To Have A Cause Of Action To Enforce Title II.**

The ADA's legislative history confirms what the statutory text makes clear: Congress intended to give the Attorney General a cause of action to enforce Title II.  Both the House and Senate committee reports accompanying the enactment of the ADA state that enforcement of Title II "should closely parallel the Federal government's experience with section 504 of the Rehabilitation Act" and that the Attorney General "should use section 504 enforcement procedures and the Department's coordination role under Executive Order 12250 as models." H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 98 (1990) ("House Report II"); S. Rep. No. 116, 101st Cong., 1st Sess. 57 (1989) ("Senate Report").  The congressional committees envisioned "Federal agencies, including the Department of Justice, will receive, investigate, and where possible, resolve complaints of discrimination.  If a Federal agency is unable to resolve a complaint by voluntary means, the Federal government would use the enforcement sanctions of section 505 of the Rehabilitation Act of 1973."  House Report II, at 98; Senate Report 57.

Significantly, the committee reports explain: "Because the fund termination procedures of section 505 are inapplicable to State and local government entities that do not receive Federal funds, *the major enforcement sanction* for the Federal government will be *referral of cases* by these Federal agencies to the Department of Justice," so that the Department "may then proceed *to file suits in Federal district court*.  As with section 504, there is also a private right of action for persons with disabilities."  House Report II, at 98 (emphasis added); Senate Report 57-58 (same); *see also* Senate Report 101 (views of Sen. Hatch) (bill "subjects state and local governments to the remedies available under Section 505," which include referrals of cases to the Department of Justice).  Clearly, Congress believed and intended to grant the Attorney General a cause of action by importing the "rights, procedures, and remedies" language into Title

II, which the Supreme Court confirms is the "relevant inquiry." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 711 (1979) ("For the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was.") (citation and internal quotation marks omitted).

> **C.**     **Comparing the Enforcement Provisions of Titles I and III of the ADA to Title II Does Not Undermine the Attorney General's Authority to Sue Under Title II.**

Mississippi misinterprets the references to the Attorney General in the enforcement provisions of Titles I and III of the ADA to suggest Congress did not authorize the Attorney General to bring suit under Title II. MSJ Mem. 4-5. The differences, however, are readily explained by the fact that, unlike with Title II, Congress could not have conveyed its intended meanings with respect to enforcement of Titles I and III without explicit references to particular government actors, including the Attorney General. Titles I, II, and III simply illustrate different ways in which Congress can grant litigation authority to the Attorney General, not some tacit intent to preclude the Attorney General from bringing actions to enforce Title II, as Mississippi argues. MSJ Mem. 4.

The enforcement section of Title I cross-references five different provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), which establishes a complicated regime in which different enforcement actions may be taken by complainants, the Equal Employment Opportunity Commission, and the Attorney General. 42 U.S.C. § 12117(a). Because the point of Section 12117(a) was to make clear that the same division of authority among the various actors under the five different sections of Title VII applies to Title I of the ADA, Congress avoided confusion by specifying the actors among whom the authority is divided. No such references were necessary to prevent confusion under Title II, which cross-references only a single section of another statute to incorporate a well-established enforcement mechanism.

Title III, unlike Titles I and II, does not merely incorporate a preexisting enforcement scheme. To be sure, to address disability discrimination in public accommodations, Title III incorporates the preexisting remedies and procedures of Title II of the Civil Rights Act of 1964, which also addresses discrimination in public accommodations. 42 U.S.C. § 12188(a) (citing 42 U.S.C. § 2000a-3(a)). But Title III of the ADA names the Attorney General because it expands on the Attorney General's enforcement authority with new authority to seek damages and civil penalties not available in Title II of the Civil Rights Act of 1964. 42 U.S.C. § 12188(b). Congress could not have expanded the enforcement power of the Attorney General under Title III of the ADA without express reference to the Attorney General. Title III's enforcement provision does not imply that the Attorney General lacks enforcement authority under Title II.

Title II of the ADA, on the other hand, incorporates a single, existing enforcement scheme established under Title VI and incorporated into the Rehabilitation Act. As discussed above, when Congress enacted Title II, the Attorney General's authority to enforce these two statutes through litigation had already been established. The relative lack of detail in Title II's enforcement provision is mirrored in how Congress approached other provisions of Title II. 42 U.S.C. §§ 12132-12134. In explaining Congress's different drafting approach to Title II, as compared with Titles I and III, one House Committee Report accompanying the ADA's enactment emphasized that "[t]he Committee has chosen not to list all the types of actions that are included within the term 'discrimination', as was done in titles I and III, because this title essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of state and local governments." House Report II, at 84. In short, whereas Titles I and III of the ADA could not make clear the Attorney General's authority without explicit reference to the Attorney General, Congress could and did make such authority clear in Title II with a simpler cross-reference.

Relatedly, Mississippi invokes several principles of statutory interpretation, MSJ Mem. 4-5, but as the above shows, none can be used to conclude that the Attorney General lacks authority to sue to enforce Title II. Rather, it is Mississippi that violates the obligation to "interpret[] provisions of a statute in a manner that renders them compatible, not contradictory," *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 488 n.8 (5th Cir. 2013), by its attempt to deny the federal government the "central role in enforcing" Title II that Congress demands. 42 U.S.C. § 12101(b)(3)); *see* Black's Law Dictionary (10th ed. 2014) (defining "enforce," in relevant part, as "[t]o give force or effect to (a law, etc.); to compel obedience to"). This Court should affirm the Attorney General's central enforcement role regarding Title II.

## V. A STAY OF PROCEEDINGS IS UNWARRANTED AND PREJUDICIAL.

Mississippi's request for a stay pending the appeal of the *Dudek II* decision should be denied. "The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997). The burden to demonstrate a stay is appropriate is a heavy one. *David v. Signal Int'l, LLC*, 37 F. Supp. 3d 836, 840 (E.D. La. 2014) (quoting *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 761 F.2d 198, 203 n.6 (5th Cir. 1985)). In considering whether to grant a motion to stay, the Court should consider (1) harm to the non-movant, (2) hardship or inequity for the movant if the stay is denied, and (3) whether the stay would simplify or complicate issues, proof, and questions of law. *Chapman v. Allstate Prop. & Cas. Ins. Co.*, No. 3:16-CV-613-DPJ-FKB, 2017 WL 7795113, at *1 (S.D. Miss. Mar. 28, 2017). Here, the State has argued only that *Dudek II* "may provide federal circuit court guidance for this Court in deciding the standing issues." MSJ Mem. 7. The State's request to delay this case in order to await a decision that is not binding on this Court is insufficient for several reasons.

First, as discussed above, Section III *supra*, Mississippi has already conceded the United States' authority to sue directly under Title II, and its new contradictory challenge is untimely and waived. The State has provided no justification for this Court to reconsider the previously admitted authority. Because a stay now would only exacerbate Mississippi's unjustified delay in bringing its challenge, a stay does not promote the "interests of justice." *McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982); *see, e.g.*, *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 102 (2d Cir. 2012) (finding "defendants' failure to make use of the ability they had, and the additional assistance the district court offered . . . paints their insistence that the civil proceedings be stayed as part of a larger pattern of overall delay and obfuscation").

Second, a stay would significantly prejudice the United States because it almost certainly would require postponing the trial and reopening discovery to update evidence. *See Saenz v. City of El Paso, Tex.*, No. EP-14-CV-244-PRM, 2015 WL 4590309, at *4 (W.D. Tex. Jan. 26, 2015) (recognizing the "obvious interest" a plaintiff has in bringing a case to trial). As the Supreme Court recognized, a stay "delaying trial would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party." *Clinton*, 520 U.S. 707-08. Here those evidentiary risks are palpable. The parties have conducted 58 depositions, reviewed thousands of pages of factual and expert disclosures, and spoken with more than one hundred currently and formerly institutionalized persons in Mississippi. Much of that evidence can grow stale and would need updating to reflect the governing circumstances at the time any stay issued by this Court is lifted. The danger of witnesses becoming unavailable for health reasons or death is very real in this case, as evidenced by the fact that several individuals who had been in a State Hospital between October 2015 and October 2017 died before they could be interviewed by the United States' experts. It will also not be easy to reschedule a trial of this length.

Third, there is no undue burden on Mississippi in denying the stay because a decision in *Dudek II* is non-binding on this Court and CRIPA enables the United States to proceed to trial irrespective of the Attorney General's authority under Title II of the ADA. "[A]bsent a showing of undue prejudice upon defendant or interference with his constitutional rights, there is no reason why plaintiff should be delayed in its efforts to diligently proceed to sustain its claim." *Louis Vuitton Malletier S.A.*, 676 F.3d at 97 (internal citation and quotation marks omitted).

Finally, a stay is unwarranted because it will unnecessarily prolong violations of Title II suffered by persons inappropriately institutionalized in Mississippi's State Hospitals. Courts consider harm to nonparties and the public interest, especially where the pleadings include allegations of violations of federal law that cause harm to the public. *See, e.g.*, *Benham v. Ozark Materials River Rock, LLC*, No. 11-CV-339-JED-FHM, 2013 WL 5372301, at *3 (N.D. Okla. Sept. 24, 2013) (denying stay, holding "public interest favors compliance with federal [] statutes and expeditious resolution of civil litigation"). This case was filed over two years ago and every day people are unnecessarily institutionalized in the State Hospitals. *See, e.g.*, U.S. Resp. Mem. in Opp'n to Miss. *Daubert* Mot. (Dkt. 151) (showing State has admitted that individuals in State Hospitals are committed even when a State Hospital is not the most integrated setting appropriate for the individual).

For all these reasons, a stay pending the resolution of a nonbinding, out-of-circuit decision is inappropriate.

## CONCLUSION

For the foregoing reasons, the Court should deny Mississippi's Motion for Summary Judgment and Alternative Motion to Stay Proceedings.

Dated January 21, 2019.

D. MICHAEL HURST, JR.
United States Attorney
Southern District of Mississippi

MITZI DEASE PAIGE [MS BAR 6014]
CANDACE MAYBERRY
Assistant United States Attorneys
501 E. Court Street, Suite 4.430
Jackson, MS 39201
Telephone: (601) 973-2840
mitzi.paige@usdoj.gov
candace.mayberry@usdoj.gov

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief

REGAN RUSH
Deputy Chief

*/s/ Jorge M. Castillo*
JORGE M. CASTILLO (NY 4893194)
MATHEW SCHUTZER
DEENA FOX
PATRICK HOLKINS
ASHLEY MCDONALD
LINDSEY WEINSTOCK
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - PHB
Washington, DC  20530
Telephone: (202) 305-2396
jorge.castillo@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Jorge M. Castillo, Attorney for the United States, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties.

**THIS** 21st day of January, 2019.

/s/ Jorge M. Castillo
Jorge M. Castillo