**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                                          **PLAINTIFF**

**V.**                                              **CIVIL ACTION NO.: 3:16-CV-00622-CWR-FKB**

**THE STATE OF MISSISSIPPI**                                              **DEFENDANT**

<u>**THE STATE OF MISSISSIPPI'S TRIAL BENCH BRIEF**</u>

**Introduction**

The United States sued the State of Mississippi under a single cause of action:  Alleged violations of Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12131-12134, as interpreted by *Olmstead v. L.C.*, 527 U.S. 581 (1999).  The United States' interpretation of *Olmstead* in this case goes far beyond the actual parameters of *Olmstead*, and is at odds with the amicus brief the United States filed in *Olmstead*.  This Court should interpret and apply *Olmstead* in accordance with its actual terms as follows:

- In order to prevail on its claim, the United States must prove, among other things, that a reasonable modification of Mississippi's mental health service system is available.  The United States cannot satisfy the reasonable modifications prong of its claim because it has not identified (i) the reasonable modifications Mississippi must allegedly make to its mental health service system, (ii) the quantity of community-based services Mississippi should allegedly add to its mental health service system, or (iii) the cost of the modifications it is seeking.

- *Olmstead* holds that ***unnecessary*** isolation is discrimination based on disability, but it also holds that States need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities.  *Olmstead* does not ban institutional care.  If institutionalization is necessary, it is not discriminatory.

- Even if the United States establishes the elements of its claim, Mississippi may present a defense that the relief the United States requests would not require a reasonable modification of Mississippi's programs, but would fundamentally alter the nature of its programs.  A formal *Olmstead* plan is not a prerequisite to asserting a fundamental alteration defense.

- Institutional settings, such as Mississippi's State Hospitals, are a legitimate part of the mental health continuum of care.

- States may rely on the reasonable assessments of its professionals, and the courts should generally defer to those assessments.

- In comparing the cost of institutional care to the cost of community-based care, the fixed costs of institutional care should be considered.

- Deinstitutionalization is not a panacea.  It has produced positive and negative results.  The key to positive outcomes is to deinstitutionalize responsibly.  Mississippi is deinstitutionalizing responsibly.

- *Olmstead* does not require the States to create programs.

- The ADA does not impose a standard of care on the States nor does it require States to provide a certain level of benefits.

When *Olmstead* is applied as intended, the United States' ADA claim against Mississippi fails and should be dismissed, but the Court should note several additional key points.

First, Mississippi's State Hospitals do not control their own front doors.  The exclusive avenue for civil commitment of adults with serious mental illness (SMI) to a State Hospital in Mississippi is a chancery court order.  Mississippi's State Hospitals must comply with chancery court commitment orders.

Second, community-based services can help individuals remain in the community, but, as the United States' experts admit, they do not always do so.

Third, the federal mental health service system imposes barriers on the ability of the States to provide community-based services. One of the barriers imposed by the federal system is the Institutions for Mental Disease (IMD) exclusion, which generally prohibits using federal funds to pay for the care that adults with SMI receive in state hospitals.  The IMD exclusion limits Mississippi's ability to fund community-based services.

Fourth, the courts have paid undue deference to DOJ's "at-risk of institutionalization" position.

Fifth, the United States seeks to impose requirements on Mississippi that no other State meets or can meet.  The United States alleges that Mississippi must provide a mental health

service system that has no "gaps" and no "unmet needs" and is available "uniformly" throughout the State.  Although those are worthy aspirational goals for all States, no State can deliver such a mental health care system on a state-wide basis.

Sixth, in a case like this, where the United States seeks system-wide relief, Title II of the ADA and *Olmstead* require only that States have a mental health service system that delivers a reasonable continuum of mental health services.  Because Mississippi does so, it is not engaging in discrimination within the meaning of Title II of the ADA and *Olmstead*.

Seventh, the United States is not entitled to individualized injunctive relief because there are no individual plaintiffs and this is not a class action, nor is the United States entitled to system-wide permanent injunctive relief.  Because Mississippi delivers a reasonable continuum of mental health services, the United States' claim should be dismissed.

Another federal district court, in *Martin v. Taft*, poignantly summed up *Olmstead* cases: "No one with a conscience and any sense of fundamental fairness would argue that mentally retarded and developmentally disabled people who are capable of living in the community should be kept in segregated institutions.  In this regard, it is crucial to note that defendants are in no way opposed to providing such community-based services.  They agree that it is a good thing, and they and their predecessors have instituted programs that provide community-based services, although not at the pace plaintiffs believe is required by federal law."  *Martin v. Taft*, 222 F.Supp.2d 940, 987 (S.D. Ohio 2002).  Community-based services are a good thing and Mississippi provides them.  The United States contests the pace at which Mississippi is doing so.

The *Martin* court continued:  "In a larger sense, this case is, unfortunately, not as simple as deciding whether providing community-based services is a good idea.  Government programs, federal and state, operate with limited resources, and these limited resources must be allocated in a manner that serves a wide variety of needs with fairness.  Germane to this case, the U.S.

PD.26019430.1

Supreme Court has recognized that a state has a legitimate need to retain some institutions, as there will always be people who will need services in such settings, and hence a certain portion of the resources available to a state will always be directed to such institutions." *Id*.

The continuum of mental health care includes both community-based care and institutional care. *Olmstead* requires a balancing of the needs for institutional care and community-based care. The United States' desire to eliminate institutional care from the continuum of care is contrary to *Olmstead*.

The Court should apply *Olmstead* as written, and not how the United States seeks to have it misapplied in this case. Mississippi is in compliance with *Olmstead* as written.

**I.     *Olmstead*.**

    **A.     Title II and its implementing regulations.**

*Olmstead* concerned Title II of the ADA. In pertinent part, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Olmstead*, 527 U.S. at 589-90, *quoting* 42 U.S.C. § 12132. State governments are "public entities" under Title II. *Id*. at 590.

Congress instructed the United States Attorney General (Attorney General) to issue regulations implementing provisions of Title II. *Id*. at 591. The Attorney General issued the following integration regulation: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id*. at 592, *citing* 28 CFR § 35.130(d) (1998).

The Attorney General also issued the reasonable modifications regulation as follows: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public

PD.26019430.1

entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.*, *citing* 28 CFR § 35.130(b)(7) (1998).  In short, "the state is required to make reasonable modifications to its practices, but is not required to fundamentally alter the nature of any program." *Martin*, 222 F.Supp.2d at 970.

The *Olmstead* Court cited these regulations "with the caveat that we do not here determine their validity." *Olmstead*, 527 U.S. at 592.

*Olmstead* found that the Attorney General made two key determinations in issuing the integration and reasonable modifications regulations.  *Id.* at 596.  "The first concerned the scope of the ADA's discrimination proscription, 42 U.S.C. § 12132; the second concerned the obligation of the States to counter discrimination.  As to the first, the Attorney General concluded that unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II …. Regarding the States' obligation to avoid unjustified isolation of individuals with disabilities, the Attorney General provided that States could resist modifications that 'would fundamentally alter the nature of the service, program, or activity.'" *Id.* at 596-97 (internal citations omitted).

**B.    Facts of *Olmstead*.**

*Olmstead* involved two plaintiffs – L.C. and E.W.   L.C. was diagnosed with schizophrenia, and E.W. with a personality disorder. *Olmstead*, 527 U.S. at 593. "In May 1992, L.C. was voluntarily admitted to Georgia Regional Hospital at Atlanta (GRH), where she was confined for treatment in a psychiatric unit.  By May 1993, her psychiatric condition had stabilized, and L.C.'s treatment team at GRH agreed that her needs could be met appropriately in one of the community-based programs the State supported. Despite this evaluation, L.C.

remained institutionalized until February 1996, when the State placed her in a community-based treatment program." *Id*.

E.W. was voluntarily admitted to GRH in February 1995, and was confined for treatment in a psychiatric unit. *Id*. "By 1996, E.W.'s treating psychiatrist concluded that she could be treated appropriately in a community-based setting. She nonetheless remained institutionalized until … 1997." *Id*.

L.C. alleged that the State's failure to place her in a community-based program, once her treating professionals determined that such placement was appropriate, violated Title II of the ADA. *Id*. at 594. L.C. requested "that the State place her in a community care residential program, and that she receive treatment with the ultimate goal of integrating her into the mainstream of society. E.W. intervened in the action, stating an identical claim." *Id*.

In its amicus brief in *Olmstead*, the United States noted L.C. alleged that the State of Georgia "had violated Title II of the ADA and its implementing regulations by failing to offer her treatment in a community-based residential program after treatment professionals determined that such a placement was appropriate." *Olmstead v. L.C.*, 1999 U.S. S.Ct. Briefs, LEXIS 566 at *2.[1] This factor is largely absent in this case. Patients in Mississippi's State Hospitals are discharged to the community when Mississippi's treatment professionals determine that discharge to the community is appropriate.

In this case, the Court will hear that in limited instances there is a delay between when Mississippi's treatment professionals determine that a patient can be discharged to the community and when an appropriate community placement can be arranged for that patient. In its amicus brief in *Olmstead*, the United States recognized that such delays legitimately occur in the real world: "[N]othing in the ADA suggests that courts must ignore the State's legitimate

---

[1] The United States' amicus brief in *Olmstead* is attached as Exhibit 1.

administrative concerns in accomplishing the transition of eligible individuals from institutional to community-based care.  The transfer of eligible persons from institutions to the community is a multifaceted process that sometimes cannot be accomplished all at once.  Even when treating professionals have evaluated eligible individuals and determined that a community setting is appropriate, States will need to locate proper community placements and determine which eligible individuals should receive priority for available slots."[2]  *Olmstead v. L.C.*, 1999 U.S. S.Ct. Briefs, LEXIS 566 at *22.

> **C.**    ***Olmstead's* holding.**

*Olmstead* held as follows:  "Unjustified isolation, we hold, is properly regarded as discrimination based on disability.  But we recognize, as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand.  Accordingly, we further hold that the Court of Appeals' remand instruction was unduly restrictive.  In evaluating a State's fundamental-alteration defense, the District Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably."  *Olmstead*, 527 U.S. at 597.  The need to maintain a "range of facilities" and a "range of services" includes state hospitals.

> **D.**    **The United States' Burden of Proof.**

To prevail on an ADA claim under *Olmstead*, Plaintiff must establish the following elements:

> 1.    The plaintiffs have a mental disability satisfying the ADA's disability requirement.

---

[2] This statement of the United States recognizes that not having "available slots" for literally all qualified individuals is not a violation of the ADA.

2.      The plaintiffs are institutionalized, or the plaintiffs are in need of services that are offered in the community-based program, but would have to submit to institutionalization to receive them.[3]

3.      The plaintiffs are qualified to participate in an existing, less restrictive state program for community-based care, giving due deference to the reasonable eligibility assessment of the state's own professionals.

4.      The plaintiffs' request for community-based services can be reasonably accommodated.

5.      The plaintiffs do not oppose participation in the state's existing program for community-based care.

6.      The plaintiffs have nonetheless been excluded from participation in the program for community-based care.

*Martin*, 222 F.Supp.2d 971-72, *citing Olmstead*, 527 U.S. at 587.

If the United States satisfies these elements, Mississippi "may present a defense that the relief [the United States] requests would not require a reasonable modification of the program, but would fundamentally alter the nature of the program." *Martin*, 222 F.Supp.2d at 972, *citing Olmstead*, 527 U.S. at 604.

**E.      The fundamental alteration defense.**

A plurality of the Justices in *Olmstead* found that States can assert a fundamental alteration defense. "The State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless." *Olmstead*, 527 U.S. at 603. Indeed, the reasonable modifications regulation allows States to resist modifications that entail a fundamental alteration of the States' services and programs. *Id.*, *citing* 28 CFR § 35.130(b)(7) (1998).

In *Olmstead*, the Eleventh Circuit Court of Appeals' construed the reasonable modifications regulation "to permit a cost-based defense 'only in the most limited of circumstances,' and remanded to the District Court to consider, among other things, 'whether the

---

[3] *See* Section VI, *infra*.

additional expenditures necessary to treat L.C. and E.W. in community-based care would be unreasonable given the demands of the State's mental health budget.'"  *Id*. at 603 (internal citations omitted).

*Olmstead* found that "[t]he Court of Appeals' construction of the reasonable-modifications regulation is unacceptable for it would leave the State virtually defenseless once it is shown that the plaintiff is qualified for the service or program she seeks.  If the expense entailed in placing one or two people in a community-based treatment program is properly measured for reasonableness against the State's entire mental health budget, it is unlikely that a State, relying on the fundamental-alteration defense, could ever prevail." *Id*.

Under *Olmstead*, the proper standard is this:  "Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Id*.

The fundamental alteration test must take into account "the state's need to maintain institutions for those individuals for whom community-based care may never be appropriate, as well as for those who may require institutionalization from time to time." *Martin*, 222 F.Supp.2d at 971.  "[I]n evaluating the fundamental alteration defense, a court must carefully consider the state's legitimate interest in providing a variety of services for persons with mental disabilities, including institutional-based services, as well as the state's interest in allocating available resources fairly and evenhandedly." *Id*.

Courts should consider the following factors when applying the fundamental alteration analysis:

1.      The resources available to the State;

2.      The State's responsibility to care for and treat a large and diverse population of persons with mental disabilities, including those who will require services in an institutional setting; and

3.      Whether the relief plaintiffs seek would be inequitable given the above considerations.

*Id.*, 222 F.Supp.2d at 986, *citing Olmstead*, 527 U.S. at 604.

> **F.      A Formal *Olmstead* Plan Is Not a Prerequisite To Asserting A Fundamental Alteration Defense.**

Mississippi does not have a single written document that constitutes an *Olmstead* plan, but it does have a collection of documents and practices that constitute its *Olmstead* plan.  The United States alleges that this prohibits Mississippi from asserting a fundamental alteration defense, but the United States is mistaken.  *See Sanchez v. Johnson,* 416 F.3d 1051, 1068 (9th Cir. 2005).  Federal district courts have also found that an *Olmstead* Plan is not a requirement to assert the fundamental alteration defense.  *See, e.g., Disability Advocates, Inc v. Paterson*, 598 F. Supp.2d 289 (E.D. N.Y. 2009); *Martin*, 222 F.Supp.2d at 985-86.

*Olmstead* provided the following example regarding the fundamental alteration defense: "If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met."  *Olmstead*, 527 U.S. at 605–06.

"Nothing in the *Olmstead* decision suggests that this illustration was meant to express the exclusive means for determining the reasonable accommodation issue.  Indeed, the use of the word 'example' implies the opposite.  The quoted language is but one way a defendant may prevail if the plaintiff proves a prima facie case.  If the defendant fits the example, it has

essentially proven that it has ***already reasonably accommodated*** the plaintiff's request for participation in a community-based program.  The presence or absence of an existing state plan and a waiting list that moves at a reasonable pace does nothing whatsoever to answer whether, in the first instance, a reasonable modification is available."  *Martin*, 222 F.Supp.2d at 983-84.

The United States ignores "that the fundamental alteration analysis entails far more than the comprehensive plan and reasonably paced waiting list example the *Olmstead* Court provided. *Olmstead* had much more to say about the defense than the cited example.  In fact, the example is not actually an illustration of fundamental alteration at all.  Rather, it is a way the State may show that it has ***already*** provided a reasonable accommodation.  If the State makes this showing, then there is simply no need to further modify the program.  As a corollary, if the State demonstrates a comprehensive plan and a reasonably paced waiting list, then there is no need for the State to prove that the requested modification would fundamentally alter the nature of the program."  *Id*. at 985.

In *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 364 F.3d 487 (3rd Cir. 2004), the Third Circuit found that the Commonwealth of Pennsylvania did not have a satisfactory *Olmstead* plan. Instead of finding that Pennsylvania was prohibited from offering a fundamental alteration defense, the Third Circuit remanded the case to the District Court "so that it can direct the Commonwealth to make a submission that the District Court can evaluate to determine whether it complies with this opinion."  *Frederick L.*, 364 F.3d at 501.  Even when a State does not have an *Olmstead* plan, the remedy is not to exclude a fundamental alteration defense, but instead to require the State to submit an *Olmstead* plan to the District Court.  *Olmstead* "did not envision the fundamental-alteration defense to be a rare one that states would seldom be able to invoke." *Id*.

G.     **Institutional settings, such as state hospitals, are part of the continuum of care.**

*Olmstead* emphasized "that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings.  Title II provides only that 'qualified individual[s] with a disability' may not 'be subjected to discrimination.'  'Qualified individuals,' the ADA further explains, are persons with disabilities who, 'with or without reasonable modifications to rules, policies, or practices, ... mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'"  *Olmstead*, 527 U.S. at 601-02 (internal citations omitted).

The "ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk.  Nor is it the ADA's mission to drive States to move institutionalized patients into an inappropriate setting … Some individuals, like L.C. and E.W. in prior years, may need institutional care from time to time 'to stabilize acute psychiatric symptoms.'  For other individuals, no placement outside the institution may ever be appropriate." *Id*. at 604-05.

*Olmstead* approvingly cited the amicus brief of the American Psychiatric Association: "'"Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times – perhaps in the short run, perhaps in the long run – for the risks and exposure of the less protective environment of community settings'"; for these persons, 'institutional settings are needed and must remain available.'"  *Id*. at 605.  *Olmstead* also approvingly cited the amicus brief of the Voice of the Retarded as follows:  "Each disabled person is entitled to treatment in the most integrated setting possible for that person – recognizing that, on a case-by-case basis, that setting may be in an institution." *Id*.

PD.26019430.1

**H.     Placement in a state hospital is not discrimination if the state hospital is the most integrated setting appropriate to the needs of the individual.**

Only "unjustified" and "unnecessary" placements in a state hospital are discriminatory. *Id*. at 596-97.  The "key in *Olmstead* is that the institutionalization must be ***unjustified*** and ***unnecessary*."   *Boyd v. Steckel*, 753 F.Supp.2d 1163, 1172-73 (M.D. Ala. 2010), *citing Olmstead*, 527 U.S. at 596-97.

Justice Kennedy emphasized this point in his concurrence.  "Unlike Justice Thomas, I deem it relevant and instructive that Congress in express terms identified the 'isolat[ion] and segregat[ion]' of disabled persons by society as a 'for[m] of discrimination,' §§ 12101(a)(2), (5), and noted that discrimination against the disabled 'persists in such critical areas as ... institutionalization,' § 12101(a)(3).  These findings do not show that segregation and institutionalization are always discriminatory or that segregation or institutionalization are, by their nature, forms of prohibited discrimination.  Nor do they necessitate a regime in which individual treatment plans are required, as distinguished from broad and reasonable classifications for the provision of health care services."  *Id*. at 613-14 (Kennedy, J. concurring).

**I.      States may rely on the reasonable assessments of its professionals.**

The States may generally rely on the reasonable assessments of its professionals regarding whether an individual is appropriate for community-based services.   *Id*. at 602.  The "State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program.  Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting."  *Id*.  A state is required to administer its services and programs in "the most integrated setting ***appropriate*** to the needs of qualified individuals with disabilities."  *Id*., *citing* 28 CFR § 35.130(d) (1998).  If a state hospital is the most integrated setting ***appropriate*** to the needs of an individual, based on the reasonable assessment of the

13

State's professionals, then that setting is appropriate under Title II and its implementing regulations.  *See id.*

In his concurring opinion, Justice Kennedy echoed the majority's admonition that the opinion of the State's treating physicians are owed significant deference.  "It would be unreasonable, it would be a tragic event, then, were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision.  The opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference."  *Id.* at 610 (Kennedy, J. concurring).

Although the United States has abandoned any deference in this case to Mississippi's treatment professionals, it recognized in *Olmstead* that such deference is warranted:   The Attorney General interprets the integration regulation "to require a State to provide services to persons with disabilities in a community setting, rather than in an institution, when a State's treatment professionals have determined, in the exercise of reasoned professional judgment, that community placement of the individual is appropriate."  *Olmstead v. L.C.*, 1999 U.S. S.Ct. Briefs, LEXIS 566 at *4-5.   In this case, the United States has hired a series of experts to disagree with the reasoned judgments of Mississippi's treatment professionals, but that was not the position the United States took in *Olmstead*:  "The integration regulation does not require a State to provide a community placement when the State's treatment professionals determine that such a placement is not 'appropriate,' and that determination is based on a reasonable professional judgment that is not affected by extraneous considerations such as administrative convenience and costs."  *Olmstead v. L.C.*, 1999 U.S. S.Ct. Briefs, LEXIS 566 at *17-18.

Justice Kennedy further found that appropriate deference is due to the program funding decisions of the States.  "In light of these concerns, if the principle of liability announced by the

14

Court is not applied with caution and circumspection, States may be pressured into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition.  This danger is in addition to the federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts.  It is of central importance, then, that courts apply today's decision with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers." *Id.* (Kennedy, J. concurring).

The United States alleges that Mississippi violated Title II of the ADA by not requesting additional funds for community-based services from the legislature, but the United States is incorrect.  The pre-budgetary process "is beyond judicial scrutiny." *Frederick L.*, 364 F.3d at 497 (citations omitted).

In addition, the United States alleges Mississippi should have shifted its budgeted funds from institutional care to community-based care, but that is contrary to *Olmstead*.  "Assuming a limited pool of budgetary resources if [the State mental health agency] had siphoned off monies appropriated for institutional care … in order to increase community placements, [the State mental health agency] would run afoul of [*Olmstead's*] prohibition on favoring those 'who commenced civil actions' at the expense of institutionalized mental health patients who are not before the court.  Any effort to institute fund-shifting that would disadvantage other segments of the mentally disabled population would thus fail under *Olmstead*, 527 U.S. at 604-06." *Id.*

J.      **In comparing the cost of institutional care to the cost of community-based care, the fixed costs of institutional care should be considered.**

*Olmstead* expressly recognizes that the fixed costs of institutional care must be considered when comparing the costs of institutional care to the cost of community-based care. The "District Court compared the cost of caring for the plaintiffs in a community-based setting

with the cost of caring for them in an institution. That simple comparison showed that community placements cost less than institutional confinements.  As the United States recognizes, however, a comparison so simple overlooks costs the State cannot avoid; most notably, a 'State ... may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions.'"  *Olmstead*, 527 U.S. at 604, *citing* Brief for United States as *Amicus Curiae* 21.

Justice Kennedy emphasized that States are entitled to wide discretion regarding the comparative costs of institutional and community-based care.  "[A]s Justice Ginsburg's opinion is careful to note, … it was error in the earlier proceedings to restrict the relevance and force of the State's evidence regarding the comparative costs of treatment.  The State is entitled to wide discretion in adopting its own systems of cost analysis, and, if it chooses, to allocate health care resources based on fixed and overhead costs for whole institutions and programs."  *Id*. at 615 (Kennedy, J. concurring).

In its amicus brief in *Olmstead*, the United States recognized that fixed overhead costs are a legitimate consideration.  "The fixed overhead costs involved in operating [state hospitals] may negate the cost savings that States could otherwise achieve by treating persons in the community rather than in institutions."  *Olmstead v. L.C.*, 1999 U.S. S.Ct. Briefs, LEXIS 566 at *20.  In this case, the United States hired an expert, Kevin O'Brien, to erroneously opine that fixed costs do not matter.  This is contrary to *Olmstead*.  "Even if a community-based placement would be less costly than an institutional placement for a specific individual, the State must still factor into its overall budget the fixed cost of maintaining some necessary number of state institutions." *Sanchez*, 416 F.3d at 1067 n. 10.

In applying the fundamental alteration defense, *Olmstead* "expressly proscribed two methods of cost-analysis.  First, courts may not simply compare the cost of providing the

plaintiffs with immediate relief against the entirety of the state's mental health budget because the state's mental health budget will almost always dwarf the requested relief.  Second, courts may not merely compare the cost of institutionalization against the cost of community-based health services because such a comparison would not account for the state's financial obligation to continue to operate partially full institutions with fixed overhead costs."  *Frederick L.*, 364 F.3d at 493  (citations omitted).

The United States alleges that any increased costs associated with expanding community-based services will be offset by reductions in the costs of institutional care.  But this is "precisely the sort of reductive cost comparisons proscribed by the *Olmstead* plurality, as well as by Justice Kennedy."  *Id*. at 497 (citations omitted).

### K. Deinstitutionalization has produced positive and negative results.

In his concurrence, Justice Kennedy noted that deinstitutionalization has produced positive and negative results.  "Beginning in the 1950's, many victims of severe mental illness were moved out of state-run hospitals, often with benign objectives.  According to one estimate, when adjusted for population growth, 'the actual decrease in the numbers of people with severe mental illnesses in public psychiatric hospitals between 1955 and 1994 was 92 percent.'  This was not without benefit or justification.  The so-called 'deinstitutionalization' has permitted a substantial number of mentally disabled persons to receive needed treatment with greater freedom and dignity.  It may be, moreover, that those who remain institutionalized are indeed the most severe cases …. Nevertheless, the depopulation of state mental hospitals has its dark side.  According to one expert:

> For a substantial minority ... deinstitutionalization has been a psychiatric *Titanic*.  Their lives are virtually devoid of 'dignity' or 'integrity of body, mind, and spirit.'  'Self-determination' often means merely that the person has a choice of soup kitchens.  The 'least restrictive setting' frequently turns out to be a cardboard box,

a jail cell, or a terror-filled existence plagued by both real and imaginary enemies."[4]

*Olmstead,* 527 U.S. at 609 (Kennedy, J. concurring) (internal citations omitted).

The United States' experts have not offered any opinions to the effect that Mississippi should close any of its State Hospitals, nor do they have any opinions regarding the number of State Hospital beds Mississippi should have.

### L.  *Olmstead* **does not require States to create programs.**

*Olmstead* does not require States to create community-based programs where none exist. "Of course, it is a quite different matter to say that a State without a program in place is required to create one.  No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities.  If, for example, funds for care and treatment of the mentally ill, including the severely mentally ill, are reduced in order to support programs directed to the treatment and care of other disabilities, the decision may be unfortunate. The judgment, however, is a political one and not within the reach of the statute.  Grave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs.  It is not reasonable to read the ADA to permit court intervention in these decisions.  In addition, … by regulation a public entity is required only to make 'reasonable modifications in policies, practices, or procedures' when necessary to avoid discrimination and is not even required to make those if 'the modifications would fundamentally alter the nature of the service, program, or activity.'  28 CFR § 35.130(b)(7) (1998).  It follows that a State may not be forced to create a community-treatment program where none exists.  *See* Brief for United States as *Amicus Curiae* 19–20, and n. 3."  *Id.* at 612-13 (Kennedy, J. concurring).

---

[4] "[I]t is an error to assume that a community placement *ipso facto* precludes the possibility of isolation or automatically provides more interaction with nondisabled persons than an institutional setting."  *United States v. Arkansas*, 794 F.Supp.2d 935, 973 (E.D. Ark. 2011).

PD.26019430.1

M.     **The ADA does not impose a standard of care on the States nor does it require States to provide a certain level of benefits.**

*Olmstead* plainly held that the ADA does not impose a standard of care or require a certain level of benefits.  "We do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'  We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide."  *Olmstead*, 527 U.S. at 603 n. 14.  According to the Second Circuit, "*Olmstead* does not, therefore, stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions."  *Rodriquez v. City of New York*, 197 F.3d 611, 618 (2nd Cir. 1999).

II.     **Mississippi's State Hospitals Must Comply With Chancery Court Commitment Orders.**

Mississippi's State Hospitals do not control their own front doors.  The exclusive avenue for civil commitment to a State Hospital in Mississippi is set forth in Mississippi Code Sections 41-21-61 through 41-21-107.   The chancery court has jurisdiction over civil commitment. "Broadly speaking, Section 41-21-77 sets forth the procedures to be followed when an individual has been committed to a treatment facility."  *C.W. v. Lamar County*, 250 So.3d 1248, 1252 (Miss. 2018).

The chancery court's determination to commit an individual to a State Hospital is "entitled to the full force of law."  *Id*. at 1253.  The State Hospitals are "not at liberty to second guess the chancery court and to determine for themselves whether mental-illness treatment for [an individual] was necessary."  *Id*.

The chancellor must find "by clear and convincing evidence" that the individual is mentally ill or intellectually disabled.  MISS. CODE ANN. § 41-21-73(4).  The chancellor also

must give "careful consideration [to] reasonable alternative dispositions" including dismissal, voluntary or court-ordered outpatient commitment for specifically-referenced treatment regimen, day or night treatment in a hospital, placement in the custody of a friend or relative, or home health services. *Id*. If the chancellor finds there is no suitable alternative to commitment, the patient must be committed to the "least restrictive treatment facility that can meet the patient's needs." *Id*. The orders committing an individual to a State Hospital thus include a judicial determination that the State Hospital is the least restrictive treatment facility that can meet the individual's needs.

### III. Community-Based Services Can Help Individuals Remain In The Community, But They Do Not Always Do So.

One of the United States' experts, Dr. Robert Drake, admits that community-based services are not nearly 100% effective in reducing hospital admissions. For example, based on his review of the literature, Dr. Drake concluded that the "hospital reduction effect" for Assertive Community Treatment is 41%.[5] That means, in most cases (59%), Assertive Community Treatment is not effective in reducing hospitalizations.

### IV. The United States Seeks To Impose Requirements On Mississippi That No Other State Meets Or Can Meet.

The criticisms the United States levels against Mississippi – such as that community-based service are not "uniformly" available throughout the State – can be leveled against every State. The United States wants Mississippi, one of the poorest States, to have a mental health service system that no other State has or realistically could have. For example, the United States' experts admit that no State determines what community-based services it needs to offer based on the methodology the United States' experts used in this case – *i.e.*, review a random sample of individuals discharged from state hospitals, determine what community-based services

---

[5] Exh. 2, "Interventions to Reduce Hospitalizations among People with Serious Mental Disorders," by Bob Drake and Stephanie Acquilano, p. 1.

PD.26019430.1

each individual allegedly needs to stay in the community, and then extrapolate those findings to the State's SMI population as a whole.  No State designs its mental health service system on that basis, and Mississippi should not be forced to attempt it.

**V.     The ISMICC Report Identifies Federal Barriers To The Ability Of The States To Provide Community-Based Services.**

Mississippi's mental health service system is part of the federal mental health service system.  The federal system has deficiencies which impede Mississippi's ability to deliver the community-based services the United States wants Mississippi to provide. The 21st Century Cures Act authorizes the Interdepartmental Serious Mental Illness Coordinating Committee (ISMICC) to enhance coordination across federal agencies to improve service access and delivery of care for people with SMI and their families.[6]  The ISMICC has both federal and non-federal members.   The ISMICC Report states that its non-federal ISMICC members have firsthand experience with the mental health service system, and knowledge of what barriers exist for people who are seeking help.  The Report further states that the non-federal members bring on-the-ground solutions and innovative ideas that can promote change and improve lives, in partnership with the federal members.[7]

The non-federal members of the ISMICC made several recommendations in the ISMICC Report.[8]  The non-federal members recommended the development of a continuum of care that includes adequate psychiatric bed capacity and community-based alternatives to hospitalization.[9] Objectively speaking, Mississippi's State Hospitals are legitimate and necessary components of the continuum of care.

---

[6] ECF 189-1, Trial Stipulations, No. 288, p. 13.
[7] ECF 189-1, Trial Stipulations, No. 295, p. 14
[8] ECF 189-1, Trial Stipulations, No. 344, p. 18.
[9] ECF 189-1, Trial Stipulations, No. 344, p. 18.

The non-federal members also recommended the development of "national and state capacity to disseminate and support implementation of the national standards for a comprehensive continuum of effective care for people with SMI.   The challenges of implementation are well known, but rarely adequately addressed.   As a consequence, we, the non-federal members, find a huge gap between what is known to be effective and what is available in communities throughout the nation."[10]  Objectively speaking, this is but one example of the United States singling out Mississippi for "gaps" that exist in every State.

The non-federal members further recommended the elimination of "financing practices and policies that discriminate against behavioral health care.   Identify and eliminate programs, practices, and policies that make it hard to deliver good mental health care.   This includes ending the exclusion for reimbursement of services to adults under age 65 in Institutions for Mental Diseases [IMD]."[11]  Objectively speaking, the IMD exclusion is but one example of a federal law which impedes Mississippi's ability to increase its funding of community-based services.

## VI.   Courts Have Paid Undue Deference To DOJ's "At-Risk Of Institutionalization" Statement.

On June 22, 2011, DOJ issued a Statement on enforcement of the integration Mandate.[12] According to the Statement, "the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated setting.[13]   Several courts have accepted DOJ's "at risk of institutionalization" position.   The Tenth Circuit did so in *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003).   The plaintiffs in *Fisher* alleged that Oklahoma's decision to limit prescription medications for participants in the waiver program to five per month would

---

[10] ECF 189-1, Trial Stipulations, No. 344, pp. 18-19.

[11] ECF 189-1, Trial Stipulations, No. 344, p. 19.

[12] Exh. 3, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title of the ADA and *Olmstead*.

[13] Exh. 3, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title of the ADA and *Olmstead*, p. 3 (Question 6).

force them out of their communities and into nursing homes.  *Id.* at 1177-78.  The Tenth Circuit found that individuals "who, by reason of a change in state policy, stand imperiled with segregation, may bring a challenge to that state policy under the ADA's integration regulation without first submitting to institutionalization."  *Id.* at 1182.  The United States has not alleged that any change in Mississippi's policies has created a serious risk of institutionalization.

*M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012), involved a class action of plaintiffs in the State of Washington.  *Id.* at 720.  Washington's Department of Social and Health Services (DSHS) adopted a regulation that reduced the amount of in-home personal care services under Washington's Medicaid plan.  *Id.*  The plaintiffs alleged the reduction in hours violated the ADA because it substantially increased the risk that they would have to be institutionalized to receive adequate care.  *Id.*  The Ninth Circuit found that the elimination of services can be a violation of the ADA if it creates a risk of unnecessary institutionalization.  *Id.* 734-35.  The United States has not alleged that Mississippi has eliminated any services which has created a serious risk of institutionalization.

Although several courts have accepted DOJ's "at-risk of institutionalization" position, those courts have given DOJ's positions undue deference.  *See Christensen v. Harris County*, 529 U.S. 576 (2000) (explaining *Chevron*, *Auer*, and *Skidmore* deference).

## VII.   Mississippi Satisfies Title II Of The ADA And *Olmstead* Because It Delivers A Reasonable Continuum Of Mental Health Services.

The following Table[14] summarizes where Mississippi ranks regionally and nationally on several metrics regarding its mental health service system:

---

[14] This Table was generated by one of Mississippi's experts, Ted Lutterman.

PD.26019430.1

| Indicator | Desired Direction | Mississippi (2017) | Regional Comparison | National Comparison | Regional Ranking (n=9 states) | National Ranking |
|---|---|---|---|---|---|---|
| % Individuals Living in Private Residence | ⬆ | 93.1% | 85.0% | 82.7% | 1 | 1 |
| % Individuals Experiencing Homelessness/ Living in Shelters | ⬇ | 1% | 3.2% | 4.2% | 1 | 2 |
| % Individuals Employed | ⬆ | 14.2% | 17.8% | 20.9% | 6 | 9 |
| MHSIP Consumer Survey: Quality & Appropriateness | ⬆ | 95.7% | 87.0% | 90.9% | 1 | 4 |
| MHSIP Consumer Survey: Outcomes | ⬆ | 75.6% | 72.7% | 82.9% | 3 | 11 |
| MHSIP Consumer Survey: Treatment Participation | ⬆ | 83.4% | 81.2% | 87.5% | 4 | 15 |
| MHSIP Consumer Survey: Satisfaction | ⬆ | 94.8% | 86.3% | 90.9% | 1 | 1 |
| MHSIP Consumer Survey: Connectedness | ⬆ | 84.0% | 74.5% | 78.9% | 2 | 4 |
| MHSIP Consumer Survey: Functioning | ⬆ | 80.4% | 75.4% | 78.6% | 2 | 6 |
| % Expenditures on Community Services (2015) | ⬆ | 61% | 64% | 75% | 5 | 31 |
| Community Per Capita Expenditures (2015) | ⬆ | $64.30 | $41.00 | $100.83 | 1 | 27 |
| Penetration Rate (per 1,000) | ⬆ | 28.76 | 20.96 | 23.00 | 2 | 19 |
| Community Utilization Rate | ⬆ | 28.34 | 20.59 | 22.47 | 2 | 19 |
| % Consumers Receiving ACT | ⬆ | 0.52% | 1.23% | 2.01% | 5 | 37 |
| % Individuals Receiving Supported Housing | ⬆ | 0.32% | 2.41% | 2.47% | 6 | 30 |
| % Individuals Receiving Supported Employment | ⬆ | 0.18% | 1.75% | 1.75% | 6 | 36 |

PD.26019430.1

| Indicator | Desired Direction | Mississippi (2017) | Regional Comparison | National Comparison | Regional Ranking (n=9 states) | National Ranking |
|---|---|---|---|---|---|---|
| State Hospital Utilization Rate (per 1,000) | ⬇ | 0.85 | 0.46 | 0.40 | 8 | 44 |
| % Expenditures on State Hospital (2015) | ⬇ | 37% | 34% | 22% | 4 | 15 |
| % Individuals Residing in State Hospitals at Beginning of Year | ⬇ | 0.69% | 0.93% | 0.02% | 3 | 10 |
| Median Length of Stay, Adults Continuing Services at End of Year (LOS >1 year) | ⬇ | 526 Days | Range: 506 days to 1,852 days | Range: 417 days to 2,730 days | 2 | 12 |
| Median Length of Stay, Adults Continuing Services at End of Year (LOS <1 year) | ⬇ | 31.3 | Range: 4 days to 145 days | Range: 4 days to 241 days | 2 | 8 |
| 30-Day Readmissions to the State Hospital, Civil | ⬇ | 2.0% | 5.8% | 7.5% | 2 | 10 |
| 180-Day Readmissions to the State Hospital | ⬇ | 6.3% | 12.6% | 15.7% | 2 | 7 |

Mississippi is first on some of these metrics, last on none, and near the middle on most. Mississippi delivers a reasonable continuum of mental health services.   And it continues to move ever further to the community-based services side of the continuum of care.   This is particularly impressive when considering that Mississippi is arguably the most resource challenged State in the United States.

PD.26019430.1

## VII.   The United States Cannot Meet The Standard For Permanent Injunctive Relief.

### A.   The United States' claim for permanent injunction is impermissibly vague.

The United States cannot meet the standard for permanent injunctive relief because the relief it seeks is impermissibly vague and does not apprise Mississippi or the Court of the conduct it seeks to enjoin.  Under Fed. R. Civ. P. 65(d), every order granting an injunction must "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained …"  While an injunction does not have to set forth every detail, it "must be more specific than a simple command that the defendant obey the law." *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 240 (2nd Cir. 2001).  The injunction must contain enough specificity "that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).

In its Complaint, the United States' seeks an injunction preventing Mississippi from "discriminating against adults with mental illness in Mississippi by failing to provide services, programs, or activities in the most integrated community setting appropriate to the their needs,"[15] and "failing to provide appropriate, integrated community services, programs, or activities to adults with mental illness in Mississippi consistent with their individual needs, to avoid placing these individuals at serious risk of institutionalization in State Hospitals."[16]  Similarly, the United States' supplemental interrogatory responses contain broad statements, asserting that the United States seeks injunctive relief requiring Mississippi to undertake modifications to its community-based services.[17]  Yet, the United States has not disclosed in discovery what specific modifications are allegedly required.  Neither the Court nor Mississippi can possibly know what

---

[15] ECF 1, Complaint, pp. 28-29.
[16] ECF 1, Complaint, pp. 28-29.
[17] ECF 121-4, United States' Second Supplemental Responses to Defendant's First Set of Interrogatories, pp. 6-8.

Mississippi would be required to undertake or refrain from doing if the United States' was granted the injunctive relief it has requested. *See Prof'l Asso. Of College Educators v. El Paso County Cmty. College Dist.,* 730 F.2d 258, 273 (5th Cir. 1984) (injunctions must contain enough specificity so that those enjoined will know what conduct is prohibited).

      **B.**     **No basis for individualized relief.**

The Court cannot grant individualized relief in this case because there are no individual plaintiffs, and this is not a class action. A court may not determine the rights of individuals who are not before the court. *Zepeda v. United States Immigration & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). No individuals are before this Court.

      **C.**     **The availability of system-wide injunctive relief without a certified class is limited.**

Generally, system-wide injunctive relief is appropriate only when the plaintiff has established a certified class. *M.R. v. Dreyfus*, 706, 738-39 (9th Cir. 2012). Class certification is crucial because it is the class certification that broadens the court's authority to grant relief to a broader group rather than a single individual. *Armstrong v. Davis,* 275 F.3d 849, 871 (9th Cir. 2001). The United States has acknowledged that in *Olmstead*-related cases the best way to achieve system-wide relief is through class action certification,[18] but it did not pursue a class action here. In an *Olmstead* class action, the plaintiffs must prove that the defendant "maintains a policy or practice (*i.e.*, a concrete systemic deficiency)" that has caused the class members to remain institutionalized against their wishes. *Brown v. District of Columbia*, 322 F.R.D. 51, 87 (D.D.C. 2017). Although this is not a class action, the United States cannot make that showing against Mississippi.

---

[18] Exh. 4, United States' Statement of Interest filed in *Thorpe v. District of Columbia.*, pp. 4-5.

**D.      The United States is not entitled to system-wide relief against Mississippi.**

We have found no reported cases where the United States sued a State for violations of Title II of the ADA, and a court issued system-wide injunctive relief without a certified class.  In a case such as this, where there is no certified class, where no individualized relief is permitted, and where the plaintiff seeks system-wide relief, Title II of the ADA and *Olmstead* require only that States have a mental health service system that delivers a reasonable continuum of mental health services.  A reasonable continuum of mental health care includes both institutional and community-based care.  Mississippi delivers a reasonable continuum of mental health services.

*Olmstead* expressly recognizes that both institutional care and community-based care are viable parts of a reasonable continuum of mental health services.  *Olmstead* expressly rejects the United States' desire to eliminate institutional care from the continuum of care.  When system-wide relief is sought, *Olmstead* does not require States to deliver a mental health service system that has no "unmet needs" or no "gaps" in service.  While such a system is a worthy aspiration of every State, it is unattainable, no matter how many injunctions courts issue.  And no injunction should impose an unattainable standard of care, especially since *Olmstead* imposes no standard of care at all.

The United States cannot show actual success on the merits.  Although the United States vaguely alleges Mississippi should modify its existing mental health service system by expanding its community-based services, the United States cannot identify or otherwise quantify the expansion that is allegedly necessary.  The United States did not ask any of its experts to do that analysis and none of them did.  One of the United States' experts, Dr. Robert Drake, testified, "I haven't studied the system as a system.  I wasn't asked to do that."[19]  The United States has no expert who can testify regarding the quantity of community-based services

---

[19] Deposition of Robert Drake, 82:17-21 (previously filed under seal).

Mississippi allegedly should add, or how much it would cost to add those services.  The United States is leaving it entirely up to the Court to fill in the blanks in the United States' case.  The Court should not take the bait.

### Relief Requested

Because Mississippi delivers a reasonable continuum of mental health services, this Court should deny the United States' claim under Title II of the ADA and *Olmstead*.

May 29, 2019.

Respectfully submitted,

PHELPS DUNBAR LLP

BY:  */s/ James W. Shelson*
Reuben V. Anderson, MB 1587
W. Thomas Siler, MB 6791
James W. Shelson, MB 9693
Nash E. Gilmore, MB 105554
4270 I-55 North
Jackson, Mississippi 39211-6391
Post Office Box 16114
Jackson, Mississippi  39236-6114
Telephone: 601-352-2300
Telecopier: 601-360-9777
Email: andersor@phelps.com
silert@phelps.com
shelsonj@phelps.com
nash.gilmore@phelps.com

Harold Pizzetta, III, MB 99867
Assistant Attorney General
General Civil Division
Walter Sillers Building
550 High Street
Jackson, MS 39201
Telephone:  601-359-3816
Telecopier:  601-359-2003
Email:  HPIZZ@ago.state.ms.us

Mary Jo Woods, MB 10468
Special Assistant Attorney General

Mississippi Attorney General's Office
Walter Sillers Building
550 High Street
Jackson, MS 39201
Telephone:  601-359-3020
Telecopier:  601-359-2003
Email:  MWOOD@ago.state.ms.us

Attorneys for the State of Mississippi

## CERTIFICATE OF SERVICE

I certify that on May 29, 2019, I electronically filed this document with the Clerk of the Court using the ECF system, which sent notification of such filing to all ECF counsel of record in this action.

/s/ James W. Shelson
JAMES W. SHELSON

30

PD.26019430.1