# OLMSTEAD v. L.C.

No. 98-536

Supreme Court of the United States

October Term, 1998

March 15, 1999

**Reporter**
1999 U.S.S. Ct. Briefs LEXIS 566 *

TOMMY OLMSTEAD, COMMISSIONER, GEORGIA, DEPARTMENT OF HUMAN RESOURCES, ET AL., PETITIONERS v. L.C., BY JONATHAN ZIMRING, GUARDIAN AD LITEM AND NEXT FRIEND, ET AL.

**Type:** Brief

**Prior History:** [*1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT.

## Table of Contents

| | |
|---|---|
| Interest of the United States | 1 |
| Statement | 2 |
| Summary of argument | 5 |
| Argument: The Attorney General reasonably interpreted the integration regulation to prohibit the unjustified segregation of persons in institutions, and the regulation as so construed falls within the Attorney General's authority to implement Title II | 7 |
| A. The Attorney General has reasonably interpreted the integration regulation to prohibit the unjustified segregation of persons in institutions | 9 |
| [*3]  B. The Attorney General was warranted in concluding that the unjustified segregation of persons in institutions constitutes a form of discrimination based on disability prohibited by Title II | 11 |
| C. The integration regulation does not intrude on the professional judgment of state treatment professionals and does not impose undue costs on the states | 18 |
| D. Petitioners 'remaining arguments are unpersuasive | 23 |
| Appendix | 30$?Concl usion$%$ ?$%$=T1* .fu;P*1a |

EXHIBIT
I

tabbies

Nash Gilmore

## Table of Authorities

Cases:

*Alexander v. Choate, 469 U.S. 287 (1985)*

*Auer v. Robbins, 519 U.S. 452 (1997)*

*Bragdon v. Abbott, 118 S. Ct. 2196 (1998)*

*Central Bank v. First Interstate Bank, 511 U.S. 164 (1994)*

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)*

*City of Boerne v. Flores, 521 U.S. 507 (1997)*

City of Cleburne v. Cleburne Living Ctr., 473 U.S. U.S. 432 (1985)

*City of Edmonds v. Oxford House, Inc., 514 U.S. 725 (1995)*

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141 (1982)*

*Garrity v. Gallen, 522 F. Supp. 171 (D.N.H. 1981)*

*Gregory v. Asheroft, 501 U.S. 452 (1991)*

*Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983)*

*Halderman v. Pennhurst State Sch. & Hosp., 446 F. Supp. 1295* (E.D. Pa .1978), aff'd in part and rev'd in part, *612 F.2d 84 (3d Cir. 1979),* rev'd, *451 U.S. 1 (1981)*

*Helen L. v. DiDario, 46 F.3d 325* (3d Cir.), cert. denied, *516 U.S. 813 (1995)*

Homeward Bound, Inc. v. Hissom Mem'l Ctr., No. 85-*C-437-E, 1987 WL 27104* (N.D. Okla. July 24, 1987)

*Jackson v. Fort Stanton Hosp. & Training Sch., 757 F. Supp. 1243 (D.N.M. 1990),* rev'd on other grounds, *964 F.2d 980 (10th Cir. 1992)*

*Katzenbach v. Morgan, 384 U.S. 641 (1966)*

*Kentucky Ass'n for Retarded Citizens, Inc. v. Conn, 674 F.2d 582* (6th Cir.), cert. denied, *459 U.S. 1041 (1982)*

*Lynch v. Maher, 507 F. Supp. 1268 (D. Conn. 1981)*

*P.C. v. McLaughlin, 913 F.2d 1033 (2d Cir. 1990)*

*Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981)*

*Pennsylvania Dep't of Corrections v. Yeskey, 118 S. Ct. 1952 (1998)*

*People First v. Arlington Dev. Ctr., 878 F. Supp. 97 (W.D. Tenn. 1992)*

*Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265 (1978)*

S.H. v. Edwards, No. C81-877A (N.D. Ga. Apr. 10, 1987),  **[\*5]**  aff'd, _860 F.2d 1045 (11th Cir. 1988),_ cert. denied, _491 U.S. 905 (1989)_

_Salinas v. United States, 522 U.S. 52 (1997)_

_School Bd. v. Arline, 480 U.S. 273 (1987)_

_Southeastern Community College v. Davis, 442 U.S. 397 (1979)_

_Thomas Jefferson Univ. v. Shalala, 512 U.S. 504 (1994)_

_Traynor v. Turnage, 485 U.S. 535 (1988)_

_Youngberg v. Romeo, 457 U.S. 307 (1982)_

Constitution, statutes and regulations:

U.S. Const. Amend. XIV, § 5

Age Discrimination in Employment Act of 1967, _29 U.S.C. 621_ et seq.

Americans with Disabilities Act of 1990, _42 U.S.C. 12101_ et seq.:

_42 U.S.C. 12101_(a)(2)

_42 U.S.C. 12101_(a)(3)

_42 U.S.C. 12101_(a)(5)

_42 U.S.C. 12101_(a)(7)

_42 U.S.C. 12101_(a)(8)

_42 U.S.C. 12101_(d)

Tit. I, _42 U.S.C. 12111_ et seq.

_42 U.S.C. 12111_(10)(A)

_42 U.S.C. 12111_(10)(B)

_42 U.S.C. 12112_

Tit. II, _42 U.S.C. 12131_ et seq.

_42 U.S.C. 12132_

_42 U.S.C. 12133_

_42 U.S.C. 12134_

_42 U.S.C. 12134_(a)

_42 U.S.C. 12134_(b)

Tit. III, _42 U.S.C. 12181_ et seq.

_42 U.S.C. 12182_(b)

_42 U.S.C. 12182_(b)(1)(B)

Developmental Disabilities Assistance and Bill of Rights Act, _42 U.S.C._ [*6] _6000_ et seq.:

_42 U.S.C. 6001_(10)(A) (Supp. II 1984)

_42 U.S.C. 6001_(10)(B) (Supp. II 1984)

_42 U.S.C. 6001_(15)(A)

_42 U.S.C. 6001_(15)(B)

_42 U.S.C. 6001_(15)(C)

_42 U.S.C. 6010_(2)(1976)

Fair Housing Act, _42 U.S.C. 3601_ et seq.

Individuals with Disabilities Education Act, _20 U.S.C. 1412_(5)(B)

Medicare Act, _42 U.S.C. 1395_ et seq.:

_42 U.S.C. 1396d_(b)

_42 U.S.C. 1396n_(c)

Rehabilitation Act of 1973, § 504, _29 U.S.C. 794_

Ga. Code Ann. § 37-4-121 (Mitchie 1995)

28 C.F.R.:

Pt. 35

Section 35.130

Section 35.130(b)(7)

Section 35.130(d)

Section 35.130(e)(1)

App. A, § 35.130

Pt. 41:

Section 41.51(d) (1997)

Section 41.51(d)

Miscellaneous:

134 Cong. Rec. S5116 (daily ed. Apr. 28, 1988)

135 Cong. Rec. S4986 (daily ed. May 9, 1989)

136 Cong. Rec. H2447 (daily ed. May 17, 1990)

136 Cong. Rec. H2603 (daily ed. May 22, 1990)

Americans with Disabilities Act of 1989 :Hearings on S. 933 Before the Senate Comm. on Labor and Human Resources and the Subcomm. on the Handicapped, 101st Cong., 1st Sess. (1989)

H.R. Rep. No. 485, 101st Cong., 2d Sess., Pt. 3 (1990)

Rosalie [*7] A. Kane et al., The Heart of Long-Term Care (1998)

Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988: Hearing Before the Subcomm. on Select Educ. of the House Comm. on Educ. and Labor, 100th Cong., 2d Sess. (1988)

S. Rep. No. 139, 97th Cong., 1st Sess. (1981)

S. Rep. No. 273, 101st Cong., 2d Sess. (1990)

U.S. Comm'n on Civil Rights, Accommodating the Spectrum of Individual Abilities (Clearinghouse Pub. No. 81, 1983)

William G. Weissert et al., Cost Savings From Home And Community-Based Services: Arizona's Capitated Medicaid Long-Term Care Program, 22 J. of Health Pol., Pol'y & L. 1329 (1997)

## Counsel

SETH P. WAXMAN, Solicitor General, Counsel of Record.BILL LANN LEE, Acting Assistant Attorney, General.BARBARA D. UNDERWOOD, Deputy Solicitor General.IRVING L. GORNSTEIN, Assistant to the Solicitor, General.JESSICA DUNSAY SILVER, GREGORY B. FRIEL, Attorneys, Department of Justice, Washington, D.C. 20530-0001, (202) 514-2217.

## Title

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING RESPONDENTS

## Text

QUESTION PRESENTED

Title II-A of the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. 12132, provides that "no qualified individual with a disability shall, by reason of such disability, * * * be subjected to discrimination by any [public] entity." The Attorney General's "integration regulation," 28 C.F.R. 35.130(d), provides that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." The Attorney General interprets that regulation to require a State that offers treatment to persons with disabilities to provide such treatment in a community setting that offers opportunities [*2] for interaction with persons without disabilities, rather than in an institution, when (1) the State's treatment professionals have determined, in the exercise of reasonable professional judgment, that community placement of the individual is appropriate, and (2) such a placement would not require an unreasonable change in state policy or a fundamental alteration in the nature of the State's treatment program. The question presented is whether the regulation as so interpreted validly implements the ADA. [*I]

**INTEREST OF THE UNITED STATES**

The Attorney General has authority to enforce Title II of the Americans With Disabilities Act of 1990, *42 U.S.C. 12131* et seq. See *42 U.S.C. 12133.* In addition to that enforcement responsibility, Congress has directed the Attorney General to issue regulations to set forth the forms of discrimination prohibited by Title II. *42 U.S.C. 12134*(a). Pursuant to that mandate, the Attorney General has issued such regulations. See 28 C.F.R. Pt. 35. One of those regulations requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. 35.130(d). The Attorney General has interpreted that regulation to require the State, in some circumstances, to treat **[*1]** persons with disabilities in a community setting rather than an institution. The validity of that interpretation is at issue here. The United States participated as an amicus curiae in this case in the court of appeals.


## STATEMENT

1. Respondents L.C. and E.W. are mentally retarded individuals who also have mental disorders. Pet. App. 32a-33a. Before the present litigation began, L.C. and E.W. were voluntary patients at the Georgia Regional Hospital at Atlanta (GRH-A) and were confined in a locked psychiatric unit. J.A. 2, 5, 45, 48, 62-63, 78-79. GRH-A is a large, staterun psychiatric institution whose programs are designed primarily to stabilize individuals during the acute phase of a mental illness so that treatment can be continued in the community on **[*8]** an outpatient basis. J.A. 13, 48-49.

L.C. was most recently admitted to GRH-A in May 1992. J.A. 14, 51. By May 1993, L.C.'s psychiatric condition had stabilized, and petitioners and L.C.'s treating physician agreed that she could appropriately be treated in a community setting. J.A. 5, 46, 120, 205-207. L.C. nonetheless remained at GRH-A until after the present litigation began in May 1995. In July 1995, petitioners discharged L.C. to a state-run institution for treatment of persons with mental retardation, and in February 1996, petitioners released L.C. to a community-based program. Pet. App. 33a.

E.W. was most recently admitted to GRH-A in February 1995. J.A. 64, 80. In March 1996, E.W.'s treating physician concluded that she could be appropriately treated in the community. J.A. 88-89, 210-212. In that same year, a clinical psychologist at GRH-A reached the same conclusion. J.A. 213-214; see also J.A. 101. E.W. nonetheless remained institutionalized until a few months after the district court issued **[*2]** its judgment in 1997, at which point she was placed in a community-based program. Pet. App. 2a-3a n.2.

2. In 1995, L.C. filed suit against petitioners, alleging, inter alia, **[*9]** that petitioners had violated Title II of the ADA and its implementing regulations by failing to offer her treatment in a community-based residential program after treatment professionals determined that such a placement was appropriate. J.A. 26, 28; Pet. App. 31a. E.W. intervened, raising the same claim. J.A. 61-73. The district court granted summary judgment in part in favor of respondents. Pet. App. 31a-42a. The court held that petitioners' refusal to place respondents in a community-based program violated Title II of the ADA, which prohibits a public entity from subjecting any qualified individual with a disability to discrimination by reason of such disability, *42 U.S.C. 12132,* as well as the Title II integration regulation, 28 C.F.R. 35.130(d), which requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Pet. App. 37a-39a. The court rejected petitioners' defense that they lacked funds to provide such placements to L.C. and E.W. Id. at 38a-39a.

3. The court of appeals affirmed the district court's judgment, but remanded for a reassessment **[*10]** of the State's cost-based defense. Pet. App. 1a-30a. The court held that when "a disabled individual's treating professionals find that a community-based placement is appropriate for that individual, the ADA imposes a duty to provide treatment in a community setting," unless such a placement would require a "fundamental alteration" in the State's treatment program. Id. at 21a-25a.

In reaching that conclusion, the court relied on the Attorney General's Title II integration regulation. The court concluded that "the plain language of § 35.130(d) prohibits a state from providing services to individuals with **[*3]** disabilities in an unnecessarily segregated setting" and that a State violates that mandate when "the State confines an individual with a disability in an institutionalized setting when a community placement is appropriate." Pet. App. 7a, 8a.

The court rejected petitioners' contention that the integration regulation conflicts with the requirement in Title II that an individual must prove discrimination by reason of a disability. The court noted that Congress had instructed the Department of Justice to issue regulations that are consistent with the coordination regulations [*11] issued under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, and that one of those regulations requires integration in terms that are substantially the same as those in Section 35.130(d). Pet. App. 9a (citing 28 C.F.R. 41.51(d) (1997)). The court further concluded that the integration regulation was consistent with Congress's specific findings that Title II was intended to overcome discrimination in "institutionalization," and discrimination that takes the form of "segregation." Id. at 10a-11a (quoting 42 U.S.C. 12101(a)(3) and (5)). The court also determined that "the legislative history makes clear that Congress considered the provision of segregated services to individuals with disabilities a form of discrimination prohibited by the ADA." Id. at 11a. The court of appeals concluded that "because § 35.130(d) finds direct support in the plain language of the ADA, its congressional findings, and the Act's legislative history, we must apply it here." Id. at 12a.

The court held that, under Title II and its implementing regulations, a State's duty to provide integrated services when a patient's care warrants such services is [*12] not absolute. Pet. App. 25a. In reaching that conclusion, the court relied on the Attorney General's "reasonable-modification" regulation, which provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures [*4] when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Pet. App. 25a-26a (quoting 28 C.F.R. 35.130(b)(7)).

The court concluded that the key question was whether petitioners had shown that treating respondents in the community would cause a fundamental alteration in their program. Pet. App. 26a. Resolving that question, the court concluded, involves an assessment of several factors, including "whether treating [respondents] would require additional expenditures and if so, whether the State had met its burden of proving that those expenditures were unreasonable in light of the State's mental health budget." Id. at 28a. Because the district court had not addressed those questions, the court of appeals remanded for further proceedings. Id. at 29a-30a. [*13] [1]

## SUMMARY OF ARGUMENT

A. The Attorney General's Title II "integration regulation," 28 C.F.R. 35.130(d), provides that "[a] public entity shall administer services * * * in the most integrated setting appropriate to the needs of qualified individuals with disabilities." By its terms, the integration regulation applies to all services administered by a public entity, including those that are offered exclusively to persons with disabilities. The Attorney General therefore interprets the regulation to require a State to provide services to persons [*5] with disabilities in a community setting, rather than in an institution, when a State's treatment professionals have determined, in the exercise of reasoned professional [*14] judgment, that community placement of the individual is appropriate. Because that interpretation accords with the text of the regulation, it is entitled to controlling weight.

B. The Attorney General was warranted in concluding that the unjustified segregation of persons in institutions, when community placement is appropriate, constitutes a form of discrimination prohibited by Title II. In the text of the ADA, Congress found that persons with disabilities suffer from various forms of discrimination, including "segregation," and that discrimination persists in several contexts, including "institutionalization," 42 U.S.C. 12101(a)(3) and (5). Those findings demonstrate that Congress understood the concept of discrimination under the ADA to include the unjustified segregation of disabled persons in institutions. Equally important. Congress instructed the Attorney General to adopt regulations that are consistent with coordination regulations that had been issued by the Department of Health, Education, and Welfare (HEW) to implement Section 504 of the Rehabilitation Act, 29 U.S.C. 794. One of HEW's coordination regulations required integration [*15] in substantially the same

---

[1] Following this Court's grant of the petition for a writ of certiorari, the district court issued a decision on remand, rejecting petitioners' fundamental alteration defense. 1/29/99 Order at 1. The court found that the annual cost to the State of providing community-based treatment to L.C. and E.W.--about $ 20,000 each--was not unreasonable in relation to the State's overall mental health budget, which was $ 706.8 million in fiscal year 1998. Id. at 5.

terms as the Attorney General's integration regulation. Congress therefore virtually mandated the integration regulation at issue here.

Congress had ample basis to conclude that the unjustified segregation of persons in institutions constitutes a form of discrimination based on disability. First, such segregation can stigmatize persons with disabilities as incapable or unworthy of participating in community life. Second, such segregation can result in a form of dissimilar treatment: Persons with disabilities must give up participation in community life in order to receive the services they need, while persons without disabilities can receive the services they **[*6]** need without sacrificing that important interest. Finally, when persons with disabilities must obtain the services they need in an institution, they are effectively deprived of their right under the ADA to equal access to other public services.

C. The integration regulation does not impose undue costs on the State. By virtue of the Attorney General's "reasonable-modification" regulation, 28 C.F.R. 35.130(b)(7), the integration obligation does not apply when compliance would require an unreasonable **[*16]** change in state policy or a fundamental alteration in the nature of the State's treatment program. Costs have a bearing on those inquiries. Congress anticipated that the placement of persons in the community, rather than in an institution, would not impose undue costs. If a State can show that any additional costs of providing placement in a community setting are unreasonably high in comparison to a State's overall mental health budget, however, a State would not be required to provide placement in a community setting.

## ARGUMENT

### THE ATTORNEY GENERAL REASONABLY INTERPRETED THE INTEGRATION REGULATION TO PROHIBIT THE UNJUSTIFIED SEGREGATION OF PERSONS IN INSTITUTIONS, AND THE REGULATION AS SO CONSTRUED FALLS WITHIN THE ATTORNEY GENERAL'S AUTHORITY TO IMPLEMENT TITLE II

Title II, Part A of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." _42 U.S.C. 12132_. Unlike Titles I and III of the Act, Title II-A does not spell **[*17]** out the forms of discrimination that are prohibited. Compare _42 U.S.C. 12112_ and _42 U.S.C. 12182(b)_. Instead, Congress directed that "the Attorney General shall promulgate **[*7]** regulations in an accessible format that implement this part." _42 U.S.C. 12134_. That Section required the Attorney General "to issue regulations setting forth the forms of discrimination prohibited." H.R. Rep. No. 485, 101st Cong., 2d Sess., Pt. 3, at 52 (1990).

The Attorney General issued regulations in 1991. 28 C.F.R. Pt. 35. One of those regulations, the integration regulation, provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." _28 C.F.R. 35.130(d)_. In the preamble to the regulations, the Attorney General explained that "the most integrated setting" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. Pt. 35 App. A § 35.130, at 469 (1996).

The obligation set forth in the integration regulation is not absolute. **[*18]** When compliance would require a change in state policy, the integration obligation is subject to the reasonable-modification standard set forth in _28 C.F.R. 35.130(b)(7)_. That regulation provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Thus, a State must provide services to a person with a disability in an integrated setting when appropriate to that person's needs, unless it would require an unreasonable change in state policy or fundamentally alter the program.

Consistent with its text, the Attorney General interprets the integration regulation to require States, in certain circumstances, to place persons with disabilities in a community setting that offers opportunities for interaction with persons without disabilities, rather than in an institution, where such **[*8]** opportunities are far more limited, if they exist at all. In particular, when state treatment professionals determine, **[*19]** in the exercise of reasoned

professional judgment, that placement in a community setting is appropriate ( *Youngberg v. Romeo, 457 U.S. 307, 323 (1982); see also School Bd. v. Arline, 480 U.S. 273, 288 (1987))*, and such a placement would not require an unreasonable change in state policy or a fundamental change in the State's treatment program, a State must offer the individual an opportunity for placement in a community setting.

Petitioners challenge the Attorney General's interpretation of the integration regulation on two grounds. First, they argue that it reflects an impermissible reading of the regulation itself. Second, they argue that it exceeds the Attorney General's authority to define the forms of discrimination that are prohibited by Title II. As we demonstrate below, both arguments are without merit.

A. The Attorney General Has Reasonably Interpreted The Integration Regulation To Prohibit The Unjustified Segregation Of Persons In Institutions

Petitioners contend (Br. 41-42) that the integration regulation applies only to services that a State provides to non-disabled persons. That limitation, however, cannot be found in the text [*20] of the regulation. The regulation facially applies to all services administered by a public entity, including those that are offered only to persons with disabilities. Under this Court's decisions, an agency's interpretation of its own regulations is "controlling," unless it is "plainly erroneous" or "inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)*. Because the Attorney General's interpretation accords with the plain language of the regulation, that deferential standard is satisfied.

[*9] Petitioners incorrectly assert (Br. 41-42) that the Attorney General originally interpreted the integration regulation to apply only to those services that are offered to non-disabled persons. As petitioners note (Br. 41), the Attorney General has stated that requiring a disabled person to eat in the back of a government cafeteria, or requiring a blind person to go on a special museum tour rather than on the tour that is offered to the general public would violate the integration regulation. See also Pet. Br. App. 18a-20a. But the Attorney General never intimated that those are the only contexts in which the integration regulation applies. [*21] When an agency adopts a regulation, it has no obligation to list all conceivable examples of the contexts in which the rule will apply. Indeed, such a requirement would be completely unworkable. See *Pennsylvania Dep't of Corrections v. Yeskey, 118 S. Ct. 1952, 1955-1956 (1998)*. Petitioners therefore err in treating the particular examples discussed by the Attorney General as a limitation on the terms of the regulation. See *Thomas Jefferson Univ., 512 U.S. at 516*.

Nor is there any merit to petitioners' suggestion (Br. 41-42) that the Attorney General's interpretation of the regulation is not entitled to deference because it was publicly articulated for the first time in a brief filed in *Helen L. v. DiDario, 46 F.3d 325* (3d Cir.), cert. denied, *516 U.S. 813 (1995)*. This Court rejected a similar contention in *Auer v. Robbins, 519 U.S. 452 (1997)*. There, the Court deferred to an agency's interpretation of its own regulation that appeared for the first time in a brief submitted to the Court. *Id. at 462-463*. The Court explained that the Secretary's position was not "a post-hoc rationalization advanced by an agency [*22] seeking to defend past agency action against attack," and that there was "simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Id. at 462*. [*10] Those requirements for deference are satisfied here. The Department of Justice brief in Helen L. was not a post-hoc effort to defend a previous agency action, but was instead a fair and considered judgment on the issue.

Thus, as the court of appeals concluded (Pet. App. 8a), the "express terms of § 35.130(d), supported by the Attorney General's consistent interpretation, plainly prohibit a state from treating individuals with disabilities in a segregated environment, where a more integrated setting would be appropriate."

B. The Attorney General Was Warranted In Concluding That The Unjustified Segregation Of Persons In Institutions Constitutes A Form Of Discrimination Based On Disability Prohibited By Title II

Because the Attorney General issued the integration regulation pursuant to an express grant of authority to give content to the general statutory prohibition against discrimination, it is entitled to "controlling [*23] weight," unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)*. This Court has also held that, "as the agency directed by Congress to issue implementing regulations, * * * to render technical assistance explaining the responsibilities of covered individuals

and institutions, * * * and to enforce [the ADA] in court, * * * the Department's views are entitled to deference." *Bragdon v. Abbott, 118 S. Ct. 2196, 2209 (1998).*

Petitioners contend that the Attorney General acted outside the permissible limits of her authority to implement Title II. In particular, they argue (Br. 21) that Title II's prohibition on "discrimination" based on disability requires proof that similarly situated persons have been treated differently, and that, when a State offers a service only to persons with disabilities, such a showing of dissimilar **[*11]** treatment cannot be made. The term "discrimination," however, does not have a single meaning; its meaning therefore must be derived from the statutory context in which it appears. See *Alexander v. Choate, 469 U.S. 287 (1985)* **[*24]** (Section 504 ban on discrimination reaches practices that have the effect of denying meaningful access to persons with disabilities); *Southeastern Community College v. Davis, 442 U.S. 397, 413 (1979)* (refusal to make a reasonable modification to accommodate persons with disabilities constitutes discrimination under Section 504); *Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 592 (1983)* (White, J.) (the term "discrimination" is "inherently" ambiguous); *Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 284 (1978)* (Powell, J.) (the concept of discrimination "is susceptible of varying interpretations"). The Attorney General was warranted in concluding that, in the context of the ADA, "discrimination" based on disability includes the unjustified segregation of a disabled person in an institution.

1. a. That statutory context includes the specific findings that Congress enacted as part of the ADA. Among other things, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and * * * such forms of discrimination * * * continue to be a serious and pervasive social problem." *42 U.S.C. 12101* **[*25]** (a)(2). It found that "individuals with disabilities continually encounter various forms of discrimination, including * * * segregation." *42 U.S.C. 12101(a)(5).* And it found that such discrimination persists in a variety of contexts, including "institutionalization." *42 U.S.C. 12101(a)(3).* Those findings make clear that Congress understood the concept of discrimination under the ADA to include the unjustified segregation of disabled persons in institutions.

b. The genesis of Congress's findings supports that conclusion. The relevant findings were drawn from the almost-identical **[*12]** findings made by the U.S. Commission on Civil Rights in a report entitled Accommodating the Spectrum of Individual Abilities (Clearing House Pub. No. 81, 1983). Compare id. at 159 with *42 U.S.C. 12101(a)(2)* and (3)). One section of the report includes "institutionalization" among the areas in which discrimination against persons with disabilities occurs. Accommodating the Spectrum of Individual Abilities, supra, at 32-34. The report observed that "institutionalization almost by definition entails segregation and isolation." Ibid. **[*26]** The report further noted that, while "there has been increasing acceptance in recent years of the fact that most training, treatment, and habilitation services can be better provided to handicapped people in small, community-based facilities rather than in large, isolated institutions, * * * a great many handicapped persons remain in segregative facilities." Id. at 34-35.

Another section of the report identifies "segregation" as a form of discrimination based on disability, explaining that "segregation singles out handicapped people and separates them from the rest of society, frequently as a condition for receiving some service or benefit." Accommodating the Spectrum of Individual Abilities, supra, at 41. The report further states that "mental health and mental retardation institutions that house residents in almost complete isolation from the non-handicapped community are perhaps archetypal examples of segregation." Ibid.

c. The legislative debates and hearings confirm that Congress's findings concerning "segregation" and "institutionalization" reflect an understanding that the unjustified segregation of persons with disabilities in institutions constitutes a form of disability-based **[*27]** discrimination. Numerous statements attest to that understanding. E.g., 136 Cong. Rec. H2447 (daily ed. May 17, 1990) (statement of Rep. Miller) ("It has been our unwillingness to see all people with disabilities that has been the greatest barrier to full and **[*13]** meaningful equality. Society has made them invisible by shutting them away in segregated facilities."); 134 Cong. Rec. S5116 (daily ed. Apr. 28, 1988) (statement of Sen. Simon) (persons with disabilities "remain[] substantially hidden. They are hidden in institutions. They are hidden in nursing homes. * * * Because they are hidden, we too easily ignore the problem and the need for change."); 135 Cong. Rec. S4986 (daily ed. May 9, 1989) (statement of Sen. Harkin) (a purpose of the ADA is get disabled persons "out of institutions"); Americans with Disabilities Act of 1989: Hearings on S. 933 Before the Senate Comm. on Labor and Human Resources and the Subcomm. on the Handicapped,

101st Cong., 1st Sess. 215 (1989) (statement of former Senator Weicker) ("For years, this country has maintained a public policy of protectionism toward people with disabilities. We have created monoliths of isolated care in institutions and [*28] in segregated educational settings. It is that isolation and segregation that has become the basis of the discrimination faced by many disabled people today. Separate is not equal."); Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988 Before the Subcomm. on Select Educ. of the House Comm. on Educ. and Labor, 100th Cong., 2d Sess. 193 (1988) (statement of Phillip Campbell, Ass'n for Retarded Citizens of Mass.) ("Persons with mental retardation have experienced some of the grossest examples of discrimination during the last 100 years. They have been relegated to segregated congregate facilities across the Nation.").

2. Congress's understanding that Title II would prohibit the unjustified segregation of persons in institutions is also reflected in its express instruction to the Attorney General to promulgate regulations consistent with (1) existing regulations under a related statute, and (2) the definitions of discrimination that appear in other titles of the ADA. Congress specified, _42 U.S.C. 12134(b)_, that, "except for [*14] 'program accessibility, existing facilities', and 'communications', regulations under subsection (a) of this [*29] section shall be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations (as promulgated by the Department of Health, Education, and Welfare [HEW] on January 13, 1978), applicable to recipients of Federal financial assistance under section 794 of title 29 [Section 504 of the Rehabilitation Act]." That language requires the Attorney General, in issuing regulations to enforce Title II, to make the regulations consistent with other parts of "this chapter", i.e., Titles I (employment) and III (public accommodations) of the ADA, and with the coordination regulations that had been issued by HEW to enforce Section 504 of the Rehabilitation Act.

In adopting the integration regulation, the Attorney General adhered to that mandate. The integration regulation tracks a Section 504 coordination regulation that provides that "recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." _28 C.F.R. 41.51(d)_. The integration regulation also parallels a requirement in Title III of the ADA, which provides that "goods, services, facilities, privileges, [*30] advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual." _42 U.S.C. 12182(b)(1)(B)_. By requiring the Attorney General to adopt regulations "consistent" with the HEW coordination regulations and with the ADA, Congress virtually mandated the integration regulation at issue here. [2]

[*15] Moreover, like the Attorney General's integration regulation, HEW's comparable coordination regulation and the requirement in Title III are not, by their terms, limited to those services that are offered to persons without disabilities; instead, they apply to all services that are offered. Nor is there any reason to believe that Congress understood the regulation or the statutory provision to contain an implicit limitation [*31] not found in the text. To the contrary, in a 1984 statute Congress had previously used the term "integration" in regard to individuals with developmental disabilities, and defined it to include not only the opportunity for persons with disabilities to use the same services and participate in the same activities as non-disabled persons, _42 U.S.C. 6001(10)(A)_ (Supp. II 1984), now codified at _42 U.S.C. 6001(15)(A)_ and (C), but also "the residence by persons with developmental disabilities in homes or home-like settings which are in proximity to community resources, together with regular contact with nonhandicapped citizens in their communities." _42 U.S.C. 6001(10)(B)_ (Supp. II 1984), now codified at _42 U.S.C. 6001(15)(B)_. In light of Congress's mandate to formulate an integration regulation, and Congress's understanding of that term, the Attorney General was warranted in concluding that Congress viewed a State's unjustified decision to place a disabled person in an institution, rather than in a community setting, as a form of discrimination based on disability.

3. Congress had ample basis to conclude [*32] that such a decision constitutes discrimination based on disability. Segregating persons with disabilities into institutions when they can be appropriately placed in community settings can have several distinct discriminatory effects. First, the unjustified segregation of persons with disabilities can stigmatize them [*16] as incapable or unworthy of participating in community life. See 136 Cong. Rec. H2603

---

[2] Congress expressed the same integration mandate in the Individuals with Disabilities Education Act (IDEA), _20 U.S.C. 1412(5)(B)_, requiring States that receive federal funds under that statute to "assure that, to the maximum extent appropriate, children with disabilities * * * are educated with children who are not disabled."

(daily ed. May 22, 1990) (statement of Rep. Collins) ("To be segregated is to be misunderstood, even feared," and "only by breaking down barriers between people can we dispel the negative attitudes and myths that are the main currency of oppression."). Segregation always has the potential to engender or perpetuate negative attitudes, and when the segregation is unnecessary for treatment purposes, it is especially likely to result from and reinforce negative attitudes.

Second, the unjustified segregation of persons with disabilities into institutions imposes a substantial burden on persons with disabilities that the State does not impose on persons without disabilities: In order to obtain the medical or therapeutic services that they need, persons with disabilities must sacrifice [*33] their interest in community life, while persons without disabilities can obtain the services from the State that they need without sacrificing that important interest.

Finally, the unjustified segregation of persons with disabilities into institutions can defeat the statutory requirement-- not disputed by petitioners--that the State make available to persons with disabilities the same services that they provide to non-disabled persons. _42 U.S.C. 12132_. When persons with disabilities must obtain the services they need in an institution, rather than in a community setting, they are effectively deprived of equal access to parks, beaches, museums, and other similar public services.

4. The integration regulation's prohibition against unjustified segregation of persons in institutions is well-designed to serve the important goals that Congress sought to further through enactment of the ADA. In the text of the Act, Congress stated that its goals "regarding individuals with disabilities" were to "assure" not only "equality of opportunity," but also "full participation, independent living, [*17] and economic self-sufficiency for such individuals." _42 U.S.C. 12101_ [*34] (a)(8). The Attorney General's integration regulation serves all those purposes, while petitioners' interpretation of Title II does not.

Indeed, as Congress knew, the isolation of persons with disabilities can breed fear and stereotypes about persons with disabilities, which in turn can generate additional discrimination that spills over into other areas, such as employment, public accommodations, and transportation. See _42 U.S.C. 12101(a)(5)_ (finding persistent discrimination in those areas); _42 U.S.C. 12101(a)(7)_ (finding that persons with disabilities face discrimination as a result of "stereotypic assumptions"). The Attorney General properly recognized, as did Congress, that this cycle of discrimination could perpetuate itself indefinitely unless efforts were taken to increase interaction between persons with disabilities and non-disabled persons. The integration regulation promotes such interaction and thereby helps to erode the negative stereotypes that continue to impede equality of opportunity. Prohibiting unjustified segregation of persons in institutions thus goes hand-in-hand with all the other portions of the ADA, including [*35] the barrier-removal obligations, the reasonable-accommodation requirements, and the prohibitions on denial of equal benefits and services. All those provisions promote the common objective of integrating persons with disabilities into the mainstream of society.

C. The Integration Regulation Does Not Intrude On The Professional Judgment Of State Treatment Professionals And Does Not Impose Undue Costs On The States

1. Petitioners mistakenly assert (Br. 38) that the integration regulation intrudes on the treatment decisions of the State's health professionals. The integration regulation does not require a State to provide a community placement when [*18] the State's treatment professionals determine that such a placement is not "appropriate," and that determination is based on a reasonable professional judgment that is not affected by extraneous considerations such as administrative convenience and costs. _28 C.F.R. 35.130(d)_; see _Youngberg, 457 U.S. at 323;Arline, 480 U.S. at 288._ Petitioners' complaint that the integration regulation interferes with state treatment policy has a particularly hollow ring in this case, since the State's [*36] own treatment professionals determined that the placement of respondents in a community setting would be appropriate. See p. 2, supra. And Georgia law expresses a preference for treatment in the most integrated environment appropriate. _Ga. Code Ann. § 37-4-121_ (Mitchie 1995) ("It is the policy of the state that the least restrictive alternative placement be secured for every client at every stage of his habilitation. It shall be the duty of the facility to assist the client in securing placement in noninstitutional community facilities and programs.").

2. Petitioners are similarly mistaken in their assertion (Br. 13) that the integration regulation imposes "massive" costs on the States. As we have noted, the integration mandate does not apply when compliance would require an unreasonable change in state policy or a fundamental alteration in the nature of the State's treatment program. _28 C.F.R. 35.130(b)(7)_. Costs have a bearing on those inquiries. As the court of appeals concluded (Pet. App. 28a), if any additional costs of providing treatment in a community setting, rather than an institution, were shown to be unreasonable in comparison to a State's overall mental health budget, [*37] a State would not be required to provide the treatment in a community setting. Cf. _42 U.S.C. 12111(10) (B)_ (factors for determining undue hardship under Title I [*19] include cost and overall financial resources of the covered entity). [3]

Unsubstantiated claims of such costs, however, are no substitute for proof. Congress has found that community placements are less expensive, on average, than institutional care, S. Rep. No. 139, 97th Cong., 1st Sess. 481 (1981); S. Rep. No. 273, 101st Cong., 2d Sess. 7, 25-26 (1990), and numerous studies have reached the same conclusion. Accommodating the Spectrum [*38] of Individual Abilities, supra, at 78 ("Virtually all the relevant literature documents that segregating handicapped people in large, impersonal institutions is the most expensive means of care."). Petitioners also acknowledge (J.A. 84-85, 171) that community-based care of mentally retarded persons is generally less expensive, on a per-patient basis, than institutional care. For example, Georgia has estimated (J.A. 171) that it would cost $ 30,000 to $ 60,000 more per person per year to keep mentally retarded individuals in an institution than it would cost to move them to a community program and provide necessary support services.

Moreover, in 1981, Congress enacted a Medicaid "waiver" program that permits States to apply to the Department of Health and Human Services (HHS) for a waiver of certain Medicaid rules in order to offer community-based services. See _42 U.S.C. 1396n(c)_. Under the program, the federal government provides between 50% and 83% of the total Medicaid costs for community-based care, the same federal [*20] contribution that is available for institutional care. _42 U.S.C. 1396d(b)_. By 1996, HHS had authorized (at [*39] Georgia's request) matching funds for up to 2109 community placements. Georgia, however, used only 700 of its "waiver slots." J.A. 93. When petitioners ultimately moved respondents to community placements, they used federal money from the waiver program to offset a significant portion of the cost of such care. J.A. 161-164.

At the same time, the federal government's experience in operating the Medicaid waiver program has revealed costs that States may incur in the aggregate in moving persons from institutions to more integrated settings. If a State is unable to close or consolidate facilities, it may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions. If a State is able to consolidate or close facilities in response to community placements, the State may still incur the transitional cost of operating institutions that are only partially full until the closure or consolidation can be completed. The fixed overhead costs involved in operating those facilities may negate the cost savings that States could otherwise achieve by treating persons in the community rather than [*40] in institutions. See Pet. App. 28a-29a; J.A. 171-172. The availability of community placements may also increase the aggregate demand for community services among those not currently in institutions. For example, persons eligible for treatment may not have sought it in the past because they were unwilling to receive it in an institution. The increased availability of community services may prompt such persons to seek treatment for the first time. See William G. Weissert et al., Cost Savings From Home And Community-Based Services: Arizona's Capitated Medicaid Long-Term Care Program, 22 J. of Health Pol., Pol'y & L. 1329, 1337-1339, 1344 (1997); Rosalie A. Kane et al., The Heart Of Long-Term Care (1998). [*21] Nonetheless, studies dealing with the elderly suggest that those concerns can be anticipated and that it appears possible to design a community placement program that manages costs and need not produce unreasonable increases in the overall cost to the State of providing long-term care. Weissert, supra, 22 J. of Health Pol., Pol'y & L. at 1343, 1345-1347; Kane, supra, at 70-71.

---

[3] It would also be a fundamental alteration to require a State to create an entirely new community-based program. For example, a State that has a community-based program that serves persons with mental retardation would not be required to create a program to serve mentally ill individuals who are not mentally retarded. A State, however, could be required to expand existing community-based programs to serve additional eligible individuals to the extent that such an expansion did not require an unreasonable change in state policy or a fundamental alteration.

In addition, nothing in the ADA suggests that courts must ignore the States' legitimate administrative [*41] concerns in accomplishing the transition of eligible individuals from institutional to community-based care. The transfer of eligible persons from institutions to the community is a multifaceted process that sometimes cannot be accomplished all at once. Even when treating professionals have evaluated eligible individuals and determined that a community setting is appropriate. States will need to locate proper community placements and determine which eligible individuals should receive priority for available slots. In order to ensure that this occurs in an orderly fashion, States may appropriately adopt a plan that addresses various administrative issues, including the order in which eligible persons will be placed in the community, so as to proceed in a systematic and prompt way. In determining whether a public entity has a defense under 28 C.F.R. 35.130(b)(7), a court may appropriately take into account whether the public entity has adopted such a plan to achieve compliance with the ADA. If a State establishes that it has such a plan, that plan would serve as a valid defense in situations where a particular request for a community placement was inconsistent with the plan and responding [*42] to such a request and similar requests would so disrupt the orderly implementation of the plan as to create an unreasonable change in state policy or a fundamental alteration not required by the ADA.

Petitioners conceded below (J.A. 159) that the costs of providing services to respondents in the community "are, by [*22] definition, not unreasonable, nor could they 'fundamentally alter' the services provided by the State." Petitioners contend, however, that the relevant inquiry is the cost of providing services to all persons who desire it and that the court of appeals erred in limiting the inquiry to the costs of providing treatment to respondents. Br. 37-38. In their question presented to this Court, petitioners did not challenge the court of appeals' ruling on that ground. In any event, the court of appeals did not preclude petitioners from introducing evidence that they had devised a comprehensive plan that takes into account the aggregate costs of moving persons from institutions to community settings, and that placement of respondents would fundamentally alter that plan. While the court of appeals instructed the district court to consider the costs of providing services [*43] to the respondents, it also stated that "[t]he district court may also consider any other factors it believes are relevant to the fundamental alteration inquiry." Pet. App. 30a.

D. Petitioners' Remaining Arguments Are Unpersuasive

Petitioners offer a series of additional arguments intended to show that the Attorney General's integration regulation exceeds the authority conferred by Congress to implement the Title II mandate against discrimination based on disability. None is persuasive.

1. Petitioners first contend (Br. 22-29) that, prior to enactment of the ADA, courts uniformly rejected claims that Section 504 required placement of persons with disabilities in the community. Petitioners further contend that Congress intended to incorporate that settled interpretation when it enacted the ADA. See Bragdon, 118 S. Ct. at 2208. The premise of petitioners' argument is incorrect: prior to enactment of the ADA, there was no settled judicial understanding concerning whether Section 504 prohibited the [*23] unjustified segregation of persons with disabilities in institutions.

Petitioners rely (Br. 26) on several lower-court decisions to support their [*44] view that there was a judicial consensus rejecting any right to community placement under Section 504. But of the decisions cited by petitioners, three were decided after Congress enacted the ADA, P.C. v. McLaughlin, 913 F.2d 1033 (2d Cir. 1990); Jackson v. Fort Stanton Hosp. & Training Sch., 757 F. Supp. 1243 (D.N.M. 1990), rev'd on other grounds, 964 F.2d 980 (10th Cir. 1992); People First v. Arlington Dev. Ctr., 878 F. Supp. 97 (W.D. Tenn. 1992)), and one of the cases did not decide the issue, S.H. v. Edwards, No. C81-877A (N.D. Ga. Apr. 10, 1987), aff'd, 860 F.2d 1045 (11th Cir. 1988). cert. denied, 491 U.S. 905 (1989). More important, petitioners ignore the decisions that held or assumed that Section 504 requires community placement in certain circumstances. Kentucky Ass'n for Retarded Citizens, Inc. v. Conn, 674 F.2d 582, 585 (6th Cir.), cert. denied, 459 U.S. 1041 (1982); Homeward Bound, Inc. v. Hissom Mem'l Ctr., No. 85- C-437-E, 1987 WL 27104, at * 20-21 (N.D. Okla. July 24, 1987); Garrity v. Gallen, 522 F. Supp. 171, 213-215 (D.N.H. 1981); Lynch v. Maher, 507 F. Supp. 1268, 1278-1280 (D. Conn. 1981); [*45] Halderman v. Pennhurst State Sch. & Hosp., 446 F. Supp. 1295 (E.D. Pa. 1978), aff'd in part and rev'd in part, 612 F.2d 84 (3d Cir. 1979), rev'd, 451 U.S. 1 (1981). Thus, before enactment of the ADA, the question whether Section 504 prohibited unjustified segregation of persons in institutions was an open one.

*Traynor v. Turnage, 485 U.S. 535 (1988),* relied upon by petitioners (Br. 23), does not hold otherwise. That case held that Section 504 did not repeal a statute that prevented persons with a disability resulting from their own willful misconduct (in this case alcoholism) from using educational benefits provided by the GI bill after the statutory deadline. The Court found "nothing in the Rehabilitation Act that **[*24]** requires that any benefit extended to one category of handicapped persons, also must be extended to other categories of handicapped persons." *485 U.S. at 549.* Traynor does not remotely suggest that Section 504 permits the unjustified segregation of persons in institutions.

Petitioners are also incorrect in their assertion (Br. 28) that, prior to enactment of the ADA, no federal administrative **[*46]** agency had interpreted Section 504 to prohibit segregation of persons in institutions. The Department of Justice argued in the Pennhurst litigation that, in certain circumstances, Section 504 prohibits unnecessary institutionalization of persons with disabilities. See U.S. Br. at 36-45, Halderman v. Pennhurst State Sch. & Hosp., No. 78-1490 (filed Oct. 2, 1978). Following *Southeastern Community College v. Davis, 442 U.S. 397 (1979),* the Department again argued that Section 504 prohibits unnecessary institutionalization, but indicated that, in light of Davis, a State could not be required to create a new system of community facilities where none existed before. See U.S. Br. at 29, Halderman v. Pennhurst State Sch. & Hosp., No. 78-1490 (filed Oct. 14, 1981). The Department did not address the question after *Alexander, 469 U.S. at 300-301,* and *Arline, 489 U.S. at 287 n.17,* clarified the meaning of Davis. Because there was no settled judicial or administrative construction of Section 504 on the question presented in this case prior to enactment of the ADA in 1990, the fact that Congress generally patterned Title II of the ADA on Section 504 has no **[*47]** significance here.

2. Petitioners contend (Br. 30-32) that the Attorney General's interpretation of Title II conflicts with the Medicaid Act, because that Act establishes a preference for care in institutions rather than the community. As we have noted, however, the Medicaid Act provides a mechanism by which States may obtain waivers to treat persons in the community. Moreover, HHS has a policy of encouraging States to take advantage of the waiver program, and often **[*25]** approves more waiver slots than a State ultimately uses. For example, as we have noted, HHS approved up to 2109 waiver slots for Georgia, but Georgia used only 700. In any event, nothing in the Medicaid Act prevents the State from fulfilling its obligations under Title II. To the extent that the State is unable to utilize funding obtained under the Medicaid Act to serve all those who are eligible for treatment in the community, it may use its own resources for that purpose.

Petitioners also contend (Br. 30-32) that the Attorney General's interpretation of Title II conflicts with the Medicaid Act because the Medicaid Act does not provide funding for the community placement of persons who prefer institutional **[*48]** care. Neither Title II nor the Attorney General's regulations, however, require a State to treat an individual in the community if that individual prefers treatment in an institution. See *42 U.S.C. 12201(d);* *28 C.F.R. 35.130(e)(1).*

Petitioners also err (Br. 32) in attributing "great weight" to Congress's failure to pass legislation that would have made the treatment of persons in the community a requirement for receiving Medicaid funds. That legislation would have gone significantly beyond the requirements in Title II and the integration regulation. More fundamentally, failed legislative proposals do not provide a sound basis for determining the meaning of another statute. *Central Bank v. First Interstate Bank, 511 U.S. 164, 187 (1994).*

3. Petitioners contend (Br. 32-33) that the Attorney General's interpretation of the integration regulation is inconsistent with the "clear statement" rule set forth in *Gregory v. Ashcroft, 501 U.S. 452 (1991).* In that case, the Court refused to construe ambiguous language in the Age Discrimination in Employment Act of 1967, *29 U.S.C. 621* et seq., to require States to alter their **[*49]** practices concerning when state judges must retire. The Court relied on a canon of statutory construction that, absent an "unmistakably **[*26]** clear" expression of intent to "alter the usual constitutional balance between the States and the Federal Government," a court should interpret a statute to preserve rather than destroy the States' "substantial sovereign powers." *501 U.S. at 460-461.* Gregory is inapplicable here for three reasons.

First, contrary to petitioners' understanding (Br. 33), the Gregory clear statement rule does not apply simply because a proposed interpretation of a federal statute would affect "an area traditionally regulated by the States."

*City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 732 n.5 (1995)* (refusing to apply a clear statement rule to decide whether the Fair Housing Act, *42 U.S.C. 3601* et seq., applies to zoning restrictions that limit the number of unrelated persons that can occupy a home in a residential community). The clear statement rule applies only when the proposed interpretation would implicate "a decision of the most fundamental sort for a sovereign entity." Ibid. The present case [*50] does not implicate the type of core sovereignty concerns that were at issue in Gregory. Instead, it is much more akin to the kind of imposition on traditional state functions at issue in City of Edmonds.

Second, Gregory's clear statement rule is merely "a rule of statutory construction to be applied where statutory intent is ambiguous." *501 U.S. at 470; Salinas v. United States, 522 U.S. 52, 59-61 (1997).* As explained above, Congress's findings concerning "segregation" and "institutionalization" reflect Congress's clear understanding that the unjustified segregation of persons in institutions constitutes a form of discrimination based on disability. And Congress's instruction to the Attorney General in *42 U.S.C. 12134*, in essence, required the Attorney General to adopt an integration regulation covering all services provided by public entities, including the type of treatment services offered by petitioners in this case. Because there is no ambiguity with [*27] respect to Congress's intent on the question presented in this case, the Gregory clear statement rule does not apply.

Finally, even assuming that Congress's intent is [*51] ambiguous, Congress directed the Attorney General to issue regulations that would resolve any ambiguities on the scope of Title II's nondiscrimination prohibition. *42 U.S.C. 12134*. Since the clear statement rule is nothing more than an aid to resolving Congress's intent on an issue, that rule is inapplicable when Congress expressly delegates authority to an administrative agency to give content to a general statutory prohibition. Cf. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 154 (1982)* (agency acting within the scope of its delegated authority may preempt state law, even though a court acting on its own would not conclude that Congress preempted state law unless Congress clearly manifested such an intent).

4. Petitioners' reliance (Br. 33-35) on *Pennhurst State School & Hospital v. Halderman, 451 U.S. 1 (1981),* is also misplaced. The statutory provision at issue there stated that treatment "should be provided in the setting that is least restrictive of the person's personal liberty." *42 U.S.C. 6010(2)* (1976) (emphasis added). In the absence of any clear indication that Congress intended [*52] through that language to impose a mandatory obligation on the States, the Court held that the provision was merely precatory. *451 U.S. at 19.* By contrast, Title II of the ADA, *42 U.S.C. 12132*, provides that "no qualified individual with a disability shall, by reason of such disability * * * be subjected to discrimination by any [public] entity" (emphasis added). And the integration regulation provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *28 C.F.R. 35.130(d)* (emphasis added). "The contrast between the congressional preference at issue in Pennhurst and the antidiscrimination mandate of [Title II [*28] and the integration regulation] could not be more stark." *Arline, 480 U.S. at 286 n.15.* Pennhurst is therefore inapplicable here. See *Arline, 480 U.S. at 286 n.15* (holding that Pennhurst is not applicable to statutes, like Section 504, that clearly mandate action).

5. Finally, petitioners assert (Br. 44) that the Attorney General's interpretation should be rejected in order [*53] to avoid the constitutional question whether Title II as so construed would exceed congressional authority under Section 5 of the Fourteenth Amendment. The principle that a statute should be construed to avoid constitutional doubt is only implicated, however, when the statute is genuinely ambiguous. *Salinas, 522 U.S. at 59-61.* For the reasons we have given, there is no such ambiguity here.

In any event, the prohibition against unjustified segregation of persons in institutions readily satisfies constitutional standards. Legislation will be upheld as a valid exercise of Congress's power under Section 5 of the Fourteenth Amendment if there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores, 521 U.S. 507, 520 (1997).* The integration mandate of Title II readily satisfies that test.

Irrational and invidious discrimination on the basis of disability violates the *Equal Protection Clause. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985).* Moreover, this Court in Cleburne recognized that "irrational prejudice," *473 U.S. at 450,* "irrational [*54] fears," *id. at 455* (Stevens, J., concurring), and "impermissible assumptions or outmoded and perhaps invidious stereotypes," *id. at 465* (Marshall, J., concurring in part and

dissenting in part), existed against persons with disabilities and, at times, infected governmental decisionmaking. Congress similarly found that discrimination against persons with disabilities persists in many contexts and that such discrimination is **[*29]** often the product of impermissible stereotypes and misconceptions, *42 U.S.C. 12101(a)(2)*, (3), (5) and (7).

The integration regulation is a measured response to the discrimination identified by Congress. It is designed to increase the interaction between persons with disabilities and their non-disabled counterparts, thus hastening the breakdown of the stereotypes that have impeded full equality. The regulation also serves as a prophylactic safeguard against intentionally discriminatory efforts to exclude persons with disabilities from residential communities. Cf. *Katzenbach v. Morgan, 384 U.S. 641, 654 (1966).* At the same time, the regulation is carefully crafted to avoid undue burdens on **[*55]** the States. The Title II integration mandate is therefore well within Congress's power under Section 5 of the Fourteenth Amendment.


# CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

SETH P. WAXMAN, Solicitor General

BILL LANN LEE, Acting Assistant Attorney, General

BARBARA D. UNDERWOOD, Deputy Solicitor General

IRVING L. GORNSTEIN, Assistant to the Solicitor, General

JESSICA DUNSAY SILVER, GREGORY B. FRIEL, Attorneys

MARCH 1999


**[*30]** APPENDIX

1. *Section 12101 of Title 42 of the United States Code* provides in pertinent part:

## § 12101. Findings and purpose

**(a) Findings**
* * * *

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services; **[*56]**
* * * *

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification **[*1a]** standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

\* \* \* \*

(8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

\* \* \* \*

2. *Section 12111 of Title 42 U.S.C.* provides in relevant part as follows:

## § 12111. Definitions

As used in this subchapter:

\* \* \* \*

## (10) Undue hardship

(A) In general

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

### (B) Factors to be considered

In determining whether an accommodation would impose an undue [*57] hardship on a [*2a] covered entity, factors to be considered include--

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

3. *Section 12131 of Title 42 of the United States Code* provides as follows:

## § 12131. Definitions

As used in this subchapter:

### (1) Public entity

The term "public entity" means--

(A) [*3a] any State or local government; [*58]

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of title 49).

### (2) Qualified individual with a disability

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

4. *Section 12132 of Title 42 of the United States Code* provides as follows:

### § 12132. Discrimination

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

[*4a] 5. *Section 12133 of Title [*59] 42 of the United States Code* provides as follows:

### § 12133. Enforcement

The remedies, procedures, and rights set forth in section 794a of title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

6. *Section 12134 of Title 42 of the United States Code* provides as follows:

### § 12134. Regulations

(a) In general

Not later than 1 year after July 26, 1990, the Attorney General shall promulgate regulations in an accessible format that implement this part. Such regulations shall not include any matter within the scope of the authority of the Secretary of Transportation under section 12143, 12149, or 12164 of this title.

### (b) Relationship to other regulations

Except for "program accessibility, existing facilities", and "communications", regulations under subsection (a) of this section shall be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations (as promulgated by the Department of Health, Education, and Welfare on January 13, [*5a] 1978), applicable [*60] to recipients of Federal financial assistance under section 794 of title 29. With respect to "program accessibility, existing facilities", and "communications", such regulations shall be consistent with regulations and analysis as in part 39 of title 28 of the Code of Federal Regulations, applicable to federally conducted activities under section 794 of title 29.

7. *Section 12182 of Title 42 of the United States Code* provides in pertinent part:

### § 12182. Prohibition of discrimination by public accommodations

* * * *

### (b) Construction

### (1) General prohibition

* * * *

### (B) Integrated settings

Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.

8. *Section 35.130 of Title 28 of the Code of Federal R*egulations provides as follows:

### [*6a] § 35.130 General prohibitions against discrimination.

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public [*61] entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability--

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary [*7a] to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination [*62] against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

(vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) [*8a] That have the purpose or effect of defeating or substantially impairing accomplishment [*63] of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections--

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified [*64] entities [*9a] that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

(c) Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d) A public entity [*65] shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)(1) [*10a] Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(2) Nothing in the Act or this part authorizes the representative or guardian of an individual with a disability to decline food, water, medical treatment, or medical services for that individual.

(f) A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship [*66] or association.

---

End of Document