**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>       v.<br><br>STATE OF MISSISSIPPI,<br><br>    *Defendant.* | CIVIL ACTION NO.<br>3:16-CV-00622-CWR-FKB |

### UNITED STATES' PRETRIAL BRIEF

Mississippi provides services to thousands of people with serious mental illness[1] in segregated state-run psychiatric hospitals, even when it would be appropriate to provide those services in community settings and when individuals do not oppose community-based services. This service system forces these individuals to choose between receiving State services in segregated residential settings or not receiving them at all. This system, in design and operation, violates the Americans with Disabilities Act, 42 U.S.C. § 12132, (ADA).

Nearly twenty years ago, the United States Supreme Court determined that: "Unjustified isolation … is properly regarded as discrimination based on disability." *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999). Twelve years later, in 2011, the United States issued its investigative findings in a letter to the Governor of Mississippi, concluding that the State fails to provide services to adults with serious mental illness in the most integrated setting appropriate to their

---

[1] A person with a serious mental illness is someone over 18 who has a diagnosable mental, behavior, or emotional disorder that causes serious functional impairment that substantially interferes with or limits one or more major life activities within the last year. Mental Health and Substance Use Disorders, Substance Abuse and Mental Health Services Administration, *available at*: https://www.samhsa.gov/find-help/disorders.

needs as required by the ADA and *Olmstead*. Letter from United States Department of Justice, Civil Rights Division to The Honorable Haley R. Barbour (Dec. 22, 2011), ECF No. 19-1. This ADA violation continues to this day. The State unnecessarily institutionalizes individuals with serious mental illness in Mississippi's four state hospitals—North Mississippi State Hospital (NMSH), South Mississippi State Hospital (SMSH), East Mississippi State Hospital (EMSH), and Mississippi State Hospital (MSH) (collectively, the "State Hospitals")—and fails to provide community mental health services in integrated settings, consistent with their needs.

Mississippi has the framework of a community-based service system that would prevent unnecessary State Hospital stays, but has not sufficiently developed the system statewide. The evidence at trial will demonstrate that thousands of adult Mississippians with serious mental illness are forced to enter State Hospitals because the services that would support them in the community are not available. Some of these individuals remain in the State Hospitals for months or years. Others are discharged without being connected to appropriate mental health services in the community, putting them at risk of returning to a State Hospital.

This is a solvable problem. The State can reasonably modify its existing mental health system to increase services provided in the community, thereby decreasing reliance on services provided in State Hospitals. The evidence will show that Mississippi agrees that community-based services are effective in preventing State Hospital admissions, and that expanding these services is reasonable.[2] Still, for too many people with serious mental illness in Mississippi, the State provides no practical alternatives other than admission to a State Hospital.

---

[2] Community-based services, including mobile crisis, crisis stabilization (also called crisis residential services), Assertive Community Treatment (also called Program for Assertive Community Treatment, or "PACT"), community support services, psychiatric services, supported employment, peer support services, and permanent supported housing, are designed for people who might otherwise experience a hospitalization and are effective at reducing hospital use. *See, e.g.,* JX 60 at 105, 215 (DMH Operational Standards); Tr. Stipulations ¶¶ 212, 236, ECF No. 189-1.

## APPLICABLE LAW

The ADA prohibits discrimination "by reason of [a] disability" in the provision of public services. 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity"). Defendant State of Mississippi is a "public entity" within the meaning of Title II of the ADA and, therefore, is subject to the ADA's provisions and obligations. 42 U.S.C. § 12131(1)(A). In enacting the ADA, Congress explained that discrimination includes unnecessary segregation, saying: "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2)-(3), (7). Congress stated, "The purpose of [T]itle II is to continue to break down barriers to the integrated participation of people with disabilities in all aspects of community life." H.R. Rep. No. 101-485 (II), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 472-73.

### A. The ADA's Integration Mandate

The ADA regulations require that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B (2011).

Nine years after the ADA was enacted, the Supreme Court reiterated in *Olmstead v. L.C.* that "[u]njustified isolation . . . is properly regarded as discrimination based on disability" in violation of Title II of the ADA. 527 U.S. at 597. The Supreme Court explained that its holding

"reflects two evident judgments." *Id.* at 600. First, "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable of or unworthy of participating in community life." *Id.* at 600-01. Second, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

The Court held that public entities must provide community-based services to individuals with disabilities when (1) such services are appropriate to the needs of the individual; (2) the affected individuals do not oppose community-based treatment; and (3) community-based services can be reasonably accommodated, taking into account the resources available to the public entity and the needs of other persons with disabilities. *Id.* at 607.

## B. The ADA Applies to People at Serious Risk of Institutionalization

The protections of Title II, as affirmed in *Olmstead*, apply not only to people with disabilities who are currently in institutions, but also to people with disabilities who are at serious risk of institutional placement. *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 262-63 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1116-18 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012). As the Tenth Circuit reasoned, the integration mandate "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). *See also Pitts v. Greenstein*, No. 10-635-JJB-SR, 2011 WL1897552, at *3 (M.D. La. May 18, 2011) ("A State's program violates the ADA's integration

mandate if it creates the *risk* of segregation; neither present nor inevitable segregation is required."). A state may violate Title II by failing to provide meaningful alternatives to institutional care for persons at serious risk of institutionalization. *Pashby*, 709 F.3d at 322. *See Radaszewski v. Maram*, 383 F.3d 599, 609 (7th Cir. 2004) ("[A] State may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community integrated setting.").

### C. Public Entities Must Make Reasonable Modifications to Avoid Discrimination

To comply with the ADA's integration mandate, public entities must reasonably modify their policies, procedures, or practices when necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R.§ 35.130(b)(7)(i) ("A public entity *shall* make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.") (emphasis added).

This Court has determined that:

> The burden of showing reasonable accommodations is not a heavy one. It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits and once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant. (quotations and citations omitted) (Order Den. Mot. for Summ. J. at 6, May 13, 2019, ECF 204)

Courts have found proposed modifications that expand existing services to be reasonable, particularly when the modifications align with the jurisdiction's own stated plans and obligations. *See, e.g., Henrietta D. v. Bloomberg*, 331 F.3d 261, 280-81 (2d Cir. 2003) (upholding as a reasonable modification an order requiring agency charged with connecting

people with AIDS to needed services to "perform its statutory mandate"); *Haddad v. Arnold*, 784 F. Supp. 2d 1284; 1304-05 (M.D. Fla. 2010) (providing a service that the state chose to include in its own service system to additional individuals is not a fundamental alternation); *Messier v. Southbury Training School*, 562 F. Supp. 2d 294, 344-45 (D. Conn. 2008) (finding plaintiffs' requested service expansion, which was consistent with defendants' publicly stated plans for the system was reasonable, not a fundamental alteration).

### D. The State Bears the Burden of Establishing the Fundamental Alteration Affirmative Defense

A state would not violate the ADA's integration mandate if it can show, as an affirmative defense, that the modifications would "fundamentally alter" the nature of the services provided. 28 C.F.R. § 35.130(b)(7). Although a state can raise this defense, to succeed, it must first show that it has a "comprehensive, effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings." *Frederick L. v. Dep't of Pub. Welfare of Pa. (Frederick L. III)*, 422 F.3d 151, 157 (3d Cir. 2005) ("a comprehensive working plan is a necessary component of a successful 'fundamental alteration' defense"). *See also Olmstead*, 527 U.S. at 604-06.

#### i. *Comprehensive, Effectively Working Plan*

An effectively working plan is one that includes and implements reasonably specific and measurable goals for community placement by target dates. *Frederick L. III*, 422 F.3d at 157-58. A key inquiry for whether a jurisdiction has an effectively working plan is whether the jurisdiction *actually moves* people to integrated settings and reduces the number of institutionalized people. *See Day v. District of Columbia*, 894 F. Supp. 2d 1, 28-29 (D.D.C. 2012) (finding "there is wide-spread agreement that one essential component of an 'effectively working' plan is a measurable commitment to deinstitutionalization" and that the Defendant had

not demonstrated such a commitment given the negligible decrease in the nursing facility population); *Jensen v. Minn. Dep't of Human Servs.*, 138 F. Supp. 3d 1068, 1072-73 (D. Minn. 2015) (approving plan where there was "concrete baseline data and specific timelines to establish measurable goals," where goals were "not only measurable, but strategically tailored to make a significant impact in the lives of individuals with disabilities across the state," and where the state "provides a rationale for each of the metrics used, explains why each metric was chosen, and explains how each metric will adequately reflect improvement over time").

ii.     *Fundamental Alteration of a Plan or Service System*

A state with an effectively working *Olmstead* Plan can seek to demonstrate that the modifications sought would disrupt its plan or fundamentally alter its service system.  When a state already offers community services to some individuals with disabilities, it cannot demonstrate a fundamental alteration where the modification sought is the expansion of those services to additional persons with disabilities.  *See Disability Advocates, Inc. v. Paterson (DAI)*, 598 F. Supp. 2d 289, 335-36 (E.D.N.Y. 2009) ("Where individuals with disabilities seek to receive services in a more integrated setting—and the state *already provides* services to others with disabilities in that setting—assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'"); *Townsend v. Quasim*, 328 F.3d 511, 519 (9th Cir. 2003) ("*Olmstead* did not regard the transfer of services to a community setting, without more, as a *fundamental* alteration.  Indeed, such a broad reading of fundamental alteration regulation would render the protection against isolation of the disabled substanceless.").  Finally, as the Third Circuit has held, though relevant, "budgetary constraints alone are insufficient to establish a fundamental alteration defense."  *Penn. Prot. & Advocacy, Inc. v. Penn. Dep't of Public Welfare*, 402 F.3d 374, 380 (3d Cir.2005). *See also M.R. v. Dreyfus*, 663 F.3d 1100,

1118-19 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012) (same); *Frederick L. v. Dep't of Pub. Welfare (Frederick L. II)*, 364 F.3d 487, 495 (3d Cir. 2004); *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 995 (N.D. Cal. 2010) (rejecting defendants' justification of termination of adult daycare services placing plaintiffs at serious risk of institutionalization in skilled nursing facilities due to severe state budget cuts).

## STATEMENT OF THE CASE

The ADA requires Mississippi to serve eligible people with serious mental illness in the most integrated setting appropriate to their needs. The evidence will show that the State has failed to meet that obligation. Instead of providing people with serious mental illness appropriate services in community-based settings, the State overly relies on State Hospitals to provide services.

The agencies principally in charge of the public mental health system in Mississippi are the Mississippi Department of Mental Health (DMH) and the Mississippi Division of Medicaid (DOM). Together, they plan, fund, regulate, and oversee the State's mental health system, which includes the four State Hospitals and 14 regional community mental health centers (CMHCs) that offer community-based mental health services. State's Answer, at ¶¶ 25-26, 69, 72 (ECF No. 3); JX 53 at 6-7 (FY 2019-2021 DMH Strategic Plan).

## I.   Mississippi Unnecessarily Segregates Adults with Serious Mental Illness in its State Hospitals

State Hospital care is the most restrictive mental health service that Mississippi offers adults with serious mental illness. State Hospitals are locked facilities on campuses set apart from the rest of the community. PX 407 at 14-15 (Peet Report). In State Hospitals, people have little choice and autonomy; their meals, roommates, and daily schedules are dictated to them. *Id.* By overly relying on State Hospitals and failing to provide sufficient community-based services,

8

Mississippi violates the rights of individuals with serious mental illness to receive services in the most integrated setting appropriate to their needs.

## A. Many People are Hospitalized in Mississippi or at Serious Risk of Hospitalization Because They Do Not Receive Appropriate Community-Based Treatment

Through its experts, the United States conducted a review of a representative sample of individuals admitted to the State Hospitals. The review concluded that individuals who are appropriate for community-based treatment are often hospitalized in Mississippi because they do not have access to services that could prevent unnecessary hospitalizations. Six experts (collectively, the "clinical review team") examined a sample of 154 individuals who were in a State Hospital between October 15, 2015 and October 15, 2017 (the "Sample Period"). Summarizing his findings, one of the clinical review experts explained: "For most individuals with mental illness whose symptoms are worsening, there are multiple opportunities for community-based services to rapidly react, intensify services, and stabilize. For the people I reviewed in Mississippi, the necessary services were not available, and those opportunities were lost. These people were admitted to the State Hospital because of those lost opportunities." PX 401 at 8 (Byrne Report).

### i. Thousands of Individuals Experience Long or Repeated Admissions to State Hospitals

In fiscal year 2018, Mississippi's four State Hospitals collectively had 438 beds, Tr. Stipulation ¶¶ 68, 69, 112, 148, 182, ECF No. 189-1, and treated almost 2,800 adults.[3] *Id.* ¶¶ 70, 71, 113, 149, 183.

---

[3] The State's reliance on State Hospital beds is not the result of a dearth of other inpatient psychiatric capacity in the State. Research by one of the State's own experts shows that Mississippi's psychiatric hospital bed capacity is among the highest in the country. PX 394 at 27 (Lutterman, T. & Mandersheid, R., Trends in Total Psychiatric Inpatient and Other 24-Hour Mental Health Residential Treatment Capacity, 1970-2014, NASMHPD Commissioners Meeting (July 31, 2017))

A large number of hospitalizations in the State Hospitals last for months or years. During the Sample Period, there were over 350 admissions that lasted more than six months. PX 405 at 29 (MacKenzie Report, Exhibit C). Approximately 850 more admissions lasted between two and six months. *Id*. Moreover, as of fiscal year 2018, Mississippi State Hospital had 92 beds in its continuing care unit, which is specifically designed for long stays. Tr. Stipulation ¶ 69. According to DMH, patients in the continuing treatment unit stayed, on average, 1,656 days—or over four and a half years. PX 354 at 4 (DMH, Fast Facts FY2018). Although East Mississippi State Hospital does not have a dedicated long-term unit, some of the patients recently discharged from that institution were there for more than a decade. Carlisle Dep. 73:8-17, June 15, 2018.

Not only do people experience long stays, but many also have repeated admissions to the State Hospitals. For example, one individual in the client review population was admitted to a State Hospital three times between October 2016 and March 2018. PX 406 at 137 (Burson Report). In total, 743 of 3,951 adults who were in State Hospitals during the Sample Period had more than one State Hospital admission *during that time*. PX 405 at 28 (MacKenzie Report, Exhibit C).

Looking beyond the two years of the Sample Period, the number of admissions is often even higher. One person in the clinical review sample has been in a State Hospital at least 19 times in as many years. PX 401 at 33 (Byrne Report). Still another had been admitted to a State Hospital 46 times as of the time the United States' expert met him when he was 68 years old. PX 402 at 69 (VanderZwaag Report). Eighteen of his 46 admissions occurred in the last seven years. *Id.*

What is more, many individuals heading to the State Hospital are first held in jails, crisis stabilization units, or local hospitals while awaiting placement in a State Hospital. PX 404 at 16

(Drake Report); *see* Vaughn Dep. 181:9-21, Mar. 29, 2018. Of the 154 individuals in the review population, at least 61 individuals (40%) were held in county jails *without criminal charge* pending their civil commitment to a State Hospital. *See generally* PX 401 (Byrne Report); PX 402 (VanderZwaag Report); PX 403 (Baldwin Report); PX 404 (Drake Report); PX 406 (Burson Report); PX 407 (Peet Report); PX 408 (Bell-Shambley Report).

>    ii.    *Many of These Hospitalizations Could Have Been Avoided with Effective Community-Based Services*

As described more fully below, *infra* section I.B., community-based services that already exist to an extent in Mississippi are effective at preventing hospitalization. PX 404 at 9-15 (Drake Report); PX 407 at 10-14 (Peet Report); Allen Dep 35:8-12, June 14, 2018. Mississippians who entered State Hospitals after struggling to cope with the symptoms of their mental illness often could have avoided a State Hospital stay if they had instead received these community-based services. In many cases, the crisis that resulted in commitment could have been prevented or addressed with community-based services.

The clinical review team identified a number of people who had stabilized by the time they arrived at a State Hospital or shortly thereafter. In some of these instances, the clinical review team determined it was likely that crisis services could have effectively prevented State Hospital admissions. For example, one individual had multiple brief admissions that could have been prevented with effective crisis response services. PX 401 at 58-60 (Byrne Report). Another person's hospitalization likely could have been prevented if mobile crisis had rapidly connected her with necessary supports. *Id.* at 39. In another case, a mobile crisis team could have offered a man in psychiatric crisis an immediate appointment to identify his needs and connect him to other community-based services that may have prevented a State Hospital commitment. PX 403 at 99 (Baldwin Report).

In other cases, the records indicated that people entered State Hospitals because they had not received other community mental health services to meet their ongoing needs. For example, one man, who had 14 State Hospital admissions, likely could have been supported in the community with Assertive Community Treatment (described in Section I.B.), but he was not receiving PACT. PX 403 at 89, 91-93 (Baldwin Report). If he had been receiving PACT, providers would have been watching for changes in his symptoms and intervening when there were signs of decompensation. The same pattern of unmet need for ongoing services holds true for many others in the clinical review. *See, e.g.,* PX 402 at 60-61, 89-90 (VanderZwaag Report); PX 406 at 106 (Burson Report).

iii.   *Many Hospitalizations Could Be Shortened with Effective Discharge Planning and Sufficient Services to Serve People Upon Discharge*

Effective discharge planning, which can reduce the length of hospitalizations by identifying services to meet the needs that precipitated the hospital stay and quickly reconnecting individuals to service providers to prevent readmissions, often does not occur at the State Hospitals. PX 404 at 12, 22 (Drake Report); PX 407 at 26-28 (Peet Report). Discharge planning should begin early in the individual's hospital admission and involve the community providers who will participate in the individual's care and recovery, not just hospital staff. Mikula Dep. 49:22-52:11, Mar. 28, 2019; PX 401 at 9 (Byrne Report). Yet, the clinical review team found that, in Mississippi, discharge planning and coordination "among family members, State Hospital staff members, and community-based clinical staff members were sparse or non-existent, and even basic diagnostic formulations were often confusing and inaccurate." PX 401 at 9.

Furthermore, discharge is delayed when the services people need are not available. For example, one woman was discharged three months *after* staff determined she was stable. PX 403 at 22 (Baldwin Report). As of the clinical review, one individual in the sample had been

awaiting community placement for over a year.  PX 402 at 30 (VanderZwaag Report).

Defendant admits that "it's quite frequent" that an individual remains in the hospital because a

discharge destination has not been identified.  Maddux Dep. 147:11-15, May 7, 2018.

> iv.    *People Remain At Serious Risk of Hospitalization After Discharge*
>        *Because They Are Not Connected to Needed Services*

When individuals return to their homes and communities, many have found themselves at

serious risk of re-institutionalization because they are not receiving the community mental health

services they need.  As noted above, 743 of 3,951 adults who were in State Hospitals during the

Sample Period had more than one State Hospital admission during that time.  *See* PX 405 at 28

(MacKenzie Report, Exhibit C).  And just over half of the people who were in the State

Hospitals during the sample period had at least one prior admission.  *Id.* at 29.  These are all

individuals whom the State was aware of and should have connected to services to prevent the

cycle of crisis, civil commitment, and readmission.

Of the representative sample of 154 individuals, the United States' experts found 104

individuals were not in a psychiatric unit at the time of their interview, but were at serious risk of

returning to a State Hospital because they were not receiving appropriate mental health services.

PX 405 at 5 (MacKenzie Report); PX 404 at 2 (Drake Report).  For example, one man had at

least 11 hospitalizations, including seven at Mississippi State Hospital, but has never received

PACT, supported employment, or other intensive services.  PX 406 at 108, 110 (Burson Report).

Similarly, another individual in the sample had been hospitalized at East Mississippi State

Hospital eight times without receiving PACT or other intensive services.  *See id*. at 118, 120.

Multiple individuals in the client review were identified by their State Hospital treatment teams

as meeting criteria for PACT, but were not connected to the service because it was not available

where they live.  *See, e.g.,* PX 401 at 68 (Byrne Report); *id.* at 86-87; PX 402 at 59

(VanderZwaag Report).

### B.  The Particular Community-Based Services People Need to Avoid Hospitalization are Unavailable and Underutilized

The client review team found that most individuals who enter Mississippi's State

Hospitals ended up there, and are at risk of returning there, due to a dearth of community-based

services.  This is consistent with Mississippi's own documents and testimony, which confirm

there are insufficient quantities of key community-based services, and the services that do exist

are not distributed to meet the needs across the State.  *See, e.g.,* PX 408 at 7 (Bell-Shambley

Report) ("Interviews with certain CMHCs indicated that they do not have PACT, Supported

Employment, or Supported Housing.  There are rural areas that are greatly in need of services.");

Day Dep 88:17-23, Mar. 22, 2018 ("[T]here's areas of the state that for a variety of reasons may

not have a particular service, and so I felt like some of those could be used -- utilized in those

service area -- in those geographical locations.").  The parties agree that the services discussed

below are designed for and effective at preventing State Hospital admissions, but are unavailable

to many of the people who need them.

#### i.  *Mobile Crisis Services*

Crisis services help stabilize individuals experiencing a mental health crisis and prevent

them from needing hospitalization.  When an individual is experiencing a mental health crisis,

often the first line of defense against a hospitalization is mobile crisis response.  Mobile crisis

response is an intensive, evidenced-based service designed to provide support to individuals

experiencing a mental health crisis at their homes and other community locations.  JX 60 at 105

(DMH Operational Standards).  In addition, mobile crisis teams "play an important role in

connecting individuals to options for ongoing services."  PX 407 at 11 (Peet Report) (citing

Technical Assistance Collaborative, A Community-Based Comprehensive Psychiatric Crisis Response Service: An Information and Instructional Monograph, at 9 (April 2005)).  *See* JX 60 at 107.  Teams provide on-site assessment and intervention services to stabilize individuals in crisis with the goal of preventing unnecessary hospitalizations.  JX 60 at 105-106.

When provided with sufficient intensity, mobile crisis response prevents hospitalizations and helps sustain adults with serious mental illness in their homes and communities.  PX 404 at 11, 13 (Drake Report); PX 407 at 11-12, 20 (Peet Report).  Beyond simply defusing mental health crises when and where they occur, mobile crisis response serves as a critical entry point for other community-based services that help clients to achieve stability and avoid future crises.  JX 60 at 105-107 (DMH Operational Standards); PX 407 at 11; PX 404 at 11.  Without effective mobile crisis response services, as the State has acknowledged, individuals in crisis "may be inappropriately and unnecessarily placed in a jail, holding facility, hospital or inpatient treatment facility."  JX 60 at 105.

Mobile crisis response is provided unevenly across Mississippi and often without the intensity needed to prevent unnecessary State Hospital admissions.  PX 406 at 5 (Burson Report) ("Crisis supports designed to prevent hospitalization were often not available and, if they were, unfamiliar to families and thus not used."); PX 402 at 7 (VanderZwaag Report) ("Mobile crisis services, respite, facility-based crisis, and other diversion services appeared to be underutilized or not available.").  The evidence will show, for example, that CMHC Region 11 has disproportionately fewer mobile crisis contacts per capita than other regions in the State and sends more people to the State Hospitals, per capita, than most CMHCs.  PX 415 (2017 Mobile Crisis Calls per 1000 Residents by CMHC); PX 919 at 3 (Comparison CMHCs FY2017).  The region accounts for 4.8% of the State population and 8.7% of the State Hospital admissions.  PX

919 at 3. A neighboring region, Region 8, provides about 11 times more mobile crisis responses per capita. PX 415. And that region has a disproportionately low rate of State Hospital admissions: it accounts for 11.5% of the State population and 5.9% of the State Hospital admissions. PX 919 at 2. Some CMHCs do not respond to crises in all of the counties in their catchment area. PX 407 at 20 (Peet Report).

<i>ii.     Crisis Stabilization Services</i>

In Mississippi, Crisis Stabilization Services are short-term residential services designed to prevent civil commitment and/or longer-term inpatient hospitalization by addressing acute symptoms, distress, and further decompensation. Tr. Stipulations ¶ 212, ECF No. 189-1. Nationally, crisis stabilization beds have a length of stay of around five days, but in Mississippi the average length of stay is about ten days. PX 407 at 12 (Peet Report); Tr. Stipulations ¶ 213. Mississippi has explained that using the CSUs, "[a]n individual can now receive services before they decompensate to the point of meeting commitment criteria." PX 216 at 1 (Mississippi Works to Improve Crisis Services, Press Release, May 5, 2014). DMH leadership has testified that the goal of a crisis stabilization unit is to keep individuals who are in acute mental health crisis in the community and that with these services people can avoid commitment to a State Hospital. Day Dep. 94:12-15, 100:8-101:1, Mar. 22, 2018.

The State reported in its 2018 Annual Report that CSUs existed in only eight of the 14 regions in the state. PX 941 at 22 (FY18 Annual Report). Since 2012, DMH has recognized that it needs CSUs in all regions, setting itself a goal to "provide Crisis Stabilization Unit (CSU) services through each CMHC region." PX 980 at 20 (DMH FY2012 to 2016 Strategic Plan). In that strategic plan, DMH set a deadline of establishing a CSU in each region by the end of 2016.

*Id.* But the State did not establish a CSU in every region by the end of FY 2016, and still does not have a CSU in every region today. Mikula Dep. 109:17-110:7, Mar. 28, 2018.

*iii.*      *Program of Assertive Community Treatment("PACT")*

PACT is a multi-disciplinary treatment approach that prevents unnecessary hospitalizations for individuals who have "the most severe and persistent mental illnesses, have severe symptoms and impairments, and have not benefited from traditional outpatient programs." JX 60 at 215 (DMH Operational Standards); *see* PX 407 at 12 (Peet Report); PX 404 at 13 (Drake Report); Day Dep. 192:17-19, Mar. 22, 2018; Allen Dep. 35:8-12, June 4, 2018; Fleming Dep. 112:8-10, Apr. 11, 2018; Newbaker Dep. 54:23-25, Apr. 12, 2018. PACT teams include a psychiatrist or psychiatric nurse practitioner, registered nurses, a substance abuse specialist, an employment specialist, and a peer specialist. Tr. Stipulations ¶ 191, ECF No. 189-1. The teams provide support by building relationships and having frequent contact with the individuals they serve.[4] *See* Tr. Stipulations ¶¶ 192, 193. The DMH Executive Director called PACT "essential to keep individuals in the community and … on their road to recovery." PX 23 at 2 (Mississippi Expands Program of Assertive Community Treatment Teams, Press Release, May 5, 2014).

While the demand for PACT is high across the state, as of June 2018, the service was not available in 68 of 82 counties, representing 58% of Mississippi's population. PX 413 (Mississippi Counties with Program of Assertive Community Treatment (PACT) Teams as of 6/30/2018); Hutchins Dep. 56:19-57:5, June 11, 2018; Vaughn Dep. at 39:7-21, Mar. 29, 2018; PX 402 at 7 (VanderZwaag Report); PX 406 at 5 (Burson Report); PX 419 (Home Addresses of

---

[4] Substance Abuse and Mental Health Services Administration, a component of the United States Department of Health and Human Services, has developed toolkits for states developing evidence-based services such as Assertive Community Treatment. The toolkit for Assertive Community Treatment describes the service in detail. *Available at*: https://store.samhsa.gov/product/Assertive-Community-Treatment-ACT-Evidence-Based-Practices-EBP-KIT/sma08-4345

the 30% of Patients who Account for 73% of Total State Hospital Bed Days October 2015 to October 2017).  Of the 154 individuals in the review population, the United States' experts concluded that 100 individuals were appropriate for and would benefit from PACT.  Of the 100 individuals in the review population determined to be appropriate for PACT, 55 of them (55%) cannot access it in their home counties, no matter how dire the need, because it is not available there.  PX 417 (Client Review Members with PACT Recommendations and PACT Team Locations).  As for the others, the State has simply failed to connect many of them to the service. *See, e.g.,* PX 401 at 129 (Byrne Report); PX 402 at 18, 40 (VanderZwaag Report).  Indeed, the State's own clinicians have identified individuals who would benefit from PACT, but have not received the service.  *See, e.g.*, PX 281 (PACT Team Tracking Form).

iv.     *Community Support Services*

Community support services are a mobile case management service that can assist people in becoming and remaining stable in the community.  *See* JX 60 at 121 (DMH Operational Standards); Windham Dep. 168:3-12, May 29, 2018.  The overarching focus of community support services is on promoting "the individual's ability to succeed in the community; to identify and access needed services; and to show improvement in school, work, family, and community participation."  JX 60 at 121.  Services encompassed in community support services include medication management, crisis intervention, assistance with accessing services and pursuing recovery goals, in-home supports, and family psychoeducation.  *Id.*  By design, the frequency and intensity of those services vary according to each individual's needs.  *Id.* at 121-22.  Community support services can prevent hospitalization for people who do not need PACT services, but do need regular, in-home contact and support.  *See* Day Dep. at 224:24-225:2, Mar. 22, 2018; Maddux Dep. at 149:8-12, May 7, 2018.

The United States' clinical review experts have discussed in their reports, and will highlight at trial, examples of the insufficiency of community support services. Community support services are available to some degree through all 14 of Mississippi's CMHCs. PX 1006 (Berkeley Research Group Analyses for Systems Expert). However, the State does not provide community support services with sufficient intensity to help adults with serious mental illness who are at serious risk of institutionalization to remain in the community and avoid repeated hospitalizations. PX 402 at 5 (VanderZwaag Report) ("[T]here was again evidence that [community support] was not implemented with the appropriate degree of frequency and penetration to impact the target population's outcomes."); PX 403 at 14 (Baldwin Report) ("There appears to be limited proactive or assertive case management efforts and, in particular, limited proactive outreach regarding home visits."). Plaintiff's experts also identified several adults who are appropriate for community support services, but do not receive it in any amount. *See, e.g.*, PX 401 at 42-43, 103-104 (Byrne Report); PX 403 at 207-209; PX 402 at 57-58, 92-93.

Data from the State's managed care providers from FY 2017 also demonstrate that community support is not provided with sufficient intensity to prevent hospitalization. In FY 2017, community support providers only spent, on average, about 15 hours with a person per year, when they could have provided 100 hours or more under the State's own policies. PX 424 (Summary of Magnolia Billing Data for Community Support Services 2017); PX 869 (CMHC Billing Guidelines); PX 1006 (Berkeley Research Group Analyses for Systems Expert). Data from one of the managed care providers revealed that only 23 people, or 1% of those who received community support services, received 75 or more hours of the service in 2017. PX 424.

v.     *Supported Housing*

Supported housing is a service that combines housing supports (such as assistance locating an affordable, safe apartment; help negotiating with landlords; apartment and utilities setup; and ongoing consultation) with access to integrated affordable housing.[5]  Mississippi provides supported housing through the CHOICE Program— Creative Housing Options in Communities for Everyone—which targets individuals transitioning from State Hospitals to the community and those who have a history of multiple hospital visits in the last year due to mental illness.  Tr. Stipulations ¶ 236 (ECF No. 189-1).  Individuals receive help finding and remaining in housing through the program, in addition to getting temporary rental assistance.  *Id.* at ¶¶ 238, 241.

Though the CHOICE supported housing program is a statewide program, as of 2018, it had been used in only about half the counties in the State.  *See* PX 416 (CHOICE Program Client Addresses February 2016 to January 2018); PX 374 at 20 (Mississippi's Annual Affordable Housing Conference 2018, All Aboard: Reaching the Special Needs Population).  As of January 2018, there were seven CMHC regions where fewer than five individuals were receiving supported housing.  PX 416.  Moreover, the staff responsible for developing the program at the Mississippi Housing Corporation estimated the State would need 2,500 housing units to meet the need in particular regions of the State.  Tr. Stipulations ¶¶ 250, 247.  Yet, through June 2018, the program served fewer than 350 people in total.  *Id.*

---

[5] Supported housing is an evidence-based practice.  To help states establish and grow their programs, SAMHSA has developed a Supported Housing toolkit.  *Available at:*
https://store.samhsa.gov/product/supported-employment-evidence-based-practices-ebp-kit/sma08-4365

###### vi. *Supported Employment*

Supported employment for people with serious mental illness assists individuals in obtaining and maintaining competitive employment, which can increase stability in the community.[6] *Id.* at ¶¶ 227, 228. Supported employment addresses an essential part of a person's recovery. PX 1005 (DMH, Strategic Plan Highlights, FY15 Third Quarter). Department of Mental Health leadership testified that supported employment reduces reliance on State Hospitals by providing structure in people's lives. Allen Dep. 35:8-22, June 14, 2018. Supported employment was offered only in four pilot regions (of fourteen total) as of June 2018. PX 854 at 2 (DMH, Accomplishments with Community Expansion Funds, 2016); Tr. Stipulations ¶ 229.

###### vii. *Peer Support*

Peer support is a key contributor to stability and recovery in the community. PX 1004 at 4 (Certified Peer Support Specialist Provider Toolkit); Day Dep. 258:18-260:14, Mar. 22, 2018. Peer support is provided by trained and certified individuals or family members of individuals who have received mental health services. Tr. Stipulations ¶ 251. Peer support specialists engage in person-centered activities with a rehabilitation and resiliency/recovery focus. *Id.* at ¶ 252. These activities allow recipients of mental health services and their family members the opportunity to build skills for coping with and managing psychiatric symptoms and challenges associated with various disabilities while directing their own recovery. *Id.* State Hospital staff explained that peer support contributes to successful transition planning because "When you see somebody that's been through what you've been through and you're kind of

---

[6] SAMHSA has developed toolkits for states developing Supported Employment that describes the service in detail. *Available at:* https://store.samhsa.gov/product/Permanent-Supportive-Housing-Evidence-Based-Practices-EBP-KIT/SMA10-4510

feeling like my life is just shattered right now and I'm just -- and they tell you, well, no, I went

through that, you know, and I got out and I kept on keeping on and I'm here.  I'm here to help

you to understand that this is not the end for you, you know."  Kelly Dep 110:12-22, May 11,

2018.  In each of three regions, CMHCs billed Medicaid for peer support services for fewer than

ten people in 2017.[7]  PX 423 at 1 (Charts of Medicaid Billing Data).

These large gaps in service coverage leave many individuals without the necessary

community-based services to avoid hospitalization.  Mississippi has admitted as much.  *See,*

*e.g.,* PX 38 at 1 (Mid-Year Data Supporting Documentation) (NMSH self-assessment that "our

readmission rates and averages are due to the lack of community resources in our area such as

PACT and limited placement options"); Maddux Dep. 46:24-47:3, 47:15-19, 149:2-150:8.

## II.     Adults with Serious Mental Illness in Mississippi Do Not Oppose Receiving Services in the Community

The State must provide services in the most integrated setting appropriate, unless the

qualified person knowingly opposes receiving services in that setting.  *See Olmstead*, 527 U.S. at

607 (where "the affected persons do not oppose" community-based treatment, Title II of the

ADA requires that states provide qualified individuals that option); 42 U.S.C. § 12201(d)

("Nothing in this chapter shall be construed to require an individual with a disability to accept an

accommodation, aid, service, opportunity, or benefit which such individual chooses not to

accept.").  With few exceptions, adults with serious mental illness in Mississippi do not oppose

receiving services in the community rather than in the Hospitals.  Of the 150 living individuals

assessed as part of the United States' representative client review, 149 did not oppose receiving

services in the community.  PX 405 at 5 (MacKenzie Report).

---

[7] Peer support may also be provided through a PACT team or through mobile crisis or by providers who do not bill Medicaid.  *See, e.g.*, JX 60 at 225 (DMH Operational Standards).

Key DMH staff acknowledge that adults with serious mental illness typically prefer to receive community-based mental health services, rather than treatment in a State Hospital. Veronica Vaughn, the then DMH Adult Services Director, testified that typically if a person could choose where to receive treatment, "I would expect them to choose the community." Vaughn Dep. 29:16-19, Mar. 29, 2018. *See also* Day Dep. 164:11-22, Mar. 22, 2018. Furthermore, as of the client review, 122 of the 150 living individuals in the client review sample were not in a State Hospital. *See* PX 405 at 5 (MacKenzie Report); PX 406 at 8 (Burson Report). These individuals had been deemed appropriate for, and apparently did not oppose, receiving treatment in the community—in fact, they were all discharged from a State Hospital to the community.

## III. The State Can Make Reasonable Modifications to Prevent Unnecessary Hospitalizations

The ADA requires that public entities make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of individuals with disabilities, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7). *See also Olmstead*, 527 U.S. at 597 (holding that unjustified isolation is discrimination).

The State of Mississippi can make modifications to its existing service design and administration that will prevent unnecessary hospitalizations, including expanding community mental health services that prevent hospitalization and implementing effective discharge planning and diversion practices. The State can identify eligible adults with serious mental illness who need community-based services to avoid entering State Hospitals, ensure the

provision of community-based services necessary to avoid admissions, and implement effective discharge planning processes to prevent readmissions.

These modifications are reasonable.  The State, which already has the framework of an effective system, cannot credibly argue that extending existing services to individuals who need them to avoid unnecessary hospitalizations is anything but a reasonable modification of its service system.  *See, e.g., Messier,* 562 F. Supp. 2d at 345; *Radaszewski*, 383 F.3d at 611-12; *Haddad*, 784 F. Supp. 2d at 1202-03.  The State of Mississippi also has endorsed the goals of expanding services and establishing effective discharge planning, but has not implemented the modifications.  That the United States' requested modifications align with the State's own plans and obligations likewise indicate that the modifications are reasonable.  *See, e.g., Henrietta D.*, 331 F.3d at 280-81 (upholding as a reasonable modification an order requiring agency to follow existing law and procedures); *Messier*, 562 F. Supp. 2d at 344-45 (finding plaintiffs' requested service expansion, which was consistent with defendant's publicly stated plans for the system was reasonable, not a fundamental alteration).

**A. Expanding Community-Based Services and Providing Them To People Who Are in the State Hospitals and at Serious Risk of State Hospital Admission Is A Reasonable Modification**

It is a reasonable modification for the State to expand community-based services that are effective in preventing unnecessary hospitalizations and are available, but in insufficient quantities to prevent individuals with mental illness from being unnecessarily hospitalized.  As discussed above, Mississippi has recognized that crisis services, PACT, community support services, supported housing, supported employment, and peer support reduce reliance on State Hospitals.  The State provides these services, but not enough of each to meet the needs of people with serious mental illness throughout the State.  *See* PX 407 at 20-23 (Peet Report).

The State must also connect the individuals who are in or at serious risk of State Hospital admission with the expanded services. Data available to the State shows that a relatively small number of people consume a disproportionate share of State Hospital resources. Between October 2015 and October 2017, fewer than 1,200 individuals consumed 73% of the bed days in State Hospitals. PX 421 (Charts of State Hospital Data). In that two-year period, 743 individuals had multiple admissions to a State Hospital. PX 405 at 28 (MacKenzie Report, Exhibit C). The State has recognized that additional factors such as co-occurring substance use disorders and homelessness also indicate a need for intensive services.[8] The State can use its data to identify the population most likely to need high-intensity services.

Through the testimony of State officials and the DMH strategic plans, Mississippi has recognized and confirmed a need to expand the services the United States seeks. For example, the then-DMH Director of Adult Services testified that PACT and residential crisis services should be expanded to areas of the State that are currently unserved. Vaughn Dep. 39:8-12, Mar. 29, 2018. The DMH Strategic Plan also highlights the need for expansion of PACT, crisis beds, supported employment, supported housing, and peer support.[9] JX 53 at 11-15 (FY 19 - FY21 DMH Strategic Plan). And the Mississippi Home Corporation estimated a need for 2,500 units of supported housing. Tr. Stipulations ¶ 247; JX 5 at 3 (MAC 2.0 Stakeholder's Meeting

---

[8] These factors are among the State's own criteria for receiving Assertive Community Treatment. JX 60 at 217-18 (DMH Operational Standards).

[9] Unfortunately, the goals related to these services are lacking in specificity or insufficient. PX 407 at 25-26 (Peet Report). For example, the goal related to crisis stabilization is "Divert individuals from more restrictive environments such as jail and hospitalizations by utilizing Crisis Stabilization Units" and the goal related to supported employment is "Expand employment options for adults with serious and persistent mental illness to employ an additional **75** individuals." JX 53 at 13 (FY 19 - FY21 DMH Strategic Plan) (emphasis added). These goals provide a statement of principle, but not a roadmap for meeting the need for those services. For the first time this year, as this litigation moved toward trial, the State established a goal of reducing State Hospital admissions. *Id.* at 11.

Minutes, Nov. 4, 2015). The State itself has confirmed that expanding community-based services that reduce hospitalization is reasonable.

Furthermore, when a State participates in the Medicaid program and includes services in its State Medicaid Plan, as it has done here, the State is obligated to ensure that those services are available with reasonable promptness to all individuals who meet the eligibility criteria statewide. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930; *see also* Toten Dep. 77:12-23, May 23, 2018. Mobile crisis, crisis stabilization services, PACT, community support services, and peer support are all included in Mississippi's State Medicaid Plan. PX 96 11-17 (Approved Medicaid State Plan Amendment 2012-03 Attachments). The State already must make these services accessible statewide. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930. Meeting this obligation is, therefore, inherently reasonable.

i. *The State Can Achieve This Reasonable Modification by Maximizing Resources to Align with the Goal of Integrated Services*

Maximizing federal dollars within the State's current Medicaid program to increase resources for mental health services would enable the State to expand the available resources for community-based services. The State has placed key services that prevent hospitalization in its Medicaid State Plan. This means that when those services are provided to individuals enrolled in Medicaid, the State only pays one quarter of the bill. Tr. Stipulations ¶ 264. Yet, the State currently does not even come close to recouping all of the available federal reimbursement for those services. For example, providers billed Medicaid for less than half of their mobile crisis contacts with individuals on Medicaid. PX 423 (Total Number of Medicaid Beneficiaries and Units by Region). Similarly, in 2017, only 163 of 387 individuals who received PACT had a Medicaid claim for the service. PX 422 (Summary of Individuals Served by PACT Team). However, individuals eligible for PACT are typically eligible for Medicaid, and PACT teams

typically work with clients to access benefits if they are not already enrolled, so it would be expected that nearly all individuals receiving PACT would have a Medicaid claim for the service. PX 407 at 21 (Peet Report). Instead, those PACT services are paid for by State grants, with no federal funding participation.

Though the State loses money when it does not bill Medicaid for these Medicaid eligible services, it does not take basic steps to maximize reimbursement. The State has no policy requiring that providers bill Medicaid for Medicaid services. Mikula Dep. 103:21-24, Mar. 28, 2019. Neither DMH nor DOM regularly review Medicaid billing for community-based mental health services to identify potential under-billing or any other trends in spending or service use. *See, e.g.,* Toten Dep. 21:22-22:18, 138:18-139:10, May 23, 2018; Allen Dep. 77:25-79:7, June 14, 2018.

The State can make the most of its money by ensuring that (1) anyone who is eligible for Medicaid is enrolled; (2) that all services that are Medicaid eligible are included in the State's Medicaid service array; and (3) that all Medicaid eligible service are billed to Medicaid. Maximizing federal dollars would enable the State to provide more services using the same amount of State money.

> ii. *The State Can Achieve This Reasonable Modification by Shifting Resources to Align with the Goal of Integrated Services*

Shifting dollars within the mental health system to align with the goal of integration, where appropriate and not opposed, will also enable the State to expand community-based services. The State has long recognized that it must shift resources from the State Hospitals to the community. PX 363 at 1 (PEER Report, June 26, 2008). In its first Strategic Plan, the Department of Mental Health identified the goal of "Continu[ing the] transformation to a community-based service system" and noted that the goal "is both bold and challenging and

addresses shifting funds from facilities to support community services." JX 63 at 19, 7 (DMH Strategic Plan 2010-2020). Nonetheless, DMH only began shifting funds from the State Hospitals to the community in the last year. Mikula Dep. 112:17-113:12, 143:18-23, March 28, 2019, Bailey Dep. 162:22-164:5, May 9, 2018; Allen Dep. 57:11-13, June 14, 2018.

Despite having, for a decade, the goal of shifting funds from State Hospitals to community-based services, the State still disproportionately allocates its mental health spending to State Hospitals. As of 2017, DMH spent over $100 million a year in State funds for the State Hospitals and $26 million a year in State grants to fund community services. PX 979 at 25, 27 (FY2017 DMH Annual Report). Including the State's contributions to Medicaid, the State calculated that only 35.65% of its mental health spending went to community-based services in FY17. PX 324 (Recalculation for Anna). Actually implementing the goal the State laid out in its first strategic plan will enable the State to expand funds for community-based services.

The focus on spending in State Hospitals also does not make financial sense. An expert in health systems cost analysis, Kevin O'Brien, will testify that the average annual cost per person in a State Hospital is more than the cost of providing needed community-based services, especially when the individual is enrolled in Medicaid. PX 409 at 10-16 (O'Brien Revised Report); PX 410 at 6-11 (O'Brien Supplemental Report). Using the State's Medicaid billing data, Mr. O'Brien estimated the cost of providing key community-based services that were recommended by the clinical review team for many individuals in the sample. *See, e.g.,* PX 408 at 12 (Bell-Shambley Report); PX 402 at 35 (VanderZwaag Report); PX 401 at 25 (Byrne Report); PX 403 at 33 (Baldwin Report); PX 406 at 24 (Burson Report); PX 404 at 39 (Drake Report). He concluded that the cost of providing a Medicaid-enrolled person with three of the most expensive community-based services, PACT, crisis residential services, and CHOICE

housing, would cost less than the average annual cost of hospitalization.  *Compare* PX 409 at 35

(O'Brien Report) (estimated average annual cost of inpatient services per person), *with* PX 410

at 32 (O'Brien Suppl. Report) (estimated average annual cost of combined community-based

services per person).  Even Mississippi's own expert concluded that the costs of inpatient and

community-based services "are comparable."  DX 301 at 32 (Fowdur Report).

### B.  Implementing Effective Discharge Planning is a Reasonable Modification

The Department of Mental Health recognizes that effective discharge planning can

prevent State Hospital admissions.  *See, e.g.,* Wuichet Dep. 66:16-24, 70:5-12, May 7, 2018;

Maddux Dep. 54:9-55:10, May 7, 2018; Kelly Dep. 128:10-14 May 11, 2018.

Effective discharge planning requires close coordination between the State Hospitals

and community providers before discharge.  Mikula Dep. 49:22-52:6, March 28, 2018; Wuichet

Dep. 87:13-22, May 7, 2018.  When community providers who will be working with an

individual are involved in the discharge planning, they can best identify community services and

resources that will work, anticipate potential challenges, and build a relationship with the

individual they will be serving.  Wuichet Dep. at 87:23-88:11, May 7, 2018*; see generally* PX

404 at 12 (Drake Report).  Though the State has known that there are inconsistencies and

challenges related to State Hospital discharges for years, the State first established a task force to

improve discharge planning from State Hospitals this spring.  Mikula Dep. 49:22-52:11, 56:2-21,

Mar. 28, 2019.  Actually implementing the necessary changes to discharge planning is a

reasonable modification to the State's system.

### IV.  Mississippi Cannot Establish a Fundamental Alteration Defense

The State would not violate the integration mandate if it can show, as an affirmative

defense, that the requested modifications would "fundamentally alter" its service system.  28

C.F.R. § 35.130(b)(7).  To prove this defense, the State first must show that it has developed and

is implementing a comprehensive and effective plan to serve adults with mental illness in the community.  *Id.*; *Frederick L. III*, 422 F.3d at 155-59.

The State cannot credibly state whether it has an Olmstead Plan and, if it does, what documents constitute that plan.  The Department's Deputy Executive Director has "never seen" a Mississippi Olmstead Plan.  Allen Dep. 164:23-24, June 14, 2018.  The Director of the Bureau responsible for Strategic Planning testified that the 2001 Mississippi Access to Care ("MAC") Plan is the State's Olmstead Plan.  Bailey Dep. 34:22-35:8, May 9, 2018.  After receiving Melodie Peet's expert report noting that testimony, the State asserted in an interrogatory response that its Olmstead Plan includes the Department of Mental Health strategic plans and related documents.  *See* DX 145 at 2 (Def.'s 1st Suppl. Resps. to Pl.'s 1st Set of Reqs. for Produc. of Docs) ("The 'Olmstead plan' consists of the MAC plans and the final Strategic Plans (and progress reports) of DMH, EMSH, NMSH, and SMSH from FY 2012 forward which have been previously produced.").

Even assuming that the DMH Strategic Plans are the State's Olmstead Plan, they still do not include measurable goals "strategically tailored to make a significant impact in the lives of individuals with disabilities across the state," for which the State "provides a rationale for each of the metrics used, explains why each metric was chosen, and explains how each metric will adequately reflect improvement over time."  *Jensen*, 138 F. Supp. 3d at 1071-74; *see also Frederick L. III*, 422 F.3d at 157 (holding the plan must "adequately demonstrate[] a reasonably specific and measurable commitment to deinstitutionalization for which [the defendant] may be held accountable").  To the contrary, DMH officials' testimony reveals that there is no clear rationale for the selection of goals.  *See, e.g.,* Hutchins Dep. 139:21-140:22; 198:21-199-25, June 11, 2018; Bailey Dep. 213:10-214:13, May 9, 2018; Mikula Dep. 130:20-132:3, March 28, 2019.

And more importantly, the State will not be able to show that its plans actually result in reduced institutionalization. *See Day v. District of Columbia*, 894 F. Supp. 2d 1, 28-29 (D.D.C. 2012). In fact, the number of people served in the psychiatric beds at the State Hospitals has been hovering around 3,000 for the last five years. PX 412 at 3 (Number Served in State Hospitals FY 2011-2018).

Even assuming the State has an effectively working Olmstead Plan, the State cannot meet the second element of the defense: that implementing the modifications described above would fundamentally alter the service system. The services the United States is seeking in this case already exist in Mississippi, albeit insufficiently. *See DAI*, 598 F. Supp. 2d at 335-36. And, the State cannot demonstrate that implementing the changes would be prohibitively expensive. Quite the opposite, the State's own expert determined that the cost of treating individuals in the community is about the same as the cost of treating them in a State Hospital. DX 301 at 32 (Fowdur Report) ("indeed the costs are comparable"). The State cannot meet its burden to demonstrate a fundamental alteration defense.

## CONCLUSION

Individuals with serious mental illness in Mississippi are entitled to receive services in the most integrated setting appropriate to their needs. But the State continues to violate their civil rights, more than two decades after the *Olmstead* decision and over seven years after the United States issued its investigative findings in a letter to the Governor. The evidence at trial will make clear that individuals with serious mental illness can be appropriately served in the community, they do not oppose community placement, and the State violates their civil rights under the ADA by unnecessarily segregating them in State Hospitals.

Dated: May 29, 2019

D. MICHAEL HURST, JR.
United States Attorney
Southern District of Mississippi

MITZI DEASE PAIGE [MS BAR 6014]
CANDACE MAYBERRY
Assistant United States Attorneys
501 E. Court Street, Suite 4.430
Jackson, MS 39201
Telephone: (601) 973-2840
mitzi.paige@usdoj.gov
candace.mayberry@usdoj.gov

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

REGAN RUSH
Deputy Chief
Special Litigation Section

/s/ *Deena Fox*_____
DEENA FOX [DC Bar 992650]
JORGE CASTILLO
PATRICK HOLKINS
ASHLEY MCDONALD
MATHEW SCHUTZER
HALEY VAN EREM
LINDSEY WEINSTOCK
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - PHB
Washington, DC  20530
Telephone: (202) 616-3179
Deena.fox@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2019, I electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to all counsel of record.

*/s/ Deena Fox*
DEENA FOX [DC Bar 992650]