**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**V.**                                         **CIVIL ACTION NO.: 3:16-CV-00622-CWR-FKB**

**THE STATE OF MISSISSIPPI**                                               **DEFENDANT**

**THE STATE OF MISSISSIPPI'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

**I.      The Structure Of Mississippi's Public Mental Health System.**

Diana Mikula started working at the Mississippi Department of Mental Health (DMH) in 1995, and became the Executive Director of DMH on July 1, 2014.  (Tr. at 2313).[1]  Mississippi's public mental health system is a very complex system, which is made up of 3 components: DMH operated programs, the 14 Community Mental Health Centers (CMHC), and the for-profit and not-for-profit organizations and agencies that provide mental health services in Mississippi. (Tr. at 2314).  DMH also works closely with other state agencies like the Division of Medicaid and the Department of Health, and with other organizations like Mississippi Home Corporation. (Tr. at 2315).  DMH issues Operational Standards for Mental Health, Intellectual/Developmental Disabilities, and Substance Use Disorder Community Service Providers.  (JX-60).

Steven Allen has been employed by DMH for 30 years.  (Tr. at 2024).  He has been the Deputy Executive Director of DMH since January 2017.  (Tr. at 2024).  Ms. Mikula made Mr. Allen the Deputy Executive Director because her vision "was to move our system to a more community-based system of care," and that aligned with Mr. Allen's vision.  (Tr. at15).

---

[1] References to the trial transcript are cited as "Tr. __."  References to joint trial exhibits are cited as "JX-__." References to Plaintiff's trial exhibits admitted into evidence are cited as "PX-__."  References to Plaintiff's trial exhibits marked for identification only are cited as "PDX-__."  References to Defendant's trial exhibits admitted into evidence are cited as "DX-__."  References to Defendant's trial exhibits marked for identification only are cited as "DDX-__."

Dr. Marc Lewis has been employed by DMH for 23 years.  (Tr. at 1665).  He is the Director of the Bureau of Certification and Quality Outcomes.  (Tr. at 1665).  Dr. Lewis testified, " I think 12 years ago, we were an institutional-based system.  But … we have moved our system from an institutional-based care to a community delivery system model where there are services and supports throughout the state."   (Tr. 1676-77).   In FY 2018, Mississippi served approximately 4,000 people in state hospitals and over 100,000 people in the community.  (Tr. at 1701).

James "Bo" Chastain began working in Mississippi's mental health system in 1990, and has been the Director of Mississippi State Hospital since November 1993.  (Tr. at 2247).  Jake Hutchins, who has been employed by DMH since 2002, is the Bureau Director of Behavioral Health.  (Tr. at 1576).  In that capacity, Mr. Hutchins manages state and federal grants for community providers for adult and children services, substance use services, and peer support services.  (Tr. at 1577).

### A.      Community Mental Health Centers.

There are 14 regional CMHCs in Mississippi.  (Tr. at 1578).  DDX-3 shows a regional map of the CMHCs, and identifies their catchment areas.  (Tr. at 1578).  The 14 regions in Mississippi are referred to as Regions going forward in this document.

The board of supervisors in each of the counties that comprise a CMHC's catchment area appoints a mental health commissioner.  (Tr. at 1579).  The mental health commissioners make up the board of that CMHC, and they appoint the CMHC's Executive Director.  (Tr. at 1579, 2224, and 2317).  The Executive Directors of the CMHCs report to their respective board of commissioners.  (Tr. at 2318).  The CMHCs are the providers of community-based services in Mississippi.  (Tr. at 1579-80).  Ms. Mikula described DMH's authority over the CMHCs as follows:  DMH "has the responsibility to certify, coordinate and establish the standards of

2

operation, and those are the standards for which the CMHCs, the guidelines for which they provide services." (Tr. at 2318). DMH's certification allows the CMHCs to bill Medicaid and to receive grant funding from DMH. (Tr. at 1579-80).

**B.     Mississippi's State Hospitals.**

DMH operates 4 state hospitals – *i.e.*, Mississippi State Hospital at Whitfield (MSH), East Mississippi State Hospital in Meridian (EMSH), South Mississippi State Hospital in Purvis (SMSH), and North Mississippi State Hospital in Tupelo (NMSH). (Tr. at 1667 and 1671). With respect to adult psychiatric beds, in FY 2018, MSH had 230 beds, EMSH had 108 beds, and SMSH and NMSH had 50 beds each. (Tr. at 1687, 1704, and 1933). The catchment area for each state hospital is shown on page 18 of JX-52. (Tr. at 2028).

Civil commitments of adults to the state hospitals are made exclusively through the chancery courts. (Tr. at 1667). As Mr. Chastain explained, "[w]e receive an order from a chancery judge that the person … needs to be treated at the hospital because they have been determined by the judge to be dangerous to themselves or other people because of their mental illness." (Tr. at 2249). DMH is not involved in the civil commitment process. (Tr. at 1689).

**C.     Central Mississippi Residential Center.**

The Central Mississippi Residential Center (CMRC) is located in Newton, Mississippi, and is operated by EMSH. (Tr. at 2029-30). CMRC is a step-down facility that helps transition individuals from the state hospitals to the community. (Tr. at 2029-30).

**D.     Permanent Supported Housing is offered through the CHOICE program.**

Mississippi provides Permanent Supported Housing (PSH) through CHOICE, the Creative Housing Options in Communities for Everyone program. (DX-7). Mississippi Home Corporation administers the CHOICE program. (Tr. at 684). In 2015, the Mississippi legislature created the CHOICE program (JX-51 at 1), and CHOICE started serving clients in early 2016.

(Tr. at 689).  CHOICE provides rental assistance to make housing affordable for individuals with serious mental illness (SMI).  (JX-1).  The CHOICE program serves 3 priority populations.  (JX-51 at 1; JX-1).  "Priorities 1 and 2 address individuals who have been in state psychiatric facilities long term or have been recently discharged from those facilities.  Priority 3 addresses individuals in intermediate or long-term care facilities."  (JX-51 at 1).  Mississippi United to End Homelessness (MUTEH) and Open Doors Homeless Coalition are CHOICE housing providers.  (Tr. at 674 and 690).

### E.      The Region 9 CMHC – Hinds Behavioral Health Services.

Ms. Mikula testified all of the CMHCs do a good job of providing community-based services, but some do better than others because "they are 14 separate entities.  They have 14 separate business models, and … financially, some of them may be more stable than the other ones."  (Tr. at 2318).  One of the more stable CMHCs is Hinds Behavioral Health Services (HBHS), which is the Region 9 CMHC.  Region 9's catchment area is Hinds County.  (Tr. at 2190-91).

Kathy Crockett is the Executive Director of HBHS.  (Tr. at 2188).  She has a doctorate in counselor education from Mississippi State University and a doctorate in clinical psychology from Jackson State University.  (Tr. at 2188-89.  Dr. Crockett provides oversight for the services and staff of approximately 243 employees at HBHS.  (Tr. at 2189-90).

HBHS provides a vast array of services to adults with SMI.  (Tr. at 2192).  For example, HBHS provides outpatient therapy, psychiatric services, supported employment, psychosocial rehabilitation programs, Assisted Outpatient Treatment (AOT), and community support services.  (Tr. at 2192 and 2230).  HBHS employs approximately 11 peer support specialists.  (Tr. at 2203).

HBHS has a Crisis Intervention Team, a Mobile Crisis Response Team, and a Crisis Stabilization Unit (CSU).  (Tr. at 2193 and 2200).   The CSU opened in May 2019.  (Tr. at 2202).  Dr. Crockett testified the CSU is a 16-bed unit "that enables us to stabilize individuals who are in crisis as opposed to sending those individuals to the hospital …. It's working great. The bed[s] are full."  (Tr. at 2202).  The average length of stay in the HBHS CSU is 3 to 7 days. (Tr. at 2232).

HBHS has had one PACT team for about 4 years; it offers PACT services to residents of Hinds, Rankin, and Madison counties.  (Tr. at 2191 and 2194-95).  Dr. Crockett testified, "our PACT team is composed of nine individuals.  That includes the team lead, two peer support specialists, two therapists, and four community support specialist …. They also have nurse practitioners and provide medical care to clients.  And what they do is they take their services to the individual whether that person be at home, living under a bridge, wherever they are in their community to provide those services for those individuals."  (Tr. at 2194 and 2225).  HBHS's PACT team had a capacity of 50 clients, but recently expanded its capacity to 100 clients.  (Tr. at 2195-96).  It serves approximately 74 clients.  (Tr. at 2195).

According to Dr. Crockett, "one of the biggest impediments to providing PACT services is "the individual has to want to participate in the program.  And oftentimes people will be sick and need the services, but may not have the insight that they really need to participate in the program and the benefits of the program."  (Tr. at 2196 and 2223).

HBHS operates a drop-in center for the homeless population.  (Tr. at 2192).  Dr. Crockett testified, "[t]he drop-in center is located in downtown Jackson, West Capitol Street.  And it is a program for individuals who are homeless, who are in need of some support.   We take the opportunity to provide mental health services to those individuals who need it and are willing to receive it …. It's a peer-run drop-in center, and there's a team lead there.  And our goal is to

improve the functioning of those individuals, get them to the supports that they and, and hopefully … house them as well." (Tr. at 2199).

HBHS operates a Community Transition Home, which HBHS calls a PALS Living Home. (Tr. at 2192 and 2197). It is a four-bedroom home for males who had been patients at MSH; it opened in approximately June 2018. (Tr. at 2197-98 and 2227-28). It gives individuals "an opportunity to live in the community and receive services that they need to keep them stable in their community." (Tr. at 2226-27). The PALS Living Home is not scattered-site housing. (Tr. at 2237).

HBHS provides housing services through the CHOICE program, and it works closely with MUTEH. (Tr. at 2198). As Dr. Crockett explained, "we partner with them to see how they can assist us with getting housing for the individuals we serve. They often come to our drop-in center to work with the homeless population there, as well as they receive referrals from other individuals within the agency who have clients who need housing support." (Tr. at 2198-99).

HBHS works closely with MSH. (Tr. at 2203). HBHS and MSH have quarterly meetings. (Tr. at 2203). Dr. Crockett explained, "we also have staff who go to their treatment teams when there are individuals from Hinds County who are hospitalized and will be discharging back to Hinds County, and who need community health service. So our staff members go to the discharge planning teams and work locally with the social work staff and other providers there. In addition to that, our staff – while the individual is hospitalized, our staff go and meet the individual, conduct an intake interview when that's necessary, and work with the providers and the patient to ensure that there's a warm-handoff between" MSH and HBHS. (Tr. at 2203).

The bulk of HBHS's funding comes from DMH and Medicaid reimbursements. (Tr. at 2232). For example, HBHS receives a $350,000 annual grant from DMH for its Mobile Crisis

Response Team, and an $800,000 annual grant from DMH for its CSU.  (Tr. at 2221).  HBHS receives a $300,000 annual grant from DMH for the drop-in center.  (Tr. at 2221).  The PALS Living Home was funded by the $13.3 million shift of funds described, *infra* 48-49.  HBHS receives a $600,000 annual grant from DMH to provide PACT services.  (Tr. at 2196).  If HBHS did not receive that $600,000 annual grant from DMH, it would not be able to provide PACT services.  (Tr. at 2196-97).

## II.    The United States' 154-Person Survey Is Flawed And Entitled To No Weight.

The United States' case is substantially based on the 154-person survey conducted by its six-person Clinical Review Team (CRT).  The survey is flawed and entitled to no weight for the seven reasons discussed below.

### A.    CRT's opinions not stated to any reasonable degree of probability.

The CRT had six members:  Dr. Robert Drake, Dr. Carol VanderZwaag, Dr. Beverly Bell-Shambley, Dr. Judith Baldwin, Daniel Byrne, and Katherine Burson.  (Tr. at 156).  Dr. Drake and Dr. VanderZwaag are psychiatrists.  Dr. Bell-Shambley is a psychologist.  Daniel Byrne is a licensed social worker.  Katherine Burson is an occupational therapist.  Melodie Peet is not a member of the CRT, but she was retained by the United States to evaluate Mississippi's mental health system.  (PX-407 at 1).

The United States Department of Justice (UDSOJ) gave the CRT four questions to answer:  (i) whether the individuals in the survey could have avoided hospitalization or spent less time in a hospital if they had received reasonable community-based services, (ii) were the individuals at serious risk of institutionalization, (iii) did the individuals object to receiving community-based services, and (iv) what community-based services were appropriate for the individuals.  (Tr. at 106-07 and 196).

The CRT reviewed 154 individuals who had one or more admissions to a Mississippi state hospital (Patients). (Tr. 106, 162-63, and 278-29). Four of the individuals are deceased (Persons 20, 48, 70, and 84), so the CRT interviewed or attempted to interview 150 Patients in Mississippi. (Tr. 164-65 and 299).

The CRT collectively found 100% of the Patients they reviewed would have avoided or spent less time in state hospitals, 100% would benefit from community services, and 85.1% were at serious risk of institutionalization. (PDX-5). But no CRT member stated their opinions to any reasonable degree of medical, scientific, or other probability. (Tr. at 171-72, 589-90, 953-55, and 1066-67). Instead, the CRT's conclusions regarding the Patients they reviewed are based largely on hope, possibilities, and feelings, but none are based on any reasonable degree of probability. Some examples follow.[2]

Mr. Byrne testified that if the Patients he reviewed "had been receiving appropriate community-based mental health services, ***they probably would not have*** had the crises or whatever events that occurred that ended up with hospitalization." (Tr. at 590) (emphasis added).

When asked why she found 21 of the Patients she reviewed were at serious risk of institutionalization, Dr. Bell-Shambley responded, ""[b]ecause absent them receiving appropriate community-based services, ***I felt like*** they were at risk for reoccurrence or worsening of symptoms and ultimately a return to the hospital." (Tr. at 817) (emphasis added). Dr. Bell-Shambley was asked whether receiving intensive services like PACT would help Person 3 rebuild his life, start working again, or assume other goals. She responded: "***Certainly that would be the hope***. And based on experience and seeing other individuals and who indeed are able to rebuild their lives and experience recovery and stability in the community, I would say

---

[2] Other examples are found at Tr. 413, 430-31, 667-68, and 844.

yes." (Tr. at 821) (emphasis added). When asked if Person 18 had received more intensive services, is it possible she could have avoided the state hospital admission altogether, Dr. Bell-Shambley testified, "*it's certainly possible, yes*." (Tr. at 840-41) (emphasis added).

Dr. Baldwin found if Person 90 had received more intensive services, that "could" have prevented her state hospital admission, but Dr. Baldwin did not state what she means by "could," nor did she state her opinion to any reasonable degree of medical, scientific, or other probability. (Tr. at 973). Dr. Baldwin found that benefits assistance "may have prevented unnecessary hospitalizations" for some of the Patients she reviewed. (Tr. at 999).

Ms. Burson testified that when she found a person could have avoided a state hospitalization she was determining whether the services a person was receiving were "sufficient to mitigate the risk" of hospitalization, but she did not quantify the alleged mitigation of risk in any way. (Tr. at 1069-70). When pressed regarding how much community-based services mitigate the risk, the most Ms. Burson could say was, "different services do that to different amounts, and in combination, if it's the right service to the right person." (Tr. at 1140).

**B.      No separation of avoided hospitalization and spent less time.**

Avoided hospitalization or spent less time in a hospital are two different things. (Tr. at 191-92). Avoided means the Patient would have avoided hospitalization altogether. (Tr. at 192). Spent less time means the Patient would have been admitted to a state hospital, but would have spent less time there. (Tr. at 192). The CRT did not identify which Patients would have avoided hospitalization altogether, as opposed to which Patients would have been admitted to a state hospital, but spent less time there. (Tr. at 193-94; 484-85).

For example, Dr. Baldwin did not separate avoided hospitalization from spent less time "because it was mixed. Some *might have* spent less time, some *might have* avoided, or it might have been earlier hospitalizations that they would have avoided or spent – *there was too many*

*moving parts*.  And because it was a two-pronged questioned, I answered it together."  (Tr. at 1032-33) (emphasis added).  "Might have" tells the Court nothing.

### C.    No deference to Mississippi's treatment professionals.

Despite interviewing the Patients for only one-to-two hours each (Tr. at 452, 856, and 1031), the CRT made its determinations regarding the four questions in 2018.  So, for example, if a Patient had been admitted to a state hospital in 2015, the CRT determined well after the fact, in 2018, that admission to a state hospital would have been avoided or the Patient would have been admitted but spent less time in the hospital.  (Tr. at 199-200).

Daniel Byrne is a licensed social worker.  (Tr. at 583).  Licensed clinical social workers do "a variety of interventions, but they are often involved in psychotherapy kinds of activities and in working with families."  (Tr. at 196).  Judith Baldwin is a psychiatric mental health clinical nurse specialist.  (Tr. at 941).  Dr. Baldwin has not had an active inpatient caseload since 1972.  (Tr. at 1024).  She has not had an active outpatient caseload since 2015.  (Tr. at 1024).  Katherine Burson is an occupational therapist.  (Tr. at 1058).  "Occupational therapists are often involved in helping people learn the skills for basic living and taking care of their apartment and finding a job and, that's basically it."  (Tr. at 195).  Occupational therapists do not prescribe medication  (Tr. at 1060), nor do they make a medical diagnosis of any particular mental illness. (Tr. at 1117).  Ms. Burson has never admitted people to or discharged them from a state hospital. (Tr. at 1117).  These CRT members in particular should not be permitted to second-guess Mississippi's treating psychiatrists.

### D.    No basis for system design.

Dr. Baldwin does not know of any state that has a group of experts review a random sample of individuals discharged from a state hospital to determine what community-based services it needs to offer on a system-wide basis.  (Tr. at 1054).  Ms. Burson does not know of

any state that has developed its community-based services based on the methodology utilized by the CRT in Mississippi. (Tr. at 1143). Nor can she identify any peer-reviewed paper that has published a study that used the methodology the CRT used in Mississippi. (Tr. at 1143).

**E.    The hidden assumption invalidates any attempt to extend the CRT survey beyond the 154 Patients reviewed.**

Dr. Todd MacKenzie is a statistician. He was retained by the United States to draw a sample from a group of 3,951 people who were admitted to a state hospital in Mississippi during the two-year period from October 2015 to October 2017. (Tr. at 277). This group of 3,951 people is a "sampling frame." (Tr. at 277). Dr. MacKenzie then selected 299 individuals drawn randomly from the sampling frame. (Tr. at 298). The CRT surveyed 154 of those individuals. (Tr. at 278-79).

Dr. MacKenzie reviewed the answers to three questions. The Patients answered Question 1 – (whether the Patient is opposed to receiving services in the community). (Tr. at 300-01). The CRT answered Question 2 (would the Patient have avoided or spent less time) and Question 3 (was the Patient at serious risk of institutionalization). (Tr. at 301). As summarized in PDX-5, 99.4% of the Patients did not oppose receiving services in the community, the CRT found 100% of the Patients would have avoided or spent less time in a state hospital, and the CRT found 85.1% of the Patients were at serious risk of hospitalization. (Tr. at 297-98).

On this basis, Dr. MacKenzie concluded that the sample of 299 individuals was representative of all 3,951 individuals in the sampling frame (Tr. at 298), but his conclusion is invalidated by the "hidden assumption" he made. Questions 2 and 3 were answered by the CRT, not the Patients. Dr. MacKenzie admitted there is a "hidden assumption" that "the experts in this project were like other experts" (Tr. at 307). That "hidden assumption" is the only thing that enabled Dr. MacKenzie to conclude that all experts would answer Question 2 and 3 exactly the same why the CRT answered them and so he could extrapolate the CRT's findings regarding

11

Questions 2 and 3 to the entire sampling frame, but Dr. MacKenzie has no basis for his "hidden assumption."  (Tr. at 302).  Because Dr. MacKenzie does not know how any experts other than the CRT would have answered Questions 2 and 3, he cannot apply the CRT's answers to Questions 2 and 3 to the entire sampling frame.

F.      **The Mississippi Bump.**

Dr. Drake reviewed the literature regarding how effective community-based services are at reducing hospitalizations.  His findings are set forth in DX-235.  (Tr. at 222 and 224).  The following Table compares how effective community-based services are at reducing hospitalizations based on Dr. Drake's review of the literature with the CRT's uniform finding that those same services are 100% effective at reducing hospitalizations in Mississippi:

| Service | Dr. Drake's Literature Review | DOJ's Experts – Only in Mississippi |
|---|---|---|
| Medication Assistance | 66% | 100% |
| Supported Employment (variable) | 55% | 100% |
| Diversion | 50% | 100% |
| Assertive Community Treatment | 41% | 100% |
| Supported Housing | 33% | 100% |
| Therapy (variable) | 25% | 100% |
| Transition | 25% | 100% |
| Family Education | 22% | 100% |
| Substance Abuse Treatment | Unclear | 100% |
| Case Management | Lack of Data | 100% |
| Peer Support | Lack of Data | 100% |
| Medical Services | Lack of Data | 100% |
| Combined Community-Based Services | Lack of Data | 100% |

The CRT's uniform conclusion that 100% of the Patients they reviewed would have avoided or spent less time in a hospital is largely based on their experience in seeing community-based services work for other people, but they cannot identify any rates of the effectiveness of community-based services in reducing hospitalizations other than the rates Dr. Drake identified in DX-235, and those rates are far lower than 100%.  (Tr. at 1052-53).

Dr. Baldwin agreed that if you want to eliminate hospitalizations altogether, the approach you are using must be 100% effective: "I think to have 100 percent of anything is very difficult, if not impossible." (Tr. at 1029-30). This impossibility did not restrain the CRT from finding the impossible – *i.e.*, that community-based services are somehow 100% effective at reducing hospitalizations in only Mississippi.

Melodie Peet admitted that sufficient community-based services do not prevent all state hospital admissions: "Serious mental illnesses are chronic in nature but they also have periods of acute exacerbation. And those acute episodes evolve differently for every individual and those systems are built to try to address those needs. Sometimes everything just doesn't come together in the right way and we don't get to the people early enough to help them through the crisis or it's confusing because of substance use or there are many reasons why at points in time having an inpatient backup is absolutely essential." (Tr. at 1326).

The practical limitations on the CRT's erroneous finding that community-based services are 100% effective at reducing hospitalizations in only Mississippi is illustrated by Ms. Burson's use of PDX-21 to testify regarding the alleged cycle of state hospital admissions. (Tr. at 1074-75). Ms. Burson recommended PACT for Person 133, and testified that "PACT has the capacity to intervene in all kinds of ways that would help break the cycle." (Tr. at 1075). But PACT is only 41% effective at reducing hospitalizations. (DX-235 at 1). The CRT has no explanation for how a service that is 41% effective at reducing hospitalizations is somehow 100% effective in Mississippi.

### G.    USDOJ managed the survey.

Before beginning its survey, the CRT met for two days as a team in January 2018 in Washington, D.C. at the Department of Justice. (Tr. at 196-97). Several USDOJ lawyers were present. (Tr. at 197). The CRT also held weekly calls to discuss themes and findings. (Tr. at

13

197).  USDOJ lawyers participated in those calls.  (Tr. at 197).  USDOJ lawyers attended the CRT's interviews of the Patients and, in some instances, participated in the interviews.  (Tr. at 198 and 640).

## III.   The United States And Its CRT Ignore Federalism Considerations.

The CRT made a number of standard of care criticisms regarding the manner in which Mississippi delivers mental health services.  The CRT testified to several different "standards of care" that purportedly apply to discharge planning.  (*Compare* Tr. at 611-13 *with* Tr. at 1005 and *with* Tr. at 1090-91).[3]  Melodie Peet believes that 100% of the individuals admitted to a state hospital should meet with their CMHC case manager before they are discharged (Tr. at 1375-76), that DMH should introduce a "lead agency" as a mechanism to coordinate the state hospitals and community providers (Tr. at 1327-28 and 1371), that DMH should reexamine the way its Mobile Crisis Teams are being deployed (Tr. at 1352), that Mississippi's state hospitals should automatically refer two categories of patients to PACT – patients with repeated state hospital admissions and patients with lengths of stay beyond the average length of stay (Tr. at 1401), that state hospitals and community providers should be required to enroll all eligible individuals in Medicaid as part of the admission process.  (Tr. at 1402), and that Mississippi should apply for a waiver for Medicaid to pay for supported employment services.  (Tr. at 1415).  Such issues,

---

[3] Dr. Marc Lewis testified that discharge planning, on paper, is supposed to start the day of admission, but "[t]he reality is, when you a psychiatric patient in your hospital, they may be screaming, hitting, punching, smearing feces on the wall.  And for a patient that is that psychotic, your first job as a practitioner is to psychiatrically stabilize them, to dodge the punching, to make sure that they're safe and not harming themselves or harming anyone else ….  And that's something that a lot of people don't realize, that we get people … that are pretty dangerous.  They're dangerous to a community, they're dangerous to themselves.  And we want to stabilize them first, and in the course of that stabilization start working on their discharge planning."  (Tr. at 1698).  Aside from those patients, discharge planning does begin upon admission to Mississippi's state hospitals, and the state hospitals do coordinate with the CMHCs to transition patients to the community.  ECF 217-2, Sheila Newbaker at 66 (11:13-12:7), 68 (27:13-28:18), 70-71 (39:10-40:22), 71 (41:1-42:1), 71-72 (42:9-20), 72 (43:2-25), 74 (47:13-21); Debra Wuichet at 157 (9:8-25 and 10:4-18), 158-159 (19:8-20:25), 161 (29:10-30:2), 161-62 (30:8-32:12 and 33:10-34:4), 163-64 (35:22-38:18), 166 (53:18-54:5), 167 (58:13-20); Angela Pounds at 196 (7:21-8:7, 8:8-10, and 8:19-9:4), 199 (16:7-14, 16:15-22, and 16:23-17:12), 202-03 (44:1-46:3), 204 (56:16-24), 207-08 (94:3-95:10), 209-10 (101:6-103:7), 210 (103:19-25), 212-13 (114:7-118:21), 213 (118:17-119:22).

which go to the level of care Mississippi delivers and how it delivers them, are beyond the scope of *Olmstead*.

In her report, Ms. Peet stated: "Resources are finite in every state. It will always be a challenge to find additional resources to devote to the funding of community programs." (PX-407 at 29). That is so "because state governments operate within a fixed set of resources and the legislature and governor are always looking at competing needs when they're making allocation decisions." (Tr. at 1464). And yet the CRT made recommendations for expanding Mississippi's mental health system without regard to how much the expansion would cost or to, as Ms. Peet put it, legislative allocation decisions.

## IV.      This Is A Serious Risk Of Institutionalization Case Only.

The CRT did not evaluate whether the Patients were appropriate for discharge. (Tr. at 1116). As Ms. Burson testified, "I was not asked to do an assessment about readiness for discharge." (Tr. at 1116 and 1145-46). There is no evidence that any individual was unnecessarily institutionalized in a Mississippi state hospital as of the fact cut-off date of December 31, 2018. Likewise, there is no evidence that any individual requested any community-based services, but was denied those services by Mississippi.

78% of the Patients Dr. VanderZwaag reviewed were living in the community when she interviewed them. (Tr. at 453). 84% of the Patients Dr. Bell-Shambley reviewed were living in the community when she interviewed them. (Tr. at 873). 89% of the Patients Ms. Burson reviewed were living in the community when she interviewed them. (Tr. at 1115). Collectively, 124 of the 150 (82%) living Patients were living in the community at the time of the CRT's survey.[4]

---

[4] The CRT's expert reports (PX-401 through PX-406) show that 124 of the 150 (82%) living Patients were in a state hospital at the time of the CRT's survey.

The CRT found that 85.1% of the Patients were at serious risk of institutionalization.  (Tr. at 279-80; PDX-5).  In some instances, the CRT found a Patient was doing well living in the community, but still found the Patient to be at serious risk of hospitalization.  (Tr. at 881).  Although Dr. Baldwin found that Person 105 had created a stable life for herself in the community, and had not been admitted to a state hospital in nearly two years, Dr. Baldwin found that Person 105 was at serious risk of institutionalization.  (Tr. at 1037).

Of the 150 living Patients in the CRT's survey, 92 of them (61%) had been discharged from a state hospital for at least one year before the CRT produced their reports on July 30, 2017.[5]  This means that those 92 Patients had successfully lived in the community for a year or more at the time the CRT had completed its survey.  The CRT found that 76 of those 114 Patients (83%) were at serious risk of institutionalization.  The CRT collectively found that 85.1% of the Patients surveyed were at serious risk of institutionalization without regard to how long the Patients had been discharged from a state hospital before the survey was completed (PDX-5), which is only 2% more than the CRT's finding that 83% of the Patients who had been living in the community for one year or more were at serious risk of institutionalization.  Given that 83% of the Patients the CRT found be at serious risk of institutionalization had lived in the community for a year or more at the time the CRT completed its survey, the CRT has an expansive and dubious conception of "at serious risk of institutionalization."

## V.    Federal Deficiencies Inhibit Mississippi's Ability To Deliver Services.

### A.    The long history of federal deficiencies regarding mental health.

#### 1.    New Freedom Commission Report.

On April 29, 2002, President George W. Bush announced the creation of the New Freedom Commission on Mental Health (Commission).   (DX-195). The Commission was

---

[5] This is summarized on Exhibit 1, which was compiled from the information in the CRT's expert reports (PX-401 through PX-406).

charged with studying the mental health service delivery system, and making recommendations that would enable adults with SMI to live in their communities.  (DX-195).  On July 22, the Commission issued its final report, which is admitted into evidence as DX-195.  (Tr. at 230).

In 2003, the Commission concluded that America's mental health delivery system was in shambles.  The Commission's final report stated that "for too many Americans with mental illnesses, the mental health services and supports they need remain fragmented, disconnected and often inadequate, frustrating the opportunity for recovery."  (ECF 189-1, ¶ 296).  A number of the recommendations of the Commission were not implemented or have only been partially realized.  Since the Commission issued its final report in 2003, the quality of life has not fundamentally changed for adults with SMI.  (ECF 189-1, ¶ 297).  The Interdepartmental Serious Mental Health Coordinating Committee (ISMICC) was created, in part, to address things the Commission could not get done on the federal level since 2003.

### 2. ISMICC.

The 21st Century Cures Act, 114 Pub. L. No. 255, 130 Stat. 1217 (2016), authorizes the ISMICC to enhance coordination across federal agencies to improve service access and delivery of care for people with [SMI] …"  (ECF 189-1, ¶ 288).  DX-179 is a report issued by the ISMICC on December 30, 2017.  (Tr. at 1441).

Eight federal departments and agencies are represented on the ISMICC.  (ECF 189-1, ¶ 291).  Each of these eight federal departments supports programs that address the needs of people with SMI.  (ECF 189-1, ¶ 292).  Collaboration between the eight federal departments is informed and strengthened by the participation of non-federal members, including national experts of health care research, mental health providers, advocates, and people with mental health conditions and their families and caregivers.  (ECF 189-1, ¶ 293).

17

Over the next five years, the ISMICC will work in collaboration with federal interdepartmental leadership to build shared accountability for a system that provides the full range of treatments and supports needed by individuals and families living with SMI.  (ECF 189-1, ¶ 333).  As the ISMICC undertakes the challenging work of evaluating and recommending ways to strengthen federal policies and programs, a key goal will be to ensure that changes made at the federal level actually lead to better lives for people with SMI throughout the nation.  (ECF 189-1, ¶ 335).

The ISMICC Report notes a concern that federal programs may be designed, accidentally or intentionally, to restrict the number of people who can participate and consequently exclude vulnerable populations or those with limited access such as people in rural areas.  (ECF 189-1, ¶ 337).  Programs designed to restrict the number of people who can participate may occur inadvertently through the construction of program eligibility criteria that fail to acknowledge all relevant circumstances.  (ECF 189-1, ¶ 338).  Programs designed to restrict the number of people who can participate also may occur simply as the result of inadequate funding – a universally important consideration that may be difficult to address.  (ECF 189-1, ¶ 339).

Chapter 4 of the ISMICC Report contains recommendations developed solely by the non-federal members of the ISMICC, which reflect the hope of the non-federal members that federal departments will better align and coordinate their efforts to support people with SMI.  The recommendations should not be interpreted as recommendations from the federal government.  (ECF 189-1, ¶ 342).  Nonetheless, the carefully selected set of recommendations of the non-federal members of the ISMICC were chosen to provide critical points of deliberation within the ISMICC.  (ECF 189-1, ¶ 343).  A partial list of the recommendations of the non-federal members is found at ECF 189-1, ¶ 344; the full list is found at DX-179 at 78-92.  Some of the key recommendations aimed at correcting federal deficiencies are:

- Harmonize and improve policies to support federal coordination … Activities include but are not limited to … identifying federal and other barriers across federal departments that preclude or impede access to services, treatments, or continuity of care.

- Evaluate the federal approach to servicing people with SMI.  Evaluate systems, services, and supports for people with SMI, and assess effectiveness.  Routinely measure, evaluate, and improve the federal government's efforts.  Identify areas where the federal government is failing to meet the needs of people with SMI.  Support evaluation and accountability for individual federal programs.  See how federal programs fit within the larger support system.  Identify and reduce non-coordinated duplications across departments.

- Define and implement a national standard for crisis care.

- Develop a continuum of care that includes adequate psychiatric bed capacity and community-based alternatives to hospitalization.

- Provide a comprehensive continuum of care for people with SMI.

- Develop national and state capacity to disseminate and support implementation of the national standards for a comprehensive continuum of effective care for people with SMI.  The challenges of implementation are well known, but rarely adequately addressed.  As a consequence, we, the non-federal members, find a huge gap between what is known to be effective and what is available in communities throughout the nation.

- Adequately fund the full range of services needed by people with SMI.  Federal health benefit programs (including Medicaid, Medicare, VA, and TRICARE) should cover outreach services, bidirectional integration of physical and behavioral health care, care coordination, consultation, supported housing and employment services, family and peer support services, and other services needed by people with SMI.  Payment models should make it easy to reimburse providers for services.  Fund such services directly or through models such as health homes, accountable care organizations, and managed care organizations.  Federal departments should partner with private health plans, and with state and local governments, to promote similar approaches.

- Medicare, Medicaid, and other benefit programs should provide adequate reimbursement for the full range of services needed by people with SMI, at rates equivalent to rates for other types of health care services.

(ECF 189-1, ¶ 344).

## B.    SSI and SSDI.

Supplemental Security Income (SSI) is a means-tested, income-assistance program  (DX-195 at 28-29).  Social Security Disability Insurance (SSDI) is a social insurance program with

benefits based on past earnings.  (DX-195 at 28-29).  Dr. Drake testified federal disability policies interfere with and disincentivize the ability to work.  (Tr. at 212-13).  Dr. Drake testified that under SSI and SSDI, "the rules about how much a person can work are very complicated so that we actually have to have a benefit specialist on the team to help people understand if they can go to work and how much they can work, because people are afraid that they're going to lose their disability payment, and with it, they may also lose their health insurance by going to work." (Tr. at 213).  As a result, some states hire benefits specialists to help people navigate these issues.  (Tr. at 213).  The number one reason why adults with SMI do not work is they are concerned if they do work, they will lose their federal benefits, including their health insurance. (Tr. at 214, 1118, and 1447).

### C.      Supported employment.

IPS supported employment is an "evidence-based approach to helping people with mental illness to find and succeed in employment."  (Tr. at 233).  There is no direct federal funding mechanism for IPS supported employment.  (Tr. at 233).  Dr. Drake testified the federal funding mechanism for IPS supported is too complicated, and it would be better if Medicaid just paid for it as a core service.  (Tr. at 233-34).

### D.      Housing.

The non-federal members of ISMICC made the following recommendation:  "Have the Department of Housing and Urban Development issue guidance for state and local housing authorities on establishing tenant selection preferences for non-elderly people with SMI consistent with federal fair housing requirements."  (Tr. at 1434; DX-179 at 86).  Ms. Peet agrees with that recommendation "[b]ecause local housing authorities have a history of discriminating against people with mental illness, and this would be helpful in breaking through that discriminatory practice."  (Tr. at 1443).

Housing Choice Vouchers are federally funded vouchers, which are usually issued through state housing authorities, that enable individuals to seek housing in apartments that are available on the fair market. (Tr. at 1444). Ms. Peet believes consistent federal policies should be developed to support and require adequate housing for people with SMI. (Tr. at 1444).

The non-federal members of ISMICC made the following recommendation: "Target resources such as Housing Choice Vouchers for individuals with SMI experiencing chronic homelessness or transitioning from settings such as correctional facilities, nursing homes or board and care homes." (Tr. at 1443; DX-179 at 86). Ms. Peet agrees with that recommendation "[b]ecause historically, having access to safe and affordable and permanent housing is a major problem for individuals with serious mental illness, and having more vouchers available to them would have a positive impact on the problem." (Tr. at 1443-44).

Section 8 housing is a federal housing program meant to provide scattered-site housing for people who are economically disadvantaged and/or disabled. (Tr. at 679 and 1445). Section 8 vouchers are given to individuals so they can find an apartment in the community of their choice. (Tr. at 1445). There is a waiting list to obtain Section 8 vouchers in Mississippi. (Tr. at 1445). There are a finite number of Section 8 vouchers available in each state. (Tr. at 1445). In Ms. Peet's opinion, Section 8 vouchers should be expanded to increase the resources for adults with SMI who are seeking supported housing. (Tr. at 1445).

There are income levels for being eligible to receive Section 8 vouchers, and they are set so low that if an adult with SMI gets a job, she can lose her Section 8 vouchers while not making a living wage. (Tr. at 1446). In Ms. Peet's opinion, federal funding for PSH for adults with SMI should be increased because there is so much unmet needs for such housing, and those unmet needs exist nationwide. (Tr. at 1446).

PD.26516595.1

### E.    Application process for benefits.

Ms. Peet believes the federal government should make the application process for both Medicaid and Social Security easier to assist adults with SMI.  (Tr. at 1448).  That should be done because if adults with SMI received Medicaid and Social Security disability, then they have a wider array of services and income available to them.  (Tr. at 1448).

## VI.    Mississippi Has Expanded Community-Based Services, But They Have Limitations Given The Complex Nature Of SMI.

### A.    PACT.

#### 1.    PACT is an important service, but it does not work for everyone.

PACT is appropriate for individuals who experience the most intractable symptoms of severe mental illness and the greatest level of functional impairment.  (Tr. at 234).  PACT is a very aggressive engagement model, which means the intensity of the service is high.  (Tr. at 1455).  PACT should be utilized only as long as people really need that level of intensity of service because PACT is an expensive service to provide.  (Tr. at 1455).  PACT should be reserved for only the people who really need that intense level of service because if you are using PACT for people who do not need it, you are wasting that resource.  (Tr. at 1455-56).

The CRT admits PACT is not 100% effective.  (DX-235).  The reasons why PACT is not successful for everyone include that some people have very, very bad illnesses, some people do not want treatment, some people feel they have been mistreated by the mental health system, some people have substance abuse issues, some people have legal issues, some people do not want PACT in their homes, and some people may be so psychotic and disorganized that they do not understand PACT may benefit them.  (Tr. at 475-76 and 639).  People who are a danger to themselves or others do not need to be served on a PACT team until they are stable.  (Tr. at 1692).

PD.26516595.1

Robert Blair Duren receives PACT services from Region 3. Mr. Duren was hospitalized 3 times at North Mississippi State Hospital.  (Tr. at 567-68).  He was connected with the Region 3 PACT team during his second hospitalization.  (Tr. at 578).  Despite receiving PACT services, Mr. Duren was rehospitalized.  (Tr. at 568).  Mr. Duren is living in an apartment provided through MUTEH.  (Tr. at 579).  He believes the mental health system worked for him.  (Tr. at 581).

### 2.     PACT is not well suited to rural areas.

PACT is not well suited to rural settings because sparsely populated communities lack a critical mass of service users who require intensive mental health services.  (Tr. at 236, 238, and 874).  Dr. Drake testified that "the resources and characteristics of rural communities place different demands on service systems compared to urban communities."  (Tr. at 215).  Social isolation, poverty, social stigma, and lack of qualified mental health workers are particularly significant barriers in rural areas.  (Tr. at 215).  Rural patients may differ diagnostically from urban patients.  (Tr. at 215-16).

When asked whether the data in PX-417 tells us anything about the degree to which PACT services are needed in any counties in Mississippi, Dr. Drake testified that "we would need a lot more data to make that determination.  You know, from my brief study of the regions of Mississippi, many of these regions are largely national forests, aren't they?"  (Tr. at 241-42).  Dr. Drake admits that Mississippi is a rural state.  (Tr. at 216).

### 3.     PACT utilization.

Kim Sistrunk is the supervisor of the Region 3 PACT team.  (Tr. at 523).  There are 11 staff members on the Region 3 PACT team as follows:  1 psychiatric nurse practitioner, 2 therapists, 2 community support specialists, 2 registered nurses, 1 peer support specialist, 1 employment and housing specialist, 1 program coordinator, and 1 supervisor.  (Tr. at 529 and

PD.26516595.1

560).  Region 3 receives an annual $600,000 grant to operate its PACT team.  Without that grant, Region 3 could not provide PACT services.  (Tr. at 552).

Ms. Peet testified that Mississippi's PACT teams are not being fully utilized, and "the goal should be to bring all of those programs up to scale ASAP."  (Tr. at 1340-41). Using a 10 to 1 client/staff ratio, Ms. Peet testified the maximum PACT capacity in Mississippi is 640 clients. (Tr. at 1388).  In Mississippi, PACT teams have 8 staff members.  (JX-60 at 215-16).  At a client/staff ratio of 10 to 1, each PACT team can theoretically handle 80 clients.  8 PACT teams multiplied by 80 clients per PACT team is 640 clients.

But Kim Sistrunk explained that, in reality, the Region 3 PACT teams cannot effectively serve the theoretical maximum of 80 clients per PACT team. Ms. Sistrunk testified that it would be "very difficult" to deliver PACT services to 80 clients because "[w]e are so intensely involved in so many aspects of each person's life."  (Tr. at 546).

As noted above, the Region 3 PACT team has 11 staff members.  Using a 10 to 1 client/staff ratio, the theoretical maximum of the Region 3 PACT team is 110 clients.  According to Ms. Sistrunk, the Region 3 PACT team can only effectively serve a maximum of 60 to 65 clients, which is 45 to 50 clients less than its theoretical maximum of 110 clients.  (Tr. at 557). Moreover, PACT teams cannot add more than four or five new patients per month because when people are referred to PACT they typically are high need patients.  (Tr. at 473-74).  As Dr. VanderZwaag testified, "[y]ou don't want to overwhelm by having too many people with too high needs so that everything falls apart."  (Tr. at 474).

Dr. Marc Lewis testified:  "Some of the community mental health centers are struggling keeping their PACT teams full.  They just don't have the need for that … level of service in their community.  Some of them have identified they don't need a PACT team in Byhalia, Mississippi or some other rural area because there's not a need.  And even if they had a PACT team, finding

a psychiatrist to staff it or a psych nurse practitioner to staff that PACT team … couldn't be achievable in our state, and we'd be back in this court arguing why a model that works in another state can't work in Mississippi."  (Tr. at 1701-02).

B.   Housing.

Dr. Drake testified that "[s]upported housing refers to scattered-site individual apartments where one or two people with a disability would live and be supported by a treatment team in the community."  (Tr. at 109).  CHOICE offers only scattered-site housing, which is also referred to as permanent supported housing (PSH).  (Tr. at 706).   PSH is not staffed or supervised on site.  (Tr. at 706).

The United States criticizes Mississippi for providing any housing for adults with SMI other than PSH.  The only type of housing identified in the United States' Complaint is PSH.  (ECF-1, Complaint at ¶ 89).  So the United States gives Mississippi no credit for non-PSH housing, such as the housing available at CMRC, or group homes, or the Community Transition Homes, one of which is the PALS Living Home in Region 9.  The United States erroneously believes that any housing other than PSH does not permit individuals to live "just like any other members of the community."   (ECF-1, Complaint at ¶ 89).   But the CRT made housing recommendations that are not scattered-site housing, and that housing is not available through CHOICE.  (Tr. at 707).

Ledger Parker is the Executive Director of MUETH.  (Tr. at 674).  Mr. Parker testified that the CHOICE program is working very well because "it's been able to ramp up and serve a lot of different people all across the state of Mississippi, different communities everywhere, and being able to connect them to mental health services."  (Tr. at 708).  Even so, Debra Wuichet, the social services director at NMSH, testified by deposition that some patients "cannot function in a

supported housing arrangement.  It wouldn't be in their best interest."  (ECF 217-2, Debra Wuichet at 175-76 (147:16-148:24)).[6]

### C.    Peer support.

Dr. Drake testified that "[t]here's no standardized way of providing peer support so it varies a lot from one program and one intervention to another."  (Tr. at 137).  Dr. Drake testified that 90% of adults with SMI do not use peer support services and that some portion of that 90% do not find them useful.  (Tr. at 221).

### D.    SMI is complex and difficult to treat.

In its closing statement, the United States implied that Mississippi is denying one of the Patients the right to play the saxophone (Tr. at 2451), but that trivializes the complex care and treatment of adults with SMI.  Adults with SMI have a range in the severity of their illnesses from temporary conditions to very serious and persistent mental illness.  (Tr. 943).  The 28 Patients Dr. VanderZwaag reviewed had a range in the severity of their mental illnesses that included people who were chronically psychotic and at risk of disruptive behavior.  (Tr. at 453).  Dr. Drake agrees that mental illnesses can be incredibly complex and difficult to treat.  (Tr. at 201).

Many Patients have forensic and other complex histories that cannot be ignored.  Person 54 has a forensic history of robbing a grocery store with a knife.  (Tr. at 461-62).  Person 86 has a forensic history of stabbing his father to death.  (Tr. at 661-62).  Person 86 was found not competent to stand trial and not restorable in the foreseeable future.  (Tr. at 662).  As a result, he was transferred from the circuit court to the chancery court and committed to Mississippi State Hospital.  (Tr. at 662).

---

[6] ECF 217 is the Pre-Trial Order.  ECF 217-2 are the admissible depositions designations.

Person 111 has a forensic history of use of a weapon with assault charges.  (Tr. at 1038). Because of his forensic history, Person 111's discharge must be approved by a Discharge Advisory Committee.  Dr. Baldwin does not disagree with the use of a Discharge Advisory Committee in connection with the discharge of individuals with a forensic history.  (Tr. at 1038).

Person 154 has a history of inappropriate sexual behavior.  (Tr. at 248).  If Person 154 were placed in the community, he would have to be escorted by close male supervision when he left his housing.  (Tr. at 250).  Person 82 is a registered sex offender with a pornography conviction.  (Tr. at 660-61).  Person 82's pornography conviction negatively impacted his employment and housing options.  (Tr. at 661).

Person 38's medical records indicate that his "community living skills are very limited to negligible, with his performance comparable to that of the average individual at four years, three months."  (Tr. at 458).

Mr. Chastain testified there are some patients who have been in the Continued Treatment Unit at MSH for quite a long time, particularly some of the forensic patients.  "There have been patients that were there when I became director [in 1993], and they're going to be there when I retire …. I can think of one in particular that killed three members of his family.  That was in the 70's.  And he remains in the hospital today."  (Tr. at 2255-56).

## VII.    The Vital Role Of State Hospitals In The Continuum Of Care.

### A.    State hospitals are part of the continuum of care.

Dr. VanderZwaag believes state hospitals are part of the continuum of care:  "[W]e need … an array of care, we need a continuum of care to meet people's needs at the time.  So hospitals are part of that continuum of care, just as in any … other health-related fields.  So sometimes people need a hospital."  (Tr. at 495).  Daniel Byrne agrees state hospitals are part of the continuum of care because they are the highest level of care.  (Tr. at 645).  The highest level of

care means that state hospitals are staffed 24 hours a day and are equipped to manage people who need that intensity of service.  (Tr. at 645).  Dr. Bell-Shambley agrees state hospitals are part of the continuum of care.  (Tr. at 873).

### B.    Sufficient inpatient capacity is critical.

The ISMICC Report found most states report insufficient psychiatric crisis response capacity as well as insufficient numbers of inpatient psychiatric hospital beds (ECF 189-1, ¶ 316); it is critical that every state have adequate bed capacity to respond to the needs of people experiencing both psychiatric crises and those who are in need of longer inpatient care, such as people in forensic care (ECF 189-1, ¶ 317); a report by the National Association of State Mental Health Program Directors Research Institute found that most states (35 of 46 who responded) have shortages of psychiatric hospital beds (ECF 189-1, ¶ 318); and the configuration of available psychiatric hospital beds and the number of psychiatric hospital beds per 100,000 population varies substantially across states, but few states report they have adequate numbers of psychiatric inpatient beds to meet needs (ECF 189-1, ¶ 319).

### C.    Mississippi's state hospitals stabilized the Patients.

Melodie Peet, who is not a clinician, criticized Dr. Charles Carlisle, the Director of EMSH, for testifying in his deposition that the role of the state hospitals is "to get [patients] in contact with the [CMHC] as a good, you know, 'here they are.'  You know, 'we've stabilized them, this is the medication that they're on.'"  (PX-407 at 26).  But Dr. VanderZwaag testified that state hospitals help people regain stability.  (Tr. at 375).  The record is replete with examples of Mississippi's state hospitals stabilizing individuals and returning them to the community.

Person 32's symptomatology during his last hospital admission before Dr. VanderZwaag interviewed him included aggression, agitation, and fights on a regular basis, but he was not exhibiting any major symptoms when Dr. VanderZwaag interviewed him.  (Tr. at 454).

Person 41's symptomatology during his last hospitalization before Dr. VanderZwaag interviewed him included paranoia, use of associations, disorganizations, some bizarre thoughts, impaired insight, and impaired judgment, but when Dr. VanderZwaag interviewed him, he was pleasant, appropriate, and not psychotic.  (Tr. at 458-59).

Person 60's symptomatology during his last hospital admission before Mr. Byrne interviewed him  included that he refused to take his medications, his psychotic symptoms were re-presenting, and a history of assaultive and self-destructive behavior (which included setting himself on fire and cutting off his arm with a saw), but he was not a danger to self or others when Mr. Byrne interviewed him.  (Tr. at 651).

Person 65's symptomatology during his last hospitalization before Mr. Byrne interviewed him included an accusation that he tried to rape another resident of a personal care home, but he was not a danger to self or others when Mr. Byrne interviewed him.  (Tr. at 653-54).

Person 69's symptomatology during her last hospitalization before Mr. Byrne interviewed her included suicidal feelings and decompensation, but she was pleasant, cooperative, stable, and not a danger to self or others when Mr. Byrne interviewed her.  (Tr. at 655-56).

Five experts in the field of general psychiatry retained by Mississippi testified at trial – *i.e.*, Drs. Mark Webb, Benjamin Root, Philip Merideth, Susan Younger, and William Wilkerson. (Tr. 1815, 1863, 1987, 2116, and 2144.)

Dr. Mark Webb found, to a reasonable degree of medical certainty, that Persons 93, 96, 105, 108, 121, 128, 130, 132, 133, 136, 142, 143, and 144 "suffer with significant and chronic mental illnesses, such as Schizophrenia, Schizoaffective Disorder, and Bipolar Disorder.  All of these illnesses are severe, chronic, disabling, and cyclical in nature.  These are relapsing illnesses which have a waxing and waning component to them …. In all of the chronic illnesses noted in

29

the above patients, when the symptoms become too prominent, the person can become a danger to themselves or others and/or unable to take care of themselves. Their welfare is in danger when the illness is out of control. Suicidal and homicidal threats are quite common, along with the inability to take care of themselves. Another feature of these illnesses is that the person does not believe that they are ill and has poor insight and thus, will be noncompliant with treatment. They will typically refuse treatment and will refuse any attempts to help them ….In my opinion, with the above patients, the State Hospital was the least restrictive setting at the time of their admission. Also, the care and treatment, including discharge planning, received in the State Hospital met the applicable standard of care. There is no cure for these illnesses, but the symptoms were eased and decreased, and discharge planning was performed adequately." (DX-307 at 1-2; Tr. 1817-1840).

Dr. Benjamin Root found to a reasonable degree of medical certainty that, with respect to Persons 91, 92, 94, 95, 98, 102, 103, 106, 107, 109, 110, 111, 116, 115, and 118, "[m]ost of these patients represent severe enough psychopathology that multiple hospitalizations are, from time to time, required. Most of these patients represent cases of severe pathology and it is inevitable that this kind of patient, frequently manifesting multiple diagnoses, ends up requiring inpatient services to put them back, at least temporarily, on the right road … It appears that hospitalization in a psychiatric facility is the least restrictive setting for these patients from time to time given the patient's situation and their response to it. The hospital appears to have been an appropriate setting in the records I have reviewed at the time they were in the hospital. My opinion is that the standard of care was met and the services were adequate …. Community mental health resources can only help so much in cases such as these." (DX-06 at 1-2; Tr. at 1862-76).

Dr. Philip Merideth found to a reasonable degree of medical certainty that, with respect to Persons 27, 28, 30, 35, 38, 41, 42, 43, 44, 45, 46, 48, 52, 54, and 148, "a state hospital was the

least restrictive treatment setting available for the patient in Mississippi, and the care and treatment including discharge planning met the applicable standard of care for inpatient services in a state hospital setting in Mississippi." (DX-305 at Attachment 4, Section 1; Tr. 1988-2001).

Dr. Susan Younger found to a reasonable degree of medical certainty that Persons 55, 56, 57, 61, 64, 65, 74, 76, 82, 84, 85, 88, 89, and 126 were treated in the least restrictive setting appropriate for their care at the time of their admission to the respective state hospitals, and the treatment they received was appropriate and met the standard of care for treatment of severe mental illness. (DX-309 at 1; Tr. at 2116-25). Dr. Younger testified, "The people that I reviewed have a severity of illness to such a degree that they cannot be treated adequately in the community most of the time despite real good services, medicine, support." (Tr. at 2119).

Dr. William Wilkerson found to a reasonable degree of medical certainty that Persons 3, 4, 6, 7, 8, 11, 13, 16, 18, 19, 20, 21, 24, 25, 59, 71, and 81, at the time of their admission to a Mississippi state hospital, suffered from a diagnosed mental illness, had little or no insight into the seriousness of their mental illness and their need for treatment, were unable to judge for themselves the risks and benefits of treatment, the state hospital was the most appropriate and least restrictive setting for their treatment, and they received appropriate treatment for their conditions. (DX308 at 5; Tr. 2144-67 and 2185-86).

Dr. Roy Reeves is a psychiatrist and was accepted as an expert in the field of general psychiatry. (Tr. 1929-32). He has been the clinical director at SMSH for 4 years. (Tr. 1930-31). Dr. Reeves testified, to a reasonable degree of medical certainty, that Persons 53, 123, and 131 were appropriate for admission to SMSH at the time of their respective admissions, SMSH was the least restrictive setting, and their treatment met the applicable standard of psychiatric care. (Tr. 1939-49).

C.      **The state hospital as the least restrictive setting.**

As noted, *supra*, 29-31, Drs. Webb, Root, Merideth, Younger, Wilkerson, and Reeves found the state hospital was the least restrictive setting at the time of admission for the patients they reviewed.

When Ms. Peet was the Commissioner in Maine, individuals who were admitted to the Maine State Hospitals were appropriate for care in those facilities at the time they were admitted. (Tr. at 1448).  The same is true for the state hospitals in Connecticut during the period 2000-2007.  (Tr. at 1449; PX-407 at 36-37).  Dr. Bell-Shambley testified when an individual was civilly committed to one of the Alabama state hospitals she worked at, the state hospital was the least restrictive setting for the individual at that time.  (Tr. at 862).

In July 2018, Dr. VanderZwaag became one of the deputy chief medical officers at Central Regional Hospital (CRH), a state hospital in North Carolina.  (Tr. at 465).  Dr. VanderZwaag believes that when an individual is admitted to CRH, the hospitalization is necessary.  (Tr. at 469).  Saint Elizabeths Hospital (SEH) is the state psychiatric facility for the District of Columbia.  (Tr. at 585).  Daniel Byrne worked at SEH three different times for a total of nine years.  (Tr. at 633).  If an individual met the admissions criteria and was admitted to SEH, then SEH was the most integrated setting appropriate for that individual at the time of admission.  (Tr. at 634).

**VIII.  Deinstitutionalization Must Be Done Responsibly.**

Deinstitutionalization had unintended consequences, including homelessness, incarceration, and people ending up without clinical services.  (Tr. at 1462-63).  Those unintended consequences happened, at least in part, because many states downsized state hospitals without transferring sufficient resources to community-based services.  (Tr. at 1463).  As Ms. Peet testified, "I would say that the process in some ways happened in reverse of the

sequence it should have.  In the days of rapid deinstitutionalization, people were often discharged into the community before those appropriate services had been developed, and I think we're still playing catch-up to correct for that."  (Tr. at 1463).

There is no formula for deinstitutionalization.  (Tr. at 219).  It is not a simple process.  (Tr. at 219).  Based on her experience as an administrator in state mental health systems, Ms. Peet believes the way to deinstitutionalize responsibly is to downsize state hospitals as you increase community-based services.  (Tr. at 1463-64).  Dr. Drake agrees.  (Tr. at 217).

**IX.    Community-Based Services Do Not Cost Less Than State Hospital Care.**

**A.    The cost comparisons of United States' experts Kevin O'Brien and Melodie Peet.**

Kevin O'Brien was retained by the United States to compare the cost of treatment in an inpatient setting (*i.e.*, Mississippi's state hospitals) versus the cost in a community-based setting.  (Tr. at 1244).  Prior to this case, Mr. O'Brien had never been engaged to compare the cost of community-based care to the cost of institutional care.  (Tr. at 1277).  Mr. O'Brien has not authored any publications which compare the cost of community-based care to the cost of institutional care.  (Tr. at 1277).  Melodie Peet did cost calculations similar to what Mr. O'Brien did.  (Tr. at 1741).

Mr. O'Brien calculated the average annual inpatient costs at Mississippi's state hospitals and compared it to the cost of community-based services under three scenarios (Scenarios).  (Tr. 1253-54).  Mr. O'Brien's Scenarios are as follows:

| Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|
| Assertive Community Treatment | Assertive Community Treatment | Community Support Services |
| Crisis Residential | Crisis Residential | Evaluation & Management |
| | Permanent Supported Housing CHOICE | Psychotherapy |
| | | Family Therapy (without patient) |
| | | Family Therapy (with patient) |

|  |  | Peer Support |
|  |  | Crisis Response |
|  |  | Crisis Residential |
|  |  | Supported Employment Services |

(DDX-8; Tr. at 1719).

CPT codes are a classification system that allows the identification of particular types of services. (Tr. at 1255). The services included in each Scenario were provided by USDOJ to Mr. O'Brien. (Tr. at 1255 and 1280-81). All of the services in Mr. O'Brien's Scenarios have CPT Codes, except for CHOICE housing and supported employment. In Mississippi, CHOICE housing and supported employment are not reimbursable under Medicaid, but all of the other services in Mr. O'Brien's Scenarios are. (Tr. 1282). Mr. O'Brien assumed that community-based services are a viable alternative to the provision of mental health services in a state hospital, but he admits he has no opinions regarding whether his assumption is accurate. (Tr. at 1283 and 1294-96).

The Federal Medical Assistance Percentage (FMAP) is used to calculate the amount of federal matching funds for state medical services expenditures. (PX-409 at 13, ¶ 39). The FMAP for Mississippi in 2017 was 74.63%. (PX-409 at 13, ¶ 39). Because of the IMD exclusion, *infra* 56-57, Mr. O'Brien applied the FMAP to reduce his calculations of the cost of community-based services, but he did not apply the FMAP to reduce his calculations of the cost of state hospital services. (Tr. at 1253, 1264 and 1298; PDX-27).

In his report, Mr. O'Brien wrote, "Generally, treating an individual with mental illness in a community-based setting appears to be less costly to the State of Mississippi than treating an individual in an inpatient setting." (Tr. at 1283; PX-409 at 10). He used the word "appears less costly" because he did not want to make the blanket statement that community-based services are less costly every single time. (Tr. at 1283-84).

Mr. O'Brien did not do a savings calculation; therefore, he does not know whether there are any potential savings to Mississippi by treating individuals in the community as opposed to a state hospital.  (Tr. at 1284).

### B.      Flaws in Mr. O'Brien's analysis.

Dr. Lona Fowdur is an expert in economics, including healthcare economics.  (Tr. at 1713-17).  Dr. Fowdur was retained by Mississippi to analyze the cost comparisons of Kevin O'Brien and the cost calculations of Melodie Peet.  (Tr. at 1714-15).  Dr. Fowdur identified 4 flaws in Mr. O'Brien's methodology.  (DX-301 at 10-28, sections V.A.-D.).  Three of those flaws, as well as Mr. O'Brien's failure to consider mental health workforce shortages, are discussed below.

### 1.      Flaw 1:  Mr. O'Brien overestimated state hospital costs.

Mr. O'Brien overestimated state hospital costs because he included fixed costs in his calculation of state hospitals costs, but he should not have done so.  (Tr. 1721 and 1724; DX-301 at 10-14).  As Dr. Fowdur explained, "So if we're comparing a patient that can be treated in an inpatient modality of care to a patient who can be treated in a community-based setting, if I transition that patient, the only component of the total costs that I'm going to save is that variable cost component, not the fixed cost component.  So Mr. O'Brien's focus on total costs is erroneous in that he fails to make the distinction that if I were to transition the patient, it's only the variable cost component that I would save.  I would not be saving the totality of the costs."  (Tr. 1722).

Dr. Fowdur used two approaches to correct Mr. O'Brien's overestimation of state hospital costs.  (Tr. 1725-26; DX-301 at 11-14, ¶¶ 41-44).  Dr. Fowdur's corrections show that Mr. O'Brien overestimated state hospital costs by at least 48%.  (Tr. 1725-26).  For example, Mr. O'Brien's average annual state hospital costs of $22,802 should be reduced to a range of

$2,410 (at MSH) to $7,976 (at EMSH), with the costs at SMSH and NMSH falling between that range.  (Tr. at 1735 and 1738; DDX-9; DX-301 at 28-32).

    **2.**    **Flaw 2:  Mr. O'Brien underestimated community-based service costs.**

Mr. O'Brien's Scenarios are unduly restrictive because they do not constitute the totality of care patients receive in the state hospitals, as the patients receive a number of services in the state hospitals that are not included in the Scenarios.  Tr. at 1719-20 and 1726-27; DX-301 at 14-20).  Nor do the Scenarios capture the full set of services that patients receive in the community.  (Tr. at 1727; DX-301 at 14, ¶ 46).  The data Mr. O'Brien reviewed was limited to a list of 30 CPT codes, which truncated the data "to a limited set of codes that excluded additional services that patients receive in the community."  (Tr. at 1727-28).  Mr. O'Brien further restricted those codes to the subset of codes included in his Scenarios, which further limited the data to only a portion of the services that the patients receive.  (Tr. at 1728).  Dr. Fowdur testified, "Mr. O'Brien's own work demonstrates that by including the plurality of codes that patients receive and adjusting those codes for the likelihood the patients would receive those services, his cost estimates would go up by the magnitude of the reimbursement for those codes, as well as his weighting of the likelihood that the patients would receive those codes."  (Tr. at 1803).  As a result of leaving out these services, Mr. O'Brien underestimated the community-based service costs.  (Tr. at 1730).

Mr. O'Brien's community-based service cost estimate also erroneously assumed that patients transitioned to the community will not subsequently need treatment in a state hospital.  (Tr. at 1730; DX-301 at 18).  Based on the data Mr. O'Brien reviewed, 12% of the individuals who received PACT services were admitted to a state hospital after they received those services, and 10% of the individuals who received treatment in a CSU were admitted to a state hospital after receiving those services.  (Tr. at 1731).  Because the data show that some patients are

readmitted to state hospitals after they are discharged to the community, Mr. O'Brien should have accounted for the costs associated with patients being readmitted to state hospitals, but failed to do so.  (Tr. at 1730-32).

> **Flaw 3:  Mr. O'Brien failed to consider acuity differences that invalidate a comparison of average costs.**

Mr. O'Brien's analysis does not consider inherent acuity differences between populations of patients who are likely to need state hospital care and the population of patients whose needs can be met with community-based services.  (DX-301 at 20-26).  Dr. Fowdur testified, "As an economist, when I look at the data and I have two populations of patients, one population is treated in the inpatient state hospitals, one population is treated as part of the community.  When I look at the distribution of costs of these patients, I find that there's a significant variation both in terms of the inpatient service needs and the community-based service needs.  So this suggests to me there are tremendous acuity differences between these patients that manifest itself in the form of these differential costs as you go from one patient to another."  (Tr. at 1732).

Mr. O'Brien's failure to consider these acuity differences *invalidates* a comparison of costs because "[i]f the acuity is not the same, then the comparison will not be an apples-to-apples comparison."  (Tr. at 1733).  Mr. O'Brien admits he does not know whether any of his Scenarios are an apples-to-apples comparison to treatment in a state hospital.  (Tr. at 1297).  As Dr. Fowdur explained, "Mr. O'Brien made no attempt to harmonize the type of patients that he's studying in an inpatient context to the patients that he's studying in the community-based context.  So if the two patient populations are different from one another, then that basically disqualifies an analysis that is going to be based on averages of two incongruent populations of patients."  (Tr. at 1720).

A host of experts and fact witnesses testified there are acuity differences between the two populations.  Dr. VanderZwaag testified that state hospitals "have evolved to be able to manage the needs of people who are most acutely aggressive or most acutely self-injurious, so people who are more complex and more ill than the average person needing a hospitalization because of the special team working with that population."  (Tr. at 388).  Dr. Drake testified "there are advantages to state hospitals, too, because they often have the facilities to be able to manage people with the most severe problems."  (Tr. at 116).

Kim Sartin-Holloway works in the Office of Mental Health in the Mississippi Division of Medicaid.  She testified by deposition that some individuals "are so ill that they need to be in an institution.  You know, unfortunately, we have those that just can't be out in the community, that they just can't function no matter what we do."  (ECF 217-2, Kim Sartin-Holloway at 106 (6:24-7:5) and 122 (164:20-165:7).  Debra Wuichet is the director of social services at NMSH.  She testified by deposition that "[t]he patients we get have a chronic mental illness as opposed to some of the other private, freestanding facilities.  Usually they've exhausted all of their psychiatric health benefits, they've had a chronic illness with multiple hospitalizations, so typically our patients are the sickest of the sick."  (ECF 217-2, Debra Wuichet at 157 (9:8-25) and 175-76 (124:10-24).  Dr. Jeffrey Geller also testified to acuity differences, *infra* 62.

### 4.    Mr. O'Brien ignored mental health workforce shortages.

Mr. O'Brien improperly ignored the effect of workforce shortages on his analysis.  Dr. Fowdur testified that "shortages of mental health professionals in the country are ubiquitous. And in states such as Mississippi, which is more rural than the average state, these types of mental health shortages have become even more pronounced …. So if the contention here is that … Mississippi should expand the set of services that are provided in the community, we can't just focus on the reimbursements for those services because we are going to need additional

capacity in order to absorb this intake of additional community-based patients that we're required to treat. And in order to do that, we're going to need to hire additional mental health professionals, additional psychiatrist, the availability of whom is seriously constrained in a rural state such as Mississippi." (Tr. at 1740; DX-301 at 33-36, ¶¶ 87-94). *See also*, *infra* 54-56.

### C. The flaws in Mr. O'Brien's analyses apply to Ms. Peet's analyses.

Ms. Peet made an inpatient cost calculation and a community-based cost calculation that are similar in approach to what Mr. O'Brien did. (Tr. at 1741). All of the flaws Dr. Fowdur identified in Mr. O'Brien's analyses apply to Ms. Peet's analyses. (Tr. at 1741; DX-301 at 37-41).

### D. Summary of Dr. Fowdur's opinions.

Dr. Fowdur found that Mr. O'Brien and Ms. Peet significantly overstated state hospital costs, and significantly understated the cost of community-based services. (Tr. at 1742). Given those findings, Dr. Fowdur's "bottom line opinion in this case is that because of the differences in patient population, I don't think a comparison of averages is, in and of itself, in any way adequate or reliable. But if Your Honor were to agree that an averages comparison is valid, then what I have shown … is that some very simple corrections to the methodological flaws in Mr. O'Brien's and Ms. Peet's analyses would bring those averages very much in line with each other, and they would not be as discrepant as Mr. O'Brien and Ms. Peet make them seem to be." (Tr. at 1742-43).

## X. *Olmstead* Is Not Boundless.

### A. No state has no unmet needs or no gaps.

There are gaps in North Carolina's mental health service delivery system. (Tr. at 478). There are unmet needs for adults with SMI in Alabama, North Carolina, and Illinois. (Tr. at 478, 888, and 1123-24). Dr. VanderZwaag and Dr. Bell-Shambley are not aware of any states that

have no unmet needs for adults with SMI.  (Tr. at 478 and 888).  "[N]o mental health system can provide services for everyone with every type of need."  (Tr. at 1198-1200; PX-366 at 4).

Daniel Byrne testified there are adults with SMI in Washington, D.C. who have unmet mental health needs, all states have unmet mental health needs for adults with SMI, and you cannot assess a state's mental health system based on whether there are adults with SMI who have unmet mental health needs.  (Tr. at 666).  When asked whether having no unmet needs for adults with SMI is a standard any state can meet, Ms. Burson testified, "I would not think that that would be."  (Tr. at 1124).

**B.      No state makes community-based services uniformly available.**

Ms. Peet is not aware of any state that has mental health services in sufficient quantity to ensure uniform geographic access throughout the state.  (Tr. at 1433).  Dr. Drake does not know what USDOJ means by "uniformly available" in this case, but he testified that "it's difficult to have the same quality of services across a state."  (Tr. at 226-28).  PACT is not currently available in every area of North Carolina.  (Tr. at 484).  There are rural areas in Alabama that are greatly in need of community-based services.  (Tr. at 895).

The ISMICC Report states that relatively few adults with SMI receive effective treatments (ECF 189-1, ¶ 303);[7] nearly a third (32.6%, 2.2 million adults) of those adults with SMI who get treatment receive medications only, with no psychosocial or psychotherapeutic services (ECF 189-1, ¶ 304); among adults with co-occurring SMI and substance use disorders, nearly two-thirds (63.2%) received mental health care, but only 14.3% received specialized substance use treatment (ECF 189-1, ¶ 305); effective treatment models for treating adults with SMI exist, but are not widely available (ECF 189-1, ¶ 306); states report annually on the implementation of select evidence-based practices (EBPs) in their systems (ECF 189-1, ¶ 306),

---

[7] ECF 189-1 is the parties' Trial Stipulations.

but the percentage of the population who have access to these EBPs remains low and varies widely across states, recognizing that not all EBPs are appropriate for all people with SMI (ECF 189-1, ¶ 308); and national data of the treatment gap – the difficulty of people accessing care – reveals that 50-90% of those in need of mental health treatment are not receiving services (ECF 189-1, ¶ 330).

ISMICC video clips were admitted into evidence as DX-362.  (Tr. 2437-38).  Paolo del Vecchio, the Director of the Center for Mental Health Services at SAMHSA, stated that most individuals who receive public mental health services across the nation do not receive EBPs, for only 1-2% of adults with SMI received EBPs, such as family psychoeducation, assertive community treatment, and supported employment.  (DX-362, ISMICC Meeting Part 3, 01:13-01:22 and 01:30-01:44).

**C.      USDOJ's standards for *Olmstead* compliance are arbitrary.**

In July 2011, the United States issued a Findings Letter to North Carolina, alleging that North Carolina's adult care homes violated the ADA.  (DX-265 Tr. at 491-92).  The United States and North Carolina entered into a settlement agreement in August 2012.  (DX-269 at ¶ 1; Tr. at 293).  In October 2017, the United States and North Carolina entered into a Modification of Settlement Agreement (Modification).  (DX-269).

The Modification requires North Carolina to provide housing to at least 3,000 individuals by July 1, 2021.  (DX-269 at ¶ 5.i.; Tr. at 493).  Melodie Peet testified Mississippi should have 2,600 housing slots.  (Tr. at 1461).  The Modification also requires North Carolina to provide supported employment services to 2,500 individuals by 2021.  (DX-269 at ¶ 6).  The United States suggests that Mississippi should provide supported employment services to 1,266 individuals.  (Tr. at 1543).

According to the United States Census Bureau, as of July 1, 2018, North Carolina's population was 10,383,620,[8] and Mississippi's population was 2,986,530.[9]  In summary, the United States believes North Carolina and Mississippi should offer housing slots and supported employment as follows:

| State | Population | Housing Slots | Individuals receiving Supported Employment |
|---|---|---|---|
| North Carolina | 10,383,620 | 3,000 | 2,500 |
| Mississippi | 2,986,530 | 2,600 | 1,266 |

## XI.    Mississippi Has Expanded Community-Based Services At A Reasonable Pace.

### A.    Mississippi's expansion of community-based services.

Ted Lutterman was accepted as an expert in policy analysis regarding the financing and organization of state mental health systems.  (Tr. at 1493).  Mr. Lutterman reviewed various national public data sets to look at how Mississippi compares both nationwide and to similar states in the southern region.  (Tr. at 1494-95).  In this regard, Mr. Lutterman compared Mississippi to other non-Medicaid expansion states, and the following southern states:  Alabama, Arkansas, Florida, Georgia, Louisiana, South Carolina, Tennessee, and Texas.  (Tr. at 1496).  In short, Mr. Lutterman found that community-based services have increased, and institutional care has decreased.

Consumer Satisfaction.  "For 2017, Mississippi led the region in terms of mental health consumer assessments of access to services, quality and appropriateness of services, satisfaction and functioning.  Mississippi only fell below the national average in two domains:  health outcomes related to treatment, and participation in treatment planning.  The state's results were higher than the average for the region in all domains."  (DX-302 at 13 and Table 2; Tr. at 1505).

---

[8] https://www.census.gov/quickfacts/fact/table/NC/PST045218
[9] https://www.census.gov/quickfacts/fact/table/MS/PST045218

Community Mental Health Expenditures.  From FY 2006-2015, Mississippi increased expenditures on community services faster than other southern states and the U.S. as a whole. (DX-302 at 14 and Figure 4; Tr. at 1508-09).  Mississippi's total expenditures on community services have also steadily increased over time, with spending on community services surpassing spending on state hospital in 2008.  Mississippi nearly doubled its spending on community services between 2001 to 2015, increasing its spending by 98%.  Only one state in the southern region – Georgia – surpassed Mississippi's rate.  During this same period, Mississippi decreased its spending on state hospitals.  (DX-302 at 14-15 and Figure 5; Tr. at 1509-10).

"When accounting for population size, Mississippi spent the most per capita on community services of the southern states in FY 15, at $64.30 per capita.  Although this is less than the average of $100.83 per capita across the U.S., Mississippi spends the second most of any southern state per capita, exceeding the average of $41.00 per capita in the southern region by $23.30."  (DX-302 at 15-16 and Figures 7 and 8; Tr. 1511-12).

Community Utilization.  The community utilization rate shows how many people, per 1,000 of a state's population, receive state-funded mental health services in the community. Since 2003, Mississippi's community utilization rate has consistently exceeded both the regional and national averages.  (DX-302 at 17-18 and Figure 9; Tr. 1512).

PACT.  The percentage of individuals in Mississippi receiving PACT is below the national and southern averages, but Mississippi is steadily increasing the number of individuals that receive PACT, and is ensuring that the PACT services individuals receive are to fidelity. (DX-302 at 18 and Figures 10 and 11; Tr. 1512-14).

Supported Housing.  "Although Mississippi's rate of Supported Housing services is less than the national and regional rates, the state's low level of adults experiencing homelessness or living in shelters suggests there are enough supports to keep individuals residing in private

43

residences.   The state also expects to continue serving more individuals in the CHOICE supported housing program, and has steadily increased the number of individuals it serves each year it has been available."  (DX-302 at 20 and Figure 12; Tr. at 1514-15).

Supported Employment.  The percentage of individuals receiving supported employment in Mississippi is less then regional and national rates, but Mississippi has more than doubled the number of individuals receiving the service between 2017 and 2018.  (DX-302 at 21 and Figures 13 and 14; Tr. at 1515).

Peer Support.  34 states have a program that does training to certify peer support specialists so they can bill Medicaid for services.  Mississippi is 1 of the 34 states and 1 of the 7 southern states that has a program to certify peer support specialists.  Mississippi began certifying peer support specialists in FY 2013.  In FY 2018, Mississippi certified 230 certified peer support specialists.  (DX-302 at 23 and Figure at 23; Tr. 1516-17).

State Hospital Expenditures.  As a proportion of its overall budget, Mississippi has steadily decreased funding to its states hospitals since FY 2007.  While above the national average, Mississippi's allocation of 37% funding is in line with how other southern states allocate their funds.  Mississippi has made major progress in moving towards community services.  (DX-302 at 25 and Figure 15; Tr. 1517-18).

State Hospital Utilization Rate.  Mississippi's state hospital utilization rate is higher than the national and regional rates, but Mississippi's rate has fallen nearly 50% since 2008, and it has showed a larger decrease than the regional and nation averages.  (DX-302 at 25 and Figure 16; Tr. at 1518 and 1561-62).

State Hospital Residents.  Mississippi's rate of state hospitals residents at the start of the year is higher than the national average, but had declined steadily since 2014, and has consistently been less than the regional average.  (DX3-20 at 26 and Figure 17).

Length of Stay in State Hospitals.  With respect to how long individuals are in state hospitals, Mississippi is using its state hospitals for much shorter lengths of stays.  The median length of stay (LOS) for individuals in Mississippi's state hospitals is shorter than most states. Mississippi has the second lowest LOS among the southern states, and the twelfth lowest LOS in the U.S.  (DX-302 at and Figure 18; Tr. at 1519).

"For residents who are discharged during the year that had an LOS greater than one year Mississippi's median LOS was 526 days in 2017, giving Mississippi the eighth lowest LOS for this population in the U.S. (ranging from 417 days in Minnesota to 2,730 days in Washington, D.C.).  Among the southern states, Mississippi has the second shortest LOS for adults discharged during the year with a LOS greater than one year (ranging from 506 days in Arkansas, to 1,852 days in South Carolina)."  (DX-302 at 27 and Figure 19; Tr. at 1519-20).

Readmission Rates to State Hospitals.  With respect to how many individuals who are discharged from a state hospital are readmitted within 30 days, Mississippi has a much lower readmission rate within 30 days of discharge than other southern states or the U.S. average. Mississippi's 30-day readmission rate is 2.0%, the regional average is 5.8%, and the national average is 7.5%.  In 2017, Mississippi ranked tenth nationally in terms of the fewest 30-day readmissions, and second in the region.  (DX-302 at 28 and Figure 20; Tr. at 1520).

Similarly to the 30-day readmission rate, Mississippi also does well regarding the 180-day readmissions rate.  Mississippi's 180-day readmission rate of 6.3% is less than the national average of 15.7% and less than the regional average of 12.6%.  In 2017, Mississippi ranked seventh nationally in terms of fewest 180-day readmissions, and second in the region.  (DX-302 at 28-29 and Figure 21; Tr. 1520-21).

When individuals are discharged from Mississippi's state hospitals, a higher percentage of them remain in the community for the next 30 days and the next 6 months than the regional

and national average.  (Tr. 1521).  This dispels the CRT's opinion that the Patients cycled through Mississippi's state hospitals at inflated rates.

Summary of Mr. Lutterman's Opinions.  Based on his review of the data, Mr. Lutterman concluded:  "Mississippi is working hard to move in the direction that advocates and SAMHSA and places are pushing states to do.  So they've almost doubled their community health expenditures in the last decade.  They are serving more people in the community than most southern states.  They've been reducing  their use of state hospitals.  They are doing a very good job in terms of low homelessness."  (Tr. at 1522).  But Mississippi is below regional and national averages  for  supported  employment,  supported  housing  and  PACT,  although  Mississippi's numbers are increasing for those services.  (Tr. at 1522; DX-302 at 18-21).  "And as the federal ISMICC  report  showed,  it's  a  problem  across  the  country  in  getting  those  types  of  services available  for  everybody  who  needs  them."   (Tr.  at  1522).   In  terms  of  transitioning  from institutional care to community-based care, Mississippi got a later start than many other states, but Mississippi has "been continuing to move funds from the hospital into the community, [and] overall, more new dollars have gone into the community, so Mississippi's increased their overall spending for mental health."  (Tr. at 1562).

**B.      The pace of change of the federal government, other states, and under consent decrees.**

The federal mental health system changes very slowly.  14 years elapsed between the issuance of the New Freedom Commission's final report in 2003 and the issuance of the ISMICC Report in 2017 without many of the recommendations of the Commission being implemented or fully realized.  (ECF 189-1, ¶ 297).

As shown by the experience of other states, the pace of moving a public mental health system from institutional to community-based care is a slow process, and even states under consent decrees have not moved faster than Mississippi.  Dr. Drake testified that all states have

shifted to community-based services "to different degrees" because "they have their own budgets and legislatures and everything, have developed community-based services at different paces and in different ways." (Tr. at 118).

Massachusetts began introducing community-based services in 1978. (Tr. at 1026). Twenty-one years later, in 2009, Massachusetts was still expanding community-based services. (Tr. at 1027). Dr. Baldwin testified, "[i]t was a continuous process of fine-tuning services, building new services, improving on old ones." (Tr. at 1027).

When Ms. Peet left her position as Commissioner in Maine in 2000, Maine did not have all of the "key services" in all of its regions. (Tr. at 1432). In particular, Maine had no PACT teams during Ms. Peet's five-year tenure as Commissioner. (Tr. at 1433). A consent decree regarding Maine's state hospital has been in effect for at least twenty-four years. (Tr. at 1317-19). When Ms. Peet was Commissioner in Maine from 1995-2000, Maine had two state hospitals. (Tr. at 1448). Nineteen years later, Maine still has those same two state hospitals. (Tr. at 1448).

Illinois began rebalancing its mental health system from institutional care to community-based care in 1995. (Tr. at 1124). That rebalancing was on-going twenty-two years later when Ms. Burson left Illinois DMH in March 2017. (Tr. at 1124-25). When she worked in the Illinois DMH, Ms. Burson was involved with the *Williams* and *Colbert* class action lawsuits against Illinois. (Tr. at 1119). As a result of those class actions, Illinois was under consent decrees to move people out of nursing homes and into the community. (Tr. at 1120). The *Williams* consent decree was filed on September 29, 2010. (Tr. at 1121). Seven years later, when Ms. Burson left Illinois DMH in March 2017, the *Williams* consent decree was still in effect. (Tr. at 1121-22). Dr. Baldwin was an expert witness in *Amanda D. v. Hassan*, a lawsuit in New Hampshire involving the Glencliff Nursing Home, and New Hampshire's failure to provide sufficient

community-based services.  (Tr. at 1046).  Dr. Baldwin's involvement in that case started in 2012, the case is still on-going, and New Hampshire is still in the process of developing community-based services.  (Tr. at 1047).

## XII.   Fundamental Alteration Defense.

### A.   Mississippi's "Olmstead plan."

Diana Mikula testified that Mississippi's "Olmstead plan" is a collection of documents, which includes DMH's Strategic Plans (*see, e.g.*, JX-53 and JX-64 through JX-70), Annual Reports (*see, e.g.*, JX-8, JX-12, and JX-52), legislative budget office five-year plans (*see, e.g.,* JX-24), and Mississippi Access to Care Plans (*see, e.g.*, JX-4, JX-16, and JX-17).  (Tr. at 2316-17 and 2381-82).  Ms. Mikula explained the purpose of DMH's Strategic Plans is to be "a road map to help us transform our system.  It is a living, breathing document.  It does have changes, but it has goals and outcomes to help us move the system to a more community-based system of care."  (Tr. at 2317).

Steven Allen testified in his deposition that he had never seen an "Olmstead plan."  Mr. Allen had not seen an "Olmstead plan" because he had never been appointed to a committee that worked on an "Olmstead plan."  An "Olmstead plan" would be useless to Mr. Allen because DMH's strategic plan is sufficient to guide DMH's day-to-day operations.  (Tr. at 2025-26).  Since Mr. Allen became Deputy Executive Director in January 2017, he has easily backed this up.

### 1.   The shift of funds.

In 2018, DMH shifted $13.3 million from state hospitals to expand community-based services.[10]  (Tr. at 2033 and 2292-93).  $8 million was shifted to expand crisis services, $4 million for IDD services, $900,000 for Community Transition Homes, and $400,000 for

---

[10] DMH solicited the recommendations of the CMHCs in determining how to allocate the $8 million.  (Tr. at 204-35; JX-41 through JX-47).

48

competence restoration. (DX-12). The goal of the shift of funds is to reduce reliance on inpatient care by 10%. (Tr. at 2036). As of December 31, 2018, that goal had been met. (Tr. at 2036-37).

The shift of funds enabled Regions 1, 3, 7, 9, 11, 14 to receive CSU beds. (Tr. at 2037). DX-330 shows the number of CSU beds each Region added. (Tr. at 2037). The shift of funds enabled Regions 3, 4, 8, 9, 11, 14, and 15 to provide supported employment services. (Tr. at 2045-46; DX-5; DX-8).

The shift of funds enabled Region 4 to add a new PACT team in northeast Mississippi, which covers the counties of Tippah, Alcorn, Prentiss, and Tishomingo. (Tr. at 2038; DX-331). The shift of funds enabled DMH to fund a PACT team in Region 8. (Tr. at 2045). As of December 31, 2018, the Region 8 PACT team was not fully operational, but it was fully funded to begin operating. (Tr. at 2045).

The shift of funds enabled Regions 2, 6, 8, 10, 12, 13, and 15 "to have more boots on the ground to deal with people in a proactive way to try to deter commitment" – such as through adding crisis therapists and court liaisons. (Tr. at 2038-39).

The shift of funds enabled DMH to open 3 Community Transitions Homes (1 in Region 9 and 2 in Region 8). (Tr. at 2040). MSH has a Continued Treatment Unit for long-stay patients. (Tr. at 2040 and 2254-56). Many of those patients are very difficult to place in the community. (Tr. at 2040). The Community Transition Homes are placement option for those patients, and they are working very well. (Tr. at 2040-41 and 2259-60; JX-49 at 2-5). For instances, Person 79 was discharged to a Community Transition Home in Region 8 in May 2018, and Mr. Byrne found that was an appropriate placement for her. (Tr. at 659).

**2.     Other accomplishments since January 2017.**

DMH and the Mississippi Division of Medicaid entered into the Memorandum of Understanding (MOU) which is JX-48. (Tr. at 2042-44). The MOU became effective on July 1, 2018. (Tr. at 2044). Before the MOU became effective, a patient's Medicaid benefits were terminated when the patient was admitted to a state hospital. (Tr. at 2044). But under the MOU, when a patient is admitted to a state hospital, the patient's Medicaid benefits are suspended during the hospitalization and reinstated when the patient is discharged. (Tr. at 2044).

In 2018, DMH began planning for a Transition Work Group to standardize the discharge and transition process from state hospitals to CMHCs. (Tr. at 2046). The Transition Work Group met for the first time in February 2019, and is in the process of standardizing the discharge and transition process. (Tr. at 2046-47 and 2079).

As of July 2018, a patient in a state hospital cannot be discharged to homelessness or a homeless shelter without a referral first being made to DMH's Branch of Coordinated Care, which attempts to find a community placement for those patients. (Tr. at 2030-31). During the period of July 1 through December 31, 2018, 12 patients were discharged to a homeless shelter, but no patients were discharged to homelessness. (Tr. at 2030-31).

When an individual is committed to a state hospital and is waiting for a bed in jail, the state hospitals attempt to place the individual in a Crisis Stabilization Unit (CSU). (Tr. at 2032). If they are unable to do so, the individuals goes to the top of the waiting list, so they get the next available bed in a state hospital. (Tr. at 1703-04, 1934, 2032, 2263, and 2323). As of December 2018, the number of individuals waiting in jail for a state hospital bed ranged from 1 to 5 on any given day. (Tr. at 2032-33).

Moreover, Mississippi has done far more than make vague commitments regarding expansion of community-based services. When Ms. Burson left Illinois DMH in 2017, Illinois

was coming off a period where it did not have a budget for two years.  (Tr. at 1134-35).  As a result of Illinois going without a budget for two years, Illinois reduced spending on community-based services, but did not reduce spending on institutional care.  (Tr. at 1135-36).  This caused some community mental health providers to close.  (Tr. at 1135).  In FY 2017 and 2018, DMH took combined budget cuts of $28 million.  (Tr. at 2327).  Those budget cuts were absorbed by cutting spending on state hospitals (including by reducing the state hospital work force by 650 people) while maintaining spending on community-based services.  (Tr. at 2327-29).  When the Illinois DMH took budget cuts, it cut spending on community-based services and maintained spending on its state hospitals.  On the other hand, when Mississippi DMH took budget cuts, it cut spending on its state hospitals and maintained spending on community-based services.

### 3.    Mississippi's Strategic Plans are more than adequate, especially when compared to what other states have done.

The United States criticizes DMH's Strategic Plans for allegedly not having "specific, measurable targets."  (PX-407 at 25).  The Strategic Plans of two other states – Illinois and North Carolina – have been admitted into evidence.   Katherine Burson was involved in the development of the Illinois Mental Health Strategic Plan.  (Tr. at 1126).  DX-293 is the 2013-2018 Illinois Strategic Plan.  (Tr. at 1127).  Ms. Burson agrees that the Illinois Strategic Plan does not establish specific, measurable goals.  (Tr. at 1129; DX-293 at 17-23).  North Carolina's 2018 Strategic Plan is admitted into evidence as DX-276.   (Tr. at  490).   It contains no measurable goals whatsoever.  (DX-276 at 6-7).  In terms of providing specific, measurable goals, DMH's Strategic Plans are superior to the Strategic Plans of Illinois and North Carolina. *Compare* DMH's Strategic Plan, JX-53, *with* DX-293 and DX-276.

B.     **The cost of the CRT's recommendations constitute a fundamental alteration.**

1.     **Housing.**

Mr. O'Brien testified the annual cost of CHOICE housing is $8,100.93.  (Tr. at 1461; PX-409 at 14, ¶ 41).  Ms. Peet testified Mississippi should have 2,600 CHOICE housing slots, but it had 311 CHOICE housing slots in 2018, which is a difference of 2,289.[11]  (Tr. at 1461).  2,289 multiplied by $8,100 for each CHOICE housing unit is $18,540,900.  (Tr. at 1461-62).

2.     **PACT.**

The CRT collectively concluded that 66% of the Patients discharged from a Mississippi state hospital need PACT services.  (DX-320; ECF 189-1, ¶¶ 281-286).  Mississippi would have to add 11 new PACT teams to provide PACT services to 66% of the individuals discharged from state hospitals.  DMH provides a $600,000 annual grant to 8 of its PACT teams, and a $400,000 annual grant to 1 of its PACT teams.  The PACT teams could not survive without this funding.  (Tr. at 1648-49).  It would cost $4,400,000 annually to fund 11 new PACT teams if DMH provided a $400,000 annual grant to each of those new PACT teams.  It would cost $6,600,000 to fund 11 new PACT teams if DMH provided a $600,000 annual grant to each of them.  (Tr. at 1609-11; DDX-6).  As of December 31, 2018, DMH did not have funding to add 11 new PACT teams.  (Tr. at 1647).

3.     **Mobile Crisis Response Teams.**

The average amount of annual funding DMH provides for Mobile Crisis Response Teams is $300,000, with the lowest amount of $150,000 to Region 14, and the highest amount of $575,000 to Region 6.  (Tr. at 1611).

---

[11] In its closing statement, the United States suggested Mississippi should have 1,899 or 2,500 housing slots.  (PDX-61).  Thus, the United States has suggested three different numbers of housing slots for Mississippi – 1,899, 2,500, and 2,600 – which further shows the equivocal and arbitrary nature of the relief the United States is seeking here.

### 4.   Crisis Stabilization Units.

CSUs in Mississippi are 4-, 8-, or 16-bed units.  (Tr. at 1611-12).  DMH provides $800,000 annual funding to 4- and 8-bed units, and $1,400,000 annual funding for 16-bed units. (Tr. at 1612).

### C.   Costs not considered by Kevin O'Brien.

If the CRT recommended any services that are not one of the CPT Codes in Mr. O'Brien's Scenarios, and are not PSH or supported employment, then those services are not in Mr. O'Brien's cost comparison.  (Tr. at 1285-86).  The Table below summarizes the services recommended by the CRT which are not included in Mr. O'Brien's cost comparison or Mr. O'Brien does not know whether they are included:

| Service | Included in Mr. O'Brien's Cost Comparison |
|---|---|
| Trauma informed care | No |
| Respite care | Mr. O'Brien does not know |
| Procurement of adaptive devices | Mr. O'Brien does not know |
| Physical therapy | No |
| Occupational therapy | No |
| Dietician | Mr. O'Brien does not know |
| Nutritionist | Mr. O'Brien does not know |
| Dentist | No |
| 24-hour warm line | Mr. O'Brien does not know |
| Dementia care | Mr. O'Brien does not know |
| Grief counselor | Mr. O'Brien does not know |
| Day program | No |
| Intellectual or developmental disability services | No |
| Rehabilitative services | No |
| Neuropsychological testing, brain scans, MRIs, and comprehensive medical services | Possibly yes for the office visit, but no for the tests |
| Nursing facility care | No |
| Substance recovery services | No |
| Transitional income support | No |

*See* Tr. 1286-89.

Mr. O'Brien does not know whether any housing settings other than PSH which were recommended by the CRT are included in CHOICE housing.  (Tr. at 1290-91).  Jake Hutchins

identified the CRT housing that is not PSH/scattered-site. (Tr. at 1607-08; DX-328). The cost of housing other than CHOICE housing recommended by the CRT was not considered by O'Brien.

### D. The impact of workforce shortages.

The ISMICC Report states the following regarding mental health workforce shortages: Most counties in the United States face shortages of mental health professionals (ECF 189-1, ¶ 311); in 96% of the counties in the nation, there is a shortage of psychiatrists who prescribe medications for people with SMI (ECF 189-1, ¶ 312); from 2003 to 2013, the number of practicing psychiatrists decreased by 10% when adjusted for population size (ECF 189-1, ¶ 313); many psychiatrists are shifting to private practice, accepting only cash for reimbursement, which may reflect low reimbursement for psychiatric services from state Medicaid program and Medicaid-contracted managed care payers, cuts to federal and state funding for public sector programs, and inadequate rate setting for psychiatric services (ECF 189-1, ¶ 314); the greatest shortages of psychiatrists are in poor and more rural areas (ECF 189-1, ¶ 315); and in terms of availability of treatment and services for people with SMI the psychiatry shortage is particularly severe (ECF 189-1, ¶ 332).

Dr. VanderZwaag confirmed there are mental health workforce shortages in North Carolina, especially for psychiatrists in rural areas. (Tr. at 489). Ms. Burson testified that in most public mental health systems, turnover of staff is very high. (Tr. at 1128). Turnover of staff can be a problem in the mental health field because as you hire new people, you must equip them to do complicated work. (Tr. at 1128).

When Ms. Peet was the Commissioner in Maine, she faced shortages of mental health professionals. (Tr. at 1466). There were times when Maine had only one psychiatrist in the whole northern part of the state. (Tr. at 1466). At other times, there were no psychiatrists at all in the northern part of Maine. (Tr. at 1466). Mental health centers in Maine would recruit

literally for years trying to get advanced practice registered nurses and psychiatrist without success.  (Tr. at 1467).  In Ms. Peet's experience, the shortage of mental health professionals is greater in rural areas than in urban areas.  (Tr. at 1467).  Ms. Peet recognizes there are mental health workforce shortages in Mississippi.  (Tr. at 1467).  Ms. Peet testified that adding a PACT team to a rural area in Mississippi could face workforce challenges in staffing that PACT team. (Tr. at 1468).

Diana Mikula, Jake Hutchins, Dr. Marc Lewis, Dr. Roy Reeves, and James "Bo" Chastain all testified that Mississippi experiences mental health work shortages.  (Tr. at 1646, 1669-71, 1934, 2257-58, and 2319-20).  As Dr. Lewis summarized, "the greatest challenge in our state … is the availability of qualified workforce, and that's all areas of provision of care, from direct care staff who provide direct patient care, all the way up to your psychiatrist, nurse practitioner …. And it's, in essence, because of the rural nature of our state."  (Tr. at 1669-70). Recruiting and keeping mental health professionals is a challenge throughout Mississippi.  (Tr. at 1670-71).

Dr. Fowdur testified that, based of federal designations of health professional shortage areas, Mississippi needs an additional 366 psychiatrists in order to fully meet the needs of the population in Mississippi, and that it costs nearly $300,000 a year to hire each additional psychiatrist.  (Tr. at 1799-1800).  Dr. Fowdur further explained:  "So right now we have a shortage in terms of the pool of psychiatrists that exist to provide services.  These psychiatrists have already chosen where they want to work.  So a psychiatrist goes to Mississippi State Hospital … the psychiatrist has chosen to work in that environment.  So now we say to the psychiatrist, okay, we don't want you to work here anymore, we want you to go to the community and travel two hours a day to this rural place to visit this particular patient or another two hours a day to this visit this other patient, one, it's an inefficient use of the psychiatrist

resources, and two, you run the risk of losing that person to a for-profit or not-for-profit hospital where they feel they have a work environment more comparable to what they have now, without needing to meet the needs in the community that are less aligned with the work choices that they have already made." (Tr. at 1800).

     **E.**     **The IMD exclusion should be repealed.**

According to Ms. Peet, the Institutes for Mental Disease (IMD) exclusion, 42 U.S.C. § 1396d(a)(30)(b), "is a federal law that precluded Medicaid reimbursement for institutions of greater than 16 beds serving individuals from [ages] 21 to 65 when the mission of the entity was primarily psychiatric care. It was targeted primarily to state hospitals." (Tr. at 1330-31).

If the FMAP for Mississippi were applied to Mr. O'Brien's cost estimates for the state hospitals, then those cost estimates would be reduced by 74.63%. (Tr. at 1298). As Dr. Jeffrey Geller (*infra*, 60), explained, "Mississippi is spending a dollar for dollar cost in the state hospitals today. If the IMD exclusion was eliminated and Mississippi … could bill Medicaid, they would spend approximately 25 cents of the dollar. The other … 75 cents would come from the federal government, and that would give them that 75 cents to spend on services outside the hospital." (Tr. at 2414).

When Ms. Peet was the Commissioner in Maine, the IMD exclusion precluded the state hospitals in Maine from receiving Medicaid dollars for the treatment of adults with SMI. (Tr. at 1427). Ms. Peet admits if Maine would have received Medicaid dollars for those services, it could have applied or shifted those funds to community-based services. (Tr. at 1427).

The non-federal members of the ISMICC made the following recommendation regarding the repeal of the IMD exclusion: "Eliminate financing practices and policies that discriminate against behavioral health care. Identify and eliminate programs, practices, and policies that make it hard to deliver good mental health care. This includes ending the exclusion for

56

reimbursement of services to adults under age 65 in Institutions for Mental Diseases." (ECF 189-1, ¶ 344).

## XIII.   Baseline Is The United States' New And Begrudgingly Made Request For Relief.

### A.   Ms. Peet's baseline.

After years of litigation, the United States waited until it called its very last witness in this case, Melodie Peet, to disclose how much it thinks is enough to satisfy *Olmstead*. Ms. Peet was the Commissioner of the Maine Department of Mental Health (Commissioner) from 1995-2000, but she has not held a position with a state mental health authority that dealt with adults with SMI since 2000. (Tr. at 1317 and 1438). According to Ms. Peet, the "key services" that prevent state hospital admissions are Mobile Crisis, Crisis Stabilization, PACT and/or Intensive Case Management,[12] Peer Support, and Supported Employment, and Supported Housing. (PDX-32).

Ms. Peet believes the baseline amount for the "key services" in Mississippi is for each region to have is one PACT team[13] (Tr. at 1389), one Mobile Crisis Response Team (Tr. at 1389-90), supported employment services (Tr. at 1391), and the peer support function[14] (Tr. at 1391-92). In addition, Ms. Peet believes Mississippi should have 2,600 CHOICE housing slots. (Tr. at 1390-91).

### B.   If the job is now baseline, Mississippi is close to finishing that job.

Jake Hutchins, the Bureau Director of Behavioral Health at DMH, testified regarding which Regions have the "key services." Since 2014, all Regions have had a Mobile Crisis

---

[12] Ms. Peet clarified that PDX-32 should say PACT and/or Intensive Case Management. (Tr. at 1434-35).

[13] Ms. Peet testified a state can have either PACT or Intensive Case Management. (Tr. at 1434-35).

[14] Ms. Peet explained, "The peer support service is confusing I think in the way we refer to it because it's not a program per se; it's a cluster of individuals who can be deployed to be part of every single service that we deliver. So in that case, I would just say that it would be important to ensure that each region really understood the importance of the peer support function and had access to sufficient numbers of peer support workers that they could be attached to existing programs." (Tr. at 1392).

Response Team.  (Tr. at 1580 and 1650).  As of December 31, 2018, Mississippi had 9 PACT teams – one each in Regions 3, 6, 9, 10, 12, 13/14, and 15, and two in Region 4.  (Tr. at 1581; DX-331).  Peer support specialists are employed at CMHCs in all Regions, on PACT and Mobile Crisis teams, in outpatient and residential settings, and at all state hospitals.  (Tr. at 1589-90and 1963).  DMH offers housing for adults with SMI through the CHOICE housing program.  (Tr. at 1593-94).

In September 2018, Regions 3, 4, 8, 9, 11, 14, and 15 applied for supported employment programs, and funding was awarded.  (Tr. at 1596).  As of December 31, 2018, all Regions had been awarded supported employment grants, except for Regions 1, 6, and 13.  (Tr. at 1594-95).

As of December 31, 2018, all Regions had a Crisis Stabilization Unit (CSU), except for Regions 11 and 15.  (Tr. at 1598).  Region 4 operates two CSUs – one is in Corinth and the other is in Batesville.  (Tr. at 1601).  Region 6 also operates two CSUs – one in Cleveland and one in Grenada.  (Tr. at 1601).  In July 2018, Region 11 was awarded an $800,000 for a CSU, but has not been able to find an appropriate facility to operate a CSU.  (Tr. at 1598).  Region 15 does not have a CSU because Region 15 has an agreement with Region 6, which enables individuals living in Region 15 to receive CSU services.  (Tr. at 1600-01).

Through FY 2018, Mississippi appropriated $5.3 million for CHOICE.  (JX-51 at 1). Through FY 2018, 345 individuals had been housed through the CHOICE program (JX-51 at 2-3), and CHOICE recipients have located in 60 different communities.  (JX-51 at 10). Approximately 30% of MUTEH's clients receive PACT services, and another 20% receive AOT. (Tr. at 707).  MUETH receives about $1.5 million in annual funding from the state of Mississippi.  (Tr. at 708).

Crisis Intervention Teams (CIT) are partnerships between local law enforcement agencies and a variety of programs, including CMHCs, advocacy groups, and behavioral health

professionals. (JX-52 at 14). Mississippi has CIT in East Mississippi, DeSoto, Lee County, Tupelo, Pike County, and Hinds County. (Tr. at 1602-03). In addition, as of December 2018 approximately 495 police officers had received CIT training in Mississippi. (Tr. at 1602). DMH provides an annual grant of $300,000 for CIT training. (Tr. at 1603).

DMH's Bureau of Alcohol and Drugs offers primary residential treatment (substance use treatment for less than 30 days), transitional residential treatment (substance use treatment for over 30 days to 90 days or more), regular and intensive outpatient services, prevention, and medication-assisted treatment. (Tr. at 1603-04). Those services are offered in all 14 Regions. (Tr. at 1604).

DDX-11 summarizes the status to the key community-based services in Mississippi by Region as of December 31, 2018. (Tr. at 2332). The key services are Mobile Crisis Response Teams, CSUs, PACT, Intensive Case Management (ICM), peer support, and supported employment (DDX-11). All of the key services which are highlighted in yellow on DDX-11 did not exist before January 1, 2014. (Tr. at 2336-37). But as of December 31, 2018, every key service was fully operational or fully funded and pending in every Region, except for a CSU in Region 15, a PACT team in Regions 1, 2, 7, 11, and 14, and supported employment in Regions 1, 6, and 13. (Tr. at 2332-34; DDX-11).[15]

It would take two years to implement a CSU in Region 15, a PACT team in Regions 1, 2, 7, 11, and 14, and supported employment in Regions 1, 6, and 13, and 3 additional years to build capacity for those services. (Tr. at 2335-36). It would cost $3 million annually to fund those additional services. (Tr. at 2336).

---

[15] To the extent the United States alleges that Mississippi has only expanded community-based services in about the last year, it is incorrect. That Mississippi has been expanding community-based services for years is evidenced by the timelines Mississippi introduced at trial – i.e., DDX-4 (PACT timeline) (Tr. at 1583-88), DDX-5 (Supported Employment timeline) (Tr. at 1594-97), and DDX-12 (global timeline) (Tr. at 2504).

## XIV.  Dr. Jeffrey Geller Put Mississippi's Mental Health System In Context, And Showed It Is Comparable to Other States.

### A.    Dr. Geller's qualifications.

Dr. Jeffrey Geller is a psychiatrist who was retained by Mississippi.  (Tr. at 2391).  Dr. Geller's mental health credentials are extensive; they are summarized in his curriculum vitae, which is DX-304.  (Tr. at 2391-99).  Dr. Geller was accepted as an expert in the fields of psychiatry, public mental health, SMI, and community-based mental health assessments.  (Tr. at 2399).  Dr. Geller's report is admitted into evidence as DX-303.[16]  (Tr. at 2394).

### B.    Dr. Geller's assessment of Mississippi's state hospitals.

Dr. Geller conducted sited visits of and interviewed individuals at MSH, NMSH, EMSH, SMSH, and CMRC.  (Tr. at 2401-02).  Dr. Geller testified, "[b]ased on my experience visiting, as I've said, I've been in 26 states, and that's probably at least 100 state hospitals, I thought these Mississippi state hospitals were well within the modal operation of state hospitals in the United States."  (Tr. at 2404).

### C.    Mississippi in context.

Dr. Geller reviewed data to put the State of Mississippi in context.  (DX-303 at 7-9).  He did so because "[s]ervices for individuals with [SMI] don't exist in a vacuum.  They … exists in the context of the place where an individual lives ….  So the fact that Mississippi is the poorest state in the United States, it actually ranks number 51, including the District of Columbia, is relevant to what psychiatric services may or may not be able to be delivered ….  [H]ealth disparities and health in general are related to income level or poverty.  So the fact that Mississippi … is a very poor state is going to have direct access to illnesses people have, the

---

[16] As part of his review of Mississippi's public mental health system, Dr. Geller reviewed the medical records of a random sample of one-third of 154 Patients in the CRT's survey.  (Tr. at 2400-01; DX-303 at 2-3 and 31-177).  Dr. Geller reviewed the documents listed on pages 3 and 178-181 of his report, DX-303.  (Tr. at 2401).

degree of those illnesses and their access to health care in general." (Tr. at 2405-06). These are the risk factors. (Tr. at 2406).

Dr. Geller also put Mississippi's mental illness and psychiatric services in context. (Dx-303 at 9-11). He did so to determine whether the risk factors play out in what you actually find. (Tr. at 2406). Dr. Geller found "the prevalence of the mental illness is higher in Mississippi than most other states, and it's particularly high in the elderly, that Mississippi had one of the lowest rates of providers per capita of any state. This means that if you put in the funds, you still might not get the services because you don't have the people to provide the services …" (Tr. at 2407).[17]

Putting Mississippi in context led Dr. Geller to find "the Justice Department is asking Mississippi to achieve a standard of care that no state that I'm familiar with has ever achieved. To ask the state with the lowest per capita income to achieve things that states with the highest per capita income have never achieved doesn't make much sense. I listed the ten states with the highest per capita income, and I've had direct involvement with nine of those ten states, and I can tell you that the parameters being set for Mississippi are not met in any of those states." (Tr. at 2407-08; DX-303 at 17).

### D.     Cost comparisons.

Dr. Geller testified there is no evidence that the total costs of treating an individual in a state hospital is more expensive than the total cost of treating an individual in the community. (Tr. at 2409; DX-303 at 14). The state hospital and the community have about the same costs in absolute dollars. (Tr. at 2410).

---

[17] Ms. Peet agrees that "population characteristics, including the prevalence of mental disorders, availability or lack of social supports, and barriers of race of poverty vary by locale." (Tr. at 1460).

### E.    Acuity differences.

Community-based settings and what they provide are not the same as what a state hospital provides.  (DX-303 at 16).  Dr Geller testified, "the services that a state hospital can provide in terms of security and safety are obviously different than what can be provided in the community.  But more importantly, in terms of the well-being of individuals, the assessment of an individual in trying to determine a diagnosis so that you can understand what you might do for the individual is very different."  (Tr. at 2411-12).

Dr. Geller further observed that, "[i]n most instances, at the time of admission to a state hospital, that person at that time is not similar to all other people with [SMI] in the community." (DX-303 at 29; Tr. at 2416).  Dr. Geller explained "[w]e don't admit people to state hospitals, and we haven't for a very long time just because they are psychotic.  We admit people on the basis of their behaviors that may be driven by psychotic thinking.  At the time somebody presents in a crisis, they are not at their own baseline.  Otherwise, they wouldn't be in crisis.  And they're not similar to all other people with [SMI] in the community who are also not in crisis.  So they are a distinctly different population at that point in time."  (Tr. at 2416-17).

### F.    Even states with the most robust community-based services, make regular use of the state hospital.

Dr. Geller discussed his personal experience in western Massachusetts:  "In the 1980, we created a lot of the services that have been talked about in this case because they didn't exist.  We had the best funded community system in the United States by orders of magnitude.  Despite that, we had regular use of the state hospital.  We had repeated admissions, and the services that were provided allowed them to return to the community while the services in the community couldn't keep them safely in the community."  (Tr. at 2412-13).

PD.26516595.1

G.      **The best interest of the patient is not always the community.**

"USDOJ set out a core belief that is not subscribed to in any field of medicine, and not subscribed to by almost everyone who provides care and treatment to persons with mental illness.  That belief is that because one ***could*** be treated outside a hospital, one ***should*** be treated outside a hospital.  Almost all childbirths, for example, could take place outside of [a] hospital, but few believe that because mothers could deliver at home all women should deliver at home. There is recognition of the added benefits of a hospital.  The same holds true for person with mental illness."  DX-303 at 30; Tr. at 2417-18).

H.      **The United States' complaints about Mississippi apply to all other states.**

A number of things the United States criticizes Mississippi for can be said about every state.  (DX-303 at 28-29; Tr. at 2415-16).  Dr. Geller found that significant because it shows that the United States "is asking Mississippi to do something that no other state has ever accomplished, and I don't see how that establishes what is reasonable or expectable."  (Tr. at 2416).

## CONCLUSIONS OF LAW

I.      **Title II of the ADA And *Olmstead*.**

A.      **Title II and its implementing regulations.**

The United States sued the State of Mississippi under a single cause of action:  Alleged violations of Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12131-12134, as interpreted by *Olmstead v. L.C.*, 527 U.S. 581 (1999).  Congress instructed the United States Attorney General to issue regulations implementing Title II.  *Id*. at 591.  Under the integration regulation, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  *Id*. at 592, *citing* 28 CFR § 35.130(d) (1998).  Under the reasonable modifications regulation, "[a] public

PD.26516595.1

entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id*., *citing* 28 CFR § 35.130(b)(7) (1998).

The *Olmstead* Court cited these regulations "with the caveat that we do not here determine their validity." *Olmstead*, 527 U.S. at 592. *Auer* deference is deferring to an agency's reasonable interpretation of ambiguous regulations. The Supreme Court recently decided not to overrule *Auer* deference completely, but held whether to apply it depends on a range of considerations. *Kisor v. Wilkie*, No. 18-15, 2019 U.S.LEXIS 4397, at *9, 139 S. Ct. 2400 (2019). *Auer* deference can only apply "if a regulation is genuinely ambiguous." *Id*. at *23. If a genuine ambiguity does exist and the agency's interpretation is reasonable, *Auer* deference may still not be applicable. Therefore, the court should perform an "independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id*. at *27. *Auer* deference is unwarranted when "an interpretation does not reflect an agency's authoritative, expertise-based, fair or considered judgment." *Id.*

**B.    *Olmstead's* holding.**

*Olmstead* held as follows: "Unjustified isolation, we hold, is properly regarded as discrimination based on disability. But we recognize, as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand. Accordingly, we further hold that the Court of Appeals' remand instruction was unduly restrictive. In evaluating a State's fundamental-alteration defense, the District Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but

also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably." *Olmstead*, 527 U.S. at 597.

## II.   No Discrimination By Mississippi And At Risk Of Serious Institutionalization Not Applicable Here.

### A.   No unnecessary institutionalization.

The United States cannot identify, let alone prove, any discrimination by Mississippi. Only "unnecessary" placements in a state hospital are discriminatory. *Olmstead*, 527 U.S. at 596-97.   But the United States has not shown that any individual was unnecessarily institutionalized in a Mississippi state hospital as of the fact cut-off date of December 31, 2018. (*Supra* at 15).   The measuring date for any alleged violation of the ADA should be the fact cut-off date of December 31, 2018.   The only relief sought by the United States is injunctive relief. The purpose of injunctive relief is not to punish for past violations, but to prevent future violations.   *BCOWW Holdings, LLC v. Collins*, 2017 U.S. Dist. LEXIS 142618 at *6 (W.D. Tex. Sept. 5, 2017) (citation omitted).   To pursue an injunction, the plaintiff must allege a likelihood of future violations, not simply future effects from alleged past violations.   *Id.* at *6 (citation omitted).

### B.   No other discrimination by Mississippi.

The United States alleges the ADA prohibits discrimination because it provides that no qualified individuals with a disability shall, by reason of such disability, be excluded from participation in – or be denied the benefits of – the services, programs, or activities of a public entity.[18]   That is true, but the United States has not shown that Mississippi excluded any disabled individuals from participation in, or denied them the benefits of the services, programs, or activities.   There are no individual plaintiffs in this case, and the 154 Patients in the CRT's survey are not a proxy for a class action, as no class has been certified.

---

[18] ECF 209, United States' Pretrial Brief at 3.

The United States' default position for attempting to avoid that it cannot show discrimination is to allege that Mississippi has an existing array of community-based services, and a state may violate Title II when it does not "sufficiently" expand its existing services.[19]   In other words, the United States claims Mississippi discriminates by allegedly not having enough community-based services.

The United States cites *Radaszewski v. Maram*, 383 F.3d 599, 609 (7th Cir. 2004), to support its claim,[20] but a careful reading of *Radaszewski* shows it does not support the United States' claim. *Radaszewski* found that, "post-*Olmstead*, courts have recognized that a State may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting."  *Id*. (citations omitted). This occurs when, for example, a state caps the number of drug prescriptions it will fund through Medicaid for participants in community-based care programs, but not for persons who live in nursing homes.  *Id*.  The United States does not allege that Mississippi engaged in any such conduct.  The United States is essentially alleging that not having the "key services" available in every Region is discrimination, but we have found no case which holds that (allegedly) not having sufficient community-based services is tantamount to the denial of a service.

"States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide."  *Olmstead*, 527 U.S. at 603 n. 14.  The United States produced no evidence that Mississippi has engaged in discrimination with regard to the community-based services it in fact provides.  Allegedly not having enough PACT teams, for example, is not discrimination with regard to the community-based services Mississippi in fact provides.

---

[19] ECF 209, United States' Pretrial Brief at 5, 23-24, and 31.
[20] ECF 209, United States' Pretrial Brief at 5.

### C.     At risk of serious institutionalization not applicable here.

Because the United States cannot prove unnecessary institutionalization, its case is exclusively an at risk of serious institutionalization case.  The United States alleges "[t]he protections of Title II, as affirmed in *Olmstead*, apply not only to people with disabilities in institutions, but also to people with disabilities who are at serious risk of institutional placement."[21]  But *Olmstead* is an unnecessary institutionalization case only.  It says nothing about at serious risk of institutionalization.  The United States actually relies instead on the *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher* cases discussed below to incorrectly claim that at serious risk of institutionalization applies to this case.[22]

*Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016), involved plaintiffs in Indiana who are developmentally disabled.  *Id*. at 906.  Indiana runs 3 Medicaid waiver programs:  A&D waiver, CIH waiver, and FS waiver.  *Id*.  The A&D waiver has no cap on services, but the FS waiver has a $16,545 annual cap on services.  *Id*.  Indiana enacted a policy change which moved the plaintiffs from the A&D waiver to the FS Waiver.  *Id*.  The plaintiffs alleged the policy change placed them at serious risk of institutionalization, and the Seventh Circuit agreed.  *Id*.  at 913.  Mississippi has not enacted any policy change to its Medicaid program or otherwise which even allegedly places any individuals at serious risk of institutionalization, so *Steimel* is not on point.

*Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016), involved a class action of individuals in New York.  *Id*. at 237.  Until 2011, New York's Medicaid program provided orthopedic footwear and

---

[21] ECF 209, United States' Pretrial Brief at 4.

[22] In *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher*, the notion of "at serious risk of institution" is often based on a statement of interest USDOJ filed in the case, or the "Statement of the Department of Justice on Enforcement of the Integration Mandate of the Americans with Disabilities Act and *Olmstead v. L.C.*" (ECF 208-3).  These "statements" of USDOJ are entitled to receive only *Skidmore* deference.  *Freeman v. Quicken Loans, Inc.¸* 626 F.3d 799, 626 F.3d 799, 805 (5th Cir. 2010) (an agency's interpretation that lacks the force of law receives *Skidmore* deference).  Under *Skidmore* deference, the weight afforded to an agency's informal interpretation "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those facts which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

compression stockings to all beneficiaries for whom such services were medically necessary. *Id*. at 240. New York was facing a fiscal crisis, so it amended its Medicaid plan to limit coverage for both orthopedic footwear and compression stockings. *Id*. The amendments caused the plaintiffs to lose funding for their orthopedic footwear and compression stockings. *Id*. at 242. The plaintiffs alleged the amendments placed them at serious risk of institutionalization, and the Second Circuit agreed. *Id*. at 261. The United States has not even alleged that Mississippi has amended its Medicaid plan to restrict coverage of home health services, so *Davis* is not on point.

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013), involved 13 plaintiffs who lost access to in-home personal care services when North Carolina made a statutory change which imposed stricter eligibility requirements for such services. *Id*. at 313. The Fourth Circuit affirmed the district court's conclusion that the statutory change placed the 13 plaintiffs at serious risk of institutionalization "as long as the record supports this conclusion." *Id*. at 322. Mississippi has not enacted any statutory change that imposed stricter eligibility requirements for any mental health services, so *Pashby* is not on point.

*M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012), involved a class action of plaintiffs in the State of Washington. *Id*. at 720. Washington's Department of Social and Health Services adopted a regulation that reduced the amount of in-home personal care services under Washington's Medicaid plan. *Id*. The plaintiffs alleged the reduction in hours violated the ADA because it substantially increased the risk that they would have to be institutionalized to receive adequate care. *Id*. The Ninth Circuit found that the elimination of services can be a violation of the ADA if it creates a risk of unnecessary institutionalization. *Id*. 734-35. The United States has not alleged that Mississippi has eliminated any services which has created a serious risk of institutionalization, so *Dreyfus* is not on point.

PD.26516595.1

*Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003), involved 3 plaintiffs who alleged Oklahoma's decision to limit prescription medications for participants in the waiver program to five per month would force them out of their communities and into nursing homes. *Id.* at 1177-78. The Tenth Circuit found that individuals "who, by reason of a change in state policy, stand imperiled with segregation, may bring a challenge to that state policy under the ADA's integration regulation without first submitting to institutionalization." *Id.* at 1182. The United States has not alleged that any change in Mississippi's policies has created a serious risk of institutionalization, so *Fisher* is not on point.

*Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher* are distinguishable for five reasons. First, there are no individual plaintiffs in this case, nor is this case a class action, so there is no one the Court can grant individualized relief to who allegedly is at serious risk of institutionalization.

Second, the CRT did not cite their opinions that the Patients are at serious risk of institutionalization to any reasonable degree of probability, so those opinions are entitled to no weight. (*Supra* at 7-9).

Third, the data does not support the United States' at serious risk of institutionalization claim. 83% of the Patients the CRT found be at serious risk of institutionalization had lived in the community for a year or more at the time the CRT completed its survey. (*Supra* at 16). *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 2019 U.S. Dist. LEXIS 45703 at *19 (E.D. Mich. March 20, 2019) (plaintiffs cannot establish they are at serious risk of institutionalization in the traditional sense because they have lived in the community for 3 years).

Fourth, *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher* all involved a change to a specific state policy or statute – such as limiting prescription medications or reducing the amount of in-home personal care services – that placed one or more individuals, or a class of them, at serious risk of institutionalization. In this case, the United States has not identified any change to a

69

specific state policy in Mississippi that allegedly places one or more individuals at serious risk of institutionalization.  The United States has vaguely alleged that Mississippi does not provide sufficient community-based services.  No legal basis exists for applying "at serious risk of institutionalization" to a case such as this that has no individual plaintiffs and is not a class action, and where no change to a specific state policy or statute is at issue.

Fifth, *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher* focus on changes to one program which reduced services and whether that program should have been continued in the same manner as it was administered before the change. Here, the United States does not allege Mississippi closed or reduced a program that had the effect of reducing services.  Rather, the United States incorrectly alleges Mississippi has yet to build a system that eliminates all service gaps.[23]  That was not the issue in *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher*, so what those cases say about at risk of institutionalization does not apply here.  Moreover, unlike *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher*, the United States in this case makes a system-wide challenge in which the overall pace of change and improvement across the entire spectrum of mental health services are relevant.  In *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher* there was no consideration of the "reasonable pace" of change in order to protect patients' safety as there is when talking about the pace of expansion or deinstitutionalization at issue here.  In *Steimel*, *Davis*, *Pashby*, *Dreyfus*, and *Fisher*, there was no need to account for the time, expertise, and cost of dramatically expanding programs, but all those factors must be considered in this case.

## III.    The United States Cannot Satisfy Its Burden Of Proof.

The United States has the burden to prove:  (i) Mississippi's treatment professionals have determined that community placement is appropriate, (ii) the transfer from institutional care to a less restrictive setting is not opposed by the patient, and (iii) the placement can be reasonably

---

[23] As shown *supra* at 39-40, the Court should reject any standard based on "no unmet needs" or "no gaps" or "uniformly available" because no state has or can meet those standards.

accommodated, taking into account the resources available to Mississippi and the needs of others with mental disabilities (such as those in state hospitals). *Olmstead,* 527 U.S. at 587.

The United States did not satisfy the first element of its proof. The United States presented no evidence of any instance where a Mississippi treatment professional determined that a patient was appropriate for community placement and that individual was denied the placement.

The United States did not satisfy the second element of its proof. Although the CRT found that 100% of the 150 living Patients were not opposed to living in the community, 124 of the 150 Patients (82%) were living in the community when the CRT asked them that question. The relevant question is whether someone who is institutionalized is opposed to living in the community. The question has no application to individuals who are living in the community.

The United States did not satisfy the third element of its proof because it is unduly vague regarding the relief it is seeking. To the extent the "reasonable accommodation" the United States is seeking is Melodie Peet's baseline (*supra* at 57), the United States arguably identified a reasonable accommodation. But to the extent the United States is seeking any relief in addition to baseline, it failed to establish that any such relief constitutes a reasonable accommodation.

## IV.   The United States' 154-Person Survey Is Flawed And Entitled To No Weight.

There are six flaws in the CRT's survey, *supra* at 7-14, and two of them are discussed below.

### A.   The CRT's opinions not stated to any reasonable degree of probability.

One of the reasons the Unites States' survey is flawed and entitled to no weight is that the CRT's opinions are not stated to any reasonable degree of probability. Experts retained to offer scientific, technical, or professional testimony are required to state their opinions in terms of probability, rather than possibility. *Carter v. McNaughton*, No. 1:15CV37, 2018 U.S. Dist.

LEXIS 57561, at *6 (N.D. Ohio Apr. 4, 2018). This applies equally to experts who offer medical testimony, which must be stated "within a reasonable degree of medical certainty or probability." *Savage v. Pilot Travel Ctrs., LLC,* No. 3:10CV208TSL-FKB, 2011 U.S. Dist. LEXIS 61952, at *6 (S.D. Miss. May 19, 2011). When medical expert testimony is stated in terms of mere possibilities rather than probabilities it has no probative value. *Patterson v. RadioShack Corp.*, No. 1:04CV297, 2006 U.S. Dist. LEXIS 54966, at *6 (N.D. Miss. Aug. 7, 2006). "When an expert's opinion is not based to a reasonable degree of medical certainty, or the opinion is articulated in a way that does not make the opinion probable, the [finder of fact] cannot use that information to make a decision." *Dreher v. State Farm Mut. Auto Ins. Co.*, No.1:15-cv-00023-JCG, 2016 U.S. Dist. LEXIS 27102, at *9 (S.D. Miss. Mar. 3, 2016). Because the CRT's opinions were not stated to any reasonable degree of medical, scientific, or other probability, this Court should give the CRT's survey no weight.

### B. No deference to Mississippi's treating professionals.

A second reason why the CRT's survey is entitled to no weight is the CRT failed to give any deference to Mississippi's treating professionals. This is contrary to *Olmstead*. States may generally rely on the reasonable assessments of its professionals regarding whether an individual is appropriate for community-based services. *Olmstead*, 527 U.S. at 602. In his concurring opinion, Justice Kennedy echoed the majority's admonition that the opinions of the state's treating physicians are owed significant deference. "The opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference." *Id.* at 610 (Kennedy, J. concurring). The CRT's failure to give any deference to Mississippi's treating physicians greatly diminishes the weight, if any, the Court should give to the CRT's survey.

## V.     *Olmstead* **Recognizes The Vital Role Of State Hospitals In The Continuum Of Care.**

*Olmstead* emphasized "that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings.  The "ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk.  Nor is it the ADA's mission to drive States to move institutionalized patients into an inappropriate setting … Some individuals … may need institutional care from time to time 'to stabilize acute psychiatric symptoms.'   For other individuals, no placement outside the institution may ever be appropriate." *Id.* at 604-05.

*Olmstead* approvingly cited the amicus brief of the American Psychiatric Association: "'Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times – perhaps in the short run, perhaps in the long run – for the risks and exposure of the less protective environment of community settings'"; for these persons, 'institutional settings are needed and must remain available.'"  *Id.* at 605.  *Olmstead* also approvingly cited the amicus brief of the Voice of the Retarded as follows:  "Each disabled person is entitled to treatment in the most integrated setting possible for that person – recognizing that, on a case-by-case basis, that setting may be in an institution." *Id.*

One of the United States' experts, Dr. Carol VanderZwaag, admits that the purpose of state hospitals is to stabilize patients so they can return to the community.  (*Supra* at 28).  It is undisputed that Mississippi's state hospitals routinely stabilize patients and return them to the community.  (*Supra* at 28-31).  There is nothing discriminatory about that process.

## VI.    **Deinstitutionalization Has Produced Positive And Negative Results, So It Must Be Done Responsibly, Which Is What Mississippi Is Doing.**

In his concurrence in *Olmstead*, Justice Kennedy noted that deinstitutionalization has produced positive and negative results.  "Beginning in the 1950's, many victims of severe mental illness were moved out of state-run hospitals, often with benign objectives.  According to one

estimate, when adjusted for population growth, 'the actual decrease in the numbers of people with severe mental illnesses in public psychiatric hospitals between 1955 and 1994 was 92 percent.'  This was not without benefit or justification.  The so-called 'deinstitutionalization' has permitted a substantial number of mentally disabled persons to receive needed treatment with greater freedom and dignity.  It may be, moreover, that those who remain institutionalized are indeed the most severe cases …. Nevertheless, the depopulation of state mental hospitals has its dark side. According to one expert:

> For a substantial minority ... deinstitutionalization has been a psychiatric *Titanic*. Their lives are virtually devoid of 'dignity' or 'integrity of body, mind, and spirit.' 'Self-determination' often means merely that the person has a choice of soup kitchens.  The 'least restrictive setting' frequently turns out to be a cardboard box, a jail cell, or a terror-filled existence plagued by both real and imaginary enemies."[24]

*Olmstead,* 527 U.S. at 609 (Kennedy, J. concurring) (internal citations omitted).

The United States' experts concede that the way to deinstitutionalize responsibly is to downsize state hospitals as you increase community-based services.  (Tr. at 217 and 1463-64). Mississippi is downsizing responsibly because Mississippi is downsizing its state hospitals as it increases community-based services.  (*Supra* at 42-46).

## VII.   Mississippi's State Hospitals Must Comply With Chancery Court Commitment Orders.

The chancery court has jurisdiction over civil commitments to state hospitals, while the circuit court maintains jurisdiction over commitments arising from criminal justice matters, such as, where a person is acquitted of a crime by reason of insanity.[25]  Commitments from circuit court to state hospital are not at issue in this case, so the chancery court civil commitment process is described below.

---

[24] "[I]t is an error to assume that a community placement *ipso facto* precludes the possibility of isolation or automatically provides more interaction with nondisabled persons than an institutional setting."  *United States v. Arkansas*, 794 F.Supp.2d 935, 973 (E.D. Ark. 2011).

[25] § 41-21-63(2) – (3).

PD.26516595.1

## A.     The civil commitment process is established by statute.

**Affidavit.**[26]  The civil commitment process begins when "any person is alleged to be in need of any treatment" and "any relative of the person, or any interested person" makes an affidavit of the need for treatment and files the same with the chancery clerk in the county where the person to be committed ("Proposed Patient") resides or, in the discretion of a chancellor or special master, may be found.   The Affidavit must, among other things, contain factual descriptions of the Proposed Patient's behavior, including time, place, and duration of the behavior.  The affiant must have personally observed the behavior.

**Writ.**[27]  Following the filing of the Affidavit, the clerk shall issue a writ directed to the sheriff to take the Proposed Patient into custody, unless the chancellor finds the Affidavit "fails to set forth factual allegations and witnesses sufficient to support the need for treatment."  The chancellor may also order that the Proposed Patient be referred to a Crisis Intervention Team rather than issuing the Writ.  The Proposed Patient is brought before the clerk or chancellor, who orders "pre-evaluation screening and treatment" either in a CHMC, or, if none is available, a physician, psychologist, nurse practitioner or physician assistant, in the discretion of the chancery court.   The Writ may also contain directions regarding where to hold the Proposed Patient prior to the appearance before the chancellor.

**Appointment of Healthcare Providers for Physical and Mental Evaluation.**[28]  Upon issuance of the Writ, the chancellor then appoints either two physicians or a physician and either a psychologist, nurse practitioner, or physician assistant to conduct a full physical and mental examination of the Proposed Patient (the "examiners").   The two examiners are to be (a)

---

[26] § 41-21-65.
[27] § 41-21-67 (1).
[28] § 41-21-67(2).

PD.26516595.1

independent of one another, (b) not related to the Proposed Patient or interested in her estate in any way, or (c) be on the full-time staff of any residential treatment facilities operated by DMH.

**Appointment of Attorney for Proposed Patient.**[29]   The clerk is to ascertain, as early as possible, whether the Proposed Patient has an attorney for the proceedings.  If she does not, the chancery court is to appoint one at the same time as the examiners.

**Probable Cause Finding.**[30]  If the chancellor concludes, prior to the evaluation, that the person is mentally ill and there is no reasonable alternative to detention, the chancellor may order the person committed as an emergency patient at any licensed medical facility for supervision by healthcare providers prior to the formal evaluation proceedings conducted by the appointed providers discussed above.  Any healthcare provider at the licensed facility who has reason to believe that the Proposed Patient poses an immediate substantial likelihood of physical harm to herself or others or is unable to care for herself may retain the Proposed Patient for up to 72 hours prior to the entry of a civil order of commitment.  The healthcare provider must certify her reasons in writing.  The 72 hour requirement is waived if the Proposed Patient consents to further treatment at that facility.  The facility may not be a hospital operated by DMH or a jail, unless the court finds there is no reasonable alternative.

**Examination.**[31]  As soon as practicable ("immediately"), the examiners conduct their examination.  The examiners must make a report and certificate of their findings to the clerk. They ultimately must provide an opinion on whether the person is suffering mental disability and whether commitment to a treatment facility is appropriate, and include the reasons for the opinion in the report.

---

[29] § 41-21-67(3).
[30] § 41-21-67(4).
[31] § 41-21-69(1) – (2).

PD.26516595.1

**Outpatient Alternative.**[32]   If the examination results in the following findings, the examiners are to recommend outpatient commitment:  The Proposed Patient has a mental illness, but is capable of living safely in the community with the available supervision of family, friends, or others, and based upon the Proposed Patient's medical history and other medical or psychiatric indicia, the examiners conclude the Proposed Patient is in need of treatment to avoid further deterioration of his condition, and the Proposed Patient's mental condition precludes him from making an informed decision to voluntarily seek or comply with needed treatment.

**Timing.**[33]   The examination and completion of the report and certificate is to be completed within 48 hours of the order for examination, or by the beginning of the next business day.  An eight-hour extension may be granted by the clerk or chancellor if the examiners request.

**Hearing Overview.**[34]   Where the examiners certify the Proposed Patient is not in need of treatment, the affidavit is dismissed without a hearing.  Upon the timely filing of the examiners' certificate, and if upon that basis and any other relevant evidence the chancellor or clerk determines the Proposed Patient is in need of treatment, the clerk is to set a hearing for within seven days of the filing of the certificate, or within ten days if the Proposed Patient's attorney requests an extension.  The hearing is conducted before the chancellor, but may be held at the location where the Proposed Patient is being held.

**Hearing Notice.**[35]   Notice of the hearing is to be provided "[w]ithin a reasonable period of time before the hearing" to the Proposed Patient and her attorney.

**Hearing Procedures.**[36]   The Proposed Patient must be present at the hearing unless the chancellor concludes she is unable to attend and states the reasons for non-attendance on the record.  The Proposed Patient is entitled to offer evidence, be confronted by witnesses "against

---

[32] § 41-21-69(1)(b).
[33] § 41-21-69(2).
[34] §§ 41-21-71 – 73.
[35] § 41-21-73(1).
[36] § 41-21-73(2) – (9).

him," to cross-examine witnesses, and is privileged against self-incrimination. The rules of evidence apply as in typical judicial proceedings. The hearing must be recorded stenographically or electronically and retained by the court.

**Standard for Commitment.**[37] The chancellor must find "by clear and convincing evidence" that the Proposed Patient is mentally ill or intellectually disabled. The chancellor also must give "careful consideration [to] reasonable alternative dispositions" including dismissal, voluntary or court-ordered outpatient commitment for specifically-referenced treatment regimen, day or night treatment in a hospital, placement in the custody of a friend or relative, or home health services. If the chancellor finds there is no suitable alternative to commitment, the patient must be committed to the "least restrictive treatment facility that can meet the patient's needs." The chancellor must state findings of fact and conclusions of law, including a list of all alternatives to commitment, as well as the chancellor's reasons for finding the alternatives unsuitable. Pre-admission treatment must be conducted as near as possible to the Proposed Patient's home. Intake must be made to the relevant state hospital in compliance with the catchment areas established by DMH. The initial commitment cannot exceed three months. The United States has not challenged the legal validity or constitutionality of Mississippi's civil commitment statutes.

**B.      The state hospitals must comply with civil commitment orders.**

The chancery court's determination to commit an individual to a state hospital is "entitled to the full force of law." *C.W. v. Lamar County*, 250 So.3d 1248, 1253. The state hospitals are "not at liberty to second guess the chancery court and to determine for themselves whether mental-illness treatment for [an individual] was necessary." *Id.*

---

[37] § 41-21-73(4).

## VIII.   Fundamental Alteration Defense.

If the United States satisfies the elements of its burden of proof, then Mississippi "may present a defense that the relief [the United States] requests would not require a reasonable modification of the program, but would fundamentally alter the nature of the program." *Martin*, 222 F.Supp.2d at 972, *citing Olmstead*, 527 U.S. at 604.   The United States did not prove discrimination (*supra* at 65-66) or satisfy its burden of proof (*supra* at 70-71), so the Court need not reach the fundamental alteration defense.   If the Court nonetheless considers the fundamental alteration defense, Mississippi is free to assert it (with or without a formal "Olmstead plan"). The defense is satisfied here because the reasonable modifications sought by the United States would fundamentally alter Mississippi's mental health system.

### A.        What is an "Olmstead plan?"

According to *Olmstead*, an "Olmstead plan" is "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moves at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." *Olmstead*, 527 U.S. at 606-07.   According to the United States, an "Olmstead plan" is "a public entity's plan for implementing its obligation to provide individuals with disabilities opportunities to live, work, and be served in integrated settings."[38]  Nothing in *Olmstead* supports the United States' expansive definition of an "Olmstead plan."

*Olmstead* references a plan to move patients out of a state hospital when there is a list of patients waiting to move out.   The United States does not seek such a plan here.   Instead, the United States seeks a plan for Mississippi to develop the public mental health system the United States believes Mississippi should have.   That is not the type of plan contemplated by *Olmstead*. The Court should not require a plan that *Olmstead* does not require.

---

[38] ECF 208-3, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the ADA and *Olmstead v. L.C.* at ¶ 12.

**B.     A formal "Olmstead plan" is not a prerequisite to asserting a fundamental alteration defense.**

Mississippi does not have a single written document that constitutes an "Olmstead plan," but it does have a collection of documents and practices that constitute its "Olmstead plan." (*Supra* at 48).   The United States alleges that this prohibits Mississippi from asserting a fundamental alteration defense, but the United States is mistaken.  *See Sanchez v. Johnson,* 416 F.3d 1051, 1068 (9th Cir. 2005).

The Ninth Circuit found, "[i]n *Olmstead*, the Court recognized that a State must have sufficient leeway, '[t]o maintain a range of facilities and to administer services with an even hand,' … and that courts should be sympathetic to fundamental alteration defenses against proposed modifications to state service programs for care of the disabled …. [W]hen there is evidence that a State has in place a comprehensive deinstitutionalization scheme, which, in light of existing budgetary constraints and the competing demands of other services that the State provides, including the maintenance of institutional care facilities [and that scheme] is 'effectively working,' the courts will not tinker with that scheme."  *Id*. at 1067-68.   Here, Mississippi has in place a comprehensive deinstitutionalization scheme which is "effectively working," especially in light of existing budgetary constraints and the competing demands of other services Mississippi provides, including its state hospitals.  (*Supra* at 42-51).   Federal district courts have also found that an "Olmstead plan" is not a requirement to assert the fundamental alteration defense.  *See, e.g., Disability Advocates, Inc v. Paterson*, 598 F. Supp.2d 289 (E.D. N.Y. 2009); *Martin*, 222 F.Supp.2d at 985-86.

*Olmstead* discussed an "Olmstead plan" in the context of an example:  "If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully

populated, the reasonable-modifications standard would be met." *Martin*, 222 F.Supp.2d at 971, *quoting Olmstead*, 527 U.S. at 605–06.  In other words, when a state hospital has a waiting list to move people to the community, the state can satisfy the reasonable modifications standard by having a comprehensive, working plan to reduce its waiting list by moving people to the community at a reasonable pace.

Indeed, "[n]othing in the *Olmstead* decision suggests that this illustration was meant to express the exclusive means for determining the reasonable accommodation issue.  Indeed, the use of the word 'example' implies the opposite.  The quoted language is but one way a defendant may prevail if the plaintiff proves a prima facie case.  If the defendant fits the example, it has essentially proven that it has ***already reasonably accommodated*** the plaintiff's request for participation in a community-based program.  The presence or absence of an existing state plan and a waiting list that moves at a reasonable pace does nothing whatsoever to answer whether, in the first instance, a reasonable modification is available." *Martin*, 222 F.Supp.2d at 983-84.

The United States ignores "that the fundamental alteration analysis entails far more than the comprehensive plan and reasonably paced waiting list example the *Olmstead* Court provided. *Olmstead* had much more to say about the defense than the cited example.  In fact, the example is not actually an illustration of fundamental alteration at all.  Rather, it is a way the State may show that it has ***already*** provided a reasonable accommodation.  If the State makes this showing, then there is simply no need to further modify the program.  As a corollary, if the State demonstrates a comprehensive plan and a reasonably paced waiting list, then there is no need for the State to prove that the requested modification would fundamentally alter the nature of the program." *Id.* at 985.

In its closing statement, the United States referred to *Jensen v. Minn. Dep't of Human Servs.*, 138 F.Supp.3d 1068 (D. Minn. 2015), and claimed the decision considers what is required

81

to establish an effectively working "Olmstead plan."  That is not accurate.  In *Jensen*, the parties entered into a Stipulated Class Action Settlement Agreement (Agreement) in June 2011.  *Id*. at 1070.  Under the Agreement, Minnesota had to develop an "Olmstead plan," and submit it to the court for approval.  *Id*.  On May 6, 2015, more than 3 years after the court approved the Agreement – the court considered Minnesota's fourth revised version of an "Olmstead plan."  *Id*. at 1071.  The court rejected the plan.  *Id*.  Minnesota subsequently submitted the fifth version of its plan, and the court approved it in September 2015.  *Id*.  The court found that Minnesota's fifth revised plan "substantially complies with the comprehensive standards and requirements set forth in the [Agreement], *Olmstead* …, and in prior orders" of the court.  *Id*. at 1072.  *Olmstead* contains no details regarding what an "Olmstead plan" should contain, and the *Jensen* opinion does not disclose the extent to which "the comprehensive standards and requirements" it references were agreed to by the parties in their Settlement Agreement.  But the most important take-away is that it took nearly 4 years for Minnesota to develop an "Olmstead plan" that was satisfactory to the court, and its appears the United States thinks Mississippi should have such a plan.  The 4 years it took to develop an "Olmstead plan" in Minnesota puts the pace of expansion of community-based services in Mississippi in a very positive light.

### C.    Community-based services do not cost less than state hospital care.

Kevin O'Brien was retained by the United States to compare the cost of treatment in an inpatient setting versus the cost in a community-based setting.  (*Supra* at 33-38).  *Olmstead* makes clear "courts may not merely compare the cost of institutionalization against the cost of community-based health services because such a comparison would not account for the state's financial obligation to continue to operate partially full institutions with fixed overhead costs." *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 364 F.3d 487 at 493 (3rd Cir. 2004)  (citations omitted).  But that is exactly what Mr. O'Brien did (*supra* 33).  Because that is "precisely the

sort of reductive cost comparisons proscribed by the *Olmstead* plurality, as well as by Justice Kennedy," *Id*. at 497, the Court should reject Mr. O'Brien's cost comparison for that reason alone.

**D.      The relief the United States seeks would fundamentally alter Mississippi's mental health system.**

"The State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless," so states may resist modifications that entail a fundamental alteration of the state's systems and programs. *Olmstead*, 527 U.S. at 603.   The fundamental alteration test must take into account "the state's need to maintain institutions for those individuals for whom community-based care may never be appropriate, as well as for those who may require institutionalization from time to time." *Martin*, 222 F.Supp.2d at 971.  "[I]n evaluating the fundamental alteration defense, a court must carefully consider the state's legitimate interest in providing a variety of services for persons with mental disabilities, including institutional-based services, as well as the state's interest in allocating available resources fairly and evenhandedly." *Id*.

The United States did not seek any monetary relief in its Complaint, so the Court should not order any.  Nonetheless, in summary, expanding community-based services in the manner suggested by the United States would cause Mississippi to annually incur the following additional costs:

| HOUSING | PACT | CSU | MCRT | O'Brien |
|---|---|---|---|---|
| $18,540,900<br><br>Plus<br><br>All housing recommended by the CRT other than scattered-site housing | $4,800,000 to $6,600,000 for 11 new PACT teams | $800,000 for each additional 4-8 bed CSU<br><br>$1,400,000 (for each additional 16 bed CSU | $300,000 (average per each new team) | All services identified by the CRT, but not included in O'Brien's Scenarios, and increased workforce staffing with higher utilization |

(*Supra* at 52-56).  The United States alleges Mississippi "cannot demonstrate that implementing the changes would be prohibitively expensive,"[39] but the additional housing and PACT costs alone exceed $23 million per year.  All other new services would incrementally increase that amount as shown in the Table above.  DMH does not have a spare $23 million per year to spend on the additional services suggested by the United States, so the proposed changes are "prohibitively expensive."[40]

The United States next alleges Mississippi should shift more of its budgeted funds from institutional care to community-based care, but that is contrary to *Olmstead*.  "Assuming a limited pool of budgetary resources, if [the State] had siphoned off monies appropriated for institutional care … in order to increase community placements, [the state] would run afoul of [*Olmstead's*] prohibition on favoring those 'who commenced civil actions' at the expense of institutionalized mental health patients who are not before the court.  Any effort to institute fund-

---

[39] ECF 209, United States' Pretrial Brief at 31.

[40] The United States will likely argue that cost is insufficient to establish the fundamental alteration defense.  Many courts disagree.  *See, e.g.*, *Toledo v. Sanchez*, 454 F.3d 24, 39 (1st Cir. 2006); *Radaszewski*, 383 F.3d at 613 n. 5; *Brown v. District of Columbia*, No. 17-7152, 2019 U.S. App. LEXIS 20058, at *29 (D.C. Cir. July 5, 2019); *B. N. v. Murphy*, No. 3:09-CV-199-TLS, 2011 U.S. Dist. LEXIS 132482, at *30 (N.D. Ind. Nov. 16, 2011); *Williams v. Wasserman*, 164 F.Supp.2d 591, 630-638 (D. Md. 2001).  Cost is the primary concern when analyzing the fundamental alteration defense.

shifting that would disadvantage other segments of the mentally disabled population would thus fail under *Olmstead*." *Frederick L.*, 364 F.3d at 497.

Any further shifting of funds from Mississippi's state hospitals would disadvantage the patients in the state hospitals.  The state hospitals took budget cuts totaling $16 million in FY 17 and FY 18, and $8 million was shifted from MSH's budget in FY 19 to expand community-based services.  (Tr. at 2330).  As Diana Mikula explained, "there's just no more money to shift …. And I don't want to jeopardize patient safety and the quality of services that we're providing."  (Tr. at 2330-31).

Nor can Mississippi expand community-based services even more than it already has by closing one or more of its state hospitals.  (Tr. at 2331).  Diana Mikula testified, "[w]e have a waiting list for people to access the state hospital, and I am not going to close a state hospital while there is a need for that bed.  That is only going to result in someone not receiving services, and that's just not the right thing to do."  (Tr. at 2331).

It is a fundamental alteration of Mississippi's mental health system to require it to increase funding, especially for a significant amount like $23 million, or to shift funds from state hospitals, as doing so would jeopardize patient care.  Moreover, workforce shortages would likely prevent Mississippi from being able to hire the additional mental health professionals that would be required to provide the expanded services suggested by the United States.  Any such relief would exceed constitutional limits.  "No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities.  If, for example, funds for care and treatment of the mentally ill, including the severely mentally ill, are reduced in order to support programs directed to the treatment and care of other disabilities, the decision may be unfortunate.  The judgment, however, is a political one and not within the reach of the statute.  Grave constitutional concerns are raised when a federal court is given the

authority to review the State's choices in basic matters such as establishing or declining to establish new programs.  It is not reasonable to read the ADA to permit court intervention in these decisions." *Olmstead*, 527 U.S. at 612-13 (Kennedy, J. concurring).

## IX.  An Annual $23 Million Increase In Spending And Standard Of Care Micromanagement Violate Principles of Federalism.

The concept of federalism is one of upmost importance to ensure a "healthy balance of power between the States and the Federal Government." *Printz v. United States*, 521 U.S. 898, 921 (1997).  Federalism represents "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44 (1971).  The United States is violating principles of federalism by seeking to impose onerous funding obligations on Mississippi, and by attempting to micromanage Mississippi's mental health system.

### A.  Onerous funding obligations.

Ordering Mississippi to increase its mental health spending by $23 million per year or any other substantial sum would violate the principles of federalism.  Because of the importance of State autonomy, federalism concerns are heightened when a federal court decree or order "has the effect of dictating state or local budgetary priorities." *Horne  v. Flores*, 557 U.S. 433, 434 (2009).

In his concurrence in *Olmstead*, Justice Kennedy found that appropriate deference is due to the program funding decisions of the States.  "In light of these concerns, if the principle of liability announced by the Court is not applied with caution and circumspection, States may be pressured into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition.  This danger is in

addition to the federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts.  It is of central importance, then, that courts apply today's decision with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers." *Olmstead*, 527 U.S. at 610 (Kennedy, J. concurring); *see Frew v. Hawkins,* 540 U.S. 431, 442 (2004) (principles of federalism and common sense require federal courts give "significant weight to the views of government officials," and that "state officials with front-line responsibility for administering [a state program] be given latitude and substantial discretion").

### B.    Micromanagement of Mississippi's mental health system.

Concerns about federalism and state sovereignty are especially heightened here because the CRT made a number of standard of care criticisms regarding the manner in which Mississippi delivers its mental health services, including how Mississippi should conduct discharge planning and when it should automatically refer individuals to PACT.  (*Supra* at 14-15).  Because this kind of micromanagement interferes with Mississippi's management of its mental health system, it infringes on Mississippi's sovereignty.  *See Rizzo v. Goode,* 423 U.S. 362 (1976) (intrusiveness of federal injunctive relief must be taken into account in deciding whether to grant injunctive relief).

The United States' desire to micromanage Mississippi's mental health system is also contrary to *Olmstead* itself.  The ADA does not impose a standard of care or require a certain level of benefits.  *Olmstead*, 527 U.S. at 603 n. 14.  The Sixth Circuit found that Olmstead "does not set a standard of care or specifically require that states offer all the aid a patient wants." *Carpenter-Barker v. Ohio Dep't of Medicaid*, 752 Fed. Appx. 215, 221 (6th Cir. 2018).  According to the Second Circuit, "*Olmstead* does not, therefore, stand for the proposition that

states must provide disabled individuals with the opportunity to remain out of institutions." *Rodriquez v. City of New York*, 197 F.3d 611, 618 (2nd Cir. 1999).  Nor does *Olmstead* impose a negligence-like standard on the states.  For example, Mississippi conducts discharge planning, but the CRT alleges Mississippi does not do it well enough.  Nothing in *Olmstead* suggests that not delivering an existing service to the standard the United States believes it should be delivered is a violation of the ADA.

## X.  Federal Barriers To Mississippi's Ability To Provide Community-Based Services Should Be Considered In Mitigation Of Any Relief Sought By The United States.

As explained, *supra* at 16-22, deficiencies in federal policies and programs inhibit Mississippi's ability to deliver community-based services in the manner the United States is insisting they be delivered.  Under the equitable component of injunctive relief, the Court should consider such federal barriers in mitigation of any relief sought by the United States.

Injunctive relief is an extraordinary equitable remedy. *Envtl. Def. Fund, Inc. v. Alexander,* 614 F.2d 474, 477-78 (5th Cir. 1980).  When considering whether to  award equitable relief, there is not a rigid or formulaic approach the Court must take. *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982).  Rather, the court must do "equity and mould each decree to the necessities of the particular case. *Id.*  One factor the court should consider is the "balance of equities and consideration of public interest."  Additionally, because of the equitable nature of injunctive relief, traditional considerations such as unclean hands, militate against issuing an injunction. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 947 (9th Cir. 2013).

The New Freedom Commissions Report (*supra* at 16-17) and the ISMICC Report (*supra* at 17-19) identify many federal barriers to the ability of the states to provide community-based services.  In addition, the United States' own experts admit there are federal barriers to providing

community-based services in the areas of SSI, SSDI, supported employment, housing, and the application process for benefits.  (*Supra* at 19-22).

But the biggest federal barrier is the IMD exclusion.  (*Supra* at 56-57).  The FMAP for Mississippi is 74.63%.  (PX-409 at 13, ¶ 39).  Todd MacKenzie found there were 5,070 admissions to Mississippi's state hospitals over a two-year period, which is an average of 2,535 per year.  (PX-405 at 28).  Kevin O'Brien found the weighted average annual inpatient cost per individual in Mississippi's state hospitals is $22,802.  (Tr. at 1253).  2,535 individuals admitted to state hospitals per year multiplied by $22,802 is $57,803,070.  74.63% of $57,803,070 is $43,138,431.  The IMD exclusion thus prevents Mississippi from receiving approximately $43 million per year in federal Medicaid reimbursement.  This is ironic because the United States criticizes Mississippi for not doing enough to maximize federal Medicaid dollars.

Although the Court cannot order the United States to repeal the IMD exclusion, the Court can equitably consider in mitigation of any relief sought by the United States that the IMD exclusion prevents Mississippi from receiving approximately $43 million per year that Mississippi could apply to community-based services.

## XI.   The United States' Claim Should Be Dismissed.

### A.   Reasons for dismissal.

The United States' sole claim for violation of Title II of the ADA should be dismissed for the following reasons:

First, Mississippi has not engaged in discrimination.

Second, because the United States did not prove discrimination, this is exclusively an at serious risk of institutionalization case, but at serious risk of institutionalization does not apply to cases like this that have no individual plaintiffs and no certified class.

Third, the United States has not satisfied its burden of proof.

PD.26516595.1

Fourth, the United States' 154-Patient survey is flawed and entitled to no weight.

Fifth, the United States has not shown any unnecessary institutionalization.

Sixth, *Olmstead* recognizes the vital role of state hospitals in the continuum of care.

Seventh, deinstitutionalization must be done responsibly, and Mississippi is deinstitutionalizing responsibly by downsizing its state hospitals as its increases community based services.

Eighth, Mississippi is in compliance with the ADA and *Olmstead* because it has a reasonable continuum of mental health services, which it has expanded at a reasonable pace.

Ninth, if the Court reaches the fundamental alteration defense, Mississippi can assert it, and Mississippi has shown that the modifications sought by the United States would fundamentally alter Mississippi's mental health system, so those modifications are not required.

Tenth, the relief sought by the United States violates principles of federalism.

Eleventh, federal barriers to Mississippi's ability to provide community-based services should be considered in mitigation of any relief sought by the United States.

**B.    Limitations on permissible relief.**

Although the Court should dismiss the United States' claim, the Court's ability to grant any relief to the United States is constrained by the United States' failure to include any individual plaintiffs or seek class certification.   A court may not determine the rights of individuals who are not before the court. *Zepeda v. United States Immigration & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).  No individuals are before this Court.

Generally, system-wide injunctive relief is appropriate only when the plaintiff has established a certified class. *Dreyfus*, 697 F.3d at 738-39 (9th Cir. 2012).  Class certification is crucial because it is the class certification that broadens the court's authority to grant relief to a broader group rather than a single individual. *Armstrong v. Davis,* 275 F.3d 849, 871 (9th Cir.

2001).   In an *Olmstead* class action, the plaintiffs must prove that the defendant "maintains a policy or practice (*i.e.*, a concrete systemic deficiency)" that has caused the class members to remain institutionalized against their wishes.   *Brown*, 322 F.R.D. at 87.   Although this is not a class action, the United States has not made that showing against Mississippi.

Moreover, the United States' requested relief, to the extent it has been sufficiently articulated, is particularly inappropriate given Mississippi's substantial expansion of its community-based services.   *See Horne*, 557 U.S. at 448 (2009) (broad, sweeping injunctive relief is often problematic because, over time, "changes in the nature of the underlying problem" often warrant a Court's reconsideration of judgment).

### C.      Time to finish the job.

Melodie Peet testified that baseline for a state's mental health system is to have the "key services" available in every Region.   Mississippi is only 1 CSU, 5 PACT teams, and 3 supported employment programs away from having the "key services" in every Region.   To the extent the Court finds the United States is entitled to any relief at all, it should be limited to baseline – *i.e.*, the addition 1 CSU, 5 PACT teams, and 3 supported employment programs in the Regions that do not have them.

Dr. Jeffrey Geller found that Mississippi has a hospital and community-based system of care and treatment for persons with SMI comparable to many other states.   (DX-303 at 30).   He explained:   "It's my opinion because I have seen hospitals and their interfaces with the community in Mississippi, and I have seen them … in 26 states …. And I do not believe that Mississippi is an outlier.   It's certainly not the best, but it's far from the worst.   And if Mississippi is achieving something comparable to its peers, rather than condemn it, I think we might consider giving it an award because it starts way, way, way behind a whole lot of other states … because of the various factors that are in my report that describe economic conditions

and the social conditions of the state." (Tr. at 2418-19). Mississippi is not asking for an award, but it is asking for time to finish the job. That request should be granted. It has not been shown that states under consent decrees expand community-based services faster than Mississippi has done on its own. In the end, the United States has not shown sufficient reason to order Mississippi to do more to downsize state hospitals and increase community-based services than it has done and will continue to do on its own.

**Relief Requested**

This Court should deny the United States' claim under Title II of the ADA and *Olmstead*.

July 22, 2019.

Respectfully submitted,

PHELPS DUNBAR LLP

BY:   /s/ James W. Shelson
         Reuben V. Anderson, MB 1587
         W. Thomas Siler, MB 6791
         James W. Shelson, MB 9693
         Nash E. Gilmore, MB 105554
         4270 I-55 North
         Jackson, Mississippi 39211-6391
         Post Office Box 16114
         Jackson, Mississippi  39236-6114
         Telephone: 601-352-2300
         Telecopier: 601-360-9777
         Email: andersor@phelps.com
                  silert@phelps.com
                  shelsonj@phelps.com
                  nash.gilmore@phelps.com

         Harold Pizzetta, III, MB 99867
         Assistant Attorney General
         General Civil Division
         Walter Sillers Building
         550 High Street
         Jackson, MS 39201
         Telephone:  601-359-3816

92

Telecopier:  601-359-2003
Email:  HPIZZ@ago.state.ms.us

Mary Jo Woods, MB 10468
Special Assistant Attorney General
Mississippi Attorney General's Office
Walter Sillers Building
550 High Street
Jackson, MS 39201
Telephone:  601-359-3020
Telecopier:  601-359-2003
Email:  MWOOD@ago.state.ms.us

Attorneys for the State of Mississippi

## CERTIFICATE OF SERVICE

I certify that on July 22, 2019, I electronically filed this document with the Clerk of the Court using the ECF system, which sent notification of such filing to all ECF counsel of record in this action.

*/s/ James W. Shelson*
JAMES W. SHELSON

93