

————————————

No. 3:16-CV-622-CWR-FKB

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

STATE OF MISSISSIPPI,

*Defendant.*

————————————

MEMORANDUM OPINION AND ORDER
————————————

Before CARLTON W. REEVES, *District Judge*.

Melody Worsham has a unique perspective on Mississippi's mental health system. She knows the system as a patient because she has struggled with serious mental illness (SMI) throughout her life. But she also knows it as a professional, in her job as a certified peer support specialist. That means Ms. Worsham is trained to help other persons with SMI "overcome the obstacles that might be getting in their way of living the life they want to live. And also navigating the system,

helping to find resources, and then just being moral support, you know, just being there for somebody." Trial Tr. 323.

Ms. Worsham was one of dozens of witnesses who testified in this case about whether Mississippi unnecessarily institution- alizes persons with SMI. The trial record spans four weeks of testimony, thousands of pages of exhibits, and voluminous le- gal briefs by both sides, and still does not begin to reflect the enormity of Mississippi's mental health system. One would be forgiven for throwing their hands up in exasperation at the complexity of the situation.

Yet we reached a moment of lucidity when Ms. Worsham was cross-examined by one of the State's attorneys. Ms. Worsham readily testified that the State was acting in good faith. "I think the people that I have worked with at the Department of Mental Health really want to see this change. I really do." Trial Tr. 344. But Ms. Worsham could not agree that the State was making a "major effort" to expand community-based ser- vices throughout Mississippi:

> It's like they stop right at that point to do the very thing that actually would make a differ- ence. They stop. So there is a lot of talk, there is a lot of planning, but there is also a lot of people being hurt in the process.

Trial Tr. 348.

The Court fully agrees with Ms. Worsham. On paper, Missis- sippi has a mental health system with an array of appropriate community-based services. In practice, however, the mental health system is hospital-centered and has major gaps in its community care. The result is a system that excludes adults with SMI from full integration into the communities in which

they live and work, in violation of the Americans with Disabilities Act (ADA).

At its heart, this case is about how Mississippi can best help the thousands of Melody Worshams who call our State home. The State generally understands the urgency of these needs, and it understands its obligations under federal law. It is moving toward fulfilling those obligations. The main question at trial was, has it moved fast enough to find itself in compliance with the ADA?

The United States Department of Justice has presented compelling evidence that the answer to that question is "no." Mississippi's current mental health system—the system in effect, not the system Mississippi might create by 2029—falls short of the requirements established by law. The below discussion explains why.

## I.

### The Americans with Disabilities Act

In 1990, Congress passed the ADA, "the last major civil rights bill to be signed into law,"[1] to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101

---

[1] David M. Perry, *How George H.W. Bush Proved Himself to the Disability Right Community*, Pacific Standard (Dec. 6, 2018). The ADA is regarded as one of President George H.W. Bush's greatest legislative achievements. *See, e.g.*, Rachel Withers, *George H.W. Bush was a Champion for People with Disabilities*, Vox.com (Dec. 2, 2018) (quoting Lex Frieden, a professor at the University of Texas Health Science Center at Houston, as saying that President H.W. Bush "considered [the ADA] among some of his greatest accomplishments. From time to time, he told me he felt like it was the best thing that he did.").

(b)(1).[2] Congress explained in the statute exactly what it wanted to rectify. Some of those explanations have direct bearing on our situation nearly 30 years later.

Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Id.* § 12101(a)(2). It specifically acknowledged that such discrimination "persists in such critical areas as . . . institutionalization" and "health services." *Id.* § 12101 (a)(3). Congress then wrote that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . segregation, and relegation to lesser services." *Id.* § 12101(a)(5).

To establish a violation of the ADA, "plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by

---

[2] At the signing of the historic legislation, President Bush declared that "every man, woman, and child with a disability can now pass through once-closed doors into a bright new era of equality, independence, and freedom." He continued, "[t]his historic act is the world's first comprehensive declaration of equality for people with disabilities – the first. Its passage has made the United States the international leader on this human rights issue." President George H.W. Bush, Statement upon Signing the Americans with Disabilities Act (July 26, 1990).

reason of plaintiffs' disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citation omitted).

Title II of the ADA prohibits discrimination by public entities. It establishes that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Title II does not only benefit individuals with disabilities. . . . Congress specifically found that disability discrimination 'costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.'" *Frame v. City of Arlington*, 657 F.3d 215, 230 (5th Cir. 2011) (en banc) (citations omitted).

Congress instructed the Attorney General to promulgate regulations implementing Title II. Those regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Such a setting "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B. Public entities "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130 (b)(7)(i).[3]

---

[3] This affirmative obligation distinguishes the ADA. Unlike other anti-discrimination laws, the ADA "was considered innovative in that it went

The Supreme Court interpreted Title II in the landmark case *Olmstead v. L.C ex rel. Zimring*, 527 U.S. 581 (1999). It first noted that "Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'form of discrimination.'" 527 U.S. at 600 (citation and brackets omitted). The Court then reasoned that "unjustified institutional isolation of persons with disabilities is a form of discrimination [that] reflects two evident judgments."

> First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life.

> Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

---

'beyond a mere nondiscrimination rule to demand the alteration of societal structures that, however unintentionally, stand in the way of opportunities for people with disabilities' through its reasonable accommodation requirement." Ariana Cernius, *Enforcing the Americans with Disabilities Act for the "Invisibly Disabled": Not a Handout, Just a Hand*, 25 Geo. J. Poverty L. & Pol'y 35, 50 (2017) (citations omitted). Not only are persons with disabilities "entitled to reasonable accommodations to a public entity's services, programs, and activities, . . . it is discriminatory when an entity fails to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Id*. (quotation marks and citations omitted).

*Id.* at 600–01 (citations and brackets omitted).

Because discrimination on the basis of disability might not be obvious, the Court tried to explain the "dissimilar treatment" in simpler terms. It came up with this: "In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." *Id.* at 601 (citation omitted).

*Olmstead*'s final holding reads as follows:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607.[4] This is often referred to as the "integration mandate." *Disability Advocates, Inc. v. Paterson (DAI I)*, 653 F. Supp.

---

[4] Thus, "*Olmstead* is noteworthy for its broad recognition of the rights of people institutionalized in congregate facilities to live and receive needed services and supports in the community. Critically, *Olmstead* endorsed the congressional finding in the ADA that institutionalization constituted discrimination." Robert D. Dinerstein & Shira Wakschlag, *Using the ADA's "Integration Mandate" to Disrupt Mass Incarceration*, 96 Denv. L. Rev. 917, 926 (2019) (citing 42 U.S.C. § 12101(a)(3)). The decision "has come to stand

2d 184, 190–91 (E.D.N.Y. 2009), *vacated on other grounds sub nom. Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc. (DAI II)*, 675 F.3d 149 (2d Cir. 2012). "[F]ollowing *Olmstead*, courts have looked to the language of the Attorney General's regulations interpreting Title II, as well as the holding in *Olmstead*, as the standard by which to determine a violation of the ADA's integration mandate." *Id*. (citations omitted).

Though *Olmstead* spoke of "the State's treatment professionals," courts recognize that any treatment professional, whether employed by the state or not, may be used to show that community placement is appropriate. *See Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). If establishing a case required reliance on the government's own treatment professionals, states could circumscribe the requirements of Title II. *See Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 290–91 (E.D.N.Y. 2008); *Long v. Benson*, No. 4:08-CV-26, 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008); *see also Martin v. Taft*, 222 F. Supp. 2d 940, 972 n.25 (S.D. Ohio 2002).

## II.

### Procedural Background and Preliminary Arguments

In 2011, the United States Department of Justice issued a findings letter summarizing the results of its long investigation into the State of Mississippi's mental health system. It concluded that Mississippi was "unnecessarily institutionalizing persons with mental illness" in violation of the ADA's integration mandate. Docket No. 150-24 at 2. After years of

---

for a ringing endorsement of community integration of people with mental disabilities in multiple aspects of daily life." *Id*. at 929.

negotiations failed, the United States filed this suit in 2016. It named the State as the sole defendant. *See* Docket No. 1.

The parties have stipulated that the State is a public entity that must comply with the ADA and its implementing regulations. Trial Stipulations ¶ 1.[5] The State controls and operates the mental health system through the Mississippi Department of Mental Health (DMH), which provides services, and the Mississippi Division of Medicaid, which pays for services for Medicaid-enrolled persons. *Id.* ¶ 2. Persons with SMI are "almost always" eligible for Medicaid. Trial Tr. 1402.

The United States alleges that Mississippi over-relies on state psychiatric hospitals in violation of *Olmstead*. Adults with SMI are forced into segregated hospital settings instead of being able to stay in their communities with the help and support of their families and local services. The United States claims that as a result, all Mississippians with SMI are denied the most integrated setting in which to receive services, and are at serious risk of institutionalization.[6]

The case culminated in a four-week bench trial in June and July of 2019.[7] The parties have now submitted their post-trial

---

[5] The Trial Stipulations were filed at Docket No. 231-1. In this opinion, the plaintiff's exhibits are cited as "PX," the defendant's exhibits are cited as "DX," and joint exhibits are cited as "JX."

[6] The United States' allegations echo President Bush's lament that "tragically . . . the blessings of liberty have been limited or even denied" to many persons with disabilities. President Bush, *supra* note 2.

[7] The attorneys for both sides provided admirable representation to their clients. The Court appreciates how all involved worked together in good faith for the most efficient management of this case, and treated the subject of this matter with the seriousness and respect it deserves. The

proposed findings of facts and conclusions of law. *See* Docket Nos. 232–33.

Motion practice established that the United States filed this action pursuant to its authority to enforce Title II of the ADA, 42 U.S.C. § 12133, and under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997a. *See United States v. Mississippi*, No. 3:16-CV-622-CWR-FKB, 2019 WL 2092569, at *2–3 (S.D. Miss. May 13, 2019); *see also DAI II*, 675 F.3d at 162 (finding that the United States had standing to bring suit on behalf of thousands of individuals with SMI living in segregated settings). The United States has complied with the necessary statutory prerequisites. The State has not challenged that these prerequisites have been met at or since trial.

The State, however, has raised several arguments that all suggest the same conclusion: despite the statutory authority to bring such a suit, the United States cannot prevail in this case because it is the sole plaintiff. Without other named plaintiffs or a certified class of individuals, the State says, there is no violation of the ADA. These arguments must be addressed first, because while not expressly articulated as such, they invoke the basic principle of Article III standing that a plaintiff must suffer an "injury-in-fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

First, the State argues that the United States has not proven that anyone was unnecessarily hospitalized. Second, the State argues that the United States has not proven that anyone was denied the benefits of, or excluded from participation in, any

---

professionalism they exhibited during the trial is one which the Court wishes it experienced in each of its cases.

community-based program. Third, the State contends that because the United States does not have named plaintiffs who are currently institutionalized, this case is "only" an at-risk of institutionalization case. Docket No. 232 at 15.

The first two arguments were refuted at trial. The United States' experts provided dozens of examples of individuals who were unnecessarily hospitalized or hospitalized too long because they were excluded from community-based services. Some of the persons the United States' experts analyzed for this suit were still hospitalized when the experts interviewed them. All of that evidence will be discussed below. In this section, though, the Court will discuss the third argument: whether this case is somehow deficient for emphasizing that Mississippians remain at risk of institutionalization and re-institutionalization.

Most of the cases brought pursuant to Title II's integration mandate are brought by individual plaintiffs or classes of persons. *E.g.*, *Olmstead*, 527 U.S. at 593 (reciting that plaintiffs L.C. and E.W. were persons with disabilities who challenged their institutionalization). This case is different. Here, the United States alleges, *inter alia*, that Mississippi's system pushes thousands of people into segregated hospital settings that could have been avoided with community-based services. When persons with SMI are eventually discharged, it claims, Mississippi's ongoing lack of community-based services means they are at serious risk of re-institutionalization.

The Fifth Circuit has not reviewed a similar case, so decisions from around the country guide this Court's determination. *Cf. Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018), *as revised* (Sept. 25, 2018) ("If there is no directly controlling

authority, this court may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority.").

The cases show that Title II protects not only those persons currently institutionalized, but also those at serious risk of institutionalization. *See Steimel v. Wernert*, 823 F.3d 902, 911–13 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 321–22 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1116 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012); *Fisher*, 335 F.3d at 1181; *Steward v. Abbott*, 189 F. Supp. 3d 620, 633 (W.D. Tex. 2016); *Pitts v. Greenstein*, No. 10-635-JJB-SR, 2011 WL 1897552, at *3 (M.D. La. May 18, 2011); *DAI I*, 653 F. Supp. 2d at 187–88 (finding violation of ADA and Rehabilitation Act where approximately 4,300 individuals with SMI were "residing in, or at risk of entry into" segregated settings), *vacated sub nom. DAI II*, 675 F.3d at 162 (finding that original plaintiff lacked organizational standing but the United States could bring such a suit). In other words, the prospective approach taken by the United States is supported by the weight of authorities from around the country.

The State argues that these cases have differing fact patterns. The argument is unpersuasive because these cases all evaluated the key premise at issue here—whether at risk of institutionalization claims are valid.

In *Pashby*, for example, the Fourth Circuit rejected the idea that an *Olmstead* claim is limited to instances of "actual institutionalization." 709 F.3d at 321. It instead agreed with the plaintiffs that *Olmstead* protects those facing "risk of institutionalization." *Id.* at 322. The Tenth Circuit added that a contrary conclusion makes little sense, as the ADA's "protections

would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher*, 335 F.3d at 1181; *see also Steimel*, 823 F.3d at 912. "Unsurprisingly, . . . courts of appeals applying the disability discrimination claim recognized in *Olmstead* have consistently held that the risk of institutionalization can support a valid claim under the integration mandate." *Davis*, 821 F.3d at 263 (collecting cases).

Unsatisfied with this principle, Mississippi pivots, and says those cases are distinguishable because those defendants were making "policy changes" to take away services, whereas here, Mississippi is simply moving slowly on deinstitutionalization. But that is not a complete statement of the facts or the law. The evidence showed that Mississippi is making policy changes that both decrease *and increase* institutionalization. For example, the State is increasing hospital beds at some of its facilities. The law, meanwhile, indicates that the ADA and *Olmstead* protect persons trapped in a snail's-pace deinstitutionalization.

The ADA is unique among civil rights laws. It is "a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame*, 657 F.3d at 223 (citations omitted). Somewhat unusually, the ADA "impose[s] upon public entities *an affirmative obligation* to make reasonable accommodations for disabled individuals. Where a defendant fails to meet this affirmative obligation, the cause of that failure is *irrelevant*." *Bennett-Nelson v. Louisiana Bd. of*

*Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005) (emphasis added and citations omitted).

This affirmative obligation extends to deinstitutionalization cases. *Olmstead* explicitly holds that "States are *required* to provide community-based treatment" if three elements are met. 527 U.S. at 607 (emphasis added).[8] None of those elements turn on whether the State is eliminating services or failing to provide services. The rate-of-change question is instead folded into element three of the standard; whether community placement "can be reasonably accommodated." *Id.*

Case law also indicates that states dragging their feet on deinstitutionalization can be held accountable under *Olmstead*.

In *Frederick L.*, the Third Circuit was faced with a situation with similarities to our own. Both parties sought deinstitutionalization and citizens' "integration into community-based healthcare programs." *Frederick L. v. Dep't of Pub. Welfare of Pa. (Frederick L. II)*, 422 F.3d 151, 154 (3d Cir. 2005). They disputed only the timeline of implementation (or lack thereof). The appellate court found that although the Commonwealth of Pennsylvania "proffers general assurances and good faith

---

[8] Similarly, the ADA's implementing regulations provide that public entities "*shall* make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (emphasis added). Nothing in this regulation provides an exception for states that characterize segregation on the basis of disability as a mere failure to act. Such an exception might well swallow the rule.

intentions to effectuate deinstitutionalization," that was not enough to satisfy the ADA.

> General assurances and good-faith intentions neither meet the federal laws nor a patient's expectations. Their implementation may change with each administration . . . , regardless of how genuine; they are simply insufficient guarantors in light of the hardship daily inflicted upon patients through unnecessary and indefinite institutionalization.

*Id.* at 158–59. The Third Circuit concluded that under *Olmstead*, states must provide more than "a vague assurance" of "future deinstitutionalization"; that "verifiable benchmarks or timelines" are "necessary elements of an acceptable plan"; and that any plan must "demonstrate a commitment to community placement in a manner for which [the state government] can be held accountable by the courts." *Id.* at 155–56. This Court agrees, and will therefore consider the State's arguments regarding the timing of deinstitutionalization later in the *Olmstead* analysis, rather than as a bar to the entire action.

Given all of these authorities, the Court cannot sustain the State's preliminary legal arguments. The Court will now turn to the evidence.

### III.

### Mississippi's Mental Health System

Mississippi's mental health system looks like a broad continuum of care—with community services on one end and the state hospitals on the other. On one end, the State is divided

15

into regions, each covered by a community mental health center that provides a range of services. On the other end, a handful of state hospitals are used to institutionalize patients when necessary.

Dr. Robert Drake, one of the United States' experts, testified that the community-based system described in Mississippi's manuals "is well written." Trial Tr. 105. In practice, however, the continuum of care morphs from a line into a circle. Mississippians with SMI are faced with a recurring cycle of hospitalizations, without adequate community-based services to stop the next commitment. This process of "cycling admissions" is "the hallmark of a failed system." Trial Tr. 119.

## A.    Community-Based Services

"The State offers community-based mental health services primarily through fourteen regional community mental health centers (CMHCs). DMH is responsible for certifying, monitoring, and assisting the CMHCs." Trial Stipulations ¶ 5. DMH promulgates standards for the CMHCs and provides them with grant funding, but the management of each CMHC is left to a board appointed by the county supervisors within the catchment area covered by the CMHC. *Id.* ¶ 7; Trial Tr. 1579.

"Community-based services" refers to a bundle of evidence-based practices. If these services are provided in a county, they are provided through the regional CMHC. Each kind of service is described in more detail below.

- *Programs of Assertive Community Treatment (PACT)*: PACT is the most intensive community-based service available in Mississippi. It is for individuals "who have the most severe and persistent mental illnesses, have

16

severe symptoms and impairments, and have not bene-fited from traditional outpatient programs." JX 60 at 215; *see* Trial Stipulations ¶¶ 189–90. PACT teams include some combination of psychiatric nurse practitioners, psychiatrists, registered nurses, community support specialists, peer support specialists, employment and housing specialists, therapists, and program coordina-tors. *See* Trial Tr. 529 and 2194. Currently, PACT services are offered in Mississippi through eight PACT teams, which together cover 14 of Mississippi's 82 counties. *See* PX 413; Trial Stipulations ¶ 195.

- *Mobile Crisis Response Services*: "All fourteen CMHC re-gions established Mobile Crisis Response Teams in 2014. Mobile crisis response services are required by DMH regulation to be available 24 hours a day, 7 days a week, 365 days a year." Trial Stipulations ¶¶ 208–09.

- *Crisis Stabilization Units (CSUs)*: "CSUs provide psychi-atric supervision, nursing, therapy, and psychotherapy to individuals experiencing psychiatric crises, and are designed to prevent civil commitment and/or longer-term inpatient hospitalization by addressing acute symptoms, distress, and further decompensation." *Id*. ¶ 212. There are nine CSUs in Mississippi. They are lo-cated in Batesville, Brookhaven, Cleveland, Corinth, Grenada, Gulfport, Laurel, Newton, and Jackson. *Id*. ¶ 222.[9]

---

[9] The ninth CSU was added in Hinds County, the State's most populous county, in the spring of 2019, past the fact cut-off date agreed to by the parties. *See* Trial Tr. 2202. Nevertheless, this is relevant for understanding the complete range of services currently provided by DMH.

- *Community Support Services*: Community support services are similar to PACT services, but are less intensive. They allow healthcare professionals to provide in-home services like medication management and referrals to other service providers. Medicaid will reimburse up to 100 hours of community support services per person per year. *See* Trial Tr. 40 and 1345.

- *Peer Support Services*: "Peer Supports are provided in Mississippi by Certified Peer Support Specialists (CPSS), individuals or family members of individuals who have received mental health services and have received training and certification from the State. CPSS may work in State Hospitals, as part of PACT or Mobile Crisis Response Teams, for CMHCs, or for other providers and serve as a resource for individuals with mental illness. Peer specialists engage in person-centered activities with a rehabilitation and resiliency/recovery focus. These activities allow consumers of mental health services and their family members the opportunity to build skills for coping with and managing psychiatric symptoms and challenges associated with various disabilities while directing their own recovery." Trial Stipulations ¶¶ 251–52.

- *Supported Employment*: "Supported Employment for SMI assists individuals with severe and persistent mental illness in obtaining and maintaining competitive employment." *Id*. ¶ 227. "In FY17 116 individuals with SMI received supported employment." *Id*. ¶ 232.

18

- *Permanent Supported Housing*: "According to SAMHSA,[10] Permanent Supported Housing is an evidence-based practice that provides an integrated, community-based alternative to hospitals, nursing facilities, and other segregated settings. It includes housing where tenants have a private and secure place to make their home, just like other members of the community, and the mental health support services necessary to maintain the housing." *Id.* ¶ 235. In Mississippi, supported housing services are delivered through a program known as CHOICE. "CHOICE recipients receive mental health services from the local CMHC or other providers and are eligible for a rental subsidy administ[ered] through MHC." *Id.* ¶ 237. "In FY17 205 individuals were served through CHOICE." *Id.* ¶ 249.

The evidence established that the descriptions of the services provided by CMHCs is adequate. The problem is that the descriptions do not match the reality of service delivery, in terms of what is actually provided and where it is provided. Some of those realities are presented below.

### 1.    PACT is unavailable and under-enrolled.

The following map provides an understanding of the regional catchment areas that each CMHC covers. It shows that PACT services do not exist in 68 of Mississippi's 82 counties.

---

[10] The Substance Abuse and Mental Health Services Administration (SAMHSA) is an agency within the U.S. Department of Health and Human Services.

**Figure 1**

**Mississippi Counties with PACT Teams as of June 2018[11]**



PACT is the most intensive community-based service. It targets individuals who need the most assistance staying out of the hospital. The prime candidate for PACT is someone who has had multiple hospitalizations, such as the 743

---

[11] PX 413.

Mississippians hospitalized more than once between 2015 and 2017. *See* PX 405 at 28.[12] The United States refers to this group as the "heavy utilizers" of the mental health system. Trial Tr. 2468.

As of September 2018, however, only 384 people in the state were receiving PACT services. *See* JX 50 at 8. The problem is obvious. If there are more than 700 heavy utilizers who have been hospitalized multiple times, but fewer than 400 persons receive PACT services, the penetration rate of PACT services is low.

Again, one obvious reason for the under-enrollment of heavy utilizers is geographical. The below map shows that many of Mississippi's most-hospitalized persons live in areas where PACT services are not available.

---

[12] Dr. Todd MacKenzie, one of the United States' experts, compiled state hospital admission records from October 2015 through October 2017. He found that during that time frame, 514 patients were admitted twice, 147 patients were admitted three times, and 82 patients had four or more admissions. Trial Tr. 278. Over that period, just 30% of state hospital patients accounted for 73% of the total state hospital bed days. *See* PX 419.

**Figure 2**

**Home Addresses of the top 30% of Hospital Utilizers[13]**



Even in those 14 counties where PACT exists, there is another problem. Testimony revealed that existing PACT teams are not operating at full capacity. A DMH Bureau Director attributed the shortfall to "staff issues" and the fact that some

---

[13] PX 419.

patients "choose not to have that level of intervention in their life." Trial Tr. 1587–88.

The first explanation is understandable. The second is less persuasive. Other states' experiences show that patients do in fact choose to have intensive community-based services in their lives. We know this because other states have significantly higher PACT penetration rates. One of the State's experts testified that if Mississippi's PACT services had the nation's average penetration rate, a total of 1,329 Mississippians with SMI would be receiving PACT services. Trial Tr. 1539. That is nearly 1,000 persons more than are being served today.

### 2.   Mobile Crisis Services are illusory.

Geographic availability does not always translate into true accessibility. The Court heard from Sheriff Travis Patten, the top law enforcement official in Adams County, Mississippi. He testified that although his county is covered by the CMHC for Region 11, when people call the mobile crisis line, the Adams County Sheriff's Department is dispatched to respond to the call. That is in large part because the mobile crisis team is based in McComb, over an hour away. His department never sees the mobile crisis team. *See* Trial Tr. 914–15.

Ms. Worsham, the certified peer support specialist, has called the mobile crisis line in Gulfport "dozens of times." Trial Tr. 335. They came only once. Trial Tr. 336. Every other time, they told her to take herself or her client to the hospital or call the police. Trial Tr. 336–37.

It is no surprise then that the mobile crisis lines covering Adams County and Gulfport are utilized less often than others in the state. The below map shows the utilization of this service by region:

23

**Figure 3**

**2017 Mobile Crisis Calls and Contacts per 1000 Residents[14]**



PX 0415    Page 1 of 1

### 3. Crisis Stabilization Units are not available.

Not all of the CMHCs have crisis stabilization units. Sheriff Patten does not have a CSU in Adams County or in the larger Region 11 catchment area. That is a missed opportunity, as

---

[14] PX 415.

24

the State does not dispute that CSUs are an effective diversion from hospitalization. DMH data show that CSUs successfully divert a patient from a state hospital 91.85% of the time. *See* PX 354 at 9.

### 4. Peer Support Services are not billed.

Peer support services are included in the Mississippi Medicaid State Plan, but there is no indication that the service is being utilized across the State. Shockingly, in the three most populous regions of the State, CMHCs billed Medicaid for a *total* of 17 persons who received peer support services in 2017. *See* PX 407 at 22; PX 423 at 2; Trial Tr. 1356–57.

Meanwhile, Mississippi has only two peer-run drop-in centers—places that allow anyone suffering from SMI to come in at any time and connect with peers. Those are located in Gulfport and Jackson. *See* Trial Tr. 328–30 and 2206.

### 5. Supported Employment is miniscule.

In 2018, 257 Mississippians received supported employment services. *See* DX 302 at 21; Trial Tr. 1515 and 1558. Not surprisingly, despite working as a peer support specialist within the community, Melody Worsham is not aware of anyone with SMI who has received supported employment services. *See* Trial Tr. 341.

One of the State's experts, Ted Lutterman, testified that Mississippi's penetration rate on supported employment is "quite low." Trial Tr. 1515. If it were increased to the national average, he said, a total of 1,266 people would benefit from the service. Trial Tr. 1558. That is (once again) 1,000 more people a year than the State is currently serving.

In 2019, DMH attempted to increase supported employment services by giving new $40,000 grants to seven CMHCs. *See* DX 12 at 2; Trial Tr. 1631–32. Each grant would pay for one additional supported employment specialist, who in turn could assist another 20 to 25 clients per region. Trial Tr. 1632. While that is a step in the right direction, it represents one fewer supported employment specialist than DMH recommended *per region in 2011*, and will help a maximum of 175 Mississippians with SMI. *See* Trial Tr. 1632. A DMH official explained this at trial by saying, "You just have to go with the funding you have." Trial Tr. 1632.

### 6.    CHOICE is far too small.

The CHOICE housing program is grossly underutilized. Overall, about 400 Mississippians have benefited from CHOICE. *See* Trial Tr. 742. The map below shows seven CMHC regions with fewer than five individuals enrolled in CHOICE, despite an estimate by the program administrator that over 2,500 beds statewide are needed. *See* JX 5 at 3.

**Figure 4**

**CHOICE Program Utilization 2016-2018[15]**



CHOICE Program Client Addresses
February 2016 to January 2018

**7.      Other management concerns.**

One reason many community services are underutilized is the lack of data-driven management. *See* PX 407 at 31; Trial Tr. 1396. DMH executives admitted that they do not regularly

---

[15] PX 416.

review data on community-services utilization, much less use that data to drive programmatic changes. *See* Trial Tr. 1639–40; Allen Dep. 10–11; Holloway Dep. 34–35; Hurley Dep. 48–49; Toten Dep. 21–22, 109, 133–34, 140, 194, and 208–09. As an example, the clinical director at South Mississippi State Hospital testified that the committee established to monitor hospital readmission rates stopped meeting regularly. Reeves Dep. 24–25. "I think we addressed whatever we were capable of addressing," he said. *Id.* at 25.

A different kind of management problem concerns DMH's relationship with community health providers. DMH views CMHCs as independent, autonomous organizations, *see* Allen Dep. 14–15 and 45, but DMH sets the standards for the CMHCs and gives them grants for programs, *see id.* at 14–15 and Trial Stipulations ¶¶ 5–7. It is ultimately DMH's responsibility to manage the expansion of community-based services at CMHCs.

## B.     State Hospitals

On the other end of the continuum of care are the state hospitals. "DMH funds and operates four State Hospitals: Mississippi State Hospital in Whitfield, MS (MSH), East Mississippi State Hospital, in Meridian, MS (EMSH), North Mississippi State Hospital, in Tupelo (NMSH), MS, and South Mississippi State Hospital, in Purvis, MS (SMSH)."[16] Trial Stipulations ¶ 9.

---

[16] DMH also runs the Central Mississippi Residential Center in Newton, a step-down facility that helps transition individuals from the state hospitals to the community. *See* Trial Stipulations ¶ 186.

In 2018, a total of 2,784 Mississippians were institutionalized across the four hospitals. *See* PX 412 at 3. That year, the State had 438 state hospital beds.[17] *See* Trial Tr. 2453; PX 412A at 1. These beds cost the State between $360 and $474 per person per day. *See* PX 452 at 38; PX 453 at 30; PX 454 at 20; PX 455 at 20.

Mississippi has relatively more hospital beds and a higher hospital bed utilization rate than most states. *See* PX 393 at 39; PX 394 at 20 and 27. The State concedes that its "hospital utilization rate is higher than the national and regional rates," but emphasizes that since 2008 it has fallen faster than the regional and national averages. Docket No. 232 at 44.

While the number of hospital beds in Mississippi fell from 2011 to 2014, it has remained relatively stable since then. *See* PX 412 at 1. The graphic below demonstrates such:

---

[17] This total does not include "forensic" beds, which are used for pretrial mental health evaluations or for persons found not guilty by reason of insanity. *See* Trial Tr. 1363 and 2321. Forensic beds have largely been excluded from this suit because they serve a need in the criminal justice field. That, however, does not mean that the State does not face challenges with the availability of those beds. *See* Adam Northam, *Bed shortage leaves mentally ill in jail*, The Daily Leader, Sept. 8, 2018 ("He's not a criminal, he's a sick man, and his confinement to the jail instead of the hospital is shameful, said Lincoln County Sheriff Steve Rushing.").

**Figure 5**

**Average Staffed Bed Capacity in State Hospitals[18]**



Bo Chastain, the Director of Mississippi State Hospital, testified that he intends to operate the same number of beds each year. Trial Tr. 2272. One of the United States' experts testified that "East Mississippi [State] Hospital actually added beds as did South Mississippi State Hospital in 2018." Trial Tr. 1362.

When compared to other states, Mississippi allocates significantly more of its budget to institutional settings and correspondingly less of its budget to community-based services. *See* PX 407 at 29. Mississippi's funding allocation is about a decade behind other states. In 2015, for example, Mississippi's proportional spending on community-based services was less than the 2006 national average. *See* Trial Tr. 1544.

The State admits that the share of its budget spent on institutional care remains above the national average. *See* Docket

---

[18] PX 412 at 1.

No. 232 at 44. If federal Medicaid dollars are excluded from the calculation, only 35.65% of Mississippi's mental health spending went to community-based services in 2017. *See* PX 319; PX 407 at 29; Trial Tr. 1419.

There is no dispute that the state hospitals are "institutional, segregated settings." Trial Stipulations ¶ 11. If you are in a state hospital, your "routine is determined by other people, and the food is determined by other people, and your privacy level is determined by []other people." Trial Tr. 511. Life there is best described by those who have experienced it.

According to Blair Duren, who has been admitted on three occasions, state hospitals are "very scary."

> It's anxiety and depression and paranoia all built up. There is a lot of sick people who are very sick and have worse issues than myself, and it was very hard to be in a hospital because you were told, you know, when to go to bed, when it's time to eat. There is no freedom. There is no independence at all, no privacy.

Trial Tr. 568–69. Another patient told one of the United States' experts that "it was the most humiliating experience she had ever had in her life." Trial Tr. 966. Others said it was "like a prison." Trial Tr. 966. "It's no life to be in a hospital," one of the United States' experts said. "It's being alive, but that's different than having a life." Trial Tr. 509–10.

Ms. Worsham told the Court that:

> I'm terrified of [state hospitals]. . . . They take all your rights away and there is no dignity. They pump people full of drugs. They make you use

> a community bathroom even though you have
> your own room. Women who are menstruating
> have to walk around the halls with a handful of
> tampons. If I want to rest or if a person wants to
> rest, they have to just lay in the hallway. They
> don't let people rest. Sometimes there is coer-
> cion. I would never want to be there, and I have
> made efforts in the past to stay out of them.

Trial Tr. 335. Individuals at East Mississippi State Hospital
have to earn back the privilege of wearing their wedding ring.
An expert said that was "unusual and extreme." Trial Tr.
1333.

T.M. is a man with SMI who has been admitted to state hos-
pitals on six different occasions. Trial Tr. 778. While hospital-
ized in Meridian, on the other side of the state from his mother
in the Delta, he once wrote her a letter saying, "I'm not sure
when [or] if I'll ever see you again." PX 1102 at 2; Trial Tr. 782.

It particularly struck this Court that a single hospitalization
can result in you losing custody of your children. That is what
happened to Person 11, a 41-year-old woman with two
daughters. When she was interviewed by one of the United
States' experts, she still had not regained custody of her chil-
dren. Trial Tr. 853–54.

Transition planning is another area of concern. While individ-
uals being discharged are often given a date to report to the
local CMHC, there is no follow-up or consistent connection to
local services. *See* Trial Tr. 818. DMH documents show that in
2016, only 20% of patients met with a CMHC representative
before being discharged from the hospital. *See* PX 151 at 9. The
Social Services Director at MSH, who supervises 40 social

workers, testified that a social worker's involvement with the patient ends as soon as the patient leaves the hospital. Fleming Dep. 8 and 79.

It is common for state hospitals to use the same discharge plan even after an individual has returned for another commitment. Katherine Burson, one of the United States' experts, "found the discharge planning to be formulaic. People pretty much got the same discharge plan, and it -- I didn't see discharge plans change, even when in the past the discharge plan hadn't worked." Trial Tr. 1091. Person 3, for example, was admitted to state hospitals three times between 2014 and 2016, and his planning looked identical upon each discharge. *See* Trial Tr. 819–32. Some patients did not have access to medication upon discharge, which led to rehospitalization "relatively quickly." Trial Tr. 445.

## IV.

### Everyday Mississippians

The Court heard from several DMH executives who testified about the extent of community-based services currently provided by the State.[19] They uniformly agreed that the State prioritizes community-based care. *See* Trial Tr. 1613, 1672–73, 2050, 2293, and 2331. One of the challenges mentioned by these witnesses is the lack of a qualified workforce for mental

---

[19] These witnesses included Jake Hutchins, Bureau Director of Behavioral Health at DMH; Marc Lewis, Director of the Bureau of Certification and Quality Outcomes at DMH; Steven Allen, Deputy Executive Director of DMH; Director Chastain of MSH; and Diana Mikula, Executive Director of DMH.

healthcare employers across Mississippi.[20] *See* Trial Tr. 2258 and 2318–20.

The United States, in contrast, called several people who have used the State's mental health services or whose family members have used such services. They all testified that a lack of community-based services is devasting to individuals with SMI and their families.

The Court heard harrowing and tragic stories about what happens when people fall through the cracks. Through tears, H.B. shared one of those stories.

His daughter, S.B., is a 52-year-old woman who has relied on the State's mental health system for approximately three decades. S.B. has been in state hospitals 23 times in that span. H.B. has been forced to initiate commitment proceedings several times, because he has no other options and S.B. does not receive any services when she is not hospitalized.[21] *See* Trial Tr. 721–42. "I would have liked to have had other options that

---

[20] One of the factors contributing to this problem is a lack of competitive pay. Director Chastain testified that a direct care worker in a state hospital has a starting salary of approximately $17,500, which is far from a living wage. *See* Trial Tr. 2258.

[21] In the winter of 2013-2014, H.B. was unable to locate his daughter. S.B. had been living in a care home called Creation Elite, where she alleged that a male staff attendant was sexually assaulting her. In response, the owner of the home moved S.B. into an apartment without any oversight, and she quickly stopped taking her medication. *See* Trial Tr. 726–31; DX 338. Personal care homes seem to be a particularly egregious problem. There is little oversight and nothing to ensure that "care" is actually provided.

were -- were better options, but they weren't there." Trial Tr. 738.[22]

C.R. told the Court about her cousin, T.M., who has been hospitalized six times. One time, a social worker at MSH called and asked C.R.—a layperson—"what is the discharge plan for T.M.?" At the time, C.R. did not even know that T.M. had been hospitalized. C.R. has never heard about crisis stabilization services that could help T.M. when he is in the community.[23] *See* Trial Tr. 773–86.

The witnesses also offered glimpses into what it is like when the State provides the services it promises. Dr. Kathy Crockett, Executive Director of Hinds Behavioral Health Services, testified for the State about the array of services provided in Hinds County, including (among other things) a PACT team, crisis stabilization unit, and drop-in center. *See* Trial Tr. 2192–94. She says they serve everyone they can, but would "love to" expand their community-based services because there are others out there who need assistance. Trial Tr. 2228 and 2235.

---

[22] S.B.'s story gets even sadder. Eighteen years ago, her father took custody of her son at three days old, and later adopted him. That child was the product of what H.B., a former police officer, described as a felonious relationship—a married man had taken advantage of his daughter. *See* Trial Tr. 756–57. Years later, in large part because of the lack of services, S.B.'s mental health declined to a "bad state." One day she was walking in the street and was struck by a hit-and-run driver. She suffered two broken legs, a broken pelvis, and a concussion, resulting in two knee replacement surgeries. Her total hospital stay was five months, including rehabilitation so that she could learn to walk again. *See* Trial Tr. 731–32 and 764–66.

[23] Similar to S.B., T.M. also spent time in a personal care home that was shut down. T.M.'s personal care home was unlicensed. *See* Trial Tr. 793.

Kim Sistrunk is the PACT team leader in Tupelo. While she has funding only to provide services to persons living in Lee County, she described a committed, on-the-ground team that helps clients manage SMI and learn to live fulfilled lives. Trial Tr. 529 and 540. Her PACT team has a client who, with their support, has maintained a job at a local furniture manufacturer, increased her credit score, and recently bought her own car. Before connecting with PACT, the client was dependent on others to get around. *See* Trial Tr. 537–38. Mr. Duren, a client who was quoted earlier in this opinion, provided heartfelt testimony about the "dramatic[]" impact Ms. Sistrunk's team has had on his life—the therapy sessions they offer, their careful preparation of "med boxes," and even the fact that they have a washer and dryer on-site. Trial Tr. 570–72.

Ms. Sistrunk has seen firsthand how her team can divert clients from hospitalization. The team has a client in his fifties who does not have any family or friends to support him. They noticed that he had become suicidal, and they were able to get him into a crisis stabilization unit for a few days. The providers at the CSU "tweaked" his medications successfully. The PACT team was there to pick him up and take him home. Prior to his connection to PACT services, this gentleman had been committed for longer stays in state hospitals because of similar suicidal symptoms. *See* Trial Tr. 540–41.

Ms. Worsham shared Dr. Crockett and Ms. Sistrunk's sentiments about the impact community-based services can have.

> I have seen amazing progress in people's recovery. . . . I have seen people when I first started there that had kind of resolved the life that I thought I had for me back in the day, that I'm

> just going to never work, nobody wants me be-
> cause I'm sick, I'm going to watch TV, I'm going
> to play some crossword puzzles or something,
> and that's my life, to all of a sudden people hav-
> ing a desire to go back to school or own a home
> or get married, you know, real life things, get-
> ting into life, joining a bowling league.

Trial Tr. 326.

## V.

## The Experts

In many ways, this case is a battle of the experts.

### A.    The United States' Clinical Review Team

The United States retained six experts for its Clinical Review
Team (CRT). The CRT was comprised of Dr. Drake,[24] Dr.
Carol VanderZwaag,[25] Mr. Daniel Byrne,[26] Dr. Beverly Bell-

---

[24] Dr. Drake is a medical researcher and psychiatrist. He was admitted as
an expert in serious mental illness and mixed methods research on mental
health services. *See* Trial Tr. 104. His expert report was admitted as PX 404.

[25] Dr. VanderZwaag is a psychiatrist. She was admitted as an expert in
psychiatry and community-based mental health services assessments. *See*
Trial Tr. 373. Her expert report was admitted as PX 402.

[26] Mr. Byrne is a clinical social worker. He was admitted as an expert in
clinical social work and assessments for community-based mental health
services. *See* Trial Tr. 588. His expert report was admitted as PX 401.

Shambley,[27] Dr. Judith Baldwin,[28] and Ms. Burson.[29] Dr. Drake led the CRT. The United States also hired experts in other fields to assist the CRT.

Dr. Todd MacKenzie, a statistician,[30] worked with Dr. Drake to draw a randomized, stratified sample of 299 individuals (out of nearly 4,000 total) who were hospitalized at least once between October 2015 and October 2017. PX 404 at 5. Dr. Drake conducted a literature review on the state of community-based services around the country and worked with the CRT to design a study.[31] The CRT then sought to interview

---

[27] Dr. Bell-Shambley is a psychologist. She was admitted as an expert in psychology, serious mental illness, and community-based mental health assessments. *See* Trial Tr. 809. Her expert report was admitted as PX 408.

[28] Dr. Baldwin is a registered nurse and a board-certified specialist in psychiatric nursing. She was admitted as an expert in psychiatric nursing, serious mental illness, and assessments for community-based mental health services. *See* Trial Tr. 949. Her expert report was admitted as PX 403.

[29] Ms. Burson is a board-certified occupational therapist. She was admitted as an expert in psychiatric occupational therapy, serious mental illness, and community-based mental health assessments. *See* Trial Tr. 1064. Her expert report was admitted as PX 406.

[30] Dr. MacKenzie was admitted as an expert in statistics and biostatistics. *See* Trial Tr. 276. His expert reports were admitted as PX 405 and PX 405A.

[31] The State argues that the CRT study is unreliable because two of the six CRT members could not identify a similar model used by other states or published in a peer-reviewed journal. Docket No. 232 at 10–11. But those two CRT members were not responsible for designing the study—*Dr. Drake* was the expert in research methods, and he testified that the system CRT used is similar to the methods he has employed in hundreds of articles he has published in peer-reviewed journals. *See* Trial Tr. 98–103 and 166; PX 404 at 5. Interestingly, the State's attorneys did not ask Dr. Drake whether he knew of any peer-reviewed studies that used a similar model.

154 of the 299 individuals in the sample. *Id.* at 1. The CRT also reviewed medical records for the 154 individuals and, in certain instances, spoke with their family members and community service providers. After the interviews and review, the CRT answered four questions for each individual:

1. Would this patient have avoided or spent less time in the hospital if reasonable community-based services had been available?

2. Is this patient at serious risk of further or future hospitalization in a state hospital?

3. Would this patient be opposed to receiving reasonable community-based services?

4. What community-based services are appropriate for and would benefit this patient?

*Id.* at 4. Finally, Dr. MacKenzie used a weighted analysis to draw conclusions about the population of adults with SMI. *See* Trial Tr. 296.

The experts found that "nearly all, if not all, of the 154 patients would have spent less time or avoided hospitalization if they had had reasonable services in the community."[32] Trial Tr. 107; *see* PX 405 at 5. Of the 150 persons in the sample who were still living, 149 of them (~99%) were not opposed to receiving community-based services. PX 405 at 5. And of the 122 persons who were not living in an institution during their

---

[32] "Reasonable community-based services" was defined as the evidence-based practices described earlier in this opinion. *See* Trial Tr. 107–08.

interview, 103 of them (~85%) were at serious risk of re-institutionalization. PX 405A.[33]

The response to the fourth question was not quantified, because it was not a "yes or no" question. Instead, the CRT described which community-based services would benefit and were appropriate for the individual. Here are some of the CRT's findings on question four:

1. Person 133, interviewed by Ms. Burson, had been admitted to a state hospital 16 times at the time of his interview. He has a work history and supportive family, and because of that support and desire to work, he would benefit from community-based services. Yet, Person 133 had never received community-based services. *See* Trial Tr. 1071–76. At the time of his interview, he was appropriate for and would have benefited from PACT, supported employment, peer support, and mobile crisis services. PX 406 at 76–80.

---

[33] The State contends in its post-trial brief that these findings are not scientific. The argument, which was not presented alongside the State's other *Daubert* challenges, *see* Docket No. 148, is difficult to accept. To the extent the State's argument turns on nomenclature, it is perfectly acceptable for an expert to describe herself as a "clinician" rather than a "scientist." *See, e.g.,* Trial Tr. 487 ("I'm a clinician, and I deal with individuals."). To the extent the State's argument goes to the merits, however, Dr. Drake specifically testified that the "most scientific way to address the questions" DOJ asked was the "mixed-method approach" he used with the CRT. Trial Tr. 156. The truth is that both parties did an excellent job of not attempting to pass off unqualified testimony as expertise. The United States' experts wrote reports fully satisfying the standards of *Daubert* and Rule 702, *see Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006), then testified in accordance with those reports.

2. Person 3, interviewed by Dr. Bell-Shambley, was in an acute state at the time of his interview. He was not receiving any community-based services, nor had he after any of his three hospital admissions. *See* Trial Tr. 825–26. At the time of his interview, he was appropriate for and would have benefited from PACT, mental health therapy, and medication management. PX 408 at 19–22.

3. Person 58, interviewed by Mr. Byrne, had been in and out of state hospitals five times over a two-year span at the time of her interview. Mr. Byrne testified that she was not receiving any community-based services between hospitalizations. *See* Trial Tr. 591–93. At the time of her interview, she would have benefited from PACT and permanent supported housing. PX 401 at 25.

4. Person 46 was interviewed by Dr. VanderZwaag at the MSH. He had been admitted to the state hospital 18 times in the previous seven years and would have benefited from PACT—but had never received it. *See* Trial Tr. 414–16. At the time of his interview, he was appropriate for and would have benefitted from PACT and permanent supported housing. PX 402 at 71.

5. Person 41 was interviewed by Dr. VanderZwaag while he was living with his father. He was struggling to find work and gain financial independence. He had several prior admissions and would not show up to the CMHC for months at a time, which would lead to hospitalization. He would benefit from a service like PACT but had never received it. *See* Trial Tr. 418–21. At the time

of his interview, he also would have benefitted from permanent supported housing. PX 402 at 55.

6. Person 108, interviewed by Dr. Baldwin, was 27 years old at the time of his interview but had been hospitalized eight times in the past nine years. He would have benefited from crisis services when his symptoms became acute, particularly because he had a good grasp of his own symptoms. Without such a service, he had to rely on hospitals. *See* Trial Tr. 999–1001. At the time of his interview he was appropriate for and would have benefitted from PACT, crisis stabilization, and community support services. PX 403 at 155–56.

7. Person 132, interviewed by Ms. Burson, has a high school diploma, some college education, and a work history. He had been in state hospitals on three separate occasions. He was not receiving community-based services, but would have benefited from them because of his work history and desire to be active in the community. *See* Trial Tr. 1082–85. At the time of his interview, he was appropriate for PACT and supported employment. PX 406 at 85.

8. Person 125, interviewed by Ms. Burson, used to work as a commercial truck driver and fisherman. He has been committed to state hospitals on three separate occasions. Community-based services could have helped him avoid hospitalization but he was not receiving any such services. *See* Trial Tr. 1086–90. At the time of his interview, he was appropriate for and would have benefited from PACT and permanent supported housing. PX 406 at 25.

Dr. Drake was "surprised" to find that most of the 154 individuals the CRT reviewed did not receive the community-based services that the State claims to have in its policy manuals. Trial Tr. 105. Ms. Burson, the psychiatric occupational therapist, testified that most of the people she interviewed were not receiving any sort of community-based services. Trial Tr. 1080–81. The State's experts have offered no opinions as to why so many of the 154 were without community-based services between hospitalizations.

## B.      Mississippi's Clinical Experts

Mississippi, of course, hired its own experts.

The State hired a group of psychiatrists to review the medical records of patients within the sample that the CRT evaluated.[34] Those experts were Dr. Mark Webb,[35] Dr. Benjamin

---

[34] The State also retained Dr. Joe Harris, a psychiatrist at South Mississippi State Hospital. Dr. Harris testified via deposition that as many as half of the people at SMSH do not need to be hospitalized. *See* Harris Dep. 26. The State has emphasized that its hospitals do not have control over who arrives at their doors because of the statutory commitment process, and should not be held accountable for the number of hospitalizations. It is a valid point. The state hospitals must take who is committed to them and have little recourse to push back, despite clinical opinions that might differ with a chancellor's determination. *See C.W. v. Lamar Cty.*, 250 So. 3d 1248 (Miss. 2018) (holding that the director of a state hospital may not refuse to admit civilly-committed patients sent for alcohol and drug therapy, even if those services are not provided at the hospital). This may be an area where DMH could advocate for a change in the commitment process and secure state hospital clinicians a right to appeal.

[35] Dr. Webb is a board-certified psychiatrist whose expert report was entered as DX 307. *See* Trial Tr. 1815. Dr. Webb, Dr. Root, and Dr. Younger practice together at the Mississippi Neuropsychiatric Clinic.

Root,[36] Dr. Ken Lippincott,[37] Dr. Roy Reeves,[38] Dr. Philip Mer-
ideth,[39] Dr. Susan Younger,[40] and Dr. William Wilkerson.[41]
These experts did not conduct interviews and did not evalu-
ate community-based services. *E.g.*, Trial Tr. 1878. Instead,
they evaluated whether, based on their review of the medical
records, the individuals were appropriate for care in a hospi-
tal *at the time of admission*.[42] The experts came to the same

---

[36] Dr. Root is a board-certified psychiatrist whose expert report was en-
tered as DX 306. *See* Trial Tr. 1863.

[37] Dr. Lippincott is a board-certified psychiatrist and the clinical director
at North Mississippi State Hospital. He did not submit an expert report.
He testified about the care he provided to the patients he evaluated. *See*
Trial Tr. 1902.

[38] Dr. Reeves is a psychiatrist and the clinical director at South Mississippi
State Hospital. He did not submit an expert report. His testimony was
about the appropriateness of admission of those who were within his care.
*See* Trial Tr. 1931.

[39] Dr. Merideth is a board-certified psychiatrist whose expert report was
admitted as DX 305. *See* Trial Tr. 1987.

[40] Dr. Younger is a board-certified psychiatrist whose expert report was
admitted as DX 309. *See* Trial Tr. 2116.

[41] Dr. Wilkerson is a board-certified psychiatrist whose expert report was
admitted as DX 308. *See* Trial Tr. 2144.

[42] An excerpt of Dr. Webb's testimony helps show the scope of his analysis
in this case:

> Q:   So do you not -- you do not have an expert opinion
>      today as to whether any of the 13 received adequate
>      community-based mental health services. Right?
>
> A:   That is correct. I was not provided the records.
>
> Q:   And you don't have an opinion on whether the 13 in-
>      dividuals should have received additional commu-
>      nity-based mental health services, I take it?

conclusion: all of the individuals had SMI and the hospital was the least restrictive setting at the time they were admitted. *E.g.*, Trial Tr. 1875–76.

The State's team then uniformly opined that the individuals they reviewed could not have been properly served in the community at the time of their hospitalization. Dr. Younger explained that the people she reviewed "have severity of illness to such a degree that they cannot be treated adequately in the community most of the time despite real good services, medicine, support." Trial Tr. 2119.

The State's experts also testified that the standard of care was met while in the hospital, and that discharge planning was "adequate[]." *See* Trial Tr. 1825–40 and 1990.

## C.    Expert Testimony on Costs and Management Issues

In addition to the experts who evaluated the 154 individuals in the sample, both sides retained experts to provide more sweeping analyses of the mental health system.

The United States called Kevin O'Brien, a healthcare consultant, who was admitted as an expert in health systems cost analyses.[43] *See* Trial Tr. 1246. Mr. O'Brien created three scenarios of what it would cost the State to expand community-based services. His conclusion was that community-based care is generally less expensive than hospitalization. PX 409 at 10. This, in large part, is due to the fact that most community-

---

A:    Correct. I would defer to other experts.

Trial Tr. 1841.

[43] Mr. O'Brien's expert reports were admitted as PX 409 and PX 410.

based care is Medicaid-reimbursable, while hospitalization is not.[44] *See* Trial Tr. 1584.

The State brought Dr. Lona Fowdur, a healthcare economist, to challenge Mr. O'Brien's cost analysis.[45] *See* Trial Tr. 1717. She testified that Mr. O'Brien did not account for the fixed costs associated with inpatient care, so he overstated the cost of inpatient care and underestimated the cost of community care. *See* Trial Tr. 1722. She corrected what she perceived as his errors and ultimately concluded that there is not much difference between the costs of community care and hospitalization. *See* Trial Tr. 1744; DX 301 at 4 ¶ 9 ("the average costs of each modality of care are comparable"). Dr. Fowdur nevertheless encouraged the Court to not compare the costs because patient populations in hospitals and in the community are not the same.[46] *See* Trial Tr. 1720 and 1732.

---

[44] Currently, the "IMD exclusion" generally prevents state hospitals from receiving Medicaid reimbursement. The parties seem to agree that if Congress repealed the IMD exclusion, the State would have more money available for the system as a whole. *But see* Trial Tr. 1331 (describing new federal IMD waiver and explaining that the IMD exclusion has not prevented other states from shifting care to community-based services).

[45] Dr. Fowdur's expert report was admitted as DX 301.

[46] The Court must respectfully disagree, in part, with Dr. Fowdur. This case is not primarily about the population of persons at either end of the spectrum—those that will be hospitalized most of the time or those that will never be hospitalized. The testimony and exhibits showed that this case is about the significant number of persons in the middle: those who cycle repeatedly between their communities and hospitals, who could be served less restrictively with community-based services. That is where the cost comparison is most useful.

Reviewing the expert opinions, the most conservative estimate is that the costs of community-based care and hospitalization are about equal. This opinion was reiterated by Dr. Jeffrey Geller, another of the State's experts.[47] "One very good study of this showed they were about the same," he said. Trial Tr. 2409.

The parties then presented expert testimony about the management of the mental health system. Melodie Peet was the United States' systems expert.[48] Ms. Peet found that Mississippi's mental health system is not administered in a way that prevents unnecessary hospitalizations.[49] *See* Trial Tr. 1336. The theme of her testimony was that Mississippi has identified the correct community-based services, but a lack of

---

[47] Dr. Geller is a board-certified psychiatrist and was admitted as an expert in psychiatry. *See* Trial Tr. 2399. In preparing his report, Dr. Geller reviewed medical records and visited each of the four state hospitals, as well as the Central Mississippi Residential Center. His expert report was admitted as DX 303.

[48] Ms. Peet was admitted as an expert in the field of mental health administration. *See* Trial Tr. 1320. To prepare her report, she conducted a literature review, visited EMSH, and met with representatives from seven CMHCs, the CHOICE housing providers, community social service providers such as Stewpot, mental health advocates, and a chancery court clerk. Her expert report was admitted as PX 407.

[49] *See* Trial Tr. 1336 ("There were three primary themes that led to that conclusion. One was the insufficiency of community services throughout the state. Second was, I would say the state still has a hospital-centric view of their system. And thirdly, there is a complete lack of coordination between the hospitals and the community systems which really means significant disruptions in care for the people who are using the system.").

effective oversight and data utilization has failed to put that system into practice. *See* Trial Tr. 1337.

One helpful illustration of the problem came when Ms. Peet compared PX 419, a map showing the home addresses of the top 30% of state hospital bed utilizers, with PX 413, a map showing where PACT teams—which she called "ACT programs"—are available. *See* Trial Tr. 1338–39. The overlay showed gaping holes in coverage. She explained that "the people represented by the red dots are the very people who are targeted as the ideal patient to be served by an ACT program. So this isn't a theoretical analysis. These are real human beings who have demonstrated by their pattern of service utilization that they would be benefited by an ACT program. And many of them are in the unserved areas of the state." Trial Tr. 1339.

Ms. Peet pointed out that the PACT program is not just unavailable for many Mississippians, but is an example of DMH's inability to use data and strategic planning to expand services. In its most recent end-of-year report, for example, DMH discussed its goal of expanding PACT utilization by 25%. *See* JX 50 at 8. The goal was conservative, and DMH did not meet it. The number of PACT users went from 328 in 2017 to only 384 in 2018. *See* Trial Tr. 1340. Ms. Peet said,

> The fact that over three years after the establishment of the last ACT program, the ACT services are still significantly under-enrolled, I would say operating at about 50 percent capacity, *while the state has been paying the rate for a fully subscribed ACT program* means a lot of things, but

> mostly that people who need the service desper-
> ately aren't getting it.

Trial Tr. 1341 (emphasis added).

This problem extends beyond PACT. Ms. Peet explained with precision how certain services are not available in certain regions, and how statewide there is a gross underutilization of available community-based services. *See* Trial Tr. 1345–46 (discussing underutilization of Medicaid billing for community support services), 1351–53 (discussing underutilization of mobile crisis services), 1354 (discussing lack of capacity for supported employment), 1354–55 (discussing lack of capacity for supported housing), and 1356–57 (discussing underutilization of Medicaid billing for peer support services).

Finally, Ms. Peet concluded that Mississippi, having already identified the correct services, is capable of changing the system to make services more available and effective. She suggested expanding community-based services statewide, actively using data to target future services, and increasing oversight of and technical assistance to providers. *See* Trial Tr. 1377–84.

In response, the State called Ted Lutterman, an expert in "policy analysis regarding the financing and the organization of state mental health systems."[50] Trial Tr. 1493. He concluded that when compared with other states in the region, Mississippi has increased its spending on community-based

---

[50] Mr. Lutterman's report was entered as DX 302. He used self-reported state and national data sets to compare Mississippi's use of hospitalization and community-based services to other states in the region.

services more rapidly than others.[51] *See* Trial Tr. 1509. "Between 2001 and 2015," he wrote in his report, "Mississippi nearly doubled its investment on community-based services, increasing its expenditures during this period by 98%. Only one state in the southern region, Georgia, surpassed Mississippi's rate." DX 302 at 6. This testimony suggests that Mississippi should receive credit for its growth.

Dr. Geller presented similar testimony. He said that when Mississippi's "distribution of funding" is compared to other states, "Mississippi's not an outlier." Trial Tr. 2413. Yet Dr. Geller also agreed that Mississippi has one of the highest per-capita rates of psychiatric beds in the country. *See* Trial Tr. 2425. One table he reviewed from the witness stand showed that only the District of Columbia and Missouri have higher rates of psychiatric beds than Mississippi. PX 393 at 41–42.

Dr. Geller's comparisons were not always reliable. His expert report had admonished the United States, claiming that its "assessment of Mississippi's mental health spending has no relationship to facts." Trial Tr. 2427. Dr. Geller supported that conclusion by asserting that "Mississippi was spending 19%

---

[51] Mr. Lutterman also testified that when states expand Medicaid, they see a larger increase in people served by community-based services. *See* Trial Tr. 1496. Mississippi, of course, has not made such an expansion despite its high demand for Medicaid services. *See* Center on Budget and Policy Priorities, *How Would the Medicaid Expansion Affect Mississippi?*, https://www.cbpp.org/sites/default/files/atoms/files/medicaid_expansion_mississippi.pdf (last visited Aug. 23, 2019) (concluding that Medicaid expansion in Mississippi would render an additional 231,000 adults eligible for health care). The evidence nevertheless showed that Mississippi need not expand Medicaid, but can satisfy the requirements of *Olmstead* by better utilizing existing Medicaid rules. *See* Trial Tr. 1230.

of its mental health dollars on state hospitals and 80% on the community." Trial Tr. 2427. But Dr. Geller's assertion was based on the spending data for a state labelled "MI"— Michigan. Trial Tr. 2428. In truth, the data for Mississippi— "MS"—was the inverse; Mississippi was spending 77% of its mental health dollars on state hospitals and 21% on community-based care. Trial Tr. 2428; *see also* PX 395 at 15.

Finally, Dr. Geller cautioned the Court that health disparities are related to poverty, and opined that because Mississippi is a very poor state, even an increase in funds might not solve Mississippi's mental health problem. "Mississippi had one of the lowest rates of providers per capita of any state. This means that if you put in funds, you still might not get the services because you don't have the people to provide the services, that poverty, being in a rural area, lack of providers, access to services, puts Mississippi at a high ranking for poor access to services." Trial Tr. 2407.

## VI.

### Mississippi Is Violating the ADA

The stipulations and testimony establish the basics. Thousands of Mississippians suffer from SMI and are qualified individuals with disabilities under the ADA. The State is required to comply with Title II of that law. Yet the State's mental health system depends too much on segregated hospital settings and provides too few community-based services that would enhance the liberty of persons with SMI. The "great majority" of those Mississippians "would prefer to receive

their services in the communities where they are living." Trial Tr. 1331.[52]

Even understanding these basics, though, the sheer number of expert opinions, witnesses, and legal arguments can obfuscate whether Mississippi's system actually violates the Supreme Court's mandate in *Olmstead*. For guidance, then, it is important to return to the text of that case.

*Olmstead*'s final holding says that "States are required to provide community-based treatment for persons with mental disabilities when" (1) "treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 607. Each of these elements will be discussed in turn.

First, the treatment professionals on the CRT determined that the individuals they interviewed would be appropriate for community-based services. They described exactly which community-based services would be beneficial to the patient's current and future needs.[53] The State's experts, in

---

[52] The great majority of Mississippi's hospitalized persons are also on Medicaid. *See* PX 488; Trial Tr. 2284 ("85.3% of women in the [MSH] receiving unit [have] Medicaid or Medicaid plus another form of insurance.").

[53] The State complains that none of the CRT members splintered their findings on the first question: would the individual have avoided hospitalization *or* spent less time in a hospital. The State observes that avoiding hospitalization and spending less time there are two different things. That is true. But the way the CRT designed question one is consistent with

contrast, limited their review to the hospitalizations of the past. They did not address whether the individuals are presently suited for community-based services. In other words, they answered a question about the past despite this being a case about the past *and* the future. They did not refute the CRT's findings on this element of *Olmstead*.

Second, the CRT found that everyone they interviewed, except for one individual, was not opposed to treatment in the community. The State's experts never addressed this question and did not refute the CRT's findings on this point.

Third, the United States' experts showed that providing community-based services can be reasonably accommodated within Mississippi's existing mental health system. Ms. Peet testified that the State already has the framework for providing these services, and can more fully utilize and expand that framework to make the services truly accessible. The State's experts did not refute this testimony. While they testified that Mississippi is doing well when compared to others in the region, that is not the applicable standard. And the State's own experts admitted that institutional and community care cost the system the same amount of money, so the State cannot claim that the resources are not available or that the costs constitute an unreasonable accommodation.

Overall, when the evidence is evaluated under the precise standard set forth in *Olmstead*, the United States has proven

---

*Olmstead*. Community-based services are a less-restrictive environment than state hospitals, and therefore are appropriate if they can help persons with disabilities avoid or minimize hospitalization.

that Mississippi's system of care for adults with SMI violates the integration mandate of the ADA.

## VII.

## Mississippi's Defenses

A state is excused from having to make reasonable modifications if it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Mississippi argues that the United States' proposed modifications would "fundamentally alter" the nature of its mental health system. Docket No. 232 at 64. Under *Olmstead*, the State has the burden "to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental [illness]." 527 U.S. at 604.

The Supreme Court has explained that one way a state can take advantage of this defense is by demonstrating "*a comprehensive, effectively working plan* for placing qualified persons with mental [illness] in less-restrictive settings, and a waiting list that moved at a reasonable pace." *Id.* at 605–06 (emphasis added). A sufficient plan is one that "set[s] forth reasonably specific and measurable targets for community placement" and demonstrates a "commitment to implement" its terms. *Frederick L. II*, 422 F.3d at 158 (rejecting Pennsylvania's fundamental alteration defense).

DMH's senior executives testified that Mississippi does not have such a plan. Deputy Executive Director Steven Allen, a 30-year veteran of DMH, said he had never seen an *Olmstead*

plan at DMH. He added that even if he had, it would be "useless." Trial Tr. 2025. Executive Director Diana Mikula, a 24-year veteran of the agency, defended her deputy by claiming that he would not need to read an *Olmstead* plan in his job because "he knew the vision." Trial Tr. 2381. Somewhat confusingly, she then claimed that DMH's *Olmstead* plan is "a collection of documents" such as annual strategic plans and budget requests—documents that Mr. Allen *has* read. *See* Trial Tr. 2316–17 and 2381.

This latter testimony was not persuasive. In the two-and-a-half years Mr. Allen has served as Deputy Executive Director, he has been "in charge of the programmatic responsibilities of the agency, whether it be the programs [it] directly operate[s] that provide services, or through the grants or the certification process, those divisions and bureaus." Trial Tr. 2025. If he has never seen an *Olmstead* plan at DMH, this Court is inclined to believe him, since he has the longest tenure of the executives and is in the best position to know.

Ms. Mikula's eagerness to defend her staff, her agency, and to some extent herself is understandable. But it would be very odd for Mr. Allen, a person whose judgment she trusts, and a person with substantial experience in the mental health field, to be unaware that the strategic plans and budgets he reviews are, in fact, an *Olmstead* plan. It is more likely that DMH simply lacks an *Olmstead* plan.

In any event, the Court also cannot accept the alternative suggestion—that any plan Mississippi has is "comprehensive" and "effective[]." *Olmstead*, 527 U.S. at 605–06. A collection of smaller, routine documents is hardly "comprehensive." And the evidence discussed above showed that the existing

documents are not effectively meeting the State's own goals. Among other examples, PACT planned to expand over 2017-2018 and failed to meet its modest goal; supported employment is below the level DMH recommended in 2011; and despite the State's best intentions about shifting from hospitalization to community-based care, the number of state hospital beds has been stable since 2014.

If a comprehensive, effective plan would satisfy *Olmstead*, Mississippi's scattered, ineffective assemblage of documents cannot.

The State's attorneys then press that the cost of community-based services is itself a fundamental alteration. But as already mentioned, by the admission of its own experts, community-based services and hospitalization cost the system approximately the same amount of money, though community-based services receive federal Medicaid reimbursement that hospitalization does not. The worst case is that the State would spend the same amount of money it does now—just redirected to more cost-effective services. The best case for the State is that the movement from hospitalization to community-based services would save money.

The case law further weakens the State's argument. The weight of authority indicates that "budgetary constraints alone are insufficient to establish a fundamental alteration defense." *Pa. Prot. & Advocacy, Inc. v. Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d Cir. 2005) (collecting cases); *see also M.R.*, 697 F.3d at 736; *Frederick L. v. Dep't of Pub. Welfare (Frederick L. I)*, 364 F.3d 487, 495 (3d Cir. 2004); *Fisher*, 335 F.3d at 1183 ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the

ADA's integration mandate would be hollow indeed."). "Congress and the courts have recognized that compliance with *Olmstead* may require 'substantial short-term burdens, both financial and administrative' to achieve the goal of community integration." Dinerstein & Wakschlag, *supra* note 4, at 951 (citations omitted).

For these reasons, Mississippi has not proven an affirmative defense.

## VIII.

## Moving Forward

People living with SMI face very real, and sometimes very dangerous, symptoms that can make daily life extraordinarily difficult. With those individual challenges comes a system that, even in its best form, will have problems.

As the State has pointed out, at no point during the four weeks of trial was any expert willing to parade their home state as an example of a mental health system without flaws. States from every corner of the country have struggled to provide adequate mental health care services. Mississippi has its own unique challenges due to its rural nature and limited funding.[54]

---

[54] The themes that emerged in this trial have been repeated in a variety of legal challenges to Mississippi's large institutions. It is obvious that low-paying, dangerous, and difficult jobs are often hard to fill. *See generally Dockery v. Fisher*, 253 F. Supp. 3d 832, 840 (S.D. Miss. 2015) (alleging, in part, that constant staffing shortages have contributed to constitutional violations at privately run prison); *Olivia Y. v. Bryant*, No. 3:04-CV-251-TSL-FKB, Docket 570 at 41 (S.D. Miss. June 29, 2012) (in case alleging systemic deficiencies in the State's foster care system, a follow-up Monitor's report explains, "[a]s described in the Monitor's prior reports, persistent staffing

Despite all of these challenges, the people that care for Mississippians suffering from SMI should be recognized for their efforts to expand community-based care. The State has made some strides. Part of the difficulty of this case is to simultaneously acknowledge that progress and ensure that community-based services ultimately live up to DMH's promises. The fact remains that neither Congress nor the Supreme Court have made a state's good intentions a defense to an *Olmstead* claim. "General assurances and good-faith intentions . . . are simply insufficient guarantors in light of the hardship daily inflicted upon patients through unnecessary and indefinite institutionalization." *Frederick L. II*, 422 F.3d at 158–59.

Perhaps the central difficulty of this case is the question of time. What timeline for expanding community-based services might constitute a reasonable accommodation? The State

deficits have compromised defendants' ability to satisfy certain key Settlement Agreement requirements. . . . [U]nderstaffing has affected both the pace at which the practice model can be implemented and whether implementation efforts are effective."); *Depriest v. Walnut Grove Correctional Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *15 (S.D. Miss. June 10, 2015) (finding, in case regarding violations of the Eighth Amendment at State-run prison, that "Walnut Grove continues to have a problem with understaffing, a condition linked to staff resignations and terminations. The Court understands the challenge of retaining employees given the salaries offered and the dangers that the job presents. . . . Regardless, being adequately staffed is imperative to Defendants providing a reasonably safe environment."). The evidence demonstrated that state mental hospitals face these same staffing difficulties. It should come as no surprise that when the State underfunds its large systems, whether schools, social service agencies, prisons, or mental health providers, the systems become ripe for constitutional violations. If it remains uninterested in fixing this problem, the State will be doomed to repeat it—and repeatedly have to defend it in federal court.

argues that no timeline at all should be imposed—it is getting there and should be left alone to do the job.

The problem is that the State has known for years that it is over-institutionalizing its citizens. Eleven years ago, the Mississippi Legislature's PEER Committee found that "[a]lthough the mental health environment in the United States has dramatically changed from an institution-based system to a community-based system in recent years, Mississippi's mental health system has not reflected the shift in service delivery methods." PX 363 at 1. Eight years ago, the United States Department of Justice released a comprehensive findings letter and started what would ultimately be five years of fruitless negotiations. DMH's long-range strategic plan for 2010-2020 declared a goal of "creating a community-based service system," but testimony showed that it was not until 2018 that the Department first moved money from hospitals to community services. *Compare* JX 63 at 7 *with* Trial Tr. 1418. No, the history of this case shows that DMH's movement toward community-based services has only advanced alongside the United States' investigation and enforcement litigation.

This Court is keenly aware of the judiciary's limitations in a systems case such as this. A mental health system should be run by experts and overseen by state officials who respect the law. The only role of this Court is to consider whether Mississippi's mental health system is operating in compliance with that law. The weight of the evidence proves that it is not. The United States has met its burden and shown that despite the State's episodic improvement, it operates a system that unlawfully discriminates against persons with serious mental illness. That discrimination will end only when every

Mississippian with SMI has access to a minimum bundle of community-based services that can stop the cycle of hospitalization.

Since the United States has proven its case, the Court could order the remedy proposed at trial by the Department of Justice and its experts. Acknowledging and understanding the complexity of this system, the progress that the State has made, and the need for any changes to be done in a patient-centered way that does not create further gaps in services for Mississippians, however, the Court is not ready to do so. The Court is hesitant to enter an Order too broad in scope or too lacking in a practical assessment of the daily needs of the system. In addition, it is possible that further changes might have been made to the system in the months since the factual cut-off.

This case is well-suited for a special master who can help the parties craft an appropriate remedy—one that encourages the State's forward progress in a way that expedites and prioritizes community-based care. The evidence at trial showed what the State needs to do. The primary question for the special master is how quickly that can be done in a manner that is practical and safe for those involved.

The parties are therefore ordered to submit, within 30 days, three names of potential special masters and a proposal for the special master's role. A hearing will be held this fall. The proposals and lists may be separate, but the parties should confer prior to that date to see if there might be any agreed-upon candidates respected, competent, and neutral enough to do the job.

This has been a long process. The parties have put nearly a decade's worth of work into this matter. There has been "a lot of talk," "a lot of planning," and "a lot of people . . . hurt in the process." Trial Tr. 348. But the Court is optimistic that the parties can achieve a system that provides Mississippians struggling with mental illness "the basic guarantees for which they have worked so long and so hard: independence, free-dom of choice, control of their lives, [and] the opportunity to blend fully and equally into the rich mosaic of the American mainstream."[55]

**SO ORDERED**, this the 3rd day of September, 2019.

s/ CARLTON W. REEVES
*United States District Judge*

---

[55] President Bush, *supra* note 2.