```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                         NORTHERN DIVISION

 3


 4    UNITED STATES OF AMERICA                          PLAINTIFF

 5    VERSUS                      CIVIL ACTION NO. 3:16-CV-00622-CWR-FKB

 6    STATE OF MISSISSIPPI                              DEFENDANT

 7


 8
                  TELEPHONIC STATUS CONFERENCE PROCEEDINGS
 9                BEFORE THE HONORABLE CARLTON W. REEVES,
                   UNITED STATES DISTRICT COURT JUDGE,
10                         APRIL 27, 2020,
                          JACKSON, MISSISSIPPI
11

12
                      (Appearances noted herein.)
13

14

15

16

17

18

19

20

21
      REPORTED BY:
22
          CANDICE S. CRANE, CCR #1781
23        OFFICIAL COURT REPORTER
          501 E. Court Street, Suite 2.500
24        Jackson, Mississippi  39201
          Telephone:  (601)608-4187
25        E-mail:  Candice_Crane@mssd.uscourts.gov
```

```
 1   APPEARANCES VIA TELEPHONE:

 2       FOR THE PLAINTIFF, THE UNITED STATES OF AMERICA:

 3           MATTHEW SCHUTZER, ESQ.
             DEENA FOX, ESQ.
 4           MITZI DEASE PAIGE, ESQ
             PATRICK HOLKINS, ESQ.
 5           REGAN RUSH, ESQ.
             SARAH T. RUSSO, ESQ.
 6
         FOR THE DEFENDANT, THE STATE OF MISSISSIPPI:
 7
             JAMES SHELSON, ESQ.
 8           HAROLD PIZZETTA, ESQ.
             WILLIAM ROSAMOND, ESQ.
 9
         ALSO PRESENT:
10
             DR. MICHAEL F. HOGAN, SPECIAL MASTER
11           KEITHFER ROBINSON

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **PROCEEDINGS VIA TELEPHONE, APRIL 27, 2020**

2

3           THE COURT:  Good morning.  I know we're all trying to

4      navigate this situation that we all are in with COVID-19.

5      I'll just ask when you -- because the court reporter actually

6      is in the courtroom, when you're speaking, please be

7      deliberate about your tone, your modulation, and all of that,

8      the speed at which you're speaking, because the court reporter

9      is taking the transcript as best as she can and any sort of

10     lapse that might occur in communication might be a little bit

11     difficult.  Try to pause between the time you might speak and

12     someone else might speak, so that the two people -- two or

13     three people will not be speaking at the same time.

14          Finally before speaking, please identify yourself,

15     because although we are in the courtroom, we cannot see each

16     other.  I do recognize most people's voices so -- but the

17     court reporter does not have the benefit of that, because

18     y'all just have not been before her as much as you've been

19     before me.  So I say all of that.

20          Also, this hearing is made available to the public.  The

21     public is on the line, I believe.  I don't know who.  They

22     cannot be seen nor can they be heard, because we have it

23     designed where they can only hear.  If I ask a question that

24     might require counsel to divulge confidential information, I

25     apologize, but please let me know, so that we can for -- so

1    that we can have -- so you can approach the bench and speak

2    about anything that we might have to talk about outside of the

3    presence of the public just like in any other court

4    proceedings.

5        So I guess first of all, after those preliminary

6    instructions, I wanted to thank each of you for your diligence

7    for attending this hearing, and I want to make sure that we've

8    gotten started, on a foot at least, to see how -- basically,

9    to hear from the special master.  So -- and I know he's done

10   me -- done us a written report that we've seen.  But I think

11   because of the magnitude of this case, and I know this case is

12   being followed by the public.  In fact, I have a couple of

13   questions with respect to that of the state at some point in

14   time.  I know that the public has been following, including

15   public officials, because they may be taking steps to try to

16   do things to address some of the issues that the Court

17   identified in its order.  And we may see if any -- what, if

18   any, steps have been taken in that regard.

19       But I do want to hear from Mr. Hogan, who I've appointed

20   as the special master in this case.  Just to hear from him

21   briefly about what he believes his charge is and how he

22   intends to accomplish those goals.

23       One of the things that I did point out in my order, the

24   initial order finding that there needs to be some sort of

25   remedy in place, I think there's a line in that order about

1    the parties and everyone else might be forgiven for throwing

2    up their hands in exasperation at the complexity of this

3    situation.  And I said that because I know this is an awesome

4    task for anyone, and I believe the parties are going to work

5    collectively to not only identify what the problems are, but

6    to address those problems.

7        I also mentioned that one of the witnesses testified

8    during the court -- or during the proceeding that she

9    recognized that Mississippi, you know, was doing some things,

10   and that there were people within the Department of Mental

11   Health who wanted to see the change.  It's just that change

12   has not been coming soon enough, basically, and so we do want

13   to make sure that we get to the right result at the end of the

14   day.  And in that regard, I realize the end of the day

15   projection might have to be further down the road a little bit

16   because of the unique situation that the country is in right

17   now.

18       But I do want to hear from you, Mr. Hogan, so that you

19   could tell us what you believe your charge is, and how do you

20   intend to tackle that charge?

21       MS. FOX:  Your Honor, this is Deena Fox.  Before

22   Mr. Hogan -- Dr. Hogan begins, I wanted to let you know we've

23   heard from someone who is trying to call in to the public

24   line, and they've only heard elevator music and that the host

25   has not arrived.  So I'm not sure if anyone from the court

1    system needs to open the conference line for the public line,

2    but I just wanted to let you know about that issue.

3        THE COURT:  Okay.  Thank you, Ms. Fox.  Hold on for one

4    second then.  Thank you.

5        MR. ROBINSON:  Judge, I think they may be in now.  I

6    just checked and tested, so...

7        THE COURT:  Okay.  All right.  We believe the line is

8    open, Ms. Fox.  We believe it is.  So I'll -- if -- our

9    chambers e-mail is being monitored, so if anyone in the public

10   has any difficulty, you can contact the Court's chambers'

11   e-mail or either the clerk's office and let us know if you

12   cannot get in.

13       MS. FOX:  Thank you very much.

14       THE COURT:  All right.  All right.  Thank you, Ms. Fox.

15   Mr. Hogan, I turn to you.

16       SPECIAL MASTER HOGAN:  Yes, Mike Hogan for the reporter.

17   Thank you, Your Honor, for the opportunity to work on this

18   problem.  As you say, it is exceedingly complicated, but the

19   parties are very well informed.  And I know my way around the

20   territory generally, although I wish -- I wish I understood

21   more about the circumstances in Mississippi.

22       Your charge to me was to review the record, confer with

23   counsel, and to propose a plan to remedy the ADA violations

24   you identified in your September 2019 order.  I must begin

25   with --

```
 1          THE COURT:  Mr. Hogan --

 2          SPECIAL MASTER HOGAN:  Yes, sir.

 3          THE COURT:  -- Mr. Hogan, I'm sorry to come across you.

 4     I think my public line might not be available.  If you'll just

 5     hold for a second?

 6          SPECIAL MASTER HOGAN:  Yes, sir.

 7          THE COURT:  Hold on for just one second, please.

 8          MR. ROBINSON:  Hey, Judge, I just got a text, and I

 9     think it's open now.

10          THE COURT:  Okay.  Thank you.  I got that same text.

11     Thank you.  Okay.  Thank you.  Thank you.  I'm sorry,

12     Mr. Hogan.  Again, we're operating under unique circumstances

13     here.  It may be -- it may not be so unique in a few weeks or

14     a few months.  We may be operating like this for some period

15     of time, but I apologize for cutting across you.  I want to

16     make sure that, again, this issue is -- this issue, this case,

17     as many of the cases that the Court has, has some public

18     relevance, and I want to make sure that the public is always

19     involved.  So if you will, Mr. Hogan; I'm sorry.  If you will

20     repeat what you were saying.

21          SPECIAL MASTER HOGAN:  Yes.  Thank you, Your Honor.  So

22     your charge to me is to review the record, which is

23     voluminous, to confer with the parties, and ultimately to

24     propose a plan to remedy the violations of the Americans with

25     Disabilities Act that you identified in your September 2019
```

1    order.

2    I guess I must begin with two comments.  One is to

3    appreciate, as you've already noted, the diligence and

4    forbearance of the parties with me to help get me up to speed

5    and also to participate in a number of phone calls and

6    especially, too, conversations or negotiating sessions that we

7    have conducted.

8    I will note that doing this in this fashion is

9    challenging, and at my age and possible ineptitude at working

10   with a media like this was already apparent in one of those

11   negotiating sessions when I couldn't make the computer work;

12   but we have pressed on.  I do particularly want to appreciate

13   the participation of the state officials whose day-to-day

14   duties have gotten much more demanding and onerous with people

15   in their care who are vulnerable.  But they've been present

16   and accounted for also when we have -- when we have met.

17   So the first task, far from complete for me, is to try

18   and learn the record.  The parties did provide it to me, and

19   thankfully also the parties agreed on key aspects or exhibits

20   in that record, including some testimony in the court and

21   reports and data and documents from the Department of Mental

22   Health.  And so I've been studying them quite a bit.

23   The second task, I guess for me, was to review the

24   preliminary offers or initial proposals that both the state

25   and the Department of Justice prepared as, in effect, offers

1    to become a -- become a plan.  And I guess without going into

2    too much detail there, I will just say that both of those

3    proposals were substantive.  Neither is going to settle the

4    case in and of itself.  The -- I guess I would say that the

5    positions that are apparent in those proposals are not

6    inconsistent with the -- the approaches that the parties took

7    at trial.  Although, they go beyond that in a way to try to

8    settle the case.

9        So I would say the -- the third task has been to

10   commence conversations to try to explore where there might be

11   space that could be agreed between or among the proposals of

12   the parties to become a remedial plan, and we have had to date

13   two substantive conversations to explore that.  These have not

14   yet gone to concrete proposals, but they've illuminated some

15   of the issues and concerns that the parties have.

16       And so now I would say the task becomes to pivot from

17   this initial studying and a collaborative definition of

18   directions and to get into planning and negotiations, and that

19   will be a challenging task.  But, again, I want to note the

20   collaborative spirit that the parties have brought to the task

21   and the deep knowledge they have of -- of things on the ground

22   in Mississippi.

23       I guess the only other issue that I would mention -- and

24   I can do that now, or we can put it off, as you wish -- has to

25   do with the question to which I, as special master, can engage

1    with people on the ground in Mississippi to try to understand

2    better how things work and to explore from their perspective

3    solutions to the case.  So I talk about that some more now, or

4    do we want to put that off?

5        THE COURT:  You may talk about that now because one of

6    the -- I think in your report, I think you ask that specific

7    question based on your reading of my order.  I believe it

8    probably was not clear as to whether or not you should engage

9    outside of the record, but on reflection, I do think that it

10    might be worthy for you to have, I assume, some contact with

11    stakeholders or advocates or people who care about this

12    system.  And it might require that you do -- you know, it

13    might require that you do have at least some minimal

14    conversations.

15        I would like to hear from the parties on that issue if

16    that's -- if this is appropriate time in your mind to discuss

17    that.  Any -- I mean, are there -- to the state of

18    Mississippi, I mean, would this be something -- should the

19    master, for example, notify the parties whom he -- notify the

20    individuals or the entities that he seeks to talk to prior to

21    engaging in conversation?  Should he let you-all know either

22    beforehand, or after the fact or allow you, if you needed to

23    be, to be a part of those conversations?  I think this is

24    something we need to talk about.

25        SPECIAL MASTER HOGAN:  This is Mike Hogan again.  I

1    think you've framed it well, Your Honor.  I do believe those

2    conversations would be -- would be helpful.  They would need

3    to be candid.  I would like to understand more about how the

4    hospitals and the community mental health centers actually

5    work.  And so -- but I think you've -- you've covered the

6    territory.  And I believe counsel for both parties has some

7    concerns or suggestions about this, so I will be quiet for

8    now.

9          THE COURT:  Okay.  And I understand.  Again, I want to

10   make sure because we do have the public -- I mean, it's one

11   thing having the public present.  It's another thing having

12   the public present, and they cannot hear.  I understand

13   there's a lot of static, Mr. Robinson, on that public line,

14   and I'm going to see if I get another text.  It says difficult

15   to understand because of all the static.  So I want to make

16   sure that the people actually can hear and not just be

17   present.  I'll wait on a text to tell me if they can hear now.

18         MR. ROBINSON:  Hey, Judge, this is Keithfer --

19         SPECIAL MASTER HOGAN:  Thank you, Your Honor.  Sometimes

20   we know that people have to mute their phone, even if they're

21   not speaking, to reduce the background noise.

22         MR. ROBINSON:  Hey, Judge, this is Keithfer.  If you'll

23   give me just a few minutes, I may disconnect that public line

24   real quick and re-join it, and we'll see if that helps.

25         THE COURT:  Okay.  Okay.  Let's go off the record.

1          (A brief recess was taken.)

2          THE COURT:  Again, parties, you know, I apologize for

3     these technical mishaps.  So where we stopped was, I was

4     asking Mr. Hogan one of the questions that has arisen is if

5     the master can or should seek information that may not be part

6     of the current record that we have, but in doing his due

7     diligence, might he have to speak to certain stakeholders or

8     advocates or persons who have a peculiar interest in our

9     mental health system to sort of just seek out information

10     about the operations, if you will, of our mental health system

11     that might not be clear from the particular record.

12          And if he is permitted to do that, should he let the

13     parties know with whom he may be speaking either before he

14     goes to talk to them or afterwards or even invite the parties

15     to go along with him while he does that additional work of

16     trying to figure out what might be useful to him to help him

17     prepare his record.  And I do know one of the things that we

18     all would be concerned about is the cost in doing that.  We

19     don't want to -- I'm pretty sure the parties -- I'm pretty

20     sure the parties, not just the state, does not want to incur

21     unnecessary costs, and if there are things that can be pointed

22     to in the record that could address or answer a particular

23     question, then, yes, it's there in the record and no need to

24     invest too much time, too much energy, too much expenses in

25     trying to get to an issue that we already know.

1          But I understand from the special master there are

2     certain other things that might not be clear from the record

3     or that might -- him knowing the background might help

4     expedite what he's doing, so I do want to talk to the parties

5     about that.  And I'll start with -- I guess I initially said

6     I'll start with the state, so I will start with the state.

7     What might be your position on that?

8          MR. SHELSON:  Your Honor, this is Jim Shelson.  The

9     state opposes that request for a number of reasons.  If Your

10    Honor wants me to launch into them, I'll be glad to do that.

11         The state would also separately request we be able to

12    file written objections just so that's -- that's a part of

13    that, the file record, too.

14         But the first reason, Your Honor, is the process is

15    working.  I don't think anybody disputes that.  As the special

16    master already said, the parties are cooperating.  The state

17    is engaging with senior-level people.  We know of no instance

18    where the special master asked for something from the state,

19    and the state refused to give it to him.  If somebody were

20    stonewalling the special master, this might be a different

21    conversation, but that's just not happening.

22         The second reason, Your Honor, is engaging outside the

23    record untethers the remedy from the record.  We respectfully

24    submit that untethering the remedy from the record invites

25    error.  In our view, the special master is not working on a

1   blank canvas.  The canvas is the record, and the special

2   master should stay on that canvas.  We're in no way saying

3   he's not doing that, but we think it would be a mistake for

4   him -- to allow him to depart from the record.

5        The special master's mandate is clear from Your Honor's

6   order appointing him.  We -- we disagree a little bit with how

7   the special master stated his charge at the beginning of this

8   call, and we can get into that in more depth if Your Honor

9   would like to.  But the Court specifically -- the Court first

10  made clear that the mental health needs are well known.

11  Services to expand have already been defined, and we do not

12  additional discovery or consultants.

13       The Court then identified two specific things that the

14  Court's looking for from the special master.  One is a

15  timeline, and two is how to measure success.  And opening up

16  the record in -- in unlimited and in undefined ways we don't

17  think advances the ball on either of those.

18       The third reason, Your Honor, is as we understand the

19  special master's charge, he is not a factfinder, and we

20  respectfully submit -- "we" being the state -- to put him in

21  that role in any respect.

22       The problem with talking to staff and stakeholders is

23  that the parties have had an opportunity to present whatever

24  they wanted to present at trial from both those sources, and

25  they both did that to some extent and they both rested.  So

1    opening this back up, in an unlimited way especially, to talk

2    to staff and stakeholders is, in some respect, starting over.

3    And not just for cost reasons, but for a number of other

4    reasons, that's certainly not an attractive idea to the state,

5    and we hope its not an attractive idea to the United States.

6         But, again, Your Honor, the parties had the opportunity

7    to call the special master, call staff, and stakeholders as

8    witnesses at trial; they did that, they rested, and that part

9    of the process should be over.

10        The fourth reason, Your Honor, is -- is, again, and this

11    is no negative reflection on the special master.  He's got a

12    tough job.  He's doing it thoroughly and diligently, and we

13    appreciate his efforts.  But the proposal to talk to staff,

14    stakeholders is a form of discovery without the safeguards

15    of -- of the Federal Rules of Civil Procedure discovery and

16    with no evidentiary safeguards whatsoever.  As proposed by the

17    special master, the parties would not even be participants,

18    and they would effectively deprive the state of its counsel,

19    especially when -- when the special master were talking to

20    individuals who work with the state.

21        Again, there's no evidentiary safeguards whatsoever.

22    The parties will not know who the information comes from, will

23    not know what the special master used it for, would not know

24    whether the information is anecdotal, hearsay, or based on

25    personal knowledge.  And none of the special master's extra

1    record discussions will be subject to cross-examination.

2        The fifth reason, Your Honor, is the special master's

3    proposal is unlimited, and DOJ is separately making its own

4    substantial requests for additional information.  And it -- at

5    some point, Your Honor, especially in the middle of a

6    pandemic, it's just too much.  And, again, we don't need to

7    start over.  We don't need to do discovery over.  The Court

8    has already ruled on that in appointing the special master,

9    and we respectfully submit it would be a mistake to reopen

10   discovery.  But if discovery is reopened, it should have

11   all -- it should have the Federal Rule of Civil Procedure

12   safeguards and the evidentiary safeguards that are available

13   in litigation because we're still -- unfortunately, still at

14   this stage of this, should be available.  And that was long,

15   Your Honor, but that is a summary of the state's position.

16       THE COURT:  Well, it's clear that you came prepared to

17   answer that question, Mr. Shelson.  Let me ask you this.  The

18   record has not remained static, I don't believe, to the degree

19   at which -- obviously, I assume the state has attempted to do

20   some things or has fulfilled some of their things that they

21   might have said that they would do at the trial or, you

22   know -- you know, maybe since the trial record was closed,

23   maybe there have been some more paths open up, maybe there

24   have been some that were closed, maybe they've been moved

25   around.

1        But what if that information -- if those things were to

2    have occurred since last September when the record was closed,

3    is that something that the state needs to let the special

4    master know about as he prepares his report?  And would that

5    be information that generally the -- under the state's theory

6    would be unavailable to the special master?

7        MR. SHELSON:  Your Honor, the fact cutoff date was

8    December 31st, 2018, and that was a long time ago and the

9    state recognizes that.  The state doesn't think anybody had

10   any expectation, including the Court, that the state system

11   would be frozen in place as of December 31st, 2018, and it has

12   not been.  The state has continued to attempt to make

13   improvements to its mental health system.

14       So if there's a combined way so -- so we're not getting

15   over time multiple and overlapping requests from both the

16   special master and the DOJ, the state is willing to have that

17   discussion with both DOJ and the special master.  And

18   hopefully it can be a unitary discussion, so, again, there's

19   not competing requests.

20       But to the extent that DOJ or the special master feels

21   that the state's expansion of its system since the trial fact

22   cutoff of December 31st, 2018, that that information is needed

23   to get done what we're trying to get done here, the state's

24   willing to have that discussion.  But that's a much more

25   narrow -- and it's a defined subject matter than I think what

1    is being proposed.

2        THE COURT:  Okay.  Let me hear -- let me hear from DOJ

3    on that -- on those particular issues.

4        MS. FOX:  Thank you, Your Honor.  This is Deena Fox.

5    The -- we think that there are a few different buckets of

6    information that would be appropriate to update that are

7    outside of the trial record or that might be useful to the

8    special master at this time during the process of mediation,

9    and we think they fall into a few different categories that I

10   want to address separately.

11       First, I'll go through the last subject that you and

12   Mr. Shelson were discussing, which is updates to facts that

13   were in the record as of the time of trial.  We have proposed

14   to the state a set of specific facts that we -- we did engage

15   the special master before we shared our proposal with the

16   state to try and ensure that it covers information that the

17   special master would find useful.  Specific targeted requests,

18   like, you know, where the task teams are and how many people

19   are being served by those, more recent data than what was

20   included in, you know, the stipulations and the trial record

21   given that time has passed and the importance of ensuring that

22   any remedy that the Court ultimately orders is based on

23   knowledge of a continuing and ongoing violation of

24   individuals' rights.  So we think that would be an important

25   piece of the puzzle, and that would be information that we

1      would hope the parties can agree would be submitted to the

2      Court and added to the record of this case.

3          Second is information that Mr. Shelson referred to that

4      is being shared informally by the parties during negotiations.

5      As Mr. Shelson alluded to, the state has been including the

6      leadership of the state agencies that are involved in those

7      conversations.  One point we'd like to clarify in the order

8      appointing Dr. Hogan is that it referred only to

9      communications with counsel of record and with the court.  We

10     interpreted that, the parties did, and informed the Court we

11     were interpreting that to include the party representatives.

12     And we have been including those individuals in these

13     conversations.  We want to clarify on the record that that is

14     what was intended, and in any updated order appointing the

15     special master, modifying the appointment.

16         We think that that is useful and important as far as

17     enabling Dr. Hogan to assess the parties' proposals and what

18     will be feasible for the state in fulfilling the duties that

19     the Court has laid out, and we would ask that those continue

20     to go forward.

21         The information being shared during that, we think it's

22     appropriate for Dr. Hogan to be able to make requests of the

23     state for information and for the state to respond.  Again, we

24     would ask that the appointment order reflect that he has that

25     ability to seek that information, again, all directed

1    specifically at assessing and planning for a remedial order.

2    So not, you know, as Mr. Shelson said, unlimited and about any

3    subject matter, but really specifically targeted at the remedy

4    and assessing the parties' proposals.

5        The final bucket of information that I think Dr. Hogan

6    started us off with is the question of people outside of the

7    party representatives and information shared there, but third

8    parties.  Again, United States doesn't object to those

9    communications to the extent that they are focused on this

10    question of assessing what is feasible as Dr. Hogan is

11    developing his plan and working with the parties.  To the

12    extent that those communications, though, are permitted to

13    proceed, we would ask that the counsel for the parties be

14    present or invited to participate in those communications and

15    be given at -- you know, warning in advance of the

16    conversations so that we can ensure, as Mr. Shelson mentioned,

17    that the parties are aware of what information is being

18    shared.  And, again, we would expect that that information

19    would be used only for the purpose of assessing what is

20    feasible and whether some of the suggestions or proposals made

21    by the parties are actually practicable going forward.

22        We do believe that we've provided a significant amount

23    of information through the record that addresses many of the

24    background facts.  But, of course, any -- you know, all of us

25    have had the benefit of learning about this system for many

 1     years through the course of this litigation and beyond, and so

 2     it's a very different perspective for someone coming in and

 3     trying to learn it all through a cold record.  And we

 4     understand the desire to really quickly get us to speed and

 5     figure out what is possible given the way that the system

 6     works on the ground.

 7          So to the extent that any of those pieces of information

 8     are going to be permitted, we would ask that the Court's

 9     appointment order be modified and clarified to address that

10     and also address the recordkeeping that Dr. Hogan will conduct

11     during -- you know, to ensure that everyone is aware

12     throughout the process about any contact that he does have.

13          THE COURT:  Okay.  Well, Mr. Shelson, you did

14     specifically ask to be able to make certain written objections

15     or put your objections in writing, and the Court will allow

16     you to do that.  You know, the record, though -- I will say to

17     the parties and to the master, the record is the record, and

18     whatever information we need to know about how things worked

19     up until December the 18th or December 2018 is there in the

20     record.  And I -- you know, to the extent the master, if it's

21     not clear, can consult with the parties and they can agree on

22     things that this is the way things worked up until that point.

23     It may be clear from the record.  It may be clear from the

24     judge's order, then that should frame that.  But to the extent

25     I do believe -- to the extent we're looking at -- to the

```
 1    extent we're trying to sort of craft a remedy that takes us
 2    through 2019, 2020, 2021, and beyond, I do think -- and,
 3    again, I'll take the state's written objections, but I think
 4    it might make some sense to have some conversations or some
 5    communications with folk who can help with that information on
 6    a going-forward basis, I would think.  Again, I'm going to
 7    accept the state's -- I'm going to allow the state to file its
 8    written objections.  But off the top of my head, I think that
 9    there might have to be at least some communications with
10    individuals, because the system is not static.
11         In fact, one of the questions that I wanted to raise
12    with the state is, I know since the legislature has come into
13    session, for example, I do know from what I've read in the
14    paper that there is a new chairman of the committee that deals
15    with mental health.  Obviously, there's new leadership.
16    There's a new lieutenant governor in the senate, and that
17    lieutenant governor, I believe, has appointed Hob Bryan,
18    Senator Hob Bryan, as the chairman, I believe, of the
19    committee that oversees the Department of Mental Health.  And
20    I think I read in the paper that he has at least -- I'm not
21    sure if there's a bill that's out there that is -- you know,
22    because the legislative session was interrupted.  But I think
23    I read in the paper where he at least voted some proposal out
24    there.  Again, in trying to move forward and trying to craft a
25    remedy that the -- a remedy for the mental health program, you
```

1    know, would some information about what has happened since

2    2018 be -- I mean, I'm assuming the state would not contend

3    that information that comes out of this legislative session,

4    for example, would not be information that would be helpful to

5    the master.

6        The state is not taking that position; correct?

7        MR. SHELSON:  This is Jim Shelson, Your Honor, and, Your

8    Honor, you are correct.

9        THE COURT:  Okay.  All right.  So but I'll take the

10   state's written objections, and I'll consider any response

11   that the United States makes.  But I do -- I do not -- now,

12   this is my conversation to the parties and the special master.

13   I do not want to retread things that are in the record.  It

14   seems to me that we can -- if the special master needs to get

15   information that's "outside of the record" from particular

16   individuals, it can be narrowly focused, and that the parties

17   can be "present" at the time through some way.  I mean, either

18   present through written communications or present physically

19   or present through Zoom or whatever might be -- it seems to me

20   we can -- we can craft an approach where the parties interests

21   are still protected, but I don't think the parties ought to be

22   spending a lot of money into re-creating the wheel in this

23   case.  And I do think that, again, the monies that are

24   expended should be -- the monies going into developing or

25   refining or making this system that we have work better.

1          But I'll take the state's written objections, and I know

2     you've already, I think to some degree -- I'm not sure if

3     you've put all those objections in writing, but I know I've

4     heard these objections before.  But I do think it's

5     appropriate to allow you to put them in writing, Mr. Shelson.

6     So that, you know, our record will be complete on this.  So --

7     yeah, so that our record will be complete, and then the

8     Government would have an opportunity to respond, and we will

9     act accordingly.

10          In the meantime, however, I do want the special master

11     to move forward with his work.  No need to delay, you know,

12     significant -- I mean, no need to really delay what he needs

13     to do, because we need to find the best way to get to the end

14     result as quickly as possible through this pandemic that we're

15     in.  And I'm -- you know, the initial timeline that the Court

16     had in mind, obviously, is probably going to have to be

17     adjusted to some degree.

18          Mr. Hogan, have you thought about the types of

19     stakeholders or the -- or, you know, Mr. Shelson mentioned

20     being concerned about talking to staff and other

21     representatives within the state.  Have you thought about,

22     Mr. Hogan, what individuals or institutions or anything that

23     you think you might need to speak with to help you understand

24     where you might have to go?

25          SPECIAL MASTER HOGAN:  Thank you, Your Honor.  I have in

1  a preliminary way, and I'll just illustrate a couple of

2  examples.  The community mental health centers are obviously

3  pivotal in this.  They operate most of the programs that the

4  department, as well as the Division of Medicaid fund or

5  reimburse.  As the trial record makes clear, the state's rules

6  regarding those services are quite extensive.

7      My observation from years in this business is that a

8  community mental health program, like any other institution,

9  the whole is somewhat more than the sum of its parts.  And --

10  but things -- things work differently based on leadership and

11  so on, so I'm interested in how these organizations work with

12  respect to the requirements of the ADA.  And a subplot, if you

13  will, of that is that the state funds mental health services

14  both through Department of Mental Health grants and through

15  Medicaid.  These are very different mechanisms and suffice it

16  to say they -- it appears that they may not work that well

17  together.  Some things that Medicaid pays for don't seem to

18  happen that much, and some areas where grants are provided, it

19  looks as if Medicaid might enhance those programs

20  substantially.  But it's not clear that it -- that it does.

21      There are -- the state has in effect hired managed care

22  organizations to manage the Medicaid program, and it's not

23  clear how they work in relation to what's at issue in this --

24  in this case.  So that would be an example of something that

25  I'm trying to explore.  I guess another -- so I would want to

1    talk to some community mental health center people, and not a

2    lot of them, not necessarily in every center, but enough to

3    know how things work.  I haven't seen, for example -- maybe

4    there's something in the voluminous record that I've missed.

5    But I haven't seen budgets or annual reports from the mental

6    health centers, so I see there's a lot of information about

7    X-grant works, and there's some information about how this

8    Medicaid program works.  But I don't know how those things

9    work together.  And for this to be resolved substantially,

10   whatever ultimately emerges from the case is going to have to

11   be executed by those -- by those parties.

12        I think I'll stop there.  I guess one other -- one other

13   comment, and to say my kid sister developed schizophrenia

14   about the same time that I started working in mental health.

15   And my observation is that her career and my career look quite

16   different, and things look a little different from the corner

17   office than they do from the street.  And neither party has

18   the whole truth, and I guess based on that, I think it would

19   be very helpful to talk to a limited number of advocates who

20   would have their own view of how things work and what works

21   and what doesn't and what might help shape a remedial order

22   that would be effective when implemented.

23        So before I go on and on, I think I'll just stop there.

24   Those might be some examples.

25        THE COURT:  Okay.  Thank you, Mr. Hogan.  Let me ask

1     you, Mr. Shelson, how much time do you think you need to --

2     I'm willing to give you as much time as you need to submit any

3     written objections.

4          MR. SHELSON:  Your Honor, this is Jim Shelson.  If

5     its -- one week, if the Court thinks that's reasonable.

6          THE COURT:  I was thinking -- I was thinking actually

7     14 days simply because of where we are and how we're doing

8     things.  And I realize on one end, I'm talking about the

9     special master trying to do his thing as quickly as possible.

10    But you won't -- I'll give you the option seven, ten, or

11    14 days?

12         MR. SHELSON:  Thank you, Your Honor.  Jim Shelson again.

13    I would take ten days, Your Honor.  Thank you.

14         THE COURT:  Okay.  All right.  I'll give you ten days.

15    The government, the United States, then should respond in

16    seven days to what -- to those objections.

17         MS. FOX:  Thank you, Your Honor.

18         THE COURT:  All right.  And, you know -- and then, you

19    know, it may be that the Court will consider them on the

20    papers, or if I need to hear from the master and the parties,

21    we may do that through a subsequent call to see if we can

22    reach an agreement on how to resolve that particular -- or how

23    to best resolve any of those objections, if possible.

24         The -- you know, the -- my overall thing is I do want,

25    obviously, the cooperation of the parties.  And I don't -- and

1    I expect that the parties have been cooperating with the

2    master and we are doing -- when I say "we," the parties, the

3    master, they're doing the best that they can do to address the

4    issues that came forward during the trial.

5         Obviously, I think the main thing in the case was the

6    Court's belief that the State of Mississippi is overutilizing

7    hospitalization and underutilizing community-based resources,

8    and so the state, in the Court's view, needed to expand their

9    use of these community-based resources.

10        I am glad that the Division of Medicaid, I believe, has

11   been a part of the conversations since September and since the

12   time that Mr. Hogan has been involved.  I think there have

13   been conversations at least with the Department of Mental

14   health and the Division of Medicaid, as I appreciate it, and

15   that's going to be helpful, I think, to everyone in trying to

16   find a path at which we can move forward.

17        Now, one of the issues that, you know, did not come up

18   or that this Court might not even be tasked with or that the

19   special master might not even be concerned with, but -- and

20   nobody knows where I'm going with this, because I just learned

21   of it on Friday, again, from the newspaper.  And I'm not even

22   sure if -- even if we look at the grand scope of all the

23   things that we were talking about during the course of the

24   trial, whether this ought to be a concern for the special

25   master or the parties or anyone else.  In light of the

1   pandemic, the COVID-19 stuff, I understand, again, from

2   reading the newspaper on Friday that there were a significant

3   number of positive tests within the Department of Mental

4   Health facilities, particularly over in Lauderdale County, I

5   believe.

6        Is that something that this Court ought to be concerned

7   with, that the special master ought to be concerned with, that

8   the parties ought to be concerned with?  And maybe, you know,

9   again, nobody knew I would bring this up, because nobody knew

10  that I was reading the paper the other day.  So I -- is

11  this -- is that something that has come to the attention of

12  the parties?  I guess that's the first question.  And should

13  we be concerned, alarmed, or should we just put that in the

14  category of that should stay where it is and no need for

15  anybody to be worried about that in this case?

16       SPECIAL MASTER HOGAN:  Your Honor, this is Mike Hogan.

17  The -- this is a substantial concern and the -- many of the

18  individuals that the department is taking care of are

19  vulnerable.  This is a -- it's a little bit of a digression,

20  but some of the people that are most vulnerable are

21  individuals with developmental disabilities who are not really

22  the focus of this case.  But many live in group settings, and

23  the nature of their care is face-to-face.

24       But there are also concerns for many people in the

25  mental health systems, and those concerns are probably most

1    intense for those people who are in congregant settings like

2    hospitals.  Their movement is restricted.  Many of them have

3    other health conditions, and this is a really significant

4    national problem.  There have been a number of deaths in

5    hospitals, as well as other facilities like board-and-care

6    homes all over the country.

7         I did get through other sources, and I just took the

8    liberty of sharing with Diana Mikula, the executive director,

9    some information about -- about this problem.  There is a lot

10   of conversation going on among people in the field, for

11   example, the National Community Mental Health Centers Group is

12   working on it.  I think the Association of State Mental Health

13   Directors is working on it, so it's a really big problem.  I

14   am not -- I don't know what I have to say beyond that, other

15   than having just provided this little information that came

16   across my desk, I'm not sure how to be helpful.

17        And I do think that the staff, and particularly the

18   medical staff, are working under great pressure, so I think

19   its for our purposes respecting that and giving them the space

20   to do their work is important.  And I guess that's about the

21   extent of my thoughts about this.

22        THE COURT:  Any comment from --

23        MS. FOX:  Your Honor, this is --

24        THE COURT:  Oh, I'm sorry.  Go ahead.  It sounded like

25   that was Ms. Fox?

1          MS. FOX:  Yes, Your Honor.  I wanted to share that our

2     office, as you know, works with institutions around the

3     country and has certainly been engaging with a number of other

4     institutions of all types about this issue, and we do have

5     concerns, of course, about individuals who are currently

6     institutionalized in Mississippi.  As -- as we have been

7     working toward throughout the course of this case, one

8     solution to reduce risk for those individuals is of course to

9     discharge to community-based services as soon as possible.

10     And we would be happy to engage with the state on, you know,

11     weekly updates, brief weekly updates, or other calls both to

12     provide any information that we are learning from our work

13     nationally and to learn about the steps that the state is

14     taking with that population now at risk due to COVID.

15          THE COURT:  Okay.  I guess I'll hear from the state.  I

16     guess what, if any, does this at all -- should this at all be

17     sort of -- again, this is -- this obviously is all new

18     information.  I mean, but should information such as this,

19     that is the number of positive findings over there in the

20     facilities among the individuals, should I guess -- obviously,

21     it's a concern.  I mean, outside of this litigation or not,

22     it's a concern.  But should information like that be useful to

23     the parties in seeking how we -- how the state provides these

24     services in a remedial sort of manner down the road?  I mean,

25     should this -- should we be concerned, or should this

1    information be helpful?  Because it is of concern.  I think

2    that would be an under -- I mean, you know, it's -- I think

3    everybody agrees it's a concern.  The question becomes for the

4    Court is whether it should be part of the framework that the

5    special master or anyone else ought to be looking at in this

6    particular case?

7         MR. SHELSON:  Your Honor, this is Jim Shelson.  It's

8    clearly a concern.  The state is addressing it.  It's on top

9    of it, but it should not be a part of this case.  You know,

10   the record -- I'm not -- I don't want to get into a back and

11   forth about if the problem is more pronounced in congregant

12   settings and other settings.

13        But let me just say this.  The record is clear that

14   virtually all the community-based services that we're talking

15   about now and we talked about at trial are face-to-face.

16   *pact is face-to-face.  Mobile crisis response is

17   face-to-face.  So a congregant setting, everybody in the state

18   gets that it's a concern.  It's happened, and it's being

19   addressed appropriately.  But to suggest that that's the only

20   setting in the context of mental health that this pandemic is

21   an issue in is just not so.

22        Not to make excuses, Your Honor, and we've tried not to.

23   We've soldiered on in the middle of a pandemic, and I think

24   we've done so cooperatively and well.  And I think we're doing

25   what the Court expects us to do under the spirit and intent of

1    its orders.

2        But this, I would circle back to discovery.  The state's

3    running a mental health system.  It's running it in the middle

4    of a pandemic and we -- we -- that's another reason why we

5    have to be very careful about what we do regarding further --

6    further discovery or further opening the record.

7        I will just share this with the Court, when we got --

8    and I don't want to debate this in detail either.  When we got

9    DOJ's request for supplemental information, it included 110

10   items, many with subparts.  And the initial reaction we got to

11   that is, look, at some point, someone is going to have to tell

12   us whether you want us treating patients or gathering more

13   data and more documents.

14       So, to us, the pandemic is a huge concern, and the folks

15   in the mental health system who have COVID-19 are being

16   appropriately segregated and treated.  And this really needs

17   to be in the context of why we need to be extra careful about

18   adding extra discovery demands onto the state mental health

19   workers.

20       THE COURT:  Okay.  Well, I mean, I think I heard from

21   the United States the obvious position would be if the

22   state -- I assume, I think this is what I heard.  If the state

23   was confining less people who are otherwise qualified for

24   community-based services, then you would reduce the number of

25   people who might ultimately test positive.  It's just -- and

1    this is a -- this may be a crass analogy, I guess, but it's

2    like our prison system.  If you reduce the number of people

3    who are actually incarcerated who might not need to be

4    incarcerated, that is on the detention side of things, those

5    persons who maybe have not been convicted of anything yet.

6    But the way you possibly reduce the number of people who might

7    get a positive finding is to get them out of the system

8    that -- that gets them out of the place where they cannot use

9    the tools that the CDC says could help them prevent getting

10   the positive findings; i.e., being more than six feet apart,

11   being able to utilize the necessary hygiene information, and

12   things of that sort.

13        So what I think I heard from the United States was, you

14   know, if these patients who are otherwise qualified for

15   community-based services are institutionalized, then you

16   increase the risk of them being susceptible to getting a

17   positive finding of COVID-19, which would then have to result

18   in them being quarantined and, et cetera, et cetera, et

19   cetera.

20        So while -- you know, while the state is taking efforts

21   to protect those individuals and not -- I hear what you're

22   saying.  I guess one of the concerns would be what if -- what

23   steps is the state taking, again, to reduce the population of

24   those people who it believes -- or who should not otherwise be

25   institutionalized?

1          MR. SHELSON:  Your Honor, this is Jim Shelson again.

2     And -- and, Your Honor, that's the merits question, and Your

3     Honor has decided that, and Your Honor found against the

4     state.  And the state -- the state agrees with the basic

5     proposition that fewer hospitalizations are better.  The state

6     made its record of what its tried to do over time to reduce

7     that, and the Court has found what its found, that it wasn't

8     fast enough and enough.  And since trial, the state has

9     continued to expand its community-based services.  And as part

10    of its proposal at this stage of the litigation has proposed

11    further expansion.

12         But I'm not sure what to say, other than the state gets

13    that fewer hospitalizations are better, and that's the state's

14    goal and it continues to work towards that goal.

15         THE COURT:  Okay.

16         SPECIAL MASTER HOGAN:  Your Honor, if I might, this is

17    Mike Hogan.

18         THE COURT:  Yes, Mr. Hogan.

19         SPECIAL MASTER HOGAN:  Just on this -- on this question,

20    as I'm listening it occurs to me that this matter is -- it's a

21    different and scarier version of a problem that is much

22    broader than in psychiatric hospitals, and the problem is that

23    it's dangerous to go to a hospital, period.  It's dangerous to

24    go to a hospital for anything.  The best estimate these days

25    is 20,000 people die because of one kind or another of

1   medical -- medical error.  And so its a -- you want to go

2   there, and now, ironically, people are staying out of

3   hospitals when they've got problems that might be treated

4   there, in part because of this, and we don't know what those

5   consequences are.

6        I guess my take on this is that, first, yes, this is

7   another reason to not be in a congregant setting.  But number

8   two, as Mr. Shelson points out, there are a lot of things

9   going on and indeed our planning is to try to refine that, and

10  to the extent it's feasible and appropriate, to accelerate it.

11       I think that the medical and the psychiatric people are

12  going to have to be thinking about and learning about this as

13  we go forward, and I think we're going to know some things in

14  six months or a year from now that we don't know now.  And I

15  guess my thought or my recommendation would be that we all

16  stay mindful of this; that we continue to monitor it; that we

17  consider on an ongoing basis whether the course of what we're

18  doing needs to be changed.

19       But I guess my take is that we don't know enough today

20  to do that, and that the medical personnel should be given the

21  space to do the work that they have to do.  That would be my

22  thought, Your Honor.

23       THE COURT:  Okay.  Thank you, Mr. Hogan.

24       We're getting ready to wrap this up, I believe.  But I

25  wanted to just make sure that the parties, again, continue to

1    work cooperatively as best as you can through the special

2    master.  I think it was important to let the public know what

3    was going on, or what is going on, and I wanted to just make

4    sure that we're moving forward.

5         And I realize that our state of the world right now

6    might complicate how quickly we ought to get things done, but

7    I certainly don't think we ought to stop moving toward getting

8    things done.  So with all of that being said, is there

9    anything else from the special master?

10        SPECIAL MASTER HOGAN:  No, Your Honor.

11        THE COURT:  Thank you so much for your attention,

12   Mr. Hogan.  We appreciate your service.

13        Is there anything from the United States?

14        MS. FOX:  Yes, Your Honor.  This is Deena Fox.  Just two

15   clarifications, or one clarification and one request.  While

16   we definitely do want to continue pressing forward as quickly

17   as possible with the special master, I wanted to clarify that

18   the communications with third parties would not commence

19   unless there was a clarified -- unless and until there's a

20   new, clarified order from the Court; is that correct?

21        THE COURT:  That's right.  I'll take that up after I

22   receive the written objections.

23        MS. FOX:  Okay.  Thank you, Your Honor.  And we would

24   like to file with any response to the objections a proposed

25   order to clarify those points, if that is acceptable?

1          THE COURT:  That would be acceptable.

2          MS. FOX:  Thank you, Your Honor.  Final point was just

3     on the issue of timing that I know has come up a few times

4     this morning.  We think that the status conference today has

5     been very useful.  As I think we all know, deadlines are

6     useful at focusing the mind, and I think that they did focus

7     the parties on some productive conversations over the last few

8     weeks.  And we think that it would be very useful to continue

9     having monthly status conferences to keep the public made

10    aware of what's going on in these -- in this process and to

11    ensure that the process moves forward and ensure we can

12    resolve any issues that arise, like this issue of third-party

13    communications, as quickly as possible.

14         We would also hope that while we don't have a deadline

15    for this process at this time, and I know the special master

16    is just, I think, considering what next steps and timelines

17    should be in light of the pivot to the next phase of the

18    process, we would hope that at the next status conference that

19    we could have a clearer idea of the process overall.  As we

20    think that that would be very useful in ensuring that we get

21    to implementation of the necessary remedial order as soon as

22    practicable given the concerns about the harm to individuals

23    during this phase.

24         THE COURT:  Okay.  Well, I'll just say this, and I'm not

25    sure -- I'll just say this.  I'm not sure if we will have

1    monthly meetings.  We may.  But I don't want to assure the

2    parties that we'll have monthly status conferences.  It may

3    be -- you know, it may be every other month.  It may be every

4    six weeks, or, again, it may be monthly.  I mean, but I don't

5    want to say that right now.  I do want to have the opportunity

6    to receive the state's written objections and the United

7    States' response to that.

8         And as I think about how we move forward from that

9    point, again, that would take us through mid to late May.

10   Obviously, this Court's original order came down, and I didn't

11   appoint the master until later on.  But the original order was

12   in September, and I think the order appointing the master was

13   in February.  And, again, this is going to be a huge

14   undertaking, particularly if there's a lot of resistance from

15   both ends, and there's not an agreeable point or there's not

16   much cooperation.  And I think that there has been so far.

17   I'm not suggesting that there has not been.

18        But I think if we lose focus on fighting through issues

19   rather than trying to be conciliatory, then we delay whatever

20   remedy the master could propose and hopefully -- well -- and

21   whatever remedy he proposes, I hope can be implemented

22   expeditiously for the benefit of the public, and, you know,

23   for the benefit of the citizens of Mississippi.

24        So I'll take that, Ms. Fox, under consideration.  The

25   state -- as I indicated, I do know at least from the newspaper

1    that Senator Hob Bryan has alluded to the fact that -- has at

2    least intimated, or at least taken some sort of steps, and I

3    think that's beneficial.  I'm not sure how things -- I think

4    there was testimony during the trial, or if not, there was

5    something in the record about the state not having acted over

6    years when confronted with this, when confronting these

7    issues.

8         But I do get the impression at least, again, from that

9    article and those articles related to the senator's

10   appointment that there may be some movement from the state,

11   and I certainly appreciate the state if it is seeking to

12   address this issue, along with so many others that have come

13   forward, and particularly that might come forward as a result

14   of where we are in the world today.

15        But now I turn to the state, is there anything else we

16   need to discuss at this point, Mr. Shelson or Mr. Pizzetta or

17   Mr. Rosamond?

18        MR. SHELSON:  Your Honor, this is Jim Shelson.  Just a

19   few things, first, just about the charge of the special

20   master.  The special master stated, as he understood it,

21   review the record, confer with the parties, and ultimately

22   propose a remedial plan.  We would just -- we see that

23   slightly differently, and, again, this is no criticism of the

24   special master.  He -- we think he's doing exactly what the

25   Court wanted him to as far as trying to get his arms around

1    this and getting the parties talking.  But -- and we recognize

2    the special master can't do everything at once.

3         But as we understand what the Court wants the special

4    master to do is before we get to the stage of the special

5    master proposing a plan, it seems to us that we only get there

6    if the parties are not able to agree.  And so that should be

7    the first focus is the negotiation aspect of this, where the

8    mediator's role is -- is akin to the -- the special master's

9    role is akin to a mediator.  And we know the special master is

10   getting his arms around all this, and that that's coming, he

11   alluded to that.

12        But from the state's perspective, negotiations should be

13   the primary next focus going forward, and that dovetails with

14   what Your Honor talked about about the parties being

15   conciliatory to the extent that they can.  And in short, you

16   know, more negotiations and less litigation or litigation-like

17   activities the state believes would be a good thing.

18        If we get to the stage where the special master feels an

19   agreement cannot be reached, then, yes, he is charged with

20   proposal a remedial plan.  But we think the parameters of that

21   are the -- are within the scope of the trial record, and at

22   least generally speaking, within the parties' proposal.

23        The second thing, Your Honor, is if we get to the

24   special master having to propose a plan, we may need some

25   clarification on the standard the special master is suppose to

1    apply in that regard.  Because, you know, you could get into

2    questions of law and fact about that, and ultimately, the

3    Court's the decider of those issue.

4         The third thing, Your Honor, is if we get to the stage

5    where the special master has to propose a plan, the state

6    would request, at least to the extent feasible, the special

7    master addressing his plan, the cost of whatever remedy he

8    proposes.

9         And the final point, Your Honor, is -- is we agree with

10   Ms. Fox's point about maybe the next telephonic hearing, or

11   whatever form of hearing we have, to develop a more clear

12   understanding on the path forward based on where all this is

13   on that time -- at that time.

14        And, Your Honor, I don't know if Mr. Pizzetta or

15   Mr. Rosamond have anything else to add, but that's all I had.

16        MR. PIZZETTA:  This is -- this is Mr. Pizzetta.  No, I

17   think we're in agreement, Jim.  Thank you very much.

18        THE COURT:  Yeah.  Thank you.  Thank you, Mr. Shelson.

19        I think the way I envision this matter to work, I think

20   it is set forth in the order appointing the special master at

21   docket entry -- I think its 241.  I do expect the parties

22   initially -- and I think the parties' use of the special

23   master is best utilized through sort of a mediation sort of

24   function initially.  I mean, not just initially, but broadly

25   speaking.

1          I do think the parties are going to have to have some

2     give and take that should be useful in come -- the best plan

3     is one that is agreed upon.  I mean, because that's just --

4     that just takes away so much of everything if -- the best plan

5     is one that is agreed upon by the parties.

6          And to the extent we cannot get something that's agreed

7     upon as to every detail, obviously a plan that incorporates

8     all the things that the parties can agree to, along with

9     something else that the master might propose, would be

10     beneficial.  But for the parties to not work together, I think

11     that's completely unacceptable, so I would encourage you-all

12     to continue to work with each other as you have so far.

13          And, again, I'll take up the state's objections and the

14     United States' response to how the process moves forward with

15     the master being able to collect additional information that

16     might be outside of the record.

17          So, you know, again, I do thank the parties for engaging

18     in this preliminary discussion.  I did note, I think in one of

19     my earlier orders, that there are entities that have stepped

20     forward and at least offered to make themselves available.  I

21     think one of them was the Mississippi Psychiatric Association,

22     for example.  I think they submitted something that the

23     parties are aware of.

24          But I do, you know, thank those persons, those entities

25     for trying to make sure that our mental health system is one

1    that we can all be proud of, and I do want to encourage the

2    State of Mississippi, the Mississippi legislature, the

3    Department of Mental Health, the Department of Medicaid, I do

4    want you-all to be intimately involved with the lawyers for

5    the state on this issue, because it's going to take the

6    cooperation of all those bodies, including the governor's

7    office because I imagine -- well, we know the governor is over

8    the Division of Medicaid.  We do know the Medicaid Division

9    reports to the governor.  And that ultimately, any bills that

10    might have to be passed to sort of restructure things to sort

11    of get funding for will all have to come through the

12    legislature through these -- well, start out in these

13    committees through the legislature, and ultimately, on the

14    desk of the governor.

15         I know Mississippi has many, many competing concerns,

16    but this is a concern that's been around for decades.  And we

17    need to make sure that we put this front and center along with

18    everything else, and when I say "this," I mean repairing our

19    mental health system.

20         Again, I thank the parties for your involvement.  I look

21    forward to receiving those written objections.  I look forward

22    to hearing about how the parties are working together on a

23    path forward.  So thank you so very much.  Please continue to

24    be safe and be vigilant, and we'll get back and set up another

25    call at a time that's convenient for the Court and the

1    parties.  Thank you so much.

2         MS. FOX:  Thank you, Your Honor.

3         MR. SHELSON:  Thank you, Your Honor.

4         THE COURT:  All right.  That concludes it.

5    ************************************************************

1                          **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Certified Court Reporter, in and

4    for the State of Mississippi, Official Court Reporter for the

5    United States District Court, Southern District of Mississippi,

6    do hereby certify that the above and foregoing pages contain a

7    full, true, and correct transcript of the proceedings had in

8    the aforenamed case at the time and place indicated, which

9    proceedings were recorded by me to the best of my skill and

10   ability.

11         I further certify that the transcript fees and format

12   comply with those prescribed by the Court and Judicial

13   Conference of the United States.

14         THIS the 5th day of May, 2020.

15

16                         /s/ Candice S. Crane, CCR

17                         Candice S. Crane, CCR #1781
                           Official Court Reporter
18                         United States District Court
                           Candice_Crane@mssd.uscourts.gov
19

20

21

22

23

24

25