<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3


 4   UNITED STATES OF AMERICA                      PLAINTIFF

 5   VERSUS                   CIVIL ACTION NO. 3:16-CV-00622-CWR-FKB

 6   STATE OF MISSISSIPPI                          DEFENDANT

 7


 8
                      VIDEOCONFERENCE PROCEEDINGS
 9            BEFORE THE HONORABLE CARLTON W. REEVES,
              UNITED STATES DISTRICT COURT JUDGE,
10                      OCTOBER 2, 2020,
                      JACKSON, MISSISSIPPI
11


12


13


14                 (Appearances noted herein.)

15


16


17


18


19


20


21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
</pre>

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2       FOR THE PLAINTIFF, THE UNITED STATES OF AMERICA:
              DEENA FOX, ESQ.
 3            MITZI DEASE PAIGE, ESQ
              PATRICK HOLKINS, ESQ.
 4            REGAN RUSH, ESQ.

 5
          FOR THE DEFENDANT, THE STATE OF MISSISSIPPI:
 6            JAMES SHELSON, ESQ.
              MARY JO WOODS, ESQ.
 7

 8        ALSO PRESENT:
              DR. MICHAEL F. HOGAN, SPECIAL MASTER
 9            KEITHFER ROBINSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **PROCEEDINGS VIA VIDEOCONFERENCE, OCTOBER 2, 2020**

2

3          THE COURT:  You may call the case.

4          MS. SUMMERS:  The Court calls Civil Action No.

5     3:16-cv-622-CWR-FKB, the United States of America versus the

6     State of Mississippi.

7          THE COURT:  Thank you.  Good morning.  Can everyone hear

8     me fine?  I can remove my mask if I have to.  Is anyone having

9     any difficulty hearing me?  I see a couple of thumbs up.

10         Okay.  Thank you-all for making yourselves available for

11    this status conference.  My purpose in us being here today is

12    just to find out how things are going and where we are because

13    it has been a little over a year that the Court entered its

14    order.  I realize I didn't appoint the master until sometime

15    later, but I just want to try to find out the progress that

16    the parties are making with the assistance of the special

17    master, and if you-all want to, you can give me a grade for

18    the special master if you wish.  You know, do we need to

19    change paths or do anything like that?  Or do you need to

20    change judges?  I don't know.

21         But this call is open to the public, and I understand

22    that the public may be participating.  There's no one in the

23    courtroom, obviously, but we have made -- opened up this to

24    the public because obviously it's an issue of public concern,

25    and so I wanted you to be aware of that.  This is not, you

1    know, sort of a status conference sitting in my chambers with

2    just the lawyers, but it is one that is open to the public as

3    well.

4        So I guess what I'll start off doing is allow the

5    special master to lead the discussion or conversation, and

6    then I may have some questions to ask of him and/or the

7    parties, and we'll just go from there.

8        Hold on for a second.

9        MS. SUMMERS:  Could you have them to identify themselves

10    for the record.

11        THE COURT:  Oh, okay.  I'm sorry.  I did not have you

12    identify yourself for the record.  I see for the State of

13    Mississippi we have Jim Shelson.  Is anyone else with you,

14    Mr. Shelson?

15        MR. SHELSON:  Mary Jo Woods from the Attorney General's

16    Office, Your Honor.

17        THE COURT:  Okay.  All right.  Thank you, Ms. Woods.

18        Now, who's on for the United States?

19        MS. FOX:  Your Honor, this is Deena Fox for the United

20    States.  I'm here with my colleagues Regan Rush, Patrick

21    Holkins, and Mitzi Dease Paige.

22        THE COURT:  Okay.  All right.  Thank you.  Thank you so

23    much.  And I'm sorry for having overlooked your introduction.

24    I apologize.

25        Now I turn to the special master.

1        SPECIAL MASTER HOGAN:  Well, thank you, Your Honor.

2   First, am I coming through okay?

3        THE COURT:  Yes, you are.  I hear you fine.

4        SPECIAL MASTER HOGAN:  Thank you.  Well, I will try to

5   be uncharacteristically brief.  I report that the parties have

6   been courteous and diligent and professional in this effort.

7   Since the last status conference, there have been a half dozen

8   three-way negotiating sessions, and additionally the parties

9   have been in communication among themselves.  This may have

10  developed out of an experience relatively early on where,

11  after we'd had a very productive discussion, I tried to draft

12  something and all the parties said, no, it will work better if

13  we do that.  So that's been going quite well.

14        The requirement that settlement negotiations remain

15  confidential -- that's my way to articulate it, not attorney

16  language -- limits somewhat what I can say about how we're

17  doing, but I think it's -- I don't expect anybody would object

18  if I describe it in the following fashion.

19        The focus of the trial and of Your Honor's judgment

20  decision last September was on specific community mental

21  health services and their adequacy or inadequacy in the state

22  of Mississippi, and so logically we've proceeded to discuss

23  those services and how they might be expanded or improved.

24  And that's included discussions of the amount of additional

25  services that might be needed, timeframes to develop them, and

1    some conversation that goes to Your Honor's statement that

2    there need to be ways to measure success along the way.

3        I would say that the parties are in substantial

4    agreement on those issues for most of those community services

5    that were discussed at trial, but not all.  We continue to

6    talk about that and exchange drafts of a plan or an agreement.

7    I am cautiously optimistic about our progress so far and

8    the -- always when you climb a hill, the last part gets the

9    steepest, and so we have some challenging issues ahead, but

10   with the good spirit that we've seen so far, again, I'm

11   cautiously optimistic, and we keep working.

12       THE COURT:  Okay.  Well, let me ask this question.  I

13   know that -- well, the legislature has been in and out of

14   session for most of this year.  I know they've been out of

15   session for most of the year, but they've had extended

16   sessions, and I think they may be in session today.  I mean,

17   this may be the last day of the session, unless it was last

18   night.

19       What -- and this is to the state lawyers, I guess.  What

20   has been the prospect of identifying resources to carry

21   forward or to move the conversations forward -- with respect

22   to either expanding community services or making sure that

23   things that were set forth in the Court's order or even what

24   the parties have been talking about, what prospects are there

25   with respect to resources?  And, you know, did the legislature

1    for example, this session give or fund MDH adequately, or did

2    they give them more money?  Did they use any of the CARES Act

3    money to provide money for the mental health system?  I just

4    want to know are there any additional resources?  Were there

5    any?  In other words, was there a response from the

6    legislature to the Court's order?  Either symbolically or

7    otherwise I mean.

8         MR. SHELSON:  Your Honor, this is Jim Shelson.  I'll

9    address that.  The fiscal year 2021 budget is out.  It's

10   public information.  DMH budget overall was cut $6 million,

11   but there was a directive to increase community-based spending

12   by $4 million.  That is the parameters in which the State is

13   negotiating with DOJ.  The -- as I understand it, the CARES

14   money cannot be used in connection with the services at issue

15   in this lawsuit, and that's where we are, Your Honor.

16        THE COURT:  Okay.  And with respect to -- I guess this

17   is to Mr. Hogan and the parties.  At the pace that you're

18   moving right now, is there any estimation about when you-all

19   believe that you could reach maximum agreement, I guess?  You

20   know, there may be some things that might be on the table

21   that -- you know, that the parties might sort of feel like

22   they've reached an impasse, but is -- what's your individual

23   or collective idea about when you might be able to reach

24   maximum agreement?

25        SPECIAL MASTER HOGAN:  Your Honor, this is Mike Hogan.

1        The -- I'm out on a limb a little bit here because we

2   haven't discussed this matter, but my own assessment is that

3   we have to have a lot of progress made by the end of the year.

4   And I would hope that we'll have resolved everything that we

5   can resolve by the anniversary date of your appointing me to

6   do this, and that's entirely a guesstimate.  As I said, there

7   are some tough issues.  And some of those issues, I think the

8   parties are likely to get to agreement or close to agreement

9   on the needed services.  Some of the toughest issues relate to

10  the legal framing of this in an agreement with the Court, and

11  that's an area that it's harder for me to assess, but that's

12  my seat-of-the-pants estimate, Your Honor.

13       THE COURT:  I'll hear from the parties what their

14  perspective is on what Mr. Hogan has said about that.

15       MS. FOX:  Your Honor, this is Deena Fox for the United

16  States.

17       I think from our perspective, we expect the timeline

18  similar to what Dr. Hogan's estimate was, probably.  I think

19  we would expect that we will have been able to address all of

20  the issues and likely reach, as you said, the maximal

21  substantial agreement before the end of this year.

22       THE COURT:  And the State?

23       MR. SHELSON:  Your Honor, Jim Shelson.

24       We agree with Dr. Hogan's assessment.

25       THE COURT:  Okay.  And, Dr. Hogan, I realize when the

1    Court issued this order and appointed you, we were in a

2    different place and you probably expected to be able to get on

3    the ground here and possibly see people, talk to people, touch

4    people, and things of that sort, and obviously that just has

5    not been possible, but what, if any, way has that impacted

6    your ability to do what you need to do?

7        SPECIAL MASTER HOGAN:  Your Honor, it's a good question,

8    and I think the -- my answer would be that you don't know what

9    you don't know.  I would say with the various parameters

10   around the case and then what we're dealing with with this

11   pandemic, it has seemed logical that the stage that we're in

12   right now is essentially a negotiation and that, you know, if

13   we get to a stage where there are disagreements that we can't

14   negotiate, then I would have to play a larger role.  I can't

15   say that I anticipate that that will be necessary, which is to

16   say that we've proceeded in negotiations quite well, and we've

17   had to rely on the knowledge of the -- both the State team and

18   the Department of Justice team, which know Mississippi, each

19   of them, far -- far better than I do.  So -- but again, you

20   don't know what you don't know, and -- so I don't know what

21   I'm missing, but we've been able to make, I think, pretty

22   substantial progress so far.

23       THE COURT:  Okay.  Thank you.  And this question is

24   specifically for the State and I guess for a matter of the

25   record and also for my benefit.  Obviously, since this court

1    entered its order, there was a state election; there was --

2    there's been new leadership throughout state government,

3    including the Attorney General's Office, and I want to just

4    know -- and the other -- well, not only the Attorney General's

5    Office, but I guess with the change in leadership, the new

6    elected officers throughout state government, has there been a

7    change in leadership in the Department of Mental Health,

8    Mr. Shelson and Ms. Wood?  Or did the -- did the elections

9    even, you know, affect the Department of Mental Health in any

10   way?

11       MR. SHELSON:  To answer -- Your Honor, Jim Shelson.

12       To answer your first question, the senior leadership of

13   the Department of Mental Health has not changed.

14       The second part, Your Honor, elections are always

15   consequential, so of course they affected directly or

16   indirectly, either through the budget process or otherwise.

17       What I can say, Your Honor, is that, you know, the

18   senior leadership of the State has been receptive to being

19   open to trying to resolve these issues short of continued

20   litigation.

21       THE COURT:  Okay.  Thank you.  That's helpful.

22       Is there ongoing -- obviously the change of election

23   also included new leadership within the legislature; the,

24   obviously, committee chairman change with respect to the house

25   and senate, I would imagine; and I realize the Department of

1    Public Health probably -- probably reports to or either --

2    there are probably several different committees that might

3    have some oversight over the agency.  I don't know if it's the

4    public health committee or some other, you know.  This is a

5    major part of the State's budget, so I imagine, you know,

6    there has to be ongoing communications with those in the

7    legislative branch, and I just want to know is -- you know, is

8    that indeed a fact?  Is there constant communication or at

9    least, you know, are they apprised of the progress that

10   you-all may or may not be making with respect to, you know,

11   this litigation -- with respect to this litigation?

12       MR. SHELSON:  Your Honor, Jim Shelson again for the

13   State.

14       I can't say it's constant.  I think a better description

15   would be regular.  Again, the legislative leadership and the

16   chairs you mentioned are interested in this and the progress

17   this is making for budgetary and other reasons.  Your Honor,

18   there's been legislation that has passed that at least

19   directly or indirectly addresses some issues related to CMHCs,

20   for example, so this is definitely on the legislature's radar

21   screen, I think it's fair to say, and again, I think that the

22   legislature, the senior leadership of the State, is taking it

23   seriously.

24       THE COURT:  As I recall, I think I read that the

25   Department of Finance and Administration was supposed to

1    appoint an individual to either monitor -- that would have a

2    central role, I thought, in this particular case, if I'm not

3    mistaken, or who would have duties that would affect this

4    particular case.  Has that person been appointed or named?  Or

5    if I'm mistaken about what I've read or my recollection of

6    what I've read, please let me know, but has that person been

7    appointed by the -- in the Department of Finance and

8    Administration?

9         MR. SHELSON:  Your Honor, Jim Shelson again for the

10   State.

11        That is part of the legislation I just referenced a

12   minute ago.  That person has not been appointed, to my

13   knowledge, at this time.  One of the person's duties, as Your

14   Honor alluded to, is that person can communicate with the

15   special master, Dr. Hogan, as that person sees fit.

16        But to answer your question directly, as of today, I do

17   not believe that person has been appointed.

18        THE COURT:  Okay.  And would that appointment come from

19   the governor, or would that appointment come from someone

20   else?

21        MR. SHELSON:  Your Honor, my recollection of the statute

22   is that the head of the DFA appoints that person.

23        THE COURT:  I'm sorry.  The -- I'm sorry.

24        MR. SHELSON:  The head of DFA.

25        THE COURT:  The head of DFA would?

1      MR. SHELSON:  Your Honor, yes, sir.

2      THE COURT:  So if that person has not been appointed, I

3  guess wouldn't it help the State in dealing with -- you know,

4  is there -- and you may be the wrong person to ask this,

5  Mr. Shelson, because I'm just trying to find out what's the

6  holdup in appointing that person, because again, I have not

7  read the specific legislation.  I think I've read a

8  characterization of what the legislation said, newspaper

9  articles or something like that that said that the person

10  would be appointed, and that's all I really know.  But I would

11  imagine that that person would be appointed for a particular

12  reason, and I'm just trying to figure out what's the holdup

13  with getting that person appointed?  Because it's September

14  now -- no.  I'm sorry.  It's October, and everywhere in the

15  world, including right here.

16      What's the holdup with -- you know, I don't know if it's

17  been advertised or even if they're going to seek advertisement

18  or, you know, if it's going to be a plum -- you know,

19  obviously the person over DFA reports to the governor, and it

20  may be that -- they may view it as a plum job for someone, but

21  I do think if -- I think it's beyond time to have someone

22  there, and I'm just trying to figure out why no one is there

23  yet.

24      MR. SHELSON:  I don't know, Your Honor, why that

25  position hasn't been filled.  That's above my pay grade.  You

1    know, how it affects these negotiations is speculative.  In

2    the meantime, we agree with Dr. Hogan that steady progress is

3    being made and is going as well as it can go under the

4    circumstances of negotiating in a global pandemic.  I imagine

5    that whenever that person gets in there, there will be a

6    period of getting up to speed.  So frankly, I don't see that

7    immediately speeding up negotiations and the communications --

8    that person's duties with respect to the special master is

9    just one of that person's duties, and as I read the statute, I

10   don't read the statute to mean that that's really the core

11   focus of that person's job, but again, I'm sorry, Your Honor

12   but you're getting into an area above my pay grade.

13        THE COURT:  Okay.  Well, let me ask you this.

14        MR. SHELSON:  In the meantime --

15        THE COURT:  Go ahead.  I'm sorry, Mr. Shelson.

16        MR. SHELSON:  So in the meantime, the DOJ is stuck

17   negotiating with me.

18        THE COURT:  Well, let me ask you this, then.  I mean, is

19   there a scenario or -- I realize that person is not involved

20   now and things are going smoothly, but when that person does

21   come aboard, does your review of the statute -- would it allow

22   for that individual to come in and sort of be a wrecking crew

23   and sort of just dismantle all the work -- the good work that

24   you may have done with trying to come to an agreement?  And

25   would that person have the authority to question everything

1   that you've done and sort of say -- and try to unwind or undo

2   or unnecessary -- yeah, unwind or undo any of the progress

3   that you've -- that the State has committed to?

4        SPECIAL MASTER HOGAN:  Your Honor, this is Mike Hogan.

5        I'm quite uninformed about the Mississippi dynamics

6   here, but having experienced things in a bunch of other

7   states, on the one hand I don't think it's unreasonable for

8   Your Honor to answer that question, and probably all of us are

9   a tiny bit worried in the back of our mind that there might

10  be, you know, at the least some delays when this person comes

11  in and -- assuming they do and they want to get up to speed,

12  and it takes them a while to do that.  So I think all that's

13  possible.

14       As I read the statute that Mr. Shelson referenced, this

15  is all I know is what I've been able to read on paper.  It

16  seemed to me that there were two main -- two or three main

17  thrusts of the legislature's concern.  One of those was

18  improving access to services, which, after all, is the same

19  agenda that we have in this negotiation, so that one is a

20  positive.

21       There was a second angle that had to do with the

22  performance of community mental health centers and some

23  procedures that might allow or require the Department of

24  Mental Health to be a little aggressive with community mental

25  health centers if they weren't delivering, and that could be

1    complicated.  But I don't view that agenda as being a negative

2    one vis-à-vis our shared concerns here.

3         And then the third possible agenda is that it's just

4    interesting that the position is located in Finance and

5    Administration, and it makes you wonder whether cost control

6    is an agenda here or not.

7         But all that is in a sense just embroidering on Your

8    Honor's speculation.  We have no evidence yet that any of that

9    is true, and so I think, as Jim has said, we'll keep our heads

10   down and keep plodding along and deal with this when it's in

11   front of us.

12        THE COURT:  Does the legislation, Mr. Shelson, provide a

13   timeline or a date by which that person should be in place?

14   I've not looked at the statute, and I'm sorry for speaking

15   ignorantly.  But does the statute give a due date by which the

16   person should be on board or will be on board?

17        MR. SHELSON:  Your Honor, it gives a date by which the

18   person should be on board, and we're past that date.

19        THE COURT:  Okay.

20        MR. SHELSON:  It's my understanding, Your Honor, that

21   it's not definitive or it's my understanding that the goal is

22   to have that person in place by October 15th, but again,

23   that's not -- I can't state -- I can't represent to the Court

24   that's definitive.  My understanding is that's the goal.

25        THE COURT:  Okay.  Well, if they're past the time, I

1  think the Court might make a formal inquiry since they're past

2  the time that the statute says that the person would be in

3  place.  I think it would be appropriate for the Court to do

4  some sort of formal inquiry through an order or something to

5  find -- to make an inquiry about it, and I'll consider what

6  might be the best way to do that.

7         Obviously I do appreciate counsel for letting me know,

8  and, you know, obviously in your report to your client, I'm

9  pretty sure you would let them know that the Court has

10  expressed concern.  I guess that's the -- at least he kept

11  asking questions about it and wanted to know why it -- why

12  that person has not been appointed, because I do fear that the

13  person who is appointed could take the position that he or she

14  might be able to -- and this is a -- this is a -- I don't want

15  to suggest that they're going to blow up everything, but they

16  could blow up everything.

17         They may take the position that they can blow up

18  everything, and that would not be good for the process that

19  the parties, as I've heard, have actually been working really

20  good toward a resolution on so many things, as I've heard

21  Mr. Hogan sort of allude to and say.  And I appreciate the

22  parties for working with each other, and I do appreciate what

23  the parties -- particularly the state people making -- and I'm

24  assuming persons have been made available to speak with

25  Mr. Hogan and all of that when he's needed to speak with

1    persons and, again, to fulfill the mission or to fulfill the

2    things that the Court pointed out in its order, and I

3    appreciate what the parties have done.

4        I just don't want anybody from the "outside" to come

5    in -- with full authority to come in and sort of, again, blow

6    up all the progress that you've been making so far.  And, you

7    know, obviously -- obviously things are much different from

8    September 2019 to September 2020 on a whole -- on many, many

9    levels: budgetary-wise, the prospect of how things might look

10   in the future, just on so many levels.  I understand that.

11   But I also understand that the needs of many, many people

12   across the state of Mississippi have to be met through our

13   mental health system, and I know that they'll be -- and I know

14   with the State there are many, many competing interests for a

15   finite number of dollars and cents.

16       And, of course, for purposes of this hearing, I'm more

17   concerned about mental health.  Now, I will have a group of

18   actors here from the State on another case and I will express

19   this same sort of sentiment in that case or in those cases,

20   and I'm sure my colleagues who are overseeing the case

21   involving Family and Children's Services might take the same

22   position.  You know, the people who are dealing with the state

23   prisons will take the same thing -- sort of the same stand.

24       You know, we know you're dealing with a finite pot of

25   money, but when we are on our particular cases, we want to

1    make sure that there are sufficient resources for the issues

2    that we have identified in our particular case that we might

3    be monitoring or supervising or overseeing or dealing with.

4    But I do appreciate the parties in all that you're doing on

5    this end, but please -- lawyers for the State, please let your

6    client know I am very much interested in finding out why the

7    person who will be specifically authorized to sort of review,

8    monitor, stand on the sidelines, or whatever his or her role

9    may be with respect to this litigation -- I would rather for

10    that person to be here at the table, get involved now rather

11    than later, and sort of start questioning what efforts, the

12    progress and stuff, that you-all have made.

13        I've not heard anything from the lawyers for the

14    Government, probably because I haven't asked you any specific

15    questions.  But do the lawyers for the Government have

16    anything to add about the process or questioning of the

17    process, how things might be going, how they could be going

18    better, or anything?

19        MS. FOX:  Your Honor, this is Deena Fox with the United

20    States.

21        I think that Dr. Hogan's rendition of how things have

22    gone is accurate, and we have been working in good faith with

23    the State.  There are still significant issues that we have

24    left to address.

25        I will say as it pertains to the legislation that you

1    mentioned, we -- we believe that there could be some benefit

2    to having this additional role in the state.  However, there

3    are always some concerns related to the fact that it's outside

4    of the DMH, so it may provide some useful perspective or may

5    ultimately provide greater fragmentation.

6         Ultimately, with regard to this case, we will need

7    oversight, and, you know, we think through court for

8    enforcement of whatever we finally agree to here, which would

9    be, you know, separate and apart from any work that goes on

10   within the state to continue to improve access to services,

11   which of course we have always wanted and is always the goal.

12   But as part of compliance with the ADA, that appropriately

13   resides with the Court in this matter.

14        THE COURT:  With respect, just like the State had

15   elections in 2019, obviously we're on the verge of election on

16   the federal side.  To the extent you can predict, if there's a

17   change in administration, would that have any effect on how --

18   this litigation or the role of DOJ in this particular case?

19   To the extent you do know or can tell or predict, will

20   there -- you know, what has been done in the past?  Does

21   change in leadership sort of change anything about the work

22   that you-all will have to do to carry forward this order?  I

23   mean, you know, could a new administration, for example, come

24   in and say let's be done with this litigation, get it done, or

25   tell the Court we're through with it?

1          MS. FOX:  Your Honor, again, this is Deena Fox.

2          And I will say that of course we can't predict -- you

3     know, with changes in administration, if there were to be one,

4     there would a change in political leadership.  However, I can

5     say that this matter was originally opened as an investigation

6     in 2011 and has continued through multiple administrations,

7     and the work that the Department of Justice has done to

8     enforce the ADA's *Olmstead* requirements have been through

9     multiple administrations since the *Olmstead* decision.  So I

10    anticipate that we will continue to enforce the ADA regardless

11    of what occurs during the election.

12         THE COURT:  Okay.  Thank you.  Have I not asked a

13    question -- Mr. Hogan or the parties, have I not asked a

14    question or made an inquiry of something that you think should

15    be made?

16         SPECIAL MASTER HOGAN:  Not, Your Honor, that I could

17    identify.

18         THE COURT:  Okay.  Anyone has any last words on

19    anything?

20         MR. SHELSON:  Your Honor, Jim Shelson.

21         The State does not.  Thank you for your time, Your

22    Honor.

23         THE COURT:  No, no.  Thank you-all for your time, and I

24    know we're still continuing to work under the situation that

25    we're working under.  I do appreciate you-all for working, as

 1   I've heard from Dr. Hogan, so diligently, so professionally,

 2   so cordially.  I appreciate that so much, and I do understand

 3   that there has been much progress.  I understand that there

 4   will be some disagreement, and that's -- because there will be

 5   disagreement on some things or it will be harder to get to

 6   full agreement on some things; that's one of the reasons I

 7   think it's paramount to have that person in DFA who is

 8   supposed to be on board to show his or her face sooner rather

 9   than later.  And so -- but I do appreciate all the efforts

10   that you're doing.

11       Thank you, State of Mississippi, for making persons

12   available to communicate with Dr. Hogan and, you know, to make

13   his job easier, although -- you know, while he cannot be here

14   present and face-to-face with anybody.  So hopefully at some

15   point he will be able to get here on the ground if he needs

16   to, but until then I commend and thank you-all for cooperating

17   in the way that you have.

18       This concludes all -- this concludes all the questions

19   that I have.  And, again, thank you for your time and thank

20   you for your efforts, and I wish you much luck.  And please

21   continue to be safe, continue to be careful, and continue to

22   be vigilant.

23       That concludes all that the Court has in this matter or

24   any other matter today, so the Court is adjourned.  Thank you

25   so much.

1          MS. FOX:  Thank you, Your Honor.

2          MR. SHELSON:  Thank you, Your Honor.

3          SPECIAL MASTER HOGAN:  Thank you, Your Honor.

4          MS. PAIGE:  Thank you, Your Honor.

5     ****************************************************************

1           **COURT REPORTER'S CERTIFICATE**

2

3           I, Candice S. Crane, Registered Professional Reporter,

4    Certified Court Reporter, in and for the State of Mississippi,

5    Official Court Reporter for the United States District Court,

6    Southern District of Mississippi, do hereby certify that the

7    above and foregoing pages contain a full, true, and correct

8    transcript of the proceedings had in the forenamed case at the

9    time and place indicated, which proceedings were

10   stenographically recorded by me to the best of my skill and

11   ability.

12          I further certify that the transcript fees and format

13   comply with those prescribed by the Court and Judicial

14   Conference of the United States.

15          THIS the 10th day of November, 2020.

16

17                      /s/ Candice S. Crane, RPR CCR

18                      Candice S. Crane, RPR, CCR #1781
                        Official Court Reporter
19                      United States District Court
                        Candice_Crane@mssd.uscourts.gov
20

21

22

23

24

25