**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

UNITED STATES OF AMERICA,

     *Plaintiff,*

     v.

STATE OF MISSISSIPPI,

     *Defendant.*

CIVIL ACTION NO.
3:16-CV-00622-CWR-FKB

**UNITED STATES' MEMORANDUM IN SUPPORT OF
RESPONSE TO COURT'S ORDER (ECF No. 253)**

This Court found that the State of Mississippi discriminates against adults with serious

mental illness by subjecting them to unnecessary institutionalization in State-run psychiatric

hospitals ("State Hospitals") and by placing them at serious risk of such institutionalization, in

violation of the Americans with Disabilities Act (ADA).  September 3, 2019 Memorandum

Opinion and Order, ECF No. 234.  As instructed by the Court, ECF No. 253, the United States

submitted its Proposed Remedial Plan to bring the State into compliance with the ADA as soon

as reasonably possible.  ECF No. 265-1.

The Proposed Remedial Plan is firmly rooted in the evidence admitted at trial[1] and is

appropriately tailored to comply with the legal requirements for injunctive relief.  *See, e.g.*, *M.D.

v. Abbott*, 907 F.3d 237, 271-72 (5th Cir. 2018).  The Plan reflects the reality that there are

"major gaps" in the State's community-based service system that result in unnecessary State

Hospital admissions.  ECF. No 234 at 2.  To fill these gaps, the Proposed Remedial Plan requires

---

[1] The Court presided over a four-week bench trial in June 2019.  The expansive trial record spans
thousands of pages of exhibits, more than 300 stipulated facts, deposition designations from over
25 deponents, and in-court testimony by 33 witnesses.

the State to expand its existing programs.  The Plan is consistent with the State's Operational

Standards[2] for community mental health providers and incorporates, where appropriate, the

State's Report, ECF No. 262-1, which the State submitted in lieu of a proposed remedial plan.[3]

The Proposed Remedial Plan defines the "Core Services" at issue in this litigation –

Mobile Crisis Teams, Crisis Stabilization Units, Programs of Assertive Community Treatment

(PACT), Community Support Services, Permanent Supported Housing, Supported Employment,

and Peer Support.  The Plan sets realistic benchmarks to ensure that the State reaches an initial

baseline of statewide capacity for each service within two to four years of its entry as an order of

the Court.  Once the baseline capacity is reached, the Plan requires that the State assess whether

additional Core Services are needed to comply with the ADA and, if so, increase capacity

commensurate to the demonstrated need.[4]  *See infra* at II.A.

The Proposed Remedial Plan also addresses State Hospital discharge planning, oversight

of the Core Services, and technical assistance to community mental health providers.  *See infra*

at II.B.  The Court found that failures in these areas contributed to unnecessary State Hospital

admissions.  *See, e.g.*, ECF No. 234 at 32-33, 47-48.  Finally, the Proposed Remedial Plan

---

[2] The State's Operational Standards are policies issued by the Mississippi Department of Mental Health that describe the mental health services included in the Proposed Remedial Plan and set qualifications and standards for those services.  JX 60.

[3] The State filed its Report, Response, and supporting exhibits on April 30, 2021, arguing that the Court should "order no relief because Mississippi is now in substantial compliance with Title II of the Americans with Disabilities Act."  ECF No. 262 at 1.

[4] The Proposed Remedial Plan applies to adults with serious mental illness who are eligible for public mental health services in Mississippi and are institutionalized in one of Mississippi's four State Hospitals under a civil (non-forensic) order or are at serious risk of institutionalization in a State Hospital.  The Plan refers to these adults as the "Covered Individuals."  Ex. 1 at 2. *See* ECF No. 234 at 8-9 (describing the population at issue in this litigation).

provides for a Monitor to assess the State's compliance and includes clear termination provisions.  Proposed Plan ¶¶ 51-56.

By contrast, the State's Report regarding the remedy fails to address in full the violations identified by the Court.  ECF No. 234.  This is true when considering the record that is appropriately before this Court, and it remains true even accepting the State's alleged enhancements of its adult mental health system since the trial.[5]  The State's proposal would not establish a statewide, baseline capacity for all Core Services.  Nor does it require an assessment of service capacity after the baseline expansion to determine whether additional Core Services are needed to prevent unnecessary State Hospital admissions.  *See* ECF No. 262 at 5-10. *See infra* at II.A.  In other important respects, the State proposes services and responsive measures that are incomplete, unjustifiably limited, or otherwise inconsistent with the Court's findings. *See, e.g.*, *infra* at II.B.iv and II.B.v.  Furthermore, the State is unwilling to be held accountable to this Court for many of the provisions in its own Report, recommending that the Court enforce, at most, 13 of 39 paragraphs in the Report.  ECF No. 262 at 12.

In a case whose long history shows that the State's "movement toward community-based services has only advanced alongside the United States' investigation and enforcement litigation," ECF No. 234 at 59, an appropriately tailored, time-limited, judicially enforceable remedial plan—subject to monitoring by a Court-appointed expert—is the only reliable path to ADA compliance. *See Ruiz v. Estelle*, 679 F.2d 1115, 1160-61 (5th Cir. 1982), *modified on other grounds*, 688 F.2d 266 (5th Cir. 1982).

---

[5] The State's Response and Report, ECF Nos. 262 and 262-1, introduce and rely on information not in evidence concerning developments in Mississippi's adult mental health system since the trial.  The United States has moved for limited discovery concerning the alleged changes or, alternatively, to strike the State's extra-record allegations.  ECF No. 263.

I.    **Legal Standard**

"It is axiomatic that 'federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief.'" *M.D.*, 907 F.3d at 271 (quoting *Horne v. Flores*, 557 U.S. 433, 450 (2009)).  In ADA cases, this responsibility includes ordering injunctive relief where appropriate.  42 U.S.C. § 12133 (incorporating "the remedies, procedures, and rights" of Section 504 of the Rehabilitation Act of 1973, under which courts had long entertained suits for injunctive relief by the time Congress enacted the ADA).  Injunctions must be "narrowly tailored . . . to remedy the specific action which gives rise to the order."  *M.D.*, 907 F.3d at 272 (quotation marks omitted)*. See John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) (citing Fed. R. Civ. P. 65) ("[T]he scope of injunctive relief is dictated by the extent of the violation established[.]") (quotation marks omitted).  Beyond simply addressing past wrongs, injunctive relief appropriately may seek to "prevent repetition of the violation . . . by commanding measures that safeguard against recurrence."  *Ruiz*, 679 F.2d at 1156.

Courts are required to afford states deference in administration of their state systems and "'the first opportunity to correct [their] own errors,'" but that deference is not absolute, particularly when a state has had "ample opportunity to cure the system's deficiencies" and "failed to take meaningful remedial action."  *M.D.*, 907 F.3d at 272 (quoting *Lewis v. Casey*, 518 U.S. 343, 362 (1996)) (finding that the defendant "has had a wealth of information at its disposal detailing the structural deficiencies in its foster care system since long before plaintiffs filed this lawsuit" and failed to take adequate responsive measures). *See Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1157 (9th Cir. 2007) ("As for the deference accorded to state agencies in their internal affairs, the court appropriately allowed defendants an opportunity jointly to develop the remedial plan needed to implement the injunction.").  Where violations of law persist, courts should not be deterred from issuing narrowly tailored injunctive relief.  *M.D.*,

907 F.3d at 272. *See Milliken v. Bradley*, 433 U.S. 267, 281 (1977) (if state and local authorities

fail in their affirmative obligations, judicial authority may be invoked); *Katie A.* 481 F.3d at 1157

(upholding mandatory preliminary injunction and finding that "no further deference" was owed

to defendants than the opportunity to jointly develop an adequate remedial plan).

## II.    The United States' Proposed Remedial Plan is Narrowly Tailored to Remedy the Violations Identified in the Court's September 3, 2019 Order.

The Proposed Remedial Plan sets forth the relief that is needed to bring the State into

compliance with the ADA.  It defines the measures the State must take to provide and sustain

community-based services for adults with serious mental illness who are in or at serious risk of

unnecessary institutionalization in State Hospitals.  The Plan does so in a manner that accounts

for the State's legitimate interest in administering its adult mental health system.

### A.  Community-Based Services for Adults with Serious Mental Illness

The community-based services identified in the Court's September 3, 2019 Order—

Mobile Crisis Teams, Crisis Stabilization Units, Programs of Assertive Community Treatment,

Community Support Services, Permanent Supported Housing, Supported Employment, and Peer

Support—are all effective in preventing unnecessary hospitalizations.  ECF No. 234 at 16-19.

*See, e.g.,* Trial Tr. 2054:19-2056:1, June 25, 2019 (Allen). *See also* ECF No. 233 at ¶¶ 19-22.

Each of these "Core Services" has also been implemented successfully across the country,

including in rural regions.  *See, e.g.,* PX 1078 at 63 (SAMHSA ACT Toolkit); Trial Tr. 2056:2-

16, June 25, 2019 (Allen); ECF No. 233 at ¶ 20.

The State has chosen to establish each of the Core Services in Mississippi.  *See generally*

JX 60 (DMH Operational Standards); JX 51 (Mississippi Home Corporation, CHOICE FY 2018

Annual Report).  There is a need for each of these services throughout the state.  *See, e.g.,* PX

419 (Home Addresses of the 30% of Patients who Account for 73% of Total State Hospital Bed

Days October 2015 to October 2017); Trial Tr. 1338:12-20, June 17, 2019 (Peet); Trial Tr.

1616:16-1617:4, June 19, 2019 (Hutchins). *See also* ECF No. 233 at ¶¶ 78-79.

      i. <u>Mobile Crisis Teams</u>

      Mobile Crisis Teams prevent unnecessary State Hospital admissions by providing support

to individuals experiencing a mental health crisis at their homes and other community locations

and by promptly connecting them to needed community-based services.  ECF No. 233 at ¶¶ 48-

50.  As the Court found, Mobile Crisis Teams are "illusory" in many parts of Mississippi.  ECF

No. 234 at 23.  The State began to offer Mobile Crisis Teams as a Medicaid service beginning in

2012.[6]  Trial Stip. at ¶ 211.  At the time of the trial, the State had only one Mobile Crisis Team

per Community Mental Health Center, leaving some counties with no Mobile Crisis Team

services at all.  Trial Tr. 914:19-21, 923:2-925:21, 930:18-25, June 12, 2019 (Patten).  Even in

areas served by a Mobile Crisis Team, there was not enough capacity to provide timely, face-to-

face mobile crisis response to individuals with serious mental illness, as required by the State's

Operational Standards, resulting in avoidable admissions to State Hospitals.  *See* PX 415 (2017

Mobile Crisis Calls and Contacts per 1000 Residents by Community Mental Health Center

Region); PX 420 (graphs of after-hours mobile crisis calls/contacts and Medicaid mobile crisis

calls/contacts, showing regional variability); PX 376 at 1 (DMH Mobile Crisis Response Team

Data Report). *See also* ECF No. 233 at ¶¶ 105-09.

---

[6] When a state participates in the Medicaid program and includes services in its State Medicaid Plan, as Mississippi has done here, it is obligated to ensure that those services are available with reasonable promptness to all Medicaid beneficiaries who meet the eligibility criteria statewide. 42 U.S.C. § 1396a(a)(8), 42 C.F.R. § 435.930 (with reasonable promptness); 42 U.S.C. § 1396a(a)(1), 42 C.F.R. § 431.50 (statewide). *See* Toten Dep. 77:12-23, 213:2-9, May 23, 2018 (Mississippi Division of Medicaid is obligated to ensure statewide availability of services included in the State Medicaid Plan).

The Proposed Remedial Plan holds the State accountable to its own Operational Standards for mental health providers.  The Plan requires that the State provide, across Mississippi, Mobile Crisis Teams that promptly: (1) respond to the site of the crisis – within one hour for urban areas or two hours for rural areas; and (2) connect individuals to ongoing community-based services.  Proposed Plan ¶¶ 4-7.  To meet these obligations, the State must expand the number of Mobile Crisis Teams or redistribute existing services.  *See* ECF No. 233 at ¶¶ 105-09.  The State, by contrast, proposes to maintain the same Mobile Crisis Team distribution and capacity that the Court has already found to be grossly insufficient.  ECF No. 262-1 at ¶¶ 12-13; ECF No. 234 at 23.

To help individuals who are at serious risk of unnecessary State Hospital admission remain in the community, the Proposed Remedial Plan also requires that Mobile Crisis Teams seek to divert individuals who are being considered for State Hospital admission by engaging them in community-based services.  Proposed Plan ¶¶ 6, 31; Trial Stip. at ¶ 207 (ECF No. 189-1) ("Without [Mobile Crisis Team] intervention, the individual experiencing the crisis may be inappropriately and unnecessarily placed in a jail, holding facility, hospital or inpatient treatment facility.").  *See* ECF No. 233 at ¶¶ 48-50, 113-21.

### ii. Crisis Stabilization Units

Crisis Stabilization Units—short-term residential services for individuals experiencing acute symptoms of mental illness—help to prevent unnecessary State Hospital admissions by rapidly stabilizing individuals and preventing further decompensation.  PX 354 at 9 (DMH FY18 Fast Facts). *See* ECF No. 233 at ¶¶ 19-22, 51.  The State could divert more individuals from needless institutionalization in State Hospitals by ensuring the availability of Crisis Stabilization Units across the State, increasing referrals to Crisis Stabilization Units, and reducing lengths of stay at those Units.  *See* PX 404 at 16 (Drake Report); Kelly Dep. 59:16-61:19, May 11, 2018;

Trial Stip. at ¶ 213; JX 50 at 9 (DMH Strategic Plan FY18 End-of-Year Progress Report); Trial Tr. 2231:25-2232:3, June 26, 2019 (Crockett). *See also* ECF No. 233 at ¶¶ 112 & n.31-32, 176.f.

To prevent unnecessary hospitalizations, the Proposed Remedial Plan requires that the State: (1) provide and sustain a Crisis Stabilization Unit in each Community Mental Health Center region; (2) divert individuals being assessed for civil commitment to Crisis Stabilization Units whenever possible; and (3) connect people to ongoing services prior to discharge from the Crisis Stabilization Units. Proposed Plan ¶¶ 9-10, 33; ECF No. 233 at ¶¶ 51, 110-12. Despite the need to connect people to community-based services upon discharge to prevent readmissions, the State's Report does not require discharge planning for individuals admitted to Crisis Stabilization Units. *See* ECF 262-1 ¶¶ 14-16, 29.

### iii. Programs of Assertive Community Treatment

Programs of Assertive Community Treatment (PACT) are an intensive, team-based service for individuals with the most severe and persistent mental illnesses. *See* ECF No. 233 at ¶ 23. The State has long recognized PACT's success in keeping people in the community and preventing unnecessary hospital admissions. *See* ECF No. 233 at ¶¶ 19-26. The Court found that PACT was "unavailable and under-enrolled" in Mississippi, years after the State added the service to its Medicaid State Plan in 2012. ECF No. 234 at 19. *See* ECF No. 233 at ¶¶ 78-88. As of June 2018, PACT services did not exist in 68 of 82 counties, leaving approximately 58% of Mississippi's population without access to the service. PX 413 (map showing counties with PACT teams as of 6/30/2018); PX 920 (population by CMHC region and adult psychiatric admissions per region); PX 417 (client review participants recommended for PACT are spread across the state, including many in counties where PACT is not available). In FY 2018, just 384 individuals received PACT in Mississippi. JX 52 at 6 (DMH FY18 Annual Report). Many individuals with multiple State Hospital admissions were discharged to counties without PACT

or were discharged without being connected to PACT where it was available.  *See, e.g.,* JX 15 at

119, 121 (2019 DMH Budget Request – Program Performance Indicators and Measures); PX

1124 at 13-14 (FY 2018 Mississippi State Hospital Strategic Plan Report).

To eliminate the gaps in this critical service and divert more individuals with severe

mental illness from unnecessary and unnecessarily long State Hospital admissions, the Proposed

Remedial Plan requires the State to provide one PACT Team in every Community Mental Health

Center region except for Region 9 (Hinds County), where the evidence at trial demonstrated the

need for two PACT Teams.  Proposed Plan ¶ 13. *See* Trial Tr. 2218:9-22, June 26, 2019

(Crockett).  To ensure that access to PACT "isn't dependent on where you live," Trial Tr.

1450:15-25, June 17, 2019 (Peet), the PACT team(s) in each CMHC region must serve eligible

individuals in every county within the region.  Proposed Plan ¶ 13. *See* ECF No. 233 at ¶¶ 78-88.

The Proposed Remedial Plan also requires the State to screen individuals recently admitted to a

State Hospital or being evaluated for civil commitment for PACT eligibility and connect those

individuals to the service if appropriate.  Proposed Plan ¶¶ 30, 32, 39. *See* ECF 262-1 at ¶ 28. *See

also* ECF No. 233 at ¶ 24.

The State acknowledges the need for statewide availability of an intensive community-

based service, but instead of expanding PACT, it proposes implementing two alternative

services—Intensive Community Outreach and Recovery Teams (ICORT) and Intensive

Community Support Services—in the unserved regions of the state.  ECF 262-1 ¶¶ 8, 9.  There is

no evidence in the trial record demonstrating the adequacy of either service—one of which,

ICORT, is newly created—as a substitute for PACT.[7]  ICORT does not have key elements of the

---

[7] As noted above, the United States has moved for limited discovery to assess the State's
allegations concerning the implementation of ICORT since the trial or, alternatively, to strike

PACT model, including integration of a prescribing clinician on the team, and has not been proven to prevent unnecessary hospitalizations. *See id.* at ¶ 8; JX 60 at 215-26 (DMH Operational Standards for PACT). Moreover, under the State's Report, neither PACT nor ICORT would be available in some counties. *See* ECF 262-1 at ¶ 9. Those counties instead would have to rely on Intensive Community Support Services—a service that is not designed for individuals with the most severe and persistent mental illnesses who meet the eligibility requirements for PACT. Intensive Community Support Services are provided by a single clinician instead of a full-service team like PACT and do not include the same frequency of service. *See infra* at 11 n.8. *Compare* JX 60 at 215-26 (DMH Operational Standards for PACT), *with* PX 198 (DMH Funding Continuation Application Request for ICSS).

Under the Proposed Remedial Plan, the State may demonstrate to the Court the effectiveness of alternative services such as ICORT in preventing unnecessary State Hospital admissions. Proposed Plan ¶ 3. However, until and unless that showing has been made, the State must meet the overwhelming need for intensive services by expanding and sustaining PACT. ECF No. 233 at ¶¶ 78-88.

iv. <u>Community Support Services</u>

Community Support Services are mobile support services, including medication management and in-home supports, and are designed to vary in frequency and intensity according to the individual's needs. JX 60 at 121-22. Community Support Services can provide flexible, community-based support as an alternative to State Hospitals for people who do not

---

those allegations and other extra-record information from the State's April 30, 2021 filings. ECF No. 263.

need the frequency of services provided through a PACT team.[8]  However, the State does not provide Community Support Services with sufficient intensity to help these individuals remain in the community.  *See, e.g.*, PX 402 at 5 (VanderZwaag Report); PX 403 at 14 (Baldwin Report); PX 424 (Summary of Magnolia Billing Data for Community Support Services 2017).  For example, Person 36 in the United States' clinical review could have avoided or spent less time in State Hospitals had she received Community Support Services with sufficient frequency, but instead experienced a nearly six-month admission to Mississippi State Hospital.  PX 402 at 37-39.  The Court found that Community Support Services are underutilized in Mississippi.  ECF No. 234 at 49.

Under the Proposed Remedial Plan, the State must provide an intensive community-based service to people who are at serious risk of admission to a State Hospital but who do not need PACT.  Proposed Plan ¶ 34.  The service should be aligned with the State's existing standards for Community Support Services.  Those standards include providing services multiple times per week as needed, assisting individuals with accessing medications and needed benefits for which they are eligible, and providing interventions primarily in the community rather than in office settings.  *Id.*  The State's Report does not provide for this service (including the grant-funded version, Intensive Community Support Services) except as a substitute for PACT in some parts of the state.  ECF No. 262-1 at ¶¶ 6, 9.

v. <u>Permanent Supported Housing</u>

Permanent Support Housing combines housing supports (such as assistance locating an affordable, safe apartment and help negotiating with landlords) with access to integrated

---

[8] In addition to the Medicaid funded Community Support Services, the State has also established a time-limited, grant funded service called Intensive Community Support Services.  Few people receive this service.  *See* PX 198 at 4; JX 30 at 27-28. *See also* ECF No 233 at ¶¶ 94-96.

affordable housing.  It is effective in preventing unnecessary hospitalizations.  *See* ECF No. 233 at ¶¶ 19, 21, 35-41.  Since 2014, the State has provided Permanent Supported Housing through the CHOICE Program, which targets individuals with serious mental illness transitioning from State Hospitals to the community.  *Id.*  CHOICE is administered by the Mississippi Home Corporation and the State's Department of Mental Health, in collaboration with non-profit provider organizations.  *Id.* at ¶ 41.

The Court found that the CHOICE program is "grossly underutilized."  ECF No. 234 at 26.  *See* ECF No. 233 at ¶¶ 89-93.  Though CHOICE is theoretically a statewide program, as of 2018, it was provided in only about half of the counties in the state.  PX 407 at 20, 23 (Peet Report); PX 416 (map of CHOICE client addresses February 2016 to January 2018).  As of 2018, the program served only about 350 individuals total, despite the State's estimate that it would need at least 2,500 housing units.  Trial Stip. at ¶ 250; JX 5 at 3.  During the same timeframe, seven Community Mental Health Center regions each had fewer than five CHOICE enrollees.  PX 416 (map of CHOICE Program client addresses February 2016 to January 2018).  Rather than increasing referrals to CHOICE, State Hospitals discharged some individuals to homelessness or homeless shelters.  *See, e.g.,* JX 15 at 113, 119, 121 (2019 DMH Budget Request: Program Performance Indicators and Measures).  *See also* ECF No. 233 at ¶ 93.

To meet the need for the service demonstrated by the United States' clinical review, the Proposed Remedial Plan requires that the State increase the number of people served in Permanent Supported Housing by 750 over three years.  Proposed Plan ¶¶ 17-19. *See* PX 401 (Byrne Report), PX 402 (VanderZwaag Report), PX 403 (Baldwin Report), PX 404 (Drake Report), PX 406 (Burson Report), PX 408 (Bell-Shambley Report); ECF No. 226-46 (State exhibit identifying the housing service recommendations made by the United States' clinical

review experts).  Even with that expansion, the State's Permanent Supported Housing capacity

will be far less than the national average after adjusting for population.  Trial Tr. 1514:18-

1515:3, 1539:16-1540:9, 1540:13-23, June 19, 2019 (Lutterman).  By contrast, the State's Report

potentially would support fewer than 100 additional people in Permanent Supported Housing,

ECF 262-1 ¶ 27, nowhere near the need estimated by the State's own officials and expert.  JX 5

at 3 (MAC 2.0 Stakeholder's Meeting Minutes, Nov. 4, 2015).

        vi.  <u>Supported Employment</u>

Individual Placement Support (IPS) Supported Employment helps adults with serious

mental illness secure and maintain integrated, competitive-wage employment.  It is effective in

promoting stability and preventing unnecessary hospital admissions.  *See* ECF No. 233 at ¶¶ 19-

21, 42-43.  The Court found that the availability of this critical service is "miniscule" in

Mississippi, ECF No. 234 at 25, despite the fact that the State has offered it since 2015.  At the

time of trial, the State provided IPS in only four Community Mental Health Center regions, and

even then, only in small quantities within those regions.  ECF No. 233 at ¶¶ 97-100.  The State's

expert admitted that access to Supported Employment in Mississippi is "quite low."  Trial Tr.

1515:6-21, 1558:3-12, June 19, 2019 (Lutterman).  If the State provided Supported Employment

at a rate equal to the national average, it would serve 1,266 individuals with mental illness in a

given year; in fact, it served approximately 250 individuals in 2018.  *Id*.  The Proposed Remedial

Plan requires that the State implement IPS Supported Employment across all CMHC regions to

help prevent unnecessary State Hospital admissions.  Proposed Plan ¶¶ 22-23.

The State's Report recognizes the need for Supported Employment throughout the State.

ECF No. 262 at 8; ECF No. 262-1 at ¶¶ 20-24.  However, the State proposes implementing IPS

Supported Employment in only half of the CMHC regions.  ECF 262-1 ¶¶ 22-24.  Under the

State's Report, the other CMHC regions would receive limited supported employment services

through a new partnership with the State's Department of Vocational Rehabilitation.  ECF 262-1 ¶¶ 21-24.  At trial, the State did not offer evidence establishing the effectiveness of its modified Supported Employment model.  Under the Proposed Remedial Plan, the State may rely on this alternative service only after showing that it has comparable success in reducing unnecessary hospitalizations.  Proposed Plan ¶ 3.

> vii.  <u>Peer Support</u>

Peer Support Services are recovery-focused services provided by certified specialists who have lived experience with mental illness.  These services help maintain people in the community and prevent unnecessary State Hospital admissions.  ECF No. 233 at ¶¶ 19-22, 44-47.  Although the State in theory has offered Peer Support Services statewide since adding it to Mississippi's Medicaid State Plan in 2012, the Court found "no indication that the service is being utilized across the State" and concluded that Medicaid billing for the service was "shockingly" low in certain regions of Mississippi.  ECF No. 234 at 25. *See, e.g.*, Trial Tr. 138:15-20, June 4, 2019 (Drake).  *See also* ECF No. 233 at ¶¶ 101-04.  In each of the three most populous regions, Community Mental Health Centers billed Medicaid for peer support services for fewer than ten people in 2017.  See PX 423 at 2 (Charts of Medicaid Billing Data).

The Proposed Remedial Plan requires that the State provide Peer Support Services at all CMHC offices in Mississippi to individuals who are at serious risk of admission to a State Hospital.  Proposed Plan ¶¶ 26-27.  The State's proposal—requiring Peer Support Services at every "primary CMHC office in each Region," ECF No. 262-1 at ¶ 18—does not adequately address the Court's findings.  ECF No. 234 at 25.  CMHC regions include as many as 12 counties, and it may take hours for an individual to reach the primary CMHC office.  *See* ECF No. 233 at ¶¶ 101-04.

### B. Other Measures Necessary to Address the Court's Findings

#### i. Connecting Individuals with Serious Mental Illness to Core Services

The State fails to take steps to identify individuals at serious risk of unnecessary institutionalization and, where appropriate, connect them to Core Services. *See, e.g.*, PX 151 at 10 (Mississippi State Hospital Comprehensive Strategic Plan Report Fiscal Year 2017); Trial Tr. 693:5-18, 699:5-700:2, June 10, 2019 (Parker), 2220:4-19, June 26, 2019 (Crockett). *See also* ECF No. 233 at ¶¶ 105 & n. 30, 135-38, 143.

The Proposed Remedial Plan requires that the State, through the Community Mental Health Centers, make reasonable efforts to identify individuals at serious risk of hospitalization, screen them for Core Services, and provide those services as needed to divert them from unnecessary institutionalization. Proposed Plan ¶¶ 28, 31-34. The Plan also requires that the State, through the CMHCs, locate and appropriately serve the participants in the United States' clinical review[9] who were determined to be at serious risk, so as to prevent further unnecessary State Hospital admissions. Proposed Plan ¶¶ 29-30. *See* ECF No. 233 at ¶¶ 135-38, 187.

#### ii. State Hospital Discharge Planning

Effective discharge planning begins soon after a State Hospital admission and requires close communication between the State Hospitals and community providers. *See, e.g.,* Reeves Dep. 48:3-13, May 8, 2018; PX 404 at 22 (Drake Report); PX 407 at 26 (Peet Report). Discharge planning that is consistent with these principles can ensure that people have the shortest hospitalizations appropriate, avoid gaps in services, and avoid further State Hospital

---

[9] Many of the 154 individuals in the United States' clinical review—who are representative of hundreds more adults with SMI in Mississippi—were at serious risk of unnecessary State Hospital admission because they were not receiving adequate and appropriate community-based services. ECF No. 234 at 39-40, 43; PX 405A at 1 (McKenzie Addendum) (of the 122 persons not institutionalized at the time of the clinical review, 103 were at serious risk of re-institutionalization).

admissions. *See e.g.,* Trial Tr. 1327:8-1328:22, June 17, 2019 (Peet); ECF No. 233 at ¶¶ 52-56. Nonetheless, for many individuals discharged from a State Hospital, the Court found that the State did not connect them with community providers before discharge. ECF No. 234 at 32-33. *See* ECF No. 233 at ¶¶ 122-31. State Hospitals did not even consistently refer individuals for key services like Programs of Assertive Community Treatment and Permanent Supported Housing where those services were available. *See, e.g.,* Trial Tr. 693:5-18, 699:5-700:22, June 10, 2019 (Parker); Trial Tr. 591:16-596:8, June 10, 2019 (Byrne). *See also* ECF No. 233 at ¶ 128. Some people experience unnecessarily long hospitalizations because of inadequate discharge planning and criteria. *See, e.g.,* PX 403 at 18-19, 22 (Baldwin Report); Trial Tr. 440:7-23, June 6, 2019 (VanderZwaag). Furthermore, formulaic discharge planning and lack of engagement by community-based providers lead to future unnecessary State Hospital admissions. *Id. See also* PX 403 at 14, 18-19, 22, 23 (Baldwin Report); Trial Tr. 1081:2-13, 1090:10-1097:17, June 12, 2019 (Burson); Trial Tr. 1151:3-1155:18, June 13, 2019 (Burson); Trial Tr. 625:20-630:25, June 10, 2019 (Byrne).

The Proposed Remedial Plan includes critical State Hospital discharge planning requirements that would connect people to community-based services and providers, refer eligible individuals to PACT, and ensure that people get reconnected to public benefits. Proposed Plan ¶¶ 37, 39-40. *See* ECF 262-1 ¶¶ 32, 34. Unlike the State's Report, the Plan requires that discharge planning refer eligible individuals to Permanent Supported Housing and defines the roles of all the participants, including the Community Mental Health Centers, in the discharge planning process. Proposed Plan ¶¶ 38-40. *See* ECF No. 233 at ¶ 128. To address the problem identified at trial of unnecessarily long State Hospital stays due in part to inadequate discharge planning, ECF No. 233 at ¶ 132, the Plan also requires that the State create a

specialized discharge planning team to advise on discharge for individuals experiencing stays of 45 days or longer.  Proposed Plan ¶ 42. *See* ECF No. 233 at ¶¶ 131-32.

      iii.  <u>Medication Assistance</u>

Individuals with serious mental illness are unnecessarily institutionalized, or placed at serious risk of unnecessary State Hospital admissions, in part because they do not have access to prescribed medication.  *See, e.g.,* PX 402 at 80, 92-93 (VanderZwaag Report); PX 404 at 22 (Drake Report); Trial Tr. 447:1-23, 448:1-13, June 6, 2019 (VanderZwaag).  *See* ECF No. 233 at ¶¶ 127, 137c, 140.  To address this problem, the Proposed Remedial Plan adopts the State's proposal for providing "continuity of medication access" to individuals in the community who cannot access prescribed medication that they need to avoid State Hospital admission.  Proposed Plan at ¶ 43; ECF No. 262-1 at ¶ 35.  However, the Proposed Remedial Plan requires that medication access be maintained until there is no longer a demonstrated need, rather than arbitrarily expiring after two years as the State proposed.  ECF No. 262-1 at ¶ 35.

      iv.  <u>Assessing Need for Additional Service Capacity to Prevent Unnecessary Hospitalization</u>

Data collection and analysis—relating to civil commitments by Community Mental Health Center region, repeat admissions to State Hospitals, length of stay in State Hospitals, and use of Crisis Stabilization Units, for example—are relevant to assessing the need for additional Core Service capacity and fully utilizing existing services.  Trial Tr. 1392:16-1393:21, 1396:18-23, 1397:11-14, June 17, 2019 (Peet).  As the Court found, however, the State does not review data on community-based service utilization "much less use that data to drive programmatic changes" that would help to prevent unnecessary hospitalizations.  ECF 234 at 27-28. *See* ECF No. 233 at ¶¶ 184, 208.  The State's "inability" to collect, share, and effectively deploy data is

"one reason many community services are underutilized" in Mississippi.  ECF No. 234 at 27, 48-49.

The Proposed Remedial Plan addresses the Court's findings by requiring the State to assess, on an ongoing basis, the adequacy of Core Services by collecting and reviewing relevant data – for example, the number of units of each Core Service reimbursed through the State's Medicaid program or through State-funded grants.  Proposed Plan ¶ 45.  In contrast to the State's Report, ECF No. 262-1 at ¶¶ 38-39, the Proposed Remedial Plan also requires that the State use that data to identify gaps in Core Services and take steps to reduce unnecessary State Hospital admissions.  Proposed Plan ¶ 46. *See* ECF No. 233 at ¶¶ 179-84.  Toward that same end, the Plan requires that the State conduct, within four years of the entry of the Plan as a court order, a clinical review of a sample of individuals served in the State Hospitals.  Proposed Plan ¶ 47. That clinical review will assess whether inadequate access to Core Services led to the State Hospital admissions and whether further service capacity should be added.  *Id.*

     v.  <u>Technical Assistance to Mental Health Providers and State Oversight of Core Services</u>

As the Court found, while the State's array of community services may appear sufficient on paper, the experience of people in State Hospitals or at serious risk of unnecessary institutionalization reveals a different reality.  ECF 234 at 2, 47-48.  Without robust technical assistance to ensure that community-based services are provided throughout the State consistent with the State's Operational Standards for mental health providers, individuals who need community-based services will continue to go unserved, resulting in avoidable State Hospital admissions.  *See id.* at 47-49. *See also* ECF No. 233 at ¶¶ 185-86.  That technical assistance necessarily includes assessing the availability and provision of community-based services to

ensure that individuals are served in the most integrated setting appropriate to their needs and that Core Services are provided in accordance with the Plan. *Id.*

While the Parties both recognize the State's role in providing technical assistance to community providers, the State stops short of acknowledging its oversight responsibility for the community service system as a whole. *Compare* Proposed Plan ¶¶ 48-50, *with* ECF No. 262-1 at ¶¶ 36-37. Consistent with the Court's findings, ECF No. 234 at 28, the Proposed Remedial Plan requires the State to exercise oversight over the Community Mental Health Centers and other providers to enable the State to comply with the terms of the Plan. Proposed Plan ¶ 48. *See* ECF No. 233 at ¶¶ 185-86. *See also* 28 C.F.R. § 35.130(b)(3)(i) (stating that a public entity may not "directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability").

### III.    An Independent Monitor is Necessary to Ensure the State's Compliance with the Remedial Plan.

The Proposed Remedial Plan provides for a Court-appointed Monitor both because of the complexity of the issues in this case and because of the State's decade-long failure to remedy widely acknowledged deficiencies in its adult mental health system. ECF No. 234 at 2, 59-60. *See Ruiz*, 679 F.2d at 1160-61 & n.234 (upholding district court's appointment of a monitor to assess compliance with order of injunctive relief based on difficulty of overseeing implementation of complex remedies and on the defendant's "record of intransigence"); *Moore v. Tangipahoa Parish Sch. Bd.,* 843 F.3d 198, 201 (5th Cir. 2016) (noting that monitor was appointed "pursuant to the court's inherent authority in fashioning equitable remedies"); *Sierra Club v. Babbitt*, Nos. 94-50260 & 95-50165, 81 F.3d 155 (5th Cir. 1996) (unpublished per curium opinion) (finding that appointment of monitor did not exceed the district court's power).

**A. The Difficulty of Implementing a Comprehensive Remedial Plan in this Case Warrants Appointing a Monitor.**

As the Court has observed, Mississippi's adult mental health system is complex. ECF No. 234 at 2 ("One would be forgiven for throwing their hands up in exasperation at the complexity of the situation."). In addition to operating four State Hospitals with a total of 438 beds as of 2018, Trial Stip. at ¶¶ 68-69, 112, 148, 182, the State certifies and monitors a network of regional Community Mental Health Centers that serve thousands of adults with serious mental illness. *Id.* at ¶ 5, 7. The CMHCs collectively operate, subject to State oversight, dozens of facilities across Mississippi, including eight Crisis Stabilization Units as of 2018. *Id.* at ¶ 222. *See* ECF No. 234 at 28. Through the Division of Medicaid, the State funds services for Medicaid-eligible individuals based on detailed parameters that determine whether services are medically necessary and reimbursable. Trial Stip. at ¶ 261.

Monitoring the implementation of a comprehensive remedial plan will require an expert with the skills, qualifications, and experience necessary to assess the State's compliance in this complex landscape. *See Ruiz*, 679 F.2d at 1161-62; *Howe v. City of Akron*, 801 F.3d 718, 756 (6th Cir. 2015) (upholding the district court's conclusion that the complex issues in the case warranted appointment of a monitor). For that same reason, the Court appointed Dr. Michael Hogan—a "seasoned executive" with more than 40 years of experience in the mental health field—as Special Master to help the Parties craft a remedial plan. ECF No. 241 at 3. The Court's reasoning applies with equal force at the implementation stage.

**B. The State's Record of Intransigence Further Supports Appointing a Monitor to Oversee Compliance with the Court's Remedial Order.**

The State has known for years, as the Court found, "that it is over-institutionalizing its citizens" who have serious mental illness. ECF No. 234 at 59. But even now the State is unwilling to propose an adequate and enforceable plan to ensure its compliance with the ADA.

*See supra* at 3.  Instead, implausibly, it has proposed that the Court order no relief at all and suggested that the Court reconsider its liability findings.  *See* ECF No. 262 at 1.  Against this backdrop, appointing an independent monitor to assess and report on the State's compliance will help to minimize disputes and keep the focus on the successful implementation of the Court's remedial order.  *See Ruiz*, 679 F.2d at 1161-62; *United States v. City of New York*, 717 F.3d 72, 96 (2d Cir. 2013) (identifying "the City's recalcitrance in undertaking remedial steps" as a justification for the district court's injunctive order that included appointment of a monitor).

## IV.    Conclusion

For the foregoing reasons, the United States respectfully requests that the Court issue a judgment ordering the injunctive relief identified in the Proposed Remedial Plan.

Dated: May 20, 2021

Respectfully submitted,

| | |
|---|---|
| DARREN J. LAMARCA | PAMELA S. KARLAN |
| Acting United States Attorney | Principal Deputy Assistant Attorney General |
| Southern District of Mississippi | Civil Rights Division |

MITZI DEASE PAIGE [MS BAR 6014]          STEVEN H. ROSENBAUM
Assistant United States Attorneys          Chief
501 E. Court Street, Suite 4.430          Special Litigation Section
Jackson, MS 39201
Telephone: (601) 973-2840          REGAN RUSH
mitzi.paige@usdoj.gov          Principal Deputy Chief
          Special Litigation Section

          /s/ *Patrick Holkins*
          PATRICK HOLKINS [VA Bar 85665]
          DEENA FOX
          Trial Attorneys
          Special Litigation Section
          Civil Rights Division
          U.S. Department of Justice
          950 Pennsylvania Avenue, N.W. – 4CON
          Washington, DC  20530
          Telephone: (202) 305-6630
          Patrick.Holkins@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2021, I electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to all counsel of record.

*/s/ Patrick Holkins*
Patrick Holkins