**Report of the Special Master**
**Submitted in Response to Court Order (ECF 253)**

I.    **Background and Overview**

1. On August 11, 2016, the United States Department of Justice (DOJ) filed a complaint under Title II of the Americans with Disabilities Act alleging that the State of Mississippi (State), through its programs, services, and activities, unnecessarily requires persons with serious mental illness to receive services in four State Hospitals, instead of in integrated community settings.

2. The Court presided over a four-week bench trial commencing on June 3, 2019. The trial record includes: 33 testifying witnesses, over 2,500 pages of transcript, 345 stipulated facts, more than 400 exhibits, and excerpts from the deposition transcripts of 19 additional witnesses.

3. Based on this trial record, the Court found that "Mississippi's system of care for adults with [serious mental illness] violates the integration mandate of the ADA." Memorandum Opinion and Order, September 3, 2019, ECF No. 234 at 54. This is so because the State's public mental health system depends too much on segregated State Hospital settings and provides too few community-based alternatives. The Court found that many individuals with serious mental illness who have received treatment in a State Hospital can appropriately receive services in community-based settings instead of State Hospitals. The Court also found that, with few exceptions, those individuals do not oppose community-based services. Further, the Court found that the State can reasonably accommodate their treatment in the community through its existing program for community-based mental health services.

4. The State of Mississippi recognizes the efficacy of these services, funds many of the services through its Medicaid program (under which approximately 75% of the cost is paid by the federal government) and provides grant funding for the services through the Mississippi Department of Mental Health (DMH). Through DMH, the State has also issued detailed Operational Standards for mental health providers, and periodically inspects and certifies programs. Mississippi provides services primarily through a network of Community Mental Health Centers (CMHC's).

5. As of the trial evidentiary cut-off date of December 31, 2018, Mississippi had 14 CMHC Regions, but the area that was Region 13 as of December 31, 2018, is now operated by Region 12 due to a failure of the former Region 13 provider. Mississippi now has 13 CMHC Regions.

6. The Court appointed a Special Master, Dr. Michael Hogan, to assist the Court in developing an appropriate remedial plan. After working with Dr. Hogan for more than a year, the Parties were unable to agree on an appropriate remedial plan.

7. On February 24, 2021, the Court directed the parties and Special Master to submit plans to resolve this matter. The Court's Order stated: "The defendant's request for at least 60 days to submit a proposed Agreed Order or its proposed remedial plan is granted. Either an Agreed Order or proposed remedial plan shall be filed on the docket by April 30, 2021. The plaintiff's response, if any, is due 21 days later. The Special Master is asked to

weigh in on the parties' points of disagreement—again, if any. As the plaintiff observed at the status conference, Dr. Hogan's expert advice to this Court concerning any proposed remedial plan was central to his engagement so long ago. The Special Master is asked to support his recommendations by reference to his vast experience and knowledge of mental health systems, rather than to any statement made by a party during settlement negotiations. See Fed. R. Evid. 408. The Special Master's input is requested by June 4, 2021."

8. In response to the Court's Order, on April 30, the State submitted a Report, Declaration by DMH Director Wendy Bailey, and Response to the Order. Similarly, in response to the Order, on May 20, the DOJ submitted a Proposed Remedial Plan (Plan), a Memorandum in Support of the Remedial Plan and a Response explaining the submissions.

9. Both the State's Report and DOJ's Plan substantively address the matters at issue in this case: identifying needed community mental health services that were not in place at the time of the trial, timelines to develop these services, improvements to prevent the unnecessary institutionalization of Mississippians in State Hospitals, improvements in discharge planning at the State Hospitals, technical assistance to be provided by the State to providers and Chancery Courts, and provisions for data collection and review.

10. According to the State's Report, DMH Annual Reports and other public documents, the State has implemented additional community services since the trial in this case. The parties have not reached agreement on the capacity and quality of these services, but they represent considerable forward progress. Additionally, there are several areas where the parties appear to agree on additional services that are needed.

11. There are also several areas where the parties remain in disagreement. In some areas, these disagreements relate to the extent of needed additional services (e.g., needed levels of Supported Housing). In other areas, the parties disagree not so much on the extent of needed services, but on the exact type of services to meet the need. For example, the State proposes to provide various types of intensive, mobile services, while DOJ focuses exclusively on PACT (Program of Assertive Community Treatment), a research-validated program.

12. There are some areas where the parties are far apart. In general, the State's materials indicate that it believes any deficiencies in its care of adults with serious mental illness vis a vis the requirements of the Americans with Disabilities Act have been virtually resolved—and if not yet sufficient will be fully adequate by the end of FY22. The State asserts that the data provided in its Report and in Director Bailey's Declaration provide sufficient evidence of compliance. In general, the DOJ takes the position that independent validation of services adequacy will be needed, that the Court should approve any alternative services not discussed at trial, and that a Court Monitor should be appointed to validate implementation of new services and procedures.

## II    Special Master's approach to this recommended plan

13. Parameters for the Special Master's approach to recommendations were set in the Court's February 22 Order: "The Special Master is asked to support his recommendations by reference to his vast experience and knowledge of mental health systems, rather than to any statement made by a party during settlement negotiations."

14. The recommendations made by both parties are substantive. In general, it is possible to find the right approach in either the State's or the DOJ's proposals, or in an approach that considers the merits of each and finds a middle ground. In this Report, the Special Master will discuss the merits of the State and DOJ approaches to elements of a Plan and outline the rationale for his recommended approach. The final section of the Report will be the Special Master's recommendations to the Court for the Plan.

15. The voluminous trial record provides the foundation for the recommendations that are appropriate to resolve the case. Recommended approaches are derived from the proposals of the parties and align with the record. In some cases, sensible approaches are not found specifically in the record, but are consistent with the record. At trial, the adequacy of services in Mississippi was considered based on realities at the time, and there has been some progress. For example, the State has developed and proposes to further develop some Intensive Community Services that were not present several years ago and are therefore not explicitly supported by the record. In the Special Master's view, this should not be disqualifying—if the proposed services are well designed, adequately implemented, and appropriately monitored they can be included in a Plan even if they are not explicitly discussed in the trial record. In fact, except for Supported Housing, where the trial record demonstrates that the State's proposal is insufficient, the Special Master's recommendations are largely what the State has proposed.

16. The Special Master finds that there are some strengths in Mississippi's mental health system, and it also appears that progress in better serving adults with serious mental illness and meeting the mandates of the ADA has been made in recent years and since the trial. Much of the evidence of improvement is outside the record (e.g., in annual reports of DMH) and has not been validated. Levels of institutionalization, as measured for example by individuals remaining in State Hospitals for very long periods of time, have been reduced. The ingredients of Mississippi's crisis services (mobile teams, hot lines, crisis stabilization units) are well considered (although performance problems such as response time to crises and not providing crisis residential services to all who could benefit prior to a State Hospital admission may persist). The DMH Operational Standards for community mental health services, as established at trial, are sound and it appears that the DMH infrastructure for periodically inspecting community services against these standards is adequate. However, data on community service performance is not yet adequate to assess performance or to allow the Court to determine if the requirements of the ADA are being met. Levels of services that are in place have not been verified. The actual availability of services to Mississippians is not yet certain.

17. The performance of the State's community mental health services is central to resolving this case. The trial record amply demonstrates long standing gaps between service levels

that were funded vs. those that were available to people with mental illness, and delivered to help prevent unnecessary institutionalization:

    a. The trial record demonstrates that PACT services were serving far fewer individuals than their funded capacity. Mobile Crisis Teams were funded, and the DMH Operational Standards require a mobile team response within an hour of the request for services, but many individuals who needed these services did not receive them at all. There is thus a crucial gap between the funded, theoretical capacity of services and the number of people who receive care. Addressing this gap and validating the adequacy of services, not just on paper, is central to resolving the case.

    b. The record does not demonstrate that, at the time of trial, the State had the capacity to adequately oversee the CMHC's overall performance. Having led state mental health agencies in three states over 25 years, the Special Master is aware that this is a complex and difficult challenge. It involves tensions between state and local control, the management of nonprofit organizations that operate with limited funding from multiple sources, and the delivery of varied and complicated health care services to people with multiple needs, in an environment where attracting and retaining skilled staff is challenging. The problem is that the trial record suggests that prior to and at the time of trial, management, and oversight of the mental health system by the State was insufficient to demonstrate compliance with the requirements of the ADA.

    c. The Special Master's experience confirms that developing the capabilities for effective and efficient oversight of complex mental health systems is not achieved overnight or accomplished via one or two actions. Individual steps (such as creation of the new role of Coordinator of Mental Health Accessibility) are welcome but insufficient, on their own, to assure accountability. In the Special Master's experience, an individual or an office located outside the Departments of Mental Health and Medicaid cannot assure accountability. Turning a large complex system around is like turning an aircraft carrier at sea. It takes time and personnel to give the order, turn the wheel, assess the new course, and make corrections.

    d. Therefore, the Special Master's proposal will suggest that monitoring of whether services are in place, available and used by people with serious mental illness, and functioning according to their intent is essential. In fact, monitoring is the pathway to demonstrating that the State is meeting the requirements of the ADA and has resolved the inadequacies found in the Court's Opinion and Order.

18. The Special Master is also sympathetic to the need of State officials to chart and implement directions that will resolve the ADA issues in the case in a fashion that works for Mississippi. Two examples exist in the differing approaches to Intensive Community Support Services and to Supported Employment proposed in the State and DOJ plans. In both cases, the DOJ Plan relies solely on the research-validated services (PACT and Individual Placement and Support--IPS) that are clearly supported in the trial record. DOJ proposes that the State be ordered to implement these programs statewide, and if the State

wishes to provide alternatives it should offer proof of effectiveness sufficient for the Court to amend its order and include the alternatives as part of a remedy.

19. The following paragraphs summarize the Special Master's assessment of the varying State and DOJ proposals to resolve the case, starting with the heart of the matter: the Core Services that must be provided to avoid unnecessary institutionalization.

20. <u>Intensive Community Services.</u> Regarding Intensive Community Services, the DOJ proposed Remedial Plan proposes that the State provide a Program of Assertive Community Treatment Team (PACT) in every Region (two in Hinds County) and adjust the number of teams upward based on need. On the other hand, the State proposes continued support of PACT teams that are now in place but indicates it has developed alternative services that it suggests are comparable, in large parts of the state. As an alternative to PACT for mid-sized counties, the State offers a kind of "mini-PACT team" called Intensive Community Outreach and Recovery Team (ICORT); for very small rural counties it proposes mobile clinicians with small caseloads called Intensive Community Support Specialists.

    a. <u>Impact of Intensive Community Services on people with serious mental illness.</u> The choices regarding Intensive Community Services will have very real effects on Mississippians with serious mental illness. PACT teams are proven effective in reducing institutionalization for individuals with the most serious mental illness for whom institutionalization as well as community neglect are very damaging. The first PACT team, deployed in Wisconsin over 40 years ago, was based on the staffing of a psychiatric inpatient unit, considering the observation that some people with very complex mental illness did very well in the hospital, but could not sustain recovery in the community. So, a central principle was to replicate key elements of hospital care in the community: a full clinical team, availability of staff 24/7, frequent monitoring of how people are doing, assuring adherence to medication regimens, etc. The effectiveness of PACT derives from "fidelity" to these elements that are most essential for people with the most complex mental illness. Deviating from these proven elements increases risk. Yet, at the same time, providing alternative Intensive Community Services is more feasible in smaller and rural areas, and allows more people to be served with approaches that are more flexible than traditional clinic services, if not as comprehensive as PACT. The State proposes two alternative models: "mini-PACT teams" (ICORT) for smaller communities and individual mobile clinicians (Intensive Community Support Specialists or ICSS) in very small rural communities.

    b. These adaptations, as DOJ points out in its response, are not equivalent to PACT. For example, including a psychiatrist/prescriber on the mobile team is required in DMH Operational Standards for PACT. But to see a physician/prescriber, people receiving ICORT and ICSS services must visit the Community Mental Health Center. The Remedial Plan proposed by DOJ requires statewide reliance on PACT: "Within one year of entry of this Order, the State shall provide at least one PACT Team to operate in every Community Mental Health Center region and to serve Covered Individuals in every county within that region. The State shall

provide a second PACT Team operating in Hinds County." This would require 14 PACT teams and allow care for up to 1,120 individuals.

c.  However, ICORT and perhaps ICSS are reasonable adaptations for rural areas where the number of individuals needing intensive services may be too small to justify a full PACT team. As the trial record indicates, PACT is not feasible in dispersed rural areas where there are simply not enough people to justify a full team. ICORT operates on enough of the same elements of PACT, according to a review of the Operational Standards, to be a reasonable substitute. Finding ICSS– a solo clinician—to be a reasonable substitute for PACT is more of stretch. But some remote and sparsely populated counties do require a more flexible approach. The Special Master finds that ICSS may be a reasonable alternative in the very rural areas where the State has proposed it if the performance of the CMHC's for these rural areas is monitored.

d.  The DOJ Plan proposes a rigorous process whereby the State could substitute alternative services such as ICORT and ICSS with Court approval: "If, in implementing this Order, the State identifies an alternative service demonstrated to have comparable success at reducing hospitalization, the State may petition the Court to modify the injunction and replace any Core Service with the comparable alternative."

e.  The State's Report proposes to provide 10 PACT teams (each with capacity to serve 80 people), 16 ICORTs (each with a capacity to serve 45 people) and 35 ICSS (each with a maximum caseload of 20 people). The total funded capacity of the State's proposal is thus 2220 individuals (800 via PACT, 720 via ICORT, 700 vis ICSS). In a research report, Cuddleback et al. (Psychiatric Services, 57 (12) p. 1803-1806) describe a methodology which would suggest approximately 1242 individuals in Mississippi require a PACT level of care. Therefore, the State's proposal would be sufficient to meet the need—if it is implemented, managed, and monitored well.

f.  Given this context, the Special Master's recommended Plan leans toward the State's proposal. The DOJ approach relies on proven services, but they may be impracticable in large parts of Mississippi. DOJ's Plan would impose a process of review and Court approval before substituting alternatives that are reasonable, but which are not backed by research evidence. The State Report represents that the proposed PACT, ICORT and ICSS services are already substantially in place, with standards for their operation. However, the State offers no assurance as to their accessibility and utilization, or certainty that the proposed services will work effectively. Therefore, the Special Master will suggest accepting the State's proposed mix of PACT, ICORT and ICSS services. However, data review to validate that the proposed services are in place, serving people as intended and working as intended will be proposed to provide the State the opportunity to demonstrate compliance.

21. <u>Supported Employment Services.</u> The DOJ Plan proposes the State provide, within two years, evidence based IPS teams in all Regions. The State's Report indicates the State

will provide IPS in 7 Regions by the end of FY 22 and deliver employment services via Employment Specialists provided through a partnership with the Mississippi Department of Rehabilitation Services in the other Regions. This may be a reasonable adaptation, although there is no evidence in the trial record or in the research literature for the effectiveness of the alternative Employment Specialist approach.

    a.  <u>Impact of Supported Employment on people with serious mental illness.</u> As with Intensive Community Services, the consequences for people with serious mental illness of good employment services are robust. Using IPS vs. other forms of employment services is not just a choice between different flavors of a service— the results are substantially different. The evidence shows that for many individuals with serious mental illness, having employment leads to stability and recovery, not the other way around. Therefore, the evidence shows that IPS reduces levels of hospitalization; for many individuals with serious mental illness work is as or more effective in promoting good outcomes than medication treatment or therapy. Employment provides income, which helps with life and housing stability The evidence also shows that interest and success in employment are less related to "readiness" to work (e.g., having fewer symptoms) and more related to an interest in working. Many traditional forms of employment services and some vocational rehabilitation approaches try to pre-select individuals who are "good candidates" for employment; the services then focus on readiness assessment and training vs. the IPS emphasis on including any person who wants to work, with rapid job search and placement.

    b.  The trade-offs regarding the State vs. DOJ approaches to supported employment involve the proven efficacy if IPS vs. the uncertain effectiveness of Employment Specialists, the time that would be needed to review and approve the alternative service, and potentially differences in cost.

    c.  Therefore, in accepting the State's alternative proposal, which relies on services possibly already in place, the Special Master will suggest the state must validate that its Employment Services are working as planned. The State should incorporate and assess provider adherence to selected key features of IPS in the Employment Specialist programs. These would include: availability of the service to all individuals with serious mental illness, integration of Employment Specialists with the clinical staff of the CMHC, use of a rapid job search rather than the protracted assessment that is often characteristic of vocational rehabilitation services, and the ability to provide ongoing rather than time limited support. The recommended Remedial Plan will incorporate these elements. And recommended processes of program review and individual client review will validate that the State's proposed services are working.

22. <u>Mobile Crisis services</u>. the State's Report and DOJ's Plan do not differ substantially with respect to the recommended capacity of services. Each requires a Mobile Crisis Team in each Region. (The Special Master's understanding is that Mississippi's funding of Mobile Crisis services does not involve a single team—which is usually two individuals to go to

where people are and assess and resolve their crisis—but rather a regional program with several teams that are to be available 24/7.)

    a. <u>Impact of Mobile Crisis Services on people with serious mental illness.</u> The impact of good crisis services is hard to overstate. Nationally, well-functioning mobile crisis programs resolve about 80% of the situations they deal with without resorting to institutional placement or police custody—which is frequently problematic for both the individual in crisis and the officers who are pulled away from public safety duties to deal with issues that should be resolved via treatment. Well-functioning mobile crisis teams can often resolve crises without placing people in hospital Emergency Departments that are usually not staffed or organized to provide emergency psychiatric care—leading to long delays, forced stays in a busy, noisy environments that are not conducive to recovery, overreliance on inpatient beds as a "disposition," and disruption of the Emergency Department. A lack of timely access to mobile crisis services can also result in suicide. Where services are adequate—even if a higher level of care is needed—mobile teams can arrange access to services like Crisis Residential Services or even hospitalization if it is needed—without deleterious delays.

    b. The major difference between the parties' proposals has to do with whether there is a commitment and requirement for the State to adjust services levels to achieve compliance with its own Operational Standards requirement (19.3, E, 1) that Mobile Crisis Teams respond timely to crises. The trial record suggests this requirement was not met at the time of trial. It is an essential element of adequate crisis care.

    c. The Special Master's proposed Remedial Plan will include a requirement that the State monitor Mobile Crisis service timeliness. The State will need to act accordingly to meet its own Operational Standards.

23. <u>Crisis Residential Services.</u> The differences between the State's report and DOJ's proposed Plan are not great. Crisis Residential Services would be provided in all Regions under the DOJ proposed plan. In the State's Report, these services exist and would be sustained in all regions except Region 11 (where the State commits to develop and sustain a program) and Region 15, where the State proposes to provide access to Crisis Residential Services in neighboring Regions.

    a. <u>Impact of Crisis Residential Services on people with serious mental illness.</u> Access to community residential alternatives to inpatient care for people who are in a crisis is urgent. People in psychiatric crisis may be overwhelmed with disturbing thoughts and feelings. It is the worst time to have no access to care or to be placed or restricted to locations such as jails or Emergency Departments that are both stressful and not prepared to deal with these thoughts and feelings in a comforting way. Often local police are forced to serve as the front line of crisis care, which can be distressing for people in crisis, can occasionally lead to tragic violence, and diverts officers from public safety duties. Having Crisis Residential Services as a timely option can shorten periods of distress and reduce the inappropriate reliance on law enforcement to solve health care problems. As data

from Mississippi's Crisis Residential Services demonstrates, over 75% of people receiving these services do not need to be hospitalized, and psychiatric hospitalization—though sometimes necessary—can be distressing. Crisis Residential Services are the most urgent level of community mental health care and an essential ingredient of a system of care.

b. The development and effective operation of a Crisis Residential Service in Region 11 is crucial to preventing unnecessary hospitalizations from that Region, and must be completed and documented.

c. The Special Master is not persuaded that having a Crisis Residential Service in Region 15 is necessary given the Region's small population, low levels of State Hospital admissions, and promised availability of services in adjoining Regions. However, it is imperative that timely access of Region 15 citizens to these services be sustained, and that levels of hospital use be monitored by the State. If data show it is necessary, the State must be prepared to assure availability of these services in region 15.

24. <u>Peer Support Services.</u> The State's Report and the DOJ's Plan do not differ significantly in terms of proposed levels of Peer Support Services. It is important to note that certified Peer Specialists are part of the essential complement of staffing for PACT, ICORT and Mobile Crisis teams. The State's Report also commits to utilizing Peer Specialists in a particular role called Peer Bridgers at all the State Hospitals by the end of FY 22, performing crucial roles in discharge planning that DOJ recommends. Peer Bridgers provide a familiar face and a helping hand to help people transition from institutional care back to their community. And the State commits to providing Peer Support Services at all main CMHC offices. The area where the State Report and DOJ Remedial Plan differ is that DOJ proposes that Peer Support Services be available at every CMHC office.

a. <u>Impact of Peer Support Services on people with serious mental illness</u>. The importance of this service is demonstrated by the fact that Mississippi has embedded it in all its most intensive and urgent, team-based community services. Peers can form relationships with individuals needing mental health services on an "equal" basis that is grounded in the reality that Peer Specialists have themselves experienced mental health care. Their "lived experience" qualifications complement the professional perspective of other staff, providing trusted communication, and a different, real world viewpoint. The evidence shows that peers play key roles in engaging people in care, helping them articulate concerns in a way that can help them get resolved, and validating their experiences and concerns.

b. By including Peer Specialists as part of the required staffing for crisis and intensive community service teams, Mississippi has addressed crucial roles for peers—in services that support those individuals with the most serious ongoing challenges and those who have the most urgent and immediate needs.

c. The availability of Peer Support Services at main CMHC offices is the next most important way to ensure the value of peers is available throughout the community

mental health system. These are the major service locations in community mental health, where the most people are served.

    d.  Availability of Peer Support Services at other CMHC clinical service locations is desirable but the Special Master does not have information sufficient to dictate a requirement. The Remedial Plan will recommend that the State evaluate the availability of Peer Support Specialists at additional outpatient service locations and utilize them in these locations as appropriate.

25.  <u>Supported Housing.</u> The parties are far apart with respect to recommendations for Supported Housing. The State has established and maintained a Supported Housing program for some time, and the State's report describes Permanent Supported Housing as "an evidence-based practice that provides an integrated, community-based alternative to hospitals, nursing facilities, and other segregated settings," indicating that Mississippi accepts the value of the service. A state official testified at trial that capacity of well over 2,000 units of supported housing was needed, Mississippi's approach to supported housing does not offer permanent support but is capped at 12 months of service. Time limited support may result in challenging transitions, but the State's procedures are intended to mitigate this. Time limited housing departs from the usual approach of housing that is permanent. However, this difference is modest compared to the chasm between the proposed State and DOJ proposals for capacity. The State Report indicates that additional funding for the program is being added in FY 21 ($150,000) and will be proposed for FY 22 (up to $400,000), so the State acknowledges the need to expand the program. However, the DOJ's Remedial Plan proposes a much more substantial expansion: "Within three years of the entry of this Order, the State shall serve at least 750 more individuals with serious mental illness through Permanent Supported Housing than were served in the year prior to issuance of this Order." (The current capacity of the State's program allowed it to serve about 350 individuals in FY 18.) The Special Master has considered a number of issues in recommending an approach to this issue in his recommended Remedial Plan:

    a.  <u>Impact of Stable and Affordable Housing for people with serious mental illness.</u> Few factors are as important to the well-being of people with mental illness than having decent, stable, and affordable housing. Without a stable place to live— which can be achieved or provided in various ways but is assured through access to Permanent Supported Housing—the stress of day-to-day life increases greatly and is a frequent cause of relapse and hospital readmissions. For individuals with serious mental illness, poverty is typical. Almost all are unemployed (reinforcing the importance of Supported Employment). Even if people achieve eligibility for Supplemental Security Income (SSI), it results in monthly income of $794 in Mississippi. According to national/state data complied by the Technical Assistance Collaborative, median rents of an efficiency apartment in Mississippi could require individuals to spend 76% of their income just on rent; rents for one-bedroom apartments are slightly higher. This makes low-income housing more affordable than in most other states, but still beyond the reach of many Mississippians with serious mental illness. The high cost of housing in relation to

limited income leads people to rely on friends and family—which can result in stresses and frequent moves—share units with people they might otherwise choose not to, move frequently, and be at greater risk of homelessness. This is traumatic for anyone, but for people with serious and persistent mental illness, it can be s a disastrous, recurrent precipitant of relapse and readmission.

b. The significance of Supported Housing was reinforced in the DOJ's expert reviews of 154 individuals served in Mississippi's mental health system. The experts found that 74 of the individuals reviewed—almost half—should have access to Permanent Supported Housing.

c. Other states have used various mechanisms to supplement Permanent Supported Housing services to assist people with serious mental illness to secure stable housing, such as assistance with down payments and partial subsidies. Mississippi does not appear to offer these options and has not proposed alternative ways to address the problem (for example, setting aside Section 8 vouchers for people with serious mental illness). These factors reinforce the need to expand the State's Supported Housing program.

d. Given this context, the Special Master's recommended Remedial Plan will suggest an expansion of Supported Housing.

26. <u>Medication Assistance.</u>  A failure to receive prescribed medications—whether through conscious choice or not having the medicine—is a frequent cause of relapse and hospital readmissions. In recognition of this, and the fact that many individuals with serious mental illness do not have health insurance and therefore cannot afford medications, the State's Report proposes a new Medication Access fund, with $200,000 proposed for FY 22 and FY 23 for this purpose. The DOJ proposed Plan recommends continued funding of this fund after FY 23.

a. <u>Impact of medication access on people with serious mental illness.</u> Medication is the first line treatment for virtually all serious mental illness, and a failure to receive prescribed medication treatment often leads to relapse and hospital readmissions. Some individuals with serious mental illness learn to manage their condition without medications, but this is always best done planfully in collaboration with a prescriber. Not having access to medications that have been prescribed is a problem that can lead directly to rehospitalization. Affordability is a major concern, given the low income of many individuals with serious mental illness. Generally, community mental health centers are able to assist some individuals by providing samples but this is often time-limited and samples may not be available. Some individuals may receive medication through assistance programs offered on a selective basis by pharmaceutical companies, but accessing this assistance takes time and is also uncertain. Thus, having some funds for a medication assistance program to bridge these gaps is essential.

b. Therefore, the Special Master's proposed Plan will recommend continuing the State's proposed program unless it is demonstrated to be unnecessary.

27. <u>Diversion from State Hospitals.</u> The major element of avoiding unnecessary institutional admissions is establishing adequate Core Services, so that the capacity exists to meet

people's needs appropriately in their community. However, several management steps are essential to make sure that people are connected to services and that local systems function to meet the goal of preventing unnecessary admissions. While it is not clear that Mississippi holds its Community Mental Health Centers accountable for managing State Hospital utilization, the State is making progress on this goal. The proposals of the State in its Report and DOJ in its proposed Remedial Plan do not differ dramatically on this issue. The Special Master's proposed Plan will substantially accept what the State has proposed.

28. <u>Connecting known individuals with serious mental illness to care.</u> As part of the trial, DOJ consultants conducted interviews and performed a Clinical Review of 154 individuals who had received care in Mississippi. Many were still at serious risk of institutional care. Both the State and DOJ have acknowledged the need to reach out to these individuals, assure their needs are assessed by CMHC's, and they are provided services as needed. The Special Master agrees.

29. <u>State Hospital Discharge Planning.</u> Timely and rigorous discharge planning for people who have been admitted to State Hospital care is essential. Without timely planning that begins on admission, people may stay in the hospital longer than is clinically necessary. Usually stays in State Hospitals are longer than the 4-5 day national average for all hospital stays, and the additional time, while often necessary, can result in lost housing or employment and compromise recovery. Establishing connections to community care are also essential; since serious mental illness is not cured during hospital stays, timely access to the right follow-up care is very important. The fact that virtually all people discharged from State Hospitals will get follow-up care at their Community Mental Health Center makes connecting them to care manageable if arrangements are in place. And enhancements to discharge planning, such as including Peer Specialists (Peer Bridgers) can significantly improve connections. Past discharge planning processes at Mississippi State Hospitals were shown at trial to have significant deficiencies. However, the State's Report shows a commitment to resolve these problems. The DOJ's proposed Plan suggests similar approaches to discharge planning, with additional suggested improvements. The Special Master's proposed Remedial plan will largely adopt the State's recommendations and consider several additional DOJ recommendations.

30. <u>Technical Assistance.</u> Both the State Report and the DOJ proposed Remedial Plan acknowledge and address the need for state leadership and technical assistance to providers, and to chancery courts, so the courts are aware of current services and policies that may affect or improve the courts' consideration of civil commitment for people with serious mental illness. The Special Master concurs.

31. <u>Data Collection and Review.</u> Reviewing data on the performance of the mental health system is for the State to assure that its requirements are met and is also a necessary element of ultimately resolving this case. To end the case, the Court needs to validate that the improvements which are required have been made. This is particularly important because the trial record demonstrates that historically the State was not adequately using data to manage the system of care. As was established at trial, the State has sound requirements in its Operational Standards for the operation and periodic inspection of

programs. But, while necessary, this is not sufficient for effective oversight of the system. Data on the utilization of Medicaid paid services (most of Mississippi's community mental health services) is available to the Department of Medicaid, but it is not clear how this information is shared with DMH on a timely, regular basis and used by DMH or DOM to assess performance. And information on utilization patterns of DMH funded programs (e.g., levels of services used by different individuals) has not been available.

    a. The State's Report promises that "On a monthly basis, Mississippi will collect, review, and analyze person level and aggregate data…" on Core Services and State Hospital utilization. The State also promises to "begin collecting, reviewing, and analyzing — on a monthly basis — person level and aggregate data capturing the number of units of each Covered Core Service reimbursed under DMH grants, excluding Purchase of Service grants." These are helpful steps toward accountability.

    b. The Special Master concludes that the Data Collection and Review suggestions of the State are necessary, and that some additional elements suggested by the DOJ are appropriate.

    c. Internal data collection and analysis is necessary for the State to manage its mental health system but is insufficient to inform the Court about whether the commitments in a Remedial Plan are being met. For the Court to assess that the State has achieved compliance with the requirements of the ADA, reporting and limited validation of the State's data is necessary.

32. <u>Assessing the need for additional service capacity.</u> The DOJ proposed Plan includes several provisions intended to assure future adjustments in service capacity if these are deemed necessary based on review of data:

    a. "Using data collected pursuant to this Order, the State shall assess the need for service expansion to further reduce State Hospital admissions by (1) identifying trends in State Hospital and community service utilization; and (2) developing plans as needed for community service expansion and additional State Hospital diversion efforts."

    b. The DOJ's proposed plan also provides that "Within four years of the entry of this Order, the State shall assess whether the availability of Core Services is sufficient to serve Covered Individuals. That assessment shall include (1) conducting a clinical review of a sample of individuals served at State Hospitals in the year prior to the review; and (2) reviewing the data collected under paragraphs 44 and 45. The State shall provide a draft plan for conducting the assessment to the U.S. Department of Justice and the Monitor…for review and comment. After the assessment is completed and reviewed, the Parties shall meet and confer about whether any additional Core Services are needed to prevent unnecessary hospitalizations, and if so, shall define the necessary expansion. If the Parties do not reach agreement, either Party may seek relief from the Court."

    c. The Special Master concludes that the need for additional services to enable compliance with the ADA is known. As the Court indicated in its February 20, 2020 appointment order: "Mississippi's mental health needs are well-known; the

services to expand have already been defined. Many of the challenges and remedies are not disputed. We do not need additional discovery or consultants to elaborate on them…What we need is…a timeline for the State to reach full compliance. By when can the Department of Mental Health and the Division of Medicaid deliver the necessary community-based services—realistically—and how should we measure success along the way?"

d. Therefore, the Remedial Plan that the Special Master will propose will be finite with respect to the services that Mississippi must expand—and indeed most of the needed services, per the State's Report, have already been funded. An open-ended expansion of services will not be recommended. However, as the Court also noted, the ability to "measure success along the way" is also essential, and therefore reporting of progress by the State will be necessary to assess whether the planned services are working to assure compliance with the ADA's requirements.

e. Independent of the requirements in this case, the Special Master recommends that the State evaluate the adequacy of its services and whether they are working as intended, and make adjustments in capacity and focus as needed to achieve the best outcomes for its citizens with serious mental illness. Regardless of how change has been motivated, there is evidence the State is moving in this direction, and this progress should be continued.

33. <u>Implementation and Termination.</u> The State's Report does not address implementation or monitoring, and simply suggests that what the State has done or promises to do should be sufficient to resolve the case. The DOJ's proposed Plan provides that the State should develop and submit a detailed Implementation Plan for the Court's review and approval to enable it to achieve compliance and update this Plan annually for review and approval. DOJ further proposes that "This Order shall terminate when the State has attained substantial compliance with paragraphs 1-54 and maintained that compliance for one year as determined by this Court."

a. The Special Master concludes that development of an Implementation Plan—primarily focused on oversight and reporting, since most services per the State have already been implemented—would be useful for the State, for public accountability, and to apprise the Court of progress. A proper balance suggests that review and approval of plans should be within the authority of the State, while the Court's review of overall progress will be required to determine compliance and terminate the case. The Special Master's proposed Plan will therefore recommend that the State develop an Implementation Plan, post it for public comment and review by the DOJ and Monitor, and file the plan with the Court. The DOJ may raise objections to the Implementation Plan and if needed the Court may consider them.

b. As to compliance with the Court's order and termination of the case, the Special Master concludes that the expectation of a year's substantial compliance is a suitable benchmark for compliance, but that compliance may be assessed and approved by category of services (e.g., Crisis Services, Intensive Community

Support Services, Supported Housing) and by other major elements of the Remedial Plan that is ordered by the Court.

34. <u>Monitoring Compliance</u>. The State's submissions are silent on monitoring by the Court, and the DOJ's proposed Plan, while it includes numerous references to a Monitor, merely suggests that "The Court will appoint a Monitor to act as an agent of the Court to assess the State's compliance with this Order. The Court will issue a separate Order setting forth a schedule and process for selecting the Monitor and for determining the Monitor's duties, compensation, and authority."

   a. The Special Master concludes that the trial record establishes the need for Court review of progress, and that the State's internal monitoring—although it should provide the great majority of data needed to assess progress—requires independent validation. And the Court will need assistance in this task. Therefore, the Special Master will recommend appointment of a Monitor to serve as the eyes and ears of the Court and to facilitate finding the State in compliance with the ADA.

   b. The powers and duties of the Monitor should be focused on independent review of the data reporting by the State, mediating any concerns or disagreements about implementation that arise between the parties, and reviewing and recommending compliance with the Remedial Plan and the Court's Order.

## III    Proposed Remedial Order

35. In accordance with the terms of this Plan, the State must develop and implement effective measures to prevent unnecessary institutionalization in State Hospitals. Those measures shall include providing—either directly or through certified providers—adequate and appropriate services and supports to adults with serious mental illness, described below.

36. The State of Mississippi has established regional CMHCs, which work in conjunction with and are subject to oversight by the State. Consistent with the State's Operational Standards for mental health providers and the State's Report, each CMHC shall be the entity in its region responsible for preventing unnecessary hospitalizations by:

    a. identifying individuals with serious mental illness in need of mental health services;

    b.  screening individuals with serious mental illness during annual planning meetings to determine their need for the services required by this Plan;

    c. coordinating mental health care for individuals with serious mental illness; and

    d. diverting individuals from unnecessary hospitalizations through the provision of appropriate mental health care.

37. The State has adopted key services that can prevent adults with serious mental illness from being unnecessarily hospitalized in State Hospitals. These services include Mobile Crisis Teams, Crisis Stabilization Units, Programs of Assertive Community Treatment, Intensive Community Outreach and Recovery Teams, Intensive Community Support Specialists, Permanent Supported Housing, Supported Employment, Peer Support, and Community Support Services (collectively, Core Services).

38. Mobile Crisis Teams:

    a. Mobile Crisis Teams (also known as Crisis Response Services) provide face-to-face interventions at the site of a mental health crisis, including at the person's home, to de-escalate the crisis without unnecessarily either removing the person from the community or referring the person to a hospital for psychiatric treatment. The Operational Standards for Crisis Response Services including Mobile Crisis Services are set forth in Rules 19-19.4 of DMH's Operational Standards.

    b. The State will sustain one Mobile Crisis Team in each Region except Region 12. Region 12 is operating and will sustain two Mobile Crisis Teams — one in Hattiesburg and one in the former Region 13.

    c. The State will maintain its regional crisis hotlines that are staffed 24 hours per day, seven days per week, with staff who assess a crisis by phone, assist with immediate stabilization efforts, and help a caller identify and connect with ongoing local services. Mississippi will require the Mobile Crisis Teams to work with law enforcement personnel to respond to people in crisis who come in contact with law enforcement and will seek to coordinate the regional crisis hotlines with 911 dispatch to ensure the appropriate response involving Mobile Crisis personnel and/or law enforcement/Emergency Medical Technicians.

    d. The State will monitor performance of Mobile Crisis Teams including response times defined in its Operational Standard 19.3, E, 1.

39. Crisis Residential Services:

    a.  Crisis Residential Services (also known as Crisis Stabilization Units) provide time limited residential treatment to persons who are experiencing a period of acute psychiatric distress which severely impairs their ability to cope with normal life circumstances. The Operational Standards for Crisis Residential Services are set forth in Rules 19.5-19.7 of DMH's Operational Standards.

    b.  The State will provide Crisis Residential Services in each Region as except Region 11. Mississippi will sustain its existing Crisis Residential Services capacity — i.e., a capacity of 172 beds.

    c.  The State will fund Crisis Residential Services in Region 11 through the Region 11 CMHC or another DMH certified provider so that these services are available before the end of FY22; this unit will have the capacity to serve at least 12 persons at any given time. Mississippi will sustain that additional Crisis Residential Services capacity.

    d.  The State will continue providing access to Crisis Residential Services for Region 15 in neighboring Regions and will evaluate the access of Region 15 citizens to Crisis Residential Services.

    e.  The State will monitor utilization of Crisis Residential Services including the number of individuals served who are diverted from State Hospital admission and admitted to State Hospitals from Crisis Residential Services or without having been first served in Crisis Residential Services.

40. Programs of Assertive Community Treatment (PACT): PACT is an individual-centered, recovery-oriented intensive mental health services delivery model for facilitating community living, psychological rehabilitation and recovery for people who have the most severe and persistent mental illnesses, have severe symptoms and impairments, and have not benefitted from traditional outpatient services. The Operational Standards for PACT are set forth in Rules 32.1-32.8 of DMH's Operational Standards.

    a.  Mississippi will sustain 10 PACT teams. The PACT teams will provide intensive community services in the Regions and counties identified in Exhibit 1. PACT teams will meet Operational Standards 32.1-32.8.

    b.  To assure PACT teams function as intended, DMH will conduct reviews of each team periodically using a recognized fidelity scale (e.g., from SAMHSA, Dartmouth, or Case Western Reserve Center for Evidence Based Practices). The State will submit its fidelity scale and assessment schedule with its Implementation Plan.

41. Intensive Community Outreach and Recovery Teams (ICORT). ICORT is a recovery and resiliency oriented, intensive, community-based rehabilitation and outreach service for adults with a severe and persistent mental illness. ICORT, like PACT, is a multidisciplinary, community-based mobile service. The teams and caseloads are smaller as ICORT is designed to serve smaller communities. The Operational Standards for ICORT for adults are set forth in Rules 32.9-32.13 of DMH's Operational Standards.

    a.  Mississippi will sustain 16 ICORTs in the Regions and counties identified in Exhibit 1. ICORT teams will meet the criteria in Rules of D32.9-32.13 of DMH's Operational Standards.

    b.  To assure ICORTS function as intended, the State will develop a fidelity scale based on the Operational Standards and periodically conduct fidelity reviews. The State will submit its fidelity scale and assessment schedule with its Implementation Plan.

42. Intensive Community Support Specialists (ICSS). ICSS are clinical professionals who work with a small caseload of individuals with the most serious mental illness (maximum 20), generally in communities where PACT and ICORT services are impractical because of small populations in rural areas. have direct involvement with the person and attempt to develop a caring, supportive relationship with the person served. The Operational Standards for Intensive Community Support Services are set forth in Rule 32.18 of DMH's Operational Standards.

    a.  Mississippi will fund and sustain 35 full time ICSS. The ICSS will provide intensive community services in the counties identified in Exhibit 1.

    b.  ICSS services will meet the criteria of Rule 32.18.

43. Supported Employment Services are evidence-based services that assists persons with severe and persistent mental illness in obtaining and maintaining competitive employment. The Operational Standards for Supported Employment are set forth in Rules 24.4-24.6 of DMH's Operational Standards.

    a.  The State will provide Supported Employment Services by two methods: (i) Individual Placement and Support (IPS) services, and (ii) Supported Employment Specialists that partner with Mississippi Department of Rehabilitation Services Office of Vocational Rehabilitation (MDRS). Mississippi will provide Supported Employment services in each Region using one of these methods.

    b.  Mississippi will sustain existing IPS services in CMHC Regions 2, 7, 10, and 12. By the end of FY22, Mississippi will develop IPS in Regions 4, 8, and 9 and will sustain IPS services in those Regions.

    c.  IPS services will meet the criteria of Rule s 24.4-24.6.

    d.  In Regions without IPS services, Mississippi will offer supported employment through Supported Employment Specialists that are partnering with MDRS through an MOU between the Region and MDRS.

    e.  Mississippi will measure fidelity of IPS Supported Employment Services using the Supported Employment Fidelity Review Manual developed by the IPS Employment Center.

    f.  Mississippi will measure fidelity of VR partnering Supported Employment Specialists to key elements of IPS by assessing fidelity to key elements of evidence-based Supported Employment. Elements will be selected by DMH but include at least: Integration of Rehabilitation with Mental Health Treatment, Zero Exclusion Criteria, Rapid Job Search for Competitive Job, and Time-unlimited Follow-along Supports.

      g.  The State will submit its fidelity scales for IPS and Supported Employment with its Implementation Plan,

44. Peer Support Services are person-centered activities with a rehabilitation and resiliency/recovery focus that allow a person receiving mental health services and substance use services and their family members the opportunity to build skills for coping with and managing psychiatric symptoms, substance use issues, and challenges associated with various disabilities while directing their own recovery. The Operational Standards for Peer Support Services are set forth in Rules 42.1-42.3 of DMH's Operational Standards.

      a.  The State will sustain Peer Support Services in every Region by providing Peer Support Services at the primary CMHC office in each Region. Peer Support Services will meet the criteria of Rules 42.1-42.3.

      b.  By the end of FY22 the State will implement a plan to provide Peer Support Services at other e.g., satellite CMHC offices, including those offices that provide service five days a week.

      c.  By the end FY 22, the State will provide Peer Bridger Program services at each State Hospital and integrate such services into discharge planning for persons discharged from a State Hospital.

45. Permanent Supported Housing (supported housing) is an evidence-based practice that provides an integrated, community-based alternative to hospitals, nursing facilities, and other segregated settings. In Mississippi, supportive housing services are delivered through the CHOICE program. The rental assistance component of the CHOICE program is operated by the Mississippi Home Corporation (MHC).

      a.  Mississippi will sustain the current capacity of CHOICE including $150,000 in additional funding provided to CHOICE Providers in FY 21 to conduct assessments of people discharged from the State Hospital and CSUs who have been in a State Hospital for 90 days or more, are or were recently homeless, lived in an unlicensed boarding home prior to admission, or have had another hospital or CSU admission in the last year.

      b.  Mississippi will fund an additional 250 CHOICE housing vouchers in FY 22 and an additional 250 CHOICE housing vouchers in FY 23 and sustain funding for these services.

46. Medication Access. The State will allocate $200,000 annually beginning in FY22 for a medication assistance fund. These funds will be used to provide medication access to people in the community who have a serious mental illness and who are receiving services through a CMHC who could not otherwise access prescribed medication that they need to avoid a serious risk of hospitalization.

      a.  The fund will be used to provide medication assistance on a timely basis to prevent discontinuities in treatment. The CMHC will document that it has: (i) assisted the person in initiating the enrollment process for Medicaid, and/or (ii) submitted a request to enroll the person in a prescription assistance program.

    b. Persons will be eligible for medication assistance for a period of 90 days. The 90-day eligibility period may be renewed, for up to one year, at the discretion of the State.

47. Diversion from State Hospitals. During the pre-evaluation screening process, CMHCs will determine if a person meets the criteria for intensive community services — specifically, PACT, ICORT, or ICSS, as applicable — in accordance with DMH Operational Standards and arrange those services if appropriate, to the individual. During the pre-evaluation screening process, CMHCs will consider all persons who are civilly committed in their Region for Crisis Residential Services In lieu of State Hospital placement, except when a chancery court has ordered the person to be committed to a State Hospital.

48. Connecting individuals with serious mental illness to care. On or before October 1, 2021, the United States will provide Mississippi with information concerning the whereabouts of persons included in the United States' Clinical Review of 154 persons conducted for purposes of the June 2019 trial. Mississippi will provide this information to the CMHCs, provide funding for, and require each CMHC to:

    a. make reasonable efforts, including phone calls and letters, to contact the persons and conduct assertive outreach, as appropriate, to engage persons in treatment; and

    b. screen persons for eligibility for the Core Services included in this Report, document the screening in the persons' records, and offer them Core Services which are appropriate and for which they are eligible.

49. Discharge Planning. Discharge planning at the State Hospitals will begin within 24 hours of admission to a State Hospital and will:

    a. Identify the person's strengths, preferences, needs, and desired outcomes;

    b. identify the specific community-based services the person should receive upon discharge;

    c. identify and connect the person to the provider(s) of the necessary supports and services;

    d. refer the person to PACT or ICORT when the person meets the criteria for PACT or ICORT in DMH's Operational Standards;

    e. include, where applicable and appropriate, assistance to the person in securing or re-activating public benefits;

    f. prior to discharging the person from a State Hospital, coordinate between the State Hospital and the community provider so that, upon discharge, the person continues to receive prescribed medications in the community as appropriate for the person's ongoing clinical needs;

    g. identify resources for the person to access in the event of a crisis and educate the person about how to access those services; and

    h. include an anticipated discharge date.

50. Discharge planning for persons who have previously been admitted to a State Hospital within the prior one-year period includes review of the prior discharge plans, the reasons

for the readmission, and adjustment of the new discharge plan that accounts for the history of prior hospitalization.

51. Prior to the person's discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll the person in appropriate services.

52. Technical Assistance. The State will provide the chancery courts in each county with an annual overview of mental health services provided in their area, including alternatives to civil commitment to State Hospitals.

53. Mississippi will provide technical assistance to providers including competency-based training, consultation, and coaching. The technical assistance shall be provided by persons who have demonstrated substantial experience implementing the Core Services.

54. Data Collection and Review. On a monthly basis, the State will collect, review, and analyze person level and aggregate data capturing:

   a. Admissions to Residential Crisis Services locations, by location broken down by CMHC region and by county, and admissions to State Hospitals from Residential Crisis Services and where Residential Crisis Services were not provided;

   b. Calls to Mobile Crisis Teams, with the number of calls leading to a mobile team visit, the average time from call to visit, the number of calls where the time to visit exceeded limits in the DMH Operational Standard 19.3, E, 1, and disposition of the call and/or Mobile Team visit;

   c. Civil commitments to State Hospitals by CMHC region and by county;

   d. Jail placements pending State Hospital admission by CMHC region and county, including length of placement (Mississippi will collect this data, as to each person, when a State Hospital receives the commitment order for the person);

   e. Individuals who remain hospitalized in State Hospitals for over 180 days:

   f. Persons receiving each Core Service by CMHC region and by county;

   g. Number of units of each Core Service reimbursed through Medicaid by CMHC region and by county.

55. By the end of FY22, Mississippi will begin collecting, reviewing, and analyzing — on a monthly basis — person level and aggregate data capturing the number of units of each Covered Core Service reimbursed under DMH grants, excluding Purchase of Service grants.

56. On an annual basis, Mississippi will analyze by CMHC the current compliance status of all CMHC Core Service programs with the DMH Operational Standards, and for those Core Services where fidelity is monitored, on the current fidelity score/status.

57. To assure that services are working as intended to address the needs of people with serious mental illness and to achieve compliance with the ADA, the State will design, with the participation of the DOJ and the Monitor, a Clinical Review Process to assess the adequacy of services received by a small sample (e.g., 100-200) of individuals receiving Core Services and/or State Hospital care. Consultation with the DOJ and Monitor will address at least: sampling, evaluation criteria and instrument, scoring, reviewer training and reporting. The agreed process will be used by the state on an annual

basis, beginning in FY 22 and until the case is terminated, to assess the adequacy of services and procedures in the system and to provide data to the State to make improvements and to the Court to determine compliance.

58. Beginning at the end of FY22, and until the case is terminated, Mississippi will post an agency websites and provide on an annual basis to the DOJ and Monitor the data described in Paragraphs 53-55, not to include individual identifiable data.

59. Implementation. The State shall develop an Implementation Plan to enable it to comply with this Order by the prescribed deadlines. The Plan shall focus on any services yet to be implemented and on data and reporting requirements. It should identify interim steps the State must take to comply with the Order, timelines for those steps, and the State officials responsible for implementing those steps.

60. The State shall provide the initial Implementation Plan to the Monitor and the DOJ for comment within 120 days of the issuance of this Order and shall submit the final proposed Implementation Plan to the Monitor with 180 days.

61. Termination. This Order shall terminate when the State has attained substantial compliance with each paragraph of this Order and maintained that compliance for one year as determined by this Court. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure by the State to maintain substantial compliance. Similarly, temporary compliance during periods of sustained noncompliance shall not constitute substantial compliance. The State may seek and if justified may achieve compliance and termination of the Court's oversight for individual major sections of the Order, e.g., on individual Core Services or Discharge Planning. Paragraphs 53-57 will remain in effect until full compliance and termination are achieved. The Special Master is appreciative of the efforts of State officials to improve mental health services and hopes and suggests that improvements continue once this case has ended.

62. Monitoring Compliance. The Court will appoint a Monitor to act as an agent of the Court to assess the State's compliance with this Order. The Court will issue a separate Order setting forth a schedule and process for selecting the Monitor and for determining the Monitor's duties, compensation, and authority.

**Exhibit 1: Intensive Community Support Services to be Offered by Region, County**

| Region | Current Status | Proposed Expansion | FY19 State Hospital Acute Psych Admissions | Comments |
|---|---|---|---|---|
| 1 | 1 ICORT; 1 ICSS | ____ | 49 | Existing ICORT serves all counties - Coahoma, Quitman, Tallahatchie, and Tunica. Number of commitments do not require additional intensive community supports. |
| 2 | 1 ICORT; 1 ICSS | 1 ICORT | 142 | Existing ICORT serves all counties – Tate, Marshall, Panola, Lafayette, Yalobusha, and Calhoun. Number of commitments require an additional ICORT to assist in coverage of counties. |
| 3 | 1 PACT Team; 1 ICSS | 2 ICSSs | 114 | Existing PACT serves Lee county. Number of commitments require 2 additional ICSSs to serve Benton, Union, Pontotoc, Monroe, and Chickasaw. Existing PACT will begin serving Itawamba. |
| 4 | 2 PACT Teams; 3 ICSSs | ____ | 148 | One existing PACT serves DeSoto county and 1 PACT serves Tippah, Alcorn, Prentiss, and Tishomingo. Number of commitments do not require additional intensive community supports. |
| 6 | 1 PACT Team; 1 ICORT; 2 ICSSs | 2 ICSSs | 119 | Existing PACT serves Leflore, Grenada and Holmes. Existing ICORT serves Bolivar and Washington. Number of commitments require 2 additional ICSSs to serve remaining counties – Issaquena, Sharkey, Humphreys, Sunflower, Carroll, Montgomery, and Attala. |
| 7 | 1 ICORT; 2 ICSSs | 1 ICORT | 147 | Existing ICORT serves all counties – Webster, Clay, Choctaw, Oktibbeha, Lowndes, Noxubee, and Winston. Number of commitments require an additional ICORT to assist in coverage of counties. |
| 8 | 1 PACT Team; 1 ICSS | 1 ICORT | 145 | Existing PACT serves Rankin and Madison. Number of commitments require an ICORT to serve Copiah, Lincoln and Simpson. |
| 9 | 1 PACT Team; 1 ICSS | 1 ICORT and 2 ICSSs | 291 | Only includes Hinds county. Number of commitments require an ICORT and 2 additional ICSSs. |
| 10 | 1 PACT Team; 1.5 ICSS | 2 ICORTs and 2 ICSSs | 289 | Existing PACT serves Lauderdale. Number of commitments requires 2 additional ICORTs to serve Leake, Scott, Newton, Smith and Clarke and 2 ICSSs for Neshoba, Jasper, and Kemper. |
| 11 | 1 ICORT; 1 ICSS | 1 ICORT and 4 ICSSs | 250 | Existing ICORT serves all counties (not operational yet) – Pike, Amite, Lawrence, Walthall, Franklin, Adam, Wilkinson, Claiborne, and Jefferson. Number of commitments require an additional ICORT and 4 additional ICSSs to assist in coverage of counties. |
| 12 | 1 PACT Team; 1 ICSS | 3 ICORTs | 273 | Existing PACT serves Forrest and Perry counties. Number of commitments require 3 additional ICORTs to cover Lamar, Pearl River, Marion, Jefferson Davis, Covington, and Jones. Existing ICSS staff will cover Greene and Wayne. Region 12 operates an additional PACT in Region 13 that serves Hancock and Harrison. |
| 13 | 1 PACT Team; 5 ICSSs | ____ | 141 | Existing PACT operated by Region 12 serves Hancock and Harrison. An ICSS will serve Stone. In the previous year, Region 13 added 4 ICSSs. |
| 14 | 1 ICORT; 1 ICSS | ____ | 66 | Existing ICORT serves George and Jackson counties. Number of commitments do not require additional intensive community supports. |
| 15 | 1 PACT; 2 ICSS | ____ | 34 | Existing PACT serves Warren and Yazoo counties. Number of commitments do not require additional intensive community supports. |

<u>Types of Intensive Community Supports</u>

Program of Assertive Community Treatment Team (PACT) – Caseload is 80
Intensive Community Outreach and Recovery Team (ICORT) – Caseload is 45
Intensive Case Management (ICSS) – Caseload will be 20 as of July 1, 2020