# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| V. | CAUSE NO. 3:16-CV-622-CWR-FKB |
| STATE OF MISSISSIPPI | DEFENDANT |

**ORDER**

In 2019, this Court issued a Memorandum Opinion finding that the State of Mississippi's adult mental health system violates the integration mandate of the Americans with Disabilities Act. Docket No. 234.

In 2020, the Court appointed a Special Master, Dr. Michael Hogan, "to review the record, confer with counsel of record, and propose a plan to remedy the ADA violations identified in the September 3, 2019 Order." Docket No. 241.

It is now 2021. Dr. Hogan has completed his work and submitted his recommendations to bring Mississippi's adult mental health system into minimum compliance with the ADA. Docket No. 269. Generally speaking, Dr. Hogan recommends implementing the State's proposal regarding the services to be delivered, and the United States' proposal for how those services should be monitored.

On July 12, 2021, this Court held a hearing on Dr. Hogan's proposed remedial plan, the United States' proposal, and Mississippi's proposal.[1] Dr. Hogan testified about his efforts and was cross-examined by counsel for both parties. Counsel then presented oral argument explaining why their respective proposal for service delivery and monitoring should be adopted.

---

[1] At the hearing, Mississippi objected to the length of the United States' proposed remedial plan (13 pages). So, for what it is worth, the Court notes that Dr. Hogan's proposed remedial plan is seven pages long, just one page longer than the State's proposal.

\* \* \*

The Special Master "occupies a position of honor, responsibility, and trust; the court looks to him to execute its decrees thoroughly, accurately, impartially, and in full response to the confidence extended." *Newton v. Consol. Gas Co. of N.Y.*, 259 U.S. 101, 105 (1922). The Court extended its confidence in this case to Dr. Hogan to learn how the State can comply with the ADA "in a manner that is practical and safe." Docket No. 241 at 2.

The hearing confirmed the Court's confidence in Dr. Hogan. He testified for hours about the proper, primary role of the State agencies and other entities involved in this case: the Mississippi Department of Mental Health, the Mississippi Division of Medicaid, and the State's regional Community Mental Health Centers. He brought the perspective of one who has led state mental health systems for 25 years—someone with experience leading large institutions while trying to improve them, which his report characterized as "turning an aircraft carrier at sea." Docket No. 269 at 4. Dr. Hogan also has the bruises of someone who knows firsthand the promise and pitfalls of federal court intervention into state mental health systems.[2] We are trying as best we can to avoid those pitfalls in this case.

The Court will adopt Dr. Hogan's recommendations in full. He has put forward a careful and modest[3] proposal for achieving minimum compliance with the ADA.

In simple terms, Dr. Hogan's remedial plan calls for all involved to "trust, but verify." *Chickaway v. United States*, No. 4:11-CV-22, 2012 WL 3186376, at *1 (S.D. Miss. Aug. 3, 2012). The plan recognizes the primary role of the State in setting the standards to be achieved

---

[2] "The Courts should never be counted on as anything but a last resort where there are problems in the provision of mental health care." JACK BASS, TAMING THE STORM 299 (1993) (quoting the Honorable Frank M. Johnson, Jr., speaking to the 1976 convention of the National Association for Mental Health).

[3] The Court says "modest" because the improvements should not come at any net cost to the State of Mississippi. *See* Docket No. 234 at 47. Earlier efforts to improve state mental health systems were much more expensive. *See, e.g.*, BASS, *supra* note 2, at 299 (recounting that Alabama's mental health budget went from $16 million to $86 million after six years of litigation—and those figures are in 1970s dollars, not 2021 dollars).

and then actually achieving them. He credits the post-trial evidence the State has submitted discussing the various improvements it has made to its mental health system.

Dr. Hogan's plan recognizes, however, that the trial record revealed a disconnect between the services promised by the State and the services delivered on the ground. *See* Docket No. 234 at 2 ("On paper, Mississippi has a mental health system with an array of appropriate community-based services. In practice, however, the mental health system is hospital-centered and has major gaps in its community care."); *see also id.* at 16. Measuring those gaps requires monitoring. *See, e.g.*, *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 156 (3d Cir. 2005) (holding that the ADA requires more than "a vague assurance" of "future deinstitutionalization"). The total proposal is eminently reasonable.

\* \* \*

If Dr. Hogan's recommendations are not perfect, it is perhaps because the task assigned to him was impossible. As the Court wrote two years ago, "[o]ne would be forgiven for throwing their hands up in exasperation at the complexity of the situation." Docket No. 234 at 2. That said, the Court will delve into two possible critiques of Dr. Hogan's recommendations.

First, Dr. Hogan was hamstrung by the State's objection to him communicating with anyone on the ground—the non-party stakeholders in Mississippi's mental health system. The State had understandable intentions: to stop the post-trial proceedings from devolving into a second discovery period. The Court has long shared that goal and issued several orders to secure it. Unfortunately, that meant Dr. Hogan was deprived of family-level insight[4] into the mental health system.

---

[4] That family-level perspective is something with which Dr. Hogan has extensive familiarity. He testified about how his sister's life has been shaped by her mental illness and how he has assisted her in navigating the systems leading to a more productive life. Another of his family members also has experienced the interconnectedness of a State's criminal justice and mental health systems. Dr. Hogan's personal experience and connection to these issues

3

That's not a problem limited to this case. In *all* of the Court's systems-reform cases, the issues can become so abstract, so esoteric, that the lawyers, the monitors, and even the Court can forget that real families and real people are involved. It takes effort to stop and remember that systems and institutions are made up of people whose lived experiences don't fall neatly into categories or statistics. If we fail to recognize that Mississippians with mental illness have lost their children because of their needless institutionalization, *see* Docket No. 234 at 32, then we have done a disservice to those people and to the Americans with Disabilities Act we are supposed to enforce.

Given the limitations on his investigation, the Court was pleased to see that Dr. Hogan's proposed remedial plan contains a Clinical Review Process. The Process, a review of 100-200 patients a year, is designed "to assure that services are working as intended to address the needs of people with serious mental illness." Docket No. 269 at 21. Dr. Hogan testified that this kind of evaluation should provide a meaningful cross-check of the State's own data.

A second possible critique of Dr. Hogan's report lies in the fact that he credited post-trial evidence from only one party—the State—and none from the United States. The Department of Justice previously called this development "untenable" and "manifestly prejudicial." Docket No. 264 at 1. On this point, the Court accepts any error as its own.

The fundamental truth unearthed at trial was the disconnect between the services Mississippi promises to patients and the services it actually delivers. The headers of the Court's Memorandum Opinion tell the tale:

- "PACT is unavailable and under-enrolled." Docket No. 234 at 19.
- "Mobile Crisis Services are illusory." *Id.* at 23.
- "Crisis Stabilization Units are not available." *Id.* at 24.
- "Peer Support Services are not billed." *Id.* at 25.

---

obviously help inform his opinions and recommendations. This enhances, not clouds, Dr. Hogan's insight and background. The Court and the parties have expressed their gratitude for his service. It has been valuable.

4

- "Supported Employment is miniscule." *Id.*
- "CHOICE [housing program] is far too small." *Id.* at 26.

It was only through vigorous prosecution at a four-week trial that the United States proved each of these points.

Despite this trial record and the prohibition on post-trial discovery, the State submitted additional evidence in April 2021. *See* Docket No. 262. Chief among its exhibits was a declaration by the new Executive Director of Mental Health describing all of the improvements the Department allegedly made to the system since the discovery cut-off date. Dr. Hogan credited these improvements, perhaps because of his years in state system management, and the Department of Justice did not have a fair opportunity to test this evidence.

That may have been unfair, but to the extent it was error, it was the Court's alone. In its 2019 Memorandum Opinion, the Court invited the State to make improvements to its system pending post-trial proceedings. *See* Docket No. 234 at 60. Although the Court contemplated that the State would reap the benefit of the improvements when *a Monitor* was appointed, rather than a Special Master, that the evidence was perhaps premature will not be assessed against the State.[5]

\* \* \*

To all this, the State argues that it should not be held accountable for the "performance" of its mental health system. But the poor performance of its mental health system, in its over-institutionalization, is exactly what led it to violate the Americans with Disabilities Act. The remedy is to enforce the ADA by increasing the availability of community-based services. *See*

---

[5] In the two years since the trial, if the State had adopted every proposal that DOJ insisted to meet the ADA's mandates, would the Court not have to give credit to those actions or would the Court simply be limited to the threadbare landscape proved at trial? The better course is to reflect on where we were, look at the present, and verify that a path is created to a brighter future. *See* Docket No. 261.

*Olmstead v. L.C.*, 527 U.S. 581 (1999). That is exactly what the Special Master's remedial plan will achieve.

Ten years have passed since the United States issued its findings letter describing in detail how Mississippi's mental health system was over-institutionalizing citizens. Five years have passed since the United States filed this lawsuit seeking to fix that problem. Two years have passed since trial, where the United States proved the violations with evidence. It is now time for a Monitor to be appointed in line with the Special Master's recommendations and testimony. Mississippians with serious mental illness need help and this Order seeks to give them the help they so desperately need.

Within 30 days, the parties shall each submit two names of a possible Monitor and proposals for the Monitor's role. In line with the State's wishes, and unless the State should change its mind, a Final Judgment shall issue upon entry of the Order of Appointment and the Remedial Plan.

**SO ORDERED**, this the 14th day of July, 2021.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE