UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                          CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                       DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 3


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MORNING SESSION
JUNE 5, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

```
 1     APPEARANCES:

 2     FOR THE PLAINTIFF:     MR. MATHEW SCHUTZER
                              MS. REGAN RUSH
 3                            MS. DEENA FOX
                              MR. PATRICK HOLKINS
 4
       FOR THE DEFENDANT:     MR. JAMES W. SHELSON
 5                            MR. REUBEN V. ANDERSON
                              MR. HAROLD PIZZETTA
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      TABLE OF CONTENTS

2

3      WITNESS FOR THE GOVERNMENT

4      ROBERT DRAKE                                        185

5        Direct Examination By Mr. Holkins  .................185

6        Cross-Examination By Mr. Shelson  .................191

7          Exhibit D-257 for ID  ...........................209

8          Exhibit D-232 for ID  ...........................211

9          Exhibit D-249  ..................................217

10         Exhibit D-235  ..................................225

11         Exhibit D-195  ..................................230

12         Exhibit D-253  ..................................231

13         Exhibit D-250  ..................................238

14         Exhibit D-251  ..................................239

15         Exhibit D-320  ..................................257

16       Redirect Examination By Mr. Holkins ..............257

17       Examination by the Court..........................262

18       Redirect Examination By Mr. Holkins  .............265

19       Recross-Examination by By Mr. Shelson  ...........266

20

21

22

23

24

25

1          THE COURT:  Good morning.  I take it there's not an

2    announcement, so I guess we'll -- you have another 30 days or

3    so to tell me you have an announcement.  Oh, and that's what I

4    tell every party throughout the course of any case.  It's in

5    your hands until the -- in this case, until the juror or the

6    judge has ruled, but it's in your hands, and I encourage you

7    all to continue to try to get it resolved.  I learned that from

8    a mighty wise person 30 years ago.  You try to get it resolved.

9    Do that.

10          All right.  But if you will, we're ready, I believe.

11   Are we ready to continue the testimony of Dr. Drake?

12          MR. HOLKINS:  Yes, Your Honor.

13          THE COURT:  All right.  Dr. Drake, you may return to

14   the stand.

15          MR. HOLKINS:  Your Honor, very briefly, before we get

16   started with Dr. Drake, I want to give you a quick road map for

17   the day.

18          THE COURT:  Great.

19          MR. HOLKINS:  We just have a few questions for

20   Dr. Drake on direct, and then we have relatively brief

21   testimony from our statistical expert, Dr. Todd MacKenzie.

22   After that, we hope to call the peer support specialist on our

23   witness list, let Melody Worsham, who is also a mental health

24   consumer.

25          THE COURT:  Okay.  Thank you.  Dr. Drake, you're still

1    under oath.  I'm not going to have you resworn.  Your oath

2    yesterday still applies.  All right.  Thank you.

3            You may proceed, counsel.

4            MR. HOLKINS:  Thank you, Your Honor.

5                        ROBERT DRAKE,

6      having first been duly sworn, testified as follows:

7            DIRECT EXAMINATION (Continuing)

8    BY MR. HOLKINS:

9    Q   Good morning, Dr. Drake.

10   A   Good morning.

11   Q   Let's pick up where we left off yesterday with your

12   aggregate findings.  Could you turn to page 20 of your report,

13   which is the first tab in your binder.

14   A   Okay.

15   Q   Dr. Drake, you wrote on page 20, toward the top, that

16   patients returning to the community from State Hospitals are

17   not connected to permanent supported housing in other

18   recovery-oriented community-based services that would prevent

19   future hospitalizations.  Is assertive community treatment one

20   of the services you were referring to?

21   A   Yes.

22   Q   Dr. Drake, please turn to the document marked PX-417 in

23   your binder.  That's the fourth tab.

24           MR. HOLKINS:  Your Honor, this document was

25   preadmitted into evidence.

1    THE COURT:  Okay.  Thank you.

2  BY MR. HOLKINS:

3  Q   Dr. Drake, what is the title of this document?

4  A   It says, "Client review members with program of assertive

5  community treatment recommendation and PACT team locations."

6  Q   And what does that document show?

7  A   It shows that for many of the clients in the review, there

8  was -- they did not live close or within the areas that were

9  providing PACT services.  Yes, this graphic shows that many of

10  the patients in the client review lived in areas that were not

11  covered by PACT teams.

12  Q   Let's return to your report in the second aggregate finding

13  on page 21.

14  A   Okay.

15  Q   I want to direct you to a line at the end of the last full

16  paragraph on page 21.  You wrote, "Mississippi remains mired in

17  this early phase of deinstitutionalization."  What from the

18  clinical review led you to conclude that?

19  A   I think we discussed that the first phase of

20  deinstitutionalization moved people out of hospitals into ward

21  and care homes, family homes and nursing homes, and that was

22  prior to the use of assertive community treatment and other

23  community-based interventions.  And we -- and during that

24  phase, many people cycled back and forth between the hospital

25  and the community.  As we -- as states implemented more

1   community-based services, that cycling in and out of hospitals

2   reduced over time.

3       In Mississippi, in the 164 patients that we reviewed, we

4   found that many of them or the great majority of them could

5   have done better with a greater access to community-based

6   services.

7   Q   Just to clarify, the number of individuals that you

8   reviewed for this case is 154?

9   A   154.  Excuse me.

10  Q   Have other states moved beyond this first phase of

11  deinstitutionalization?

12  A   Yes.

13  Q   Please turn to page 22 and your third aggregate finding.

14  You write that "Treatment and discharge planning at State

15  Hospitals in Mississippi do not involve the necessary

16  participants and processes to ensure speedy effective

17  transactions."  You may have testified about this yesterday,

18  but could you briefly restate what are the necessary

19  participants in discharge planning?

20  A   Well, in addition to the inpatient team, the patient, the

21  family and the outpatient team should be involved in planning

22  the transition.

23  Q   Generally, which participants did you find were not

24  involved in discharge planning for the individuals in the

25  clinical review?

1  A   Many of the patients were discharged with a call to the

2  community mental health center or an appointment sheet to the

3  community mental health center, but they had themselves not

4  been involved in the process, at least according to their

5  testimony and the hospital records, and we encountered almost

6  no families that had been involved in the process, even though

7  they were often the ones receiving the patients on discharge.

8  Q   And why is the participation of family members and

9  community service providers important to ensuring speedy

10  effective transitions?

11  A   Well, for many reasons, but the biggest one, I think, is

12  that when the community players are not involved, people often

13  get lost in the transition between the hospital and the

14  community.  That is, they may have an appointment in their

15  hand, but they don't make the appointment.  They may have some

16  medicines, but they don't get the prescriptions to -- so that

17  they have continuity of medications and, you know, other

18  reasons.

19  Q   Are adults with serious mental illness who do not receive

20  effective discharge planning, as you've described it, at

21  greater risk of rehospitalization?

22  A   Yes.

23  Q   Dr. Drake, let's turn back quickly to something that

24  appears earlier in your report.  This is on page 2 at the

25  bottom of the second full paragraph.  You write that

1  "reasonable community-based services are scarce or

2  nonexistent," and you list examples of those reasonable

3  community-based services.  Do you see where I am?

4  A   Yes.  Yes.

5  Q   For what group of people in Mississippi did you find that

6  reasonable community-based services are scarce or nonexistent?

7  A   For what group?  The 154 patients when we reviewed.

8  Q   I'd now like to turn to JX-60, which is the last tab in

9  your binder.  We discussed this document yesterday.  It is the

10  Mississippi Department of Mental Health's operational standards

11  for adult mental health services.  Correct?

12  A   Yes.

13  Q   Have you reviewed this document?

14  A   Yes.

15  Q   When you reviewed it, did you recognize parts of it?

16  A   Yes.

17  Q   From where?

18  A   Well, quite a bit of it comes from the language that we

19  wrote on evidence-based practices for SAMHSA years ago.

20  Q   How would you compare the community-based mental health

21  services described in this document with what the people in the

22  clinical review were actually receiving?

23  A   Well, the practices described are described well, and they

24  are -- they represent the core services that we believe and

25  SAMHSA believes and I think state leaders believe should be

1  available everywhere, but we found that people rarely had

2  access to these services, so the standards were not being

3  implemented or fulfilled, at least among the 154 patients whom

4  we reviewed.

5  Q   Dr. Drake, looking back on your work for this case, what

6  lasting images from the clinical review will stay with you?

7  A   What comes to mind as a -- the most poignant image in some

8  ways was visiting a large group home outside of Jackson where a

9  large number of men were sitting around in a very large day

10  room, and they were all rocking and shaking and drooling and

11  not communicating with each other or doing anything, and it

12  reminded me of State Hospital units that I had seen back in the

13  1970s, and it -- I'll stop there.

14  Q   How did you react to that?

15  A   Well, it really makes me very sad that situations like that

16  persist in the United States.

17       MR. HOLKINS:  If I could, Your Honor, just confer with

18  counsel for one moment.

19       THE COURT:  You may.

20  (Short Pause)

21       MR. HOLKINS:  That's all the questions I have for

22  Dr. Drake at this time, Your Honor.

23       THE COURT:  All right.

24       MR. SHELSON:  May I proceed, Your Honor.

25       THE COURT:  Yes, you may.

1          MR. SHELSON:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. SHELSON:

4   Q    Good morning, Dr. Drake.

5   A    Good morning.

6          MR. SHELSON:  May I just flip this up?

7   BY MR. SHELSON:

8   Q    All right.  Dr. Drake, do you remember being asked about

9   this document yesterday?

10  A    Yes.

11  Q    Dr. Drake, I'd like to ask you about the far left bar

12  graph.

13         THE COURT:  For the record, Mr. Shelson -- for your

14  record, which document is this?

15         MR. SHELSON:  Thank you, Your Honor.  That's -- unless

16  I'm mistaken, it's PDX-3.

17         THE COURT:  All right.  Thank you.

18  BY MR. SHELSON:

19  Q    Dr. Drake, the far left column, is that "would have avoided

20  or spent less time in the hospital"?

21  A    Yes.

22  Q    Is that referring to State Hospitals?

23  A    Yes.

24  Q    Okay.  So you agree with me that would have avoided or

25  spent less time two different things?

1    A    Yes.

2    Q    Okay.  So by "would have avoided," do you mean would have

3    avoided hospitalization altogether?

4    A    Yes.

5    Q    And by "spent less time," do you mean that the individual

6    would have gone to a State Hospital but would have spent less

7    time there?

8    A    Yes.

9    Q    All right.  As you testified yesterday, you reviewed seven

10   individuals in the sample of 154?

11   A    As the first interviewer, yes.

12   Q    Yes, sir.  So with respect to those seven individuals, did

13   you differentiate how many of them would have avoided

14   hospitalization altogether versus how many would have went to

15   the hospital but spent less time there?

16   A    Yes, I think so.

17   Q    How did you do that?

18   A    Well, there were at least two people in the -- among the

19   seven who had diagnoses of drug-induced psychosis, which is a

20   topic I've studied over the years, and people with that problem

21   rarely, rarely go to State Hospitals.  The standard --

22   Q    In your expert report in this case, you have a write-up on

23   each of the seven individuals you were the lead reviewer on.

24   Correct?

25   A    Yes.

1    Q    In those write-ups, did you differentiate between whether

2    the individual would have avoided hospitalization or would have

3    went to the hospital but spent less time there?

4    A    I don't remember.

5    Q    Is there any aggregate finding in your report about whether

6    the seven individuals would have avoided hospitalization

7    altogether or would have still went to the hospital but spent

8    less time there?

9    A    Aggregate -- by aggregate finding, you mean the whole

10   sample?

11   Q    For example, four would have avoided hospitalization

12   altogether, and three would have went to the hospital but spent

13   less time there?

14   A    So you mean of the seven?

15   Q    Yes, sir.

16   A    I don't think I recall writing that in the report.

17   Q    Do you -- did any of the other clinical review team members

18   do that?

19   A    I don't recall.

20   Q    Do you know whether the court has any way to know, of the

21   154 individuals, how many would have avoided hospitalization

22   altogether versus they would have went to the hospital but

23   spent less time?

24   A    You're asking me whether the court has some way to know the

25   answer to that?

1  Q    Based on the reports of the CRT members in this case.

2  A    Again, I don't recall that that's in the report.

3  Q    This is a minor point, Doctor, but why does this say

4  "client-specific findings"?

5  A    I think that refers to the findings on the seven clients

6  that I was the first interviewer for.

7        MR. ANDERSON:  Your Honor, just a moment.  I'm having

8  difficulty hearing the doctor.  He needs to speak louder or

9  into the microphone.  My hearings aids are working.

10  A    I'll try.  Thank you.

11  BY MR. SHELSON:

12  Q    Doctor, in what sense are the 154 individuals clients?

13  A    Pardon me?

14  Q    In what sense are the 154 individuals clients?

15  A    Oh, well, in the mental health field, people who use mental

16  health services are referred to by different terms, and

17  sometimes, especially in hospitals, they are called patients,

18  and sometimes, or predominantly in community mental health,

19  they're called clients, and sometimes they're referred to by

20  other terms.

21  Q    Did you establish the doctor-patient relationship with any

22  of the 154 clients in the sample?

23  A    Do you mean was I the treating doctor with any of them?

24  Q    Or did you, in any other sense, establish the

25  doctor-patient relationship with any of them?

1   A   I'm not sure what you mean by that.

2   Q   Okay.  I'll move on.  Doctor, at some point, all 154

3   individuals in the sample were hospitalized in a State Hospital

4   at least once.  Is that correct?

5   A   Yes.

6   Q   All right.  At the time that they were admitted, were they

7   appropriate for admission?

8   A   I believe that they were all civilly committed so that a

9   court -- I believe the process in Mississippi is that a court

10  has to be involved in that process.

11  Q   Do you know what the criteria are for admission to a State

12  Hospital in Mississippi?

13  A   I believe that I'd read that, and I believe that it refers

14  to immediate dangerousness or -- to self or others.

15  Q   To your knowledge, is that a common standard for admission

16  to State Hospitals among the states?

17  A   Yes, I think so.

18  Q   Doctor, I'm going to show you PDX-1, which you talked about

19  a little bit yesterday.  Do you recall that document?

20  A   Yes.

21  Q   All right.  In the mental health field, what does an

22  occupational therapist do?

23  A   Occupational therapists are often involved in helping

24  people learn the skills for basic living and taking care of

25  their apartment and finding a job and, and that's basically it.

1  Q   What do certified psychiatric rehabilitation practitioners

2  do?

3  A   They -- that varies tremendously, but in general,

4  rehabilitation specialists are experts in helping people to

5  develop skills, helping them to develop support systems, and

6  helping them to improve their functioning in the community.

7  Q   And generally speaking, at least what do licensed clinical

8  social workers do?

9  A   Again, a variety of interventions, but they are often

10  involved in psychotherapy kinds of activities and in working

11  with families.

12  Q   Do you recall yesterday giving some testimony about

13  medications, particularly antipsychotic medications?

14  A   Yes.

15  Q   Are there any individuals on this client review team who

16  cannot prescribe medications?

17  A   Yes.

18  Q   Doctor, I'm going to refer to the client review team as the

19  CRT.  Would that be okay?

20  A   Okay.

21  Q   Thank you.  You testified yesterday that DOJ gave you the

22  four questions that the CRT members were to answer in this

23  case.  Is that correct?

24  A   Yes.

25  Q   Did the CRT meet for two days as a team in January 2018 in

1    Washington, DC?

2    A    Yes.

3    Q    Was that meeting at the Department of Justice?

4    A    Yes.

5    Q    Was anyone from the Department of Justice present at those

6    meetings?

7    A    Yes.

8    Q    Who was present?

9    A    Several DOJ lawyers were in and out of those meetings.

10   Q    During the client review team process, did the CRT hold

11   weekly calls to discuss themes and findings?

12   A    Yes.

13   Q    Did anyone from the DOJ participate in those calls?

14   A    Yes, I think so.

15   Q    All right.  Now, at various points in time, the CRT --

16   well, let me digress.  There are 154 individuals in the sample,

17   and four are deceased?  Yes?

18   A    Yes.

19   Q    And so of the 154, 150 individuals were actually

20   interviewed.  Is that correct?

21   A    That's close to correct.  There were a couple of patients

22   at least who were mute, and so most of the interview was with

23   their families.

24   Q    Okay.  But at some point, the CRT came to Mississippi and

25   attempted to interview the 150 -- 150 individuals?

1   A   Well, we attempted to interview the 299, but we did

2   interview 150.

3   Q   Okay.  And they're the individuals discussed in your

4   report.  Correct?

5   A   Yes.

6   Q   So I'm talking about those individuals.  When DOJ -- excuse

7   me.  When the CRT interviewed or attempted to interview the 150

8   individuals, did any of the DOJ lawyers participate in those

9   interviews?

10  A   They attended the interviews.  They were driving us around

11  Mississippi to find people, and when we found the person, the

12  DOJ member would explain why we were there and I think would go

13  over the consent issues, but then the CRT members, as you call

14  us, were the interviewers.

15  Q   All right.  As Mr. Holkins went over with you a few minutes

16  ago, in your report you wrote that community-based services are

17  scarce or nonexistent in Mississippi.  Is that correct?

18  A   Yes.

19  Q   All right.  Do you know what community-based services are

20  allegedly nonexistent in Mississippi?

21  A   Again, this is based on the 154 people in our sample.

22  Right.

23  Q   So I think, as you said, your conclusion that

24  community-based services are scarce or nonexistent in

25  Mississippi is based only on the survey of the 154 individuals

1    in the CRT sample?

2    A    Yes.

3    Q    Did you survey every region of Mississippi?

4    A    I did not.

5    Q    Did you survey every CMHC in Mississippi, community mental

6    health center?

7    A    No.

8    Q    Did you survey every community-based service that's

9    available in Mississippi?

10    A    Not as part of this process.

11    Q    The conclusions that the CRT came to regarding the 154

12    individuals, did they arrive at those conclusions in 2018?

13    A    Yes, I think so.

14    Q    All right.  So as you testified yesterday, the conclusion

15    of the CRT is that 100 percent of the sample would have avoided

16    or spent less time in a State Hospital if they had received

17    reasonable community-based services.  Is that correct?

18    A    Yes.

19    Q    All right.  And the CRT members made those determinations,

20    as you just said, in 2018?

21    A    Yes.

22    Q    So, for example, if one of the individuals had a hospital

23    admission in, say, 2005, the CRT concluded in 2018 that they

24    would have avoided or spent less time in the hospital at -- in

25    2005, if they had received community-based services back then?

1    A    Yes.

2    Q    And that applies to whatever year the admission occurred

3    in.  Is that correct?

4    A    I think I follow your reasoning.

5    Q    Yeah.  So if you had a 2015 admission, in 2018, DOJ --

6    excuse me, the CRT concluded that with reasonable

7    community-based services that admission would have been

8    avoided, or they would have been admitted but would have spent

9    less time?

10   A    Yes.

11   Q    All right.  Yesterday you said something to the effect that

12   we are at a very primitive stage in psychiatry.  Do you recall

13   that testimony?

14   A    Yes.

15   Q    All right.  I want to ask you a little bit about that.  Is

16   our understanding of the brain very early and incomplete

17   compared to the rest of the body?

18   A    Yes.

19   Q    And why is that?

20   A    The brain is much more complicated than other organs in the

21   body.  Just to give you an example, the human genome project,

22   which has been studied closely for the last decade, has come up

23   with very surprising findings about mental disorders that we

24   didn't expect at all, and it has to do with just the early

25   stage of the science of brain functioning and chemistry and

1  genes and expression and so on.

2  Q   Depending on the severity of the mental illness, can mental

3  illnesses be incredibly complex and difficult to treat?

4  A   Yes.

5  Q   Doctor, just to -- before I leave this topic, talking about

6  the human genome and whatnot, let's talk about DNA for a

7  second.  Is there some emerging literature to the effect that

8  based on an individual's DNA, determinations can be made about

9  what antipsychotic medications may be most effective for that

10  individual?

11  A   There are papers on that, but I believe the latest data,

12  including an editorial within the last two weeks, say that they

13  are not scientifically valid.

14  Q   So we're not quite to that point in medical science at this

15  time?

16  A   Correct.

17  Q   Let me -- I just want to briefly touch on polypharmacy,

18  because you gave some testimony about that yesterday.  Is it

19  your testimony that a clinician can never exceed the

20  recommended dosage for an antipsychotic medication?

21  A   No.

22  Q   When individuals have a choice, do some of them choose to

23  stop taking their medications?

24  A   Yes.

25  Q   Doctor, I want to ask you about that, the tool kit document

1   that's P-1078 in the notebook in front of you.

2   A   Yes.

3   Q   When you were testifying yesterday, did you call that

4   document the base manual of standards for ACT?

5   A   I may have used those words.

6   Q   You agree with me that document's 430 pages long?

7   A   I haven't counted the pages.

8   Q   They're on there.

9   A   It looks pretty thick.

10  Q   At the bottom.  Why does it take 430 pages to explain how

11  to do PACT?

12  A   I'm not sure that it always takes over 400 pages.  I've

13  seen one-page descriptions, and this document contains a large

14  number of small descriptions that are intended for different

15  purposes, doesn't it?

16  Q   The document we're talking about, P-1078, what is SAMHSA's

17  role in that document?

18  A   The Substance Abuse and Mental Health Services

19  Administration commissioned us to prepare these documents on

20  core evidence-based practices.

21  Q   And at least generally speaking, what is SAMHSA's role in

22  mental health?

23  A   Generally speaking, SAMHSA was created when the services

24  division was split off from the National Institute of Mental

25  Health, and it was intended to -- as I remember it, facilitate

1  services in mental health, and it has, to a large extent, been

2  responsible for distributing state block grants.

3  Q   Or among other things, people with SMI or serious mental

4  illness?

5  A   Yes, sir.

6  Q   All right.  Do you know what the ISMICC report is?

7  A   That's the interagency --

8  Q   Yes, sir.

9  A   -- report on mental illness?  Is that what you're referring

10 to.

11 Q   Yes, sir.  Are you familiar with that report?

12 A   I have read it.

13 Q   Let's talk about New Hampshire for a minute.  I'm going to

14 refer you, Doctor, to your report, which is Exhibit PX-404, and

15 I believe you have that in front of you.

16 A   Yes.

17 Q   I'm also going to display -- all right.  Doctor, this is on

18 page 3 of your report that I'm directing your attention to the

19 highlighted sentence.  Does it read, "In the 1990s, the

20 National Alliance on Mental Illness rated New Hampshire as the

21 best state mental health system in the U.S.?

22 A   Yes.

23 Q   Do you hold New Hampshire's mental health system out as a

24 model for Mississippi?

25 A   You understand that I haven't worked in New Hampshire for

1    15 years, so I have not kept up with the details of New

2    Hampshire.  In the 1990s, New Hampshire was considered a model,

3    but I gather that's changed a lot.

4    Q    You work at Dartmouth.  Correct?

5    A    Yes.

6    Q    And Dartmouth, of course, is in New Hampshire?

7    A    Yes.

8    Q    Do you have any -- on any -- do any of the research project

9    you do or have done over the last 15 years involve the state of

10   New Hampshire?

11   A    Very little.

12   Q    Look at page four of your report.  I'm sorry, Doctor.  Page

13   7.  All right.  Doctor, do you see the highlighted part there?

14   A    Yes.

15   Q    It talks about in New Hampshire, the single state

16   psychiatric hospital, New Hampshire hospital had 2700 beds in

17   1955, but only 120 beds by the 1990s, when the state mental

18   health system was considered a national model of excellent

19   mental health care.  Did I read that correctly?

20   A    Yes.

21   Q    As we sit here today, does the New Hampshire hospital still

22   exist?

23   A    Yes.

24            MR. SHELSON:  Your Honor, may I approach the witness?

25            THE COURT:  Yes, you may.

1  BY MR. SHELSON:

2  Q   Doctor, have you seen Exhibit P-257 (sic) before today?

3  A   Have I seen it before today?

4  Q   Yes, sir.

5  A   No.

6  Q   Do you know what the Human Services Research Institute is?

7  A   Yes, I know some of those people.

8  Q   Do you know what the technical assistance collaborative is?

9  A   Yes.

10 Q   What is it?

11 A   It's a group of mental health people who try to provide

12 technical assistance to states.

13 Q   To your knowledge, did they do that in Mississippi at some

14 point?

15 A   I don't know about that.

16 Q   All right.  Would you turn to page 3 of D-257?

17     MR. SHELSON:  I'm sorry.  It's D-257.

18 BY MR. SHELSON:

19 Q   Do you see the highlighted part there?

20 A   Yes, I'm reading that.

21     THE COURT:  I presume D-257 is one of the agreed to

22 exhibits?

23     MR. SHELSON:  No, sir.

24     THE COURT:  Huh?

25     MR. SHELSON:  No, sir.

1	THE COURT:  Oh, okay.  Go ahead, then.

2	MR. SHELSON:  I haven't offered it yet, Your Honor.

3	THE COURT:  Okay.  All right.

4	BY MR. SHELSON:

5	Q   Have you finished?

6	A   Yes.

7	Q   All right.  Does this indicate that the Department of

8	Health and Human Services in New Hampshire issued a request for

9	proposals for an independent evaluation of the capacity of the

10	current health system?

11	MR. HOLKINS:  Objection, Your Honor.  Dr. Drake has

12	not seen this document before.  He's testified that he's not

13	been keeping up with practices in New Hampshire since the mid

14	2000s.  The objection is to the relevance of this.

15	THE COURT:  Any response, Mr. Shelson?

16	MR. SHELSON:  Yes, sir.  There are, Your Honor, at

17	least five reasons why we think this document is relevant.

18	Number one, Dr. Drake discusses the New Hampshire mental health

19	system in his report; number two, he gave some testimony about

20	the New Hampshire mental health system yesterday; number three,

21	at approximately 4:47 p.m. yesterday, Mr. Holkins asked

22	Dr. Drake the following questions.  And he was referring to

23	Dr. Drake's findings in Mississippi, but the question was:

24	"Question:  How do these findings compare to your work

25	in other states?"

1    This morning, Mr. Holkins asked Dr. Drake, "Have any

2    other stages moved beyond this initial stage of

3    deinstitutionalization?"  They've opened the door to the mental

4    health systems in other states.

5        And number five, the mental health systems of other

6    states is relevant to establishing when a public mental health

7    system offers sufficient systemwide -- sufficient services on a

8    systemwide basis to satisfy *Olmstead*.

9        THE COURT:  But how is he going to testify about this

10   document that he has not seen before?

11       MR. SHELSON:  Well, when I -- I'm laying a foundation

12   for that, but when I get to specifics about New Hampshire, if

13   his answer is he doesn't know, then so be it, but we don't know

14   that until I get to the actual questions.

15       THE COURT:  And I guess -- I mean, in his report, he

16   mentions New Hampshire, but it's confined to the period of

17   looks like 1955 up to 1990, and I assume this report here is

18   something that goes up to 2017.  I don't know when it starts,

19   but it looks like it's something that evaluates or critiques

20   what's going on in New Hampshire in 2016 and 2017.  Right?

21       MR. SHELSON:  Yes, sir.

22       THE COURT:  Okay.  I'll see where you go with it, but

23   I'll note if he cannot testify about what's currently happened

24   there -- we'll see where you go -- where he goes.  So right

25   now, the objection is overruled for right now.  I'll allow to

1  you continue to make your foundation, Mr. Shelson.

2         MR. SHELSON:  Let me see if I can do it without this,

3  Your Honor.

4  BY MR. SHELSON:

5  Q   Dr. Drake, to your knowledge, are there any work force

6  shortages in the mental health field in New Hampshire?

7  A   Since I left working in New Hampshire, my only knowledge

8  about these issues comes from our local newspaper.  I have not

9  done any work in New Hampshire.

10 Q   All right.  Let me ask you this, and then I'll move on from

11 this document.  This is on page -- this map is on page 33.  Do

12 you at least know that in New Hampshire, they have CMHCs?

13 A   Yes, that was true in the 1990s and 2000.

14 Q   And those CMCs are organized by region.  Is that correct?

15 A   They were in 2000.

16 Q   And of the regions -- of the ten regions in New Hampshire,

17 does this map purport to show that there are -- that New

18 Hampshire has mobile crisis response teams in three of the ten

19 regions?

20 A   Well, I've not seen this figure before, but that's what it

21 purports to show.

22 Q   You can set that document aside.

23        THE COURT:  I'll mark D-257 for identification

24 purposes only for your record.

25        MR. SHELSON:  Yes, sir.

1           THE COURT:  All right.

2        (Exhibit D-257 for ID marked)

3           MR. SHELSON:  Can I have D-232?  May I approach the

4 witness, Your Honor.

5           THE COURT:  Yes, you may.

6 BY MR. SHELSON:

7 Q   Dr. Drake, have you seen Exhibit D-232 before today?

8 A   Is this the same document that you handed to me when we had

9 a deposition?

10 Q   It may be one of them.

11 A   Yeah.  That would have been the only time I've seen it, if

12 I have.

13           MR. HOLKINS:  Your Honor, the United States objects to

14 this document for the same reasons.  It post dates Dr. Drake's

15 work in New Hampshire.  It's from October of 2016.  We objected

16 on their exhibit list when the State shared this document with

17 us.

18           THE COURT:  What was the basis of the objection,

19 because I don't have that in -- what was the basis?

20           MR. HOLKINS:  The basis of the objection is the

21 relevance of this document.

22           THE COURT:  What was the basis in the pretrial order,

23 though?

24           MR. HOLKINS:  The same, Your Honor.

25           THE COURT:  Relevance?

1      MR. HOLKINS:  Yes, Your Honor.

2      THE COURT:  Let me hear from you, Mr. Shelson.

3      MR. SHELSON:  It would be shows same five reasons,

4  Your Honor, I gave with respect to D-257.

5      THE COURT:  Was the defendant questioned about this at

6  his deposition?  Is this a document that he was questioned

7  about at his deposition?  I know -- I know you've responded to

8  the witness that this may be one of several documents.

9      MR. SHELSON:  This particular one, Your Honor, no, he

10  was not.

11      THE COURT:  Okay.

12      MR. SHELSON:  I'm sorry, Your Honor.

13      THE COURT:  No, no.  Go ahead.

14      I'm going to sustain the objection as to relevance if

15  it postdates by -- it looks like it's -- it's 2016, 2017, which

16  is, for all practical purposes today -- well, way past the time

17  that was discussed in the report, it looks like.

18      MR. SHELSON:  Your Honor, this article -- well, this

19  document is from October 6, 2016.  The date is -- the other

20  date is the date it was printed on, but in any event, it is --

21  it's a 2016 document.

22      THE COURT:  Okay.

23      MR. SHELSON:  I'll move on Your Honor.

24      THE COURT:  All right.  I'll allow you to mark -- that

25  one will be marked for identification purposes only for your

1   record.

2          MR. SHELSON:  Yes, sir.

3      (Exhibit D-232 for ID marked)

4   BY MR. SHELSON:

5   Q   Doctor, do you know what the secure psychiatric unit is in

6   New Hampshire?

7   A   I'm not sure.

8   Q   Do you know whether they have -- do you know whether --

9   that they use cages in New Hampshire for therapy booths for

10  adults with SMI?

11  A   I'm not aware of that.  I really have almost no information

12  about mental health in New Hampshire since I left.

13  Q   If they do, would you approve of that practice?

14  A   I would have to know a lot more about the issues and what

15  you're talking about and where this occurs and so on.

16  Q   Are there any federal, state and county components to

17  the -- let me redo that.  Are there federal, state and county

18  components to the public mental health system?

19  A   Yes, sir.

20  Q   Are there -- are the federal and state public mental health

21  systems interrelated in all kinds of ways?

22  A   Yes.

23  Q   Are they interrelated in financing?

24  A   Yes.

25  Q   Are they interrelated in training?

1  A   Yes.

2  Q   Are they interrelated in research?

3  A   Yes.

4  Q   Are they interrelated in many other ways?

5  A   Probably many other ways.

6  Q   Are the federal and state public mental health systems a

7  complex system?

8  A   Yes, I think so.

9  Q   Are there any federal mental health policies that are not

10  helpful?

11          MR. HOLKINS:  Objection, vague.

12          THE COURT:  Objection overruled.

13  A   That are unhelpful in terms of what?

14  BY MR. SHELSON:

15  Q   Assisting people with SMI.

16  A   There are debates about that, but I believe that some of

17  the federal policies are unhelpful.

18  Q   Is one of the federal mental health policies that you

19  believe is unhelpful in the area of insurance and disability

20  payments?

21  A   Yes.

22  Q   Is another example of an unhelpful federal mental health

23  policy that the Social Security Administration policies don't

24  incentivize people to work?

25  A   Again, there's lots of debate and research about that, but

1  I believe that the disability policies sometimes interfere with

2  people's ability to get back to work.

3  Q   Would you explain why that is?

4  A   Well, outside of the military and special programs for

5  Native Americans and a few other groups, I think, the federal

6  disability policies for people with mental illness are two.

7  There's the Social Security Income, and there's Supplemental

8  Security Disability Insurance.  They are called SSI and SSDI.

9  And under both policies, the rules about how much a person can

10 work are very complicated so that we actually have to have a

11 benefit specialist on the team to help people understand if

12 they can go to work and how much they can work, because people

13 are afraid that they're going to lose their disability payment,

14 and with it, they may also lose their health insurance by going

15 to work.

16 Q   So let's talk a minute about that benefit specialist you

17 just referenced.  By that, do you mean that at least some

18 states hire benefits specialists to help people navigate the

19 issues you just described?

20 A   Yes.

21 Q   All right.  So the federal policies you just described are

22 so complicated that some states have had to resort to hiring

23 benefits specialists to help people navigate the system?

24 A   I'm not sure your phrase "have to resort to" is correct,

25 but this is a service that's often offered through the

1  Department of Vocational Rehabilitation in states.

2  Q   The concern, though, is because the process is so

3  complicated, that adults with SMI cannot navigate that process

4  without assistance?

5  A   Yes, many cannot understand it.

6  Q   And of course, the bottom line concern is that many adults

7  with SMI are concerned that if they go to work, they will lose

8  certain federal benefits?

9  A   Including their insurance, yes.

10  Q   And including their health insurance?

11  A   Yes.

12      MR. SHELSON:  Can I have D-249, please.

13      May I approach the witness, Your Honor?

14      THE COURT:  Yes, you may.

15  BY MR. SHELSON:

16  Q   Doctor, do you recognize Exhibit D-249?

17  A   Yes.

18  Q   What is that document?

19  A   It's a review article that colleagues and I wrote on case

20  management services.

21  Q   And was this article that you coauthored published in 1998?

22  A   Yes.

23  Q   Would you turn to page 65, please.  Doctor, why don't you

24  just read the highlighted part to yourself, and tell me when

25  you're finished.

1  A    (Witness complied with request.)   Okay.

2  Q    First sentence, does it read, "It is becoming increasingly

3  clear that there's no single community care model that is

4  equally appropriate across all service settings"?

5  A    Yes.

6  Q    Is that still true today?

7  A    Yes, I think so.

8  Q    Next sentence, "For example, the resources and

9  characteristics of rural communities place different demands on

10 service systems compared to urban communities."  Is that still

11 true today?

12 A    Yes.

13 Q    "Because of smaller numbers of patients served, rural case

14 management teams typically are smaller, have less frequent

15 staff meetings and have less crisis coverage than their urban

16 counterparts."  Is that still true today?

17 A    Yes, I think so.

18 Q    "Social isolation, poverty, social stigma, and lack of

19 qualified mental health workers have all been reported as

20 particularly significant barriers in rural areas."  Is that

21 still true today?

22 A    Yes, I think so.

23 Q    And the last one, "In addition, rural patients may differ

24 diagnostically from urban patients."  Do you still believe

25 that's true today?

1  A   Yes.

2  Q   And why is that, Doctor?

3  A   The last point?

4  Q   Yes, sir.  Why do rural patients -- why may rural patients

5  differ diagnostically from urban patients?

6  A   Well, they're often different socioeconomic forces in rural

7  areas.  Many people with the most serious illnesses migrate to

8  urban areas because the services are better.  There are

9  different types and amounts of drug exposure in rural and urban

10 areas.  There are different amounts of family involvement in

11 rural and urban areas.  So there are several issues that

12 differ.

13 Q   Doctor, to some extent, have you traveled throughout the

14 state of Mississippi?

15 A   I'm not sure what you mean "to some extent."

16 Q   Have you -- how much of Mississippi have you seen?

17 A   I have seen the Jackson area, and I have seen the Delta

18 region, and I have seen the southern and gulf region where my

19 relatives live, but I've not seen everywhere in Mississippi.  I

20 would like to.

21 Q   Based on your observations, is Mississippi a rural state?

22 A   It looks quite rural to me.

23       MR. SHELSON:  Your Honor, I move to admit

24 Exhibit D-249 into evidence.

25       THE COURT:  Any objection?

1      MR. HOLKINS:  No objection, Your Honor.

2      THE COURT:  All right.  D-249 will be received into

3  evidence.

4      (Exhibit D-249 marked)

5  BY MR. SHELSON:

6  Q   Doctor, I want to ask you about deinstitutionalization.  Do

7  you note in your report that deinstitutionalization has its

8  critics?

9  A   Yes, I think I said that in the report.

10 Q   All right.  This is page 9 of your report, Doctor, which is

11 PX-404.  Let me refer you to the highlighted part.  "Many

12 states have closed hospitals but failed to set up

13 community-based services simultaneously."  Did I read that

14 correctly?

15 A   Yes.

16 Q   Is that a problem when states do that?

17 A   Yes.

18 Q   Why is it a problem?

19 A   Well, people who are moved from hospitals to the community

20 without appropriate services struggle quite a bit.

21 Q   If a state closes State Hospitals without setting up

22 community-based services simultaneously, is that

23 deinstitutionalizing irresponsibly?

24 A   I think so.

25 Q   All right.  Doctor, the next sentence we're looking at

1  here, you wrote, "Other states established community-based

2  services but failed to sustain them when budget crisis

3  appeared."  Did I read that correctly?

4  A   Yes.

5  Q   What other states are you referring to there?

6  A   Well, I think this occurred during the recent recession in

7  many states around the country.  I work with teams in about 20

8  states, and this was a -- not New Hampshire, but 20 other

9  states, and this was a common refrain during the recession,

10 that state budgets cut funding to mental health programs.

11 Q   It continues that "These failures have undoubtedly

12 contributed to incarceration, homelessness and readmissions

13 among people with serious mental illness."  Why is that the

14 case?

15 A   Well, if we discharge patients from hospitals without

16 having appropriate housing, and without having appropriate

17 services and supports, and without having insurance, and

18 without having jobs, it's very difficult for them.

19 Q   Is the way to deinstitutionalize responsibly to increase

20 community-based services as you decrease State Hospital bed

21 capacity?

22 A   Well, there are lots of debates about that.  It's walking a

23 fine line.  The finding has been that if you close beds before

24 you increase services, then the State may back off from

25 increasing the services, and then you're in a pickle.  If you

1    don't close beds and you increase services, then hospitals have

2    a way of finding new populations and filling up, and then

3    you're in a pickle because you're -- you haven't saved money in

4    one place to pay for the services in the other place.  Does

5    that make sense?

6    Q   Sure.  But what you just said, do you agree that that shows

7    that the deinstitutionalization process we're discussing is not

8    a simple process?

9    A   I agree with that.

10   Q   There's no formula for how you do that.  Correct?

11   A   It's been done differently in different states.

12         MR. SHELSON:  May I have just a moment, Your Honor?

13         THE COURT:  Okay.

14   (Short Pause)

15   BY MR. SHELSON:

16   Q   Doctor, you talked earlier about cycling through hospitals.

17   Do you recall that?

18   A   Yes, sir.

19   Q   Did you compare the readmission rates of Mississippi's

20   State Hospitals to the readmission rates of state -- the

21   readmission rates of State Hospitals in other states?

22   A   No.

23   Q   Doctor, would you please turn to page 11 of your report?

24         THE COURT:  Before you turn away from that page,

25   Mr. Shelson, remind the court what page is that of his report.

1          MR. SHELSON:  Your Honor, page 9.

2          THE COURT:  Okay.  Thank you.

3   BY MR. SHELSON:

4   Q   All right.  Dr. Drake, in your report, PX-404, I'm on page

5   11, and I'm in the crisis service section, and the highlighted

6   sentence reads, "For example, mobile crisis teams which exist

7   in many states include mental health professionals and

8   practitioners who are available 24 hours a day to reach out to

9   people experiencing a mental health crisis in home schools and

10  other locations."  Did I read that correctly?

11  A   Yes.

12  Q   You wrote that mobile crisis teams exist in many states.

13  Does that mean that there are states which have no mobile

14  crisis teams?

15  A   You know, I haven't surveyed states about mobile crisis

16  teams.  I think that's not what I was asked to do.

17  Q   So you don't know one way or the other?

18  A   Correct.

19          MR. SHELSON:  Your Honor, may I approach.

20          THE COURT:  Yes, you may.

21  BY MR. SHELSON:

22  Q   Doctor, you're free to look at your deposition for this

23  next question, but this is from page 168 of your deposition,

24  lines 8 through 14.  You testified that "There are about

25  10 percent of the people who love peer support services, lots

1    who don't."  What did you mean by that?

2    A    Page 168, did you say?

3    Q    Yes, sir.  There have been many studies of peer support

4    services, and I think the general finding has been that about

5    10 percent of the people with serious mental illness use those

6    services regularly.  Is that what you're referring to?

7         Well, to be specific, Doctor, I'm referring to this

8    sentence right here.  "You know, there are 10 percent of the

9    people who love peer support services, lots who don't."  I

10   think you just answered the 10 percent part.

11   A    Yes.

12   Q    So when you said lots who don't, are you referring to the

13   90 percent of people with SMI that -- are you saying that

14   90 percent of adults with SMI do not find peer support services

15   helpful?

16   A    Well, 90 percent don't use them, and I'm confident that

17   some portion of that 90 percent don't find them useful.

18   Q    Based on your experience or your review of the literature,

19   do you know why 90 percent of adults with SMI do not use peer

20   support services?

21   A    I think I testified yesterday that people with serious

22   mental illness in general do not want to live with other people

23   with serious mental illness.  And I'm speculating that that

24   also explains why the majority of people don't use peer support

25   services.  But I don't really know the answer.

1        MR. SHELSON:  Your Honor, may I approach.

2        THE COURT:  Yes, you may.

3    BY MR. SHELSON:

4    Q    Doctor, do you recognize Exhibit D-235?

5    A    Yes.  Could I ask you a question, Mr. Shelson?

6    Q    Yes, sir.

7    A    Would it be possible to take a bathroom break.

8        THE COURT:  Yes.  Yes.

9        THE WITNESS:  Thank you very much, Your Honor.

10        THE COURT:  We'll take a -- it's a good time to take a

11    15-minute break anyway.  We'll take a 15-minute break, and

12    we'll just resume up at 10:45.  Thank you.  We're in recess.

13        (Recess)

14        THE COURT:  You may proceed whenever, Mr. Shelson.

15    Oh, Dr. Drake, no need for him to proceed without you.

16    BY MR. SHELSON:

17    Q    Dr. Drake, the document that you're looking at now, Exhibit

18    D-235, did you prepare this document in connection with this

19    case?

20    A    Yes.

21    Q    Is this the document where you reviewed the literature and

22    determined how effective certain community-based services are

23    at reducing hospitalizations?

24    A    Yes.  This is one version of it for sure.

25    Q    Okay.  So over here to the right, is this where you -- so,

1   for example, diversion 50 percent, that means you found that

2   diversion -- that 50 percent is the hospital reduction rate for

3   diversion.  Is that correct?

4   A   It means that the latest systematic review that we were

5   able to find concluded that.

6   Q   All right.  And obviously, where it says -- and I've

7   highlighted a number of them here, for example, "case

8   management, lack of data," in your review of the literature,

9   you found no data on how effective case management is at

10  reducing hospitalization?

11  A   Not sufficient data for us to make a conclusion.  There's

12  only one randomized controlled trial of peer support in

13  relation to the hospital reduction, for example.

14  Q   Where it says -- Doctor, do you see the sentence above the

15  heading summary that I've highlighted here?

16  A   Yes.

17  Q   All right.  Where it says, "Few, if any, studies have

18  addressed combined effects," by that do you mean if you, for

19  example, combined assertive community treatment with case

20  management, there's not studies of that nature?

21  A   It's complicated.  Assertive community treatment often

22  combines some of these other services as a bundled package, but

23  it's generally true that there are not many studies that have

24  put several evidence-based practices together and then

25  determined what's the effect on hospitalization.

1  Q   For substance abuse treatment, you said it's unclear?

2  A   Yes.

3  Q   Why is it unclear?

4  A   Because it usually hasn't been measured.  Most of the

5  studies of substance abuse treatment or co-occurring substance

6  abuse treatment focused on the abstinence or reduction of

7  substance use and the effects on symptoms, but they don't

8  measure hospitalization.

9  Q   Is the bottom line that community-based services are

10  effective at helping some people but not all people avoid

11  hospitalization?

12  A   I think that's a fair summary.  We -- again, you know,

13  there are no studies where somebody's really put all of these

14  interventions together to see what would be the combined

15  effect.

16  Q   And the degree to which a particular community-based

17  services reduces hospitalization is summarized on

18  Exhibit D-35 -- 235?

19  A   Is that the page we're looking at here at the top?

20  Q   Yes, sir.  Yes, sir.

21  A   Yes.

22        MR. SHELSON:  Your Honor, I apologize.  I don't

23  remember if I did this before the break, but in any event, I

24  move to admit D-235 into evidence.

25        THE COURT:  Any objection?

1      MR. HOLKINS:  No objection, Your Honor.

2      THE COURT:  D-235 will be received into evidence.

3    (Exhibit D-235 marked)

4  BY MR. SHELSON:

5  Q   Doctor, you testified yesterday that, or words to this

6  effect, "Variability across the country is really amazing from

7  state to state and region by region."  What did you mean by

8  that?

9  A   Was I testifying in relation to evidence-based practices?

10 Q   Yes, sir.

11 A   Of course, I don't know every state well, but I do some

12 work in about half of the states, and we did a national survey

13 of supported employment in all states.  So that's the only

14 state where I really have national data.  But there's -- across

15 states, there is tremendous variability.  There's states --

16 well, you don't need examples.  The answer is yes.

17 Q   One of the issues in this case is whether services are

18 uniformly available.  Are you familiar with that concept?

19 A   Well, you and I discussed it before, and I looked it up to

20 make sure I would understand what it means.

21 Q   Do you now know what it means?

22 A   Yeah.  All the definitions referred to statistical and

23 physical properties.

24 Q   Well, let me cut --

25 A   I assume that what you mean by it is an even distribution

1   across different regions of a state.  Is that correct?

2   Q   I'm more concerned what DOJ means by it.

3   A   Okay.

4   Q   You're one of their experts.  So here's the question.

5   A   Okay.

6   Q   Do you have an opinion on what it means to have services

7   uniformly available throughout a state?

8   A   Yes.

9   Q   What is your opinion?

10  A   I've done a lot of work in New Hampshire and Vermont,

11  which, by the way, is the most rural state in the country, and

12  I know that it's difficult to have the same quality of services

13  across a state.

14  Q   Do you agree with me that no public mental health system

15  can deliver community-based services in a manner that is truly

16  uniform?

17  A   You know, again, that depends on what we're going to mean

18  by uniform.  I think if we're referring to quality rather than

19  the specific form of services, that that's what states aspire

20  to.

21  Q   Do you agree with me, since you're from New Hampshire, that

22  if I go visit New Hampshire and I have a heart attack, I'm

23  going to be treated for that heart attack more quickly in some

24  parts of New Hampshire than others?

25  A   Yes, I'm sure that's true.

1   Q    Does the same concept apply to community-based services?

2   A    I think that there's what's called regional variation in

3   all medical and social services in this country.

4   Q    So when one talks about making community-based services

5   uniformly available, that's not a concrete concept, is it?

6   A    Well, you and I haven't agreed on a definite definition.

7   Q    Which is -- which -- well, let me just give you an example.

8   If because of geographic distance from where the service is

9   located, say a mobile crisis team, if that service is available

10  in the region, some people are going to be further away from

11  the service than others.  Is that correct?

12  A    Yes, I think so.

13  Q    So in my example, it may take 20 minutes for a mobile

14  crisis team to get to an individual and maybe 30 minutes to get

15  to somebody else.  Is that fair?

16  A    That's what it says in the Mississippi criteria for

17  services.

18  Q    And in my example, if it took longer to get to somebody

19  because they live further away from the service, does that mean

20  that the service is not uniformly available?

21  A    You keep assuming I know what you mean by uniformly

22  available.

23  Q    Let me ask it this way.

24  A    Okay.

25  Q    Do you know what the DOJ means by uniformly available in

1  this case?

2  A   No.

3  Q   All right.  I'll move on.  Doctor, did you cite what's

4  called "The President's New Freedom Commission Report" on page

5  8 of your report?

6  A   Yes, I think so.

7        MR. SHELSON:  Your Honor, may I approach the witness.

8        THE COURT:  Yes, you may.

9  BY MR. SHELSON:

10  Q   Is document D-195 a copy of the New Freedom Commission

11  Report on mental health?

12  A   Yes, it appears to be.

13  Q   And this is a 1993 report.  Is that correct?  Excuse me.

14  It's a 2003 report.

15  A   Yes.

16  Q   All right.  And this first page we're looking at is a

17  letter to the President of the United States at that time.

18  It's dated July 22, 2003.  Is that correct?

19  A   Yes.

20  Q   All right.  Do you see the highlighted part there?  That

21  first sentence that's highlighted, "Yet for too many Americans

22  with mental illnesses, the mental health services and supports

23  they need remain fragmented, disconnected and often inadequate,

24  frustrating the opportunity for recovery."  Do you still

25  believe that's true today?

1  A    I haven't surveyed every state, but I believe to different

2  degrees, that's true across states and regions.

3  Q    Next sentence reads, "Today's mental health care system is

4  a patchwork relic, the result of disjointed reforms and

5  policies."  Do you still that's true today?

6  A    Patchwork relic?  I'm not really sure.

7  Q    Okay.  Would you turn to page 50, please.

8  A    Page 50.  Okay.

9  Q    Do you see the part I've highlighted that's captioned,

10  "Rural America needs improved access to mental health

11  services"?

12  A    Yes.

13  Q    "The vast majority of all Americans living in underserved

14  rural and remote areas also experience disparities in mental

15  health services."  To your knowledge, is that true as we sit

16  here today?

17  A    I don't really know.  There have been huge changes in the

18  last 16, 17 years, since this was written.  I know that, for

19  example, telemedicine and other interventions are widely used

20  to improve services in rural areas.

21  Q    I want to skip down to the sentence that reads, "Despite

22  these proportions, rural issues are often misunderstood,

23  minimized and not considered in forming national mental health

24  policy."  Is that consistent with your experience?

25  A    You know, I wasn't asked that question as part of this

1    process, and I really don't have a data-informed opinion about

2    that.

3    Q   Okay.

4         MR. SHELSON:  Your Honor, I move to admit Exhibit

5    D-195 into evidence.

6         THE COURT:  Any objection?

7         MR. HOLKINS:  No objection, Your Honor.

8         THE COURT:  D-195 will be received into evidence.

9      (Exhibit D-195 marked)

10        MR. SHELSON:  Your Honor, may I approach the witness?

11        THE COURT:  Yes, you may.

12   BY MR. SHELSON:

13   Q   Doctor, is Exhibit D-253 an article that you're an author

14   of?

15   A   Yes.

16   Q   Is the -- is this document a published paper?

17   A   Yes.

18   Q   Is it entitled "Lessons learned in developing community

19   mental health in North America"?

20   A   Yes.

21   Q   All right.  And the part here, does that indicate it was

22   published in *World Psychiatry* in 2012?

23   A   Yes.

24   Q   All right, sir.  Will you please turn to -- it's page 2 of

25   the document.  It's page 48 of the article.

1    A    Uh-huh.

2    Q    All right.  You see here where it's highlighted,

3    "Approximately half of all people with severe and persistent

4    mental illnesses in the United States have received no mental

5    health services in the past year, often because they have

6    rejected the available services."

7    A    Yes.

8    Q    That was your finding in 2012?

9    A    Well, that was the finding in reference number 21, which

10   we've cited there.  And I think that that's been the general

11   finding of epidemiologic studies in the United States.

12   Q    True, as we sit here today?

13   A    I haven't seen any evidence to contradict that in the last

14   few years.

15        MR. SHELSON:  Your Honor, we move to admit

16   Exhibit D-253 into evidence.

17        MR. HOLKINS:  No objection, Your Honor.

18        THE COURT:  All right.  D-253 will be received into

19   evidence.

20     (Exhibit D-253 marked)

21        MR. SHELSON:  Your Honor, may I approach the witness.

22        THE COURT:  Yes, you may.

23   BY MR. SHELSON:

24   Q    Doctor, do you recognize Exhibit D-256?

25   A    Yes.

1   Q   What is Exhibit D-256?

2   A   It's a short essay from *Psychiatric Services* in 2011.

3   Q   Are you the author of that essay?

4   A   I'm one of the authors, yes.

5   Q   You're one of the authors of it.  I'm sorry.  What year did

6   you say this was?

7   A   It was published in 2011.

8   Q   Okay.  Do you see this -- the first part I've highlighted,

9   "In an article in this issue, Pogoda and colleagues make

10  several excellent points regarding barriers that impede the

11  dissemination and implementation of evidence-based supported

12  employment within the Department of Veterans Affairs health

13  care system.  We have encountered similar barriers within the

14  federal/state public health systems."  Did I read that

15  correctly?

16  A   Yes.

17  Q   Doctor, specifically, when you said you've encountered

18  similar barriers within the federal/state public health care

19  systems, what barriers were you referring to?

20  A    Barriers that they cited in the Pogoda article.  And I

21  can't remember exactly which ones they highlighted in their

22  article.

23  Q   I'll move on then.  Let me move on to the next paragraph

24  that's highlighted.  "Unfortunately, a much larger barrier

25  prevents the adoption of evidence-based supported employment.

1    The crux of the matter is our failure to develop a clear,

2    simple direct funding mechanism.  No single agency funds IPS

3    supported employment, and providers must cobble together

4    funding from multiple sources."

5        Let me stop there.  What is IPS supported employment?

6    A    That's the evidence-based approach to helping people with

7    mental illness to find and succeed in employment.

8    Q    And the issue you were writing about at the time of this

9    article is there was not a direct funding mechanism for IPS

10   supported employment?

11   A    Yes.

12   Q    As we sit here today, is there a direct funding mechanism

13   for IPS supported employment?

14   A    It's better, but it's still too complicated.

15   Q    What do you mean by that?

16   A    Well, CMS, the Center for Medicare and Medicaid Services,

17   which funds most of the services for public mental health

18   system, they have adopted various waivers and other mechanisms

19   so that it's easier for states to use Medicaid to fund

20   employment services, but it could be even better.

21   Q    And it could be even better -- strike that.  The source of

22   making it even better is the federal level?

23   A    It's complicated because most states that implement IPS

24   supported employment use a combination of funds, some from the

25   federal sources, some from state sources, and some from local

1  sources, but it would be ideal if Medicaid just paid for it as

2  a core service.

3  Q   Would you endorse Medicaid doing that?

4  A   Yes.

5  Q   Let me shift gears to PACT, Doctor, if I may.  Is PACT

6  appropriate for individuals who experience the most intractable

7  symptoms of severe mental illness and the greatest level of

8  functional impairment?

9  A   Yes.  If we're talking about the population of people with

10  serious mental illness, that's true.

11  Q   All right.  So when we say the most intractable symptoms,

12  can you give us an example of that?

13  A   There -- there's a large proportion of people with serious

14  mental illness who do not respond to medications.  Various

15  estimates are that it's somewhere between one-third and

16  one-half.  So that's a lot of people.

17      And -- but most of those people can nevertheless learn to

18  control symptoms and function at a much higher level in the

19  community, and assertive community treatment is one of the main

20  services that we use for that population.

21  Q   And are -- individuals with intractable symptoms tend to be

22  more difficult to treat?

23  A   Sometimes they are, although not always.  I've treated many

24  patients who have ongoing symptoms and, you know, work

25  full-time and function at a very high level.

1        MR. SHELSON:  Your Honor, may I approach the witness?

2        THE COURT:  Yes, you may.

3    BY MR. SHELSON:

4    Q    Doctor, do you recognize Exhibit D-250?

5    A    Yes.

6    Q    Is Exhibit D-250 a published paper that you're one of the

7    authors of?

8    A    Yes.

9    Q    Is the subject of the article assertive community

10   treatment?

11   A    Yes.

12   Q    Could you turn to the second page of the article, which

13   is -- second page of the document.  It's page 76 of the

14   article.  The first highlighted paragraph, "Another

15   perspective, however, is to question the long-term viability of

16   the fundamental ACT model."  All right.  Doctor, what is the

17   fundamental ACT model?

18   A    Assertive community treatment was developed a long time

19   ago, in the late 1970s.  And it's been modified in many

20   different ways in different places over the years.  And so

21   if -- I'd have to reread this article to refresh my memory, but

22   if we mean the original model as the fundamental ACT model, I

23   would say that it has been changed many, many times over the

24   years.

25   Q    Has it also been modified for rural areas?

1    A    Yes.

2    Q    What are the natures -- what is the nature of the

3    modifications to the original PACT model for rural areas?

4    A    Yes.  The original model was designed in an urban area in

5    Wisconsin, and it assumed that a team of about ten clinicians

6    would be responsible for a group of about 100 patients with

7    serious mental illness.  In rural areas, we don't have 100

8    patients with serious mental illness, and we don't have teams

9    that are that large either.  So we've needed to do a number of

10   things to modify the model.  I mean, and most of those have to

11   do with serving a smaller number of patients with a smaller

12   number of clinicians.  So, you know, I've worked in rural areas

13   myself for years and years.

14   Q    And in your opinion, is modifying the original PACT model

15   to accommodate rural areas acceptable?

16   A    Yes.  I know when I was monitoring the teams in New

17   England, we had very good outcomes, often the best outcomes in

18   rural areas.

19   Q    Moving on to the second paragraph that's highlighted here,

20   "Two antithetical answers portray the chaotic, diverse and

21   inconsistent state of the U.S. public mental health system.  On

22   the one hand, in some state and county systems, basic

23   principles of ACT, such as continuity of responsibility and

24   working in the community to help people learn the skills they

25   need to succeed in roles of their choice, have been

1  incorporated by all community mental health teams as usual

2  care."  Is that an example of one way in which ACT has you

3  involved from the original model?

4  A    Not really.  It's an example of how the principles of

5  evidence-based practices have influenced other treatment

6  approaches in the community.

7  Q    Okay.  The next sentence, "In these settings" -- to be

8  clear, when you say "In these settings," what are you referring

9  to?

10  A    Well, let me see if I can explain it by an example.  Back

11  in the 1970s and '80s, and '90s too, really, you had a group of

12  patients who would get assertive community treatment, and then

13  the other patients would get office-based treatment.  And

14  what's happened over the years -- and this is what generally

15  happens with evidence-based practices -- is that some of the

16  principles of assertive community treatment, you know,

17  influence the rest of the care system so that all of the teams

18  in many mental health centers do their work as a team and do

19  their work predominantly out in the community and do their work

20  in terms of integrating disciplinary care.

21  Q    So back to this sentence, "In these settings, as in

22  European countries with more integrated systems of care, ACT

23  services offer little or no statistical averages in producing

24  better outcomes, and almost certainly no advantages in quality

25  of interaction."  Did I read that correctly?

A    Yes.

        MR. SHELSON:  Your Honor, I move to admit

Exhibit D-250 into evidence.

        THE COURT:  Any objection?

        MR. HOLKINS:  No objection, Your Honor.

        THE COURT:  D-250 will be received into evidence.

    (Exhibit D-250 marked).

        MR. SHELSON:  Your Honor, may I approach the witness.

        THE COURT:  Yes, you may.

BY MR. SHELSON:

Q    Dr. Drake, do you recognize Exhibit D-251?

A    Yes.

Q    Is this an article you're the coauthor of entitled "The

Critical Ingredients of Assertive Community Treatment"?

A    Yes.

Q    If you look down at the bottom right, does this indicate

that this article was published in *World Psychiatry* in

June 2015?

A    Yes.

Q    Would you turn to page 2 of the document, please.  The

highlighted sentence reads, "ACT is not well suited to rural

settings because sparsely populated communities lack a critical

mass of service users requiring intensive mental health

services."

A    Yes.

1  Q    Is -- is that true as we sit here today?

2  A    Well, this pertains to your previous question about ACT.

3  You know, it does need to be modified considerably in rural

4  areas, but it seems to be equally effective in rural areas.

5  Q    As modified?

6  A    As modified, yes, sir.

7       MR. SHELSON:  Your Honor, we move to admit

8  Exhibit D-251 into evidence.

9       THE COURT:  Any objection?

10      MR. HOLKINS:  No objection, Your Honor.

11      THE COURT:  D-251 will be received into evidence.

12    (Exhibit D-251 marked)

13      MR. SHELSON:  May I approach the witness, Your Honor.

14      THE COURT:  Yes, you may.

15 BY MR. SHELSON:

16 Q    Doctor, I've just handed you Exhibit P-417.  Do you

17 remember looking at this map yesterday?

18 A    I think we looked at it this morning.

19 Q    You're probably right.  This morning.  All right.  I've

20 taken the liberty of writing numbers on this map.  And I wrote

21 a number wherever there's not a red dot.  Do you see that?

22 A    Yes.

23 Q    And -- well, let me back up.  What does -- what does a red

24 dot on this map signify?

25 A    I think it stands for one individual in the client review

1   who -- for whom ACT was recommended but lived in a region where

2   ACT was not available.

3   Q   Well, is it your understanding of this map that the areas

4   shaded in green are where PACT is available?

5   A   Yes.  That's what the legend says.

6   Q   Okay.  Do you know one way or the other whether the areas

7   shaded in green on Exhibit P-417 are some of the most densely

8   populated areas of Mississippi?

9   A   I wouldn't be an expert on that at all.

10   Q   Okay.  Fair enough.  I want you to direct your attention to

11   these -- this cluster of four counties here, Smith, Jasper,

12   Covington and Jones.  Do you agree with me there's no red dots

13   in any of those four counties?

14   A   Yes.

15   Q   All right.  So based on your experience in the client

16   review sample, do you think it would make sense to put a PACT

17   team in each of those four counties?

18   A   I'm not sure you understand statistical sampling.  You

19   know, we reviewed only 154 out of 3,000 people, and so we may

20   not have gotten an ACT -- I don't think this would represent --

21   that you could interpret this as saying that there are few or

22   no people who need the service in these counties just because

23   people didn't happen to come up in our sample.

24   Q   When you say I probably don't understand statistical

25   sampling -- since I can't even say it, I'm not going to fight

1   you on that.  So let me -- you're right, I may be confused,

2   then.  Are you saying that the sample that -- of the 154

3   individuals is or is not generalizable to the state of

4   Mississippi as a whole?

5   A    That will be a great question for you to pose to Dr.

6   MacKenzie, but what I'm saying is, 154 is only 1/20th of the

7   population that we sampled from.  And so in selecting

8   1/20th and then looking at this number of counties, which is

9   41, it's highly likely that the dots in one or more of these

10  counties is unrepresentative or not accurate.

11  Q    Well, so are we able then to draw -- I mean, on the one

12  hand, it seems that this map is being used to say that there

13  are areas in Mississippi where there should be more PACT

14  services.  Do you agree with that?

15  A    I think it was used to show that we -- our sample

16  identified people who were distributed all over the state, and

17  yet there were ACT teams available only in a few specific

18  regions.

19  Q    But you agree, based on your sample, that there are, by

20  my -- well, by my count, there are 38, if I'm wrong -- but

21  let's assume I'm right, that there are 38 counties in

22  Mississippi where there's no red dot?

23  A    Yes, I see that.

24  Q    Okay.  So based on your knowledge of statistical sampling,

25  does the data depicted on Exhibit P-417 tell us anything about

1    the degree to which we need PACT services in any of the

2    counties in Mississippi?

3    A    I think we would need a lot more data to make that

4    determination.  You know, from my brief study of the regions of

5    Mississippi, many of these regions are largely national

6    forests, aren't they?

7              MR. SHELSON:  If Your Honor will let me answer the

8    question.

9    BY MR. SHELSON:

10   Q    I don't think I can answer your question.  I'm sorry.

11   A    Sorry.

12   Q    But had you finished your answer?

13   A    Yes.

14   Q    You can set that document aside.

15             MR. SHELSON:  May I approach the witness, Your Honor.

16             THE COURT:  Yes, you may.

17   BY MR. SHELSON:

18   Q    Good news, Dr. Drake, last document.

19             MR. SHELSON:  Your Honor, just so the record is clear,

20   P-417 was previously admitted into evidence.

21             THE COURT:  Thank you.

22   BY MR. SHELSON:

23   Q    All right.  Dr. Drake, I put up here on the screen

24   Exhibit D-320, and this is a bar graph of -- the orange bar

25   graph is the number of living individuals who each member of

1  the CRT reviewed, and the blue is how many of those individuals

2  the CRT member recommended PACT services for.

3  A    Yes.

4  Q    Okay.  So, for example, you reviewed seven individuals, and

5  you recommended PACT for one.  Is that correct?

6  A    Yes.

7  Q    And that's 14 percent?

8  A    That sounds about right.

9  Q    Okay.  I'll represent to you that the parties have agreed

10 that -- they can correct me if I'm wrong, but the parties have

11 agreed that the data on this slide is accurate.  Okay?

12 A    Yes.

13 Q    So it ranges from you, at 14 percent, to Dr. VanderZwaag at

14 81 percent.  Do you see that?

15 A    Yes.

16 Q    Why is there such a wide range?

17 A    Well, speaking again in terms of statistics, you would have

18 to throw out my data because of the small sample size and what

19 I described yesterday that by the luck of the draw, I had some

20 very idiosyncratic cases in my seven.  Then if you look at the

21 other five, you have a range from 57 to 81 percent.  So that

22 means that you would have a mean of about 65 percent, somewhere

23 around there and --

24 Q    Very close.

25 A    You -- and this is the kind of distribution you would

1   expect in a -- it's -- we call it a normal distribution.  So in

2   almost any human phenomena, if you draw a sample of people by

3   chance, they're not all going to be in the middle.  They're

4   going to be displayed with some at the high end and some at the

5   low end.

6   Q   Page 2 of the document you're holding, D-320, is on the

7   screen now.

8   A   Yes.

9   Q   And 100 of 150, 66 percent.  Do you know of any state which

10  provide PACT to 66 percent of the individuals that discharges

11  from the State Hospitals?

12  A   You know, that's outside the range of my scope on this

13  study.  I haven't surveyed states in relation to ACT services.

14  Q   So you don't know?

15  A   Right.

16  Q   Do you know how many PACT teams Mississippi would need to

17  provide PACT to 66 percent of the people it discharges from

18  State Hospitals?

19  A   I believe at the deposition, you told me the number would

20  be 28.

21  Q   Well, I don't think I can testify.  Do you know?

22  A   No, I haven't calculated that.  I wasn't asked to do that.

23  Q   Do you know how much it would cost to provide PACT services

24  to 66 percent of the people discharged from Mississippi State

25  Hospitals?

1    A    No, I wasn't asked to do that.

2    Q    You can set that aside, Doctor.  Would you look at your

3    report, please, and I'm going -- in the bottom right there, the

4    pages are numbered whatever of page -- whatever of 125.  Would

5    you turn to page 35 of 125?

6    A    Page 35?

7    Q    Of 125, yes, sir.

8    A    Yes.

9    Q    Is this a summary of your findings regarding person 148?

10   A    Yes.

11   Q    Would you turn, please, to page 36 of 125.

12   A    Yes.

13   Q    Did you recommend a small home in the intellectual

14   disability system for person 148?

15   A    Yes, I believe I did.

16   Q    All right.  What type of housing is a small home in the

17   intellectual disability system?

18   A    Well, in the states where I've worked, the IDD system often

19   has housing for two or three people with full-time behavior

20   staff, behavioral management staff.

21   Q    Is that -- is that kind of housing the same thing as

22   permanent supported housing?

23   A    No.

24   Q    Is it scatter site housing?

25   A    Well, these small units are often scattered throughout a

1  community, but I think that the goal in these small units,

2  these are -- people with intellectual disabilities often have

3  behavioral dyscontrol syndromes, like this fellow, and the IDD

4  specialists use applied behavioral analysis to try to help them

5  learn to control those behaviors before they would be ready to

6  live more independently.

7  Q   Let me see if I understood your testimony from yesterday.

8  Do you recall testifying that most patients don't like group

9  homes or congregate living?

10  A   Yes.

11  Q   All right.  And you distinguish group homes from permanent

12  supported housing, or PSH.  Is that correct?

13  A   Yes.

14  Q   Did you describe PSH as scatter site housing?

15  A   Yes, in most cases it is.

16  Q   Okay.  So in this sense that you used scatter site housing

17  in your testimony yesterday as a small home in the intellectual

18  disability system scatter site housing?

19  A   It's not a perfect classification, you know, between group

20  homes and scatter site housing, and the IDD system has some of

21  these kinds of specialty units that the mental health system

22  generally does not provide.

23  Q   In your opinion, are there types of housing that are

24  appropriate for adults with SMI that are not permanent

25  supported housing?

1    A    Yes.

2    Q    What are some -- what are some samples of such housing?

3    A    Well, there's some patients who prefer to live with their

4    families and do well in that setting.  There are some patients

5    who, because of very special needs, need -- you know, need to

6    be in other kind of settings, for example, patients that have

7    such severe medical problems that they need around-the-clock

8    medical services, and patients who have such severe co-morbid

9    conditions, like intellectual disability, that they need

10   specialized services.

11   Q    Doctor, a small home in the intellectual disability system,

12   how would such a home typically be staffed?

13   A    You know, that's really outside of my expertise.  I

14   understand that they have -- they tend to have 24-hour staff,

15   but I don't have a large knowledge in that area.

16   Q    I'll just ask you one more question.  If you don't know,

17   that's fine.  But in that type of housing, are there any

18   limitations on whether the person housed there is free to come

19   and go from the facility as they choose?

20   A    I think that varies a lot.  I was a doctor for the IDD

21   system in my area for several years, and I was really impressed

22   with their ability to individualize housing and staff services

23   and regulations.

24   Q    Do you agree that even individuals with SMI who are living

25   in the community, depending on the circumstances, there may be

1    restrictions on their freedom of movement?

2    A    There may be for some people.  We're not very good at

3    predicting that.  I've treated lots of people who left the

4    hospital, and we expected they would need very close

5    supervision, and it turned out they didn't.

6    Q    Well, when the housing recommendation for one of the

7    individuals in the 154-person sample is a type of housing that

8    has 24/7 supervision, there is something about that

9    individual's circumstances why 24/7 supervision was

10   recommended.  Do you agree with that?

11   A    Yes.

12   Q    So if you would please turn to page 50 of 125 of your

13   report.  Is this person 154?

14   A    Yes.

15   Q    Does person 154 have a history of inappropriate sexual

16   behavior?

17   A    At least -- let me just make sure I have the right client

18   in mind, because the names aren't here, and I'm used to them --

19   thinking of them as names.

20          MR. SHELSON:  May I approach the witness, Your Honor.

21          THE COURT:  Yes, you may.

22          MR. SHELSON:  I'm going to show the witness this

23   individual's name.

24          THE WITNESS:  Oh, yes.  Yes, got it.  Yes.

25   A    I remember this fellow.

BY MR. SHELSON:

1

2  Q   Okay.  So person 154, what is -- briefly or summarize, what

3  is his history of inappropriate sexual behavior?

4  A   I believe that about ten years earlier, he, in a very

5  psychotic state, had entered a neighbor's house and was alleged

6  to make some sort of physical or sexual attack on a young

7  woman, I believe a daughter who was in the house.

8  Q   Dr. Drake, the next question I'm going to ask you is on

9  page 51 of 125 of your report, the next page.

10  A   Yes.

11  Q   Is the community-based housing -- strike that.  Is your

12  community-based housing recommendation for person 154 close

13  male supervision?

14  A   Yes.

15  Q   And what type of community-based housing offers close male

16  supervision?

17  A   I think small group homes for men and staffed by men.

18  Q   And the staffing by men, in this instance, is obviously

19  because of the inappropriate sexual behavior history?

20  A   Yes.

21  Q   And so, obviously, the group home you just referenced is

22  not permanent supported housing, and it's not scatter site

23  housing?

24  A   Yes.

25  Q   All right.  The housing that you recommended for person

1   154, would that be a locked facility?

2   A   Probably would be locked in the evening, and this fellow

3   would probably need to have, you know, somebody with him during

4   the day when you were going out to shop or go fishing or

5   whatever.

6       I should also say that I've seen a large number of people

7   over the years who had a history of a serious assault and then

8   made a good adjustment in the community and never had another

9   assault for -- in their lives and were able to transition to

10  permanent supported housing.  So I think this fellow is very

11  unlikely ever to get out of the hospital, for legal reasons,

12  but I don't think we can predict what he's going to be like in

13  the next ten years.

14  Q   And, but I'm asking you these questions because you did

15  make recommendations for community-based services, of course,

16  all premised on him getting out.

17      So the next question is, and you may have already answered

18  this, if person 154 were to be placed in the type of housing

19  you've recommended for him, at least for a period of time, when

20  he left the facility, would he have to be escorted by close

21  male supervision?

22  A   That's what I would recommend.

23  Q   And did you also recommend supported employment for this

24  individual?

25  A   Yes.

1  Q   All right.  In terms of employment, would you foresee any

2  restrictions on person 154's ability to be employed in jobs

3  where he may come into contact with women?

4  A   Yeah, probably.  The essence of supported employment is

5  finding a job and a job site that fits the person, both in

6  terms of their strengths and also in terms of a job that they

7  enjoy doing and they can succeed in.  So, you know, I've seen

8  people who scream at their hallucinations all day but can work

9  in a saw mill because everyone wears ear covers in a saw mill.

10 Q   As perhaps person 154 illustrates, do people with SMI who

11 are living in the community encompass a range of independence?

12 A   Yes.

13 Q   Do you have an opinion regarding whether Mississippi should

14 close any of its four State Hospitals?

15 A   Well, I wasn't asked to make a judgment about that, but

16 that would seem to be a rash maneuver.

17 Q   Have you reviewed the literature on how many State Hospital

18 beds a mental health system should have?

19 A   Yes, I have.

20 Q   And did you find that -- well, is there any agreement in

21 the literature on that issue?

22 A   No.

23 Q   Do you know what percentage of admissions to a State

24 Hospital in Mississippi come from hospitals that are not State

25 Hospitals?

1   A    No, nobody gave me those data.  I haven't seen those data.

2   Q    In your experience, do you have any knowledge of instances

3   where -- well, let me -- strike that.  Let me back up.  I'm

4   just going to refer to a nonState Hospital.  Do you know what

5   I'm referring to?

6   A    Well, there are a range of general hospitals and local

7   hospitals and private hospitals and so on.

8   Q    That's what I'm referring to when I say nonState Hospitals.

9        Right.  In your experience, do you know of any instances

10  where nonState Hospitals move to have individuals civilly

11  committed to a State Hospital?

12  A    Yes.

13  Q    In your experience, what other reasons some such nonState

14  Hospitals do that?

15  A    I guess I've seen that happen for a wide variety of

16  reasons.

17  Q    Do -- in your experience, do any of the reasons include

18  that the time for which Medicaid or private insurance will pay

19  for the individual's stay in the nonState Hospital has expired?

20  A    Yes.  I've seen that.

21  Q    And so, in other words, an individual is an inpatient at,

22  say, a general hospital, the period of time that private

23  insurance will cover that stay is expired, and so the general

24  hospital seeks to have that person civilly committed to a State

25  Hospital?

1    A    I believe that happens.

2    Q    And if that happens in Mississippi and the judge civilly

3    commits the person, then one of the Mississippi State Hospitals

4    is going to have to deal with that person for a period of time.

5    Do you agree?

6    A    That's the way I understand that system to work here.

7    Q    Doctor, do you know how many PACT teams Mississippi has?

8    A    I was told at one point, but I can't recall.  I think it's

9    in the range of six or eight.

10   Q    Did you make any determination regarding how many PACT

11   teams Mississippi should have?

12   A    No, I think you asked me that earlier, and I did not.

13   Q    You testified yesterday to I think what you referred to as

14   the core community-based services?

15   A    Yes.

16   Q    Okay.  So you know what -- I'm using that term as you used

17   it yesterday.

18   A    Okay.

19   Q    Okay.  So with respect to any core community-based

20   services, did you make any determination regarding the quantity

21   of those services Mississippi should have?

22   A    I was not asked to do that.

23   Q    And therefore, you didn't do it?

24   A    Correct.

25   Q    Did you personally make any determination regarding the

1   degree to which Mississippi offers any community-based

2   services?

3   A   Only through the lens of the 154 people that we reviewed.

4   Q   But you didn't do it on a systemwide basis?

5   A   That's correct.

6   Q   Did you make any determinations regarding the locations in

7   which Mississippi should offer its community-based services?

8   A   No.

9   Q   Is there any state that doesn't have limitations in its

10  mental health system?

11  A   Well, states vary a lot, and as we've talked about before,

12  some do much better than others.  All have to struggle with the

13  same financing and regulatory and legislative issues.

14  Q   Is there any state that doesn't have any limitations in its

15  mental health system?

16  A   I doubt it.  I haven't surveyed every state, but I think

17  that that's a pretty fair statement.

18  Q   Are you aware of any state that has no unmet needs in its

19  public mental health system?

20  A   No unmet needs.  You know, the only area where I really

21  have broad knowledge about different states is supported

22  employment.  And, you know, there are states that do a pretty

23  good job of making supported employment available to the people

24  who would need it.  And there are states that do a poor job,

25  and there are states that do very little.  So it's variable,

1    but some states actually do a very good job with supported

2    employment.

3    Q    Even though states who do a very good job, do you believe

4    there are no unmet needs for supported employment in those

5    states?

6    A    Well, because there are always people who are not in the

7    mental health system at all, you know, there are definitely

8    unmet needs everywhere.  That's the nature of our health care

9    system in this country.

10   Q    Do you know of any states that have no gaps in its public

11   mental health system?

12   A    I only know, on a national basis, the supported employment

13   literature.

14   Q    In this case, are you offering any opinions regarding what

15   Mississippi needs to do on a systemwide basis to meet the needs

16   of adults with SMI?

17   A    You know, I was not asked to address that question.  I

18   think there are other expert witnesses that were asked to do

19   that.

20   Q    But you didn't do it?

21   A    Right.

22   Q    And you're not an expert in mental health system design and

23   cost issues?

24   A    Not in the cost issues for sure.  I have helped lots of

25   states over the years in designing their system, but I have

1   never been the one to handle the cost and fundraising side of

2   it.

3   Q   Do you have any opinions on system design issues with

4   respect to Mississippi?

5   A   The system design issues that are offered in the operations

6   manual by DMH in Mississippi, I think they're very good.

7   Q   Let me try it this way.  This is page 174 of your

8   deposition.

9   A   Okay.

10   Q   Okay.  Question at line 4, "How do you determine whether a

11   state has sufficient community-based services to meet the needs

12   of its adult SMI population, or is that outside your area?"

13   What was your answer?

14   A   I said, "Yes.  I'm not an expert in those areas."

15   Q   Okay.

16        MR. SHELSON:  Thank you, Doctor.  That's all the

17   questions I have.

18        THE COURT:  Okay.

19        MR. HOLKINS:  Your Honor, we do have some questions

20   for redirect.  If Dr. Drake would like, we can take a short

21   five-minute break if the court would permit.

22        THE COURT:  How long is your redirect?

23        MR. HOLKINS:  No more than ten minutes, Your Honor.

24        THE COURT:  Do you need to take a break, Doctor?

25        THE WITNESS:  I don't need a break.

1       THE COURT:  All right.  Mr. Shelson, before you step

2   down, you referred to Defense Exhibit 320, the bar graph.  Did

3   you intend to -- was that admitted into evidence?

4       MR. SHELSON:  Now that you mention it, Your Honor, and

5   thank you for pointing out my oversight on that.  If I may, I

6   would move to admit Exhibit D-320 into evidence.

7       THE COURT:  Okay.  It's admitted.

8       MR. SHELSON:  Thank you, Your Honor.

9       THE COURT:  I assume.  Any objections from the

10  government?

11      MR. HOLKINS:  This is to --

12      THE COURT:  D-320.

13      MR. HOLKINS:  No objection, Your Honor.

14      THE COURT:  All right.  It will be admitted.

15   (Exhibit D-320 marked)

16      MR. SHELSON:  Thank you, Your Honor.

17      THE COURT:  All right.

18                    REDIRECT EXAMINATION

19  BY MR. HOLKINS:

20  Q   Hi, Dr. Drake.

21  A   Hello.

22  Q   I want to ask you a few questions about some of the topics

23  that came up during the cross-examination.  You were asked

24  about delivering community-based services in rural areas?

25  A   Yes.

1    Q    You mentioned that assertive community treatment can be

2    modified to meet the needs of rural communities.  Is that

3    right?

4    A    Yes.

5    Q    Is that true for other community-based services?

6    A    Yes.

7    Q    Could you give some examples?

8    A    I've worked for the last 35 years on and off in Vermont and

9    New Hampshire, which are both very rural states.  I think

10   Vermont is even more rural than Mississippi, and so we've had

11   to modify all the services that we deliver.  You know, the ACT

12   teams are very small.  The psychiatric services are generally

13   delivered by telepsychiatry.  Everyone worries that there are

14   no jobs in rural areas, and so supported employment won't work,

15   but, you know, it gets modified a bit.  We have to pay more

16   attention to arranging transportation and so on.  But the

17   results have always been that we do just as well getting people

18   competitive employment in rural areas as we do in urban and

19   suburban areas.

20        One of the advantages of rural areas is that most -- a

21   higher number of patients live with their families, and so

22   it's -- and family provide a lot of the care.  And so it's

23   really incumbent upon us to provide family psycho-education in

24   those areas, even more than in urban areas.

25        There are not as many people in rural areas who are

1  homeless, so we don't need to -- generally, we don't have

2  homeless outreach teams.  So, you know, you'll just have to

3  respond to the differences in the particular rural area.

4      Right now I'm supervising a bunch of teams in Appalachia,

5  and the patients there have been just overwhelmed by the opioid

6  crisis in rural Appalachia.  It's a real tragedy.  And so we

7  have had to modify the teams and the services to provide opioid

8  treatment and opioid recovery services.  So it varies.

9  Q   I'd like to show you one of the exhibits.  This is D-235.

10 A   Yes.

11 Q   Do you remember talking about this document?

12 A   Yes.

13 Q   And this is a version of your research regarding hospital

14 reduction rates for various community-based services.  Is that

15 right?

16 A   Yes.

17 Q   Regarding substance abuse treatment, you wrote "Unclear

18 variable."

19 A   Correct.

20 Q   Are you -- does that refer specifically to the absence of

21 randomized controlled studies?

22 A   Yes.

23 Q   Is there other research, short of a randomized controlled

24 study, regarding possible reduction rate for substance abuse

25 treatment?

1  A    There are many different kinds of services.  We followed a

2  cohort of people with co-occurring serious mental illness and

3  substance use disorder in New Hampshire over 16 years.  And we

4  found that people recovered in different patterns, but in the

5  general finding was that more people were in recovery in

6  different areas every year.  And the hospital, you know, rates

7  went down to just about zero over the years for that cohort.

8       You know, and that reminds me of another aspect of rural

9  care that I should have mentioned when we've talked about that.

10 Q    What was that aspect?

11 A    You know, when I moved from Boston to New Hampshire, I

12 spent the first two or three years saying, Where are the really

13 sick patients?  And finally, I realized that -- and there's

14 literature on this too, that dense, noisy, highly populated

15 inner city areas are really very toxic for people who have

16 serious mental illness, and rural areas just have a lot of

17 advantages.  I think that's why I was so surprised.  And it

18 took me awhile to learn to take advantage of that.

19      You know, we had patients in the area where I was the

20 medical director in New Hampshire who, when they were really

21 psychotic, you know, they would go to a local pond and fish for

22 the day and avoid being around people.  Well, you can't do that

23 in the middle of Boston.  That person is more likely to be

24 walking down the street talking to himself and be harassed by

25 some kids and maybe punch somebody and end up in jail or the

1    hospital.

2        So, you know, we've been -- there's been a lot of

3    discussion here about the disadvantages of rural areas, but I

4    actually think the advantages outweigh the disadvantages.

5    Q    Thank you.  Dr. Drake, you were asked about a direct

6    federal funding mechanism for supported employment.

7    A    Yes.

8    Q    And your testimony was that there is no direct federal

9    funding mechanism for supported employment.  Correct?

10   A    Well, under some terms of Medicaid waivers, people can bill

11   directly for supported employment or large aspects of it, but

12   it's still not an easy issue, you know.

13   Q    Despite the difficulties with a direct federal funding

14   mechanism for supported employment, are states providing IPS

15   supported employment?

16   A    Oh, yes, some do very well.  There are states that have

17   more than 100 programs and more than 500 employment

18   specialists.  A state close by here, which is another

19   relatively poor southern state, South Carolina, does a terrific

20   job.

21   Q    Do you know if that state offers supported employment

22   through each of its community mental health centers?

23   A    Yes.  In South Carolina, I believe they have 17 community

24   mental health centers across the state, and everyone has a

25   supported employment team.  So you think if they have an

1   average of four employment specialists, that's 68 specialists

2   providing services for 30 people apiece, so they're really

3   reaching a large proportion of their patients who need that

4   service.

5   Q   Dr. Drake, you wrote reports about seven of the individuals

6   in the clinical review.  Correct?

7   A   Yes.

8   Q   And you answered four questions for each of those seven

9   individuals.  Correct?

10  A   Yes.

11  Q   Setting aside the issue of whether seven is large enough to

12  be a sample, do you have confidence in the findings you made

13  regarding those four questions for those seven individuals?

14  A   Yes.  Those people --

15          MR. HOLKINS:  I have no further questions.

16  A   Those people are similar to lots of people that I've

17  treated over the years, and I would think any of them would

18  have a chance to do well in the community.

19          MR. HOLKINS:  Thank you, Dr. Drake.  I have no further

20  questions, Your Honor.

21          THE COURT:  I have one question for you, Doctor.

22          THE WITNESS:  Yes, sir.

23                        EXAMINATION

24          THE COURT:  And the government will have an

25  opportunity to do a follow-up, as well as the defendant, based

1    on the question that I've asked.

2           Earlier on in your direct examination, you mentioned

3    that you -- I guess you came to a or saw a group home in North

4    Jackson where men were sitting around in the home, a large

5    group outside of Jackson, all rocking and shaking and drooling,

6    like State Hospital units of the 1970s.  You were around then.

7    Some of us -- I mean, I was very young then.

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Other than *One Flew over the Cuckoo's*

10   *Nest*.  You were about to describe it, and you said, Well, no

11   need to.  But I do need you to describe the 1970 -- you

12   indicated that it was like the mental health system of the

13   19 -- of the 1970s.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  If you could just give me a brief

16   description of that.

17          THE WITNESS:  Sure.  So one of the main reasons for

18   the institutionalization was, back in those days, people would

19   get sent to the State Hospital, and they would be there for

20   decades.  And they would be -- because the medications were

21   new, and we didn't know how to use them, they would be grossly

22   overmedicated.  So the rocking and shaking and drooling are all

23   results of gross overmedication.  And then because the

24   environment was so stagnant, people's skills and personalities

25   and IQs would, you know, generally erode over time.  So the

1  psychiatric literature back in the '60s and '70s was often

2  filled with the notion that severe mental illness was a

3  deteriorating dementing illness, like dementia.

4      We didn't realize then that what we were seeing was

5  mostly the effects of bad treatment.  And when we started -- I

6  mean, those back -- they were called back wards in those days.

7  And you read *One Flew Over the Cuckoo's Nest*, and there were

8  many books about it and movies made about it, and it was a

9  very, very -- there have been many sad times in the history of

10  mental health.  Right?  We've done awful things to patients.

11  But that was one of the worst times.  And when we moved people

12  into the community, I think we were all surprised by how well

13  some people did.

14      You know, just like the biggest surprise in my career

15  has been when we started closing day treatment centers and

16  people got better rather than worse.  And it took me awhile to

17  realize that because in the day treatment center, they were

18  really being treated like incompetent dependent children.

19  Somebody told them what to do every minute of the day.  And

20  once they got out on their own, lots of people, you know, found

21  jobs, found activities and just flourished, and we were not

22  good at predicting -- I was not good at predicting, I know,

23  which people were going to do really well.

24      The fellow in my day treatment center that I would

25  have pegged as having the least possibility of doing well

1   without day treatment, because he just sat in a chair all day

2   long and did nothing, when the day treatment center closed, he

3   got a part-time job in a bank.  And now, 20 years later, he's

4   still working every day in that bank.  He's had all kinds of

5   promotions.  He drives a car.  He has his own apartment.  I see

6   him at the Skyway when I take my kids up there.  He's a

7   different person.

8          THE COURT:  Okay.  Thank you.  Any follow-up based on

9   the question that I've asked?  Oh, I was going to go to the

10  government -- to the United States first.

11         MR. SHELSON:  Yes, Your Honor.

12         THE COURT:  Okay.

13                      REDIRECT EXAMINATION

14  BY MR. HOLKINS:

15  Q   One question following up, Your Honor.  Dr. Drake,

16  returning to that personal care home in North Jackson that you

17  remember --

18  A   Yes.

19  Q   -- do you recall whether or not the individuals you met

20  there, the clients who were living in that personal care home,

21  had been in State Hospitals in Mississippi?

22  A   I didn't get to interview all the clients, but I talked

23  extensively with the staff, and I believe what they told me was

24  that all of these people were men with serious mental illness

25  who had been transferred there from State Hospitals.

1          MR. HOLKINS:  Thank you, Dr. Drake.  That's all, Your

2     Honor.

3          THE COURT:  All right.  Thank you.  Mr. Shelson?

4                    RECROSS-EXAMINATION

5     BY MR. SHELSON:

6     Q    Dr. Drake, have State Hospitals evolved since the 1907s?

7     A    Oh, yes.

8     Q    In positive ways?

9     A    Many, many positive ways, yes, sir.

10    Q    Such as?

11    A    Well, my -- one of my close friends is the medical director

12    of New Hampshire Hospital, and so I talk to him frequently and

13    consult with him about patients like the ones we've reviewed

14    here, and it amazes me that the average length of stay there is

15    seven days.  You know, they're really able -- they are really

16    very efficient at getting people evaluated and treated and

17    working out discharge plans right away with the local

18    community.  We did nothing like that in the 70s.

19    Q    So is your view of State Hospitals as they generally

20    existed today is that they're not some evil places that need to

21    be boarded up and closed?

22    A    I would never say anything like that.

23    Q    Okay.

24         MR. SHELSON:  Thank you, Your Honor.

25         THE COURT:  All right.  Dr. Drake, you may step down.

1          THE WITNESS:  Thank you.  It's time for our lunch

2     break.  It's approximately 12:16.  We'll start back up at 1:45.

3     All right.  We're in recess.

4          (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10         I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14         This the 5th day of June, 2019.

15

16                           s/ *Cherie G. Bond*
                             Cherie G. Bond
17                           Court Reporter

18

19

20

21

22

23

24

25