UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                         CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                        DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 4


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
AFTERNOON SESSION
JUNE 5, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  BRENDA D. WOLVERTON, RPR, CRR, FCRR
Mississippi CSR #1139

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4188

```
1   APPEARANCES:

2   FOR THE PLAINTIFF:     MR. MATHEW SCHUTZER
                           MS. REGAN RUSH
3                          MS. DEENA FOX
                           MS. HALEY VAN EREM
4                          MR. PATRICK HOLKINS

5   FOR THE DEFENDANT:     MR. JAMES W. SHELSON
                           MR. REUBEN V. ANDERSON
6                          MR. HOWARD PIZZETTA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          TABLE OF CONTENTS

2     WITNESSES FOR THE GOVERNMENT

3     DR. TODD MACKENZIE

4          Direct Examination by Mr. Schutzer          272

5               Exhibit PDX-4 for ID                    276

6               Exhibit PDX-5 for ID                    278

7               Exhibit PX-405A                         280

8               Exhibit PDX-6                           286

9               Exhibit PDX-7                           288

10              Exhibit PX-1079                         288

11              Exhibit PX-1080                         288

12              Exhibit PX-1081                         288

13              Exhibit PX-1082                         288

14         Cross-Examination by Mr. Shelson            299

15         Redirect Examination by Mr. Schutzer        307

16    MELODY WORSHAM

17         Direct Examination by Ms. Van Erem          315

18         Cross-Examination by Mr. Anderson           342

19              Exhibit D-354                           356

20         Redirect Examination by Ms. Van Erem        356

21

22

23

24

25

1          THE COURT:  Is the government ready to call its next

2    witness?

3          MR. SCHUTZER:  Yes, Your Honor.  Mathew Schutzer for

4    the United States.  Our next witness will be Professor Todd

5    MacKenzie.  After Dr. MacKenzie, we will have one more fact

6    witness for the day.  We're going to try to move quickly so

7    that they both can go back home at the end of the day.

8          THE COURT:  Okay.  All right.

9                    **DR. TODD MACKENZIE,**

10   having first been duly sworn, testified as follows:

11         THE COURT:  The microphone is before you.  Just speak

12   loudly and clearly enough for all of us to hear you.  Always

13   speak into the microphone.  Make sure all your responses are

14   verbal.  If you are going to nod or shake your head, say yes or

15   no.  Try to avoid using uh-huh and huh-uh and please speak at a

16   pace at which the court reporter can keep up with you, and

17   allow the lawyers to finish their question or statement before

18   you begin to speak so that the two of you will not be speaking

19   at the same time.

20         So, for the record, could you state and spell your

21   name?

22         THE WITNESS:  Todd MacKenzie.  Spell it, did you say?

23         THE COURT:  Yes.

24         THE WITNESS:  T-O-D-D, M-A-C-K-E-N-Z-I-E.

25         THE COURT:  Okay.  I'm going to ask you to speak up

1    just a little bit.

2            THE WITNESS:  Okay.

3            THE COURT:  Make sure you are always speaking into the

4    microphone.

5            You may proceed.

6            MR. SCHUTZER:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8    BY MR. SCHUTZER:

9    Q    Dr. MacKenzie, where do you work?

10   A    Dartmouth College.

11   Q    What field do you work in?

12   A    In statistics.

13   Q    Were you retained as an expert for the United States in

14   this case?

15   A    Yes, I was.

16   Q    What were you retained to do?

17   A    So my role in this project was to -- given a list of

18   patients who were at the Mississippi State Hospitals between

19   October of '15 and October of 2017 to draw a sample of those

20   patients that would be representative of the entire population

21   of patients.

22   Q    What was the sample used for?

23   A    So after I provided a sample, it was given to, in my

24   understanding, other experts to go out and interview those

25   patients or their next of kin.

```
 1              THE COURT:  Try to slow down just a little bit.  You
 2    say you are from Dartmouth?
 3              THE WITNESS:  Yes.
 4              THE COURT:  Okay.  South of the Mason-Dixon around
 5    here.  Slow down just a little bit.
 6    BY MR. SCHUTZER:
 7    Q   In addition to drawing the sample, did you do any other
 8    analysis?
 9    A   So in addition to drawing the sample, the first thing I did
10    when I received the list of patients was to do -- well, I took
11    the data and I cleaned it, that's a term we use, and did
12    descriptive statistics on it that would help inform how we go
13    about the sampling.
14    Q   We will talk about all of that in a few minutes.  Did you
15    write a report describing what you did and what you found?
16    A   Yes, I did.
17    Q   You have a binder in front of you.
18              MR. SCHUTZER:  Your Honor, I have also handed up a
19    copy and a copy to cocounsel.
20    BY MR. SCHUTZER:
21    Q   Is your report PX-405, the first tab in that binder?
22    A   Yes, it is.
23              MR. SCHUTZER:  And that was preadmitted on the first
24    day of trial, Your Honor.
25    BY MR. SCHUTZER:
```

1  Q   I would like to talk a little bit more about you,

2  Dr. MacKenzie.  Do you have a Ph.D.?

3  A   Yes, I do.

4  Q   What is it in?

5  A   Statistics.

6  Q   You have a particular focus within the field of statistics?

7  A   So, in general, I do what's called biostatistics, which is

8  statistics for medical applications.

9  Q   Where did you get your Ph.D.?

10  A   McGill University in Montreal, Canada.

11  Q   When did you get that degree?

12  A   1997.

13  Q   How long have you been a professor?

14  A   Since 1997.  Twenty-two years.

15  Q   And you currently work at Dartmouth?

16  A   Yes, I do.

17  Q   What classes do you teach?

18  A   I teach a class on what's called statistical modeling and a

19  class on what's called biostatistics consulting.

20  Q   In addition to teaching, do you also work on research?

21  A   Yes, I do.

22  Q   About how much of your time is spent on research versus

23  teaching?

24  A   About 80 percent of my time is research.

25  Q   You have been the author of articles that have been

1  published in peer-reviewed publications?

2  A    Yes.

3  Q    Have any of those articles involved pulling samples?

4  A    Yes, some of them have.

5  Q    How does the complexity of the work that you did in this

6  case compare to the complexity of work you have done in

7  peer-reviewed publications?

8  A    Well, I could say that it's a little more rigorous.  This

9  project was more rigorous.  Typically when we use samples in

10  medical research, often we go for what's called a convenience

11  sample.  And in this case, convenience was not used.  It was

12  more rigorous.

13  Q    Have you ever been an expert witness before?

14  A    No.

15        MR. SCHUTZER:  Your Honor, we tender Dr. MacKenzie as

16  an expert in statistics and biostatistics.

17        MR. SHELSON:  No objection, Your Honor.

18        THE COURT:  All right.  This witness will be allowed

19  to testify as an expert witness on statistics and

20  biostatistics.

21        You may proceed.

22        MR. SCHUTZER:  Thank you, Your Honor.

23  BY MR. SCHUTZER:

24  Q    Let's turn back to the work that you did in this case.

25  What were you retained to do?

A    So I was retained to -- given a list of patients from

Mississippi State Hospitals between a two-year period,

October 2015 and October 2017, to draw a sample from that list

of patients that would be representative of the entire

population, I use the term.

Q    All right.  Do you have a demonstrative slide that

describes the population you were working with?

A    Yes, but I do not see it.

Q    All right.  Well, let's get that one on the screen.

MR. SCHUTZER:  Your Honor, we're going to mark this

for identification as PDX-4.  May I approach?

THE COURT:  Yes, you may.

MR. SCHUTZER:  We have disclosed a copy to the State.

(EXHIBIT PDX-4 MARKED FOR IDENTIFICATION)

BY MR. SCHUTZER:

Q    How many people were admitted to the Mississippi State

Hospitals in that two-year period you were looking at?

A    It was almost 4,000, so 3,951 individuals.

Q    And what was the two-year period?

A    October of 2015 to October 2017.

Q    Is this group of 3,951 people known by a specific term in

statistics?

A    Well, typically we would refer to this as the sampling

frame.

Q    Is a sampling frame the same as a population of interest?

1    A    Yes.

2    Q    Were any of these 3,951 individuals in a State Hospital

3    more than once within the two-year period you were looking at?

4    A    Yes.  Some of them were.

5    Q    How many?

6    A    I would have to look at my report to recall that.

7    Q    All right.  Let's turn to page 28, using the numbers in the

8    bottom right-hand of the page.  This is PX-405.

9    A    Okay.  I have that.

10   Q    Take a look at the section at the top of the page,

11   descriptive statistics.

12   A    Yes.  So to answer your question, 514 of the patients had

13   two admissions during that period.  Another 147 had three

14   admissions during that two-year period.  And 82 of those

15   individuals had four or more admissions during the two-year

16   period.

17   Q    By my math, that adds up to 743 people.  Does that sound

18   right?

19   A    Sounds right.

20   Q    Let's go back to the slide that you had about the

21   population of interest.  How many people of these 3,951 were a

22   part of the sample?

23   A    So I drew a sample of 299 individuals.

24   Q    How many of the 299 individuals participated in the client

25   review?

1    A    154.

2    Q    Were all -- did all 154 of the individuals personally

3    participate?

4    A    It's my understanding two or three had passed away, so

5    family was contacted.

6    Q    The interviews were done by other researchers?

7    A    Correct.

8    Q    Did those researchers make findings that you then analyzed?

9    A    That's correct.

10   Q    Do you have a slide showing your analysis of those

11   findings?

12   A    Yes, I do.

13        MR. SCHUTZER:  We will mark this for identification as

14   PDX-5.

15       (EXHIBIT PDX-5 MARKED FOR IDENTIFICATION)

16   BY MR. SCHUTZER:

17   Q    What did you conclude about the findings with respect to

18   the question of whether individuals were not opposed to the

19   community?

20   A    So based on the interview responses I received, I

21   calculated 99.4 percent were not opposed.

22   Q    What did you find with respect to the responses to the

23   question about whether individuals would have avoided or spent

24   less time in a State Hospital?

25   A    In that case it was 100 percent.

1  Q   Before we talk about the third column on this slide, let me

2  ask you, did you submit an addendum to your expert report

3  related to the third question?

4  A   Yes, I did.

5  Q   Why was that?

6  A   I found out in the past month that one of the responses in

7  the data set, the spreadsheet I received, was in error.

8  Q   What impact did that error have on your analysis?

9  A   So for the third question, it had a small impact and

10 reduced the percentage a small amount.

11 Q   Was there any other impact?

12 A   No.

13 Q   Is your addendum Exhibit PX-405A in your binder?

14 A   Yes.

15      MR. SCHUTZER:  Your Honor, I move PX-405A into

16 evidence.

17      THE COURT:  Any objection?

18      MR. SHELSON:  No, Your Honor.

19      THE COURT:  PX-405A will be received in evidence.

20   (EXHIBIT PX-405A MARKED)

21 BY MR. SCHUTZER:

22 Q   Let's go back to the slide that has your analysis with the

23 correction.  What is your finding with respect to the third

24 question about whether individuals were at serious risk?

25 A    In that case I calculated 85 percent, 85.1 percent.

1  Q   What did these numbers, 99.4, 100 percent, and

2  85.1 percent, how do those numbers relate to the 3,951 people

3  in the population of interest?

4  A   So we could not interview all individuals, all 4,000, but

5  by going through the process of taking a representative sample,

6  we can be confident that these calculations here apply to the

7  entire population or what we call estimates of those.

8  Q   Before we talk more about the process of how you got these

9  numbers in particular, I want to take a step back and focus on

10  some of the statistical principles you used to get there, and

11  we will start at the beginning.  What is a sample?

12  A   So -- so when you have a population that you want to answer

13  questions about but you cannot go and answer that question in

14  every particular individual because it would be too costly,

15  what we do is we take a sample of the population, a subset.

16  Q   Is the number of people in a sample important?

17  A   Yes.  In general, as the number of individuals in a sample

18  of what we call the sample size, as that increases, the

19  precision, the value of the information improves.

20  Q   Can you give a concrete example of what you mean?

21  A   So, for instance, actually the one that comes to mind right

22  now is actually batting percentages.  So in baseball if you

23  were to just use the first five at-bats for a baseball player

24  during a baseball season, that would not give you a very good

25  idea of their batting average the whole season whereas if you

1  could take the first half of the season, that would be a much

2  better estimate.  So as the sample size increases in that case

3  at-bats, your estimate gets better and better.

4  Q    Would you turn, please, to page 1 of your report which is

5  PX-405.

6  A    Yes.

7  Q    Looking at the last sentence of the first paragraph, you

8  wrote, "The key statistical concepts utilized in the design of

9  the sample were randomness, stratification, and weighting."

10  A    Yes.

11  Q    I would like to talk about each one of those briefly.

12  Let's start with randomness.  What does that mean?

13  A    So randomness is a concept we employ repeatedly in

14  statistics and medical research, and the whole point is to --

15  is by randomly sampling individuals, we create a representative

16  sample, a sample that's representative of the entire population

17  of interest.

18  Q    How do you achieve randomness in a sample?

19  A    So what I would do as a statistician or statisticians do is

20  we employ what's called random number generators which is

21  analogous to using flips of a coin or throw of a die to create

22  randomness.

23  Q    What is the relationship between randomness and

24  representativeness?

25  A    So -- so if a sample is completely random, that means that

1  everyone in the population has an equal chance of being drawn

2  into your sample and, thereby, your sample is representative

3  because everyone has an equal chance of getting into it.

4  Q   The next concept that you wrote about in your report is

5  stratification.  What is that?

6  A   So, often when surveys are done, it's -- stratification is

7  an option that's considered.  So I would -- I have

8  conversations with people doing samples about what is the value

9  of -- is there any characteristics that you would like to

10  stratify by.

11  Q   What does it mean to stratify?

12  A   So, for instance, something that's often stratified by

13  samples is race or ethnicity.  So to stratify a sample by race

14  or ethnicity would mean that into your sample you draw a fixed

15  number of people from each of the race categories.

16  Q   Why would you use stratification?

17  A   Well, so there's a couple motivations for using

18  randomization.  One might be to guarantee that you get a

19  certain number of each category of race.  So, for instance, if

20  in the City of Jackson you were to take a sample, and I don't

21  know what proportion are Asian, I will say maybe 3 percent, if

22  you were to take a sample of 100 individuals, there is a

23  somewhat reasonable probability that just a random sample would

24  not actually draw any Asians.  So what you do is you fix ahead

25  that I'm going to sample, like, so many Asians, like three or

1    five of the 100.

2    Q    What is the relationship between stratification and

3    randomness?

4    A    So they are complementary concepts.

5    Q    What do you mean by that?

6    A    So if a sample is stratified and random, that means that

7    first you're going to break up the population into categories,

8    such as like race.  And then within each race category you are

9    going to randomly sample.

10   Q    If a sample is stratified, can the results related to that

11   sample be generalized back to the population of interest?

12   A    Yes.

13   Q    The third concept that you wrote about in your report is

14   weighting.  What is that?

15   A    So weights are the use of -- actually, weights is probably

16   a good intuitive term, where some people in your sample will

17   get weighted more than others to reflect the fact perhaps that

18   they had a better chance of getting into your sample or not.

19   So, for instance, a good example is an annual survey done in

20   the United States called the National Health and Nutrition

21   Examination Survey where every year they sample about 3,000

22   individuals.  But they stratify it by race.  And what they do

23   is they purposefully oversample Hispanics, I believe is the

24   category they oversample.  But that -- so a Hispanic might,

25   say, have twice as good a chance of making it into the sample

1    than a non-Hispanic. But at the end when you analyze the

2    results in order to make it representative of the entire U.S.

3    population, you actually end up assigning less weight to the

4    Hispanics because they were oversampled. So if they had double

5    the chance of being -- if their chance of getting into the

6    sample were twice --

7                THE COURT REPORTER: I'm sorry.

8    A    And so if their chance of getting into the sample was twice

9    as high as someone else, their weight would be half as high as

10   someone else, half as big as someone else.

11   BY MR. SCHUTZER:

12   Q    Why oversample and then adjust the weight as opposed to not

13   oversampling?

14   A    It's always a judgment call we make in any study whether to

15   stratify or not.

16   Q    What factors would influence that judgment call?

17   A    To stratify?

18   Q    Yes.

19   A    Well, so to stratify, as I was saying, to make sure that

20   you get a certain number of each of a category, such as race

21   categories, or in some cases you might want to leave the

22   potential that you can individually study particular groups,

23   like you can individually report results specific to Hispanics

24   or Asians or whites.

25   Q    Let's put all those concepts together and talk about how

1  you constructed the sample in this case.  How did you come to

2  be an expert in this case?

3  A   I was contacted by a colleague of mine at Dartmouth

4  College, Dr. Robert Drake.

5  Q   Did you know him before he contacted you for this case?

6  A   Yes.

7  Q   How often would you say it occurs that you work with

8  somebody that you already know?

9  A   75 percent of the time.

10  Q   When you are working with another researcher, can you

11  describe generally what the division of labor would be between

12  you as the statistician and that researcher?

13  A   So the role of the statistician in medical research is to

14  provide the quantitative expertise in any study.  So typically

15  we would be part of a team, and our role is limited to the

16  quantitative aspects such as helping to design the study to

17  make sure that the data that's collected can answer the

18  questions those individuals are trying to answer.  And then at

19  the end when the data is collected, I participate in the

20  analysis of the data.

21  Q   Is that generally the division of labor in this case?

22  A   Yes.

23  Q   Do you have a slide identifying the steps that you took in

24  this case?

25  A   Yes.

1   Q    Let's get that one on the screen.

2            MR. SCHUTZER:  We will mark this, Your Honor, for

3   identification as PDX-6.

4            THE COURT:  PDX-6 will be marked for ID only.

5        (EXHIBIT PDX-6 MARKED FOR IDENTIFICATION)

6   BY MR. SCHUTZER:

7   Q    Let's talk about the first step.  What was that?

8   A    To clean the data.

9   Q    What does that mean?

10  A    So anytime a statistician receives data, the first step is

11  to clean it.  And that means to take the data, for instance,

12  spreadsheets that you have received, to get an understanding of

13  what's in the spreadsheet to know which variables are which,

14  which ones are going to be relevant to the analysis, and to

15  identify errors, possible errors in the data.

16  Q    What sorts of errors did you come across in this case?

17  A    So an example of an error that is obviously an error would

18  be for these -- in this data that I received from Mississippi

19  State Hospitals about their admissions, if their date of

20  admission was actually after their date of discharge, that

21  would obviously be an error.

22  Q    What did you do when you came across an error like that?

23  A    In that case I would eliminate it.  I think there ended up

24  being a few patients like that.

25  Q    How often do you encounter data that needs to be cleaned?

1  A   That is almost always.

2  Q   How did the amount of cleaning that you did here compare to

3  cleaning that you have had to do in other work?

4  A   Very similar.

5  Q   You mentioned looking at a number of spreadsheets.  Did you

6  prepare a list of those spreadsheets?

7  A   Yes.

8  Q   Let's turn to that.

9       MR. SCHUTZER:  We will mark this for identification,

10  Your Honor, as PDX-7.

11       THE COURT:  PDX-7?

12       MR. SCHUTZER:  Yes.

13       THE COURT:  All right.  For identification purposes?

14       MR. SCHUTZER:  Yes, Your Honor.

15       THE COURT:  Okay.  All right.

16  (EXHIBIT PDX-7 MARKED FOR IDENTIFICATION)

17  BY MR. SCHUTZER:

18  Q   Is this the list that we're looking at?

19  A   Yes, this is the list that I amalgamated into my sampling

20  frame.

21  Q   Would you identify the exhibit numbers, the far left

22  column?  Would you just read them, please?

23  A   Yes.  So I used PX-1064, 1079, 1065, 1066, 1080, 1081,

24  1082, 1069, 1070, 1071, 1072, 1073, 1074, 1075 and 1076.

25       MR. SCHUTZER:  Your Honor, all of those except the

four I'm about to list were preadmitted.  I'm going to move to admit PX-1079, 1080, 1081 and 1082.

THE COURT:  That should be PX-1079 and PX-1080?

MR. SCHUTZER:  Yes.

THE COURT:  1081 and 1082?

MR. SCHUTZER:  Yes, Your Honor.

THE COURT:  Any objection from the State?

MR. SHELSON:  No, Your Honor.

THE COURT:  All right.  Those exhibits will be received into evidence.

(EXHIBITS PX-1079, PX-1080, PX-1081 AND PX-1082 MARKED)

BY MR. SCHUTZER:

Q   Dr. MacKenzie, other than the fact that they contained information about different patients, was the type of information in each spreadsheet similar?

A   Very similar, yes.

Q   Can you describe generally the sorts of information that were contained in these spreadsheets?

A   So it had personal identifiers such as Social Security number, medical record numbers, some Medicaid numbers, I believe.  It had information on gender, race, age, diagnoses, primary and secondary diagnoses, the number of the prior admissions, length of stay, admission and discharge dates.

Q   Thank you.  Before we took a look at this list of documents, we were talking about you cleaning the data.  Once

1  you cleaned the data, how many people did you identify as being

2  in the population of interest?

3  A  3,951.

4  Q  Let's go back to the demonstrative that talks about the

5  steps that you took, PDX-6.  What was the next step after

6  cleaning the data?

7  A  So after I cleaned the data, I conducted some

8  descriptive -- I calculated some descriptive statistics.

9  Q  What does that mean?

10  A  So descriptive statistics means calculating proportions, a

11  proportion that came from each hospital, a proportion that were

12  male, female, a proportion that were black, white, calculating

13  the average age, things like this.

14  Q  Why did you prepare descriptive statistics?

15  A  So this is something I shared with Dr. Drake to help inform

16  how we would go about the design of the sample.

17  Q  Did you include the descriptive statistics in your report?

18  A  Yes, I did.

19  Q  Those at Exhibit C of your report?

20  A  Yes.

21  Q  Beginning on page 28 of PX-405?

22  A  Yes.

23  Q  What sort of information did you look at within the

24  descriptive statistics?

25  A  So, as I was saying, the percentages by race and gender, by

1    hospital, by diagnoses, things like this.

2    Q   Once you cleaned the data and prepared these descriptive

3    statistics, what did you do?

4    A   So the sample was designed in conversation with Dr. Drake

5    what factors we should stratify by.

6    Q   What did you decide with Dr. Drake to stratify by within

7    the sample?

8    A   So we decided that length of stay would be stratified by in

9    the sample as well as hospital that the patient had been at.

10   Q   Why did you decide to stratify or why did you and Dr. Drake

11   decide to stratify by State Hospital?

12   A   By State Hospital?  So the stratification with respect to

13   State Hospital was to make sure that we had enough patients

14   from each of the four hospitals that comprised our sampling

15   frame, our population.

16   Q   Why did you and Dr. Drake decide to stratify by length of

17   stay?

18   A   So, in my understanding -- in my understanding, the reason

19   we stratified by length of stay was to make sure we had enough

20   subjects from the whole range of length of stay.  So that means

21   we would have patients with short length of stays, moderately

22   long length of stays, and enough patients with long lengths of

23   stays.

24   Q   Do you have a demonstrative slide identifying the strata

25   that you used?

```
1    A    Yes.

2    Q    Let's get that one up.

3            MR. SCHUTZER:   That one was previously marked for

4    identification, Your Honor, as PDX-2.

5    BY MR. SCHUTZER:

6    Q    What were the strata that you used?

7    A    So the strata we used were 1 to 20 days or approximately

8    the first -- a length of stay less than three weeks; 21 to 60

9    days, which is a length of stay of three weeks to two months;

10   61 to 180 days, or a length of stay from over two months to a

11   half a year; and finally, a length of stay of 181 days or more,

12   or half a year or more.

13   Q    Why these particular cutoffs?

14   A    So these -- when cutoffs are decided in this kind of

15   project in research that I am involved in, it is usually a

16   combination of expert insight and the distribution of the data

17   and round numbers to some extent.  So in this case we chose,

18   for instance, the cutoff of 180 days to represent patients with

19   really long lengths of stay.

20   Q    For people who had multiple hospitalizations of different

21   lengths within the two-year period, for instance, somebody who

22   had a 20-day stay and then somebody who had a 61-day stay a few

23   months down the road, how did you decide which strata that

24   person would go in?

25   A    We used the first -- their first admission to the hospital.
```

1  Q   Why was that?

2  A   It's just a convention, when you have more than one, to

3  take the first.

4  Q   How many people were pulled into the sample?

5  A   299 individuals were sampled, were part of my sample that I

6  randomly generated with stratification.

7  Q   Did you have a role in collecting data about those people?

8  A   No.

9  Q   Did you have a role in looking at the data once it was

10 collected?

11 A   Yes.

12 Q   What was that role?

13 A   So once the interviews had been completed and responses

14 from those interviews put into a spreadsheet, that spreadsheet

15 was given to me to analyze.

16 Q   What did you do to analyze that information?

17 A   So in analyzing the results of the interviews, the first

18 step was to address the question, was there any difference

19 between the people in the sample that were interviewed and the

20 people in the sample that were not interviewed.

21 Q   Why did you check for a difference between the people who

22 were interviewed and the people who were not interviewed?

23 A   So the point of that is to determine if there is any

24 characteristics which suggest that the people who complete

25 interviews or people that respond to surveys are different

1  somehow than those who do not.  And if there is a difference,

2  then we would account for it in our final analysis.

3  Q   How would you account for it in your final analysis if

4  there was a difference?

5  A   So the typical way to account for differential response

6  rates, for instance, this type of person is much more likely to

7  respond than this type of person, is to use weighting.

8  Q   What factors did you check for in this data to see if there

9  were differences in response rates?

10  A   So I -- so, in looking at response rate, I asked was gender

11  related to the response rate, was age related, was race

12  related, was which hospital they had been at related, number of

13  prior admissions, length of stay, about eight or nine different

14  factors.

15  Q   Across all of those factors, did you find any statistically

16  significant differences in response rates?

17  A   So with respect to all the factors I looked at to ask if

18  they were related to the probability of completing an

19  interview, the only one which showed some evidence was race.

20  Q   Did you apply weighting to account for the difference in

21  response rates related to race?

22  A   Yes.  So because, for instance, blacks were -- blacks

23  completed the interviews at a 60 percent rate versus whites,

24  which is about 40 percent, I added up weighting in my analysis

25  the blacks a little more than the whites because the whites

*** DAILY TRANSCRIPT ***

1  were less likely to complete the interviews.

2  Q   How common is it to need to apply weighting to account for

3  differences in the response rates?

4  A   Well, it happens almost always.

5  Q   How common is it to need to apply weighting to only one

6  factor to address differences in response rates?

7  A   Often it can be many factors that you might use.

8  Q   In addition to weighting to account for race, was there any

9  other weighting that you used in your analysis?

10  A   Yes.  Because by design, we stratified by length of stay

11  and hospital, those factors were used in the weighting.

12  Q   Can you explain what that means?

13  A   So, for instance, in our sample we drew 75 patients from

14  each of those four length-of-stay categories.  So patients in

15  the longest length-of-stay category, a half year or more, 181

16  days, that was probably 7 percent of the patients, but they

17  comprised 25 percent of our sample.  So in my final

18  calculations, I ended up weighting the long length-of-stay

19  people less because they were oversampled.

20  Q   Why not draw a sample that has only 7 percent of people

21  within the 181-plus stay strata?

22  A   Well, we could have.  I think -- my understanding is that

23  we wanted to have more than that in our final sample in case we

24  wanted to look specifically at patients that had long length of

25  stays.  So if you only sampled -- if our sampling proportion

1    matched what it was in the population, 7 percent, of the 300,

2    21 would have been in the sample, and maybe that would not be

3    enough to make conclusions about people if we wished to make

4    specific conclusions about patients with long length of stays.

5    Q    To wrap up, I would like to talk about your analysis of the

6    overall findings.  Would you turn, please, to page 5 of PX-405

7    which is your report.

8    A    Yes.

9    Q    In the second paragraph, you wrote, "I characterized

10   responses to each of the yes/no questions, *Is not opposed to*

11   *community-based services*, *Would have avoided or spent less time*

12   *in a State Hospital,* and*, Is at serious risk of*

13   *institutionalization,* by reporting the frequency with which

14   they were responded to in the positive."  What does that mean

15   in layman's terms?

16   A    Meaning the answer to the question was yes.

17   Q    Once you had the number of yes questions for each answer --

18   I'm sorry.  Once you had the number of yes answers for each

19   question, what did you do?

20   A    So I -- so the goal was to estimate in the entire

21   population if they had been interviewed what that proportion

22   would be that would answer yes.  And so I went about

23   calculating those using this weighted analysis.

24   Q    And then underneath that paragraph, you have an estimate of

25   the frequency for each of the questions.  And there is

1   something there, each of them has a 95 percent confidence

2   interval.  What does that mean?

3   A   So in statistics, a 95 percent confidence interval, which

4   is -- sometimes goes by the name of margin of error, is -- so

5   instead of providing just a specific one number, you provide a

6   range.  And that range, so this confidence interval or margin

7   of error is a range where you are 95 percent confident that the

8   true value lies.  And in this case, the true value being if you

9   had gone back and interviewed all 3,951 people.

10  Q   Let's go through those estimates.  For the first question,

11  whether the individual is not opposed to community-based

12  services, what is your estimate?

13  A   99.4 percent.

14  Q   For the second question, whether the individual would have

15  avoided or spent less time in a State Hospital, what is your

16  estimate?

17  A   100 percent.

18  Q   For the third question, let's flip to PX-405A, your

19  addendum.

20  A   Oh, yes.

21  Q   What is your estimate to the answer -- of the answer to the

22  third question, whether the individual is at serious risk of

23  institutionalization in a State Hospital?

24  A   That's 85.1 percent.

25  Q   99.4, 100, 85.1 percent, how --

1      THE COURT REPORTER:  I'm sorry?

2  BY MR. SCHUTZER:

3  Q   99.4, 100 percent, 85.1 percent, how do those three

4  findings about 154 people relate to the 3,951 people who were

5  in the population of interest?

6  A   Well, I'm confident that they are very close to what it

7  would be if they were -- if the entire list of patients has

8  been interviewed, all 4,000.

9  Q   I'm sorry to interrupt you.  Was the sample of 299

10 individuals drawn randomly within each strata?

11 A   Yes.

12 Q   Was the sample of 299 individuals representative of the

13 3,951 individuals who were in a State Hospital?

14 A   Yes, especially after we weight, too, in our analyses.

15      MR. SCHUTZER:  If I could have a moment to confer with

16 cocounsel, Your Honor.

17      THE COURT:  Yes, you may.

18  (SHORT PAUSE)

19 BY MR. SCHUTZER:

20 Q   Dr. MacKenzie, just to go back to a couple of questions on

21 weighting, just to make sure your testimony is clear, you

22 testified that you found a statistically significant difference

23 in the response rates for blacks and whites.  Is that correct?

24 A   Yes.

25 Q   Of those two groups, which was -- which responded more

1  frequently?

2  A   A black individual is more likely to complete an interview

3  than a white individual.

4  Q   To account for that, did you weight -- which group then got

5  weighted more?

6  A   So because African Americans were more likely to complete

7  an interview than whites, in the end, if you want to make the

8  analysis specific to the entire population, you end up

9  weighting the whites a little bit more because they were less

10  likely to participate in an interview.

11  Q   Would you turn, please, to page 4 of your report, PX-405.

12  A   Yes.

13  Q   In the first sentence of the section called analysis of the

14  completed interviews, you write that there were four deceased

15  patients?

16  A   Yes.  Can you remind me which section is that?

17  Q   Section E, first sentence, bottom of page 4.

18  A   Okay.

19  Q   You wrote that there were four deceased patients?

20  A   Okay.

21  Q   Is that an accurate number of the number of people who were

22  deceased within the 154?

23  A   That's my understanding.

24  Q   Thank you.

25       MR. SCHUTZER:  No further questions.

1          MR. SHELSON:  May I proceed, Your Honor?

2          THE COURT:  Yes, you may.

3                    **CROSS-EXAMINATION**

4    BY MR. SHELSON:

5    Q    Good afternoon, Dr. MacKenzie.

6    A    Good afternoon.

7    Q    I'm Jim Shelson.  I'm one of the lawyers representing the

8    State of Mississippi.  I won't keep you long but I do have a

9    few questions for you.  I want to direct your attention to

10   PX-405, which is your report, in page 5 of your report.  All

11   right.  On page 5 here, these are the three questions that you

12   did a statistical analysis of.  Is that correct?

13   A    Correct.

14   Q    All right.  And then you were showed this slide which is

15   PDX-5.  Do you recall this?

16   A    Yes.

17   Q    Okay.  And so moving from left to right, the left-most

18   column on PDX-5 corresponds to question number 1?

19   A    Yes.

20   Q    Is that correct?

21   A    Yes.

22   Q    And so on.  And the second from the left is question 2 and

23   the right-most is question 3?

24   A    Yes.

25   Q    Okay.  So based on your understanding -- well, question 1

1   is whether the individual is not opposed to community-based

2   services.  Is that correct?

3   A   Yes.

4   Q   All right.  To your understanding, who was answering that

5   question?

6   A   It's my understanding it was the patients and, in a few

7   cases, family members.

8   Q   Okay.  And question 2, whether the individual would have

9   avoided or spent less time in a State Hospital, who was

10  answering that question?

11  A   I'm not entirely sure but a combination of the patient or

12  the expert interviewer.

13  Q   Your understanding who was answering question 3, which is

14  whether the individual is at serious risk of

15  institutionalization in a State Hospital.

16  A   I presume that was the expert interviewer giving their

17  opinion.

18  Q   So where -- like, in question 3 -- so it's your

19  understanding that the expert found that 85.1 percent of the

20  individuals they reviewed were at serious risk of

21  institutionalization in a State Hospital?

22  A   Yes.

23  Q   So with respect to where the expert answered the question,

24  are you saying that the expert would have answered that

25  question at this same percentage for the 3,951 people?

1    A    Yes.  That's what I -- that's how I would phrase it.

2    Q    Okay.  So do you have an understanding of how many experts

3    participated in this review?

4    A    It's my understanding it was six or seven.

5    Q    So does this result for question 3 tell us anything at all

6    about what the result would be if, say, we had six different

7    experts?

8    A    I presume it does.

9    Q    Well, when you say you presume, what are you presuming?

10   A    So it's my understanding that those -- the experts who

11   conducted the interviews are -- would be similar to other

12   experts.

13   Q    And if you are incorrect, then what?

14   A    Then it's plausible that -- if, for instance, the

15   interviews who conducted -- the experts who conducted the

16   interviews were just very, very different from your typical

17   expert, then, yeah, the numbers would be different.

18   Q    Well, what's your basis for assuming that the six experts

19   on DOJ's review team are typical experts?

20   A    Well, I don't have information to make a judgment one way

21   or the other because I don't know them or I have not learned

22   anything about them.

23   Q    I will represent to you that questions 2 and 3 are both the

24   opinions of the DOJ experts in this case.  Do you agree that

25   where the answers to questions 2 and 3 are based on the

1  opinions of six experts, that that's different than how

2  question 1 was responded to?

3  A    Yeah.  Arguably, yes, there is some differences, yes.

4  Q    Because 1 is a yes or no by a patient, and questions 2 and

5  3 are opinions by the experts?

6  A    I agree.

7  Q    Doctor, do you recall this exhibit?  It's PX-405.

8  A    Yes.

9  Q    And remind us what this is.

10  A    So this is some descriptive statistics on that list of

11  patients who had been in a Mississippi State Hospital during

12  the two periods, the population or sampling frame as I have

13  called it.

14  Q    Okay.  And could I direct your attention, please, to the

15  diagnosis section of this?  And so that -- I don't mean to

16  belabor the obvious, but the percentages you have listed there

17  represent the percentage of individuals of the nearly 4,000 who

18  have that particular diagnosis?

19  A    Yes.  And some of them might have had more than one, I

20  believe is the way I calculated it.

21  Q    Right.  But so based on the data you have here, what was

22  the most frequent diagnosis?

23  A    The schizophrenia.

24  Q    At 28.8 percent?

25  A    Yes.

1    Q    And then so on is listed there.

2    A    Yes.

3    Q    All right.

4           THE COURT REPORTER:  I'm sorry?

5           MR. SHELSON:  I'm sorry.

6    BY MR. SHELSON:

7    Q    And then so on is listed there.  And then, Doctor, if I

8    could direct your attention to the next heading, is that number

9    of prior admissions?

10   A    Yes.

11   Q    And 0 prior admissions was 54.1 percent?

12   A    Yes.

13   Q    And that was the highest percentage category?

14   A    Yes.

15   Q    And then those who had exactly one admission, that was

16   17.6 percent?

17   A    Yes.

18   Q    And so then you combine either zero or one admission and

19   you get 71.7 percent?

20   A    Yes.

21   Q    Okay.  Doctor, this is P-417.  Have you seen this document

22   before today?

23   A    No.

24   Q    Okay.  This is a document produced by DOJ, and I will

25   represent to you that each red dot is an individual in the

1 sample who was recommended a PACT service and their last known

2 address at the time.

3 A   Okay.

4 Q   So if that representation is accurate, should these red

5 dots or the 154 individuals in the review be generalizable to

6 the 3,951 individuals?

7 A   So are you asking if the people who had completed

8 interviews were representative of the entire 3,951?

9 Q   Yes, sir.

10 A   Yes.

11 Q   Okay.  So, for example, I'm just going to direct your

12 attention to -- I will represent to you that these are counties

13 in Mississippi and these are the names of the counties.  You

14 have this cluster of four counties here, Smith, Jasper, Jones,

15 Covington, and there is no red dots in any of those four

16 counties.  So how, if at all, is that generalizable from the

17 154 to the 3,951?

18 A   Sir, I'm not sure what your point is.

19 Q   Well, of the 154, none of the individuals who PACT was

20 recommended for lived in those four counties.  Are you with me

21 so far?

22 A   Okay.

23 Q   So if you extended the results from 154 to the 3,951, would

24 you expect to find any individuals in those counties?

25 A   Sir, can you repeat the last part?

1    Q   If you extended the results for the 154 that's depicted on

2    this document to the 3,951, what would you expect to see with

3    respect to those four counties?

4    A   I'm not sure the exact nature of the question.  Are you

5    suggesting that the sample is not representative because it

6    doesn't have people from those counties?

7    Q   No.

8    A   Okay.

9    Q   No, no.  I'm sorry.  I'm saying that -- maybe this will

10   make it easier.  Let's look at a county like Lamar here where

11   there is one red dot.  Okay?  So if you extended these sampling

12   results to the 3,900 -- what do we call the 3,951?

13   A   Yeah.  Sampling frame or population.

14   Q   If you extended that result to the sampling frame, would

15   you expect to see more red dots in Lamar County?

16   A   Yes, but I'm not sure a red dot means that they were

17   sampled and completed the interview, or I'm not sure --

18   Q   That's where they resided.

19   A   Uh-huh.

20   Q   Uh-huh.

21   A   Yeah.  I'm sorry.  I'm not totally understanding the

22   question.

23   Q   That's okay.  I will move on.  So you spoke earlier in

24   terms of a confidence interval for the three questions.  Is

25   that correct?

1    A    Yes.

2    Q    So again, going back to the two questions, questions number

3    2 and 3 that were the opinions of the DOJ experts, again, is

4    that the confidence interval that those same experts would

5    answer those two questions the same way if they answered it for

6    the entire sample frame?

7    A    Well, there is a hidden assumption, if you will, that the

8    experts in this project were like other experts.

9    Q    All right.

10            MR. SHELSON:  Could I have just a moment to confer,

11    Your Honor?

12            THE COURT:  Yes.

13            MR. SHELSON:  Thank you, Your Honor.

14        (SHORT PAUSE)

15            MR. SHELSON:  Thank you, Dr. MacKenzie.  That's all

16    the questions we have.

17            Thank you, Your Honor.

18            THE COURT:  All right.

19                      **REDIRECT EXAMINATION**

20    BY MR. SCHUTZER:

21    Q    Just a few questions.  Dr. MacKenzie, you were shown a page

22    from your descriptive statistics.  You were looking at page 30

23    of PX-405.

24            MR. SCHUTZER:  Can we switch to the -- thank you.

25    BY MR. SCHUTZER:

1   Q   You were asked about the sections on diagnosis and number

2   of prior admissions.  Do you recall that?

3   A   Yes.

4   Q   If you look at page 29 of your report, PX-405, at the

5   bottom there is a heading, Descriptive Statistics:  Patient at

6   First Admission.  You see that?

7   A   Yes.

8   Q   That's the section that the statistics on diagnosis and

9   number of prior admissions were in.  What does it mean, patient

10  at first admission?

11  A   So in total, we had information on over 5,000 admissions,

12  but that was from 3,951 patients, and so when I calculated

13  these descriptive statistics, it applied to their

14  characteristics at that first admission if they had more than

15  one.

16  Q   So somebody who had zero prior admissions on their first

17  admission, if they had more than one admission within the

18  sampling window, that wouldn't be reflected in this set of

19  data, would it?

20  A   Correct.

21  Q   Would you turn in your report, please, to page 6 of 32 in

22  PX-405.  The last sentence of your report is, "In other words,

23  they," you're referring to the sample of population of

24  patients, "they are representative of the actual value were the

25  entire population to be interviewed."  Do you see that?

1    A    Yes.

2    Q    What does that mean?

3    A    So it means the calculations I made, for instance, for

4    those three questions apply to the entire population, the

5    representative of what would happen if the entire population

6    had been interviewed.

7    Q    Thank you.

8         MR. SCHUTZER:  No further questions.

9         THE COURT:  Doctor, I have a couple of questions to

10   follow up on.  Each side will have an opportunity to follow up

11   based on what I have asked.  Just so I can be correct on your

12   statistical sampling, one of the questions that Mr. Shelson was

13   asking --

14        And maybe if you will, Mr. Shelson, could you put back

15   up on the screen PX-0417?  I believe that's what you were

16   pointing to with the -- is that the client review members with

17   the programs?  Is that -- I think I'm looking at the same

18   document.  It may be titled something else.  I'm sorry.  I'm

19   talking about the first document.

20        MR. SHELSON:  Yes, sir.  This is P-417.

21        THE COURT:  Right.  Okay.

22        Mr. Shelson was asking about Smith, Jasper, Jones and

23   Covington Counties there in southeast Mississippi.  And I guess

24   it shows there in that general area, in that four-county area,

25   that none of the people who were interviewed, I guess, came

1   from those particular counties.  I don't know if it makes any

2   difference statistically.  You know, we have 82 counties in the

3   state, and in that four-county area, nobody came from either of

4   those counties.  But there are other counties where there's --

5   because I noticed further south, Perry, Greene, George, Stone

6   and Pearl River, there are no individuals from those counties.

7           I guess, and we do see a lot -- we do see several

8   people apparently from Hinds County because that's the most

9   populous county.

10          THE WITNESS:  Uh-huh.

11          THE COURT:  I would suspect that that's the reason.

12          THE WITNESS:  Uh-huh.

13          THE COURT:  So is there anything statistically

14  significant in the fact that there are no dots in several of

15  these counties?

16          THE WITNESS:  To me, that's not surprising that some

17  counties will not be representative when you take a random

18  sample.  Inevitably, some aspects, like depending on how much

19  you carve it up, and the more you carve it up, the less likely

20  that some of those places will not be represented.

21          THE COURT:  And -- okay.  That's all I have, then.

22  Okay.

23          Any follow-up based on what I have asked?

24          MR. SCHUTZER:  Just briefly, Your Honor.  Just two

25  things.

BY MR. SCHUTZER:

Q    When you in your testimony, Dr. MacKenzie, just referred to carving up, what did you mean by that?

A    So when I say carving it up, I mean in this case carving it up geographically, but it could be carving it up with respect to any other characteristics, like about the individuals, you know, what color their eyes were, or what country they originally came from, et cetera.

         MR. SCHUTZER:  May I approach, Your Honor.

         THE COURT:  Yes, you may.

BY MR. SCHUTZER:

Q    (Tenders document.)  I have handed you PX -- I have handed you PX-418.

         MR. SCHUTZER:  Your Honor, this is a document that was preadmitted.

         THE COURT:  Okay.

BY MR. SCHUTZER:

Q    Have you -- what is this document?

A    Are you asking me?

Q    Yes.  Would you read the title?

A    So it's my understanding that each red dot represents the home address or the residence of where the patients in the sample came from.

Q    Is this all 154 people?

A    Well, I trust someone else to count them.  I can't tell off

1    the top of my head.

2    Q    I'm going to display PX-417 which you looked at with

3    counsel for the State.  Is this all 154 people, or is this a

4    subset of the 154?

5    A    The one on --

6    Q    The one that's now on the screen, --

7    A    The PACT?

8    Q    -- PX-417?

9    A    I believe that's a smaller set of the 154.  Is that

10   correct?

11   Q    I can't answer that.  I ask the questions.

12   A    I believe it's my understanding that that's not all of

13   them; that's a subset of the 154 that were interviewed.

14   Q    Does the fact that there are some counties in the state of

15   Mississippi where none of the 154 people reside impact the

16   representativeness of the results of the client review?

17   A    Well, I would say no unless there was a compelling reason

18   that someone could identify that those counties that are not

19   represented are really different from the counties that are.

20            MR. SCHUTZER:  No further questions.

21   BY MR. SHELSON:

22   Q    Doctor, here is my question:  Does the document that --

23   well, strike that.  If you were in the Mississippi Department

24   of Mental Health, would the document that's marked P-417 tell

25   you anything about where you need to focus your PACT services?

1        MR. SCHUTZER:  Objection, Your Honor.  This is far

2   outside the scope of the witness' expertise.

3        THE COURT:  You can answer.  Objection overruled.

4        MR. SHELSON:  Would you like me to repeat that?

5        THE WITNESS:  Yes, please.

6   BY MR. SHELSON:

7   Q   If you were in the Mississippi Department of Mental Health,

8   would Exhibit P-417 tell you anything about where you need to

9   focus your PACT services?

10  A   So I'm not sure of the nature of the question.  I'm not

11  sure.  I'm not sure I am an expert to answer that.

12       MR. SHELSON:  I will move on, Your Honor.

13       That's all.  Thank you.

14       THE COURT:  Okay.  All right.  Is this witness finally

15  excused?

16       MR. SCHUTZER:  Yes, Your Honor.

17       THE COURT:  All right.  You may step down.

18       THE WITNESS:  Thank you.  Do I leave these here?

19       THE COURT:  You can leave them.

20       Before we call the next witness, I have to tend to a

21  matter so we will take about a 15-minute break or so, but

22  hopefully we will be able to get through with this witness

23  today.

24       MR. SCHUTZER:  Thank you, Your Honor.

25       THE COURT:  All right.

1    (Recess)

2          THE COURT:  Thank you for bearing with me.  Is the

3    government ready to call its next witness?

4          MS. VAN EREM:  Yes, Your Honor.  Haley Van Erem for

5    the United States.

6          THE COURT:  Tell me your name again.

7          MS. VAN EREM:  Haley ––

8          THE COURT:  Okay.  I see it.

9          MS. VAN EREM:  Okay.  Haley Van Erem.

10         Before we call our next witness, Melody Worsham, I

11   just had a brief housekeeping question.  We expect

12   Ms. Worsham's testimony to take about an hour and additionally

13   whatever the State has for cross.  We would just request that

14   after Ms. Worsham's testimony we recess for the day and start

15   our next witness tomorrow if that would be okay.

16         THE COURT:  That's going to be perfect because I have

17   to be out of here –– yeah, that will be perfect.

18         MS. VAN EREM:  Okay.  Great.

19         The United States calls Melody Worsham.

20         THE COURT:  All right.  Ms. Worsham, you may come

21   forward.

22                         **MELODY WORSHAM,**

23   having first been duly sworn, testified as follows:

24         THE COURT:  Ms. Worsham, you are free to adjust the

25   mic as you might need to, bring your seat forward.  Please

       1    speak loudly and clearly enough so we all can hear you.  Speak

       2    at a pace at which the court reporter can keep up with you.

       3    Allow the lawyers to finish their questions or statements

       4    before you begin to speak so that the two of you will not be

       5    speaking at the same time.  Make sure all your responses are

       6    verbal.  If you are going to nod or shake your head, say yes or

       7    no, and try to avoid using uh-huh and huh-uh because it might

       8    be spelled the same and have totally two different meanings.

       9            If you will, state your name for the record and spell

      10    it, please.

      11            THE WITNESS:  My name is Melody Worsham, M-E-L-O-D-Y,

      12    W-O-R-S-H-A-M.

      13            THE COURT:  Perfect.  Thank you.

      14            You may proceed.

      15            MS. VAN EREM:  Thank you, Your Honor.

      16                        DIRECT EXAMINATION

      17    BY MS. VAN EREM:

      18    Q   Good afternoon, Ms. Worsham.  First, before we get started,

      19    this case has a fact cutoff of December 31st, 2018.  So for the

      20    purposes of my questions today, I would appreciate it if you

      21    focus on the facts that existed through the end of 2018.  Is

      22    that okay?

      23    A   That's okay.

      24    Q   Ms. Worsham, where do you reside?

      25    A   In Wool Market, Mississippi.

```
1   Q    Is that on the Gulf Coast?

2   A    It is.

3   Q    How old are you?

4   A    I'm 57.

5   Q    How long have you lived in Mississippi?

6   A    Off and on all my life.

7   Q    When is the last time that you moved to Mississippi?

8   A    Thirty years ago.

9   Q    What is your educational background?

10  A    I have a bachelor's degree in sociology.

11  Q    Are you employed?

12  A    I am.

13  Q    What is your job?

14  A    I'm a certified peer support specialist for the Mental

15  Health Association of South Mississippi.

16  Q    We will get into this in more depth later, but what is a

17  peer support specialist?

18  A    A peer support specialist is a person who has been trained

19  to use their own lived experience of mental illness or

20  substance use, whichever the case may be, to help other people

21  in their recovery process.

22  Q    In addition to your direct work as a peer support

23  specialist, do you serve on any professional committees?

24  A    I do.

25  Q    What are those committees?
```

```
1   A   I am a co-founder and I sit on the board of the Association

2   of Mississippi Peer Support Specialists.

3   Q   And are you on any committees with the State of

4   Mississippi?

5   A   I am.

6   Q   What are those committees?

7   A   I am on the Mississippi Advisory and Planning Committee for

8   Mental Health.

9   Q   Are you also a peer ambassador?

10  A   I am also a peer ambassador, yes.

11  Q   What is a peer ambassador?

12  A   A peer ambassador is -- they're a contract of certified

13  peer support specialists whose primary task is to provide

14  technical assistance training to licensed DMH providers on

15  recovery process, recovery systems.

16  Q   You just mentioned the word recovery.  What is recovery?

17  A   So our definition of recovery is the one that SAMHSA uses

18  and it is a process by which a person achieves the quality of

19  life that they want for themselves.

20          THE COURT:  I'm going to ask you just to slow down

21  just a little bit.  You're doing well.  Volume is great.  Just

22  slow down just a little bit.

23          THE WITNESS:  Okay.

24  BY MS. VAN EREM:

25  Q   Ms. Worsham, have you recently spoken at conferences
```

1  regarding peer support?

2  A   Yes, last week.

3  Q   What was the conference last week?

4  A   The conference was the DMH AMPSS Peer Summit.  It was the

5  summit for the certified peer support specialists in the state

6  of Mississippi.

7  Q   And when you say AMPSS, is that the Association of

8  Mississippi Peer Support Specialists?

9  A   Yes.

10 Q   And what did you speak about at that conference?

11 A   I did the plenary session to lay down the groundwork for

12 the conference, the training conference for supervisors and

13 peer supporters to understand what peer support is and also

14 what a recovery-oriented system of care is.

15 Q   Ms. Worsham, you mentioned that a peer support specialist

16 is someone with lived experience with mental illness.  Do you

17 have a mental illness?

18 A   Yes, I do.

19 Q   What is your mental illness?

20 A   I was diagnosed with schizophrenia, undifferentiated, and

21 PTSD.

22 Q   Why are you here testifying today?

23 A   There's a lot of people out there that don't have a voice,

24 and I need to be here to be a voice for those people.

25 Q   So I would like to start by asking you a few questions

1   about your background and your diagnosis with schizophrenia.

2   Is that okay?

3   A    Sure.

4   Q    How old were you when you first started experiencing

5   symptoms of schizophrenia?

6   A    I was in my early teens.

7   Q    What were the first symptoms you started to experience?

8   A    The first symptoms that I experienced was it was a gypsy

9   that would come and visit me at night and her fortune that she

10  was telling me was always that I'm going to die.  She would try

11  to take my breath away and then I would be blocked from leaving

12  my house from a goat that would be outside the door that would

13  not let me leave the house.  It was terrifying.

14  Q    Did you seek mental health treatment as a teenager?

15  A    No, I did not.

16  Q    Why not?

17  A    The aunt and uncle that I was living with at the time

18  didn't think anything was wrong with me.

19  Q    What was your life like up until that point?

20  A    My father came back from the war with PTSD, and he tried to

21  kill my mother, and I was abandoned in the family home for

22  about a year and a half so I was homeless as a child around 8

23  or 9 until my aunt and uncle took me in around the age of 10 or

24  so.  But I went from house to house between then also.

25  Q    Did you live in Mississippi as a child?

1   A   I did.

2   Q   Did your parents receive any mental health services in

3   Mississippi?

4   A   No, they did not.

5   Q   And when were you diagnosed with schizophrenia?

6   A   As a young adult.  My early twenties.

7   Q   Were you in Mississippi when you were first diagnosed?

8   A   Yes.

9   Q   Had you sought mental health treatment at that time?

10  A   Yes, I did.

11  Q   Where did you seek mental health treatment?

12  A   At my church.  They had a counselor there and so I sought

13  help with her first, and she was the one who recommended that I

14  be evaluated for mental illness.  And she referred me.

15  Q   Where did you receive that evaluation?

16  A   At Gulf Coast Mental Health.

17  Q   Is that a community-based mental health center?

18  A   Yes, it is.

19  Q   A CMHC or community mental health center?

20  A   Yes.

21  Q   Okay.  How did you react to receiving the diagnosis of

22  schizophrenia?

23  A   I believed what I had seen in magazines and movies about

24  that diagnosis, that it was a progressively serious mental

25  illness, that I would probably end up being heavily medicated,

1    maybe even lose my children, that my life wouldn't amount to

2    anything, I would probably be institutionalized.

3    Q    What understanding did you get from your doctor at that

4    time?

5    A    Well, part of that came from him as well.  He told me that

6    schizophrenia was a progressive disease and that I would be

7    medicated my entire life and he also told me that I really

8    should give up on some ambitions and I probably would end up

9    being institutionalized at some point.

10   Q    Ms. Worsham, have your symptoms changed since you first

11   started experiencing those symptoms?

12   A    Yes.

13   Q    In what way?

14   A    They got worse for a little while but then they've gotten

15   progressively better.

16   Q    And have you been hospitalized due to mental health

17   symptoms?

18   A    Yes, I have.

19   Q    Since you moved to Mississippi the last time you said about

20   30 years ago, how many times have you been hospitalized?

21   A    In Mississippi, I have been hospitalized six times.

22   Q    Where were you hospitalized?

23   A    Two times at Singing River Hospital, two times at Gulfport

24   Memorial, and one time at Gulf Oaks in Biloxi.

25   Q    Were those general hospitals?

1    A    Gulfport Memorial and Singing River are community hospitals

2    with psychiatric units.

3    Q    During those six hospitalizations, for what lengths of time

4    have you been hospitalized?

5    A    Some were just a three-day observation time and I think the

6    longest one was almost three weeks.

7    Q    Were your hospitalizations voluntary or involuntary?

8    A    They were voluntary.

9    Q    When is the last time you were hospitalized?

10   A    2016.

11   Q    Have you ever been hospitalized in a Mississippi State

12   Hospital?

13   A    No, I have not.

14   Q    Ms. Worsham, do you still experience symptoms?

15   A    Yes, I do.

16   Q    Do your symptoms vary?

17   A    They do.

18   Q    In what way?

19   A    I have certain symptoms that are with me all the time.

20   There is always a buzzing voice in my head.  They can go all

21   the way to, you know, where I'm feeling like -- it can be very

22   severe, yeah.

23   Q    And do you have good days and bad days?

24   A    I do.

25   Q    What is a bad day like for you?

1  A   Having all the lights turned out in my house, crawling

2  around on the floor so that people can't see me through the

3  windows.  I can't feed myself because either my brain is

4  telling me I'm not allowed to eat or if I open up the

5  refrigerator, someone is going to see a light and they're going

6  to know someone is home, and I just have to keep myself safe.

7  And so I might go, you know, days without bathing or eating.

8  Q   Will you tell me what a good day is like for you?

9  A   Getting up, feeding my animals, going to work, helping

10  other people, visiting friends.

11  Q   So now I would like to turn and focus on your role as a

12  peer support specialist.  What do peer support specialists do?

13  A   Peer support specialists have a lot of roles, depending on

14  what they -- you know, what their own strengths are, but they

15  help other people to figure out how to overcome the obstacles

16  that might be getting in their way of living the life they want

17  to live.  And also navigating the system, helping to find

18  resources, and then just being moral support, you know, just

19  being there for somebody.

20  Q   When you say helping other people, are you referring to

21  adults with serious mental illness?

22  A   Yes.  That is my experience and those are the people that I

23  help.

24  Q   How long have you been a peer support specialist?

25  A   Since 2012.

1   Q    How did you become a peer support specialist?

2   A    The Department of Mental Health provides a 36-hour training

3   that you go through in order to become a peer support

4   specialist and then you take an exam.  If you pass it, then

5   you're eligible for a job as a peer support specialist.

6   Q    Did you have a role in the mental health system before

7   becoming a peer support specialist?

8   A    Yes.

9   Q    What was that role?

10  A    I was part of the breakthrough series collaborative teams

11  to help transform the State of Mississippi to a recovery and

12  resiliency-oriented system of care.

13  Q    And right before you became a peer support specialist at

14  the Mental Health Association for South Mississippi, did you

15  have a role there?

16  A    Yes.  I was the WRAP program manager.

17  Q    What is WRAP?

18  A    WRAP is Wellness Recovery Action Planning, which is an

19  evidence-based wellness program to help a person to use their

20  own strengths to achieve their own recovery goals.

21  Q    Is WRAP an important part of peer support?

22  A    It is essential.

23  Q    And does WRAP have an impact on mental health crises?

24  A    Yes, absolutely.  It actually has two components or three

25  components.  One is pre-crisis, recognizing the signs that you

might be entering a crisis stage so that you can take some
action for yourself to keep yourself well and possibly even
prevent a crisis.  Then it actually has a nine-part crisis
plan, because during that time, a person doesn't feel like they
have any control over their lives or they might not be able to
communicate their needs or wants for help at that time.  And
then there is a post-crisis part of the WRAP as well to help a
person get back into life after the crisis.

Q    So going back to your role as a peer support specialist,
how many hours a week do you work as a peer support specialist?

A    I work at MHA for 18 hours a week.

Q    And MHA is the Mental Health Association?

A    That is correct.

Q    And do you do any other work as a peer support specialist?

A    Yes.  I help other peer supporters in their professional
life, which is also a type of peer support, and then I also
lead some recovery.  I volunteer in the community in leading
recovery groups.

Q    Is your work as a peer support specialist important?

A    Very important.

Q    Why?

A    People with mental illness for a long time have not had a
voice, and a lot of traditional providers really don't get it,
you know, how we are feeling and what's going on with us.
Knowing that there is somebody who understands because they

1    have been through it themselves, it means a lot.  And what they

2    have to say about how they got themselves well is something to

3    listen to because they have been through it.  So it's extremely

4    important.  It is important for me and I think it's important

5    for everybody.

6    Q   What effect does peer support have on people with serious

7    mental illness?

8    A   I have seen amazing progress in people's recovery.  Where I

9    work, I have seen people when I first started there that had

10    kind of resolved the life that I thought I had for me back in

11    the day, that I'm just going to never work, nobody wants me

12    because I'm sick, I'm going to watch TV, I'm going to play some

13    crossword puzzles or something, and that's my life, to all of a

14    sudden people having a desire to go back to school or own a

15    home or get married, you know, real life things, getting into

16    life, joining a bowling league.

17    Q   In your experience, does peer support have an effect on the

18    need for hospitalization for individuals with serious mental

19    illness?

20    A   Yes.

21    Q   Can you describe why?

22    A   So not everything needs hospitalization.  Not everything is

23    an emergency.  Most of the time people living with mental

24    illness, they live with it every day.  And to be able to just

25    stay well is really a better goal.  When I go to a hospital,

1  I'm losing all of my power over myself, and that in itself is

2  traumatizing.  And to know that I can use peer support and

3  someone who understands the concept of recovery, that it's a

4  process, I don't have to be fixed, I just need to be able to

5  get myself through the day, and then I can worry about tomorrow

6  tomorrow.  It matters.  It just means a lot to people.  It

7  means a lot to me.

8  Q   Ms. Worsham, where do you work as a peer support

9  specialist?

10 A   I work for the Mental Health Association of South

11 Mississippi.

12 Q   And is there a drop-in center at that location?

13 A   Yes, it is called the Opal Smith Center.

14 Q   Can you please briefly describe the Opal Smith Center?

15 A   So the Opal Smith Center is a day program for adults living

16 with any mental health diagnoses, and it's a living room model.

17 It's like a home away from home.  It gives caregivers a rest

18 but it also gives them a break.  It's a stigma-free

19 environment.  They can just go and relax, make friends.  We

20 also teach wellness programs, the dimensions of wellness, WRAP,

21 those kinds of things.  We also have support groups like for

22 grief, bipolar, you know, whatever their issues are or whatever

23 they are interested in learning about.  And then fun and

24 socializing, learning how to make friends, eating nutritious

25 meals twice a day as well.

```
 1    Q    Is the center peer run?

 2    A    It is peer run, yes, it is.

 3    Q    Does the Opal Smith Center focus on recovery?

 4    A    Yes.  Absolutely.

 5    Q    How does the center support recovery?

 6    A    They believe that -- they believe that everybody -- anybody

 7    can do anything they want to do; it's just that one person's

 8    path to that goal might be different from another person's path

 9    to that goal.  And something that might take you a week to do,

10    it might take me six months to do or even six years to do.  But

11    we have hope and we don't give up on people, that there is

12    always an opportunity for you to do whatever you want to do.

13    And that's what recovery is all about.

14    Q    Who comes to the Opal Smith Center?

15    A    They are adults living with mental health diagnoses.

16    Q    Have any Opal Smith clients been in State Hospitals?

17    A    Yes.

18    Q    In what settings do people who come to the Opal Smith

19    Center live?

20    A    Some are married and live with their spouses.  Some have

21    children.  Some live in subsidized housing.  Some do live in

22    group homes and some live with their family or caregivers.

23    Q    What does a typical day look like for you as a peer support

24    specialist at the Opal Smith Center?

25    A    So first thing in the morning as the drop-in members come
```

in, it's greeting.  I'm also looking for where they might be in
their mental health that day, you know, if they had a good
weekend or a good evening.  I want to hear about, you know,
what they have done, what they have been up to.  Then we serve
a nutritious breakfast.  There are a couple of people who get
stipend jobs to help them, you know, earn an income.  So, you
know, it's just $20 but it's a stipend job that they're
assigned to for the day.  Then we usually have a guest speaker
on Tuesdays that comes in for topics that they have chosen that
they want to understand and learn more about.

We also have the support groups, arts and crafts,
nutritious lunch, and then each afternoon we have actual
discussion groups.  On Tuesday it is dimensions of wellness.
Wednesday, it's NAMI Peer-to-Peer, and on Thursday, it's WRAP.

Q    How many members do you work with at the Opal Smith Center?

A    It varies between 15 and 25 members.

Q    What effect has coming to the Opal Smith Center had on the
people that you work with?

A    I have seen amazing strides.  People who didn't think that
they could accomplish things that they wanted to do in their
lives, and they did.  You know, people who have started to
stand up for themselves and become more independent, people who
have decided to challenge what the doctors have said even, you
know, that they don't need all that medication, they want to
try other alternative therapies and see what's going to work

 1   for them.  So it empowers people.

 2   Q   Has the Opal Smith Center had an impact on mental health

 3   crises?

 4   A   Yes, it has.

 5   Q   In what way?

 6   A   So, because with -- as somebody who has had crises and

 7   having peer support on staff, we tend to be able to recognize

 8   when a person might be approaching a crisis.  We see it a

 9   little clearer.  And so we can kind of start to address that

10   with that person and find out where they are, you know, see

11   what's going on in their lives.  We ask what's happened to

12   them, because not every crisis has to do with their mental

13   illness.  It could be that they are having their home

14   environment is stressful for some reason.  And so we try to

15   address those things and let them know what kind of resources

16   are available to them.  And I think it gives people hope.  And

17   then sharing my own wellness tools has helped people to stay

18   out of crisis.

19   Q   As of the end of 2018, do you know whether there were any

20   other programs like Opal Smith in other parts of the state?

21   A   No.

22   Q   Were there any other programs?  I'm sorry.  I asked an

23   unclear question.  Let me back up.  Were you aware of any other

24   programs in other parts of the state?

25   A   No.

1    Q    And have you worked with any other peer support specialists

2    in your work?

3    A    Yes.

4    Q    In what context?

5    A    Half of the staff at where I work, my place of employment,

6    are peer support specialists.  And then as a member of the

7    ambassador team with DMH and then also as the board -- a board

8    member for the Association of Mississippi Peer Support

9    Specialists, I work with a lot of peer supporters.

10   Q    What other types of places can peer support specialists

11   work?

12   A    Oh, goodness.  Where can they not work?  I think they would

13   work very well in regular medical emergency hospitals because

14   people living with mental illness have medical emergencies as

15   well, and having that peer support would be a very helpful

16   thing.  But they can work in drug courts.  They can work in

17   State Hospitals, crisis stabilization units, psychosocial

18   rehabilitation centers.  Anywhere that people are with mental

19   illness, which is pretty much everywhere.

20   Q    And through your work that you have described, are you

21   familiar with the availability of peer support services in

22   Mississippi?

23   A    Yes, I am.

24   Q    Are you familiar with any concerns that peer supporters

25   have regarding availability of peer support?

1  A   Can you rephrase that question, please, or ask it again?

2  Q   Sure.  Are you familiar with any concerns that other peer

3  supporters have regarding the availability of peer support?

4  A   Yes.

5  Q   Can you describe those concerns?

6  A   Peer support specialists are supposed to work in teams.

7  They are supposed to have at least two so that we can work

8  together to support each other because we are people who live

9  with mental illness and we need that.  On the professional

10  level and on the personal level, we need peer support.

11      There is a lot of peer support specialists who are working

12  by themselves and they have very large areas that they have to

13  serve, very large case loads, they are getting burned out, they

14  are having compassion fatigue, they are starting to become sick

15  and have to lose their jobs because of it.  There is a lot of

16  places that don't have peer support at all.

17  Q   Based on what you have seen, are there needs for peer

18  support in Mississippi that are not being met?

19  A   Yes.

20  Q   Can you describe that a little bit more?

21  A   So some of the biggest things that I think would be most

22  important, when people get out of a hospital, they have been in

23  crisis and they've also -- very possibly have lost a lot of

24  momentum in their lives.  They could have even lost their

25  apartments.  They could have lost their children.  They could

1   have lost a lot by being hospitalized.  And peer support being

2   able to help that person to transition back into the community,

3   get back into the swing of life would be an awesome thing.

4   Q    And is that currently available in all parts of the state?

5   A    Not that I know of.  Not every place.

6   Q    Ms. Worsham, do you personally need peer support services?

7   A    Yes.

8   Q    Have you been able to access peer support services?

9   A    No.  There is no peer support specialist in my area that

10  can serve me.

11  Q    Are there particular settings where peer support

12  specialists are particularly needed in Mississippi?

13  A    Yes.  The community mental health centers need them.  The

14  crisis stabilization units need them.  The PSRs need them, the

15  psychosocial rehabilitation centers need them.  They really

16  are -- we have a shortage everywhere.  I know that there are

17  some places that are doing a very good job of getting peer

18  support in, but it's just so lacking.  There are also PACT

19  teams and then the mobile crisis teams as well need peer

20  support.

21  Q    And you mentioned PSR earlier.  Is that psychosocial

22  rehabilitation?

23  A    Yes.

24  Q    And is that a day program?

25  A    It is a day program.

1    Q    Okay.  Do peer support specialists ever work in State

2    Hospitals?

3    A    Yes.

4    Q    Have you ever been in a State Hospital in Mississippi

5    through your work as a peer support specialist?

6    A    Yes, I have.

7    Q    In what contexts?

8    A    As providing technical assistance.  When they first hired

9    peer support specialists, I came in and provided technical

10   assistance to teach the traditional staff what the role of a

11   peer support was and also to help them, I made an assessment of

12   their environment and how they worked and I made

13   recommendations on how I felt like they could utilize peer

14   support in the services that they provided.

15   Q    What State Hospitals did you provide technical assistance

16   to?

17   A    South Mississippi State Hospital and Whitfield.

18   Q    Is Whitfield Mississippi State Hospital?

19   A    I -- yeah, I think that's what they call it, yes.

20            THE WITNESS:  I need to get a drink of water.

21            MS. VAN EREM:  Sure.

22        (SHORT PAUSE)

23   BY MS. VAN EREM:

24   Q    Are you ready?

25   A    Yes.

1    Q    Okay.  Based on what you experienced in providing this

2    technical assistance, what are your impressions of State

3    Hospitals?

4    A    I'm terrified of them.

5    Q    Why is that?

6    A    They take all your rights away and there is no dignity.

7    They pump people full of drugs.  They make you use a community

8    bathroom even though you have your own room.  Women who are

9    menstruating have to walk around the halls with a handful of

10   tampons.  If I want to rest or if a person wants to rest, they

11   have to just lay in the hallway.  They don't let people rest.

12   Sometimes there is coercion.  I would never want to be there,

13   and I have made efforts in the past to stay out of them.

14   Q    Ms. Worsham, I would like to turn to the issue of crisis

15   services in Mississippi.  Have you ever tried to utilize mobile

16   crisis services in Mississippi?

17   A    Yes.

18   Q    Have you tried to utilize mobile crisis services for

19   yourself?

20   A    Yes.

21   Q    How many times?

22   A    Once.

23   Q    Have you ever called the crisis line or how many times have

24   you called the crisis line?  Excuse me.

25   A    I have called the crisis line dozens of times.

1  Q    Okay.  And how many times did mobile crisis services

2  respond?

3  A    One time.  But they really weren't the ones that responded.

4  Q    So in that case, what happened after you called the crisis

5  line?

6  A    I was in a mental health crisis, and I called the crisis

7  line and they told me just to go to the hospital.  And I

8  couldn't drive at that time.  I can't drive when I'm in crisis.

9  And so I called someone that I know at the Department of Mental

10 Health and I told them I was in crisis and she said, "Well, why

11 don't you call the mobile crisis team."  And so I called the

12 same number that I called for crisis and it was the same number

13 and I said, "I want the mobile crisis team."  And she goes,

14 "Well, why don't you just go to the hospital."  And so I hung

15 up and gave up.  And that person at the Department of Mental

16 Health called me back to check on me and I told her what

17 happened.  And she made a phone call and mobile crisis came

18 then.

19 Q    And have you ever tried to utilize mobile crisis services

20 for individuals you work with as a peer support specialist?

21 A    Yes, I have.

22 Q    How often would you say?

23 A    Just a few times.

24 Q    What has been your experience generally when you have tried

25 to access mobile crisis services for other individuals?

1   A    They tell me to take them to the hospital.

2   Q    Does the crisis team generally come out?

3   A    They have only come out once.

4   Q    When was the last time you tried to utilize mobile crisis

5   services for another individual?

6   A    It was last summer.

7   Q    What was occurring at that time?

8   A    Excuse me?

9   Q    What were the reasons why you tried to utilize the mobile

10  crisis services?

11  A    I had a client who was in a mental health crisis, and he

12  was outside of a hotel room on a highway, and he had called and

13  so I took a coworker to go see him and I knew he was in really

14  bad shape.  When I got there, he was so dejected, he was in

15  really bad shape, he needed help.

16       So I called the mobile crisis team and I told them, I said,

17  "I have a client here."  I said, "Would you please bring

18  someone out?"  And she goes, "Why don't you just call the cops

19  to take him to the hospital?"  And I said, "Because you're

20  mobile crisis and I want you to come see my person."  I said,

21  "He doesn't want to leave."And she said, "Well, you just need

22  to call the cops on him."  And so I hung up.

23       Me and my coworker, we finally talked him into getting into

24  our vehicle, and I was like, "You know what, I'm going to take

25  you to the community mental health center and because when you

walk in and say you're in crisis, they have to see you." And

so I drive -- we drove him over there and just when we walked

in the door, the lady that I had talked to on the phone from

mobile crisis met us right inside the entrance with her hands

on her hips, and she goes, "I told you if you showed up I would

just call the cops." And my client took off. I had to go

after him.

Q    Did that person end up in a hospital?

A    I finally talked him into -- I had to keep pace with him

and I promised him I would not call the cops on him and I

promised him that I would let him use my cell phone to call his

wife. It seemed important to him. I thought it was a

bargaining tool, and to let call -- if as soon as he got the

hospital band on his wrist, he could call his wife.

Q    And what were the individual symptoms at the time you had

called the mobile crisis team?

A    He was a crumbled ball on the ground. He couldn't stop

crying, and it was more -- it was more wailing. He was so

dejected.

Q    You mentioned that the mobile crisis line told you they

would call the police. Was this individual exhibiting violent

behaviors?

A    No. No. He was in a ball just crying, just crying. He

was crying so hard he was weak. When we tried to get him in

the car, he was so weak, he needed our help to get in the car.

1   This is the devastated situation he was in.  He couldn't stop.

2   Q   Other than what we have already discussed, have you

3   observed any other unmet needs for services in your work with

4   individuals --

5           THE COURT REPORTER:  I'm sorry.

6           MS. VAN EREM:  Sure.  I'll start over.  I apologize.

7   BY MS. VAN EREM:

8   Q   Other than what we've already discussed, have you observed

9   any other unmet needs for services in your work with

10  individuals with serious mental illness?

11  A   Just that there is no peer support specialists in my area

12  that can serve people with serious mental illness.  It's just

13  not there.

14  Q   Have you observed the availability of services for

15  individuals who are moving out of State Hospitals?

16  A   Not really.  There is one peer support specialist at South

17  Mississippi State Hospital who has called to let me know that

18  someone is being discharged and she is referring them to the

19  drop-in center and for me to expect them.  But because there is

20  no formal process for her to transfer that person to me, she

21  can't tell me who that person is.  She can't tell me what kind

22  of help they will need or anything like that.  And then I can't

23  communicate to her whether that person arrived or not.

24  Q   And are you familiar with the availability of services for

25  individuals with both serious mental illness and substance use

1  disorder?

2  A    You mean like dual diagnosis?

3  Q    That's right.

4  A    That's a problem as well.  My experience, especially with

5  the people that I serve, if they are dual diagnosis, they have

6  to choose which crisis they are going to have taken care of at

7  that moment.  If they go to -- if they go to an alcohol and

8  drug treatment center and they find out they have serious

9  mental illness, they will tell them, "No, you can't come here,

10  you have serious mental illness, we are strictly addiction."

11  If they go to the serious mental illness side and they find out

12  they have an addiction, they go, "You have to get that taken

13  care of."  So I have already recommended my clients to lie.  I

14  say, "Pick one.  Which one is the one that is bothering you the

15  most?  Which one is causing you the most problems?  And don't

16  tell them about the other one so that you can get the care that

17  you need."

18  Q    I would like to shift gears a little bit.  I just have a

19  few more questions, Ms. Worsham.  What impact has your

20  employment had on your well-being?

21  A    It has had an amazing impact.  This is the longest I have

22  ever held down a job in my life.  And, also, I have been

23  medication free for three years now.

24  Q    Are you aware of something called supported employment?

25  A    I have heard of it, yes.

1   Q   What is your understanding of what supported employment is?

2   A   What I understand it to be is someone who helps a person to

3   seek meaningful employment but also to help an employer to

4   understand how to accommodate a person with mental illness,

5   because most employers understand how to accommodate someone

6   with a physical disability but not with a mental health

7   disability.  So -- and also to do that follow-up and provide

8   some kind of support for that person as they are employed, you

9   know, to help them to be successful.  That's how I understand

10  that to be.

11  Q   Are you aware of whether supported employment is available

12  in Mississippi?

13  A   I don't.

14  Q   Do you know of anyone who is utilizing supported

15  employment?

16  A   No, I don't.  I have heard that it exists but I don't know

17  anything about it and I don't know anyone who has ever received

18  those services.

19  Q   I would like to cycle back to the concept of recovery.  Why

20  is it important to view mental illness in terms of recovery?

21  A   The best way to describe that, it's the example I give to a

22  lot of people when they want to understand the difference.  In

23  a medical situation, if I have a broken arm, I go take an

24  x-ray, they look at that and they can say, "You have a broken

25  arm.  That's the diagnosis."  And the treatment is simple and

1    it's a one-size-fits-all model.  You get the brace on, you

2    might have some anti-inflammatories and then you come back six

3    weeks later, they do another X-ray, they take the cast off and

4    say, "You are fixed.  It's over.  You have recovered from a

5    broken arm."

6        Mental illness is something you live with your entire life.

7    There is no fix.  There is no cure.  And so the medical model

8    simply doesn't work.  There is no way that I will walk into a

9    psychiatrist's office one day and he will say, "Melody, you no

10   longer have schizophrenia."  It will never happen.  So

11   managing -- managing it and allowing me to just live the

12   fullest life that I can possibly live based on my strengths and

13   my own goals is the best that can be offered.  And that can't

14   be done with a one-size-fits-all model, because what's going to

15   be right for me is going to be different for somebody else,

16   even if they have the same exact diagnosis as me.

17        MS. VAN EREM:  Your Honor, may I have one brief moment

18   to confer with cocounsel?

19        THE COURT:  Yes, you may.

20        MS. VAN EREM:  Thank you.

21   (SHORT PAUSE)

22        MS. VAN EREM:  No further questions at this time.

23        THE COURT:  All right.  Thank you.

24                    **CROSS-EXAMINATION**

25   BY MR. ANDERSON:

```
1    Q    Good afternoon, Ms. Worsham.  I'm Reuben Anderson.  I'm one
2    of the lawyers for the State of Mississippi.  Let me start out
3    by saying thank you for being here.  Your testimony was
4    something I have never heard before, and I have been a lawyer
5    for 52 years.
6         You said that you wanted to be the voice.  And who are you
7    the voice for?
8    A    Ask me again.  I'm sorry.
9    Q    In your testimony you said that you wanted to be the voice.
10   I'm just asking you, who are you the voice for?
11   A    I'm the voice for people who live with mental illness and
12   are not getting the care that they need to succeed in life.
13   Q    Is this in your area where you live on the Mississippi Gulf
14   Coast or throughout the state of Mississippi?
15   A    Throughout the state of Mississippi.
16   Q    Okay.  Do you do peer support all over the state?
17   A    Yes, I do.
18   Q    And you are of the opinion that peer support specialists
19   are burned out in Mississippi?
20   A    I said that many are.
21   Q    Okay.  Your testimony borders on being an expert, and I
22   think you are an expert; you just haven't been qualified, but
23   you have seen things that probably no one in this courtroom has
24   seen.  You have been homeless, abandoned and locked up in
25   mental institutions, and you have shared a story.  Tell me
```

1  about your family.

2  A   My father served two wars, Korea and Vietnam.  He was MIA

3  for a while.  He came back not a whole person.  My mother was a

4  homemaker.  I have two brothers, older brothers, that when my

5  father tried to kill my mom, he took me with him as a witness,

6  and a man in the restaurant took my mother and helped her to

7  escape, and my brothers took off after her to try to find her.

8  Q   I really didn't want to take you that far, but --

9  A   Okay.

10  Q   -- I was just asking.  Do you have children?

11  A   I do.  I have two.  One is gone now.

12  Q   I'm sorry.  One --

13  A   I had two children.  I lost one three years ago.

14  Q   Oh, I'm sorry.  You are of the opinion from your testimony

15  that the State of Mississippi does a sorry job in taking care

16  of people who would have serious mental illnesses.  Is that

17  your testimony?

18  A   I don't recall saying it was sorry.

19  Q   I didn't -- and I apologize.  I don't think you said it

20  either, but your description of it -- tell me what you think of

21  it.

22  A   I think the people that I have worked with at the

23  Department of Mental Health really want to see this change.  I

24  really do.

25  Q   And the change that you speak of is what?

1   A   To transition our system of care over to a

2   recovery-oriented system.

3   Q   And you know by interacting with the Mississippi Department

4   of Mental Health that that is their main goal, that is their

5   vision, that whenever you meet, that's what they talk about, is

6   getting people out of the State Hospitals and getting them

7   close to their families.  Don't you know that?

8   A   I have heard them say that but that's not what they talk

9   about.

10  Q   You're not saying that that's not their mission and in

11  their vision statement and in their mission?

12  A   Yes, it is in their strategic plan, yes, it is.

13  Q   But you are saying they are not executing?

14  A   I don't think they are enforcing it.

15  Q   And when you say "they," you're not talking about the board

16  of directors of the Mississippi Department of Mental Health and

17  the executives that work there.  Who are you speaking of?

18  A   I am speaking of the people at the Department of Mental

19  Health that I work with that I guess oversee the peer support

20  program, and it is called the Department of Recovery and

21  Resiliency.

22  Q   The peer support program that you speak of, and you are

23  eminently involved in it, how many individuals have that

24  certification?

25  A   Right now I believe the count is 238 that have the

1   certification.

2   Q   And they are spread all over the state of Mississippi, are

3   they not?

4   A   I think there are several clusters and then there are very,

5   very sparse one-person in a very, very large swath of area.  So

6   there are concentrations of peer support specialists in

7   Mississippi.  I don't believe they are spread out across

8   Mississippi.

9   Q   Well, Mississippi is probably one of the most rural states

10   in the -- it's 80 percent rural, so they don't need people in

11   every little town, do they?  Or do they?

12   A   They do.  There are people with mental illness diagnoses in

13   every part of Mississippi, and I would venture to say that the

14   rural areas have as many as the urban areas.

15   Q   We have heard that from experts and I gather that that is

16   true.  But economically speaking, you can't put a peer support

17   person in every municipality in the state of Mississippi, can

18   you?

19   A   I don't believe I'm qualified.

20         MS. VAN EREM:  Objection, Your Honor.  This is beyond

21   the scope of Ms. Worsham's direct.

22         THE COURT REPORTER:  I'm sorry.  The microphone --

23         THE COURT:  Make sure you speak into the microphone.

24         MS. VAN EREM:  I apologize.  This is beyond the scope

25   of Ms. Worsham's direct and it's also expert opinion testimony

1    about the costs of peer support services.

2         MR. ANDERSON:  And I will withdraw that question, Your

3    Honor.

4         THE COURT:  Okay.  All right.

5    BY MR. ANDERSON:

6    Q    Are you an advocate for more than the peer support group?

7    Are you an advocate for other entities that are concerned about

8    serious mental illnesses?

9    A    Ask me again.

10   Q    Well, I guess what I'm asking you is that most of your

11   testimony has been critical of the peer support specialist

12   program that is operated and funded by Mississippi Department

13   of Mental Health.  What other departments of mental health are

14   you critical of?

15   A    The hospitals.

16   Q    And your criticism there, and I heard you say that, is that

17   people are mistreated there and medicated extensively and those

18   things.  Other than the hospitals, what are your criticisms?

19   A    I said that the peer support program was wholly inadequate.

20   It needs to be extended.  That's what I said.  And that's what

21   I was criticizing, was the lack of service.

22   Q    You are not here to tell Your Honor that Mississippi

23   Department of Mental Health is not trying to extend it.  You

24   are not saying that, are you?

25   A    No, that's not what I'm saying.

1 Q   And you would agree with me that they make a major effort

2 to extend that program throughout the state of Mississippi,

3 would you not?

4 A   I would say they are not doing the very thing that actually

5 would make a difference.  It's like they stop right at that

6 point to do the very thing that actually would make a

7 difference.  They stop.  So there is a lot of talk, there is a

8 lot of planning, but there is also a lot of people being hurt

9 in the process because they are doing things, they are setting

10 up people like peer support specialists, and there is not an

11 infrastructure that supports them, and they are not crossing

12 that line and making sure that when they go around training

13 these hundreds of people for peer support that there is

14 actually jobs available.  And it's frustrating because they are

15 not enforcing their own policies on the provider level.  So the

16 Department of Mental Health, that building that's right here in

17 Jackson, has the right idea, but none of the agencies under

18 them, I won't say none, the majority of the agencies under them

19 are not following the new policies, and they are not enforcing

20 it.

21 Q   Okay.  And you have said this on numerous occasions, on

22 Facebook and other places, have you not?

23 A   I have never said it on Facebook.

24 Q   Well, social media?

25 A   I have never said it on social media, no, I have not.

1    Q    So the only place you have made this comment is in this

2    courtroom today?

3    A    No.  I say it to my fellow peers.  I say it to the

4    Department of Mental Health.  I say it in the advisory council

5    meeting.  I say it to my employer.  I have said it to agencies

6    where I have provided technical assistance.  I have said it to

7    the people who actually need to make the change.  I have not

8    just said it to the general public.

9    Q    And you have said it to the people who pay you, have you

10   not?  And they haven't had any repercussions and they have

11   listened to you?

12   A    That is correct.  I work for an agency that has fully

13   embraced the recovery-oriented system.  They are not one of the

14   people I am critical of.

15   Q    Okay.  The Mississippi Department of Mental Health has

16   numerous programs.  You all have some outstanding programs on

17   the Mississippi Gulf Coast, do you not?  One of them is the

18   drop-in program.  Is that correct?

19   A    That's correct.

20   Q    And that's something that you helped initiate, is that not

21   correct?

22   A    No.  That program is 55 years old.  I have only been there

23   for seven, eight years.

24   Q    Well, you have promoted it, have you not?

25   A    I have promoted it, yes.

1    Q   And spoke kindly about the people and the work that they

2    do?

3    A   Absolutely.

4    Q   And they have, because of that, attempted to expand that

5    throughout the state of Mississippi, have they not?

6    A   I am not aware of that.

7    Q   Okay.  They have the PACT teams, they have the mobile

8    crisis teams, they have employment support that you know very

9    little about.  Am I correct?

10   A   That is correct.

11   Q   And that's not unusual because you are unemployed in that

12   arena, are you not?

13   A   Excuse me?

14   Q   You are not involved in the employment support program for

15   the Mississippi Department of Mental Health, are you?

16   A   No.  As that program, no, I am not.  I do help people get

17   jobs as a peer support specialist but not that formal program,

18   no.

19   Q   Well, let me ask you another way.  You know about all of

20   the programs in Mississippi and probably around the nation that

21   benefit people with serious mental illnesses, are you not?

22   A   I try to be as educated as possible.

23   Q   What is it that Mississippi and what program is Mississippi

24   not pursuing that help people with serious mental illnesses?

25   A   Turning their system of care over to a recovery-oriented

1   system, taking it out of the medical model which does not work.

2   Q   I heard you say that, and I will just ask you about it.

3   You said that traditional providers pretty much don't know what

4   they are doing.  Did you -- you didn't use that term, but

5   that's the point that you were making, were you not?

6           MS. VAN EREM:  Objection, Your Honor.  This misstates

7   her testimony.

8           MR. ANDERSON:  I will withdraw the question and ask

9   it -- and try to remember her testimony as I could, Your Honor.

10          THE COURT:  All right.

11  BY MR. ANDERSON:

12  Q   And I apologize.  I didn't try to mislead you but you did

13  say that traditional providers make a lot of mistake and errors

14  in their treatment of people with serious mental illnesses.

15  Did you not say --

16  A   I said that they were a one-size-fits-all, that they only

17  know one way of treating people.

18  Q   And you also said that --

19  A   And that they are not following Mississippi's plan to

20  transition over to a recovery-oriented system of care.  They

21  have been resistant to it and DMH has not enforced it.

22  Q   So you're essentially saying that people who are

23  psychiatrists and other professionals know less about what they

24  are doing than you do?

25  A   They are very good at what they do.  I'm saying that what

1    they do is not enough, and it's a one-size-fits-all.  Not

2    everybody needs a psychiatrist.  Not everybody needs a

3    therapist.

4    Q   Last year the State of Mississippi and Department of Mental

5    Health reached out to 26,000 people who had emergencies

6    regarding their mental condition.  Do you think that's a plus

7    or a minus?

8            MS. VAN EREM:  Objection, Your Honor.  This is outside

9    the scope of her direct and she has no information about

10   what --

11           THE COURT:  Hold on.  She is on cross-examination.  I

12   will overrule that objection.

13           THE WITNESS:  Could you ask the question again?

14   BY MR. ANDERSON:

15   Q   I just simply said that last year the State of Mississippi

16   treated in an emergency situation 26,000 Mississippians.

17   That's about the population of where you live on the Gulf

18   Coast.  That's a lot of progress, is it not, for this state to

19   do that?

20   A   I don't consider that progress.

21   Q   You don't?

22   A   I don't.  Chances are -- chances are a large majority of

23   those people did not need crisis services had peer support or

24   other recovery-oriented providers been available.  I think it's

25   sad that that many people go into crisis and need that kind of

1    help when they might have been -- it could have been prevented.

2    It's like waiting until you have a full-blown heart attack

3    before someone says, "Maybe you shouldn't be eating five pounds

4    of bacon every day."

5    Q    There are a lot of people in Mississippi who are confined

6    at the State Hospital.  You don't think any of them should be

7    there, do you?

8    A    I think there are probably some that absolutely do.  Yes, I

9    do believe that the hospitals are necessary for some people.

10   Q    Did you reach out to the government or how did you end up

11   being here today?

12   A    When we were doing the breakthrough series collaborative in

13   2011, it was my understanding that the breakthrough series

14   collaborative was the result of a letter that was written by

15   the Department of Justice.  So I went online and I found the

16   letter and I read it.

17       Since then, I have tried to keep up with what DOJ was doing

18   because I was interested and I was concerned for my own self,

19   for my own wellness and my own experience, but also the people

20   that I was serving in their experiences.

21       A couple of years ago, I think it was like a couple years

22   ago, and I am not sure exactly when, so don't pin me on that, I

23   just remember that some members of the Department of Justice

24   came to our -- my organization, and they talked to a few

25   people, including myself, about how things were going, you

know, what we thought, my experience as a peer support
specialist and those kinds of things.  And then they came back
a couple of other times and asked me other questions and I was
happy to, you know, to let them know what I knew, and so were
some of my other coworkers.

Q   I read your statement, and I guess it's called Success
Stories.  And I just want to say to you that it is profound.
In my long years, I have never encountered many people who have
serious mental illnesses, and your statement really describes a
situation that I had never thought about before.  I don't know
if it's in evidence but I'm going to ask Your Honor to read it
and I'm going to ask that it be introduced into evidence.  I
think you tell a unique story and have a unique perspective of
mental illnesses.

          MR. ANDERSON:  I don't know -- yeah, I've got several
copies, Your Honor.

          THE COURT:  Any objection from the government?

          MS. VAN EREM:  Can I see a copy?

    (SHORT PAUSE)

          MS. VAN EREM:  No objection.

    (DOCUMENT TENDERED TO COURT)

          MR. ANDERSON:  Excuse me just a moment, Your Honor.

    (SHORT PAUSE)

BY MR. ANDERSON:

Q   I just wanted to make one final question of you, and that

1  is that where you work is under a grant from the Mississippi

2  Department of Mental Health, and I think that grant is like

3  $113,000.  Is that correct?

4  A   I do not know the amount.

5  Q   But your salary is taken from that grant, is it not?

6  A   I don't know that either.  I don't know what grant I work

7  under.  We're a private nonprofit.  We have several sources of

8  funding.

9  Q   If I told you that you were operating under a $113,000

10  grant from the Mississippi Department of Mental Health and that

11  your salary comes out of that, you would not question that,

12  would you?

13  A   I might.  Yes.

14  Q   Okay.  You get paid, do you not?

15  A   I do.

16  Q   Who is on the check when they pay you?

17  A   The Mental Health Association of South Mississippi is the

18  person who gives me the check.

19  Q   And you don't have any idea where that entity gets its

20  funding?

21  A   I do know the sources of their funding.  I don't know where

22  my particular salary comes from.  I don't know what grant

23  that's under.

24  Q   Well, where does their funding come from?

25  A   It comes from the Department of Mental Health.  I think at

1   one time we had a BP grant.  I think at one time we had a

2   SAMHSA grant.  We have a lot of individual giving, and then we

3   have an annual fundraiser that raises a significant amount of

4   money.  And if I'm not mistaken, in the past -- this past nine

5   months, that's where my salary has come from.  But I don't -- I

6   don't know that for sure because I don't ask those questions

7   and I don't bill the grants directly for my salary.  That goes

8   through our bookkeeper.

9   Q   But the Mental Health Association of South Mississippi is

10  funded from the Mississippi Department of Mental Health.  Is

11  that not correct?

12  A   Yes, they do receive funding from the Department of Mental

13  Health.

14          MR. ANDERSON:  Nothing further, Your Honor.

15          THE COURT:  All right.  Let me ask a question about

16  this exhibit.  I don't think it was ever shown to the -- it was

17  never shown to the witness but the government did not object to

18  it.  It's a statement of Ms. Melody Worsham.  If you will, show

19  it to her and let me know --

20          MR. ANDERSON:  I was just going to say I have run out

21  of copies to show her a copy, Your Honor.

22          MS. VAN EREM:  I can give her my copy, if I may

23  approach.

24          THE COURT:  Yes.  And I'm assuming that will be --

25          THE CLERK:  D-354.

*** DAILY TRANSCRIPT ***

1          THE COURT:  D-354.  D-354 is the Success Stories

2    statement of Ms. Melody Worsham.  All right.

3          THE WITNESS:  Yes.

4       (EXHIBIT D-354 MARKED)

5          THE COURT:  Any redirect of this witness?

6          MS. VAN EREM:  Yes, Your Honor.

7          THE COURT:  You may.

8                    **REDIRECT EXAMINATION**

9    BY MS. VAN EREM:

10   Q   Okay, Ms. Worsham, almost done.  You mentioned or I think

11   Mr. Anderson mentioned on cross-examination how many

12   individuals are certified peer support specialists in

13   Mississippi.  Do you remember that?

14   A   Yes.

15   Q   And I think you said there are 238.  Is that right?

16   A   Yes.

17   Q   Where did you receive that information that there are 238

18   certified peer support specialists?

19   A   I received that from the Department of Mental Health.  They

20   do an annual survey.

21   Q   Are all of those 238 people working as certified peer

22   support specialists?

23   A   It's what it says on paper but they're not necessarily

24   providing peer support.

25          MS. VAN EREM:  I have no further questions.

1          THE COURT:  All right.  Based on what you know,

2    Ms. Worsham, those 238 people, are they based all over the

3    state or --

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  All right.  Okay.  All right.

6          Any follow-up based on what I've asked?

7          MS. VAN EREM:  No, Your Honor.

8          THE COURT:  From the State, any follow-up?

9          MR. ANDERSON:  No, Your Honor.

10          THE COURT:  Okay.  All right.  Is this witness finally

11    excused?

12          MS. VAN EREM:  Yes, she is.

13          THE COURT:  Okay.  Ms. Worsham, you are excused.  You

14    can go about your regular duties.  You can stay in court.  You

15    can come back for the next six weeks with me if you want to.

16    All right.  Thank you so much.  Because I still haven't been

17    told it's going to be less than six weeks.  So I just want

18    somebody else to be here with me.

19          Okay.  This concludes the testimony for today.  Let me

20    ask the parties, my ruling yesterday with respect to CR and I

21    want to say her name is Kirksey but it's not.  It's --

22          MR. SHELSON:  Sistrunk, Your Honor.

23          THE COURT:  Sistrunk.  I got some K's and some S's in

24    there.  I have -- aha.  There was a Sistrunk.  The other person

25    was Sistrunk.  Okay.  The other one was Frye.  That's right.

1     Okay.  Have the parties worked out when those persons would be

2     made available to the State?

3         MR. HOLKINS:  Your Honor, the State has chosen not to

4     depose Kim Sistrunk.  Our plan is to proceed calling her as a

5     witness.

6         THE COURT REPORTER:  I'm sorry.

7         THE COURT:  Make sure you're talking into the

8     microphone.

9         MR. HOLKINS:  I'm sorry.  The State has chosen not to

10     depose Kim Sistrunk.  We will proceed with calling her as a

11     witness next week if that is okay with the court.  And we are

12     still conferring with the State regarding whether and when CR

13     would be deposed.

14         THE COURT:  Okay.  All right.  Now, --

15         MR. SHELSON:  We thought CR was going to be made

16     available Friday afternoon.  I thought we just hadn't settled

17     on the time but we will get with them on that.

18         THE COURT:  Okay.  Now, Mr. Shelson, while you're

19     standing, the motion that you filed was multifaceted about that

20     motion in limine, and I think the other week you -- I think you

21     either withdrew or you said -- well, the only two things you

22     were worried about were these witnesses here.  I am just trying

23     to deal with my gavel that's on my docket with respect to that

24     particular motion.

25         MR. SHELSON:  Yes, sir.  With respect to that motion,

1   what we said is everything but the issue of the witnesses that

2   we withdraw, and to the extent we wish to pursue it, we would

3   make a contemporaneous objection should it arise at trial.

4           THE COURT:  Okay.

5           MR. SHELSON:  So I think Your Honor has dispensed with

6   everything in the motion subject to if it comes up at trial we

7   may make an objection.

8           THE COURT:  Okay.  All right, then.  Thank you.

9           MR. SHELSON:  Thank you.

10          THE COURT:  As I indicated to the parties several

11  weeks ago, tomorrow will be an abbreviated day and then we will

12  not meet on Friday and we will just be prepared to come back

13  Monday at 9.  In that regard, tomorrow we will go from 9 until

14  1 straight through instead of breaking for lunch.  We will give

15  you four hours, 9:00 a.m. until 1:00 p.m.  You will be able to

16  get a snack or something in one of these 15-minute breaks or

17  so.  That's what I'm proposing for tomorrow.  I know I had

18  indicated that we would probably go until about 2:00 or 2:30

19  but that would have been taking a break for lunch.  We will not

20  have a break for lunch.  You will have a break for lunch after

21  1 but I wanted to -- is that going to complicate how the

22  parties wanted to proceed with their case tomorrow?

23          MS. RUSH:  That's not a problem, Your Honor.  Thank

24  you.

25          THE COURT:  Okay.

*** DAILY TRANSCRIPT ***

1          MS. RUSH: Your Honor, if I may, would it be possible

2  to start before 9:00 tomorrow morning so we can possibly finish

3  the witness that is coming tomorrow so we can let her go on

4  home? She is an expert witness from North Carolina.

5          THE COURT: Would going to 1:30 allow it to happen?

6          MS. RUSH: That would certainly help, Your Honor.

7  Starting at 8 would help a lot as well.

8          THE COURT: Starting at 8?

9          Is that the only witness you will have tomorrow?

10         MS. RUSH: Yes, Your Honor.

11         THE COURT: And which witness is that? What's her

12  name?

13         MS. RUSH: Dr. Carol VanderZwaag. She is a doctor

14  from North Carolina.

15         THE COURT: She wasn't one of the ones on the team --

16  the CRT. Right? She was one?

17         MS. RUSH: That's correct, Your Honor.

18         THE COURT: Okay.

19         MR. SHELSON: Can I ask you, how long do you

20  anticipate --

21         MS. RUSH: We anticipate three hours for her

22  testimony.

23         I'm sorry. And if I may, I apologize for this

24  request. I understand that the court had previously indicated

25  the abbreviated day. The only issue is that Ms. VanderZwaag

1    would then need to stay here through Monday and she is a

2    medical director at a state hospital in North Carolina so we're

3    just trying to do the best we can to try to get her back.

4         THE COURT:  We will take a couple of breaks to give

5    people an opportunity to get a snack if they need it.  Let's

6    still start at 9.  And I apologize.  But we will go until we

7    get through, I'm thinking until 2:00 o'clock, not until we get

8    through, but from 9 -- I have an appointment in the morning and

9    if I get here by 8:45 or so and everybody is here, we could

10   start up.  But we will go until 2 and see how it -- hopefully

11   we will be done by then.  That still gives me some flexibility

12   based on having to be out of here.  So, you know, if it's 2:15

13   maybe, it's good, but let's try to keep it from 9 to 2, knowing

14   there will be no official Southern lunch break.  It will be one

15   of those lunch breaks that y'all do in these frou-frou places.

16   So let's prepare to start up at 9 but the court will check in

17   to see if people are situated.  If I'm here at 8:45 or earlier

18   and the court reporters are set, we will begin when that

19   happens.  I just have an appointment tomorrow morning and I'm

20   hoping I will get here before 9.  All right.

21        MS. RUSH:  Thank you very much, Your Honor.  We

22   appreciate it.

23        THE COURT:  All right.  I'm trying to accommodate

24   y'all so y'all can do this in less than six weeks.  So you can

25   at least appreciate my fact that I wanted it in less than six

1    weeks.

2          Okay.  Anything else that we need to -- hold on.

3          The pretrial order, I did see where it came through

4    chambers.  The parties worked out whatever was on Exhibit 2, I

5    think.  Is it ready for me to -- are the parties ready for me

6    to enter it?

7          MS. RUSH:  Yes.  The United States is.

8          MR. SHELSON:  Yes, Your Honor.

9          THE COURT:  Okay.  All right.  We will enter it

10   tonight or tomorrow.  So is there anything else we need to take

11   care of?

12         MS. RUSH:  Not from the United States.  Thank you.

13         THE COURT:  All right.

14         MR. SHELSON:  Not from the State, Your Honor.

15         THE COURT:  All right.  Thank you.  I will see you all

16   tomorrow morning.

17      (Trial was recessed.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, BRENDA D. WOLVERTON, Official Court Reporter, United

4    States District Court, Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true and correct transcript of the

7    proceedings had in the aforenamed case at the time and

8    place indicated, which proceedings were recorded by me to

9    the best of my skill and ability.

10         I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         This the 5th day of June, 2019.

14

15                    s/ Brenda D. Wolverton
                      U.S. DISTRICT COURT REPORTER
16

17

18

19

20

21

22

23

24

25