UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                        CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                        DEFENDANTS



TRIAL TRANSCRIPT
VOLUME 5



BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MORNING AND AFTERNOON SESSION
JUNE 6, 2019
JACKSON, MISSISSIPPI



REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186



*** DAILY TRANSCRIPT ***

```
 1        APPEARANCES:

 2        FOR THE PLAINTIFF:      MR. MATHEW SCHUTZER
                                  MS. REGAN RUSH
 3                                MS. DEENA FOX
                                  MS. HALEY VAN EREM
 4                                MR. JORGE MARTIN CASTILLO
                                  MR. PATRICK HOLKINS
 5
          FOR THE DEFENDANT:      MR. JAMES W. SHELSON
 6                                MR. REUBEN V. ANDERSON
                                  MR. HAROLD PIZZETTA
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*** DAILY TRANSCRIPT ***

1                          TABLE OF CONTENTS

2

3    DR. CAROL VANDERZWAAG                                     369

4       Direct Examination By Mr. Schutzer  ...............369

5          Exhibit PX-1083  ...............................378

6          Exhibit PX-1084  ...............................383

7          Exhibit PX-281  ................................429

8          Exhibit PX-1093  ...............................436

9       Cross-Examination By Mr. Shelson  .................452

10         Exhibit D-276  .................................490

11         Exhibit D-269  .................................493

12      Redirect Examination By Mr. Schutzer  .............496

13      Examination The Court  ............................498

14      Recross-Examination by By Mr. Shelson  ............512

15

16

17

18

19

20

21

22

23

24

25

                         *** DAILY TRANSCRIPT ***

1          THE COURT:  This is United States v. State of

2     Mississippi, Civil Action Number 3:16CV622CWR-FKB.  Good

3     morning.  Is there anything we need to take up before we --

4     before the United States calls its next witness?

5          MR. SCHUTZER:  Not from the United States.

6          MR. SHELSON:  We would just say, Your Honor -- Your

7     Honor, the witness today is a psychiatrist.  The State does not

8     dispute she's an expert in the field of psychiatry.  If this

9     speeds up any part of this process, then so be it.

10          THE COURT:  Okay.  All right.  Well, great.  Thank

11     you, Mr. Shelson.  The government may call the witness.

12          MR. SCHUTZER:  Thank you, Your Honor.  We call

13     Dr. Carol VanderZwaag.

14          THE COURT:  All right.

15          MR. SCHUTZER:  Let me again thank the court for

16     flexibility in scheduling today so that we can kind of get this

17     done in one day.

18          THE COURT:  All right.  No problem.

19        (Witness Sworn)

20          THE COURT:  Ms. VanderZwaag, before you are at the

21     microphone, please speak loudly and clearly for everybody to

22     hear you.  The court reporter needs you to speak at a pace at

23     which she can keep up with you.  Allow the lawyers to finish

24     their questions before you speak so that the two of you will

25     not be speaking at the same time.

```
 1              Please make sure all of your responses are verbal.  If
 2    you're going to nod or shake your head, say yes or no too, and
 3    try to avoid using uh-huh and unh-unh.  They're kind of spelled
 4    the same sometimes but have two different meanings.  And I
 5    think you're from North Carolina, right?
 6              THE WITNESS:  Yes, sir.
 7              THE COURT:  All right.  So we won't have any problem
 8    with you.  It's these other people.  But if you will, please
 9    state and spell your name for the record.
10              THE WITNESS:  Yes.  Right now?
11              THE COURT:  Yes, ma'am.
12              THE WITNESS:  My name is Carol VanderZwaag.  It's
13    C-A-R-O-L.  Last name is V-A-N-D-E-R-Z-W-A-A-G.
14              THE COURT:  Thank you.  You can bring that microphone
15    just a little bit closer to you if you can.  You may proceed.
16              MR. SCHUTZER:  Thank you, Your Honor.
17                        DR. CAROL VANDERZWAAG,
18      having first been duly sworn, testified as follows:
19                        DIRECT EXAMINATION
20    BY MR. SCHUTZER:
21    Q   Dr. VanderZwaag, were you retained as an expert in this
22    case?
23    A   Yes.
24    Q   What were you asked to do?
25    A   I was asked to meet with and interview and review the
```

1   community mental health records and -- and yes, Mississippi

2   State Hospital records of individuals who had been hospitalized

3   in one of the state hospitals between 2015 and 2017.

4   Q   Did you write a report setting out what you did and what

5   you found?

6   A   Yes, I did.

7   Q   Is that report PX-402 in the binder you have in front of

8   you?

9   A   Yes.

10  Q   Does that report accurately reflect your opinions and the

11  basis for them?

12  A   Yes.

13  Q   Let's talk about that report and your opinions in some

14  detail.  I want to spend a few minutes introducing you to the

15  court.  We'll cover this briefly.

16      Could you describe your professional history since

17  finishing your medical education?

18  A   Yes.  I finished my medical education in 1991, and I -- my

19  first job was at John Umstead Hospital in Butner, North

20  Carolina.  It's a state hospital.  And I spent eight years

21  there, first as a staff psychiatrist, and then as the medical

22  director of the rehabilitation unit.  And that was the

23  intermediate to longer-term unit of that hospital at the time.

24      I then took a position with a community mental health

25  center in North Carolina as well, and at the time that I took

1  that position, they were developing an ACT team, so I went to

2  work as the ACT psychiatrist, and I spent the next 18 years

3  working as an ACT psychiatrist with that team.

4      The team stayed together in terms of the individuals we

5  were serving and the staff, but we went through a number of

6  different organizations that we worked for over time.  So the

7  last seven years of that 18 years, I was clinical professor of

8  psychiatry at UNC.  UNC picked up that ACT team.  And there I

9  worked in the Center for Excellence for Community Mental

10  Health, which is part of the outpatient services of the

11  department of psychiatry.  And I was involved just not only

12  with ACT services but a number of other community services that

13  were offered there.

14      And then last summer, I took a position back at a state

15  hospital, a different state hospital called Central Regional

16  Hospital, where I'm now the deputy chief medical officer.

17  Q   In your roles at state hospitals and as an ACT team

18  psychiatrist, did you have responsibility for assessing

19  individuals for community-based mental health services?

20  A   Yes.

21  Q   Have you provided any training to other ACT teams?

22  A   Yes, I have.

23  Q   Could you describe that training?

24  A   Yes.  So, again, going the last seven years when I was

25  working at UNC, there was an Institute for Best Practices

1  within that Center for Excellence, and I worked with them to --

2  they ran a three-day -- we called ACT 101 training program that

3  every ACT provider in the state needed to attend, and I was

4  part of that training program.  So I taught the part about the

5  psychiatric services and the nursing services within the ACT

6  team as part of that training.

7      We also did that training.  At least once I remember doing

8  that in Virginia as well for Virginia ACT teams.  And then,

9  also, my team was established as a high fidelity team, so we

10  were able to have other teams who were working on improving

11  their practice come and shadow us, so typically that would

12  involve working one-on-one for several days with individuals

13  from other teams and just work -- helping them work through the

14  practice of ACT.  So we did that with a number of teams in

15  North Carolina and also a number of teams in Virginia.

16  Q   Are you familiar with something called ACT stepdown?

17  A   Yes.

18  Q   What is that?

19  A   So that's a relatively recent Medicaid service definition

20  in North Carolina that I had some role in helping design what

21  that might look like.  It's a transitional service off of ACT

22  teams that allows people who've made improvements but still

23  need to stay connected to the ACT providers because of the

24  relationship that they have and also still need services to go

25  to them, but with less intensity and less frequency.  So it's a

1   portion of the work that an ACT team can do.  Some of them --

2   some of the individuals can be receiving stepdown services and

3   some ACT services.

4          MR. SCHUTZER:  Your Honor, we offer Dr. VanderZwaag as

5   an expert in psychiatry and community-based mental health

6   services assessments.

7          MR. SHELSON:  No objection, Your Honor.

8          THE COURT:  All right.  Dr. VanderZwaag will be

9   permitted to testify in the designated areas, psychiatrist --

10  psychiatry and community health services.  I'm looking at what

11  you have there.  Okay.  That's not what -- they're cleaning it

12  up.  Tell me, again, Mr. Schutzer, what is her area.

13         MR. SCHUTZER:  Psychiatry and community-based mental

14  health services assessments.

15         THE COURT:  Okay.  She will be so designated.  Thank

16  you.

17         MR. SCHUTZER:  Thank you, Your Honor.

18  BY MR. SCHUTZER:

19  Q   Dr. VanderZwaag, before we talk in detail about the work

20  that you did in Mississippi, I want to ask some preliminary

21  questions about hospitals and mental illness.  Generally

22  speaking, is there a difference between hospitalization in the

23  psychiatric unit of a general hospital and hospitalization in a

24  state hospital?

25  A   Yes.

1  Q   Could you describe what the difference is?

2  A   The -- so the main difference is that general hospital

3  psychiatric units, there tend to be more of them.  They tend to

4  be more widely disbursed in communities.  So the main benefit

5  is to keep individuals as close to home as possible when they

6  need a hospital stay.  That allows for not only their family

7  and other natural supports to interface with the treatment team

8  and the individual while they're hospitalized but also their

9  outpatient provider.

10     So one of the things I was able to do routinely was to go

11  visit with individuals who were hospitalized that I had been

12  working with, and I could work with the inpatient teams.  And

13  that kind of coordination of care and developing a coordinated

14  treatment plan allows for shorter lengths of stay, because by

15  staying engaged with the individual, the outpatient provider

16  will know, you know, at which point they reach that they're

17  safe to come out and that they can continue working with them.

18     So that proximity to home, connection to the people who

19  know the person best, is a major benefit.

20  Q   In your answer just there, you referred to being able to

21  routinely go visit with individuals who are hospitalized that

22  you had been working with.

23  A   Yes.

24  Q   Is that referring to the time when you were working on an

25  ACT team?

1   A   Yes.

2   Q   Is it preferable for people to have a shorter length of

3   stay in a hospital?

4   A   Yes.

5   Q   Why is that?

6   A   Because the hospital is really just to help them regain

7   stability, but the work of recovery and moving forward in their

8   lives happens in the community.  So it's not -- it's not been

9   shown that one can do the significant work of recovery

10   that's -- that people are seeking in a hospital because they

11   are removed from their community where they need to learn and

12   adapt, and the skills don't transfer from one environment to

13   another.

14   Q   You used the word "recovery" a couple of times in your

15   answer.

16   A   Yes.

17   Q   Will you define what you mean by recovery?

18   A   So recovery is a process of change that is essentially

19   about individuals regaining a connection to their full life.

20   It's about developing a meaningful life for that individual.

21   It's about having hope and being resilient.  It's about

22   developing the connections to other people and community.

23   Q   I want to talk about somebody who you met who's been in the

24   state hospital for a while, person 38.  In your binder, you

25   have a tab labeled PX-400.  That's a list of all the people in

1    the client review, as well as an anonymous number we've

2    assigned them to protect their confidentiality.  Please refer

3    to this any time you need to check who I'm talking about.

4    A    Yes.

5    Q    So let's turn in your report, please, which is PX-402, the

6    first tab in your binder, to page 43 of that document.  Using

7    the numbers in the bottom right of the page.

8    A    Yes.

9    Q    Can you tell the court a little bit about person 38?

10   A    Yes, I interviewed person 38 at Mississippi State Hospital

11   in February of 2018.  At that time, he was a 43-year-old male

12   who had been residing at the state hospital since 2006.  And he

13   had had a difficult stay at the hospital, and he was not in

14   very good condition at the time that I met him, and it was

15   difficult for him to maintain alertness and actually have an

16   interview, although he was able to state a few of his

17   interests, like going to church, lifting weights, and he was a

18   big lover of music.

19   Q    In your report at page 45, in the section called "Community

20   Services and Summary Assessment," you write that he may have

21   experienced institutional dependence.  That's at the end of the

22   first paragraph.  Do you see that?

23   A    Yes.

24   Q    What is institutional dependence?

25   A    So it's a situation where if you've been confined to an

1    institution for a long period of time, you start to rely very

2    much on the structure, routine and assistance that you get

3    within that institution so that there can be a loss of

4    independence, a loss of skills.  And it's problematic when

5    people do leave an institution because sometimes they can feel

6    like they don't have that internal structure anymore to -- or

7    so it can lead to just a decrease in functioning.

8    Q    Generally, are there harms that occur when somebody stays

9    in a state hospital for an extended period of time?

10   A    That is one of the harms, yes, that people can lose

11   their -- they lose motivation, they lose hope, they lose

12   skills.

13   Q    What led you to conclude that person 38 may have

14   experienced institutional dependence?

15   A    Well, there was some evidence in his Mississippi State

16   Hospital record that, based on some assessments, there had been

17   a decline in his independent functioning.

18   Q    Would you turn in the binder, please, to the tab marked

19   PX-1083, after the very big tab.

20   A    Yes.

21   Q    This is a document we've marked as PX-1083.  What is this

22   document?

23   A    This is a psychological evaluation update by a Ph.D.

24   psychologist.

25   Q    When was the evaluation update completed?

1   A    Well, it was completed in 2011, although looking at this,

2   someone had written 1911, but I think that was an error.

3          MR. SCHUTZER:  Your Honor, I move PX-1083 into

4   evidence.

5          THE COURT:  Is there any objection?

6          MR. SHELSON:  Sorry, Your Honor.  I'm looking real

7   quick.

8          THE COURT:  Uh-huh.

9          MR. SHELSON:  No, Your Honor.

10          THE COURT:  All right.  PX-1083 will be received into

11   evidence.

12      (Exhibit PX-1083 marked)

13   BY MR. SCHUTZER:

14   Q   Did you review this evaluation update when you reviewed

15   person 38?

16   A   Yes.

17   Q   Was there anything notable about this evaluation?

18   A   Yes.

19   Q   What was that?

20   A   There was -- on the fourth page, I believe, there was a

21   summary of the -- so this was an assessment of his adaptive

22   living skills, which basically measure independent functioning.

23   And there was a paragraph that discussed the decline that he

24   had had over time while in the hospital.

25   Q   Is that the paragraph that starts "Previous assessment of

```
 1   adaptive living skills"?

 2   A   Yes.

 3   Q   Would you read the last two sentences, please?

 4   A   Yes.  "It is possible that his functioning represents a

 5   decline due to living in an institution where health care staff

 6   attends to many of his basic needs for him.  In other words,

 7   person 38 may be able to improve his adaptive living skills,

 8   given the opportunity and skills training."

 9   Q   When was this evaluation completed?

10   A   2011.

11   Q   When did you meet him?

12   A   I met him in 2018.

13   Q   Had he been in Mississippi State Hospital continuously

14   between 2011 and 2018?

15   A   Yes.

16   Q   In total, how long had he been at the hospital when you met

17   him in 2018?

18   A   He had been there almost 12 years.

19   Q   Did he need to be there for almost 12 years?

20   A   Not in my opinion.

21   Q   Why is that?

22   A   I believe that there could be appropriate outpatient

23   services developed for him where he would have done well.  I

24   think that he is someone who would need certain levels of

25   support, but I think in the right environment, he could have
```

1  made some gains and would have had opportunities at least to

2  have enrichment that was individualized for him, services that

3  were individualized for him and not ones that were sort of

4  routine within an institution.  So I think those things would

5  have helped him.

6  Q   In this evaluation in 2011, the psychologist wrote that

7  person 38 may be able to improve his adaptive living skills,

8  given the opportunity and skills training.  That's the end of

9  the sentence that you read a few minutes ago.

10  A   Yes.

11  Q   Did you see evidence that he had, between 2011 and 2018,

12  received skills training while at the hospital?

13  A   Not of the kind that would have helped him regain those

14  independent skills.

15  Q   You mentioned earlier that adapting living -- or an

16  assessment of adaptive living skills is a measure of

17  independent functioning.  Did I get that right?

18  A   Yeah.  It's broadly looking at how independent are

19  individuals in certain domains.

20  Q   Thank you.  I was going to ask you what independent

21  functioning was, but you got there for me.  For somebody like

22  person 38, who you testified is going to need a level of

23  support when he leaves the hospital, is living in the community

24  different than living in the hospital?

25  A   Yes, because, again, I think that it -- there are ways to

1   design an individual treatment plan for him based on his

2   preferences and his specific needs, and if services are

3   designed around the things that he needs specifically as

4   opposed to the generalized things that are provided in larger

5   care settings, then I believe he, A, would be more engaged in

6   his own life and have the possibility of improving

7   significantly.

8   Q   When you met him, did person 38 express any of his goals to

9   you?

10  A   Can I look at that part of my report?

11  Q   Certainly.

12  A   Can you remind me what page that was on?

13  Q   I can.  You start talking about person 38 at page 43.

14  A   Okay.  As I said, he had difficulty maintaining alertness,

15  and he was difficult to understand because of articulation

16  problems, but he did say a few things clearly.  He did say, *I*

17  *wish I was discharged.*  He said his needs were to take

18  medication, but he also said he knows how to microwave and

19  knows how to wash clothes, and expressed some of the things

20  that he enjoys doing.

21  Q   Did you have concerns about institutional dependence for

22  anyone else that you met in your review?

23  A   I have that concern whenever someone is in the hospital for

24  long periods of time.  So one of the individuals that I met was

25  a woman -- another woman who had been at the hospital for three

1    years at the time that I met her.

2    Q    Which person was that?

3    A    That would be person 50.

4    Q    Let's turn to page 82 of PX-402.  It's the section on

5    person 50.  Could you tell us a little bit about her?

6    A    Yes.  So I met with person 50 at Mississippi State Hospital

7    in February of 2018.  At that time, she was a 51-year-old

8    mother of four children who had been at the hospital since

9    April of 2015.  Prior to her hospitalization, she had been

10   living with her mother and brother and one of her children, I

11   believe.  She had had -- she was on her 24th admission to

12   Mississippi State Hospital at the time that I met her.

13   Q    How common is it, in your experience, to meet somebody

14   who's been to a state hospital 24 times?

15   A    It -- it would be uncommon to have someone at -- in my

16   experience, go into the hospital frequently, state hospitals

17   frequently now, but back in the time that I worked at the state

18   hospital originally in the 1990s, it was not particularly

19   uncommon.

20   Q    How did person 50 feel about being in the state hospital?

21   A    She very much did not want to be in the state hospital.

22   Q    How do you know that?

23   A    By both my interview with her and the review of her medical

24   records.

25   Q    What did you learn in your interview with her about whether

1    she wanted to be in the state hospital?

2    A   She told me that she had a desire to live independently in

3    her own place, and she had long-term goals that could not be

4    accomplished in the state hospital, one of which was to look

5    after and make sure that her children were happy and healthy,

6    and also to own an art gallery.  She also perked up a lot when

7    we talked about employment in general.

8    Q   What did you learn from the medical records you reviewed

9    about her desire to not be in a state hospital?

10   A   The medical records also reflected that.  She -- there was

11   evidence that at times, when other people were being

12   discharged, she would be upset because she was not.  So she

13   clearly talked about discharge on a somewhat regular basis.

14   Q   Would you flip please in your bind to the tab labeled

15   PX-1084.  What is this document?

16   A   This is an annual progress note from Mississippi State

17   Hospital by a physician there.

18   Q   Is this one of the records that you reviewed about person

19   50?

20   A   Yes.

21           MR. SCHUTZER:  I move PX-1084 into evidence.

22           THE COURT:  Any objection?

23           MR. SHELSON:  No, sir.

24           THE COURT:  PX-1084 will be received into evidence.

25       (Exhibit PX-1084 marked)

1    BY MR. SCHUTZER:

2    Q    What was the date of this annual progress note?

3    A    April 2017.  April 13, 2017.

4    Q    Is the date of dictation April 27th, 2017?

5    A    Yes.  There's two dates.  One is a date of note -- due date

6    of note.  The date of dictation was April 27, 2017.

7    Q    Would you turn to page 4 of this document, please.  In the

8    middle paragraph, the one that starts "The social worker

9    noted."  Do you see that?

10   A    Yes.

11   Q    Would you read -- would you read that paragraph, please?

12   A    "The social worker noted in May of 2016, that the psychotic

13   symptoms in this patient were active.  She continued to talk to

14   herself.  She also made bizarre comments, such as, *My mom is*

15   *waiting outside to take me on pass.*  She did have several

16   passes home with family during the past year without problems.

17   She also had periods when she appeared to be irritable and

18   would say, *Why are y'all keeping me here?  I've done everything*

19   *right.*"

20   Q    What did this tell you about person 50's hospitalization?

21   A    Well, if she was going on passes, it told me that she was

22   not considered dangerous.  So that was -- and also, it told me

23   that she wanted to leave.

24   Q    Why is it significant that she was not considered

25   dangerous?

1   A    Well, because, in my view, the reason for any

2   hospitalization is related to keeping people safe.  If they're

3   engaged in either active or risk of self-injury or injuring

4   others, then hospitalization is appropriate.  But once they

5   achieve some level of stability where the dangerousness is no

6   longer a problem, then their need for hospitalization should

7   have ended.

8   Q    Would you look at the next page, please, the third

9   paragraph up from the bottom, "For the next few months."  Do

10  you see that?

11  A    Yes.

12  Q    Could you read the last sentence of that paragraph, please?

13  A    "There were not any immediate plans for discharge at this

14  time due to the patient not meeting her goals."

15  Q    What was this referring to?

16  A    This was referring -- this was referring to the goals that

17  the inpatient treatment team had for her related to

18  acknowledging that she has a mental illness and stating that

19  she would take medications on discharge.

20  Q    This refers to those goals as her goals.  Do you agree with

21  that characterization?

22  A    No.

23  Q    Why not?

24  A    Because those were the goals the treatment team had for

25  her.  They were not ones that she identified individually.

```
1    Q    Is it appropriate to continue to hold someone in a state
2    hospital because they won't promise to take medication when
3    they're discharged?
4    A    No.
5    Q    Why not?
6    A    Well, in the case of this particular individual and in the
7    case of many others, that -- they will not do that, ever.  So
8    they are then stuck in a situation waiting for something to
9    happen that's not going to happen.  The nature of her illness
10   was such that she did not have insight and did not acknowledge
11   the need for medication.  It's clear over 24 hospitalizations,
12   plus the number of years she's been there, that is not going to
13   change.  So the treatment plan has to be designed based on that
14   reality.  But there are ways to address the concerns that the
15   hospital staff had by accepting that reality and working on it
16   in a different way, rather than trying to push her into a
17   certain way of seeing things.
18   Q    Could you give an example to -- of what you mean by ways
19   you could address the concerns about -- around medication
20   differently than what happened in this record?
21   A    Sure.  So, first of all, there's no need to ever sort of
22   expect that someone will say, I am mentally ill.  I have an
23   illness.  Some people do say that, and some people don't.  That
24   doesn't mean you don't provide services for them or you don't
25   provide support.
```

1    So this is an individual who had a clear desire to live on

2  her own, and so I would certainly believe that there are ways

3  to help her get into housing which she would be motivated for,

4  it seems, and work with her on what it takes to keep that thing

5  that she's motivated for.  One of those things would be to, you

6  know, get better about managing her mental health.  And

7  certainly there are a lot of different ways to address

8  medication on here.  And one can use certain kinds of

9  long-acting medications.  One can do daily visits, imprompts

10  and help people set up medications, and there's just ways to

11  address this.

12  Q   Is there a particular service that would work with person

13  50 in the way you're describing?

14  A   Yes.

15  Q   What's that service?

16  A   PACT.

17  Q   You referenced this a bit a few minutes ago.  I want to ask

18  a few more questions about it.  You talked about when a

19  hospitalization is appropriate.  Could you remind us, in your

20  opinion, when hospitalization is appropriate for mental

21  illness?

22  A   Sure.  I mean, there are times where individuals end up

23  with either an exacerbation of symptoms or some other crisis

24  situation where there are real safety concerns, and there's a

25  concern that any lesser level of care would not be able to

1   manage that -- the safety issues.  So people become aggressive

2   or they become self-injurious or they have significant thoughts

3   of either of those things happening and don't feel they can

4   control those impulses, and hospitalization is helpful.

5   Q   What circumstances call for admission to a state hospital,

6   specifically?

7   A   Well, in my reading and experience, you know, the state

8   hospitals still have a place in many parts of our country, and

9   they are, you know, part of the continuum of care, probably the

10   last safety net place.  So in some ways, they, overtime, have

11   evolved to be able to manage the needs of people who are most

12   acutely aggressive or most acutely self-injurious, so people

13   who are more complex and more ill than the average person

14   needing a hospitalization because of the special team working

15   with that population.

16   Q   Are there any people for whom long-term hospitalization is

17   the only option?

18   A   I would like to -- I would like to say no, but I think that

19   there's still -- there are still some very small number of

20   people where we don't have really other good alternatives to

21   that.  So there's a small group, probably.

22   Q   Are there any particular characteristics that define that

23   group?

24   A   Yeah.  I would say that group would be limited to

25   individuals who, rather than having a chronic remitting kind of

1   illness, have a degenerative illness.  So individuals who

2   perhaps have some kind of neurodegenerative disorder, where the

3   expectation is not based on our medical knowledge, that there

4   is a way to improve, that it's going to be a declining course,

5   and that would be for individuals who have that declining

6   course, and also exhibit enough agitation or aggression that it

7   would be difficult to manage in other environments.

8   Q   Just to make sure we all understand, what is a

9   neurodegenerative disorder?

10  A   So it's a brain disease where the process is known to get

11  worse in that we don't have any treatments.  Things are going

12  to get worse, and it's not about recovery in that situation.

13  It's really about trying to, you know, help an individual

14  through that process of decline.  So things like dementia, a

15  certain kind of dementia, or, for instance, a disease like

16  Huntington's disease.  So there's certain kind of well-defined

17  conditions that the expectation that people will improve or are

18  going to learn new skills or be able to recover significantly

19  is not there.

20  Q   I want to take a look now at the process that you used in

21  this case to do the work that you did.  What were the questions

22  that you were asked to answer?

23  A   I know them.  I just want to look at them specifically,

24  just to make sure I state them correctly.  So the first one

25  was:  Does the individual oppose or not oppose living in the

1    community?  The second was:  Is the individual appropriate for

2    and could they benefit from mental health services and supports

3    available in a community setting?  And had -- the third was:

4    Had the individual been offered and had they been receiving

5    appropriate community-based services, would they have avoided

6    hospital admissions, or would they have spent less time in the

7    hospital during a given admission?  And finally:  Is the

8    individual at serious risk of readmission to a state hospital?

9    Q    Did you answer every question for every person?

10   A    No.

11   Q    When did you not answer every question?

12   A    So one individual that I reviewed was deceased.  So I was

13   not able to ascertain whether they opposed or didn't oppose.

14   And then when someone was -- in a state hospital at the time

15   that I saw them, I did not answer the risk of readmission.

16   Q    Which person -- if you need to look at PX-400 to check the

17   number, please do.  Which person was deceased?

18   A    Person 48.

19   Q    How did she die?

20   A    She died while she was in East Mississippi State Hospital.

21   She choked on a sandwich.

22   Q    Regarding the question about whether -- about individuals

23   avoiding hospital admissions or spending less time in the state

24   hospital, what factors did you look at to answer that question?

25   A    I basically looked at -- I did an assessment based on my

1    review of the records and my interviews with them about what

2    kind of situations led to their hospitalizations, and so what

3    were the kinds of problems that could put them at risk again.

4    And so I basically made an assessment of the kinds of

5    interventions that I thought would be of benefit, given those

6    patterns that they were exhibiting.  And for many people,

7    there's a pattern; for some there's not.  But just looking at

8    the things that they identified needing support with, looking

9    at what they had available in terms of community services

10   already, and also looking at the disconnect sometimes between

11   what was available and what they were actually availing

12   themselves of, which is kind of a common problem of being -- of

13   individuals being disengaged from treatment.

14   Q   How do you know that providing the community services would

15   impact whether a person went to or spent less time in a state

16   hospital?

17   A   I know by my experience of doing it, and I -- I think

18   there's ample research that supports that as well.

19   Q   Focusing on the question about whether the individual was

20   opposed, how did you go about answering that question?

21   A   Generally, by asking them, and people are usually pretty

22   clear about that.

23   Q   Were there any individuals who didn't give you an explicit

24   yes/no clear indication?

25   A   Not that I recall.  I supplemented whatever they said to me

1    also with evidence in their medical records as well.

2    Q    How many people did you look at?

3    A    Twenty-eight.

4              MR. SCHUTZER:  May I approach, Your Honor?

5              THE COURT:  Yes, you may.

6    BY MR. SCHUTZER:

7    Q    I've handed you what we have marked for identification as

8    PDX-8.  Is this a chart showing what you found about these 28

9    individuals?

10   A    Yes.

11   Q    Let's walk through those findings for a moment.  How

12   many -- what proportion of people, of the 28 people that you

13   looked at and answered the question for, did you find were --

14   would have avoided or spent less time in a hospital if they'd

15   been receiving community-based services?

16   A    100 percent.

17   Q    What proportion of the people you looked at and for whom

18   you answered the question did you find were at serious risk of

19   going back into a state hospital?

20   A    80 percent.

21   Q    What proportion of people for whom you answered the

22   question did you find were appropriate for and would benefit

23   from community-based services?

24   A    100 percent.

25   Q    Finally, what proportion of the people who you answered the

1   question for did you determine were not opposed to

2   community-based services?

3   A    96 percent.

4   Q    How many of your 28 people were opposed to community-based

5   services?

6   A    Again, I could not ask one because she was deceased, but of

7   the remaining 27, one was opposed.

8   Q    You've mentioned that you conducted interviews of these

9   individuals?

10  A    Yes.

11  Q    Were there any people, setting aside -- in addition to the

12  individual who is deceased, were there any other individuals

13  you were not able to personally interview?

14  A    Yes.  There was one individual who I met at his home, and

15  he gave me permission to speak with his father and stepmother,

16  but he declined to talk, so I was not able to interview him.

17  And then I had several individuals who agreed to be interviewed

18  initially, but because of the level of symptoms they were

19  experiencing, they were rather brief interviews.

20  Q    For those individuals who you did not interview or briefly

21  interviewed, how did you gather information about those

22  individuals?

23  A    When it was available, through close contact, so family

24  supports.  Otherwise, through review of the medical records.

25  Q    Did you also interview family members of individuals who

1   you were able to personally interview?

2   A   Yes.

3   Q   The medical records that you looked at, where -- what

4   entities were those the records of?

5   A   So they were from the various state hospitals and also

6   records from the community mental health centers.

7   Q   Did you come away from your review of these 28 individuals

8   with any overarching conclusions?

9   A   A couple of overarching conclusions.  One is that I felt as

10  though they were in need of more comprehensive outpatient

11  services, particularly of the kind that addresses individuals

12  who seemed to be disengaged from outpatient care.  So those

13  would be services that go to the individual and work in a

14  particular fashion to develop a therapeutic alliance and do

15  assertive engagement.  So there was overarching conclusion that

16  people were not receiving the kinds of services that they were

17  likely to benefit from.

18      And the second was that there seemed to be a reliance, in

19  the absence of that, on families filling in the gap, so

20  families being responsible for making people take meds,

21  families being responsible for any variety of things.

22      And in a number of situations, I saw where that burden on

23  families led to their essentially being burned out by it and

24  then forcing individuals into a group home or personal care

25  home setting that they really did not want to be in.

1  Q   Focusing for a moment on the first thing that you listed,

2  that individuals were in need of comprehensive outpatient

3  services, what was the result of people not receiving those

4  services?

5  A   So there was definitely evidence that basic services exist

6  in the community mental health centers.  By basic services, I

7  mean that they would have an opportunity to meet with a

8  prescriber, some opportunity for nurse visits, some opportunity

9  for some community support staff, but the result of, like,

10  having those -- if people -- if they're not meeting people's

11  needs, then people tend to not take advantage of them.  So just

12  being there, if a person doesn't go to them, is not going to be

13  helpful in terms of their recovery or even stability at that

14  point.  So I did not see much evidence of very much outreach

15  when people disconnected from treatment.  And what I did see

16  evidence of is when they did disconnect from treatment, then

17  they often ended up back in the hospital.

18  Q   What impact did going to the hospital then have on these

19  individuals?

20  A   Well, the problem with repeated hospitalizations or any

21  hospital is, A, it takes you out of your life while you're

22  there, so it's a big event to go into a hospital.  It removes

23  you from the life that you either, A, are leading or would like

24  to work on leading.  So it's a bit of time that you can't get

25  back.  So the more time one spends in a hospital, the more time

1    one can't get back for their lives and continue to move on.

2        Also, what happens is, after people have had many

3    admissions, then everyone basically says, this isn't working.

4    And the solutions that I saw tend to be ones, again, that

5    aren't very recovery-based.  The solutions are, if it's not

6    working, let's now make this person go from the institution of

7    the state hospital to the institution of a personal care home,

8    even if they don't want to.  So the solutions become less

9    recovery-oriented over time rather than more recovery-oriented.

10   Q   What would be the more recovery-oriented alternative to the

11   solution?

12   A   Well, one thing I noticed is that -- and just about

13   everyone I spoke with, the things that they wanted in their

14   lives are things that we all want.  So they wanted a stable

15   home.  They wanted opportunities to be employed or be engaged

16   in something meaningful.  They wanted good connections with

17   their families.  So the alternative is, say, well, let's take

18   one of those goals and let's work on that.  Let's help someone

19   get stable housing, and then we'll see what kind of supports

20   they need in that housing so that they can maintain it.  And

21   then once they're doing that well, then, hey, they want to --

22   they're talking about work.  Well, let's see if we can help

23   them get employed.

24       So the alternative is to say, hey, this hasn't been

25   working.  We need to try a new approach.  We need to try

1    something.  Maybe it sounds, you know, drastic.  It doesn't to

2    me because I've done it, and I know it works.  But rather than

3    get more restrictive, we need to get sometimes less restrictive

4    so people can grow.

5    Q    Can you think of an example of one of the individuals you

6    met who was in need of the comprehensive mobile outpatient

7    services that you described?

8    A    Yes.  There are a number of them.  I think person 52 was

9    one of those.

10   Q    Can you tell the court a little bit about person 52?

11   A    Yes, if can I look at where she is.  Do you know what --

12   I've got it.  Page 88.  So she was an individual that I met in

13   April of 2018 at her home.  At that time, she was a 64-year-old

14   woman who was living with her husband of 30 years, and she was

15   a mother.  She had a history of many hospitalization, 13 at

16   Mississippi State, also hospitalized at East Mississippi, South

17   Mississippi, some local hospitals as well.

18       And I interviewed her briefly.  She was one of the

19   individuals who was experiencing quite a few symptoms on the

20   day that I went, but I also spent a fair amount of time talking

21   with her husband.

22   Q    Did you identify a pattern that her hospitalizations tended

23   to follow?

24   A    Yes.  It appears that -- so this is a woman who had a very

25   supportive family.  And as I said, she was married for 30

1   years.  And so her pattern was that she would experience a

2   significant level of symptoms, go to the hospital.  And

3   usually, by the time she got to the hospital, she had some

4   period of nonadherence to her medication.  She would get

5   started on medication again.  The level of irritability and

6   agitation that usually was present on admission would decrease.

7   She would have her sort of usual level of psychotic symptoms,

8   which are unchanging for her, but she would go home better.

9   But over time, that would start to fall apart again.  So she

10  would get better in the hospital.  She would leave.  Her

11  husband would do his best to keep her, you know, doing well

12  post-hospitalization.  He took a lot of the responsibility for

13  making sure she took medicines and things.  But she -- and

14  sometimes she would go to the community mental health center,

15  and sometimes she wouldn't, so variable engagement with what

16  was offered at the community mental health center.

17       Over time, she would deteriorate, and he expressed to me

18  that he would essentially seek hospitalization at the point

19  that he was exhausted because her symptoms were so severe.

20  Q   Are there community-based mental health services that can

21  help someone like person 52 get out of this pattern?

22  A   Yes.

23  Q   What are those services?

24  A   Again, this is an individual who would be a good candidate

25  for a PACT team.

1  Q    Why, in particular, would she be a good candidate for a

2  PACT team?

3  A    Well, she has a number of different needs, and so that sort

4  of comprehensiveness of PACT services, the coordination of care

5  that's available through that would be the best service.  She

6  definitely needs to improve on regular medication adherence

7  because it appears that that's helpful to her when she does it.

8  So any variety of medication assistance services.  And you

9  know, a team would have to design what that looks like for her.

10     She would be difficult to engage at first, so the very

11 first work of a team would be doing what we call assertive

12 engagement, which is trying to develop some kind of alliance

13 with her around the things that she feels would be important to

14 her, and that's how you start to get in there before you even

15 start talking about medicine.

16     So she's someone that would take awhile to develop the

17 kinds of supports around her and her engagement with it to

18 start to see change.  But over time, it would definitely

19 improve.  She also had some history of substance use disorder,

20 and so that could be addressed by the team.  She also had major

21 medical problems and a concern that she was also disengaged

22 from medical treatment.  So PACT teams are very good at that

23 part as well.

24 Q    Was she receiving PACT services?

25 A    No, she was not.

1   Q   Were PACT services available in her home county?

2   A   I'm not sure.

3          THE COURT:  Do we know what her home county was?  I'm

4   looking at this particular record, and I can't tell.  That was

5   a question I was going to ask.

6   A   I think she was from Rankin, maybe, I believe.

7          MR. SCHUTZER:  I don't know that off the top of my

8   head, Your Honor.

9          THE COURT:  But we have the information?

10         MR. SCHUTZER:  Yes, we do.  I'm sure my colleagues are

11  working on it.

12         THE COURT:  That's fine.

13  BY MR. SCHUTZER:

14  Q   Was she receiving any community-based mental health

15  services that were of the type you described in terms of mobile

16  or assertive, even if it was not PACT?

17  A   Her husband described to me that at some period of time,

18  and I'm not exactly sure that I nailed that down, there was

19  some community support, a staff person who did come and tried

20  to be helpful.  I think that he described one situation that

21  there was a crisis situation where that person tried to be

22  helpful.  But there was nothing -- there was nothing ongoing,

23  assertive, consistent or comprehensive enough to really make a

24  difference in how things were going within their household.

25  Q   Was she at serious risk of going back to a state hospital?

1    A    Yes.

2    Q    Why is that?

3    A    It was based on the fact that she had had as many

4    hospitalizations as she did, that she had a history of not

5    adhering to medication, and she had some history of substance

6    use as well.  And so all of those things are risk factors for

7    further admissions.

8    Q    If she received PACT services, would PACT services change

9    that risk?

10   A    I believe it would.  I think, you know, my experience of

11   working with an individual like this is that it might take

12   awhile to get to the point of very few or no hospitalizations,

13   but I do think that one could relatively quickly get to fewer

14   and shorter hospitalizations.

15   Q    How would the PACT team work with person 52 to achieve

16   fewer and shorter hospitalizations?

17   A    Well, first and foremost, as I said, she would be difficult

18   to engage.  Based on the kinds of symptoms that she has, her

19   trust level about who's trying to help and how helpful they are

20   going to be is difficult.  So there are ways to do assertive

21   engagement.  So, you know, developing that alliance.  Then

22   helping her with things that she identifies as important to

23   her.  So working with her preferences and values so that she

24   starts to have a more trusting relationship, and over time, you

25   know, just being in there all the time, one thing is to be

1  responsive to changes in her condition.  So, you know, if she

2  is adhering to medication but she starts to have symptoms,

3  then, you know, teams can get in there and, you know, make a

4  change relatively quickly to avoid crisis.

5      There were a lot of apparently crisis situations within

6  that household.  Teams could go out during those and try to

7  diffuse it, try to help the husband have a break at times.

8  There are lots of ways that -- I think he was very much

9  invested in her staying at home, so I think if he had more

10  support and had less to do himself, that I think he would have

11  been able to continue that, and some of the admissions perhaps

12  would not happen because of that.

13  Q   Have you provided PACT services to individuals like person

14  52 in your career?

15  A   Yes.

16  Q   Did those -- did PACT services have an impact on whether

17  those individuals went to state hospitals?

18  A   Yes.

19  Q   What was that impact?

20  A   Definitely decreased the number of times that they went to

21  state hospitals.  It was very unusual in my years of doing PACT

22  services that anyone was hospitalized in a state hospital.

23      MR. SCHUTZER:  Your Honor, I'm at a somewhat natural

24  break point, I'm happy to continue or happy to take a break,

25  whatever your preference is.

1    THE COURT:  We'll go with natural break points any

2    time.  Anything less than six weeks is going to be great too.

3    Just keep putting it out there.

4    All right.  We'll take a 15-minute break.  All right.

5    (Recess.)

6    THE COURT:  Is there anything we need to take care of

7    before Ms. VanderZwaag returns to the stand.

8    MR. SCHUTZER:  Not from the United States, Your Honor.

9    THE COURT:  All right.  As I summoned her on here.

10   And if there was something, she would just have to hear it from

11   the stand, I guess.  Counsel, you may -- let me ask you, have

12   we figured out where person 52 lives yet?

13   MR. SCHUTZER:  We have, Your Honor.  The parties will

14   stipulate that she's from Simpson County.

15   THE COURT:  Simpson County.  Okay.  Thank you.

16   BY MR. SCHUTZER:

17   Q   Sticking with person 52 for one more minute, could we get

18   PX-413 up on the screen.

19   MR. SCHUTZER:  Your Honor, this document was

20   preadmitted.

21   THE COURT:  Okay.

22   BY MR. SCHUTZER:

23   Q   Dr. VanderZwaag, this is a map showing where -- what

24   counties were covered by PACT teams as of June 30th, 2018.  Do

25   you see that?

```
 1    A    Yes.

 2    Q    Do you see where Simpson County is?

 3    A    Yes.

 4    Q    What -- were PACT teams available in person 52's home

 5    county when you met her?

 6    A    No.

 7    Q    And just so it's clear for the record, Dr. VanderZwaag,

 8    what's your profession?

 9    A    I'm a psychiatrist.

10    Q    When we broke, we'd been speaking about PACT services for

11    person 52.  What is PACT?

12    A    So PACT, it's also sometimes known as ACT in my state.

13    It's ACT, but they are essentially the same service.  And it's

14    a multi-disciplinary team of mental health professionals who

15    work together in a coordinated fashion to assist people with

16    any number of different interventions.  There's a whole host of

17    interventions that PACT teams can provide, based on the various

18    disciplines that work within it.  So those include, you know,

19    mental health and wellness, physical health and wellness,

20    permanent supported housing type services, sort of supported

21    employment services, substance use disorder treatment,

22    medication assistance, any variety of case management things to

23    make sure that people have and can keep benefits, work with

24    families, so family psycho-education, individual therapy.

25    There's just a host of different services.  And one team of
```

1   people work together to design a treatment plan and carry out

2   the interventions that are individualized and specialized for

3   each person.

4   Q   Where are PACT services -- what sorts of locations are PACT

5   services provided?

6   A   All over.  They are broadly distributed throughout the

7   United States and a number of other countries as well.

8   Q   What types of settings do PACT team members go to to meet

9   with their clients?

10  A   Kinds of settings?  So a lot of work is done in the

11  individual's home, sometimes at work sites, if you're working

12  on supported employment or job coaching type skills, any number

13  of agencies that the individual might need to interface with,

14  like Social Security or DSS.  Then it could be at a McDonald's.

15  It can be at a shelter.  It can be attending court with

16  someone.  So go where the person needs you at the time.

17  Q   How often do -- does -- do PACT team members meet with

18  their clients?

19  A   So that's the part that -- so PACT is a -- I think of it as

20  an individualized and flexible service.  So it's based on the

21  individual need, and that can change over time, which is one of

22  the benefits of this service.  So if someone needs to be seen

23  daily because they're in a period of impending crisis, and you

24  want to prevent that crisis from occurring, then a daily visit.

25  If someone needs daily visits over an extended period of time

1    because the team's working with them on proper medication

2    adherence, then that.  But sometimes people need less than

3    that.  So anywhere from daily to -- you know, in our state, you

4    need to be seen a minimum number of times per month in order to

5    actually bill Medicaid, so there's a minimum, and then the

6    maximum is sometimes, you know, a couple of times a day.

7    That's very rare.  So...

8    Q    What does -- I'm sorry to cut you off.

9    A    The minimum is, you know, at least weekly, but that would

10   be someone who -- if that's the level of need that they had,

11   that would be someone I would be looking to graduate to another

12   service.

13   Q    What does PACT stand for?

14   A    Program for Assertive Community Treatment.

15   Q    What does the assertive mean in that context?

16   A    So assertive means that you -- basically, that you keep

17   trying, that you don't give up on people, that you stay

18   engaged, and you continually make adjustments when there's

19   evidence that an individual is difficult to engage or seeking

20   to disengage from treatment.

21        So one of the things is, many people who get referred to

22   ACT teams have a history of, like, either intermittent

23   engagement with services or complete disengagement from

24   services.  So the assertive engagement piece says, hey, there's

25   ways of working with individuals that can actually bring them

```
 1    on board with what you're trying to do.  And then you have to
 2    be very persistent about it and very sort of -- you have to
 3    individualize it to, you know, the particulars of the person
 4    that you're working with.
 5    Q    Is that part of the standard or the definition of PACT?
 6    A    Yes.
 7    Q    Is PACT designed for a particular type of client?
 8    A    Well, yes and no.  So there's no singular type, but in
 9    general, most of the research showing -- you know, it's
10    effectiveness has been done with a population of individuals
11    who have severe -- sometimes called severe and persistent
12    mental illness or individuals with psychotic disorders who, by
13    their own history, have had any number of particular things
14    that suggest they're not doing well, and regular office-based
15    services aren't working for them.  So that could be people who
16    have had frequent hospital admissions, or people who have been
17    in the emergency department a lot, or incarcerated frequently
18    or homeless a lot, or people who are at risk for those things
19    because those are the kinds of situations that, you know, we're
20    trying to prevent, these crises.
21    Q    Where do these -- where does this population of individuals
22    fall on the spectrum of how severe their mental illness is?
23    A    Many people served by PACT teams do have, some of them,
24    more severe kinds of illness.  Again, there's a range.  So not
25    everyone being served by a PACT team will look exactly the same
```

```
 1   or have the same kind of history.  But many of them have, some

 2   of them, more severe chronic unremitting kind of symptoms.

 3   Q   Do Mississippi's operational standards for PACT address who

 4   is appropriate for PACT services?

 5   A   Yes.

 6   Q   Let's take a quick look at that.  Would you turn in the

 7   binder to the tab labeled JX-60?

 8   A   Yes.

 9   Q   You're looking for page 217, using the numbering at the

10   bottom right of the page.

11   A   Okay.

12   Q   Is this where the eligibility criteria in Mississippi's

13   standards is?

14   A   Yes.

15   Q   Would you look on the opposite page, page 216 of JX-60,

16   paragraph C?

17   A   Yes.

18   Q   Is this a section listing who is required to be -- what

19   staff members are required to be on the team?

20   A   Yes.

21   Q   Do PACT services -- well, let's look at it this way.

22   Earlier you -- when you were describing PACT, you described

23   PACT providing service -- permanent supported housing type

24   services, supported employment type services.  What's the

25   difference between receiving employment or housing help through
```

*** DAILY TRANSCRIPT ***

1    a PACT team versus receiving standalone supported employment or

2    supported housing?

3    A    Well, the way PACT or ACT has evolved over time is that

4    evidence-based practices like IPS supported employment or

5    permanent supported housing are embedded within the ACT service

6    now.  So ACT itself is an evidence-based practice, and it's

7    really a service platform.  And then other evidence-based

8    practices can be embedded within the team so that the team --

9    the difference is that usually with someone who needs PACT

10   services, they need help with a number of different things.  So

11   they might need housing support and employment support and

12   support taking their medications regularly, and also need the

13   nurse to come out to their house, because they won't go to --

14   so they need a variety of things.

15        So it's the same service, but it's carried out by the PACT

16   team because they're able to coordinate all of those

17   interventions together.  They build a treatment plan based on

18   that variety of interventions that's being offered.

19   Q    When is PACT available?

20   A    When are the team members available?

21   Q    Yes.

22   A    So it's considered a 24-hour wraparound service, so 24

23   hours a day, seven days a week, 365 days a year.

24   Q    Does -- is there -- do PACT teams address mental health

25   crises for the individuals they serve?

1   A   Yes.

2   Q   How does -- how do PACT teams do that?

3   A   So there are a variety of ways, but usually the standards

4   encourage that the team has someone on call all the time.  So

5   one of the things about PACT teams is, you work with a limited

6   number of people at any given time, so the entire team knows

7   what's happening with those individuals, and they know -- the

8   team meets on a daily basis.  The team anticipates crises that

9   could happen.  So the person on call knows that person, knows

10  what works with them.  There's a crisis plan that's been

11  developed by the team.  So usually teams are staffed at 12 to

12  16 hours a day with regular interventions, and then after those

13  hours, there's someone from the team on call.  And I was -- as

14  a psychiatrist, I was always on call all of the time as backup

15  to the primary person on call so that they could always reach

16  me as well.  So there are a number of ways to build in access.

17  Q   You just referred to crises.  Let's make sure we define

18  that.  What is a mental health crisis?

19  A   So it's anything that kind of sets someone off course.  And

20  it can be a variety of things.  It could be related to an

21  increase in symptoms of their illness.  It can be related to a

22  change in their environment, such as new conflict in their

23  home, between other individuals, that's destabilizing to the

24  person.  It can be an eviction.  It could be, you know, someone

25  gets a speeding ticket, and they're distressed by that and

1    they're concerned about that.  So things that set someone into

2    a state of disequilibrium, where they feel like they need more

3    support, essentially, or it's evidence to others that they need

4    more support.

5    Q    Do PACT services have an impact on whether people are

6    hospitalized in a state hospital?

7    A    I believe they do, yes.

8    Q    What is that impact?

9    A    Well, one thing is, PACT is very -- as I said, the team

10   meets every day and discusses every individual that they're

11   serving with -- serving, and the benefit of doing that is that

12   there are very few crises that develop without the team being

13   aware that something is changing.

14        So most of all, it's a preventative service.  It's a crisis

15   prevention service, so when there is crisis, if the team

16   members are responding to that crisis in an effective way,

17   which hopefully they have learned over time what's effective

18   with each individual and they have a crisis plan, then usually

19   you can help people get out of crisis.  If you can't do that

20   and keep them safely in their home, sometimes you can help them

21   move to another place, maybe go stay with a friend for a while

22   because things are too tough -- there's all -- many ways that

23   you can help people not end up in a hospital.

24        Obviously, if someone's really struggling and, you know,

25   everything else seems to be, you know, short of safety, then

1    hospitalization sometimes is necessary.

2    Q   When was PACT invented?

3    A   In the 1970s.

4    Q   Now that we've talked about PACT in a little more detail, I

5    want to circle back and talk about how PACT would work for

6    person 52.  Can you remind us in a sentence or two who person

7    52 is?

8    A   Yes.  So this was when I saw a 64-year-old woman who was

9    married for 30 years and living with her husband in Simpson

10   County.

11   Q   Was she receiving PACT?

12   A   No.

13   Q   Was she receiving any mental health services?

14   A   Yes.

15   Q   What services were those?

16   A   She had a prescriber, a psychiatric prescriber at I believe

17   it was Region 8, and she had some -- someone identified as a

18   therapist, so some interactions with therapist as well.

19   Q   Were those services adequate for her?

20   A   It appeared that she was struggling in spite of those

21   services.

22   Q   Why was that?

23   A   At the time that I saw her, she was significantly

24   psychotic, and I essentially decided to terminate trying to

25   interview her because of her level of agitation that was

1    developing at her husband, over the course of that brief bit of

2    time.  But the -- she'd had a bunch of hospitalizations, and it

3    did not appear that anything was changing in response to those.

4    Q    What impacts would PACT have?

5    A    So, again, this is a situation where her needs are to

6    develop trust in providers, eventually, hopefully through the

7    kind of work of motivational interviewing, and there are just,

8    again, a number of strategies that can be used to help her

9    become better about taking care of her mental health, adhering

10   to her medications.  It would have take some of the burden away

11   from her husband, who it's very difficult to place a family

12   member in the job of having to get medicines into someone who

13   really doesn't want to take medicine.  That's a very bad setup

14   for relationships and continuing those.

15        So I think, you know, giving that back to the team and

16   having them do that and let him disengage from that, and then

17   also being available for crisis situations, which there were a

18   number of crisis situations there.  I think if the team had

19   come to know her and she could develop some level of trust,

20   then they probably could help deescalate some crises.

21   Q    Were there other people you met and reviewed who would

22   benefit from PACT services?

23   A    Yes.

24   Q    Can you think of another example?

25   A    Person 46.

*** DAILY TRANSCRIPT ***

1  Q   Before we talk about why person 46 needs PACT services, can

2  you tell us a little bit about person 46?

3  A   Yes.  It's an individual whom I met at Mississippi State

4  Hospital.  He was up there on his 46th hospital admission, and

5  he had 18 in the seven years prior to when I met him.  He was

6  68 years old, a gentleman who, prior to admission, was living

7  in his own home, that he had been in the same home for 40

8  years, along with his wife, had essentially been ill since the

9  1970s, and unemployed at the time that I saw him.

10 Q   Of the 46 admissions, you write at page 69 of your report

11 that 18 of them occurred in the last seven years.  Do you see

12 that?

13 A   Yes.

14 Q   When was the last time you saw somebody who's been admitted

15 18 times in seven years?

16 A   It's been awhile.

17 Q   Can you recall treating anyone in the last decade who had

18 had 18 admissions in seven years?

19 A   Not anyone that I was treating.

20 Q   Is there a pattern to these 46 hospitalizations?

21 A   Yeah.  I mean, the major pattern is that he's someone who

22 goes into the hospital and gets on medicine and comes out of

23 the hospital and doesn't stay on medicine.  That's not

24 100 percent true, but often enough that it's led to many

25 hospitalizations.  I think, also, he's someone who one of the

1   intervention that's been tried has been outpatient commitments,

2   and so I think sometimes he's been admitted for a violation of

3   outpatient commitment without actually necessarily showing any

4   signs of dangerousness of things.  So there's a number --

5   number of ways that he has ended up in the hospital.

6   Q   What is an outpatient commitment?

7   A   Essentially, it's a court order that says that people need

8   to present for treatment so that they can't just disengage from

9   it.  And it's varies from state to state, so I don't -- I have

10  not read the exact parameters of that in this state, but I have

11  seen evidence in reading the medical records of people being

12  admitted because they violated the outpatient commitment.

13  Q   Is violating the outpatient commitment always the same as

14  being a danger to themselves or to another person?

15  A   No, oftentimes, it's not.

16  Q   When you say oftentimes, it's not, are you referring

17  generally or specifically to the records you reviewed in this

18  case?

19  A   To the records I reviewed.

20  Q   Would PACT have an impact on person 46's hospitalizations?

21  A   I believe it would.  Again, I think this is a gentleman

22  who's had a lot of admissions, and he has -- does not really

23  see that he has a mental health problem, and therefore, he

24  can't, therefore, see that he needs medication.  So it would

25  take -- and I think he would be a little bit resistant to

1  people showing up and say, I'm here to help.  So you need to be

2  knowledgeable about the fact that that's sometimes how an

3  individual's mental illness manifests and just know that there

4  are ways to approach that and eventually start to develop some

5  kind of alliance that could improve his medication here, which

6  would improve his tenure in the community.

7  Q    How common is it to come across somebody who may be

8  resistant to receiving services due to lack of insight?

9  A    That's pretty common.

10  Q    Is there a standard way that PACT teams can respond to that

11  resistance?

12  A    Well, PACT teams -- one of the reasons individuals get

13  referred to PACT team is for that very reason.  So the same

14  person who doesn't necessarily want PACT services doesn't want

15  any services, yet they keep ending up getting services in the

16  hospital.

17      So the way to do it is to keep trying, A, and have a whole

18  list of strategies about how you might do that.  So you keep

19  showing up, and you keep trying to make connection, and you

20  give someone some space and freedom to say no, but at the same

21  time, let them know that, you know, you're trying to be there

22  to be of assistance.  One way we would do it would be to find

23  out what that individual wanted help with.  So we might want

24  them to take medicines because we think it would be good for

25  them, but that might not be what they're interested in, but

1    maybe they would like help getting to Social Security because

2    they have paperwork to fill out.  So you start by helping

3    people with the things that they see as a need, and then over

4    time, you can start to work in some of the other things.

5    Q    Are there any standards about how long a PACT team should

6    spend on this process before saying, Okay, enough, this is not

7    going to work for this person?

8    A    There's no set amount of time or number of attempts, but

9    the standard is that, you know, people make a very solid

10   consistent, repetitive effort to engage someone in services,

11   and they don't give up if the person says no the first time.

12        The times that you might eventually is if the person has

13   made it so clear by virtue of saying, you know, *I'm going to*

14   *call the police if you show up again*, or, you know, threatening

15   you.  You know, short of that, if it's just someone who is

16   resistant, you keep showing up and keep trying.

17   Q    How long do people spend, generally speaking, receiving

18   PACT services?

19   A    It can vary considerably.  When it was first designed, it

20   was thought of as a life-long service, that people would need

21   it long term.  My experience is that there are some people who

22   do need it long term, and that because they've improved with

23   the service and it's pretty clear that the -- they still need

24   the frequency of interventions that a PACT team can give, it

25   would not -- it's not good to try to, you know, force them into

1    a less intensive service.  But some people do get better after,

2    you know, sometimes a year, or even I've seen individuals

3    improve significantly with -- you know, under a year, when they

4    started getting PACT services, and some of those individuals'

5    improvement is such that they can then go on to, you know, less

6    intensive services.

7    Q   Did you meet anyone in your review who is somebody you

8    would expect to be on the shorter end of receiving PACT

9    services?

10   A   Let's see.  I would say person 41.

11   Q   Tell us a little bit about person 41.  Page 50 of your

12   report if you need -- I'm sorry, page 53.

13   A   So person 41 is someone that I met at his home, where he

14   lives with his father.  He's 38 years old at the time that I

15   met him, which was in February of 2018.  He's a gentleman who

16   was a father of three, struggling to get or stay employed.  No

17   income, no insurance, had a number of hopes and dreams for his

18   family, but he really was struggling financially around that.

19   He had three admissions to East Mississippi State Hospital and

20   also an admission or maybe more than one to the crisis

21   stabilization unit.

22   Q   Why did you determine that person 41 would benefit from

23   PACT services?

24   A   So I identified a number of needs that he had.  So he not

25   only has a major mental illness, but he had a significant

1   substance use disorder.  So diagnostically, you know, up to

2   50 percent of people with serious mental illness also have a

3   co-occurring substance use disorder.  And having a co-occurring

4   substance use disorder is one of the indicators for

5   recommending PACT services because of the coordination of care

6   and the model that's used for treatment.  So mental illness,

7   substance abuse, he really had a need for supported employment

8   because he was struggling with employment on his own.

9        Also, in reviewing his records, there was evidence that the

10   stability of living with dad, while it's basically been there,

11   he really probably eventually would do best moving out on his

12   own, so establishing independent living with supported housing.

13        So it was the number of different needs that he had.  And

14   it's clear, when reading his records, that he didn't always

15   make it to community mental health services, and there was one

16   period of time where he essentially didn't show up for about 11

17   months before he presented to the hospital.  And there was no

18   evidence that there was any outreach to him to find out what's

19   going on with him.  He struggled to maintain access to

20   medication because of his income and that sort of thing.  So he

21   just had a variety of needs.

22   Q   Did you determine --

23        THE COURT:  Hold on for one second.  Slow down just a

24   little bit, because you're not taking any breath in between

25   your sentences.

```
1                 THE WITNESS:  Okay.

2                 THE COURT:  Take your time.

3                 THE WITNESS:  Got it.  Thank you.

4    BY MR. SCHUTZER:

5    Q   Did you determine that person 41 was at serious risk of

6    going back to a state hospital?

7    A   Yes.

8    Q   Why is that?

9    A   As I said, the kinds of needs and stresses that he was on

10   on a regular basis related to his struggle to have income, his

11   struggle without income, to get to treatment, to afford his

12   medication.  Sometimes some conflict with his dad and the fact

13   that there could be, you know, crises that developed within the

14   house.  There were just indicators based on, you know, his

15   prior hospitalizations, co-occurring substance use disorder,

16   which increases the risk, and then intermittent medication

17   nonadherence.

18   Q   Would PACT have an impact on that serious risk?

19   A   I believe it would.

20   Q   What impact would it have?

21   A   I believe it would definitely decrease his risk.

22   Q   Why is that?

23   A   One thing is that a PACT team is not going to let someone

24   disappear from treatment for any period of time.  They're going

25   to -- if someone is hard to find, they are going to figure out
```

1    where they are and what's happening with them and try and

2    address whatever's going on.

3        A PACT team could deal with any kind of crisis related to

4    interpersonal conflict and help, you know, remove someone from

5    that for a period of time until things cool down.  A PACT team

6    would make sure that someone has ongoing access to their

7    medication, that there's never -- that's never a reason for not

8    taking it is because of lack of access.

9        A PACT team, I think, would be able to work with him in an

10   effective way around harm reduction related to his substance

11   use.  He was probably not ready to say he was not going to use,

12   but there's certain harm reduction strategies that one can use

13   to help make sure that that doesn't become a reason for

14   hospital admission.

15   Q    What does harm reduction mean?

16   A    It means that rather than telling someone who's not ready

17   to stop using a substance, Stop using the substance.  It's more

18   about helping them find ways where their use of substances

19   doesn't negatively impact their life in ways that are

20   disruptive, like getting into legal trouble, or getting into

21   fights with family, or ending up in the hospital.

22   Q    We started talking about person 41 as somebody you'd expect

23   to spend less time receiving PACT services.  Why is that?

24   A    For -- one of the reasons is that I think, unlike some of

25   the other people I met, he has a fairly good response to taking

1  medication, and he has an attitude of readiness to take

2  medication, so he's not resistant to that.  So I think if he

3  had regular access, that would help.  And I think if he had

4  regular access and the team was there to work with him on the

5  things like getting a job or get his own housing, once those

6  things were accomplished and well stabilized, he struck me as

7  someone who could start to do things a little more

8  independently and not need as much support.

9  Q   Over time, does going without access to medication cause a

10  person's illness to become more serious?

11  A   Yes.

12  Q   Once person 41 reaches the point at which you think he

13  might not need as much support as a PACT team would provide,

14  would he need any other support?

15  A   He would continue to need mental health services.

16  Q   What kind of mental health services would he need at the

17  point where he no longer required the intensity of a PACT team?

18  A   I would have to assess that at the time.  I'm not sure I

19  could say.  Because it would depend on his response and what

20  the residual thing -- needs were.

21  Q   Did you meet anyone in your review who was actually

22  receiving PACT services?

23  A   I did meet one person, yes.

24  Q   Who was that one person?

25  A   Person 32.

1    Q   Can you tell us a little bit about person 32 on page 23 of

2    your report?  Yes, page 23.

3    A   Yes.  So I met person 32 in April of 2018 at the chancery

4    court offices in Brandon, Mississippi.  His conservator is the

5    chancery court clerk in Rankin County, so that's where we met.

6    He was a 26-year-old male at the time that I met him, a

7    gentleman who is deaf and whose primary language is American

8    sign language.  At the time I met with him, he was living in

9    his own apartment and had a part-time job, of which he was very

10   proud.

11   Q   How many times had person 32 been to a state hospital?

12   A   Oh, I believe at least seven.

13   Q   How was he -- how was he doing before he started receiving

14   PACT services?

15   A   He was really struggling prior to the time that I saw him.

16   So he had gone from Boswell Developmental Center to East

17   Mississippi State Hospital because he was so aggressive at

18   Boswell that the staff there was having a very difficult time

19   maintaining safety.  And then it was from East Mississippi

20   State Hospital that he got connected to the services that he

21   was receiving when I saw him.

22       It was a unique situation because he was actually getting

23   some services from one region and some services from another.

24   Q   Was there anything else unique about his situation?

25   A   He was -- he did not have the more usual psychiatric

1   diagnosis of individuals who receive ACT services.  So best I

2   could tell from the assessments, that he was diagnosed with

3   intermittent explosive disorder, and some concern over time

4   about whether he had a developmental disability, but the

5   records were not clear to me about that.

6   Q   How did he end up connected to PACT services given this --

7   these unique circumstances?

8   A   I think he had a very strong advocate in his conservator

9   who helped push to put together a package of services for him

10  to try to get him out of the hospital system.  He seemed to me

11  to be someone who was more likely to be aggressive in a

12  hospital than out, and I think this conservator understood

13  that.

14  Q   How was he doing when you met him?

15  A   He was doing well on the day that I met him, and I think he

16  was -- he did need a fair amount of support around independent

17  living, and I think he had a -- needed a fair amount of support

18  around maintaining his employment, but he was happy.  He was --

19  you know, he had a few minor complaints, but he was 26, so

20  that's kind of normal.

21  Q   What was the PACT team helping him with?

22  A   Well, again, this is someone who there was a combination of

23  things.  So they were largely helping him with medication

24  adherence.  And it wasn't that he wouldn't take medicine, but

25  he had a tendency to become a little bit disorganized about

1  when to take and what to take, so trying to help keep up a

2  reliable medication adherence system, then, you know,

3  psychiatric care provider visits.

4      And it was not completely clear to me if it was the ACT

5  team or the Region 8 people who were helping him with the

6  supported employment, but they were all helping with supported

7  housing.

8  Q   Did you come across anyone else in your review who was

9  receiving services from two different CMHCs at the same time?

10  A   No.

11  Q   I want to jump back to person 41 for a minute.  He's the

12  gentleman we discussed who your expectation would be that he

13  would be on PACT for a relatively shorter amount of time.  And

14  I have a couple of more questions about him.  Would you turn to

15  page 55 of your report, please.

16  A   Yes.

17  Q   In the first full paragraph on that page, the one that

18  begins "Because there are" --

19  A   Uh-huh.

20  Q   -- you also refer in the next sentence to unbundled

21  services.

22  A   Right.

23  Q   And you write "Unbundled services, such as those previously

24  offered to him by Weems, are less effective if they do not

25  operate from a perspective of assertive engagement and

1    outreach."  What did you mean by that?

2    A   So in reviewing his medical records from Weems, it looks as

3    though he had -- they had identified the various needs of

4    mental health treatment, substance use treatment and supported

5    employment, and I think he had been referred to all of those

6    services, but if he -- those were all office-based services, so

7    if he did not go and connect with whatever provider was

8    offering them, then he could get no benefit from them.  And

9    there was evidence, in reading that record, that he would

10   disconnect over time or at times from it.  So there was no --

11   and there was nobody then calling up and saying, *Hey, it's*

12   *supported employment day.  You know, do you have transportation*

13   *here, or should I come to you so we can work on supported*

14   *employment today?*  So that kind of -- that kind of difficulty

15   of, like, making sure he got what was being offered.

16   Q   And what do you mean by unbundled services, specifically?

17   A   So I think of ACT as sort of a bundle of different kinds of

18   interventions and different kinds of expertise.  So within that

19   bundle, there's things that you can take out as separate

20   services.  So someone can just see a psychiatrist, and that

21   would be fine for a certain individuals.  Or someone could just

22   get supported employment, if that's all they need.  So you take

23   it out of the bundle.

24       So ACT team is responsible, if someone's on ACT, for doing

25   any of those interventions that the person needs, that they are

1   the sole source of responsibility for that.  But you could, for

2   some people who have fewer needs, just take a separate service

3   and offer that service in a different way.

4   Q   If unbundled services are provided with a perspective of

5   assertive engagement at outreach, can they be effective?

6   A   Yes.  I think -- I think for me, I would say if an

7   individual needs more than one or two unbundled services in

8   order to get their needs met -- so if they have multiple needs,

9   it's better to do it through something like PACT because that

10  team coordinates that care.

11      So as soon as you start to get into multiple providers

12  doing different things and no one's talking to each other,

13  that's very confusing and not very effective for people.  So

14  it -- if they were assertive, I've seen supported employment

15  work where it's singular service and people are assertive about

16  making sure that people are doing it.  So yes, it does work if

17  someone's needs are limited to just one or two areas.

18  Q   Let's turn to person 43 at page 59 of your report, PX-402.

19  Can you tell us a little bit about person 43?

20  A   Oh, yes, sir.  I'm sorry.  Yes.  Person 43, I met him in

21  March of 2018, at a personal care home somewhere in the Delta

22  region.  I cannot remember the name of the town.  He's from

23  Bolivar County, though, I believe.  He's 63 years old at the

24  time that I met him, and most of his life he had lived with his

25  mom, who -- but in the past -- in the one or two years before I

1    met him, he had been in several personal care homes.  He has a

2    history of many admissions, I think 16 Mississippi State

3    Hospital admissions.

4    Q    Did you determine that he would be appropriate for PACT

5    services?

6    A    Yes.

7    Q    Why did you determine that?

8    A    Again, based on the diagnosis co-occurring substance use

9    disorder, history of multiple hospitalizations, need for help

10   with medication adherence, and just need in a variety of areas.

11   Q    Did Mississippi State Hospital ever identify him as

12   somebody who would benefit from PACT services?

13   A    Yes.

14   Q    When was that?

15   A    I believe it was in 2016.

16   Q    Let's take a look in your binder at tab -- at the tab

17   labeled PX-281.

18   A    Yes.

19   Q    What is this document?

20   A    It's called a PACT team tracking form.

21   Q    Is it a record from Mississippi State Hospital?

22   A    Yes.

23           MR. SCHUTZER:  I'd move PX-281 into evidence.

24           THE COURT:  Any objection?

25           MR. SHELSON:  No, Your Honor.

*** DAILY TRANSCRIPT ***

```
1            THE COURT:  All right.  PX-281 will be received into

2    evidence.

3        (Exhibit PX-281 marked)

4    BY MR. SCHUTZER:

5    Q   Will you turn to page 11, please, using the numbers in the

6    bottom right of the page.

7        Is person 43 in the second row?

8    A   Yes.

9    Q   This is the tracking form from February 2016?

10   A   Yes.

11   Q   What was the results of the referral from Mississippi State

12   Hospital for person 43?

13   A   Under the heading that says "County, region, meet criteria

14   but no PACT team in the area."  For him it was listed as, "No

15   PACT team in area, Bolivar County."

16   Q   Turning way from the mechanics of PACT for a bit, are you

17   familiar with the term "recovery oriented"?

18   A   Yes.

19   Q   What does that mean?

20   A   So offering recovery-oriented services and supports is

21   essentially a way of supporting individuals' recovery.  It's

22   recognizing that they are the experts in their lives, and that

23   their goals have value, and that the kind of things that you're

24   offering to help them with are driven by their own needs,

25   preferences, goals and values.
```

1  Q   What is -- specific to serious mental illness, what is the
2  opposite of recovery-oriented?
3  A   Well, I would think the traditional medical model is not
4  particularly recovery-oriented.  It's a model that is tried to
5  be -- people tried to use it for sort of chronic disease in the
6  management of things that are sort of more chronic but that
7  model works best in acute situations, and, you know, things
8  that can be resolved quickly and not likely to keep coming back
9  and keep coming up.
10      So recovery means that even in spite of things that stay
11  around all the time and are problematic all the time or likely
12  to come up, you still learn to live with that, manage that and
13  lead a full life.  So it's more along the lines of, in
14  medicine, kind of the rehabilitation model that people who've
15  had, like, stroke or whatever, the goal is to try to regain
16  functioning again and get back to a normal life.  So
17  recovery-oriented mental health care is more in line with that.
18  Q   Is there a relationship between recovery-oriented care and
19  whether people are at risk of being hospitalized in a state
20  hospital?
21  A   Well, I believe there is, because one of the things is, if
22  you're really working with someone in a recovery-oriented
23  fashion, then hopefully some of that work is successful.  And
24  if you're successful, it means that you're meeting individuals'
25  goals.  If people have achieved something, whether it's, like,

1   they got married or they had a kid or they got into housing,

2   they're more likely to really want to hold on to those things.

3   So the work just kind of, like, blossoms from there, where

4   people are highly motivated to keep going forward.  So I think

5   that has an impact on hospital admissions.

6   Q   What is the standard in mental health care as it relates to

7   providing recovery-oriented services?

8   A   That is the standard now.

9   Q   Did you review any documents regarding Mississippi's

10  policies on providing recovery-oriented care?

11  A   Yes.

12  Q   Is that the DMH operational standards?

13  A   Yes.

14  Q   Let's take another look at those.  That's JX, Joint

15  Exhibit 60.  Generally, before we look at the specific parts of

16  it, what is Mississippi's policy regarding recovery-oriented

17  services?

18  A   There's an expectation that their services are

19  recovery-oriented and person-centered.

20  Q   Would you turn to page 91 of Joint Exhibit 60.  If we start

21  at the bottom of page 90, this is the section on service and

22  program design.  Is that correct?

23  A   Yes.

24  Q   What is their requirement in paragraph B, as in boy, at the

25  top of page 91?

1   A   "Services and programs must be designed to provide a

2   person-centered recovery-oriented system of services with a

3   framework of supports that are self-directed, individualized,

4   culturally responsive, trauma-informed, and that provide for

5   community participation opportunities.

6   Q   Did you see evidence that the individuals who you reviewed

7   received services that were, in fact, person-centered and

8   recovery-oriented?

9   A   Largely, no.

10  Q   Before I ask you for an example, let's also make sure we're

11  clear.  What does person-centered mean?

12  A   Again, person-centered means that the services being

13  offered are driven by the needs of the individual, that the

14  needs of the individual are paramount, and that they are full

15  participants in development of a plan of service.

16  Q   Could you give me an example of somebody you reviewed who

17  was not receiving services that were person-centered and

18  recovery-oriented?

19  A   Yes.  Person 49.

20  Q   Can you tell us a little bit about person 49?

21  A   Yes.

22  Q   Page 79, if you need to check.

23  A   So person 49 is a gentleman that I met March of 2018.  He

24  was living at a personal care home in the -- somewhere north.

25  I don't know exactly.  It's blanked out.  And he had been,

 1   prior to that, living up -- he was a distance from his own

 2   home, which I do know was several hours away.  He previously

 3   lived with family, but following a hospitalization at North

 4   Mississippi State Hospital, he was placed in this personal care

 5   home where I saw him.  And he told me that he had long-range

 6   goals of owning a car, getting married again and having a

 7   family.  He had previously been married, but I believe his wife

 8   was deceased.  He had a history of many -- five admissions to

 9   the state hospital, and then a number of crisis stabilization

10   unit admissions as well.

11   Q   Let's -- let me see if we can help with some of the

12   geography.  Could you pull up 413 again.  So you're looking at

13   PX-413, which is a map of Mississippi.  If you look back at

14   your report, PX-402, at the bottom of page 79, you write that,

15   "Prior to his most recent hospital admission, person 49 was

16   receiving outpatient services at Community Care Region 2 CMHC.

17   Durion the see on map where Region 2 is?

18   A   Yes.

19   Q   If you flip the page of your report to page 80, the second

20   full paragraph begins, "Person 49 attends CMHC appointment at

21   Life Help, Region 6 CMHC."  Let me go back to the map and check

22   where Region 6 is.  Do you see that?

23   A   Yes.

24   Q   Do you recall generally where within Region 6 he was

25   living?

*** DAILY TRANSCRIPT ***

1  A   No, I don't.  Sorry.

2  Q   Did -- we'll go back to your report.  Did you determine

3  that person -- what did determine about whether person 49 was

4  at serious risk of going back to a hospital, a state hospital?

5  A   I determined that he was at serious risk.

6  Q   Why was that?

7  A   Based on a number of risk factors, including his multiple

8  past hospital admissions, a history of medication, intermittent

9  medication nonadherence, also a co-occurring substance use

10  disorder.  Also, at the time I met him, his extreme

11  dissatisfaction with where he was living and what services he

12  was being asked to participate in.  So a number of things.

13  Q   What's the connection between risk of hospitalization and

14  his dislike with where he was living and the services he was

15  being asked to participate in?

16  A   What's the connection between those?

17  Q   Right.

18  A   So, if -- as I said, he was being asked to participate in

19  things that were not services that he had requested or

20  identified the need for, so -- and he was living in a place

21  that he appears had not requested and did not identify the need

22  for.  So his level of motivation to, you know, get any benefit

23  from those situations was very low, pretty much fighting

24  against them, from just reading the records and where he was

25  living in Region 6.

1      So essentially, you know, there's some identified needs,

2  and they weren't being addressed, because he was not engaged at

3  all with the treatments.

4  Q   And what is the link between not addressing identified

5  needs and the risk of going back to a state hospital?

6  A   Well, when I talk about identified needs, it's the kind of

7  needs that puts you at risk.  So whether it's in making some

8  progress on addressing your substance use disorder that at

9  times can lead to an admission because of setting your mental

10 health off, or whether it's a need to have ongoing access to

11 medication and someone to help you in that process.  So an

12 identified need, when I'm referring to them for the most part

13 in these reports, it's around those risks.

14           MR. SCHUTZER:  May I approach, Your Honor.

15           THE COURT:  Yes, you may.

16 BY MR. SCHUTZER:

17 Q   Dr. VanderZwaag, I've handed you what we've marked as

18 PX-1093.  It's a TCM progress note from Region 6, Life Help

19 Mental Health Services, about person 49.  Do you see that?

20 A   Yes.

21 Q   Have you seen this document before?

22 A   Yes, I have.

23 Q   Do you know what TCM means?

24 A   I believe it's targeted case management.

25 Q   What is targeted case management?

```
1    A    It's a type of case management that's targeted.  I don't

2    know exactly how to define it.  I'm not sure -- I mean, I've

3    heard it many times, but I'm not exactly sure the parameters of

4    what it does.

5    Q    First, if you look at the bottom, in the boxes towards the

6    bottom, that says "Subfacility code, Washington County,

7    Washington County office --"

8    A    Yes, yes.

9    Q    -- does that refresh your recollection about where he

10   lives?

11   A    Probably in Washington County, then.

12        MR. SCHUTZER:  I move PX-1093 into evidence.

13        THE COURT:  Any objection from the plaintiff?

14        MR. SHELSON:  No, sir.

15        THE COURT:  Excuse me.  From the defendant.

16        MR. SHELSON:  I got it.  No.

17        THE COURT:  All right.  PX-1093 will be received into

18   evidence.

19        (Exhibit PX-1093 marked)

20   BY MR. SCHUTZER:

21   Q    Would you read the section in the box labeled

22   "Impression/summary of contact"?

23   A    Yes.  "Individual is making poor progress towards ISP and

24   objectives as evidence of staff member's reprots of the

25   individual not participating in group activities or discussions
```

*** DAILY TRANSCRIPT ***

1   and being distracted by his notebook.  He has shown little to

2   no interest in being at the program.  Therefore, he does not

3   comply to directives."

4           THE COURT:  Looks like a misspell.  It should be

5   reports, probably.

6   BY MR. SCHUTZER:

7   Q   From your review of person 49's records, do you know what

8   the notebook is referring to?

9   A   I'm thinking he had a note pad, like an electronic note

10  pad, but I don't know for sure.

11  Q   Is there -- what does this impression/summary of contact

12  tell you about whether he was receiving person-centered

13  recovery-oriented services?

14  A   This note says to me that this was not -- there was not a

15  strong recovery focus because the individual was being asked to

16  participate in things that he did not have an interest in, was

17  not motivated by.  And it -- in his response to basically, you

18  know, acting like he had apparently told them, they therefore

19  then saw him as noncompliant.  So it's not recovery-focused.

20  Q   What would be recovery-oriented?

21  A   It would be to say to this individual, *It doesn't appear*

22  *that this PSR program is something that you're interested in.*

23  *What are the things that you would like help with?  How can we*

24  *be of help?  What are your goals?*  And then, *Let's look at*

25  *developing a service plan that helps you work towards those.*

1   Q    From reviewing records about person 49, did you come to

2   understand what his goals were?

3   A    Yes.

4   Q    What were they?

5   A    He wanted to work, and he wanted to live independently.

6   Q    How could mental health services assist him in achieving

7   those goals?

8   A    They could offer him permanent supported housing and

9   supported employment, but he had a number of other needs, so I

10  think for him, they would be best offered through a PACT team.

11  Q    How -- did the fact that he was not receiving

12  recovery-oriented person-centered services impact his risk of

13  going back into a state hospital?

14  A    Yes.

15  Q    How did it do that?

16  A    I think the main risk for him is the developing a sense of

17  hopelessness, feeling like services are not useful to him, but

18  not yet having all of the skills and supports he needed outside

19  of mental health services to be able to stay well on his own.

20  So his hopelessness about what was being offered, his feeling

21  that he was useless to him, and his motivation to do something

22  differently, I think he might make attempts on those on his

23  own, but I think he would have trouble being particularly

24  successful without supports.

25  Q    How would that link to his risk for going back into a

1    hospital?

2    A   Well, it links to the risk -- so if you're unsuccessful,

3    then you stop taking care of yourself.  You might start missing

4    medicines.  You might start using more substances.  You might

5    forget to go home at night and end up outside.  Lots of

6    different things can happen and go wrong once people are

7    feeling hopeless and like no one's listening to me.

8         You know, one of the things about recovery-oriented

9    treatment is, the reason that it helps is because the main

10   focus is to maintain hope.  And without that, people go back to

11   old behaviors that have not necessarily been very successful

12   for them.

13   Q   So far -- you can put that document to the side.  So far

14   we've spent a lot of time talking about services that reduce

15   the risk that people will go to the hospital, and I want to

16   shift gears a little bit and talk about people who do go to the

17   hospital.  What did you conclude about whether people could

18   have spent less time in the state hospitals?

19   A   There were many instances where I concluded they could have

20   spent less time.

21   Q   Why was that?

22   A   Well, because, again, I think hospitalizations are

23   necessary sometimes when someone's safety is at stake, the

24   individual themselves or someone else.  So getting through any

25   kind of crisis situation where that's true, the goal of the

1   hospital should be to stabilize.  So, you know, the opposite of

2   working in a recovery fashion is in a stability fashion.  So

3   hospitals stabilize.  The recovery work happens outside.  So I

4   just feel like there was evidence of people having achieved a

5   level of stability that they should have been -- now be working

6   on outpatient services.

7   Q   Why -- why weren't people moving on to outpatient recovery

8   services?

9   A   So there are a variety of reasons why some of the hospital

10   admissions were extended.  In a number of instances, I saw

11   evidence that the inpatient team kept trying to get significant

12   diminishment of psychotic symptoms.  So the fact that

13   individuals were still exhibiting psychotic symptoms was

14   sometimes used as a reason to keep them in the hospital.

15       In addition, it appeared to me that a number of individuals

16   would go in and have extended stays where they were stuck

17   because the treatment team's plan was to move them to a

18   supervised living placement, and sometimes they did not want

19   that, so they were sort of stuck in a battle with the team over

20   that discharge plan.  And sometimes, even though people might

21   have gone along with that, they were still waiting for that

22   placement, so they're just stuck waiting for the right place to

23   open up.

24   Q   Let's talk about the first reason you mentioned, that the

25   inpatient team was trying to diminish symptoms.  Is it possible

1   for somebody to live in the community while experiencing

2   symptoms of their mental illness?

3   A   Yes.

4   Q   When -- at what point do symptoms, if at all, prevent

5   community-based living?

6   A   Well, I think at the point where the -- either the level of

7   agitation or seriousness of risk of danger makes it impossible

8   that someone could sort of stay out without someone noticing

9   and sort of saying, you know, this is a risky situation.  So,

10  you know, it's -- determining exactly when is about knowing

11  that individual and trying to figure out like what -- have they

12  functioned before, you know, with this level of symptoms, and

13  you know, were they safe?  That safety factor really important.

14      But it's unreasonable to expect that -- I mean, many people

15  do get better with medicines, but only to a certain degree, and

16  that they are left with a lot of symptoms.  Those people still

17  deserve a chance to live out in the community and live their

18  lives as fully as possible.

19  Q   Let's turn to the second reason you described, which was

20  that the treatment team's plan was for the person to go to a

21  supervised living setting, and the person did not agree with

22  that.  Can you give us an example of somebody in your review

23  that this happened to?

24  A   Yes.  Person 50.

25  Q   We talked about person 50, it feels like a lifetime ago,

1   earlier this morning.  Can you remind us in one or two

2   sentences who she is?

3   A   Yes, she's a 51-year-old, in 2018, woman from -- who had

4   been living with her mom and one of her four children and her

5   brother prior to her hospital admission, and she had had many

6   admissions to Mississippi State Hospital.

7   Q   When you met her, where she was?

8   A   She was at Mississippi State Hospital.

9   Q   How long had she been there?

10  A   She had been there for almost three years.

11  Q   At the time that you met her, was she appropriate to live

12  in the community?

13  A   Yes.

14  Q   Was staying in the hospital necessary for her?

15  A   No.

16  Q   Why do you say that?

17  A   Again, we reviewed the fact that her level of safety

18  appeared to have stabilized to the point where she was able to

19  go on regular passes to visit her mom.  So safety was no longer

20  an issue.  They were essentially waiting for her -- it appeared

21  that they were hoping that her symptoms would change

22  significantly so that she would have insight into her mental

23  illness and would verbalize that she would take medicines as an

24  outpatient.

25  Q   Was there -- where did -- where did supervised living come

*** DAILY TRANSCRIPT ***

1  into the equation?

2  A   Well, because she had never verbalized that she would take

3  medication as an outpatient, and because prior to this

4  admission, the community mental health center staff had

5  convinced her mom to stay firm and not let her come back, live

6  at home, the inpatient team was recommending that she go to a

7  supervised placement, a group home or personal care home, and

8  she wanted no part of that.

9  Q   What alternative was there to supervised living that -- was

10  there an alternative to supervised living that the treatment

11  team was not considering?

12  A   Yeah, I believe independent living.  I did not see that it

13  was considered.

14  Q   What do you mean by independent living?

15  A   Permanent supportive housing.

16  Q   Would she need any -- in addition to permanent supported

17  housing, would she need any other services?

18  A   Yes.

19  Q   What would those services look like?

20  A   She would need a PACT team as well.

21  Q   Did you see any evidence that referring person 50 to

22  permanent supported housing or PACT had occurred?

23  A   No.

24  Q   Generally, if people were discharged to a supervised living

25  setting at the behest of their treatment team, did that have an

```
 1   impact on whether they were at risk of going back to a state

 2   hospital?

 3   A    So a lot of times people get referred to supervised living,

 4   like group homes or personal care homes, because people see

 5   that as a solution to the not-taking-your-medicine problem

 6   which is pretty common.  It's -- it's a solution, although it's

 7   not a perfect solution, because even in those settings, people

 8   can decide they are not going to take medicine, so it's not

 9   100 percent.

10        But again, people going to that kind of setting that's

11   often removed from their communities, their families, their

12   connection, their world, and being told to live there if they

13   really don't want to be there, again, that's very demoralizing,

14   there's lack of hope, there's lack of motivation to do anything

15   different than you've done before.  So the risk is high.  The

16   risk is high unless someone identifies it as their goal.

17   Q    I want to turn to one last topic for the morning, and that

18   is some questions about medication.  When people are discharged

19   from a state hospital, is it important to plan for how the

20   person's going to access medication?

21   A    Yes.

22   Q    Why is that important?

23   A    Well, many times the significant intervention of a hospital

24   is to actually get people back on medicine and stabilized, and

25   so you want to be able -- you want them to be able to continue
```

1   that when they leave so that they don't again become at risk.

2   So sometimes, for some individuals, missing only a few days of

3   medicine is enough to increase their risk significantly.  For

4   others, it could be longer.  But we do know that missing

5   medications with any kind of regularity can lead to increased

6   risk of readmission.

7   Q   What did you find in your review about whether the state

8   hospitals were, in fact, planning for access to medication on

9   discharge?

10  A   I found a couple of instances that were concerning to me

11  because people didn't have access on discharge.

12  Q   What was the result of those people not having access to

13  medication on discharge?

14  A   They were both rehospitalized relatively quickly.

15  Q   Who are the two examples that you're talking about?

16  A   Person 49 and I believe person 31.

17  Q   Let's take them in numeric order.  Let's go with person 31

18  first.  It's at page 20 of your report.  Will you tell us a

19  little bit about him?

20  A   Yes.  This is a gentleman that I met at Mississippi State

21  Hospital in February of 2018.  At the time, he was a

22  55-year-old male.  He was on the long-term unit at Mississippi,

23  on his tenth admission to that facility.  He had had a number

24  of North Mississippi State admissions as well.  And he had

25  previously been living with his mother.

1    Q    What happened with respect to access to medications in

2    person 31?

3    A    So the records indicated that -- so he's a gentleman who

4    had very significant symptoms and eventually ended up taking a

5    medication called Clozapine, which is a medicine that is more

6    beneficial than others for people who have -- we call it

7    treatment refractory illness, meaning that they don't get good

8    symptom response to other medications.  So he was on Clozapine.

9         Clozapine is a medicine that has certain -- more intensive

10   monitoring needs than the average, and there are very specific

11   requirements from the FDA regarding monitoring of it.  And that

12   leads to some dispensing registration issues and things like

13   that.  So anyway, he got better.  He was on -- discharged on

14   the Clozapine, sent home, but mom and he went to pick up the

15   Clozapine prescription, and they couldn't get it because the

16   pharmacy that he used wasn't registered with the Clozapine REMS

17   program, which you have to be to dispense.  So, again, nobody

18   followed up to find out.

19        So when we send someone out on Clozapine from a state

20   hospital, A, are they going to a provider who's familiar with

21   that medicine and knows how to monitor it?  It has more risks

22   than some others.  And then, B, is it -- you know, are they

23   going to be able to get the medicine?  Is the pharmacy

24   registered with REMS.  So it didn't happen in this case.

25   Anyway, he didn't get it, and so he ended up being readmitted.

1   Q    Let's turn, then, to the other example you gave, person 49.

2   He's a gentleman we've discussed already.  Can you just remind

3   us who he is?

4   A    Yes.  He's the gentleman who I met at the personal care

5   home who was unhappy with his programming and things.  He was

6   living at a personal care home and had been -- I think he had

7   been discharged from North Mississippi State Hospital in

8   November of the year prior to I met him.  So four or so months

9   before I met him.

10  Q    Is that November 2017?

11  A    Yes.

12  Q    What happened with respect to medications?

13  A    So it looks like his discharge came up right before a

14  Thanksgiving holiday, and he was going to a new county to live

15  in this personal care home.  So when he had his follow-up

16  appointment, which was the week after Thanksgiving, the

17  personal care home provider said that he had been without his

18  medication for four days, related to the fact that the pharmacy

19  that the personal care home utilized wasn't open over the

20  holiday weekend.  So he essentially got out of the hospital but

21  had no access to his anti-psychotic medication.  By the time he

22  showed up at the follow-up appointment, he had to be admitted

23  to the hospital because he was psychotic again.

24  Q    What should have happened before discharge with respect to

25  medication?

```
1   A    So you just need to think about all of the difficulty

2   related to access.  Typically, hospitals, or state hospitals,

3   typically will give the individual a supply of medication to

4   take with them, hopefully enough to get to the first

5   appointment with a prescriber.  But if not, at least enough to,

6   you know, get through a weekend or a holiday weekend or any

7   kind of thing like that would come up, so that then someone can

8   go with a prescription and get it dispensed.

9        So you just need to think through all of the ways in which

10  things can go wrong and people don't have access to medication.

11  It's just standard in mental health practice to always think

12  about access to things like medicine, or access to anything

13  that might support someone's health and well-being.

14            MR. SCHUTZER:  If I could take a minute to confer with

15  cocounsel, Your Honor.

16            THE COURT:  Okay.

17            MR. SCHUTZER:  Thank you.

18  BY MR. SCHUTZER:

19  Q    A few more questions, Dr. VanderZwaag.  We talked earlier

20  about recovery-oriented and person-centered approaches to care.

21  What impact -- how does person-centered care impact the chances

22  of avoiding state hospital admissions?

23  A    Again, it's really understanding that when, as a mental

24  health service provider, you're hoping to have the individual

25  engaged in whatever activities are going to improve their
```

*** DAILY TRANSCRIPT ***

1  mental health, that that is best achieved by hearing from the

2  individual themselves, who know themselves the best, what are

3  the things that might help me do that, what are the things that

4  are most important to me?

5      And that process of -- so what we know from psychology is

6  that nothing changes if people aren't motivated.  It has to

7  have some level of internal motivation.  And sometimes we have

8  to work to bring that motivation out, but if someone's

9  motivated, then you've got something that you can do to push

10  their well-being forward or help them push their well-being

11  forward really.

12  Q   We talked about assertive engagement on ACT teams.

13  A   Yes.

14  Q   Is assertive engagement the standard of care when it comes

15  to ACT services?

16  A   Yes, it's standard intervention in ACT.

17  Q   Would you turn back in your report, please, to the section

18  on person 46, which is page 70 -- starts on page 69.  I'd like

19  you to look at page 70.

20  A   Yes.

21  Q   Person 46, what CMHC region is he geographically covered

22  by?

23  A   Region 8, I believe.

24  Q   At the time you met him, did Region 8 have a PACT team?

25  A   I don't believe they did.

1    Q    We looked at PX-1093.  That's the loose one.  This is about

2    person 49?

3    A    Yes.

4    Q    He's in Washington County?

5    A    Yes.

6    Q    Can we get 413 back on the screen?  Does Washington -- is

7    Washington County covered by a PACT team?

8    A    No.

9              MR. SCHUTZER:  Your Honor, if we could take a

10   five-minute recess before I tender the witness.

11             THE COURT:  You tender?

12             MR. SCHUTZER:  I want to take a five-minute recess, if

13   that's okay with you, ask one or two more questions.

14             THE COURT:  Okay.  All right.  Let's take a 15-minute

15   recess, and hopefully, you might tender her.  And then the

16   State will be able to start up, hopefully, right after that.

17             MR. SCHUTZER:  Yes, sir.

18             THE COURT:  We'll be in recess.

19        (Recess)

20             THE COURT:  Doctor, you can return to the stand.

21   Looks like a lot of papers just to ask one or two questions,

22   there, Mr. Schutzer.

23             MR. SCHUTZER:  It will be brief, Your Honor.

24             THE COURT:  Okay.  You may proceed.

25             MR. SCHUTZER:  Underpromise and overdeliver, right?

1    May I approach?

2           THE COURT:  Yes, you may.

3    BY MR. SCHUTZER:

4    Q   Can we get PX-413 up.  Dr. VanderZwaag, I've handed you a

5    document that we've marked as PX-1094.  I'll represent to you

6    that it's records related to person 41.  What county is person

7    41 from, if you look at the first page of Exhibit 1094?

8    A   He's from Lauderdale.

9    Q   If you look on this page, PX-413, does Lauderdale County

10   have a PACT team?

11   A   Yes.

12   Q   Was person 41 ever referred for PACT services?

13   A   I did not see any evidence of him having been referred.

14   Q   Let's turn back to -- let's keep 413 up.  Turn in your

15   report to the section about person 49.  Right before we took a

16   break, I asked you about whether the county that person 49 was

17   living in at that time you met him had a PACT team.  I also

18   just want to clarify, before he moved to Washington County, he

19   was living in Region 2.  Correct?

20   A   That's correct.

21   Q   Does Region 2 have a PACT team?

22   A   It does not appear from that map that they do.

23          MR. SCHUTZER:  Thank you.  Pass the witness.

24          THE COURT:  All right.

25          MR. SHELSON:  May I proceed, Your Honor.

1          THE COURT:  Yes, you may.

2                    CROSS-EXAMINATION

3     BY MR. SHELSON:

4     Q    Good morning, Doctor.

5     A    Good morning.

6     Q    Doctor, you reviewed, I think as we've heard, 28 people.

7     Is that correct?

8     A    That's correct.

9     Q    And one is deceased?

10    A    That's correct.

11    Q    And so that leaves 27 living individuals who you either

12    interviewed or attempted to interview?

13    A    That's correct.

14    Q    And with respect to your interviews of those 27

15    individuals, did those -- did you interviews take approximately

16    an hour each?

17    A    They varied, I would say.  Approximately an hour would be

18    reasonable.

19    Q    Of the 27 individuals you interviewed, at the time of the

20    interview, were five of them in a state hospital?

21    A    If can I have a minute just to refresh my memory on that.

22    Q    I'll represent to you that person 34, page 32 of 107 -- you

23    may have a sheet there -- person 38, person 46, person 51,

24    person 54.

25    A    Yes.  Okay.  Yes.

1    Q    All right.  So then that leaves that at the time of the

2    interviews, 21 of the 27 were living in the community?

3    A    That's right.

4    Q    When you interviewed the 27 individuals in Mississippi, did

5    anyone from DOJ accompany you on the interviews?

6    A    Yes.

7    Q    Who accompanied you on the interviews?

8    A    There were a number of people different days.  So Mark

9    Williams, Patrick Holkins, Adrienne Mallinson.

10   Q    Did the 28 individuals you reviewed in Mississippi have a

11   range of severity of their serious mental illness?

12   A    Yes.

13   Q    Did the range include people who were chronically psychotic

14   and at risk of behavioral disruption?

15   A    Yes.

16   Q    Do you agree that there is no one right kind of medicine in

17   the field of psychiatry?

18   A    Yes.

19   Q    Doctor, if I could direct your attention to person 32?  And

20   you're certainly welcome to look at your report.  I believe

21   that person starts on page 23.

22   A    Yes.

23   Q    What is symptomatology?

24   A    So that's a way of describing sort of the range of kinds

25   of -- so when someone has an illness, there are symptoms of an

```
 1    illness.  So it's a way of describing the range of symptoms

 2    that the individual exhibits related to that illness.

 3    Q   Did person 32's symptomatology during his last admission

 4    before you interviewed him include aggression, agitation and

 5    fights on a regular basis?

 6    A   Yes.

 7    Q   And when you interviewed person 32, he was not exhibiting

 8    any major symptoms.  Is that correct?

 9    A   That's correct.

10    Q   And you already testified that person 32 was receiving PACT

11    when you interviewed him?

12    A   That's correct.

13    Q   Would you look on page 31 of your report, please.  What

14    housing recommendation did you make for person 32?

15    A   Excuse me, page 31 of my report?

16    Q   I think so.  I may have written it down wrong.

17    A   I think maybe it would be page 25 for person 32.

18    Q   Yes, I'm sorry.

19    A   What housing recommendation?

20    Q   Yes.

21    A   So I recommended permanent supported housing.

22    Q   Is permanent supported housing what you referred to in your

23    earlier testimony as independent housing?

24    A   Independent housing is a broader term than permanent

25    supported housing, so permanent supported housing implies some
```

1    standards related to that.  It's related to affordability and

2    permanency and services offered in support of that.  So

3    independent housing could mean just someone living on their

4    own, doing everything by themselves.

5    Q    Would you turn to person 34.  I believe that's page 31 of

6    your report.

7    A    Starts on 30.

8    Q    Page 30.  If you would turn to page 32 of your report.

9    What housing recommendation did you make for person 34?

10   A    I recommended that he be living in a small census group

11   home or an adult foster family situation.

12   Q    Is a small census group home a permanent supported housing?

13   A    No.

14   Q    Is it scatter site housing?

15   A    No.

16   Q    Is it in the housing that you deemed to be independent

17   housing?

18   A    No.

19   Q    And why did you believe that one of the housing options

20   that may be available for -- that may be appropriate for person

21   34 is adult foster family setting?

22   A    So he was someone who had a variety of -- let's see.  I

23   think this is someone who had dual diagnosis of both a mental

24   health issue and a developmental disability, and there was

25   evidence that he had been both in developmental centers and at

*** DAILY TRANSCRIPT ***

1   the state hospitals in the past, and I felt like this is

2   someone who could be moved out in the community, but he would

3   need particular kinds of supports and services that are a

4   little bit different from some I've recommended for other

5   people, largely because of his developmental disability and

6   some of the risks that that could generate.  So his need for

7   more ongoing supports on a regular daily basis was evident,

8   based on reviewing his record.

9       So there's a variety of ways to do that.  I have seen,

10  again, small census group homes where the activities and all of

11  the enrichment and skills training are designed towards just a

12  few people so that it meets their need very well, but trained

13  family settings can do that as well.

14  Q   And trained family setting, adult foster homes, is that

15  independent housing?

16  A   No.  For that individual, that would be what I would

17  consider more like a supervised housing.

18  Q   Doctor, I want to next talk about person 38, and that

19  starts -- person 38 starts on page 43 of your report.  Do you

20  remember testifying about person 38 this morning?

21  A   Yes.

22  Q   Okay.  I'm not going to spend a lot of time with him.  But

23  does person 38 have a history of being very aggressive?

24  A   Yes.

25  Q   What housing recommendation did you make for person 38?

1   And I believe that's on page 46 of your report.

2   A   So I recommended an individualized supervised independent

3   apartment or small group setting.

4   Q   I want to focus on the individualized part.  When you made

5   your recommendation for person 38, was it your opinion that in

6   that setting, person 38 would need one-to-one supervision?

7   A   Not necessarily.  I don't think that I -- so when I said

8   small group setting, I didn't necessarily think that needed to

9   be one-to-one staff.  It would depend on who the person is

10  living with and whether a single staff could manage.  For him,

11  at the time I did the assessment, I was thinking he would need

12  24-hour staff available.

13  Q   At the time that you thought that, why did you think that?

14  A   Because he was -- again, this is someone who had not very

15  high level of independent functioning.  I think he's last --

16  the testing that I referred to said that he would function at

17  the level of a four-year-and-some-month-old individual.  So he

18  had broad needs for assistance with -- in a variety of domains.

19  Q   This is Exhibit PX-1083, and it concerns person 38.  Do you

20  remember discussing this exhibit this morning?  It should be in

21  your binder.

22  A   Yes.

23  Q   Okay.  I wanted to direct your attention to the page on the

24  bottom that says page 312, and the part here that's

25  highlighted.  Does it read that "The community living skills

1   domain assessed person 38's ability to successfully use

2   community resources performed in an employment setting and

3   assumed social and economic requirements encountered in the

4   community setting relating to time and so on"?

5   A   Yes.

6   Q   And what is the community skills -- living skills domain?

7   A   I'm not -- I'm not particularly familiar with the exact

8   tests that were used.  So I know that, again, that they were

9   measuring activities of daily living from probably basic

10  things, such as hygiene and access to food and things like that

11  to more broad things, like ability to use transportation,

12  public transportation, or to manage money and things.  So I'm

13  not -- I don't know that particular test that they were --

14  Q   Okay.  But in any event, at least the records state, below

15  the sentence that's highlighted, "Person 38's community living

16  skills are very limited to negligible, with his performance

17  comparable to that of the average individual at four years,

18  three months"?

19  A   Yes.

20  Q   Doctor, the next person I'd like to ask you about is

21  another person discussed this morning, and that's person 41.

22  Person 41 starts on page 53.

23  A   Yes.

24  Q   Did person 41's symptomatology during his last

25  hospitalization, before you interviewed him, include paranoia,

1    uses of associations, disorganizations, some of bizarre

2    thoughts, impaired insight and impaired judgment?

3    A    Yes, that's what the clinical notes from that admission

4    state.

5    Q    And when you interviewed person 41, was he pleasant,

6    appropriate and not psychotic?

7    A    That's what I remember him to be.  I'm assuming I wrote

8    that down in here somewhere too, but yes.  Yes.

9    Q    The last person I'm going to ask you about at this time

10   is -- well, it's not, actually -- person 51.  Person 51 starts

11   on page 85.

12   A    Yes.

13   Q    And when you interviewed -- when you interviewed person 51,

14   was she at Mississippi State Hospital?

15   A    Yes.

16   Q    Did person 51 tell you that she did not feel she was ready

17   to leave Mississippi State Hospital?

18   A    Yes.

19   Q    Doctor, I'm going to next ask you about person 50.  Starts

20   on page 82.  And do you recall testifying about person 50 this

21   morning?

22   A    Yes.

23   Q    And do you recall looking at this exhibit in connection

24   with person 50, which is PX-1084?

25   A    Yes.

1    Q    You see on here where it says the clinician is Robert

2    Maddux, M.D.?

3    A    Yes.

4    Q    All right.  I'm going to refer you, Doctor, to page 211 of

5    Exhibit 1084.  The first sentence I have highlighted, "She is

6    considered dangerous to herself and others because of her

7    inability to care for herself and active psychosis, if not

8    maintained, in a structured and supervised environment."  Did I

9    read that correctly?

10   A    Yes.

11   Q    I want to refer your attention to the sentence that starts

12   here.  "She also poses a danger to others if unsupervised, and

13   that she is paranoid and thinks others have a conspiracy out to

14   get her, including her elderly mother.  She also believes she

15   was shot at while on building 63, when she was first admitted

16   to Mississippi State Hospital this admission.  She has a

17   history of assaulting her mother and history of thoughts of

18   physical harm to others and has made threats in the past."  Did

19   I read that correctly?

20   A    Yes.

21   Q    All right.  And then turning the page, Doctor, to page

22   212 -- yeah, page 212 of Exhibit 1084, this sentence here, does

23   it read, "Building 845:  She had a hearing with the judge while

24   on Building 45"?

25   A    Yes.

1    Q   Do you know anything about that hearing with the judge?

2    A   I imagine it was related to renewal of her commitment, but

3    I don't know any -- that's a guess.  I don't know.

4    Q   All right.  Doctor, last thing on this exhibit, this

5    highlighted sentence, does it read, "Barriers to discharge at

6    this time.  Grave impairment, noncompliant as an outpatient, 24

7    admissions to Mississippi State Hospital, refused any placement

8    but home with an elderly mother whom she endangers with her

9    spraying of chemicals and her threatening behaviors"?

10   A   Yes, that's correct.

11   Q   Doctor, now this is the last one I think I'll ask you

12   about, person 54.  Person 54 starts on page 94 of your report,

13   and I do not believe you discussed person 54 this morning.

14   Have you had a chance to look, and do you know what person I'm

15   talking about?

16   A   Yes, sir, I do.

17   Q   Does person 54 have a forensic history?

18   A   Yes, he has a forensic history.

19   Q   And in the field of psychiatry and mental health, what does

20   forensic mean?

21   A   It means that an individual has had interfaces with the

22   law, and so forensic psychiatric patients are typically ones

23   who are receiving treatment, but at the same time under some

24   kind of monitoring related to a criminal activity.

25   Q   At least based on your review of the records, what is

1   person 54's forensic history?

2   A   It looks as though -- I'm going to take a minute to read

3   it.   It looks like he had -- I'm not sure that he had forensic

4   hospitalizations, but he had served several years at Parchman

5   State Penitentiary.

6   Q   For robbing a grocery store with a knife?

7   A   Yes.

8   Q   At the time that you interviewed person 54, had he been at

9   Mississippi State Hospital since April 2012?

10  A   Yes.

11  Q   All right.   After you interviewed person 54, did you learn

12  that he had been discharged to a new four-bed group home

13  operated by Hinds Behavioral Health Services and funded by the

14  Mississippi DMH?

15  A   I did hear that, yes.

16  Q   Doctor, this morning you testified -- and this is about

17  person 52.   So you're welcome to look, but I wanted to ask you

18  something about your testimony regarding person 52.   You

19  testified it would take awhile to engage person 52 in PACT

20  services.   What do you mean by a while?

21  A   I can't give it an exact number, but in my experience of

22  working with individuals like person 52, the assertive

23  engagement piece, the part of just having her be accepting of

24  why you're there and that you have something to offer, and it

25  might actually make her life better, that piece can take

1   months.  It's not -- and in the process of those months, if

2   people go in and out of the hospital regularly before you

3   started the service, you might still have some of that early on

4   in treatment.  But once you've made an effective -- talking

5   about therapeutic alliance with someone, in other words, they

6   no longer distrust or resent your presence, but they see you as

7   someone who's been helpful to them in the past, and therefore,

8   hopefully, will be helpful going in the future, then you can

9   start to have an impact on some of the other things that lead

10  to hospital admissions and stuff.

11  Q   So at the initial phase of PACT team engagement with an

12  individual, how frequently may the PACT team have to visit with

13  that individual at the beginning, for a person like person 52?

14  A   So for someone like her, I -- what you don't want to do is

15  overwhelm her, so what you want is a long-term service

16  connection, not doing anything quickly.  That's not helpful.

17  You know, her history is longstanding.

18      And so for someone like her, I think attempts would be

19  made, you know, a few times a week, probably two, so you don't

20  want to all of the sudden come in like, you know, the cavalry

21  and say, We're here to save you.  You just gradually start to

22  have her get used to you.  I might take it slow with her and

23  only send one or two people out to start, to first -- so with a

24  team of people, for people who are difficult to engage, you

25  start with just a couple of those team members trying to do it

```
 1   so you don't overwhelm the person again.  So...

 2   Q   You're obviously very familiar with PACT teams in North

 3   Carolina?

 4   A   Yes.

 5   Q   Do PACT teams in North Carolina have peer support

 6   specialists on the team?

 7   A   Yes.

 8   Q   What are the disciplines or the professions on the PACT

 9   team in North Carolina?

10   A   Psychiatrists, nursing staff, master's level team leader

11   who's usually also a therapist, substance abuse specialist,

12   vocational specialist, and peer support specialist, as well as

13   a kind of administrative coordinator.  I can't remember the

14   name of that person.

15   Q   So in North Carolina, how many peer support specialists are

16   on the team?

17   A   One.  At least one.  Has to be at least one.

18   Q   In North Carolina, on PACT teams, is the -- is it common to

19   have, say, two peer support specialists, so in addition to

20   helping the PACT team clients, the peer support specialist can

21   be a peer support specialist for each other?

22   A   For each other?

23   Q   Yeah.

24   A   Oh, so that they are actually peers to each other on the

25   team?
```

1    Q    Yes.

2    A    That's -- I have not run across that.

3    Q    Doctor, I want to ask you about Exhibit P-281.  Do you

4    recall this exhibit from this morning?

5    A    Yes.

6    Q    I'm going to be very brief.  I mean, we all agree that

7    there are PACT teams in some areas of Mississippi, and there

8    are not PACT teams in other areas of Mississippi.  Is that

9    correct?

10   A    Yes.

11   Q    Okay.  The only point I want to make about this is because

12   you recall earlier, there was a discussion about an individual

13   on this document who was in a county that did not have PACT

14   services available?

15   A    Yes.

16   Q    If you just flip through pages 1, 2 and 3, however far you

17   want to go, are there a number of individuals here who were, in

18   fact, accepted on PACT teams?

19   A    Yes.

20   Q    Doctor, I want to ask you a few questions about your

21   current employment.  In July 2018, did you become the chief

22   medical officer at Central Regional Hospital?

23   A    I became one of the deputy chief medical officers.

24   Q    Okay.

25   A    At Central Regional.

1  Q    Did I refer this morning -- well, this afternoon now, I

2  think, Central Regional Hospital as CRH?

3  A    Yes.

4  Q    Where is CRH located?

5  A    It's in Butner, North Carolina, which is in the central

6  part of the state.

7  Q    As we sit here today, are there three state hospitals in

8  North Carolina?

9  A    Yes.

10  Q    And is CRH one of them?

11  A    Yes.

12  Q    And the other two are Cherry Hospital?

13  A    Yes.

14  Q    And is it Broughton?

15  A    Broughton.

16  Q    Thank you.  What are your duties as one of the deputy chief

17  medical officers at CRH?

18  A    So I have a number of duties.  Broadly, the ongoing one is

19  to oversee the clinical care and planning and implementation

20  and monitoring of clinical care on the adult admissions unit

21  and also on the forensic units.  Additional responsibility is

22  to make sure that we have adequate -- we call it throughput,

23  but that, you know, people are coming in and going out of the

24  hospitals, so working really hard to kind of maintain that

25  movement of individuals through the system.

1   Q   So not to ask the obvious, but so the record is clear,

2   adult admissions unit, is that for adults with SMI, inpatient?

3   A   That's right.  It's the acute units for adults, yes.

4   Q   Does CRH have approximately 400 beds?

5   A   Approximately.  A little less, yes.

6   Q   How many of those beds are for the adult psychiatric unit?

7   A   I believe approximately 140.

8   Q   So excluding forensics, this question only concerns adult

9   inpatient beds.  What are the criteria for admission for

10  adult -- for an adult inpatient psychiatric bed at CRH?

11  A   The criteria for admission are that an individual has a

12  mental illness, and at the time that they are presenting, they

13  are dangerous to themselves or others.

14  Q   To your understanding, is that essentially the same

15  admissions criteria for a Mississippi State Hospital?

16  A   I believe it probably is, yes.

17  Q   You testified this morning one of the things you reviewed

18  in Mississippi with respect to the 28 individuals you reviewed

19  was whether they would have avoided or spent less time in a

20  state hospital had they received reasonable community-based

21  services.  Is that correct?

22  A   That's correct.

23  Q   All right.  Have you -- since you've been at CRH, have you

24  made a similar analysis at CRH?

25  A   It's one of the things that -- part of my job is to pay

1   very close attention to the length of stay and why individuals

2   are still there, and what barriers might be in the way of

3   discharge and working to break down those barriers.  So it's

4   certainly -- it's not something I haven't seen before.

5   Q   You've been at CRH for roughly a year?

6   A   Right.

7   Q   Coming up on a year.  In that time, have you been able to

8   determine whether there have been patients there who would have

9   avoided hospitalization had they received reasonable

10  community-based services in North Carolina?

11  A   Yes.

12  Q   Have -- can you, as you sit here today, can you quantity

13  that in any way?

14  A   I don't think I can quantify it.

15  Q   Are you able, in your time at CRH, to make any

16  determination regarding what percentage of patients at CRH are

17  appropriate for and would benefit from community-based

18  services?

19  A   The majority of them are appropriate for and would benefit

20  from community-based services.  So there's -- as I said before,

21  there are some very limited circumstances where I think

22  treatment is -- should be in the hospital on a long-term basis.

23  Q   Are there any -- strike that.  In your experience at CRH

24  since July 2018, when an individual is admitted to CRH, is that

25  the most integrated setting appropriate to his or her needs at

1    that time?

2          MR. SCHUTZER:  Objection, Your Honor, calls for a

3    legal conclusion.

4          THE COURT:  Objection overruled.

5    A    Can you repeat the question.

6    BY MR. SHELSON:

7    Q    Yes, ma'am.  Okay.  Based on your knowledge of being at CRH

8    since July of 2018, when an individual is admitted to CRH, is

9    CRH the most integrated setting appropriate to that

10   individual's needs at the time of admission?

11   A    So when someone is admitted to the hospital, I don't

12   consider it an integrated setting, so it's a hospital

13   admission.  It's meant to be temporary, meant to achieve

14   stability and then get them back into, hopefully, an integrated

15   community setting.  So we admit people to CRH if they are

16   dangerous to themselves or others.  So at the time, they need

17   hospital admission.

18   Q    So you believe at that time -- strike that.  So at the time

19   they're admitted, is that a necessary hospitalization?

20   A    Yes.  I believe, generally, that's true.

21   Q    All right.  Doctor, you briefly referred to the length

22   of -- length of stay at CRH earlier.  As you sit here today, do

23   you know what the average length of stay is at CRH?

24   A    No, I don't know where -- I don't know the current average

25   length of stay.  It would be different for different units

1   because we serve different populations, so -- within the

2   hospital.

3   Q    Do you know the average length of stay for the adult

4   psychiatric unit?

5   A    The acute admission unit?

6   Q    Yes.

7   A    I cannot -- it's a guess because I haven't seen the recent

8   figures, but I would say probably about 40 days.

9   Q    Is there a waiting list for admission to CRH?

10   A    Yes.

11   Q    Is CRH certified by the joint commission?

12   A    Yes.

13   Q    What is the joint commission?

14   A    It's an accrediting agency that does thorough surveys of

15   all of the treatment at hospitals and safety measures and

16   things of those sorts.  They also monitor CMS standards around

17   certain things.

18   Q    And they do that for general as well as psychiatric

19   hospitals?

20   A    That's right.

21   Q    So, to your understanding, what is the significance of

22   certification or accreditation by the joint commission?

23   A    Well, I know it's essential.  I'm fairly certain that not

24   being certified could lead to barriers around some federal

25   funding or -- I don't know the details.  I'm not that familiar.

1    I know the certification process, we just went through it, but

2    I'm not sure what would happen if you weren't certified.

3    Q    And I'm sorry.  I don't remember exactly how you put it

4    this morning, but when you were -- I forgot the phrase you

5    used.  Again, I apologize.  But you were talking about

6    dependence in an institution.

7    A    Yes.

8    Q    I'm sorry.  Do you recall the phrase?

9    A    I think the phrase that I had put in one of my reports was

10   institutional dependence.

11   Q    Thank you.  What -- what do you do at CRH to counter the

12   possibility of institutional dependence?

13   A    Now, I think it's something that hospitals have to be

14   constantly aware of.  The main way to counter it is to get

15   people into more integrated settings than a hospital as soon as

16   possible.  So that's what we do, is we work very hard to try to

17   get people to settings which are able to meet their needs in a

18   better way than a hospital can.

19   Q    Does Mississippi have a shortage of state hospital beds?

20   A    I don't know.

21   Q    Is PACT reserved for certain diagnoses?

22   A    Certain diagnoses are more frequently served by PACT teams,

23   but in my experience, it doesn't have to be reserved for  those

24   diagnoses.

25   Q    What is a service definition?

*** DAILY TRANSCRIPT ***

1   A    Service definition is essentially a document that lays out

2   what the elements of a service are and who can deliver it and

3   the frequency of -- so it lays out the way that a service is

4   defined and delivered.  I speak of them in regard to, like,

5   Medicaid service definitions.  So in order to be able to bill a

6   Medicaid service, you have to meet the requirements of a

7   service definition.

8   Q    Do most service definitions of PACT have very specific

9   criteria to meet a medical necessity?

10  A    They have -- yes, they do.

11  Q    What does it mean to meet medical necessity?

12  A    It means that -- well, some medical necessities, it -- are

13  the things that are defined matching what the service has to

14  offer.  So you basically want to have a good match between a

15  service that's being recommended and the person that it's being

16  recommended for.  So medical necessity says, yes, this person

17  actually does have all of those things that this service has

18  been shown to be helpful with.

19  Q    I believe you testified this morning that PACT serves a

20  limited number of individuals?

21  A    That's right.  The team size is limited, yes.

22  Q    Okay.  So when you say it serves a limited number of

23  individuals, what do you mean?

24  A    I mean that each team has a maximum number of people that

25  they are working with at a given time, and that's because the

1   service definition defines the client-to-staff ratio very

2   explicitly.

3   Q   And although that ratio may vary from place to place, is it

4   typically a ten-to-one ratio?

5   A   Yes.

6   Q   The higher number being patient, the lower number being

7   staff?

8   A   Yes.

9   Q   And is the ratio in North Carolina 9 to 1?

10  A   Nine to 1 for medium size and large teams, I believe.

11  Q   So let's focus on the medium size to large teams.  So then

12  what would -- what is the maximum capacity of a medium to large

13  team in North Carolina?

14  A   Medium, I believe, is from 50 individuals being served up

15  to 74, and then the large team would be from 75 up to 120.

16  Q   And are there more staff members on the large team?

17  A   Yes.

18  Q   In North Carolina, are there any prior approval

19  requirements for PACT?

20  A   So we have -- we get services authorized through MCOs,

21  which are our managed care organization for mental health.

22  Q   Are there guidelines on how frequently new patients can be

23  added to a PACT team?

24  A   Yeah, the recommendation for adding new clients to a PACT

25  or ACT team is no more than four or five individuals per month.

1    Q    Why is that a guideline?

2    A    Well, because when people are referred to PACT, they're

3    typically referred to the team at a time of high need, so

4    usually individuals requiring PACT services are identified,

5    like, through a hospital admission or some other kind of high

6    need situation.  The team doesn't know them yet, and so it

7    takes awhile, those initial assessments and developing a crisis

8    plan and doing that engagement to -- you don't want to

9    overwhelm by having too many people with too high needs so that

10   everything falls apart.

11        It's really managing the resources of the entire team,

12   because as you're bringing new people on, you still have

13   responsibility for everybody else who's achieved something

14   stability, and you don't want to overwhelm the system.

15   Q    Can the limitations on the number of individuals that can

16   be added to a PACT team per month affect whether a particular

17   PACT team is operating at full capacity?

18   A    Yes.  It takes awhile to build up to full capacity.

19   Q    To your understanding, is PACT approximately 40 percent

20   effective in reducing hospitalizations?

21   A    Yes.  Yeah, I think that it's one of the services that's

22   been shown to reduce the use of hospitalizations.  I think

23   about 40 percent.

24   Q    Is one of the reasons why PACT isn't successful for

25   everyone because some people have very bad illnesses?

1    A    I don't -- I don't think it's necessarily the level of

2    illness.  I think that some people are extremely difficult to

3    engage, and I think that usually is illness related.  So that

4    doesn't mean that their illness is more severe.  It's just an

5    element of their illness.  So people who actively or repeatedly

6    consistently avoid any contact with the team, it's not going to

7    be successful with.

8              MR. SHELSON:  May I approach the witness, Your Honor?

9              THE COURT:  Yes, you may.

10   BY MR. SHELSON:

11   Q    Doctor, this is your deposition from September 2018.  I

12   want to refer you to -- there's line numbers in the left

13   margin.  I'm going to refer you to page 27, starting at line 9.

14   Would you just read that and then your answer to yourself,

15   please, and tell me when you're done.

16   A    (Witness complied with request.)  Yes, I see that.

17   Q    So the question was at line -- page 27, line 9, "Why isn't

18   ACT successful for everyone?"  And at line 13, starting at line

19   13, did you say, "Some people have very, very bad illness"?

20   A    I did.

21   Q    And then you said, "Some people really don't -- even if you

22   try really hard to engage, really don't want treatment."

23   A    Yes.

24   Q    So you agree that -- well, let me back up.  You said this

25   morning that assertive means you have to keep trying to get

1  people to have the service in some instances?

2  A   That's right.

3  Q   But even with that in mind, no matter how hard you may try,

4  there's some people who are not going to take the service?

5  A   In my experience, there are some people who will not, yes.

6  Q   Before you started working at CRH in July 2018, were you on

7  a PACT team in Chatham County, North Carolina?

8  A   Yes.

9  Q   And back then, how often did the Chatham PACT team, on

10  average, see patients per month?

11  A   Per month, on average, probably about ten times per month.

12  Q   And was the Chatham team limited to enrolling no more than

13  four new patients per month?

14  A   We generally did that.  I wouldn't say we 100 percent of

15  the time didn't have five, but we -- generally, four was -- no

16  more than that, yes.

17  Q   Doctor, this morning you testified that PACT services are

18  broadly distributed throughout the United States.  Do you

19  recall that?

20  A   Yes.

21  Q   What do you -- what do you mean by broadly distributed?

22  A   Meaning that there are many states that have PACT services.

23  Q   Do you know what the SAMHSA national outcome measures are?

24  A   I'm sure I've heard of them, but I don't follow them,

25  generally.

1  Q   Do you know whether there's a SAMHSA outcome measure for

2  the penetration rate of PACT services among adults with SMI in

3  the nation?

4  A   I haven't seen it.

5  Q   Okay.  I'll move on, then.  Based on your experience, is

6  housing the biggest challenge for ACT teams?

7  A   I would say housing was probably the biggest challenge,

8  yes.

9  Q   And when you were on a PACT team, I think you said for 18

10 years, was housing the biggest challenge because there was not

11 enough affordable housing in North Carolina?

12 A   That's what we struggled with, yes.  So affordability and

13 availability were -- once people had housing, that was not as

14 much of a struggle to help them maintain it, but finding it and

15 being able to afford it, yes.

16 Q   Doctor, in the notebook in front of you is J-60,

17 Mississippi Operational Standards.

18 A   Yes.

19 Q   Do you recall reviewing that document this morning?

20 A   Yes.

21 Q   And your attention was directed to the PACT section, which

22 I believe is Chapter 32, maybe page 205.  I did not bring that

23 document up here with me.  Is that right?

24         MR. SHELSON:  May I approach, Your Honor.

25         THE COURT:  Yes, you may.

*** DAILY TRANSCRIPT ***

1   A   It looks correct, 205.

2   BY MR. SHELSON:

3   Q   Now, you reviewed the Mississippi operational standard for

4   PACT previously?

5   A   Yes.

6   Q   Did you have any problem with that document?

7   A   No.  I thought it was a reasonably good document.

8   Q   Doctor, do you hold North Carolina's mental health system

9   out as a model for Mississippi?

10  A   No.

11  Q   Are there unmet needs for adults with SMI in North

12  Carolina?

13  A   Yes.

14  Q   Are you aware any of states that have no unmet needs for

15  adults with SMI?

16  A   I'm not aware of any.

17  Q   Do you agree that there are barriers to adults with SMI in

18  both Mississippi and North Carolina to receiving

19  community-based services?

20  A   I agree there are barriers in both places, yes.

21  Q   As we sit here today, are there gaps in North Carolina's

22  mental health service delivery system?

23  A   Yes.

24  Q   Do you agree that in North Carolina, there is a need to

25  balance the system with more prevention in other

*** DAILY TRANSCRIPT ***

1479

1   community-based services that can decrease the need for higher

2   levels of care?

3   A   Yes.

4   Q   Do you agree that in North Carolina, state funding for

5   mental health and substance abuse treatment services is

6   inadequate to meet the needs of the uninsured and underinsured?

7   A   I don't know that the issue is a monetary one.  What I will

8   say is I do know throughout my time in mental health that

9   having enough money for mental health services has been a

10  problem.

11  Q   Is North Carolina -- is North Carolina's mental health

12  system complex and not well understood?

13  A   It's complex.  I think it -- at the level of the individual

14  seeking services, it oftentimes is not well understood, and

15  that is a problem that we have at this point.

16  Q   I don't have a lot of time, so I'm going to do this as

17  succinctly as I can.  Is that, in part, because at some point

18  North Carolina switched to a private provider base?

19  A   Yes.  The private provider base has made things -- it's

20  less clear to individuals where to get care with -- there are

21  multiple private providers as opposed to the single

22  county-based community mental health center that used to be

23  there.

24  Q   So before North Carolina went to a private provider base,

25  it had a regional system of mental health centers similar to

1   what Mississippi has now?

2   A   Similar, yes.

3   Q   Yeah.  So what -- what is the private provider base?

4   A   So the private providers mean that -- so local county

5   governments no longer can provide services, so that basically

6   they split off from management and contracting for care and

7   service delivers.  So service delivery became a private

8   enterprise and therefore a number of different -- a large

9   number of providers now are throughout the state in various

10  areas.  There's some big providers, and then there are some

11  smaller ones, and they're all disbursed around.

12  Q   Doctor, in your experience in North Carolina, why do people

13  have difficulty understanding where to go for mental health

14  care?

15          MR. SCHUTZER:  I'm going to object, Your Honor.  This

16  line of questioning is irrelevant to Dr. VanderZwaag's opinions

17  about what the clinical needs are of the people she met in

18  Mississippi and the mental health services that would meet

19  those things.

20          THE COURT:  Objection -- I'm sorry.

21          MR. SCHUTZER:  I apologize.  We're now getting into

22  policy and planning questions that Dr. VanderZwaag did not

23  offer opinions on.

24          THE COURT:  Okay.  Objection overruled.

25  BY MR. SHELSON:

```
1   Q   You need the question repeated?

2   A   Yes, please.

3   Q   Yes, ma'am.  Okay.  In your experience, in North Carolina,

4   why do people have difficulty understanding where to go for

5   mental health care?

6   A   Because it's not coordinated in a well-organized central

7   way.  There are places to find out who are the providers in the

8   area.  You would call a managed care organization, an MCO.

9   Someone there should maintain a list of all accredited

10  providers for that area, but many people don't under that rule.

11  So if they're calling about services, they think they are

12  actually calling a provider, when they're actually calling, you

13  know, a contract overseer, a manager.  And then they get

14  referred to another place which is actually a provider.

15      It's just difficult when things aren't centralized.  And if

16  you're just the average person on the street and you haven't

17  been following everything going on with mental health,

18  sometimes that's confusing.

19  Q   And it can be especially confusing for people with SMI?

20  A   Yes, it would be even more difficult for someone with SMI.

21  Q   What is emergency room boarding?

22  A   Emergency room boarding refers to someone being in an

23  emergency room and having been identified as needing a hospital

24  admission but having to stay in the emergency room until a bed

25  is available.
```

1    Q    In your experience, have emergency rooms in North Carolina

2    experienced emergency room boarding issues?

3    A    Yes, they have.

4    Q    Do you have any personal knowledge of that occurring?

5    A    Yes.

6    Q    What personal knowledge, just generally speaking, do you

7    have of that?

8    A    I know that many of the people waiting to get into the

9    hospital where I work right now are in that situation.  What we

10   do is, we prioritize the people who are most dangerous and try

11   to move them as quickly out of emergency rooms.  I also, when I

12   was working as an ACT team member, you know, was in emergency

13   rooms, you know, periodically with individuals, so I was aware

14   of that.

15   Q    Do you have similar -- strike that.  To your knowledge, do

16   you have similar issues with -- in North Carolina with people

17   with SMI being in jails?

18   A    Yeah, I would say that they're not in jails just waiting to

19   go to treatment.  So there are people who get -- are picked up

20   and in jails because they've been charged with something and

21   happen also to have mental health problems, yes.

22   Q    You personally don't believe that mental health has ever

23   been funded sufficiently.  Is that correct?

24   A    I personally believe mental health has always needed more

25   funding, as long as -- yes, as long as I've been doing the job,

1  yeah.

2  Q   Is funding a universal issue in mental health?

3  A   It's -- I don't know if it's universal, but it seems, from

4  what I've read and have experienced, that it's pretty common to

5  have --

6  Q   Test your memory.  Did you say it was universal in your

7  deposition?

8  A   I might have.

9  Q   Okay.  Do you believe that mental health has historically

10 been underfunded by the federal government?

11 A   Yes.  I mean, I think we have had to struggle to get

12 funding for research, and -- yes.  So I would say yes.

13 Q   Is housing one of the areas in which the federal government

14 has historically underfunded mental health?

15 A   That's a complicated -- I'm not -- there's multiple ways

16 that housing gets funded, so I'm not sure.  But I'm going say

17 yes to that.

18 Q   Okay.

19 A   So having enough affordable housing or enough supports to

20 afford housing, regardless of where that money comes from, has

21 been a struggle.

22 Q   Doctor, how do you assess whether community-based services

23 are uniformly available throughout a state?

24 A   How do you assess that?  I would hope that states monitor

25 and track that.  They would know what providers are there and

1    what services are available and how far they reach in those

2    areas.

3    Q    Do you know how to do that?

4    A    I haven't had that as part of my experience, no.

5    Q    Is PACT available in every area of North Carolina?

6    A    I don't believe it is yet.

7    Q    Doctor, I'm showing you what you previously saw today in

8    PDX-8.  Do you recall looking at this document this morning?

9    A    Yes.

10   Q    I'd like to direct your attention to the far left column.

11   "Would have avoided or spent less time."  Is that two different

12   categories?

13   A    Yes.

14   Q    "Would have avoided" means would not have gone to the

15   hospital at all?

16   A    That's correct.

17   Q    And "spent less time," a person would have gone to the

18   hospital but spent less time there?

19   A    That's correct.

20   Q    Would you turn to your report on page 8.

21   A    Yes.

22   Q    And this is person 27, and this is the first person in your

23   report.  Is that correct?

24   A    Yes.

25   Q    Would you turn to page 10 of your report, please?

1   A    That's not the first one.  Page 10?

2   Q    Yes.

3   A    Okay.

4   Q    All right.  I want to direct your attention to finding

5   number 2.  Does it say "Person 27 would have avoided or spent

6   less time in a state hospital if he had been provided

7   reasonable community-based services"?

8   A    Yes, it does.

9   Q    Okay.  So for any of the individuals that you reviewed, did

10  you distinguish between "would have avoided," on the one hand,

11  and "spent less time" on the other hand?

12  A    Did I distinguish, like, in my report --

13  Q    Yes, ma'am.

14  A    -- which one it would be?  I don't recall separating those

15  out.

16  Q    From reviewing -- strike that.  Is there a way -- strike

17  that.  If one reads your report, can one determine whether the

18  person would have avoided hospitalization altogether, or if

19  they would have went to a hospital but spent less time there,

20  for each of the 28 people you reviewed?

21  A    I'm not sure that you could tell that for each of them.  I

22  think probably there were -- for some of them, it could be

23  distinguished.

24  Q    And that would be -- for those ones you could distinguish,

25  it would have stayed in the text of the report?

1   A   Right.  It would have been probably evident based on

2   whether or not they were, like, frequent admissions at a very

3   short duration or, you know, a very long one then -- yeah.

4         MR. SHELSON:  I'm sorry, Your Honor.  I keep looking

5   at what time it is because I want to finish in time.

6      (Short Pause)

7   BY MR. SHELSON:

8   Q   All right.  Doctor, this is Exhibit D-276.

9   A   Yes.

10  Q   It's the "Strategic Plan for Improvement of Behavioral

11  Health Services, North Carolina Department of Health and Human

12  Services," and it's dated January 31, 2018.  Do you remember

13  discussing this during your deposition?

14  A   Yes.

15  Q   Let me direct your attention to page 3, please, which is

16  going to display.  The context, "North Carolina's behavioral

17  health system faces many challenges from a chronic lack of

18  funding, to the stigma associated with mental illness, to a

19  work force that is hard to recruit and retain."  Do you agree

20  with that statement?

21        MR. SCHUTZER:  Objection, Your Honor.  This is also

22  irrelevant and does not go to Dr. VanderZwaag's opinions about

23  the clinical needs of individuals in Mississippi and how to

24  meet those needs.  It's policy documents that Dr. VanderZwaag

25  did not offer an opinion on about North Carolina or

1   Mississippi.

2              THE COURT:  Let me hear your response, Mr. Shelson.

3              MR. SHELSON:  Well, Your Honor, two things:  First,

4   Dr. VanderZwaag has testified to a good bit more than literally

5   only the clinical needs of individuals in Mississippi.

6              The second thing we would say, Your Honor, is I'm not

7   asking her about any policy of North Carolina.  I'm simply

8   asking whether the statements I would like to read to her are

9   consistent with her extensive experience in the state of North

10  Carolina.

11             THE COURT:  Okay.  Objection overruled.

12  A    The question was, do I agree with that statement?

13  BY MR. SHELSON:

14  Q    Yes, ma'am.

15  A    The bold there?  I generally agree.  I don't think that --

16  I think there's been a lot of change and improvement with

17  stigma, but otherwise...

18  Q    This is page 4.  "About one in five American adults have a

19  mental health condition.  Yet 56 percent of adults with mental

20  illness do not receive treatment."  Is that consistent with

21  your experience as a psychiatrist?

22  A    I don't know the number -- the percentage.  It's not

23  something I've followed.  I'm a clinician, and I deal with

24  individuals.  So most of my work is really brought down to the

25  individual level.

1    Q    The next sentence reads, "Barriers to care include a

2    chronically underfunded mental health care system, the social

3    stigma of behavioral health conditions, high costs of care, a

4    lack of mental health professionals, and insufficient

5    community-based resources to meet the needs of those

6    populations."  In your career as a clinician, have you

7    encountered those kind of barriers?

8    A    Yes.  I've also -- I've also encountered a lot of the

9    things there that are going well too, so I have mixed -- it's

10   mixed, from my experience.

11   Q    Okay.  If I could direct your attention to in North

12   Carolina.  "In North Carolina, there have been cuts in mental

13   health spending each year since the Great Recession.  These

14   cuts have exacerbated the many barriers to mental health care

15   in North Carolina."  Do you agree with that statement?

16            MR. SCHUTZER:  I object again, Your Honor.  We're now

17   just reading the document into the record.  It speaks for

18   itself and is of limited relevance.

19            THE COURT:  All right.  Objection overruled.

20            MR. SCHUTZER:  If I could have a standing objection,

21   Your Honor.

22            THE COURT:  All right.

23            MR. SCHUTZER:  Thank you.

24   A    I'm sorry.  I don't remember what it said.

25   BY MR. SHELSON:

1    Q    I apologize.

2    A    That's all right.

3    Q    Can you just read it to yourself?  No reason for me to read

4    it to you again.  These two sentences starting right there.

5    A    Again, I'm like layers removed from all of that level of

6    knowledge about the actual funding or cuts.  Anything I would

7    learn would be through reading a newspaper or general knowledge

8    of that sort of thing.  I did not see an impact of those cuts

9    on the care that I was providing at the time.

10   Q    In your experience, are there mental health work force

11   shortages in North Carolina?

12   A    Yes.

13   Q    To your knowledge, what mental health work force shortages

14   are there in North Carolina?

15   A    Like most parts of the country, we have some shortages with

16   psychiatry.  There are shortages of mental health nurses.  And

17   I do think that we still have some shortages of peer support.

18   Q    Are the mental health work force shortages more pronounced

19   in the rural areas of North Carolina?

20   A    I can say that I am more familiar with that with related to

21   the psychiatric provider positions.  So yes, I know of that to

22   be true with that group, but I'm not sure about others.

23   Q    So in your experience in rural areas of North Carolina,

24   there are psychiatric work force shortages?

25   A    Psychiatrists, yes.

1   Q   Psychiatrists.  Thank you.  And to your knowledge, is that

2   because it is difficult to recruit psychiatrists to rural areas

3   of North Carolina?

4   A   I can only assume that that's true.  I know that there are

5   certain -- not all rural areas in the state, but certain areas

6   of the state that have had difficulty getting psychiatrists to

7   work there.

8   Q   Such as western North Carolina, west of, say, Asheville?

9   A   Again, I think the shortages I'm more aware of are in the

10  northeastern part of the state, but it's possibly some

11  shortages in the western part of the state as well.

12          MR. SHELSON:  Your Honor, I did not do this, but we

13  would move to admit Exhibit D-76.

14          THE COURT:  Exhibit D-276?

15          MR. SHELSON:  Yes, sir, D-276.

16          THE COURT:  Any objection from the United States?

17          MR. SCHUTZER:  The same objection, Your Honor,

18  relevance.

19          THE COURT:  D-276 will be received into evidence.

20      (Exhibit D-276 marked)

21          MR. SHELSON:  May I approach the witness, Your Honor?

22          THE COURT:  Yes, you may.

23  BY MR. SHELSON:

24  Q   I'm going to try my best to finish by 1:30.

25          THE COURT:  All right.

*** DAILY TRANSCRIPT ***

1    BY MR. SHELSON:

2    Q   Okay.  Doctor, Exhibit D-265, this is a findings letter to

3    the State of North Carolina dated July 28th, 2011.  Do you

4    recall discussing this document in your deposition?

5    A   Yes.

6    Q   Were you aware that this letter had been issued?

7    A   I believe I was aware that it had been issued, yes.

8    Q   Were you aware that the United States alleged North

9    Carolina's adult care homes violated the Americans with

10   Disabilities Act?

11   A   Yes.

12        MR. SHELSON:  Your Honor, we would move to admit

13   Exhibit D-265 into evidence.

14        THE COURT:  Any objection from the United States?

15        MR. SCHUTZER:  Yes, Your Honor.  The relevance of this

16   document, it is not relevant.  Mississippi -- I'm sorry.  North

17   Carolina's compliance or noncompliance with the ADA is not

18   relevant to Mississippi's noncompliance with the ADA.

19        THE COURT:  Let me hear from you, Mr. Shelson.

20        MR. SHELSON:  Your Honor, it's going to go to two

21   things that we haven't had the opportunity to explore yet at

22   this stage of the proceedings, but one is the standard that the

23   United States is attempting to hold Mississippi to for the

24   sufficiency of its statewide system of mental health care.

25   That's one.  And the second thing it goes to is -- Your Honor,

 1   I'm 56 years old, and I forgot the second thing, so I'm down to

 2   one.  I just have one thing.

 3          THE COURT:  The court is going to overrule the

 4   objection.  I heard the prefatory statement that this witness

 5   was presented with this during her deposition.  Is that

 6   correct?

 7          MR. SHELSON:  Yes, Your Honor.

 8          THE COURT:  All right.  The court is going to overrule

 9   the objection.

10          MR. SHELSON:  Your Honor, may I approach.

11          THE COURT:  Yes, you may.

12          MR. SHELSON:  It's the last one, Your Honor.

13   BY MR. SHELSON:

14   Q   Doctor, this is Exhibit D-269.  Do you recall discussing

15   this document during your deposition?

16   A   I believe I did -- I believe we did, yes.

17   Q   And is this document the modification of the settlement

18   agreement between the United States and the State of North

19   Carolina?

20   A   Yes.

21   Q   And I just have two questions about this, and they are both

22   on page 2.  The first one here, Doctor, does it say, "By

23   July 1st, 2021, the State will provide housing to at least

24   3,000 individuals"?

25   A   Yes.

1   Q   Were you aware of the existence of that item?

2   A   Yes.

3   Q   All right.  And then the highlight below that reads, "The

4   State will provide supported employment services to a total of

5   2500 individuals."  Were you aware of that requirement?

6   A   Not the exact numbers, but I knew there was a number

7   identified to receive the service, yes.

8           MR. SHELSON:  Your Honor, we move to admit

9   Exhibit D-269 into evidence.

10          THE COURT:  Any objection from the United States?

11          MR. SCHUTZER:  Yes, Your Honor.  Same objection, in

12  particular --

13          THE COURT:  Make sure you're speaking into the mic.

14          MR. SCHUTZER:  Yes, Your Honor.  For all of the

15  reasons I've previously stated as well, this relates to a

16  settlement agreement between the United States and North

17  Carolina.  And so the issue that this document speaks to is

18  compliance with the settlement agreement, not compliance with

19  the ADA.

20          THE COURT:  Okay.  The court is going to overrule the

21  objection.  I think it's -- I think it's relevant, particularly

22  if we talk about remedies later on.  So that's D-269 --

23          MR. SHELSON:  D-269.

24          THE COURT:  -- will be received into evidence.

25      (Exhibit D-269 marked)

1    BY MR. SHELSON:

2    Q    All right.  Doctor, I'm almost finished.  So as we

3    established, you reviewed 28 individuals in Mississippi.

4    Correct?

5    A    Yes.

6    Q    And well, at least for the 27 who are living, you made --

7    you gave your opinions on what each of -- the services that

8    each one of them needed to stay in the community.  Is that

9    right?

10   A    Yes.

11   Q    And did you determine what it would cost to deliver the

12   services you recommended for those individuals?

13   A    I wasn't asked to look at costs.

14   Q    In your deposition, I asked you the following question:

15   "How do you determine whether a state is offering sufficient

16   community-based services?"  Do you recall your answer?

17   A    Not offhand.

18   Q    Well, let me just ask you the question then.  How do you

19   determine whether a state is offering sufficient

20   community-based services?

21   A    I think you would have to look at a variety of measures

22   that we would consider positive outcomes in response to

23   appropriate services.  So again, reduction in the use of

24   hospital bed days, people in stable housing, number of people

25   employed.  Those kinds of measurements would give an indication

*** DAILY TRANSCRIPT ***

1  of whether or not the system is supporting people in the ways

2  that are most helpful to them.

3  Q   Okay.  I want to show this to you.  This is page 93 of your

4  deposition.  I'll direct your attention to line 8.

5     "Question:  How do you determine whether a state is

6  offering sufficient community-based services?"  What was your

7  answer?

8  A   At that point, I was struggling to answer that question,

9  and I said, I don't know the answer to that.  I said that

10 sometimes that you can't just use the need for hospital care as

11 a measurement because sometimes people need hospital care even

12 if everything's going right.

13    And then I said you can use any number of indicators.  So I

14 don't know what I said after that.

15 Q   Which, in fairness to you, I represent there's some of the

16 ones you just mentioned.  But -- so the point I want to make

17 here is, the sentence that -- from lines 14 to 16, where you

18 said, "So it can't be evidenced by having no psychiatric

19 hospitals," what were you referring to there?

20 A   Well, I think what I was referring to was that we need a --

21 an array of care, we need a continuum of care to meet people's

22 needs at the time.  So hospitals are part of that continuum of

23 care, just as in any health -- other health-related fields.  So

24 sometimes people need a hospital.

25    MR. SHELSON:  Your Honor, may I have a moment to

1    confer.

2            THE COURT:  Yes, you may.

3            MR. SHELSON:  Thank you, Your Honor.

4       (Short Pause)

5            MR. SHELSON:  Your Honor, thank you.  We have no

6    further questions.  And thank you, Doctor, for your time.

7            THE COURT:  All right.

8            MS. RUSH:  Your Honor, our realtime seems to have

9    broken down.  I'm having difficulty following the proceedings.

10            THE COURT:  Okay.

11       (Off Record)

12            THE COURT:  You may proceed, Mr. Schutzer.

13            MR. SCHUTZER:  Thank you, Your Honor.  Just a few

14    brief questions for you, Dr. VanderZwaag, and then we'll get

15    you out of here.

16                         REDIRECT EXAMINATION

17    BY MR. SCHUTZER:

18    Q   You were asked some questions comparing the symptoms people

19    experience when they went into the hospital to the symptoms

20    they were experiencing at the time you met them.  Do you recall

21    those questions?

22    A   Yes.

23    Q   If somebody is not experiencing symptoms, does that mean

24    they are not at risk of going back to a state hospital?

25    A   No.

```
1    Q    Why is that?

2    A    Because that -- what that indicates is that they are

3    individuals who -- there are some effective treatments that get

4    them back to a level of low symptoms, but that person in

5    particular that we were discussing had had episodes of

6    increased symptoms multiple times in his history.

7         So again, without ongoing proper treatment and supports,

8    he's at risk because another episode could certainly come on.

9    So sometimes being without medicine or sometimes having a

10   significant stressor happen, all of those things can make those

11   symptoms return, which could put them at risk.

12   Q    Are there effective community-based services for people who

13   have significant behavioral issues?

14   A    Significant behavioral issues?

15   Q    I'm sorry.  People with SMI, serious mental illness, who

16   also may have aggression or violent behaviors.  Are there

17   effective community-based services for those individuals?

18   A    That's a hard question to answer because I -- in my mind,

19   I'm trying to understand what level of behavior you're

20   discussing.  So sometimes aggression or self-injurious behavior

21   rises to such a level that the community would not be a place

22   that it's possible to keep someone safe.  However, if things

23   are more sort of low level or chronic, then that -- there

24   certainly are interventions that can be used to try to reduce

25   that kind of behavioral disturbance, yes.
```

1    Q    You were asked a few questions about PACT services and

2    assertive engagement.  How good are PACT services at engaging

3    individuals who are resistant to services?

4    A    Well, hopefully, they are very good at it.  It's one of the

5    things that we measure in doing fidelity reviews of ACT to

6    understand how good a team is, how close to the model.  So a

7    way to measure assertive engagement is to look at the number of

8    dropouts from a team, and so the lower number of dropouts, the

9    better they are at assertive engagement and also retention.  So

10   those things kind of go together in a way.

11   Q    Last few questions.  You were also asked a few questions

12   about North Carolina.  How many PACT teams are there in North

13   Carolina?

14   A    There are approximately 75.

15   Q    How would you compare the community-based services received

16   by the 28 individuals you looked at with the community-based

17   services that are commonly available in North Carolina?

18   A    There was much less variety, and there was an absence of

19   the kind of, again, assertive bringing treatment to the

20   individual that we have available in our state.

21            MR. SCHUTZER:  No further questions.  Thank you.

22                     EXAMINATION BY THE COURT

23            THE COURT:  Doctor, I have a couple of follow-up

24   questions based on your testimony earlier.  And as always, the

25   United States -- the parties will have an opportunity to follow

1   up based on the questions that I've asked.  So it may be a few

2   minutes, but not much longer, I don't think.  But early on --

3   you've been testifying for a while.

4           THE WITNESS:  Yes.

5           THE COURT:  Early on in your testimony, there was some

6   discussion about person 46, I believe, and he had been admitted

7   to a hospital 18 different times over a period of seven years.

8   Do you recall that testimony?

9           THE WITNESS:  Yes, I do.

10          THE COURT:  Okay.  And the United States asked you a

11  question.  I think you talked about what would cause those

12  different -- possibly cause those different 18 admissions, and

13  also asked if you had treated someone who had been -- well,

14  maybe you answered the question in a way and said, I've never

15  treated anyone who had had 18 different admissions.  I believe

16  that was your testimony.

17          My question, though, is in your work area, have you

18  seen or observed others who had -- who might have had -- I

19  think your testimony was you had never treated anyone who you

20  directed to go into an institution 18 different times, or

21  hospitals, I think.

22          THE WITNESS:  Correct.  So I think what -- I think I

23  did say that.

24          THE COURT:  Go ahead.

25          THE WITNESS:  What I meant by that was, while they

*** DAILY TRANSCRIPT ***

1   were receiving the kinds of services that I was doing, I didn't

2   see those kind -- that kind of frequency of hospitalization

3   while they were receiving that service.

4        I have worked with people who, prior to receiving

5   reasonable or, you know, appropriate services, had a history of

6   going in many, many times.  So I definitely have worked with

7   people who, in their distant history, had over 100 hospital

8   admissions before.

9        THE COURT:  In their distant history before --

10       THE WITNESS:  Right, right.

11       THE COURT:  Okay.  And so you've seen it in North

12  Carolina?

13       THE WITNESS:  Yes.

14       THE COURT:  And other places, I guess?  I don't know.

15       THE WITNESS:  Right.  I think that it was not uncommon

16  years ago.  It's becoming less common.

17       THE COURT:  When you say years ago, what decade are

18  you talking about?

19       THE WITNESS:  Well, I'm talking in probably the '80s,

20  '90s.  Starting in the '90s, there were definitely -- there's

21  been an increase in evidence-based practices, community

22  services, and things have started to decrease since.  So you

23  see fewer of individuals like that.

24       THE COURT:  Okay.  Thank you.

25       The next question deals with I believe it's person 54.

*** DAILY TRANSCRIPT ***

1    And as a part of person 54 -- no, I'm sorry.  Must be person

2    50, because the State of Mississippi directed your attention to

3    PX-1084, page 211 of PX-1084, which is in that binder toward

4    the end.  It's the progress note.

5             THE WITNESS:  Yes, uh-huh.

6             THE COURT:  I think everybody agrees that this is a

7    progress note for person 50.  And Mr. Shelson pointed out some

8    things in that progress note about the patient having had a

9    hearing with the judge at Building 45, and also a social work

10   note noted in May of 2016, that the psychotic symptoms in this

11   patient were active.  And I think the questions, "grave

12   impairment, noncompliant," and stuff -- in other words, there

13   was some indication that this patient might have either had

14   delusions or either had acted on some and making threats

15   against her mother, I believe.

16            THE WITNESS:  Yes, I think prior to admission, yes.

17            THE COURT:  Prior to admission?

18            THE WITNESS:  Yes.

19            THE COURT:  Okay.  I guess my question is, if someone

20   is acting in that way and had been under a doctor's care prior

21   to that, would the hospital be the best place for this person

22   if -- I mean, would you consider those to be acts that are

23   dangerous either to herself, or does she really -- or based on

24   these progress notes, does she pose a danger to others, like

25   her elderly mother?

1       THE WITNESS:  Right.  So I think it would involve some

2    assessment of is there some way to do it short of a

3    hospitalization, but sometimes people do need hospitalization.

4       So I agree, if someone is assaultive and there's no

5    way to find a lower level of care that could help them contain

6    that behavioral disturbance, then a hospital is a safe place to

7    go in order to get treatment until that goes away.

8       So -- but sometimes it's just a matter -- so if she

9    was directing her assaultiveness towards her mother and she was

10   delusional about her mother, an alternative sometimes is just

11   to help her move away from her mother rather than go to a

12   hospital herself.  In other words, it doesn't really have to be

13   about going to the hospital.  There's other strategies you can

14   use to kind of get a safe environment.

15      So -- and I think that -- but there was concerns

16   throughout her notes about her mother's safety, even though mom

17   seemed to want her at home.  But there were concerns by other

18   people about that.  But that's, you know, partly why -- she's

19   saying, I'd like to live on my own.  That's partly why I also

20   recommend live on your own.  You're not putting anyone else at

21   risk then, if you're putting Clorox on the walls.  Like maybe

22   that's not a behavior we want to see, but it's not putting

23   anyone at risk.  And a team could continue to work with her

24   while that's going on, and maybe she wouldn't necessarily just

25   have to stay in a hospital because of the potential to do those

1  things.

2       THE COURT:  Okay.  And I guess that calls for another

3  question.  It might depend on what community she lives in, what

4  city or what county or what locality, as to whether or not

5  there may be another place to place her.  Right?

6       I mean, I would imagine in some counties in

7  Mississippi -- let's not do counties.  Let's do municipalities.

8  In some places, the options are much fewer, as far as putting

9  her -- if the alternative is to put her in a place of her own,

10  well, could you do that in some areas, in some localities in

11  Mississippi?  That's just one of the questions that I'm going

12  to be asking the lawyers.  Maybe that's not a question for you

13  at this time, but I'm just trying to find out if she is a

14  danger, the one place where many counties put people when

15  they -- when it looks like they are posing a danger is the

16  county jail.  And would you consider that an appropriate place?

17       THE WITNESS:  No, sir.

18       THE COURT:  Okay.

19       THE WITNESS:  I think what I was suggesting was that

20  in some places and with the right level of assessment, just

21  because someone has been exhibiting something that in a

22  particular environment or towards a particular person was

23  dangerous, that doesn't mean the only solution is to get locked

24  up either in a hospital or a jail, no.  I understand some of

25  these limitations of where people are and things, but it could

1    just be going -- say she's angry at this person but not

2    everybody else.  Maybe she could go stay with a friend for a

3    few days.

4         So there's ways to diffuse crises sometimes that don't

5    necessarily even involve institutions at all.  They involve

6    problem solving and creativity.

7         THE COURT:  Okay.  I believe, and I didn't make my

8    proper notes here -- I think you said in North Carolina, you

9    believe that -- I think Mr. Shelson asked you the question if

10   there was a waiting list for persons who are waiting to -- were

11   there enough beds in North Carolina, I believe was the

12   question.  I'm hoping that was your question.  Was it not,

13   Mr. Shelson, something like that?

14        MR. SHELSON:  Your Honor, I was asking her about the

15   hospital she works at now, and I asked her whether there was a

16   waiting list for admissions to that hospital.

17        THE COURT:  Okay.  And you indicated that there was a

18   waiting list, I believe?

19        THE WITNESS:  Yes, sir.

20        THE COURT:  From where do you all receive your

21   patients?  If there's a waiting list, where are those people --

22   where are they --

23        THE WITNESS:  Where are they waiting?

24        THE COURT:  Where are they waiting?

25        THE WITNESS:  Many of them are already in a

1  psychiatric hospital.  They are at another inpatient facility.

2  So that would be a group of individuals who they have treated

3  maybe up to, like, 30 days in an acute admission, but the

4  person still needs further hospitalization.  So we get people

5  referred to us that way.  Other ones are in emergency rooms,

6  and they have not yet been admitted to a community hospital

7  bed.  But oftentimes, they'll get on our waiting list, but

8  they're also putting out -- trying to get beds elsewhere at the

9  same time.

10       So except -- so the ones that really wait to get into

11  our hospital are the ones who are -- they're having problems

12  managing the level of aggression or self-injury that they are

13  exhibiting in those other settings.  So again, the way our

14  state hospitals work at this point, the vast majority of people

15  who make it in to us are people who are prioritized because

16  they have -- their extremely aggressive or assaultive or

17  dangerous to themselves in other -- either emergency room

18  settings or hospital settings.

19       THE COURT:  Okay.  Did I hear your testimony

20  correct -- am I right?  I've been trying to make sure -- let me

21  ask -- let me ask the question.  How many state hospitals does

22  North Carolina have?

23       THE WITNESS:  Three.

24       THE COURT:  That's what I thought you said.  Only

25  three?

```
 1                    THE WITNESS:  Yes, sir.

 2                    THE COURT:  Okay.  Do you know how many hospitals

 3      there have inpatient treatment centers for -- to treat people

 4      with mental illness?

 5                    THE WITNESS:  Community hospitals or any kind of

 6      hospital?

 7                    THE COURT:  Any kind of hospital.

 8                    THE WITNESS:  Many.  I don't know the number.

 9                    THE COURT:  Many?

10                    THE WITNESS:  Yes.

11                    THE COURT:  Okay.  Well, what about community

12      hospitals then, if you know that number?

13                    THE WITNESS:  Well, I don't know that number.

14                    THE COURT:  Okay.  You mentioned that there's --

15                    THE WITNESS:  I mean, they are all private, so we

16      don't have, like, other state-funded hospitals or local

17      community -- I mean, all of the hospitals -- when I say

18      community hospital, I mean ones that are in, you know, this

19      small community or that small community.

20                    THE COURT:  I suspect what we're going to hear later

21      on, I guess, we have our four state hospitals, whatever number

22      it is.

23                    MR. SHELSON:  It is four, Your Honor.

24                    THE COURT:  Four?

25                    MR. SHELSON:  Yes, sir.
```

1    THE COURT:  Okay.  And we might hear about the number

2    of hospital beds or hospital -- private hospitals that have

3    true inpatient services in the state of Mississippi, and I

4    don't think it's many.  I may be wrong.  I don't think it's

5    many.  But you indicated there's 75 PACT teams in North

6    Carolina.  Is that correct?

7        THE WITNESS:  Yes.

8        THE COURT:  Do you consider North Carolina a rural or

9    sort of an urban state or --

10       THE WITNESS:  We're a mixed state.  I would say we're

11   probably 50-50, a guess.

12       THE COURT:  Okay.  And we'll hear something about the

13   population of North Carolina.  Or we'll take judicial notice of

14   what its population is.  It is much higher than Mississippi.

15       THE WITNESS:  Yes, sir.

16       THE COURT:  All right.  But I do want to ask you this

17   question, and this is my last question.  When responding to

18   questions by Mr. Shelson, I think, he may have asked a

19   question, but I'm not exactly sure what question he asked, but

20   your response was that you do not hold North Carolina's mental

21   health system as a model for Mississippi, I think.

22       THE WITNESS:  Yes, sir.

23       THE COURT:  Is there a health care system in the

24   United States that would be a model for the State of

25   Mississippi to follow?

 1              THE WITNESS:  I cannot --

 2              THE COURT:  Based on your experience.

 3              THE WITNESS:  I cannot say.  I don't know the answer

 4     to that.  So I think what all states are trying to do is,

 5     we're -- I think all -- this is what I know about the field.

 6     States are looking at what -- where is the field now, what do

 7     we know about treatment, what do we know about best treatment,

 8     how do we start to implement those practices, or in some

 9     places, you know, how do we continue to modify that?

10              So it's going to always be an evolving field.  So

11     holding out a model today might not be particularly helpful,

12     you know, three years from now.  I've been in the field working

13     for a long time.  There's been a lot of changes in the time

14     that I've been a psychiatrist.  How I practice, what I believe

15     in, how I see things, how I see potential has changed

16     dramatically, and I think it will continue to change.

17              So what I think -- the only model I could say is

18     everyone -- there needs to be some flexibility for making

19     changes when there's evidence that things are no longer working

20     or are not working, and systems need to find some level of

21     nimbleness to address those changes so that they don't stay

22     behind, and that the people who receive services in those

23     states don't fall behind because they happen to live there.  So

24     that's the best I can say about it.

25              I haven't studied it, but I've been in the field

*** DAILY TRANSCRIPT ***

1   awhile, and I've seen the changes in my state.  And I do go to

2   national conferences, and I do keep up with the field.  So it's

3   my best read on it.

4         THE COURT:  But I guess your overall assessment would

5   be that there may not be a model, but Mississippi could be

6   doing better than what it's doing?

7         THE WITNESS:  Right.  There are services that we know

8   are evidence-based and work, and they help keep people out of

9   hospitals.  So the extent that there's a model, it's like,

10   well, make sure those services are there.

11         So things we talked about today, like PACT or

12   permanent supported houses, supported employment, effective

13   crisis and diversion services, we know those things help people

14   stay out of hospitals, but how you put them together, how they

15   are financed, you know, each state's different around things

16   like that or rural versus urban.  I mean, those things -- you

17   know, I don't know enough about Mississippi that I would say,

18   you know, this state matches Mississippi's best, follow that

19   one.  I don't know enough about it.

20         THE COURT:  But the evidence-based practice at this

21   time suggests that deinstitutionalization is good, I mean,

22   trying to keep people from getting into the cycle of being

23   reinstitutionalized?

24         THE WITNESS:  Correct.  Because we hope everyone can

25   live a life.  And it's no life to be in a hospital.  I mean,

1   it's being alive, but that's different than having a life.

2          So working with people effectively in the community is

3   about helping them establish and maintain, hold on to a

4   meaningful life.  So that's where the evidence-based is.

5          THE COURT:  Do you -- your current job is what?

6          THE WITNESS:  Right now, I'm working back in a state

7   hospital.  And --

8          THE COURT:  Okay.  That's what I thought.  You are

9   working in a state hospital?

10          THE WITNESS:  Uh-huh.

11          THE COURT:  Since you're an expert witness, you could

12   have been here yesterday, but the testimony from one of the

13   witnesses described her hospital experience here in

14   Mississippi.  One of the things she indicated was the lack of

15   privacy that one has in a hospital.  I think her testimony was

16   that even though she had a bath -- or access to a bathroom in

17   her room, I think she still had to -- and if I'm wrong on this,

18   the parties will let me know -- she was still forced to use

19   communal -- an open bathroom where everybody was, and that --

20   she didn't use the word of taking away her dignity, but

21   obviously, that was discussed.

22          But I'm just trying to figure out the hospital

23   setting -- one of the other things she mentioned was having to

24   walk around with her personal tampons, or something of that

25   sort, and described that as well.  But I guess my question is,

1511

1   the hospital where you are in, are there -- is the hospital

2   instituting anything to make sure that the hospital setting

3   itself is less -- I don't want to call it -- I guess inspires

4   dignity with the residents who are in there?  I guess that's my

5   question.

6           THE WITNESS:  Yeah.  Yeah.

7           THE COURT:  What steps should hospitals do?

8           THE WITNESS:  So I don't know -- I don't know how

9   possible it is to make a hospital setting, you know, whether

10  it's a medical hospital or a psychiatric hospital, feel like

11  you're anywhere close to home or somewhere comfortable.

12  They're just not.  They're institutions, and the routine is

13  determined by other people, and the food is determined by other

14  people, and your privacy level is determined by other people.

15  So I'm not sure our hospital is any better or worse than that.

16          I do know that we do do -- we train every single staff

17  in our hospital on things like trauma-informed care.  We're

18  very attuned to the fact that even just being in the hospital

19  can be traumatizing.  Plus, people come with prior trauma.  So

20  that's all about really treating people with dignity and

21  understanding that not responding to things that they might do

22  with anger or confrontation, but understanding, like, why --

23  you know, that they're doing the best they can at the time, and

24  things can sort of set them off.

25          So we're working hard to try and do that kind of

1    training and -- I will say, out in the field when I was doing

2    ACT services, it was very easy and very usual to run across all

3    sorts of outpatient people who talk and live recovery in

4    person-centered.  In the hospital, I have to -- I'm working

5    hard to do a lot of training even, you know, in our system.  So

6    everywhere -- it's a learning curve to go from a medical model

7    to a recovery model, but I think it's an important one, and

8    inpatient settings struggle a little bit more than the

9    outpatient settings with it.

10            THE COURT:  Thank you, Dr. VanderZwaag.  Those are all

11   the questions I have.  I turn to the United States.  Is there

12   follow-up based on what I've asked?

13            MR. SCHUTZER:  Nothing further, Your Honor.

14            THE COURT:  All right.  To the State, Mr. Shelson?

15            MR. SHELSON:  Yes, sir.  I just wanted -- to Your

16   Honor's point about Melody Worsham's testimony, and I'm sure

17   the United States will correct me if I'm wrong.  We understood

18   her testimony to be that she had never personally been in a

19   state hospital as a patient, but some of the things you listed

20   were her observations she made when she visited.  I only wanted

21   to -- because Your Honor asked if there was a clarification.

22            THE COURT:  Thank you.  Thank you for that.

23            MR. SHELSON:  Yes, sir.

24                        RECROSS-EXAMINATION

25   BY MR. SHELSON:

1513

```
1   Q   And then just for Dr. VanderZwaag, Judge Reeves asked you,

2   in effect, you know, what do you do if someone wants to live in

3   a community where there may not be housing available.  And you

4   may recall we talked about that in your deposition.  As I

5   recall your testimony, you said, you know, that's a tough

6   problem, but what you do in that situation is work to get as

7   close as possible to the family and other natural supports.  Is

8   that --

9   A   Yes.  Yes.

10  Q   So even you can't get -- I don't know.  For instance, if

11  somebody wants to live in community X, but they're just not

12  housing there, you try to get as close as you reasonably can?

13  A   That's right.

14          MR. SHELSON:  Thank you, Your Honor.  Thank you.

15          THE COURT:  All right.  Dr. VanderZwaag, you may step

16  down.  I assume this witness is finally excused?

17          MR. SCHUTZER:  Yes, Your Honor.

18          THE COURT:  All right.  Thank you for your testimony.

19  Counsel, I certainly appreciate you all working with the court.

20  This concludes the testimony for this week, not just today.

21          We will start back up on Monday morning at 9 a.m.

22  Obviously, if there's anything that the court needs to take

23  care of before then, let the court know through contact with

24  the court either -- the best way to contact us would be through

25  e-mail, the chambers e-mail.  We all have access to that.  I
```

514

1   have access to it 24 hours a day.  The law clerks don't like to

2   have access to it all that time.  But if there's anything we

3   need to take care of before then, please let us know.

4           I hope you all are spending all the money you can here

5   in Jackson.  I hope you're enjoying your stay.  If you're

6   staying here over the weekend, I hope you take in some good

7   stuff.  I recommend the Civil Rights Museum.  That's a good

8   starting point.

9           I know it's all going to be on the record.  That's

10  fine.  That's a good starting point.  If there's anything,

11  though, you all need that I can do, please let us know through

12  chambers e-mail.  We'll see you all on Monday morning.

13          I will be open to any announcement that you are ready

14  to give me.  Anything.  Anything.  I'm open to it, whether *It's*

15  *now resolved, and now that we can sort of work toward what*

16  *might be a model, it's been resolved* or, *Judge, I can guarantee*

17  *you it won't be six weeks*.  That's always going to be on the

18  table.  Thank y'all so much.  I'll see you Monday morning.

19      (Recess)

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***

1                    CERTIFICATE OF REPORTER

2

3         I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10        I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14        This the 6th day of June, 2019.

15

16                    s/ *Cherie G. Bond*
                      Cherie G. Bond
17                    Court Reporter

18

19

20

21

22

23

24

25

                    *** DAILY TRANSCRIPT ***