UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                          CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                        DEFENDANTS



TRIAL TRANSCRIPT
VOLUME 6



BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MORNING SESSION
JUNE 10, 2019
JACKSON, MISSISSIPPI




REPORTED BY:  BRENDA D. WOLVERTON, RPR, CRR, FCRR
Mississippi CSR #1139

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4188


*** DAILY TRANSCRIPT ***

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:      MR. MATHEW SCHUTZER
                              MS. REGAN RUSH
 3                            MS. DEENA FOX
                              MS. HALEY VAN EREM
 4                            MR. PATRICK HOLKINS

 5    FOR THE DEFENDANT:      MR. JAMES W. SHELSON
                              MR. REUBEN V. ANDERSON
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*** DAILY TRANSCRIPT ***

TABLE OF CONTENTS

WITNESSES FOR THE GOVERNMENT

KIM SISTRUNK

    Direct Examination by Mr. Holkins      522

    Cross-Examination by Mr. Shelson      545

    Redirect Examination by Mr. Holkins      552

    Examination by the Court      554

    Further Examination by Mr. Shelson      561

ROBERT BLAIR DUREN

    Direct Examination by Mr. Holkins      564

    Cross-Examination by Mr. Shelson      578

DANIEL BYRNE

    Direct Examination by Mr. Schutzer      582

*** DAILY TRANSCRIPT ***

1          THE COURT:  Good morning.  I apologize for the delay.

2     It's Monday and I was out on Friday so we're trying to get some

3     things taken care of early this morning.  I am aware of the

4     email that I received from Ms. Rush over the weekend.  Way to

5     make me smile the first thing in the morning.  By the end of

6     the week you will have me smiling even more, I'm sure.

7          Before we start this morning, I wanted to talk about

8     scheduling for today.  The lunch hour will probably be a little

9     bit longer than usual.  I have a speaking obligation over the

10    lunch hour so it will probably be about an hour and a half.

11    Maybe, maybe not.  I mean, I'm going to go over there and say

12    what I have to say and come back.  And I know I have to take a

13    break in the late afternoon because I have a matter that I have

14    to deal with that's aside from this case and I'm hoping we

15    could go until about 5:30 today to try to make up for the time.

16    So if that poses a problem for witnesses or whatever, just let

17    me know, but that's how I want today to sort of progress if

18    possible.  All right?

19          Is there anything we need to take up before we get the

20    next witness?

21          MR. SHELSON:  Just briefly, Your Honor.

22          THE COURT:  Make sure you're speaking into the

23    microphone.

24          MR. SHELSON:  Your Honor, it's great news on that

25    United States is going to finish earlier than anticipated.  I

```
1   just want to say a couple things about that.  United States
2   anticipates finishing sometime on June 17th.  If we could just
3   start June 18th without regard to when they finish on the 17th,
4   that would help us tremendously.
5         We had our experts locked in for certain dates
6   including dates in July.  We think we've got all those adjusted
7   over the weekend.  Bottom line is we think we can finish on
8   June 27th.  There may be a day or two where it gets to be 3 and
9   we're out of witnesses but may not.  There may be one or two
10  instances of that and I just wanted to bring that to the
11  court's attention.
12        THE COURT:  Okay.  That won't be a problem.  I expect
13  the government to start on the 18th or 19th, if you have to, to
14  figure out where you might go based on what the final testimony
15  is on the last day that the government -- before the government
16  rests.  So this is a bench trial.  We're real flexible.  So...
17        MR. SHELSON:  Thank you, Your Honor.
18        THE COURT:  All right.  Is the government ready to
19  call its next witness?
20        MR. HOLKINS:  Yes, Your Honor.
21        THE COURT:  You may proceed.
22        MR. HOLKINS:  Your Honor, if I may, I would like to
23  give you a brief preview of what we have planned for the day
24  before I call our next witness.
25        THE COURT:  Okay.
```

*** DAILY TRANSCRIPT ***

1      MR. HOLKINS:  First up is Kim Sistrunk, a PACT

2   provider in Region 3.  Next we have Robert Blair Duren, who is

3   a PACT consumer.  Next we have Daniel Byrne who is one of the

4   United States' clinical experts.  And if time permits, we plan

5   to call Ledger Parker today.  He is the executive director of

6   Mississippi United to End Homelessness which administers the

7   State's supported housing program.

8      THE COURT:  Okay.  Thank you.

9      MR. HOLKINS:  Additionally, I have an update on CR.

10  She is the family member we discussed on the first day of

11  trial.  She was deposed by the State on Friday and we expect to

12  call her tomorrow.

13      THE COURT:  Okay.  Thank you.

14      MR. HOLKINS:  Thank you, Your Honor.

15      THE COURT:  All right.  You may call your next

16  witness.

17      MR. HOLKINS:  Thank you.  The United States calls Kim

18  Sistrunk.

19      THE COURT:  All right.  Just step around,

20  Ms. Sistrunk, and place your right hand on that Bible, please.

21                          **KIM SISTRUNK,**

22  having first been duly sworn, testified as follows:

23      THE COURT:  Thank you.  You may take a seat.

24  Ms. Sistrunk, the microphone is there before you and somebody

25  was gracious enough to already pour you a glass of water.

```
 1              THE WITNESS:  I will need it.

 2              THE COURT:  Okay.  Please speak into the microphone

 3    loudly enough for us to hear it.  The court reporter is taking

 4    down everything that is being said so it's important to speak

 5    at a pace at which she can keep up with you.

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  All right.  Please allow the lawyers to

 8    finish their questions before you begin to speak so that the

 9    two of you will not be speaking at the same time.  And make

10    sure all your responses are verbal.  If you're going to nod or

11    shake your head, say yes or no and try to avoid using uh-huh

12    and huh-uh.  And if you will, state and spell your name for the

13    record.

14              THE WITNESS:  Kim Sistrunk, K-I-M, S-I-S-T-R-U-N-K.

15              THE COURT:  Thank you.  I don't think you have to bend

16    down.  You look uncomfortable bending down so you can adjust it

17    any way you see fit.

18              THE WITNESS:  Okay.

19              THE COURT:  Thank you.  You may proceed, counsel.

20              MR. HOLKINS:  Thank you, Your Honor.

21                         DIRECT EXAMINATION

22    BY MR. HOLKINS:

23    Q   Good morning, Ms. Sistrunk.

24    A   Good morning.

25    Q   First I want to make clear that this case has a fact cutoff
```

1    of December 31st, 2018.  For the purposes of my questions

2    today, I would appreciate it if you could focus on facts that

3    existed through the end of 2018.  Is that okay?

4    A    Yes.

5    Q    Ms. Sistrunk, what do you do for a living?

6    A    I'm the supervisor at the PACT program in North Mississippi

7    in Tupelo.

8    Q    And do you work for a community mental health center?

9    A    Yes.  Lifecore Health Group.

10   Q    Is that known as Region 3?

11   A    Yes.

12   Q    How long have you worked as a PACT team supervisor at

13   Region 3?

14   A    One year and nine months.

15   Q    What is the overarching goal of PACT?

16   A    The PACT program's mission is to help individuals to

17   maintain and sustain in the community and to prevent

18   hospitalization and incarceration.

19   Q    We will talk more about PACT in a minute but first I have

20   some questions about you.

21   A    Okay.

22   Q    Where did you grow up?

23   A    Tupelo, Mississippi.

24   Q    And how long have you been working in the mental health

25   field?

1    A    Almost 24 years.

2    Q    What made you want to pursue this work?

3    A    My father was killed in Vietnam and after his death my

4    mother had a break, and from that point she was hospitalized on

5    and off over 20 years.

6    Q    What do you mean by "a break"?

7    A    She had a psychotic episode.

8    Q    And where was she hospitalized?

9    A    At that time she went to a hospital in Memphis, Tennessee.

10   Q    Was she ever treated in State Hospitals in Mississippi?

11   A    Yes.

12   Q    What was it like for you to see your mom go into State

13   Hospitals in Mississippi?

14   A    It was very difficult, being that she was my only parent

15   that was living.  And so certainly for her to be hospitalized,

16   to have the issues that she had that led her to needing to be

17   hospitalized, was very difficult and difficult as a child.

18   Q    Ms. Sistrunk, could you briefly describe your educational

19   history starting with your college degree?

20   A    I have a bachelor's in psychology.  I have a master's of

21   science in counselor ed, education, educational psychology with

22   a community emphasis.

23   Q    Where did you obtain your master's degree?

24   A    Mississippi State University in Starkville.

25   Q    I would like to discuss your path to the Region 3 PACT

1   team.  Could you quickly run through the jobs you had before

2   joining the PACT team?

3   A    Yes.  Directly out of graduate school I worked for Region 3

4   in Tupelo, Mississippi, then moved to Aberdeen, Mississippi at

5   Aberdeen Memorial Hospital and worked on a geropsych unit, a

6   senior care unit.  I left there and became employed at North

7   Mississippi State Hospital in Tupelo, Mississippi, was employed

8   there for 12 years serving both clinically and

9   administratively.  I then left and went to the Department of

10  Mental Health in the Division of Alzheimer's and Other Dementia

11  and was there for four years, and I have now been at PACT with

12  Lifecore for a year and nine months.

13          THE COURT:  Okay.  Let me interrupt for a second.

14  Counsel, are you able to see anything on your screen?

15          MR. HOLKINS:  The real time is not updating on the

16  screen right now.  And if we are able to --

17          THE COURT:  Well, let's see if we can get that fixed,

18  Brenda.

19     (SHORT PAUSE)

20          MR. HOLKINS:  Thank you, Your Honor.

21          THE COURT:  All right.  Ms. Rush, do you need to be

22  able to see anything?

23          MS. RUSH:  No, Your Honor.  Ms. Sistrunk is very

24  clear.  Thank you.

25          THE COURT:  All right.

*** DAILY TRANSCRIPT ***

BY MR. HOLKINS:

Q   Ms. Sistrunk, why did you decide to join the Region 3 PACT team?

A   So that I was able to return to providing services in an adult psychiatric setting.

Q   Let's talk a bit about Region 3.

A   Yes.

Q   How many counties are in Region 3's catchment area?

A   We serve seven counties.

Q   In how many of those counties is PACT available?

A   In Lee County.

        MR. HOLKINS:  At this time I would now like to pull up a preadmitted exhibit, PX-413.

BY MR. HOLKINS:

Q   Ms. Sistrunk, I would first like you to name the six other counties in Region 3.

A   We have Union, Pontotoc, Chickasaw, Monroe, Itawamba.

Q   Focusing on the seven counties in Region 3, does this map accurately reflect the availability of PACT as of June 30th, 2018?

A   Yes.

Q   Did the availability of PACT in Region 3 change between that date and the end of 2018?

A   No.

Q   As of December 31st, 2018, were there any plans to expand

1   PACT beyond Lee County in Region 3?

2   A    Not to my knowledge.

3   Q    Ms. Sistrunk, does your program get referrals from the

4   counties in Region 3 where PACT is not available?

5   A    Yes.

6   Q    How often does that happen?

7   A    Monthly.

8   Q    And how often per month?

9   A    Anywhere from maybe two to four times.

10  Q    Has the number of referrals from outside of Lee County

11  increased over time?

12  A    It's remained pretty steady.

13  Q    How do you handle these referrals from outside of Lee

14  County?

15  A    Trying to refer them to mainly the community mental health

16  center that is in that particular town, whether it be Timber

17  Hills or Communicare or if Lifecore has a satellite office in

18  that community.

19  Q    If those individuals are not able to move to Lee County,

20  can you provide them PACT services?

21  A    No.

22  Q    What other community-based mental health services do you

23  refer these individuals to in their home counties?

24  A    Mainly just the community mental health centers.

25  Q    And are the services that they receive at those community

*** DAILY TRANSCRIPT ***

1   mental health centers less intensive --

2   A    Yes.

3   Q    -- than the PACT service that you provide in Lee County?

4   A    Yes.

5   Q    And how are those services less intensive than PACT?

6   A    Typically because most often individuals are seen, for

7   example, therapy once a month, and to see a provider probably

8   once a month or no more than once a month.

9   Q    And how is that different from PACT?

10  A    Well, PACT, you can see individuals every single week.  So,

11  therefore, they could receive therapy every single week.  They

12  could see a provider as needed weekly if necessary.

13  Q    I have a few more questions about the people you can't

14  serve because they're outside of Lee County.  Do those

15  individuals have similar mental health needs as the people you

16  serve on your PACT team?

17  A    Yes.

18  Q    How do you feel about having to turn those individuals away

19  and refer them for less intensive services in their home

20  counties?

21  A    It's difficult because, you know, oftentimes they are

22  aware, the individual is aware or that provider from that

23  community is aware, of PACT services, and when you know what

24  your providing services are and you're not able to provide

25  those and wish that you could.  Uh-huh.

1    Q    Let's talk about staffing --

2    A    Uh-huh.

3    Q    -- of your Region 3 team.  As of December 2018, how many

4    staff members worked on the Region 3 PACT team?

5    A    Ten.

6    Q    What are the roles of the nine other PACT team members?

7    A    Well, it would be 11 including me.

8    Q    Okay.  And what are the roles of the other 10?

9    A    We have a psychiatric nurse practitioner.  We have two

10   therapists, three including myself, two registered nurses, two

11   community support specialists, one peer support specialist, an

12   employment and housing specialist, and a program coordinator.

13   Q    How regularly are PACT team members in contact with each

14   other?

15   A    Every day, all day.

16   Q    Does the PACT team use any tools to facilitate

17   communication between team members?

18   A    Yes.  We utilize an app that's called GroupMe, and we

19   communicate all day long, through the night, on the weekend.

20   Q    In general, how would you describe the collaboration

21   between PACT team members?

22   A    Excellent.  We have a great team, very cohesive team.  We

23   are very supportive of one another and step up whenever we need

24   to to make changes based on crises that may happen.

25   Q    What population does Region 3's PACT team target?

1   A    Adult psychiatric.

2   Q    Does that include adults with serious mental illness who

3   have a history of repeated hospitalization?

4   A    Yes.

5   Q    What are some of the obstacles to community integration

6   that your PACT clients commonly face?

7   A    Housing, employment, transportation, obtaining medications,

8   lack of support from family or others that they may know.

9   Q    What makes PACT the right service for the population you

10  have described?

11  A    It makes the right service because of the level of

12  involvement and intensity that goes into the services that are

13  provided.

14  Q    How does Region 3 get its clients?

15  A    By referral.

16  Q    Where do those referrals come from?

17  A    They come from the crisis centers, North Mississippi State

18  Hospital, Behavioral Health with the North Mississippi Medical

19  Center, the Lee County jail, the Salvation Army, S.A.F.E.  We

20  have case managers that have worked with United Healthcare who

21  have provided some referrals.

22          THE COURT:  You indicated S.A.F.E.  Is that an acronym

23  for something?

24          THE WITNESS:  It is a domestic violence home.

25          THE COURT:  Okay.  And the name of it is S.A.F.E.?

```
 1              THE WITNESS:  S.A.F.E.
 2              THE COURT:  Thank you.
 3              THE WITNESS:  Yes, sir.
 4              MR. HOLKINS:  Thank you.
 5   BY MR. HOLKINS:
 6   Q   You mentioned getting referrals from crisis centers.
 7   Right?
 8   A   Yes.
 9   Q   Is that the same as a crisis stabilization unit?
10   A   Yes.
11   Q   Ms. Sistrunk, does your team get referrals from crisis
12   stabilization units outside of Region 3's catchment area?
13   A   From crisis centers, maybe not necessarily a crisis
14   stabilization unit.  Primarily it's the stabilization unit that
15   is with Lifecore.
16   Q   How common is it for Region 3's PACT team to get referrals
17   from crisis centers outside of its catchment area?
18   A   We have, yes.
19   Q   Does it happen regularly?
20   A   Sometimes.  It varies.  Maybe every other month.
21   Q   What is the initial assessment process for clients who have
22   been referred to your PACT team?
23   A   We go to the referral site where the individual is and
24   provide a preliminary assessment in terms of what their
25   awareness may be of the PACT program, assessing the criteria
```

```
1   needed in order for an individual to be served on -- within the

2   PACT program.  We would then -- once that is determined, we

3   would set up an intake with that individual and do a total what

4   we refer to as a round table where it's a multidisciplinary

5   approach with all of the PACT staff and the individual.

6   Q    Are clients ever skeptical of this service during these

7   initial assessment meetings?

8   A    Yes, sometimes.

9   Q    How do you handle that?

10  A    Spend time talking with them, building a rapport, giving --

11  assessing sort of what their goals are, what their needs are,

12  and then given the opportunity to be able to share with them

13  some of the success stories that we've had and the things that

14  we're able to provide to help them meet those needs and to be

15  successful.

16  Q    What kind of relationship do you strive for between PACT

17  clients and staff?

18  A    Respect.  Being able to respect them goes a long way in

19  being able to help them because oftentimes there are trust

20  issues because of active symptoms that they may have, such as

21  paranoia primarily, sometimes others, such as hallucinations or

22  delusions, and helping them to feel more at ease and

23  comfortable about receiving these services.

24  Q    And why does it matter whether PACT clients and staff have

25  the kind of relationship you just described?
```

1  A    To me, it makes the difference in their success to have,

2  you know, a good therapeutic working relationship.

3  Q    Once a client has enrolled in PACT at Region 3, what

4  services does the team provide?

5  A    The psychiatric nurse practitioner would evaluate their

6  medications based on what their symptoms are or difficulties

7  that they may be having.  We have two nurses that prepare

8  medication boxes weekly for probably three-fourths of the

9  clients.  We deliver those medications.  They also give

10  injections that are needed and keep up with when those

11  injections are due.  They also set up medical appointments that

12  they may need to address, whether it be acute needs or it be

13  chronic medical problems.

14      We have therapists that we provide individual one-on-one

15  therapy on a weekly basis.  We provide groups, various types of

16  groups.  The community support specialists help individuals who

17  may need guidance and advocacy for obtaining Medicaid, Social

18  Security, driver's license, birth certificates.

19      The peer support specialist is very integral in being able

20  to also provide in those groups along with a therapist to

21  advocate for them in a different capacity and help to sort of

22  be a voice for those clients in sharing with staff what other

23  needs there may be that we may not be aware of.

24      The employment and housing specialist works very closely

25  with MUTEH, which is Mississippi United to End Homelessness.

1    And we actually have their database.  And so we initiate that

2    process so that we can go ahead and begin housing for

3    individuals that need or may be homeless.

4    Q    Thank you.  Generally where are PACT services provided?

5    A    They are provided at the PACT building, in the individual

6    client's home, and in the community.

7    Q    Why does your team provide services at clients' homes?

8    A    We have some individuals that have limited mobility which

9    makes it difficult for them to come to the building, some

10   individuals, depending on maybe their symptoms that they have,

11   very strongly paranoid, have difficulties with severe anxiety

12   and being in groups of people.

13   Q    How often do your clients receive PACT services, whether at

14   the PACT building or in their homes?

15   A    At a minimum, three times a week.  For some, it's more than

16   that.  It could be five or more just depending on what those

17   needs for a particular individual may be.

18   Q    I would like to drill down on a few of the services that

19   you mentioned.  You described the housing related services that

20   your team provides.  My question is why is access to housing

21   important for your PACT clients?

22   A    So they're not sleeping in a tent or on the streets or

23   sleeping at the library or at a church.  There's various places

24   it may be that they are, or under a bridge, and it's very

25   difficult to take care of one's mental health needs as well as

1    medical needs if they don't have food, clothing and shelter.

2    Q   If your clients don't have access to safe housing, does

3    that affect their ability to fully participate in and benefit

4    from PACT services?

5    A   It does create difficulties.  Unfortunately, some express

6    often to us until they're in housing the difficulties that

7    there can be.  For example, those who may be in tents and

8    various places that I mentioned, as well as at the Salvation

9    Army when they're staying in the Salvation Army's lodge, that

10   they have had their belongings stolen, their medication stolen,

11   food stamp cards, their personal belongings or effects have

12   been stolen.

13   Q   Are you familiar with the CHOICE program in Mississippi?

14   A   Yes, the housing program.

15   Q   In your experience, has that program been effective in

16   helping your clients access the housing they need?

17   A   Yes.

18   Q   Could you give an example of a client your team has helped

19   with accessing housing through CHOICE?

20   A   Yes.  We have had a number of individuals.  We had two who

21   were actually staying in a tent together, and both of those

22   individuals have been able to obtain housing through the

23   program, the housing program.  But we've had numerous.

24   Q   How has obtaining housing affected those individuals?

25   A   Very positively.  It gives them a sense of, you know,

```
1   independence and safety, because oftentimes they may have
2   knives on them, they may have bats, they may carry other things
3   just because of the nature of being homeless, that they carry
4   weapons with them.
5   Q    How does your team help clients with accessing employment?
6   A    For many we begin with the Mississippi Department of
7   Rehabilitative Services with a program that they have called
8   Ability Works.  And it serves as a transitioning opportunity.
9   Many individuals who have never been employed or maybe it has
10  been quite some time before they have had employment and it's
11  to help them to gradually transition back into the workplace.
12  Q    Do you have people on your PACT team who are not ready to
13  work?
14  A    Yes.
15  Q    How do you approach those individuals?
16  A    Just assessing sort of what their goals may be and what to
17  them work looks like.  I think oftentimes what they share with
18  us is just a fear and anxiety that there may come with, you
19  know, returning to work.
20  Q    And how do you help them overcome that fear and anxiety
21  about returning to work?
22  A    We have groups that individuals that are seeking and/or
23  interested in employment.  We do actually employment groups as
24  well as working with them during times of individual therapy to
25  sort of work through some of the fears or the anxieties that
```

1    they may experience.

2    Q    What kinds of jobs do your PACT clients have?

3    A    We have individuals that have worked in furniture.  They

4    have worked retail, working large supermarkets.  We have an

5    individual that works for a chemical company.  So a number of

6    types of employment.

7    Q    How do your clients who do work benefit from employment?

8    A    Greatly.  I mean, especially for a, you know, financial

9    aspect.  Oftentimes you have individuals, those that haven't

10   worked at all, you know, it gives them the opportunity to make

11   their own money and which creates greater independence for them

12   as well as being able to purchase medications and other

13   personal things that they -- that they need.

14   Q    Would you give an example of a client who has benefited

15   from the team's employment-related services?

16   A    Yes.  We have a lady who is in her forties and she was able

17   to begin working at a furniture manufacturing place.  Through

18   that, she worked towards increasing her credit score so that

19   she could obtain her own vehicle, of which her previous vehicle

20   had been taken from her, from her family.  And she really

21   wanted the independence because she felt like they had so much

22   control over her life.

23       And so we worked through that and she has just recently

24   obtained employment at another manufacturing company.  And the

25   nurse practitioner has worked closely with her with the two

```
 1    medications that she has been on to titrate her down from those
 2    medications and she has done extremely well.  She is very
 3    proud.
 4    Q    Before this individual got a job at the furniture
 5    manufacturing company, how long had it been since she worked?
 6    A    A little less than a handful of years.
 7    Q    I would like to shift to another service that your PACT
 8    team offers, therapy.  What is the goal of therapy?
 9    A    The goal of therapy serves to be able to educate
10    individuals about their symptoms and ways to manage those
11    symptoms that they experience.  It could be lots of trauma for
12    individuals, different types or forms of abuse that they've
13    experienced, isolation, loneliness, anxiety, depression.
14    Q    How long do therapy visits last typically?
15    A    At least an hour, sometimes more than an hour.
16    Q    How often do therapy visits occur?
17    A    Weekly.
18    Q    Does the PACT team organize social activities for its
19    clients?
20    A    Oh, yes.
21    Q    What kinds of activities does the PACT team organize?
22    A    We just recently went to Veterans Park and we had a picnic
23    and we had lots of different activities and games that they
24    could participate in, even brought fishing poles and crickets
25    for some older gentlemen that are on our PACT program that
```

*** DAILY TRANSCRIPT ***

```
 1   haven't done that in a number of years.  We have done bowling,
 2   to the movies.  So...
 3   Q   Why does the PACT team organize activities like this for
 4   its clients?
 5   A   Many of these clients do not either have family or family
 6   that lives nearby or family that's involved, you know, in their
 7   lives.  Many of them don't have the financial means to do these
 8   things.  Sometimes they don't even have the financial means to
 9   do what they need to do just for living.  And so it gives them
10   an opportunity to be with others and build those relationships
11   with others who are in the program to help with, you know,
12   isolation issues and just being able to do things that most of
13   us are able to do in our lives.  It kind of can bring a little
14   bit of normalcy to their lives.
15   Q   What does the PACT team do when clients start having
16   increased symptoms of mental illness?
17   A   We intervene and assess those situations to determine what
18   those needs may be, if it's something that the PACT team, along
19   with all of us as providers within the team, can manage and
20   help that individual.  There may be times that that individual
21   needs to go to a crisis stabilization unit.  And then there may
22   be some occasions that they would be hospitalized.
23   Q   By intervening in these moments, is your team able to
24   prevent mental health crises?
25   A   Yes.  There are -- definitely have been times that we have
```

1   been able to do that.

2   Q   When clients do experience mental health crises, is a team

3   available at all times to assist them?

4   A   Yes.

5   Q   What does the team do to deescalate clients when they're

6   experiencing mental health crises?

7   A   We come together as a team.  Oftentimes we will all meet

8   with them and be able to sit down and work through what is

9   going on and what it is that we're able to do to help to

10   manage -- help them to manage the situation along with each of

11   us.

12   Q   Could you share an example of a time when your team was

13   able to divert a client in crisis from a State Hospital

14   admission?

15   A   Yes.  We had a gentleman who is in his early to mid fifties

16   and he was suicidal, and he does not have any family around.

17   He has a brother but they're not really involved in his life.

18   And he primarily just has the PACT team.  And he became very

19   suicidal and so we were able to have him come in, work with

20   him, and we did have him go to the crisis stabilization unit.

21   He was there about four or five days and they did tweak some

22   medications for him, and so which was very successful.  And

23   because of where we are located, we are right next door, so we

24   are fortunate in that sense that we are located right next door

25   so that we were able to visit him to let him know that we were

1    still there and that we had not forgotten about him and that he

2    was, you know, being thought about.

3    Q    And when this individual was discharged from the crisis

4    stabilization unit, did he reconnect with your PACT team?

5    A    Oh, immediately.  We transported him home.

6    Q    Had this person been suicidal in the past before he

7    enrolled in PACT?

8    A    Yes.  Uh-huh.

9    Q    What happened when he experienced those same symptoms

10   before enrolling in PACT?

11   A    He went one time to Behavioral Health and another time to

12   North Mississippi State Hospital.

13   Q    And by Behavioral Health, do you mean North Mississippi

14   Medical Center?

15   A    Yes.

16   Q    Why is it important in your mind to bundle together all of

17   the PACT services you have described today?

18   A    Because of the level of intensity that can be provided

19   within the scope of the services.  There is not really, to my

20   knowledge, any programs that can provide what each of the

21   individuals professionally can provide to them therapeutically,

22   medically, with medications, when you're looking at three to

23   five times or more a week, depending on what those needs may

24   be.

25   Q    Did some of your clients experience multiple State Hospital

```
1    admissions before connecting with the PACT team?
2    A    Yes.  We have had a good number of individuals that have
3    been hospitalized prior to coming to the PACT program.
4    Q    From your perspective, how did the experience of repeated
5    state hospitalization affect those individuals?
6    A    Some, it was very difficult, very scary, just something
7    that for some, you know, that had not been, just being, you
8    know, locked down within a facility.
9    Q    How long do your PACT clients typically receive the
10   service?
11   A    On an average about a year to a year and a half.  We have
12   some that have been with us longer.  Their issues are more
13   chronic and persistent, so there have been some that have been
14   on longer than what I have been there as a supervisor.
15   Q    How do you determine if a client is ready to leave?
16   A    Sometimes they determine it.  Sometimes they feel like that
17   they have met their goals and what their needs were in coming
18   into the program and so we've had some that said, "I think I've
19   done what, you know, I needed to do."  And other times it may
20   be, you know, us as a team looking at they have been able to
21   obtain housing, to obtain employment, they have been stabilized
22   on medications, they have a greater understanding of what their
23   medications are and what those medications help them with.
24        Through therapy and group, we've been able to, you know,
25   help them manage difficult times, difficult relationships in
```

*** DAILY TRANSCRIPT ***

1    their lives so that it's not sort of a trigger for them.

2    Q    Is the lack of other intensive community-based mental

3    health services at times a barrier to transitioning clients off

4    of PACT?

5    A    I would say yes.  The only services that I know are the

6    community mental health centers.  Those are the only ones that

7    I am aware of and that we would refer back to.  So, for

8    example, those that have, you know, left the PACT program, if

9    they still see that they need services, they can do adult case

10   management through Lifecore, the community mental health

11   center, Region 3, and then continue to see a provider to have

12   prescription refills.  But outside of -- I mean, there are

13   private providers, yes, but oftentimes financially these

14   individuals may not necessarily be able to do that.

15   Q    You have mentioned sharing success stories with incoming

16   clients.  I'm curious.  What does success look like for a PACT

17   client?

18   A    Well, this is something that we discuss often.  It's

19   actually something that I personally do a group with because I

20   think success can easily become defined for any of us, and so

21   ideally what success looks like to one person is not

22   necessarily what it is for another person.

23        So you have a person coming to us who doesn't have a roof

24   over their head, doesn't have employment, doesn't have basic

25   life needs.  That in itself is success for many.  Others

```
 1    actually have employment.  You know, they're employed.  We have
 2    an individual who just recently has gotten a second part-time
 3    job.  He likes money, so he likes to be able to have money for
 4    what things that he needs, and he is looking to buy a vehicle.
 5         So it varies from person to person.  You have individuals
 6    who when they come to us they may be in the part of their life
 7    where returning to school.  Maybe for some it could be getting
 8    a GED, that they didn't complete school.  Then you have older
 9    individuals who they are through that part of their life of
10    having families and, you know, they are at 60, 70, and, you
11    know, it's looking to help them find things to be engaged in.
12    So when you're looking at of ages, you know, 18 and above to 70
13    or 80 years old, there is a lot of differences as to what
14    success would look like for each person.
15    Q    Have you seen PACT clients achieve those kinds of outcomes?
16    A    Oh, yes.  Yes.
17    Q    Ms. Sistrunk, how does PACT affect the lives of the adults
18    with serious mental illness whom you serve?
19    A    Significantly.  I mean, it's an opportunity that I'm
20    grateful to have and be a part of.  It means a tremendous
21    amount to me to see individuals gain independence and be able
22    to take care of themselves, know that other people care about
23    them and their well-being and their success.
24    Q    Is PACT effective, in your experience, in preventing
25    hospitalizations for adults with serious mental illness?
```

1   A    Absolutely.  Absolutely.

2   Q    Based on your 24 years in the mental health field, what is

3   the most effective service in helping adults with serious

4   mental illness avoid hospitalization?

5   A    I have worked in a lot of places, and they all have served

6   individuals, but honestly I have not ever worked in a program

7   that functions and serves the way that a PACT program does.

8           MR. HOLKINS:  I have no further questions at this

9   time, Your Honor.

10          THE COURT:  All right.

11          MR. SHELSON:  May I proceed, Your Honor?

12          THE COURT:  Yes, you may.

13                     **CROSS-EXAMINATION**

14  BY MR. SHELSON:

15  Q    Good morning, Ms. Sistrunk.

16  A    Good morning.

17  Q    I'm Jim Shelson.  I'm one of the lawyers representing the

18  State of Mississippi in this lawsuit.  I won't keep you long

19  this morning.

20  A    Okay.

21  Q    Ma'am, as of December 31st, 2018, approximately how many

22  clients did the Region 3 PACT team have?

23  A    When I came into the program, there were approximately 29.

24  We now have 46.

25  Q    And when did you come into the program?

1   A    A year and nine months ago, September 26, 2017.

2   Q    How would it affect your ability to deliver the PACT

3   services you do deliver if you had, say, 80 clients?

4   A    Very difficult.

5   Q    And why is that?

6   A    We are so intensely involved in so many aspects of each

7   person's life.  Transportation, for one, when you look at this

8   from one side of the service area to the other side of the

9   service area, could be almost an hour in travel.  So there's a

10  lot -- basically, that there's a lot of time that's spent on

11  the road even though you are doing things to provide for them,

12  but that's a lot of time.

13  Q    So there is only so many clients you can deliver that

14  intensity of service to?

15  A    Uh-huh.

16  Q    Do you agree with that?

17  A    That there would be a number, sort of a cap, to what we --

18  the number of individuals that we could serve?

19  Q    Effectively.

20  A    Uh-huh.  Yes.

21  Q    I want to follow up with something that Mr. Holkins asked

22  you about, and it's where you get your -- where Region 3 gets

23  its PACT referrals from.

24  A    Uh-huh.

25  Q    One of the things I want to ask you about is CIT officers.

```
 1    What are CIT officers?

 2    A    What are -- they are crisis.

 3    Q    Intervention?

 4    A    Uh-huh.

 5    Q    And are they police officers trained in crisis intervention

 6    techniques?

 7    A    Yes.

 8    Q    Does Region 3 get referrals from CIT officers?

 9    A    Yes.

10    Q    Does Region 3 get PACT referrals from the Lee County jail?

11    A    Yes.

12    Q    Does someone from Region 3 visit the Lee County jail daily?

13    A    Not daily.

14    Q    How frequently?

15    A    Mainly when we are contacted.  If they contact us to see if

16    an individual happens to be a part of the PACT program or if we

17    have an individual who is there or if there is an individual

18    that they feel like would need services.

19    Q    Does Region 3 have a mobile crisis team?

20    A    We have had a mobile crisis team.  Uh-huh.

21    Q    How does -- when the Region 3 PACT team gets a call from

22    the Lee County jail, what does it do?

23    A    We go to the jail and assess that individual.

24    Q    And if it's not an existing PACT client, could that

25    individual become a PACT client?
```

*** DAILY TRANSCRIPT ***

1    A    Yes, if they met the criteria.

2    Q    Has that happened before?

3    A    Yes, actually.  Yes.

4    Q    Does Region 3 have a crisis stabilization unit?

5    A    Yes.

6    Q    And what is a crisis stabilization unit and how does it

7    work?

8    A    The crisis stabilization unit may receive individuals that

9    come through by way of a CIT officer.  It could be that they're

10   self-referred or a family brings them.  We have actually

11   referred to them.  Other entities that are aware of the crisis

12   stabilization unit have also utilized it.

13   Q    To your knowledge, does North Mississippi State Hospital

14   have a peer bridger program?

15   A    Yes.

16   Q    At North Mississippi State Hospital, what is the peer

17   bridger program?

18   A    The peer bridger program, the person who is the peer

19   bridger, she attends the meetings every Wednesday and she comes

20   to the PACT building and we go over those individuals that are

21   looking to be referred to the PACT program so that we can

22   initiate that process by scheduling an appointment with the

23   social worker to go to the State Hospital and do the initial

24   assessment.

25   Q    Based on your experiences, is the peer bridger program an

1  effective program?

2  A    Oh, yes.

3  Q    Now, I just wanted to talk about your testimony that the

4  Region 3 PACT team delivers services to -- PACT services to Lee

5  County.

6  A    Yes.

7  Q    Is there any sort of prohibition from the Mississippi

8  Department of Mental Health on PACT services being delivered to

9  counties outside of Lee County?

10  A    Not to my knowledge, no.

11  Q    The United States has an expert named Robert Drake.  This

12  is -- I want to share with you a page of his report and I want

13  to ask you about it, this highlighted part here.  Do you see

14  that on your screen?  It says, "Even services called Program

15  for Assertive Community Treatment, PACT, appear to be targeting

16  medication compliance more than community integration and

17  recovery."  Is that statement true of the Region 3 PACT team?

18  A    No, sir.

19  Q    And why is it not true of the Region 3 PACT team?

20  A    We do a tremendous amount that helps to actually integrate

21  them into community services because we understand the

22  importance of what that can be in their actual recovery.

23  Q    Based on your experience, does the Region 3 PACT team

24  deliver PACT services in sufficient intensity to meet the needs

25  of its clients?

1   A   Yes.  Yes.

2   Q   And I agree with you, but I take it you think Region 3 PACT

3   team does a very good job?

4   A   Absolutely.

5   Q   And explain to the court why you believe that.

6   A   Because I'm working even when I'm on vacation.  We do a

7   lot.  We schedule a tremendous amount of needs that these

8   people have, and there are appointments every day almost of

9   every single week, and it takes every single one of us to make

10  this happen.

11  Q   Does the Region 3 PACT team have a good relationship with

12  North Mississippi State Hospital?

13  A   Oh, absolutely.  Yes.

14  Q   Do you have a good relationship with DMH?

15  A   Absolutely.

16  Q   One more thing I wanted to follow up that Mr. Holkins asked

17  you about in the Region 3 community mental health center, what

18  services do they offer?

19  A   We have a part of Lifecore that is referred to as midtown.

20  At midtown there are both medical primary services and there

21  are mental health services.  There is Telehealth.  We have

22  adult case management therapy as provided.  We have chemical

23  dependency services.  We have some satellite clinics that are

24  in some areas.  The PACT program, the crisis stabilization

25  unit, support therapists that are in the school systems.

```
1    Q    I'm going to ask you about an individual Mr. Holkins

2    mentioned earlier today who is testifying next, Robert Duren.

3    Are you familiar with that individual?

4    A    Yes, sir.

5    Q    Is he a Region 3 PACT client?

6    A    Yes, sir.

7    Q    As of December 31st, 2018, how was he doing with the PACT

8    team?

9    A    Doing very well.

10         MR. SHELSON:  May I approach the witness, Your Honor?

11         THE COURT:  Yes, you may.

12   BY MR. SHELSON:

13   Q    Ma'am, here are some individuals we cannot refer to by name

14   and we have to refer to them by a number.

15   A    Uh-huh.

16   Q    I wanted to talk to you about an individual.

17   A    Sure.

18   Q    Can you refer to him as person 59?

19   A    Yes.

20   Q    Ma'am, are you familiar with person 59?

21   A    I am.

22   Q    Is person 59 a Region 3 PACT client?

23   A    He has been a Region 3 PACT client.

24   Q    And as of December 31st, 2018, was he a Region 3 PACT

25   client?
```

*** DAILY TRANSCRIPT ***

1    A    No.

2    Q    Do you believe the Region 3 PACT team delivered effective

3    PACT services to person 59?

4    A    Yes.

5           MR. SHELSON:  Your Honor, may I have a moment to

6    confer?

7           THE COURT:  Yes, you may.

8       (SHORT PAUSE)

9    BY MR. SHELSON:

10   Q    Ms. Sistrunk, where does the funding for the Region 3 PACT

11   team come from?

12   A    The Department of Mental Health.

13   Q    And does that come in the form of a grant?

14   A    Yes, sir.

15   Q    Is it an annual grant?

16   A    Yes, sir.

17   Q    Is it $600,000?

18   A    Yes, sir.

19   Q    Could you function without that grant?

20   A    No.

21          MR. SHELSON:  Thank you, Your Honor.  That's all the

22   questions we have.

23          THE COURT:  All right.  Any redirect of this witness?

24          MR. HOLKINS:  Just a few questions, Your Honor.

25                    **REDIRECT EXAMINATION**

BY MR. HOLKINS:

Q   Ms. Sistrunk, you mentioned that your PACT team receives grant funding from the Department of Mental Health.  Correct?

A   Yes.

Q   Does your team also rely on Medicaid funding for its services?

A   Yes.

Q   You testified that it would be difficult to serve up to 80 clients on your PACT team.  Is that correct?

A   To the degree that we provide services, yes.

Q   What are the obstacles to expanding enrollment in your PACT team?

A   It would be transportation.  PAs are difficult.  I'm sorry, prior authorizations that are required to obtain Medicaid units to bill for the individual services that we provide.  It would just -- it would change what the scope of that looks like.  It would be less in many ways of what we're able to do.  There is only so many hours in a day and a lot of that is spent on the road.

Q   Does your team have a full-time or a part-time prescriber?

A   That position is two days a week.

Q   Would it help in terms of expanding enrollment in PACT to have access to more prescriber hours?

A   Yes, because even when that prescriber is there two days a week, they are often called all the other days as well.

```
1   Q    Have you received any guidance from the Department of
2   Mental Health or the Division of Medicaid about how to expand
3   enrollment in the service despite these obstacles?
4   A    No.  Not necessarily, no.
5   Q    Have you received any guidance from the Department of
6   Mental Health or the Division of Medicaid on how to maximize
7   available Medicaid funding for the PACT service?
8   A    No.
9   Q    Have you received any guidance from the Department of
10  Mental Health or the Division of Medicaid about PACT practices
11  in other states?
12  A    No.
13            MR. HOLKINS:  No further questions.
14            THE COURT:  All right.
15            MR. HOLKINS:  Your Honor, assuming there are no
16  further questions, we would ask for a short break before --
17            THE COURT:  I will.  I will do that but I have a
18  couple of questions first for Ms. Sistrunk.
19            In describing your background, Ms. Sistrunk, you
20  indicated that your father died or was killed in Vietnam and
21  your mother had -- I believe what you called had a break.
22            THE WITNESS:  Yes, sir.
23            THE COURT:  Okay.  Could you tell me how old you were
24  at that time that your mother had the break?
25            THE WITNESS:  It actually occurred when I was one year
```

1    old, and my family intervened at that time in order to seek

2    services for her.

3            THE COURT:  Okay.  And did you grow up in the home of

4    your mother?  I mean, was your mother -- from that point was

5    she able to take care of you through elementary and high school

6    and all that?

7            THE WITNESS:  Yes and no.  Her hospitalizations over a

8    20-year period, on average, if you took the number of

9    hospitalizations over the course of that period of time, it

10   varied, but it was around every two to three years that she

11   became hospitalized.

12           THE COURT:  And do you know for how long -- I mean,

13   how long those hospitalizations were?

14           THE WITNESS:  Sometimes they were a few weeks but

15   sometimes -- there was one time I was 12 years old and I went

16   to live with my family in Frederick, Maryland, and that was for

17   three months.

18           THE COURT:  Okay.  Is your mother still alive?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Okay.  Is she receiving any sort of

21   treatment, either hospitalizations or using any sort of mental

22   health services?

23           THE WITNESS:  We see a private physician.

24           THE COURT:  All right.  Now, you also -- this is

25   transitioning.  You also indicated that the PACT that you're in

1  includes the six-county region in Region 3, and I think you

2  testified -- I'm just trying to find out.  You live in -- well,

3  the PACT is located in Lee County.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Does one have to be a resident of Lee

6  County to take the benefits of the PACT services?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  In other words, as a region that composes

9  six counties, Itawamba, I believe you indicated, Pontotoc and

10  those other counties, a person who would need PACT services in

11  the region cannot come to Lee County to get the PACT services?

12          THE WITNESS:  They can if they relocate to Lee County.

13          THE COURT:  Okay.  But they have to reside in Lee

14  County.

15          THE WITNESS:  Yes.  I mean, we don't turn someone away

16  if they are looking or willing to relocate in order to receive

17  the services, which we do have.

18          THE COURT:  But as far as you know, the PACT that is

19  there in Lee County can only serve the residents of Lee County?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  And it doesn't matter if you live right

22  across the line in one of the adjoining counties?

23          THE WITNESS:  No, sir.

24          THE COURT:  Doesn't matter if you are five minutes

25  away from Tupelo or wherever you all are?

*** DAILY TRANSCRIPT ***

1            THE WITNESS:  It's just Lee County.

2            THE COURT:  All right.

3            THE WITNESS:  Yes, sir.

4            THE COURT:  I think your testimony showed that as of

5     late 2018, you had 29 clients around.

6            THE WITNESS:  When I came into the program in

7     September, we had right at 29.  Throughout the course until as

8     of last week, we took our 46th client.

9            THE COURT:  Okay.  So are you currently taking new

10    clients?

11           THE WITNESS:  We have a long waiting referral list

12    right now, but yes.

13           THE COURT:  Okay.  How many clients can your PACT

14    group handle as of today based on the resources you currently

15    have, based on the staffing, based on whatever it is that you

16    need to --

17           THE WITNESS:  And I'm just basing it on my time,

18    experience, awareness of what the program provides.  I'm going

19    to say to do well and to serve them well, 60, 65.  And that

20    would really be pushing it.

21           THE COURT:  Do you know how many people are on the

22    wait list?

23           THE WITNESS:  We have approximately like 11 or 12 that

24    we are trying to do the actual intake process with.

25           THE COURT:  Okay.

*** DAILY TRANSCRIPT ***

1          THE WITNESS:  Some are -- you know, they have been

2     referred to us so they're in the hospital.  We're waiting for

3     them to come out so that they can come to the building to do

4     the intake that puts them actually into PACT services.

5          THE COURT:  And so if you were to reach that number of

6     60 and 65 or around that number or so, would you all -- as you

7     currently are configured, would you just stop taking additional

8     people?

9          THE WITNESS:  I don't know that it's that we would

10    necessarily stop but we would have to get really creative.  Our

11    scheduling is really tight, and things that complicate matters

12    is when there are crisis situations, which we are faced with

13    most every day.  And so that kind of disrupts the scheduling

14    that has been set for the day.

15         THE COURT:  Now, there are other PACTs across the

16    State of Mississippi, you would agree, or do you know?

17         THE WITNESS:  Four others.  We make five.

18         THE COURT:  You think that there are just five?  My

19    only question was do you have any -- my only question will be

20    do you have any sort of communications or any discussion with

21    people in other PACTs and how they do things?

22         THE WITNESS:  No, sir.

23         THE COURT:  Okay.  All right.  You indicated that

24    there is a wait list through I guess private maybe physicians

25    and maybe hospitals and other agencies.  I think you may have

1    mentioned the Salva- -- where you get your referrals from,

2    Salvation Army?

3              THE WITNESS:  Yes.

4              THE COURT:  Do you get any referrals from the local

5    court systems, either chancery, youth court, county court,

6    circuit court?

7              THE WITNESS:  Not to my knowledge have we, no.

8              THE COURT:  Okay.  Do you know if any persons come to

9    PACT straight from the local jail, for example?

10              THE WITNESS:  Yes.

11              THE COURT:  They do?

12              THE WITNESS:  Yes.

13              THE COURT:  Do you know what percentage?  And this is

14    totally off the top of your head.  I understand.

15              THE WITNESS:  Yeah.  It's not great.  I mean it's

16    minimal.  However, the previous that you mentioned, we have

17    some individuals that maybe were not referred to us necessarily

18    from those particular courts but they have at some point maybe

19    in their history have been within the scope of those courts,

20    meaning that they have been in those, they didn't necessarily

21    get referred to us from them but it's in their history.

22              THE COURT:  Okay.  And I think this is the final

23    question.  You also indicated that you work with homeless

24    shelters or the homeless community.

25              THE WITNESS:  Uh-huh.

1          THE COURT:  Again, I'm not trying to tie you to any

2     specific estimate on the percentage of those persons, but do

3     you -- I guess what, if any, percentage of people might come

4     through you?  How do the homeless people get to you?  Is that

5     only through S.A.F.E.?

6          THE WITNESS:  No, sir.  Through the Salvation Army.

7     It's been a couple of months ago that we actually had four

8     individuals referred to us at the same time, four men, and all

9     four of them were homeless.  And we have three of those four

10    have been placed into housing.  The fourth one hopefully will

11    happen within the next one to two weeks.

12         THE COURT:  Okay.  And this may be repetitive and I

13    apologize to the parties, but could you tell me who makes up

14    your PACT team in Region 3?

15         THE WITNESS:  The staff?

16         THE COURT:  Yeah, and their positions.

17         THE WITNESS:  Okay.  We have a psychiatric nurse

18    practitioner.  We have two therapists.  We have two community

19    support specialists.  We have two registered nurses.  We have

20    one peer support specialist, one employment and housing

21    specialist, one program coordinator, and myself as a therapist

22    providing both clinically and administratively.

23         THE COURT:  Okay.  Thank you so very much.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Any follow-up to the United States based

*** DAILY TRANSCRIPT ***

1    on the questions that I have asked?

2             MR. HOLKINS:  No, Your Honor.

3             THE COURT:  All right.  Any follow-up, Mr. Shelson, to

4    the State based on the questions that I have asked?

5             MR. SHELSON:  Yes, please, Your Honor.

6             THE COURT:  All right.

7             MR. SHELSON:  May I proceed, Your Honor?

8             THE COURT:  Yes, you may.

9    BY MR. SHELSON:

10   Q    Ms. Sistrunk, when an individual gets referred to the

11   Region 3 PACT team, is there a process that occurs by which you

12   determine whether the individual will be accepted to the PACT

13   team?

14   A    Could you repeat that?

15   Q    Yes.  When you get a referral to the Region 3 PACT team, is

16   there a process you go through to determine whether you will

17   accept that individual?

18   A    Not necessarily a process but there are certain criteria as

19   far as diagnosis, maybe the number of hospitalizations and/or

20   incarcerations, treatment that they have received that they

21   continually repeat, that there is recidivism that occurs.

22   Q    So do you accept everybody who is referred?

23   A    I would say about 98 percent.  I mean, you do have

24   individuals that choose not to receive services.

25   Q    Okay.  And so to clarify one other thing, we talked about

1  going from 19 clients on your team to 46.  Is that right?

2  A    Twenty-nine.

3  Q    Excuse me.  Twenty-nine to 46.

4  A    Uh-huh.

5  Q    What was the period of time you went from 29 to 46?

6  A    That's been a gradual process since I came.  There's times

7  we have taken steps forward, people have, you know, kind of

8  graduated from the program.  So throughout the course of my

9  year and nine months, that's pretty much just been the course

10  that it has taken in which we have gotten to, which we have

11  been striving for that, to increase those numbers.

12  Q    That's what I'm driving at.  So it took a year and nine

13  months to go from 29 to 46.

14  A    Uh-huh.

15  Q    Yes?

16  A    Yes.

17  Q    And you mentioned people graduate from the program.  So,

18  for example, right now you have 46 clients.  Over your year and

19  nine months, the PACT team has obviously served more than 46

20  individuals.  Is that correct?

21  A    Yes.

22          MR. SHELSON:  Thank you, Your Honor.

23          THE COURT:  All right.  Any follow-up based on those

24  questions to the United States?

25          MR. HOLKINS:  No, Your Honor.

```
 1              THE COURT:  All right.  Is this witness finally
 2    excused?
 3              MR. HOLKINS:  Yes, Your Honor.
 4              THE COURT:  All right.  Ms. Sistrunk, thank you for
 5    your testimony.  You may return to your regular duties.
 6              THE WITNESS:  Yes, sir.  Thank you so much.
 7              THE COURT:  All right.  Thank you.
 8              At this time we will take a 15-minute recess.  This
 9    will be our morning break.  And if we have to take another
10    little one before the lunch hour, that will be fine too.  Court
11    is in recess.
12       (RECESS)
13              THE COURT:  Is there anything we need to take care of
14    before you call your next witness?
15              MR. HOLKINS:  No, Your Honor.  We're ready to go.
16              THE COURT:  Are you ready to proceed?
17              MR. SHELSON:  We're ready, Your Honor.
18              THE COURT:  All right.  You may call your next
19    witness.
20              MR. HOLKINS:  The United States calls Robert Blair
21    Duren.
22                       ROBERT BLAIR DUREN,
23    having first been duly sworn, testified as follows:
24              THE COURT:  Mr. Blair, these are just general
25    instructions.  Speak into the microphone.
```

*** DAILY TRANSCRIPT ***

```
 1          THE WITNESS:  Hello.

 2          THE COURT:  Yes.  And the court reporter is taking

 3   down everything that's being said, so speak at a pace at which

 4   she can keep up with you.  Allow the lawyers to finish their

 5   questions before you begin to speak so that the two of you will

 6   not be speaking at the same time.  And make sure all your

 7   responses are verbal.  If you nod or shake your head, say yes

 8   or no and just try to avoid using uh-huh and huh-uh so that the

 9   record will be clear about what you're saying.

10          If you will, for the record, will you please state and

11   spell your name.

12          THE WITNESS:  Robert Blair Duren.  R-O-B-E-R-T.

13   B-L-A-I-R.  D-U-R-E-N.

14          THE COURT:  D-U-R-E-N?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Okay.  All right.  Thank you.

17          You may proceed.

18                          DIRECT EXAMINATION

19   BY MR. HOLKINS:

20   Q   Good morning.

21   A   Good morning.

22   Q   What name do you prefer to be called?

23   A   Blair.

24   Q   Blair?  I first want to make clear that this case has a

25   fact cutoff of December 31st, 2018.  For the purpose of my
```

1    questions today, I would appreciate it if you could focus on

2    facts that existed through the end of 2018.  Is that okay?

3    A    That's fine.

4    Q    Blair, have you received PACT services in Mississippi?

5    A    I have.

6    Q    Where have you received PACT services?

7    A    In Tupelo, Mississippi.

8    Q    In what year did you start receiving PACT?

9    A    In 2017.

10   Q    We're going to discuss your experience receiving PACT in

11   more detail but first I have some questions about you.  Where

12   did you grow up?

13   A    In Gulfport, Mississippi.  I also grew up in New Orleans as

14   well, too.

15   Q    Do you have any siblings?

16   A    I have a half-brother.

17   Q    Where does he live?

18   A    He lives in Gulfport.

19   Q    What was your childhood like?

20   A    It was really good.  I was an athlete.  I had lots of

21   friends and, you know, family was around.

22   Q    Which sports did you play?

23   A    Football, basketball, baseball, tennis.

24   Q    How old are you?

25   A    Thirty-six.

```
1    Q    Where do you live?

2    A    I live in Tupelo, Mississippi, right now.

3    Q    Do you have your own place?

4    A    I do.

5    Q    How much education do you have?

6    A    I dropped out of the ninth grade but I did go to Job Corps

7    to get a trade, and I got a trade in data entry.

8    Q    Have you worked before?

9    A    Yes.  I've worked ever since I was 15.  I was a car

10   detailer.  I worked in restaurants, some fast food but some

11   major restaurants, too, as well.

12   Q    What do you like to do for fun, Blair?

13   A    I like video games in my spare time.  I like movies and

14   music.

15   Q    Blair, what are your goals for yourself?

16   A    My main goals right now is I have never owned a car, never

17   had a driver's license, so I would like to get my driver's

18   license and I would like to get my GED.

19   Q    Blair, is it okay if I ask you some questions about your

20   mental illness and the services you received for it?

21   A    That's fine.

22   Q    How old were you when you started to experience mental

23   illness?

24   A    I was 16.

25   Q    When were you diagnosed with mental illness?
```

1   A    In 2002.  I was 19.

2   Q    What was that diagnosis?

3   A    Well, first they said it was acute schizophrenia, and there

4   was no drugs in my system or anything like that.  You know,

5   they tested me and they couldn't understand where it came from.

6   I had a terrible psychiatric episode.

7   Q    And do you still have that diagnosis?

8   A    Yes.

9   Q    Blair, have you been admitted to a State Hospital in

10  Mississippi?

11  A    I have.

12  Q    How many times have you been admitted to a State Hospital

13  in Mississippi recently?

14  A    Three times.

15  Q    In what year did those admissions occur?

16  A    2017.

17  Q    Let's go back to the first admission in 2017.  Was that to

18  North Mississippi State Hospital in Tupelo?

19  A    Yes, but it was also -- I also went to the Behavioral

20  Medical Center, too, which there are two different types of

21  treatment.

22  Q    Before your first admission to North Mississippi State

23  Hospital in 2017, were you receiving PACT?

24  A    No.

25  Q    Were you receiving any mental health services at that time?

1   A    I wasn't -- I was getting help from a doctor but I

2   wasn't -- not getting a lot of help.

3   Q    Were you experiencing symptoms of mental illness at that

4   time?

5   A    Yes.

6   Q    What symptoms?

7   A    Hallucinations, voices, depression, paranoia, anxiety.

8   Q    How would you describe what your life was like then before

9   you started receiving PACT?

10  A    It was terrible.  I felt lost.  I didn't have any friends.

11  I didn't have a place to go to.  I was very lost.

12  Q    Let's skip to your third admission to the State Hospital in

13  2017.  Before that admission, were you receiving PACT?

14  A    Yes, I was.  My second admission, I started receiving PACT

15  but then I went right back to the hospital because my medicine

16  wasn't right.

17  Q    Did you have time to receive much PACT services at that

18  time?

19  A    No, I didn't.

20  Q    Blair, could you describe for the court what it's like to

21  be in a State Hospital?

22  A    It's very scary.  It's anxiety and depression and paranoia

23  all built up.  There is a lot of sick people who are very sick

24  and have worse issues than myself, and it was very hard to be

25  in a hospital because you were told, you know, when to go to

1   bed, when it's time to eat.  There is no freedom.  There is no

2   independence at all, no privacy.

3   Q   Are there things that you like to do at home that you can't

4   do in a State Hospital?

5   A   Yeah.  I mean, I like to go to the mall.  I like to go

6   outside and get the fresh air, you know, to hang out with

7   friends and do things.  You can't do that inside of a hospital.

8   Q   Did you have any privacy when you were in the State

9   Hospital?

10  A   No, I did not.

11  Q   How did you feel about not having privacy?

12  A   Not having any privacy at all is bad for everybody but

13  there was just no room for it really.

14  Q   You mentioned that you were in a State Hospital three times

15  in 2017.  Correct?

16  A   That's correct.

17  Q   And all of those admissions were to North Mississippi State

18  Hospital.  Right?

19  A   Right.

20  Q   How did you feel about going from the State Hospital to the

21  community and then back to the State Hospital?

22  A   I felt crippled still.  I kind of felt like I was still

23  kind of lost.  And when I went back, I didn't -- I was very

24  confused.  It was because of my medicine, though.  It wasn't

25  correct.

```
1    Q    Do you want to go back to a State Hospital?

2    A    Absolutely not.

3    Q    Why not?

4    A    No freedom, no privacy, no independence, no -- no fun time

5    in a hospital.  You know, there is no freedom at all.

6    Q    Did you reconnect with PACT after your third admission?

7    A    I did.

8    Q    Have you received PACT ever since?

9    A    I have.

10   Q    Have you been back to a State Hospital since 2017?

11   A    Yes, I have.

12   Q    Let me rephrase the question.  Have you been back to a

13   State Hospital for psychiatric treatment --

14   A    No.

15   Q    -- since 2017?

16   A    Not really.  Huh-uh.

17   Q    What has helped you stay out of a State Hospital?

18   A    The PACT services has helped me dramatically.  When we are

19   in PACT, we are given services, you know, that are handed down

20   to us.  Like for me recently, I just got a house from PACT.

21   We're able to get medication and we're able to get

22   transportation.  We're able to get therapy.  And we have group

23   therapy and one-on-one therapies, and we have -- the services

24   help us out a lot.

25   Q    I want to ask you about some of the services.
```

```
1    A    Okay.

2    Q    You mentioned getting assistance with medication.  Could

3    you describe what assistance with medication you receive?

4    A    We have a provider that gives us our medicine and then it

5    goes to the nurses, and what the nurses do is they prepare a

6    med box for the week.  And the nurses will go in and they put

7    the medicines all in correctly for us, and we get it every

8    week.  They just line it up and set it up for us.  That way,

9    people won't get confused what day they need to take their

10   medicine.

11   Q    Does that help you?

12   A    Yes, it does.

13   Q    You also mentioned therapy services.  Could you describe

14   what those are?

15   A    I have my therapy with Kim.  She is my therapist.  She is

16   also the director.  But everybody's therapy is a little bit

17   different.  We have other therapists that are there that are

18   good therapists that has filled in at times.  But I get a sense

19   of healing and good treatment from sitting and having a

20   one-on-one with someone who is trying to help me and solve

21   through my world problems.

22   Q    You mentioned Kim.  Are you referring to Kim Sistrunk?

23   A    Yes.

24   Q    And what about group therapy, how does that help you?

25   A    Group therapy is based on we come in and we get a topic,
```

1    and when the topic comes up, we all work together.  It might be

2    coloring.  It might be something, watching a movie, to answer

3    questions about what the movie is about or something like that.

4    But a lot of it is just writing down answers and going over it

5    with an open discussion.

6    Q    You mentioned receiving assistance with transportation.

7    Where does the PACT team take you?

8    A    Transportation?  A lot of people that are in the PACT

9    building, PACT -- in PACT don't have cars, so the staff goes

10   out of their way to pick us up to bring us to the building or

11   they will bring us to go grocery shopping.  I knew one nurse

12   the other day was actually -- he had to actually guide this

13   person every which way in the store to get his groceries

14   because he can't see that well.

15        And it's all from the nurses, and even Kim Sistrunk does

16   it, too, they will pick us up and they will take us, you know,

17   like washing clothes.  They have a washer and dryer there.  I

18   don't have a washer and dryer at home but they bring us there,

19   let us wash our clothes and then transport us back.  We're

20   always getting transported back.  Some people don't realize,

21   it's a lot of gas money.  It's a lot of gas.

22   Q    Does the PACT team organize social outings and activities

23   for its clients?

24   A    Yes, they do.

25   Q    Would you give us some examples of those activities?

*** DAILY TRANSCRIPT ***

```
1    A    Well, we have been to the park twice.  One was an actual
2    health event where it was PACT services was there.  They had a
3    whole bunch of fliers and stuff to give out to people, pens and
4    a whole bunch of goodies.  And there was other companies that
5    were out there too.
6         We also went to the park, a different park, and we grilled
7    out.  We had hot dogs, sausages and hamburgers.  And we go to
8    the movies and we go to the -- go bowling, stuff like that.
9    Q    You mentioned going to a park and grilling out.  Who did
10   the cooking?
11   A    I did.
12   Q    You also mentioned going to the movies with the PACT team?
13   A    Uh-huh.
14   Q    Before you went to the movies with the PACT team, how long
15   had it been since you had been to the movies?
16   A    I hadn't been in ten years.
17   Q    What does it mean to you to be able to do things like going
18   to the movies and going to the park through the PACT team?
19   A    A lot of the services, like being able to do things like
20   that, I know for myself, I wouldn't know what to do if I didn't
21   have PACT.  For example, a month ago I was living out of a
22   hotel room because my name wasn't on a lease where my dad had
23   just died so I was getting kicked out of the house.  And Kim
24   Sistrunk and a couple of other ladies and men worked their
25   butts off just so I could get me my own apartment.  And that's
```

```
1    something to be truly grateful for.
2    Q    Did the activities that you mentioned, like going to the
3    movies and going to the park, help you build connections with
4    other people?
5    A    Yes.
6    Q    Have you made any friends through PACT?
7    A    Just about everybody there is my friend, including staff.
8    Q    Could you tell the court about one of the friends you have
9    made through PACT?
10   A    My friend David, he has been there ever since I have gotten
11   there, and I have been there about two years now.  And he --
12   you know, we all go through life struggles and everything but
13   he is really coming around.  You know, he is trying to get a
14   job and trying to do really good, and I'm really grateful for
15   that because it has become a pretty good friendship that I have
16   with him.
17   Q    Blair, how many times per week do you receive services from
18   PACT?
19   A    On a regular schedule, I go to therapy on Mondays and
20   Tuesdays.  I wash my clothes on Wednesdays, which that's a
21   service right there to be able to do that, but I also associate
22   with other people that are there.  And then Thursdays I
23   actually go there for group on Thursdays where they do a
24   dinner, you know, for us.  And we have two groups, one in the
25   morning and one in the evening.  So about four times a week.
```

1   Q    Blair, do you see any of your PACT providers in the

2   courtroom today?

3   A    I do.

4   Q    Who do you see?

5   A    Ms. Kim Sistrunk.

6   Q    How would you describe your relationship with Ms. Sistrunk?

7   A    As friends.  She was replacing another director that was

8   there, and the first director was not really coherent with

9   everything, and there was a lot of rumors and a lot of stuff

10  that went down.  But Kim does the best job there.  You know, I

11  love all the staff but she is one of my best friends there.

12  Q    How often do you talk with Ms. Sistrunk?

13  A    Almost every day.  She has two beautiful children and a

14  wonderful husband.  But I try to almost -- if it's a Saturday

15  or a Sunday, you know, I try not to mess with her.

16  Q    If you need to talk with her in the evening, can you do

17  that?

18  A    Yes.

19  Q    What does Ms. Sistrunk help you with?

20  A    She helps me build structure on becoming a better person.

21  And sometimes it's stern, you know, even in therapy and stuff.

22  And you have to be stern about certain things, but she wants to

23  build all of us up into being the best people that we can be.

24  It's very difficult sometimes when you have these emotions like

25  schizophrenia and the sickness that's with you all the time and

576

1    you're trying to go good every day.  It can be difficult doing

2    it alone.

3    Q    Blair, you mentioned some symptoms of mental illness that

4    you experienced back in 2017 before your admission to North

5    Mississippi State Hospital.  Do you still experience symptoms

6    of mental illness?

7    A    I do.

8    Q    Has PACT helped you stay out of the hospital despite those

9    symptoms?

10   A    Yes.  Some days are a little bit symptom-free but it

11   doesn't really add up because I haven't really caught a day

12   that I don't, you know, have problems with hallucinations or

13   problems with voices and being depressed.  And paranoia just

14   comes and goes, but anxiety is one of my worst problems.

15   Q    When you are experiencing those symptoms, how does the PACT

16   team help you?

17   A    Being around those guys, being around the people, it kind

18   of helps the situation, learning different things and getting

19   out and doing things like we talked about.

20   Q    Blair, earlier you shared some goals that you have for

21   yourself.  Did you have hope for the future before PACT?

22   A    No, I did not.

23   Q    Do you have hope now?

24   A    I do.

25   Q    Since you started receiving PACT, how has your life

1    changed?

2    A   Dramatically.  I find myself happier during the day.  And

3    being around the PACT people and being around staff and stuff,

4    you just -- it's like one big family.

5    Q   Blair, was it difficult for you to make the decision to

6    testify today?

7    A   It was.

8    Q   Why?

9    A   I never thought I would be on a stage like this, you know.

10    It just kind of makes you a little nervous, I guess.

11    Q   Despite that, did you want to testify in this case?

12    A   Yes.

13    Q   Why?

14    A   Because I want for what we have in Tupelo to be around the

15    whole United States and to help people that -- because, I mean,

16    I'm going to be honest with you, I know people right now that

17    are in PACT that are homeless.  You know, they're still going

18    to PACT, they're still washing their clothes and doing things

19    but they are waiting their turn just to get, you know, a house.

20    And I was in a hotel.  I mean, it could happen to me too.  But

21    I want this to go around the United States.  I want people to

22    be -- in every corner to get the PACT services.

23    Q   Thank you.

24          MR. HOLKINS:  No further questions at this time.

25          THE WITNESS:  Thank you.

```
 1              MR. SHELSON:  May I proceed, Your Honor?

 2              THE COURT:  Yes, you may.

 3                        CROSS-EXAMINATION

 4    BY MR. SHELSON:

 5    Q    Good morning.  May I call you Blair as well?

 6    A    That's fine.

 7    Q    Thank you.  I'm Jim Shelson.  I am one of the lawyers for

 8    the State of Mississippi.  I do not have a lot of questions for

 9    you this morning.  But in any event, you testified that you

10    have been to North Mississippi State Hospital three times?

11    A    Right.

12    Q    Okay.  And the dates I have for the first time were

13    March 30th, 2017 through April 21st, 2017.  Is that --

14    A    I'm not really good on dates but if that's what you want to

15    go with.

16    Q    Okay.  And then the second admission I have for you, the

17    dates are June 28, 2017 through July 28, 2017.  Does that sound

18    about right?

19    A    Yes, that one does.

20    Q    Okay.  And is that the hospitalization where you were

21    connected with the PACT team?

22    A    I was connected with the PACT team first on my second

23    admission.  That's what I can really give you.

24    Q    Yes, sir.  And that's what I want to talk to you about.

25    During your second admission, tell us how it happened that you
```

1   got connected with the PACT team.

2   A    I was approached by my social worker Amanda who worked in

3   the State Hospital and she said, you know, they were trying to

4   get me a home and they said that they had a grant.  And she

5   told me, "Would you like to join the PACT services, join the

6   PACT program," and I said sure.  And she just got me -- it was

7   an interview that I had to do, and I spoke with a couple people

8   from PACT, and that was pretty much it.  I mean, when I got out

9   of the hospital, I was part of the program.

10  Q    During your second admission, did folks from the PACT team

11  come to the North Mississippi State Hospital to talk to you?

12  A    They did.

13  Q    Okay.  And this next question, I don't mean to pry into

14  your personal business, but it's following up a question

15  Mr. Holkins asked you about.  You mentioned that Kim Sistrunk

16  and others worked hard to get you housing.  Is that correct?

17  A    That's correct.

18  Q    What type of housing did they help you with?

19  A    It was an apartment, a one-bedroom apartment.

20  Q    Do you know if that housing is through any particular

21  program?

22  A    It is.  It is called MUTEH.

23  Q    And what is your understanding of what MUTEH is?

24  A    I don't know that much about it.  I was very desperate at

25  the time to -- we had a lady that -- her name is Latesha --

```
 1    that came to the PACT building, and she would help people get,

 2    you know, homes.  And I knew some people that got homes

 3    quickly, and mine took about a month or a month and a half.

 4    But the MUTEH program basically, from what I understand, is you

 5    get the first month free because I had income, and then the

 6    next month and so on for the rest of the year, it would be

 7    12 percent of the amount of rent.

 8    Q   As I understood your testimony, Mr. Holkins asked you,

 9    after the second time you got out of the hospital, was there

10    some problem with your medication?

11    A   There was.

12    Q   And so you went back to the hospital the third time?

13    A   Right.

14    Q   During that third visit, were any adjustments made to your

15    medications?

16    A   Yes, it was.

17    Q   All right.  And then you got discharged and you have been

18    with the PACT team ever since?

19    A   Right.

20          MR. SHELSON:  Your Honor, may I have just a moment to

21    confer?

22          THE COURT:  Yes, you may.

23       (SHORT PAUSE)

24    BY MR. SHELSON:

25    Q   Just one more thing, sir.  Since your last discharge from
```

1  the hospital and since you have been with the PACT team since

2  then, since that time do you feel the mental health system has

3  worked for you?

4  A   I do.

5          MR. SHELSON:  Thank you, Your Honor.  No further

6  questions.

7          THE COURT:  All right.  Any redirect?

8          MR. HOLKINS:  No, Your Honor.

9          THE COURT:  Is this witness finally excused?

10         MR. HOLKINS:  Yes, Your Honor.

11         THE COURT:  All right.  Mr. Blair, if I may call you

12  that -- Duren, I believe it is?  Duren.

13         THE WITNESS:  Duren.

14         THE COURT:  Yeah.  You may step down, sir.

15         THE WITNESS:  Thank you, sir.

16         THE COURT:  And you can return to your normal duties.

17  You can stay in court or do whatever you wish.

18         THE WITNESS:  I'm just going to leave with her.

19         THE COURT:  Okay.

20         THE WITNESS:  Thank you, Your Honor.

21         THE COURT:  All right.

22         MS. RUSH:  Your Honor, we have our next witness,

23  Mr. Dan Byrne, here ready.  We are ready to proceed or we can

24  take an early lunch break.

25         THE COURT:  We will proceed with him and we will go as

*** DAILY TRANSCRIPT ***

```
 1    far as we can based on my schedule during this lunch hour.
 2              MS. RUSH:  Okay.  Thank you, Your Honor.
 3              THE COURT:  All right.
 4                            DANIEL BYRNE,
 5    having first been duly sworn, testified as follows:
 6              THE COURT:  Mr. Byrne, before you is the microphone.
 7    I just ask that you speak loudly and clearly enough for us to
 8    hear you.  Of course the court reporter is taking down
 9    everything that is being said, so speak at a pace at which she
10    can keep up with you.  Make sure all your responses are verbal.
11    And allow the lawyers to finish their question before you begin
12    to answer so that the two of you will not be speaking at the
13    same time.
14              So for the record, could you state and spell your
15    name?
16              THE WITNESS:  Yes.  My first name is Daniel,
17    D-A-N-I-E-L.  Last name, Byrne.  B-, as in boy, Y-R-N-E.
18              THE COURT:  Thank you, sir.  And you can bring the mic
19    closer to you if you need to or whatever you need to do to be
20    comfortable.
21              THE WITNESS:  Thank you, Your Honor.
22              THE COURT:  You may proceed.
23              MR. SCHUTZER:  Thank you, Your Honor.
24                            DIRECT EXAMINATION
25    BY MR. SCHUTZER:
```

1    Q    Would you tell the court your profession.

2    A    I am a clinical social worker.

3    Q    Did you work as an expert for the United States in this

4    case?

5    A    I did.

6    Q    What were you asked to do?

7    A    I was asked to review cases of persons who had been in the

8    State Hospitals, review the records and form opinions.

9    Q    How many people did you look at?

10   A    I looked at 35.

11   Q    Did you write a report that sets out what you did and what

12   you found?

13   A    Yes, I did.

14   Q    That report is PX-401.  It's in the binder that you have up

15   there.

16         MR. SCHUTZER:  And, Your Honor, that has been

17   preadmitted.

18         THE COURT:  Thank you.

19   BY MR. SCHUTZER:

20   Q    Do you agree with all the opinions in your report?

21   A    I do.

22   Q    Before we talk more about your report, I would like to talk

23   a little bit more about you.  How long have you been a clinical

24   social worker?

25   A    About 37 years.

```
1    Q    What is a clinical social worker?
2    A    A clinical social worker is someone who has at least a
3    master's in social work and also has had additional training in
4    mental health courses.
5    Q    What's the difference between a social worker generally
6    speaking and a clinical social worker?
7    A    The clinical social worker would have had additional
8    training in mental health subjects, had probably had more
9    clinical supervision and would have sat for licensure.
10   Q    As a clinical social worker, what kind of treatments have
11   you directly provided to individuals with mental illness?
12   A    Those services would include assessment services,
13   diagnostic counseling, psychotherapy, referral, rehab services,
14   things of that nature.
15   Q    What do you mean by assessment services?
16   A    Assessment services would be reviewing information from
17   previous clinical records, interviewing the person,
18   interviewing people that are close, collateral interviews, and
19   being able to collect and synthesize the information.
20   Q    What do you mean by collateral interviews?
21   A    A collateral interview would be an interview that would
22   be -- occur with someone who knows the subject.
23   Q    What's your educational background?
24   A    I have a master's in social work.
25   Q    After you got that degree, did you work at Saint Elizabeths
```

*** DAILY TRANSCRIPT ***

1    Hospital in Washington, D.C.?

2    A    Yes, I did.

3    Q    I want to talk a little bit more about your work there.

4    What is Saint Elizabeths Hospital?

5    A    Saint Elizabeths Hospital is the state psychiatric facility

6    for the District of Columbia.

7    Q    When did you work there?

8    A    I began working there in 1983 and was in and out of there a

9    couple of times but I believe left the hospital in about 2000.

10   Q    What sorts of mental illness did the people who were

11   treated at Saint Elizabeths have?

12   A    Generally, there were people that had different kinds of

13   schizophrenia, bipolar disorders, major depressive disorders,

14   things of that nature.

15   Q    Was one of your jobs at Saint Elizabeths in the

16   outplacement department?

17   A    Yes.

18   Q    What is the outplacement department?

19   A    The outplacement department at the hospital was the

20   organization that reviewed all proposed discharges to ensure

21   that the discharge was appropriate and that the right community

22   services were in place if the person was green-lighted for

23   discharge.

24   Q    How did you determine whether a discharge was appropriate?

25   A    I determined that by again reviewing the records,

```
 1   interviewing the patient, interviewing staff and, you know,
 2   coming to a conclusion about whether, in fact, this was the
 3   right thing to do.
 4   Q    In addition to working in the outplacement department at
 5   Saint Elizabeths, did you also have management roles there?
 6   A    I did.
 7   Q    What were those roles?
 8   A    I was the chief social worker for the child and youth
 9   services division.  I was the risk manager for the hospital.
10   Q    Did you have any management roles within the broader D.C.
11   government?
12   A    I did.
13   Q    What were those roles?
14   A    I was the acting director of quality improvement.  I was
15   the risk manager for the Department of Mental Health and the
16   director of quality improvement for the Department of Mental
17   Health.
18   Q    When you were the acting director of quality improvement,
19   was that also for the Department of Mental Health?
20   A    That's correct.
21   Q    Generally, what did those quality improvement and risk
22   management roles entail?
23   A    The risk management roles entailed reviewing unusual
24   incidents or reportable incidents, looking at any allegations
25   of whether those patient abuse -- any irregularities with
```

1  seclusion and restraint, any polypharmacy issues.  And then in

2  terms of quality improvement, my work involved auditing and

3  ensuring that the services that were being provided met the

4  district and federal regulations.

5  Q  Do you still work for the D.C. government?

6  A  No, I don't.

7  Q  When did you leave the D.C. government?

8  A  I retired in 2009.

9  Q  What have you been doing since then?

10  A  Since then I have been a consultant on various projects in

11  a number of states.

12  Q  Without going through every consulting job that you've had,

13  can you describe generally what the focus of those projects

14  have been?

15  A  Yes.  The focus sometimes was on helping organizations get

16  ready for either Medicare or Joint Commission surveys.  It

17  could have involved if there were allegations of

18  Medicaid/Medicare fraud.  It could have also been helping

19  organizations redesign their mental health services, things

20  like that.

21  Q  Have you consulted to any ACT teams?

22  A  Yes.

23  Q  Doing what?

24  A  When I was an interim CEO in D.C., I had ACT teams under me

25  and I also was a consultant at the Green Door to their ACT

```
 1    teams.  Green Door was another mental health provider in
 2    Washington.
 3    Q    What were you the interim CEO of in D.C.?
 4    A    I was the interim CEO of Capital Community Services.
 5    Q    What is Capital Community Services?
 6    A    They no longer are in business.  They were a behavioral
 7    health provider in the District of Columbia.
 8         MR. SCHUTZER:  We offer Mr. Byrne as an expert in
 9    clinical social work and assessments for community-based mental
10    health services.
11         MR. SHELSON:  No objection, Your Honor.
12         THE COURT:  Mr. Byrne will be designated as an expert
13    in clinical social work and assessments for community-based
14    mental health services.
15         You may proceed.
16         MR. SCHUTZER:  Thank you, Your Honor.
17    BY MR. SCHUTZER:
18    Q    Mr. Byrne, I would like to talk about the work that you did
19    in this case.  What questions did you answer about the people
20    that you looked at?
21    A    I answered questions that had to do with whether the
22    persons opposed community mental health services, whether they
23    would have, in fact, benefited from community mental health
24    services, if they would have spent less time or had
25    hospitalizations prevented, shorter hospitalizations, and
```

1  whether they were at serious risk for returning to the

2  hospital.

3  Q    How many people did you look at?

4  A    I looked at 35.

5           MR. SCHUTZER:  May I approach, Your Honor?

6           THE COURT:  Yes, you may.

7  BY MR. SCHUTZER:

8  Q    Mr. Byrne, I have handed you what we have marked for

9  identification as PDX-9.  It is also on the screen in front of

10 you.  Is this a chart of your findings about each of those

11 questions?

12 A    Yes, it is.

13 Q    Let's walk through those.  What did you find with respect

14 to the question of whether people would have avoided or spent

15 less time in a State Hospital?

16 A    I found that 100 percent of the people I interviewed would

17 have avoided or spent less time.

18 Q    What did you find with respect to the question of whether

19 people were at serious risk of going back to a State Hospital?

20 A    I found that 87 percent of the persons that I interviewed

21 were at serious risk.

22 Q    What did you find with respect to whether individuals were

23 appropriate for and would benefit from community-based

24 services?

25 A    I found that 100 percent would benefit from community

1  services.

2  Q    And finally, what did you find with respect to whether

3  individuals were opposed?

4  A    I found that 100 percent were not opposed to receipt of

5  community-based services.

6  Q    What sort of information did you consider in order to

7  answer these questions about the people that you looked at?

8  A    I considered the clinical records from the hospitals as

9  well as available community mental health records.  I

10  interviewed the persons and I also had some collateral

11  interviews.

12  Q    Who were the collateral interviews with?

13  A    Generally family members.

14  Q    Did you interview any community-based providers?

15  A    Yes.

16  Q    I would like to focus on the first bar, the question about

17  whether people would have avoided or spent less time in the

18  hospital.  How is it that people would have avoided or spent

19  less time in a State Hospital?

20  A    If they had been receiving appropriate community-based

21  mental health services, they probably would not have had the

22  crises or whatever events that occurred that ended up with

23  hospitalization.

24  Q    How do community-based services prevent hospitalizations?

25  A    Well, they're able to do that by helping people, you know,

```
 1   maintain and improve their functionality and also by either the
 2   reduction or elimination of the symptomatology that would have
 3   troubled them.
 4   Q   What do you mean by functionality?
 5   A   How they're able to operate on a daily basis, you know,
 6   work, being at home, recreation, activities, things of the
 7   like.
 8   Q   I would like to talk about this in context of person 58.
 9   In the binder, you have a tab labeled PX-400.  That's a
10   crosswalk of the names of the individuals you looked at as well
11   as the numbers that we will use to protect their privacy.  Do
12   you see that?
13   A   I do.
14   Q   And do you know -- do you remember who person 58 is?
15   A   I do.
16   Q   Let's turn to page 23 of PX-401 that's your report.  This
17   is the section on person 58.  Correct?
18   A   Yes.
19   Q   Could you tell us a little bit about her?
20   A   She is a Caucasian lady, 59 years old, had her first break,
21   psychotic break, in her late twenties.  She was hospitalized.
22   She has had a number of hospitalizations since then.  And she
23   is really a lovely lady and, you know, had unfortunately not
24   received the services with the intensity that she needed to
25   maintain herself and keep herself out of the hospital.
```

1    Q    Let's talk about that in a little more detail.  Did she

2    experience a series of hospitalizations in 2016 and 2017?

3    A    Yes, she did.

4    Q    Let's look at those visits.  Was the first one into East

5    Mississippi State Hospital in early 2016?

6    A    That's correct.

7    Q    Was she then admitted to East Mississippi State Hospital

8    again for seven months from May 31st, 2016 to January 3rd,

9    2017?

10   A    Yes.

11   Q    Was she then admitted to Mississippi State Hospital in

12   May 2017 for approximately three weeks?

13   A    Yes.

14   Q    Was she then admitted to Mississippi State Hospital from

15   July 25th, 2017, to October 23rd, 2017?

16   A    Yes.

17   Q    Was she admitted to South Mississippi State Hospital on

18   January 12th, 2018, through February 15th, 2018?

19   A    That's correct.

20   Q    Was she admitted to South Mississippi State Hospital on

21   May 17th, 2018?

22   A    That's correct.

23   Q    At the time you wrote your report, did you know whether

24   that admission had ended?

25   A    I didn't.

```
 1    Q    Why did she go in and out of a State Hospital five times in
 2    two years?
 3    A    Well, there are a number of reasons.  The first was that
 4    she was not receiving adequate community-based services.  She
 5    had a history of being nonadherent with her medications and was
 6    not getting the level of support she needed in terms of
 7    maintaining that.  She would then get disorganized, paranoid,
 8    and would begin to either threaten other people in her home or
 9    staff.
10    Q    Was she receiving any mental health services in between
11    these hospitalizations?
12    A    No.
13    Q    What services would she have needed in order to keep from
14    going back to the hospital?
15    A    The services that I recommended, I believe, were PACT
16    services and supported housing.
17    Q    Why did you determine that she would need PACT services?
18    A    PACT services are the most intensive community-based
19    services available.  Oftentimes they will see the person three,
20    four times a week.  In the situation of this lady, they would,
21    you know, help her remain adherent with her medication and
22    provide the other supports that she would need to be able to
23    successfully maintain herself in the community.
24    Q    Had she received PACT services?
25    A    She had not.
```

*** DAILY TRANSCRIPT ***

1   Q    Had she been offered PACT services?

2   A    No.

3            MR. SCHUTZER:  Could we get PX-413 up?

4            I will represent to the court she lives in Forrest

5   County.

6   BY MR. SCHUTZER:

7   Q    Would you take a look at this map, Mr. Byrne.  Is PACT

8   available in her home county?

9   A    It is not.

10  Q    The green counties have PACT teams.

11  A    Well, yes, it is available.  I'm sorry.

12  Q    How would PACT have impacted her going to a State Hospital?

13  A    Well, they would have been able to provide a very robust

14  level of service, visiting her again, you know, three or four

15  times a week or as many times as necessary, to help her remain

16  adherent with her medication and to help her maintain and, you

17  know, again, live a productive life in the community.

18  Q    You also recommended supportive housing for her.  Correct?

19  A    Yes.

20  Q    Why?

21  A    She had -- we had asked, you know, what some of her wishes

22  were, and she -- in terms of her wishes, she wanted her own

23  place, which was, you know, what many of us want.  And she

24  would have also have needed, you know, some level of support if

25  she were to have her own place.

*** DAILY TRANSCRIPT ***

1    Q   What supports would she need in order to live in her own

2    home?

3    A   She would need, you know, someone to check on her, make

4    sure that, you know, the bills are getting paid, that there is

5    food, that she is involved in some kind of day activities,

6    that, you know, nothing that she is doing would either endanger

7    herself or others.

8    Q   Had she been placed in supportive housing?

9    A   She had not.

10   Q   Had she been offered it?

11   A   I don't believe so.

12   Q   What impact would supported housing have had on whether she

13   went to the State Hospital?

14   A   Well, if she had been in a housing configuration of her own

15   choice, she would have had much more impetus and reason to

16   remain in the community and to be adherent with her medication.

17   Q   What did you conclude would have happened if she had been

18   receiving PACT and supported housing?

19   A   I concluded that she would have either had fewer

20   hospitalizations or the hospitalizations would have been

21   shorter in duration.

22   Q   What did you conclude about whether she was at serious risk

23   of going back to a State Hospital?

24   A   My conclusion was that she was at serious risk.

25   Q   Why was that your conclusion?

1   A    It was my conclusion because based on her history, I mean,

2   that she had had several recent hospitalizations and that she

3   was not receiving the level of service in the community that

4   was necessary to maintain herself successfully in the

5   community, and not receiving those services would have put her

6   at risk of getting nonadherent with her medication.   There

7   would be a crisis and then she would end up back in the

8   hospital.

9   Q    Have you treated people like person 58 in your career as a

10  social worker?

11  A    Oh, yes.

12  Q    Do community-based services have an impact on whether those

13  people went to State Hospitals?

14  A    Yes.

15  Q    What was that impact?

16  A    If people were receiving the services that they needed at

17  the appropriate intensity, oftentimes they were able to

18  function well in the community and avoid the kinds of crises

19  and events that happened that would push the hospitalization.

20  Q    Would you turn in your binder, please, to page 8 of your

21  report, which is PX-401.   I am in Section 6(a), overall

22  findings.

23  A    Yes.

24  Q    I would like to ask you to read the last paragraph in that

25  section, the one that begins, "For most individuals".

1  A   "For most individuals with mental illness whose symptoms

2  are worsening, there are multiple opportunities for

3  community-based services to rapidly react, intensify services,

4  and stabilize.  For the people I reviewed in Mississippi, the

5  necessary services were not available, and those opportunities

6  were lost.  These people were admitted to the State Hospital

7  because of those lost opportunities."

8  Q   What did you mean by intensify services?

9  A   What I mean by intensify in services is --

10         THE COURT:  Dr. -- I mean, Mr. Byrne, make sure -- I

11  realize you are reading from a notebook but just make sure you

12  are always speaking into the microphone.

13         THE WITNESS:  Okay.

14         THE COURT:  The court reporter has on headphones.

15         THE WITNESS:  Okay.  Thank you, Your Honor.

16         THE COURT:  I'm sorry.  Go ahead and reask your

17  question.

18         MR. SCHUTZER:  Certainly.

19  BY MR. SCHUTZER:

20  Q   What did you mean when you wrote "intensify services"?

21  A   What I meant by intensify services, you know, if the person

22  were, you know, under specific stressors and were getting more

23  agitated and more symptomatic, that the services would then

24  intensify, so you would either see the person more often or you

25  would ratchet up the services to attend to that situation so

1   that the services would be flexible and adjusted to what the

2   person's clinical needs were.

3   Q    How would you expect a community-based provider to rapidly

4   react?

5   A    Well, I would expect them to be very aware of what the

6   person's situation was.  And if the person needed additional

7   attention that they would be able to either bring the person

8   into the clinic or go to the home or wherever the person was

9   and provide those services there.

10  Q    What did you see happening in Mississippi?

11  A    I didn't see the services being provided that were needed,

12  and I didn't see the -- the flexibility in terms of the

13  intensity.

14  Q    What impact did that have on State hospitalizations?

15  A    Well, the impact it has is that crises are not able to be

16  averted in the community.  The person deteriorates and then

17  they end up being hospitalized.

18  Q    How does person 58's experience compare to the experience

19  of the other people that you looked at in this case?

20  A    Unfortunately, there are many similarities.

21  Q    Can you provide a few examples of the similarities?

22  A    Sure.  There were a number of people that, you know, needed

23  assistance with medication adherence that weren't getting that.

24  There were also a number of people who were having crises in

25  the community and those crises were not mediated and resolved

*** DAILY TRANSCRIPT ***

```
 1   and, therefore, the situations would continue to worsen and the
 2   result was hospitalization.
 3   Q   I would like to go back to PDX-9, the chart, and talk about
 4   a different question.  What percent of people that you looked
 5   at were at serious risk of going back into a hospital, a State
 6   Hospital?
 7   A   87 percent.
 8   Q   Why was that?
 9   A   That number is high again because the -- the services and
10   the level of intensity of services that these folks needed to
11   maintain themselves in the community were not there.
12   Q   What was different about the remaining percent of people
13   who were not at serious risk?
14   A   Two of those persons were receiving PACT services, and
15   there were a couple others that my clinical determination was
16   that their risk was not at the serious level.
17   Q   Let's talk a little bit more about PACT services.  Can you
18   give us a one- or two-sentence definition of PACT?
19   A   Sure.  A PACT team is the most intensive community service
20   that's offered, and it's team-based, and it generally would
21   have a psychiatrist or an advanced practice registered nurse as
22   the prescriber.  There could be another nurse, a social worker,
23   a team leader, a rehab specialist, a substance specialist, and
24   maybe a peer specialist and, you know, a case manager that
25   could assist with benefits, acquisitions, things like that.
```

1    Q    And you testified that you met two people who were

2    receiving PACT services?

3    A    That's correct.

4    Q    Who were they?  Are you looking for a list?

5    A    Yes.

6    Q    It's the second tab after your report.

7    A    Okay.  Thank you.  Those persons were person --

8              THE COURT:  Make sure you are speaking into the

9    microphone.

10   A    Those persons were person 59 and person 62.

11   BY MR. SCHUTZER:

12   Q    Let's focus on person 62.  Did PACT have an impact on her

13   hospitalizations?

14   A    Yes, it did.

15             MR. SCHUTZER:  May I approach?

16             THE COURT:  Yes, you may.

17   BY MR. SCHUTZER:

18   Q    (Tenders document.)  I have handed you what we have marked

19   for identification as PDX-10.  Does this slide show the impact

20   of PACT services?

21   A    It does.

22   Q    Can you explain what we are looking at?

23   A    Certainly.  In the upper part of the chart, the red

24   indicates hospitalization.  And then in the third row where you

25   see that darker blue, that was the date that this person became

*** DAILY TRANSCRIPT ***

1  engaged with PACT services.

2      The following months in the lighter shade of blue are all

3  of the months where this person was receiving PACT services,

4  and there were no hospital events.

5  Q   Are the hospitalizations shown here only the State

6  hospitalizations?

7  A   There also are some private hospitalizations.

8  Q   Are those shown on this slide?

9  A   On this slide, I don't believe so.

10 Q   So in the first year, she had three State hospitalizations?

11 A   Yes.

12 Q   And since receiving PACT, she has had none?

13 A   That's correct.

14 Q   In addition to preventing hospitalization, has PACT had any

15 other impacts on her mental health?

16 A   Yes.  She -- the team has been able to help her get

17 connected to other community resources.  They have been able to

18 help her with the Meals on Wheels program.  They're either able

19 to arrange or provide transportation to doctors' visits.  And

20 they have also been able to help her with recreational

21 activities in the community like the senior center, things like

22 that.

23 Q   Let's back up a little bit and talk a little bit more about

24 person 62 and how she came to be on PACT.  Would you turn,

25 please, to page 37 of your report which is PX-401.  Can you

1  tell us, please, a little bit about person 62?

2  A    Yes.  It is a delightful lady, lots of energy.  She loved

3  to call into the radio stations to request songs.  So she was a

4  real character, you know, lots of energy, lots of fun.  And she

5  was very fond of her PACT team and particularly the team leader

6  of the PACT team.

7  Q    Before she started receiving PACT, how was she doing?

8  A    Not well.

9  Q    Why do you say that?

10  A    Well, based on the crises that were unresolved and also the

11  number of hospitalizations.

12  Q    Why did she start receiving PACT?

13  A    I'm sorry?

14  Q    Why did she start receiving PACT?

15  A    She was initially a little resistant, and then through the

16  successful engagement by the team, the determination was

17  that -- the clinical determination was that she needed a much

18  more intensive outpatient service, and so PACT had been

19  identified.  And she was a little resistant at the beginning,

20  and the team continued to work with her, answer her questions,

21  were able to explain the benefits, you know, to her that they

22  could provide.

23      And I think within a month she was engaged with the team

24  and, you know, we can see by the chart that it's been a

25  successful engagement.  She is getting her community-based

603

1   services and staying out of the hospital.

2   Q    In your answer you referred to the successful engagement by

3   the team.  What did you mean by that?

4   A    Well, oftentimes in these kinds of situations, people might

5   be initially resistant to the team.  They may have had negative

6   experiences in the past.  They may not like the medications.

7   They may not like mental health workers.  And so they are

8   either very reticent or unwilling to make a commitment to

9   actually engage with the team.

10  Q    What is the standard response for mental health providers

11  who encounter someone who is reticent or unwilling to engage

12  with the team?

13  A    In terms of a nonPACT situation or PACT?

14  Q    Let's start with PACT and then we'll talk about nonPACT.

15  A    Okay.  Well, in the situations with PACT, PACT team members

16  are going to expect a level of either, you know, "I don't want

17  the service," or what people might call resistance, something

18  like that, so that's to be expected and it's something that,

19  again, with continued engagement and working with the person

20  and, again, trying to explain the benefits and, you know, how

21  this can help their daily lives, generally speaking, over time

22  people will say, "Well, I will give it a try."

23       So the PACT teams, you know, traditionally and generally,

24  they don't easily give up on people whereas in other community

25  services, if someone says, you know, "I don't want the

1   service," or "Go away," or "I am not going to take my

2   medication," you know, oftentimes the response is, "Oh, well,"

3   and the people throw up their hands and the person doesn't get

4   served.  Obviously, we know what happens.  They deteriorate,

5   there is a crisis, the crisis isn't averted, something happens,

6   and then they are admitted to a hospital.

7   Q    In your answer just there, you testified that in a nonPACT

8   situation, oftentimes the response is to say, "Oh, well," and

9   the providers will throw up their hands.  Is that the

10  appropriate response?

11  A    No.

12  Q    What is the appropriate response to somebody who is

13  reticent to engage in services in a nonPACT context?

14  A    Well, the appropriate response would be to try to

15  understand what are the barriers and why is this person or what

16  are the reason or reasons why this person is unwilling to

17  either engage in the services, take medication, see the doctor,

18  or whatever it is.

19       So you have to -- you have to try to understand also what

20  the person's historical experiences have been, if they have had

21  bad experiences with either community-based or hospitals and

22  try to understand why they're being resistent and then try to

23  work through and, you know, in a solution-based way, to figure

24  out, you know, a way that this can be presented so that they

25  will at least give it a try.

```
1    Q    Other than for person 62, did you see evidence of this kind
2    of persistent engagement by providers in Mississippi?
3    A    Unfortunately not.
4    Q    You mentioned that you met two people who were receiving
5    PACT services.  Were there other people you met who you
6    recommended PACT services for and were not receiving it?
7    A    Yes.
8    Q    Let's talk about one of those people, person 87.  Would you
9    turn to page 120 of your report, please.  And can you tell us,
10   please, a bit about person 87?
11   A    This gentleman is a mid-thirties, African-American fellow.
12   He has had multiple hospitalizations and he has had problems
13   with medication adherence and has not unfortunately received,
14   again, the services and the level of support that he needs to
15   keep him stabilized in the community and functioning well.
16        Additionally, he has had episodic problems with substance
17   abuse which further complicate, you know, his clinical picture.
18   Q    Why did you determine that he would be appropriate for PACT
19   services?
20   A    That determination in part was made because, again, of the
21   number of hospitalizations.  He had problems again with, you
22   know, his medication adherence.  He also had, you know, as I
23   indicated, problems with substance abuse.  So if he were, you
24   know, hooked up to a PACT team, many of these issues, if not
25   all, could have been better addressed.
```

*** DAILY TRANSCRIPT ***

```
1   Q    How would a PACT team go about addressing some of these
2   issues?
3   A    Well, I think they would begin by trying to, you know, make
4   an assessment of him and to try to understand, you know, what
5   does this fellow want, you know, in terms of what would improve
6   his life.  In this gentleman's case, for example, he was
7   unemployed and he was looking for work.  He wanted to acquire
8   some skills and get into the job market.
9        So I think that if -- it's like anybody else.  If you
10  figure out what they want and you can help them get there, the
11  chances are that they're going to become more adherent with the
12  medications because they want to be successful in either their
13  training or their job.
14  Q    Was PACT available in his home county?
15  A    No, it wasn't.
16  Q    In your report, you describe something called intensive
17  home-based support services.  Can you explain what that is?
18  A    Sure.  Intensive home-based services would be services that
19  are provided either in the home or in a natural environment,
20  and they would -- you know, they could be psychotherapy
21  services, they could be psychoeducational services for the
22  person and/or their family members.  There could be
23  socialization services, assistance with acquiring benefits, you
24  know, or if the person, you know, is having problems with their
25  disability, you know, claim or something like that, they could
```

*** DAILY TRANSCRIPT ***

1   help with that.  So they are services that they are pretty much

2   home-based that are designed to keep the person stable and, you

3   know, over time, you know, with some success, the services

4   could be then transitioned to a more traditional setting like a

5   community mental health center.

6   Q    What does intensive mean in the label here?

7   A    Intensive would mean that you would be seeing the person,

8   you know, at least a couple times a week and be available

9   pretty much, you know, when, like, for example, if a crisis

10   occurs, to be available and, again, to be flexible in terms of

11   where you might meet the person and also flexibility with the

12   level of intensity of the services based on what their clinical

13   needs are.

14   Q    How do intensive home-based support services compare to

15   PACT services?

16   A    Well, PACT services would be the most intensive.  They

17   would differ also in the PACT team would be a large entity.

18   Intensive home can be either provided by an individual or a

19   small team.  With the PACT team, there is always at least one

20   prescriber on the team that is immediately available whereas in

21   an intensive home, generally there is not a nurse or a

22   psychiatrist as part of that team so they would have to

23   negotiate if there is any medication issues.  They would have

24   to negotiate with the provider to, you know, secure whatever

25   they need.

1   Q   Would you give an example of some factors that might

2   differentiate somebody who is appropriate for PACT services

3   versus somebody who is appropriate for intensive home-based

4   support services.

5   A   Yes.  Generally people that receive PACT services have had

6   multiple hospitalizations.  They may have a co-occurring

7   substance issue.  They may have also had, like, some forensic

8   involvement or had problems with being homeless or things of

9   that nature whereas the needs of people that receive intensive

10  home are not as -- quite as acute generally as those who

11  receive PACT services.

12  Q   I would like to talk about this in the context of

13  person 63.  Could we go to page 40 of your report, please?  And

14  could you tell us a little bit about person 63?

15  A   Person 63 again is an African-American male, unmarried, in

16  his mid thirties, who has had three hospitalizations.  He had

17  had some work history and some educational history, and he was

18  unfortunately not appropriately hooked up to the mental health

19  service, the community-based mental health services, and had

20  had a couple situations that resulted in hospitalizations.

21  Q   How many times had person 63 been to a State Hospital?

22  A   Three.

23  Q   Was he held in county jails before he went to the hospital?

24  A   Yes.

25  Q   Did you determine that he would benefit from intensive

1   home-based support services?

2   A    I did.

3   Q    Why is that?

4   A    He had had some unfortunate experiences historically with

5   the community mental health center.  And my thinking was that

6   we would try a different approach and try to see if he could

7   get used to receiving some of the services in an environment

8   that was more comfortable to him and then be able to move from

9   there.

10  Q    Why did you conclude intensive home-based support services

11  as opposed to PACT?

12  A    In my clinical judgment, I didn't -- I wanted to try with

13  the less intensive, because he had not had that experience, see

14  how that worked, and then go from there.

15  Q    What services was he receiving at the time that you met

16  him?

17  A    None.

18  Q    Did you determine that he was at serious risk of going back

19  to a hospital?

20  A    Yes.

21  Q    Why was that?

22  A    Because he was not getting the necessary supports.  This is

23  a gentleman that had had a number of family crises.  He was not

24  getting any assistance with the family crises.  And, you know,

25  this had happened three times.  And without any kind of

```
 1   intervention, you know, it would, you know, arguably happen
 2   again.
 3   Q   What effect can going without mental health services have
 4   on a person's mental health?
 5   A   Well, it would, you know, cause it to continue to
 6   deteriorate.
 7   Q   As a person's mental health continues to deteriorate, does
 8   that impact the intensity of services the person will require?
 9   A   Yes, it does.
10   Q   Are you familiar with mobile crisis services?
11   A   Yes.
12   Q   What are mobile crisis services?
13   A   Mobile crisis services are oftentimes provided by a team,
14   and they are -- well, they're mobile.  I mean, the people, you
15   know, if there is a crisis, they will oftentimes go to the
16   person's home or wherever they are and try to understand what's
17   going on and try to resolve the crisis and prevent any further
18   deterioration and prevent hospitalization if at all possible.
19   Q   What impact do mobile crisis services have on whether
20   people are hospitalized in a State Hospital?
21   A   Ideally, if the services are effective, the crisis will be
22   resolved and hospitalization would not then be indicated.
23   Q   Did you see evidence that the people you reviewed had
24   received mobile crisis services before they were hospitalized?
25   A   Unfortunately, no.
```

1   Q    You have been talking about what happens before

2   hospitalization.  I would like to talk now about what happens

3   when a person is in a hospital and preparing to leave.  Are you

4   familiar with the term "discharge planning"?

5   A    Yes.

6   Q    What is discharge planning?

7   A    Discharge planning is a process by which the service needs

8   of the person are carefully considered and a plan is developed.

9   This usually involves staff from the hospital, so it would be

10  the hospital treatment team, and a representative or

11  representatives from the receiving community mental health

12  center so that they would be able to exchange information, you

13  know, any new information they could consider, and they would

14  be able to, you know, with a common understanding, figure out

15  what the best service package is so that when the person leaves

16  the hospital, the services are in place and, you know, it's

17  more of a seamless transition.

18  Q    When does discharge planning begin?

19  A    Well, ideally on the first day of admission.

20  Q    What does it mean for discharge planning to begin on the

21  first day of admission?

22  A    Well, what it means is that, you know, when the person

23  comes in, that they're going to at some point leave.  So when

24  you begin the process, you know -- and, again, a lot of this is

25  information collection, information sharing -- the better

1  informed everyone is right from the beginning, you can then

2  better plan for a successful transition to the community when

3  discharge occurs.

4  Q   Could you give a concrete example of something -- a piece

5  of discharge planning that would happen at the first day when

6  you might not necessarily know when the person is leaving?

7  A   Well, one part would be to invite a representative from,

8  say, if the person historically had been currently receiving

9  community-based mental health services, to invite someone from

10 his team at the community mental health center to the hospital

11 so that that person could brief the hospital team on, you know,

12 what was happening prior to the admission.  And then the

13 person, you know, from the community mental health center would

14 then be able to better understand what the treatment team on

15 the inpatient side, what their thinking is and what their plan

16 is.

17      So, again, I mean, the goal here is that the information is

18 shared, that there is good communication between the two

19 providers, and that also that the -- that the person is

20 factored into this, most importantly.  I mean, it's their plan.

21 And, you know, it could also involve the person's family

22 members so that everybody understands what happened and going

23 forward what needs to be in place so that the person can have a

24 successful reentry into the community.

25 Q   I think you've touched on this but just so we're clear, who

1   is involved in discharge planning?

2   A    Well, ideally, you would have, again, a representative from

3   the community mental health center, the treatment team in the

4   inpatient facility.  There could be an advocate.  There could

5   be another family member, significant other.  And, you know,

6   again, most importantly we would hope that the person

7   themselves would be actively involved so that, again, everybody

8   has a full understanding of, you know, what's involved and

9   what's the best way to collectively move forward.

10  Q    What does discharge planning need to address in order to be

11  appropriate?

12  A    Well, I think it would need to address, you know, what the

13  person's situation is.  So, for example, if someone is admitted

14  and they don't have income or they don't have any benefits or

15  they don't have housing or those kinds of supports, those kinds

16  of things have to be addressed.  If there are medication

17  issues, that needs to be considered.  Oftentimes with some

18  medications, they require very specific lab work so those kinds

19  of arrangements would have to be made.

20      So all of these different pieces need to be identified,

21  understood, and put in place prior to discharge so, again, that

22  when the person moves from the hospital, which is the most

23  intensive point on the continuum of care, to the community,

24  that the person's needs are well understood and that there is

25  an opportunity and a chance before they're discharged to put

1   whatever services and supports are necessary to make sure that

2   those are in place so that when the discharge occurs, this can

3   just smoothly move forward.

4   Q    What impact does discharge planning have on the chances

5   that somebody will be at serious risk of going back into a

6   State Hospital when they are discharged?

7   A    Well, poor discharge planning oftentimes is a factor in a

8   readmission.

9   Q    Why is that?

10  A    Because the groundwork wasn't done.  There oftentimes was

11  not either a collaboration or cooperation between the two teams

12  and the -- sort of the continuity of service and planning is

13  lost and, therefore, when discharge occurs into the community,

14  the person does not have the necessary services and supports in

15  place and, you know, things fall apart.  There's a crisis

16  occurs, whatever it might be, and the person ends up, you know,

17  rehospitalized.

18  Q    I would like to show you a portion of the deposition of

19  Charles Carlisle.  And I will represent to you that he is the

20  director of East Mississippi State Hospital.

21       MR. SCHUTZER:  Your Honor, this is a page from the

22  deposition designations that are Exhibit 2 of the pretrial

23  order.  Page 492.

24  BY MR. SCHUTZER:

25  Q    Would you read this excerpt, please?

1   A   The question is:  "Do you view it as important for East

2   Mississippi State Hospital to attempt to connect individuals

3   discharged from this facility to the right services to maximize

4   the likelihood that they will be successful in the community?"

5       The answer is:  "I think it is our responsibility to get

6   them in contact with the community mental health center as a

7   good, you know, *Here they are.  You know, we have stabilized*

8   *them.  This is the medication that they're on.*"

9   Q   Is this consistent with the standard of practice related to

10  discharge planning?

11  A   Unfortunately, it's not.

12  Q   Why not?

13  A   Well, from the response, again, I mean, it's sort of, you

14  know, "On the hospital side, we did this, and now you do this."

15  And there isn't -- again, there isn't the shared thinking and

16  consideration of what happened and what's the best way moving

17  forward using both teams and their expertise and their

18  experience to fashion a plan that, you know, is going to

19  increase the likelihood that the person will have a successful

20  transition into the community and maintain their community

21  tenure.

22  Q   And I should say for the record it's page 492 of the

23  designated depositions.  It's page 151 of Dr. Carlisle's

24  deposition.

25      Mr. Byrne, if a person has multiple admissions to a State

*** DAILY TRANSCRIPT ***

1    Hospital, would you expect discharge planning to look different

2    on the second or third or fourth admission than it did on the

3    first one?

4    A    Yes, I would.

5    Q    Why is that?

6    A    Well, if the first discharge occurs and the right kind of

7    planning and the right kind of execution didn't occur, and the

8    person is, you know, readmitted within a month or a short time

9    period thereafter, what ought to happen is that people, you

10   know, really try to think, "Okay, why did this happen so -- in

11   such a short period of time?  What did we miss?  And in going

12   forward, what do we need to put in place and build so that this

13   person is able to have a successful transition again from the

14   hospital and into the community?"

15   Q    I would like to show you another piece of a deposition.

16   This is from the deposition of Debra Wuichet, W-U-I-C-H-E-T.

17   It's page 199 of the deposition designations that's Exhibit 2

18   of the pretrial order and it is page 59 of her deposition.

19   Would you read this question and answer, please.

20   A    Sure.  The question is:  "Do you think that readmission

21   within 30 days of discharge has any bearing on the

22   effectiveness of the discharge plan that the social workers put

23   together for that individual?"

24       The response, the answer was:  "That would be on a case-by

25   case basis but usually the discharge plan was a good plan, it's

```
 1   just the patients didn't follow through with whatever we had

 2   set up for them to do.  We can't judge our effectiveness on

 3   whether they come back to the hospital."

 4   Q   I will represent to you and for the record that Ms. Wuichet

 5   is the director of social services at North Mississippi State

 6   Hospital.

 7       Is this testimony from Ms. Wuichet consistent with the

 8   standard of care for discharge planning?

 9   A   No.

10   Q   Why not?

11   A   Well, I mean, first of all, they identified social workers,

12   which that's a good thing, but what we're looking for are

13   teams.  You know, what does the treatment team have to say?

14   You know, we need -- you know, in these kinds of situations,

15   you need everybody's input.  You know, everybody has something

16   to offer.  And it -- and this is obviously true on the

17   inpatient side as well as the outpatient side.  So you need

18   that thinking and you need people to kick around, "Okay, we

19   had -- we've had a rehospitalization with a short amount of

20   time.  Okay.  That suggests strongly that something did not

21   work, because they're back in."

22       Okay.  So then you have to rethink what the planning is and

23   do we need to add services, do we need to look at this

24   differently, what do we need to do?  This is typical of -- you

25   know, unfortunately, they're blaming the patient.  The patient
```

1    has a responsibility.  They have a level of responsibility and

2    a role here.  It's not the whole thing.  So again, we need the

3    excellent thinking of the clinicians to fashion a plan that the

4    person can buy into, except maybe tweak if they need to, and

5    that is doable so that, you know, upon discharge, the person

6    has some, you know, skin in the game in terms of the plan and

7    hopefully, you know, in the future this will turn out better

8    than the last time.

9    Q    Did you observe discharge planning consistent with the

10   standard you've testified about for the people that you

11   reviewed in Mississippi?

12   A    I did not.

13   Q    What did you see instead?

14   A    I saw oftentimes there was a phone call made from someone

15   on the hospital treatment team to the receiving community

16   mental health center.  There was a date and appointment and a

17   time identified, and that information was conveyed to the

18   patient.

19   Q    Is that effective?

20   A    No.

21   Q    Why not?

22   A    Well, I mean, again, I mean, you don't have the right

23   process and the right building blocks and the right pieces in

24   place to make it successful.

25              THE COURT:  Hold on.  At this time we're going to take

```
 1   our -- and I really apologize.  We're going to take our lunch
 2   break.
 3           We're going to put a pin right there, Mr. Byrne, and
 4   we will pick back up after the lunch hour.
 5           I hope I'm back and we will be ready to start up at
 6   2:00 p.m.
 7           MR. SCHUTZER:  Thank you, Your Honor.
 8           THE COURT:  All right.  Thank you.
 9           Court is in recess.
10      (Lunch Recess)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3        I, BRENDA D. WOLVERTON, Official Court Reporter, United

 4   States District Court, Southern District of Mississippi, do

 5   hereby certify that the above and foregoing pages contain a

 6   full, true and correct transcript of the proceedings had in the

 7   aforenamed case at the time and place indicated, which

 8   proceedings were recorded by me to the best of my skill and

 9   ability.

10        I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13        This the 10th day of June, 2019.

14

15                         s/ Brenda D. Wolverton
                           U.S. DISTRICT COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```

*** DAILY TRANSCRIPT ***