UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                              CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                        DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 7


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
AFTERNOON SESSION
JUNE 10, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

APPEARANCES:

FOR THE PLAINTIFF:    MR. MATHEW SCHUTZER
                      MS. REGAN RUSH
                      MS. DEENA FOX
                      MS. HALEY VAN EREM
                      MR. PATRICK HOLKINS

FOR THE DEFENDANT:    MR. JAMES W. SHELSON
                      MR. REUBEN V. ANDERSON
                      MR. WILLIAM T. SILER, JR.

1                         TABLE OF CONTENTS

2

3     WITNESSES FOR THE PLAINTIFF:

4     DANIEL BYRNE                                        624

5        Direct Examination By Mr. Schutzer ................624

6          Exhibit PX-1097 ................................627

7          Exhibit PX-1096 ................................629

8          Exhibit PX-1095 ................................631

9          Exhibit PDX-10 for ID ..........................632

10       Cross-Examination By Mr. Shelson ..................632

11       Redirect Examination By Mr. Schutzer ..............666

12    LEDGER PARKER                                       673

13       Direct Examination By Ms. Fox ....................673

14       Cross-Examination By Mr. Shelson ..................705

15       Redirect Examination By Ms. Fox ..................710

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13          THE COURT:  Thank you all for bearing with me.  I

14   know, as you all are in public practice, most of you have been,

15   you know we're doing our public service duty when you get these

16   calls and you go speak to these groups.  And it's like I've got

17   to get elected again.  But I appreciate your patience.

18          Thank you for returning to the stand.  I will -- we

19   may go a little bit longer than 5:30 today if we need to catch

20   up, but I wanted that opportunity to be available to you.

21          MR. SCHUTZER:  Thank you, Your Honor.

22          THE COURT:  All right.

23                        DANIEL BYRNE,

24     having first been duly sworn, testified as follows:

25               DIRECT EXAMINATION (Continuing)

1 BY MR. SCHUTZER:

2 Q   Welcome back, Mr. Byrne.  Before we took our break, we were

3 talking about discharge planning.  Let's get back into that.

4 What is appropriate discharge planning?

5 A   Appropriate discharge planning would be where the treatment

6 team on the inpatient service and at least a representative

7 from the community service would get together and, again,

8 exchange the relevant clinical information, consider any new

9 information that they might have, and then collaboratively

10 develop a plan that would identify the services and the

11 supports that are needed for the person to be able to be safely

12 discharged, return to the community and be able to resume their

13 lives.

14 Q   What kind of discharge planning did you see in the people

15 you reviewed in Mississippi?

16 A   In many cases, the discharge planning consisted of a phone

17 call to the community mental health center and an appointment

18 to date and time were arranged.  And there, of course, were

19 some medication orders.  But that was about it.

20 Q   I'd like to talk about the discharge planning that person

21 89 experienced.  Can we turn to page 127 of your report,

22 please.  Can you tell us a little bit about person 89.

23 A   Yes.  This say a 46-year-old Caucasian male, unmarried, who

24 had had some work history, and he had also had a substance

25 problem, and he had experienced multiple hospitalizations, both

1    in private hospitals, crisis stabilization units and in the

2    Mississippi state system.

3    Q    Focusing on the state hospitals, how many times had he been

4    to Mississippi State Hospital?

5    A    Three times.

6    Q    Let's get the dates of those.  Was the first one

7    September 23rd, 2016 through October 24, 2016?

8    A    Yes.

9    Q    Was the second one June 12th, 2017 to June 22nd, 2017?

10   A    Yes.

11   Q    Was the third one August 21st, 2017 to August 30th, 2017?

12   A    Yes.

13   Q    What, if anything, does having three hospital admissions in

14   less than a year suggest to you about the discharge planning

15   that happened for each of these admissions?

16   A    I think the planning, you know, was underpowered and, you

17   know, unfortunate, because I don't think that there was the

18   adequate thinking and planning that needed to go into the plan

19   to ensure that there was some level of success when this

20   gentleman returned to the community.

21   Q    What services would have been appropriate for him to

22   receive to ensure there was some level of success when he

23   returned to the community?

24   A    In this situation, I mean, I recommended PACT services.  I

25   think, again, given this gentleman's history, and also, you

1    know, with -- he had a co-occurring substance use problem, so

2    given the number of hospitalizations, decompensations, problems

3    that he had, he would have required the most intensive service,

4    which would have been PACT.

5    Q   Did the state -- did Mississippi State Hospital ever refer

6    him to a PACT team?

7    A   I don't believe so, no.

8    Q   Did Mississippi State Hospital ever identify PACT as

9    something that he would be appropriate for?

10   A   They did not.

11   Q   Let's take a look -- did he receive PACT services?

12   A   He did not.

13   Q   What happened when he was discharged from -- well, I'm

14   going to do it this way.  Would you turn in your tab -- in your

15   binder, please, to the tab labeled PX-1097.  What is this

16   document?

17   A   This is a Mississippi State Hospital diagnostic discharge

18   summary.

19   Q   Which of his three Mississippi State Hospital admissions is

20   this the discharge summary for?

21   A   I believe this is the first.

22        MR. SCHUTZER:  I move PX-1097 into evidence.

23        THE COURT:  Any objection from the State?

24        MR. SHELSON:  No, Your Honor.

25        Okay.  PX-1097 will be received into evidence.

1      (Exhibit PX-1097 marked)

2    BY MR. SCHUTZER:

3    Q    Will you turn to page 5 of this document, please?  Looking

4    towards the bottom of the page, the paragraph -- paragraph 8,

5    after-care plans?

6         Yes.

7    Q    What was the after-care plan for person 89's first

8    discharge?

9    A    Do you want me to read it?

10   Q    Yes, please.

11   A    The after-care plan was:  "Follow up with the mental health

12   center, follow up with primary care provider within one month

13   of discharge for hypertension, and follow-up X-ray of left arm

14   (follow-up left radial head fracture.)  The social worker

15   arranged an after-care appointment for this patient at Region 9

16   Mental Health Center on November 4, 2016 at 1 p.m."

17   Q    Could you turn to the tab labeled PX-1096 in your binder,

18   please.  What is this document?

19   A    This is a Mississippi State Hospital diagnostic discharge

20   summary.

21   Q    Is this for his second Mississippi State Hospital

22   discharge?

23   A    It is.

24   Q    Would you turn, please, to page 4.  What is the after-care

25   plan for this second discharge?

1    A    The after-care plans:  "Follow up with mental health

2    center.  The social worker arranged an after-care appointment

3    for this patient at Hinds Behavioral Health on July 10, 2017,

4    at 1:30 p.m. with Dr. Lundy.  The nurse practitioner instructed

5    the patient to follow up with primary care provider in one

6    month for blood pressure management.  Take" -- I believe that

7    should be:  "Clonodine as directed.  Must be wean off Clonodine

8    to avoid rebound hypertension."

9    Q    Would you turn in the binder, please, to PX-1095.  I think

10   I neglected to do this.

11            MR. SCHUTZER:  I move PX-1096 into evidence.

12            THE COURT:  Any objection from the State?

13            MR. SHELSON:  No, sir.

14            THE COURT:  All right.  PX-1096 will be received into

15   evidence.

16        (Exhibit PX-1096 marked)

17   BY MR. SCHUTZER:

18   Q    Are you on PX-1095, Mr. Byrne?

19   A    Yes.

20   Q    What is this?

21   A    This is a Mississippi State Hospital diagnostic discharge

22   summary.

23   Q    Is this from person 89's third trip to Mississippi State

24   Hospital?

25   A    That's correct.

1    Q    Would you turn, please, to page 4.  What is the after-care

2    plan for this discharge?

3    A    "After-care plans:  Follow up with the mental health

4    center.  Take medications as ordered.  Do not stop or alter

5    them.  Report any thoughts of suicide or homicide immediately.

6    The social worker arranged an after-care appointment at Region

7    15 Mental Health Center for this patient on September 11, 2017

8    at 10 a.m.  He was also instructed to follow up with his

9    primary care provider in one week or sooner for continued

10   management of hypertension and yearly wellness exam."

11          MR. SCHUTZER:  Can we get all three of them up

12   together.

13   BY MR. SCHUTZER:

14   Q    Looking at all three of these after-care plans, are they

15   appropriate for person 89?

16   A    Not clinically appropriate.

17   Q    Why is that?

18   A    Well, they are not robust.  They don't have -- again, they

19   don't have the shared thinking and the engagement of the

20   treatment team on the inpatient side, as well as representation

21   from the community-based provider in terms of what the

22   collective thinking was in terms of what's best for this person

23   and what services and supports need to be considered and in

24   place so that he has a more successful opportunity to, upon

25   discharge, live in the community and be successful there.

1          MR. SCHUTZER:  If could I have a moment to confer with

2     counsel.

3          THE COURT:  Yes, you may.

4      (Short Pause)

5     BY MR. SCHUTZER:

6     Q    Just a few more questions for you, Mr. Byrne.  To wrap up,

7     I'd like to go back to PDX-9, the chart.  It's on your screen.

8     Focusing on the column of 87 percent of people at serious risk,

9     why were they at serious risk?

10    A    They were at serious risk because the content and quality

11    of the outpatient services was not meeting their needs.

12    Q    What change to Mississippi's mental health services would

13    change that 87 percent number?

14    A    Well, there are a number of things.  I think to start with,

15    we would need to have discharge planning, as I've described it

16    here today, and we would also need a much more robust array of

17    community-based services that are calibrated to the needs of

18    the clients and are able to, you know, in terms of intensity

19    and flexibility, that they would need to be sensitive to what

20    the person's specific needs at a specific point in time would

21    be.

22         MR. SCHUTZER:  I pass the witness, Your Honor.

23         THE COURT:  Let me ask, did the United States intend

24    to admit this into evidence?

25         MR. SCHUTZER:  That's for identification.

1    THE COURT:  All right.  Tell me what this document is.

2  Not even for ID, huh?

3    MR. SCHUTZER:  That one, the calendar, Your Honor,

4  that's PDX-10.

5    THE COURT:  PDX-10 for ID only?

6    MR. SCHUTZER:  I've been reminded I neglected to move

7  PX-1095 into evidence.

8    THE COURT:  Any objection to 1095 from the State?

9    MR. SHELSON:  No, sir.

10    THE COURT:  All right.

11   (Exhibit PX-1095 marked)

12    THE COURT:  Any objection to the ID only for PDX-10?

13    MR. SHELSON:  No, sir.

14    MR. SCHUTZER:  Thank you, Your Honor.

15   (Exhibit PDX-10 for identification marked)

16    MR. SHELSON:  May I proceed, Your Honor?

17    THE COURT:  Yes, you may.

18                    CROSS-EXAMINATION

19  BY MR. SHELSON:

20  Q   Good afternoon, Mr. Byrne.

21  A   Good afternoon, sir.

22  Q   Mr. Byrne, are you a psychologist?

23  A   I am not.

24  Q   Are you a psychiatrist?

25  A   I am not.

1   Q   Can you prescribe medications?

2   A   No.

3   Q   Let me visit with you about your time at St. Elizabeth's

4   Hospital.  May I refer to that as SEH?

5   A   Sure.

6   Q   Okay.  You were there at two different periods of time.  Is

7   that correct?

8   A   Yes.

9   Q   And the first time you were at SEH was from 1994 to 2001?

10   A   The first time began in 1983, sir.

11   Q   Okay.  What were the periods of time you were at SEH?

12   A   I was at the hospital from 1983 to I think about 1986, and

13   then I was there from 1994 through 2000.

14   Q   Did you also work at SEH from June 2009 through

15   September 2009?

16   A   Yes.

17   Q   When you worked at SEH, what were the admissions criteria?

18   A   Well, the admissions criteria were if someone was

19   clinically adjudicated to require inpatient care, they were

20   referred and received.

21   Q   Was there a standard for being clinically adjudicated to

22   receive state hospital level of care?

23   A   Yes.

24   Q   What was that standard?

25   A   If the person was in immediate danger to themselves or

1  others would be the most prominent.

2  Q   If an individual met the admissions criteria and was

3  admitted to SEH, was SEH the most integrated setting

4  appropriate for that individual at the time of admission?

5  A   Yes.

6  Q   When you worked at SEH, was it treating any patients who

7  would have avoided admission if they had received appropriate

8  community-based services before they were admitted?

9  A   In some cases, yes.

10 Q   Why does that happen in some cases at state hospitals?

11 A   It happens because there may be either some interruptions

12 or misunderstands about what level of service and what services

13 might be needed to maintain the person in the community.

14 Q   All right.  Do you recall testifying earlier about the

15 Office of Outpatient Services at SEH?

16 A   Yes.

17 Q   And remind us what that office did.

18 A   The office was basically the clearinghouse, sort of the

19 quality control for all discharges.

20 Q   And you personally worked in that office?

21 A   I did.

22 Q   And did you review discharge applications to make sure

23 individuals were appropriately to be discharged from the

24 hospital to live in the community?

25 A   Yes.

1   Q   What criteria did you use to determine whether an

2   individual was appropriate to be discharged to the community?

3   A   Well, there would be a chart review, so I would be able to

4   see if the person, you know, in terms of had the symptomatology

5   decreased as their functionality improved.  You know, were they

6   stable on the ward?  And then I would be looking at -- in terms

7   of the discharge planning, I would be looking at the services

8   that had been identified for the person that they would receive

9   in the community and make sure that everything was in place.

10   Q   Did you ever determine that an individual is not

11   appropriate for discharge to the community?

12   A   Yes.

13   Q   And was it based on the review of the factor that you just

14   mentioned?

15   A   Yes.

16   Q   And so can you give us an example of someone you found not

17   appropriate for discharge at the time?

18   A   One example that comes to mind is someone that had been an

19   incident on the ward, and they ended up -- I believe that they

20   struck another patient and ended up in seclusion.

21   Q   Can you give us an example of a patient you reviewed where,

22   based on their symptomatology at the time, you found they were

23   not appropriate for discharge?

24   A   I can't recall a specific case for that, sir.

25   Q   Okay.  Did you work for the Disability Rights Center of New

1  Hampshire for a period of time?

2  A   Yes.

3  Q   When did you work for the Disability Rights Center?

4  A   I was -- I worked there in late 2012 to the beginning of

5  2013.

6  Q   Were you involved in any lawsuits filed by the Disability

7  Rights Center?

8  A   I was.

9  Q   Was one of those the *Disability Right Center versus New*

10  *Hampshire*?

11  A   Yes.

12  Q   What was your role in that lawsuit?

13  A   My role was to review clinical records, interview patients,

14  family members, and get a sense of what the content and quality

15  of the inpatient services were, as well as the community-based

16  services.

17  Q   Was that role similar to your role in this case?

18  A   There are some similarities.

19  Q   All right.  Was the person named Judith Boardman an expert

20  in that case?

21  A   Yes.

22  Q   Is Judith Boardman one and the same person as Judith

23  Baldwin, who is an expert in this case?

24  A   Yes.

25  Q   You mentioned a Green Door during your testimony this

1  morning.  Do you recall that?

2  A    Yes.

3  Q    What is Green Door?

4  A    Green Door has been -- it used to be a private mental

5  health provider in the District of Columbia.

6  Q    And you said used to be.  Why used to be?

7  A    They were taken over by a larger entity.

8  Q    At some point in time, did Green Door in the District of

9  Columbia have a clubhouse?

10  A    They did.

11  Q    What is a clubhouse?

12  A    A clubhouse is a place where people with mental health

13  disabilities and diagnoses can come every day.  They can learn

14  new skills.  There are specific activities.  There's also some

15  job readiness training that was offered, and there were also

16  some supports in terms of psychoeducational education in terms

17  of medication adherence, side effects.  So it was -- there were

18  educational, occupational and recreational components to their

19  program.

20  Q    Did the clubhouse close at some point because of lack of

21  funding?

22  A    The funding -- the whole mechanism for house services

23  were -- being paid for changed, and the clubhouse closed,

24  because that service, at that point in time, was not recognized

25  as a reimbursable service.

1    Q    It was not recognized at the time at a reimbursable service

2    under Medicaid?

3    A    Yes, because the system went into a Medicaid rehab option,

4    and the services changed from grant-based services to fee for

5    services -- fee for service.

6    Q    You worked directly on PACT in the District of Columbia?

7    A    At Green Door and Capital Community, yes.

8    Q    Have you worked directly on PACT team anywhere else outside

9    the District of Columbia?

10   A    No.

11   Q    Do the mental disorders that PACT is indicated for include

12   schizophrenia?

13   A    I missed the first couple of words.

14   Q    I'm sorry.  Do the mental disorders that PACT is indicated

15   for include schizophrenia?

16   A    Yes.

17   Q    Does it include major depression?

18   A    Yes.

19   Q    Does it include bipolar diagnoses?

20   A    Yes.

21   Q    Does it include schizoaffective disorders?

22   A    Yes.

23   Q    Do you agree that some people are resistant to PACT

24   services?

25   A    Initially, yes.

Q   Let's talk about some of the reasons why people may

initially be resistant to PACT.  Is one of the reason that some

people don't like medications?

A   Yes.

Q   Is one of the reasons that they feel they've been

mistreated by the mental health system?

A   Yes.

Q   Is one of the reasons that they may also have substance

abuse issues?

A   Yes.

Q   Is one of the reason that's they also may have legal

issues?

A   That could be a factor, yes.

Q   And is another reason that some people just don't want PACT

in their homes?

A   I don't have direct familiarity with that.

Q   Is another one of the reasons that they may be so psychotic

or disorganized that they don't understand PACT may benefit

them?

A   Yes.

Q   All right.  Of the 35 individuals you reviewed in

Mississippi, are two of those individuals deceased?

A   Yes.

Q   Are those individuals person 70 and person 84?  I think if

you look in your notebook, PX-400.

1   A   Can you repeat the numbers, please.

2   Q   Sure.  First one is person 70.

3   A   Yes.

4   Q   And the second one is person 84.

5   A   That's correct.

6   Q   Did DOJ staff accompany you on each of your interviews in

7   Mississippi?

8   A   Yes, with the exception of the telephone interviews.

9   Q   Okay.  So the in-person interviews, DOJ staff accompanied

10  you?

11  A   Yes.

12  Q   And who are the individuals from DHS -- who are the

13  individuals from DOJ who accompanied you on your interviews in

14  Mississippi?

15  A   They included Bobby Molson, Regan Rush, Mary Bohan, Ryan

16  King, Linda Garcia, Gary -- I'm forgetting his last name, and

17  there may be another person I'm not recalling.

18  Q   Ryan King?

19  A   Ryan King, yes.

20  Q   Okay.  At times, did the DOJ staff ask questions during

21  your interviews of individuals in Mississippi?

22  A   That happened a few times.

23  Q   All right.  So when we exclude the two individuals who are

24  deceased, that obviously leaves 33 living individuals you

25  interviewed?

1    A   Yes, sir.

2    Q   All right.  And of those 33 individuals, at the time of

3    your interview, three of them were at Mississippi State

4    Hospital, and one was in the Pearl River County Jail?

5    A   Yes.

6    Q   So you exclude those four, and that's 29 of 33 who are

7    living in the community?

8    A   Yes.

9    Q   Okay.  And 29 of 33 is 87 percent.  I'll represent to you

10   that it is.  But 29 of 33 were living in the community at the

11   time you interviewed them?

12   A   Yes.

13   Q   All right.  I want to ask you a question about person 63.

14   Of course, you're free to look at your report.  Person 63

15   starts on page 40 of 144.

16   A   Yes.

17   Q   All right.  Do you recall your testimony this morning when

18   you were talking about discharge planning, did you say that one

19   of the things that can help with discharge planning is for

20   someone who was treating the person in the community to visit

21   the state hospital and coordinate that person's care?

22   A   Yes.

23   Q   All right.  Do you -- do you recall where person 63 lives?

24          MR. SHELSON:  May I approach the witness, Your Honor.

25          THE COURT:  Yes, you may.

1  BY MR. SHELSON:

2  Q   I'm going to show you an unredacted copy of page 40 of your

3  report.  And where does it say this person lives.

4  A   I'm not seeing.

5  Q   Here.

6  A   He lives in Lorman, Mississippi.

7  Q   Do you happen to recall what county Lorman is in?

8  A   I don't offhand.

9  Q   It's okay if you don't.  I'll represent to you that Lorman

10  is in Jefferson County, Mississippi, which would be here, and

11  Mississippi State Hospital, you agree, is in Hinds County?

12  A   I believe, yes.

13  Q   Okay.  So if that's roughly an hour and a half drive each

14  way, is that a practical reality that would face somebody who

15  treated Mr. -- excuse me, I shouldn't say his name -- who

16  treated person 63 in Lorman for that person to travel to

17  Mississippi State Hospital and back?

18  A   Well, it's a distance, and you know, sometimes, you know,

19  in other places they -- people would make the trip.  It can

20  also be done either by telephone or by Skype.  The important

21  thing here is that there is an exchange of information between

22  the treating teams so that we get the best information and the

23  best planning.

24  Q   Do you remember -- this is Exhibit PX-1096.  Do you

25  remember discussing this exhibit earlier about person 89?

1  A   Yes.

2  Q   It's in your notebook.

3  A   Yes.

4  Q   I want to direct your attention down here to the

5  highlighted part.  Does it say -- that sentence read, "The

6  social worker arranged an after-care appointment for this

7  patient at Hinds Behavioral Health on July 10th, 2017, at

8  1:30 p.m., with Dr. Lundy"?

9  A   That's correct.

10 Q   Does Hinds Behavioral Health have a PACT team?

11 A   I believe they do.

12 Q   When the person -- when this person, person 89, was sent to

13 Hinds County Behavioral Health, could there have been -- would

14 there have been an internal referral to PACT?

15 A   Possibly.

16 Q   So just because the hospital doesn't make a direct referral

17 to PACT doesn't mean it cannot happen once that person is in

18 the community.  Is that correct?

19 A   Hypothetically, yes.

20 Q   And then still on person 89, and this is Exhibit PX-95,

21 which is also in your binder, this was the discharge subsequent

22 to the one we just looked at.  And the highlighted sentence

23 reads, "The social worker arranged an after-care appointment at

24 Region 15 Mental Health Center for this patient."  And it lists

25 the date and time.  Do you know whether Region 15 has a PACT

1  team?

2  A   I believe they do.

3  Q   Again, could Region 15 have indicated a PACT for this

4  individual?

5  A   Internally, possibly, yes.

6  Q   I want to shift gears and talk about state hospitals

7  briefly.  In your experience, are there any instances where an

8  individual is appropriate for admission to a state hospital?

9  A   Oh, yes.

10 Q   In your experience, when is an individual appropriate for

11 admission to a state hospital?

12 A   If they are in immediate danger to themselves or others,

13 and if other measures like, you know, crisis counseling, crisis

14 services, if those have not been successful in terms of

15 remediating the situation, and again, and the person continues

16 to be either a present danger to themselves or others, you

17 know, hospitalization can be indicated.

18 Q   What is the continuum of care for mental health?

19 A   Well, it would start with -- on the far left, it would

20 start with, you know, the traditional outpatient services

21 and -- which would be low intensity services, if that's what

22 was indicated, and it would extend all the way to, on the

23 right, to hospitalization.

24 Q   So from left to right, left would be the lowest intensity

25 of services, and the right would be the highest level?

1   A   Which would be hospitalization, yes.

2   Q   Are inpatient beds in state hospitals part of the continuum

3   of care?

4   A   Yes.

5   Q   And are state hospitals part of the continuum of care

6   because they are the highest level of care?

7   A   That's correct.

8   Q   And does highest level of care mean that state hospitals

9   are staffed 24 hours a day and are equipped to manage people

10   who need that intensity of service?

11   A   Yes.

12   Q   Based on your experience, at least generally speaking, what

13   services are available in state hospitals?

14   A   Generally, state hospitals would offer assessment services,

15   diagnostic services, medication services.  There could be

16   rehabilitation services.  There could be psychotherapy or

17   counseling individually.  There could be groups.  There could

18   be other rehab services.  Oftentimes, there's a medical

19   component, recreational therapy, a benefits office so that if

20   someone, you know, needs Medicaid or is having problems, say,

21   with a disability application, that all of those issues could

22   be managed by the hospital.

23   Q   Were you able to determine one way or the other whether the

24   state hospitals in Mississippi offer those services?

25   A   I believe they do.

1    Q    In your opinion, when is an individual not appropriate for

2    community-based services?

3    A    It would be a rare situation, small number of people, but

4    if someone, you know, has behavior, either self-injurious

5    behavior or injurious behavior towards others that cannot be

6    managed or remediated, that would be a situation where just --

7    and a safety issue that they would not be appropriate to be in

8    the community.

9    Q    In your opinion, when would an individual not benefit from

10   community-based services?  Is it the same answer you just gave?

11   A    Pretty much, yes.

12   Q    Anything you have to add to it?

13   A    There could be -- there could be situations where someone

14   could have either a medical disorder that's having a negative

15   effect on their psychiatric status, or there could be -- you

16   know, they could have behavior such as would make it, you know,

17   not a safe situation.

18   Q    I want to ask you next, sir, about some of the individuals

19   you reviewed, and I'm going start with person 55, who, again,

20   your report is PX-401, and person 55 starts on page 12 of 144.

21   A    Yes, sir.

22   Q    Did you make any determination regarding whether the

23   treatment person 55 received at Mississippi State Hospital met

24   the applicable standard of care?

25   A    I think that it did.

1   Q   And did you make a different standard of care assessment

2   for any of the other 34 individuals you reviewed?

3   A   No.

4   Q   In 1996, was person 55 admitted to the forensic unit at

5   Mississippi State Hospital after allegedly killing his brother?

6   A   He was.

7   Q   Did you find person 55 was not opposed to living in the

8   community?

9   A   He was not opposed to living in the community.

10  Q   Pardon?

11  A   He was not opposed to living in the community.

12  Q   Was person 55 living in the community when you interviewed

13  him?

14  A   Yes.

15  Q   All right.  Would you turn to person 56, please.  And

16  does -- person 56 starts on page 16 of your report.  Is that

17  correct?

18  A   Yes.

19  Q   All right.  When you interviewed person 56, was she a

20  danger to self or others?

21  A   When I interviewed her, no.

22  Q   When you did interview her, was she living in the community

23  with her husband and two children?

24  A   Yes.

25  Q   I want to go next to person 57.  Starts on page 19 of 144

1  of your report.  Did person 57's symptomatology at the time of

2  her last state hospitalization before you interviewed her

3  include that she was not medication-adherent and had violated

4  outpatient commitment requirements?

5  A   That's correct.

6  Q   And not to ask an obvious question, but what does it mean

7  to violate outpatient commitment requirements?

8  A   She did not adhere to the conditions of the order.

9  Q   Meaning that she was out of the state hospital subject to

10  certain conditions?

11  A   That's correct.

12  Q   All right.  When you interviewed person 57, was she stable?

13  A   Yes.

14  Q   Was she a danger to self or others?

15  A   Not when I interviewed her.

16  Q   I'm going to direct your attention to page 20 of 144 of

17  your report, and we're still on person 57.  And I'm going to

18  direct your attention to the second paragraph that's starts

19  here.  Did you write that the identification and acquisition of

20  appropriate housing with the correct behavioral health and

21  environmental supports for person 57 has been a challenge for

22  MSH -- MHS is Mississippi State Hospital, for the record.  But

23  anyway, did you write that sentence?

24  A   Yes.

25  Q   Why had that been a challenge for MSH?

1    A    It had been a challenge because she wanted to reside in her

2    own place, and she wanted to live independently.  And the

3    clinical team -- the clinical decision was that she required a

4    level of supervision.

5    Q    What type of housing did you recommend for person 57?

6    A    I recommended that this person receive supported housing.

7    Q    And is that -- is that supported congregate housing?

8    A    It could be.

9    Q    Was it in the case of person 57?

10   A    That was -- in that case, it was congregate.

11   Q    Wasn't that also the type of housing that the staff at MSH

12   was recommending for person 57?

13   A    I think that there might be a difference in terms, that

14   supported housing, as I recommended, has different clinical

15   supports than I believe what the hospital was suggesting.

16   Q    Did you recommend that person 57 would at least initially

17   have 24/7 supervision at the housing you recommended for her?

18   A    I don't think it would -- the supported housing, I don't

19   think that that would have 24/7 supervision.  They would have

20   some staff presence, and there would be some supportive

21   services.  I don't believe it would go 24 hours a day.

22        MR. SHELSON:  May I approach the witness, Your Honor?

23        THE COURT:  You may.

24   BY MR. SHELSON:

25   Q    I'm going to show you that, Mr. Byrne, because I did not

1  redact this individual's name, but if you would just read to

2  yourself, starting there, and tell me when you're done and I'll

3  flip the page.

4  A   (Witness complied with request.)

5  Q   And then page 70 line 1 through 6.

6  A   (Witness complied with request.)

7  Q   So in your deposition, did you find that -- did you testify

8  that person 57 would initially need 24/7 supervision?

9  A   Yes.

10 Q   All right, sir.  If we could move on to person 59; which

11 starts on page 26 of 144 of your report.  My first question

12 about person 59 is, at the time you interviewed him, was he

13 living with his wife in CHOICE housing?

14 A   Yes.

15 Q   And CHOICE housing is what?

16 A   It's a program that's funded by the Department of Mental

17 Health in the state of Mississippi.  It offers housing

18 subsidies and rental supports.

19 Q   And was person 59 also receiving PACT services when you

20 interviewed him?

21 A   He was.

22 Q   And, sir, this is on page 16 of your report, if you'd like

23 to look, but did you write in your report -- that's page 16.

24 It's page 27 of 144.  Did you find that person 59 was very

25 pleased with the comprehensive approach to coordinated

1  community care he was receiving?

2  A   With the PACT services, yes.

3  Q   Would you turn to person 60, who begins on page 30 of 144

4  of your report.  Did the person's symptomatology at the time of

5  his last state hospitalization include that he refused to take

6  his medications, his psychotic symptoms were re-presenting, and

7  a history of being assaultive and self-destructive behavior?

8  A   Yes.

9  Q   Did that -- well, did Mr. -- did person 60's history of

10 self-destructive behavior including -- include setting himself

11 on fire at least once?

12 A   I believe he attempted to.

13 Q   Did it include self-amputating his arm by cutting it off

14 with a saw?

15 A   Unfortunately, yes.

16 Q   When you interviewed person 60, was he a danger to self or

17 others?

18 A   No.

19 Q   I'd like to turn next, sir, to person 62, who begins on

20 page 37 of 144 of your report.  Did person 62's symptomatology

21 at the time of her last state hospitalization before you

22 interviewed her include that she was not medication-adherent

23 and had threatened her daughter with physical harm?

24 A   That's correct.

25 Q   And when you interviewed her, was she a danger to self or

1  others?

2  A   No.

3  Q   Did -- well, strike that.  Was person 62 receiving PACT

4  when you interviewed her?

5  A   She was.

6  Q   Did you recommend senior supported housing for person 62?

7  A   Yes.

8  Q   What is senior supported housing?

9  A   This was -- this supported housing would be with seniors,

10 and there would be some level of services that would be

11 available at the apartment complex or at the facility.

12 Q   And the senior was simply because of person 62's age at the

13 time?

14 A   Right.

15 Q   And do you recall approximately how old person 62 is?

16 A   I believe she was 74, if I'm not mistaken.

17 Q   Could we move next, Mr. Byrne, to person 64?  And he starts

18 on page 44 of 144 of your report.

19 A   Yes.

20 Q   Did person 64 have a history of hospitalizations in states

21 other than Mississippi?

22 A   Yes.

23 Q   And again, I'm on page 44 of 144 of your report, and I'm in

24 the first paragraph under the caption, "Review of

25 hospitalizations."  Was person 64 hospitalized as an inpatient

1  at Baptist Behavioral in Florida in 2004?

2  A   Yes.

3  Q   Was person 64 admitted several times at West Florida

4  Pavilion and West Florida Community Care?

5  A   Yes.

6  Q   Did person 64 spend approximately three and a half years as

7  an inpatient at Chattahoochee State Hospital in Florida before

8  being discharged in 2011?

9  A   Yes, that's correct.

10  Q   Has person 64 also been hospitalized in Tennessee three

11  times?

12  A   Yes.

13  Q   Has he been hospitalized in Louisiana?

14  A   Yes.

15  Q   Has he been hospitalized in a Veterans Administration home

16  in Virginia?

17  A   Yes.

18  Q   Do those -- strike that.  Did those admissions range

19  between six months and two years?

20  A   They did.

21  Q   Did you review the records from person 64's admissions to

22  hospitals in states other than Mississippi?

23  A   No.

24  Q   Would you turn next, sir, to person 65, who begins on page

25  47 of 144 of your report.  Did person 65's symptomatology at

1  the time of his last state hospitalization before you

2  interviewed him include an accusation of trying to rape another

3  resident at a person care home?

4  A   Yes.

5  Q   When you interviewed person 65, was he a danger to self or

6  others?

7  A   No.

8  Q   What -- did you recommend permanent supported housing for

9  person 65?

10  A   Yes.

11  Q   Did person 65 indicate to you that he preferred to live in

12  a personal care home?

13  A   Initially, yes.  He had some concerns that he wouldn't be

14  able to prepare his own meals.

15  Q   Well, to the extent person 65 did prefer to live in a

16  personal care home, should that choice be honored?

17  A   Yes, it should be honored.  I think that the other parts of

18  that would be, I think that he needed to be also informed on

19  some potentially -- some other options, like supported housing,

20  which, you know, could offer a different array of services than

21  the personal care home where he currently resided.

22  Q   The next person I'd like to talk about is person 67, and

23  that person starts on page 55 of 144 of your report.  When you

24  interviewed person 67, was she living in a nursing facility in

25  Natchez, Mississippi?

1   A   Yes.

2   Q   Was person 67 in that facility because she had developed

3   some medical issues and dementia?

4   A   Yes.

5   Q   And did you agree with that level of care?

6   A   Yes.

7   Q   Is the housing recommendation you made for person 67 to

8   stay where she was at the time you interviewed her?

9   A   Yes.

10   Q   If we could go next to person 68, who begins on page 58 of

11   144 of your report.  Did person 68's symptomatology at the time

12   of his last hospitalization before you interviewed him include

13   that he had threatened staff at the local community mental

14   health services?

15   A   Yes.

16   Q   And when you interviewed person 76, was he cooperative?

17   A   Yes.

18   Q   And was he a danger to self or others?

19   A   No.

20   Q   Could we turn, please, to person 69, who begins on page 62

21   of 144 of your report.  When you interviewed -- strike that.

22   Did person 69's symptomatology at the time of her last state

23   hospitalization before you interviewed her include suicidal

24   feelings, decompensation and some evidence that she has been

25   substance dependent?

1  A   That's correct.

2  Q   When you interviewed person 69, was she pleasant,

3  cooperative and stable?

4  A   Yes.

5  Q   Was she a danger to self or others?

6  A   No.

7  Q   Could we turn to person 71, who begins on page 70 of 144 of

8  your report.  Did person 71's symptomatology at the time of his

9  last state hospitalization before you interviewed him include

10 organic psychosis, some manic behavior and physically

11 aggressive behavior towards female residents at a personal care

12 home and some incidents with his family?

13 A   Yes.

14 Q   When you interviewed person 71, was he a danger to self or

15 others?

16 A   No.

17 Q   Was person 71 living in a personal care home in

18 Plantersville, Mississippi when you interviewed him?

19 A   Yes.

20 Q   And, sir, this is on page 71, 144 of your report, and it's

21 the first paragraph under the caption "Review of community

22 services."  Did you write that person 71 has adjusted to living

23 at his personal care home and has a good relationship with the

24 manager, as do other members of the family?

25 A   Yes.

1  Q   And you did not make some other housing recommendation for

2  person 71, did you?

3  A   I indicated I recommended supported housing, sir.

4  Q   Did you?  Okay.  But you did that even though he appeared

5  to be doing well in the personal care home?

6  A   Yes.

7  Q   All right.  Can we turn to person 73, please, who starts on

8  page 77 of 144 of your report.  Did person 73's symptomatology

9  at the time of his last state hospitalization before you

10  interviewed him include that he had physically assaulted his

11  mother, was experiencing -- was experiencing anxiety, sleep

12  disturbance, substance use and was not adhering to his

13  psychiatric medication?

14  A   That's correct.

15  Q   Was person 73 a danger to self or others when you

16  interviewed him?

17  A   No.

18  Q   Would you turn next, please, to person 77, which starts on

19  page 88 of 144 of your report.  The only question -- the only

20  thing I want to ask you about with respect to person 77 is, did

21  you recommend income supports for her to remain in the

22  community?

23  A   Yes.

24  Q   What are income supports?

25  A   Income supports could be, until someone gets their

1  benefits, there could either be like a bridge loan or a small

2  grant or, you know, a loan so that someone, when leaving the

3  hospital, would be able to afford, you know, to be able to live

4  in a place, a safe place in the community while their benefits

5  application was being considered.

6  Q  In your experience, what is the amount of those loans or

7  grants?

8  A  Oh, I don't know now, sir.

9  Q  Okay.  Can we turn next to person 78, who starts on page 91

10  of 144 of your report.  Do the records you reviewed indicate

11  that community support services were recommended for person 78,

12  but the services were refused?

13  A  Yes.

14  Q  Did you find that the identification and acquisition of

15  appropriate housing with the necessary behavioral health and

16  environmental supports for person 78 had been difficult and

17  challenging?

18  A  Yes.

19  Q  And why had that been difficult and challenging?

20  A  In part because he had a co-occurring substance use problem

21  which got in the way of, you know, his better functioning.

22  Q  If we could turn to person 79, who starts on page 95 of 144

23  of your report.  And what I'm going to ask you about is

24  actually on the -- on page 96 of 144 of your report, but on --

25  and it's the second paragraph from the bottom, if you want to

1   look.

2       Anyway, here's the question.  On May 31, 2018, was person

3   79 discharged from MSH to a four-bedroom supervised living home

4   operated by the Region 8 committees?

5   A   Yeah.  I'm very pleased to tell you yes.

6   Q   Pardon?

7   A   I said I'm very pleased to tell you yes.

8   Q   Thank you.  And so my next question, I think I already know

9   the answer, but did you find that was appropriate housing for

10  person 79?

11  A   I haven't seen it, but from what I understand, I believe it

12  would be appropriate.

13  Q   If you could, sir, turn to person 80, who starts on page 98

14  of 144 of your report.  Did person 80's symptomatology at the

15  time of his last state hospitalization before you interviewed

16  him include that he was suicidal, and there was evidence of a

17  mood disturbance, substance use and some medical issues?

18  A   Yes.

19  Q   When you interviewed person 80, was he a danger to self or

20  others?

21  A   No.

22  Q   Did person 80 have multiple prior hospitalizations in

23  Louisiana and Texas?

24  A   Yes.

25  Q   Was person 80 discharged from South Mississippi State

1    Hospital to a personal care home on July 24, 2017?

2    A    Yes.

3    Q    Was that housing acceptable to person 80?

4    A    It was.

5    Q    Do the records indicate that person 80 has an IQ of 75?

6    A    Yes.

7    Q    And what does an IQ of 75 indicate?

8    A    It would indicate that he would be on the lower level of

9    intelligence as it's measured by that battery of tests.

10   Q    If that IQ test was accurate, does it indicate that person

11   90's capacity to work with his environment and move forward

12   with his agenda is impaired?

13   A    It would be impaired.  And again, with the right supports,

14   he could certainly possibly do a good job.

15   Q    Could we turn to person 82, starts on page 105 of 144 of

16   your report.  Did -- well, is person 82 a registered sex

17   offender?

18   A    He is.

19   Q    Did person 82 express concerns about the Brookhaven Crisis

20   Stabilization Unit in Region 8, staff members?

21   A    He did.

22   Q    Did person 82 believe that some of the credentials and

23   licenses maintained by staff members were not legitimate?

24   A    He did.

25   Q    Did person 82 tell you that a therapist at Region 8 wrote

1  false information in his clinical record?

2  A    He did.

3  Q    Were you able to determine whether any of the things person

4  82 told you about Region 8 were true or untrue?

5  A    I wasn't able to make that determination.

6  Q    Does person 82's pornography conviction negatively impact

7  his employment and housing options?

8  A    It does.

9  Q    Why does that negatively impact his employment option?

10  A    Well, I think when people would see that on a record, I

11  mean, there's certainly a prejudice against people that have

12  that kind of a charge, that kind a conviction and have done

13  time.  So many opportunities, occupational opportunities, would

14  be not available to him.

15  Q    Why does person 82's child pornography conviction

16  negatively impact his housing options?

17  A    Well, I think that, again, with that kind of a conviction,

18  I think that there would be certainly a prejudice against

19  offering that kind of a person -- that person with that kind of

20  a conviction, you know, housing.

21  Q    Some people just may not be willing to lease housing to

22  him?

23  A    Correct.

24  Q    Okay.  Last one, person 86, starts on page 117 of 144 of

25  your report.  Does person 86 have a forensic history?

1    A    He does.

2    Q    Was person 86 charged with stabbing his father to death in

3    1997?

4    A    That's correct.

5    Q    And was person 60 -- excuse me.  Was person 86 found not

6    competent to stand trial and not restorable in the foreseeable

7    future?

8    A    That's correct.

9    Q    Was person 86 transferred by the circuit court to the

10   chancery court, and the chancery court committed him to

11   Mississippi State Hospital?

12   A    That's correct.

13   Q    Given person 86's forensic history, is it your

14   understanding that the MSH discharge advisory committee would

15   have to approve his discharge?

16   A    Yes.

17   Q    When you worked at --

18   A    SEH.

19   Q    -- SEH, did you -- thank you.  When worked at SEH, did you

20   have any experience with forensic patients who were civilly

21   committed to SEH?

22   A    Yes.

23   Q    Was there any special discharge policies or procedures for

24   such individuals?

25   A    Yes.

1    Q    Was it similar to a discharge advisory committee?

2    A    Right.  I mean, in those situations, the forensic service,

3    we'd have to work very closely with the court, and the court

4    would have to review and approve any discharge plans, as well

5    as the type of housing that had been identified.

6    Q    Do you take issue with the fact that Mississippi State

7    Hospital has a discharge advisory committee process for

8    individuals with a forensic history?

9    A    Do I take issue with it?

10   Q    Yes, sir.

11   A    No.

12   Q    Do you think that's appropriate?

13   A    Yes.

14   Q    And can --

15   A    I don't know much about it, but just having that process,

16   you know, seems to be reasonable.

17   Q    In your experience, can a discharge advisory committee

18   process prolong an individual's length of stay?

19   A    It can.

20   Q    All right, sir.  I wanted to ask you about this, and I'm on

21   page 117 of 144 of your report, which is PX-401, and it's this

22   sentence in the last paragraph.  "The identification and

23   acquisition of appropriate housing with the correct behavioral

24   health and environmental support for person 86 has been a

25   particularly difficult challenge for MSH."  Did I read that

1    correctly so far?

2    A   Yes.

3    Q   Then you go on to say, "Historically, he has preferred an

4    independent arrangement, and the treatment team prefers a

5    supervised congregate placement."

6        My question to you is this:  In your opinion, should person

7    86 have any supervision, if and when he is discharged?

8    A   Yes.

9    Q   What type of supervision do you believe would be

10   appropriate for person 86, if he were to be discharged?

11   A   Well, it's hard for me to answer that because I haven't

12   seen any recent chart.  So I don't know how he's doing or, you

13   know, what his current clinical status is.

14   Q   All right.  I will move on, then.  I'm going to move on

15   next to your findings regarding which of the individuals you

16   reviewed.  You recommended PACT 4.  Did you recommend PACT 4

17   for 19 of the 33 living individuals you reviewed?

18   A   Yes.

19   Q   And I'll represent to you that that's 57 percent.  When you

20   worked at SEH, a lot less than 50 percent of the people

21   discharged from SEH received PACT.  Correct?

22   A   Yes.

23   Q   Is the percentage of people who received PACT nationwide

24   significantly lower than 57 percent?

25   A   I don't know what the number is, sir.

1    MR. SHELSON:  Your Honor, may I approach the witness?

2    THE COURT:  Yes, you may.

3  BY MR. SHELSON:

4  Q   All right, sir.  Do you remember being deposed in September

5  of 2018?

6  A   Yes.

7  Q   Let me direct your attention to page 178, lines 3 through

8  6.  The question is, "Do you know" -- you can keep this, and

9  I'll go back here.  Sir, I'm on page 178 of your deposition.

10  The question beginning at line 3, "Do you know if the national

11  data indicates that anywhere near 57 percent of people with SMI

12  receive PACT services?"  And what was your answer?

13  A   My answer was, "Probably would be a lower number."

14  Q   Do you know how many additional PACT teams Mississippi

15  would need in order to provide PACT services to 57 percent of

16  the people it discharges from its state hospitals?

17  A   I don't.

18  Q   Do you know how much it would cost to have that many PACT

19  teams?

20  A   I don't.

21    MR. SHELSON:  May I have a moment to confer, Your

22  Honor?

23    THE COURT:  Yes, you may.

24  BY MR. SHELSON:

25  Q   Mr. Byrne, is it your understanding that Mississippi

1  annually spends over $200 million on its state hospitals and

2  about $10 million on community-based services?

3  A    I don't know what the exact number is for this fiscal year,

4  but I believe at least a few years ago, it was roughly those

5  numbers.

6  Q    Are there adults in Washington D.C. with SMI who have unmet

7  mental health needs?

8  A    Yes.

9  Q    Do all states have unmet mental health needs for adults

10  with SMI?

11  A    Yes.

12  Q    Do you assess a state's mental health system on whether

13  there are adults with SMI who have unmet mental health needs?

14  A    No.

15        MR. SHELSON:  That's all the questions I have.  Thank

16  you, Mr. Byrne.

17        THE COURT:  All right.

18        MR. SCHUTZER:  I will have some redirect, Your Honor,

19  I wonder if we could take a bathroom break first.

20        THE COURT:  Okay.

21        MR. SCHUTZER:  I appreciate that.

22        THE COURT:  We'll take a 15-minute break.  I'll take

23  care of my other matter that I've scheduled for 3:00, 3:15 or

24  whatever, but we'll be back in about 15 or 20 minutes.  Court's

25  in recess.

1    (Recess)

2         THE COURT:  All right.  Is there anything we need to

3  take care of?

4         MR. SCHUTZER:  No, Your Honor.

5         THE COURT:  Other than your redirect, I know.

6         MR. SCHUTZER:  That's it, Your Honor.

7         THE COURT:  All right.  You may proceed.

8         MR. SCHUTZER:  Thank you.

9                   REDIRECT EXAMINATION

10  BY MR. SCHUTZER:

11  Q   Mr. Byrne, just a few questions for you.  Mr. Shelson asked

12  you questions about what people's symptoms were when they were

13  committed to the state hospital.  Do you recall those

14  questions?

15  A   Yes.

16  Q   Are there community-based mental health services that can

17  address a person's symptoms before they become so severe that

18  the person is committed?

19  A   Yes.

20  Q   Could you give a couple of examples of the services you're

21  referring to?

22  A   Sure.  There could be services like intensive home supports

23  intensive case management, case management, medication

24  services, crisis services, things of that nature, which

25  would -- you know, if the situation or the person is beginning

1   to deteriorate, there are interventions that can be provided

2   that would hopefully stabilize the person, stabilize the crisis

3   that they're in, and hopefully prevent a hospitalization.

4   Q   Generally speaking, did the individuals that you looked at

5   receive those kinds of services before they went to state

6   hospitals?

7   A   No.

8   Q   Let's return to person 60.  He begins on page 30 of your

9   report.  You were asked some questions about his

10  self-amputation of his arm.  When did that occur?

11  A   Can you direct me to a page?

12  Q   Without knowing the exact year, was it in the recent past

13  or had it been --

14  A   My recollection is that it was several years ago.

15  Q   Was he experiencing psychiatric symptoms at the time that

16  he amputated his arm?

17  A   Yes.

18  Q   Had he been hospitalized multiple times since then?

19  A   Yes.

20  Q   Was he, between those hospitalizations, receiving

21  community-based services?

22  A   He was not.

23  Q   Let's turn next to person 65, who's on page 47 of your

24  report.  Directing your attention to the last paragraph, the

25  one that begins "For the lengthy MHS admission," do you see

1  that?

2  A   Yes, I do.

3  Q   See about half -- two-thirds of the way towards the bottom,

4  "Clinical reviewer, Dr. Bob Drake, spoke with the manager at

5  the personal care home"?

6  A   Yes.

7  Q   "The manager reported that he does not allow gay men at his

8  personal care home.  He tried to get person 65 readmitted to

9  MSH, but MSH responded that being gay is not a valid basis for

10  commitment.  The manager said that eventually, he was

11  successful in getting person 65 readmitted and referenced an

12  incident between person 65 and another resident."  Do you see

13  all of that?

14  A   I do.

15  Q   Last week, Dr. Drake testified about a personal care home

16  he visited in north Jackson, where men who were living there

17  were drooling and not talking to each other.  Are you aware

18  whether this is the same personal care home?

19         MR. SHELSON:  Objection, exceeds the scope of the --

20  exceeds the permissible scope of redirect.

21         THE COURT:  Objection sustained.

22  BY MR. SCHUTZER:

23  Q   Your report says that person 65 was, after this incident,

24  readmitted to Mississippi State Hospital and discharged to a

25  different personal care home, the one that you met him at.  Is

1  that correct?

2  A   Yes.

3  Q   What happened when you -- did you visit that personal care

4  home?

5  A   I did.

6  Q   What happened when you visited it?

7  A   When I visited, the manager/owner of the home indicated

8  that I and my DOJ counterpart were not welcome and we needed to

9  leave.

10  Q   Did anything else happen when you visited?

11  A   Well, after we visited, we were able to -- spoke with the

12  gentleman that we were able to interview.

13  Q   Finally, you were asked about whether there were people in

14  your group of 35 who were deceased.  Do you recall that?

15  A   Yes.

16  Q   One of them is person 70.  Is that correct?

17  A   Yes.

18  Q   Before person 70 died, was he receiving appropriate

19  community-based mental health services?

20  A   No.

21  Q   Did he seek them out?  Person 70 is at page 66 of your

22  report.

23  A   He did attempt to identify services that he thought might

24  meet his needs.

25  Q   Did he receive any such services?

1    A    Unfortunately not.

2    Q    How did he die?

3    A    He killed himself.

4         MR. SCHUTZER:  No further questions.

5         THE COURT:  All right.

6         I don't really have a question.  I just want to clear

7    something up in the record.  And this is to Mr. Shelson.  I

8    think Mr. Shelson asked you if the state hospital was in Hinds

9    County.  I believe the state hospital is in Rankin County.

10   Whitfield.  Right?  We're talking about Whitfield.  Right?

11        MR. SHELSON:  Your Honor is correct, and Shelson is

12   wrong.

13        THE COURT:  I just -- and I know you were talking

14   about the number of miles, but I don't think it affects

15   anything because from Jefferson County to out there is about

16   the same or -- and I'll give you an opportunity, if it's

17   germane in some way.

18        MR. SHELSON:  Thank you, Your Honor.  Again, you're

19   right, and I misspoke.

20        THE COURT:  Okay.  All right.  I have nothing for you,

21   Mr. Byrne.  You may step down.  Is this witness finally

22   excused?

23        MR. SCHUTZER:  Yes, Your Honor.

24        THE COURT:  All right.  Mr. Byrne, you may go about

25   your normal duties.  Thank you.

1          Call your next witness.

2          MR. SCHUTZER:  We would.  Your Honor, our next witness

3     will be Ledger Parker.  He will be in in a moment.  And in the

4     interim, I have one housekeeping matter I'd like to address,

5     and that is one of our experts, one of the United States'

6     experts, Mr. Kevin O'Brien, he -- in addition to submitting his

7     expert report, he submitted a rebuttal expert report.  We

8     anticipate right now he will be testifying this week, traveling

9     in from Chicago, and we would like to take his testimony all at

10    once rather than having his rebuttal testimony come after the

11    state's expert that he's rebutting.

12         THE COURT:  The only problem it would be, we don't

13    know what the State is going to put on.  Maybe y'all will be

14    able to work it out some kind of way.  I'll give you that

15    opportunity.  I understand not having him come and go and then

16    come and go, but...

17         MR. SCHUTZER:  Given the nature of his testimony and

18    the testimony of the expert, or the anticipated testimony of

19    the expert he's responding to, I think it will be relatively

20    clear.

21         THE COURT:  Has he submitted, as part of his expert

22    report, the rebuttal to the other side's expert report.

23         MR. SCHUTZER:  Yes.  His rebuttal report was

24    submitted.  And I don't remember if it was October or November,

25    but it was one of those months of 2018.

1          THE COURT:  Oh, okay.  So he will be testifying about

2   what's in his report, the report that was disclosed or reports

3   that were disclosed?

4          MR. SCHUTZER:  Correct.

5          THE COURT:  All right.  That won't be a problem.

6          MR. SCHUTZER:  Thank you.

7          THE COURT:  All right.  Call your next witness.

8          MS. FOX:  United States calls Ledger Parker.

9          THE COURT:  All right.  Mr. Parker, the microphone is

10  there before you.  Speak into it.  You can bring it towards you

11  if you need to or adjust it any kind of way.  Speak loudly and

12  clearly so we can all hear you.  Speak at a pace at which the

13  court reporter can keep up with you.  Allow the attorneys to

14  finish their questions before you begin to speak so that the

15  two of you will not be speaking at the same time, and make sure

16  all your responses are verbal.

17          If you will, state your name and spell it for the

18  record.

19          THE WITNESS:  My name is Ledger Parker,

20  L-E-D-G-E-R P-A-R-K-E-R.

21          THE COURT:  I'm going to ask you speak up just a

22  little bit.  I can hear you fine.

23          THE WITNESS:  Ledger Parker, L-E-D-G-E-R P-A-R-K-E-R.

24          THE COURT:  Thank you.

25          MS. FOX:  May I proceed?

1    THE COURT:  You may proceed.

2    MS. FOX:  Thank you, Your Honor.

3                    LEDGER PARKER,

4    having first been duly sworn, testified as follows:

5                   DIRECT EXAMINATION

6    BY MS. FOX:

7    Q    Mr. Parker, what is your job?

8    A    I'm executive director of Mississippi United to End

9    Homelessness, MUTEH for short.

10   Q    What is MUTEH?

11   A    MUTEH is a 501(c)(3) nonprofit agency that focuses on

12   housing, vulnerable Mississippians in our state.

13   Q    When was MUTEH established?

14   A    MUTEH was established in 1991.

15   Q    And where is it based?

16   A    It's based out of our offices here in Jackson, Mississippi,

17   but we have offices all across the state.

18   Q    Do you serve people all across the state?

19   A    Yes.  Our bylaw allow us to serve anyone in Mississippi's

20   82 counties.

21   Q    How many employees do you have at MUTEH?

22   A    Right now, 43 employees.

23   Q    And how long have you been in the role of executive

24   director there?

25   A    I became executive director in 2017, but I've been at MUTEH

1    since 2010.

2    Q    What are your responsibilities as the executive director?

3    A    As the executive director, I oversee our contracts and

4    various grants that we have.  I help facilitate some statewide

5    and national partnerships, as well, but then also oversee our

6    staff to make sure that they are functioning as they are

7    supposed to.

8    Q    What's your educational background?

9    A    I'm going into my third year at Mississippi College School

10   of Law, and then also finishing up a Master's of Public

11   Administration at the University of Louisiana Monroe.  And I

12   have an undergraduate from Jackson State University.

13   Q    And that's along with your full-time job?

14   A    Yes.

15   Q    What programs -- can you describe generally the types of

16   programs that MUTEH runs?

17   A    MUTEH, in its mission, we seek to serve Mississippi's

18   vulnerable populations.  We work with disabled homeless folks,

19   but also homeless veterans as well.  We provide housing options

20   and data tracking services for them.  And then we work with

21   people that are living with HIV or AIDS in housing and housing

22   vulnerable, and then also those that are exiting or have been

23   in and out of Mississippi's psychiatric institutions.

24   Q    And that final program, working with individuals who've

25   been in and out of the psychiatric institutions, what's the

1  name of that program?

2  A   CHOICE.

3  Q   How did you become interested in affordable housing?

4  A   Well, it started working with homeless people in a ministry

5  setting at a church, just through college.  And then I found

6  that there were actual government subsidies available for those

7  people, and I came to work in MUTEH in 2010.

8  Q   Were you subpoenaed to be here today in court?

9  A   Yes.

10  Q   Next, I'd like to ask you about supported housing generally

11  and get some related terminology, some definitions of key

12  services.  What is supported housing?

13  A   Supported housing is the belief that you can put somebody

14  into housing and at the same time be providing case management

15  or connection to other resources that they may need for

16  whatever their situation is.

17  Q   What is the Housing First model?

18  A   Housing First is a new initiative, relatively new, before

19  people had the approach of getting someone housing ready, which

20  meant that they had to accomplish some type of service plan

21  before they were actually going into housing.  Housing First

22  changes that to you put them in housing first, and then, as you

23  have them housed, you start to connect them to those resources

24  and provide case management while they're in housing.

25  Q   Is Housing First a common approach in supported housing?

1  A   Yeah.  Nationally, it's a trend with both HUD and the VA

2  and their housing programs.  You see it in communities all over

3  the nation.

4  Q   What's the difference and impact if you take a Housing

5  First approach?

6  A   What research tells us is that you will run usually

7  probably twice as good of success rates.  Long-term stability

8  rates typically double with Housing First approach.  At the

9  same time, the intervention, the subsidy that you're using, is

10  typically more efficient, so you'll spend less in the Housing

11  First intervention with double the results, the positive

12  results.

13  Q   And that, what you just described, the impact, is that the

14  impact for supported housing or Housing First or both?

15  A   Both.

16  Q   You mentioned that with the Housing First approach as

17  compared to requiring people to be housing ready, in Housing

18  First, you don't wait for them to meet certain requirements or

19  thresholds before providing housing.  Is that right?

20  A   (No verbal response.)

21  Q   What's the impact of that choice, of not waiting --

22  requiring housing readiness?

23  A   We see that clients are more likely to actually

24  meaningfully participate in the services that are provided to

25  them when they're in their housing, what they see as their

1  housing, versus trying to utilize those services to get into

2  housing.  They usually are more meaningfully participate in

3  those services in Housing First.

4  Q    What kinds of services?

5  A    So they're diverse.  I mean, we work with health care

6  providers, mental health care, but then also job readiness

7  programs, employment support, and then even just case

8  management or master level social workers will work with that

9  client through a service plan and case management as well.

10  Q    And what's your understanding about why it is more

11  successful to work with people, engage them in those supports

12  after they're in housing?

13  A    I think that somebody being in housing gives them a level

14  of security to where now they can mentally and emotionally

15  focus on areas that they probably have compartmentalized off

16  and not addressed.

17  Q    When you use the term -- do you use the term "supported

18  housing" and "supportive housing" interchangeably?

19  A    I do, yes.

20  Q    What is scattered site housing?

21  A    So MUTEH rehoused 401 households last year, and we used a

22  scattered site approach, in the calendar year of 2018.

23  Q    Was that all in the CHOICE program or all your programs?

24  A    All of our various programs.

25  Q    Go ahead.

1   A    We use a scattered site approach.  That means that our

2   clients find housing, and we help find them housing in the

3   community, rentals that anybody in the market will be able to

4   get in their name.

5   Q    So it could be an apartment, an affordable apartment next

6   to yours or mine?

7   A    That's right.

8   Q    What is Section 8 housing for the housing CHOICE voucher

9   program?

10  A    Section 8 vouchers come from the federal government.  They

11  come particularly through housing authorities, whether regional

12  housing authorities or housing authorities associated with a

13  municipality.  There are federal funds that simply provide the

14  housing subsidy.  They're housing focused and may have low

15  levels of case management, but not always.  Typically It's just

16  housing.

17  Q    And so how would that be different from supported housing,

18  if at all?

19  A    Supported housing brings in the case management as much as

20  it brings in housing.  We are working -- we house people first.

21  We try to make sure they are connected to all of the different

22  resources that they need to be connected to to maintain

23  stability.  So case management is just as important as the

24  housing component.

25          THE COURT:  Could you slow down just a little bit.  I

1    mean, you're talking great, but it sounds like you're talking

2    fast.  That's all.

3         THE WITNESS:  I will.

4    BY MS. FOX:

5    Q    Is supported housing different from a group home?

6    A    Yes.

7    Q    How so?

8    A    In supported housing model, the client has autonomy over

9    their unit.  They have responsibility and ownership over their

10   unit.  And typically, they have their own set-aside space.  So

11   there may be some variations of it that have shared housing,

12   but even the shared housing model would look drastically

13   different than group home -- than a group home model.

14        In shared housing, they still have their own housing.  They

15   have their own space that they control, where in a group home

16   setting, they feel like they are watched over more closely, and

17   typically it's not considered their home, it's not considered

18   their room, and so that's the difference.

19   Q    Who typically holds a lease -- holds the lease in supported

20   housing?

21   A    In all of MUTEH's programs, our clients will hold the

22   lease.

23   Q    Is supported housing an evidence-based practice?

24   A    Yes.

25   Q    Based on your knowledge, what are some of the outcomes

1  associated with supported housing?

2  A   Whenever we look at supported housing, typically we see a

3  reduced cost to the state or community.  So you'll see, even

4  with providing free supportive housing, you can see savings,

5  like $9,500 per household per year -- per individual.  I'm

6  sorry.  Per year.

7  Q   And what's the basis for those savings?

8  A   Typically, they access emergency and crisis services much

9  less frequently.  There will be a tremendous drop in those.

10  And they also will start accessing more affordable, you know,

11  interventions that we would use.  Instead of going to the ER,

12  they go to their clinic.  And instead of calling a crisis line,

13  they schedule an appointment with their mental health care

14  provider.

15  Q   Do you know if supported housing is a program used in other

16  states?

17  A   Yes.

18  Q   How do you know that?

19  A   Well, HUD funds it across the nation through the CSC

20  grants, and then we also get money from the VA as well.  They

21  fund the exact same model.  So you see it in communities all

22  across the nation.

23  Q   What populations are receiving supported housing through

24  those grants and any other that you're aware of?

25  A   Any vulnerable housing population, but those people that

1  are living with HIV or AIDS, people that have a mental health

2  care or mental health diagnosis, and those also that may have a

3  physical disability that impairs their ability to live

4  independently.

5  Q   Is supported housing a program that's specifically

6  effective for people with serious mental illness?

7  A   Yes.

8  Q   Why is that?

9  A   Once again, when somebody is in the security of their own

10 housing, typically they're much more likely to open the door to

11 for the mental health care provider, whether it an ACT model

12 team or an intensive case manager.

13 Q   Now, I'd like to ask you about the CHOICE program here in

14 Mississippi.  Did the Technical Assistance Collaborative

15 prepare a important on the need for supportive housing here in

16 Mississippi?

17 A   Yes.

18 Q   Do you know if that report was commissioned by the

19 Department of Mental Health?

20 A   I believe so.

21 Q   If you could look at PX-163 in your binder.  I believe it's

22 the first tab.  Is this that report?

23 A   Yes.

24      MS. FOX:  This document, Your Honor, was previously

25 admitted into evidence.

1    THE COURT:  Okay.  Thank you.

2   BY MS. FOX:

3   Q   What's the title of this document?

4   A   "Statewide Approach for Integrated Supportive Housing in

5   Mississippi."

6   Q   What year was it written?

7   A   In 2014.

8   Q   Now, if you turn to the Bates page 19 in this document,

9   which is the small number in the bottom right of the documents,

10  including the recommendations in this report, can you read

11  recommendation 3 for us?

12  A   "The Mississippi Legislature should develop and appropriate

13  funds for a state-funded bridge housing subsidy program, HSP."

14  Q   And is there a program now in Mississippi that meets that

15  description?

16  A   I believe so, yes.

17  Q   What's that program?

18  A   CHOICE.

19  Q   Is it your understanding the CHOICE program was developed

20  in response to this recommendation?

21  A   Yes.

22  Q   Can you next look at JX-51, the second document in your

23  binder, which also was previously admitted into evidence.

24  Looking at page 1 -- well, first of all, what is this document?

25  A   I believe this is an annual report or one of the reports

1  that Ben Mokry at Mississippi Home Corp developed.

2  Q    Who is Ben Mokry?

3  A    Ben is the vice president and chief strategy officer of

4  Mississippi Home Corporation.

5  Q    And what's their role in the CHOICE program?

6  A    I believe they're tasked with administering the dollars for

7  the legislature.

8  Q    Looking at the bottom half of this page, does this

9  document, this report on the CHOICE program indicate who the

10  target population is for the CHOICE program?

11  A    Yes.

12  Q    Who is the target population?  You can summarize it in your

13  own words.

14  A    People that are being discharged from the state psychiatric

15  hospital after they've been there for more than 90 days, or

16  they've been discharged from the state psychiatric hospital in

17  the last two years and have had multiple hospital visits in the

18  last year due to mental illness, or known to mental health or a

19  state housing agency to have been arrested or incarcerated in

20  the last year due to conduct related to their mental illness,

21  or they're known to the mental health or state housing agency

22  to have been homeless for one full year and have had four or

23  more episodes of homelessness in the past three years.  And

24  then lastly, they are discharged from a nursing facility or an

25  intermediate care facility after a stay of more than 90 days,

1 and they have an SMI diagnosis.

2 Q   Are these serious mentally ill people who are also housing

3 vulnerable?

4 A   Yes.

5 Q   Can you describe for us the components of the CHOICE

6 program that MUTEH provides?

7 A   We seek kind of a marketing component, marketing and

8 outreach, of traveling around the state, letting different

9 mental health entities know what's available under CHOICE and

10 who's eligible.  Then also the assessment that we do with

11 clients, from housing identification, move-in assistance, and

12 housing case management as well.

13 Q   Great.  Let's take each of those briefly.  So, for the

14 outreach component, what does that entail?

15 A   For outreach, we've gone to all of the state hospitals, the

16 mental health hospitals, and also to CMRC, and to many of the

17 community mental health centers and crisis stabilization units

18 to educate staff on what's available in CHOICE and who's

19 eligible.  But then the outreach also involves, whenever we get

20 a referral, following up with the hospital or the CMHC.

21 Q   If we could look at JX-1, the next tab in your binder,

22 which is another document previously admitted into evidence.

23 What is this document?

24 A   This is a flyer for the program that we take with us when

25 we do outreach.

1   Q   The next component you mentioned was enrollment.

2   A   Uh-huh.

3   Q   Can you tell us a little bit what you do there?

4   A   Once we get a referral from one of the mental health folks,

5   we will -- Department of Mental Health will ultimately confirm

6   that they're eligible for CHOICE, and then we will follow up

7   typically within one business day.  We'll come out and provide

8   an assessment there on site.  We use a triage tool to kind of

9   generate a score that measures their vulnerability, and then we

10   also make sure that they are able to live independently and

11   aren't a danger to themselves or others.  And they will be

12   admitted into CHOICE, and we'll start looking for a unit.

13   Q   I'll get into the DMH part of the process in a minute, but

14   can you next talk about the housing identification component?

15   A   So when somebody's in care, we will work with them to

16   figure out where they want to live, what part of the state

17   typically they are from.  We'll ask that question.  That's

18   usually where they want to go back to.  And then they have the

19   opportunity, if they have housing in mind that they think they

20   may be able to access, they're able to bring options to the

21   table, but our housing staff will also go and find several

22   different options for them to choose from that we can recommend

23   to the client.

24   Q   Why does allowing the client to identify the area where

25   they want to go or even the unit that they'd like to go to make

1  a difference?

2  A   We feel like if they are invested in that decision, it's

3  helpful in their care.  But also, people have support networks

4  and family and friends that they want to get back close to.

5  And typically, those are vital in achieving long-term

6  stability.

7  Q   Have there been times when you've not been able to identify

8  housing near where someone wants to live?

9  A   There are times, depending on the area of the state that

10  we're looking in, that we can't find it.

11  Q   Why would that -- why wouldn't you be able to find it?

12  A   We're bound by the fair market rent rates for each county.

13  And so sometimes we can't find affordable housing that meets

14  that standard.

15  Q   Is there any particular part of the state where that has

16  been particularly difficult?

17  A   DeSoto County would be a good example.

18  Q   And is that frequent or infrequent in terms of inability to

19  find something for a client?

20  A   We don't track it, but there's just certain areas of the

21  state that if a client says that, we're going to immediately

22  tell them in person, hey, you probably need to be thinking

23  about the second best option for you.  What's the second city

24  you'd want to live in.

25  Q   Do you continue working with them at that point?

1  A   Yes.

2  Q   Next thing you mentioned was the housing support and case

3  management.  What does that entail?

4  A   We see ourselves as coordinators of case management, which

5  means that we look for the mental health case management that

6  may be available in the area.  So we try to connect them to the

7  community mental health center and let them receive mental

8  health care through that entity.  And then we see ourselves as

9  the safety net if there's crisis, but also as the housing case

10 management.  We serve as liaison between the client and the

11 landlord and can address issues as they come up.

12 Q   Can you give an example of that?

13 A   You know, somebody's leaving junk on their front porch, and

14 the landlord doesn't like it.  Instead of leaving a note that

15 could startle the client or trigger something, we -- they

16 usually call us, and then we can go and talk to the client

17 about maybe we need to get our boots off the porch in the

18 evening.

19 Q   And I think you were indicating, does MUTEH provide the

20 mental health services to clients receiving CHOICE services?

21 A   Not ideally.

22 Q   So who does typically provide that?

23 A   Usually we look to the mental health services are available

24 in that area.

25 Q   Have you identified any community mental health services

1   that are particularly effective for people who've been in the

2   CHOICE program?

3   A   Yeah, we like -- we look to PACT often, and then also

4   there's other, like, AOT teams that are a PACT level resource

5   that we can get people into.

6   Q   What is AOT?

7   A   It's an outpatient treatment program that's at the level of

8   PACT.  Typically, I think it's required for that person, and so

9   they will participate.

10  Q   What about having PACT is helpful for people in the CHOICE

11  program?

12  A   Well, it's a multi-disciplinary team, so there's different

13  areas of expertise with each team member, and so they can

14  usually handle just about any situation that comes up with our

15  clients, whether it's trying to budget or work on employment

16  support, even outside of their mental health issues.

17  Q   Can all the participants in CHOICE access PACT services?

18  A   No.  It depends on where you are in the state if you can

19  access PACT.

20  Q   When was the CHOICE program started?

21  A   We started serving clients in early 2016.

22  Q   And how do you identify potential participants in CHOICE?

23  A   Most of them will be referred through a database by a

24  mental health provider, whether it's a state hospital or a

25  community mental health center.

1   Q   Who approves someone for participation in the program?

2   A   Department of Mental Health and Ms. Sherry Holloway at DMH.

3   Q   Do any other state agencies have a role?  I think you

4   mentioned Mississippi Home Corporation.

5   A   Yes, Mississippi Home Corporation, they don't approve them

6   for the program, but they will review that documentation when

7   we're working to get funding.

8   Q   What's their general role in the program?

9   A   It feels like to administer the funds.  So they make

10  sure -- like we can't pay rental assistance.  We have to draw

11  down from Mississippi Home Corporation, and then even guiding

12  some of the data tracking and stuff like that.

13  Q   The legislature appropriate the funds to Mississippi Home

14  Corporation?

15  A   That's my understanding.

16  Q   Okay.  Are you, at MUTEH, the only providers of the CHOICE

17  program at this point?

18  A   No, we are one of two.  So Open Doors, Homeless Coalition

19  on the coast also is a CHOICE provider.

20  Q   In the CHOICE program, is there a time limit for

21  participation?

22  A   Twelve months.

23  Q   What is supposed to happen during those 12 months?

24  A   Hopefully, with whatever case management and services

25  they're getting from the mental health provider, they're also

1  working on a plan for at the end of the assistance.

2  So some of our people will go to housing vouchers,

3  Section 8 vouchers.  Some will be able to develop disability

4  income or some other type of earned income that they can use to

5  pay their rent.  And then others may have, you know,

6  reconnected with family and be able to move in with family.  So

7  those are the options.

8  Q   The housing choice -- excuse me.  The CHOICE program is

9  called a bridge subsidy.  Is that right?

10 A   Yes.

11 Q   And so are these -- you're bridging to one of those

12 solutions at the end of the day?

13 A   Yes.

14 Q   What happens if someone hasn't found the next step for

15 housing at the end of a 12-month period?

16 A   We can ask for an extension from Mississippi Home

17 Corporation.  It usually, I think, goes directly to Ben.  And

18 we'll have to have a plan in place of how are they going to

19 become stable, given the extension.

20 Q   What kind of plan might that be?

21 A   For some, that plan could be that they have disability

22 actually coming through, and they'll actually have disability

23 income to be able to help cover their rent payment.  Others

24 it's been that there's been a project-based Section 8 voucher

25 that's available, and they are able to move into it, but they

1    need time.

2    Q    You -- now I'd like to ask you about how many people you've

3    served through the CHOICE program.  How many people so far have

4    you been able to serve in CHOICE?

5    A    A little over 400 households.

6    Q    How many are currently on the rolls at MUTEH?

7    A    157.

8    Q    Could MUTEH serve even more people than the 157 that you

9    are currently serving?

10   A    I believe so.

11   Q    Could you serve even more than 157, even with the same

12   funding that you have?

13   A    Yes.

14   Q    About how many could you serve in a given year with your

15   current funding?

16   A    I believe we've had months where we've had 20 move-ins,

17   which means we moved 20 people into housing.  We believe that

18   we could get close to that.  So somewhere between 200 and

19   around 240, close to it.

20   Q    Do you believe that there's a need for more people to

21   receive CHOICE services than are currently receiving them?

22   A    Yes.

23   Q    Why do you think that?

24   A    In all of our time of providing CHOICE services, we've

25   never had to turn people away because we were at capacity on

1   housing.  So we've always been able to serve everyone that's

2   ever been referred to CHOICE that was eligible for it.  So in

3   theory, there's -- we have the room to be able to serve more if

4   there was that demand.

5   Q   And do you think there is additional demand?

6   A   Yes.

7   Q   Why do you think that?

8   A   In working with CHOICE services, there are all of these

9   referring mental health providers, and there are some that go

10  long periods of time without making any referrals.  So it would

11  be illogical for us to think that they aren't having anybody

12  that's eligible.

13  Q   What types of providers are you talking about when you say

14  there's providers that go long periods without referring anyone

15  to CHOICE?

16  A   State hospitals.

17  Q   Any other providers?

18  A   And then some community mental health centers as well, yes.

19  Q   Has the state made any estimates of the number of units of

20  CHOICE that would be needed to meet the needs?

21  A   Yes.

22  Q   About -- what are the estimates, to your knowledge?

23  A   From early conversations, there was the number 2500 units

24  that were needed to be established.

25  Q   If you could turn to JX-5 in your binder, another document

1  that's previously been admitted to evidence.  Can you tell us

2  what this document is?

3  A   It's from Medicaid.  It's the MAC 2.0 Stakeholder's Meeting

4  Minutes.

5  Q   What date was this meeting?

6  A   November 4, 2015.

7  Q   Could you turn to Bates Number 3 of this document to the

8  bullet with the header over it "Ben"?

9  A   Yes.

10  Q   Is this in line with the estimate, as far as you understood

11  it, of the need?

12  A   Yeah, it says here we need about 2500 units.

13  Q   Do you have any reason to agree or disagree with this

14  estimate?

15  A   I would trust it.

16  Q   You mentioned that you believe you could serve even more

17  people in the CHOICE program than you currently have.  Why

18  aren't you serving even more people?

19  A   We take what's referred, so if they come -- as the

20  referrals come in, we serve them.  So, I mean, we could look

21  and say that there's not the number of referrals that we would

22  have anticipated in all of the different areas of the state.

23  Q   Do referrals, particularly referrals from state hospitals,

24  when they come in, do they typically come in to you on the

25  first few days after someone is admitted to a state hospital or

1   toward the event of the time that they're at the state

2   hospital?

3   A   Ideally, they would come in early in their hospital stay,

4   or at even admission, but typically they come in near the end

5   of someone's stay at the hospital.

6   Q   Why do you say ideally they would come early on?

7   A   If that referral happened at assessment, when they admitted

8   them into the program, it would allow for more time for housing

9   documents and even, you know, housing units to be identified to

10  be able to get them ready.

11  Q   Thinking back on the last year of services at MUTEH, how

12  many referrals did you get from Mississippi State Hospital?

13  A   Forty.

14  Q   And it can be approximate, if you don't recall.

15  A   In 2018, around 40.

16  Q   And how many from North Mississippi State Hospital?

17  A   Eighteen.

18  Q   How about from South Mississippi State Hospital?

19  A   Thirteen.

20  Q   And what about from East Mississippi State Hospital?

21  A   Twelve.

22  Q   I'd like to show you some deposition testimony.  And this

23  is from page 110 of the report compiling the designated

24  deposition testimony that we filed as Exhibit 2 to the pretrial

25  order.  I also have copies here that I can provide.  This is

1  Sheila Newbaker's deposition at page 56, beginning on line 24

2  of the deposition.

3          MS. FOX:  May I approach, Your Honor?

4          THE COURT:  Yes, you may.

5          MS. FOX:  It's Sheila, S-H-E-I-L-A, Newbaker,

6  N-E-W-B-A-K-E-R.

7  BY MS. FOX:

8  Q   Would you read for us from the deposition starting at page

9  56, line 24, until page 58, line 4.

10  A   What was that first -- where do you want me to start?

11          THE COURT:  I tell you what, it will probably -- since

12  this is so long, you ask the question and allow him to do the

13  answer.

14          MS. FOX:  Okay.

15  BY MS. FOX:

16  Q   Okay.  Are you familiar --

17      "Question:  Are you familiar with other supportive housing

18  programs in the state of Mississippi?"

19  A   "I'm familiar with the MUTEH" -- "Answer:  I'm familiar

20  with the MUTEH program for the homeless."

21  Q   "Question:  What is that?"

22  A   "Answer:  It's a program that -- it's mostly used by our

23  social workers at our group home when they're doing a

24  placement.  It will provide housing for, like, one year."

25  Q   "Question:  For one year?"

1  A   "Answer:  Yes."

2  Q   "Question:  And is that specifically for homeless

3  individuals?"

4  A   "Answer:  Yeah."

5  Q   "Question:  And do you know whether EMSH refers individuals

6  to MUTEH?"

7  A   "Answer:  Not to my knowledge."

8  Q   "Question:  Is there anyone at East Mississippi State

9  Hospital who would have knowledge about the CHOICE program?"

10  A   "Answer:  Yes.  Probably some of the social workers would

11  know."

12  Q   "Question:  Are you aware of whether or not East

13  Mississippi State Hospital is currently referring clients to

14  the CHOICE program?"

15  A   "Answer:  I'm not aware."

16  Q   In light of this -- is this consistent with the rate of

17  referrals that MUTEH has received from East Mississippi State

18  Hospital to the CHOICE program?

19  A   Yes.

20  Q   Does it appear that Ms. Newbaker understood the eligibility

21  criteria for the CHOICE program?

22        MR. SHELSON:  Objection.  Calls for speculation as to

23  what Ms. Newbaker knew.

24        THE COURT:  Objection sustained.

25  BY MS. FOX:

1  Q    Did Ms. Newbaker indicate that the program was for homeless

2  individuals?

3  A    Yes, she indicated that.

4  Q    Is the CHOICE program available only to individuals who are

5  homeless?

6  A    No, that's not the case.

7  Q    Have you conducted outreach to East Mississippi State

8  Hospital about the CHOICE program?

9  A    Yes.

10  Q    Can you accept referrals directly from state hospitals to

11  the CHOICE program?

12  A    Yes.

13  Q    Does the State have access to the data on referrals to the

14  CHOICE program showing where referrals came from and how many

15  there were?

16  A    Yes.

17  Q    Do you -- does MUTEH provide that data to the Department of

18  Mental Health?

19  A    Yes.

20  Q    How often?

21  A    Monthly.

22  Q    You mentioned earlier that what you -- part of the work

23  that MUTEH does includes outreach to educate people about the

24  program.  Is that right?

25  A    Yes.

1  Q   Can you estimate approximately how many outreach meetings

2  MUTEH has undertaken to educate the state hospitals and other

3  providers about the program?

4  A   I'd say dozens, dozens.

5  Q   Now I'd like to look at JX-15, which is also included in

6  the binder in front of you, another document that was

7  previously admitted into evidence.  If could you look at page

8  121 of this document.  Looking at the top, and can you read the

9  title across the top of this document?

10 A   "Program Performance Indicators and Measures."

11 Q   Looking at the top of the document, what facility does this

12 appear to be discussing?

13 A   South Mississippi State Hospital.

14 Q   Looking at number 1 on that page, how many individuals were

15 served in FY2017 at South Mississippi State Hospital?

16 A   593.

17 Q   Looking down a little further, how many individuals were

18 discharged to homelessness in FY2017?

19 A   Forty-nine.

20 Q   And how many did they project they would discharge to

21 homelessness in FY2019?

22 A   Forty-three.

23 Q   Looking down a little further on the page, how much did it

24 cost the state to serve someone in the state hospital, South

25 Mississippi State Hospital, per person per day in 2017?

1   A    $473.95.

2   Q    And thinking back to the number of referrals, can you

3   remind us how many referrals MUTEH received last year from

4   South Mississippi State Hospital?

5   A    Eighteen.

6   Q    Was that your testimony about North Mississippi or South

7   Mississippi State Hospital?

8   A    You're right.  North Mississippi was 18.  South was, I

9   think, 13.  Yeah, 13.

10  Q    Is this data about discharges to homelessness consistent

11  with your knowledge in your work in CHOICE?

12  A    Can you clarify?

13  Q    Is it your understanding, based on people that you have met

14  in outreach you've conducted that individuals are discharged to

15  homelessness from State Hospitals?

16  A    Yes.

17  Q    Could those individuals be referred to the CHOICE program?

18  A    Yes.

19  Q    Are you receiving referrals that would indicate to you

20  everyone who is homeless is being referred to the CHOICE

21  program before discharge from a state hospital?

22  A    No.

23  Q    Are you aware of any policy requiring the state hospitals

24  to refer to CHOICE before discharging to homelessness?

25  A    Not to my knowledge, there's not one.

1   Q   Have you ever made a recommendation about such a policy?

2   A   We thought that it would be good for the Department of

3   Mental Health, just at every portal of entry into the state's

4   mental health system, to assess for CHOICE at that time, and if

5   appropriate, to make the referral upon admission.

6   Q  You mentioned that the community mental health centers can

7   also refer to CHOICE.  Is that right?

8   A   Yes.

9   Q  Do you serve some -- have you served more clients in some

10   community mental health center regions than in others?

11   A   Yes.

12   Q  If we can look at PX-416, which is also included in your

13   binder and was previously admitted into evidence, this is the

14   CHOICE program client addresses for participants between

15   February 2016 and January 2018.

16       Looking at this map, each red dot is an indicator of the

17   address of one CHOICE participant.  Is this consistent with

18   your knowledge of where people have been served through the

19   CHOICE program at least as of January 2018?

20   A   Yes.

21   Q  In your experience, have -- which regions have served --

22   excuse me, have referred more clients to the CHOICE program?

23   A   Regions 9 and 8, 10 and Region 3 and 12.

24   Q  Are there some CMHC regions where you have served fewer

25   than five clients?

1    A    Yes.

2    Q    What are some of those Regions?

3    A    Region 6, Region 1, Region 2, Region 7, Region 11, and

4    Region 15.

5    Q    Turning to costs and spending on the CHOICE program, has

6    MUTEH spent all of the money that was allocated to it in each

7    year of the program?

8    A    No.

9    Q    Why not?

10   A    The first year for sure, there just wasn't the number of

11   referrals to serve.

12   Q    Did you estimate approximately how much it would cost

13   someone -- cost to serve someone through the CHOICE program

14   before the program started?

15   A    Yes.  We projected to spend around 10,500 per household per

16   year.

17   Q    How much has it actually cost to serve people in the CHOICE

18   program?

19   A    By our estimation, with every dollar spent for CHOICE on

20   the household, right at $8,000.

21   Q    It costs less than what you expected?

22   A    Yes.

23   Q    Why?

24   A    Rental rates were cheaper than we anticipated.  So I think

25   that that was something that we didn't foresee.  And the areas

1  where we have concentrated populations, those were low FMRs, so

2  we had to spend less on rent there.

3  Q   Have you been maintaining data on the impact of the CHOICE

4  program at discharge on the people who've participated in the

5  program?

6  A   Yes.

7  Q   Can you look back at JX-51 at page 6.  Looking at the chart

8  here and/or based on your own knowledge of the outcomes, can

9  you summarize how the program has impacted the participants?

10 A   The majority, the largest groups exit into a rental by

11 client, with no ongoing subsidy.  And then the others are

12 living with family.

13 Q   Before -- can you tell me about some of the people, stories

14 of any individuals who you recall have participated in the

15 CHOICE program and the impact on them?

16 A   One of our first clients that we worked with was in the

17 Kemper County group home.  He had been in and out of the

18 hospital there at East for over two years.  He had -- his wife

19 had gotten ill.  She eventually passed away.  He lost -- he

20 quit his job to stay home to take care of her and ends up

21 struggling with depression and then goes into the hospital

22 setting.

23     When we got him, we got him into housing.  We got him

24 connected to different mental health resources.  Some of those

25 he opted to take the more minimal mental health services.  And

1    even now, he's still employed.  He got employment with the city

2    there and has maintained his own rental housing for all of

3    these years since 2016.

4    Q    Any other individuals that you can recall?

5    A    There are others.  There's another in the Jackson area.

6    Whenever we first got him housed, he didn't really want to open

7    the door to mental health services, and so we went over there

8    with homemade brownies from Laura Brown on our team, and he

9    started opening the door for PACT services.  And now that

10   landlord, years later, would tell us, and he's paying his own

11   rent now, that he's one of the best tenants he's ever had in

12   housing.

13   Q    Thank you.

14        MS. FOX:  Your Honor, if I could have a moment to

15   confer.

16        THE COURT:  You may.

17   (Short Pause)

18   BY MS. FOX:

19   Q    Just for clarification, in document JX-5, which was the MAC

20   stakeholder meeting minutes where it said "Ben," who was Ben?

21   A    Ben Mokry at Mississippi Home Corporation.

22   Q    You testified that, where possible, the community mental

23   health centers are responsible for the mental health services

24   that individuals receiving CHOICE services receive.  Is that

25   right?

1    A    That's right.

2    Q    What happens when services are not available through the

3    community mental health center?

4    A    MUTEH employs licensed masters level social workers that

5    can fill in as needed, but our hope is usually to connect them

6    to the services that are available in the community.

7    Q    So do the MUTEH staff have time and resources to serve as

8    the mental health professionals?

9    A    Not really, no.

10   Q    You testified that you thought it would be good for DMH to

11   assess for CHOICE at every point of entry to the state's mental

12   health system.  In your experience, is that actually occurring?

13   A    No.

14           MS. FOX:  No further questions.

15           THE COURT:  All right.

16           MR. SHELSON:  May I proceed, Your Honor?

17           THE COURT:  You may.

18                        CROSS-EXAMINATION

19   BY MR. SHELSON:

20   Q    Good afternoon, Mr. Parker.

21   A    Good afternoon.

22   Q    Once MUTEH gets a referral, what is the process for placing

23   the client in housing?

24   A    Once they get the referral and it's confirmed by the

25   Department of Mental Health, that they are eligible for the

1    program, we'll go into wherever that person's at and work with

2    the client to figure out where they want to go, and then also

3    what housing is appropriate for them, given their household

4    size.  And we'll try to come up with options for them there.

5    Q    So if the person is in a state hospital, you go to the

6    state hospital?

7    A    Yes.

8    Q    What -- Ms. Fox asked you about scatter site housing.  Do

9    you remember that?

10   A    Yes.

11   Q    Is scatter site housing the same thing as permanent

12   supported housing?

13   A    It can be.

14   Q    So what type of housing is available through CHOICE?

15   A    It's scattered site, and it would be called permanent

16   supportive housing in the community.

17   Q    So in the context of CHOICE, permanent supported housing

18   and scatter site housing are the same thing?

19   A    Yes.

20   Q    Yes?

21   A    Yes.

22   Q    All right.  So is permanent supported housing staffed?

23   A    Not on site.

24   Q    Is it supervised on site?

25   A    No.

1    Q    All right.  So to the extent that any experts for DOJ are

2    making housing recommendations that are not scatter site

3    housing, is it correct that that housing is not available

4    through CHOICE?

5    A    I think that's correct.

6    Q    What is a wraparound service?

7    A    It's service that you wrap around them in the housing.  So

8    when they enter into housing, we're connecting them to

9    different services that they need to remain stable.

10   Q    What are the most common wraparound services that MUTEH's

11   clients receive?

12   A    Typically, if we're talking about mental health care, it's

13   going to be the wraparound services provided by the community

14   mental health center in that area.

15   Q    Can you give any examples of what type of mental health

16   services they offer?

17   A    So intensive case management, even peer support at a lower

18   level, but PACT teams, AOT teams, and then when needed, MCERT

19   teams, mobile crisis teams.

20   Q    Approximately what percentage of MUTEH's clients receive

21   PACT services?

22   A    PACT alone, I guess would be 30 percent.  But with AOT,

23   you're looking at 50 percent total.

24   Q    You covered this a little bit, but I wasn't entirely clear

25   on it.  What funding does MUTEH receive from the State?

1    A    We receive CHOICE funding from both Mississippi Home

2    Corporation and from the Department of Mental Health.

3    Q    So -- well, do you know how much funding MUTEH ultimately

4    received from the State?

5    A    It's varied from year to year.  When it first started, it

6    was around a million and 78,000 per year for three years, was

7    what it was set up to be, but it's changed.

8    Q    What has it changed to?

9    A    In the next year, they took leftover unspent funds and

10   grouped it in to -- I think it ended up being around

11   1.49 million.  And then I think that's where we're at right

12   now.

13   Q    Now, to be clear, is that just what MUTEH receives, or is

14   that the entire CHOICE program?

15   A    I believe that's what MUTEH received, and it was multiple

16   years of state funding that they were actually allocating at

17   that time.

18   Q    Based on your experience, how is the CHOICE program

19   working?

20   A    I think it's working well.

21   Q    Why do you think that?

22   A    Because it's been able to ramp up and serve a lot of

23   different people all across the state of Mississippi, different

24   communities everywhere, and being able to connect them to

25   mental health services.

1  Q   You testified that it's your view that there should be more

2  referrals from the state hospitals to CHOICE.  Is that correct?

3  A   Yes.

4  Q   All right.  With -- and specifically, you would like to see

5  enough referrals from state hospitals to get to a capacity of

6  around 200 to 240 individuals per year?

7  A   Yes.

8  Q   All right.  And other than that, do you have any complaints

9  regarding what the state hospitals are doing regarding housing?

10 A   No.

11 Q   This is from Exhibit J-51.  And you're welcome to look at

12 it in your binder, but it's page 3.  Have you seen -- well,

13 first of all, let's be clear on what J-51 is.  Is J-51 the 2018

14 annual report issued by Mississippi Home Corporation regarding

15 CHOICE?

16 A   Yes.

17 Q   So this Figure 3, does this show the number of individuals

18 housed with CHOICE by fiscal year?

19 A   Yes.

20 Q   Do you know if this data includes -- strike that.  To your

21 knowledge, does that data include MUTEH clients?

22 A   Yes.

23 Q   So are there individuals who receive CHOICE housing who are

24 not MUTEH clients?

25 A   Yes.

1  Q   And so likewise, are there people housed in communities who

2  receive CHOICE vouchers who are not MUTEH clients?

3  A   In the southern six counties of the state, yes.

4  Q   Okay.  So when -- so where people are housed with CHOICE

5  vouchers is broader than just the MUTEH population of clients?

6  A   Yes.

7  Q   All right.  So this is page 10 from Exhibit J-51.  Do you

8  see here where it says 46 communities with under four units?

9  A   Uh-huh, yes.

10  Q   What is your understanding of what that means?

11  A   That there are only -- there are under four units of CHOICE

12  housing in those communities.

13  Q   And there are 46 such communities.  Yes?

14  A   Yes.

15  Q   And those 46 communities are in addition to the other

16  cities listed on this page?

17  A   Yes.  That would be my understanding.

18  Q   And do you happen to know what any of those communities

19  are?

20  A   I would -- I could imagine some that we've housed in being

21  here or within the 46.

22  Q   All right.  I don't want you to imagine.  Do you

23  specifically know?

24  A   Not offhand, no.

25  Q   All right.

1        MR. SHELSON:  May I have a moment to confer, Your

2   Honor.

3        THE COURT:  Yes, you may.

4        MR. SHELSON:  Thank you, Your Honor.

5      (Short Pause)

6        MR. SHELSON:  Your Honor, we have no further

7   questions.  Thank you.  Thank you, Mr. Parker.

8        THE COURT:  All right.  Any redirect of this witness?

9        MS. FOX:  Just a few, Your Honor.

10                    REDIRECT EXAMINATION

11  BY MS. FOX:

12  Q   I won't make everyone wait while I adjust.  You won't

13  believe that I'm the tallest of my sisters.

14        THE COURT:  My goodness.

15  BY MS. FOX:

16  Q   Just a few questions.  Do the state -- do all the referrals

17  from the state hospitals come to MUTEH, or do some of them go

18  to Open Doors, the other provider?

19  A   All state hospitals go to MUTEH from the state hospital.

20  Q   You talked with Mr. Shelson about the amount of money that

21  MUTEH receives.  Does that money include the actual subsidy,

22  the amount that goes toward the rent for those individuals?

23  A   Yes.

24  Q   And do the individuals in the program make any contribution

25  toward their own rent as well?

1    A    They're required to pay 15 percent of their income towards

2    rent, but very few of our clients have income at program entry.

3    Q    Do more have income by the end of the program?

4    A    Some, yes.

5    Q    Mr. Shelson asked you about the term "scattered site" and

6    whether that is the same thing as permanent supported housing.

7    Is scattered site a description of one's form of supported

8    house?

9    A    Yes.

10   Q    So they are not totally equal terms?

11   A    No.  It's a form of permanent supported housing.

12   Q    Mr. Shelson also asked you about the increase in number of

13   people.  He showed you that chart of the increase in number of

14   people served by the CHOICE program over time.  Do you believe

15   that the CHOICE program could have been ramped up even faster

16   than it has been?

17   A    Yes.

18   Q    And I believe he asked if you were -- wanted to set -- to

19   get to the capacity of about 240 referrals a year.  Is your

20   goal to reach 240 referrals a year or for everyone who needs

21   CHOICE to be referred to the program?

22   A    Everyone that needs CHOICE to be referred to the program.

23         MS. FOX:  No further questions.

24         THE COURT:  All right.  Is this witness finally

25   excused?

1          MS. FOX:  Yes, Your Honor.

2          THE COURT:  All right.  Mr. Parker, you may step down.

3   I assume this concludes the testimony for today.

4          Ladies and gentlemen, thank you so much for

5   accommodating the court on my schedule today and on Friday and

6   even on Thursday.  We might have to do that again at some

7   point -- well, we know we will on the 21st -- 20th, 21st,

8   something like that.  But other than that, unless there's

9   anything we need to take up this afternoon -- I don't think

10  there is.

11         MS. RUSH:  Nothing from the United States, Your Honor.

12         MR. SHELSON:  Nothing from the State, Your Honor.

13         THE COURT:  All right.  Well, we'll see each other,

14  then, tomorrow morning at 9 a.m.  Thank you so much.  Court is

15  adjourned.

16         (Recess)

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF REPORTER

2

3        I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10        I certify that the transcript fees and format comply

11    with those prescribed by the Court and Judicial Conference of

12    the United States.

13

14        This the 10th day of June, 2019.

15

16                    s/ *Cherie G. Bond*
                     Cherie G. Bond
17                   Court Reporter

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***