UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                          CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                        DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 8


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MORNING SESSION
JUNE 11, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186


*** DAILY TRANSCRIPT ***

1    APPEARANCES:

2    FOR THE PLAINTIFF:     MS. REGAN RUSH
                            MS. HALEY VAN EREM
3                           MR. JORGE MARTIN CASTILLO

4    FOR THE DEFENDANT:     MR. JAMES W. SHELSON
                            MR. REUBEN V. ANDERSON
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***

1              TABLE OF CONTENTS

2

3   WITNESSES FOR THE PLAINTIFF:

4   HB                                          720

5     Direct Examination By Ms. Van Erem  ................720

6     Cross-Examination By Mr. Shelson  .................744

7       Exhibit D-338  ..................................750

8       Exhibit D-345  ..................................753

9     Redirect Examination By Ms. Van Erem  .............755

10    Examination The Court  ............................756

11  CR                                          771

12    Direct Examination By Ms. Van Erem  ................771

13      Exhibit PX-1102  ................................781

14    Cross-Examination By Mr. Shelson  .................790

15    Examination The Court  ............................792

16    Redirect Examination By Ms. Van Erem  .............796

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  I apologize for the delay.

2     I had a last-minute issue to come up on another matter.  Is

3     there anything we need to take up before we begin?

4          MS. RUSH:  Good morning, Your Honor.

5          THE COURT:  Good morning, Ms. Rush.

6          MS. RUSH:  I do have just a few housekeeping matters

7     around scheduling I wanted to make the court aware of.

8          THE COURT:  Okay.

9          MS. RUSH:  This morning we have two family members of

10    individuals with mental illness who will be witnesses, then

11    followed by one of your experts from our clinical review.

12         THE COURT:  Okay.

13         MS. RUSH:  I would anticipate, though, that we'll

14    probably be able to end a little early today, maybe early

15    afternoon, if that's okay with the court.  We also anticipate

16    that we may not need -- we may not need Friday.  Our witnesses

17    are coming from out of town, and we had some scheduling

18    difficulties, so we'll have one witness on Monday, and we'd be

19    able to end I think by early to mid afternoon on Monday.  We'll

20    know a little bit more after the next couple of days, but at

21    this point, I just wanted to make sure you're aware that we may

22    not have a witness ready for Friday.

23         THE COURT:  Okay.  That's fine.  That's fine.  Unless

24    the State objects in any way, and I'm pretty sure they don't,

25    but I can speak for them.

1          MR. SHELSON:  Your instincts are correct, Judge.

2          THE COURT:  Okay.

3          MS. RUSH:  Thank you, Your Honor.  Ms. Van Erem will

4     present the witnesses for the United States this morning.

5          THE COURT:  All right.  Thank you.

6          MS. VAN EREM:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MS. VAN EREM:  Haley Van Erem for the United States.

9     The United States calls HB.

10         MS. VAN EREM:  All right.  Your Honor, as Ms. Rush

11    said, the first two witnesses we have are family members of

12    people who have been admitted to state hospitals.  To protect

13    the confidentiality of their family members, we'll be using

14    initials.

15         Okay.  Thank you.  HB.

16    (Witness Sworn)

17         THE COURT:  Sir, before you is the microphone.  Just

18    speak loudly and clearly for everyone to hear you.  Please

19    speak at a pace at which the court reporter can keep up with

20    you because she's taking down everything that's said.

21         Allow the attorneys to finish their questions before

22    you begin to speak so that the two of you will not be speaking

23    at the same time.  And make sure all your responses are verbal,

24    yes or no, if you're going to nod or shake your head, and try

25    to avoid using uh-huh and unh-unh because they may be spelled

1   the same in the record.  But we'll try to -- if that happens,

2   we'll try to make sure we clean it up a little bit.

3        But for the record, sir, could you please state and

4   spell your name.

5                THE WITNESS:  H█████████████B███████████.

6                THE COURT:  Thank you, Mr. █████.  Ms. Van Erem, you

7   may proceed.

8                MS. VAN EREM:  Thank you.

9                            HB,

10    having first been duly sworn, testified as follows:

11                       DIRECT EXAMINATION

12   BY MS. VAN EREM:

13   Q   Mr. HB, thank you for being here today.  For the purpose of

14   my questions I would appreciate if you focus on the facts that

15   existed through the end of 2018, which is the relevant period

16   for purposes of trial.  Do you understand that?

17   A   Yes, ma'am.

18   Q   Where do you live?

19   A   I have two residences.  One is in Moss Point on the coast,

20   in Mississippi, and the other one is in Fairhope, Alabama.  I

21   spend a great deal of my time in Fairhope.

22   Q   Are you employed?

23   A   I'm retired.

24   Q   Where have you worked in the past?

25   A   Right out of high school, I worked for about six months

1   with International Paper in Mobile.  And from there, I went to

2   work in 1962 to 1970 with Louis Dreyfus Grain Elevator in

3   Jackson County, Mississippi in Pascagoula.  And from '70 to

4   '82, I was a police officer with Pascagoula Police Department.

5   Seven of those 11 years that I was there, I was a criminal

6   investigator.  And then in '62, I went to work with Allstate

7   Insurance Company and worked there until '97 -- '98, excuse me,

8   '98, at which time I retired on a disability.

9           THE COURT:  You said in -- you said '62, you started

10  at Allstate.  Did you mean '92 or some other date?

11  A   Excuse me.

12          THE COURT:  I'm sorry.

13  A   That's okay.  I appreciate that.  I started with

14  Allstate -- I was with the police department from '70 to '82

15  and I went with Allstate in '82.

16          THE COURT:  Okay.

17  BY MS. VAN EREM:

18  Q   And do you have any children?

19  A   Yes.  I have a daughter that's 52 years old, and I adopted

20  my grandson, which is a child that she birthed, and I am

21  legally his father as well, based on the birth certificate.

22  Q   Does your daughter have experience being admitted to the

23  state hospital in Mississippi --

24  A   Yes, she does.

25  Q   Okay.  Are your daughter's initials S.B.?

```
1    A    Ma'am?

2    Q    Are your daughter's initials S.B.?

3    A    Yes, ma'am.

4    Q    Are you S.B.'s conservator?

5    A    Yes, I am.

6    Q    What does that mean?

7    A    Granted by the Chancery Court of Jackson County, I was

8    granted with a full conservatorship to manage her financial and

9    her medical needs, basically to oversee all aspects of her

10   life.

11   Q    I'd like to start with some general questions about your

12   daughter.  What types of activities does your daughter like to

13   do?

14   A    Like most ladies, she loves to shop.  Her main focus of --

15   that I would refer to as a hobby is that she finds drawing very

16   fulfilling, and she loves to draw.

17   Q    What are her strengths?

18   A    Survival of coping with her illness is one of her main

19   strengths.

20   Q    Does she live in Mississippi?

21   A    Yes, she does.

22   Q    How long has your daughter lived in Mississippi?

23   A    She was born January 7th, 1967, at Singing River Hospital

24   in Jackson County, Pascagoula, Mississippi.  And when she was

25   in her early teens, her mother and I divorced, and they moved
```

1    temporarily for a short period over to Mobile, where her

2    mother, after about less than a year, I suppose, was

3    transferred by her employment to Atlanta.  And they moved to

4    Atlanta, and she was there for a couple of years.  And then in

5    '90, she came back to reside with me in Mississippi.

6    Q    Has she lived in Mississippi since 1990?

7    A    Yes.

8    Q    Where does she live now?

9    A    She's in a program at -- in a four-person group home in

10   Mendenhall, Mississippi that's operated by Region 8 Mental

11   Health.

12   Q    Please briefly describe your daughter's mental health

13   diagnoses.

14   A    Over the years the diagnosis has evolved or changed from

15   time to time, and I've learned that by dealing with her over a

16   period of 52 years, that in mental health, the symptoms that

17   you're displaying at the time of treatment is -- usually drives

18   the diagnosis.  But for all general purposes, she is bipolar

19   with schizoaffective disorder, and she is borderline

20   personality disorder, and she has a ID, an intellectual

21   disability.  Her testing score is -- ranges from 71 -- overall

22   testing, ranges in the 71, 72 range, which is borderline,

23   referred to as borderline retardation.  And I try not to use

24   the word because it's not appropriate, but it's hard to avoid

25   from time to time.

1        In some areas of her most recent testing, she dipped down

2   below -- way below the 69 in maturity.  In some respects, she

3   actually -- her behavior can be infantile.

4   Q   When was she diagnosed with these conditions?

5   A   The ID was first noticed when she was six years old in the

6   first grade.  That was the first thing that was noticed when

7   she began school in Pascagoula, Mississippi.  And they were

8   just beginning LD classes in the state at that time, learning

9   disability classes.

10  Q   When was she first diagnosed with her mental health

11  diagnoses?

12  A   Sometimes after that date of when she was about ten or 11

13  or so, or maybe 12, the borderline was suspected by a doctor

14  named Sapata, from South Alabama, who treated her as a child.

15  He was a child psychiatrist and a teacher at South Alabama.

16  Then in the '80s, when she was in her late teens, early 20s,

17  the first incident occurred during that period that she and her

18  mother were living in Mobile.  She stabbed herself in the

19  stomach and was acting out.  And at that time, she was sent to

20  a private hospital in Dothan, Alabama.

21  Q   What are the types of symptoms that your daughter has?

22  What symptoms does your daughter have?

23  A   It -- when she is -- at times over the years, when she's

24  been not medicated properly, she's displayed behavior where she

25  had hallucinations.  There were times that apparently that she

1   was showing paranoia.  One time several years ago when -- at

2   one time, she was able to drive, and she had a state of

3   delusional behavior where she was insistent that someone was

4   trying to poison her, that they were putting something in her

5   car to cause her to die.  As it turned out, it -- it was later

6   detected that there was some real -- something real going on.

7   There was antifreeze -- radiator or a heating component of the

8   car was leaking antifreeze, which was the smell that she

9   smelled, but she was extremely paranoid.

10       And then there are other times that she has been so

11  delusional, that she was running from what she thought was the

12  devil was after her, things of that nature.

13  Q   How often do you keep in contact with your daughter?

14  A   We try to talk at least once a week.

15  Q   Are you familiar with her medical records?

16  A   Yes.

17  Q   Are you familiar with the services and treatment that your

18  daughter receives?

19  A   Yes.

20  Q   How many times has your daughter been in a state hospital

21  since she moved back to Mississippi in 1990?

22  A   Twenty-three times.

23  Q   Which state hospitals has she been in?

24  A   She's been in East Mississippi State Hospital in Meridian

25  from beginning in '95 to 2011.  She was there about 17

1    commitments to East Mississippi, and then she was discharged to

2    a personal care home in Booneville, Mississippi.  And they

3    found the need to return her to, at that time, to North

4    Mississippi State hospital four different times for

5    stabilization.  And then on the fourth time, they would not

6    accept her back.  And then she was moved -- the State placed

7    her in a personal care home named Creation Elite.

8    Q    Then after that, did she have two more state hospital

9    admissions?

10   A    There was actually only one after that, unless I'm missing

11   one.  I apparently left one out of the count that I gave,

12   because after some time at the Creation Elite, many months

13   later, it became necessary for her to be committed to

14   Whitfield.

15   Q    That's Mississippi State Hospital?

16   A    Mississippi State Hospital at Whitfield I understand is the

17   correct way.

18          THE COURT:  I'm sorry.  Let me ask a question.  I'm

19   sorry.  Tell me where Creation Elite is.  Where is it; what

20   county?

21          THE WITNESS:  Jackson.

22          THE COURT:  On the coast?

23          THE WITNESS:  No, sir, here in Jackson.

24          THE COURT:  Oh, it's here in -- okay.

25          THE WITNESS:  It's no longer in existence.  It was

1    closed because of the abuse of her.

2            THE COURT:  Okay.  All right.

3    BY MS. VAN EREM:

4    Q    So going back to your daughter's first admission, when was

5    she first admitted to a state hospital in Mississippi?

6    A    I'm sorry.  Would you repeat that?

7    Q    What year was your daughter first admitted to a state

8    hospital in Mississippi?

9    A    In Mississippi?  In '95.

10   Q    1995?

11   A    Yes.

12   Q    Okay.  Did you have personal experience visiting a state

13   hospital in Mississippi before your daughter was ever admitted

14   there?

15   A    I did.  Yes, I did.

16   Q    Can you describe that experience?

17   A    As a young police cadet, I went to the Mississippi Police

18   Academy, State Police Academy, which is located on the property

19   adjacent to Whitfield, and part of our training in 1970 was a

20   tour of Whitfield institution.  And the first place they took

21   us on a driving -- the class on a driving tour was a village

22   that was located on the back grounds of Whitfield at the time,

23   and it was referred to as Mongoloid Village.  And Mongoloid is

24   a term that's not acceptable to use.  It's refers to people

25   with Downs Syndrome.  And in this village was little brick

1  homes.  And out in front of these homes, the folks gathered up

2  because of the cars coming through doing the tour that we were

3  in, and they were males and females, young and old, older,

4  living in these little houses on the back grounds.

5      I don't know what year that was closed, but it was later

6  closed, and those folks would have been transferred to Boswell,

7  which is there close to the property.

8      Another area of the hospital that they felt was helpful to

9  take us on was the criminally insane unit, where the folks that

10  had committed murders and so forth that could not stand trial,

11  that were ill to the point of not being responsible, were

12  housed.

13  Q   What was your reaction to that experience?

14  A   It was a terrible heart-rending experience.  I never forgot

15  it.

16  Q   Did that have an influence on where you wanted ███ to

17  be --

18          MS. VAN EREM:  I'm sorry, Your Honor.  Please strike

19  that.  I accidentally said her name.

20  BY MS. VAN EREM:

21  Q   -- on where you wanted your daughter to be placed?

22  A   Yes, ma'am.  Well, it affected me in such a way that I

23  thought to myself -- at the time, I was in my 20s, and my

24  daughter was about three years old.  She was born in '67, so it

25  was '70.  So she was about three years old back at home.  And I

1  thought to myself, I would never want anyone that I loved to

2  have to be housed in a facility that was seemingly so inhumane.

3      And by 2014, I was put in a position where I had to do a

4  commitment to send her to that very hospital.

5  Q   Was that difficult for you?

6  A   Yes.

7  Q   Now, approximately -- was this 2014 commitment that you

8  mentioned, was that her most recent admission to a state

9  hospital in Mississippi?

10 A   Yes.

11 Q   And how long was she in Mississippi State Hospital during

12 that most recent admission?

13 A   I'm sorry?

14 Q   How long was she in Mississippi State Hospital during that

15 most recent admission?

16 A   She went in around January 30th of 2014, and she was

17 discharged to this new program at Mendenhall around the middle

18 of September of 2018, so about four years and eight months,

19 roughly.

20 Q   Going to right before her most recent admission, where was

21 she immediately prior to entering Mississippi State Hospital at

22 Whitfield?

23 A   Immediately prior, she had -- she was lost after -- during

24 the Christmas holidays of 2013, she had been at the owner of

25 Creation Elite's home, and she had disappeared from there.  The

1  owner had said that the Jackson police had taken her.  And the

2  Jackson police denied any knowledge of her and said that she

3  had went to -- that someone with mental health from Yazoo City

4  had picked her up.  And my wife and I spent the next 29 days

5  tracing it down.  And we finally found her in the woman's

6  detention center next door to the Jackson Police Department, or

7  in close proximity, the downtown woman's detention center.

8  Q   Would that be the Hinds County Women's Detention --

9  A   Hinds County Detention Center, yes, ma'am.

10  Q   And you mentioned that she had been in a personal care home

11  before this happened?

12  A   Yes.

13  Q   Who originally placed her in the personal care home?

14  A   The Mississippi Department of Mental Health through their

15  North Mississippi State Hospital.

16  Q   When she was in the Hinds County Woman's Detention Center,

17  had she been charged with anything?

18  A   Yes.  Prior to -- while she was at the -- may I give a

19  clarification?

20  Q   Yes.

21  A   While she was at the Creation Elite boarding home, doing

22  business as a personal care home, she was -- alleged that the

23  male attendant in charge of predominantly all women residents,

24  she had alleged that he had been having sexual relations with

25  her.  That was never proved -- proven.  And she, as a result of

1    that accusation, the owner of Creation Elite loaded her and her

2    belongings up and took her to Clinton and placed her in an

3    apartment on her own, by herself, and continued -- the owner

4    continued to receive her Social Security.

5        And my daughter was picked up there by a lady that had

6    befriended her at McDonald's, that had worked at McDonald's and

7    had -- she was sleeping on this lady's couch, and she had

8    been -- had not been properly medicated for months, and she was

9    in apparently a bad state, and she walked out on Raymond Road

10   and was hit by a hit-and-run automobile, and it broke both her

11   legs, her pelvis and a concussion.  She was taken to University

12   Medical Center, and they did surgery on the worst leg.  The

13   other one was fractured, but they missed it until later.  It

14   was caught later by -- Whitfield Hospital found it.

15       They stabilized her and then sent her to a rehab -- Yazoo

16   City to a rehab center where she was allowed to -- a nursing

17   home rehab program, where she was allowed to learn to walk

18   again.  And when she was discharged there, she was discharged

19   back to Jackson, Jackson, Mississippi.  And the owner of

20   Creation Elite, who by that time, the Mississippi Department of

21   Health had removed her license.  And you only have to have a

22   license if you have four or more.  And they -- so she took her

23   and took her to her home where she had one other person that

24   she was keeping, and she began taking her Social Security check

25   again.  And she's the one that I found out called the police.

1  Q   And that's how your daughter ended up in Hinds County?

2  A   Got to the Hinds County.  And the charge that she was

3  charged with was prior to that automobile hitting her while she

4  was virtually living on the streets, she shoplifted a pair of

5  panties from Walmart at Clinton, and she was caught and

6  charged.  And she was out on a bond.  And when the car hit her,

7  she did not make the court.  And when I backtracked and found

8  out what had happened, she had been brought to Jackson Police

9  Department and placed in the lobby by the Jackson police, who

10  had lied to me and said they didn't.  And she was in the lobby,

11  and a bondsman that knew her that had made her bond on the old

12  charge at Clinton walked in to meet court that morning and saw

13  her sitting there.  That's how I got the information.  I found

14  the bondsman that took her in.

15  Q   Okay.  And to be clear, at this point, she had already had

16  22 state hospital admissions in the state of Mississippi?

17  A   Yes.

18  Q   When you found her at the Hinds County Women's Detention

19  Center, what symptoms was she experiencing at that time?

20  A   She would not allow the nurse, the duty nurse at the

21  facility, or anyone else, she wouldn't come out of the cell.

22  She wouldn't allow her to take her vitals, to check her blood

23  sugar.  When she first got there, the nurse said that she was

24  aware enough --

25          MR. SHELSON:  Objection, Your Honor, to, one, hearsay,

1    and two, there's no foundation for how he knows any of this.

2            THE COURT:  All right.  Objection sustained.  You may

3    reask your question, though.

4            MS. VAN EREM:  Sure.

5    BY MS. VAN EREM:

6    Q   When you arrived at the Hinds County Detention Center, who

7    did you speak with?

8    A   At the -- I had filed a complaint in chancery to have a

9    lunacy hearing, a commitment hearing, and when it came time for

10   the court, the judge had appointed two psychiatrists to examine

11   my daughter and appointed an attorney to represent her, and a

12   decision was made, because she couldn't be brought down from --

13   they were having a problem getting her out to bring her down to

14   the courtroom, they sent the doctors and her attorney up, and

15   they came back and reported to me and the court her condition,

16   and --

17   Q   What did they report to you?

18   A   That --

19           MR. SHELSON:  Objection, Your Honor, hearsay.

20           MS. VAN EREM:  Your Honor, this falls within the Rule

21   803 exception under both present sense impression and statement

22   made for medical diagnosis.

23           MR. SHELSON:  There's been no showing that he's

24   qualified to make a medical diagnosis, and present sense

25   impression is the witness' observations, not what somebody else

1   told him, which we maintain is hearsay.

2          THE COURT:  Objection sustained.  You may try to get

3   it in through some other way, though.

4          MS. VAN EREM:  Sure.

5   BY MS. VAN EREM:

6   Q   HB, after you arrived at the Hinds County Women's Detention

7   Center, did you initiate commitment proceedings for your

8   daughter?  Did you initiate commitment proceedings for your

9   daughter?

10  A   Yes, I did.

11  Q   Why did you do that?

12  A   Because of her condition that had been reported to me by

13  others.

14  Q   And was the condition that had been reported to you worse

15  than you had experienced before?

16  A   Yes.

17  Q   In what way?

18  A   In all the 23 commitments, there was never a commitment

19  that I did, which I was involved in all of them, that was --

20  except the North Mississippi, but all the ones at East

21  Mississippi and that last one at Whitfield, I was involved, and

22  none of those were ever done without her being present in the

23  courtroom, but it was necessary for the judge to do that.

24  Q   Why couldn't she be present in the courtroom?

25  A   Because of her deteriorated condition.

1  Q   In what way was her condition deteriorated?

2  A   She was nude from the waist down and had urinated all

3  over -- had soiled herself, urinated on herself, and she

4  couldn't -- she wouldn't come out of the jail cell to come

5  down.

6  Q   Okay.  To your knowledge, was she receiving mental health

7  treatment at the detention center?

8  A   No.  I know from discussion with medical staff at the

9  hospital that they felt like the need was there, but they

10  didn't have the resources to take care of it.

11  Q   Had she been receiving any community-based services before

12  her January 2014 admission to the state hospital?  Let me

13  repeat.

14  A   Okay.

15  Q   Had she been receiving any community-based mental health

16  services before her January 2014 admission to the state

17  hospital?

18  A   Not -- no.

19  Q   At that time, were you aware of any services that she could

20  be receiving?

21  A   No.

22  Q   Sir, I would like to spend some time talking about your

23  daughter's time in her most recent admission to Mississippi

24  State Hospital.  How far away from you was your daughter when

25  she was living at the state hospital?

1   A    At Mississippi -- at Whitfield?

2   Q    Yes.

3   A    A couple of hundred miles.

4   Q    And during her stays at East Mississippi State Hospital,

5   how far away was she then?

6   A    How far away --

7   Q    Was she when she was staying at East Mississippi State

8   Hospital?

9   A    At East Mississippi?  It's located at Meridian.  I'm not

10  sure the distance from Jackson to Meridian.  At least 50 miles,

11  if not further.  It's quite a ways from the coast to Meridian,

12  and I'm just not sure the exact distance.

13  Q    Was it difficult for you to visit her?

14  A    Yes.  Yes.

15  Q    Why is that?

16  A    Distance, and other family obligations at home, personal

17  disabilities, health issues.  I was able, on a couple of

18  occasions, to go visit her at Meridian.

19  Q    Did you visit your daughter during her most recent

20  admission to the state hospital?

21  A    Yes.

22  Q    How many times?

23  A    At least seven or eight times specifically, and then there

24  was another 11 or 12 times that I traveled to aid her in having

25  her -- both her knees replaced as a result of the hit-and-run

1    accident that occurred that had injured her so.  And it

2    required multiple -- required multiple trips from the coast to

3    Jackson.

4        I was put in the position where I had to find a surgeon

5    that would do the surgery and get the process done.

6    Q   And when you visited her in the -- your daughter in the

7    state hospital, how did that make you feel?

8    A   Not real well.  The place is very noisy, quite -- Building

9    45 was quite crowded.  The noise level is high.  The

10   cleanliness of the place leaves something to be desired.

11   Q   Is Building 45 where your daughter was?

12   A   Building 45, yes.

13   Q   What are your impressions of the level of privacy in the

14   state hospital?

15   A   There virtually isn't any.

16   Q   Excuse me.  What did you say?

17   A   There virtually isn't any privacy for patients.  They live

18   in a community-type basis.  They bathe, shower in an open

19   shower, and they're kept during the day in a common area, and

20   they sleep in rooms of various numbers, a dorm-type thing.  In

21   her case, they restricted her to one or two roommates, I think

22   partially because of her borderline personality disorder.

23   Q   What are your impressions of what it would be like to live

24   at Mississippi State Hospital?

25   A   It wouldn't be something that I would find to be helpful

1    for anyone, and I certainly wouldn't want to be exposed to it.

2    But I feel bad about it, but that's the only choice that I had.

3    I didn't have any other choices.  And it was -- the up side of

4    it is that she was kept reasonably safe, and safe from herself

5    and safe from others.

6    Q   Would you have preferred that she avoided her admissions to

7    state hospitals?

8    A   Yes, I would have liked to have had other options that

9    were -- were better options, but they weren't there.

10   Q   Why did you feel that there was no other option?

11   A   Well, I researched.  It was -- and tried to find other

12   options, and they just weren't there.  I had professional

13   relationship with the -- during the '90s, with the then

14   Attorney General during the '90s, Mike Moore.  And I called

15   Mike and asked if they were -- she would -- the process in the

16   state mental health system was that if a person was committed

17   for 30, 60, 90 days to be stabilized and then returned to the

18   community where they came from.

19        And I had gotten to the point, with age and all, and I

20   couldn't keep her safe anymore.  So I called to find out if

21   they were any alternatives, and Mike said that the only

22   alternative that he was aware of was those stabilizations and

23   send them back and --

24   Q   I'd like to focus you on her most recent admission to the

25   state hospital.  When she was -- when she was at the state

1  hospital between 2014 and 2018, did you try to find her a place

2  in the community?

3  A   Yes.  I first called -- when this -- when she was

4  discharged from the state hospital, I was not aware of ADA, the

5  details of ADA.  I wasn't aware of *Olmstead*.  I didn't -- I had

6  trusted the State for years to do the right thing, and I had no

7  reason to believe otherwise.

8       And when she was discharged from East Mississippi to

9  Booneville, I explained that I had tried those type things in

10  her earlier years, and they just wouldn't work, that she needed

11  close supervision.  Without it, it would be a problem.  And

12  I -- so when this happened and she wound up injured in the

13  second personal care home -- by the way, both the personal care

14  homes --

15          MR. SHELSON:  Object to -- I think we're getting into

16  an area that's nonresponsive to the question.

17          MS. VAN EREM:  I can move on, Your Honor.

18          THE COURT:  All right.  Thank you.

19  BY MS. VAN EREM:

20  Q   So during this last admission, during her last admission to

21  Mississippi State Hospital, who did you contact to help you to

22  find her a place in the community?

23  A   I called the Governor's office, and the aide, the

24  Governor's aide referred me to the Mississippi Department of

25  Mental Health, Ms. Vaughn, who represented consumer support, a

1  department of the mental health system, and I had communication

2  with Ms. Vaughn on many occasions.

3  Q   Is that Veronica Vaughn?  Veronica Vaughn?

4  A   Yes, ma'am.  Veronica Vaughn.  And Ms. Vaughn was unable to

5  find any alternative placement or any appropriate placement for

6  my daughter during that period of time.

7  Q   When did you make contact with the Office of Consumer

8  Protection with the Department of Mental Health?

9  A   Not long after my daughter was sent to the hospital.

10  Q   Sometime in 2014?

11  A   Yes, in 2014.  I don't know the exact date, but it was

12  early on when she -- not long after -- my first contact with

13  that department was pretty much -- she was sent a couple of

14  days after the hearing, and I had contacted them.  By that

15  time, I had already contacted them.  They were one of the first

16  people that I contacted.

17  Q   What was your understanding at that time of how the

18  Department of Mental Health could help your daughter transition

19  to a place in the community?

20  A   Would you -- I didn't catch all of the question.

21  Q   Sure.  What was your understanding at that time of how the

22  Department of Mental Health might be able to help your daughter

23  transition to a place in the community?

24  A   I would have thought that they would be able to find an

25  appropriate placement and help her make that transition, but

1    that turned out not to be the case.

2    Q    How long did it ultimately take to find her a placement in

3    the community?

4    A    Four years and eight or nine months.

5    Q    Why did it take more than four and a half years?

6    A    They had to create a place.

7           MS. VAN EREM:  Your Honor, if I may briefly confer

8    with my cocounsel.

9           THE COURT:  You may.

10   BY MS. VAN EREM:

11   Q    I just have a few more questions for you.  You mentioned

12   that you originally called the Governor's office in 2014.  Why

13   did you make that decision to call the Governor's office?

14   A    For guidance.  I had ran across the 2011 findings letter

15   from the Department of Justice and had determined that -- by

16   reading that letter, it was clear that the State was obligated

17   to provide services appropriate and consistent with the

18   individual needs of my daughter.  And I was trying to get help

19   in finding those services.  And that's where they led me to a

20   representative from the Department of Health who was a surveyor

21   of the personal care homes, and they referred me to the

22   department that Ms. Vaughn was director of.

23   Q    Okay.  In your estimation, since you returned to

24   Mississippi, how many -- how much of your daughter's life has

25   been spent living in a Mississippi State Hospital?

1    A    I calculated from '95 to 2014, which is about 24 years.

2    And adding up the various stays that she stayed in the

3    Mississippi hospital system, between East and North and the

4    State Hospital at Whitfield, those three different facilities,

5    she was about half of that -- about 12 years is the total time

6    that she spent.  The last two commitments were 11 months and

7    then a six-week break that she was discharged -- an attempt to

8    discharge her that didn't work out.  And then she was back for

9    about a four-year stay at East.  So she was about five years

10   there and then four and a half years at Whitfield.  Go ahead.

11   Q    How does that make you feel?

12   A    I feel terrible about -- to have to do that, you know.  I

13   feel responsible in a lot of ways because I'm the one -- I'm

14   the one to have to do the commitment.

15   Q    What effect has having to do -- let me back up.  What

16   effect has filing commitments had on you?

17   A    I -- it's preoccupied my entire life for the last 24 years.

18   The stress has been terrible.

19   Q    How have your daughter's admissions to the state hospitals

20   affected her life?

21   A    She's been miserable.  She certainly didn't want to be

22   there.  She's been there -- she's been -- for the last two

23   stays, as long as they were, I'm not sure that she's not

24   suffering from institutionalization, where you become

25   institutionalized.

1    Q   What do you mean by becoming institutionalized?

2    A   You become dependent upon the system that you're in.  It

3    happens in a criminal system as well.

4    Q   Do you have concerns for your daughter's future?

5    A   I do.

6    Q   What are those concerns?

7    A   I'm 75 years old, and I have many issues healthwise.  So

8    every day is a gift.  And my biggest concern is not having the

9    peace of mind to know that if I die, that nobody else is going

10   to fight for her.  Then she's going to wind up back in that

11   same predicament where she was when she was ran over by that

12   car.  She'll ultimately die.

13   Q   If not for the work you have done to find your daughter her

14   current placement, where do you think she would be right now?

15   A   She would still be -- if I had anything to do with it, I

16   would be forced to keep her -- to ask that she be kept at the

17   state hospital at Whitfield.  She cannot survive on her own.  I

18   tried 20 years of providing houses and overseeing her care, and

19   she can't take care of herself.  The intellectual disability

20   precludes that.

21   Q   So let me just clarify.  If she didn't have access to the

22   current placement where she is now, you believe she'd be at the

23   state hospital?

24   A   Yes, and I think that's possible that that may be what's

25   going to happen here shortly if things are --

1    Q    I'd just like to remind you about the fact -- the cut-off

2    of 2018.

3    A    Okay.

4            MS. VAN EREM:  I have no further questions at this

5    time.

6            THE COURT:  Okay.  Thank you.

7            MR. SHELSON:  May I proceed, Your Honor?

8            THE COURT:  You may.

9                        CROSS-EXAMINATION

10   BY MR. SHELSON:

11   Q    Sir, what year did you say you were a police cadet when you

12   first visited Mississippi State Hospital?

13   A    Around '70, 1970.

14   Q    Do you need -- would you like to take a break, or you would

15   like to continue?

16   A    No, sir, I'm fine.

17   Q    Okay.  And when was the next time after 1970 that you

18   visited Mississippi State Hospital?

19   A    It was after my daughter was -- in 2014.

20   Q    So approximately 44 years elapsed between what you saw in

21   1970 and when you went back to Mississippi State Hospital in

22   2014?

23   A    That is correct.

24   Q    All right.  And I wasn't clear on this.  Of your daughter's

25   commitments to a state hospital in Mississippi, how many of

1  them were you the person who moved to have her committed?

2  A   Seventeen, I believe, to East that I was the -- instigated

3  the commitment on.  And then the last one to Whitfield -- State

4  Hospital at Whitfield.  So that's about 18 of the 23.  I

5  believe that's correct, 18 or 19 of the 23.

6  Q   Where did your daughter have her knee surgeries following

7  the incident you testified about?

8  A   I was able to get a prominent surgeon in Jackson to do it

9  at Baptist Hospital.

10  Q   What did you testify to regarding what the medical hospital

11  at Mississippi State Hospital found regarding one of your

12  daughter's legs?

13  A   After she was hit by the car you're speaking?  They had to

14  do -- one of them was in extremely -- extreme injury that they

15  had to do surgery on to repair it and put it in a cast.  They

16  missed a fracture, a break in the other leg.  They missed it,

17  and it was -- they found it at Whitfield.  They found that

18  break at Whitfield.

19  Q   Once that break was found, who treated your daughter for

20  that?

21  A   It was too late for any kind of treatment.  The next

22  treatment she -- the treatment that they took her to was

23  University Medical Center, where she had originally been

24  treated, and they may have been the ones that found it, but

25  Whitfield's the one that notified me of it.

1  Q    You testified that your daughter needs close supervision.

2  What do you mean by close supervision?

3  A    That's what the program that the Mississippi Department of

4  Mental Health has set up at --

5  Q    Region 8?

6  A    Region 8, yes, sir.  Thank you.

7  Q    Do those -- the facility that your daughter's currently in,

8  does that -- do those homes have a name, to your knowledge?

9  A    It does, and I don't have it on the tip of my tongue, and I

10  don't -- I have no papers with me.  But it does have -- they

11  named the program when they created it.

12  Q    To your knowledge, is it community transition homes?

13  A    That sounds reasonably close.

14  Q    Over the years, have you corresponded with the U.S.

15  Department of Justice regarding your daughter?

16  A    I have.

17  Q    Have you done that mostly by e-mails?

18  A    A combination.

19  Q    Combination of e-mails and what?

20  A    Phone call.

21  Q    Approximately how many times do you estimate you've

22  communicated with the Department of Justice regarding your

23  daughter since 2014?

24  A    I have no recollection of number of times that I may have

25  sent something through an e-mail or a newspaper report or

1  something like that.  Any time that I saw anything that I

2  thought would be helpful to the situation, I would forward it

3  on.

4  Q   Have you communicated with the Department of Justice more

5  than 50 times?

6  A   I don't know.  I really don't, sir.

7  Q   You testified earlier about a 2014 time where your daughter

8  was in jail in Jackson, Mississippi.  Is that correct?

9  A   I did.

10  Q   And did you make a civil rights complaint to the Department

11  of Justice about that incident?

12  A   I did.  I made a notification in response to their inquiry.

13  They sent out for anyone that had anyone in the jail to

14  respond, and I notified the Justice Department and -- of the

15  circumstances.

16  Q   Did you make a complaint to the Department of Justice

17  regarding what you believed to be corruption and cover-up at

18  the Jackson, Mississippi Social Security office?

19  A   I probably notified them of a copy of it, but the complaint

20  would have not necessarily been to them.  It would have only

21  have been related to my daughter's situation.

22  Q   With regard to the Social Security matter, did you make a

23  complaint to the FBI?

24  A   I tried.

25  Q   Have you filed a lawsuit in this court regarding your

1    daughter?

2    A    I haven't, no, sir.  As her conservator --

3    Q    As the conservator, did you file a lawsuit in this court

4    regarding your daughter?

5    A    I personally didn't.  An attorney did on behalf of my

6    daughter through me.

7    Q    Okay.

8         MR. SHELSON:  Your Honor, may I approach?

9         THE COURT:  Yes, you may.

10   BY MR. SHELSON:

11   Q    Sir, I've handed you what's been marked as Exhibit D-338.

12   What is this document?

13   A    Let me get my glasses on.  It's the filing that you

14   referenced.

15        MR. SHELSON:  Your Honor, D-338 was filed in this

16   court, and it was filed as a public document, but I've

17   attempted to redact the portion I'm going to display on the

18   Elmo.  And let's see.

19   BY MR. SHELSON:

20   Q    Is this the lawsuit that was filed by and through you as

21   the conservator for your daughter, on behalf of your daughter?

22   A    Yes, sir, it appears to be one and the same.

23   Q    Okay.  Let's look at paragraph 15, please.  It's on page 4

24   of 6.  Does it read "At some point thereafter, believed to be

25   late June or early July, the decision was made, after over 20

*** DAILY TRANSCRIPT ***

1  failed attempts, to transfer SB out of the hospital environment

2  back to a personal care home in the community, this time to

3  Creation Elite boarding home in Jackson, Mississippi."  Did I

4  read that correctly?

5  A   It appears you did, yes, sir.

6  Q   Does the next sentence read as follows:  "The decision was

7  made over the objections of her father, who pointed out her

8  long record of incompatibility with life outside of closely

9  monitored institutional settings and correspondence with her

10  Department of Mental Health case worker."  Did I read that

11  correctly?

12  A   It appears you did, yes, sir.

13  Q   So -- and where it says "over the objections of her

14  father," is that you?

15  A   Yes, sir.  Yes, sir.  I'm sorry.

16  Q   And then it says -- where it says -- refers to closely

17  monitored institutional settings, what type of settings did you

18  have in mind there?

19  A   It would be something similar, not exact but similar to the

20  program that she's in now, except it would include psychiatric

21  counseling and support, and that's what the State's testing

22  suggested that was appropriate care for her.

23          MR. SHELSON:  Your Honor, we move to have

24  Exhibit D-338 admitted into evidence.

25          THE COURT:  Any objection?

1          MS. VAN EREM:  No objection.

2          THE COURT:  Okay.  It will be admitted.  We'll make

3    sure all redactions to SB, make sure all redactions are there,

4    as well as its current -- as well as the case file number.

5          MR. SHELSON:  Yes, Your Honor.  If we may, we'll

6    provide --

7          THE COURT:  That's fine.

8          MR. SHELSON:  -- tomorrow a redacted -- properly

9    redacted copy.

10         THE COURT:  All right.  That will be -- I'm sorry.  Is

11   that D-338?

12         MR. SHELSON:  Yes, sir.

13         THE COURT:  It will be received into evidence.

14      (Exhibit D-338 marked)

15         MR. SHELSON:  Your Honor, may I approach?

16         THE COURT:  Yes, you may.

17   BY MR. SHELSON:

18   Q   Sir, you've been handed Exhibit D-345.  Do you recognize

19   that document?

20   A   Yes, sir.  It appears to be an e-mail that I would have

21   sent to a couple of individuals at the Department of Justice.

22   Q   Is it dated October 1, 2016?

23   A   It is.

24   Q   Does it concern your daughter?

25   A   It appears to.  I haven't read it completely, but it

1    appears to.

2          MR. SHELSON:  May I approach?

3          THE COURT:  Yes, you may.

4    BY MR. SHELSON:

5    Q    I want to display this in a manner that doesn't show your

6    daughter's name.  Do you see the highlighted part here?  Let me

7    show you where I am.

8    A    I saw the highlighted.

9    Q    I'm right there.

10   A    Start right there?  Okay.

11   Q    Yes, sir.  All right.  "So no doubt, even though she is now

12   properly medicated, it will be quite an ordeal to rehab her

13   after a double knee replacement, but the truth is, if it has to

14   be done, the state hospital is the place she would need to be.

15   No private facility can deal with her."  Did I read that

16   correctly?

17   A    You did.

18   Q    All right, sir.  I'm going to turn to the next page of your

19   letter.  It's the second full paragraph from the top.  I've

20   marked out your daughter's name here, but does it then say that

21   "SB still says she does not want to go to a group home or a

22   PCH.  She wants nothing other than her own apartment, which, of

23   course -- which is, of course, not possible.  But now I have

24   the conservatorship, so the group home may become an option

25   again."  Did I read that correctly?

1   A    Yeah.  I'm not on the right page.  What page are you on,

2   sir?

3   Q    Page 2.

4          MR. SHELSON:  May I approach, Your Honor?

5          THE COURT:  Yes, you may.

6   A    I wasn't going down far enough.  You read it correctly.

7   BY MR. SHELSON:

8   Q    So based on your observations of your daughter, can she

9   live on her own in an apartment?

10  A    No, sir.  I've tried that in an apartment and bought two

11  houses, and she could not take care of herself.

12  Q    Based on your observations of your daughter, how

13  independently do you believe your daughter can live in a

14  community setting?

15  A    I think she has to have 24/7 oversight, which is -- as

16  again, I use as an example the program that's been established

17  in Mendenhall that she's in now.  The only -- that program

18  is -- the only thing that I know that that program is lacking

19  that would be more helpful to her particular treatment would be

20  that it offered psychiatric counseling and support.

21          MR. SHELSON:  Your Honor, we move to admit

22  Exhibit D-345 into evidence.

23          THE COURT:  Any objection?

24          MS. VAN EREM:  No objection.

25          THE COURT:  D-345 will be received into evidence.

1     (Exhibit D-345 marked)

2           MR. SHELSON:  Your Honor, we'll provide the court a

3    redacted copy of D-345.

4           THE COURT:  All right.

5    BY MR. SHELSON:

6    Q   Sir, the facility that your daughter's currently at in

7    Mendenhall, what is your understanding of how that facility

8    came about?

9    A   It was created by the Mississippi Department of Mental

10   Health, and I don't know the exact reasoning.

11   Q   Okay.  Based on -- well, how long has your daughter been at

12   the facility, the community transition home in Mendenhall?

13   A   She has been there since September of -- mid September of

14   last year.

15   Q   Mid September of 2018?

16   A   Yes, sir.

17   Q   Okay.  And based on your observations, how is she doing

18   there?

19   A   There's been a recent situation where she had to be sent to

20   their stabilization center.  She's -- according to --

21           MS. VAN EREM:  Your Honor --

22           THE COURT:  I'm sorry.  There's an objection?

23           MS. VAN EREM:  I'm sorry to interrupt.  I just want to

24   clarify the fact cut-off of December 2018 and just ensure that

25   the questions are only regarding December 2018 and prior.

1          MR. SHELSON:  I'll rephrase the question, Your Honor.

2          THE COURT:  Okay.  All right.

3   BY MR. SHELSON:

4   Q   Up until December 31st, 2018, based on your observations,

5   how was your daughter doing at the community transition home in

6   Mendenhall?

7   A   Fair.

8   Q   How frequently do you visit her there?

9   A   I've not visited her there since she's been there.  I

10  surveyed the property prior to her being relocated there, and I

11  communicate with her on a phone long -- on a regular basis.

12         MR. SHELSON:  Your Honor, may I have a moment to

13  confer?

14         THE COURT:  Yes, you may.

15     (Short Pause)

16  BY MR. SHELSON:

17  Q   Sir, you did -- I believe you testified earlier that your

18  daughter could not survive on her own.  Is that correct?

19  A   That is -- I believe that's pretty much accurate.

20         MR. SHELSON:  No further questions, Your Honor.

21         THE COURT:  All right.

22         MR. SHELSON:  Thank you, sir.

23         THE WITNESS:  Yes, sir.

24         MS. VAN EREM:  I may have a few more questions, if I

25  may have just a minute to confer.

1          THE COURT:  Yes.

2       (Short Pause)

3                       REDIRECT EXAMINATION

4   BY MS. VAN EREM:

5   Q   Okay.  I've just got a few more questions.  Sir, are you

6   ready?

7   A   Yes.

8   Q   You were asked by Mr. Shelson about a lawsuit regarding

9   your daughter's care.

10  A   Yes, ma'am.

11  Q   Why did you file that lawsuit?  Why did you file that

12  lawsuit as your daughter's conservator?

13  A   I was believed to have a fiduciary responsibility to do so

14  on my daughter's behalf.  It's my understanding, from advice

15  from counsel, that as long as she didn't have a conservator,

16  any torts committed against her, the time -- she was not

17  limited by time as to when they could be filed.  But once I

18  became her conservator, then it became up to me to make a

19  decision to do so.

20  Q   And would you prefer that your daughter live in a state

21  hospital or in a safe community setting?

22  A   In a safe community setting.

23  Q   When your daughter was in her own apartment, was she

24  receiving any community-based mental health services?

25  A   No.

*** DAILY TRANSCRIPT ***

1    Q   When you said that no -- excuse me.  Let me back up.

2    Mr. Shelson showed you an e-mail that you had written and

3    talked about a place where you wrote that no private facility

4    could deal with her.  Do you remember that?

5    A   I do.

6    Q   Was that based on the options you had been offered in the

7    community at the time?

8    A   Yes.

9            MS. VAN EREM:  No further questions.

10                    EXAMINATION BY THE COURT

11           THE COURT:  All right.  Mr. HB, I have a few

12   questions, to be followed up by the government on anything that

13   I've asked, and then the State, if they wish to.  All right?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  You mentioned that you've adopted your

16   grandchild.  When did that adoption take place.

17           THE WITNESS:  My wife and I gained custody when he was

18   three days old.  And then it took a period of about 24 months,

19   roughly two years, for it to work its way through chancery.

20   And so we had him since he was three days old, but the actual

21   adoption would have been finalized about two years later.

22           THE COURT:  How old is that child now?

23           THE WITNESS:  Now, his birthday is July -- will be

24   July 15th.  He will turn 18 years of age.

25           THE COURT:  Is he in high school?

```
1              THE WITNESS:  He is being homeschooled.

2              THE COURT:  He's being home schooled?

3              THE WITNESS:  He's autistic.

4              THE COURT:  Okay.  Did his natural father challenge or

5    seek paternity -- I mean, you know, did the natural father

6    oppose the adoption in any way?

7              THE WITNESS:  No, sir.  He was a married man who

8    fathered him with a mentally disabled individual, which, based

9    on my many years of police work, is a felony in the state of

10   Mississippi.  They can't consent, so he was -- he had all the

11   motivation in the world not to challenge anything, and he did

12   not.  And no charges were filed against him at all.  So he

13   didn't challenge the adoption at all.

14             THE COURT:  Okay.  So 18, that would have been 18

15   years ago so.  So prior to that time, I -- my understanding of

16   your daughter's various commitments and whatnot, she had

17   been -- prior to -- 18 years ago would have been 2001 or so, I

18   guess.  He was born in 2001?

19             THE WITNESS:  He was born in 2001.

20             THE COURT:  And prior to that, your daughter had at

21   least spent some time in East Mississippi State Hospital, and

22   maybe even some other hospitals.  Is that a correct statement?

23             THE WITNESS:  That is correct.

24             THE COURT:  All right.  You've indicated that you also

25   have a residence, or you've also lived in Fairhope, Alabama.
```

1    Is that correct?

2              THE WITNESS:  That's correct.

3              THE COURT:  Okay.  Did you -- while living in Alabama,

4    did you look to see if your daughter could receive treatment or

5    hospitalizations or group homes in Alabama?

6              THE WITNESS:  I --

7              THE COURT:  Did you investigate that?

8              THE WITNESS:  I have investigated it, yes, sir.

9              THE COURT:  You did?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And what did your investigation reveal?

12             THE WITNESS:  During my investigation, it seemed that

13   Alabama was in a similar predicament as Mississippi, as far as

14   services.  They had closed all of their state hospitals.  They

15   had shut them down completely.  And they had set up some mental

16   health treatment centers, community-based, and they funded --

17   they lost funding pretty quickly on those, and those had to be

18   closed.

19             And the -- Your Honor, the biggest -- one of the

20   biggest things with placement with my daughter, and some of the

21   things that I referred to are -- seemed to be cruel, but she's

22   quite disruptive, and it's the borderline personality disorder.

23   She's a very difficult person to deal with with a borderline.

24   So that limits a lot of various placements.  But that -- I hope

25   that adequately answers you.

1          THE COURT:  It does.  Let me ask you something about

2     Creation Elite.  You indicated that that facility has been

3     closed, in part at least, because of the circumstances your

4     daughter encountered there or whatever.  Is that an -- you said

5     it's your understanding that that facility in Jackson has been

6     closed now.  Is that correct?

7          THE WITNESS:  Yes, sir.  She's pled guilty to three

8     counts of embezzlement and there's still others outstanding.

9          THE COURT:  And that's the owner of Creation Elite?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Okay.

12         THE WITNESS:  Would it be appropriate if I gave you a

13    clarification about the lady that operated that?  There's been

14    brought up by the gentleman representing the State was the

15    issue about Social Security.  And she was an armed federal

16    security guard in the benefits office of Social Security here

17    in the Federal Building in Jackson.  And she was -- according

18    to the Secretary of State's Office, she filed Creation Elite,

19    which was a boarding house, as a nonprofit, which was not a

20    nonprofit.  But she had it filed as a nonprofit, and she had

21    been operating it for seven years under -- without the

22    detection of the people at Social Security.  While she was in

23    charge of security in the benefits office, she was collecting

24    up to 15 Social Security checks a month and a direct deposit

25    from the United States Department of the Treasury.

1          THE COURT:  Okay.  And she was ultimately prosecuted

2     for -- what is your understanding as to why she was prosecuted?

3     For the misfeasance or whatever of the Social Security checks?

4          THE WITNESS:  The complaint that I filed with the

5     Attorney General's office on her was that she violated the

6     Attorney General's state statute that the Attorney General

7     created, abuse of a vulnerable adult by taking her funds.  And

8     apparently, from the best I can tell, because of the actions

9     that I had filed against the State for their inappropriate

10    placement that resulted in the injuries to my daughter, they

11    never prosecuted the complaint for vulnerable -- violation of

12    vulnerable adult, and they let the statute of limitations run,

13    which was two years.

14         And then one day I kept on with Social Security, and I

15    made a complaint with the Inspector General of Social Security.

16    I kept on asking them to prosecute her.  They were finally able

17    to get her out of the employment there.  They moved her out of

18    the building.  Once I turned her in, they moved her out of

19    Social Security, and then later she was discharged.  I don't

20    know the circumstances.  They don't release that.

21         But one day I get a call from a defense attorney.  It

22    was her defense attorney, and he had been given my number by

23    the Attorney General's office, and Social Security had -- I

24    don't know whether it made any difference that I had kept on

25    asking them to please prosecute her, but they had -- they had

1    brought the case back, and this time they did it under

2    embezzlement, which doesn't have a statute.  If it does, it

3    hadn't ran.

4            THE COURT:  Do you know if the State authorities

5    prosecuted her?

6            THE WITNESS:  The attorney --

7            THE COURT:  Or the federal authorities?

8            THE WITNESS:  The Attorney General -- excuse me, the

9    State Attorney General's Office prosecuted her.  But the

10   director -- State Director of Social Security, in a response to

11   one of my inquiries, suggested that they had asked that it be

12   brought back up.

13           THE COURT:  Okay.  But as far as you know, she was

14   prosecuted by the State?

15           THE WITNESS:  They definitely were the prosecuting

16   authority, yes, sir.  Regardless of how it came up, they were

17   the one that handled it.  Myrick Jackson is the one that I

18   talked with, and that's the first I found out that she was

19   being prosecuted.

20           THE COURT:  Okay.  Do you know the results of that

21   prosecution?

22           THE WITNESS:  I do.  I have copies of it.  I obtained

23   copies of it, and she pled guilty --

24           THE COURT:  Okay.

25           THE WITNESS:  -- to embezzlement.  And she tried to

1    get that set aside and get the new nonadjudicated.  But so far,

2    as far as up until the last time I had checked with the AG's --

3    with the court, the judge that had accepted her plea, and it's

4    been now about a year, and I don't believe the judge has any

5    intentions of doing that.

6            THE COURT:  Okay.  Let me ask you this.  Was that in

7    Hinds County?

8            THE WITNESS:  It is.

9            THE COURT:  Okay.  You indicated that your daughter I

10   believe at one time thought somebody was tampering with, if you

11   will -- maybe that was not the word you used -- with her car?

12           THE WITNESS:  Yes.

13           THE COURT:  Okay.  So she's able to drive a car?

14           THE WITNESS:  She was.

15           THE COURT:  She was.

16           THE WITNESS:  I had --

17           THE COURT:  Make sure you're speaking into the mic.

18           THE WITNESS:  To answer your question, was she able to

19   drive a car, she was able to drive, not very well, but she was

20   able to get her driver's license.  And she did that with the

21   help of someone else.  I didn't have enough confidence in her

22   abilities to do it.  She wrecked about five of them before I

23   refused to place her in another car, you know.

24           THE COURT:  Does she have any relationship with her

25   natural son?

1          THE WITNESS:  With her --

2          THE COURT:  With her child.

3          THE WITNESS:  No, no.  As a matter of fact, that's not

4   allowed.  I do talk with her about him and tell her the things,

5   how good he's doing, which he is.  He does wonderful.  He's

6   quite bright, and he has a lot of disabilities that goes with

7   the autism, but he works with them every day.  He's an advocate

8   with other people with autism.  He's just a remarkable young

9   man.

10          And with her severity of her illness and the

11  circumstances, my wife and I, when we did the adoption, we

12  made -- they set her rights aside, and we took full care and

13  custody of him.  When he was a baby, while we were waiting on

14  the adoption, we tried to allow her -- this was when she was

15  not in the hospital, of course -- we tried to allow her to

16  visit from time to time with him, and it became somewhat

17  disruptive.  And we made the decision that in the best interest

18  of the child, that we leave it alone and -- the relationship

19  alone and see -- and that's before we knew he was autistic.

20          And then once we knew he was autistic, he actually

21  asked if he was adopted, and we told him yes, he was.  We

22  answered him honestly.  And he wanted to know about his birth

23  mother, and we put him off on that.  And we were in hopes,

24  originally, that when he got to adulthood that we could explain

25  the circumstances when he was capable of understand, but with

1    the autism, we're at a loss as to -- we don't do anything to

2    harm him and to psychologically cause him any problems.  My

3    daughter is not capable of true love, you know, healthy love.

4            THE COURT:  Okay.  Let me -- and I guess the last

5    question I'll ask, when she was involved in the accident or the

6    hit and run, I think you described she was -- must have been

7    walking down the street, the roadway, highway, or wherever she

8    was walking when she was hit by a vehicle, and that's when both

9    of her legs were broken?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  And her pelvis?

12           THE WITNESS:  Pelvis.

13           THE COURT:  And all of that.

14           THE WITNESS:  And a concussion.

15           THE COURT:  How long was she treated in the hospital

16   for those injuries, including any amount of time of

17   rehabilitation?

18           THE WITNESS:  Okay.  Around five months total, she

19   was -- she had the surgery at North -- or excuse me -- at

20   University Medical Center.  And that's where she was taken from

21   the scene, to the University, and they did the surgery on the

22   most serious leg.  And it was -- she was probably there a

23   couple weeks.

24           I have recently written for a discharge summary, and

25   I, for some reason, hadn't gotten it back.  But the -- she --

1   from there, they discharged her direct to Yazoo City to the

2   rehab, and she was there about four and a half months.  So for

3   a total of about five months it took to get her back, and then

4   her legs -- her leg was all twisted and turned inward.  And she

5   had difficult walking, and she had pain in her -- a lot of

6   pain.  And North -- excuse me -- Whitfield took her several

7   times, when she first got there, back to University Medical

8   Center, where -- to -- and tried to fit her with a brace, and

9   she resisted the brace.  She didn't want to wear the brace.

10          And I tried to get Whitfield to do -- to handle the

11   surgery, and the doctor at University Medical Center sent them

12   a letter at their request, that as long as she was a patient at

13   Whitfield, he would not do the surgery.

14          THE COURT:  Okay.

15          THE WITNESS:  So at that point, I hired an outside

16   orthopedic consultant and got a recommendation for a local

17   surgeon here in Jackson who specialized in knee replacement and

18   was allowed by the State to take her for an exam.  And he

19   looked at it and agreed to do the surgery.  I went back and

20   talked with the chief of staff out at the hospital, and when

21   he -- as soon as he knew that I had a surgeon that was willing

22   to do the surgery, he said that they would allow it.

23          So they -- what they did was, they released her on a

24   medical release for me to handle all of that and to make sure

25   that the payment was made for it and so forth, which I did.

1          THE COURT:  Okay.  And I do have a few more questions.

2     Are you married now?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Are you married to your daughter's mother?

5          THE WITNESS:  No, no.  Her mother and I divorced.

6          THE COURT:  Okay.

7          THE WITNESS:  And her mother passed away several years

8     ago, and I remarried 20-plus years ago.

9          THE COURT:  Yeah, I heard you say wife, and I just

10    wanted to make sure.

11         THE WITNESS:  Right.

12         THE COURT:  Now, is -- you said part of what bothers

13    you is that you don't know if anybody will be around to fight

14    for your daughter if something happened to you.

15         THE WITNESS:  That is a concern, yes, sir.

16         THE COURT:  Okay.  Let me ask you this.  Is your son

17    in a position to be able to take care of himself if something

18    happens to you?

19         THE WITNESS:  The jury's still out on that question.

20    We're very optimistic and very hopeful, but if he is -- at this

21    point, he is not.  He's under the care of both a psychologist

22    and a child psychiatrist, and the child psychiatrist has an

23    autistic child himself, and he treats a lot of autism, and we

24    counseled with them and his -- the psychiatrist that -- the

25    child psychiatrist that he goes to feels like that if he's able

1   to live independently, it will be later in life than a

2   neurotypical individual, maybe in his early 30s before he could

3   really take care of himself.  The challenge is whether my wife

4   and I can live long enough to see that happen.

5          So we've made legal provisions in the event that it

6   doesn't, and we just take every day at a time with God's grace,

7   and we try our best to do the best we can with him.

8          THE COURT:  Okay.

9          THE WITNESS:  And he's a great kid, and he responds

10   great to it, but he is mature intellectually.  He's codes,

11   computer coding.  Intellectually, in certain areas, he excels.

12   In his contact with other people, he doesn't know how to

13   socialize, you know, the interchange of socialization between

14   people.  He's not antisocial, but he understands people.  He

15   recognizes good people right away and people who are not

16   really, you know, safe to be around.  He's got -- he's got a

17   good sense about himself, and he's blessed.  He's very blessed.

18          THE COURT:  D-338 is an action that you filed on

19   behalf of your daughter, the lawsuit that was referenced.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Do you know the status of that lawsuit?

22          THE WITNESS:  It was carried to the Fifth Circuit

23   Court of Appeals, and they upheld -- we never got it certified

24   as a suit.  And the State claimed sovereign immunity

25   protection, and they were granted sovereign immunity protection

1    by this court twice.  And then on the appeal to the Fifth

2    Circuit, they upheld that sovereign protection.

3            The attorney contacted me and was willing to go

4    further with it, and I told him that I thought that three times

5    was enough and that we should end it.  And that was the end of

6    it.

7            The content of the suit, of course, was done by the

8    attorney, naturally.  I see some of that that referenced by the

9    State's side myself where it talks about 20 times --

10           THE COURT:  That's --

11           THE WITNESS:  That's not accurate.

12           THE COURT:  That's fine.  That's fine.

13           THE WITNESS:  So that case is dead.

14           THE COURT:  Okay.  You indicated that -- I think the

15   State asked you a question that you -- and you answered

16   correctly, that you instituted commitment proceedings a number

17   of different times, that caused your daughter to be committed?

18           THE WITNESS:  Uh-huh.

19           THE COURT:  And each one of those commitments was to a

20   state hospital.  Is that correct?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  All right.  The court determined that --

23   she would have to go to the state hospital.  Right?

24           THE WITNESS:  That's correct.

25           THE COURT:  All right.  If the chancellor had

1   committed her to a group home, for example, if that was an

2   option, would you have been satisfied with that option, if she

3   could have been -- if the court had committed her to a group

4   home?

5          THE WITNESS:  There was a time, on group homes, that I

6   would have been more than happy for her to go in a group home.

7   I don't -- so the answer to your question technically would be

8   yes, sir.

9          THE COURT:  Or some other licensed facility that if

10  the court had placed her at a licensed facility that could have

11  taken care of her, would you have been satisfied is my

12  question?

13         THE WITNESS:  Yes, sir.  A license certified by the

14  Mississippi Department of Mental Health is all I ever asked

15  for.  That way there's responsibility.  Putting a person in a

16  personal care home, which is nothing other than a barbaric

17  boarding home that are licensed with $100 and no felony

18  conviction offers no mental health care.  They are boarding

19  homes.

20         So that's what -- that's why -- that's why my daughter

21  got into that dangerous situation and almost got killed in that

22  placement there in the personal care home.  So what -- I've

23  said this to the Mississippi Department of Mental Health many

24  times, and the chief of staff, the doctor there, has worked --

25  back when she was in the hospital, he had worked very close

1    with me and was very professional and handled the case.  I

2    can't say enough good things about the doctor.  And the -- my

3    only thing -- his one thing was was we want to keep her safe,

4    and that's -- that's why I liked him because --

5            THE COURT:  And that's what you wanted?

6            THE WITNESS:  That's what I wanted.  I wanted her

7    safe.  That's all.  That's all.

8            THE COURT:  Thank you, Mr. HB.

9            Now, based on those questions, does the United States

10   have any questions, any follow-up questions of this witness?

11           MS. VAN EREM:  No, Your Honor.

12           THE COURT:  All right.  Mr. Shelson, does the State of

13   Mississippi have any questions?

14           MR. SHELSON:  No, Your Honor.

15           THE COURT:  All right.  Thank you, Mr. HB.  Is this

16   witness finally excused?

17           MS. VAN EREM:  Yes, Your Honor.

18           THE COURT:  All right.  You may be excused, sir, and

19   go about your regular duties.  Thank you for your testimony.

20           THE WITNESS:  Thank you, sir.

21           THE COURT:  All right.  At this time, we'll take our

22   morning break for about 15 minutes.  It's 11:02.  We'll come

23   back at 11:20, and we'll take up anything that needs to be

24   taken up at that point.  We are in recess.

25       (Recess)

1          THE COURT:  Is there anything we need to take up

2     before you call your next witness?

3          MS. VAN EREM:  No, Your Honor.

4          THE COURT:  All right.  You may proceed.

5          MS. VAN EREM:  The United States calls CR.

6       (Witness Sworn)

7          THE COURT:  You can adjust, Ms. CR, the microphone any

8     way you wish.  Please speak loudly and clearly enough for us

9     all to hear you.  Speak at a pace at which the court reporter

10    can keep up with you.  Make sure all your responses are verbal,

11    and try to avoid using uh-huh and unh-unh.  If you nod or shake

12    your head, just say yes or no along with that, and we'll try to

13    monitor that.

14         But for the record -- well, you're CR, so it doesn't

15    matter about stating and spelling your name.  I can spell CR

16    easily.  You may proceed.

17         MS. VAN EREM:  Thank you, Your Honor.

18                              CR,

19      having first been duly sworn, testified as follows:

20                       DIRECT EXAMINATION

21    BY MS. VAN EREM:

22    Q   CR, as Your Honor has referenced, we'll be using initials

23    in referring to you and your family members to protect

24    confidentiality.  Do you understand that?

25    A   Yes.

1  Q   And for the purposes of my questions today, I would

2  appreciate if you focus on the facts that existed through the

3  end of 2018, which is the relevant period for purposes of this

4  trial.  Do you understand that?

5  A   Yes.

6  Q   Ms. CR, where do you reside?

7  A   In Jackson, Mississippi.

8  Q   How long have you lived in Mississippi?

9  A   Fifty-one years.

10  Q   Where were you born?

11  A   A small town in the Mississippi Delta, Shelby, Mississippi.

12  Q   What is your educational background?

13  A   I attended college at Mississippi University for Women.  I

14  graduated from the University of Mississippi School of Law.

15  Q   Are you employed?

16  A   Yes, I am.

17  Q   Where?

18  A   City of Jackson, Office of the City Attorney.

19  Q   Do you have any family members who have been admitted to a

20  state hospital in Mississippi?

21  A   Yes.

22  Q   And we'll be speaking about one of those family members

23  today.  I'm going to refer to him as TM.  Is that okay?

24  A   Yes.

25          MS. VAN EREM:  Your Honor, may I approach.

*** DAILY TRANSCRIPT ***

```
 1              THE COURT:  Yes, you may.
 2   BY MS. VAN EREM:
 3   Q   Is what I just handed you a picture of TM?
 4   A   The male, yes.
 5   Q   And it's been marked for identification as PDX-10.  Who are
 6   the other people in this photo?
 7   A   The lady in the blue dress is TM's grandmother.  The one
 8   seated -- sitting on the sofa is TM's mother.
 9   Q   Okay.  How are you related to TM?
10   A   TM is my cousin within the third degree.
11   Q   Okay.  So does that mean that you're -- what does that
12   mean?
13   A   TM's mother and my mother were first cousins.  TM's mother
14   is my second cousin.
15   Q   Where is TM from?
16   A   Cleveland, Mississippi.
17   Q   Is that in the Mississippi Delta region?
18   A   Yes, Bolivar County.
19   Q   How old is TM?
20   A   He turned 38 this year, on February 12th.
21   Q   How would you describe TM's personality?
22   A   He's generous.  He cracks jokes.  He smiles often.
23   Q   Do you have a story about TM that you would like to share
24   with the court?
25   A   There are many, but one that I can recall concerning TM
```

1   occurred about three years ago.  I picked him up from a

2   personal care home and took him to visit with his mother in

3   Cleveland, Mississippi.  My grandmother lived in Cleveland,

4   Mississippi also.

5       It was a couple of days after Christmas.  TM had not seen

6   his mother in a significant period of time.  When we arrived in

7   Cleveland, I went to my grandmother's house.  TM was with me.

8   He had a tube of toothpaste and a bar of soap.  When he walked

9   in, he said, *Here, Aunt Otha.*  My grandmother said, *Place*

10  *that --* she had a shelf with pictures in her front room.  She

11  said, *Place that on the shelf so that can I look at it.  He*

12  *brought me something that I could use.  Sometimes people bring*

13  *me things I can't use.*

14      As we were getting ready to leave, his grandmother came by,

15  because she was in Cleveland, had been shopping and came by to

16  see my grandmother, which is her sister.  She gave him a

17  five-dollar bill and hugged him.  As we were departing to come

18  back to Jackson, my uncle came through the door.  TM handed the

19  five-dollar bill that he had just been given by his grandmother

20  to my uncle.  My uncle refused to accept it, came into the

21  house quite upset, stating, *You all have to watch him.  He will*

22  *give every penny he has away.  He just handed me the five*

23  *dollars.*  His grandmother said, *I just gave him the five*

24  *dollars.*

25  Q   So it's fair to say he's generous?

```
1    A    Yes.

2    Q    Is family important to TM?

3    A    Yes.

4    Q    Where does TM live?

5    A    Here in Jackson on Cooper Road.

6    Q    Where does TM want to live?

7    A    There have been occasions where TM stated to me that he

8    would like to be close to his home in the Mississippi Delta.

9    Q    Do you have a close relationship with TM?

10   A    I'm the family member that usually visits him, since he's

11   here in Jackson.  So I would say we're close.

12   Q    How often do you speak with TM?

13   A    At least once a week.

14   Q    When did he become involved with TM's life?

15   A    TM was here residing in Jackson.  I was not aware of it

16   until I got a telephone call from his grandmother.  There had

17   been -- he was at a personal care home, and the personal care

18   home operator had contacted her about him, and she told me

19   where he was.  So I went to check on him and to see how he was

20   doing.  That may have been -- it was probably somewhere around

21   the year 2009, maybe.

22   Q    Have you been involved with obtaining disability benefits

23   for TM?

24   A    Yes.  I represented him in a case before the Social

25   Security Administration.
```

1    Q    Why did you decide to assist with obtaining those benefits

2    for TM?

3    A    He needed them.

4    Q    Does TM keep in contact with any other family members?

5    A    He calls his mother, his grandmother.  I'm not certain if

6    he has contact with a brother and a sister.  One brother is

7    incarcerated.  One brother is in the state of Georgia.  His

8    sister is in Cleveland.

9    Q    And I think you said his mother and grandmother live in

10   Cleveland.  Is that right?

11   A    Mother lives in Cleveland, Mississippi in an assisted

12   living facility.  Grandmother lives in my hometown, which is

13   Shelby, Mississippi.

14   Q    And approximately how far away is Cleveland, Mississippi

15   from Jackson?

16   A    About two hours and 15 minutes.

17   Q    Is it similar for Shelby, Mississippi?

18   A    Shelby and -- the distance between Shelby and Cleveland is

19   15 miles.  So it's a little further.

20   Q    Okay.  Do you have any other family members who have

21   serious mental illness?

22   A    I have a aunt, my mother's sister, who has had mental

23   health issues for as long as I can remember as a child growing

24   up.  She has been admitted to the state hospital on occasion,

25   and she currently resides in a nursing facility in Cleveland,

1   Mississippi.

2   Q    And does TM's mother also have serious mental illness?

3   A    She's been diagnosed, based upon information reported from

4   her to me, with bipolar disorder.

5   Q    How often does TM see his grandmother and his mother?

6   A    He sees them usually maybe once a year if I am traveling in

7   that area and I take him with me.

8   Q    Are you the person who generally brings TM to see his

9   grandmother and mother?

10  A    The last few instances where he has seen them, yes.

11  Q    Did TM have a serious mental illness?

12  A    His condition -- he was diagnosed with disorganized

13  schizophrenia.

14  Q    Has he spent time in a state hospital in Mississippi?

15  A    Yes, he has.

16  Q    Yes?  What are some of TM's symptoms?

17  A    Medical reports indicate that he has heard voices,

18  hallucinations, irritability.

19  Q    Does he have variation in his symptoms?

20  A    I don't know.  I can only speak based upon what I read in

21  medical reports, according to when I was representing him in

22  the Social Security Disability matter.

23  Q    Have you witnessed TM on both good days and bad days?

24  A    I have seen him probably at his worst on December 29th,

25  2016.

1  Q   What is TM like on his good days?

2  A   On his good days, he's calm.  He's capable of communicating

3  with you about what he likes, what he dislikes, what he has

4  done during the day.  Some of the thoughts may be incoherent as

5  a result of his mental impairments, but he is capable of

6  communicating with you.  He's much like what you see in the

7  picture that's before me.

8  Q   What do you mean by that?

9  A   On his good days.  He's smiling, he's laughing, he's

10  hugging his family members.

11  Q   To your knowledge, how many times has TM been admitted to a

12  state hospital in Mississippi?

13  A   Six, that I am aware of.  Three instances were reflected in

14  medical reports from 2004 to 2013.  Those medical reports are

15  contained in the Social Security Administration file, and

16  that's -- that was three instances.  After he had been

17  approved -- after the Social Security hearing, I've learned of

18  three other instances where he was admitted, and I actually

19  visited him at the state hospital on those three occasions.

20  Q   Those three hospitalizations -- hospitals where you visited

21  him, which hospitals were those?

22  A   Two were at the Mississippi State Hospital at Whitfield.

23  One at East Mississippi State Hospital in Meridian.

24  Q   When was his most recent admission to a state hospital?

25  A   2018.  I'm not sure the exact date, but I visited him on

1    December 7th, 2018, at the Mississippi State Hospital at

2    Whitfield.

3    Q    How do you generally find out when TM is hospitalized?

4    A    The three instances where I visited him, I received a call

5    from a social worker for the State.

6    Q    During the most recent admission of TM, what happened

7    during that phone call?

8    A    The social worker -- it may have been late November of

9    2018.  A social worker from the Mississippi State Hospital

10   telephoned me and asked, *What is the discharge plan for TM?*  I

11   said in response, *I don't know what the discharge plan is for*

12   *TM because this is the first instance that I have knowledge*

13   *that TM has been admitted to the Mississippi State Hospital.*  I

14   then shared with him information concerning TM's family and the

15   history as it relates to his residential living at personal

16   care homes.

17   Q    Has the state hospital ever contacted you to discuss what

18   events precipitate TM's admission to the state hospital?

19   A    No.

20   Q    What were your impressions of TM's stay -- stays at the

21   state hospital?

22   A    On my visits, when I would visit him --

23   Q    That's right.

24   A    -- which was usually on weekends, either a Saturday or a

25   Sunday, we talked about family.  He appeared to be stable.  He

```
 1  laughed, asked about family members, and he shared with me that
 2  he wanted to be released.
 3  Q   You mentioned you would visit him on a Saturday or Sunday.
 4  Is that because that's when the visiting hours are?
 5  A   My understanding, they may have visiting hours during the
 6  week, but the visiting -- visitation hours during the week are
 7  at times when I am usually at work.
 8  Q   You were deposed in this litigation last Friday, weren't
 9  you?
10  A   Yes.
11  Q   Did you bring a letter with you to that deposition?
12  A   I did.
13          MS. VAN EREM:  Your Honor, may I approach?
14          THE COURT:  Yes, you may.
15          MS. VAN EREM:  I apologize, Your Honor.  Before I go
16  on, I just wanted to clarify I mentioned the photo that was
17  PDX-10, but it is actually PDX-11.
18          THE COURT:  It is.  That's marked for identification
19  purposes only.  Correct?
20          MS. VAN EREM:  That's correct.
21          THE COURT:  Okay.
22  BY MS. VAN EREM:
23  Q   CR, is this a copy of the letter that you brought to your
24  deposition on Friday?
25  A   Yes, it is.
```

*** DAILY TRANSCRIPT ***

1   Q   Do you see some redactions on it?

2   A   At the top, in the right corner, looks -- and also

3   throughout.

4   Q   I can represent we redacted to remove personally

5   identifiable information.  What is this letter?

6   A   It's a letter that TM wrote and sent to his mother when he

7   was at East Mississippi State Hospital.  His mother mailed the

8   letter to me.

9           MS. VAN EREM:  This letter has been marked for this

10   case as PX-1102.  Your Honor, I move to admit PX-1102 into

11   evidence.

12           THE COURT:  Any objection from the State?

13           MR. SHELSON:  No, sir.

14           THE COURT:  All right.  PX-1102 will be received into

15   evidence.

16      (Exhibit PX-1102 marked)

17   BY MS. VAN EREM:

18   Q   What does this letter say?  And feel free to read the

19   letter.

20   A   "Hi, Mom:  Could you send me my clothes that's at your home

21   here?  It's getting cold.  I have three outfits.  I've been

22   down here since September, 2017.  When I get released, I want

23   you to look into me coming home.  If you're not comfortable

24   with me moving home, checking -- check in to me moving to

25   Greenville group home.  That's the best way I can think of,

*** DAILY TRANSCRIPT ***

1    because Clubhouse has job-ready programs where I can save and

2    earn food.  I get SSI.  Get them to send you or" -- and there's

3    a person identified there -- "enough money -- get the money to

4    package a box, my clothes, shoes, that I asked for.  I'm not

5    sure when and if I'll ever see you again.  So be sure to take

6    this into consideration.  I can't give you all the details, but

7    I'm sure I've done -- since I've done.  Send as soon as

8    possible, or give what I ask by" -- and there's a person

9    identified -- "if she can bring down here on visitation day, or

10   get address and mail."  Above the visitation word, the words

11   "get time and day of visitation" are written.  "All I know is,

12   with my condition, it's getting better, other than flare-ups,

13   from what I've witnessed in life.  I think I should be closer

14   to home, the closer with you than we are now, because life

15   ain't promised to nobody.  Send those old clothes I left at

16   your home here along with a pair of slip-in house shoes and

17   size 11 Jordans.  If you can tell" -- and there's a person

18   identified there -- "to get the size 11 Jordans online and get

19   a furry pair of house shoes."

20   Q   There's a mention of a Greenville group home in that

21   letter.  Did TM ever move to the Greenville group home?

22   A   I don't -- not immediately after his discharge from East

23   Mississippi State Hospital.  After his discharge from East

24   Mississippi State Hospital, he returned here to Jackson.

25   Q   Is Greenville closer to his mother than Jackson?

1   A    There is -- from Cleveland to Jackson, it's about a

2   45-minute drive, so I would say yes.

3   Q    Excuse me.  From Cleveland to Greenville?

4   A    From Cleveland, Mississippi to Greenville is probably

5   between 30 to 45 minutes.  So I would say, yes, it is closer.

6   Q    To your knowledge --

7        THE COURT:  You originally said Greenville to Jackson

8   was 45.

9        THE WITNESS:  I'm sorry.  I'm sorry.

10        THE COURT:  I mean, you said Cleveland to Jackson was

11   45 minutes.  You meant Cleveland to Greenville.  Right?

12        THE WITNESS:  Yes, I meant Cleveland to Greenville.

13   BY MS. VAN EREM:

14   Q    And earlier you had testified -- let me get this right --

15   Cleveland is Jackson is about two and a half hours.  Is that

16   right?

17   A    Close, yes.

18   Q    Okay.  To your knowledge, why did TM say he wasn't sure if

19   he would see his mother again?

20   A    TM usually did not see his mother because she didn't -- she

21   could not drive to Jackson unless I took him to the Delta with

22   me to visit with his mother.

23   Q    Was his mother able to visit him when he was in the state

24   hospital?

25   A    His mother -- which admission?

1    Q    During the admission where he wrote this letter.

2    A    His mother, at that time, would not have been able to

3    travel from Cleveland to Meridian to visit.  She lacked

4    transportation.  She also has mental -- some mental and

5    physical impairments in which that type of travel alone would

6    not be feasible.

7    Q    How did you react when you read this letter?

8    A    It's heart-breaking.

9    Q    What do you mean by that?

10   A    There is a family member who is communicating with his

11   mother and stating, "I don't know when I will see you again."

12   Q    Based on this letter, did you conclude anything about

13   whether TM felt he was ready to leave the state hospital?

14            MR. SHELSON:  Your Honor, that calls for speculation.

15   We object.

16            MS. VAN EREM:  I can move on.

17            THE COURT:  All right.  Thank you.  Objection

18   sustained.

19   BY MS. VAN EREM:

20   Q    CR, I'd like to shift to some of the services, to some

21   questions about community-based services.  Have you ever been

22   informed about crisis services in the community to assist TM if

23   his symptoms start to increase?

24   A    No.

25   Q    If TM could receive services to stabilize him in the

*** DAILY TRANSCRIPT ***

1  community when he's experiencing a crisis, would you prefer

2  that to him entering a state hospital?

3  A    Yes.

4  Q    Why?

5  A    No family member wants a person they care about to be in an

6  institutional setting.   To the extent that they can be --

7  receive services and what is required for them to exist in the

8  community amongst family, then I think that any family member

9  would prefer that.   And for him, because his mother and

10  grandmother are not able to travel two and a half hours away,

11  then certainly it would be a preference so that he can be in

12  contact with them.

13  Q    Do you mean by that that it would be easier for him to be

14  in contact with them if he's in the community?

15  A    If he's in the community close to where he lives, there are

16  family members who can visit with him, check on him.   The

17  grandmother drove to Cleveland from Shelby, in that photo, to

18  visit with him when she learned that I was bringing him for a

19  visit with his mother.

20  Q    What setting would TM like to live in?

21  A    I can't say.   I know that TM has shared with me on some

22  occasions that he would like to live independently in an

23  apartment of his own.

24  Q    Why would TM like his own apartment?

25          MR. SHELSON:   Objection, Your Honor.   No foundation.

1    So I don't -- it's either -- could possibly either call for

2    hearsay or speculation.  But at this point, there's no

3    foundation, so we object.

4            THE COURT:  You may rephrase your question.  Objection

5    sustained.

6    BY MS. VAN EREM:

7    Q   CR, based on your understanding and your interactions with

8    TM, why do you think that he would like his own apartment?

9    A   TM has other family members who live independently, his

10   sister and a brother.  He's like most of us.  He realizes and

11   knows that he's an adult man, and as an adult man, that's what

12   you do.  You live independently.

13   Q   Has anyone at the state hospital -- let me rephrase that.

14   Has anyone at a Mississippi State Hospital discussed with you

15   possibilities of where TM could live?

16   A   No, none other than calling and saying to me, what is his

17   discharge plan.

18   Q   Had you heard about permanent supported housing from anyone

19   at the state hospital?

20   A   No, don't know what it is.

21   Q   Do you think that TM could successfully live in his own

22   apartment if he had some community-based services in place?

23   A   TM, at this time, is living in a house with another

24   gentleman that is owned by or either being leased by someone.

25   That person ensures that TM has food and sends someone to give

1  him medications.  So I think if TM had those services within

2  his community, he would be able to do it.

3  Q   Just to clarify, you think that TM needs assistance with

4  medications?

5  A   TM will take medications.  I think that he just needs some

6  assistance with ensuring that he receives it at the proper

7  time.  But he will take it.

8  Q   Would a service like case management help TM?

9  A   I think so.

10 Q   Would TM be opposed to receiving those services in his --

11 in his own apartment?

12         MR. SHELSON:  Objection, Your Honor, no foundation.

13 Calls for speculation or hearsay.

14         MS. VAN EREM:  I can rephrase.

15         THE COURT:  Rephrase.

16 BY MS. VAN EREM:

17 Q   Based on your interactions with and your understanding of

18 TM, do you think he would be opposed to receiving

19 community-based services in his apartment?

20 A   I don't think he would be opposed, no.

21 Q   Over the past years working with TM, did you become aware

22 of whether services were available to support him in his own

23 apartment?

24 A   No.

25 Q   Is there anything else that you think would be helpful to

1  keep TM out of the state hospital?

2  A   I think if TM had housing, consistent medication management

3  and services, he would be less likely to be admitted to the

4  state hospital.

5        MS. VAN EREM:  Your Honor, may I briefly confer with

6  cocounsel.

7        THE COURT:  Yes, you may.

8     (Short Pause)

9  BY MS. VAN EREM:

10  Q   I just have a couple more questions for you.

11  A   Okay.

12  Q   Based on what you know about TM, how do you think his state

13  hospitalizations have affected him?

14  A   TM has not --

15        MR. SHELSON:  Objection, Your Honor.  No foundation.

16  And it vague and ambiguous.  Affected him in what sense?

17        THE COURT:  Rephrase your question.

18  BY MS. VAN EREM:

19  Q   Based on your knowledge of TM and your interactions with

20  and your understanding of TM, do you believe his state

21  hospitalizations have affected him in any way?

22  A   TM, on the visits when I went to visit him at the state

23  hospitals, shared with me that he did not want to be there, and

24  he shared with me that he wanted to be released.  That is the

25  extent of my conversations with TM as to the admissions to the

1    state hospital.

2    Q   How have TM's state hospitalizations affected your family?

3         MR. SHELSON:  Object to her addressing that beyond

4    herself unless there's a foundation established for how she

5    knows how it affected other family members.

6         THE COURT:  Objection overruled.  You may answer.

7    A   One family member, TM's mother, when she learned that he

8    was at East Mississippi State Hospital and shared with me that

9    she was going to send the letter he had mailed, her statement

10   to me was, *Tell him be strong and pray.  It will get better.*

11   BY MS. VAN EREM:

12   Q   Do you have a reason to believe that it's difficult for

13   TM's mother to hear that he's in the hospital?

14   A   TM's mother has the love that a mother would have for a

15   child.  She cares for him, and she's concerned about him.  So I

16   would say, yes, when she hears that he has been admitted to the

17   state hospital, that she is or has some sorrow.

18   Q   One final question.  How have TM's hospitalizations

19   affected you?

20   A   I am usually the family member who goes to visit.  It is

21   not comfortable going to a state hospital to visit a family

22   member, but I do it, because he needs to know that someone

23   cares.  I also think that it's important for a family member

24   when they are in a state -- when there are people in a state

25   hospital, I think it's important for family members to visit

*** DAILY TRANSCRIPT ***

1    and reach out.  It encourages.  And for someone like TM, who

2    loves his family, wants to be near them, it's important.  And

3    I'm just the one who cares enough to go.

4    Q   Thank you, CR.  I have no further questions at this time.

5           MR. SHELSON:  May I proceed, Your Honor?

6           THE COURT:  Yes, you may.

7                        CROSS-EXAMINATION

8    BY MR. SHELSON:

9    Q   Good afternoon.

10   A   Good afternoon.

11   Q   It's a little awkward saying CR, but good afternoon CR.

12   I'll be brief.  Are you TM's guardian?

13   A   No, I'm not.

14   Q   Are you his conservator?

15   A   No, I'm not.

16   Q   Do you have any other fiduciary relationship with TM?

17   A   I would not say that I do.  I'm just the cousin who is

18   concerned about him.

19   Q   All right.  Have you personally visited TM three times at a

20   state hospital?

21   A   Yes.

22   Q   All right.  So let's talk about the first visit.  The first

23   time you visited TM at a state hospital, which state hospital

24   was that?

25   A   Mississippi State Hospital at Whitfield.

1    Q    During that visit, based on your observations, how was TM

2    doing?

3    A    Based upon observations, TM was -- he was stable.  We

4    laughed.  He asked about family.  I told him and gave him

5    updates about family.

6    Q    And where was -- strike that.  At what hospital was your

7    second visit with TM?

8    A    The second -- the second visit occurred when he was at East

9    Mississippi State Hospital, November 25th, 2017.

10   Q    And based on your observations during that visit, how was

11   TM doing?

12   A    He was -- he was stable.  I did not detect any unusual

13   problems for a person with his condition.

14   Q    And the third time you personally visited TM, where was he?

15   A    Mississippi State Hospital at Whitfield, December 7th,

16   2018.

17   Q    On that occasion when you visited TM, based on your

18   observations, how was he doing?

19   A    He talked about family and shared with me that he was ready

20   to be released.

21   Q    A photograph that's been marked for identification as

22   PDX-11, the one you have there, when was that photograph taken?

23   A    May 27th, 2019.

24   Q    Do you remember during your deposition, I asked you, "So do

25   you have any complaints or criticisms of the care, treatment,

1    TM has received through the State of Mississippi?"

2    A    I do recall that question.

3    Q    Do you remember your answer?

4    A    I said, "I can't criticize because I was not present during

5    the treatment, and I'm not certain of the nature of the care

6    and treatment that he received."   I believe that's my answer.

7    Q    Did you also say, "And I would go, and when I went on those

8    visits, I believe he was as good as he could be?"

9    A    I did say that.

10           MR. SHELSON:  May I have a moment to confer, Your

11   Honor.

12           THE COURT:  All right.

13       (Short Pause)

14   BY MR. SHELSON:

15   Q    Thank you, CR.  That's all the questions I have.

16           MR. SHELSON:  And thank you, Your Honor.

17           THE COURT:  All right.

18           Any redirect of this witness?

19           MS. VAN EREM:  No, Your Honor.

20                    EXAMINATION BY THE COURT

21           THE COURT:  Okay.  The court does have one question

22   for CR, and then the parties may follow up based on the

23   questions that I've asked.  Early on in your testimony, CR, you

24   indicated what TM's good days were like.  You said he's calm,

25   capable of communicating his likes and dislikes, and things of

 1   that sort.  But immediately prior to that part of your

 2   testimony, you indicated that you saw him at his worst, and you

 3   said that that date was December 29th, 2016.  And I don't think

 4   you were allowed to elaborate on what you saw as his worst.  I

 5   don't think I ever heard any follow-up about that.  What did

 6   you observe on December 29th, 2016.

 7       THE WITNESS:  On December 29th, 2016, the personal

 8   care home where TM had been residing was being closed down by

 9   the Mississippi State Department of Health because it was not a

10   licensed facility.  I received a call from a church member and

11   friend who was present on site because she was friends with

12   another personal care home operator.  They were placing the

13   residents and contacting family members to come and get the

14   family members.

15       I left work, went to the location.  TM was quite

16   agitated.  He was walking, pacing, ranting.  I thought it was

17   because of the situation.  The individual who called me was a

18   nurse.  She said, *I believe he needs medical attention.  He may*

19   *be noncompliant, or there may have been some medication doses*

20   *missed.*

21       He was not violent.  He was not threatening to harm

22   anyone or himself.  But he expressed discontentment at the

23   situation.  He expressed concern about where he would go.  I

24   took -- I said to him that I believe you need to eat, and I'm

25   going to take you with me.  We got into my truck.  I asked if

*** DAILY TRANSCRIPT ***

1    he was hungry, and when was the last time he had eaten.  He

2    didn't tell me exactly the last time he had eaten, but he did

3    say, *I want McDonald's*.  We went to McDonald's.

4         After leaving McDonald's, he said, *Take me to*

5    *St. Dominic's emergency room*.  And I asked, *Why?*  He said, *Take*

6    *me to St. Dominic's emergency room*.  He would not share with me

7    what was happening, but I did as he requested.  When we -- he

8    asked me actually to just drop him off and leave him.  I said,

9    *I won't leave you here without knowing what is going to happen*

10   *to you*.

11        The admissions clerk at St. Dominic's stated to me

12   that he had been there previously and that a doctor, a

13   psychologist or psychiatrist would evaluate him, and they would

14   let me know whether or not he was going to be admitted to their

15   behavioral health unit.  So I waited in the ER a couple of

16   hours, and then I asked what was his status.  The admissions

17   clerk said, *Did not a nurse come and talk to you?*  And I said,

18   *No*.  She said, *I will send someone out.*  The nurse came and

19   said that the doctor had evaluated him, and they were going to

20   admit him to their behavioral health unit.  I left.

21        And then several days later, I got calls from the

22   social worker advising me that his condition had improved, and

23   he was ready to be discharged, and we located another personal

24   care home for him to go to.

25        THE COURT:  Did the social worker from St. Dominic's

1   discuss with you his discharge plans or anything of that sort?

2          THE WITNESS:  The social worker shared with me -- we

3   talked about where he would be going.  The location was another

4   personal care home, which was -- was a licensed facility that

5   had been disclosed to me by the Mississippi State Department of

6   Health nurse when they were on site closing down that facility

7   on December 29, 2016.

8          The social worker also gave my cousin some document as

9   it relates to his discharge instructions, which we gave to that

10  personal care home operator.  I believe the social worker

11  indicated that there was an appointment or a follow-up

12  appointment set for him at the regional mental health facility

13  here in Jackson.

14         THE COURT:  The facility he was in on December 29,

15  2016, was that in Hinds County?

16         THE WITNESS:  It was in Jackson, Hinds County.

17         THE COURT:  And the facility that he was released to

18  after being released from St. Dominic's, was that too in Hinds

19  County?

20         THE WITNESS:  It was in Jackson.

21         THE COURT:  It was in Jackson.  Thank you.  Are there

22  any follow-up questions based on what I have asked?

23         MS. VAN EREM:  I do have a couple, Your Honor.

24         THE COURT:  All right.

25                       REDIRECT EXAMINATION

1    BY MS. VAN EREM:

2    Q   On that date in December 2016, were you aware of any

3    community-based services that TM was receiving at that time?

4    A   No.

5    Q   To your knowledge, was mobile crisis called at the time

6    when he was exhibiting his symptoms that you described?

7    A   Not to my knowledge, no.

8         MS. VAN EREM:  Nothing further.

9         THE COURT:  All right.  Does the State have any

10   follow-up based on what I've asked?

11        MR. SHELSON:  No, sir.

12        THE COURT:  All right.  CR, you may step down and

13   return -- is this witness finally excused?

14        MS. VAN EREM:  Yes, she is.

15        THE COURT:  All right.  You may step down and return

16   to your normal duties.

17        All right.  We're at the time where we can take our

18   lunch break.  It's approximately 12:15.  Let's start back up at

19   1:35.  Is there anything we need to take up before we go to

20   lunch?

21        MS. RUSH:  Not from the United States, Your Honor.

22        MR. SHELSON:  No, Your Honor.

23        THE COURT:  All right.  We're in recess until 1:35.

24   Thank you.

25       (Recess)

CERTIFICATE OF REPORTER

     I, CHERIE GALLASPY BOND, Official Court Reporter, United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

     I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.


     This the 11th day of June, 2019.


                         s/ Cherie G. Bond
                         Cherie G. Bond
                         Court Reporter

*** DAILY TRANSCRIPT ***