UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                          CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                       DEFENDANTS



VOLUME 9



BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
AFTERNOON SESSION
JUNE 11, 2019
JACKSON, MISSISSIPPI



REPORTED BY:  BRENDA D. WOLVERTON, RPR, CRR, FCRR
Mississippi CSR #1139

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4188


*** DAILY TRANSCRIPT ***

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:      MS. REGAN RUSH
                              MS. HALEY VAN EREM
 3                            MR. JORGE MARTIN CASTILLO

 4    FOR THE DEFENDANT:      MR. JAMES W. SHELSON
                              MR. REUBEN V. ANDERSON
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*** DAILY TRANSCRIPT ***

TABLE OF CONTENTS

WITNESSES FOR THE PLAINTIFF:

DR. BEVERLY BELL-SHAMBLEY

    Direct Examination by Mr. Castillo                802

        Exhibit PX-408A                               812

        Exhibit PDX-12 (for ID)                       813

        Exhibit PX-1099                               822

        Exhibit PX-1100                               827

        Exhibit PX-1101                               827

    Cross-Examination by Mr. Shelson                  855

        Exhibit D-239                                 890

    Redirect Examination by Mr. Castillo              896

*** DAILY TRANSCRIPT ***

```
 1              THE COURT:  Is there anything we need to take up
 2   before we call the next witness?
 3              MS. RUSH:  No, Your Honor, not from the United States.
 4              THE COURT:  Mr. Shelson?
 5              MR. SHELSON:  No, Your Honor.
 6              THE COURT:  All right.  The government may proceed.
 7              MR. CASTILLO:  Good afternoon, Your Honor.
 8              THE COURT:  Good afternoon.
 9              MR. CASTILLO:  I'm Jorge Castillo and I represent the
10   United States, and I would like to call Dr. Beverly
11   Bell-Shambley as our next witness.
12              THE COURT:  Okay.  All right.
13                      BEVERLY BELL-SHAMBLEY,
14   having first been duly sworn, testified as follows:
15              THE COURT:  I think you have been here a little while.
16   Were you here for earlier testimony?
17              THE WITNESS:  I was, yes, sir.
18              THE COURT:  Do you recall the instructions I gave
19   everybody else?
20              THE WITNESS:  Yes, sir.
21              THE COURT:  All right.  So speak loudly and clearly
22   and, if you will, state and spell your name for the record.
23              THE WITNESS:  Yes.  Beverly Bell-Shambley.
24   B-E-V-E-R-L-Y.  Bell, B-E-L-L, hyphen or dash, Shambley,
25   S-H-A-M-B-L-E-Y.
```

```
 1              THE COURT:  Thank you.  Dr. Shambley or Ms. Shambley?
 2   What was it?
 3              THE WITNESS:  Dr. Shambley.
 4              THE COURT:  Thank you, Dr. Shambley.
 5              Mr. Castillo, you may proceed.
 6              MR. CASTILLO:  Thank you, Your Honor.
 7                          DIRECT EXAMINATION
 8   BY MR. CASTILLO:
 9   Q    Good afternoon, Dr. Bell-Shambley.
10   A    Good afternoon.
11   Q    What is your profession?
12   A    Clinical psychology.
13   Q    And were you part of a team hired by the United States?
14   A    Yes, I was.
15   Q    And as part of that team, what were you asked to do?
16   A    I was asked to do clinical review of individuals who were
17   assigned to me.
18   Q    How many individuals did you review?
19   A    I was assigned 26 individuals.
20   Q    Can you briefly describe your overall conclusions?
21   A    Yes.  My overall conclusions were that the individuals that
22   I reviewed could have avoided or spent less time in the
23   hospital had they received reasonable and appropriate
24   community-based services.
25         I also concluded that the provision -- there were
```

1    inconsistencies in the provision of reasonable and appropriate

2    community-based services such that individuals were at risk of

3    going back into the hospital.

4                THE WITNESS:  I'm sorry.  I'll slow down.

5    A   The first conclusion was that individuals could have

6    avoided or spent less time in the hospital setting had they

7    received reasonable and appropriate community-based services.

8    I also concluded that there were inconsistencies in the

9    provision of community-based services such that individuals

10   were at risk for returning to hospitals.

11   BY MR. CASTILLO:

12   Q   Before we take a deeper dive into those conclusions, let's

13   discuss your background for a minute.  Where did you train to

14   become a psychologist?

15   A   I trained at the University of Georgia and also completed a

16   clinical internship at the V.A. Hospital in Kansas City,

17   Missouri.

18   Q   When did you graduate?

19   A   I graduated in 1985.

20   Q   With what degree?

21   A   With a Ph.D. in clinical psychology.

22   Q   And after graduation, where did you go to work?

23   A   I went to work with the Department of Mental Health in the

24   State of Alabama.

25   Q   And where did you work in the Department of Mental Health

1   of Alabama?

2          THE COURT REPORTER:  I'm sorry.

3          MR. CASTILLO:  I'm sorry.  Yes, ma'am.

4          THE COURT:  You can answer.

5          THE WITNESS:  All right.

6   A   I worked -- I began my employment with work in a hospital

7   in Tuscaloosa.

8   BY MR. CASTILLO:

9   Q   In total, how many mental health facilities did you work

10  for the state of Alabama?

11  A   I worked in four different hospitals.

12  Q   And over how many years combined did you work in those four

13  facilities?

14  A   Twenty-two years.

15  Q   And in those 22 years, what kinds of jobs did you have?

16  A   Jobs that involved the direct provision of psychological

17  services, evaluations and treatment, clinical supervision of

18  other clinical staff, administration as well as administrative

19  supervision.

20  Q   Did your clinical work during those years include assessing

21  what community-based services were available and appropriate

22  for your patients?

23  A   Yes.

24  Q   After those 22 years in Alabama mental health facilities,

25  what did you do next?

```
1    A    I was promoted to the position of director of mental
2    illness facilities and began working out of the central office.
3    Q    What did that job entail?
4    A    Generally, that job entailed the supervision of the
5    hospital directors of the mental illness hospitals.
6    Q    How long did you hold this position?
7    A    I held that position from 2007 until 2012.
8    Q    And in 2012, what did you do next?
9    A    In 2012, in July of 2012, I was appointed to the position
10   of associate commissioner for the mental health and substance
11   abuse services division.
12   Q    Generally speaking, what did that job entail?
13   A    Generally speaking, that job entailed collaboration --
14   well, supervision and oversight of the continuum of services
15   within the mental health and substance abuse division;
16   oversight of the hospital system as well as oversight of
17   contractual relations with community providers; and certainly
18   entailed collaboration with other stakeholders.
19   Q    How long did you hold this position?
20   A    I held the position from -- four years from July of 2012
21   until my retirement the end of October 2016.
22   Q    During your jobs either as director of MI facilities or as
23   associate commissioner for the Department of Mental Health for
24   the State of Alabama, were you involved in any statewide
25   initiatives related to community-based services?
```

```
 1   A    Yes.

 2   Q    Like what?

 3   A    Statewide -- a number of different statewide initiatives,

 4   but a large part of my time in the position of associate

 5   commissioner related to the downsizing of the state hospital

 6   units and ultimately the closure of state hospitals and then

 7   the work towards transitioning those services to the community

 8   and expanding community-based services.

 9   Q    While you were in the central office of the Department of

10   Mental Health in Alabama, why was Alabama in this transition in

11   expanding community services?

12   A    Varied reasons.  But the transition of downsizing

13   hospitals, recognizing that certain services could be provided

14   more -- less costly and more effectively in the community,

15   started even with the Wyatt v. Stickney case from the '70s, a

16   recognition of our need to assure that we were in compliance

17   with ADA and Olmstead, as well as, honestly, budgetary

18   constraints that required us to think about things in a

19   different way to assure that we were getting the best results

20   that we could for the consumers we served with the dollars that

21   we had.

22   Q    What was your role in this broader effort to transition to

23   the community services?

24   A    My role started in the position of director of MI

25   facilities where we recognized that we needed to develop a
```

*** DAILY TRANSCRIPT ***

1    process for evaluating those individuals who were in the

2    hospital to determine what services in the continuum we needed

3    more of or what services we didn't have at all in order to meet

4    the needs of those individuals who were currently in the

5    hospital who were going to be transitioned into the community.

6        So assistance from a clinical perspective, although the

7    position was primarily administrative, but assisting in

8    developing and evaluating a tool for gathering that

9    information, looking at and analyzing the results of the data

10   as a result of those clinical evaluations at that time, looking

11   at what services were identified as being needed, and then

12   evaluating with a team of individuals, with a team of

13   individuals, funding, how do we go about funding the identified

14   services.

15   Q   During your years as associate commissioner, what were you

16   able to accomplish with regarding this transformation?

17   A   We were able to accomplish the downsizing of the need for

18   state hospital beds in terms of acute as well as extended-care

19   services.  We were able to close three hospitals and transition

20   those individuals to community-based services.  We were able to

21   expand the provision of supported housing and expand peer

22   services.

23   Q   Just to be clear, did Alabama close all its state

24   hospitals?

25   A   No.  No.

1   Q    Can you describe generally the population of individuals in

2   state hospitals who were transferred to the community?

3   A    The individuals who were transferred to the community were

4   individuals who had a range of diagnoses, but many with

5   diagnoses of serious mental illness, individuals who had been

6   in the hospital for -- some for many years, individuals who had

7   had multiple admissions to the hospital, and certainly

8   individuals range in terms of their age as well as race and

9   gender and where they were from throughout the state.

10   Q    Have you stayed active in the field of psychology since

11   retiring from the Department of Mental Health?

12   A    Yes, I have.

13   Q    In what ways?

14   A    Even during the time of my employment with the Department

15   of Mental Health, I maintained a private practice and I have

16   continued to see individuals for psychological services,

17   evaluations, assessments and therapy.  I have also continued

18   involvement with professional organizations such as the

19   American Psychological Association and local organizations such

20   as NAMI, and continued to maintain a license, so that required

21   continuing education, participation in continuing education,

22   webinars, attending seminars, readings.

23   Q    And again, we want to slow down just a little bit for the

24   court reporter.  You mentioned NAMI.  What does that stand for?

25   A    The National Alliance of Mental Illness.

*** DAILY TRANSCRIPT ***

1          MR. CASTILLO:  Your Honor, at this time we tender

2     Dr. Bell-Shambley as an expert in psychology, serious mental

3     illness, and community-based mental health assessments.

4          THE COURT:  Any objection from the government?  From

5     the State of Mississippi, which is the government too.

6          MR. SHELSON:  No, Your Honor.

7          THE COURT:  All right.  Dr. Bell-Shambley will be

8     allowed to testify as an expert in the designated areas.

9          MR. CASTILLO:  Thank you, Your Honor.

10    BY MR. CASTILLO:

11    Q   So let's turn back to the review that you completed in

12    Mississippi.  Can you briefly summarize how you completed that

13    review?

14    A   Yes.  A tool was developed to guide the process for

15    completing interviews.  I was assigned the 26 individuals to

16    complete the interviews on, spent time interviewing those

17    individuals as well as, when available, interviewed family

18    members and also conducted some interviews with community

19    mental health providers, personnel from the community mental

20    health centers, also reviewed the records that were available

21    to me, records from State Hospital admissions, records from

22    community hospital stays, records from their community mental

23    health center services, and some records from community

24    hospitals.

25    Q   Did you write down your findings?

1    A    I did.

2    Q    Where?

3    A    In a report that I submitted.

4    Q    When did you first submit your report?

5    A    The report was submitted in the summer of 2018, I believe,

6    around the end of July of 2018.

7    Q    After your deposition in this matter, did you have any

8    changes to your report?

9    A    I did.

10   Q    What were those changes?

11   A    There was one individual that had a recommendation for a

12   service that was an error.

13   Q    And what change did you make to your report?

14   A    The removal of supported housing from the recommendations.

15   Q    How many words in total changed from your first report to

16   this revised report?

17   A    Two.

18   Q    And apart from those two words, the report was essentially

19   identical?

20   A    Yes.

21   Q    There is a binder in front of you.  Can you please open

22   your binder to Plaintiff's Exhibit 408?

23   A    Yes, I see it.

24   Q    Is that your revised report?

25   A    Yes.  It appears to be.

1           MR. CASTILLO:  Your Honor, the revised report

2     contained in the binder is marked Plaintiff's Exhibit 408 and

3     has been preadmitted into evidence.

4           THE COURT:  All right.

5     BY MR. CASTILLO:

6     Q   Dr. Bell-Shambley, did you make any additional corrections

7     to this revised report?

8     A   Yes, I did.

9     Q   Please in your binder turn to the next tab marked

10    Plaintiff's Exhibit 408A.

11    A   I see it.

12    Q   Are you there?  What is this document?

13    A   This is the document that lists the corrections that I made

14    to the report, basically corrections related to tallying

15    errors.

16    Q   Are there any corrections to the substance of your report?

17    A   No.

18    Q   Does your report, along with the corrections we just

19    discussed, accurately reflect your conclusions and opinions?

20    A   Yes.

21          MR. CASTILLO:  Your Honor, I move Plaintiff's Exhibit

22    408A into evidence.

23          THE COURT:  Any objection from the State?

24          MR. SHELSON:  No, Your Honor.

25          THE COURT:  Okay.  PX-408 will be received into

1    evidence.

2                MR. CASTILLO:  And just for a clarification, Your

3    Honor, it is PX-408A.

4                THE COURT:  Thank you.

5        (EXHIBIT PX-408A MARKED)

6    BY MR. CASTILLO:

7    Q   Dr. Bell-Shambley, turning again to the tasks you had in

8    this case, what specific questions did you answer for the

9    people that you reviewed?

10   A   I answered the questions of whether for these individuals

11   they could have avoided or spent less time in the hospital had

12   they received reasonable and appropriate community-based

13   services.  I addressed whether these individuals, in my

14   opinion, were at serious risk of state hospitalization.  I

15   addressed whether they were opposed or not opposed to receiving

16   services in the community.  And I addressed whether if they

17   were appropriate -- whether they were appropriate for

18   community-based services and, if they were, what services would

19   be of benefit to them.

20   Q   We're going to go over each of these four questions in a

21   minute.  But first, do you have a demonstrative that reflects

22   your overall findings with regards to these four questions?

23   A   Yes.

24                MR. CASTILLO:  May I approach, Your Honor?

25                THE COURT:  You may.

```
1   BY MR. CASTILLO:

2   Q    (Tenders document.)   Is this that demonstrative?

3   A    Yes.

4   Q    Does this slide accurately depict what you found?

5   A    Yes, it does.

6            MR. CASTILLO:  Your Honor, this demonstrative is

7   marked Plaintiff's Demonstrative Exhibit 12 for identity

8   purposes.

9            THE COURT:  All right.  It will be marked for ID

10  purposes.

11      (EXHIBIT PDX-12 MARKED FOR IDENTIFICATION)

12  BY MR. CASTILLO:

13  Q    Let's march through this.  You answered whether the person

14  in your review could have avoided or spent less time in a state

15  hospital.  How many clients in your review could have avoided

16  or spent less time in a state hospital?

17  A    It was my finding that all of the clients in my review

18  could have avoided or spent less time in the hospital.

19  Q    And generally speaking, what were the reasons that that was

20  your finding?

21  A    That was my finding because there were -- my knowledge of

22  community-based services and my experience with individuals who

23  were very much similar to the individuals in my sample, and the

24  awareness that there are community-based services that could

25  meet the needs that are identified for those individuals.
```

1    Q    The next question is how many people in your client review
2    did not oppose community-based services.  How many did you find
3    did not oppose?
4    A    I found that none were opposed to receiving services in the
5    community.
6    Q    How did you go about determining this?
7    A    For most of the individuals I made the determination by
8    directly asking them if they had a preference or if they were
9    opposed.  There were two individuals who did not respond
10   directly to interview questions and I came to a decision based
11   on review of their records.  And then there was one individual
12   in my sample who was deceased.
13   Q    Were you surprised that no one opposed services in the
14   community?
15   A    No.  No, I was not surprised.
16   Q    Why not?
17   A    Again, based on having worked for 30 plus years with
18   individuals who are recipients of mental health services, I
19   have not come across anyone who desired to receive services or
20   live in a hospital setting if other appropriate settings were
21   available to them.  And I doubt that there is anyone who would
22   make the choice, an informed choice, to live in a hospital
23   setting.  So, no, I was not surprised.
24   Q    Turning to the next question, how many individuals did you
25   find were appropriate for community-based services?

```
 1   A    I concluded that, again, all of the individuals were
 2   appropriate for community-based services.
 3   Q    In general, why did you find people in your review were
 4   appropriate for community-based services?
 5   A    Following analysis of all the information available to me,
 6   the interview data, information from reviewing records, I did
 7   not see -- I saw symptoms, behaviors for which community-based
 8   services were available.  I did not see behavior symptoms for
 9   which I didn't see community-based services.  So I felt like
10   there is a match here of their symptom presentation behaviors
11   and what services are available.  And based on that, I felt
12   like they were all appropriate.
13   Q    How many people in your client review were in the hospital
14   when you interviewed them?
15   A    Four.
16   Q    These people were actively committed at the time of your
17   interview.  Why did you think they in particular were
18   appropriate for community-based services?
19   A    Again, when I looked at the services that they were
20   receiving in the hospital and I looked at the community-based
21   services, the array of community-based services, I did not see
22   that there were services that they were receiving in the
23   hospital setting that could not have been provided in a
24   community setting.  And, in fact, when I look at the
25   documentation in the records, some of these individuals were
```

1    being referred for community placement but it had not occurred.

2    Q    And just to be precise, did you find or did you make any

3    specific findings for any person in your review whether they

4    were appropriate for the community at the moment in which they

5    were admitted to the state hospital?

6    A    No.  No, I did not.

7    Q    For this third question, you noted that you also identified

8    community-based services that you found were appropriate for

9    each individual.  How did you make that determination?

10   A    I made the determination again based on knowledge,

11   experience, awareness of the literature on community-based

12   services and the effectiveness of those services when

13   implemented appropriately, and I looked at the symptomatology

14   and the behaviors for the individuals in my sample and looked

15   to determine are there symptoms, behaviors for which there

16   aren't any community-based services that could reasonably be

17   effective in remediating those symptoms.

18             THE COURT REPORTER:  I'm sorry?

19             THE WITNESS:  I'm sorry.  That could reasonably be

20   effective in treating those symptoms.

21   BY MR. CASTILLO:

22   Q    So you made a match?

23   A    Yes.

24   Q    So let's discuss the serious risk question.  For which

25   people in your review did you analyze the question of serious

1   risk?  How many?

2   A    Twenty-five.  No, I'm sorry.  I am so sorry.

3   Q    That's okay.  Let me ask the question again.  For how many

4   people in your review did you analyze the question of serious

5   risk?

6   A    Twenty-one.

7   Q    For the other five people in your review, why did you not

8   analyze the question of serious risk?

9   A    The question of serious risk of hospitalization.  And I did

10  not analyze that for the four individuals who were already in

11  the hospital, nor did I look at that for the individuals who --

12  who was deceased.

13  Q    So the 21 people in your review that you did analyze the

14  question of who was at serious risk of institutionalization in

15  a state hospital, how many did you find were indeed at serious

16  risk?

17  A    Seventeen.

18  Q    And why were they at serious risk?

19  A    Because absent them receiving appropriate community-based

20  services, I felt like they were at risk for reoccurrence or

21  worsening of symptoms and ultimately a return to the hospital.

22  Q    And were they receiving the services that would ameliorate

23  that risk?

24  A    For most of the individuals in my sample, they were not.

25  Q    What services did you recommend frequently for folks -- for

1    people who were at serious risk of hospitalization?

2    A    I recommended PACT services based on the aspects of that

3    delivery model to be comprehensive and intense enough to meet

4    the needs of the individuals.

5    Q    Now that we've covered an overview of your findings, let's

6    discuss some of these conclusions in more detail, and I would

7    like to start with the transition planning that you observed.

8    What did the transition planning from the state hospital

9    largely entail for the individuals that you reviewed?

10   A    Okay.  The transition planning largely entailed someone,

11   usually the social worker at the hospital, scheduling an

12   appointment with the next provider, the community provider, and

13   then passing that information on to the recipient near or at

14   the time of discharge.

15   Q    What was the coordination between the state hospital and

16   the community-based providers that you were seeing during this

17   transition planning?

18   A    For the most part, there was not a coordination of

19   discharge planning.  I did not see consistent engagement of the

20   community providers or family, for that matter, in discharge

21   planning.

22   Q    And what happened generally after people went back to the

23   community after experiencing transition planning like this?

24   A    In general, without appropriate discharge planning,

25   individuals were not receiving the level or intensity of

```
1   services in the community.  That resulted in a deterioration of
2   their condition and ultimately return to a hospital setting.
3   Q   How did the transition planning you observed affect the
4   individual's ability to cope with the symptoms of their mental
5   illness in the community?
6   A   It affected -- if you're not receiving appropriate
7   services, if you're not receiving the treatment that you need,
8   if you're not receiving the medication that will be beneficial
9   in stabilizing your symptoms, I saw a reoccurrence of symptoms.
10  I saw a process that led towards a return to hospital setting.
11  Q   How would you describe the effectiveness of the transition
12  planning that you observed in the review?
13  A   It was not effective.
14  Q   And what impact does ineffective transition planning have
15  on a person's risk of rehospitalization?
16  A   From experience and the literature, it's clear that if an
17  individual is not connected with the services that they need
18  when they transition from the hospital to the community, it
19  lessens the likelihood of them being able to be successful and
20  maintain stability.
21  Q   Let's discuss transition planning through the lens of a
22  person in your client review.  Tell me about person 3 whom you
23  begin discussing in your report, Plaintiff's Exhibit 408, on
24  page 19.  Who is person 3?
25  A   Person 3 is a 25-year-old -- was 25 at the time that I saw
```

*** DAILY TRANSCRIPT ***

1  him -- African-American male who was suffering from untreated

2  symptoms of his illness.  He was living in the home with his

3  parents.  He had gone to high school, had gone to Job Corps,

4  completed Job Corps and returned home, had played basketball

5  and had worked with his father in his auto shop.

6  Q   When did this young man begin to show signs of mental

7  illness?

8  A   He began to show signs -- according to the information

9  available to me, he began to show signs of mental illness in

10  2013, shortly after returning from Job Corps.

11  Q   How many times has he been to the State Hospital?

12  A   He has been admitted to the State Hospital three times.

13  Q   Generally speaking, what led to those three admissions?

14  A   Generally speaking, nonadherence or noncompliance with

15  medication, resulting in an increase or worsening of symptoms

16  of psychosis, threatening behavior, aggressive behavior,

17  self-injurious behavior.

18  Q   What community services did you ultimately recommend for

19  this young man?  Let me rephrase that.  What community services

20  did you ultimately find that this young man was appropriate

21  for?

22  A   I found that he was appropriate for services -- PACT

23  services.  At the time that I saw him, I also included in

24  addition to specifically stating the PACT services, he was

25  acutely in need of medication.  He was acutely ill and I felt

1    like the intensity of services that could be provided by PACT

2    to assist in getting him stable was what was needed at the

3    time.

4    Q    How would PACT assist in keeping him stable and help keep

5    him in the community?

6    A    Here is an individual who has had three admissions to the

7    hospital, who has been identified as having some deficits in

8    insight and judgment and issues with compliance with

9    medication.  And so the -- having individuals, a team of

10   individuals, professionals, available to intervene in the

11   crisis situations, to assess and evaluate what his needs were

12   at the time without it being dependent upon him seeking out

13   services -- because the likelihood of him on his own seeking

14   out services is not likely -- again, based on the intensity and

15   the comprehensiveness of the services provided by PACT, it is

16   my opinion that that's what he needed.

17   Q    Would receiving those intensive services like PACT help him

18   avoid future hospitalizations?

19   A    Most likely, yes.

20   Q    Over time, is it possible that he would be able to rebuild

21   his life, start working again, or assuming other goals?

22   A    Certainly that would be the hope.  And based on experience

23   and seeing other individuals who indeed are able to rebuild

24   their lives and experience recovery and stability in the

25   community, I would say yes.

1   Q    Let's walk through each of his three State Hospital

2   admissions one at a time.  Please turn to your binder at tab

3   Plaintiff's Exhibit 1099.  Are you there?

4   A    I'm there.

5   Q    What is this document?

6   A    This document is a discharge summary of person 3's first

7   admission to the hospital that included an admission date of

8   September 16, 2014, with a discharge of February 23rd, 2015.

9   Q    Have you seen this document before?

10  A    Yes, I have.

11  Q    When?

12  A    As part of the review of his records.

13       MR. CASTILLO:  Your Honor, I move to admit Plaintiff's

14  Exhibit 1099 into evidence.

15       THE COURT:  Any objection from the State?

16       MR. SHELSON:  No, Your Honor.

17       THE COURT:  PX-1099 will be received into evidence.

18  (EXHIBIT PX-1099 MARKED)

19  BY MR. CASTILLO:

20  Q    If you turn -- if you turn to the second page of

21  Plaintiff's Exhibit 1099, at the bottom where it says hospital

22  course, --

23  A    Yes.

24  Q    -- there is a clinical progress note dated September 22nd,

25  2014.  Towards the end of that note, it states, "Poor insight

*** DAILY TRANSCRIPT ***

1    and lacks judgment."  Do you see that?

2    A    I see that.

3    Q    What do you make of this statement?

4    A    That the individual, the clinician making this statement is

5    of the opinion that this individual has deficits in his

6    understanding and acceptance of his illness.  That's the poor

7    insight.  And that he lacks the ability to make right or

8    appropriate decisions.

9    Q    And turning to page 4 of Plaintiff's Exhibit 1099 where the

10   heading "Mental Status Exam on Discharge" is, do you see that

11   it also states, "Insight and judgment poor"?

12   A    I do.

13   Q    Given his poor insight and judgment throughout his

14   five-month hospitalization, how important is effective

15   transition planning for person 3?

16   A    It would be very important.

17   Q    Why so?

18   A    Recognizing that this individual is not -- based on the

19   clinicians evaluating him, is not demonstrating appropriate

20   insight or awareness of his illness, is not demonstrating the

21   ability to make appropriate decisions with respect to his

22   illness or the need for treatment or continuation in treatment,

23   it would be important for there to be a comprehensive

24   transition plan to assure that there were no gaps in his

25   receiving services.

*** DAILY TRANSCRIPT ***

1  Q    Might effective transition services help prevent those gaps

2  from occurring?

3  A    Yes.

4  Q    If you turn to page 5 of Plaintiff's Exhibit 1099 where it

5  says, "Plan/Recommendations," can you read out loud the

6  portions of this document that reflect how East Mississippi

7  State Hospital actually transitioned person 3 to the community?

8  A    Yes, I can.   It indicates, "Direct discharge home on

9  2-23-2015 to family.

10      IRS encouraged to continue to abstain from the use of drugs

11 and alcohol and obtain a sponsor, attend meetings.   Also, he

12 was encouraged to attend follow-up appointment scheduled on

13 2-26-15 as instructed per social worker.

14      4.   IRS also encouraged to follow up with his private care

15 provider for management of his medical condition.

16      And IRS reminded Lithium and Depakote levels are required

17 for appropriate management of medication."

18 Q    You just read IRS.   What does IRS stand for?

19 A    My interpretation is that's individual receiving service.

20 Q    So based on this plan, how would you describe the

21 transition services person 3 received during his first state

22 hospitalization?

23 A    This -- deficits are an absence of true transition

24 planning.

25           THE COURT REPORTER:   I'm sorry?

1    A    What is documented here represents an absence or deficits

2    in true transition planning.

3    BY MR. CASTILLO:

4    Q    Can you elaborate on that?

5    A    True transition planning would engage certainly family

6    members if -- with the approval of the recipient.  It certainly

7    would involve the community mental health center or community

8    provider who is going to be providing services for the

9    individual once they transition out of the hospital.  For the

10   continuity of care, what I see here does not indicate the

11   coordination with the community provider or the engagement with

12   the family.

13   Q    How about in the rest of person 3's record of his first

14   hospitalization?  Did you see evidence of engagement with his

15   family or the community mental health provider?

16   A    I do not recall seeing such.

17   Q    On page 5 of 1099, it also says that person 3 was

18   encouraged to abstain from drug use and attend follow-up

19   appointments.  Based on his needs, is encouragement going to be

20   effective for person 3?

21   A    I think encouragement alone is not going to be effective.

22   Q    Why not?

23   A    Again, as I've said, here is an individual who has already

24   been identified as having deficits in insight and judgment, who

25   has had a history of noncompliance with medication.  Without

1    someone doing more than just encouraging, but also assisting

2    and making sure that he gets to the appointments and making

3    sure that services are available to him that if he is not

4    going, then we're going to bring the services to him, that's

5    the kind of service that would go a long way in ensuring his

6    stability.

7    Q    Receiving that sort of connection in the hospital?

8    A    An awareness of who the next provider of care is going to

9    be and awareness of where exactly he will receive the services

10   or who is going to provide the services.  Those are the kinds

11   of plans, transition planning, that should occur while in the

12   hospital.

13   Q    And, in fact, was person 3's transition into the community

14   after his first admission successful?

15   A    No.

16   Q    What actually happened when person 3 went back home?

17   A    When he returned home, there is no indication in the

18   information available to me that he received community-based

19   services.  And ultimately, he experienced a worsening, a

20   reoccurrence and worsening of symptoms, and he ended up

21   returning to the hospital.

22   Q    How soon after his return after his first discharge did he

23   go back to the State Hospital?

24   A    It was a matter of months.

25   Q    Let's turn now to that second admission.  If you can please

1  turn to Plaintiff's Exhibit 1100 in your binder and let me know

2  when you're there.

3  A   I am there.

4  Q   What is this document?

5  A   This document is the discharge summary of person 3's second

6  admission to the hospital, to East Mississippi State Hospital,

7  from October 28th of 2015 to December 8th of 2015.

8  Q   Did you review this document during your client review?

9  A   I did.

10        MR. CASTILLO:  Your Honor, I move to admit Plaintiff's

11 Exhibit 1100 into evidence.

12        THE COURT:  Any objection?

13        MR. SHELSON:  No objection, Your Honor.  And to speed

14 things along, the next exhibit, 1101, we do not object to that

15 one either.

16        THE COURT:  All right.  PX-1100 and 1101 will be

17 admitted for ID purposes -- or, excuse me, admitted in

18 evidence?

19        MR. SHELSON:  Yes, sir.

20        THE COURT:  Okay.  Will be received in evidence.

21 Excuse me.  You may proceed.

22    (EXHIBITS PX-1100 AND PX-1101 MARKED)

23        MR. CASTILLO:  Thank you, Your Honor.

24 BY MR. CASTILLO:

25 Q   Can you turn to page 5 where it says "Disposition" for his

*** DAILY TRANSCRIPT ***

1   second hospital admission?

2   A   Yes.

3   Q   And please read aloud the portions where it describes what

4   East Mississippi State Hospital did to transition person 3 back

5   in the community this time around.

6   A   "IRS was encouraged to attend his follow-up appointment

7   scheduled on Mondays and Wednesdays at 2:30, community

8   counseling service.  IRS also encouraged to follow up with his

9   private care provider regarding his medical diagnosis.  IRS

10   refused vital signs at time of discharge."

11   Q   How would you describe the transition services person 3

12   received during his second admission?

13   A   Essentially the same as the time of the discharge from his

14   first admission, an absence of true transition planning.

15   Q   Is encouragement alone appropriate for a person with a

16   mental illness history like that of person 3?

17   A   No.

18   Q   And on the same page below "Disposition," it says

19   "Prognosis."  Do you see that?

20   A   Yes.

21   Q   Can you read what the prognosis states?

22   A   "Prognosis is guarded due to his history of noncompliance

23   and substance usage."

24   Q   What does the prognosis of person 3 tell you?

25   A   It tells me that the clinician rendering this prognosis is

1   not confident, not at all confident that he will be successful

2   in his return to the community based on noncompliance with

3   medication and substance use.

4   Q   To put it simply, is this a prognosis that they expect

5   person 3 to succeed when he is discharged in the community?

6   A   No, it's not.

7   Q   Is encouragement alone appropriate to transition -- an

8   appropriate transition plan for a person with a guarded

9   prognosis due to a history of noncompliance and co-occurring

10  illness?

11  A   No.

12  Q   Why not?

13  A   For the same reasons as I've said.  This individual who has

14  deficits in insight and judgment, has a history of

15  noncompliance, has substance use, and has a diagnosis of a

16  serious mental illness is going to need more than just

17  encouragement, is going to need assertive, aggressive treatment

18  to assure that his illness is managed and that he receives the

19  services needed to promote his movement to recovery.

20  Q   Was there any evidence that the State Hospital was

21  providing more in transitions planning in the rest of person

22  3's record for his second hospital admission?

23  A   Not that I recall.

24  Q   Back to your binder, please turn to Plaintiff's Exhibit

25  1101 which was previously admitted into evidence.  Can you

1    describe this document, please?

2    A    Yes.  This is a discharge summary of person 3's third

3    admission to East Mississippi State Hospital dated for dates

4    July 1 of 2016 admission and discharge October 31, 2016.

5    Q    How old is person 3 at this point?

6    A    He is 23 years old.

7    Q    Can you turn to page 4 of Plaintiff's Exhibit 1101 where it

8    says "Disposition"?

9    A    Yes.

10   Q    Can you please read out loud the parts that describe what

11   East Mississippi State Hospital did to transition person 3 back

12   to the community in his third State Hospital admission?

13   A    "Discharged on October 31st, 2016, home to his family.

14   Psychiatric aftercare appointments have been scheduled with the

15   local mental health center.  Highly encouraged to follow up for

16   medical concerns with the healthcare provider of his choice.

17   Prescriptions for discharge medications have been provided at

18   discharge.  Highly encouraged abstinence from alcohol and drug

19   use.  Highly encouraged medication compliance and treatment

20   compliance at discharge.  However, he remains skeptical that he

21   truly needs to take psychiatric medications at home."

22   Q    Where it says he remains skeptical that he truly needs to

23   take psychiatric medications at home, is that a description of

24   person 3?

25   A    That's my -- yes.

*** DAILY TRANSCRIPT ***

```
1    Q    And how did this transition -- the transition services

2    person 3 received in his third hospital admission, how would

3    you describe it?

4    A    I would describe it as largely similar, the same as for the

5    first and second discharges, an absence of transition planning.

6    Q    Again, how successful do you think it will be to highly

7    encourage person 3 to follow up with community-based service

8    providers?

9    A    Encouragement, even high encouragement, in and of itself

10   will not be sufficient.

11   Q    On your screen now you can see the portions of the

12   discharge summaries that we just discussed.

13   A    Yes.  I see it.

14   Q    How much time elapsed between the first admission and the

15   last discharge for person 3?

16   A    I'm sorry.  Could you repeat the question?

17   Q    Between the time of his first admission to East Mississippi

18   State Hospital and his last discharge, how much time has

19   elapsed?

20   A    Approximately two years.

21   Q    And over those two years, did you observe any improvements

22   in the transition services that person 3 received?

23   A    I did not.

24   Q    How did you react, seeing identical discharges for person 3

25   admission after admission after admission?
```

*** DAILY TRANSCRIPT ***

1    A    It was disheartening.  But my reaction was more to seeing

2    the condition of this young man when I saw him.

3    Q    And let's fast-forward to when you did interview him.  When

4    was that?

5    A    I interviewed him on March -- March 26 of 2018.

6    Q    And how was he then?

7    A    Then he was in the home.  He was in the kitchen area of the

8    home.  He was moving about kind of aimlessly in that area with

9    movements of his hands and arms, appeared to be mumbling to

10   himself with movement of his lips, blinking of his eyes.

11   Appeared, in my clinical opinion, to be experiencing auditory

12   and visual hallucinations.

13   Q    What services was he receiving when you met him?

14   A    He was not receiving any services.

15   Q    What was your reaction to seeing him this way?

16   A    Extremely frustrating, and particularly frustrating when I

17   hear from his family that he has been in the state that I am

18   seeing him in in March of 2018 since the latter part of 2016,

19   and witnessing their frustration that they had reached out and

20   sought to get services for him, and those attempts to get

21   service had not been responded to.  They had not been able to

22   get medication for him.  They had not been able to get anyone

23   to come to the home to evaluate him.

24   Q    You spoke with his parents?

25   A    I did.

1   Q   How were they doing with the situation?

2   A   They were doing the best they could.  They were frustrated.

3   They were seeking help.  They were doing the best they could to

4   have maintained this individual in the home for really closer

5   to two years without medication, without treatment, and able to

6   keep him safe.  But they clearly were beginning to reach the

7   end of their rope and feeling that perhaps a return to the

8   hospital was the only option available.

9   Q   You recommended PACT for this young man.  Is there any

10  evidence that he was considered for PACT services during any of

11  his state hospitalizations?

12  A   I did not see any evidence of such.

13  Q   What community mental health region does person 3 live in?

14  A   Region 7.

15  Q   Can you give us a rough sense of what part of the state

16  that's in?

17  A   That's in the eastern part of the state.

18  Q   Is PACT available in Region 7?

19  A   At the time that I saw him, it was not available.  I don't

20  know if it currently is.

21  Q   Did you find that person 3 was at serious risk of State

22  Hospital admission?

23  A   Yes, I did.

24  Q   Why?

25  A   Because he is acutely ill and he has been without

1    appropriate community-based services for more than a year.

2    Q    Putting aside transition planning for a minute, I would

3    like to focus in some more detail about the service intensity

4    of the community-based services that you saw in Mississippi.

5    First, what does a high-intensity community-based service look

6    like?

7    A    High-intensity community-based services are those services

8    that -- it looks like PACT.  Let me just say it looks like

9    PACT.  It's services that are available to meet the needs of

10   the individual on an almost 24/7 basis.  It's services that are

11   of the right variety and array to meet the needs of the

12   individual.

13   Q    And where can high-intensity community-based services be

14   received?

15   A    In the community, in the individual's home, wherever is

16   most appropriate for that person to receive the services.

17   Those --

18   Q    I'm sorry.  Did I interrupt you?  I interrupted you.  Do

19   you have anything else you wanted to say?

20   A    I was just going to add that it's the kind of services that

21   are person-centered, and so those intense services would be

22   guided and directed by an individual evaluation of the person's

23   needs.

24   Q    As a point of comparison, what does a low-intensity

25   community-based service look like?

1    A    When I think of low-intensity community-based services, I

2    think of traditional office-based services where the individual

3    is given an appointment time and they are expected to present

4    themselves to the office or to the practitioner or clinician

5    for their services.

6    Q    In a traditional office-based treatment setting, who

7    generally has responsibility for ensuring that the individual

8    continues with treatment?

9    A    Ultimately it is the responsibility of the individual to

10   get themselves to the appointed place at the appointed time to

11   receive the services.

12   Q    And then turning back to the high-intensity services, who

13   has a responsibility for following up to ensure an individual

14   continues with treatment?

15   A    It is a shared responsibility with those clinicians

16   providing the services taking on more responsibility and

17   ownership to assure that the individual gets what they need.

18   Q    And why might the level of intensity vary over time or

19   across patients?

20   A    I'm sorry.  I think my reaching for a tissue distracted me.

21   Q    No problem.  Do you need a minute?

22        Why might the level of intensity vary over time or across

23   patients?

24   A    Okay.  There are fluctuations in individuals' experience of

25   symptoms, experience of life.  There are stressors that may

1    come and go, and so the intensity of the need for services is

2    expected to vary.  So there are times, particularly when

3    someone is transitioning from a more controlled environment,

4    one would expect the intensity of service in the community to

5    be greater.  As that person is connected with appropriate

6    community services, acclimated to a new living environment, one

7    might expect the intensity of those services to decline.  A

8    loss, a decision to discontinue medication may result in the

9    need for more intense services.  So it may vary based on the

10   needs and the presentation of the individual.

11   Q    Were there people in your review who needed intensive

12   community-based services?

13   A    Yes.

14   Q    And in general, were you seeing that they received the

15   intensity of services that they needed?

16   A    In general, no.

17   Q    What impact did that have on the individuals in your

18   review?

19   A    The impact, in general, was that they experienced a

20   reoccurrence of symptoms and in many cases a return to

21   commitment in the hospital setting.

22   Q    Is there a particular example of an individual you reviewed

23   in Mississippi who wasn't getting the intensity of services

24   that he or she needed to stay out of the hospital?

25   A    Yes.

*** DAILY TRANSCRIPT ***

1   Q   What example might that be?

2   A   Person 18.

3   Q   And in case you need it, person 18, you begin discussion of

4   her on page 81 of Plaintiff's Exhibit 408.  Can you please

5   generally describe who person 18 is?

6   A   Yes.  Person 18 is, again, at the time that I saw her, a

7   55-year-old African-American woman who was living in the home

8   with her mother and brothers.  She had children.  She reported

9   that she had had employment in the past, working hanging up

10  clothing and had worked at a motel.  She expressed interest in

11  working again.  I think one of her statements was, "There is

12  nothing like having your own money."  And she expressed

13  interest in going to school and learning to bake, with a

14  particular interest in baking cakes.  She also expressed

15  interest in living, living as independently as she could.

16  Q   And what community mental health region was she in?

17  A   Region 7.

18  Q   Was she hospitalized in 2017?

19  A   Yes.  She had two hospitalizations in 2017.

20  Q   Can you -- when were those hospitalizations?

21  A   The first was from March 22nd, 2017, through May 4th of

22  2017; and the second, September 15th, 2017, through

23  November 13th, 2017.

24  Q   Prior to her two 2017 state hospitalizations, was she

25  receiving community-based services?

1    A    She was.

2    Q    What services were those?

3    A    She was receiving services at the center that included

4    psychosocial rehabilitation.  She was, again, participating in

5    groups that were under psychosocial rehabilitation.  She was

6    seeing the doctor for medication, assessment and evaluation.

7    And I believe she was seeing the nurse for administration of

8    medication.  There is also documentation that she received

9    community support services.

10    Q    What are community support services?

11    A    Community support services are an array of services that

12    largely are provided by an individual who goes out and may meet

13    with a person in the home, may evaluate what their needs are.

14    There may be some direct provision of services, but largely

15    this individual is evaluating and perhaps referring out

16    evaluation of the individual's stability and whether there is a

17    need for additional services, evaluation of the efficacy of the

18    services that are being provided.  It's an array of service and

19    I can't say that I can remember all that is included under --

20    Q    This is not a memory test.

21    A    Okay.

22    Q    That will do.  Thank you.  How often was she seeing her

23    community support specialist, roughly?

24    A    It varied, but my recollection is that during 2016 and

25    portions of 2017, she was seeing the community support

1   specialist at least monthly.

2   Q    What led to her March 2017 admission?

3   A    Prior to admission, she was described as experiencing

4   symptoms of her diagnosed mental illness, which was paranoid

5   schizophrenia, that she was having mood swings, rapid mood

6   swings, and that she was exhibiting violent and aggressive

7   behavior.

8   Q    How did her symptoms progress leading up to the point of

9   admission?  Do you want a different question?

10  A    Perhaps a repetition of that question.

11  Q    How did her symptoms progress leading up to her March 2017

12  admission?

13  A    Oh, she continued to exhibit symptoms that resulted in her

14  going into, I believe, Alliance, a local hospital, and

15  ultimately being committed to the State Hospital.

16  Q    How did Region 7 respond to her increasing symptoms?

17  A    There is indication that the community support specialist,

18  once aware of the change or reoccurrence or worsening of her

19  symptoms, arranged for a precommitment evaluation and assisted

20  with the paperwork that ultimately led to the commitment.

21  Q    What response would you expect to see from a community

22  mental health service provider to a developing crisis like

23  person 18 was experiencing?

24  A    I would expect to see assertive aggressive effort to divert

25  from admission.  I would expect to see an engagement of crisis,

1    mobile crisis services to see if we can get a doctor to come

2    see her, evaluate her, get her back on her medication, perhaps

3    remove her from the environment for a time in respite care,

4    crisis residential program to see if we might stabilize her

5    such that a commitment can be diverted.

6    Q    What needs were resulting from her environment?  What was

7    going on in her environment?

8    A    In the home, there -- even at the time that I interviewed

9    her, there was conflict between this individual and her mother.

10   And from review of her records, it appears that this conflict

11   results in disagreement, some around medication compliance,

12   which increases the stress, which worsens her symptoms and

13   results in her making threatening remarks and sometimes

14   behaving in threatening ways.

15   Q    And you listed several responses that a community-based

16   provider could provide as person 18's crisis was developing.

17   Did you see the provision of those services in the case of

18   person 18?

19   A    I did not see the provision of those services.

20   Q    Was there any change in the intensity of services that she

21   received as she was approaching her March 2017 hospitalization?

22   A    I do not recall seeing any change in the intensity of

23   services.

24   Q    Had she received more intensive services, is it possible

25   she could have avoided the State Hospital admission altogether?

```
1    A    It's certainly possible, yes.

2    Q    How long did her March 2017 admission last?

3    A    Until May.  Early May.

4    Q    And how would you describe the services that she received

5    in May 2017 upon her discharge from East Mississippi State

6    Hospital?

7    A    She returned to receiving services at the center,

8    participation in the psychosocial rehabilitation.  There was

9    indication of a continuation of the visits with the doctor as

10   well as contact with a nurse, and a continuation of the

11   community support services.

12   Q    Was she connected with any additional services that she was

13   not receiving before her March 2017 admission?

14   A    I did not see additional services.

15   Q    Was there any change in the intensity of the services that

16   she was receiving when she was discharged in May of 2017?

17   A    I am reviewing to make sure.  But, no, I did not see nor

18   document an increase in the intensity of services.

19   Q    And what happened after she was discharged to the community

20   to essentially what were the same services that she was

21   receiving before she was admitted?

22   A    Could you repeat the question, please?

23   Q    What happened to person 18 after she was discharged back to

24   essentially the same services that she was receiving before her

25   commitment?
```

1    A    In I guess a matter of months, the same pattern, in

2    September of '17, worsening of symptoms, threatening and

3    aggressive behavior that resulted in a return to the hospital

4    in September 15th of 2017.

5    Q    Was the intensity of the service she was receiving in the

6    summer of 2017 sufficient to address her symptoms?

7    A    No.

8    Q    Again -- and her discharge which I believe you testified

9    was in November of 2017, she was discharged again.  Was she

10   connected with any additional services at that time?

11   A    It appears that she was reconnected with the services that

12   she had been receiving:  Psychosocial rehabilitation, the

13   evaluation by the doc, nurse or administration.  There was

14   documentation that the community support services would resume

15   once she returned to the community.  But as I recall, that's

16   where the notes that I had ended.

17   Q    Was there any indication that she received any more

18   intensive services upon her November 2017 discharge?

19   A    No.

20   Q    And when did you meet her?

21   A    I met her on March 29th of 2018.

22   Q    What services was she receiving at that point?

23   A    Same services, the psychosocial rehabilitation, visits with

24   the doctor, nurse for administration of medication.

25   Q    Are those services -- I'm sorry.  Are you done?  I didn't

```
 1   mean to cut you off.  If you were done, I apologize.
 2   A    Yes.
 3   Q    Are those services sufficient to sustain her in the
 4   community?
 5   A    Those services have not been sufficient to sustain her as
 6   evidenced by the returns to the hospital under committed
 7   conditions.
 8   Q    What services do you think she is appropriate for?
 9   A    It's my opinion that she is appropriate for more intense
10   services.  Some of those services that she is receiving, if
11   administered or provided at the appropriate intensity, may be
12   helpful for her.  But in looking at the issues with medication
13   nonadherence and the need for more closer monitoring of her
14   medication, when I evaluate the tendency to behave in
15   aggressive manner, once symptoms appear, indicates the need for
16   crisis response that can come where she is, they can come to
17   the house when necessary to provide those services to her.  And
18   then when I look at what she identifies as important to her,
19   the desire for employment, the desire to live in her own place,
20   those are the kinds of things that more intense services such
21   as PACT could assist her with.
22   Q    Now, you recommended PACT for her in your report.  Why
23   PACT?
24   A    Based on the strengths of that delivery model and being
25   able to not just rely on her going to the center on a daily or
```

```
 1    weekly basis to receive services, but services being brought to

 2    her and provided to her directly in the home, in the community.

 3    Based on the match between here is someone who has a serious

 4    mental illness who has had repeated hospitalizations, who has

 5    identified the need for assistance with employment, who I

 6    identified the need for assistance with crisis management and

 7    mental health therapy to assist with sorting out the sources of

 8    conflict that occur in the home.

 9    Q    I guess I'm wondering, how is PACT different from what she

10    was already receiving?

11    A    It's different in the intensity of the services.  It's

12    different in the range of services that can be provided

13    directly in the community.

14    Q    How would having received more intensive services in 2016

15    have affected her need for PACT services in 2018?

16    A    Certainly, I would hope that receiving -- and certainly, I

17    know from experience that receiving appropriate services, the

18    earlier an individual begins to receive the appropriate

19    services, the -- it doesn't completely eliminate but it

20    certainly lessens the likelihood for inpatient services.

21    Q    How does it impact the need for greater services?  Let me

22    ask it this way.  If person 18 had received community support

23    services with sufficient intensity in 2016 as her crisis was

24    developing, would she be less likely to need a more intensive

25    service like PACT in 2018?
```

*** DAILY TRANSCRIPT ***

1   A   I would certainly think so.  If I'm understanding the

2   question correctly, yes.

3   Q   And you testified that person 18 is in Region 7.  You have

4   already testified to this but, again, is PACT available in

5   Region 7?

6   A   At the time that I saw her, PACT was not available in

7   Region 7.

8   Q   You also recommended permanent supported housing in your

9   report as provided in Mississippi through the CHOICE program in

10  which the court has already heard testimony on.  How would

11  permanent supported housing help person 18 manage her mental

12  illness and avoid rehospitalization?

13  A   For this individual, in reviewing the information, it

14  appears that the stress related to the interpersonal conflicts

15  that occur in the home, and primarily with her mother, is a

16  source of stress/distress for her, resulting in a worsening of

17  symptoms of her illness and acting-out behavior.  She

18  indicates, and I believe the data supported, that there had

19  been a time when she lived in her own place.  If she was able

20  to receive the permanent supported housing type services where

21  she is not in the day-to-day environment where she is

22  experiencing the conflict, it's going to certainly improve

23  her -- it's going to improve her mood.  It's going to

24  potentially improve her perceptions of her ability to be

25  successful and take care of herself.

1    Q    Is person 18 at serious risk of hospitalization absent the

2    services that you have identified?

3    A    Yes, I think so.

4    Q    Why?

5    A    For the very same reasons that she has had hospitalizations

6    in the past:  A reoccurrence of symptoms, stressful situations

7    that result in worsening of the symptoms, acting out or

8    aggressive behavior that results in a commitment.

9    Q    We have been focusing on the limited intensity of the

10   services person 18 has received.  For the people in your

11   review, how does person 18's experience compare?

12   A    Very similar.

13   Q    So now we have discussed transition planning and service

14   intensity, and I want to turn to my last topic which is the

15   impact hospitalization has on the lives of the people of your

16   review.  What effect does prolonged or repeated

17   hospitalizations have on a person's ability to care for

18   themselves?

19   A    We talk about institutionalization where an individual

20   begins to lose those skills that are important in maintaining

21   independence and maintaining functioning in the community.

22   When someone is in the hospital for prolonged periods of time

23   or when there are repeated admissions to the hospital setting,

24   it certainly has the potential, I won't say it always but it

25   certainly has the potential for compromising those skills,

```
 1   those abilities that the individual has to effectively function
 2   in the community.
 3   Q   Were you present for the testimony of HB this morning?
 4   A   I was.
 5   Q   Is his daughter person 25 in your review?
 6   A   Yes.
 7   Q   Let's discuss person 25 for a minute.  You begin discussing
 8   her on page 108 of your report, Plaintiff's Exhibit 408.
 9   A   Yes.
10   Q   Can you just give us a brief description of person 25?
11   A   Yes.  Person 25 at the time that I saw her, 51-year-old
12   Caucasian female who was at that time in the hospital.  She
13   expressed her desire to return to the community and live as
14   independently as she could with supports.  She expressed an
15   interest in working and had, as I think he mentioned, some of
16   the artwork with her and expressed an interest in pursuing
17   education and further developing her artistic skills and
18   ultimately a desire for employment in an area that she could
19   utilize the art skills.
20   Q   Where did you meet her?
21   A   I met her at Mississippi State Hospital.
22   Q   And how long had she been there when you met her?
23   A   She had been there since 2014, January 30th of 2014.
24   Q   And did you interview HB as part of your review in this
25   report?
```

```
 1   A   Yes, I did.

 2   Q   Prior to her 2014 hospitalization, was she receiving

 3   appropriate community-based services?

 4   A   No, she was not.

 5   Q   And HB testified this morning about symptoms person 25

 6   presented leading up to her 2014 admission.  Are there

 7   community-based services that can address those symptoms?

 8   A   Yes.  As I recall, I'm not recalling all of the symptoms he

 9   spoke of.  I know the symptoms that were identified in her

10   records.  And, yes, in my opinion, there are community-based --

11          THE COURT:  Your mic went out.

12          THE WITNESS:  It did?

13          THE COURT:  Okay.

14          THE WITNESS:  It seems to be back.

15          THE COURT:  Can you repeat?

16   BY MR. CASTILLO:

17   Q   I have a feed.  I'm going to read what you had said where

18   you dropped off.  "As I recall, I am not recalling all of the

19   symptoms you spoke of.  I know the symptoms that were

20   identified in her records.  And, yes, in my opinion -- I can

21   just repeat the question.

22          THE WITNESS:  If I can pick up from there, that would

23   be fine for me.

24          THE COURT:  Okay.

25   A   In my opinion, there are community-based services available
```

*** DAILY TRANSCRIPT ***

1  to address what was identified as mood swings, temper tantrums,

2  threats of self-harm.  Those were the behaviors that I saw and,

3  yes, there are community-based services that could address

4  those symptoms.

5  BY MR. CASTILLO:

6  Q   And had she received those services, those community-based

7  services, might she have avoided the hospitalization?

8  A   Certainly it's my opinion that the hospitalization might

9  have been avoided.

10  Q   Can someone with her needs live safely in community

11  settings with appropriate community-based services?

12  A   Yes.

13  Q   What services would she need to live in a community?

14  A   I identified for -- let me make sure that I'm in the right

15  spot -- for this individual, community-based services,

16  recommending residential placement for her where there would be

17  supervision, 24/7 supervision.  I also recommended -- I spelled

18  out transition services.  Transition service would, of course,

19  be a part of services provided by PACT.  I recommended PACT for

20  the transition services, for the mental health therapy, for

21  assistance with supported employment, for assistance with

22  managing crisis situations when they occur, assistance with

23  medication monitoring and medication management, and again for

24  therapy focused on her history of substance use disorder as

25  well as a history of trauma for her.

```
1    Q    Would those services also help her -- strike.  Let me ask
2    it again a different way.
3         How would those services approach her goals that she
4    identified as well, including the art that you discussed?
5    A    Yeah, those are the kinds of services, supported
6    employment, the assistance with psychosocial rehabilitation and
7    activities of daily living, assistance, case management kinds
8    of assistance with connecting her with resources for furthering
9    her education.  They're the kinds of services that would
10   certainly be consistent with her expressed interests and needs.
11   Q    In general, did you find that people in your view wanted to
12   be in a State Hospital?
13   A    No, I did not.
14   Q    How does that compare to your professional experience?
15   A    That is consistent with my professional experience.
16   Q    Well, let's use person 1 as an example.  Can you give me a
17   brief introduction about who he is?  And if you need it, your
18   discussion of person 1 begins on page 9 of Plaintiff's Exhibit
19   408.
20   A    Okay.  Person 1 was 25 years old at the time that I saw
21   him, a single Caucasian male who lived with his mom, reported
22   having graduated from high school, talked about his desire --
23   while he was receiving disability, his desire to get a job and
24   get off of disability, felt like he could certainly make more
25   money working than he was receiving, expressed his love of
```

1   music and his love of gardening.

2   Q    What is his State Hospital commitment history?

3   A    He had had three admissions to South Mississippi State

4   Hospital, and the more recent State Hospital admission was to

5   East Mississippi State Hospital in 2017.

6   Q    How did person 1 describe his experience at South

7   Mississippi State Hospital?

8   A    Referring to my report, he described South Mississippi

9   State Hospital as a joke.  He reported attending treatment team

10  meetings and described it as they do these things called

11  treatment team once a week.  You go into a little room.  You

12  almost feel they're laughing at you.  When asked about

13  discharge planning, he stated that discharge planning feels

14  helpless, that you don't know how you're doing, and talked

15  about that you know that you're maybe getting close because

16  they take the paper bag and they put your name on it and they

17  begin to fill the bag with your clothes and your belongings and

18  then tell you that you're about to be discharged.

19       His, I guess, final statement in this area was that, "I

20  hate to say that it's worse than jail but it's worse than

21  jail."

22  Q    How was his subsequent commitment to East Mississippi State

23  Hospital?

24  A    I'm sorry?

25  Q    How did he describe his subsequent commitment to East

```
 1   Mississippi State Hospital?
 2   A   He basically said that at East Mississippi State Hospital
 3   that the food was terrible but at least they get you outside,
 4   at least you get to go outside.
 5   Q   And speaking of jail, were any of the people in your review
 6   sitting in jail with nothing more than a civil commitment
 7   order?
 8   A   There were five people for whom that was the case for their
 9   most recent admission.
10   Q   And as a clinician, what do you think about this?
11   A   It is certainly not ideal.  It certainly is not an
12   appropriate way to begin treatment.  There may be some jails
13   that have relationships with the centers or contractual
14   relationships to provide a minimum of mental health services.
15   But, by and large, certainly a jail is not a place for
16   receiving mental health treatment.  And I don't know exactly,
17   but based on my own experience, I would imagine that there
18   aren't many jails for whom they even have the resources
19   available to provide it.
20   Q   Did you see anybody getting adequate mental health
21   treatment while they were in jail in your client review?
22   A   I did not.
23   Q   Do prolonged stays in the State Hospital affect what people
24   can go back to after they're discharged?
25   A   It certainly can.
```

1    Q    In what ways?

2    A    I think of some people in the sample, and probably one

3    person in particular, where the prolonged stay in a hospital I

4    will say in general can affect living arrangements, can affect

5    whether if an individual has employment.  Certainly the

6    employer may not be willing to hold a job until someone comes

7    from a prolonged stay in a hospital.  And a rental situation

8    may not be able to hold on to a house or an apartment if this

9    individual is going to be away without the ability to pay for

10   maintaining the living arrangements.  And in that regard and

11   other regards, just a loss of contact with usual relationships.

12   Q    And did you see this happening in your client review?

13   A    I did.

14   Q    Let's discuss person 11 briefly.  Can you give us a brief

15   sense of who she is?  And if you need it, you begin discussing

16   her on page 53 of your report.

17   A    Person 11 is a 41-year-old African-American woman who lived

18   alone in the family home.  She has two daughters and she

19   expressed an interest in returning to work or beginning to

20   work.  She expressed an interest in learning -- returning to

21   school and continuing her education.  She really expressed an

22   interest after being explained about peer services in

23   ultimately one day learning more and being trained and perhaps

24   being able to become employed as a peer specialist, identified

25   liking to work on the computer and the possibility of some work

1    that she would be able to work from home.

2    Q    About how long was she committed to the State Hospital?

3    A    She was in the State Hospital from November 23rd of 2016

4    through early February, I believe the 8th, February 8th of

5    2017.  So a little over two months.

6        She was under an outpatient commitment and so her actual

7    discharge from the commitment was not until February 28th of

8    2017.

9    Q    And what impact did this State Hospital commitment have on

10   her life?

11   A    Well, I believe the major impact was that she lost custody

12   of her children.

13   Q    When you saw her, did she -- had she regained custody of

14   her children?

15   A    She had not.

16   Q    Does she have an interest in regaining custody of her

17   children?

18   A    Oh, absolutely she does.

19            MR. CASTILLO:  Your Honor, if I can have a minute to

20   confer with counsel?

21            THE COURT:  You may.

22       (SHORT PAUSE)

23   BY MR. CASTILLO:

24   Q    Just one or two more questions.  You have testified that

25   the people you reviewed could have avoided or spent less time

```
 1    in the State Hospital.  What will it take to make that a
 2    reality for the people in your client review?
 3    A    It would take I think the access to and provision of
 4    appropriate and reasonable community-based services.
 5    Q    Can you elaborate?  What do they need to avoid these
 6    hospitalizations or spend less time?
 7    A    They need services that are person-centered that takes into
 8    consideration what their individual and specific identified
 9    needs are, what their desires and their wishes are for their
10    lives, and it's going to require the appropriate array and
11    intensity of services to meet those needs.
12            MR. CASTILLO:  Thank you.  No further questions.
13            THE COURT:  We will take our afternoon break at this
14    time.  Fifteen minutes.  We will meet back up at 3:50.  That's
15    about 17 minutes.  3:50.  Thank you.
16      (RECESS)
17            THE COURT:  Dr. Shambley, you can return to the stand.
18            Any cross-examination of this witness?  I just say
19    that for the record, Mr. Shelson.  You're not being rushed at
20    all if you need to get your notes together.
21            MR. SHELSON:  Thank you, Your Honor.
22       (SHORT PAUSE)
23            MR. SHELSON:  May I proceed, Your Honor?
24            THE COURT:  Yes, you may.
25                        CROSS-EXAMINATION
```

```
1    BY MR. SHELSON:

2    Q    Good afternoon, Dr. Bell-Shambley.

3    A    Good afternoon.

4    Q    When you interviewed the people that you interviewed in

5    Mississippi, did each interview last about an hour?

6    A    Most of the interviews lasted for longer than an hour.  I

7    would say between an hour and a half to two hours.

8    Q    Okay.  And was each interview in 2018?

9    A    Yes, sir.

10   Q    And you reviewed a total of 26 individuals?

11   A    Yes.

12   Q    And your findings of the 26 individuals are based on your

13   interviews, your review of the records, and your training and

14   experience?

15   A    As well as interviews with family members where they were

16   available, as well as interviews with some of the personnel

17   from community mental health centers.

18   Q    When you said that the interviews took an hour to two

19   hours, did that include interviewing the family members?

20   A    For some, it did.  For some, it did not, because some of

21   the family interviews were conducted at a different time and

22   some over the phone.

23   Q    When individuals told you something during your interviews,

24   what did you do to verify it?

25   A    Where relevant, I looked for consistency between what I was
```

*** DAILY TRANSCRIPT ***

1   told and information obtained from record reviews and from

2   other sources.

3   Q   Let's talk about person 11, please.  Person 11 starts on

4   page 53 of 124.

5   A   Yes, I'm there.

6   Q   Do you remember talking about this person?  In the

7   highlighted part, "She said her mother and sister have legal

8   custody of them now."  And that's referring to person 11's

9   children?

10  A   Yes.

11  Q   Is that correct?

12  A   That's correct.

13  Q   Does -- did you get that -- you got that from person 11?

14  A   I got that from person 11 as well as from her mother.

15  Q   And legal custody, does that indicate to you that there was

16  court involvement in that?

17  A   Yes.

18  Q   Have you seen the court order or anything to do with that

19  court proceeding?

20  A   No, I have not.

21  Q   All right.  Do you know if there are anything that the

22  court found in addition to what you were told by person 11 and

23  her mother?

24  A   I do not.

25  Q   Did person 11's mother indicate to you that she had a

```
 1    problem with that custodial arrangement?
 2    A    I don't recall her indicating a problem with the
 3    arrangement.
 4    Q    Did person 11's mother indicate to you that she thought the
 5    custody of the children should be returned to person 11?
 6    A    I recall her expressing that she was hopeful that at some
 7    point custody would be returned.
 8    Q    And did she indicate to you that at the time you
 9    interviewed person 11 and her mother that that was an
10    appropriate time to return custody to person 11?
11    A    That was not addressed.  No.
12    Q    How many children does person 11 have?
13    A    She has two daughters that I'm aware of.
14    Q    How old are they?
15    A    At the time that I saw her, their ages were identified as
16    18 and 11.
17    Q    And they were -- at the time they were living with person
18    11's mother?
19    A    They were living with her mother and her sister.
20    Q    What is person 11's diagnoses -- diagnosis?
21    A    She had diagnoses of schizophrenia or schizophreniform,
22    undifferentiated, schizophrenia spectrum disorder, other
23    psychotic disorders.
24              THE COURT REPORTER:  I'm sorry?
25              THE WITNESS:  Yes.  I'm sorry.  I'm so sorry.
```

*** DAILY TRANSCRIPT ***

```
1    A    Her diagnosis --

2              THE COURT:  Make sure your microphone is on.

3    A    She was given provisional diagnosis of unspecified

4    schizophrenia spectrum and other psychotic disorder.

5    BY MR. SHELSON:

6    Q    And what is the schizophrenia spectrum disorder?

7    A    It is a disorder of thought, described as a serious mental

8    illness where individuals may experience symptoms of auditory

9    hallucinations or visual hallucinations or delusional or

10   believe things that are not true.

11   Q    You found that the individuals you interviewed in

12   Mississippi, that 100 percent of them were not opposed to

13   living in the community?

14   A    Yes.

15   Q    All right.  And did you testify that that finding did not

16   surprise you?

17   A    I did.

18   Q    And why did that finding not surprise you?

19   A    It didn't surprise me because in my years of working with

20   individual who have mental illness of varying ranges, I have

21   not encountered anyone who had a desire to receive services in

22   a hospital or in a restrictive setting if those services were

23   available to them in the community.

24   Q    And does that include your experience with individuals who

25   were hospitalized in a state hospital in Alabama?
```

```
1   A   Yes.

2   Q   Do many adults with SMI think they have no mental illness

3   at all?

4   A   I'm not able to answer about "many."  Are there some who

5   would deny having a mental illness?  Yes.  But I can't

6   attribute a percentage or a number to that.

7   Q   So does it surprise you that adults with SMI who are

8   hospitalized think they should never have been hospitalized?

9   A   If you could repeat that once more, please?

10  Q   I will ask it differently.  Let's talk about person 1.

11  This is on page 10 of 124 of your report.  Remember this, that

12  person 1 described South Mississippi State Hospital as a joke

13  and that it was worse than jail?

14  A   Yes.

15  Q   When people say that about state hospitals, does it

16  surprise you?

17  A   It doesn't surprise me.

18  Q   Let's talk about your experience with the Alabama

19  Department of Mental Health.  Can we refer to the Alabama

20  Department of Mental Health as the ADMH?

21  A   Yes.

22  Q   Okay.  And did you work for the ADMH for approximately 31

23  years, from 1985 to 2016?

24  A   Yes, I did.

25  Q   And did you retire on October 1st, 2016?
```

```
1    A    Yes.  I did.
2    Q    All right.  Were you a senior staff psychologist at the
3    Taylor Hardin Secure Medical Facility from 1985 through 1988?
4    A    Yes.
5    Q    What is that facility?
6    A    That is the forensic facility for the State.
7    Q    Were you the director of psychological assessment services
8    at Bryce Hospital 1988 to 1989?
9    A    Yes.
10   Q    And what is Bryce Hospital?
11   A    Bryce Hospital is a civil commitment hospital operated by
12   the Department of Mental Health.
13   Q    And were you then the director of neuropsychology service
14   at Bryce Hospital from 1989 through 1994?
15   A    Yes.
16   Q    So you were out -- you were at Bryce Hospital for a period
17   of about six years?
18   A    That's right.
19   Q    When you were at Bryce Hospital, did you treat adults with
20   SMI?
21   A    I provided psychological evaluations and neuropsychological
22   evaluations on individuals at Bryce Hospital, yes.
23   Q    When you were at Bryce Hospital, was it the most integrated
24   setting appropriate to the needs of the patients you treated?
25   A    No.
```

*** DAILY TRANSCRIPT ***

```
1   Q    And why do you say no?

2   A    I think of an integrated setting being a setting where an

3   individual has the opportunity to live and interact with

4   individuals who do not have a mental illness, and the only

5   persons that a consumer would interact with at Bryce Hospital

6   would be staff persons, so I don't think of a hospital as being

7   an integrated setting at all.

8   Q    Was it the least restrictive setting according to their

9   needs at the time?

10  A    Given that individuals were there under a civil commitment

11  order, that determination had been made, yes.

12  Q    When you were at Bryce Hospital, were the individuals there

13  appropriate for and would benefit from community-based

14  services?

15  A    Yes.

16  Q    Do you know of anyone who would not benefit from

17  community-based services?

18  A    I can't think of anyone who would not benefit from

19  community-based services in the general sense.

20  Q    Can you think of anyone who would not be appropriate for

21  community-based services?

22  A    I think that there are times when, again, based on the

23  symptom presentation and behaviors, that an individual might

24  not be appropriate for community-based services at a specific

25  time.
```

*** DAILY TRANSCRIPT ***

1   Q    What are such times?

2   A    That would vary depending on the individual.  I think in

3   terms of persons who are persistently aggressive towards

4   others, and I don't mean every now and then but persistently

5   exhibiting aggressive behavior that might not be able to be

6   managed in a community setting, individuals who have an

7   extensive history of behavior such as fire setting, but those

8   are not the typical -- typical behaviors, but that --

9   Q    In your experience in the state hospitals of Alabama, how

10  often were people who were admitted fall into just those two

11  categories?

12  A    I'm not able to say.

13  Q    Do you agree that the majority of people who you came in

14  contact with in the state hospitals in Alabama did not fall

15  into those two categories?

16  A    Did not fall into those two categories.

17  Q    Okay.  Were you the Facility Director 1 at the Mary Starke

18  Harper Geriatric Psychiatric Center from 2003 through 2007?

19  A    Yes.

20  Q    And what is that facility?

21  A    It's an acute care or psychiatric hospital for individuals

22  65 and over.

23  Q    What are the admission criteria for that facility?

24  A    Aside from the age requirement, it would be the commitment

25  criteria of having serious mental illness, danger to self or

1    others, and the presence of an illness that, absent treatment,

2    could worsen.

3    Q    In your experience, people 65 and older with serious mental

4    illness, can it be difficult to find placements for them in the

5    community?

6    A    It can be.

7    Q    So what is the purpose of a facility like Mary Starke

8    Harper Geriatric Psychiatric Center?

9    A    The purpose of the Harper Center was to provide short-term

10   acute care services to stabilize and return the geriatric

11   population either to home or community nursing homes or the

12   environment that they came from.

13   Q    When you were at that facility, was it the least

14   restrictive setting for the people who were admitted to it?

15   A    In all cases, no.  If I'm understanding your question, was

16   it the least restrictive, no.

17   Q    Then why were they there?

18   A    Because they were under a commitment.

19   Q    A commitment from a court?

20   A    A commitment from a court.

21   Q    So it's your view that in those instances, the courts just

22   made a mistake?

23   A    In some cases, yes.

24   Q    And what did you do about it?

25   A    Our responsibility was if there was someone there who did

1   not need to be there, to initiate plans for expediting

2   discharge.

3   Q   And if a court in Mississippi mistakenly sent someone to a

4   state hospital in Mississippi, is that what you would expect a

5   state hospital in Mississippi to do?

6   A   I can't say that I formulated any opinions about what the

7   State of Mississippi should do.

8   Q   Were you the associate commissioner of mental health and

9   substance abuse services division from July 2012 through

10  September 2016?

11  A   Yes.

12  Q   And was that the position you held with ADMH until you

13  retired?

14  A   Yes.

15  Q   When you became -- I'm just going to say associate

16  commissioner from now on.  Would that be okay?

17  A   That's fine.

18  Q   Thank you.  When you became associate commissioner in

19  July 2012, did Alabama have six state hospitals?

20  A   Yes.

21  Q   Were they Bryce Hospital, Taylor Hardin Secure Medical

22  Facility, Mary Starke Harper Center, Searcy Hospital, Greil

23  Hospital, and North Alabama Regional Hospital?

24  A   Yes.

25  Q   And in 2012, did Searcy and Greil close?

```
 1    A    Yes.
 2    Q    And in 2015, did North Alabama Regional Hospital close?
 3    A    Yes.
 4    Q    So when you retired in October 2016, Alabama still had
 5    three state hospitals that were open?
 6    A    Yes.  That's correct.
 7    Q    Okay.  And they were the ones we've talked about earlier,
 8    correct, Bryce Hospital, Taylor Hardin, and Mary Starke?
 9    A    Yes.
10    Q    Does Alabama have regional community mental health centers?
11    A    Yes.
12    Q    Does Alabama deliver its community-based services through
13    those community mental health centers?
14    A    And other providers.  But, yes, through the community
15    mental health centers and other community hospitals and other
16    providers, yes.
17    Q    Did Alabama have 24 regions when you retired?
18    A    That sounds right, yes.
19    Q    And do the CMHCs -- CMHCs, community mental health
20    centers -- do the CMHCs in Alabama cover certain counties?
21    A    Yes.
22    Q    And are the CMHCs in Alabama operated by the counties?
23    A    The CMHCs are operated by the -- a board of directors, a
24    310 boards that are local boards.
25    Q    Right.  So the boards are not Alabama Department of Mental
```

1   Health individuals?

2   A    No.  No.

3   Q    And then does the ADMH certify the CMHCs in Alabama?

4   A    Yes.

5   Q    And does ADMH provide funding to the CMHCs?

6   A    Yes.

7   Q    And generally speaking, what form does that funding take?

8   A    By contract, funding is primarily state dollars.  I'm not

9   sure that --

10  Q    Is it generally by state grants or state contract or what?

11  A    By contract.

12  Q    But it's -- by contract, ADMH pays state dollars to the

13  CMHCs?

14  A    If I'm understanding the question correctly, yes.

15  Q    Okay.

16  A    Yes.

17  Q    Is the structure of CMHCs in Mississippi similar to the

18  structure of CMHCs in Alabama?

19  A    I don't know enough about the structure of the CMHCs in

20  Mississippi to render an opinion.

21  Q    Do you recall in your deposition if you testified that the

22  structure is similar?

23  A    Yeah, I probably did.  The rest of what I was going to say

24  was I don't have any reason to believe that they aren't, but I

25  simply did not engage in a study or analysis of the CMHCs in

1   Mississippi.

2   Q   When you were the associate commissioner, what percentage

3   of the patients in Alabama's state hospitals were opposed to

4   receiving community-based services?

5   A   I -- I have no idea.

6   Q   When you were the associate commissioner, do you know what

7   percentage of the patients in Alabama state hospitals were

8   appropriate for or would have benefited from community-based

9   services?

10  A   No, I can't say that I have that information available to

11  me.

12  Q   When you were the associate commissioner, were any patients

13  sent to jail in Alabama on nothing but a civil commitment order

14  immediately before going to an Alabama state hospital?

15  A   I don't know specific cases.  I certainly imagine that

16  there were.

17  Q   Do jails in Alabama have the resources to address mental

18  health issues?

19  A   I have not -- I don't have that information available to

20  me.  From my own experience, I know that some do, but most do

21  not.

22  Q   And to your knowledge, is that a nationwide problem?

23  A   Again, I can't say that I have done the research or

24  analysis to know exactly, but reason tells me that yes.

25  Q   To your knowledge, is lack of resources to address mental

```
 1  health issues also an issue in the federal prison system?
 2  A    I'm not able to speak to that.
 3  Q    In Alabama, excluding forensic patients, are all
 4  commitments to state hospitals involuntary commitments pursuant
 5  to a court order?
 6  A    Yes.
 7  Q    In Alabama, is a standard for commitment to a state
 8  hospital danger to self or others?
 9  A    Along with the other.
10  Q    Well, is that one of the criterion?
11  A    Yes.
12  Q    Are there other criteria?
13  A    Yes.
14  Q    What are they?
15  A    The presence of a mental illness.
16  Q    And any others?
17  A    You've mentioned the danger to self or other.  The -- that
18  treatment is available and, absent treatment, the person would
19  be reasonably expected to continue to decline.
20  Q    As you downsize state hospitals, should you increase
21  community-based services?
22  A    If the question is in relation to what happened in Alabama?
23  Q    It's not, so let me -- in general, do you agree that as you
24  downsize state hospitals, you should increase community-based
25  services?
```

```
 1              MR. CASTILLO:  Objection, Your Honor.
 2    Dr. Bell-Shambley is not here as a systems expert.  She is
 3    doing a client -- it's outside the scope --
 4              THE COURT REPORTER:  I'm sorry?
 5              THE COURT:  Make sure you're speaking into the
 6    microphone.
 7              MR. CASTILLO:  It is outside the scope of her
 8    testimony and her work in this case.
 9              THE COURT:  Okay.  I'm going to overrule the
10    objection.  She can answer if she can.
11    BY MR. SHELSON:
12    Q   Do you need the question again?
13    A   Yes, please.
14    Q   Okay.  In general, do you believe as you downsize state
15    hospitals, you should increase community-based services?
16    A   Yes.
17    Q   As associate commissioner, did you oversee a state hospital
18    psychiatric transformation?
19    A   Yes, I oversaw the transformation of hospitals within the
20    system.
21    Q   As part of that process that you were involved in, did ADMH
22    give the community mental health centers the responsibility for
23    developing the plans and services that would be needed once the
24    hospitals closed?
25    A   Yes.
```

```
1    Q    And when you were involved in that process, were the two

2    regions in Alabama that were impacted by the hospital closings

3    Regions 2 and 4?

4    A    There -- no.

5    Q    What were the regions impacted?

6    A    Well, the planning for the downsizing, there may be

7    reference -- well, answer the question I'm asked.   To

8    downsizing efforts that included 2 and 4, the planning for the

9    closure of the hospitals was actually statewide, and the

10   potential for impact on all of the regions within the state,

11   because there were some statewide shared services.

12   Q    Yeah.  Okay.  Where is Region 2?

13   A    Region 2 is Birmingham, Tuscaloosa, kind of central north

14   part of the state.

15   Q    Where is Region 4?

16   A    Region 4 is southern part of the state.

17   Q    On the coast?

18   A    On the coast, as well as kind of across the Washington

19   counties.

20   Q    Do you believe ADMH acted reasonably in having the CMHCs

21   identify the services they believe were needed in that process?

22   A    Acted reasonably?

23   Q    Yes.

24   A    Yes.

25   Q    Why did you believe that was a good approach?
```

1    A    The centers, the community mental health centers, again,

2    and additional community providers, the Department of Mental

3    Health does not provide direct community-based services.  We

4    rely on our partners with the community mental health centers

5    as well as other community providers.

6              THE COURT REPORTER:  I'm sorry?

7              THE WITNESS:  I'm so sorry.  I'm sorry.

8    A    Direct services in the community.  And so we relied on the

9    individuals who were the experts in the provision of direct

10   community services to develop plans to say what additional

11   services or expansion or augmentation of existing services were

12   needed.

13   BY MR. SHELSON:

14   Q    Does the continuum of mental health care include both

15   community-based services and state hospitals?

16   A    The continuum in Alabama?

17   Q    Do you know what -- are you familiar with the term

18   "continuum of care" in the mental health field?

19   A    Yes, I am.

20   Q    What does that mean to you?

21   A    It means an array of services across different service

22   environments where an individual is able to receive services

23   and as step-wise or progression may move from one level of the

24   continuum to the next, hopefully in the direction from more

25   restrictive to less restrictive.

1   Q    My question is this:  In the mental health field, does a

2   continuum of care include both community-based services and

3   state hospitals?

4   A    Yes.

5   Q    All right.  You reviewed 25 individuals in Mississippi who

6   were living at the time?

7   A    Yes.

8   Q    And at the time of your review, four of those 25 were in a

9   State Hospital?

10  A    That's correct.

11  Q    So at the time of the interviews, 21 of the 25 were in the

12  community.  Is that correct?

13  A    That's correct.

14  Q    And did you also find that 19 of the 25 individuals you

15  reviewed were appropriate for PACT?

16  A    If I may get to that part of the report?

17  Q    Sure.

18  A    Yes.

19  Q    Okay.  And I'll represent to you that 19 of 25 is

20  76 percent.  To your knowledge, is there any state that

21  provides PACT services to 76 percent of the people it

22  discharges from its state hospitals?

23  A    I don't know.

24  Q    When you were with the ADMH, did Alabama provide PACT

25  services to 76 percent of the individuals it discharged from

1    its state hospitals?

2    A    No.

3    Q    Do you know what percentage of individuals it provided PACT

4    services to who were discharged from its state hospitals?

5    A    I do not.

6    Q    Do you know how many PACT teams Mississippi would need to

7    be able to provide PACT services to 76 percent of the people it

8    discharges from its state hospitals?

9    A    No, I do not.

10   Q    Do you know how much it would cost to provide that quantity

11   of PACT teams?

12   A    No, I do not.

13   Q    Has Alabama made any modifications to its PACT model for

14   rural areas?

15   A    Yes.

16   Q    Have those modifications included reducing the number of

17   staff on rural PACT teams?

18   A    Yes.

19   Q    Were those staffing modifications made because it's

20   difficult to recruit staff for rural areas?

21   A    The modifications were made for that reason as well as the

22   level of individuals in rural areas needing the service, so

23   yes.

24   Q    In Alabama, are the PACT teams operated by the CMHCs?

25   A    Yes.

1   Q    In Alabama, does funding for PACT include both state funds

2   and Medicaid funds?

3   A    Yes.

4   Q    Doctor, this is on page 6 of your report.

5   A    Okay.

6   Q    And I'm going to ask you about this paragraph here.  It's

7   the third from the bottom.  Did you find that all 25

8   individuals could benefit from mobile crisis service or crisis

9   residential services?

10  A    Yes.

11  Q    Obviously, that's 100 percent of the individuals.  Is that

12  correct?

13  A    That's correct.

14  Q    Do you know how many mobile crisis teams Mississippi would

15  need to provide mobile crisis services or crisis residential

16  services to 100 percent of the people it discharges from its

17  state --

18  A    No, that was outside of the scope of my work to --

19  Q    Do you know how much it would cost to provide that quantity

20  of mobile crisis or crisis residential services to that in

21  Mississippi?

22  A    I do not.

23  Q    We discussed earlier that three state hospitals in Alabama

24  were closed during the 2012 to 2015 time frame.  Do you recall

25  that?

```
1    A    Yes.
2    Q    Do you know what percentage of the people who were
3    discharged when those hospitals were closed received mobile
4    crisis or crisis residential services?
5    A    I do not -- I do not know.  I don't have --
6    Q    Do you know what --
7    A    -- recall.
8            MR. SHELSON:  I'm sorry.
9    BY MR. SHELSON:
10   Q    Do you know what percentage of them received PACT services?
11   A    I do not.
12   Q    Based on your experience in Alabama, is it realistic to
13   fund mobile crisis services or crisis residential services for
14   100 percent of the people discharged from state hospitals?
15   A    I'm thinking to understand the question.  Could you repeat
16   the question again, please?
17   Q    Yes, ma'am.  Based on your experience in Alabama, is it
18   realistic to fund mobile crisis or crisis residential services
19   for 100 percent of the people discharged from state hospitals?
20   A    I guess the question to me sounds as though there is an
21   assumption that 100 percent of the people would be in need of
22   this service, and I don't think that's an accurate assumption,
23   so --
24   Q    If the assumption were accurate, would it be realistic to
25   fund those services in that quantity?
```

1   A   Realistic in terms of the actual resources to do that?

2   Q   Yes, ma'am.

3   A   I don't think so.

4   Q   Based on your experience in Alabama, is it realistic to

5   fund PACT services for 76 percent of the people discharged from

6   state hospitals?

7   A   I can't answer that without --

8   Q   Without what?

9   A   Without additional information.

10   Q   Such as what?

11   A   Such as data to suggest or to evaluate whether indeed what

12   is the percentage of the people as we did when we were looking

13   at closure and downsizing of the hospitals and the individual

14   assessments of what individuals needed.

15   Q   Did you find that 76 percent of the individuals you

16   reviewed in Mississippi could benefit from mental health

17   therapy?  This is also on page 6 of your report.

18   A   Yes.

19   Q   Okay.  Do you know what Mississippi would have to do to

20   provide mental health therapy to 76 percent of the people

21   discharged from its state hospitals?

22   A   I'm sorry.  I believe the number is 96 percent for mental

23   health therapy.

24   Q   You're correct, and I'm wrong.  Do you know what

25   Mississippi would have to do to provide mental health therapy

*** DAILY TRANSCRIPT ***

```
1   to 96 percent of the people it discharges from its state
2   hospitals?
3   A   I do not.
4   Q   Do you know how much it would cost to do that?
5   A   I do not.
6   Q   Now, this number -- do you have Exhibit 408.A in your
7   binder?
8   A   I do.
9   Q   And that's an addendum to your report?
10  A   Yes.
11  Q   In what percentage of the individuals that you reviewed in
12  Mississippi did you find needed permanent supported housing?
13  A   I found that 12 individuals in my sample, 48 percent,
14  needed permanent supported housing.
15  Q   Do you know what Mississippi would have to do to provide
16  permanent supported housing to 48 percent of the people it
17  discharges from its state hospitals?
18  A   No, I don't.
19  Q   Do you know how much it would cost to do that?
20  A   I do not.
21  Q   And then sticking with Exhibit P-408A, what percentage of
22  individuals did you find were appropriate for and would benefit
23  from substance use disorder treatment?
24  A   I found that 18 of the 25, 72 percent, would benefit from
25  substance use disorder treatment.
```

1    Q    Do you know what Mississippi would have to do to provide

2    substance use disorder treatment to 72 percent of the

3    individuals it discharges from its state hospitals?

4    A    No.

5    Q    Do you know how much it would cost to do so?

6    A    I do not.

7    Q    Would you look at page 7 of your report, please.

8    A    Yes.

9    Q    And it starts on 7.  I'm looking at the last bullet point

10   on page 7.  Does it read, "Concern about the adequacy of a

11   recovery-oriented environment in personal care homes.  It is

12   unclear whether the responsible State entities are monitoring

13   compliance with applicable standards and taking remedial action

14   when PCH providers are out of compliance"?

15   A    I see that, yes.

16   Q    Did you find any instance where a PCH provider was out of

17   compliance in Mississippi?

18   A    I did not evaluate the personal care homes for compliance.

19   So, no, that was not a part of my work.

20   Q    With respect to the 26 individuals you reviewed, did you

21   find any instances where an individual was receiving a dose of

22   medication that you objected to?

23   A    Again, that was outside of the scope of my work to make

24   decisions regarding the dosage of medications.

25   Q    In your experience, are there instances where a patient can

880

| | |
|---|---|
| 1 | be prescribed more than one antipsychotic medication at a time? |
| 2 | A    There are instances where the prescriber is, according to |
| 3 | standards of care and practice, if an individual is going to be |
| 4 | prescribed more than one class of medications or antipsychotic |
| 5 | medications, that they are expected to justify the rationale |
| 6 | for that and with appropriate justifications. |
| 7 | Q    With appropriate justifications, that's an acceptable |
| 8 | practice? |
| 9 | A    Yes. |
| 10 | Q    Doctor, would you turn to page 23 of 154 of your report and |
| 11 | person 4? |
| 12 | A    Yes. |
| 13 | Q    I'm sorry I hesitated, because part of what I was going to |
| 14 | have you read or show you is redacted.  But, anyway, all right. |
| 15 | This is again page 23 of 124. |
| 16 | A    Uh-huh. |
| 17 | Q    And I'm here at the sentence.  At the time you interviewed |
| 18 | person 4, was he living independently in an apartment in the |
| 19 | community? |
| 20 | A    Yes. |
| 21 | Q    And did you find that person 4 is at serious risk of |
| 22 | institutionalization? |
| 23 | A    I did. |
| 24 | Q    This is page 25 of 124 of your report, still on person 4. |
| 25 | The highlighted sentence, does it read, "Person lives |

```
1   independently in his own apartment, receives SSI, and manages

2   his own funds"?

3   A   Yes.

4   Q   If we could turn to person 23 on page 100 of 124?

5   A   Yes.

6   Q   Okay.  Are you ready?

7   A   Uh-huh.

8   Q   When you interviewed person 23, was he living independently

9   in his home in the community?

10  A   Yes.

11  Q   When you interviewed person 23, he was not having any

12  problems with his medication, was he?

13  A   No.

14  Q   When you interviewed person 23, was he doing well living

15  independently in the community?

16  A   Yes.

17  Q   Did you find person 23 to be at serious risk of

18  institutionalization?

19  A   I did.

20  Q   Can we turn to person 25, please?  And this person starts

21  on page 108 of 124.

22  A   Okay.

23  Q   I think we established in your testimony earlier that

24  person 25 is the daughter of HB who testified this morning.  Is

25  that correct?
```

1    A    Yes.

2    Q    And person 25 is the person who was referred to as SB in

3    court this morning?

4    A    Yes.

5    Q    Is that correct?  During the 1980s, was person 25

6    hospitalized in Georgia and Alabama?

7    A    Yes.

8    Q    Were those state hospitals?

9    A    I am not certain that they were state hospitals.  I know

10   some of the hospitals -- some of the records that I saw for

11   Georgia were not state hospitals.  And I believe the hospital

12   that was referenced in Alabama was not a state hospital.

13   Q    Are person 25's most consistent diagnoses borderline

14   intellectual functioning and borderline personality disorder?

15   A    Yes.

16   Q    What is borderline intellectual functioning?

17   A    Borderline intellectual functioning by criteria is

18   intellectual functioning that is above 69, in the 70 to 79

19   range by accepted measured intellectual assessments, and

20   individuals who may have some difficulties in judgment, in

21   decision-making, but is not at a level that would be identified

22   as intellectually deficient.

23   Q    So in practical terms, how would that affect such a

24   person's daily functioning?

25   A    Individual may need some extra guidance, teaching, training

1   on activities of daily living, ADLs.

2   Q    In 2012, was person 25 discharged from North Mississippi

3   State Hospital to a personal care home?  This is on page 108 of

4   your report.

5   A    Yes.

6   Q    Okay.  And did she -- was she kicked out of that personal

7   care home?  This is on page 109 of your report, the first full

8   paragraph, second sentence.

9   A    Yes.  What's documented there is she reported that she was

10  kicked out of the last personal care home.

11  Q    And then does your report state that she subsequently lived

12  in an apartment?

13  A    Yes.

14  Q    And did she -- the highlighted part, "She said she then

15  moved in with three girls that she met, and according to her,

16  she recognized this was a *bad decision*.  She said her father,

17  who is her conservator, *had me committed because I was living*

18  *with bad people*."

19  A    Yes.

20  Q    That's what she reported to you?

21  A    That's what she reported.

22  Q    Is your housing recommendation, and this is page 110 of

23  your report -- let me start over.  Is your housing

24  recommendation for person 25 a small two- to four-person

25  residential placement with 24/7 supervision?

1  A    Yes.

2  Q    Why 24/7 supervision?

3  A    Because this is an individual who is -- the

4  recommendation -- she has been in the hospital in a restrictive

5  environment where she has received supervision and not -- and

6  decisions being made for her.  My recommendations are based on

7  transitioning and providing the supervision and supports with

8  the hope that as she continues to live in the community, that

9  the level of supervision could be decreased based on her

10 functioning.

11 Q    After you interviewed person 25, and still in 2018, do you

12 know whether person 25 was discharged from Mississippi State

13 Hospital?

14 A    I heard this morning that she had been discharged.

15 Q    Do you know anything about that other than what you heard

16 this morning?

17 A    (Shakes head in negative response.)

18 Q    Okay.  Then I will move on.

19     I want to refer you to page 3 of your report, and the

20 paragraph at the top of the page, the sentence that starts

21 here.  It's the -- there we go.

22 A    Okay.

23 Q    It starts here.  Does that read, "Under my administration,

24 ADMH expanded community-based service capacity, particularly in

25 the areas of supported employment and integrated housing, and

```
 1    increased the number of certified peer support specialists"?
 2    Did I read that correctly?
 3    A    Yes.
 4    Q    All right.  Do you hold Alabama's mental health system out
 5    as a model for Mississippi?
 6    A    No, I do not.
 7    Q    Why don't you?
 8    A    One, I recognize that there are challenges from my work in
 9    Alabama.  I recognize that the system is not perfect.  I
10    certainly did a lot of work that I was proud of and some
11    accomplishments that were I think meaningful for the lives of
12    those individuals served, but certainly I hold that -- I don't
13    hold that out as a model for Mississippi or any other state.
14    Q    When you retired from ADMH in 2016, do you know how many
15    people were receiving supported employment services?
16    A    I do not.
17    Q    When you retired from ADMH in 2016, do you know how many
18    people were receiving integrated housing?
19    A    I do not.  I don't want to hazard a guess.  I have
20    certainly numbers in my head but I don't want to guess, so, no,
21    I do not.
22    Q    When you retired from ADMH in 2016, do you know how many
23    certified peer support specialists Alabama had?
24    A    I do not.  I have a number, and I know we differentiated
25    between those individuals who were certified peer specialists
```

1    and those individuals who were employed as certified peer

2    specialists, and I know the number of individuals that were

3    certified as peer specialists was significantly greater than

4    the numbers who were actually being employed in the community

5    mental health centers or in various capacities.

6    Q    Just a couple more questions along this line and then I

7    will move on.  When you retired from ADMH in 2016, do you know

8    how many PACT teams Alabama had?

9    A    At that time, there were I believe two full fidelity PACT

10   teams.

11   Q    So not every region in Alabama had a PACT team?

12   A    Not every region had full fidelity PACT teams.

13   Q    Were you finished?

14   A    I was about to say that the regions had -- that, as we

15   talked about earlier, modified teams, the ACT teams and in-home

16   teams.

17   Q    Do other regions in Alabama have one or the other, either a

18   full fidelity PACT team or a modified PACT team?

19   A    Yes, I believe so.

20   Q    Are you sure about that?

21   A    I'm not sure about that.

22   Q    When you retired from ADMH in 2016, do you know how many

23   mobile crisis teams Alabama had?

24   A    No.  No, I do not.  I can't remember.  I don't have -- the

25   information certainly was available to me, but I can't recall.

*** DAILY TRANSCRIPT ***

1    Q    When you retired from ADMH in 2016, do you know how many

2    crisis stabilization unit beds Alabama had?

3    A    I don't recall.

4    Q    When you retired from ADMH in 2016, did Alabama have a

5    strategic plan, Alabama DMH?

6    A    Have a strategic plan for --

7    Q    Did the Alabama Department of Mental Health have a

8    strategic plan?

9    A    Yes.

10   Q    Did it have an *Olmstead* plan?

11   A    There was an *Olmstead* plan that was dated and had not been

12   updated.  That's my recollection of the *Olmstead* plan that was

13   in existence.

14   Q    When you say it was dated, do you --

15   A    Old.

16   Q    Yeah.  How old?

17   A    I don't recall.

18   Q    Was it a functioning plan at the time?

19   A    It was a plan that was -- much discussion occurred

20   regarding pulling together a group of individuals to work on

21   updating that plan.

22   Q    That was in process when you retired?

23   A    Yes.

24   Q    Okay.  Are there any unmet needs for adults with SMI in

25   Alabama?

1    A    Certainly there are.

2    Q    Are there unmet needs for adults with SMI in Alabama in

3    part because of insufficient funding for community-based

4    services?

5    A    Yes.

6    Q    Are there unmet needs for adults with SMI in Alabama in

7    part because of mental health workforce shortages in some

8    areas?

9    A    Most likely, yes.  Again, I can't quote a specific source,

10   but from my experience, yes.

11   Q    Are there mental health workforce shortages that are

12   particularly acute in rural areas of Alabama?

13   A    Again, I can't answer that.  I don't know.  Logics suggest

14   that the answer would be yes, but I don't have data to support

15   it.

16   Q    Do you know of any state that has no unmet needs for adults

17   with SMI?

18   A    I do not.

19   Q    Are there any barriers to receiving community-based

20   services for adults with SMI in Alabama?

21   A    Aside from the barriers that we just discussed, such as

22   funding of services?

23   Q    Well, let me be specific so I can hopefully finish soon.

24   Is transportation a barrier to adults receiving community-based

25   services in Alabama, especially in rural areas?

```
 1    A    It certainly can be.  I am aware of some efforts that were

 2    put in place to try and address that barrier for some parts of

 3    the state for rural areas, but certainly it can be.

 4    Q    Are there any barriers to housing for adults with SMI in

 5    Alabama?

 6    A    Yes.

 7    Q    Do those barriers include that there is not enough

 8    available affordable housing to meet the need?

 9    A    Yes.

10    Q    In Alabama, is funding a barrier to being able to provide

11    sufficient community-based services for adults with SMI?

12    A    Yes.

13              MR. SHELSON:  Your Honor, may I approach the witness?

14              THE COURT:  Yes, you may.

15    BY MR. SHELSON:

16    Q    Doctor, have you seen Exhibit D-239 before today?

17    A    I believe I saw this exhibit during my deposition.

18    Q    I will represent to you this was Deposition Exhibit D-2.  I

19    want to direct your attention to page 2 of D-239.  That first

20    highlighted paragraph, does it read, "Associate Mental Health

21    Commissioner Dr. Beverly Bell-Shambley said she met with

22    hospital staff Tuesday to announce the closure and that

23    consumers served by the facility will transition into the

24    community"?

25    A    Yes.
```

1    Q    Is that an accurate statement?

2    A    Yes.

3    Q    And then the next paragraph, does it read, "Patients will

4    receive services from the community mental health centers.

5    Bell-Shambley said some centers have contacts with local

6    hospitals but they will have community healthcare in place much

7    like they did when Greil and Searcy closed in 2012"?  Is that

8    quote accurate?

9    A    Yes.

10             MR. SHELSON:  Your Honor, we move to admit Exhibit

11   D-239 into evidence.

12             THE COURT:  Any objection from the United States?

13             MR. CASTILLO:  Yes, Your Honor.  We object on the

14   grounds of relevance and under Rule 403.

15             THE COURT:  Let me -- any response?

16             MR. SHELSON:  Yes, Your Honor.  In both her report and

17   in her testimony today, Dr. Bell-Shambley talked about that

18   while she was the associate commissioner, her involvement in

19   the transition of the downsizing or the closing of state

20   hospitals and transition to community-based care and, again,

21   that's both in her report and in her testimony today, and this

22   concerns exactly that issue.

23             THE COURT:  I'm going to overrule the objection.

24        (EXHIBIT D-239 MARKED)

25             MR. SHELSON:  Your Honor, I'm going to try to finish

*** DAILY TRANSCRIPT ***

1    up in 10 minutes.

2                THE COURT:  Yes.

3                MR. SHELSON:  Thank you.

4    BY MR. SHELSON:

5    Q    Doctor, would you -- the next exhibit there is Exhibit

6    D-241.  Would you look at that, please?

7    A    Yes.

8    Q    All right.  Did you see -- did we discuss Exhibit D-241 in

9    your deposition?

10   A    Yes, I believe you presented it to me and asked --

11   Q    And are you familiar with AL.com?

12   A    I am familiar with AL.com.

13   Q    And what is that?

14   A    Excuse me.  A news source in the state of Alabama.

15   Q    And does this indicate that this article was posted on

16   August 17th, 2016?

17   A    Yes.

18   Q    All right.  This first sentence here that's highlighted,

19   "North Alabama Regional Hospital closed in June 2015, leaving

20   only three state-run psychiatric hospitals in Alabama, all in

21   Tuscaloosa."  Is that an accurate statement?

22   A    It is.

23   Q    Would you -- I'm going to direct your attention to page 2

24   of this article and to the highlighted sentence, "The wait list

25   for Bryce Hospital, one of three facilities still operated by

1    the State, peaked at almost 60 patients one day earlier this

2    year, up from an average of less than 10 in 2012, according to

3    the Alabama Department of Mental Health."  Do you dispute that

4    the waiting list for Bryce Hospital peaked at almost 60 one day

5    in 2016?

6    A    I am not able to dispute nor agree to it.

7    Q    I'll move on then.  I'm going to direct your attention to

8    page 7 of Exhibit D-241.

9    A    Yes.

10         MR. SHELSON:  I'm sorry, Judge.  I'm envious of not

11   having Tim at my disposal, but I will move on.

12         THE COURT:  Okay.

13   BY MR. SHELSON:

14   Q    Does this read, "For every hospital bed closed by the

15   State, officials transferred $60,000 of the $150,000 savings to

16   the community mental health care system.  The amount of funding

17   for community-based services has increased but not as quickly

18   as the decrease in funding for psychiatric hospitals."  Do you

19   agree with that statement?

20         MR. CASTILLO:  Objection, Your Honor.  The document

21   speaks for itself, and there hasn't been any foundation for its

22   reliability or its relevance, so we object.

23         THE COURT:  I'm going to sustain the objection as to

24   lack of foundation right now.

25   BY MR. SHELSON:

*** DAILY TRANSCRIPT ***

1    Q    Would you look at Exhibit D-242, Doctor.

2    A    Yes.

3    Q    Have you seen this document before today?

4    A    Likewise, I saw this document that you presented during the

5    deposition.

6    Q    Do you know who Jimmy Walsh is?

7    A    I do.

8    Q    Who is he?

9    A    Mr. Walsh is an attorney in Alabama who at one point served

10   as the president of the National -- the local chapter, Alabama

11   chapter of National Alliance on Mental Illness.

12   Q    Which is NAMI?

13   A    NAMI, uh-huh.

14   Q    And did you testify earlier today about that you're

15   involved in some way with NAMI?

16   A    With the local chapter of NAMI in Tuscaloosa.

17   Q    And how does that relate to Mr. Walsh's involvement with

18   NAMI?  He was -- he was the -- out of the state NAMI chapter?

19   A    Yes.

20   Q    And you're involved with what chapter?

21   A    My current involvement is with the local chapter in the

22   city that I live, in Tuscaloosa.

23   Q    Okay.  And is the Tuscaloosa chapter of NAMI affiliated

24   with the Alabama state NAMI entity?

25   A    There is some degree of affiliation.

*** DAILY TRANSCRIPT ***

1    Q    Do you agree that there is not adequate funding for

2    Alabama's mental health system?

3         MR. CASTILLO:  Objection, Your Honor.  Asked and

4    answered.

5         THE COURT:  She may answer it.

6    A    I'm sorry.

7    BY MR. SHELSON:

8    Q    Do you agree that there is not adequate funding for

9    Alabama's mental health system?

10   A    Yes.

11   Q    All right.  Let's circle back to when you were associate

12   commissioner.  Was the plan to close state hospitals and shift

13   funds to CMHCs to treat people in the community?

14   A    Yes.

15   Q    All right.  You agree that the funding that was shifted to

16   the CMHCs was not able to fund everything that was needed in

17   the community?

18   A    Yes, I agree.

19   Q    If I could direct your attention to page 7 of your report

20   which, again, is Exhibit PX-408.  And I would like to direct

21   your attention to that first bullet point under "Key Themes."

22   Does it read that, "Inconsistencies in the availability of

23   evidence-based practices across the state.  Interviews with

24   certain CMHCs indicated that they do not have PACT, Supported

25   Employment, or Supported Housing.  There are rural areas that

1  are" -- no.  I will start over.

2      Let me just skip that.  Are there inconsistencies in the

3  availability of community-based services across Alabama?

4  A   I'm certain that there are.  I'm not able to provide

5  specific data.

6  Q   Are there rural areas in Alabama that are greatly in need

7  of community-based services?

8  A   Yes.

9          MR. SHELSON:  May I have a moment to confer, Your

10  Honor?

11          THE COURT:  Yes.

12      (SHORT PAUSE)

13  BY MR. SHELSON:

14  Q   Doctor, is there such a thing as an optimal quantity of

15  community-based services?

16  A   I can't address that.  I have not done the research or

17  studied to know whether there is or is not.

18  Q   You agree that your involvement in this case did not focus

19  on what system changes to Mississippi's mental health service

20  system may be needed?

21  A   It did not.

22  Q   And so in this case you did not evaluate Mississippi's

23  mental health service system?

24  A   I did clinical evaluations of the 26 individuals mentioned

25  in my report.  And as a result of the findings for those

 1    individuals, I came to some conclusions.  But, no, the

 2    evaluation of Mississippi's system was not within the scope of

 3    my duties.

 4    Q    It was not within the scope of your work in this case?

 5    A    Correct.

 6    Q    Thank you, Doctor.

 7         MR. SHELSON:  Thank you, Your Honor.  That's all the

 8    questions I have.

 9         THE COURT:  Mr. Castillo, any redirect?

10         MR. CASTILLO:  Yes, Your Honor.  Just briefly.  And I

11    appreciate your pronunciation.

12         THE COURT:  All right.

13                    **REDIRECT EXAMINATION**

14    BY MR. CASTILLO:

15    Q    All right.  Good afternoon again, Dr. Bell-Shambley.

16    A    Good afternoon.

17    Q    Mr. Shelson asked you about the role of the CMHCs in the

18    Alabama -- the Department of Mental Health, ADMH, I will use

19    it -- in the service development when Alabama downsized the

20    state hospitals during your tenure as the associate

21    commissioner, and I would like to ask you a few more questions

22    about that role.

23         THE COURT:  Keep your volume up, please.

24         MR. CASTILLO:  Yes, sir.

25         THE COURT:  Okay.

*** DAILY TRANSCRIPT ***

1   BY MR. CASTILLO:

2   Q   First I want to direct you to a part of your report, page 2

3   of Plaintiff's Exhibit 408.  And if you actually look on your

4   screen, can you read the highlighted portions?

5   A   My screen is blank with a blue line that says "Out of

6   Range."

7   Q   We will try this way.

8         THE COURT:  There it is.  It popped up.  So go back

9   and do whatever you were doing.  Yeah.

10         THE WITNESS:  It's there now.

11  BY MR. CASTILLO:

12  Q   Can you please read the highlighted portions?

13  A   Yes.  "To close state psychiatric hospitals, it was vital

14  that the community mental health system" --

15         THE COURT:  Hold on.  If you're going to read, slow

16  down.

17         THE WITNESS:  Thank you, Your Honor.

18  A   "To close state psychiatric hospitals, it was vital that

19  the community mental health system be positioned to increase

20  its capacity and serve the influx of new consumers.  It was my

21  responsibility to bring professionals from the hospitals and

22  community together to develop and implement a synchronized

23  effort, one that proved critical to the system of

24  transformation."

25  BY MR. CASTILLO:

*** DAILY TRANSCRIPT ***

1    Q    You can keep going.

2    A    "We were able to realign funding and resources to ensure

3    that the needed services and resources shifted to the community

4    and away from institutional settings."

5    Q    And if you turn the page, there is one more portion I would

6    like you to read.

7    A    Okay.  "The provider network was pressed to expand their

8    cultural mindset from a medical model to a recovery model.

9    Under my administration, ADMH expanded community-based service

10   capacity, particularly in the areas of supported employment and

11   integrated housing, and increased the number of certified peer

12   support specialists."

13   Q    Can you describe generally what ADMH did to expand

14   community-based services as you described in your report?

15   A    It was a collaborative effort with the community providers.

16   And again, the community providers included the community

17   mental health centers as well as community hospitals, as well

18   as probate courts, local hospitals to get buy-in for the

19   transformation that was occurring.  There were at points when

20   community providers' contracts, funding, was at risk because

21   there was an expectation that you are going to know the people

22   in your region or catchment area who are in the hospital and

23   you are going to be vigilant in assuring that those individuals

24   come out of the hospital as quickly as appropriate.  And so

25   that gave them accountability, gave us accountability for

1    monitoring and making sure that people transitioned to those

2    community-based services.

3        There was --

4    Q   If there is more to say, go ahead.  Or if you're done,

5    that's also fine.

6    A   I was just going to say there was also a degree of

7    accountability, and I certainly am not promoting that things

8    were perfect.  It's a challenge.  And it required creativity

9    and negotiations and lots of coming together to recognize that

10   we're trying to get to this step to closure of hospitals and

11   transitioning services, at the same time recognizing that there

12   are other steps to come, because we don't want to transition

13   people from the hospital and reinstitutionalize them in the

14   community.  So it was an ongoing work and work that has to

15   continue.

16       But we, in my opinion, accomplished some meaningful things

17   in those four years, things that I'm proud of.

18   Q   And you mentioned some of those earlier in your testimony

19   today.  You also note here that the provider network was

20   pressed to expand their cultural mindset.  What do you mean by

21   that?  I'm sorry.  Can you just explain what you meant by that?

22   A   To provide training to staff on a recovery-oriented system

23   of care, to -- I can't speak for -- at one time during my

24   tenure, there was a requirement that the centers hired peer

25   specialists to work in their system of care to assist people

1  with transitioning to the community, to provide training.  So

2  those kinds of things.

3  Q   What was ADMH ultimately responsible for in the oversight

4  of the community-based services?  Or, sorry.  Let me ask this a

5  different way.  Was ADMH ultimately responsible for the

6  oversight of the community-based services?

7  A   ADMH's responsibility was ultimately oversight, to a large

8  degree, funding, as well as certification of those community

9  providers.

10  Q   Was ADMH ultimately responsible for ensuring the

11  availability of community-based services?

12  A   I would say the responsibility of assuring the availability

13  of community-based services was with the community mental

14  health centers with the understanding that it was also a part

15  of ADMH's certification requirements, that --

16  Q   Is there any more?

17  A   I guess to answer your question more directly, yes, ADMH

18  ultimately was responsible for assuring appropriate services

19  were available.

20  Q   And why is it important that ADMH, the state agency, retain

21  ultimate responsibility in ensuring the availability of

22  community-based services?

23  A   By law, it is the Department of Mental Health's

24  responsibility for assuring there is a cohesive provision of

25  services for individuals with mental illness, with substance

1   abuse disorders, substance use disorders, as well as

2   intellectual deficiency.  So by law, the Department of Mental

3   Health is entrusted with the responsibility of assuring that

4   those services are available.

5         MR. CASTILLO:  If I can get one minute to confer?

6    (SHORT PAUSE)

7         MR. CASTILLO:  Maybe one second.  No more questions.

8         THE COURT:  Believe it or not, I have no questions for

9   this witness.

10        Dr. Bell-Shambley, let me make sure the record is

11   correct.  D-239 was not admitted into evidence.  Correct?

12        THE CLERK:  Yes, it was.

13        THE COURT:  It's admitted?  D-239 is admitted.  D-241

14   was not, and D-242 was only referred to and was not moved for

15   admission.  Is that correct?

16        MR. SHELSON:  That is correct.

17        MR. CASTILLO:  That is our understanding as well, Your

18   Honor.

19        THE COURT:  All right.  You may step down,

20   Dr. Shambley.

21        Is she finally excused?

22        MR. CASTILLO:  She is excused.

23        THE COURT:  All right.  You may go about whatever

24   duties you have left for today.

25        THE WITNESS:  Dance a jig.

*** DAILY TRANSCRIPT ***

 1          THE COURT:  Dance a jig?  If you're staying in Jackson
 2   overnight, spend some money here.  That's all we ask.
 3          All right.  This concludes the testimony for today.
 4   I'm not going to turn to Ms. Rush and find out how we are going
 5   to do tomorrow.
 6          MS. RUSH:  Your Honor, given my prediction this
 7   morning, I understand.
 8          THE COURT:  That's fine.  That's fine.  We are all
 9   here to have as good of a time as we can.  But let me ask you
10   this.  If your notes -- I'm looking at my notes that I have
11   been taking.  PX-1095 was yesterday's testimony with Byrne,
12   B-Y-R-N-E.  What does your record show, Ms. Summers?  PX-1095.
13          THE CLERK:  I have it as admitted.
14          THE COURT:  You don't have to check now but that's one
15   that I was not sure of based on my notes.
16          MR. SHELSON:  It's in the binder, Your Honor, and I
17   think they offered it and I know we didn't object to anything
18   offered yesterday.
19          THE COURT:  Okay.  All right.
20          All right, then.  We will start up tomorrow morning at
21   9:00 a.m.  On Thursday morning we won't start until 9:30, I
22   think.  It might be 9:30, 9:45 before we can start.  I believe
23   I have a criminal matter that I have to take care of before we
24   start on Thursday morning.  So I just tell you that so you can
25   plan for it.  And that's all we have today.  Thank you so much.

*** DAILY TRANSCRIPT ***

903

1              Oh, I'm sorry.  Is there anything we need to take care

2     of?

3              MS. RUSH:  Nothing else from the United States.  Thank

4     you.

5              THE COURT:  All right.

6              MR. SHELSON:  No, Your Honor.

7              THE COURT:  All right.  We will see everybody tomorrow

8     morning at 9:00.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***

```
 1                        CERTIFICATE OF REPORTER

 2

 3        I, BRENDA D. WOLVERTON, Official Court Reporter, United

 4   States District Court, Southern District of Mississippi, do

 5   hereby certify that the above and foregoing pages contain a

 6   full, true and correct transcript of the proceedings had in the

 7   aforenamed case at the time and place indicated, which

 8   proceedings were recorded by me to the best of my skill and

 9   ability.

10        I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13        This the 11th day of June, 2019.

14

15                        s/ Brenda D. Wolverton
                          U.S. DISTRICT COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```

*** DAILY TRANSCRIPT ***