UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                          CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                        DEFENDANTS



VOLUME 10



BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MORNING SESSION
JUNE 12, 2019
JACKSON, MISSISSIPPI



REPORTED BY:  BRENDA D. WOLVERTON, RPR, CRR, FCRR
Mississippi CSR #1139

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4188



*** DAILY TRANSCRIPT ***

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:      MS. MEGAN RUSH
                              MS. HALEY VAN EREM
 3                            MR. JORGE CASTILLO
                              MR. PATRICK HOLKINS
 4
      FOR THE DEFENDANT:      MR. JAMES W. SHELSON
 5                            MR. REUBEN V. ANDERSON
                              MR. HOWARD DAVID CLARK III
 6                            MS. MARY JO WOODS

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*** DAILY TRANSCRIPT ***

```
 1                        TABLE OF CONTENTS

 2   WITNESSES FOR THE PLAINTIFF:

 3   TRAVIS PATTEN
```

```
 4        Direct Examination by Mr. Castillo              913

 5             Exhibit PDX-13 (for ID)                    917

 6             Exhibit PDX-14 (for ID)                    917

 7             Exhibit PDX-15 (for ID)                    917

 8             Exhibit PDX-16 (for ID)                    919

 9             Exhibit PDX-17 (for ID)                    919

10        Cross-Examination by Mr. Clark                 930

11        Examination by the Court                       933

12        Further Examination by Mr. Clark               938
```

```
13   JUDITH BALDWIN
```

```
14        Direct Examination by Ms. Van Erem             941

15             Exhibit PX-399                             952

16             Exhibit PX-403A                            952

17             Exhibit PX-1108                            975

18             Exhibit PX-1109                            991

19             Exhibit PX-1110                           1009

20             Exhibit PX-1111                           1012

21             Exhibit PX-1112                           1013
```

```
22

23

24

25
```

*** DAILY TRANSCRIPT ***

1          THE COURT:  Good morning.  I apologize for the delay.

2     I was ready to come out.  I got a call at 9:00 o'clock that I

3     had to take care of.

4          Housekeeping matters.  Is there anything we need to --

5     Ms. Rush has something for me.  Going to be spot on today.

6     Right?  I'm just -- we try to --

7          MS. RUSH:  Your Honor, I did want to give you a road

8     map of the day.

9          THE COURT:  Okay.

10         MS. RUSH:  We are -- our first witness will be Sheriff

11    Travis Patten, followed by Dr. Judith Baldwin, one of our

12    experts in our clinical review.  And if we have time, we will

13    get started on Katherine Burson, another expert from our

14    clinical review.

15         THE COURT:  Okay.  Thank you.

16         Well, let me -- when we scheduled this matter, and I

17    know the parties have been working to -- you know, to sort of

18    maybe in response to some of the things that the court has been

19    saying, I do not want either party to feel like you are not --

20    I don't want you to abdicate your responsibility of putting on

21    the case that you wanted to put on.  In no way am I suggesting

22    or trying to interfere with you changing or truncating your

23    case in such a way that you do not make your record in the way

24    that you wanted to make it.  I mean, I cajole you and sort of

25    suggest to you and all of that, but I do not want the parties

1   to feel like the judge is somehow interfering with our ability

2   to put on the case that we wanted to put on.  I'm not doing

3   that.

4          MS. RUSH:  We appreciate that, Your Honor.  And we

5   appreciate all of your suggestions.  But we feel like we have

6   just been able to move a little bit faster than we anticipated.

7   But we appreciate it.  Thank you.

8          THE COURT:  Okay.  All right.  For other logistical

9   housekeeping things, I know on the front end, one of the --

10  maybe that was at the pretrial conference we were talking about

11  post trial briefing, the possibility, the request for the

12  government -- I have two governments here.  I don't need to

13  ignore my own state government.  But the United States had a --

14  sort of laid the predicate that it might ask for a number of

15  weeks to do post trial briefing.

16         And as we -- as you think about your case, I will let

17  you know that I do not intend to give a whole lot of time to do

18  the post trial briefing.  So as you think about how your case

19  is progressing and on how you are doing it, I think -- I think

20  the suggestion was maybe a minimum or a maximum of 60 days or

21  something like that, I believe, as I recall.  I am highly

22  inclined not to do that amount of time.  I think the issues are

23  front and center.  I think -- I don't know if I will need all

24  of that time to digest what I'm hearing and what is going on,

25  so as you're thinking about how your case is evolving, and this

```
1    is for everyone, I do not think I will -- I don't want to

2    delay.  That's my thing.  I don't want to unnecessarily delay a

3    final ruling on this for very long.  So, you know, if I do 60

4    days, that means, you know, that could possibly mean, you know,

5    way into the fall, and I just don't want to do that.

6              Ms. Rush.

7              MS. RUSH:  Thank you, Your Honor.  It would be helpful

8    for us to have a sense, if the court has a preference already,

9    of what kind of post trial findings and filings that the court

10   would prefer.  We would expect a post trial findings in fact

11   and conclusions of law and potentially a post trial brief,

12   but -- if the court would find that helpful.  But that would

13   help us plan --

14             THE COURT:  Right.  That's --

15             MS. RUSH:  -- for timing if you have a sense -- sorry.

16             THE COURT:  I'm sorry.  I mean, that's what I would

17   want, post trial findings of fact, conclusions of law.  And

18   that's all.  But I guess what I was alluding to, I did not --

19   I'm likely -- instead of a 60-day turnaround to do it, it may

20   be like 14 days or something like that.  I mean, it may be a

21   quick turnaround as far as the parties submitting anything

22   because of what I need to do and how soon I need to get it done

23   based on my other obligations in the late summer and fall and

24   winter and staffing and all of that.  So that's what I'm

25   concerned about.  So it would be, you know, findings of fact,
```

1    conclusions of law.

2            The one advantage everyone has here, unlike in most

3    cases, is that we are getting daily transcripts now already, so

4    the record will be done on the day that the trial ends already.

5    You won't have to wait around for a record.  So it will be

6    proposed findings of fact, conclusions of law, and I do -- you

7    know, I know the parties would want to have sufficient time.  I

8    just do not believe that that time will exceed more than two

9    weeks.  I don't know yet, but I don't think it would exceed --

10   only because of how it might impact on what I need to get done.

11   That's all.

12           MS. RUSH:  We will be ready.  Thank you, Your Honor.

13           THE COURT:  All right.  Okay.  The government has all

14   the resources in the world.  They can get it done.  And I say

15   that to both governments.

16           Is there anything else we need to take up before we

17   call our next witness?

18           MR. SHELSON:  Your Honor, just in response to that,

19   the State's position is that conclusions of law and findings of

20   fact make sense, and that, separate from that, a brief, a post

21   trial brief would not be necessary.  That's our position.

22   We're fine with whatever time the court has in mind and we

23   think that reasonable page limits would also be in order.

24           THE COURT:  Oh, yeah, it will be.

25           MR. SHELSON:  Thank you, Your Honor.

*** DAILY TRANSCRIPT ***

```
 1              THE COURT:  All right.  Yes.  And my view of
 2   reasonable may just line up with the parties' view of
 3   reasonable as well.  Thank you, Mr. Shelson.
 4              Is the United States ready to call its next witness?
 5              MR. CASTILLO:  Yes, Your Honor.
 6              THE COURT:  You may proceed.
 7              MR. CASTILLO:  Good morning, Your Honor.
 8              THE COURT:  Good morning.
 9              MR. CASTILLO:  Jorge Castillo for the United States.
10   The United States calls Sheriff Travis Patten as its next
11   witness.
12              THE COURT:  All right.
13                        TRAVIS PATTEN,
14   having first been duly sworn, testified as follows:
15              THE COURT:  Get comfortable, Sheriff Patten.  You're
16   in the hot seat now.  It looks like that seat is wobbling in
17   some way.  But if you're fine, that's good.
18              Just speak directly into the microphone.  Try to speak
19   at a pace at which the court reporter can keep up with you.
20   Allow the attorneys to finish their question or statement
21   before you begin to speak so that the two of you will not be
22   speaking at the same time and just make sure all your responses
23   are verbal, please.
24              So for the record, could you please state and spell
25   your name?
```

```
 1              THE WITNESS:  My name is Travis Patten, T-R-A-V-I-S,
 2   P-, as in Paul, A-T-T-E-N.
 3              THE COURT:  Thank you.
 4              You may proceed.
 5              And you are doing great.  That's -- the volume and
 6   everything is great.
 7              Go ahead.
 8                      DIRECT EXAMINATION
 9   BY MR. CASTILLO:
10   Q    Good morning, Sheriff.
11   A    Good morning.
12   Q    As I'm sure you know, I'm going to ask you several
13   questions today.  For the purpose of this trial, the relevant
14   fact period goes up through December 31st, 2018.  I'm going to
15   ask that your answers focus on that time period.  Okay?
16   A    Yes.
17   Q    Sheriff, what is your current job?
18   A    Sheriff of Adams County, Mississippi.
19   Q    How long have you been the Adams County sheriff?
20   A    Since January 4, 2016.
21   Q    What part of the state is Adams County in?
22   A    Southwest Mississippi.
23   Q    And broadly speaking, what are the responsibilities of the
24   sheriff of Adams County?
25   A    Criminal patrol, criminal investigation.  We serve civil
```

1    process.  We seize property, sell property.  We're over the

2    courthouse.  We're over the jail.  And we do a lot of civil

3    commitments as well.

4    Q    You mentioned you run a jail.  Where is that jail located?

5    A    It's 306 State Street.

6    Q    Where is that in relation to your main sheriff's office?

7    A    It's in the same building.

8         THE COURT:  And that's in Natchez?  You mentioned

9    Adams County.  I don't think you --

10        THE WITNESS:  Yes.  The city of Natchez, Adams County.

11   It is in the city limits of Natchez.

12        THE COURT:  Okay.  Thank you.

13   BY MR. CASTILLO:

14   Q    Do you hold people in your jail who haven't been charged

15   with a crime?

16   A    Yes, we do.

17   Q    And why are they there?

18   A    Civil commitments.

19   Q    Does a mobile crisis team serve Adams County?

20   A    There is a mobile crisis team that's supposed to serve

21   Adams County, but we don't ever see them.

22   Q    Is there a crisis stabilization unit or a CSU in Adams

23   County?

24   A    No.

25   Q    Who do the people of Adams County call in a mental health

*** DAILY TRANSCRIPT ***

1   crisis?

2   A    The Adams County sheriff's office.

3   Q    Is that a problem?

4   A    It is.

5   Q    Have you voiced your concerns about this problem with

6   anybody in the State?

7   A    Yes, I have.

8   Q    With whom?

9   A    Brent Hurley.

10  Q    Have you spoken with other sheriffs about this issue?

11  A    Yes, I have.

12  Q    Have you told any other sheriffs that you are testifying in

13  this case?

14  A    I just told the president of the Sheriffs Association

15  yesterday that I was testifying in this case, and he was glad

16  that I was because he said we all need this help.

17  Q    Let's talk about the civil commitment process for persons

18  with mental illness in Adams County for a minute.  What's the

19  sheriff's office role in a civil commitment process?

20  A    Basically what we do is we pick them up after a commitment

21  has been issued.  We make sure that we get them to the hearing

22  on time.  Once the hearing is done, if they are committed, we

23  transport them to wherever the court has deemed that they need

24  to go.  If it's outpatient, you know, we release them.  But in

25  the meantime, if that hearing is a day or two off, we actually

1   hold them in the jail until we can get them there.

2   Q    And for the people you transport to an inpatient facility,

3   who picks them up?

4   A    We do.

5   Q    Do you hold people in jail while they're going through this

6   process?

7   A    Yes, we do.

8   Q    Where do you hold them?

9   A    We have two holding cells that we retrofitted with a thick

10  padding that we hold them in in our jail.

11  Q    You said they are retrofitted.  What were these cells

12  designed for?

13  A    They were designed as more of your drunk tanks and for

14  people who were combative, people who were coming off of drugs,

15  things of that nature, but they were not originally designed to

16  be mental health -- for mental health patients.

17  Q    Could you describe these holding cells for us?

18  A    They are about a 7-by-8, approximately 7-by-8 cell.  They

19  don't have beds in them or anything like that.  The only thing

20  they have is a toilet and a sink and thick padding all over.

21  Q    I would like to show you some pictures.

22          MR. CASTILLO:  Your Honor, may I approach?

23          THE COURT:  Yes, you may.

24  BY MR. CASTILLO:

25  Q    (Tenders documents.)  Sheriff Patten, I just handed you

1    three documents, Plaintiff's Demonstrative Exhibits 13, 14 and

2    15.  Are these pictures of the commitment cells?

3    A   Yes, they are.

4          MR. CASTILLO:  Your Honor, we present these for

5    identification purposes.

6          THE COURT:  All right.

7      (EXHIBITS PDX-13, PDX-14 AND PDX-15 MARKED FOR

8    IDENTIFICATION)

9    BY MR. CASTILLO:

10   Q   Looking at these pictures, I don't see a bed.  Where do

11   people sleep when they're in the commitment cell?

12   A   We give them a mattress and they sleep on the floor.

13   Q   If you look at Number 13, Plaintiff's Demonstrative

14   Exhibit 13 and 14, there is something on the floor.  What is

15   that?

16   A   If you look at the center, picture 13 here, you'll see that

17   hole is -- that's an actual drain.  And if you look around the

18   edges of that drain, you can see -- you can kind of see how

19   thick the padding is that we had to put in there.  If you look

20   to the right of that where it's kind of awkwardly shaped, that

21   happened when one of our mental health consumers were chewing

22   on the padding.

23   Q   How many people can be held in these commitment cells?

24   A   One.

25   Q   And how many do you have?

1    A    Two.

2    Q    Have you ever needed to hold more than two people who are

3    suffering a mental health crisis?

4    A    Absolutely.

5    Q    Where do they go?

6    A    What we have to do then is we take them upstairs and we

7    have to clear out a regular cell.  And we put them in there and

8    we have to put a 24-hour, seven-day-a-week watch on them, guard

9    on them watching that cell.  Because these cells here

10   (indicating) are equipped with cameras inside the cells.  The

11   ones upstairs are not.

12   Q    How often do you need to use an overflow space to hold

13   people in mental health crises?

14   A    It's quite often.  Because, again, these cells are not just

15   for the mentally ill.

16   Q    I would like to show you some more pictures.

17        MR. CASTILLO:  Your Honor, may I approach?

18        THE COURT:  Yes, you may.

19   BY MR. CASTILLO:

20   Q    (Tenders documents.)  Sheriff Patten?

21   A    Yes.

22   Q    What are the pictures that I just handed you?

23   A    These are two of the cells upstairs in our jail that we

24   clear out when we have an overflow in those two holding cells.

25        MR. CASTILLO:  Your Honor, these images are

1    Plaintiff's Demonstrative Exhibits 16 and 17 which we offer for

2    identification purposes.

3              THE COURT:  Okay.  Any objection from the State?  I

4    did not ask that with respect to the 13, 14, 15.  Was there any

5    objection as to PDX-13, 14, 15?

6              MR. CLARK:  No objection, Your Honor.

7              THE COURT:  Okay.  And 16, 17?

8              MR. CLARK:  None.

9              THE COURT:  Okay.  Thank you.  They will be marked for

10   identification.

11       (EXHIBITS PDX-16 AND PDX-17 MARKED FOR IDENTIFICATION)

12   BY MR. CASTILLO:

13   Q    Do these overflow cells have any padding?

14   A    No.

15   Q    Were they designed for holding people in mental health

16   crisis?

17   A    No.

18   Q    Do the persons that you pick up for a commitment hearing

19   wait in jails for that hearing?

20   A    Yes, they do.

21   Q    And do they wait in jail after a hearing before they are

22   admitted to a treatment facility?

23   A    If there is not a bed readily available, yes, we hold them

24   until we can get them transported.

25   Q    And how long does that process from picking them up to

1    getting them to a treatment facility take?

2    A   It can take anywhere from 24 to 48 hours to a week and a

3    half.  Minimum 24 to 48, max about a week and a half sometimes,

4    depending on bed availability.

5    Q   Are these people receiving any mental health treatment

6    during their time in the jail?

7    A   No.

8    Q   Is there a local community mental health center that's near

9    the jail?

10   A   It is.

11   Q   What organization?

12   A   Southwest Mental Health.

13   Q   And where are they located?

14   A   Directly across the street, about 10 to 12 feet across the

15   street from the sheriff's office in Natchez, Mississippi.

16   Q   When you transport people to a commitment hearing and to

17   inpatient facility treatment, what vehicles do you use?

18   A   We have a transport van that is equipped with cameras.

19   Q   Are you always able to use that transport van?

20   A   No, because sometimes we have more than one committal that

21   needs to be transported.  So if that van is on a trip to

22   Meridian, I have to pull somebody off the street and put them

23   in a patrol car and send them to wherever they need to go.

24   Q   You said sometimes.  How often?

25   A   It's quite often.  Because you've got to look -- if we're

1  taking a trip to Meridian or the Coast, and that van is gone,

2  it's not going to be back within eight hours.  So it happens

3  more than we need it to happen.

4  Q   Are the persons you're transporting handcuffed?

5  A   Yes, they are.

6  Q   Based on your observations, what is your impression of what

7  it's like in the jail for the people who are being civilly

8  committed?

9  A   You know, when you look into those people's eyes who are

10 being civilly committed, when you look into the eyes for a

11 normal man to hear the clink of that cell close, it does

12 something to your psyche.  So for the ones who have a

13 heightened sense of fear, it is pure terror.

14 Q   How do you feel about this?

15 A   I feel like they don't need to be in my jail or anybody's

16 jail.

17 Q   I want to focus now on your office work with people who

18 have serious mental illness outside of the civil commitment

19 process.  Do you have staff who have been assigned to work with

20 people on these cases?

21 A   Yes, we have a team that is trained in CIT.  CIT team.

22 Q   What does CIT stand for?

23 A   Crisis intervention team.

24 Q   And how many officers do you have trained in CIT?

25 A   Three.

```
1    Q    What sort of training do they go through?

2    A    They went through the 40-hour CIT training course.  They

3    have been to training for the -- dealing with the mentally ill,

4    first aid training.  They went to the training, the trainer

5    course for citizens with special needs.  They've also been

6    through human behavior and conflict management training.

7    Q    Do these --

8    A    Deescalation as well.  I'm sorry.  Deescalation as well.

9    Q    How many do you have, again?

10   A    Three.

11   Q    And do these three officers work strictly with persons

12   having mental health crises?

13   A    No, they do not.

14   Q    Who else do they work with?

15   A    They work with victims of crimes.

16   Q    What triggers a response from the officers trained in CIT

17   to a scene where there is someone having a mental health

18   crisis?

19   A    Basically it could be a call from the parents or loved ones

20   who already know that that person is mentally ill because we

21   have dealt with them before, or it could be our supervisors on

22   the street who recognize the signs that this is not somebody

23   who needs to go to jail, this is somebody who is having a

24   mental health crisis and we need CIT team called out.

25   Q    Are your CIT-trained officers mental health clinicians?
```

```
1    A    No, they're not.

2    Q    Can your CIT-trained officers call clinicians when their

3    training is not sufficient to diffuse a mental health crisis?

4    A    We tried that before.  It didn't work too well.  No.

5    Q    Will Region 11's mobile crisis team come provide

6    stabilization services?

7    A    I haven't seen them since I have been there.

8    Q    Where is Region 11's mobile crisis --

9    A    McComb, Mississippi.

10   Q    Which county is that?

11   A    Pike County.

12   Q    And how far is that from Adams County?

13   A    It is about an hour away.

14   Q    What is your understanding about why they don't respond to

15   your county?

16   A    To me, my understanding would be that they are already

17   overwhelmed with the cases they're dealing with over there.  We

18   tried in 2016 and 2017, but it's just not feasible for to think

19   that if they've got a crisis in Madison or somewhere else, that

20   they're going to be able to respond to Adams County to a crisis

21   that's happening now.  And when you have officers on scene who

22   have to respond within 15 minutes, it's like an eternity when

23   you're dealing with somebody that's out of control.  So it just

24   doesn't work.  They have actually called us and asked us to go

25   deal with situations.
```

*** DAILY TRANSCRIPT ***

1    Q    What do you mean by that, someone calls mobile crisis?

2    A    Yes.   Some people have called mobile crisis, and mobile

3    crisis, because they know I have CIT-trained officers, have

4    asked them to go and deal with it.   And we have, because that's

5    the people we serve.

6    Q    You have a binder in front of you.   I would like to -- you

7    to turn in your binder to Plaintiff's Exhibit PX-415 which has

8    been previously admitted into evidence.   This map shows the

9    rate of mobile crisis response per capita by CMHC region.   The

10   dark red areas have high rates of mobile crisis utilization and

11   the light red or pinkish areas are where there is low rates of

12   mobile crisis utilization.   Do you see Adams County on this

13   map?

14   A    Yes, I do.

15   Q    Does it appear that Region 11 has a high or a low ratio of

16   crisis responses relative to other regions?

17   A    We have an extremely low.

18   Q    Is this consistent with your experience?

19   A    Yes.

20   Q    Back to your binder.   If you can turn to joint Exhibit 52.

21   And using the numbers on the bottom right of the document, turn

22   to page 5.   This has been previously admitted into evidence.

23   This is the Department of Mental Health's annual report for

24   fiscal year 2015.   In this page it discusses mobile crisis

25   response teams.   I want to focus your attention on the first

1   paragraph.  I'm just going to read it:

2       "Mobile crisis response teams provide community-based

3   crisis services that deliver solution-focused and

4   recovery-oriented behavioral health assessments and

5   stabilization of crisis in the location where the individual is

6   experiencing the crisis.  Mobile crisis response teams work

7   hand in hand with the local law enforcement, chancery judges

8   and clerks and the crisis stabilization units to ensure a

9   seamless process."

10      Would you describe your experience with mobile crisis as

11  working hand in hand?

12  A    No.

13  Q    Is mobile crisis -- is there a mobile crisis team providing

14  assessments and stabilization services in the location where

15  the individual is experiencing the crisis in Adams County like

16  it's described here?

17  A    No.

18  Q    As sheriff of Adams County, would you like a mobile crisis

19  response team to provide crisis services with or instead of the

20  sheriff's office?

21  A    Absolutely.

22  Q    Staying with this document, if you can turn to page 13,

23  again using the numbers on the bottom right.  I'm sorry.  Page

24  14, using the numbers on the bottom right, where it says crisis

25  intervention teams.  Do you see that?

1   A    Yes.

2   Q    Would you please read the -- will you please begin reading?

3   And I will tell you to stop when it's time.

4   A    "Crisis intervention teams are partnerships between local

5   law enforcement agencies and a variety of agencies, including

6   community mental health service centers, primary health

7   providers, advocacy groups such as NAMI, and behavioral health

8   professionals.  Officers joining a team learn the skills they

9   need to respond to people experiencing a mental health crisis

10  and divert them to an appropriate setting for treatment,

11  ensuring people are not arrested, taken to jail due to symptoms

12  of their illness."

13  Q    Thank you.  Do your CIT-trained officers have a partnership

14  with the local community mental health center and other

15  behavioral health professionals when it comes to responding to

16  people in mental health crises?

17  A    No.

18  Q    Are you a mental health clinician?

19  A    No.

20  Q    Is there a place where your CIT-trained officers can divert

21  people who are experiencing crisis so they don't have to go to

22  jail?

23  A    No.

24  Q    Again sticking with joint Exhibit 52 and turning to page 22

25  using the numbers on the bottom right, do you see this map?

```
 1   A    Yes.

 2   Q    This map shows the CSUs that existed in Mississippi as of

 3   July 2018.  Is there a CSU anywhere in Region 11?

 4   A    No.

 5   Q    In 2018, did a CSU open in Adams County?

 6   A    No.

 7   Q    Would you like a CSU to open in Adams County?

 8   A    Absolutely.

 9   Q    Why is that?

10   A    Because it's tasking for us when we have to take somebody

11   as far as we do and actually have to go through the process of

12   getting them committed, when some of them may not need to be

13   committed.  Some of them may be able to get stabilized right

14   here at home.  So --

15   Q    CSUs provide crisis services.  In Adams County, do you

16   believe that there is a need for services that could prevent

17   mental health crises from happening in the first place?

18   A    Yes, I do.

19   Q    I want to get into the numbers for a minute.  On average,

20   how many people go through the civil commitment process in

21   Adams County?

22   A    On average, we have an average of about -- I would say

23   about eight a month committals.

24   Q    Could you please turn to page 21 of the DMH annual report

25   for fiscal year 2018?  This is a breakdown of the adult
```

*** DAILY TRANSCRIPT ***

928

```
 1   psychiatric admissions by county to the state hospitals during
 2   that time.  Do you see Adams County?
 3   A    Yes.
 4   Q    Where does Adams County appear to fall in civil commitments
 5   to Mississippi State Hospital?
 6   A    They appear to fall behind Hinds County and Rankin County
 7   to the Mississippi State Hospital.
 8   Q    So third behind Hinds and Rankin?
 9   A    Yes.
10   Q    How does Adams County population stack up against Hinds and
11   Rankin County?
12   A    We are probably a fifth of the size of Hinds and Rankin
13   County population-wise.
14   Q    Of the people who are committed to the state hospitals, are
15   you seeing any people being repeatedly committed?
16   A    Yes.
17   Q    And for those people with repeat admissions, what are you
18   seeing after they go to the state hospital?
19   A    You know, when we go pick them back up and they have been
20   stabilized, what we are seeing is they are thinking they are
21   okay permanently and they're not taking their medication or
22   they don't have the insurance that they need to stay on their
23   medication, and they don't have the support they need to keep
24   encouraging them to stay on it.  So we see them begin to
25   self-medicate, but some of them even try to work the system.
```

1   So that's what we're seeing quite often.

2   Q   And what happens that you are seeing them again in a

3   commitment process?

4   A   Basically what happens again is the family or their loved

5   ones are at their wit's end.  They are calling me again because

6   they can't control their loved ones.  Even though they love

7   them, they can't control them.  So commitments are being issued

8   again and we're back picking them up and going through the

9   hearing process and sending them right back up there.

10  Q   If there was in Adams County someone to receive these

11  people cycling and offer them help with mental illness

12  symptoms, --

13          THE COURT REPORTER:  I'm sorry.

14          MR. CASTILLO:  Yes, ma'am.  I'm sorry.  I went too

15  fast there.

16  BY MR. CASTILLO:

17  Q   If there was someone in Adams County to receive these

18  people who are cycling and offer them help with mental illness

19  symptoms, do you think that would make a difference?

20  A   I think if they could keep their hands on some of them, I

21  think it absolutely would make a difference.

22          MR. CASTILLO:  If I can just have one second to

23  confer?

24          THE COURT:  Okay.

25      (SHORT PAUSE)

*** DAILY TRANSCRIPT ***

BY MR. CASTILLO:

Q   I just have maybe one or two questions left.  Since you became sheriff in January of 2016, have you seen any improvements in the civil commitment rates or process in Adams County?

A   No.

        MR. CASTILLO:  No further questions.

        THE COURT:  All right.  Thank you.

        Any cross-examination of this witness?

        MR. ANDERSON:  Could you give us just two minutes, Your Honor?

        THE COURT:  Yes.  Uh-huh.

    (SHORT PAUSE)

**CROSS-EXAMINATION**

BY MR. CLARK:

Q   Good morning, Sheriff Patten.

A   Good morning.

Q   You testified about services you would like in Adams County to see offered, and I want to clarify that.  What services would you like to see offered?

A   I would love to see a mobile crisis stabilization unit there.  I would love to see a partnership going on between possibly the State and some of our local medical clinicians there.  And I would love to have a crisis team that actually responds, a mobile crisis team that actually responds.

```
1   Q    Sure.  Anything else?

2   A    You know, if we could have a CSU, that would be great for

3   us.  We need a crisis stabilization unit.  We have people

4   trained to divert people to that but we need the team to make

5   sure they get there and the unit to put them in.  Right now,

6   Adams County doesn't have that.

7   Q    And there was some testimony about the CIT, the crisis

8   intervention team.  You would agree with me that CIT is a good

9   program.  Correct?

10  A    I think it is a great program but I think it is a program

11  that cannot stand alone.

12  Q    That cannot what?  Stand alone?

13  A    It cannot stand alone.

14  Q    Sure.  And you would agree with me that persons with mental

15  health issues need treatment.  Correct?

16  A    Absolutely.

17  Q    And your position is in receiving that treatment, I believe

18  your words were, "They don't need to be in my jail," meaning

19  they don't need to receive that treatment in your jail?

20  A    Exactly.

21  Q    Okay.  You would agree with me that some of those persons

22  need to be treated in a state hospital.  Is that correct?

23  A    The more violent ones, absolutely.  And the reason I say

24  that is because when we take them to some of the private

25  facilities, if they get violent, they go on a list where they
```

```
 1    can't come back.  So there is a need, yes.

 2    Q    There is a need to be institutionalized in a state

 3    hospital?

 4    A    Yes.  Not all, but the violent ones.

 5    Q    Would you agree with me that there must be a collaborative

 6    effort between the local centers and the state institutions?

 7    A    I think you need that.  Certain people require certain

 8    things and I think it definitely needs to be a collaborative

 9    effort.  Because that's what's happening.  You have resources

10    here, you have resources there, but nobody is the glue between

11    them.  And I think what some of the -- if partnerships are

12    formed, CSU unit put in place, and people are actually doing

13    the jobs that they are supposed to be doing, I think it could

14    work.

15    Q    You think it will work?

16    A    I think it could if you had a collaborative effort going,

17    yes.

18              MR. CLARK:  Thank you.  Nothing further.  Well, one

19    second, Your Honor.

20              THE COURT:  All right.

21       (SHORT PAUSE)

22    BY MR. CLARK:

23    Q    Sheriff Patten, you testified a moment ago about violent

24    individuals need to receive treatment in state institutions.

25    Could you give us an example of a violent individual that you
```

1    have dealt with that was committed to a state hospital or that

2    needed to be?

3    A    Yes.  We had one guy who beat his little brother with an

4    aluminum baseball bat.  He beat him pretty bad, and we couldn't

5    get any private institutions to deal with that guy because, you

6    know, he was pretty violent, so he needed to go to the State.

7    Q    And did he?

8    A    He went after about a year in jail.  He did.

9    Q    He went to the State Hospital?

10   A    He did.  It took us about a year to get him there.

11   Q    And which state hospital was that?

12   A    Mississippi State Hospital.

13   Q    Okay.

14          MR. CLARK:  Nothing further.

15          THE COURT:  All right.  For my own information, could

16   you tell me your name?

17          MR. CLARK:  I'm sorry.  Trey Clark.

18          THE COURT:  Okay.  Thank you, Mr. Clark.

19          Any redirect of this witness?

20          MR. CASTILLO:  No, Your Honor.

21          THE COURT:  I have a couple questions for you, Sheriff

22   Patten, and the parties will be permitted to follow up based on

23   what I have asked.

24          In giving an example, your last example, you said

25   there was a young man who stayed in your jail for a year?

```
 1              THE WITNESS:  He did, Judge.  He was one of the

 2     pretrial, and they wanted to see whether he could -- they

 3     wanted to see was he mentally stable to stand trial.  And we

 4     fought and we fought and we fought to try to get that man help,

 5     but it took us almost a year to get him to the State Hospital.

 6     Yes, sir.

 7              THE COURT:  Well, did he ever go to trial or did they

 8     find that he was not competent to go to trial?

 9              THE WITNESS:  He is still at the State Hospital.

10              THE COURT:  He is still at the State Hospital now?

11              THE WITNESS:  Yes, sir.

12              THE COURT:  But are you telling me he stayed in Adams

13     County jail for a year?

14              THE WITNESS:  We have it documented where he stayed

15     there that long.  And we have it documented where we, you know,

16     made several calls to our local judges and officials telling

17     them he doesn't need to be here, he needs to go get help.

18              THE COURT:  During that period of time that he was in

19     Adams County, was he in one of these -- do you remember what

20     cell he was in?

21              THE WITNESS:  He was in the holding cell for the

22     longest.  And then what we had to do was I actually had to hire

23     somebody.  I had to go before the board of supervisors and hire

24     an extra body because we had to put him up top in an area where

25     he could be maintained where we could utilize those holding
```

1   cells again.  I had to hire another worker, rearrange

2   schedules, everything.

3          THE COURT:  You indicated, I think it was PDX-13, 14

4   and 15, these cells that are not equipped with beds.  I think

5   you said that y'all put some sort of pallet or something for

6   those persons who have to stay there for more than several

7   hours or for more than a day or so.

8          THE WITNESS:  Yes.

9          THE COURT:  During this time that he was housed at the

10  facility, did he utilize those rooms for more than a day or

11  two?

12         THE WITNESS:  He did.  He utilized them for as long as

13  we could.  And that's why we had to keep changing our schedule,

14  because we would put him there as long as we could hold him,

15  but when other people came in who needed them, we had to take

16  him back upstairs and put manpower right there to watch him the

17  whole time.  So we got as much --

18         THE COURT REPORTER:  I'm sorry.

19         THE WITNESS:  I'm sorry.  Where do you want me to

20  start?

21         THE COURT REPORTER:  But when other people came in, --

22         THE WITNESS:  But when other people came in, we would

23  move him back up top.  We would have to come in.  We would have

24  to schedule staff to watch him.  The only time he wasn't in

25  these cells were when we didn't have other people who needed

1   those services.  Otherwise, we would move him back up top and

2   have a guard there with him the whole time.  And it was tasking

3   on us.  That's what pushed us to keep calling the judges asking

4   them, calling the DA, "Can y'all please do something with this,

5   because he doesn't need to be here?"

6           THE COURT:  Okay.  You are in your first term as

7   sheriff.

8           THE WITNESS:  Yes, sir, I am.

9           THE COURT:  Okay.  Prior to serving as sheriff, were

10  you a deputy sheriff or anything like that?

11          THE WITNESS:  Yes, I was.

12          THE COURT:  Okay.  Well, I'm going to ask you about

13  your time as being sheriff first.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Are you aware of others -- well, let me

16  ask the question this way:  Nobody else has stayed over there

17  while you were as sheriff for a year?

18          THE WITNESS:  Not on the mental health side, no.

19          THE COURT:  All right.  Has anybody else stayed over

20  there more than six months while you were sheriff, on the

21  mental health side?

22          THE WITNESS:  Yes, but it was tied in with the

23  criminal actions that he committed as well, and that was

24  another one that we fought to get out of there.  He actually --

25  a guy came to his house, knocked on the door, and he shot the

*** DAILY TRANSCRIPT ***

1    guy through the door.  But we knew this guy was one of those

2    repeat mental health consumers, and we knew that there is no

3    way he was going to be able to stand trial but we still had to

4    go through the process because he shot somebody through the

5    door.  And so that was another one.  He stayed about six

6    months.  And I'm going to be honest with you, Judge, we had to

7    just recog him out.  We had to recog him out.

8              THE COURT:  When you say -- tell me what recog is for

9    the record.

10             THE WITNESS:  Release him because he was indigent.  He

11   couldn't make bond.  So we recogged him out.  The victim didn't

12   want to file charges on him because he knew the guy was mental,

13   and so we were able to get the charges dropped and we were able

14   to push the system to make them get him some mental health.

15   His own family wouldn't come to get him out because they were

16   afraid of him.  Even when they dropped the bond extremely low,

17   the family just left him there to us.

18             THE COURT:  Now, how long -- prior to being sheriff,

19   how long were you employed by the sheriff's department?

20             THE WITNESS:  By the sheriff's office in Adams County,

21   I was employed eight years prior to becoming sheriff there.

22             THE COURT:  And what position or positions did you

23   hold during that eight-year period?

24             THE WITNESS:  I did criminal deputy.  I was in the K9

25   unit.  And I was a narcotics investigator as well.

1          THE COURT:  Okay.  As a deputy with the Adams County

2     Sheriff's Department, are you aware of any other person being

3     housed by the Adams County Sheriff's Department for a year in

4     the mental -- waiting on mental health services?

5          THE WITNESS:  As a deputy, I can't say that they were

6     housed waiting on mental health services, Judge.  But what I

7     can say is this:  I can say, as a deputy, I have seen several

8     people who should have went through getting mental health get

9     charged with crimes just to get them off the street.  And they

10    have sat there because their families wouldn't come get them.

11         THE COURT:  Okay.  Thank you.

12         Any follow-up based on what I have asked?  I turn to

13    the United States first.

14         MR. CASTILLO:  No follow-up from the United States.

15         THE COURT:  All right.  What about the State of

16    Mississippi?

17         MR. CLARK:  Briefly, Your Honor.

18         THE COURT:  Yes, sir.

19    BY MR. CLARK:

20    Q   Sheriff Patten, the individual that you were speaking about

21    a minute ago that was there for you said roughly a year before

22    going to the State Hospital, it's my understanding from your

23    earlier testimony that he was arrested.  Correct?

24    A   He was.

25    Q   He did not come to you through a civil commitment?

```
1    A    No, he did not.

2    Q    Okay.  And from your testimony with Judge Reeves, I take it

3    you understand the difference between them coming to you versus

4    civil commitment and then as an arrestee?

5    A    Yes, sir, absolutely.

6    Q    Okay.  Do you know or are you aware that the competency

7    evaluation for forensic patients --

8                THE COURT REPORTER:  I'm sorry.

9                THE COURT:  Slow down just a little bit, Mr. Clark.

10   BY MR. CLARK:

11   Q    Are you aware that the competency evaluation for forensic

12   patients is presently under 30 days?

13   A    Yes, I am.

14   Q    Okay.  And that the Mississippi State Hospital can't see

15   forensic patients until the records and the orders are

16   provided?  Are you aware of that?

17   A    I am.  That's why we -- that's why we pushed letting them

18   know, "You need to get him out of here."

19               MR. CLARK:  Nothing further.

20               THE COURT:  All right.  Is this witness finally

21   excused?

22               MR. CASTILLO:  Yes, Your Honor.

23               THE COURT:  All right.  Mr. Patten, thank you for your

24   testimony.  You may return to your normal duties.

25               THE WITNESS:  Thank you, Judge.
```

*** DAILY TRANSCRIPT ***

```
 1              THE COURT:  All right.

 2              MS. RUSH:  May I approach, Your Honor?

 3              THE COURT:  You may.

 4         (SHORT PAUSE)

 5              MS. VAN EREM:  May I proceed, Your Honor?

 6              THE COURT:  You may call a witness and we will wait

 7    until Ms. Summers comes in to swear them in, but the witness

 8    may come to the stand.

 9              MS. VAN EREM:  Sure.  The United States calls Judith

10    Baldwin.

11                        JUDITH BALDWIN,

12    having first been duly sworn, testified as follows:

13              THE COURT:  Ms. Baldwin, were you in the courtroom

14    when I gave out the last instructions to the prior witness?

15              THE WITNESS:  Yes.  I just came in for a little bit.

16              THE COURT:  Okay.  Please make sure the lawyers finish

17    their questions before you begin to speak so that the two of

18    you will not be speaking at the same time.  Speak at a pace at

19    which the court reporter can keep up with you.  And make sure

20    all your responses are verbal.

21              If you will, for the record, could you state and spell

22    your name?

23              THE WITNESS:  My name is Judith Baldwin.  It's

24    J-U-D-I-T-H, B-A-L-D-W-I-N.

25              THE COURT:  Thank you.
```

```
 1              You may proceed.
 2              MS. VAN EREM:  Thank you, Your Honor.  And my name is
 3    Haley Van Erem for the United States.
 4                        DIRECT EXAMINATION
 5    BY MS. VAN EREM:
 6    Q    Good morning, Dr. Baldwin.
 7    A    Good morning.
 8    Q    Dr. Baldwin, what is your occupation?
 9    A    I am a psychiatric mental health clinical nurse specialist.
10    Q    Were you retained by the United States in this case?
11    A    I was.
12    Q    Did you conduct a clinical review of individuals who have
13    experienced state hospital admissions in Mississippi?
14    A    I did.
15    Q    Before we get into the details of your review, I would like
16    to ask you a few --
17              THE COURT:  Slow down just a bit.
18              MS. VAN EREM:  I'm sorry, Your Honor.
19              THE COURT:  That's all right.  Follow me.
20              MS. VAN EREM:  I will try.  I'm sorry.
21              THE COURT:  That's all right.
22    BY MS. VAN EREM:
23    Q    Dr. Baldwin, before we get into the details of your review,
24    I would like to ask you a few questions about your background
25    and experience.  Can you please describe your educational
```

1  background?

2  A   I have a four-year degree in nursing.  I am a registered

3  nurse.

4           THE WITNESS:  Do I have this situated right?  Can you

5  hear me?

6           THE COURT:  We hear you fine.  Thank you.

7  A   I have a master's degree in nursing.  I have the clinical

8  nurse specialist board certification in psychiatric nursing

9  which is analogous to a nurse practitioner in the medical

10  field.  And I also have a Ph.D. in law, policy, and society.

11  BY MS. VAN EREM:

12  Q   Have you worked as a nurse?

13  A   I have.

14  Q   How long have you worked as a nurse?

15  A   Approximately 47 years.

16  Q   What is the role of a psychiatric clinical nurse

17  specialist?

18  A   The role of a psychiatric clinical nurse specialist is also

19  called an advanced practice role, so a nurse who can function

20  in an expanded role, meaning he or she can diagnose, can treat,

21  can supervise other nurses, contributes, in a way, making

22  healthcare changes more on a global level.

23  Q   Do you have experience working with people with mental

24  illness?

25  A   I do.

1    Q    How long have you been working with people with mental

2    illness?

3    A    I would say for 47 years.  It's my entire career.

4    Q    For the individuals with mental illness that you have

5    worked with over the years, what is the range of severity of

6    their illnesses?

7    A    I have worked with people who have temporary conditions,

8    conditions that are adjustment disorders, maybe a grief

9    reaction or an anxiety or a depression, and I have also worked

10   with people who have very serious and persistent mental

11   illness.

12   Q    Has the majority of your work been spent with people with

13   serious and persistent mental illness?

14   A    It has.

15   Q    Have you worked in both hospital and community-based

16   settings?

17   A    I have.

18   Q    Can you just describe generally your experience working in

19   each of those settings?

20   A    Early on in my career I worked in a community psychiatric

21   hospital.  It was a small locked ward, primarily short-term

22   stays for people.  And later on in my career, starting in about

23   the seventies, I worked more with people who were coming out of

24   a state hospital.

25   Q    Can you tell us a little bit more about that role working

```
1    with people coming out of the state hospital?
2    A   I was hired by the Department of Mental Health in
3    Massachusetts, and I was part of a small team.  I was the nurse
4    on that team, and the team was tasked with bringing people out
5    of the state hospital, about 300 people, and integrating them
6    into the community.  And thereby the team was also tasked with
7    developing community-based services to support those people.
8              THE COURT REPORTER:  I'm sorry.
9    A   Tasked with developing services that would support those
10   people in the community.
11   BY MS. VAN EREM:
12   Q   What year did you begin working in that role?
13   A   In 1978.
14   Q   What were the circumstance in which those teams were
15   formed?
16   A   At that time the Commonwealth of Massachusetts was in the
17   process of deinstitutionalization.  They had statewide funding
18   to do this.  The goal was to close many of the state hospitals
19   in the state and to integrate the majority of people in those
20   state hospitals into the community.
21   Q   What was your role on that team?
22   A   My role was -- the title was community nurse advisor,
23   aftercare services coordinator.  What the role was to -- I
24   coordinated comprehensive clinical services in the community
25   for people coming out of the hospital and integrating into the
```

1    community.  So it was to be part of this team to develop

2    services and also to see patients directly.

3    Q   And did you work with the state hospital in that role?

4    A   Yes.  That was a big part of the role, was to interface

5    with the state hospital to meet with staff there on a regular

6    basis to talk about plans about how we would help people come

7    out.  So it was a very big piece of the work.

8    Q   And as part of this role, did you develop community-based

9    services?

10   A   I did.

11   Q   And we'll talk a little bit more later about some of the

12   community-based services that you worked on developing.  But

13   after your role as community nurse advisor, did you have any

14   other roles in developing community-based services in

15   Massachusetts?

16         THE COURT REPORTER:  I'm sorry.

17   BY MS. VAN EREM:

18   Q   After your role as community nurse advisor, did you have

19   any other roles in developing community-based services in

20   Massachusetts?

21   A   I did.

22   Q   What were those roles?

23   A   I was director of outpatient services for a period of time

24   and then I became director of outpatient services.  As the

25   agency grew and more and more people became patients in the

```
 1   community-based setting, the role expanded.  And then
 2   ultimately I was the vice president for quality management
 3   within that agency.
 4   Q    What were your responsibilities as director of adult
 5   services and outpatient services?
 6   A    That was to coordinate services that had been developed for
 7   the people to make sure that they were operating at their most
 8   effective level, to supervise staff, to meet with patients and
 9   their families, and to also interface with the hospital staff
10   at various levels.
11   Q    You testified that you developed and supervised
12   community-based services in Massachusetts.  At a high level,
13   can you describe the community-based services that were
14   developed?
15   A    Yes.  It was the continuum of care within the community.
16   So to start with, 24-hour crisis.  And we had developed that
17   from the beginning, so I was actually one of three prescreeners
18   on that team just to get a sense of how the operation was
19   going.  So we had the 24-hour crisis.
20        We also had an outpatient medication clinic which was
21   dispensing, monitoring, prescribing.  We developed housing
22   within the community, a variety of housing.  We also had a case
23   management function where people would visit people in their
24   homes or people would come into the office for meetings and so
25   to stay really in touch with the folks that we had brought out.
```

```
 1    We interfaced with various community agencies and had contracts
 2    with those agencies to work with them, agencies that interface
 3    with patients.  And we had day programs and supported
 4    employment.
 5    Q   What was the time frame in which these services were
 6    developed?
 7    A   We started in 1978, and in 1980 we received a federal
 8    community mental health center grant, so it grew then in leaps
 9    and bounds.  And I would say over the next five years that we
10    had developed those services.
11    Q   When did you leave your work in the Massachusetts mental
12    health system?
13    A   That was in 2009.
14    Q   Where did you work after that work with the Massachusetts
15    mental health system?
16    A   I worked at the Veterans Administration in Boston, the V.A.
17    Medical Center.
18    Q   When did you work for the Veterans Administration?
19    A   I started there in 2009 and I stayed until 2015.
20    Q   What was your role?
21    A   I was the nurse manager for the Home-Based Primary Care
22    Program.
23    Q   What is the Home-Based Primary Care Program?
24    A   Home-Based Primary Care Program is a -- it's a national
25    model that the V.A. has developed, and it is geared completely
```

1  towards serving veterans in their homes.  And so it is a

2  multidisciplinary team with nurses and case managers and social

3  workers and doctors.  And everything was completed in the

4  patient's home through patient visits.  And the goal was to

5  keep people out of the hospital to avoid nursing home placement

6  or at least to have short hospital stays.

7  Q   As part of your work experience, have you conducted

8  clinical assessments of individuals with mental illness?

9  A   I have.

10  Q   Why do you conduct assessments in your work?

11  A   In nursing, but I believe in all healthcare professions,

12  the assessment is that it is the foundation of the work that

13  you are going to be doing with the patient so it's very

14  important to do that initial assessment with the individual for

15  a variety of reasons.

16  Q   What sources of information did you use in completing those

17  assessments in your prior work history?

18  A   Well, it's a fairly standard outline, but first you would

19  ask the person why they are coming, then what is it that's

20  troubling them or what their presenting problem is, but then

21  also to talk with them about their history, their mental

22  history or their medical history, their family history, their

23  social history, any kinds of contributing factors that might

24  play into what kind of treatment might be best for this person

25  and their problem, and to also ask them what they want, what

1    would work for them, their goals.

2              MS. VAN EREM:  Your Honor, I move to have Dr. Judith

3    Baldwin qualified as an expert in psychiatric nursing, serious

4    mental illness, and assessments for community-based mental

5    health services.

6              THE COURT:  Any objection?

7              MR. SHELSON:  No, Your Honor.

8              THE COURT:  Dr. Baldwin will be admitted as an expert

9    on the designated -- in the designated areas.

10             You may proceed.

11             MS. VAN EREM:  Thank you, Your Honor.

12   BY MS. VAN EREM:

13   Q   Dr. Baldwin, I would like to talk now about the review you

14   conducted in Mississippi.  How many individuals were in your

15   review?

16   A   Thirty.

17   Q   What sources of information did you use in making your

18   determinations in your review?

19   A   What sources of information did I use?

20   Q   Yes.

21   A   I interviewed the individual.  Whenever available, I also

22   interviewed collateral contacts, which could include family

23   members or friends or other people that would have some

24   informal relationship with them.  I reviewed medical records

25   from the State Hospital and from the CMHCs.

1    Q    Where did you conduct the interviews?

2    A    That was in a variety of places.  We met with people in

3    their own homes, we met with people in their family's homes,

4    personal care homes, group homes, nursing homes.  I also went

5    to two state hospitals, two correctional facilities, and I also

6    met with one individual at the college in -- on Capitol Street

7    in Jackson, Jackson State College.

8    Q    What records did you review?

9    A    I reviewed all records that were provided to me.  That was

10   State Hospital records, community mental health center records.

11   And within those, sometimes there were discharge summaries or

12   other summaries from the community hospitals as well.

13   Q    Did you submit a final report?

14   A    I did.

15   Q    If you will turn in your binder to tab 403.  Is PX-403 your

16   report?

17   A    It is.

18   Q    After your report was finalized, did you have an addendum?

19   A    I did.

20   Q    What did your addendum consist of?

21   A    I had the occasion -- we had tried to interview family

22   members and other collaterals, as I said, when they were

23   available.  And a response came back to my outreach on that

24   after I had submitted my final report, and it was the brother

25   of one of the folks in my sample.  And so I did interview him,

1    but my report had gone in.  So what I did was document that

2    interview and I submitted it as an addendum.

3    Q    Is your addendum in front of you labeled PX-399?

4    A    Yes, it is.

5    Q    Dr. Baldwin, did you also submit an errata to your report?

6    A    I did.

7    Q    Are the corrections you made in your errata contained in

8    the document called Errata to Expert Report of Dr. Judith

9    Baldwin dated May 24th, 2019 and labeled PX-403A?

10   A    It is.

11   Q    How would you describe those corrections?

12   A    The first bullet is there was a mistake in calculation.  I

13   had answered the question about is an individual at serious

14   risk for institution in a State Hospital, and I said 19 and it

15   should have been 18.  I had miscounted or miswritten it in the

16   report.  I actually rendered an opinion on three of those

17   people.

18       The other errata is I had a typo that I found upon later

19   review where I had put the date as '17, 2017, when, in fact, it

20   was 2015.

21            MS. VAN EREM:  Your Honor, PX-403, Dr. Baldwin's

22   report, has been preadmitted but I move to admit PX-399 and

23   403A into evidence.

24            THE COURT:  PX --

25            MS. VAN EREM:  399 and 403A, which are her addendum

*** DAILY TRANSCRIPT ***

1    and errata.

2              THE COURT:  Any objection from the State?

3              MR. SHELSON:  No, Your Honor.

4              THE COURT:  All right.  PX-399 and 403A will be

5    received into evidence.

6         (EXHIBITS PX-399 AND PX-403A MARKED)

7    BY MS. VAN EREM:

8    Q    Dr. Baldwin, does your report with the addendum and errata

9    you identified accurately reflect your opinions and conclusions

10   in this case?

11   A    It does.

12   Q    What standards did you rely on in reaching your

13   conclusions?

14   A    I relied on my professional experience, also my -- of what

15   I have seen work over my career, what has been successful for

16   people similar to the people in the sample.  I also relied on

17   my knowledge of evidence-based practices and what has been

18   proven to work for individuals living in the community with

19   serious mental illness.

20        I also relied on reviews of the literature both that I had

21   access to and was familiar with, but also that was provided to

22   me by Dr. Robert Drake who was the lead on the team, outlining

23   again evidence-based practices for success in the community.

24   Q    Let's briefly go over what you were determining in your

25   conclusions and then we will go back and talk about your

1   conclusions more.  First, what were you trying to determine for

2   the 30 individuals you reviewed?

3   A   I was trying to determine if, one, if they would oppose

4   receiving community-based services or living in the community

5   if community-based services were -- or reasonable services were

6   available to them.  I was trying to determine if they had spent

7   too much time in a state hospital or could have avoided some of

8   the admissions or all of the admissions that they had

9   experienced.

10       I was also looking at would they be appropriate for

11  community-based services and would they benefit from them.  And

12  finally, if they were at risk for rehospitalization.

13  Q   Do you have a demonstrative slide showing your findings

14  regarding these questions?

15  A   I believe I do.

16       MS. VAN EREM:  Your Honor, may I approach?

17       THE COURT:  Yes, you may.

18  BY MS. VAN EREM:

19  Q   (Tenders document.)  This has been marked for

20  identification as PDX-18.  Does this slide fairly and

21  accurately depict your findings?

22  A   It does.

23  Q   Starting with the first finding on this slide, for the 30

24  people you reviewed, how many did you find could have avoided

25  or spent less time in the State Hospital with reasonable

*** DAILY TRANSCRIPT ***

1   community-based services?

2   A   I found that all of them could have avoided or spent less

3   time in the hospital.

4   Q   How did you go about answering the question of whether the

5   person would have avoided or spent less time in the State

6   Hospital?

7   A   It was a combination of things.  I looked at the record,

8   the records that were provided to me and what the circumstances

9   were around the admissions.  Also, I looked at the pattern of

10  admissions, if the same kinds of things were happening each

11  time in between.  I looked at the community-based services that

12  were or were not being provided either before and/or in between

13  hospital admissions.

14      I also spoke with the individuals and oftentimes with

15  family members or others who were familiar with their

16  experience and asked did they think they could have avoided

17  going in the hospital had something been available to them and,

18  if something was available, what was it, and asked them to

19  identify it.  And often, they did.

20  Q   Generally, why did you find that all 30 individuals in your

21  review could have avoided or spent less time in a State

22  Hospital?

23  A   These individuals are very similar to people that I have

24  worked with in my career, and I am aware of what works for

25  people living with serious mental illness, as these individuals

1   are, and am aware that if they had had access to those

2   services, then they could have avoided or at least have had a

3   much shorter stay in an acute care setting.

4   Q   Going to the second question, how many individuals did you

5   find were at serious risk of institutionalization?

6   A   And I found that it was 18, and that is 86 percent of the

7   people that were out of the hospital at that time.

8   Q   And so that's out of the 21 people who were in the

9   community at the time for whom you formed an opinion.  Is that

10  right?

11  A   Correct.

12  Q   How did you reach the conclusion that these individuals

13  were at serious risk?

14  A   I was looking at the patterns of their hospitalizations and

15  looking at the -- what community services were or were not

16  available to them, and noticing that the same situation was

17  happening over and over again, and that there was limited

18  community-based services that were either in place when they

19  left the hospital the last time or if they had not been in the

20  hospital, they weren't in place so that really the individuals

21  were at risk because nothing -- there wasn't much that was

22  supporting them in the community in between.

23  Q   What can happen when a person with serious mental illness

24  is not getting the services they need to support them?

25  A   Serious mental illness is a chronic disease.  People can

1   live successfully in the community.  They can recover, but they

2   also will have exacerbations of symptoms on occasion.  And in

3   particular, if they are not receiving supports or they're not

4   taking medication or they're not working with a service to help

5   them stay stable in the community, and their symptoms will

6   increase periodically and they -- if they are left untreated,

7   they will exacerbate to the point where they may need a higher

8   level of care.

9   Q    Can you provide an example of someone who you determined

10  was at serious risk of hospitalization at the time you reviewed

11  them?  And you can reference PX-400 in your binder, which is a

12  list of names of individuals involved in the review, along with

13  their numbers, which we will be using the numbers to preserve

14  confidentiality.

15  A    And so to be clear, you would ask me about someone who is

16  at serious risk?

17  Q    That's right.

18  A    Okay.  I would like to talk about person 107.

19  Q    Can you please briefly describe the circumstances of person

20  107?  And it starts on page 136 of your report.

21  A    Person 107 is a 69-year-old woman.  She lives in a

22  retirement community.  She has worked her whole life.  She,

23  when well, lives very independently.  She is a college-educated

24  woman, has had a very successful career.  She has two

25  daughters.  And she is diagnosed with bipolar illness.

1  Q   How many times has person 107 been in a State Hospital?

2  A   She has been in the State Hospital four times.

3  Q   What led to those State Hospital admissions?

4  A   This is -- her situation is fairly typical of someone who

5  is diagnosed with bipolar illness.  In the case of person 107,

6  she might become feeling very well and decide that she doesn't

7  want to take a dose of her medication or she might feel

8  suspicious about her medication and over time gradually take

9  less and less of her prescribed medication.  And then, as her

10 daughter described, and as described in the record, she

11 escalates into a full manic state, which is characteristic of

12 bipolar.

13 Q   What do you mean when you say manic state?

14 A   When people have bipolar I, which is what person 107 has,

15 it's characterized by extreme mood swings, both mania where

16 people are not sleeping, they have extreme euphoria, they are

17 oftentimes agitated, they may have some strong suspicions but,

18 in a sense, the world is all great and they don't need any

19 medication, they don't need any help, they are not sleeping,

20 they are not using good judgment.

21     It also has the reverse where people can be very, very

22 seriously depressed.

23 Q   Why did you ultimately conclude that person 107 was at

24 serious risk of further State Hospital admissions?

25 A   In speaking with her daughter, as well as herself, the

1    daughter, both she and her sister believed this is the only

2    path to get -- commitment is the only path to get their mother

3    stabilized and back on her medication, that they acknowledge

4    that they cannot do this by themselves, that they try and she

5    will not listen to them because she thinks everything is fine.

6    Q    Are there community-based services that could reduce person

7    107's risk of State Hospital admission?

8    A    Do you mean do they exist?

9    Q    Yes.  Generally, would there be community-based services

10   that could reduce her risk?

11   A    Absolutely.

12   Q    What types of services would reduce her risk?

13   A    In the case of person 107, the important thing for her is,

14   one, to have a 24-hour crisis line and, if not for her, for her

15   daughters who might become concerned about her and could talk

16   with a crisis clinician early on.  Also to have, in her case, a

17   case manager who has a trusting relationship with her, sees her

18   on a regular basis on outreach and proactively and so can head

19   off these symptoms early on before they become so exacerbated

20   that she needs a higher level of care for her own safety.

21   Q    Did person 107 have access to these services?

22   A    No, I don't believe so.  Could I add?

23   Q    Sure.

24   A    The other aspect is medication.  Obviously, this is an

25   illness that is effectively managed by medication, so that

1   would be the other service that I would see as important for

2   her.

3   Q   What is it about person 107's illness that makes you

4   confident that the services you mentioned could reduce her risk

5   of hospitalization?

6   A   Because bipolar illness is one serious mental illness that

7   has been proven time and time again to be very effectively

8   managed by medication.  It's also very predictable in that

9   people will have these cycles as I have described them.  So --

10  and I have seen it work time and time again with very high

11  functioning bipolar people who respond very well to their

12  medication.

13  Q   Let's go back to your overall findings.  How many

14  individuals in your review did you find opposed receiving

15  services in the community?

16  A   There were none who opposed.

17  Q   How did you determine whether an individual opposed

18  community-based services?

19  A   I looked at multiple sources of information.  Whenever

20  possible, I would ask the individual themselves.  Or in the

21  course of the interview, the individual would tell me, without

22  being asked, that they wanted to live in the community, they

23  knew what they would need in the community to stay there and to

24  live at their highest level of independence.  I spoke with

25  family members, again, what they thought the person would need,

1    and they had a very good idea of what that would be.

2        And then I looked in the records and documentation of

3    people asking to leave the hospital or even identifying where

4    they wanted to live or what services they would need.

5    Q    Can you briefly give an example of an individual who told

6    you that they preferred to live in the community?

7    A    An example of someone who would prefer to live in the

8    community?  Is that what you said?

9    Q    Yeah, just a brief example.

10   A    Yes.  And do you want the number?

11   Q    Sure.  You can give me the number if you would like.

12   A    I'm looking at one, person 91.  And throughout his

13   interview talking about how he wanted to leave the nursing home

14   where he was and what he would need in the community to live

15   there.  And it was so important to him and it was also

16   documented continuously in his medical records.

17   Q    Go ahead.

18   A    I was going to give another example as well.

19   Q    Sure.

20   A    And let me see her -- this is person 109.  And this is a

21   young lady that I interviewed in the State Hospital who I found

22   out after the fact has been discharged to a small group home.

23   But she was very engaging, very animated, and talked about how

24   she just wanted to make it in the community.  And in going back

25   into the hospital, she blamed herself every time.  And, "I'm

```
 1   not going to screw up this time.  I'm going to get out there.
 2   I want to go in a group home and then I want to get my own
 3   place."  And, you know, it was just very important to her.
 4   Q    Regarding the final question, how many individuals did you
 5   find were appropriate for community-based services?
 6   A    I found that all the individuals in my sample were
 7   appropriate.
 8   Q    Was that surprising to you?
 9   A    No.
10   Q    Why not?
11   A    Because I have seen it throughout my career that people can
12   live successfully in the community at a very high level of
13   independence who are also living with serious mental illness.
14   The community-based services are evidence-based.  I have seen
15   them work time and time again.  A different maybe combination
16   for an individual from one to another, but they do consistently
17   work.
18   Q    Of the individuals you reviewed, how many were in the State
19   Hospital at the time you reviewed them?
20   A    I believe it was eight.
21   Q    Of those eight, can you explain generally why you
22   determined they were appropriate for community-based services?
23   A    Because these are people not unlike the other people,
24   individuals in my sample who have a variety of serious mental
25   illness.  They -- in each case, I identified strengths that
```

1    they had, which was different from one person to another, some

2    the same.  But I have seen in the past that individuals like

3    this with similar symptoms, similar strengths and similar

4    challenges, can live successfully in the community.

5    Q    Did you also determine the types of services that

6    individuals needed to remain in the community?

7    A    I did.

8    Q    How did you make that determination?

9    A    There are a series of -- there is a continuum of care of

10   community-based services for people with serious mental

11   illness.  They are evidence-based.  And if you would like, I

12   can list them, but there is --

13   Q    Sure.  If you can briefly list them?

14   A    To start with, the crisis services, 24-hour crisis, and

15   there is a continuum within the crisis which I won't go into,

16   but to start with, the 24-hour hot line and to have obviously a

17   mobile outreach capacity but also to have a crisis

18   stabilization on the other side of crisis.  To have proactive

19   outreach through case management function.  To also have access

20   to a psychiatric prescriber.  To have, when it's needed, a

21   connection being made to primary care because often people with

22   serious mental illness have co-morbid medical conditions.  To

23   also have supported housing, stable housing, and supported

24   employment as needed.  And finally, for people to have

25   connection to specialty services that they might need such as

*** DAILY TRANSCRIPT ***

```
 1   connection to trauma, because there are more people with

 2   serious mental illness who have had trauma histories as well.

 3   Q    You mentioned case management.  Can that be part of PACT

 4   services?

 5   A    Yes.  And PACT is also an evidence-based practice with

 6   those services all within one team.  And case management is a

 7   very big part of that.

 8   Q    Can case management also be provided separately from a PACT

 9   team?

10   A    It can.

11   Q    Are there any recommendations for services that you made --

12   sorry.  Let me rephrase that.

13        Are there any examples of individuals where you have made

14   recommendations beyond those core services necessary to avoid

15   hospitalization that you just mentioned?

16   A    I did.

17   Q    Is person 110 an example?

18   A    Person 110 is who I was thinking of.

19   Q    Okay.  And for person 110, did you say that he could

20   benefit from a program geared to supporting individuals with

21   dementia which included sensory stimuli such as recliners and

22   hand and neck massages?

23   A    I did.  And person 110 is one of the three people that I

24   said was not at risk for hospitalization.  This is a -- a

25   relatively young man who is in the end stages or advanced
```

*** DAILY TRANSCRIPT ***

1  stages of dementia.  When I interviewed him, he was on a

2  dementia unit in a nursing home.  And what I did at that time

3  was make the recommendations that I know are clinically

4  appropriate for someone with that diagnosis.

5  Q   So are those services geared -- you know, the program

6  geared toward supporting individuals with dementia, are those

7  services necessary to prevent his hospitalization in a State

8  Hospital?

9  A   Not necessarily, no.

10  Q   Why did you make the recommendation?

11  A   It was my experience, my most recent experience in the

12  V.A., because our average age of our consumer was 85, and

13  oftentimes there was a diagnosis of dementia, and those are

14  evidence-based practices for people with dementia.  So the

15  nurse in me, the clinician, made the recommendations I thought

16  were right for that man.

17  Q   And I apologize if you already mentioned this, but is

18  person 110 at risk of admission to a State Hospital according

19  to your review?

20  A   No, he is not.

21  Q   Now that we have talked about your overarching findings, I

22  would like to ask about some more details.  Did you make any

23  findings in your review regarding how often some individuals

24  are admitted to the State Hospitals?

25  A   I did.  Individuals -- I have at least one gentleman I can

1    think of who just went into the State Hospital one time, and

2    then I also have individuals on my -- in my sample who were

3    admitted 17 times.

4    Q    Why would it occur that people would have many readmissions

5    to the State Hospital?

6    A    Just so I understand, why would it occur if they would have

7    -- why would they have many?

8    Q    Let me rephrase.  Why did you find that people in your

9    review had many readmissions to the State Hospital?

10   A    Often it was a dearth of community-based services in

11   between those admissions or even before the first that was not

12   supporting that individual in the community adequately, and so

13   their symptoms would exacerbate, as I described before, and

14   then they would perhaps require a higher level of care for

15   safety.

16   Q    You mentioned that some people had fewer State Hospital

17   admissions than others?

18   A    I did.

19   Q    Why did some people have fewer admissions?

20   A    Well, the one gentleman that I'm thinking of who had the

21   one admission, he is a young man.  He was in his thirties, and

22   I believe that he would be at risk for rehospitalization.  It

23   would just be a matter of time.  But he was young.

24        There is also the factor of supports.  If people have a

25   number of supports in the community and formal supports, then

1    that often can delay or prevent hospitalization because those

2    supports are taking care of the individuals.

3    Q    Dr. Baldwin, did you get a sense for what people's

4    experiences were in state hospitals?

5    A    I did.  People would often tell me unsolicited, but I would

6    also ask that.  I would ask, you know, what was good about

7    being in the state hospital, what did you not like in the state

8    hospital, what recommendations would you make.  And they would

9    answer in that way as well.

10   Q    And what did you learn from asking those questions?

11   A    I learned that there were a number of people.  There was

12   one woman who told me it was the most humiliating experience

13   she had ever had in her life.  There was at least a couple of

14   people who said it was like a prison, that they had been picked

15   up by the police and that they had been taken against their

16   will.

17        Often people talked about not having choice.  More than one

18   person described lining up to get medication.  People talked

19   about not having privacy, not having access to their things.

20   One lady said, "I like to brush my teeth more than once a day

21   and when I go back, my toothbrush is gone, it is put away."

22   Q    Can those experiences that you just described occur even

23   with short admissions?

24   A    They can, yes.

25   Q    Can you provide an example from your review of someone who

1    has been admitted multiple times to State Hospitals?

2    A    I can.  Let me find the number for you.

3    Q    Sure.

4    A    This is person 98.

5    Q    And can you describe person 98?  It's page 89 of your

6    report.

7    A    Person 98 is a 53-year-old man.  You said 89.  Right?

8    Q    Page 89, yes, 88 or 89.

9    A    Got it.  It's a 53-year-old man.  He currently lives in a

10   personal care home.  He is college-educated.  He has had an

11   employment history in the past.  He is diagnosed with

12   schizoaffective disorder, bipolar type.  And I saw him -- I

13   interviewed him at the community mental health center.

14   Q    How many times has person 98 been in the State Hospital?

15   A    He has been in the State Hospital 14 times, according to

16   the records.

17   Q    What were the reasons that person 98 had been admitted to

18   the State Hospital 14 times?

19   A    Now, his appears to be a cyclical process as well.  These

20   admissions, he said the 14 admissions which have taken place

21   over the past 28 years, so starting when he was a young man,

22   and about every two years.  But what happens with him is his

23   symptoms start to increase very insidiously, and it may be

24   because he may skip a dose of medication or he may decide he is

25   not going to take his medication.  And then he gradually

1    escalates into a threatening stance.  He gets agitated.  He

2    gets angry.  And the personal care home manager becomes

3    concerned, and the other residents become fearful.  And so a

4    commitment process is initiated with him, which is what

5    happened this last time.

6    Q    In your opinion, could some of person 98's hospital

7    admissions have been avoided or shortened?

8    A    Absolutely.

9    Q    How did you make that determination?

10   A    Because he has a cyclical nature to his decompensations,

11   meaning that his symptoms increase in kind of a predictable

12   way.  And so to have a case manager who is engaged with him

13   right from the start in a trusting relationship to kind of head

14   off symptoms or get a sense of them right from the beginning to

15   then thereby avoid them escalating into an acute situation.

16   Also to have 24-hour crisis service, and that would be not only

17   available to the individual but also to the personal care

18   manager to call ahead and say, "I think, you know, person 98,

19   just I'm a little concerned, he is not sleeping, he is, you

20   know, he is getting a little angry or losing his patience."

21   Q    Did person 98 have access to those community-based services

22   before his State Hospital admissions?

23   A    Not that I'm aware of, no.

24   Q    Did you recommend that person 98 would be appropriate for a

25   PACT team?

1    A    I did.

2    Q    What is it about PACT services that gives you confidence

3    that person 98 could avoid repeated hospitalizations?

4    A    PACT has a team approach and within that team is the access

5    to the 24-hour crisis services and mobile outreach within that.

6    Also, a crisis stabilization, which I think would be very

7    appropriate for him.  Also, the case management function.  And

8    again, the proactive outreach case management function.

9         He is someone who takes medication.  He is not opposed to

10   it.  So that piece, connection to the medication through the

11   PACT team as well.

12        And he is an individual who would like to be doing

13   something during the day, either a day program or some kind of

14   work.  And the PACT team could support him in that regard, in

15   addition to possibly stepping down from a personal care home

16   into a more independent level.  The PACT team could help him

17   with that as well.

18   Q    Is person 98 at serious risk of hospitalization in a State

19   Hospital?

20   A    Yes, he is.

21        MS. VAN EREM:  Your Honor, it is my understanding

22   there has not been a morning break.  If you would like, we can

23   take a break now.  It's a natural stopping place.  Or I can

24   keep going.

25        THE COURT:  Oh, it is a natural stopping place?

```
 1              MS. VAN EREM:  Yes.
 2              THE COURT:  All right.  For you?
 3              MS. VAN EREM:  Yes.
 4              THE COURT:  Okay.  All right.  We will take our
 5   15-minute break then.
 6              MS. VAN EREM:  Thank you, Your Honor.
 7              THE COURT:  Doctor, you may step down.
 8              THE WITNESS:  I can sit right here?
 9              THE COURT:  If you wish -- if you want to stay there?
10              THE WITNESS:  No.  I think I would like to use the
11   restroom.
12              THE COURT:  Okay.  Yeah.  You can step down.  By all
13   means.
14              We are in recess.  We are in recess.
15        (RECESS)
16              THE COURT:  Is there anything we need to take up?
17              MS. VAN EREM:  Not from the United States.
18              THE COURT:  All right.  Are you ready?
19              THE WITNESS:  I am.
20              THE COURT:  All right.  You may proceed.
21              MS. VAN EREM:  Thank you, Your Honor.
22   BY MS. VAN EREM:
23   Q    Dr. Baldwin, I would like to continue talking about your
24   findings, specifically that people could have avoided or spent
25   less time in State Hospitals.  Did you find that a lack of
```

1   access to community-based services led to unnecessary

2   hospitalizations?

3   A   I did.

4   Q   And did you find that a lack of access to community-based

5   services led to hospitalizations that were longer than

6   necessary?

7   A   I did.

8   Q   What was the length of stay in State Hospitals for the

9   individuals that you reviewed?

10  A   There was a range.  Some individuals stayed as short a time

11  as a week.  I have one individual within my sample who had a

12  singular hospitalization that was 17 years, another woman 13 or

13  14 years.

14  Q   You say 17 years?

15  A   Yes.  Years.

16  Q   Are there any examples you can think of of the individuals

17  you reviewed who could have avoided or spent less time in State

18  Hospitals?

19  A   I can give a couple of examples if you want.  The first one

20  is person 90.

21  Q   Can you please tell us a little bit more about person 90?

22  It's on page 21 of your report.

23  A   Person 90 is a 64-year-old African-American woman.  She is

24  the mother of two daughters.  And when I interviewed her, she

25  was in a personal care home.  She is diagnosed with

1   schizophrenia.  She does have some co-morbid medical

2   conditions.  Prior to her most recent hospitalization, she had

3   been out of the hospital for five years and had been living in

4   her own apartment.

5   Q   What led to her most recent hospitalization?

6   A   Person 90 takes psychotropic medication.  She apparently

7   had missed a medication appointment.  And then she had missed

8   several medication appointments over a five-month period.  And

9   during that time -- a four- to five-month period.  And during

10  that time, she also was not paying her rent.  She somehow

11  thought she was paying her rent but she was not.

12  Q   Who initiated her commitment?

13  A   That was her daughter.

14  Q   I apologize if I missed this, but you had said she had

15  missed some medication appointments.  Is that right?

16  A   She had.  She had missed approximately five months worth of

17  medication appointments, which was about five appointments.

18  Q   What actions were taken when person 90 started missing

19  appointments?

20  A   I could find very little actions in the record.  There was

21  one notation of an outreach, but I don't believe the case

22  manager reached person 90.  And then I could not find any other

23  follow-up.

24  Q   Based on your experience, what should have happened when

25  person 90 started missing appointments?

```
1    A   This is an individual where I believe a case manager or
2    proactive case management function should be very much involved
3    with.  And she was someone who came to her appointments.  And
4    so for her to miss an appointment would have warranted a
5    follow-up.  In the case of person 90, ideally, the case manager
6    should be seeing her regularly on a very regular proactive
7    basis.  But in missing an appointment, the case manager would
8    follow up, make a call.  If she did not -- he or she did not
9    reach person 90, to go make a home visit, figure out what's
10   going on, talk with the daughter, talk with the landlord and
11   try to, again, head off symptoms before they exacerbate into
12   a -- in this case, it was five months.
13   Q   Had person 90's services been more intensive, could they
14   have prevented her State Hospital admission?
15   A   I believe so, yes.
16   Q   Regarding her hospital admission, based on your review, why
17   did person 90's daughter initiate commitment?
18   A   What was in the record is that person 90 had not been
19   paying her rent and she had been evicted.  She was subject to
20   being evicted and ultimately was.  And the daughter, even
21   though it's throughout the record the daughter supports her
22   mother living independently, she manages her own finances and
23   does very well on her own, and the daughter supports that.  But
24   in this case the daughter was -- knew that her mother's
25   symptoms were exacerbating and was fearful that she would be
```

1   homeless.

2   Q    Based on your review, was the daughter aware of other

3   alternatives?

4   A    No.

5   Q    Did person 90 go immediately to the State Hospital after

6   her daughter initiated commitment?

7   A    She did not.

8   Q    Where did she go?

9   A    She went to a community hospital.

10  Q    How long was she in the community hospital?

11  A    I believe approximately three weeks.

12  Q    If you will turn to tab 1108 in your binder, the document

13  marked PX-1108.

14  A    Yes.

15  Q    Do you recognize this document?

16  A    I do.

17  Q    What is it?

18  A    It is a psychiatric evaluation, and it's with the address

19  at the top, Merit Health Batesville, and it pertains to

20  person 90 admission there on 9-19-2016.

21  Q    And was this written at the time of discharge of person 90

22  from the community hospital?

23  A    Yes.

24  Q    Did you rely on this record in reaching findings about

25  person 90?

1   A   I took it into consideration among the other records that

2   were provided for me.

3             MS. VAN EREM:  Your Honor, I move PX-1108 into

4   evidence.

5             THE COURT:  Any objection from the State?

6             MR. SHELSON:  No, Your Honor.

7             THE COURT:  PX-1108 will be received in evidence.

8       (EXHIBIT PX-1108 MARKED)

9   BY MS. VAN EREM:

10  Q   I will direct you to the paragraph on page 3 where it says

11  "Discharge Criteria."  What does that say?

12  A   It says, "Discharge Criteria:  No SI, no HI," which is

13  suicidal ideation, homicidal ideation.  "No psychosis.  No

14  mania, depression, anxiety, irritability, anger, less than 3

15  out of 10, --

16             THE COURT REPORTER:  I'm sorry.

17             THE WITNESS:  I'm sorry.

18  A   "No mania, no depression, anxiety, irritability, anger,

19  less than 3 out of 10, if 10 is the worst."  Period.  "No side

20  effects to medication and fully alert and oriented.  However,

21  this is" or "will likely not apply to her as I strongly believe

22  she will be committed to the State Hospital and leave here to

23  go on to the State Hospital."

24  BY MS. VAN EREM:

25  Q   What did you conclude after reading this record?

1    A    What I concluded is the physician who was her attending in

2    the hospital had taken care of her for three weeks.  She was

3    very stable.  This physician writes that there was no evidence

4    of symptomatology of serious mental illness present, no

5    lethality, no danger to herself or others, she was oriented,

6    and that this physician had stabilized her.  But this last

7    sentence implies that it doesn't matter, she is going to the

8    State Hospital anyway.

9    Q    Generally, if someone is stabilized, do they need treatment

10   in the State Hospital?

11   A    No.

12   Q    Why not?

13   A    Because they have stabilized, they are no longer in need of

14   acute care, meaning for acute care you would need to be unable

15   to care for yourself or a danger to yourself or others, and

16   this is not apparent in this paragraph at all.

17   Q    In addition to concluding that person 90's most recent

18   State Hospital admission could have been avoided, did you make

19   any determinations regarding her length of stay in the State

20   Hospital?

21   A    I did.

22   Q    What was that determination?

23   A    It appeared that she stayed too long.

24   Q    How long was her most recent stay?

25   A    I want to go back to her report.

1   Q    Sure.  It should be around page 22.

2   A    Her most recent stay, I believe, was approximately 13 weeks

3   in total.  She came in in October, and she didn't leave until

4   January.  October of 2016 and then January 2017.

5   Q    What was your conclusion that person 90 stayed too long in

6   the State Hospital based on?

7   A    Well, the indication of the community hospital said she

8   went and she was stable and did not have any exacerbation of

9   symptoms then.  There was also a report in the record two days

10  later from Mississippi State Hospital that determined that she

11  did not meet criteria for admission on 10-13.

12       Also in the record, it indicated as early as the end of

13  November that she appeared to stabilize and was at that time

14  offered the option of a group home.  But she didn't go until

15  the third week in January 2017.  So it seemed like a long time,

16  to me, to stay in the State Hospital.

17  Q    In your opinion, could she have been discharged sooner?

18  A    Yes.

19  Q    Once she was admitted to the State Hospital, what should

20  have been taking place while she was there?

21  A    At the very first, to begin the discharge planning on the

22  day of admission.  And the concern for this woman is that she

23  was living in her own apartment and she had become evicted from

24  that apartment.  So a similar situation would need to be

25  procured for her so that she could go back to that level of

1    independence in the community.  So to start working on that

2    right away in conjunction with person 90 and person 90's

3    daughter.

4    Q    Did any of that occur?

5    A    It wasn't apparent, not to my knowledge.  There was no

6    indication that an apartment was being looked for for person

7    90.  She was offered a personal care home.

8    Q    How had person 90's circumstances changed from the time

9    that she stopped going to medication appointments to the time

10   that she was discharged from the State Hospital?

11   A    Her circumstances changed in that she had been living in

12   her own apartment, she had been living at a high level of

13   independence, she was managing her own finances, she was out

14   and about in her community, and then she was committed and

15   stayed in the hospital for the 13 weeks and then was discharged

16   to a much more dependent setting, a personal care home.  So she

17   took a step down in her independence.

18   Q    Can you describe another example of a person who would have

19   avoided or spent less time in a State Hospital?

20   A    I can talk about person 104.

21   Q    Okay.  What are the circumstances of person 104 on page 125

22   of your report?

23   A    Person 104 is a young woman.  She is 38 years old.  She is

24   diagnosed with schizophrenia.  She has had a trauma history, a

25   lot of mental illness in her own family.  She is working now

1  towards getting her GED.  She is an artist.  When I met with

2  her, she showed me her pieces which are very, very interesting,

3  very modern looking.  And she has, I believe, been in the

4  hospital four times.

5  Q   Did you interview another individual involved in person

6  104's life?

7  A   I did.  And that is the -- her informal caregiver who is

8  the wife of the pastor of person 104's church, who has been, by

9  person 104's report, tremendously supportive to her.  She calls

10  her her -- I think it's her godmother or her fairy godmother,

11  that she just sees her as such an angel.

12  Q   Focusing on person 104's last admission, what led you to

13  find that person 104 could have avoided or spent less time in

14  the State Hospital?

15  A   She had also -- this was an individual who had an

16  apartment.  Her symptoms were starting to exacerbate which in

17  her case is characterized by fighting, agitation.  She was

18  destroying property and was not able to be in that apartment

19  any longer.  And so she was, in fact, committed to the State

20  Hospital.

21  Q   Did person 104 stabilize quickly when she was committed to

22  the State Hospital?

23  A   She did.  She did.  She stabilized very quickly, according

24  to the records.

25  Q   What happened after she stabilized?

1    A    She stayed there.  She actually stabilized I believe within

2    a week from her admission.  She was admitted on May 31st, 2017,

3    and appeared to stabilize by June 6th.  The problem was trying

4    to find housing for her, that that was what was indicated in

5    the record because she couldn't go back to her apartment, she

6    had destroyed it, according to the record, and that she had

7    very difficult relationships with family so she couldn't go

8    back with them.

9    Q    After she had stabilized, did she have any incidents in the

10   State Hospital?

11   A    She did.  She had -- there was an incident of -- she had

12   talked with me and it was also in the record about noise really

13   bothers her to the extreme, which I'm associating with some

14   kind of traumatic event in her past.  She does have a trauma

15   history.  But the noise really bothers her.

16       She had a couple of events of one where she threw a binder

17   and another where she had destroyed some fixtures in a

18   bathroom.

19   Q    And do you believe person 104 could have been discharged

20   sooner than she was?

21   A    Absolutely.  I think the window was missed; that she had

22   stabilized quickly, she was not discharged, and then the

23   environment of the State Hospital and the noise triggered her,

24   for whatever reason, and she had some problems.

25   Q    You mentioned some past aggressive behavior of person 104.

1    Is that right?

2    A    Yes.

3    Q    In your experience, can individuals with a history of

4    aggressive behavior be safely served in the community?

5    A    Absolutely.  And once stabilized and services are provided

6    to them, be it by a PACT team, case manager, connection with

7    CMHC, then yes, they can live at a very high level of

8    independence.  And this woman has evidence.  She told me on the

9    interview that she now is living in a five-room house and

10   living independently there.  The house was obtained for her by

11   her church.

12   Q    Did you make a determination that person 104 is at serious

13   risk of hospitalization?

14   A    Yes.

15   Q    You determined that she was?

16   A    Yes, I did.

17   Q    What services could help person 104 live safely in the

18   community?

19   A    She is an individual who is appropriate for a PACT team.

20   The services that are within that PACT team I believe are very

21   appropriate for her, specifically case management, which would

22   offer, augment what the church is doing for her now, to give

23   support to her informal support network so they are not the

24   only ones.  Also, the 24-hour crisis so that before symptoms

25   exacerbate, to be able to contact, have local outreach --

```
 1              THE COURT REPORTER:  I'm sorry.
 2   A    To have access to 24-hour crisis service, to have mobile
 3   outreach so that she could have contact before her symptoms
 4   would exacerbate and would require her to be in a hospital.
 5   Also, support around her medication, her psychotropic
 6   medication connection there, support around her goals, which
 7   she has goals.  She wants to get her high school diploma.  She
 8   wants to pursue her art.
 9   BY MS. VAN EREM:
10   Q    Had person 104 received these services?
11   A    No.
12   Q    Had she received any community-based services?
13   A    She -- I also, as part of the collateral, interviewed the
14   community mental health center staff who were working with her.
15   In the record it shows that she comes in for a medication
16   appointment, though in my opinion the appointments are too far
17   apart.  She also sees a nurse.  And then there is a case
18   manager that visits her.  But when I spoke with the case
19   manager, she really wasn't too familiar with -- because I
20   thought the five-room house was so wonderful, but the case
21   manager really wasn't too aware of that.
22        And the visits by the case manager did not seem to be in
23   keeping with any kind of exacerbation of symptoms.  There
24   wasn't any indication that she stepped up the visits or did
25   anything more during that period of time when person 104 was
```

1    starting to have problems in the community.

2    Q    Could more intensive services have prevented person 104's

3    hospitalization?

4    A    I believe so, yes.

5    Q    Dr. Baldwin, you testified earlier that the lack of

6    community-based services has led to individuals being admitted

7    unnecessarily or staying longer than necessary in State

8    Hospitals.  I would like to draw your attention to crisis

9    services specifically.  What is the goal of crisis services?

10   A    The goal of crisis service is three-fold.  It is to divert

11   from hospital whenever possible, to stabilize the individual,

12   and to then connect them to the next level of care, the most

13   appropriate level of care for them.

14   Q    You mentioned earlier that you developed crisis services in

15   your work in Massachusetts.  Is that right?

16   A    I did.

17   Q    Can you just briefly describe the crisis services that you

18   developed?

19   A    Yes.  It's a continuum.  It should begin with a proactive

20   advanced crisis plan which is developed in conjunction with the

21   individual, any supportive family members or friends, to talk

22   with that individual when they're stable about what they would

23   like to have happen to them if they start to get into a problem

24   area with their medications.  So first that.

25        But then at the lowest level, a "warm" line where someone

```
1    can call and chat for a variety of reasons, then a hot line
2    where a person would call to get connected to a crisis service
3    or be triaged for crisis, and then to have the mobile outreach
4    capacity where clinicians are actually available to go out to
5    where that individual is, be it their home or some other place.
6    It could even be under a bridge or in a group home or whatever.
7    Also, the capacity for people to come into an office to be able
8    to meet with someone there if that would be preferable for them
9    to do that.
10        And then to also have a crisis stabilization unit which is
11   a short-term diversionary unit which can see people, have them
12   be stable, talk with people, get reconnected with their
13   medication, get connected with an appointment, whatever they
14   need, and then to be discharged back home from the CSU.
15   Q    When were the crisis services that you testified about
16   developed in Massachusetts?
17   A    They were.
18   Q    When were they developed?
19   A    Oh, when?  We started right at the beginning in 1978 with
20   the prescreening and then added services as we went along.
21   Obviously, the prescreening emergency services center was open
22   right then so people could come in, but we also had go-out
23   capacity.
24        And then we -- the warm line and the hot line also right
25   then in 1978.  And then DCSU was later after we had established
```

1   the first part.

2   Q   And I'm not sure you mentioned the term "prescreening"

3   before.  Can you describe what prescreening is?

4   A   Prescreening, that's what we called it.  I don't know -- I

5   mean, it can go by a lot of different names but it is a mobile

6   outreach capacity where a family member, anyone who is involved

7   with a patient -- it could be law enforcement, it could be a

8   homeless shelter -- sees a person with serious mental illnesses

9   having trouble, and so they can call and speak immediately to a

10  clinician.  This is a live clinician that picks up the phone.

11  It is not an answering machine.  It's 24 hours a day.  You

12  speak with that person.  A determination is made.  And then, if

13  need be, the prescreener or the clinician will travel to where

14  that individual is.

15  Q   Why were crisis services developed in Massachusetts?

16  A   It's a hallmark of community-based -- comprehensive

17  community-based services that support individuals with serious

18  mental illness in the community.  You have to have that.  By

19  nature of the illness that it is a chronic illness, and people

20  do -- they get challenged by their symptoms periodically and

21  they need help.

22      And oftentimes, as I said, it could be a warm line where

23  they just call and chat.  But maybe they need more.  And then

24  you want to be available to them to divert them from the

25  hospital, stabilize them, and connect them back.

1      Excuse me.  And it's good for family members, too, to be
2    able to access those services.
3    Q   What happens if a mobile crisis team is called in and an
4    individual is in a potentially dangerous psychiatric situation?
5    A   Well, the first thing that you do -- and I can speak from
6    personal experience -- is that when you get a call, the first
7    thing you do is get the contact information, where they are and
8    how you can reach them or how you can dispatch help to them,
9    because you may get disconnected, they may hang up, you may
10   lose service.
11       The next is to assess danger and immediacy of the problem.
12   And if you sense that there is a dangerous situation, you are
13   going to take the steps that you need to protect that person
14   and keep them safe.
15       For example, if it's a domestic violence situation, you may
16   send police.  If there is a potential for someone harming
17   themselves, you are going to send your prescreener, maybe
18   police, maybe an ambulance.  You are going to send who needs to
19   go there to help that individual.  But always with the
20   prescreener or the clinician.
21   Q   Turning back to your review in Mississippi, did you make
22   any conclusions regarding crisis services based on the people
23   you reviewed?
24   A   I did.
25   Q   What were your conclusions?

```
 1   A   It seemed that it was lacking.  It seemed that there
 2   were -- in reports I read, that there were crisis teams, but
 3   when I spoke with individuals in my sample, it wasn't -- the
 4   only way I can describe it is it wasn't part of the culture
 5   where it wasn't automatically when you talk with someone, "Now,
 6   you know you have the crisis number, you can get a live
 7   clinician there any time.  Take this card and put it on your
 8   refrigerator.  Here it is.  This is a magnet, stick it in your
 9   car."  It wasn't that kind of a go-to information, because I
10   did ask individuals and their family members, "Were you told
11   about crisis?  Did you use crisis?  Were you aware of a crisis
12   number?"  And it seemed to be lacking.
13   Q   For the people you reviewed, could mobile crisis services
14   have prevented admission to a State Hospital?
15   A   For a number of them, yes, I believe so.
16   Q   How did you reach that conclusion?
17   A   It was looking at the pattern of symptoms and how they
18   increased over time and that you could see in the record how it
19   was just getting worse and worse and worse.  The individual was
20   not accessing crisis.  The family members were not accessing
21   crisis.
22       I would ask when -- there was one individual I asked, "Did
23   you call the crisis line?"  "No."  You know, it just -- as I
24   said, it didn't seem to be a culture or a go-to, that this was
25   a hallmark of what you do, "We're here for you.  We're going
```

1  to -- you know, you just call us and we will help you."

2  Q   And is what you described different than your experience in

3  Massachusetts?

4  A   Absolutely.

5  Q   In what way?

6  A   I mean, I can remember people calling the mental health

7  center and they would say, "I think I'm going to be in trouble

8  tonight."  I mean, it would be during working hours and we

9  would say, "Well, come in right now or, you know, we'll send

10  your case manager out."  "Well, I think I'm going to" --

11          THE COURT REPORTER:  I'm sorry?

12  A   People would call and say, "I think I'm going to be in

13  trouble after you close."  And we would say, "Call the crisis

14  line.  If you get in trouble, we're there."  "Okay.  Okay.

15  Good.  Thanks.  Bye."  I mean, it was a given that they knew

16  about the crisis line and it was used, and it works.

17  BY MS. VAN EREM:

18  Q   Can you give an example of a person that you reviewed in

19  Mississippi where a mobile crisis may have prevented a State

20  Hospital admission?

21  A   I can.  I would like to talk about person 117.

22  Q   Okay.  Can you briefly describe person 117's circumstances?

23  Page 203 of your report.

24  A   This is a young man.  He is 33 or was 33 at the time of the

25  interview.  He is a father of young children.  When we saw him,

1    he was living at his mother and father's home but he is someone

2    who is working full-time.  We didn't go to see him until the

3    evening.  He asked, because he is working during the day.

4        He is diagnosed with major depression and polysubstance use

5    disorder.

6    Q    How many state hospitalizations did person 117 have?

7    A    He had one.

8    Q    How could mobile crisis services have prevented his

9    admission to a State Hospital, briefly?

10   A    He is somebody that -- this individual before the State

11   Hospital admission had had a very serious suicide attempt, and

12   then just before this admission he had had a second suicide

13   attempt.  The commitment was initiated by family, his sister.

14   And it was because he was becoming agitated, he was using

15   drugs, he has access to weapons, and the family was just so

16   fearful for him that they initiated a commitment.

17   Q    So when was person 117's first hospitalization due to

18   symptoms of mental illness?

19   A    That was in the summer of 2015, and that was to a community

20   hospital.

21   Q    And was that in conjunction with his first suicide attempt?

22   A    Yes.  He took an overdose and he was on life supports.

23   Q    Was he admitted to a State Hospital at that time?

24   A    No.

25   Q    What were the reasons for this -- sorry.  Just one second.

1    What happened when he was discharged from the 2015

2    hospitalization?

3    A    What happened when he was discharged?

4    Q    In 2015.  Yes.

5    A    He was told that if he got in trouble again to call 911 or

6    to go to the ER or to come back.  He had been in the medical

7    hospital first and then spent a couple of days at the -- at a

8    community psych unit.  And when he left there, he was told if

9    you get in trouble again to call 911, go to the ED or come back

10   to that hospital.

11   Q    Did you find any indications that person 117 had received

12   community-based crisis services after this 2015

13   hospitalization?

14   A    No.

15   Q    And when was person 117 hospitalized in the State Hospital?

16   A    That was in the summer of 2017.

17   Q    What had occurred immediately before that 2017 State

18   Hospital admission?

19   A    His symptoms of depression had increased.  He was agitated.

20   He was continuing to use drugs.  He had -- about a week before

21   that, had a -- all suicide attempts are serious, but this one

22   was not as serious as the one in the summer of 2015.  But he

23   had taken an overdose again and the family was very frightened

24   for him and so they initiated commitment.

25   Q    Where did person 117 go after his family filed commitment

1  paperwork?

2  A    He went to jail.

3  Q    How long was he in jail?

4  A    It was approximately a week, I would say the better part of

5  a week.

6  Q    Had he been charged with any crime?

7  A    No.

8  Q    Turn to tab 1109 in your binder, the document marked

9  PX-1109.  Is this a document you reviewed?

10  A    Yes.

11  Q    What is it?

12  A    It is the South Mississippi State Hospital discharge

13  summary, and it's -- the admit date is 8-16-2017.  Date of

14  discharge, 9-8-2017.

15  Q    Did you rely on this record in reaching your conclusions

16  about person 117?

17  A    I did.  I took it into consideration.

18        MS. VAN EREM:  I move to admit PX-1109 into evidence.

19        THE COURT:  Any objection from the State?

20        MR. SHELSON:  No, sir.

21        THE COURT:  All right.  PX-1109 will be received into

22  evidence.

23      (EXHIBIT PX-1109 MARKED)

24  BY MS. VAN EREM:

25  Q    So turn to page 5 of this record.  Will you please read the

1   paragraph that says, starts with "Follow-up Care"?

2   A    "Follow-up Care:  The patient is to follow up at Pine Belt

3   Mental Health in Mississippi, at 8:00 a.m. on 9-12-2017.  The

4   patient is to follow up with his primary care doctor for any

5   medical issues as needed."

6   Q    And will you also please read the last paragraph in this

7   document?

8   A    "Instructions to Patient and Family:  The patient and the

9   patient's family were educated on the patient's medication

10  regimen and the date and time of his follow-up appointments.

11  They were instructed in the importance of the patient taking

12  his medication as prescribed and keeping his outpatient

13  appointments.  The patient and the patient's family verbalized

14  understanding of discharge instructions."

15  Q    Was this record relevant to your findings?

16  A    It was.

17  Q    In what way?

18  A    I'm finding the follow-up care and the instructions to the

19  patient and family as lacking, and there is really nothing in

20  here about crisis services.  But I am also concerned that the

21  burden, the complete burden of affecting follow-up care is

22  placed on the patient and his family.  Not only the psychiatric

23  part but the medical part as well.  And this is a man who has

24  chronic pain, which was the beginning of his drug use to begin

25  with, was that he takes opiates for his pain or medication to

1   dull the pain.

2       And so even to place the burden both psychiatrically and

3   medically on him, it seems like healthcare providers have an

4   obligation to do more to help people connect.

5   Q   Did you make any findings about whether person 117 is at

6   serious risk of hospitalization?

7   A   I did.

8   Q   What were your findings?

9   A   He is.  He is at risk.

10  Q   In your experience, have people with similar severity of

11  serious mental illness as person 117 been safely served in the

12  community without being at serious risk of hospitalization?

13  A   Absolutely.  Did you want me to elaborate?

14  Q   Sure.

15  A   I mean, this is an individual -- and I have known

16  individuals in my experience very similar to this young man.

17  He has, as he verbalized, a lot to live for.  He has young

18  children.  He wants to stay involved in their lives.  He has

19  hobbies, he has a job, he has goals, and he is someone who is

20  very interested in getting well, which he talked about the

21  plans that he has for that.

22      However, he has challenges.  He has chronic pain.  He has a

23  history of drug use and he also has a history of depression.

24  Q   What services would person 117 need to be safely served in

25  the community?

1    A    The crisis services first and foremost.  And that would be
2    24-hour a day availability of a clinician.  The range that I
3    discussed previously, both available to the individual, also to
4    his family members.  I spoke at the time of the interview with
5    his mother, and she was very concerned about how they can help
6    their son.
7         The other thing that's important for him is to connect him
8    with recovery services.  He has a substance use disorder.  To
9    be connected with a 12-step program and a sponsor.  And he is a
10   veteran.  And so it would be appropriate for him to be
11   connected with veteran services.  So through that, to have a
12   case management function, either through a sponsor or through
13   the veteran service, would be appropriate for him.
14        Also, he would need connection with a psychiatric
15   prescriber.  He is somebody who at this point wants to wean
16   himself off medication but at least to have that relationship
17   if need be, and connection, as I said before, to the medical
18   because of his chronic pain.
19   Q    Did person 117 receive those services in the community?
20   A    He did not.  The other piece is benefits assistance for
21   him.  I would add that.
22   Q    And we will go into this a little bit more later but what
23   is benefits assistance?
24   A    To help people obtain the -- the ability to pay for their
25   healthcare.  It can be -- for this individual, it might be

1  through the Veterans Administration, but also for people to

2  obtain healthcare insurance or to get on a disability insurance

3  or whatever is appropriate for them to help them pay for not

4  only their psychiatric treatment, community-based services, but

5  their medication.

6  Q   Did person 117 receive any community-based mental health

7  services?

8  A   He had been referred for outpatient groups and to meet with

9  a nurse and to receive medication in the community, and he --

10  he went for a while but he stopped for a variety of reasons

11  that he talked with me about.

12  Q   What were some of those reasons?

13  A   He does not have transportation so it was hard to get

14  there.  He worked, so he would need appointments that were in

15  the evening or on the weekend.  He also was very concerned that

16  he had to pay for the visits.  He said the visits are $25 a day

17  and he is having trouble affording that, which is also

18  something his mother talked about.

19      And that to be -- I didn't -- in my opinion, the services

20  he was referred to were not the best services for him.  He

21  doesn't want to take medication.  So to refer him for a

22  medication and tell him yes, to take it, or to be in groups may

23  not be appropriate for him.  There was nothing with regard to

24  his substance use disorder either.

25  Q   What happened when he stopped going to outpatient

1    treatment?

2    A    The first time or the second time?

3    Q    You mentioned that he had been going to some outpatient

4    appointments but stopped going.

5    A    I would have to say that he just has been kind of on his

6    own since then.  He is weaning himself off medication.

7    Q    And did the community mental health center reach out to him

8    when he stopped going to his appointments?

9    A    I asked about that, and he said, "If I miss an appointment,

10   they will send a letter or they will call."  But it's not

11   their -- they have left messages or they send the letter.  It

12   is not that they've talked with -- he said he hadn't talked

13   with them directly.

14   Q    Based on your experience, would you expect a different

15   approach, given person 117's history?

16   A    I would.  I would expect a more hands-on approach with

17   someone like this individual.  He has had two suicide attempts

18   within the past three years, and he has major depression, he is

19   a substance use disorder person.  He is -- he has some high

20   lethality risk.  I would want to stay very much on top of him.

21   I would want a case management function to be very much aware

22   of how he is doing all the time.

23   Q    What do you mean by high lethality risk?

24   A    That he is someone who could enter into that same situation

25   that he was in in summer of 2015 or in 2017 where he becomes

1    depressed, he starts using drugs, and he takes another

2    overdose.

3    Q    What effect could crisis services have had on person 117?

4    A    The 24-hour capacity is important because that would be

5    accessible both to his family.  If the individual didn't call,

6    then the family could call.  But just to say, "We're worried

7    about our son."  Or his girlfriend could say, "I'm worried

8    about the father of my children.  I want someone to see him.  I

9    think he is using again, I'm not sure."  You know, and to get

10   in front of the symptoms and to get connection right away in

11   this case to keep him safe but also to avoid any further

12   hospitalization.  It's the appropriate care for this individual

13   with these symptoms.

14   Q    You mentioned benefits assistance and I would like to go

15   back to that a little bit.  In your professional experience,

16   should benefits assistance be provided to people with serious

17   mental illness?

18   A    Absolutely.

19   Q    Why?

20   A    Well, in the case of this individual, and there were

21   several other, where they did not have -- oftentimes when

22   people have serious mental illness, they have trouble

23   organizing their thoughts or planning what they need to do in

24   an organized way.  So to apply for healthcare benefits on their

25   own can be challenging.  And so to have someone help with those

*** DAILY TRANSCRIPT ***

```
 1    applications or those interviews or providing the documents,

 2    the proof needed, to have coverage for your medication.  I had

 3    one individual who was not able to obtain his medication

 4    because -- his shot, his intramuscular shot, because he didn't

 5    have his insurance in place.

 6    Q    Who should provide benefits assistance?

 7    A    It can be provided by a number of individuals.  But,

 8    appropriately, the case manager can help.

 9    Q    Does the hospital have a responsibility to provide benefits

10    assistance?

11    A    Absolutely.  The social worker in the hospital is an ideal

12    person for that role.

13    Q    How could benefits assistance have affected person 117's

14    risk of hospitalization?

15    A    If he had benefits in place, and it is something that he

16    says he wants to have, that he is working but he is not sure

17    how he could even get it through his work, he has heard stories

18    from coworkers about how to get it, but in this case he

19    wouldn't have to pay for his visits, which he said was a

20    deterrent to him going to the visits, it's $25 out of pocket.

21    So it might have helped him get more connected with the mental

22    health center if he had insurance to support that.

23         And then I would see the mental health center, once the

24    connection is made, helping him with those other services that

25    I discussed previously.
```

1    Q    Did you find that benefits assistance may have prevented

2    unnecessary hospitalization for other individuals in your

3    review?

4    A    I did.

5    Q    Going back to crisis services, did the lack of access to

6    crisis services lead to unnecessary hospitalization for any

7    other individuals you reviewed?

8    A    Yes.

9    Q    Can you provide another example?

10   A    I can.  I would like to talk about person 108.

11   Q    Can you tell us a little bit about person 108?  It is on

12   page 150 of your report.

13   A    This is a very young man.  At the time of the interview, he

14   was 27 years old.  He had been in -- had eight State Hospital

15   admissions in the past nine years.

16       When I saw him -- I'm just going to get on my page here --

17   he was living with his grandmother, and the grandmother was

18   very knowledgeable about his illness and very in touch with

19   what his symptoms are.

20       He has, I would say, an underlying symptomatology at all

21   times that he is struggling with.  And with the support of his

22   grandmother, he is managing.  He was -- I will just say briefly

23   he is delightful.  He is very interested in sports and he could

24   talk about basketball and baseball forever.  You know, it was a

25   very animated discussion.

1    Q    You mentioned the term "underlying symptomatology."  Do you

2    mean that he experiences symptoms most of the time?

3    A    Yes.  Yes.

4    Q    What typically triggers person 108's hospitalization?

5    A    His description and the grandmother's description is he

6    becomes -- particularly in the wintertime when it's dark, he

7    becomes isolated, he is not able to go out as much.  He is

8    always struggling with these symptoms.  He has a fixed

9    delusional system about there has been a lot of losses in the

10   family and he somehow in his delusion believes that he could

11   prevent these if he could learn more about who or what is

12   making them happen.  So he becomes isolated and the symptoms

13   increase.  He goes in his bedroom, he tries to drown out the

14   voices and the thoughts, and he can't.

15   Q    Why did you find that crisis services could have prevented

16   unnecessary hospitalization in person 108's case?

17   A    Because he has a lot of strengths.  He is someone who is

18   very -- he has a good deal of insight into his symptoms.  And

19   his grandmother -- he lives with his grandmother who is a

20   tremendous support.  And the 24-hour crisis services would

21   offer a contact for them when these symptoms start increasing.

22   And the grandmother could call and say, "I would like someone

23   to come visit my grandson and talk with him and figure out

24   what's going on."  He might call and talk with the hot line or

25   he might talk with a clinician.

```
1         And if symptoms were continuing, he might even -- it would
2    be appropriate for him to have a stay at crisis stabilization,
3    get connected on maybe a higher dose of medication temporarily,
4    have someone to talk to, feel in a safe place.
5    Q    Did person 108 receive those crisis services?
6    A    No.  It was not indicated in the record.
7    Q    Could crisis services have prevented his last admission to
8    the State Hospital?
9    A    I believe so.  And the others as well.  He has had a number
10   of them at such a young age.
11   Q    In your professional experience, have you seen people like
12   person 108 able to be served in the community without repeated
13   hospitalizations?
14   A    I have.  I have.
15            MS. VAN EREM:  Your Honor, I'm getting close to the
16   end but I maybe have I would estimate about 20 to 30 minutes
17   left.  I'm not sure if you would like to take a lunch break now
18   and then I can wrap up after lunch or if I should keep going.
19            THE COURT:  You should keep going.  I mean, we will do
20   our cross-examination after lunch.
21            MS. VAN EREM:  Okay.
22   BY MS. VAN EREM:
23   Q    Dr. Baldwin, did you make any findings regarding state
24   hospital discharge practices?
25   A    I did.
```

1  Q   What were your findings?

2  A   I have kind of mentioned it before but I can say I did not

3  see the discharge planning taking place right at the point of

4  admission, which is standard practice.  I did not see the

5  inclusion of the individual or their informal support network

6  involved in discharge planning as much as -- as I thought it

7  should be, given my experience.

8      And, also, I didn't see the transition kinds of activity

9  between the hospital and the community mental health center

10  that is proven to be successful.  And I can describe that

11  activity if you want or --

12  Q   Sure.  If you can briefly describe the transition activity.

13  A   To have the community mental health center involved right

14  from the beginning, that staff or the case manager or other

15  staff that would be working with that patient, come to the

16  hospital, meet with the patient, meet with hospital staff,

17  participate in meetings, and so that the individual has a

18  familiar face that when they go out, they know they have

19  already made a connection with that person.  And to start right

20  at the beginning, shared records.  There is all kinds of ways

21  that a transition phase can take place.

22      The other thing that I saw is oftentimes with individuals,

23  they would be in the hospital for a while, they would be

24  stabilized, and at that point the discharge planning would take

25  place.  So it would mean that a person is -- has very few

*** DAILY TRANSCRIPT ***

1    symptoms and yet they're still in the hospital waiting to be

2    discharged.

3    Q    And to be clear, that's what you saw in Mississippi in your

4    review?

5    A    I did.

6    Q    What was the effect of this inadequate discharge planning?

7    A    People ended up staying in the hospital longer.  The

8    connections were not made with the community-based services as

9    would effect a successful discharge.  And so the person would

10   come out of the hospital and they may or may not connect with

11   the community-based services because it's difficult at that

12   point.

13   Q    And then what would happen if there was --

14   A    Then they would go back into their pattern of an

15   exacerbation of symptoms, no one to connect with, and then end

16   up needing a higher level of care.

17   Q    And by higher level of care, are you referring to

18   hospitalization?

19   A    A hospitalization, yes.

20   Q    Are there any examples of people you reviewed who did not

21   receive an adequate discharge planning process?

22   A    There are.  I can talk --

23   Q    Will you share one example?

24   A    I can talk about person 92.

25   Q    If you will please briefly describe person 92.  It's on

1    page 35 of your report.

2    A    This is a young woman.  She is 30 years old.  I'm just

3    going to get to my page.  She has had six hospitalizations to

4    the State Hospital, according to the record.  She is someone

5    who is diagnosed with substance use disorder but also

6    schizophrenia.  She is someone who has lived independently on

7    her own.  At this point she is in a program out of state.

8    Q    What is your basis for saying that person 92 did not

9    receive an adequate discharge planning process?

10   A    Well, I reviewed her hospitalizations.  I also spoke with

11   her and I spoke with her mother as well.  And with the six

12   hospitalizations -- and again, she is 30 years old, so, you

13   know, they have all taken place recently from a young adult to

14   present.  The first two, there was no indication of any

15   discharge planning.  There was no aftercare plan for her,

16   according to the records from the State Hospital.

17        The third one, she was discharged to her grandfather, and

18   the grandfather was tasked with connecting her with another

19   family member out of state.  So no discharge planning there.

20        The fourth one, it was all aftercare service, were simply

21   referred to the -- what is it called, the CR -- the

22   residential, central residential program.  So the program was

23   tasked with all the aftercare services, so there was nothing

24   specific there.

25        The fifth one, she was discharged to a man, an older man

```
 1   who had lied twice about his relationship with her, and
 2   ultimately it was found, per the mother's report in the record,
 3   that he is in prison and he had been exploiting her,
 4   prostituting her, giving her drugs.  So that was the fifth
 5   admission.
 6        The sixth, she was discharged, and that was at that point
 7   when she went to Ohio to live, and her mother was tasked with
 8   getting her into a program in Ohio, which is where she is now.
 9   So there was no planning for that one either, just discharged
10   to the mother.
11   Q   How did person 92's discharge planning process differ from
12   professional standards?
13   A   In my opinion, the best discharge planning is, again,
14   taking place from the point of admission.  It's involving the
15   individual and the family member but also making those
16   connections for that individual, and the individual meeting
17   people who are going to be treating him or her in the community
18   and not tasking family members with the full burden of the
19   discharge -- the aftercare planning and the connection with
20   community services.
21   Q   How did person 92's discharge experience affect her?
22   A   She cycled back into the hospital six times because there
23   was no connection.  This last time she had been three weeks
24   living in woods behind Walmart.  She had been homeless.  The
25   time before that, as I said, she had been exploited and had
```

1    been prostituted.

2        So the connections within the community for her substance

3    use disorder and also her serious mental illness were not being

4    treated at all.

5    Q   Dr. Baldwin, do you have any other examples about

6    individuals who have experienced unnecessary hospitalization

7    that you would like to share with the court today?

8    A   I can talk about person 91.

9    Q   If you can tell us a little bit about person 91.  It starts

10   on page 27 of your report.

11   A   Person 91 is a 59-year-old African-American man.  On the

12   day that I saw him, he came to meet us in a meeting room at

13   Jaquith Nursing Home.  I'm sorry.  I want to find the beginning

14   here.

15   Q   Sure.

16   A   He has had a total of 17 admissions to State Hospital.  And

17   he is a double amputee.  He came to us in a wheelchair that was

18   being pushed by someone else, but he had shared with us that

19   his own wheelchair, where he is able to mobilize, had been

20   taken away from him, he didn't have that.

21       He was, again, a very animated person, very upbeat, very

22   wanting to talk with us about his strong desire to leave the

23   nursing home.  And we talked a lot about his hobbies and his

24   interests and his desires.

25   Q   You mentioned the nursing facility.  Is Jaquith Nursing

1    Facility associated with the State Hospital?

2    A    It is associated, I believe, and it is on the grounds of

3    the State Hospital.  I know when I see physical exams of the

4    patients, it's on Jaquith stationery, so I think they do the

5    physical examinations for patients.

6    Q    You mentioned person 91 talked to you about his hobbies.

7    What does he like to do?

8    A    He is a musician, and he has played in Chicago in all the

9    blues places.  He talked about other musicians.  He loves to

10   improv, improvise.  He plays a saxophone.  He plays a

11   harmonica.  He plays clarinet or he wants to learn clarinet.

12   He is very interested in music.  He has been his whole life.

13   Q    Was he able to play the saxophone during his most recent

14   admission to the State Hospital?

15   A    He had asked for a saxophone and I had interviewed his

16   friend who confirmed that he brought his saxophone to the

17   hospital.  But for some reasons, he was unable to play it

18   without some adaptations, so the saxophone was locked up for

19   safekeeping.  That's what the record said.  So he never was

20   able to play it, unfortunately, although he wanted to.

21   Q    What were the reasons for his most recent admission to the

22   State Hospital?

23   A    He had been living in a nursing home and he is very -- he

24   is a strong personality, as I described, and his brother

25   described him that way, as his friend did as well.  And he

*** DAILY TRANSCRIPT ***

1  likes to smoke cigarettes.  He likes to make his own decisions

2  and be as independent as possible, and the nursing home was not

3  allowing him to smoke his cigarettes.  And so over time he got

4  increasingly more agitated and more agitated and got engaged in

5  some bizarre behavior around wanting to smoke, and ultimately

6  the nursing home initiated the commitment process.

7  Q   How long did this most recent admission last?  I think it's

8  on page 30.

9  A   He came in in June of 2015, and he did not leave until

10  March 2016.  So he was there quite a long time.

11  Q   Did you make any findings regarding whether person 91 could

12  have avoided or spent less time in State Hospitals?

13  A   Absolutely.  This is someone who has cycled in and out of

14  State Hospitals 17 times over his life, and that the aftercare

15  services that could be available to him in the community were

16  not being provided.

17  Q   So to clarify, did you find that he could have avoided or

18  spent less time in State Hospitals?

19  A   Yes.

20  Q   During his most recent admission, did person 91 want to be

21  in a State Hospital?

22  A   Oh, no.  He was very adamant about wanting to leave.  He

23  talked with us at length about it.  And, also, it was

24  documented in the records frequently how he wanted to leave.

25  He had shared that he agreed to a nursing home because he

1    thought it would be a stepping stone to the community and to

2    his own apartment.  He thought it would be easier to get out of

3    the nursing home than to get out of the State Hospital.

4    Q   If you'll turn to tab 1110 in your binder, document marked

5    PX-1110.  Is this a document you reviewed?  It's also on the

6    screen.

7    A   Yes.

8    Q   What is this document?

9    A   This is a Mississippi State Hospital clinical progress

10   note.  It's a psychology weekly note and it's dated July 7th,

11   2015.

12           MS. VAN EREM:  Your Honor, I move PX-1110 into

13   evidence.

14           THE COURT:  Any objection from the State?

15           MR. SHELSON:  No, Your Honor.

16           THE COURT:  PX-1110 will be received into evidence.

17       (EXHIBIT PX-1110 MARKED)

18   BY MS. VAN EREM:

19   Q   Can you read the highlighted portion of this record,

20   Dr. Baldwin?

21   A   I can.  "No significant behavioral problems noted during

22   the review period.  Person 91 was observed as being calm and

23   cooperative in the milieu.  He was generally seen rolling his

24   wheelchair in the hallway or different areas of the building.

25   Mood appears stable with no signs of aggression or anger

1    observed or reported.  He continues to deny SI," suicidal

2    ideation, "homicidal ideations.  He continues to have limited

3    insight and awareness into his condition, AEB" -- or as

4    evidenced by -- "stating, *I don't know why they put me here.*

5    *I'm just ready to leave here.  This is like a prison.*"

6    Q   Dr. Baldwin, what did you conclude from looking at this

7    record?

8    A   It's very similar to the way I saw him, the way he

9    presented, that there was no evidence of exacerbation of

10   serious mental illness symptoms.  He was calm.  He -- his mood

11   appeared stable, no anger or aggression.  Absence of symptoms.

12   He has never expressed any suicidal or homicidal ideations.

13   That's not part of his symptomatology.

14       And the part that was concerning to me is he continues to

15   have limited insight and awareness into his condition by

16   stating, "I don't know why I'm here, I'm ready to leave,"

17   whereas I don't see that as limited insight.  He is talking

18   about what his goals are.  He wants to leave and he wants to be

19   more independent.

20       And the answer, if I just -- one more thing.  The response

21   to that is simply, "I will continue to monitor and assess

22   patient progress."  There is no intervention based on that,

23   saying, "Well, let's talk more about what your goals are," or

24   "You seem to not be having any symptoms right now.  Let's take

25   the next step."  That's not there.

1   Q   How much longer was he in the State Hospital after this

2   progress note was written?

3   A   Well, that was in July 2015, and so he did not leave

4   until -- and I've got to find it again so I can tell you

5   exactly.

6   Q   I think it's on page 30.

7   A   He didn't leave until March 2016.  So that's several months

8   prior.

9   Q   If you will turn to tab 1111 in your binder, document

10  marked PX-1111.  Is this a document you reviewed?

11  A   It is.

12  Q   What is it?

13  A   It's Mississippi State Hospital clinical progress note, and

14  it is the Social Service weekly note, and it is dated

15  August 7th, 2015.  There is no treatment plan problem number

16  there, so that's absent.

17  Q   Can you please read the highlighted portion?

18  A   "Person 91 met with SW," or social worker, "several times

19  this week.  He let social worker know that he has been praying

20  to God and that he is helping to carry him through.  Person 91

21  asked social worker, or SW, each day about going home.  SW

22  explained to him that he is not quite ready for discharge but

23  that if he continues to go to his groups and comply with his

24  medication, when he is ready, social worker will refer him for

25  placement."

1          MS. VAN EREM:  Your Honor, I move PX-1111 into

2    evidence.

3          THE COURT:  Any objection from the State?

4          MR. SHELSON:  No, sir.

5          THE COURT:  PX-1111 will be received into evidence.

6      (EXHIBIT PX-1111 MARKED)

7    BY MS. VAN EREM:

8    Q    Dr. Baldwin, did this record contribute to any of your

9    conclusions?

10   A    It did.

11   Q    In what way?

12   A    It supports the way he talked with me in the interview,

13   also with other notes in the record, that he is continuously

14   asking and, in this case, each day, about going home and that

15   he is feeling -- I am interpreting from this that he is praying

16   to God that he is helping him to get through this, trying to be

17   patient.

18        But the other part that was concerning to me is the social

19   worker is saying, "You are not ready for discharge, but if you

20   behave or you go to your group," she doesn't -- that's my word,

21   "behave," continue to go to your groups and comply with

22   medication, when he is ready, social worker will refer him.  He

23   is saying he is ready now.  And so that's not what the social

24   worker is doing.  And she is looking or he is looking for

25   nursing home placement as the best option.

```
1   Q   We have one more document.  So if you'll please turn to

2   tab 1112 in your binder, the document marked PX-1112.  Is this

3   a document you reviewed?

4   A   Yes, it is.

5   Q   What is this document?

6   A   This is Mississippi State Hospital clinical progress note,

7   and this is dated September 2nd, 2015.  And it is a Social

8   Service weekly note.

9           MS. VAN EREM:  Your Honor, I move PX-1112 into

10   evidence.

11           THE COURT:  Any objection from the State?

12           MR. SHELSON:  No, Your Honor.

13           THE COURT:  PX-1112 will be received into evidence.

14   (EXHIBIT PX-1112 MARKED)

15   BY MS. VAN EREM:

16   Q   Dr. Baldwin, can you please read the highlighted sentence?

17   A   "He does not specify what is bothering him but he continues

18   to say, *I got to get out of here* -- or "her," but that's a

19   typo -- *got to get out of here; these people treat me like a*

20   *child.*"

21   Q   Okay.  And can you read the next highlighted portion as

22   well?

23   A   "Person 91 initially asked SW or social worker for boots

24   when he was admitted, but after a few weeks he stopped asking.

25   This week person 91 asked social worker to get him a sixe" -- a
```

1  size, that's a typo -- "size 10 tennis shoe so that he can wear
2  them on his stumps.  Person 91 does not seem to realize that he
3  can't walk on his stumps.  When social worker told him that he
4  couldn't have tennis shoes for his stumps, he noted, *I will get*
5  *some when I get out.*
6      Social worker let him know that that was an indicator that
7  he was not ready to leave and he started speaking in a whining
8  voice as if he were crying and said, *Y'all ain't gone never let*
9  *me out of here.*  Social worker tried to explain to him that he
10 would be discharged when he was ready, but he did not want to
11 listen to reason."
12 Q   Dr. Baldwin, did this record contribute to any of your
13 conclusions?
14 A   It did.
15 Q   In what way?
16 A   It is -- I am very much aware that people with -- are
17 double amputees.  There are some people who have long leg
18 prosthesis.  Other people prefer to walk on their stumps.  They
19 have special shoes that allow them to walk on their stumps.
20 Some people have even had skin grafts to allow the skin to be
21 tougher on the stumps.  And this individual has a history of
22 walking on his stumps, which he talked to us about.  And yet
23 here -- and it is also in other parts of the record as well,
24 his wanting to get out, wanting to walk on the stumps is being
25 viewed by staff as an indicator that he is not ready to leave,

```
 1    when, in fact, he is asking to go and he is asking to have a
 2    way to be more independent so that he can ambulate.
 3    Q    In your experience, have you served individuals with
 4    similar levels of severity as person 91 in the community?
 5              THE COURT REPORTER:  I'm sorry?
 6    BY MS. VAN EREM:
 7    Q    Have you served individuals with similar levels of severity
 8    of serious mental illness as person 91 in the community?
 9    A    I have.
10              MS. VAN EREM:  Your Honor, if I may just have a brief
11    moment to confer?
12              THE COURT:  Yes, you may.
13        (SHORT PAUSE)
14    BY MS. VAN EREM:
15    Q    A couple more questions.  Dr. Baldwin, you previously
16    testified that the burden of ensuring an individual stays
17    connected to community-based services should be shared between
18    the individual and mental health providers.  Is that right?
19    A    Correct.
20    Q    Do individuals with serious mental illness have difficulty
21    staying connected to treatment on their own?
22              THE COURT REPORTER:  I'm sorry.
23              MS. VAN EREM:  I'm sorry.
24    BY MS. VAN EREM:
25    Q    Do individuals with serious mental illness have difficulty
```

*** DAILY TRANSCRIPT ***

1    staying connected to treatment on their own?

2    A    In general, yes.  And I had testified earlier that there

3    is -- it's challenging oftentimes to organize thoughts, to plan

4    ahead, to think about having an appointment, writing an

5    appointment, getting yourself there, navigating the waiting

6    room or an auto attendant on a phone.  Those are all challenges

7    to stay connected.

8    Q    Why are those challenges specifically for people with

9    serious mental illness?

10   A    Because they have -- in general, it is an executive

11   functioning or it is a piece of the brain that often has

12   trouble organizing.  I mean, I think, you know, I can speak for

13   myself, I have trouble organizing sometimes remembering

14   appointments, and they do.  It also is a trust issue, to be

15   able to build a relationship with someone to connect with them

16   so that you can receive your services and continue to do that.

17   So people with serious mental illness have those challenges.

18   They also may have paranoia or suspicion where it is hard for

19   them to connect with anyone.  They tend to be isolating

20   themselves.

21   Q    And how can community providers help people stay engaged in

22   community-based treatment?

23   A    The range of community-based services are -- each and every

24   one is very important.  Some may be more important for some

25   individuals, a PACT team, a case manager, connection to a

 1   psychiatric prescriber, 24-hour --

 2              THE COURT REPORTER:  I'm sorry.

 3              THE WITNESS:  That's okay.  Where did I go too fast?

 4   A   A case manager, connection to a psychiatric prescriber,

 5   connection to primary care for their co-morbid medical, a

 6   connection to substance use treatment if that's needed.  And

 7   all of these services to a greater or lesser degree are going

 8   to be very effective in supporting people in the community.

 9   BY MS. VAN EREM:

10   Q   Thinking back on your review, do you have any lasting

11   impressions from your experience doing the review in

12   Mississippi?

13   A   I do.  I have included in my assessments before this, this

14   particular project, throughout my whole career, when I meet

15   with people, I ask them about their three wishes.  And so I was

16   glad that it was included in this interview where we would ask

17   people about their three wishes, because it gives them an

18   ability to imagine, to step outside of their situation.  And

19   then it's the foundation of goals.

20   Q   And when you say their three wishes, do you mean if you had

21   three wishes, what would they be?  That question?

22   A   "If you had three wishes, what would they be?"  And to just

23   think about that.  And people would, for the most part, give me

24   those three wishes that they would -- they would think about it

25   and then they would provide the three wishes.  And the

1    foundation of recovery in serious mental illness is to have

2    goals, to have your own goals.  And so to develop goals, you

3    can start with wishes.  And then the wishes themselves were --

4    their wishes were things like, "I would like to live in my own

5    house," or "I would like to have enough money to do the things

6    I want to do," or "I would like to be close with loved ones."

7    And when you think about it, those are the wishes we all have.

8           MS. VAN EREM:  I have no further questions at this

9    time.

10          THE COURT:  Okay.  All right.  It is appropriate for

11   us to take our lunch break at this time.  It's about 12:46.

12   Let's start back up at 2:05.

13          And, Dr. Baldwin, you may step down and we'll begin

14   your cross-examination at 2:05.

15          THE WITNESS:  Okay.

16          THE COURT:  All right.  Thank you.

17     (Lunch Recess)

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***

1

CERTIFICATE OF REPORTER

2

3          I, BRENDA D. WOLVERTON, Official Court Reporter, United

4   States District Court, Southern District of Mississippi, do

5   hereby certify that the above and foregoing pages contain a

6   full, true and correct transcript of the proceedings had in the

7   aforenamed case at the time and place indicated, which

8   proceedings were recorded by me to the best of my skill and

9   ability.

10         I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13         This the 12th day of June, 2019.

14

15                     s/ Brenda D. Wolverton
                       U.S. DISTRICT COURT REPORTER
16

17

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***