UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                          PLAINTIFF

VS.                              CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                             DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 11


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
AFTERNOON SESSION
JUNE 12, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186


*** DAILY TRANSCRIPT ***

1    APPEARANCES:

2    FOR THE PLAINTIFF:    MS. REGAN RUSH
                            MS. HALEY VAN EREM
3                          MR. JORGE MARTIN CASTILLO
                            MR. PATRICK HOLKINS
4

5    FOR THE DEFENDANT:    MR. JAMES W. SHELSON
                            MR. REUBEN V. ANDERSON
6                          MS. MARY JO WOODS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***

1                          TABLE OF CONTENTS

2

3     WITNESSES FOR THE PLAINTIFF

4     JUDITH BALDWIN

5        Cross-Examination By Mr. Shelson  .................1023

6     KATHERINE BURSON                              1057

7        Direct Examination By Mr. Holkins  ...............1058

8          Exhibit PX-1103  ..............................1088

9          Exhibit PX-1107  ..............................1093

10         Exhibit PX-1106  ..............................1100

11         Exhibit PX-1105  ..............................1102

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        *** DAILY TRANSCRIPT ***

1          THE COURT:  All right.  Are we ready for the

2   cross-examination of Dr. Baldwin?

3          MR. SHELSON:  Yes, Your Honor.

4          THE COURT:  Dr. Baldwin, you may return to the stand.

5          MR. SHELSON:  May I proceed, Your Honor?

6          THE COURT:  You may.

7                      CROSS-EXAMINATION

8   BY MR. SHELSON:

9   Q   Good afternoon, Doctor.  Did you testify this morning that

10  some people that you interviewed in Mississippi thought they

11  were committed to a state hospital against their will?

12  A   I don't believe I testified that they said it was against

13  their will.  It was more that I said people that I interviewed

14  wanted to leave.

15  Q   Aren't, be that as it may, all civil commitments to a

16  hospital involuntary material?

17  A   I believe they are.

18  Q   So in that sense, all civil commitments to any state

19  hospital are against the individual's will.  Is that correct?

20  A   It would mean, yes, they don't have a choice.  Some may be

21  more against it than others.

22  Q   When did you last have an active inpatient case load?

23  A   So patients who are in a hospital at the time?

24  Q   Yes.

25  A   That's a very long time ago.

1    Q   Approximately how long ago?

2    A   That was at the beginning of my career.  So that would be

3    in 1972.

4    Q   When did you last have an active outpatient case load?

5    A   I had that in -- I had an outpatient case load in between

6    2010 and 2013.  I also had one while I was at the VA from 2009

7    to 2015.

8    Q   So your last active outpatient case load was sometime in

9    2015?

10   A   Yes, sir.

11   Q   Okay.  You talked a good bit this morning about the

12   Massachusetts mental health system.  Do you recall that?

13   A   I do.

14   Q   Did your career start out in New York?

15   A   It did.

16   Q   And then at some point, did you move to Massachusetts?

17   A   I did.

18   Q   And when did that occur?

19   A   When did I move to Massachusetts?

20   Q   Yes, ma'am.

21   A   1976.

22   Q   And has your -- have you been in Massachusetts ever since?

23   A   Yes, I have.

24   Q   Does every adult with SMI in Massachusetts who needs mobile

25   crisis get that service?

1  A   I don't know.  I don't know that information.  As you say

2  every adult, so I don't know.  Do you mean now?

3  Q   Yes.

4  A   I don't know.

5  Q   Does every adult with SMI in Massachusetts who needs case

6  management get that service now?

7  A   I don't know.

8  Q   Do you know what percentage of the adults with SMI in

9  Massachusetts who need case management currently get that

10  service?

11  A   No, I don't.

12  Q   Do you know what percentage of adults with SMI in

13  Massachusetts get the standard of discharge planning that you

14  testified about this morning?

15  A   Do you mean presently or --

16  Q   Presently.

17  A   No, I do not know.

18       MS. VAN EREM:  Objection, Your Honor.  Dr. Baldwin has

19  testified that her employment with the State of Massachusetts

20  ended in 2009, and she's repeatedly told Mr. Shelson that she

21  does not know the answer to the current questions regarding the

22  state of Massachusetts.

23       THE COURT:  Objection overruled.

24  BY MR. SHELSON:

25  Q   That's a nice segue of where I was going next, Dr. Baldwin.

*** DAILY TRANSCRIPT ***

1  So let's talk about what period of time that you were able to

2  testify about the Massachusetts mental health system.  You said

3  you started working in Massachusetts in 1976?

4  A   Nineteen -- I moved there in '76, and I went to school, but

5  I didn't start with the Department of Mental Health work that I

6  testified about this morning until 1978.

7  Q   Is 1978 when Massachusetts started introducing

8  community-based services?

9  A   I don't know if it was exactly that year, but it was about

10  that same that it was starting to take hold, and there were, as

11  I said this morning, in variance regions, task groups or groups

12  of staff that were tasked with bringing people out of the state

13  hospital.

14  Q   As we sit here today, is Massachusetts still working on

15  expanding its community-based services to meet the needs of

16  adults with SMI in that state?

17  A   I don't know.

18  Q   What period of time -- is there any period of time you know

19  the answer to that question up to?

20  A   Can you repeat the question?

21  Q   Did you testify this morning that you're familiar with the

22  Massachusetts mental health system up to 2009?

23  A   What I was familiar with up until 2009 is the work I was

24  doing in the agency, the community-based agency that I worked

25  in.  So it was primarily focused on the northeast of

*** DAILY TRANSCRIPT ***

1  Massachusetts.

2  Q    In 2009, were community-based services still being expanded

3  in northeast Massachusetts?

4  A    Always.  It was a continuous process of fine-tuning

5  services, building new services, improving on old ones.

6  Q    To your knowledge, are there any unmet mental health needs

7  for adults with SMI in Massachusetts now?

8  A    I don't know.

9  Q    Were there any unmet needs for adults with SMI in northeast

10  Massachusetts in 2009?

11  A    Yes, I would say so.

12  Q    You testified this morning that community-based services

13  reduced the risk of hospitalization?

14  A    Did I testify this morning that community-based services

15  can reduce risk of hospitalization?

16  Q    Yes.

17  A    Yes, I did.

18  Q    Do you remember this slide from this morning, this PDX-18?

19  A    Yes, I do.

20  Q    This is a summary of your findings in Mississippi.  Is that

21  correct?

22  A    Yes, it is.

23  Q    And you found, based on the individuals you reviewed in

24  Mississippi, that 100 percent of them would have avoided or

25  spent less time in a hospital if they had received sufficient

1  community-based services?

2  A   Would have avoided or spent less time in a state hospital

3  if they had received the services, yes.

4  Q   This is Exhibit D-320, which was previously admitted into

5  evidence.

6          THE COURT:  Okay.

7  BY MR. SHELSON:

8  Q   Did you find that 19 of the 30 individuals you reviewed in

9  Mississippi need PACT services?

10 A   I would like to refer to my --

11 Q   Sure.

12 A   -- report, if that's all right.

13 Q   Sure.

14 A   The number of PACT services, that was related to the tally

15 that you and I did at the deposition.  I don't believe I have

16 it counted in my report.

17 Q   I'll represent to you this is the number we agreed on, and

18 it's been stipulated to by the parties.

19 A   Okay.  All right.

20 Q   So 19 of 30, again, I'll represent to you that that's

21 63 percent of the individuals you reviewed in Mississippi you

22 recommended PACT services for?

23 A   Yes.

24 Q   In connection with the review that the DOJ experts did in

25 Mississippi of the 154 individuals, did DOJ's expert, Robert

1  Drake, circulate a paper on how effective community-based

2  services are at reducing hospitalization?

3  A  He did.  It was before we got started.  It was a review of

4  the literature.

5  Q  This is Exhibit D-235.  Do you recognize this as the paper

6  that we just discussed that circulated by Dr. Drake?

7  A  I do.

8  Q  All right.  And you see here that based on Dr. Drake's

9  review of the literature, he found that assertive community

10  treatment was 41 percent effective in reducing

11  hospitalizations.  Is that correct?

12  A  Yes.

13  Q  And to avoid hospitalization altogether, 100 percent of the

14  time, obviously, if you -- strike that.  If you are going to

15  avoid hospitalization 100 percent of the time if you receive

16  sufficient community-based services, those services are going

17  to have to be 100-percent effective at reducing

18  hospitalization.  Is that correct?

19  A  So that's a hypothetical question?

20  Q  Yes.

21  A  If you want to eliminate hospitalization altogether, the

22  approach that you are using has to be 100-percent effective.

23  Q  Yes.

24  A  In a hypothetical situation, I would agree.  But there's a

25  list of services, and so sometimes it involves a combination.

1   And I think to have 100 percent of anything is very difficult,

2   if not impossible.

3   Q   Did Dr. Drake's paper find that there's a lack of data on

4   the combined effectiveness of community-based services on

5   reducing hospitalizations?

6   A   Yes, he did.   The exact recipe is still -- the studies are

7   not conclusive.

8   Q   Another service you mentioned this morning about being

9   effective at reducing hospitalization was case management.   Is

10   that correct?

11   A   That's correct.

12   Q   Did Dr. Drake's paper find that there's a lack of data on

13   the effectiveness of case management at reducing

14   hospitalizations?

15   A   Yes.

16   Q   This is page 2 of Exhibit D-235.   If I may direct your

17   attention to the highlighted part, highlight sentence.   It

18   reads -- I'm sorry.   This is talking about case management.

19   And anyway, it goes on to say, "Intervention also reduces

20   length of hospitalizations, no RR."   Do you know what "no RR"

21   means?

22   A   I don't.

23   Q   Okay.   One more thing before I leave Dr. Drake's paper.

24   What Dr. Drake, in his paper, calls hospital diversion

25   services, are those -- and they're listed here in number one --

1   are those crisis services?

2   A   Yes.

3   Q   And what did -- how effective, based on Dr. Drake's review

4   of the literature, are diversion services at reducing

5   hospitalizations?

6   A   50 percent.

7   Q   For the individuals that you interviewed in Mississippi,

8   did your interviews last approximately one hour each?

9   A   Yes.

10  Q   I want to talk about person 90 briefly.  Was person 90 one

11  of the individuals you discussed this morning?

12  A   Yes, she is.

13  Q   And is person 90 the individual who you testified was

14  evicted from her apartment for not paying rent?

15  A   Yes.

16  Q   Okay.  And I believe your testimony was that what could

17  have been done to prevent her hospitalization while that was

18  going is for, I think you said, a case manager to talk to

19  person 90, her daughter and her landlord?

20  A   To work with her proactively to have an ongoing

21  relationship, an outreach proactive relationship, yes.

22  Q   Right.  And that outreach, did you testify that that

23  included speaking with person 90, as well as her daughter and

24  her landlord?

25  A   Yes.

1    Q    And you agree with me that whatever case manager is doing,

2    that takes some amount of time?

3    A    Absolutely.

4    Q    And how much of the case manager time that's going to take

5    on a case-by-case basis will depend on how far the case manager

6    has to travel to meet with and speak with those individuals?

7    A    That is one factor, yes.

8    Q    And there are a host of other factors.  Correct?

9    A    Yes.

10   Q    And do you agree that the number of individuals case

11   managers can deal with at any given time is a finite number?

12   A    Yes.

13   Q    Sticking with person 90, I want to go back to PDX18 in the

14   left-most column.  "Would have avoided or spent less time in

15   the hospital."  You agree those are two different things?

16   A    I agree.

17   Q    Okay.  Did you arrive at a conclusion in your report

18   regarding whether person 90 would have avoided hospitalization

19   altogether or whether she would have went to the state hospital

20   but spent less time there?

21   A    I don't believe I separated it out in my report.

22   Q    Did you separate it out in your report for any of the

23   individuals you reviewed in your report?

24   A    No, because it was mixed.  Some might have spent less time,

25   some might have avoided, or it might have been earlier

1  hospitalizations that they would have avoided or spent -- there

2  was too many moving parts.  And because it was a two-pronged

3  question, I answered it together.

4  Q    But correct me if I'm wrong, but I understood your

5  testimony this morning to be that you believed person 90 would

6  have spent less time in the state hospital?

7  A    Yes.  That's true for her.

8  Q    Is it quantified or otherwise stated in your report how

9  much less time person 90 would have spent in a state hospital?

10  A    No, not quantified.

11  Q    Is it quantified for any of the individuals in your report?

12  A    No.

13  Q    Doctor, what is -- well, we've heard this -- I hate to

14  belabor the record, but I want to make sure we're on the same

15  page.  What is your understanding of what scatter site housing

16  is?

17  A    I don't know what it is.

18  Q    What is your understanding of permanent supported housing?

19  A    Do you mean in general?

20  Q    Yes, ma'am.

21  A    In general, to me, meaning not specific to a state,

22  permanent supported housing is housing that an individual has

23  that they are not -- it's not time limited, or they are not at

24  risk of being moved out of it, that they would receive support

25  with that housing.  They might receive a rent subsidy.

1  Q    If we could turn to your report, please, which is PX-403

2  and page 27, please.  This is person 91.

3  A    Yes.

4  Q    Have you had -- have you had a chance to look at it

5  sufficiently to know who I'm talking about?

6  A    I know who you're talking about.

7  Q    Okay.  Thank you.  Did you recommend for person 91 three to

8  four-bed house staffed with people who could work with double

9  amputees?

10  A    I believe I did, but I can find it in my report to be sure.

11  But that is what I believe I did, yes.

12  Q    Okay.  Is that type of housing permanent supported housing?

13  A    I would view it as a step down, like that this individual

14  having -- and we did discuss him previously -- having been in a

15  nursing home, he has unique needs in that he is a double

16  amputee.  So he might need a -- a place to step down from into

17  permanent supported housing, which is why I described that

18  situation first.

19  Q    So this could be -- this housing that you recommended could

20  be an initial step, and if he did well, then perhaps some day

21  he could go to permanent supported housing?

22  A    Yes.

23  Q    But in any event, the three to four-bed house you

24  recommended, do you know how many staff members would be

25  required to operate that facility?

```
 1    A    I don't.  It would -- when I say staffed, that means

 2    someone who's living in and who's there 24 hours a day.  So it

 3    would require at least three people.

 4    Q    Do you know how much it costs to operate such homes?

 5    A    I do not.

 6    Q    Doctor, could we turn to person 105, who's on page 141 of

 7    your report.

 8    A    I have it.

 9    Q    And everything in this next series of questions I'm going

10    to ask you I think you'll find in the first paragraph of your

11    report on 141.  But in any event, did you interview person 105

12    on April 17, 2018?

13    A    I did.

14    Q    At the time, did she have a two-bedroom apartment in

15    Gulfport?

16    A    She did.

17    Q    Did you find that apartment was very neat and very clean

18    but sparsely furnished?

19    A    I did.

20    Q    And when you arrived, was person 105 cooking her own meal?

21    A    She was.

22    Q    At the time you interviewed her, was person 105 oriented in

23    all spheres?

24    A    She was.

25    Q    And what does that mean?
```

1   A   It means that she was oriented when it's in all spheres.

2   And spheres, it's to person, place, time, other, you know,

3   environment, everything.

4   Q   Would you turn to page 147 of your report, please.  And

5   here you're still discussing person 105.  Is that correct?

6   A   Yes, I am.

7   Q   All right.  Aid like to refer your attention to the last

8   paragraph on page 147.  And specific -- well, and there's a

9   sentence that begins with "specifically," do you see that?

10  A   Yes.

11  Q   You're welcome to follow either on the screen or in your

12  report.  But in any event, where I've got the word

13  "specifically" highlighted, is that where -- strike that.

14  Where the word "specifically" is highlighted, is that where you

15  begin to identify the services that you believe person 105

16  needs to remain in the community?

17  A   Yes.  And before that, I say, "would have avoided or spent

18  less time if these were available to her."

19  Q   Okay.  And so do you agree with me that that list of

20  services continues over onto page 148 and takes up that whole

21  page?

22  A   Yes.

23  Q   And do you agree with me that the list of services you

24  identified concludes on page 149 of your report at the end of

25  the bullet point at the top of the page?

1  A   I do.

2  Q   Do you believe -- based on your review of person 105, did

3  you find at the time you interviewed her that she had created a

4  stable life for herself in the community?

5  A   She had.

6  Q   And did you find that person 105 is at serious risk of

7  institutionalization?

8  A   I did.

9  Q   And I think this is on page 144 of your report, if you need

10  to verify it, but what was person 105's last discharge date

11  from a state hospital before you interviewed her?

12  A   5/2/2016.

13  Q   Which was just short of two years before you interviewed

14  her?

15  A   Yes.

16  Q   Could we turn, Doctor, please, to person 111.  And that

17  person starts on page 170 of your report.

18  A   I have it.

19  Q   So you know who this person is and are ready to talk about

20  person 111?

21  A   I do.

22  Q   Okay.  Thank you.  All right.  Does person 111 have a

23  history of forensic involvement?

24  A   He does.

25  Q   And at least briefly, what is that history?

1    A    He has a history -- I mean, I can find it exactly -- but of

2    assault charges, use of a weapon with the assault charges.

3    Q    Given his history of forensic involvement, does person

4    111's discharge from East Mississippi State Hospital need to be

5    approved by the discharge advisory committee?

6    A    That was my understanding, and that's why I put it in the

7    report, because he has unresolved forensic issues.

8    Q    I'm sorry.  Did you finish?

9    A    Issues.

10   Q    Thank you.  Do you have any issues with patients with a

11   forensic history having to go through a discharge advisory

12   committee or similar process to be discharged from a state

13   hospital?

14   A    Do I have any issues with it, meaning would I disagree with

15   that or I --

16   Q    Yes.

17   A    No, I don't disagree with that.

18   Q    And so you made a housing recommendation for person 111,

19   and that obviously assumes that at some point, he would be

20   discharged.  Is that correct?

21   A    Yes.  And I also assumed that he would have to -- also, his

22   forensic issues would have to be resolved at some point as

23   well.

24   Q    Yes, ma'am.  In your opinion, if person 111 is discharged,

25   does he need to be discharged to a setting that is staffed 24

1    hours a day?

2    A    I did make that recommendation for at least in the

3    beginning for him.

4    Q    And you made that recommendation because given his forensic

5    history, person 111 is not someone you can just put into an

6    apartment by himself?

7    A    Correct.  He also has a very likely traumatic brain injury,

8    so there's some neurological involvement as well, which is

9    another reason, in addition to his serious mental illness.

10   Q    The setting you identified for person 111 that is staffed

11   24 hours a day, would that be a locked facility?

12   A    I didn't put that in, I don't believe so, no.

13   Q    Would person 111 need to be escorted when he left the

14   facility at least for a period of time?

15   A    It would depend on his clinical presentation and what his

16   more recent behaviors had been.  It would be an individual

17   assessment.

18   Q    Do you know how much it would cost to operate and staff

19   such a facility?

20   A    I don't.

21   Q    I want to direct your attention, Doctor, next to person 117

22   in Exhibit PX-1109, which is a document you testified about

23   earlier today.  Do you recall this document?

24   A    I do.

25   Q    Okay.  And this was -- this document was discussed in the

```
1    context of some of your testimony regarding discharge planning?

2    A   Correct.

3    Q   Okay.  And --

4    A   And crisis.  It was also in the testimony regarding crisis.

5    Q   My first question about this document is this.  And it's

6    right here.  The date of discharge for person 117 was

7    September 8, 2017?

8    A   Yes.

9    Q   And his follow-up at Pine Belt Mental Health was scheduled

10   for four days later, on September 12th, 2017?

11   A   Correct.

12   Q   Is there something that -- well, let me ask -- strike that.

13   What do you think the hospital should have done, if anything,

14   in those four days between the date of discharge and the first

15   appointment?

16   A   So just so I understand your question, you're asking what

17   the hospital's responsibility was during those four days?

18   Q   In your opinion.

19   A   In my opinion, and I had testified this morning that what

20   the hospital should have done would have taken place before

21   that, starting on August 16th.  So everything would have been

22   in place by the 8th.

23   Q   In your experience, if a person who is discharged from a

24   state hospital has an appointment with the mental health center

25   within four days of his discharge, is that time lapse
```

1   satisfactory?

2   A   Are you saying as it's -- as it is here, to send a person

3   home and say, You're coming back in four days?

4   Q   No, what I'm saying is, in your experience -- and I'm

5   talking in general here.  In your experience, in general, when

6   individuals are discharged from the state hospital, they're --

7   they often have appointments with the local community mental

8   health center?

9   A   I did see that in the record, not all the time, but they

10  were given appointments, yes.

11  Q   And all I'm asking you is, in general, do you think a delay

12  of four days from discharge to the appointment in the community

13  mental health center is an unreasonable delay?

14  A   With this individual, I think it was risky because he had

15  two suicide attempts in the past, one very -- very, very

16  serious, and he also is a substance use disordered person who

17  was at risk of relapse.  So a lot can happen in four days.

18  That was my concern.  When left just to you and your family

19  being the only ones to take responsibility for the followup.

20  Q   So in your opinion, is there any period of delay that is

21  acceptable between discharge from the state hospital and

22  appointment at the community mental health center?

23  A   Can you repeat that question again, please?  I'm sorry.

24  Q   I'll try.

25  A   Okay.

1  Q   In your opinion, is there any period of delay that is

2  acceptable between the date of discharge from a state hospital

3  and the individual's first appointment at a community mental

4  health center?

5  A   Absolutely.  It depends on what's been put in place ahead

6  of time.  You can have a delay of a week or two weeks or even

7  longer, depending on what support services have been put in

8  place before the person left the hospital.  It depends on the

9  individual and what their risks are, as I mentioned with this

10 individual, but also what supports have been put in place ahead

11 of time.

12 Q   Based on your review of the records, do you know whether

13 person 117 kept this appointment?

14 A   Can you put that up again so can I see the date?

15 Q   I'm sorry.

16 A   I believe he did keep that appointment.

17 Q   Do you know what happened during that appointment?

18 A   Exactly or --

19 Q   What information, if any, do you have of what happened

20 during that appointment?

21 A   I'd have to consult my report on that to see.  He did, in

22 fact, keep the appointment.  He said it was mandatory.  He told

23 me in the interview that he had to pay for the visit, $25, and

24 he was connected with services at that time, an intake

25 assessment was done, and he was connected with services at Pine

1043

1    Belt.

2    Q   I want to move on to another topic, Doctor.  In your

3    report, did you recommend for a number of the individuals you

4    reviewed that a close relationship be established with a

5    dentist?

6    A   I did.

7    Q   And I counted that you made that recommendation for 17 of

8    the individuals you reviewed.  Is that consistent with your

9    recollection?

10   A   That would make sense to me, yes.

11   Q   Are you aware of any state mental health system that

12   provides dental care for individuals?

13   A   I am not.  I'm aware of connections being made.  I'm also

14   aware of there are dentists in communities who will provide

15   reduced rates or free services for individuals.  And my

16   personal experience has been that mental health centers or case

17   managers, or even within the VA it was done, to connect

18   individuals with those dentists.

19   Q   Have you -- let me stick with that for a minute.  In those

20   cases that you just talked about, where someone is connected

21   with dental services, do you agree there's got to be a

22   mechanism to pay for those services?

23   A   Unless it's a dentist who's giving it for free, but yes.

24   Q   Okay.

25   A   It's a service that has to be paid for.

1    Q    In your experience, what other ways you have seen those

2    type of services paid for?

3    A    Sometimes people have dental insurance.  As I had

4    indicated, a dentist will give reduced rates.  There are also

5    dental schools that will offer services, cleanings and X-rays

6    and other services for -- because students are doing it or

7    dental residents are providing the service.

8    Q    Where have you seen such dental schools?

9    A    I've seen that in Massachusetts.

10   Q    Where in Massachusetts?

11   A    It's the Tufts Dental School downtown in Boston.

12   Q    Have you been retained by the U.S. Department of Justice,

13   who I will just refer to as DOJ, in any other -- in any cases

14   or matters other than this Mississippi matter?

15   A    I have.

16   Q    All right.  Do you know whether the Mississippi State

17   Hospital provides dental services?

18   A    Am I aware if the state hospital provides it?

19   Q    Specifically, the Mississippi State Hospital.

20   A    What I saw in the records, and it was that there was a

21   consult, an assessment for dental needs, and that the patients

22   were given the choice to either go or to refuse.  But often

23   patients had serious multiple dental caries or were missing a

24   lot of teeth, which can cause a lot of health problems.  And

25   primarily what I saw in the record was extractions.  So people

1   ended up with less teeth, but at least they didn't have the

2   caries.

3   Q   You're not offering an opinion that the extractions were

4   unnecessary, are you?

5   A   No.

6   Q   All right.  And this is all on page 7 of your report, what

7   I'm about to ask you next.  And you're certainly welcome to

8   refer to page 7 of your report.  I'm going to refer your

9   attention to this second paragraph here.  Does it, in summary,

10   say that in late 2014, you worked directly with DOJ on a matter

11   in a southern state?

12   A   I did.

13   Q   Did you interview 106 individuals in that southern state?

14   A   Yes.

15   Q   And that southern state referred to in that paragraph is

16   not Mississippi?

17   A   It is not Mississippi.

18   Q   Okay.  So for the 106 individuals you reviewed in that

19   southern state, did you perform a similar analysis to the

20   analysis you performed in Mississippi?

21   A   It was similar.  It was not exactly the same.

22   Q   Did you find that all 106 individuals you reviewed in that

23   southern state could live in the community with reasonable

24   community-based services?

25   A   I don't recall.  I don't recall if it was 100 percent.

1  Q   And then you also did work for DOJ in a northwestern state.

2  Is that correct?

3  A   I did.

4  Q   And did you likewise do work for DOJ in a midwestern state?

5  A   I did.

6  Q   I want to ask you next about -- and this is still on page 7

7  of your report.  Top paragraph at the top of the page.  Do you

8  see the reference to *Amanda D. versus Hassan*?

9  A   I do.

10  Q   And was that a lawsuit in the state of New Hampshire?

11  A   It was.

12  Q   What was your involvement in that case?

13  A   I was placed at a extended care facility in the northern

14  part of the state, and I interviewed patients.  I also

15  interviewed their guardians and reviewed their records.

16  Q   Is the facility you just referenced the Glencliff Nursing

17  Home?

18  A   It is.

19  Q   To your knowledge, was a -- did New Hampshire enter into a

20  consent degree in that case?

21  A   I don't know what the proper terminology is for it, but I

22  know that New Hampshire is working now on improving their

23  mental health services, their community-based services, but I

24  don't know the legal term for it.

25  Q   So as far as you know, as we sit here today, this matter is

*** DAILY TRANSCRIPT ***

```
1    still ongoing?

2    A    What do you mean done and gone?

3    Q    Pardon?

4    A    You said considered this matter what?

5    Q    Ongoing?

6    A    Ongoing.  Okay.

7    Q    Sorry.

8    A    Sorry.  I didn't hear you.

9    Q    My fault.

10   A    My understanding is that they're in the phase, that the

11   state is in the phase of developing services, community-based

12   services.

13   Q    And your involvement in that matter started back in 2012?

14   A    It did.

15   Q    All right.  And still, in reference to your involvement in

16   the Amanda D. case, in that case were you asked to review what

17   services would be appropriate to maintain the individuals in

18   the community?

19   A    I was.

20   Q    Is the methodology you used in New Hampshire similar to the

21   methodology that you used in Mississippi in this case?

22   A    Somewhat similar, yes.  Not exactly.

23   Q    Did you interview 22 individuals who were at Glencliff at

24   the time?

25   A    Well, I don't have my report with me, and it was in 2012,
```

1    but that number sounds approximately right.

2            MR. SHELSON:  Your Honor, may I approach?

3            THE COURT:  Yes, you may.

4    BY MR. SHELSON:

5    Q    Doctor, I've just handed you what's been marked as Exhibit

6    D-289.  What is Exhibit D-289?

7    A    It's the affidavit of Judith Boardman in support of

8    plaintiff's motion for class certification.

9    Q    And Judith Boardman, was that your name at the time of this

10   affidavit?

11   A    It was.  It's not spelled correctly here, but yes, that was

12   my name.

13   Q    Is this your affidavit?

14   A    May I look at it a minute?  Can you repeat the question

15   now?

16   Q    Is Exhibit D-289 your affidavit in the New Hampshire matter

17   we're discussing?

18   A    Yes, it is.

19   Q    And if you would turn to the last page of exhibit -- excuse

20   me, second to the last page, page 9 of Exhibit D-289.  Is that

21   your electronic signature on that page?

22   A    Yes, it is.

23   Q    And does it say the date is January 19, 2013?

24   A    Correct.

25   Q    All right.  If I could direct your attention, please, to

1   page 6, paragraph 19.  It's at the bottom of the page.  Does

2   this talk about the sample that was reviewed?

3   A   Yes, it is.

4   Q   Okay.  If I turn the page, does that indicate to you that

5   you reviewed 22 participants?

6   A   Yes.

7   Q   Okay.  And the part I've highlighted, did you find that 22

8   of the 22 review participants, or 100 percent of persons

9   reviewed, very likely would have avoided admission to Glencliff

10   if they had access to the services sought in this case along

11   with other existing services?

12   A   I did write that, yes.  That's my finding.

13         MR. SHELSON:  Your Honor, we move to admit

14   Exhibit D-289 into evidence.

15         THE COURT:  Any objection?

16         MS. VAN EREM:  Yes, Your Honor.  We object on the

17   basis of relevance.  This document is about Dr. Baldwin's

18   findings in New Hampshire, which is not relevant to this case.

19         THE COURT:  Any response, Mr. Shelson?

20         MR. SHELSON:  Yes, Your Honor.  First of all, she

21   introduced this case in her report and talks about this case to

22   some degree in her report, and then in questioning a few

23   minutes ago, she said that her methodology in the New Hampshire

24   case is similar to the methodology she used here in Mississippi

25   in this case.  So we submit that this document is relevant.

1          THE COURT:  Is this the *Amanda D.* case that's

2    mentioned in her report?

3          MR. SHELSON:  Yes, sir.

4          THE COURT:  Is this -- I see in her report it's the

5    *Amanda D. versus Hassan.*  Is this the same case?

6          MR. SHELSON:  There's -- there's --

7          THE COURT:  Because this affidavit says *Lynn E. versus*

8    *Lynch*.  That's all I'm asking.

9          MR. SHELSON:  Well, as I understand it, there's *Lynch*

10   and *Amanda D.*, and they're related cases.

11         THE COURT:  Are they related cases, or are they the

12   same case?  That's the only question that I have.  Maybe

13   Ms. Boardman can -- well, the United States was involved and --

14   are these the same -- I'm just trying to figure out.  The

15   expert report that's in evidence in this case from Dr. --

16         MR. SHELSON:  Baldwin.

17         THE COURT:  -- Baldwin mentions an *Amanda D. versus*

18   *Hassan* case out of New Hampshire.  The affidavit that she's

19   been presented with today is an affidavit that was filed in

20   *Lynn E. versus Lynch*, and the United States being an intervenor

21   against the State of New Hampshire.  Are those the same two

22   cases is my question?

23         MS. VAN EREM:  Yes, Your Honor.  They are the same

24   case.

25         THE COURT:  Okay.

1          MS. VAN EREM:  Your Honor, if I may, I maintain that

2     this is irrelevant because there's no facts in this case that

3     is more likely to be established with the introduction of this

4     document.

5          THE COURT:  It's hearsay.  That's one thing it is.  I

6     know that.

7          MR. SHELSON:  Well, with that point, Your Honor, they

8     can correct me if I'm wrong, but the United States objected to

9     a number of the State's exhibits.  One of the United States'

10    objections to the exhibits that they objected to in many

11    instances included hearsay.  And my understanding is that the

12    United States has withdrawn its hearsay objections to the

13    State's exhibits.

14         MS. VAN EREM:  That's correct.  We maintain our

15    objection on relevance and Federal Rule of Evidence 403.

16         MR. SHELSON:  Your Honor, on the point about

17    relevance, if I may, we think it is relevant that where the two

18    instances that we have data that Dr. Baldwin has used the

19    methodology she used in Mississippi, she's found that

20    100 percent of the people in Mississippi and 100 percent of the

21    people she reviewed at Glencliff in New Hampshire very likely

22    would have avoided admission if they had received sufficient

23    community-based services.

24         THE COURT:  I'm going to overrule the objection.

25         I presume it just goes to the point that in this case,

1    as well as the other case, 100 percent of the people she

2    reviewed, she came to the same conclusion basically.

3            MR. SHELSON:  Yes, Your Honor.  May I?

4            THE COURT:  You may proceed.

5            MR. SHELSON:  Thank you, Your Honor.

6    BY MR. SHELSON:

7    Q   Going back, Dr. Baldwin, to your finding that 100 percent

8    of the people you reviewed in Mississippi would have avoided or

9    spent less time in the state hospital, what is your scientific

10   basis for that conclusion?

11   A   And what do you mean by scientific exactly?

12   Q   Well, I'm trying to remember back to this morning.  You

13   were tendered as an expert in the field of what?  Do you

14   recall?

15   A   Psychiatric nursing.

16   Q   Is there scientific basis for that conclusion in the field

17   of psychiatry or psychiatric nursing?

18   A   I guess I'm still not understanding scientific.  If you --

19   what I based that on was more my understanding of what

20   community-based services work for people that are very -- that

21   I've seen work for people who are very similar to the people

22   who were in my sample.  And I've them avoid hospital or spend

23   much less time in hospital when those services are being

24   provided to them effectively.

25   Q   The rates at what you -- that -- strike that.  The rates at

 1   which you have seen community-based services help people avoid

 2   hospitalizations, are those rates in line with the rates

 3   reflected in Dr. Drake's paper that we looked at earlier that's

 4   Exhibit D-235?

 5   A   I can't say the percent of rates.  I know that the services

 6   that are listed here on the ones I've talked about are

 7   effective, but I can't quote rates.  He has done a review of

 8   the literature and looked at a series of articles, not all, I'm

 9   sure, and has put together a summary.  It was used as a guide.

10   Q   Do you have any different rates based on the literature

11   that you can offer the court?

12   A   No.

13   Q   In your opinion, can everyone benefit from community-based

14   services?

15   A   When you say everyone, I mean, I would like to say in

16   general or most everyone.  I don't want to say everyone who has

17   serious mental illness can always benefit.  I'm reluctant to do

18   that.

19   Q   I'm going to refer you, Doctor, to page 147 and page 148 of

20   your deposition.  This highlighted part, I asked you, "Are

21   there instances where an individual would not benefit from

22   integrated community-based services?"  And your answer was, "Of

23   the sample or in general?"  I said, "In general."  And what was

24   your answer?

25   A   I said, "In my opinion, no.  I think everyone can benefit."

1  Q   You were not asked in this case to determine whether

2  Mississippi is offering reasonable community-based services,

3  were you?

4  A   I was asked -- my task was to answer the questions that I

5  had testified to this morning.  So not to -- what did you say?

6  Make a determination on whether the State is --

7  Q   Offering reasonable community-based services.

8  A   I was not asked to do that, no.

9  Q   To your knowledge, does any state have a clinical review

10  team review a random sample of individuals discharged from a

11  state hospital to determine what community-based services it

12  needs to offer on that basis?

13  A   To my knowledge, is any state doing that now?  Is that what

14  you're asking?

15  Q   Yes.

16  A   No, I have no knowledge of that.

17  Q   To your knowledge, has any state ever done that?

18  A   So ask the question again.  Has any state ever --

19  Q   Had a clinical review team review a random sample of

20  individuals discharged from state hospitals and determined what

21  community-based services it needs to offer on that basis?

22  A   That the state commissioned to do that, you're saying?

23  Q   Yes.

24  A   No, not to my knowledge.

25          MR. SHELSON:  Can I have a moment to confer, Your

1   Honor?

2          THE COURT:  Yes, you may.

3   BY MR. SHELSON:

4   Q   Doctor, did you make any determination regarding how many

5   PACT teams Mississippi should have?

6   A   No, I didn't.

7   Q   Did you make any determination regarding what quantity of

8   any community-based service Mississippi should have?

9   A   No.

10  Q   Did you make any determinations regarding what locations

11  Mississippi should offer its community-based services in?

12  A   Do you mean geographic locations?

13  Q   Yes.

14  A   No, I did not.

15  Q   Do you have an opinion regarding whether the

16  community-based services that Mississippi does offer are

17  reasonable in light of what other states offer?

18  A   I do not.

19         MR. SHELSON:  Your Honor, that's all the questions we

20  have.  Thank you, Dr. Baldwin.

21         THE COURT:  All right.

22         MS. VAN EREM:  The United States has no further

23  questions.

24         THE COURT:  Dr. Baldwin, I have no questions either.

25  You may step down.  Is this witness finally excused?

1     MS. VAN EREM:  Yes, Your Honor.

2     THE COURT:  All right.  You may step down and go about

3  the rest of your duties, whatever they are.  Thank you.

4     Before the government calls its next witness, we're

5  going to -- the next witness is an expert?

6     MS. VAN EREM:  That's correct.

7     THE COURT:  Okay.  We're going to take a 15-minute

8  break, and we'll figure out how far -- how long we'll go with

9  that person.  We'll be able to tell you when we get back.

10    (Recess)

11    THE COURT:  Good to have you back, Mr. Holkins.

12    MR. HOLKINS:  Good to be back, Your Honor.

13    THE COURT:  All right.  I mentioned the possibility of

14  those posttrial proposed findings of fact, and I haven't seen

15  Ms. Fox since.  Maybe she's doing them now.  I'm sorry.  We

16  have to do things to stay -- you know.  Are we ready to call

17  the next witness?

18    MR. HOLKINS:  Yes, Your Honor.

19    THE COURT:  All right.  You may proceed.

20    MR. HOLKINS:  Your Honor, United States calls

21  Katherine Burson as its next witness.

22    THE COURT:  Ms. Burson, I'm not sure if you've been in

23  the courtroom when I've given instructions, so if you will,

24  speak into the microphone, and speak at a pace at which the

25  court reporter can keep up with you.

1    Try to allow the lawyers to complete their questions

2   or their statements before you speak so that the two of you

3   will not be speaking at the same time.  We are now unplugged,

4   apparently.  We're good?  Okay.

5    Make sure all of your responses are verbal.  If you're

6   going to nod or shake your head, say yes or no, and we'll try

7   to traffic that in case -- that that doesn't happen.  And try

8   to avoid using uh-huh and unh-unh.  Also, if you will state and

9   spell your name for the record.

10    THE WITNESS:  My first name is Katherine,

11   K-A-T-H-E-R-I-N-E.  And my last name is Burson, B as in boy,

12   U-R-S-O-N.

13    THE COURT:  Thank you.  Counsel, you should not feel

14   rushed today.  It's likely that this will be our last witness,

15   obviously, and we may only get through her direct today, if

16   it's anything like some of the other -- I mean, I don't know.

17   Is this witness available tomorrow?

18    MR. HOLKINS:  Yes, Your Honor.

19    THE COURT:  Is she?  Are you, Ms. Burson?

20    THE WITNESS:  Yes, I am.

21    THE COURT:  Okay.  All right.  We may hear the rest of

22   the story tomorrow.  All right.  You may proceed, Mr. Holkins.

23    MR. HOLKINS:  Thank you, Your Honor.

24                    KATHERINE BURSON,

25    having first been duly sworn, testified as follows:

*** DAILY TRANSCRIPT ***

```
 1                      DIRECT EXAMINATION

 2   BY MR. HOLKINS:

 3   Q    Good afternoon, Ms. Burson.

 4   A    Good afternoon.

 5   Q    What do you do for a living?

 6   A    I'm an occupational therapist.

 7   Q    Were you retained by the United States to consult on this

 8   case?

 9   A    Yes, I was.

10   Q    What did your work on this case entail?

11   A    I was asked to interview a number of individuals that were

12   receiving services in Mississippi, mental health services, and

13   to make a determination, after reviewing their medical records

14   and other information that I gathered, as to whether or not I

15   thought that they could have avoided or spent less time in the

16   hospital.

17   Q    For how many individuals did you make that determination?

18   A    I did that for 28 individuals.

19   Q    Did you submit an expert report in this case?

20   A    I did.

21        MR. HOLKINS:  Your Honor, Ms. Burson's expert report

22   was previously admitted as PX-406.  A copy of her report is in

23   the binder provided to the court and opposing counsel.

24        THE COURT:  Okay.  Thank you.

25   BY MR. HOLKINS:
```

1  Q   Ms. Burson, does your report state the findings and

2  conclusions you made based on your review of those 28

3  individuals?

4  A   Yes, it does.

5  Q   We'll discuss your report in detail, but first I have some

6  questions about you.  What does an occupational therapist do?

7  A   An occupational therapist, the domain of occupational

8  therapy practice is all the everyday occupation things that we

9  do that occupy our time.  So all the things that we need to do

10  and we want to do.  And an occupational therapist is educated

11  to assess and analyze all of the factors that influence a

12  person's ability to do what they need and want to be able to

13  do.

14  Q   And what are some of those factors that influence a

15  person's ability to do what she needs or wants to do?

16  A   Okay.  So they can be factors that have to do with a

17  specific individual, how their body works, how their brain

18  works, what kinds of illnesses and conditions they have, their

19  personality, what their interests are, what their strengths

20  are, what their challenges are, so those are person level

21  things.  It also has to do with the task demands people have to

22  do.  So properties of the tasks or the roles, the things that

23  people have to do, we analyze those.

24      The environment, the context within which they have to do

25  those things, we are taught to analyze that, and then we look

```
 1   at the interaction amongst those things.  And all of those are

 2   points of potential intervention to help somebody be able to do

 3   what it is they want or they need to be able to do to function

 4   better.

 5   Q   Do occupational therapists prescribe medication?

 6   A   No, they do not.

 7   Q   Do occupational therapists assess the effects of medication

 8   on a person's functionality?

 9   A   Medications would be amongst the factors that we would

10   consider in that analysis of things.  So, for example, if

11   someone is particularly groggy, and I look and what medications

12   they are on could contribute to that grogginess, then I would

13   have a conversation with the psychiatrist or the nurse

14   practitioner about that, and we would, you know, make some

15   determination with the individual about the degree to which

16   that might be impacting the function.

17   Q   What licenses and certification do you maintain?

18   A   I have a -- an Illinois license to practice occupational

19   therapy.  I also have a national board -- board certified

20   occupational therapist nationally.  And then I also have a

21   national certification for certified recovery -- certified

22   rehabilitation -- certified psychiatric rehabilitation

23   practitioner.  Thank you.  I was going over the acronym in my

24   head.

25   Q   What is the certified psychiatric rehabilitation
```

1   practitioner?

2   A   That's a cross-professional, cross-discipline certification

3   that focuses on implementation of practices that promote hope

4   and empowerment and the kinds of things that help someone take

5   more charge over their lives and move forward.

6   Q   How long have you been working in a mental health field as

7   an occupational therapist?

8   A   Since 1980 was my first clinical practicum in mental

9   health, and then I've practiced since them.

10  Q   How would you describe the overarching focus of your career

11  in the mental health field?

12  A   My career has always ended up, for whatever reasons,

13  focusing on what was needed to help people be able to live more

14  successfully in the community.  Much of that career, I did

15  practice in hospital settings, but the focus of that was on

16  helping people be able to function better outside of the

17  hospital.

18  Q   You have a master's degree in occupational therapy.  Is

19  that right?

20  A   Yes, I do.

21  Q   Where did you obtain that degree?

22  A   I went to Washington University in St. Louis, Missouri.

23  Q   Organizing them into broad categories, how would you

24  describe the kinds of jobs you've had since completing your

25  occupational therapy training?

1   A   So I've had a number of jobs providing direct care where I

2   carried a full patient case load and did the assessment on

3   people and provided treatment and participated in treatment

4   planning meetings and in team collaboration.

5       And then I've also had jobs where I provided -- I provided

6   direct care, but I also supervised other clinicians who

7   provided direct service.  And then I've also had jobs that have

8   been in the hospital and have been in the community.  I've

9   worked in the full continuum of care.

10  Q   Let's talk a bit about your direct clinical care work.

11  Could you briefly describe the roles you've had providing

12  clinical services to adults with serious mental illness in

13  hospital settings?

14  A   Yeah.  One of the roles is assessment, particularly

15  assessment of somebody's ability to function and to be able to

16  look at how their ability to function influences those patterns

17  and behaviors that seem to drive hospitalization and -- so that

18  those can be factored in to the discharge planning and to the

19  community supports that are provided.

20      Another role that I've had has been to look at how to

21  engage somebody who doesn't seem to be making a connection to

22  treatment or is too sick at the time to connect verbally.

23  Q   You have worked in a state hospital before?

24  A   Yes, I have.

25  Q   Which one?

1    A    Chicago Read Mental Health Center.

2    Q    After you have left Chicago Read Mental Health Center, did

3    you continue to work for the State of Illinois?

4    A    Yes, I did.

5    Q    What other jobs have you had for the State of Illinois?

6    A    So while I was working at Chicago Read Mental Health

7    Center, I had led efforts to better coordinate the care

8    between -- the rehabilitation care between the hospital and all

9    of the community providers.  So they asked me to then start to

10   work for not only the state hospital but all of the network of

11   community mental health agencies that were providing community

12   services to people who were hospitalized there.  So I took the

13   lead role for rehabilitation then there.

14        And then after that, they asked me to do that for the

15   Greater Chicago area, which was then three hospitals and about

16   80 to 90 community mental health agencies.  And then they asked

17   me to take the lead for that statewide.  So that was eight

18   hospitals and about 180 community mental health agencies.

19   Q    For a period of time, did you serve as statewide director

20   of rehabilitative services for the state of Illinois?

21   A    Yes, I did, for somewhere between 10 and 12 years.

22   Q    And what were your duties in that role?

23   A    One of the things that I did is I brought to Illinois

24   evidence-based supported employment, to drive that in the

25   community system.  I eventually became the lead person for

```
 1   driving evidence-based practices in the state, and I also had

 2   oversight of rehabilitation within the state hospitals and the

 3   larger community system.

 4   Q   Ms. Burson, do you still work for the State of Illinois?

 5   A   No, I do not.

 6   Q   When did your employment for the State of Illinois end?

 7   A   In March of 2017.

 8   Q   Have you had any involvement in administering Illinois'

 9   mental health service system since then?

10   A   No, I have not.

11         MR. HOLKINS:  Your Honor, we offer Katherine Burson as

12   an expert in psychiatric occupational therapy, serious mental

13   illness, and community-based mental health assessments.

14         THE COURT:  Any objection from the State?

15         MR. SHELSON:  Sorry.  Can I have those three again?

16         MR. HOLKINS:  Psychiatric occupational therapy,

17   serious mental illness, and community-based mental health

18   assessments.

19         MR. SHELSON:  No objection, Your Honor.

20         THE COURT:  All right.

21         MR. HOLKINS:  Your Honor, may I have a moment.

22         THE COURT:  Yes.

23     (Short Pause)

24         MR. HOLKINS:  May I approach the witness.

25         THE COURT:  Hold on one second.  You may.  You may
```

1    approach the witness.  The witness will be allowed to testify

2    as an expert in psychiatric occupational therapy, serious

3    mental illness and community-based mental health assessments.

4              MR. HOLKINS:  Thank you, Your Honor.

5              THE COURT:  You may proceed.

6    BY MR. HOLKINS:

7    Q   Ms. Burson, I'd like to ask you some general questions

8    about the review you conducted in this case.  You stated

9    earlier that your review involved making clinical assessments

10   of 28 individuals who received services in one or more of

11   Mississippi State Hospitals.  Is that correct?

12   A   Yes.

13   Q   What were you assessing for those 28 individuals?

14   A   I was asked to assess whether or not they could have

15   avoided or spent less time in a state hospital.  I was asked to

16   assess, if they were out of the state hospital, whether they

17   were at serious risk for rehospitalization.  I was asked to

18   assess whether or not they would oppose community-based

19   services.  And I was asked whether or not they were appropriate

20   for community services, and if so, which services did I think

21   would be most appropriate to address their needs.

22   Q   Ms. Burson, please turn to page 4 of your report, which is

23   at the tab labeled 0406.  Is this where you explain how you

24   approached those four questions?

25   A   Yes.

1   Q   Ms. Burson, do you have a demonstrative that summarizes

2   your findings with respect to the 28 individuals you reviewed?

3   A   Yes, I do.

4          MR. HOLKINS:  May I approach, Your Honor.

5          THE COURT:  Yes, you may.

6          MR. HOLKINS:  Your Honor, this first slide is PDX-19

7   for identification only.

8          THE COURT:  All right.

9   BY MR. HOLKINS:

10  Q   Ms. Burson, does this slide accurately reflect your

11  findings?

12  A   Yes, it does.

13  Q   Let's go through them one by one.  On the question of

14  whether the individuals in your review could have avoided or

15  spent less time in a state hospital, what did you find?

16  A   I found that 100 percent of them could have avoided or

17  spent less time in a state hospital.

18  Q   On the question of whether the individuals in your review

19  opposed receiving community-based services, what did you find?

20  A   I found that 100 percent of them would not oppose

21  community-based services.

22  Q   On the question of whether the individuals you reviewed

23  were at serious risk of hospitalization, what did you find?

24  A   I found that of the people that were out of the hospital at

25  the time that I interviewed them, that 88 percent of them were

1    at serious risk of rehospitalization.

2    Q   On the question of whether the individuals in your review

3    were appropriate for and would benefit from community-based

4    services, what did you find?

5    A   I found that 100 percent of them would be appropriate for

6    and benefit from community-based services.

7    Q   What data informed your review of the 28 individuals in

8    your report?

9    A   I interviewed all 28 individuals.  I also reviewed all of

10   the medical records that were made available to me, which

11   included the medical records from the state hospital, as well

12   as, in many cases, community mental health records.  I reviewed

13   the Mississippi operations manual, their service definitions

14   for mental health services in the community and what was

15   entailed with those, and reviewed some information on the

16   housing program.  And then I also reviewed -- Dr. Robert Drake

17   had pulled together a summary of research of practices that had

18   been shown in the research to reduce hospitalization, and I

19   reviewed that document as well.

20   Q   Ms. Burson, did you also interview any family members or

21   community mental health providers in connection with this

22   review?

23   A   Yes, I did.  Whenever I was able to, I interviewed quite a

24   number of family members, and I also interviewed community

25   mental health agency staff about individual clients.

1    Q    How did you go about locating the 25 individuals you

2    interviewed who were not in a state hospital at the time?

3    A    So I came to Mississippi, and persons from the Department

4    of Justice had identified information of where people might be

5    located and tried to reach out to them, and we drove around in

6    cars trying to find them.  We knocked on doors.  Sometimes we

7    had appointments.  Sometimes they weren't able to reach

8    someone, so we would go to the most recent address that we had.

9    But we went around looking.  And so I was in four different

10   areas in the state.

11   Q    Were you able to find all of the individuals you were

12   looking for?

13   A    No, we did not find all of the individuals that we were

14   looking for.

15   BY MR. HOLKINS:  Did you interview some of the 28 individuals

16   in your review jointly with another member of the clinical

17   review team?

18   A    Yes.  The first time I came into Mississippi, we did a

19   number of interviews where we had two people on the clinical

20   review team in the same interview.  One person took the lead,

21   and one person was a secondary interviewer.  And we did that so

22   that we could see whether or not we would have drawn the same

23   conclusions.

24   Q    Ms. Burson, I'm going to be referring to the 28 individuals

25   you reviewed by numbers instead of by their names.  Do you

*** DAILY TRANSCRIPT ***

1  understand?

2  A   Yes, I do.

3  Q   I've given you Exhibit 400, which is a list of all 154

4  people in the clinical review, along with the number.  Do you

5  have that?

6  A   I don't see it.  Where would it -- do you know where it

7  would --

8          THE COURT:  It's your second tab probably in that

9  notebook.

10          THE WITNESS:  Thank you.  I do have it.

11          THE COURT:  Okay.

12          MR. HOLKINS:  Thank you, Your Honor.

13          THE COURT:  All right.

14  BY MR. HOLKINS:

15  Q   Ms. Burson, let's return to the four questions you answered

16  for the 28 individuals in your review.  The first of those four

17  questions asked whether the individual could have avoided or

18  spent less time in the state hospital.  Is that right?

19  A   Yes.

20  Q   As a practical matter, what did you mean when you found

21  that individuals could have avoided the state hospital?

22  A   What I was looking at was if there -- if they had had

23  services provided that have been shown to mitigate the risk of

24  hospitalization, were those services sufficient to help

25  mitigate that risk.  And then I also looked at if there was

1  evidence in the medical record that they had been in the

2  hospital longer than they -- than the medical record said they

3  had stabilized.

4  Q   How does your finding that some individuals could have

5  avoided hospitalization compare to a finding that those

6  individuals never needed inpatient treatment?

7  A   I don't see those as the same determinations.  So for me --

8  when I look at something, someone could need hospitalization at

9  the point in time that their symptoms have already escalated to

10  the point that they need to get hospital-based treatment to

11  get -- to right the ship.  So -- but I looked in those cases as

12  to what the community services were that they had prior to that

13  hospitalization and leading up to that, and whether those

14  services, based on their normal or their typical pattern of

15  what happens before they get hospitalized, whether the services

16  that they were prescribed and receiving were sufficient to

17  mitigate the risk.

18  Q   In some instances, did you find that the services being

19  received were not sufficient to prevent hospitalization?

20  A   Yes.

21  Q   What kinds of community-based treatment did you find the

22  individuals you reviewed needed to avoid hospitalization but

23  did not receive?

24  A   I found the PACT, Program of Assertive Community Treatment,

25  was not their supportive employment, permanent supportive

1  housing, community support services, mobile crisis supports,

2  more intensive transition services out of the hospital.

3  Q    Could you briefly describe what PACT is?

4  A    Uh-huh.  Yes.  PACT is a team-based approach to

5  providing --

6            MR. SHELSON:  Objection, Your Honor.  This is just

7  repetitive at this point.  I think we all know what PACT is at

8  this point in the trial.

9            THE COURT:  All right.  We can -- I'm fully versed in

10  what PACT is.  So --

11            MR. HOLKINS:  Okay.

12            THE COURT:  All right.

13            MR. HOLKINS:  Thank you, Your Honor.

14  BY MR. HOLKINS:

15  Q    Ms. Burson, could you give an example of one in your review

16  who needed PACT but didn't receive it?

17  A    Person 133.

18  Q    How would you describe person 133?

19  A    He's an African-American male in his mid 30s.  He lives in

20  a trailer on his sister's property.  He has kind of bounced

21  around, living with his mother sometimes, sometimes with his

22  sister on the property.  He has a remote work history, used to

23  work at a chicken plant.  He's done some car detailing, but he

24  hasn't worked in quite some time.  He has very little structure

25  to his day and has been in the hospital a lot.

1   Q   Could you please turn to page 76 of your report, which is

2   406.  Is this where you discuss person 133?

3   A   Yes, it is.

4   Q   Where did you interview this individual?

5   A   I interviewed him at Mississippi State Hospital.  He was

6   actually hospitalized at the time of the interview.

7   Q   At the time you submitted your report, how many times had

8   this individual been admitted to state hospitals in

9   Mississippi?

10  A   He had been admitted there 16 times.

11  Q   Ms. Burson, do you have a demonstrative showing how much

12  time person 133 spent in a state hospital over a one-year

13  period in 2017 and 2018?

14  A   Yes, I do.

15          MR. HOLKINS:  Your Honor, this is PDX-20 for

16  identification only.

17          THE COURT:  PDX-20?

18          MR. HOLKINS:  Yes, Your Honor.

19          THE COURT:  All right.

20  BY MR. HOLKINS:

21  Q   Ms. Burson, what time period does this demonstrative cover?

22  A   May of 2017 through April of 2018.

23  Q   How many state hospital admissions did person 133 have

24  during that one-year period?

25  A   Four.

1  Q   How were those hospitalizations identified on this

2  demonstrative?

3  A   Each hospitalization is denoted by a different color that

4  is blocked in on the calendars.

5  Q   In the first four months of 2018 alone, how many times was

6  person 133 in a state hospital?

7  A   Three.

8  Q   And during those four months, did person 133 spend more

9  time in a state hospital or not?  Over those four months, did

10  person 133 spend more time in a state hospital or not in a

11  state hospital?

12  A   He spent more time in the state hospital than outside of

13  the state hospital.

14  Q   Did this man's state hospital admissions between May 2017

15  and August -- excuse me, April 2018, follow a pattern, or was

16  each one different?

17  A   They followed a pattern.

18  Q   Do you have a slide that shows the pattern you observed?

19  A   Yes.

20       MR. HOLKINS:  Your Honor, this is PDX-21 for

21  identification only.

22       THE COURT:  All right.

23  BY MR. HOLKINS:

24  Q   What is the title of this demonstrative, Ms. Burson?

25  A   Person 133, "Cycle of State Hospitalization Admissions."

1    Q    How many steps are there in that cycle?

2    A    Four.

3    Q    Let's walk through them.  What's the first step in person

4    133's cycle of state hospital admissions?

5    A    So in the first phase, he is living in the community

6    without adequate community mental health services.

7    Q    What does community living look like for person 133?

8    A    So he's living in a trailer on his sister's property that's

9    in pretty bad shape.  He is -- has no structure to his day.  He

10   doesn't really have any steady kinds of responsibilities of

11   what he needs to do.  He typically doesn't take his medications

12   consistently, uses substances, can -- when he's using

13   substances can get irritable and moody and disruptive and

14   difficult to be around.

15   Q    What happens next in the cycle?

16   A    Eventually, he tends to go off of his medications

17   completely, uses more substances.  He's more disruptive.  He

18   escalates.  His family finds him so disruptive and out of

19   control that they push for hospitalization.

20   Q    Did you see any evidence that person 133 received crisis

21   services in that stage?

22   A    No, I did not.

23   Q    And what happens in step 3?

24   A    So in step 3, he gets admitted to the state hospital.  And

25   when he's at the state hospital, he tends to stabilize pretty

1  quickly on medications.  He's engaged in the groups and the

2  various therapies that are offered there, and he is prepared

3  for discharge.

4  Q   And finally, what's step 4 in this cycle of state hospital

5  admissions for person 133?

6  A   So in step 4, then he is discharged from the state hospital

7  with ineffective discharge planning.

8  Q   In what ways is the discharge planning that person 133 has

9  received in the state hospital ineffective?

10  A   The discharge plan doesn't provide a way to address the

11  factors that keep driving the repeated hospitalization.  So I

12  would expect with discharge planning, when a plan hasn't worked

13  and someone keeps getting hospitalized, that they would be

14  looking for an alternative plan that would address the factors

15  that keep driving the hospitalization.

16     So what happens then is he goes out there, he doesn't get

17  those kinds of services, and the cycle repeats itself.

18  Q   Why did you recommend PACT for person 133?

19  A   He meets the criteria for PACT.  He's sort of a classic

20  referral for that.  He's had repeated hospitalizations.  He has

21  a comorbid substance use condition that goes along with that.

22  He can get very disruptive and sometimes end up getting into

23  legal involvement around -- for things like disturbing the

24  peace.  And PACT has the capacity to intervene in all kinds of

25  ways that would help break up that cycle.

1  Q   Have you seen individuals like person 133 who are able to

2  avoid hospitalization once connected to PACT?

3  A   Yes.

4  Q   At the time of your review, had person 133 ever received

5  Program of Assertive Community Treatment?

6  A   No, he had not.

7  Q   Why not?

8  A   It was not available in the area where he lived, but I

9  don't think it was ever -- it was -- there was no evidence that

10  it was ever considered or that they tried to put together a

11  more intensive sort of even PACT-like sort of thing.

12  Q   In stepping back from person 133, how many people of the 28

13  in your review were receiving PACT at the time?

14  A   One.

15  Q   Who is that person?

16  A   Person 142.

17  Q   How would you describe person 142?

18  A   So he's an African-American male in his mid to late 50s.

19  He lives in his own home, which he's had for quite some time

20  now, something in the vicinity of 12 years.  He was in college

21  at one point in time to become an electrical engineer.  He

22  didn't end up completing that education, but he did end up

23  going, despite a long history of illness, completing some

24  certificates in related fields at the community college.  So he

25  has some certificates around to repairing different kinds of

1    electrical equipment.  And he has a couple of those in TV

2    repair and radio repair and those kinds of things.  His house

3    is filled with various kinds of equipment that he would like to

4    get back to repairing some day.

5    Q   Could you please turn to page 124 of your report?  Is this

6    where you describe person 142?

7    A   Yes, it is.

8    Q   At the time you interviewed him, how many times had person

9    142 been admitted to a state hospital in Mississippi?

10    A   He has had ten hospitalizations at Mississippi State

11    Hospital.  He's also had several other psychiatric admissions,

12    but ten at the state hospital.

13    Q   In general, what have been the factors contributing to

14    these man's repeated state hospital admissions?

15    A   He has -- he often also goes off of his medications.  He

16    stops taking them.  He has a comorbid medical condition.  He

17    has diabetes that he has alongside of that and often has

18    difficulty managing that diabetes, and there's an interaction,

19    and then that can spiral things.  He -- when he goes off his

20    medications, he gets manic-like.  He's been known to go out and

21    buy cars.  He's gotten into bankruptcy issues.  He's -- he gets

22    in trouble for disturbing the peace.

23    Q   When did person 142 start receiving PACT?

24    A   In 2015.

25    Q   What services does person 142 receive through PACT?

1    A    He has people regularly coming out to his home to help him.

2    He gets support around medications, in making sure and working

3    with him around taking medications.  He gets support around

4    following his diet and managing his diabetes.

5        He also is involved with peer support, and he -- they also

6    pick him up and take him to a center where he can take, you

7    know, wellness classes and does some fitness kinds of things.

8    Q    What do you -- first off, how many times has person 142

9    been admitted to state hospitals in Mississippi since 2015,

10   when he connected to PACT?

11   A    He was admitted once since 2015.  But prior to that, in the

12   few years from 2011 until 2015, he was hospitalized a total of

13   17 times.  There were four of those that were at Mississippi

14   State Hospital, I believe.

15   Q    What do you make of the fact that person 142 went back into

16   the state hospital even after he started receiving PACT?

17   A    I think that that is not uncommon.  When somebody's had so

18   many hospitalizations, sometimes it takes awhile before they

19   never get hospitalized.  Still, in that particular

20   hospitalization, he went his longest period of time since 2011

21   without being hospitalized, and it was his shortest

22   hospitalization.

23       And additionally, there was some significant stressors that

24   contributed to the hospitalization.  So he had previously a

25   brother who was killed in an auto accident and that he was

*** DAILY TRANSCRIPT ***

1   very -- he's very, very close and connected with his family.

2   And prior to that 2017 hospitalization, the one since he was on

3   PACT, his other brother was diagnosed with cancer.  So there

4   were some things going on.

5   Q   Let's turn back to person 133 for a second.  How would you

6   compare person 133's history of hospitalization with that of

7   person 142, whom we just discussed?

8   A   I think their history of hospitalization is similar in that

9   they both have a pattern of going off of their medications.

10  They both have additional medical conditions, and one having

11  the substance use issues, but the other one having the diabetes

12  that's difficult to manage, and that has some interaction

13  effects.

14       They both get disruptive and out of control and get into

15  all kinds of trouble when they -- that escalates into requiring

16  hospitalization.

17  Q   What distinguishes them?

18  A   Well, person -- one person got PACT, and one did not.  And

19  the cycle stopped when the one person got PACT, or certainly

20  was significantly altered.

21  Q   Ms. Burson, I'd like to shift to another finding from your

22  review.  You testified that many of the individuals you

23  reviewed were at serious risk of further hospitalization at the

24  time.  Is that correct?

25  A   Yes, I did.

1  Q   How did you go about determining that these individuals

2  were at serious risk of rehospitalization?

3  A   I looked at -- after collecting all the information from

4  the interviews that I did with the community mental health

5  agencies and the family members and the individuals and

6  reviewing all of their medical records, I looked for what were

7  the patterns -- what was happening before people were

8  hospitalized.  I looked at what kinds of services they were

9  getting, and I looked at whether or not the services that they

10  were receiving at the time that I interviewed them, and based

11  on how they were doing, were they receiving services that would

12  help mitigate that risk.

13  Q   In general, what's the extent of the community-based

14  services that these at-risk individuals were receiving at the

15  time of your interviews?

16  A   I'm not sure I heard your question.  Could you repeat it?

17  I'm sorry.

18  Q   In general, what was the extent of the community-based

19  services that these at-risk individuals were receiving at the

20  time of your interviews?

21  A   In general, they were receiving very little services.  For

22  the most part, people were prescribed medication services.

23  Some people were getting some very minimal community support,

24  but most of the people were not getting that either.  So the

25  treatment was predominantly focused on medications with some

*** DAILY TRANSCRIPT ***

1    community support for some individuals.

2    Q    What were the obstacles to receiving appropriate

3    community-based services for these at-risk individuals?

4    A    Well, in some cases, the services that would have been --

5    that would have addressed the factors that were contributing to

6    their hospitalizations were not available where they lived.  In

7    other cases, the services that they needed might have been

8    available to them, but for whatever reason, those services were

9    either not considered or not prescribed.  The person wasn't

10   receiving them.

11        And then in some cases, the person was receiving the

12   service, but not with the intensity or the frequency that would

13   mitigate the risk.

14   Q    What are some examples of community-based services that

15   were not available in some individuals' home counties?

16   A    PACT and supported employment.

17   Q    And what are examples of community-based services that were

18   available to at-risk individuals which they never received?

19   A    Permanent supportive housing.

20   Q    Finally, what services did you find that these at-risk

21   individuals were receiving, but not with the intensity

22   necessary to prevent hospitalization?

23   A    Community support services.

24   Q    Ms. Burson, I'd like to drill down on one of the services

25   you mentioned, supported employment, which you testified that

 1  individuals at risk of hospitalization needed but weren't

 2  receiving.  Correct?

 3  A   Yes.

 4  Q   Could you give an example of one such individual?

 5  A   Person 132.

 6  Q   Could you briefly describe person 132?

 7  A   Yeah.  Person 132 is a 23-year-old very fair-complected

 8  Caucasian male.  He's also quite overweight.  He graduated high

 9  school.  He grew up in and out of foster care.  His mother has

10  schizophrenia.  He -- he lives with his mom and his -- he's got

11  a four-year-old brother.

12     He did graduate high school, despite being sick and having

13  mental health challenges from a young age, his teens.  And he

14  even started college.  He really likes science, biology,

15  especially anything having to do with the ocean, and he likes

16  history, and especially anything having to do with the Civil

17  War.  But college was -- he got interrupted with -- he was

18  getting sick so often, so he stopped going to college.  And

19  then he worked at McDonald's, and he's worked at Sonic, and

20  he's done that, but that's kind of who he is.

21  Q   Could you please turn to page 81 of your report.  Is this

22  where you discussed person 132?

23  A   Yes, it is.

24  Q   Where did you interview him?

25  A   I interviewed him in the home that he lives in with his

1   mother, though he was the only one.  You know, his family was

2   not present at the time of the interview.

3   Q   At the time of your interview, how many times had person

4   132 been admitted to state hospitals in Mississippi?

5   A   In Mississippi, he was in the state hospital three times.

6   Prior to that, he had lived in Louisiana.

7   Q   What community-based services did you recommend for person

8   132?

9   A   I recommended PACT and permanent supported housing, and I

10  recommended that PACT also have an emphasis on supportive

11  employment.

12  Q   Why did you think person 132 was a good fit for supportive

13  employment?

14  A   He wants to work.  He had worked for about a year at

15  McDonald's, and then -- this was in Louisiana.  And then he

16  worked for another year at Sonic, and then he moved to

17  Mississippi.  And he worked at another Sonic for about six

18  months, and then he lost his job.  He was told when he was let

19  go that he was making the other employees uncomfortable because

20  he was scary.

21      And supported employment is an intervention designed to

22  help with that, to keep people working.  Since that time, he

23  has not tried to work.

24  Q   How would person 132 benefit from supported employment?

25  A   So supported employment does all kinds of things for people

*** DAILY TRANSCRIPT ***

1    besides giving them a paycheck, which, of course, is good, but

2    it also gives them a sense of their identity, and an identity

3    other than being a patient or a person with a significant

4    illness.  It gives them structure to their day.  It gets them

5    up and out of bed to go where they need to be.  Many people end

6    up taking better care of their appearance.  It gives them a way

7    to interact with other people in the community and gets them

8    rooted to their community.  It keeps them more physically

9    active.

10         For many people, it means that they build in -- it gives

11   them a reason to take their medications.  It gives them a

12   reason -- you know, there's something to lose by being

13   hospitalized.  The list goes on and on and has many, many

14   positive -- employment has many, many positive benefits for

15   people.  You see it both ways, but it's supported with an ED.

16   Q   Returning to person 132, why did you find that he was at

17   serious risk of rehospitalization?

18   A   When I interviewed him, and at the time he was not

19   receiving services that would mitigate his risk for

20   hospitalization.  Additionally, he -- he talked with me about

21   how it was a time of year when he was typically hospitalized,

22   kind of knows his pattern of when he gets hospitalized.  And in

23   talking with him, he had no sense of what he could do or a plan

24   to help prevent that in any way.

25   Q   How would the community-based services that you

1   recommended, including PACT and supported employment, help to

2   mitigate the risk of hospitalization for person 132?

3   A    So there's a few ways that he gets hospitalized.  One

4   thing, he has a history of going off of his medications, so

5   PACT would help him, you know, ensure that he is getting his

6   medications consistently.

7        He also doesn't have a sense that he can -- he doesn't have

8   much of a sense of self-agency at all, that he can manage his

9   illness, and PACT can get in there and work with him on what he

10  can do to help do that.  And PACT can do that in his natural

11  living environment.

12       I mentioned before that he's actually quite obese, and he's

13  got some health things related to that at a very young age of

14  only 23.  So a nurse and a team can also help give him some

15  guidance around that and start to build greater independence in

16  him.  He's --

17  Q    At the time that you interviewed him, had person 132 ever

18  received PACT?

19  A    No, he had not.

20  Q    At the time you interviewed him, had person 132 ever

21  received supported employment?

22  A    No, he had not.

23  Q    Ms. Burson, were any of the individuals in your review whom

24  you recommended for supported employment actually receiving the

25  service?

1    A    No.

2    Q    Ms. Burson, I'd like to shift gears and talk about

3    permanent supported housing, which is the service you testified

4    that at-risk individuals in your review didn't receive, even

5    though it was available.  Is that correct?

6    A    Yes.

7    Q    Could you give an example of one such individual?

8    A    Person 125.

9    Q    Could you briefly introduce person 125?

10   A    He's a very tall African-American male in his mid 30s.  He

11   stood the whole time of the interview.  He's got a restlessness

12   and agitation about him.  At the time of the interview, he was

13   actually watching a young nephew and was able to keep his eye

14   on his nephew to make sure he wasn't getting into something

15   that would put him in danger, though he was still quite

16   distractable with tangential speech and some other kinds of

17   symptoms.

18       He used to work -- he actually dropped out of high school

19   when he was 15 because his mother passed away, and he describes

20   having dropped out for financial reasons to be able to help

21   support the family.

22       He used to work as a commercial truck driver and as a

23   commercial fisherman, although he hasn't worked for some time

24   now.  He lives with his uncle.

25   Q    Could you turn to page 20 of your report, please.  Is where

1   you discussed person 125?

2   A   Yes.

3   Q   At the time you interviewed him, how many times had person

4   125 been committed to state hospitals in Mississippi?

5   A   Three.

6   Q   At the time you interviewed him, when was person 125's most

7   recent state hospital discharge?

8   A   His most recent state hospital discharge was

9   October 14th of 2017.

10  Q   Ms. Burson, what community-based services did you recommend

11  for person 125?

12  A   PACT and permanent supported housing.

13  Q   Ms. Burson, please turn to the tab labeled PX-1103.  What

14  is this document?

15  A   This is his most recent discharge summary from South

16  Mississippi State Hospital.

17  Q   And you are referring to person 125?

18  A   Yes, I am.

19  Q   This is in connection with his most recent state hospital

20  discharge.  Is that right?

21  A   Yes.

22          MR. HOLKINS:  Your Honor, I'd move this into evidence

23  as PX-1103.

24          THE COURT:  Any objection from the State?

25          MR. SHELSON:  No, sir.

```
 1           THE COURT:  PX-1103 is received in evidence.

 2       (Exhibit PX-1103 marked)

 3   BY MR. HOLKINS:

 4   Q   Ms. Burson, on the first page of this document, please

 5   direct your attention to the section titled "History of present

 6   illness."  Do you see that?

 7   A   Yes.

 8   Q   Could you read that section aloud?

 9   A   "The patient is a 36-year old black male.  He's been off of

10   his psychotropic medications for months, possibly a year.  He

11   has become paranoid with his family, convinced they are putting

12   poison in his food.  He has lost 20 to 30 pounds and eats only

13   fast food from outside of the home.  Further, he is convinced

14   they put a satellite in his head, have conspired against him to

15   get his money.  He states, quote, My uncle is the ring leader,

16   unquote.  He acknowledges this has caused him worry and

17   agitation, leading to decreased sleep, et cetera, and racing

18   thoughts, poor concentration and hyperactivity.  The patient

19   was admitted to Singing River Hospital, where he has improved

20   with some treatment with Risperidone.  He is agreeable to

21   further treatment."

22   Q   Ms. Burson, where was person -- Ms. Burson, where was

23   person 125 discharged after this admission?

24   A   Into that same uncle's home.

25   Q   Are you referring to the uncle described as the ring leader
```

1  in person 125's discharge summary?

2  A   Yes, I am.

3  Q   Why did you recommend this individual for permanent

4  supported housing instead of placement with his uncle?

5  A   So permanent supportive housing is a good intervention for

6  somebody that has housing instability that contributes to their

7  need for hospitalization or a person who's living situation

8  contributes to their need for hospitalization.  And in his

9  case, because -- although he's quite actually connected with

10  his family, his family and this uncle, but his family gets very

11  interconnected and intertwined into his delusions, and that

12  escalates his symptoms even further and drives hospitalization.

13      So I thought it would be better for him to mitigate that

14  risk by having him not live with his family but still live near

15  enough to his family that he can be connected to them.

16  Q   What would permanent supported housing look like for person

17  125 as a practical matter?

18  A   So he would have his own apartment or home.  Often it comes

19  with a rental subsidy.  And then he would get supports to help

20  make sure he's maintaining that home and doing the things you

21  need to do to be a good tenant.  And, you know, it would go

22  with PACT.

23      The other thing that would do is he would have his own food

24  supply.  When he gets more symptomatic, he wouldn't be worrying

25  about whose food it was that was in the refrigerator and

1   whether his family was trying to poison him.  And also, what

2   permanent supportive housing can do for someone like him is

3   provide a safe place to deescalate when his symptoms do start

4   to ramp up.

5   Q    When you interviewed him, had person 125 ever received

6   permanent supported housing?

7   A    No, he had not.

8   Q    Had he ever received PACT?

9   A    No, he had not.

10  Q    I'd like to shift gears and talk about discharge planning.

11  In general, how would you describe the discharge planning

12  services the 28 individuals in your review received in

13  Mississippi's state hospitals?

14  A    In general, I found the discharge planning to be

15  inadequate.

16  Q    Why did you find it to be inadequate?

17  A    So discharge planning -- a reasonable standard for

18  discharge planning would be that the discharge plan is

19  individualized, that it takes into account the factors that

20  have been driving hospitalization and tries to do something to

21  mitigate those factors.

22       Another reasonable standard would be that it is

23  collaborative and that it is coordinated to ensure

24  follow-through.  And the other one would be that if in the past

25  a discharge plan that you put in place didn't work, that you

1   would analyze that and figure out what didn't work about it and

2   try something different.

3   Q   So you've described what you termed a reasonable standard

4   for discharge planning.  Correct?

5   A   Yes.

6   Q   And how does that compare with what you saw for the 28

7   individuals in your review?

8   A   So, in general, I found the discharge planning to be

9   formulaic.  People pretty much got the same discharge plan, and

10  it -- I didn't see discharge plans change, even when in the

11  past the discharge plan hadn't worked.  I didn't see, in

12  general, that -- for example, so many people had a consistent

13  pattern of going off of medications, and I didn't see services

14  prescribed that would look at the reasons why they were going

15  off medications and try and do something to intervene with

16  that.  So they would still prescribe medications, for example,

17  medication services, but if somebody wasn't showing up for

18  appointments, I didn't see anything that looked at why would

19  that be and how could we get around that.

20  Q   Could you give an example of an individual you reviewed who

21  received inadequate discharge planning services at a state

22  hospital in Mississippi?

23  A   Yes.  Person 144.

24  Q   Could you introduce person 144 briefly?

25  A   Yeah.  He's a Caucasian male in his mid 30s.  When I

1    interviewed him, he was actually in the Calhoun County Jail.

2    He has been sick since he was quite young, like late teens,

3    also has a comorbid substance use problem.

4        He does have a work history.  He described working at a

5    furniture factory, a local one in the area where he lives, and

6    really described with some pride the number of different kinds

7    of saws he was able to work.  I tried to list some, but some of

8    them I had never heard of.

9        He also described really liking music, especially playing

10   the guitar, although he doesn't have that anymore, and he

11   really likes to draw.

12   Q    Would you please turn to page 136 of your report.  Is this

13   where you described person 144?

14   A    Yes, it is.

15   Q    Where did you interview person 144?

16   A    In the Calhoun County Jail.

17   Q    Why was person 144 in jail at the time?

18   A    The sheriff told me that he was there because he was

19   waiting for a state hospital bed.

20   Q    At the time of your interview with him, when was person

21   144's most recent state hospital discharge?

22   A    In 2016, November of 2016, November 22nd.

23   Q    Ms. Burson, please turn to the tab labeled PX-1107.  Please

24   turn to the second page.  What is this document?

25   A    This is the Mississippi State Hospital discharge summary

1  for person 144.

2  Q   And is this the discharge summary in connection with person

3  144's most recent state hospital discharge?

4  A   Yes, it is.

5       MR. HOLKINS:  Your Honor, I move this into evidence as

6  PX-1107.

7       THE COURT:  Any objection from the State?

8       MR. SHELSON:  No, Your Honor.

9       THE COURT:  PX-1107 is received in evidence.

10   (Exhibit PX-1107 marked)

11       THE COURT:  Did we do that for PX-1103?

12       THE CLERK:  Yes.

13       THE COURT:  We did?  All right.  Thank you.  All

14  right.  You may proceed.

15       MR. HOLKINS:  Thank you, Your Honor.

16  BY MR. HOLKINS:

17  Q   Please turn to page 6 of this document, Ms. Burson.  I want

18  to direct your attention to the section in the middle of this

19  page titled "After-care plans."  Do you see that?

20  A   Yes.

21  Q   Could you please read aloud the entry for after-care plans?

22  A   "Follow up with the mental health center.  Follow up with

23  the primary care provider.  Keep follow-up appointments at

24  Region 7 Mental Health Center in Eupora on 12/2/2016, at

25  10 a.m.  Next Abilify maintenance shot due on 12/14/16.

1   Continue all PO medications every day.  Abstain from drugs and

2   alcohol.  Attend 90 meetings in 90 days.  The family nurse

3   practitioner instructed the patient to follow up with the

4   primary care provider in three months, unless sooner.  PRN for

5   medication conditions and/or any other concerns.  May obtain

6   Prilosec over the counter.  Monitor blood pressure and pulse

7   two to three times per week, and record for the next primary

8   care provider appointment."

9   Q    Thank you.  Let's turn back now to page 137 of your report.

10   I want to direct you to the fourth paragraph on that page.  Was

11   this the discharge plan you described as setting person 144 up

12   for failure?

13   A    That was my -- that is my opinion, yes.

14   Q    Why did you find this discharge plan set person 144 up for

15   failure?

16   A    Well, the discharge plan relied solely on him for the

17   follow-through to execute it, so it did not factor in his

18   extensive history of nonadherence to medications.  It also

19   didn't include engaging his parents or the community mental

20   health center or the state hospital in some sort of a

21   collaborative discharge planning process to look at how they

22   might get him to attend to his medications, to get to those

23   appointments, to get to 90 meetings in 90 days.

24       There was no plan included around outreach if he didn't

25   show up for appointments.  There were no -- nothing -- no

1  service that would include any kind of home visits to help

2  establish any kind of the routines he would need to be

3  established, establishing to take care of his health.

4  Q   I would now like to pull up an excerpt from the deposition

5  designations for Sheila Newbaker, who I will represent to the

6  court is the social services executive for East Mississippi

7  State Hospital.

8          MR. HOLKINS:  Your Honor, this designation appears on

9  page 108 of Exhibit 2 to the party's proposed pretrial order.

10         THE COURT:  Okay.  All right.

11  BY MR. HOLKINS:

12  Q   Ms. Burson, I want to direct your attention to page 51,

13  line 23 of this deposition designation, to the question that

14  starts, "Do you think that East Mississippi."  Do you see where

15  I am?

16  A   Yes.

17  Q   I'm going to read the questions in this designation aloud.

18  Could you read Ms. Newbaker's answers aloud?

19  A   Yes.

20  Q   And we'll end at page 52, line 19.  Is that okay?

21  A   Yes.

22  Q   "Question:  Do you think that East Mississippi State

23  Hospital has a responsibility to ensure that the transition

24  from the hospital to the community is as smooth as possible?"

25  A   "Answer:  Sure."

1  Q   "Question:  What does East Mississippi State Hospital do to

2  achieve that purpose?"

3  A   "Well, you know, we certainly make the arrangements.  We

4  make sure that the client is agreeable to the arrangements,

5  they are aware of the arrangements and that we don't set them

6  up for failure, that we, you know, make it as doable for them

7  as we can."

8  Q   "Question:  What do you mean by set them up for failure?"

9  A   "You know, place them where they won't have availability of

10  services.  We want to make sure they're able to get their

11  medication, that they've got the appointment.  We put it in

12  their hand, look at transportation needs, try to get help with

13  them -- try to help them with as many arrangements as possible

14  for when they leave."

15  Q   Ms. Burson, do you agree that state hospitals have a

16  responsibility to not set their clients up for failure in the

17  community?

18  A   Yes, I do.

19  Q   Returning to person 144, did you find that he was at

20  serious risk of hospitalization at the time of the interview?

21  A   I did.

22  Q   Why?

23  A   He was in the -- he was very symptomatic.  He was in the

24  Calhoun County Jail, and I was told by the sheriff he was

25  waiting for a bed to become available to be admitted to the

1  state hospital.

2  Q    What community-based services did you recommend for person

3  144?

4  A    I recommended PACT and permanent supportive housing.

5  Q    Was there any evidence that person 144 had been receiving

6  the intensive services he needed to mitigate his risk of

7  hospitalization?

8  A    No.

9  Q    And how does that relate to the ineffective discharge

10  planning person 144 received?

11  A    Well, he was not -- PACT services were not considered.  I

12  don't think they were available in his area.  I also didn't see

13  evidence of, if they weren't available, trying to piece

14  together and collaborate around what intensive -- what more

15  intensive kind of service did they have the capacity to provide

16  in order to be able to try and mitigate and break up the

17  pattern.

18  Q    Ms. Burson, after adults with serious mental illness are

19  discharged from state hospitals, what strategies do community

20  service providers use to keep them engaged in services?

21  A    Well, one key thing that people do to keep people engaged

22  in services is they really try to get to know that person and

23  what's important to them and make the services that they're

24  providing align with what is important to that person, so -- so

25  that the services are seen as highly relevant to that person

1  being able to do what it is that they personally want to do or

2  feel like they need to be able to do.

3  Q   Is one term for that strategy assertive engagement?

4  A   Yes.

5  Q   Why does it matter whether adults with serious mental

6  illness are assertively engaged in treatment?

7  A   Well, it matters for two main reasons.  One is, for people

8  that don't identify as needing mental health treatment,

9  engaging them around the things that are important to them is

10  entree into treatment for many people.  The other -- so, for

11  example, if somebody identifies with wanting to work, engaging

12  with them around supported employment gets somebody in the

13  door.

14      The other reason it becomes really important is people give

15  up on treatment when they don't see their lives getting better.

16  So when you are supporting them and connecting it with what it

17  is that's important to them, that they want for themselves in

18  their lives, they feel some momentum, and then they engage and

19  make better use of treatment.  They start to apply what they're

20  learning more in their everyday lives.  So it -- it pushes

21  treatment further along.

22  Q   In general, were the individuals in your review assertively

23  engaged in community-based treatment after their discharge from

24  the state hospital?

25  A   No.

1    Q    Could you give an example of someone you reviewed for whom

2    the lack of assertive engagement was a barrier to accessing

3    appropriate community-based services?

4    A    Person 136.

5    Q    How would you describe person 136, briefly?

6    A    So he's an African-American male in his mid 40s.  He has

7    six children ranging from ages six or seven to 21.  He lives

8    with his mother.  He's estranged from his wife and separated.

9    He hasn't been employed since at least 2015.

10   Q    Could you turn to page 86 of your report, please.  Is this

11   where you discuss person 136?

12   A    Yes, it is.

13   Q    Why does person 136 need to be assertively engaged in

14   treatment?

15   A    He doesn't think he needs mental health treatment.  What he

16   identifies as needing is a job and a better place to live.

17   Q    How would assertive engagement help him participate more

18   fully in treatment?

19   A    Well, he doesn't engage with treatment because he doesn't

20   see a need for it.  So if he -- for example, if you get to know

21   him and in interacting with him pick up on his desire to have a

22   job, and then you work with him on, well, what would help you

23   get that job and, you know, we have supported employment, and

24   is that something that would -- you know, that you would be

25   interested in getting support with, sometimes people will --

1  and oftentimes you'll see people take up and say, yes, I'll do

2  that service, as long as I don't -- I'm not required to do

3  something else.

4  Q  Ms. Burson, on page 87 of your report, in the third full

5  paragraph, you note that person 136 was discharged from the

6  state hospital with an after-care appointment at Weems

7  Community Mental Health Center.  Is that right?

8  A  Yes.

9  Q  Ms. Burson, please turn to the tab in your binder labeled

10  PX-1106.  What is this document?

11  A  This is a -- from the Weems Community Mental Health Center,

12  and it's his intake assessment at Weems.

13  Q  Are you referring to person 136?

14  A  I am.

15  Q  What's the date of this assessment?

16  A  The screening date of this is 11/16/2017.

17        MR. HOLKINS:  Your Honor, I move this into evidence as

18  PX-1106.

19        THE COURT:  Any objection?

20        MR. SHELSON:  No, sir.

21        THE COURT:  PX-1106 is received in evidence.

22     (Exhibit PX-1106 marked)

23  BY MR. HOLKINS:

24  Q  Ms. Burson, please turn to page 5 of this document.  I want

25  to direct you to the section titled "Intake summary and

1   recommendations."  Do you see that?

2   A   Yes.

3   Q   Could you read aloud the entries in that section?

4   A   "Intake summary and recommendations.  Home:  IRS stated he

5   lives with his payments.  IRS stated he hopes to own his own

6   place when he can get on his feet financially.  Individual

7   receiving services.  Health:  IRS stated he attends scheduled

8   doctor's appointments and takes his medicine daily as

9   prescribed by doctor.  IRS stated he complies with doctor.

10  Community:  IRS stated his father has an outreach store, and he

11  helps out in the store when parents need him to help.  Purpose:

12  IRS stated he wants his own place."

13  Q   Ms. Burson, please turn to the tab labeled PX-1105.  What

14  is this document?

15  A   This is the discharge service change summary for him from

16  Weems.

17  Q   Are you referring to person 136?

18  A   Yes, I am.

19  Q   What is the date of this record?

20  A   March 12th, 2018.

21  Q   So that's less than four months after person 136's intake

22  assessment at Weems CMHC.  Correct?

23  A   Yes.

24       MR. HOLKINS:  Your Honor, I move this document into

25  evidence as PX-1105.

```
1              THE COURT:  Any objection?

2              MR. SHELSON:  No, Your Honor.

3              THE COURT:  PX-1105 is received in evidence.

4       (Exhibit PX-1105 marked)

5  BY MR. HOLKINS:

6  Q   Ms. Burson, what is listed as the reason for discharge?

7  A   "No contact within specified time frame."

8  Q   What is listed under discharge status?

9  A   "Therapist terminated treatment."

10 Q   Finally, in the text box, what discharge instructions and

11 additional information are provided?

12 A   "IRS did not come back to complete treatment plan."

13 Q   How did Region 10 -- excuse me.  How did Weems Community

14 Mental Health Center fall short of assertively engaging person

15 136 in treatment?

16 A   Although they took information down about what was

17 important to him, to get on his feet financially, a job and to

18 get another place to live, they didn't offer any connection or

19 engagement or service around that, or there's no evidence of

20 that that would make him want to use Weems services, and he's a

21 person that didn't see a need to receive mental health

22 treatment if it wasn't going to help him with what he needed.

23 Q   Did you find that person 136 was at serious risk of

24 hospitalization when you interviewed him?

25 A   Yes, I did.
```

1    Q    Why?

2    A    He was actually symptomatic at that time when I met him,

3    and he also was not receiving -- he told me he wasn't taking

4    his medications.  He showed me, you know, the bottles of them.

5    And he -- and he wasn't receiving any mental health services to

6    mitigate that risk.  He told me that he went to the first

7    intake appointment, and they just wanted him to fill out

8    paperwork, and he never came back.

9            MR. HOLKINS:  Your Honor, may I confer with counsel

10   for a moment?

11           THE COURT:  Yes, you may.

12   BY MR. HOLKINS:

13   Q    Ms. Burson, let's revisit person 132 one last time.  Could

14   you turn to page 81 of your report.  This is where you

15   discussed person 132.  Correct?

16   A    Yes.

17   Q    Could you remind us, at the time of your review, how many

18   times person 132 had been admitted to a state hospital in

19   Mississippi?

20   A    He was admitted it looks like twice at a state hospital.

21   Q    Once at South Mississippi State Hospital and once at East

22   Mississippi State Hospital.  Is that correct?

23   A    Correct.

24   Q    When you interviewed him, how did person 132 describe the

25   experience of being in a state hospital?

1  A    He said it made him feel like he -- like he wasn't a

2  person.

3  Q    How has the experience of repeated state hospitalization

4  affected person 132?

5              MR. SHELSON:  Objection.  Calls for speculation.

6              THE COURT:  If she can tell from the record, you may

7  testify if it's in the record.

8  BY MR. HOLKINS:

9  Q    Ms. Burson, based on your review of person 132's records,

10  and based on your interview with person 132, how has the

11  experience of state hospitalization affected him?

12  A    Well, he describes it as feeling less like a person.  It's

13  like going to jail over and over again, what he describes is

14  not having -- he's not doing things that he was doing, even

15  though he was sick.  He doesn't have -- you know he -- he was

16  trying to go to school.  He went to school.  He's no longer

17  trying to pursue his education.  He was working.  He's no

18  longer trying to work.  He has a driver's license and was

19  driving.  He still has a driver's license, but he's no longer

20  driving.  And he talks about not feeling like he's able and

21  capable to manage his health and his illness.  So he gets

22  hospitalized, but he's not leaving with a sense of self-agency

23  that he can manage the world.

24  Q    For someone like person 132, who is at risk of losing his

25  self-agency, how do you go about restoring it?

1    A    Well, my experience has been, and what I've seen is what it

2    really -- what it really takes when someone is losing their

3    sense of self-agency is you have to get in there and form a

4    relationship with them and build some trust because it's hard

5    to get them to take the risk again.  People become afraid of

6    failing.  They start to feel like they're not capable.  And so

7    you do it with them.

8         So a service like supported employment, for example, you

9    help the person figure out what kind of job is going to be a

10   good fit.  You help them prepare for the job.  You help them do

11   the interview.  If they lose a job, you help them figure out

12   what went wrong and what they can do different.  The whole

13   thing is a learning experience.  You celebrate every success

14   that they make, everything that they do, that they do better,

15   is a learning experience.  And so you have to engage them

16   around the management of their life and the everyday things

17   that they do, and that builds their confidence.

18        And the effect of that is that they start to have all

19   self-confidence that they can begin to manage their illness,

20   that they can -- that if -- that if they get more symptomatic

21   or something happens, that they have a sense that it will be

22   okay, they can do it.  This is a rough patch.  This is not all

23   that I am, and this is not something that I can't overcome.

24   Q    Was person 132 receiving supported employment at the time

25   you met him?

1   A   No, he was not receiving supported employment.

2   Q   Had he ever received that service?

3   A   No, he had never received that service.

4   Q   How would you describe the experiences of meeting person

5   132?

6          MR. SHELSON:  Your Honor, how the experience affected

7   her personally is of no relevance to this lawsuit, no

8   disrespect intended.

9          THE COURT:  Objection sustained.

10          MR. HOLKINS:  I have no further questions, Your Honor.

11          THE COURT:  All right.  We're in an hour where this is

12   a good place to break until tomorrow.  We'll see you tomorrow,

13   Ms. Burson.  Spend as much money as you can here in Jackson.

14   She is staying in Jackson, right?

15          Did you want to cross-examine her this afternoon?

16          MR. SHELSON:  Oh, no, sir.  Mr. Anderson asked me

17   to -- you mentioned yesterday we may be starting a little later

18   tomorrow, and he asked me to ask you.

19          THE COURT:  We will.  We will be starting later

20   tomorrow.

21          MR. SHELSON:  Yes, sir.

22          THE COURT:  You can sleep in a little bit.  With

23   respect to tomorrow, we'll start at 10 a.m. tomorrow morning.

24   I have a matter that starts at 9.  We should be through long

25   before 10, but just be prepared to start up at 10.

1          But we realized we have another matter scheduled

2    tomorrow afternoon.  Do we know what witnesses will be called

3    tomorrow?

4          MS. RUSH:  Your Honor, we have, in addition to Ms.

5    Burson, we have another fact witness tomorrow who we expect her

6    direct to last about an hour and a half.  I should also inform

7    the court our next -- our witness after that is an expert who

8    is having some travel difficulties and is stuck in the Atlanta

9    airport, so he may be coming in late tonight.  So we can either

10   hold him over for Friday morning or take him at some point late

11   in the afternoon, if that's possible.

12         THE COURT:  I tell you what.  Let's start at 9:45

13   tomorrow morning, and we'll end at 3:15.  I have another matter

14   that starts at 3:30, and rather than start that 3:30 matter and

15   then try to come back -- I think I'll be through with the 3:30

16   matter at like -- well, let's just play it by ear.  I have

17   another hearing for 3:30, so I'm thinking if we do finish up

18   with this witness and get to the fact witness, and we'll see

19   how it goes in trying to get in your expert.  We may just hold

20   your expert until Friday.

21         MS. RUSH:  That sounds good, Your Honor.  Thank you.

22         THE COURT:  And maybe we'll be able to leave early --

23   maybe you all will be able to leave early Thursday, tomorrow,

24   maybe about 3:00 or any time before then.  I do have another

25   matter at 3:30 that I need to take care of.  I don't think it

1  will take very long, but I don't want to chop up what you might

2  be doing tomorrow.

3          MS. RUSH:  Okay.

4          THE COURT:  All right.

5          MS. RUSH:  That sounds good.  Thank you, Your Honor.

6          THE COURT:  Okay.  Does that sound all right to the

7  State, Mr. Shelson?

8          MR. HOLKINS:  Yes, Your Honor.  Thank you.

9          THE COURT:  All right.  All right.  We'll start up at

10  9:45 tomorrow and then proceed -- proceed with the

11  understanding that I do have that -- a 3:30 hearing in another

12  matter.  All right.  Ms. Rush?

13          MS. RUSH:  Apologize, Your Honor, but because of your

14  morning hearing, should we clear counsel table for other

15  parties?

16          THE COURT:  You don't have to.  I mean, you know, you

17  can -- anything that you wouldn't want them to see is fine, but

18  you don't have to move the computers or move the name tags or

19  any of that type of stuff.

20          MS. RUSH:  Thank you, Your Honor.

21          THE COURT:  All right.  Is there anything we need to

22  take care of besides getting Ms. Burson down off the stand?

23  You can step down.  Is there anything else we need to take care

24  of?

25          MS. RUSH:  Not from the United States, Your Honor.

1   Thank you.

2          THE COURT:  Thank you also much, and I'll see you all

3   tomorrow morning.

4      (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1110

1          CERTIFICATE OF REPORTER

2

3      I, CHERIE GALLASPY BOND, Official Court Reporter, United

4  States District Court, Southern District of Mississippi, do

5  hereby certify that the above and foregoing pages contain a

6  full, true and correct transcript of the proceedings had in the

7  aforenamed case at the time and place indicated, which

8  proceedings were recorded by me to the best of my skill and

9  ability.

10      I certify that the transcript fees and format comply

11  with those prescribed by the Court and Judicial Conference of

12  the United States.

13

14      This the 12th day of June, 2019.

15

16          s/ *Cherie G. Bond*
            Cherie G. Bond
17          Court Reporter

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***