UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                         PLAINTIFF

VS.                               CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                            DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 12


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MORNING SESSION
JUNE 13, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND
             Registered Merit Reporter
             Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186


*** DAILY TRANSCRIPT ***

```
 1      APPEARANCES:

 2      FOR THE PLAINTIFF:     MR. MATHEW SCHUTZER
                               MS. REGAN RUSH
 3                             MS. DEENA FOX
                               MR. PATRICK HOLKINS
 4

 5      FOR THE DEFENDANT:     MR. JAMES W. SHELSON
                               MR. REUBEN V. ANDERSON
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*** DAILY TRANSCRIPT ***

1                          TABLE OF CONTENTS

2

3    KATHERINE BURSON                                    1114

4       Cross-Examination By Mr. Shelson  .................1114

5       Redirect Examination By Mr. Holkins  ..............1144

6       Examination The Court  ...........................1150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Ms. Burson, you may return to the witness
 2   stand.  I failed to ask, is there anything we need to take up
 3   before we begin today's testimony?
 4              MS. RUSH:  No, Your Honor.  Thank you.
 5              THE COURT:  All right.  Mr. Shelson?
 6              MR. SHELSON:  No, Your Honor.
 7              THE COURT:  All right.  Are we ready to proceed?
 8              MR. SHELSON:  Yes, Your Honor.
 9              THE COURT:  I mean, if you need a couple of more
10   minutes --
11              MR. SHELSON:  I'm ready, Your Honor.
12              THE COURT:  All right.  This is United States of
13   America versus State of Mississippi, 3:16CV622CWR-FKB.  Ms.
14   Burson, I'm reminding you you're still under oath.  You did
15   well yesterday in your testimony -- I mean, your audibility and
16   all the volume and all of that, and you did well.  So continue
17   on that pace, and we'll do great.
18              Mr. Shelson, are you yesterday to cross-examination?
19              MR. SHELSON:  Yes, Your Honor.  May I proceed?
20              THE COURT:  Yes, you may.
21                          KATHERINE BURSON,
22     Having first been duly sworn, testified as follows:
23                          CROSS-EXAMINATION
24   BY MR. SHELSON:
25   Q   Good morning, Ms. Burson.
```

1    A    Good morning.

2    Q    Did you work for the Illinois Division of Mental Health

3    from 1995 through 2017?

4    A    Yes, I did.

5    Q    And did you work in Illinois State Hospitals in various

6    capacities for nearly 22 years?

7    A    Yes, I was involved with the -- all of the state hospitals

8    in one way or another for many, many years.

9    Q    Can we refer to the Illinois Department of Human Services,

10   Division of Mental Health as the Illinois DMH?

11   A    Yes.

12   Q    Thank you.  Did you retire from the Illinois DMH on

13   March 31, 2017?

14   A    I did not retire.  I resigned my position, and that was my

15   last day.

16   Q    Okay.  Thank you.  Now, as we heard yesterday, you reviewed

17   28 individuals -- 28 individuals in Mississippi?

18   A    Yes, I did.

19   Q    And at the time of your review, were 25 of those 28

20   individuals living in the community?

21   A    Yes.

22   Q    Would you turn to page 70 of your report, please, which is,

23   for the record, Exhibit PX-406.

24        THE COURT:  Hold on for one second, Mr. Shelson.

25        (Short Pause)

```
 1              THE COURT:  Thank you, we're squared away.

 2              MR. SHELSON:  Sorry, Your Honor.  I'm on the wrong

 3   page.

 4   BY MR. SHELSON:

 5   Q   In any event, are you at person 133?

 6   A   I'm at person 131.

 7   Q   I'm sorry.  Will you turn to person 133?  Are you at person

 8   133?

 9   A   I am -- I want to confirm that.  I think that's who this

10   is.  May I look at the document that has the numbers?

11   Q   What page are you on of your report?

12   A   Person 133 is on page 76.

13   Q   Thank you.  Ready?

14   A   Yes, I am.

15   Q   When you interviewed person 133, was he at Mississippi

16   State Hospital?

17   A   Yes, he was.

18   Q   When you interviewed person 133, you did evaluate whether

19   he was appropriate for discharge, did you?

20   A   That is correct, I was not evaluating whether he was

21   appropriate for discharge.

22   Q   You were not asked to do that kind of assessment in this

23   case, and you did not do so?

24   A   Correct.  I was not asked to do an assessment about

25   readiness for discharge.
```

1   Q   And there were two other individuals who were in a state

2   hospital at the time of your review, and they were person 139

3   and person 140.  Person 139 is -- if you look on page 117.

4   A   I think I'll know who it is, as long as I know the person.

5   Q   That's fine.

6   A   You said 139?

7   Q   139 and 140.

8   A   That's correct.

9   Q   All right.  And you, likewise, for those individuals, did

10  not make a determination whether they were appropriate for

11  discharge at the time you interviewed them?

12  A   Correct.

13  Q   Do occupational therapists diagnose mental illness?

14  A   They do not make a medical diagnosis of any particular

15  mental illness.

16  Q   Throughout your career, have you ever been the person who

17  has admitted anyone to a state hospital?

18  A   I have never held a position where I worked in the

19  admission office of a hospital and made that determination.

20  Q   Have you ever been the person who discharged an individual

21  from a state hospital?

22  A   In a state hospital -- in all of the hospitals that I have

23  worked for, the psychiatrist has signed the discharge order

24  from the state hospital.  I have participated in the assessment

25  of whether or not somebody was ready for discharge.

1   Q   I want to talk next, briefly, about person 134.  And if

2   you'd like to look at your -- he's on page 90 of your report,

3   or you can look on the sheet you've been looking at.  Did you

4   recommend a certified benefits planner for person 134?

5   A   Yes, I did.

6   Q   Do certified benefit planners advise people on whether they

7   can get a job without losing their benefits, such as SSI?

8   A   They advise people on, if they work, what will happen to

9   their benefits, how their benefits would be affected.

10  Q   According to the literature you've reviewed, is the number

11  one reason why people with SMI don't work is a concern about

12  losing benefits such as SSI?

13  A   That is the number one reason and has been reported as the

14  number one reason why people do not try to work.

15  Q   I want to move next to person 139.  That person starts on

16  page 113 of your report.

17  A   What page, sir?

18  Q   113.

19  A   Did you say person 139?

20  Q   Yes, I did.

21  A   Thank you.

22  Q   Did person 139 allegedly murder his brother?

23  A   That is correct, according to the record.

24  Q   Person 139 was one of the individuals who was in a state

25  hospital when you interviewed him that we talked about earlier?

1    A    Yes, he was.

2    Q    If person 139 is released from the state hospital, do you

3    recommend a small group home with 24/7 supervision?

4    A    Yes, I did.

5    Q    And person 139 could not initially leave that home in the

6    community without supervision.  Is that correct?

7    A    That was my recommendation.

8    Q    Would you turn to page 2 of your report, please.

9    A    Pardon?

10   Q    Will you turn to page 2 of your report, please?  I want to

11   ask you about this sentence that's highlighted in blue.  Does

12   this say, "I was also involved in assessing and addressing

13   rehabilitation needs of Williams and Colbert class members"?

14   A    Yes, it does.

15   Q    And this is page 163 of your report.  You see here where it

16   says, "Selected task forces and systems transformation

17   committees."  Are those task forces or committees you were on?

18   A    Yes, I was involved with all of those, and I was a member

19   of those committees.

20   Q    So you were on a committee that dealt with *Williams* and

21   *Colbert* class actions?

22   A    I was in a variety of interagency work groups that

23   addressed issues related to the *Williams* and *Colbert*.

24   Q    Just very briefly, what did *Williams* and *Colbert* --

25   Colbert, is it?

1    A    Colbert.

2    Q    -- *Williams* and *Colbert*, what were those two lawsuits

3    about?

4    A    Williams was -- well, in general, they were both about

5    persons in Illinois who were living in nursing homes, or in the

6    case of *Williams* a nursing home, that has at least 50 percent

7    of the people with a serious mental illness, who were living in

8    nursing homes and were -- as a class, Illinois was under

9    consent decrees to move people out of these nursing homes and

10   IMDs into the community.

11   Q    And were you involved in the defense of those cases in your

12   capacity as an employee of the Illinois DMH?

13   A    No.  I was not involved in the defense of those cases.

14   Q    What were you involved in?

15   A    After those cases were moved into consent decree, and even

16   a ways after the consent decree had begun its implementation, I

17   was asked for my rehabilitation expertise to help planning and

18   making recommendations on what could be done to help people --

19   more people move out from a rehabilitation perspective.

20   Q    When was the consent decree entered?

21   A    I actually don't know the dates of that.

22        MR. SHELSON:  May I approach, Your Honor.

23        THE COURT:  Yes, you may.

24        MR. SHELSON:  Your Honor, I'm going to try to expedite

25   this.  I just want the date.  This is the consent decree

*** DAILY TRANSCRIPT ***

1    entered in the *Williams* case by the United States District

2    Court for the Northern District of Illinois, Eastern Division,

3    that was filed on September 29, 2010, and I ask the court to

4    take judicial notice of that date.

5         THE COURT:  Any objection from the United States?

6         MR. HOLKINS:  Your Honor, we're just trying to discern

7    whether or not this document was previously disclosed, whether

8    it has an exhibit number.

9         MR. SHELSON:  It does not.

10        THE COURT:  It does not have an exhibit number?

11        MR. SHELSON:  Correct, Your Honor.

12        THE COURT:  Okay.

13        MR. SHELSON:  I'm not offering it into evidence.  I'm

14   just asking the court to take judicial notice of the date it

15   was filed.

16        THE COURT:  Okay.  Any objection from the United

17   States?

18        MR. HOLKINS:  No objection, Your Honor.

19        THE COURT:  All right.  I'll take judicial notice of

20   that fact, that it was filed on September 29th, 2010.  The

21   consent decree being *Ethel Williams v. Pat Quinn* in the

22   Eastern -- in the Northern District of Illinois, Eastern

23   Division.

24   BY MR. SHELSON:

25   Q   All right.  When you left the Illinois DMH in March of

1    2017, was the *Williams* consent decree still in effect?

2    A   Yes, it was.

3    Q   At some point, were you on the executive leadership team in

4    the Illinois DMH?

5    A   Yes.

6    Q   What period of time were you on the executive leadership

7    team?

8    A   I was at -- at different points of time at different levels

9    within that, within the executive leadership.  So when I was

10   the statewide director of rehabilitation, I would have been at

11   a level where I was in some meetings and not in others where

12   executive decisions were made.  I was only in things that were

13   very much focused exclusively on rehabilitation issues.

14        In the last position I held for the Division of Mental

15   Health, which began less than a year before I left the state, I

16   was at a -- at the higher tier of the executive leadership.

17   Q   Do you hold the Illinois Mental Health System out as a

18   model for Mississippi?

19   A   I think -- not necessarily.  I'm not sure what you mean by

20   that, but no, not necessarily.

21   Q   In your experience, is access to supported employment for

22   adults with Illinois -- excuse me.  Let me start over.  In your

23   experience, is access to supported employment for adults with

24   SMI greater in Illinois than in most states?

25   A   At the time that I left Illinois, that -- my job with the

*** DAILY TRANSCRIPT ***

1    Division of Mental Health, that was the case, yes.

2    Q    Okay.  And at the time you left that job, was access to

3    supported employment sufficient to meet the needs in Illinois?

4    A    It was not sufficient to meet the full capacity of all the

5    people that would need the service.  It was -- we were serving

6    somewhere between 3,000 and 3,500 people a year in that

7    program.

8    Q    Does Federal Medicaid only pay for parts of the supported

9    employment service model?

10   A    That depends on each individual state's Medicaid rule and

11   their -- what waivers they have from Medicaid.

12   Q    When you worked there, was supported employment a fully

13   covered service under Medicaid in Illinois?

14   A    Not yet.

15   Q    Are there any unmet needs for adults with SMI in Illinois?

16   A    Illinois has many individuals that have very complex needs.

17   It was certainly my job to try to do all that I could to make

18   sure that complex needs were met.  And I'm sure there are some

19   people in that not everybody's needs were -- were met.  My job

20   was the ones that were drawn to my attention to figure out what

21   needed to happen for those individuals.

22   Q    I want to show you your deposition testimony from your

23   October 2018 deposition.  This is page 127?

24   A    Uh-huh.

25   Q    "Question:  Are there any unmet needs for adults with SMI

1    in Illinois?"  Was your answer, "I'm sure there are"?

2    A   Yes, that's what it says there, yes.

3    Q   Is having no unmet needs for adults with SMI a standard

4    that any state can meet?

5    A   Do you mean that there would be no individuals in this

6    state who would have unmet needs.

7    Q   Unmet mental health needs.

8    A   Unmet mental health needs?  I would not think that that

9    would be.

10   Q   I want to direct your attention to page 162 of your report.

11   And does your CV begin on page 162 of your report?

12   A   Yes.

13   Q   Here on page 162, do you see where it says at the top

14   "Executive profile"?

15   A   Yes.

16   Q   And is one of the things listed there where it's

17   highlighted "Long-term care systems rebalancing/*Olmstead*"?

18   A   Yes.

19   Q   Is that referring to your time with the Illinois DMH?

20   A   Largely, that is where most of my experience is related to

21   that.

22   Q   When you worked for the Illinois DMH from 1995 to 2017, did

23   the Illinois Mental Health System undergo any rebalancing?

24       Was the rebalancing ongoing when you left the Illinois DMH

25   in 2017?

1  A   Yes.

2  Q   When you began working for the Illinois DMH in 1995, did

3  Illinois have eight state hospitals?

4  A   In 1995, I believe there were 12 state mental health

5  hospitals.

6  Q   When you retired -- well, you didn't retire.  When you left

7  DMH in 2017, did Illinois have seven state hospitals?

8  A   Yes, they had seven, and then they had one partnership

9  hospital with a private entity.

10  Q   This is from your CV, page 163.  Do you see this heading

11  here, "Illinois Department of Human Services," and then it says

12  1995 through 2017?  So are those positions listed under that

13  heading positions you held between 1995 and 2017?

14  A   Yes, they are.

15  Q   You see the second one?  It says, "Statewide director of

16  rehabilitation services, eight hospitals"?

17  A   Yes, I do.

18  Q   Is that eight hospitals -- excuse me, that eight state

19  hospitals?

20  A   Yes, that would be -- yes.

21  Q   And so it does say 1995 through 2017.  So what period of

22  time is that referring to where it says eight state hospitals?

23  A   I assume that was probably -- I'm trying to recall now if

24  we -- I believe by the time I left, we had seven.  So the eight

25  must have been -- and that number might have been including

1   that state hospital that was co-ran by the State and the

2   private entity.

3   Q   Were you personally involved in any instances in Illinois

4   where a patient was ready to be discharged from a state

5   hospital, but there was not a placement available for the

6   individual at that time?

7   A   I believe that there were instances early on in my career

8   there where that was -- where I might have been directly

9   involved.  I was often brought in when people were trying to

10  figure out what would be a good placement fit, to help look at

11  the fit issues around placement.

12  Q   I'm going to refer you back to your CV, page 163 of your

13  report, and back to the task forces and system transformation

14  committees.  Is the last bullet point Illinois Mental Health

15  Strategic Plan 2013 to 2018?

16  A   Yes.

17  Q   So for a period of time, you were involved in the Illinois

18  Mental Health Strategic Plan?

19  A   Yes, I was involved in the development of that strategic

20  plan.

21          MR. SHELSON:  May I approach the witness, Your Honor?

22          THE COURT:  Yes, you may.

23          MR. SHELSON:  Your Honor, may I have just a moment?  I

24  pulled the wrong --

25          THE COURT:  Yes, you may.

1        (Short Pause)

2   BY MR. SHELSON:

3   Q    Is the document I just handed you, which is marked D-293,

4   the Illinois Mental Health Strategic Plan 2013 through 2018?

5   A    Yes.

6   Q    Do you remember discussing this document in your

7   deposition?

8   A    Yes.

9   Q    I'd like to direct your attention to page 11 of

10  Exhibit D-293.  On page 11, is there a heading "System gaps"?

11  A    Yes.

12  Q    Is the first item listed "Fragmented services"?

13  A    Yes.

14  Q    Is the second item listed "Insufficient resources"?

15  A    Yes.

16  Q    On the next page, which is page 12 of Exhibit 293, is the

17  first item listed "Lack of consistent data in support for its

18  use"?

19  A    Yes.

20  Q    And the last item listed is "Work force challenges"?

21  A    Yes.

22  Q    I want to ask you specifically about the work force issues,

23  and I'm talking about the period you were with the Illinois

24  DMH.  During that period, did the Illinois DMH experience both

25  work force retention issues and work force shortage issues?

*** DAILY TRANSCRIPT ***

1   A   I was in -- I was aware, from hearing things from other

2   people, that those were issues.  The part of the work force

3   that I was directly involved was development of the work force.

4   Q   In your experience in most public mental health systems,

5   can turnover of staff be high?

6   A   In my experience, turnover, particularly of the

7   noncredentialed licensed personnel, can be very high.

8   Q   In your experience, why can that turnover be very high?

9   A   I think there's different reasons.  For some people, those

10  are entry level positions, and their careers develop and they

11  move in different ways.  Sometimes it is because, depending on

12  the area, the pay may be lower than in other sectors.

13  Sometimes it's that the work is complicated and complex, and

14  when people started the jobs, they didn't fully realize maybe

15  the nature of the work, or it can be high burnout work.

16  Q   That's what I was going to ask you next.  Again, in your

17  experience, turnover can be a problem in the mental health

18  field because as you hire new people, you have to equip them to

19  do the complicated work you just described?

20  A   Yes, that is true.

21  Q   Are some community-based services reimbursable with

22  Medicaid only if the services are provided by people with

23  varying credentials and degrees?

24  A   I don't know how it works in every state.  In Illinois,

25  services were provided largely at different rates, depending on

*** DAILY TRANSCRIPT ***

1    the credentials that people had.  Some services required higher

2    credentials than others, but it was more based on who was

3    providing them the rate.

4    Q   Going back to the Illinois strategic plan, which is

5    Exhibit D-293, I want to refer you to page 17.  Does this -- is

6    this page -- is this where adult services, committee goals and

7    objectives start?

8    A   Yes.

9    Q   And then it goes on for several pages?

10   A   Yes.

11   Q   I just want to ask you very briefly about goal number one.

12   And it says, "Ensure that services provided within the state

13   are available to -- and meet the needs of individuals with

14   mental illnesses."  Did I read that correctly?

15   A   Yes, you did.

16   Q   And then under goal number one, there are three short-term

17   objectives and one long-term objective?

18   A   Yes.

19   Q   For -- is goal number one a specific measurable goal?

20   A   It does not appear to be.

21   Q   Do any of the objectives under short-term -- excuse me.  Do

22   any of the objectives under goal one contain specific or

23   measurable goals?

24   A   I'm having a hard time reading it.  I'm sorry.

25   Q   Sorry.

1   A    So, for example, the first one, "Analyze current service

2   array and develop a method and tools to collect volume service

3   need data from individual consumers and treatment providers," I

4   suppose you could say whether it was done or not, but that's

5   also probably an ongoing process.

6            MR. SHELSON:  Your Honor, I move to admit

7   Exhibit D-293 in evidence.

8            THE COURT:  Any objection?

9            MR. HOLKINS:  Yes, Your Honor.  The United States

10   objects to the relevance of this document.  It has no bearing

11   on Ms. Burson's expert opinions in this case.

12            THE COURT:  What's the response of the plaintiff -- of

13   the State?

14            MR. SHELSON:  Your Honor, it's relevant to what, on a

15   systemwide basis, Mississippi's mental health system should be

16   judged by.  And it's also relevant to the fact that in -- this

17   is page 4 of Ms. Burson's report.  She lists the standards that

18   she applied in formulating her opinions in this case.  And if

19   you look at all the highlighted one where she references her

20   experience, all those are substantially her work in Illinois.

21   And I'll be glad to establish that further right now, if you'd

22   like me to.  And as we saw in another part of her -- well, on

23   her CV, she was specifically involved on the strategic -- she

24   was involved in -- with the Illinois strategic plan.

25            THE COURT:  I'll let you -- I'm sorry.

1          MR. HOLKINS:  Could I just be heard for one more

2    second, Your Honor?  Ms. Burson did not offer any opinions

3    about Mississippi's mental health services, nor did she offer

4    opinions about Illinois's mental health services.  She provided

5    opinions specific to the clinical treatment that the twenty

6    individuals in her review needed.  This is not relevant, and it

7    is also outside the scope of her direct examination.

8          THE COURT:  She was designated as an expert, though,

9    in community-based mental health assessments.  Would that fall

10   under community-based mental health assessments?  She was

11   offered as an expert in three areas.  Psychiatric occupational

12   therapy.  I assume this does not go to that.  Serious mental

13   health illness.  I assume this does not -- when I say this,

14   D-293 does not go to that.  But she was also offered for

15   community-based mental health assessments.  Does it speak to

16   that and the standards that are identified in her report here?

17   I'm asking.

18         MR. HOLKINS:  Your Honor, the United States would

19   argue that it does not.  This report speaks to systems reforms.

20   Ms. Burson was qualified as an expert in mental health

21   assessments, which is a clinical determination.

22         THE COURT:  Okay.  Now, I'll let you respond in any

23   way, Mr. Shelson, to make your record.

24         MR. SHELSON:  Your Honor, her report talks about her

25   system -- her involvement in the system reforms in Illinois.

1  She's also testified about it.  And we would submit that in

2  addition to community-based assessments, the Illinois strategic

3  plan has everything to do with serious mental illness.

4            THE COURT:  I'll let you make your -- further develop

5  the record, Mr. Shelson.

6  BY MR. SHELSON:

7  Q   Ms. Burson, I'm on page 4 of your report.  Do you see here

8  the heading standards?

9  A   Yes.

10  Q   Is this a listing of the standards you applied in the

11  formulation of the opinions that you took into consideration

12  for your opinions in this case?

13  A   Yes.

14  Q   Does it list the first highlighted part, "My experience

15  working with similar individuals."  Are those individuals --

16  include individuals in Illinois during your period of

17  employment with the Illinois DMH?

18  A   Yes, sir.  Individuals with serious mental illnesses

19  receiving services in the system.

20  Q   And does this strategic plan, Illinois' strategic plan that

21  we just looked at, talk about issues relating to individuals

22  with serious mental illness in the Illinois mental health

23  system?

24  A   The strategic plan focuses on the systemwide barriers,

25  strengths, challenges, that surround the delivery of care.  The

1    strategic plan doesn't focus on specific -- the care of

2    specific individuals.

3    Q    No, but it does speak to the mental health care of adults

4    with serious mental illness.  Correct?

5    A    It speaks to the systems that enable delivery of mental

6    health care services.

7    Q    Including, too, adults with serious mental illness?

8    A    Including adults, yes.

9    Q    And then the next one is "My experience modifying service

10    system practices to better serve individuals with complex needs

11    in the community."  Does -- the modifying service system

12    experience, is that in Illinois?

13    A    Modifying service system practices there is referring to

14    the clinical practices delivered within the service system.  So

15    it was part of my job, for example, to drive the development of

16    supported employment throughout the system of care.  That would

17    be a practice that was driving.  So that's referring to

18    clinical practice development.

19    Q    In clinical -- clinical services were delivered to

20    individuals with SMI in Illinois?

21    A    Yes, Illinois provided mental health services.

22          MR. SHELSON:  Your Honor, we move to admit Exhibit D

23    -- renew our request to admit D-293 into evidence.

24          THE COURT:  Any objection from the government?

25          MR. HOLKINS:  We renew our objection to relevance and

1   the fact that this is outside the scope of Ms. Burson's direct.

2          THE COURT:  The court is going to overrule the

3   objection.  I think it -- one of the issues that the court is

4   going to have to deal with -- I'm not sure if the court's going

5   to have to deal with it, but what I've been hearing, this

6   witness has already testified she does not hold the Illinois

7   system out as a model.  I think I've heard that from every

8   witness who's testified about the particular states that they

9   worked in, the person was from North Carolina, the person that

10  did something in New Hampshire.

11         This case is going to stand -- I suspect one of the

12  arguments I will hear is that this case here stands on its own

13  feet with respect to what Mississippi is doing, but I do think

14  that in comparison to what others might have some relevance to

15  any sort of liability finding and any sort of remedy that is

16  ultimately done.  So therefore, I'm going to overrule the

17  objection.

18         MR. SHELSON:  Thank you, Your Honor.

19  BY MR. SHELSON:

20  Q   Ms. Burson, when you were with the Illinois DMH, was

21  funding for community-based services an issue a lot of the

22  time?

23  A   Funding in the budget in Illinois was a significant issue

24  in the last few years that I was there.

25  Q   When you left the Illinois DMH in 2017, was the State of

1   Illinois coming off a period where it did not have a budget for

2   two years?

3   A   Yes.

4   Q   Does Illinois have community mental health inners?

5   A   Illinois has community mental health centers.  They are

6   located in Illinois, yes.

7   Q   And are those community mental health centers organized by

8   region?

9   A   How it works in Illinois is we organize the service

10   delivery by region.

11   Q   As a result of Illinois going without a budget for two

12   years, did some community mental health providers not get paid

13   by the State?

14   A   Certainly not for all of their services.  There was no

15   appropriation that was approved to be able to pay them.

16   Q   And did some community mental health providers -- were

17   unable to cover their costs and closed?

18   A   Yes, that is my understanding.

19   Q   And those community mental health providers are part of the

20   system that delivers community-based services.  Correct?

21   A   Yes, they were.

22   Q   When Illinois went without a budget for two years, that did

23   not affect the state hospitals in Illinois, did it?

24   A   Not in terms of whether or not staff was paid.

25   Q   And that was because Illinois DMH still had authority to

1  pay the state hospitals during that period?

2  A   Yes, they did.

3  Q   So going without a budget for two years adversely affected

4  the community-based service parts of the system, but not the

5  state hospital part of the system?

6  A   The reason for that had to do with some ruling that was

7  related to the Unions and things, so there was an override of

8  the lack of appropriation to pay state employees at the state

9  hospitals.

10  Q   I want to turn to person 129.  It begins on page 59 of your

11  report.

12  A   Did you say 59?

13  Q   Ms. Burson, if I did, I misspoke.  Person 129, page 59.

14  When you interviewed person 129, was she in a nursing home in

15  Alabama?

16  A   Yes.

17  Q   And on page 63 of your report, you list the community-based

18  services that you recommended for person 129?

19  A   Yes.

20  Q   Since person 129 was living in Alabama when you interviewed

21  her, at that time was Alabama responsible for delivering those

22  services?

23  A   At that point in time, Alabama would have -- it would be my

24  understanding that Alabama would have been responsible for her

25  care.

1   Q    If Alabama had not delivered the community-based services

2   you recommended, do you believe she was at serious risk of

3   institutionalization in a state hospital in Alabama?

4   A    I did not have any records from Alabama to review to know

5   exactly what she was getting in Alabama.

6   Q    Do you know whether Alabama provided any of the

7   community-based services you recommended for person 129?

8   A    I do not have that information.

9   Q    Do you remember yesterday talking about Sheila Newbaker's

10  deposition?

11  A    Is that the name of the -- the social worker, the head of

12  the social worker, whatever, at one of the state hospitals,

13  East Mississippi, I think?

14  Q    Yes, the individual you read part of her deposition.

15  A    Yes.

16  Q    Is it your understanding that Ms. Newbaker is a social

17  worker at East Mississippi State Hospital or works in the

18  social work department?

19  A    That's what I recall Mr. Holkins saying.

20  Q    Have you ever read Ms. Newbaker's deposition?

21  A    Only the part that I was asked to read.

22  Q    I want to show you part of her deposition that the State

23  designated as evidence in this case.  This is page 27 and 28 of

24  Ms. Newbaker's deposition, and I want to do it the same way you

25  did yesterday with Mr. Holkins.  I'll read the question, and

1    you would read the answer.

2        "Question:  Do you feel that East Mississippi State

3    Hospital is working to discharge clients from the moment of

4    their admission?"

5    A    "Yes."

6    Q    "Question:  And what does it mean to be working to

7    discharge clients from the moment of their admission?"

8    A    "It means to be determining where they will be going once

9    they've completed treatment."

10   Q    "Question:  And how does East Mississippi State Hospital do

11   that?"

12   A    "Upon admission, the social worker meets with the client

13   and asks them where they would like to go, is the first step.

14   And then if the client permits the social worker to have

15   contact with the family, the social worker will contact the

16   family and discuss placement with them as well.  And depending

17   on where they're planning to go, make arrangements for that to

18   happen."

19   Q    "Question:  Are these tasks documented in any way?"

20   A    "Yes."

21   Q    "Question:  Where are they documented?"

22   A    "Social services progress notes."

23   Q    I didn't highlight far enough.  Last question: "And how

24   often are social workers required to update progress notes?"

25   A    "They're required to have at least one weekly note for each

1   client."

2   Q   All right.  Will you look at Exhibit PX-1103 in the

3   notebook you have in front of you?  Is PX-1103 the discharge

4   summary for person 125?

5   A   Yes.

6   Q   And you testified about this document yesterday?

7   A   Yes.

8   Q   Specifically, is one of the things you talk about the

9   follow-up care section on page 4 of this document?

10  A   I do not recall doing that yesterday.

11  Q   Okay.  In any event, in your experience, is a discharge

12  summary the same thing as a discharge plan?

13  A   The discharge summary would refer to the discharge plan and

14  include the discharge plan.

15  Q   In a summary way?

16  A   A discharge summary is a summary of the care of the

17  individual throughout the course of their hospitalization.

18  Q   And in the notebook you have in front of you, are there any

19  social worker progress notes?

20  A   No.  I reviewed them all in the medical records.

21  Q   You were asked about this yesterday.  Do you recall this

22  document?

23  A   Yes.

24  Q   Do you remember when you were asked about the column on the

25  far left, 100 percent would have avoided or spent less time in

1    the hospital?  Did you indicate that you assessed how

2    community-based services would mitigate the risk of

3    hospitalization?

4    A    Yes.

5    Q    Pardon?

6    A    I did factor in whether or not the provision of community

7    mental health services, the appropriate community mental health

8    services, would have helped mitigate risk.

9    Q    How much do community-based services mitigate the risk?

10   A    Different services do that to different amounts, and in

11   combination, if it's the right service to the right person.

12   Q    And this is Exhibit D-235.  Do you know what this document

13   is?

14   A    This is -- it appears to be the summary document that

15   Dr. Drake put together.

16   Q    And this summary is referenced in your report in this case.

17   Is that correct?

18   A    Yes.

19   Q    Do you agree with me, at least based on Dr. Drake's review

20   of the literature, that none of the community-based services

21   listed here are 100 percent effective at reducing

22   hospitalizations?

23   A    What it -- this -- what this represents is it reduces

24   hospitalization, the likelihood of hospitalization by that

25   person that is listed there.

1  Q   So if you recommended PACT for an individual, according to

2  this paper, there's a 41-percent likelihood that that will

3  reduce that person's risk of hospitalization?

4  A   No.  What that summary would mean is that there's a

5  41 percent across -- like, if you compared two groups of

6  people, one group of people that were like groups of people,

7  one having had PACT and one not having had PACT, that the group

8  that had PACT would have had that percentage less likelihood of

9  requiring hospitalization.

10 Q   Okay.  So if a person --

11 A   It's not about an individual is what I was trying to

12 explain.  I'm sorry.

13 Q   Sure.  So for a person for the only -- the only service you

14 recommended was PACT, and that person received that, he would

15 be in the population, the 41-percent population that's

16 referenced in this paper?

17 A   Yes.  If a person received PACT, it would reduce their

18 likelihood of being hospitalized.  It's been shown to be much

19 more effective than not getting PACT for that same group of

20 individuals.

21 Q   So for that group of individuals who get PACT and the risk

22 of hospitalization is reduced by 41 percent, how do you -- how

23 do you get to 100 percent of the people you reviewed would

24 avoid or spend less time in the hospital?

25 A   Well, since only one of them was receiving PACT, and PACT

1   has been shown to reduce hospitalization for persons that are

2   appropriate to receive PACT, then the likelihood of them -- of

3   having less -- spending less time in the hospital is much

4   greater than compared to whether or not they did not get PACT.

5   Q   I understand that's your testimony, but I'm asking you how

6   do you get to 100 percent, given that no community-based

7   service, according to Dr. Drake's paper and his review of the

8   literature, is 100-percent effective at reducing

9   hospitalizations?

10  A   I was not looking at a single service when I made those

11  things.  I was asked to look at whether, as a whole, the

12  service that they were receiving, was there a reasonable

13  likelihood that to get the services -- if they had the

14  different services, could they have avoided or spent less time

15  in the hospital.

16      In addition, in that factor, I was also factoring in the

17  medical records and what I read about people's symptomatology

18  and things like the State of Mississippi's InterQual reports

19  where their internal utilization review was looking at their

20  length of stay process.

21  Q   You see here that Dr. Drake's review of the literature

22  found that there's a lack of data on the combined effect of

23  community-based services?

24  A   Yes.

25  Q   In this case, as has been established, did the DOJ's

1   clinical review team analyze a sample of 154 individuals who

2   were or have been in a state hospital and identify the

3   community-based services they believe those 154 individuals

4   need to stay in the community?

5   A   We identified those services that we thought were most

6   appropriate for those individuals, yes.

7   Q   Do you know of any states that have developed their

8   community-based service systems based on that methodology?

9   A   Not the exact same methodology.

10  Q   Can you identify any peer-reviewed paper that has published

11  a study that used the methodology that DOJ's clinical review

12  team used in Mississippi to sample the 154 individuals?

13  A   I'm sorry.  Could you repeat that question.

14  Q   Sure.  Can you identify any peer-reviewed paper that has

15  published a study that used the methodology that DOJ's clinical

16  review team used to sample the 154 individuals in Mississippi?

17  A   Thank you.  No.  I've never actually looked for that.

18          MR. SHELSON:  Can I have a moment, Your Honor?

19          THE COURT:  Yes, you may.

20      (Short Pause)

21  BY MR. SHELSON:

22  Q   In your review of the 24 -- excuse me.  In your review of

23  the 28 individuals you reviewed in Mississippi, did you

24  determine how much it would cost to provide the community-based

25  services you recommended for those individuals?

*** DAILY TRANSCRIPT ***

1    A    No, I did not.

2    Q    Did you make any determination regarding whether

3    Mississippi offers a sufficient quantity of community-based

4    services?

5    A    No, I did not.

6              MR. SHELSON:  Thank you, Ms. Burson.  Thank you, Your

7    Honor.  That's all the questions we have.

8              THE COURT:  All right.  Any redirect of this witness?

9              MR. HOLKINS:  Yes, Your Honor.  We'll be brief,

10   though.

11             THE COURT:  All right.

12                        REDIRECT EXAMINATION

13   BY MR. HOLKINS:

14   Q    Good morning, Ms. Burson.

15   A    Good morning.

16   Q    I first want to briefly revisit some of the individuals in

17   your review whom counsel for the State asked you about.

18        Let's talk first about person 135.  Could you turn to page

19   76 of your report?  Excuse me.  This is person 133.  On page 67

20   of your report, is this where you discuss him?

21        Okay, yes.

22   Q    Did you form an opinion about whether, at the time of your

23   interview, person 133 was appropriate for and would benefit

24   from community-based services?

25   A    All of the determinations that I made, I made after

1   interviewing the person and reviewing all of their medical

2   records for the hospital and for the community that I was

3   provided, so I didn't make any determination immediately at the

4   point of the interview.

5   Q   And based on the interview and your review of the medical

6   records, what did you conclude with respect to person 133 as to

7   this question of whether he was appropriate for and would

8   benefit from community-based services?

9   A   I was not making determination at the point of time that I

10  interviewed him, but he was appropriate for community services

11  for his condition that he had and his presentation.

12  Q   And how does that assessment of appropriateness for

13  community-based service differ from an assessment of whether at

14  the time of your interview person 133 was ready for discharge?

15  A   Yeah, I see those as two very different things.  Deciding

16  if somebody's ready for discharge, you would want to make that

17  determination.  You would want to know what their current

18  symptoms are, what was that relative to their baseline.  You

19  would want to be looking at, you know, where were they going to

20  go to, what services were available to them, you know, how they

21  were managing things on the unit, what they were doing or not

22  doing, how they were responding to different groups and

23  treatments.

24      I didn't have any of that information to determine

25  appropriateness for services when I was doing that.  I was

1  looking at a whole pattern of behavior of him over a period of

2  time by reviewing medical records from, you know, 16

3  Mississippi state hospitalizations, not that one period and

4  that one point in time, against what he was also receiving

5  across all of the community records that I reviewed and

6  interviews with the community mental health agency staff.

7  Q   Can you turn to page 113 of your report?  This is where you

8  discuss person 139.  Correct?

9  A   Yes.

10  Q   Did you also make a determination for person 139 as to

11  whether or not he was appropriate for and would benefit from

12  community-based services?

13  A   Yes.  In preparation for discharging, in his medical

14  record, the hospital was also making that determination.  They

15  were trying to figure out what would be an appropriate

16  placement for him, and they were waiting for the court to give

17  permission for him.

18  Q   Did you determine, based on your review of person 139's

19  records and your interview with him, that he was appropriate

20  for and would benefit from community-based services?

21  A   I thought that he could -- when he was determined to be

22  ready for discharge, I did make a determination about what I

23  thought would be appropriate community services for him to

24  provide a gradual transition out of the hospital.

25  Q   You recommended person 139 for a small group home.  Is that

1   correct?

2   A   Yes, I did.

3   Q   Do you believe that person 139 necessarily needs to be in a

4   group home with 24/7 supervision for the rest of his life?

5   A   I don't know that.  They would have to assess that.  To me,

6   it looked like the best starting place for him as a transition

7   out of the hospital.  Assessment of those kinds of things I see

8   as something that is ongoing.  He's -- he's got a lot of

9   complicated needs.  I would not rule out the possibility that

10   he could move into greater independence than that, and I

11   wouldn't automatically say that he could.

12   Q   Counsel for the State asked you about benefits planning.

13   Do you remember that?

14   A   Yes.

15   Q   Are there community-based services that help adults with

16   serious mental illness access employment without losing their

17   benefits?

18   A   Could you repeat the question?

19   Q   Are there services designed to help adults with serious

20   mental illness access employment without losing their benefits?

21   A   Well, yes, in one sense.  What supportive employment does

22   is it makes sure that the person -- part of supportive

23   employment is a person would get that specific benefits

24   counseling so that they would make -- they can use that to

25   inform decisions, like how many hours they work, is it worth it

*** DAILY TRANSCRIPT ***

1    to work more hours, what would happen.  It's not just SSI.  It

2    has to do with housing vouchers and all kinds of things, food

3    stamps.  So people need to know when they are doing this, some

4    states have Medicaid buy-in plans.  You want to make sure you

5    don't lose your health insurance.  So that is always part of

6    the return-to-work process for someone, if they've been

7    receiving benefits related to disability and they need their

8    health insurance to continue to maintain their mental health.

9    And you supportive employment integrates that.

10   Q   Ms. Burson, you were asked whether or not, at the time you

11   left your employment for the State of Illinois, supported

12   employment was fully covered under Medicaid in that state, and

13   you responded "Not yet."  Do you remember that?

14   A   Yes, I do.

15   Q   What did you mean by that answer?

16   A   We were in the process of putting forth a waiver

17   application to the Centers for Medicare and Medicaid with the

18   federal government to get approval to have that service covered

19   under the State's Medicaid plan.  I had been partnering with

20   others in the state and with the state Medicaid authority as

21   part of our drive to expand access to supportive employment.

22   Q   Are you aware of the status of that application?

23   A   I was actually -- recently had a birthday party where some

24   of my former colleagues came, and they did say that it has all

25   gone through.

1  Q   Ms. Burson, when you were a member of the executive

2  leadership team in the Division of Mental Health for the State

3  of Illinois, was the State, through its component agencies,

4  ultimately responsible for ensuring the availability of

5  community-based services?

6  A   Yes, the State was responsible for that in partnership with

7  the state Medicaid authority.  As the State's mental health

8  authority, we were responsible for mental health services, but

9  many of them are also -- most of them are paid for through

10  Medicaid, so we did that in partnership.

11  Q   And did the State of Illinois, through its component

12  agencies, maintain that joint responsibility for ensuring the

13  availability of community-based services, despite work force

14  shortages?

15  A   Yes.

16  Q   Did the State of Illinois, through its component agencies,

17  maintain that joint responsibility for ensuring the

18  availability of community-based services despite budgetary

19  constraints?

20  A   Yes, we did.  And we did everything in our power to

21  continue to ensure continuity of care for individuals, even

22  when some of the mental health agencies ended up closing

23  because they couldn't meet payroll.

24        MR. HOLKINS:  No further questions, Your Honor.

25        THE COURT:  All right.  Thank you.

*** DAILY TRANSCRIPT ***

1          Ms. Burson, I have a few follow-up questions, and the

2     parties will get an opportunity to ask questions based on what

3     I've asked.

4                              EXAMINATION

5          THE COURT:  I think at some point in your testimony,

6     you testified about person 144, I believe, as a part of your

7     report at page 137.

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  Before I ask you something about

10    144, I want to ask you this question about discharge plans.

11    You are familiar with discharge plans, I believe you testified

12    about --

13         THE WITNESS:  Yes.

14         THE COURT:  -- discharge plans.  In developing a

15    discharge plan, when is the first -- well, I guess in the way

16    that you would do it, when do you start to first formulate a

17    discharge plan for any person who comes into your care?  When I

18    say "your care," the institution, the group home or whatever?

19         THE WITNESS:  Really immediately.  As soon as

20    somebody's admitted, the standard practice would be to start to

21    look at all the variables that led to that admission and to

22    begin discerning what does that mean for the discharge plan, so

23    that a standard of practice, a common one, would be that you

24    would start discharge plan at the time of admission.  As you

25    gathered more information, you might add that to your planning

1    process, to your discernment process, but it would begin at

2    admission.

3              THE COURT:  Okay.  Thank you.  And returning to person

4    144, I believe there -- I'm not sure when it was first

5    mentioned, but I'm looking at page 137, paragraph 3, talking

6    about the discharge plans for person 144.  And as a part of

7    that plan, and I think you touched on it, I think, it says

8    "Attend 90 meetings in 90 days."  Do you recall -- I think you

9    interviewed that person.  Correct?

10             THE WITNESS:  Yes, I did.

11             THE COURT:  Tell me about what your memory or what

12   your records show about this idea of this particular person,

13   part of his discharge plans was for him to attend 90 meetings

14   in 90 days?

15             THE WITNESS:  Uh-huh.

16             THE COURT:  Could you explain that?

17             THE WITNESS:  So it's not that the idea of attending

18   90 meetings in 90 days is a bad idea.  When someone has a

19   substance use problem, you know, you want to engage them and

20   you want them to be intensely engaged in doing that.  It's that

21   it -- my problem with the plan was that there was nothing that

22   was factored in around the logistics of doing that.

23             So the likelihood of him being able to do that, to do

24   that you need to be able to organize your time.  You need to be

25   able to get where you need to go.  You need to have a certain

 1    amount of sense that that's what you want to do.  I mean, it
 2    requires all kinds of organizational logistics.  He has a car
 3    that doesn't work.  He has, you know, all these other things.
 4    Right?
 5              THE COURT:  Yeah.  When person 144 -- when you
 6    interviewed person -- did you interview person 144?
 7              THE WITNESS:  I did interview him.
 8              THE COURT:  Okay.  When he received this discharge
 9    plan, from where was he being discharged?
10              THE WITNESS:  So when I interviewed him -- I think
11    this is what you're asking, and tell me if you're not.  When I
12    interviewed him, he was actually in the Calhoun County Jail
13    waiting for a psychiatric bed.  So this discharge plan was the
14    discharge plan from his most recent state hospitalization
15    before that.
16              THE COURT:  Right, right.  Okay.
17              THE WITNESS:  So he was out of the hospital when I
18    admitted him and waiting to be readmitted.
19              THE COURT:  But he received his discharge plan to be
20    released from the state hospital?
21              THE WITNESS:  This plan came from the state hospital
22    in 2016, and I interviewed him, yeah, later.
23              THE COURT:  I guess my question is, part of this plan,
24    though, that he got from the hospital said to go to 90 meetings
25    in 90 days.  Did that plan also direct him to where those

1   meetings would be?

2         THE WITNESS:  I don't know that.  That was not

3   indicated in the medical record anywhere, and nor would it have

4   been -- it wasn't indicated, as far as I can recall, in any of

5   the social work progress notes, because I did review all of

6   those.

7         THE COURT:  I mean, did the social workers help set up

8   the -- there are substance abuse centers, whatever.  So you

9   leave a hospital.  You give them instructions about getting

10  treatment for 90 days, 90 meetings for 90 days.  Do they

11  help -- did the records show if they found a place where he

12  could go to or -- go ahead.

13        THE WITNESS:  Thank you.  Now I know.  There was

14  nothing in the records that I saw that indicated that they gave

15  him a list of where those were or what times they were or -- I

16  mean, I don't -- they may or may not have, but there was

17  nothing in the medical record that supported that they -- that

18  any of the logistics were addressed.

19        THE COURT:  Right.  Was there anything there to show

20  that they had even set up the first meeting?

21        THE WITNESS:  No, not about 90 meetings in 90 days.

22  What was -- what would have been in the record was an

23  appointment to go to the community mental health agency to get

24  his next shot.  But no, there was nothing -- there was nothing

25  that I saw in the medical record that would have addressed any

*** DAILY TRANSCRIPT ***

1    of the specifics or the logistics of a first meeting.

2          THE COURT:  As a person who is in this area in your

3    capacity as an expert in occupational therapy, serious mental

4    health illness, community-based mental health assessment, what

5    would you expect to see?

6          THE WITNESS:  If someone had a pattern where they

7    didn't follow through and connect, and I knew they had that

8    pattern based on, you know, the information that I had gathered

9    and that was in the records, then I would be working with them

10   on, really, you know, I know we're telling you that we would

11   like you to do 90 meetings in 90 days.  How realistic do you

12   think that is, you know?  And how would you get there?  And I

13   might try and pull the family in, since he lives with the

14   father.  And I might try and say, you know, we really think,

15   you know, this is like a critical part of him staying out of

16   the hospital.  I might see if I could set up -- what is the

17   sponsor situation in that area in the case of those meetings

18   and figure out about that.  I don't know if -- I don't have

19   information to know.  Sometimes, you know, hospitals have

20   people from outside.  AA or NA come into the hospital and

21   people begin to get sponsors there.  And then, you know,

22   sometimes, depending on location or whatever, people try and

23   hook them up to make sure they are making a connection.

24          It works differently in different places, but I -- but

25   there was nothing in his history that would have suggested that

1    he would be able to organize around or get to 90 meetings in 90

2    days.  So the point I was making, that is, it's fine to say, I

3    think you should do that, but it's not a good discharge plan

4    because the likelihood of it happening is -- there's evidence

5    to suggest it's not going to happen.  So I would -- I would

6    expect, then, the clinical team to try and do some planning

7    around that to increase the likelihood of that.

8         THE COURT:  Do you have any idea what these -- you

9    mentioned -- I believe you mentioned -- well, yeah, you did say

10   AA.  So, I mean, do we know what type of -- one of the

11   things -- go ahead.  I'm sorry.

12        THE WITNESS:  We do.  He has a moderate cannabis use

13   disorder and a mild stimulant use disorder.  That's what he --

14   so he does not -- I'm looking at his diagnosis here, so he --

15   you know, because I don't remember those specifics from the

16   things I -- he -- so he doesn't have an alcohol use disorder

17   that they're specifying here.  So he would -- it wouldn't be AA

18   he would be looking for.  It would probably be NA.

19        THE COURT:  Okay.  Because one of the concerns I would

20   have, obviously here in Hinds County, you was have access to --

21        THE WITNESS:  Yeah.

22        THE COURT:  -- a multiple -- a variety of places,

23   private, public, probably more, but in Calhoun County, I don't

24   know, but there might be -- Calhoun County might have some, but

25   there may be counties in other states -- excuse me.  There may

1   be other counties within the state that would not even have

2   what Calhoun County has.  I mean, did we -- could you -- you

3   mentioned he was in the Calhoun County Jail when you saw him.

4   Did you know -- do we know from the records what city in

5   Calhoun County he may have lived in?

6          THE WITNESS:  I think it was something like Carmichael

7   or -- I think I wrote it in the beginning, that he lived with

8   his --

9          THE COURT:  If it's in the record, we can find it.

10          THE WITNESS:  Yeah.  He -- let's see.  I'm not looking

11   at the right --

12          THE COURT:  Well, on page 136, it's blacked out.  I

13   mean, it's redacted.  Lives in --

14          THE WITNESS:  Oh, it's blacked out.

15          THE COURT:  It's blacked out.

16          THE WITNESS:  That's why it's blacked out, for

17   confidentiality.  So I'm sorry, I don't recall.  But I do think

18   it is -- for example, what I have seen is that a lot of social

19   workers keep, like, lists of all the NA meetings, all the AA

20   meetings, all the overeating anonymous meetings, all the -- I

21   mean, they -- to let people know locations of where they're at

22   and times and things like that.  I don't know if they're

23   available.  And you're right, some AA meetings are more widely

24   available than some of the other meetings.  I have no idea what

25   the situation is in Mississippi.

1    THE COURT:  But certainly the institution from where

2  the person would be leaving would have access to all the

3  information, and I assume they should try to make sure that the

4  resources are attainable, at least?

5    THE WITNESS:  Yes, that would be a reasonable

6  expectation.  Because otherwise, you would want them to put

7  together a different plan if they weren't available there.

8    THE COURT:  Okay.  All right.  Any follow-up based on

9  the questions that I've asked from the United States?

10    MR. HOLKINS:  No, Your Honor.

11    THE COURT:  Mr. Shelson, from the State of

12  Mississippi?

13    MR. SHELSON:  No, Your Honor.

14    THE COURT:  All right.  Is this witness finally

15  excused?

16    MR. HOLKINS:  Yes, Your Honor.

17    THE COURT:  All right.  Ms. Burson, thank you so much

18  for your testimony.

19    Logistics, I know we got started a little bit later

20  than what the court had said, and we have not had a morning

21  break.  Who is the government's next witness?

22    MS. RUSH:  Your Honor --

23    THE COURT:  And I keep saying the government.  I

24  realize there's two governments.  I don't want the State to

25  ever believe that we don't consider you the government too.

1    Big government versus little government.  I don't know.  But

2    that's --

3         MS. RUSH:  Your Honor, our next witness is Ms. Angela

4    Ladner.  We expect her testimony to last approximately an hour

5    or so, so we're happy to go ahead and take her or hold until

6    after lunch, whichever the court prefers.

7         THE COURT:  I think we'll take our lunch break now, a

8    little bit earlier than what we've done in the past this week.

9    It is about five minutes until 12.  If we start back up at

10   1:00 -- well, is she expected -- in light of the 3:30 hearing

11   that I have, in light of that, will we get to the next witness?

12        MS. RUSH:  We would recommend that we hold the next

13   witness until tomorrow morning.  We just don't think we really

14   have time to get substantially into his direct testimony.  So

15   we would recommend finishing the day with Ms. Ladner.

16        THE COURT:  Okay.  Does the State have any objection

17   to that, leaving early today?  Does the State have any

18   objection to that?

19        MR. SHELSON:  Not a one, Your Honor.

20        THE COURT:  I didn't mean to put you on blast like

21   that, Mr. Shelson, but any objection, seriously?

22        MR. SHELSON:  Thank you for asking, Your Honor.  We

23   have no objection.

24        THE COURT:  Okay.  In that case, we'll start up at

25   1:15.  Is there -- is there anything we need to take care of

1    before we break?

2            MS. RUSH:  Nothing further, Your Honor.

3            MR. SHELSON:  No, Your Honor.

4            THE COURT:  Thank you.  We'll be in recess until 1:15.

5        (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***

1          CERTIFICATE OF REPORTER

2

3      I, CHERIE GALLASPY BOND, Official Court Reporter, United

4  States District Court, Southern District of Mississippi, do

5  hereby certify that the above and foregoing pages contain a

6  full, true and correct transcript of the proceedings had in the

7  aforenamed case at the time and place indicated, which

8  proceedings were recorded by me to the best of my skill and

9  ability.

10     I certify that the transcript fees and format comply

11  with those prescribed by the Court and Judicial Conference of

12  the United States.

13

14     This the 13th day of June, 2019.

15

16              s/ *Cherie G. Bond*
                Cherie G. Bond
17              Court Reporter

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***