UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                          CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                    DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 29


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
AFTERNOON SESSION
JUNE 27, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
            501 E. Court Street, Ste. 2.500
            Jackson, Mississippi  39201
                 (601) 608-4186

```
1    APPEARANCES:

2    FOR THE PLAINTIFF:    MR. MATHEW SCHUTZER
                           MS. REGAN RUSH
3                          MS. DEENA FOX
                           MS. HALEY VAN EREM
4                          MR. JORGE MARTIN CASTILLO
                           MS. LINDSEY WEINSTOCK
5                          MR. PATRICK HOLKINS

6    FOR THE DEFENDANT:    MR. JAMES W. SHELSON
                           MR. REUBEN V. ANDERSON
7                          MS. MARY JO WOODS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    TABLE OF CONTENTS

2

3                     VOLUME 29

4    JEFFREY GELLER                                2390

5      Direct Examination By Mr. Shelson ................2390

6      Cross-Examination By Ms Fox  ....................2419

7      Examination By The Court  ......................2435

8        Exhibit PX-395  .............................2435

9        Exhibit D-362  ..............................2438

10   Defendant Rests  .................................2438

11       Exhibit PX-412(a)  ..........................2440

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Anything we need to take care of before

2     the State calls its next witness?

3          MR. SHELSON:  Not from the State, Your Honor.

4          THE COURT:  All right.

5          MS. RUSH:  And not from the United States, Your Honor.

6          THE COURT:  All right.  State ready to call its next

7     witness?

8          MR. SHELSON:  Yes, Your Honor.  The State calls

9     Dr. Jeffrey Geller.

10        (Witness Sworn)

11         THE COURT:  Dr. Geller, I know you've been in the

12    courtroom.  Did you hear the instructions I gave to the

13    previous witnesses?

14         THE WITNESS:  Talk loud and talk slow.

15         THE COURT:  The slow part really.  If you will, then,

16    please state your name for the record and spell it.

17         THE WITNESS:  Jeffrey Geller, J-E-F-F-R-E-Y

18    G-E-L-L-E-R.

19         THE COURT:  All right.  Thank you.  Mr. Shelson, you

20    may proceed.

21         MR. SHELSON:  Thank you, Your Honor.

22                         JEFFREY GELLER,

23      having first been duly sworn, testified as follows:

24                      DIRECT EXAMINATION

25    BY MR. SHELSON:

1   Q   Dr. Geller, what is your occupation?

2   A   I'm a psychiatrist.

3   Q   What is Exhibit D-304?

4   A   That's my curriculum vitae.

5       MR. SHELSON:  Your Honor, D-304 has been previously

6   admitted into evidence.

7       THE COURT:  All right.

8   BY MR. SHELSON:

9   Q   Doctor, I'm going to try to go through this fairly quickly.

10  I'm going to start with your education and training.  Where did

11  you receive your undergraduate education?

12  A   Williams College in the Commonwealth of Massachusetts.

13  Q   And where did you receive your graduate education?

14  A   I went to the University of Pennsylvania School of

15  Medicine, and I went to the Harvard School of Public Health.

16  Q   So you have a medical degree from the University of

17  Pennsylvania?

18  A   That's right.

19  Q   And what degree do you have from the Harvard School of

20  Public Health?

21  A   Master's in public health.

22  Q   Postgraduate, where did you do your internship?

23  A   I was an intern at the Philadelphia General Hospital.

24  Q   Where did you do your residency?

25  A   I did my residency at Beth Israel Hospital in Boston and

1  Harvard University.

2  Q   And did you do a fellowship?

3  A   I did.

4  Q   Where did you do your fellowship?

5  A   I did a fellowship at the same institutions.

6  Q   Are your academic appointments summarized on pages 2 and 3

7  of your CV?

8  A   Yes, they are.

9  Q   I want to skip ahead to certification and licensure, which

10  starts on page 4 of your CV.  Where are you licensed to

11  practice medicine?

12  A   Commonwealth of Massachusetts.

13  Q   How long have you been licensed to practice medicine?

14  A   Since 1974.

15  Q   Are you board certified?

16  A   Yes.

17  Q   In what?

18  A   In psychiatry and neurology.

19  Q   I want to ask you next, Doctor, on page 4 of your CV, under

20  the heading "Memberships in professional and scientific

21  societies, I want to direct your attention to the next page,

22  page 5.  I'm just going to ask you about one of these, the

23  American Association of Community Psychiatrists.  What is that

24  and what's your involvement?

25  A   The American Association of Community Psychiatrists is a

1  membership organization of psychiatrists who practice in the

2  public sector.  Predominantly members practice in the

3  community.  I'm on the board of that organization, and I've

4  been the liaison between that organization and the American

5  Psychiatric Association.

6  Q  I want to ask you next about the honors section of your CV.

7  Are the honors you've received summarized on pages 5 and 6 of

8  your CV?

9  A  Yes, they are.

10 Q  I'm going to come back to that in a little bit.  I want to

11 ask you next about the service section of your CV.  Are the

12 national and regional assignments you've been involved with

13 listed on pages 6 through 9 of your CV?

14 A  Yes, sir.

15 Q  I want to ask you about one of the last ones.  It's on page

16 9.  2018, again, SAMHSA National Advisory Council, what is that

17 and what's your involvement?

18 A  I'm a member of that council.  All of SAMHSA's funding, all

19 grants by congressional mandate, are required to be approved by

20 the advisory council.

21 Q  And how long have you been involved with that council?

22 A  Since 2018.

23 Q  Are your medical school committee assignments listed on

24 pages 9 and 10 of your CV?

25 A  Yes, they are.

1    Q    I want to go next to teaching.  Is your teaching experience

2    summarized on pages 11 and 12 of your CV?

3    A    Yes, they are.

4    Q    Beginning on page 12, is your experience as a consultant or

5    expert summarized on pages 12 through 15 of your CV?

6    A    Yes, they are.

7    Q    And then the last thing about your CV directly,

8    publications, begin -- do publications that you're the author

9    or an author of begin on page 15 of your CV?

10   A    Yes, sir.

11   Q    Okay.  You see the heading on page 15, "Refereed articles"?

12   A    I do.

13   Q    What does that mean?

14   A    That means that you submitted an article for publication,

15   and it was reviewed by several experts, and that they endorsed

16   the publication, and subsequently, the editor endorsed the

17   publication.

18   Q    Okay.  I want to go next to your report in this case, which

19   is marked D-303 and has been preadmitted.  I want to direct

20   your attention to the first paragraph on page 1, the sentence

21   that begins with "Currently."  Currently, I'm -- well, let me

22   just ask you what are your -- where are you currently employed?

23   A    I'm currently a professor of psychiatry at the University

24   of Massachusetts Medical School.  I'm the medical director of

25   the Worcester Recovery Center and hospital, which is a

1   290-bed -- 260 adults, 30 children -- public psychiatric

2   hospital in the Commonwealth of Massachusetts.  I carry a case

3   load at the hospital, in addition to administrative

4   experiences.  And I also see outpatients through the UMASS

5   Memorial Group Practice.

6   Q   I want to quickly take a moment to clear up any language

7   barrier.  The facility you work at, is it spelled

8   W-O-R-C-E-S-T-E-R?

9   A   Directly from England.

10  Q   How do you pronounce it?

11  A   Well, if you're most people in the United States, you

12  pronounce it Worcester.  If you're from the city, you pronounce

13  Wooster (pronouncing).

14  Q   Which is W-O-O-S-T-E-R?

15  A   W-O-R-C-E-S-T-E-R.

16  Q   Okay.  Let me direct your attention to page 1 of your CV to

17  the second sentence, where you talk about the job you held

18  before the current job you just described.  What was that job?

19  A   I was the director of public psychiatry for the University

20  of Massachusetts.  In Massachusetts, most psychiatrists who

21  work in DMH facilities don't work for the Department of Mental

22  Health.  They work for another entity.  So at one time, I was

23  responsible for the psychiatrists in four state hospitals and

24  two community mental health centers.

25  Q   Still in the first paragraph on page 1, it says, "I've

1　always been a practicing clinician.  Currently, I have an

2　inpatient case load at the state hospital and an outpatient

3　case load at the university where I have seen some individuals

4　with serious mental illness for 32 years."  Could you just

5　explain the nature of that briefly?

6　A    Sure.  At the state hospital, according to my job

7　description, I should have a case load of five adult patients.

8　I have a case load of 32 adult patients.  That's an inpatient

9　facility.  So as an attending psychiatrist, I'm overall

10　responsible for their care and treatment in the facility, which

11　includes admission and discharge.  I also see patients at the

12　university clinic, and I do that after my normal work hours at

13　the public psychiatric hospital.

14　Q    So briefly, since 1974, what has been the nature of your

15　experience in treating patients in an outpatient or

16　community-based setting?

17　A    For approximately 30 years, I was a psychiatrist at a

18　community mental health center.  I had different roles at that

19　community mental health center, but I also had a significant

20　case load.  I only stopped doing that a couple of years ago.

21　　　At the university clinic, I've seen patients in the time

22　span.  I have never not seen patients since 1974, except for

23　one year when I was on sabbatical, and I was a Robert Ward

24　Johnson health policy fellow on Capitol Hill.

25　Q    I want to ask your briefly about the second paragraph, and

1   it says that you have served as a consultant to 26 U.S. states,

2   usually in CRIPA, C-R-I-P-A, or *Olmstead*-related matters in the

3   U.S. Department of Justice.  I don't want you to go into all 26

4   states, but briefly, what was the nature of that experience?

5   A   I started as a consultant for the U.S. Department of

6   Justice Civil Rights Division, Special Litigation Section, and

7   I did that for a number of years, and I realized that in that

8   role, the experts were coming in providing critiques but never

9   were involved in any solutions.  So then I began doing that for

10  the states.

11      In any given state, the number of facilities or systems has

12  ranged from one to eight per state.

13  Q   I want to go down to the final paragraph on page 1.  You

14  see that three awards you've received since 2010 are listed

15  there?

16  A   Yes, sir.

17  Q   I want to ask you, the first one is Outstanding

18  Psychiatrist Award for Public Sector from the Massachusetts

19  Psychiatric Society, 2010.  What was -- what was that awarded

20  for?

21  A   That is an award that's given annually to one psychiatrist

22  in Massachusetts for their achievements and contributions to

23  the public sector in the field of psychiatry in the

24  Commonwealth of Massachusetts.

25  Q   The Human Rights Award from the APA or American Psychiatric

1   Association, 2014, what was that award?

2   A   That award is given to up to one individual or agency.  I

3   say up to because it's not necessarily given every year.  And I

4   got that for my career-long fights for the rights of

5   individuals who had serious mental illness.

6   Q   Finally, what's the Profiles and Courage Award from the

7   APA?

8   A   That's an award I got from the APA assembly.  Again, it's

9   given to up to one person a year, not necessarily given.  And

10  that had to do with the fact that I had spent my career in the

11  public sector of psychiatry.  When I started that career,

12  nobody from a Harvard teaching hospital had gone to work in the

13  state hospital.  People told me that my career would be a dead

14  end if I did that.  And I fought through great adversary

15  processes to be able to continue to function in the public

16  sector and to become a mentor in that field.

17  Q   Finally, Doctor, what is your experience with

18  community-based mental health assessments?

19  A   Well, the term is used in two different ways in psychiatry.

20  One is an individual application wherein you're looking at the

21  impediments of somebody being able to function in the

22  community, and you are addressing those, based on a number of

23  assessments that then come together into a plan to correct

24  those so that they can actually function in the community.

25       And the second is on a systems level, when you're looking

1    at the community impediments to individuals, in this case, with

2    serious mental illness functioning in the community.  And the

3    word "community" can be loosely used because it can happen in a

4    state hospital.  We've actually done that analysis twice in the

5    last seven years.  It was the recovery center and hospital.

6         MR. SHELSON:  Your Honor, we tender Dr. Geller as an

7    expert in the fields of psychiatry, public mental health,

8    serious mental illness and community-based mental health

9    assessments.

10        MS FOX:  Your Honor, we would object to his tendering

11   in the area of community mental health assessments.  That's

12   outside the scope of his report and -- the area of community

13   mental health assessments is outside the scope of his report.

14   And at his deposition, he specifically testified that he did

15   not conduct an assessment of community mental health services

16   here in Mississippi.

17        THE COURT:  Any response?

18        MR. SHELSON:  Again, Your Honor, none of that doesn't

19   mean he's not an expert in that field.  We would submit that if

20   it comes up and they think it's -- something's outside the

21   scope that gets asked to him, they can make that objection at

22   the time.

23        THE COURT:  He will be designated as an expert in the

24   areas confined to what's in his expert report.  So -- but he

25   appears to be qualified to speak on a whole bunch of issues.

1    BY MR. SHELSON:

2    Q    Doctor, let's dive into your report.  I'm going to try to

3    do this quickly.  Pages 1 through 30 of your report, is that --

4    is it fair to describe that as a narrative part of your report?

5    A    Yes, it is.

6    Q    All right.  And I just want to go through the structure of

7    your report.  So then what are -- let me put that on the

8    screen.  What are pages -- this says, "Mississippi State

9    Hospital record reviews," which takes up pages 31 through 177

10   of your report.  What is this section of your report?

11   A    So the Justice Department had put forth a sample of

12   individuals, and it was clear to me that I was not going to be

13   able to review the same 154 records that they had a good number

14   of people to review.  So I took a random sample of that sample,

15   a third of the number, and then I reviewed their records at the

16   index hospitalization, looking at the factors that seemed to be

17   involved in that admission, that is, psychiatric history,

18   psychiatric diagnosis, services they were receiving when they

19   were admitted, what happened to them in the hospital, what the

20   process was for discharge, and whatever information I could

21   glean from the record, family history, family supports and so

22   forth.  And I summarized that individual by individual.

23   Q    The next part of your report, which is pages 178 through

24   181, I'm just going to show it to you.  What is this?

25   A    So I provided two things in this reference list.  One was

1  direct citations for information that I had included in the

2  report and the other was the relevant articles that formed the

3  basis for the opinions in the report.

4  Q   All right.  I'm going to now go to page 2 of your report.

5  I think you touched on this some, but briefly, where it says

6  "data and patient records," what is that?

7  A   That's a list of the individual patient records that I

8  looked at, as well as the psychiatric hospital that the person

9  was in at the time of the index admission.

10  Q   And the persons listed on pages 2 and 3 of your report, is

11  that the one-third of the 154 that you reviewed medical records

12  for?

13  A   Yes, it is.

14  Q   All right.  The next section of your report, page 3, is

15  entitled "Documents."  What is that?

16  A   These are the documents that I reviewed.  They include

17  documents that were provided by your office and documents that

18  were given to me at each of the hospitals when I visited there.

19  Q   Doctor, next, page 4 of your report, there's a heading

20  "Site visits."  What is this?

21  A   So I visited each of the four state hospitals, and I

22  visited Central Mississippi Residential Center.  This indicates

23  the dates that I was there, and it indicates some of the people

24  that I talked to.  I interviewed individuals in formal

25  settings, and I interviewed individuals while I was touring the

1  facility.  It was hard to keep track of those names, but these

2  are some of the people that I interviewed at each of the

3  facilities.

4  Q   What facilities are listed on page 4 of your report?

5  A   Mississippi State Hospital, North Mississippi State

6  Hospital, and East Mississippi State Hospital.

7  Q   What facilities are listed on page 5 of your report?

8  A   Southern Mississippi State Hospital.

9  Q   And --

10  A   And the Central Mississippi Residential Center.

11  Q   On the bottom of page 5, where it says references

12  consulted, is that part of your report we've already discussed?

13  A   Yes.

14  Q   Okay.  So moving on, then, I want to move on to page 6 of

15  your report, and it says "Methods," and the first heading under

16  that is "Mississippi State Hospital record reviews."  Is that

17  the record review you've already described?

18  A   Yes, sir.

19  Q   And the tours, is that the tours of the four state

20  hospitals in Central Mississippi Residential Center that you've

21  described?

22  A   Yes, sir.

23  Q   Okay.  I want to next direct your attention to pages 21

24  through 24 of your report, which I'll put up on the screen.  Is

25  this the part of your report where you summarize your findings

1    regarding the four state hospitals?

2    A    Pages 21 through 22?

3    Q    Yes.

4    A    It's the place in the report where I describe, I guess,

5    going into page 23, my visits to the state hospitals and the

6    residential center.

7    Q    Could you briefly, globally, summarize your findings from

8    your visits to the Mississippi -- the four Mississippi state

9    hospitals?

10   A    Well, my objectives in visiting these facilities was to see

11   if they had the capacity to meet the acute needs of the

12   patients who are being admitted, as well as the skills

13   development or psychosocial needs of patients who were being

14   visited.

15        In general, I found that providers knew their patients,

16   that they assessed them quite quickly upon admission, that they

17   developed a treatment plan, that several of the facilities had

18   different tracking systems, meaning that based on a person's

19   capacities, they would have a different program for their

20   psychosocial classes, that people were responsibly doing

21   psychopharmacologic management.  I had some criticisms, and I

22   thought that they were ready for the next steps in some

23   psychosocial rehabilitation endeavors, which was tying what was

24   happening in programs off the unit, which is where they should

25   be happening, to the nursing staff and day-to-day treatment on

1    the unit.  I talked with them about that.  I thought that they

2    had very well-done discharge summaries, but I thought that they

3    were leaving out a lot of what they did in terms of

4    psychosocial rehabilitation for the patients while they were in

5    the hospital, and I suggested that they add that to their

6    summary.

7         Based on my experience visiting, as I said, I've been in 26

8    states, and that's probably at least 100 state hospitals, I

9    thought these Mississippi state hospitals were well within the

10   modal operation of state hospitals in the United States.

11   Q   I want to turn next to the Central Mississippi Residential

12   Center, which is summarized on pages 26 and 27 of your report.

13   Would you please tell us what CMRC is, and briefly summarize

14   your findings.

15   A   On the same campus are two facilities.  One is a group

16   residence, and one is individual apartments, or garden

17   apartments.  It's used by the Department of Mental Health as a

18   step-down, that is, individuals would go from the state

19   hospitals to the residence as part of the transition to moving

20   into the community.

21        There were a good number of individuals who had previously

22   had forensic status who were using this as a vehicle to the

23   community.  Individuals could move from there to other settings

24   in the community.  They could go to the garden apartments that

25   were on the grounds.  I spent some time with one woman who was

1   a residence of the garden apartments who had come from the

2   hospital to the group residence to the apartment.  I thought

3   she could move on, and she told me she wasn't ready, and she

4   thought she might be ready in two years.

5       On the same campus is a separate building for psychosocial

6   rehabilitation programming.

7   Q   I want to turn next, Doctor, to the background section of

8   your report, which begins on page 8.  Excuse me.  It begins on

9   page 7.  On page 7 of your report, under the word "Background,"

10  there's a heading "State of Mississippi in context."  Why did

11  you include the "State of Mississippi in context" section in

12  your report?

13  A   Services for individuals with serious mental illness don't

14  exist in a vacuum.  They -- they exist in the context of the

15  place where an individual lives.

16      So it's relevant what resources the citizens of -- the

17  citizens of Mississippi have available to them as a whole so

18  it's clear where people with serious mental illness sit.  So

19  the fact that Mississippi is the poorest state in the United

20  States, it actually ranks number 51, including the District of

21  Columbia, is relevant to what psychiatric services may or may

22  not be able to be delivered.  The fact that the general

23  education is lower is going to affect that.  The fact that the

24  birth rate, for example, percentage of births to unmarried

25  women is the highest percentage basis of the population of the

1  United States, is going to affect the treatment of people with

2  serious mental illness, and all of these things are going to

3  affect who has serious mental illness and what the prevalence

4  of serious mental illness is in the state of Mississippi.

5  Q   At the end of that section starting on page 8 of your

6  report and going over to page 9, there's a heading

7  "Significance," and there's six items listed.  Without going

8  through each one, can you summarize what you included in your

9  report under that significance heading?  Maybe you already did.

10 A   To summarize --

11 Q   Go ahead.

12 A   -- just briefly, there is a huge literature that shows that

13 health disparities and health in general are related to income

14 level or poverty.  So the fact that Mississippi, unfortunately,

15 is a very poor state is going to have direct access to

16 illnesses people have, the degree of those illnesses and their

17 access to health care in general.

18 Q   I want to turn next, Doctor, to page 9 of your report and

19 the heading "Mississippi's mental illness and psychiatric

20 services in context."  Why did you include that section in your

21 report?

22 A   So we established -- or I established in the first section

23 we just talked about what the risk factors are.  And then you

24 want to know, well, do those risk factors play out in what you

25 actually find.  And if you look in the area of mental illness,

1   you find that, yes, they do, that Mississippi ranks at the

2   higher end in areas you would wish a state did not, and lower

3   percentages in areas where you would wish the state did not.

4   And that was rather consistent.

5   Q   Starting on page 10 of your report, you summarized the

6   significance of your findings in that section.  Would you

7   please briefly summarize the significance.

8   A   That the prevalence of the mental illness is higher in

9   Mississippi than most other states, and it's particularly high

10   in the elderly, that Mississippi had one of the lowest rates of

11   providers per capita of any state.  This means that if you put

12   in funds, you still might not get the services because you

13   don't have the people to provide the services, that poverty,

14   being in a rural area, lack of providers, access to services,

15   puts Mississippi at a high ranking for poor access to services.

16   Q   I want to go next, Doctor, to page 17 of your report.  The

17   second bullet point on page 17, first of all, does that bullet

18   point relate in any way to putting Mississippi in context that

19   you just testified about?

20   A   Yes.

21   Q   How does it relate to putting Mississippi in context?

22   A   From my perspective, the Justice Department is asking

23   Mississippi to achieve a standard of care that no state that

24   I'm familiar with has ever achieved.  To ask the state with the

25   lowest per capita income to achieve things that states with the

1  highest per capita income have never achieved doesn't make very

2  much sense.

3      I listed the ten states with the highest per capita income,

4  and I've had direct involvement with nine of those ten states,

5  and I can tell you that the parameters that are being laid out

6  for Mississippi are not met in any of those states.

7  Q   I want to turn next, Doctor, to page 11 of your report.

8  Excuse me, Doctor.  I'm going to move on from there.  I'm going

9  to direct your attention to page 14.  And I'm going to start

10 with the first paragraph on page 14.  I'm not going to read the

11 whole thing, but in part, it reads "Mississippi has, according

12 to USDOJ, continued to fund expensive institutional care, even

13 though less costly and more effective alternatives exist in the

14 community -- community" -- in this statement -- I'm going to

15 skip to the next sentence.

16     Well, I'll just read it.  "In this statement, the USDOJ is

17 echoing the oft repeated but unfounded belief that the cost of

18 reproducing the services in the community that the patient

19 receives in the state hospitals is less.  USDOJ echoes it

20 themselves.  The cost of providing institutional care to

21 persons with disabilities is nearly always more expensive than

22 providing care in integrated settings."  Why is that your

23 opinion?

24 A   I think it's always more expensive rather than less

25 expensive.  I think either I misheard that or you misread it,

1    one or the other.

2    Q    I'm sorry.

3    A    There's no evidence that if you compare the total costs of

4    an individual in a state hospital to the total costs of an

5    individual in a community, that the community is less expensive

6    in terms of absolute dollars.  There's been no good study of

7    this for 50 years.  One very good study of this showed they

8    were about the same.

9        The usual comparison that leads one to believe that it is

10   much more expensive in a state hospital than in a community

11   residence is saying, well, this is how much it costs for

12   somebody in the state hospital.  $125,000 a year.  And we can

13   move that person to a community residence, and that costs

14   $35,000 a year.  But in the state hospital, that $125,000

15   bought psychiatric care, medications, medical care, dental

16   care, emergency care, beautician services, barber services, all

17   sorts of things.

18       MS FOX:  Your Honor, I'm going to object that we're

19   going outside the scope of the disclosed opinion.  The opinion

20   that was disclosed in the report is what was just read.

21   Anything additional about specific costs or any kind of

22   analysis, first of all, was not completed by this expert with

23   regard to Mississippi and goes beyond what was disclosed both

24   in his report and at his deposition.

25       THE COURT:  I'll hear from the State in response.

1    He's speaking generically right now.  Right?

2           MR. SHELSON:  He is, yes, sir.  Your Honor, to address

3    Ms. Fox directly, when a State expert is on the stand, it's as

4    though the report is a transcript of of everything they might

5    say at trial.  This report is a summary of his opinions, and it

6    summarizes the subject matter.  And what he's testifying to is

7    within the subject matter of his report, and he cites the

8    studies that he's talking about in there, and they're in the

9    reference section, and those studies encompass this subject

10   matter.  And so he's not purporting to talk specifically about

11   a study in Mississippi.  As Your Honor noted, he's speaking

12   generically.

13          THE COURT:  All right.  Objection overruled.

14   BY MR. SHELSON:

15   Q   You may continue, Doctor.

16   A   So the point is that if you compare the costs in the

17   community, which would include all that I've listed, plus some

18   costs that don't occur in the state hospital, like emergency

19   room visits, law enforcement costs, and so on and so forth, the

20   outcome is that the two low sides, that is, the state hospital

21   and the community, have about the same costs in absolute

22   dollars.

23   Q   I want to move on the same page, page 14 of your report.

24   It's the four paragraph, the one that begins with "FL9:CPT7."

25   I'm just going to read the first sentence which says, "The

1    USDOJ's oft made statements that institutions foster regression

2    and learned helplessness ignores the literature."  Why is that

3    your opinion?

4    A   We're specifically talking here about people with serious

5    mental illness.  And the belief in this 1960s was that people

6    with mental illness behaved the way they did, serious mental

7    illness, because they had spent all these years in

8    institutions.  And this was tested.  It was tested in the 1970s

9    in a body of work that was called "The Young Adult Chronic

10   Patient."  And they studied individuals who had never been in

11   institutions.  And the hypothesis was that since they had never

12   been in institutions, their behavior should be significantly

13   different from the individuals who had spent all this time in

14   institutions because the effect was the regression in the

15   institutions.  But that's not what they found.  They found that

16   the two populations were not terribly different and that people

17   with schizophrenia had negative symptoms, and it was not the

18   institution that was the cause of the behaviors that were seen.

19   It was an inherent part of the disorder.

20   Q   I want to turn next, Doctor, to page 16 of your report.

21   And I'm going to address your attention the first bullet point

22   towards the bottom of the page.  It reads, "It is not the case

23   that community-based settings and what they provide is the same

24   as what a state hospital provides.  Why is that your opinion?

25   A    It's my opinion as a concept, and it's my opinion from

1    experience. So the services that a state hospital can provide

2    in terms of security and safety are obviously different than

3    what can be provided in the community. But more importantly,

4    in terms of the well-being of individuals, the assessment of an

5    individual in trying to determine a diagnosis so that you can

6    understand what you might do for the individual is very

7    different.

8       I believe this court heard from Dr. Drake that there was a

9    high rate of traumatic brain injury in individuals who were

10    dually diagnosed with mental illness and substance abuse. That

11    work-up to determine if, in fact, the traumatic brain injury is

12    impacting on this individual and what you might do about it can

13    easily happen in a hospital. It's not going to happen in a

14    community setting. And if it does, it's going to take months

15    to years rather than a week or two.

16       From my personal experience, I was involved in one of the

17    oldest consent decrees in the United States, the *Brewster v.*

18    *Dukakis* consent decree in western Massachusetts. I was

19    involved in writing what those stipulations would be, and then

20    I became a psychiatrist working in that setting.

21       In the 1980s, we created a lot of the services that have

22    been talked about in this case because they didn't exist. We

23    had the best funded community system in the United States by

24    orders of magnitude. Despite that, we had regular use of the

25    state hospital. We had people who had repeated admissions, and

1  the services that were provided allowed them to return to the

2  community while the services in the community couldn't keep

3  them safely in the community.

4  Q   I want to ask you next, Doctor, about page 27 of your

5  report.  It's the third paragraph up from the bottom on page

6  27.  It reads "Mississippi does not have a disproportionate

7  share of its state funding going to state hospitals as opposed

8  to community programs compared to other states as previously

9  documented in this report."  Why is that or why was that your

10 finding?

11 A   Well, I presented the data.  That is national data that

12 compared Mississippi and its distribution of funding to

13 compared to other states, and Mississippi's not an outlier.

14 Q   I want to go on next to where that paragraph -- paragraph

15 discusses the IMD exclusion.  The court heard some of this, so

16 would you briefly explain what the IMD exclusion is?

17 A   The IMD exclusion is the federal government's attempt to

18 continue the 150-year-old tradition that the states are

19 responsible for people with serious mental illness, not the

20 federal government.  And it basically says that if you're a

21 facility that exceeds 16 beds, and the residents are there

22 because of a psychiatric disorder, they're not entitled to SSI

23 or Medicaid.

24     The exception is, you can have considerably more than 16

25 beds, as long as less than half the beds are for psychiatric

1    disorders, so that in any state, a state would pay dollar for

2    dollar for care and treatment in the state hospital, and it

3    would pay a percentage of that dollar, with the federal

4    government paying the difference, if the person was not in an

5    IMD.  And that percentage varies based on the per capita income

6    in a somewhat complicated formula so that Mississippi's federal

7    contribution would be high.

8    Q   You write next in the paragraph that we're looking at that

9    if the IMD exclusion was eliminated, Mississippi would have

10   considerably more state dollars to spend in the community.  Why

11   is that your opinion?

12   A   Well, as I indicated, Mississippi is spending a dollar for

13   dollar cost in the state hospitals today.  If the IMD exclusion

14   was eliminated and Mississippi was billing -- could bill

15   Medicaid, they would spend approximately 25 cents on the

16   dollar.  The other 75 percent -- 75 cents would come from the

17   federal government, and that would give them that 75 cents to

18   spend on services outside the hospital.

19   Q   I want to ask you next, Doctor, about page 28 of your

20   report.  You see where it says at the top "CPT number 25," and

21   then it says --

22   A   Number 25?

23   Q   75.

24   A   Yes, I do.

25   Q   Excuse me.  -- "USDOJ can say this to every state."  And

1  then you list that for a number of entries, maybe all entries

2  on page 28.  Why did you include the things that are listed in

3  your report where you say "DOJ can say this to every state"?

4  A   The United States is saying that Mississippi is not doing

5  what it's supposed to be doing for people with serious mental

6  illness.

7          MS FOX:  Objection, Your Honor.  He's now

8  characterizing the United States' position in this matter.

9  That is not in the area of his expertise to characterize the

10 complaint.

11         THE COURT:  All right.  Objection overruled.  I'm

12 looking at -- he's about to go down CPT-75 -- I'm sorry.  What

13 page of the report is that?

14         MR. SHELSON:  Twenty-eight, Your Honor.

15         THE COURT:  Okay.  It starts up at the top?

16         MR. SHELSON:  Yes, sir.

17         THE COURT:  What you have there is not the top.

18 Right?

19         MR. SHELSON:  No, I shifted it down.

20         THE COURT:  That's fine.  That's fine.  Okay.

21 Objection overruled.  You'll have an opportunity to

22 cross-examine him on what he says.

23 A   So I took statements that the United States Department of

24 Justice was making about Mississippi, and I'm making the point

25 that I believe that United States Department of Justice could

1  make those same statements about every state in the United

2  States.

3  BY MR. SHELSON:

4  Q    What is the significance of that?

5  A    Two.  One is that Mississippi is not an outlier.  And the

6  second is that the United States Department of Justice is

7  asking Mississippi to do something that no other state has ever

8  accomplished, and I don't see how that establishes what is

9  reasonable or expectable.

10  Q    I want to ask you about one of the entries on page 29 of

11  your report, Doctor.  And it's the paragraph that begins with

12  CPT number 118.  And it reads, "In most instances, at the time

13  of admission to a state hospital, that person at that time is

14  not similar to all other people with serious mental illness in

15  the community.  If he were, he wouldn't be in the ED awaiting

16  admission or in a locked setting awaiting transfer."  First

17  question is, what is ED?

18  A    Emergency department.

19  Q    Second question is, why is what I just read your opinion?

20  A    We don't admit people to state hospitals, and we haven't

21  for a very long time just because they're psychotic.  We admit

22  people on the basis of their behaviors that may be driven by

23  psychotic thinking.  At the time somebody presents in a crisis,

24  they are not at their own baseline.  Otherwise, they wouldn't

25  be in crisis.  And they're not similar to all the other people

1   with serious mental illness in the community who are also not

2   in crisis.  So they are a distinctly different population at

3   that point in time.

4   Q   Doctor, you may or may not recall, but you were asked about

5   this in your deposition, but what is your overarching opinion

6   in this case?

7   A   My overarching opinion is that individuals with serious

8   mental illness should be afforded a lifetime of living in the

9   most integrated setting appropriate to their needs that will

10  allow them to live a self-directed life to the greatest extent

11  possible.  It's not a statement of a point in time.  It's a

12  statement of a lifetime.

13  Q   And how does -- well, let me ask you this.  On page 30 of

14  your report, this sentence here that "Belief is that because

15  one could be treated outside a hospital, one should be treated

16  outside a hospital," my question is, why is it your opinion

17  that even if a person could be treated outside a state

18  hospital, that does not mean a person should be treated outside

19  a state hospital?

20  A   Because that's paying no attention to the lifetime course

21  of illness.  It's paying no attention to the person's choice.

22  So if I could -- let me give you an example.  An individual

23  prevents -- presents in crisis, and he gets admitted to a

24  crisis bed, and four days later he gets discharged.  And that

25  happens multiple times in the year.  At the beginning of the

1    next year, he's no better equipped to not go through the same

2    cycle.  If he was admitted to the state hospital for the same

3    number of days that he accumulated in one year with all these

4    crisis admissions, in one admission he might have better

5    medication adjustments.  He might develop some skills he didn't

6    have.  And in the following year, he might spend considerably

7    less time in any psychiatric facility outside the community.

8    That means for that individual, you have increased his

9    community integration by doing a more appropriate or more

10   effective intervention acutely.

11           MR. SHELSON:  Your Honor, may I have a moment to

12   confer?

13           THE COURT:  Yes, you may.

14   BY MR. SHELSON:

15   Q   Doctor, just one more thing, and I'm still on page 30 of

16   your report.  I want to direct your attention.  It's the second

17   paragraph under the heading "Conclusion," and I'm going to read

18   this sentence.  "And Mississippi has a hospital and

19   community-based system of care and treatment for persons with

20   serious mental illness comparable to many other states."  Why

21   is that your opinion?

22   A   It's my opinion because I have seen the hospitals and their

23   interfaces with the community in Mississippi, and I have seen

24   them, as I indicated previously, in 26 states.  That does not

25   include the state where I've spent most of my professional

1   life, where I have been involved in most of the facilities and

2   most of the systems, in the Commonwealth.  And I do not believe

3   that Mississippi is an outlier.  It's certainly not the best,

4   but it's far from the worst.  And if Mississippi is achieving

5   something comparable to its peers, rather than condemn it, I

6   think we might consider giving it an award because it starts

7   out way, way, way behind a whole lot of other states, as I've

8   indicated, because of the various factors that are in my report

9   that describe economic conditions and the social conditions of

10  the state.

11          MR. SHELSON:  Thank you, Doctor.  Your Honor, subject

12  to redirect, we tender the witness.

13          THE COURT:  All right.  Thank you.  Let's take a

14  five-minute break for the court reporter.  We're in recess.

15      (Recess)

16          THE COURT:  You may proceed.

17          MS FOX:  Thank you, Your Honor.

18                      CROSS-EXAMINATION

19  BY MS FOX:

20  Q   Good afternoon, Dr. Geller.

21  A   Good afternoon.  I wish I could say I'm glad to see you

22  again.

23  Q   Well, I'm going to do my best to get you on that flight.

24  Hopefully, I'll win back your positive feelings through that.

25      I have a couple of questions for you about your

1  professional experience.  You haven't ever worked as the head

2  of a state mental health agency.  Is that right?

3  A   That's right.

4  Q   And you haven't worked at a state Medicaid agency?

5  A   That's right.

6  Q   You haven't served on an ACT team?

7  A   Served on an ACT team?  That's right.

8  Q   And you don't manage the full budget for the hospital where

9  you work.  Correct?

10 A   That's correct.

11 Q   You've been a member of the American Psychiatric

12 Association for a number of years, based on your resumé.  Is

13 that correct?

14 A   Yes.

15 Q   And each state has an affiliate of the psychiatric

16 association?

17 A   That's correct.

18 Q   The Mississippi affiliate is the Mississippi Psychiatric

19 Association?

20 A   Correct.

21 Q   And that organization advocates on behalf of the members in

22 its state?

23 A   That's correct.

24 Q   I'd like to ask you some questions about the scope of your

25 opinions in this case.  You didn't form an opinion about what

1  community services are needed here in Mississippi.  Correct?

2  A   That's correct.

3  Q   You didn't analyze the availability of community services

4  in Mississippi for your report.  Correct?

5  A   Correct.

6  Q   And you haven't done a systemic analysis of the

7  availability of community services in states with rural

8  regions.  Correct?

9  A   Correct.

10  Q   Regardless of rural or not, you haven't done a 50-state

11  survey of availability of community services in this country.

12  Correct?

13  A   Correct.

14  Q   You mentioned, when you were talking with Mr. Shelson,

15  about the part of your report where you conducted file reviews

16  of some of the individuals that the United States experts

17  reviewed.  Correct?

18  A   Yes.

19  Q   And in that section of report, you didn't include any

20  specific opinions about the individuals whose files you

21  reviewed.  Correct?

22  A   That's correct.

23  Q   And you didn't disclose any opinions about those

24  individuals at your deposition?

25  A   That's correct.

1  Q   You didn't analyze the costs or spending in Mississippi's

2  mental health system.  Correct?

3  A   Yes.

4  Q   Is that correct?

5  A   Yes.

6  Q   Okay.  You did agree that the sample the United States drew

7  for the clinical review was a random sample?

8  A   That my sample or -- which sample?  I'm sorry.

9  Q   You agreed at your deposition that the United States --

10  that the sample the United States drew of 154 individuals was a

11  random sample?

12  A   Yes.

13  Q   As part of your analysis, you visited the state hospitals

14  in Mississippi?

15  A   Yes.

16  Q   And you interviewed people that you identified as core

17  staff at the hospital in groups.  Correct?

18  A   I interviewed staff at the hospital, some of them in

19  groups, correct.

20  Q   And then some on the units as you toured the hospitals?

21  A   Correct.

22  Q   And you're assessing the scope and quality of the state

23  hospital services on those tours?

24  A   Yes.

25  Q   You didn't visit any community mental health centers as

1  part of your analysis in Mississippi?

2  A   Correct.

3  Q   You didn't meet with any of the ACT providers in the state?

4  A   Correct.

5  Q   You didn't meet with any of the mobile crisis providers?

6  A   Correct.

7  Q   You didn't speak with any of the providers who offer CHOICE

8  housing services?

9  A   Correct.

10 Q   You didn't do a systemic analysis of provider availability

11 in Mississippi?

12 A   Correct.

13 Q   You also didn't read the service descriptions for the

14 community mental health services in Mississippi.  Correct?

15 A   Correct.

16 Q   I want to look specifically at a couple of the findings in

17 the report.  If we could look at page 14 of your report.  Do

18 you have your -- you have your report?

19 A   I have a hard copy, yes, I do.

20 Q   Great.  Toward -- toward the bottom of the page there, it

21 says, "As indicated in the Mississippi's mental illness and

22 psychiatric services in context under"--

23 A   I don't see where you are.

24 Q   Sorry.  We're in the last sentence of that page.

25 A   Okay.  I'm there.

1   Q  "As indicated in the Mississippi's mental illness and

2   psychiatric services in context, under treatment, eight states

3   have higher state hospitalization rates than Mississippi.

4   NASMPD indicates no less than 25 states have higher rates per

5   capita of total psychiatric beds as compared to Mississippi."

6   Do you see that?

7   A  I do.

8         THE COURT:  Before you go on, for the record,

9         NAS --

10        MS FOX:  NASMPD.

11        THE COURT:  Thank you.

12  BY MS FOX:

13  Q  What is NASMPD?

14  A  National Association of State Mental Health Program

15  Directors.  So it's basically the commissioners or executive

16  directors, whatever each state calls them.  That's their

17  association.

18        THE COURT:  You may approach.

19  BY MS FOX:

20  Q  I've just handed you a document that's been marked PX-393

21  and previously admitted into evidence.  This report is cited in

22  your report.  Is that correct?

23  A  Yes, it is.

24  Q  "Trends in psychiatric inpatient capacity, United States

25  and each state, 1970 to 2014"?

1  A   Yes.

2  Q   And your report states that there were 25 states with a

3  higher rate of inpatient psychiatric beds than Mississippi.  Is

4  that right?

5  A   If I might, we covered this at my deposition, and we agreed

6  that I had made an error.

7  Q   So let's look at the page -- page 42 of this report, just

8  to get to the correct number.  So in Figure 7 here, which

9  identifies psychiatric inpatient beds per 100,000 as a state

10 population, Mississippi is identified in blue.  Is that

11 correct?

12 A   I'm sorry.  I was looking at this.  That's correct.

13 Q   And blue indicates that it has the highest rate of

14 psychiatric inpatient beds, when looking across the country,

15 that Mississippi has between 42 and 94 beds per 100,000 in the

16 population?

17 A   What I stated is not correct.

18 Q   Can you state it?

19 A   Sure.  You said that Mississippi had the highest rate.

20 That's not what that table shows.  It shows that Mississippi is

21 one of 13 states that falls within the highest range.

22 Q   So it's not correct that 25 states have a higher rate of

23 inpatient psychiatric beds?

24 A   That's the same point we established at my deposition, that

25 I had made an error in that sentence.

1  Q   So it should be five states, I believe, is what we agreed

2  at your deposition?

3  A   I'd have to look at the table that you referred me to.

4  Q   I believe the table is on the next page of this document.

5  Maybe it's on the previous page.  So inpatient beds appear on

6  the far right.  Mississippi, according to this table --

7       THE COURT:  Are you looking at page 39 of the

8  report -- I mean, 41?

9       MS FOX:  Forty-one, using the numbering on the bottom

10 right.  Thank you, Your Honor.

11 BY MS FOX:

12 Q   So Mississippi here is listed as having 55.4 inpatient beds

13 per 100,000?

14 A   Correct.

15 Q   Do you see?

16 A   It looks like approximately five.  However, to answer your

17 question, I did make an error, but it depends upon how NASMPD

18 is counting psychiatric beds.

19 Q   In this report --

20 A   If I could finish.  Because if the inpatient beds at a

21 state hospital include all the beds at Mississippi State

22 Hospital as state hospital beds, that's not comparing what most

23 state hospitals would refer to as state hospital beds.  And we

24 have to know that.

25 Q   This is psychiatric beds total.  Correct?  The title

1   doesn't refer specifically to state hospital beds, if you look

2   at the title for the table here?

3   A   Yes, I understand that.

4   Q   Okay.  So there are approximately five states, based on

5   your count right now, who have the same or higher rate of

6   inpatient psychiatric beds in the country, according to this

7   report?

8   A   Total inpatient bed, yes.

9   Q   Now I'd like to turn to page 12 of your report.  In the

10   section that begins "FL3 and 15," there you indicated that

11   "DOJ's assessment of Mississippi's mental health spending has

12   no relationship to facts."  And you reported that Mississippi

13   was spending 19 percent of its mental health dollars on state

14   hospitals and 80 percent on the community.  Do you see that?

15   A   I do.

16   Q   And you list a reference there, another NASMPD report.  Is

17   that right?

18   A   I'm willing to assuming that that's the source, but I'm not

19   sure that's the source.

20        MS FOX:  May I approach, Your Honor?

21        THE COURT:  Yes, you may.

22   BY MS FOX:

23   Q   I've just given you a document marked PX-393, a NASMPD

24   report on expenditures.  Do you see that?

25   A   I do.

1      THE COURT:  You gave him PX-395.  Right?

2      MS FOX:  I'm sorry.  Yes, PX-395.  We just looked at

3  393.

4  BY MS FOX:

5  Q   Now we're on PX-395, which is the NASMPD report on

6  expenditures.  If we could look at page 15 of this report.

7  This includes a table of state mental health agency controlled

8  expenditures.  Is that right?

9  A   Yes.

10 Q   And if you look there at the section beginning MS, which

11 stands for Mississippi --

12 A   Yes.

13 Q   -- the percentage of state -- of budget that is listed as

14 going to the state psychiatric hospitals is 77 percent.  Is

15 that correct?

16 A   Yes.

17 Q   And the percentage going to community-based programs is

18 listed as 21 percent.  Is that right?

19 A   That's what this table says.

20 Q   And if you look above it, to Michigan, which is MI on this

21 table, it indicates that the proportion of the Michigan budget

22 that was going to state psychiatric hospitals was 19 percent.

23 Is that correct?

24 A   Yes.

25 Q   And the community-based programs was 80 percent?

1    A    That's what this table says.

2    Q    And this table was the basis for the source for your

3    report.  Correct?

4    A    That, I'm not sure of.

5    Q    When we looked at this table at your deposition, did you

6    indicate that you thought this was the source?

7    A    I don't recall.

8    Q    Does the number -- do the numbers following MI from

9    Michigan in this report align with the numbers in your report

10   assigned to Mississippi?

11   A    They do.

12   Q    And this is a NASMPD report on expenditures for the same

13   time period you're describing in your report.  Correct?

14   A    That's correct.

15   Q    And then you base conclusions in your report as to how well

16   Mississippi was doing in its spending of community versus -- in

17   its allocation of spending on community versus state hospitals

18   on this data that you included in your report where you stated

19   that it was spending 80 percent of its budget on the community.

20   Correct?

21   A    No.

22   Q    Let's look at page 27 of your report which you discussed

23   with Mr. Shelson.  In the middle of the page, where it says,

24   "Mississippi does not have a disproportionate share of its

25   state funding going to state hospitals," was this conclusion

1  based on the incorrect data about allocation of spending in

2  Mississippi?

3  A  That's only one of the data sources.

4  Q  Can you identify any other data sources?

5  A  Not without reading my report.

6  Q  Would you like to look at the references section of your

7  report which would list the other sources?  I believe it starts

8  at page 178.

9  A  I can look at that, but I don't think that's going to

10  answer the question either without me looking at the data

11  sources.

12  Q  And if we could go back to your deposition at page 152.

13        MS FOX:  May I approach, Your Honor?

14        THE COURT:  Yes, you may.

15  BY MS FOX:

16  Q  At your deposition, we looked at this document, assessment

17  number 10, "Expenditures, a NASMPD publication, which at the

18  time was marked as 1107, and I asked you if you recognized the

19  document and you said, "Yes."

20    "Question:  I think this is always cited in your report.

21    "Answer:  Yes.

22    Then we began talking about the answers, the information on

23  page 14.  At that time, did you indicate "This is not the

24  source of the data in my report"?

25  A  I'm sorry.  Could you state that last again.

1    Q    At your deposition, when I asked you some questions about

2    this document, the expenditures document, and we looked

3    specifically at the page of your report that we're discussing

4    now, did you indicate that this was not the source of the data

5    in your report?

6    A    I don't think there's an indication one way or the other.

7    Q    So you didn't, at the time, say "This is not where I got

8    this data"?

9    A    I didn't say that.  It didn't say this is where I got the

10   data.

11   Q    Moving on to another area of data in your report, you

12   mentioned -- excuse me, you used some examples related to

13   individuals in the forensic populations at the state hospitals

14   in your report.  Is that correct?

15   A    That's correct.

16   Q    And you understood that the forensic population was outside

17   the scope of this litigation.  Correct?

18   A    That's correct.

19   Q    Your report on page 19, in the last paragraph, disputed the

20   United States' assertion that people typically prefer to live

21   in the community, and you responded "Not so."  And then you

22   highlighted one person in your report there, and that -- as a

23   person who wanted to stay in the hospital, and that was a

24   forensic patient.  Is that correct?

25   A    That's correct.

1  Q   And then you also highlighted individuals having long

2  lengths of stay, on pages 18 and 19 of your report.  Those

3  individuals were also forensic individuals?

4  A   I'm sorry.  Where are you looking on that page?

5  Q   The bottom of 18 and the top of 19, where it begins "LC"

6  and then it continues "JB."

7  A   Yes, they were.

8  Q   And were you aware that the individuals you highlighted in

9  your report weren't included in the list of 3,951 state

10  hospital patients provided by the State from which the United

11  States' clinical review sample was drawn?

12  A   I'm not sure that I did.

13  Q   I'd like to turn now to some of your general conclusions

14  about mental health care in this country.  In your view,

15  community-based services can support people with mental illness

16  in staying out of state hospitals.  Correct?

17  A   Yes.

18  Q   And relationships with community providers are key in

19  helping people stay out of the state hospitals?

20  A   Yes.

21  Q   I think you indicated earlier in your testimony that the

22  best available data indicates that hospital and community-based

23  services cost about the same, in your view?

24  A   That's the best data that's available.

25  Q   And the substantial majority of people who enter state

1  hospitals are Medicaid-eligible?

2  A   Yes.

3  Q   Sometimes people stay in state hospitals longer than they

4  need to.  Is that correct?

5  A   Yes.

6  Q   And you'd agree that one reason people are unnecessarily

7  remaining in state institutions is because there's no place for

8  them to go?

9  A   Yes.

10  Q   You'd agree that the wait -- that to reduce wait times for

11  state hospitals in Mississippi, one thing the State can do

12  would be to increase the range of community-based services

13  available to individuals in the community?

14  A   Yes.

15  Q   And one way to decrease the need for long-term state

16  hospital beds to identify placements for people who are in the

17  state hospital and ready for transition to the community?

18  A   Yes.

19  Q   So providing housing and wraparound services, like ACT and

20  supported housing, would free up state hospital bed capacity?

21  A   Yes.

22  Q   You would agree that it's possible to offer mobile mental

23  health services to reach people in rural parts of a state?

24  A   Is it possible?  Yes, it's possible.

25  Q   And Medicaid provides transportation for people to enable

1    them to come to appointments.  Is that correct?

2    A    Medicaid does do that, yes.

3    Q    So combining Medicaid transportation and mobile services

4    can address the challenges faced by people who don't have a way

5    to get to an appointment.  Is that correct?

6    A    No.

7    Q    Is that possible?

8    A    Is it possible?

9    Q    Yes.

10   A    Absolutely, it's possible.

11   Q    The data that you reviewed for Mississippi showed that

12   hundreds of people are being readmitted to the state hospitals

13   within a year.  Is that correct?

14   A    I'm sorry.  Once again?

15   Q    The data you reviewed for Mississippi showed that hundreds

16   of people are being readmitted to state hospitals within a

17   year.  Is that correct?

18   A    Yes.

19   Q    You talked with Mr. Shelson about the IMD exclusion.

20   A    I did.

21   Q    Is it your understanding that the IMD exclusion is law in

22   part of the United States Code?

23   A    Yes.

24         MS FOX:  If could I have a moment to confer, Your

25   Honor.

1      THE COURT:  Yes, you may.

2      MS FOX:  No further questions, Your Honor.

3      THE COURT:  All right.  Any redirect of this witness?

4      MR. SHELSON:  No, Your Honor.

5                          EXAMINATION

6      THE COURT:  All right.  Just help me out on one thing.

7  Maybe you can, since you're there.  IMD, tell me what that is

8  again.  IMD.  That's an acronym for something, I assume.

9      THE WITNESS:  Institution for Mental Diseases.

10     THE COURT:  That's the only question I had.  With

11  respect to the exhibits that you talked to with respect to this

12  particular expert, PX-393, I think it was PX-395.

13     MS FOX:  PX-393 is already admitted, Your Honor.

14     THE COURT:  It is.  395 was not.  Did you move to have

15  it admitted?

16     MS FOX:  I hadn't moved to admit it.  I'll move to

17  admit it at this time.

18     THE COURT:  Okay.  Any objection from the State?

19     MR. SHELSON:  No, Your Honor.

20     THE COURT:  Okay.  PX-395 is received in evidence.

21   (Exhibit PX-395 marked)

22     THE COURT:  I do have a couple of questions.  Going

23  back to your curriculum vitae, I see at page 14 of D-304, you

24  served as a monitor, I believe, in 2005 to 2008 in North

25  Carolina for CRIPA?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Did you?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Well, what did that entail?  What was your

5     role?

6          THE WITNESS:  I was actually not an individual

7     monitor.  I was part of a team overseeing the results of a

8     CRIPA case in North Carolina.

9          THE COURT:  Was that a case that the United States was

10    involved in with the State of North Carolina?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Okay.  And what was the general issue?

13         THE WITNESS:  Well, they were the issues about that

14    individuals had a constitutional right to be treated in the

15    least restrictive setting at that point.

16         THE COURT:  Okay.  And let me ask you, in 2008 to

17    2010, it says *Williams v. Quinn, Illinois*, *Olmstead* case.  You

18    served as a consultant or expert in this case?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  And was that on issues similar to what we

21    have here?

22         THE WITNESS:  Yes, although it was the State of

23    Illinois using nursing homes for people with serious mental

24    illness as opposed to state hospitals.

25         THE COURT:  And in 2009 and 2011, it says *Olmstead*

1 case for New York.  Were you an expert or consultant?  In what

2 capacity did you serve?

3           THE WITNESS:  I was an expert for the State of New

4 York.  And this case involved people with serious mental

5 illness in adult homes.

6           THE COURT:  Okay.  That's all the questions I had.

7 Any follow-up based on what I've asked?

8           MR. SHELSON:  No, Your Honor.

9           THE COURT:  From the United States?

10          MS FOX:  No, Your Honor.

11          THE COURT:  All right.  Thank you, Doctor, for your

12 service.  You may return to Massachusetts.

13          THE WITNESS:  Thank you.  I'll be able to breathe

14 again.

15          THE COURT:  Well, drop some money off before you

16 breathe -- before you leave.  I believe that brings us to the

17 end of today's testimony.  Is there any announcement from the

18 State at this point?

19          MR. SHELSON:  Not an announcement, Your Honor, but

20 just one housekeeping thing.  Your Honor may recall from

21 opening statement, there was -- we played brief excerpts from

22 what we called the ISMICC video clips.

23          THE COURT:  I remember ISMICC.  I'm trying to remember

24 the clips now.

25          MR. SHELSON:  Well, it may render what I'm about to do

1  of not great weight, but there are ISMICC clips that we would

2  like to submit to the court on a flash drive as Exhibit D-362.

3  We've provided these clips to the United States and don't

4  believe there's an objection.  And so rather than playing for

5  the court, we'd just like to submit them as an exhibit.

6          THE COURT:  Okay.

7          MR. SHELSON:  And the last thing, Your Honor, before

8  the State rests is that the parties entered into a series of

9  stipulation, some of those are -- well, at least one of them is

10  going to have to be modified, and so the parties are going to

11  do that and I think resubmit it, but I think once that's done,

12  everyone's going to want that to be a part of the record.

13          THE COURT:  Okay.  That will be fine.

14          MR. SHELSON:  Your Honor, may I present Exhibit D-362?

15          THE COURT:  You may.  D-362 will be received into

16  evidence.

17      (Exhibit D-362 marked)

18          MR. SHELSON:  May I confer for just a moment, Your

19  Honor?

20          THE COURT:  Yes, you may.

21          MR. SHELSON:  With that, Your Honor, the State of

22  Mississippi rests.

23          THE COURT:  Okay.  Subject to the submission of the --

24          MR. SHELSON:  Trial stipulations.

25          THE COURT:  Absolutely.  All right.  Thank you.

1          MR. SHELSON:  Thank you, Your Honor.

2          THE COURT:  I turn to the United States, and I'll ask

3    the question that I've asked a couple of times this week:  Does

4    the United States expect to put on any rebuttal?

5          MS. RUSH:  Your Honor, the United States is not

6    putting on live witness rebuttal.  However, we do request to

7    designate rebuttal deposition testimony that we will provide

8    tomorrow, if that pleases the court.

9          THE COURT:  Okay.  Any objection from the State?

10          MR. ANDERSON:  Provide it in which form and what time?

11          MS. RUSH:  We can provide the State, Your Honor, this

12    evening with a copy of our proposed rebuttal deposition

13    designations.

14          MR. ANDERSON:  I was just trying to ascertain my

15    workload for tomorrow, Your Honor.

16          THE COURT:  Okay.  Well, it won't be anything other

17    than reading, I presume.

18          MS. RUSH:  That's right, just reading, and I believe

19    that it's under 100 pages.

20          THE COURT:  Wow.  Tell me.  The CV alone -- okay.  You

21    can -- I just suggest that whatever you're going to submit in

22    rebuttal to the court tomorrow, just be kind enough to give it

23    to the State before you give it to me.

24          MS. RUSH:  Absolutely, Your Honor.  We also just have

25    a few other housekeeping matters.  One, we have an exhibit

1  that's been admitted.  It's PX-412, and that document is --

2  includes three charts.  We had realized that one of the data

3  points on one of the charts is incorrect, and so what we -- we

4  have corrected that, found that error and corrected it.  It's

5  on page 3.  We do not wish to redraw PX-412, which has already

6  been admitted into evidence, because it was used with a

7  witness, but we would like the court to have the corrected

8  version.  So we'd like to move that into evidence as PX-412(a).

9        THE COURT:  Okay.  All right.  Any objection?

10        MR. SHELSON:  No, Your Honor.

11        THE COURT:  All right.  PX-412(a) will be received

12  into evidence.

13      (Exhibit PX-412(a) marked)

14        MS. RUSH:  May I approach, Your Honor.

15        THE COURT:  Yes, may.

16        MS. RUSH:  Specifically, Your Honor, on page 3 of the

17  document, which is the chart regarding number of individuals

18  served in state hospitals, we found an erroneous data point as

19  to East Mississippi State Hospital in fiscal year 2011.  So we

20  have eliminated 2011 from the bar graph.  It's just starting

21  with 2012 now.

22        Your Honor, that's also the subject that Mr. Shelson

23  mentioned about the stipulation.  We will file an amended

24  stipulation on the docket with that.

25        THE COURT:  Okay.

1          MS. RUSH:  Your Honor, we also had promised, I think

2     yesterday, with Mr. Chastain, we had redacted -- we have

3     redacted copies of Exhibits PX-488 and PX-0064.  These are both

4     utilization review committee meeting notes.

5          THE COURT:  Okay.

6          MS. RUSH:  May I approach?

7          THE COURT:  Yes, you may.

8          MS. RUSH:  That's all for the United States.  Thank

9     you, Your Honor.

10          THE COURT:  All right.

11          This brings us to the end of our day, with our next

12     day to begin with everybody in here in their seats and all on

13     Monday.  I can receive the -- I can receive the rebuttal

14     testimony through e-mail, to chambers e-mail, so that you won't

15     even have to come up in here.

16          And so we will begin closing arguments Monday morning

17     at 9 a.m.  Let me make sure.  We'll begin at 9 a.m. Monday

18     morning.  I know yesterday the United States indicated that

19     they could probably do their full argument, open and rebuttal,

20     in an hour.  I've decided to set aside an hour and a half for

21     each side.  You don't have to use it.  I'm pretty sure I will

22     have some questions.  I'm pretty sure I will.  And it might

23     interrupt your flow.  So we'll set aside that time.

24          The morning will be you all.  I've moved all my other

25     stuff for the morning.  And then we will -- we will see you

1    then.  I hope you all have a great rest of the week and a great

2    weekend, and I'll see each of you on Monday morning.  Thank you

3    so much.

4              MR. SHELSON:  Thank you, Your Honor.

5              THE COURT:  Court's adjourned.

6              (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1　　　　　　　　　　CERTIFICATE OF REPORTER

2

3　　　　I, CHERIE GALLASPY BOND, Official Court Reporter, United

4　States District Court, Southern District of Mississippi, do

5　hereby certify that the above and foregoing pages contain a

6　full, true and correct transcript of the proceedings had in the

7　aforenamed case at the time and place indicated, which

8　proceedings were recorded by me to the best of my skill and

9　ability.

10　　　　I certify that the transcript fees and format comply

11　with those prescribed by the Court and Judicial Conference of

12　the United States.

13

14　　　　This the 27th day of June, 2019.

15

16　　　　　　　　s/ *Cherie G. Bond*
　　　　　　　　　　Cherie G. Bond
17　　　　　　　　　Court Reporter

18

19

20

21

22

23

24

25