UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


THE UNITED STATES OF AMERICA                    PLAINTIFF

VS.                          CIVIL NO. 3:16CV00622CWR-FKB

THE STATE OF MISSISSIPPI                        DEFENDANTS


TRIAL TRANSCRIPT
VOLUME 30


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MORNING SESSION
JULY 1, 2019
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186


*** DAILY TRANSCRIPT ***

APPEARANCES:

FOR THE PLAINTIFF:     MR. MATHEW SCHUTZER
                       MS. REGAN RUSH
                       MS. DEENA FOX
                       MS. HALEY VAN EREM
                       MR. JORGE MARTIN CASTILLO
                       MR. PATRICK HOLKINS


FOR THE DEFENDANT:     MR. JAMES W. SHELSON
                       MR. REUBEN V. ANDERSON
                       MR. NASH E. GILMORE

1                    TABLE OF CONTENTS

2

3    CLOSING ARGUMENTS

4    Closing Argument by Mr. Holkins  ....................2450

5    Closing Argument by Mr. Anderson  ...................2477

6    Continued Closing Argument by Mr. Shelson  .........2488

7    Rebuttal Closing Argument by Ms. Rush  .............2515

8    Questions by the Court..............................2525

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  I hope everyone had a great

2     weekend.  I see all the faces are back for this one last day.

3     This will be the last day.  Right?  Okay.  All right.

4          Is there anything we need to take care of before we

5     begin these closing statements -- closing arguments, whatever

6     you want to -- depends on what mood you're in today.

7          MS. RUSH:  I do have a couple of housekeeping matters.

8          THE COURT:  Okay.

9          MS. RUSH:  Your Honor, the United States sent our

10    rebuttal designations by e-mail to chambers on Friday,

11    June 9th -- sorry, 29th, and we'd just like to move those into

12    evidence, along with the three exhibits that were attached to

13    them.  That's PX-201, PX-206 and PX-213.

14         THE COURT:  Any objection from the State?

15         MR. SHELSON:  No, Your Honor.

16         THE COURT:  You said PX-201, PX-206 and PX- --

17         MS. RUSH:  213.

18         THE COURT:  213.  Those will be received into

19    evidence.  And the court did receive the rebuttal designations.

20    For the record, I did receive them.

21         MS. RUSH:  Thank you, Your Honor.  The parties intend

22    to file an amended stipulation either later today or tomorrow,

23    hopefully.  That includes the housing information that we

24    discussed last week.

25         THE COURT:  Okay.

1          MS. RUSH:  The United States will also be providing

2     the court with a disk that includes all of our offer of proof,

3     which includes all of our admitted exhibits and the joint

4     exhibits as well.  We intend to file a motion to seal a number

5     of the exhibits that really are incomprehensible with the

6     redactions.

7          THE COURT:  Okay.  All right.

8          MS. RUSH:  And finally, Your Honor, I just wanted to

9     solidify the date of the posttrial filings.

10          THE COURT:  I was going to tell you that after you got

11     through.  Is that going to have a bearing -- is that going to

12     have a bearing on how you proceed with your closing statement?

13          MS. RUSH:  It does not, Your Honor.  We will not have

14     a team run out of here as soon as you give us that deadline.

15          And, Your Honor, Mr. Holkins will present the closing

16     arguments for the United States.  I will present the rebuttal

17     argument.  Should you have any further questions regarding a

18     potential remedy that we have discussed before during the

19     trial, I will respond to those questions either during

20     Mr. Holkins' argument or during the rebuttal.

21          THE COURT:  Okay.  Thank you so much.

22          MS. RUSH:  Thank you, Your Honor.

23          THE COURT:  And we did -- I know I -- y'all indicated

24     on the front end that you would have an hour.  You requested an

25     hour, but I told you you would get an hour and 30 minutes to

1   incorporate the time that I might ask a question or two.  I'm

2   not suggesting that I will, but just in case.  How would you

3   like to divide your time if it's an hour and a half?

4           MS. RUSH:  Your Honor, we'd like to have an hour for

5   closing, and then the remainder for rebuttal.

6           THE COURT:  And do you want any sort of --

7   Mr. Holkins, would you want any warning before that hour is up?

8           MR. HOLKINS:  That would be great.  Thank you, Your

9   Honor.

10          THE COURT:  At what point?

11          MR. HOLKINS:  Ten minutes.

12          THE COURT:  Ten minutes.  Okay.  All right.  All

13   right.  Anything further?

14          MS. RUSH:  Nothing further.  Thank you.

15          THE COURT:  Mr. Shelson, anything from the State?

16          MR. SHELSON:  No, Your Honor.

17          THE COURT:  And I know you indicated the other day you

18   all will be dividing your time in what way?  I mean how?  One

19   hour for you, 30 minutes -- I mean -- I know the State does not

20   anticipate using all of their time, but --

21          MR. SHELSON:  Mr. Anderson is going first, and

22   whatever he leaves me, Your Honor, I'll deal with.

23          THE COURT:  Okay.

24          MR. SHELSON:  He anticipates 15 minutes, but...

25          THE COURT:  Okay.  All right.

1          MR. SHELSON:  Thank you, Your Honor.  Of course, you

2     may be persuaded by what you hear from the other side, so

3     and -- well, having said that, Mr. Holkins, are you ready?

4          MR. HOLKINS:  Yes, Your Honor.

5          THE COURT:  All right.

6          MR. HOLKINS:  Your Honor, may I approach to share some

7     hard copies of the demonstratives?

8          THE COURT:  Yes, you may.

9          MR. HOLKINS:  May I proceed?

10         THE COURT:  You may.

11              CLOSING ARGUMENT FOR THE PLAINTIFF

12         MR. HOLKINS:  Under Title II of the Americans with

13    Disabilities Act, the State of Mississippi is required to serve

14    adults with serious mental illness in the most integrated

15    setting appropriate to their needs.  The State has failed to

16    fulfill its obligation.  That failure is ongoing, and it is

17    systemic.

18         With alarming frequency and often for prolonged

19    periods, Mississippians languish in locked, segregated state

20    hospitals because the services they need and do not oppose, the

21    services that the State itself admits are effective and should

22    be expanded are scarce or nonexistent in their communities.

23         Their stories reveal the devastating toll of

24    institutionalization.  One man, referred to as person 133 in

25    this litigation, has endured 16 admissions to Mississippi State

1    Hospital in 18 years.  Just 34 years old when we met him, this
2    man has a work history and a supportive family.  He hopes to
3    live on his own one day.  But as you heard from Katherine
4    Burson, one of the United States' clinical experts, person 133
5    has never received the community-based treatment he needs to
6    break the cycle of repeated hospitalization.  In fact, the key
7    service that Ms. Burson determined that he needs and is
8    eligible for, PACT, is not available in his home county.
9         This man could be taking steps toward recovery in his
10   own home.  Instead, he waits for crisis to hit.  Powerless to
11   stop yet another state hospital admission, only to be
12   discharged weeks later for the same lack of appropriate
13   community-based services.
14        Another man, a 59-year-old saxophone player, has been
15   admitted to state hospitals in Mississippi 17 times.  As you
16   heard from Dr. Judith Baldwin, this man, person 91, wants what
17   no state hospital can offer, independence and autonomy.
18        In 2015, during his most recent admission to
19   Mississippi State Hospital, he asked daily about when he could
20   leave.  A month into his stay, clinical staff noted finding no
21   signs of the kind of severe symptoms that would justify his
22   continued commitment.  He remained at MSH for eight more
23   months.  State Hospital staff cited his desire to leave as
24   proof that he needed to stay.
25        Those individuals are far from alone.  The United

1    States clinical review team, led by Dr. Robert Drake, found

2    that 154 randomly selected individuals could have spent less

3    time in state hospitals or avoided them altogether had they

4    received appropriate community-based services.  They are

5    representative of thousands more who too have been

6    unnecessarily institutionalized in Mississippi state hospitals

7    and who are bound by the shared experience of stigma, isolation

8    and loss of autonomy, the very harms the Supreme Court

9    recognized 20 years ago in *Olmstead v. LC.*

10         Your Honor, my argument will focus on three main

11   subjects:  First, the evidence at trial demonstrating that the

12   State has violated and continues to violate the Americans with

13   Disabilities Act.

14         Second, the State's failure to prove its affirmative

15   defense.

16         And third, the unmistakable need for this court's

17   intervention to bring Mississippi into compliance.

18         The United States has shown that Mississippi

19   unnecessarily institutionalizes adults with serious mental

20   illness who are appropriate for treatment in more integrated

21   settings.

22         The United States has shown that those persons, almost

23   without exception, do not oppose community-based treatment.

24         And the United States has shown that by making

25   reasonable modifications to its service system, the State could

1    treat those people in the most integrated setting appropriate

2    to their needs.

3         I will address each element of Title II in turn.

4         Every year, Mississippi admits around 2,800 people to

5    its four state hospitals, which together operate 438 acute

6    psychiatric and continuing treatment beds.  For many, their

7    confinement begins not in a hospital but in jail.

8         In Adams County, as we heard from Sheriff Travis

9    Patton, adults with serious mental illness are routinely held

10   without criminal charge in 8-by-7-foot padded cells.  Mere

11   yards away from a community mental health center office that

12   does not or cannot provide the services necessary to sustain

13   them in their communities, they wait to receive treatment in

14   another segregated setting, the state hospital.

15        With few exceptions, as the evidence shows,

16   Mississippians with serious mental illness could avoid or spend

17   less time in state hospitals if they received the

18   community-based services for which they are eligible.  Drawing

19   on their extensive experience treating similarly situated

20   clients, the United States clinical review experts testified

21   that all of the individuals reviewed were appropriate for and

22   would benefit from community-based services that exist in

23   Mississippi and that are proven to promote recovery and reduce

24   the risk of hospitalization.

25        Quite simply, people who needed those services did not

1   get them, either because the services were not available or

2   because they were not provided. People capable of living and

3   receiving treatment in their homes and communities instead were

4   forced into state hospitals, often repeatedly.

5         The gaps in the state's community-based mental health

6   system are wide and they are deep. Critical services are not

7   available in many areas of Mississippi. PACT, an intensive

8   team-based intervention that the State admits is essentially to

9   keeping adults with serious mental illness out of state

10   hospitals was not offered in 64 of 82 counties as of

11   December 2018.

12         Of the 154 people reviewed, the United States' experts

13   found that 100 needed PACT, but only a lucky few had ever

14   received it. Many of these individuals, including some who

15   were referred for the service by the State's own doctors,

16   cannot access PACT, no matter how dire their need, because it

17   is not available where they live.

18         You heard from Kim Sistrunk, the PACT program leader

19   in Region 3, that some of her clients must move across county

20   lines just for PACT. There are others with the same needs, and

21   the same treatment history in Region 3 and elsewhere for whom

22   that is not an option.

23         Though the demand for PACT is overwhelming, as you

24   heard from Melodie Peet, the state's existing teams are

25   significantly under-enrolled. In September 2018, more than

1   three years after the State set a goal of fully

2   operationalizing PACT, the state's PACT teams could have been

3   serving at least 640 people, but only 384 people were receiving

4   the service.  The State's own data show that more than 700

5   adults with serious mental illness experienced two or more

6   state hospital admissions between 2015 and 2017.  Reacting to

7   that number, Ms. Peet testified that it is puzzling to think

8   about why those individuals haven't been directed to and

9   accepted for service with the ACT programs.  Rather than

10  ramping up referrals to PACT, Mississippi State Hospital

11  recommended fewer people for the service in 2017 than it did in

12  2016.

13          Supported employment, another critical evidence-based

14  intervention, likewise is not available in every region to

15  adults with serious mental illness who can and want to work.

16  Where it is available, only a select few receive it.

17          In fiscal year 2018, 257 adults with serious mental

18  illness got supported employment compared to the 1,266 people

19  that Mississippi would need to serve to be in line with the

20  national average.

21          As Dr. Drake testified, near all the individuals

22  reviewed who needed supported employment were not receiving it.

23  One of them is person 132, 23 years old at the time of his

24  interview.  He has been hospitalized for psychiatric treatment

25  in Mississippi at least five times, including twice in state

1   hospitals.  Katherine Burson found that person 132 could have

2   avoided or spent less time in state hospitals if he had

3   received supported employment and other appropriate

4   community-based treatment that he plainly wants.

5        Through supported employment, as Ms. Burson explained,

6   he would gain a paycheck, but so much more, a sense of purpose,

7   better engagement in treatment, renewed confidence, structure

8   to his day and reduced risk of rehospitalization.  Instead,

9   after multiple state hospital admissions, person 132 is losing

10  his sense of self-agency and is at serious risk of further

11  institutionalization.

12       Other key community-based services that the State

13  purports to offer statewide are not provided with the frequency

14  or intensity needed to prevent hospitalization, indeed if they

15  are provided at all.

16       The evidence at trial, including fact witness

17  testimony, the State's own utilization data and the results of

18  the clinical review reflects deep pockets of service

19  deprivation or underutilization in both urban and rural areas.

20       Mobile crisis, as Ms. Peet wrote, in her expert

21  report, has been an essential anchor of psychiatric emergency

22  systems for over 40 years.

23       In 2012, Mississippi added the service to its Medicaid

24  state plan, which means that it is required under federal law

25  to make that service available with reasonable promptness to

1  eligible individuals statewide.  Years later, mobile crisis

2  remains scarce or nonexistent in some parts of the state.

3  Region 2, in north Mississippi, reported fewer than two mobile

4  crisis contacts for 1,000 residents in 2017, ten times less

5  than Region 8 outside Jackson.

6       Just southwest of Region 8 in Region 11, Sheriff

7  Patton has never seen a mobile crisis team in Adams County,

8  which sends adults with serious mental illness to state

9  hospitals at disproportionately high rates.

10       He testified that when the mobile crisis team in

11  Region 11 gets calls from Adams County, they ask him to

12  dispatch law enforcement officers rather than sending their

13  trained staff.

14       Melody Worsham, a peer support specialist at the

15  Mental Health Association of South Mississippi, told a similar

16  story about calling the mobile crisis team in Gulfport on

17  behalf of clients in need only to be referred to the hospital

18  or to the police.

19       Their testimony aligns with what you heard from the

20  United States clinical review team, which found little evidence

21  that the individuals they reviewed received mobile crisis

22  services leading up to their state hospital admissions.

23       Community support services, another Medicaid

24  reimbursable service in theory offered across the state, is

25  rarely provided with the frequency and intensity needed to

1   prevent hospitalization and that the state's own standards

2   prescribe.  The billing data show that Medicaid enrolled

3   clients received on average between 15 and 17 hours of

4   community support services in all of 2017, a fraction of what

5   existing state Medicaid caps permit.

6          As Ms. Peet testified, fifteen hours of community

7   support services per year is not sufficient to sustain in the

8   community someone who is at serious risk of entering the state

9   hospital.

10          Peer support is another Medicaid billable service that

11   the state is required to make available to Medicaid enrolled

12   individuals statewide with reasonable promptness, yet in the

13   three most populous regions in the state, Regions 8, 12, and

14   13, CMHCs billed Medicaid for the service for fewer than ten

15   voids in 2017.

16          Ms. Worsham testified that there are a lot of places

17   in Mississippi with no peer support at all.  The state's

18   supported housing program, CHOICE, is also meant to operate

19   statewide, but as of January, 2018, three years after the

20   program's inception, there were seven CMHC regions where fewer

21   than five individuals were enrolled in CHOICE.

22          The Mississippi Home Corporation, which administers

23   the program, estimated in 2015 that the state would need at

24   least 2500 supported housing slots to meet the need.  Through

25   June, 2018, the program had served fewer than 350 people total.

1    For many adults with serious mental illness who need these

2    community-based services to avoid hospitalization, the

3    consequence of the state's failure to make full use of its

4    existing service array is unnecessary institutionalization,

5    plain and simple.

6         Nothing you heard from the State contradicts this

7    essential point.  The State's 7 clinical experts opined on the

8    question of whether individuals were appropriate for

9    hospitalization at the time of commitment.  None even

10   considered whether those individuals had received appropriate

11   community-based services leading up to that moment in time,

12   which is the relevant question in this case.

13        For 63 of the 154 individuals in the United States'

14   clinical review, the State's experts disclosed no opinions at

15   all.  It is telling that you did not hear from all of the

16   State's designated experts.

17        One of those experts is Dr. Joe Harris, a psychiatrist

18   at South Mississippi State Hospital, whose deposition testimony

19   has been designated and admitted into evidence.  At his

20   deposition, Dr. Harris testified that as many as half of the

21   people at SMSH did not need to be there.  He testified about

22   wanting to conduct an informal study to determine which

23   patients at SMSH were being hospitalized unnecessarily, but

24   stood down due to his colleagues' concerns about how it might

25   affect their jobs.

1        Once admitted to Mississippi State Hospitals, adults

2  with serious mental illness lived and received treatment in

3  locked segregated units for weeks and months, often long after

4  the symptoms that contributed to their admission had faded.  As

5  Dr. Drake wrote in his expert report, absent a forensic

6  commitment, very few people need to stay in state hospitals for

7  months at a time.

8        In Mississippi state hospital stays of six months or

9  longer are not an uncommon occurrence.  There were more than

10  350 such stays between 2015 and 2017.  During that same period,

11  another 850 state hospital stays lasted between two and six

12  months.  For some people, the months have become years, and the

13  years have become decades.

14        Person 19, a 65-year-old woman from Washington County,

15  has spent the majority of her adult life in Mississippi State

16  Hospital.  As Dr. Bell-Shambley wrote in her expert report,

17  with appropriate services, she could have spent less time in a

18  state hospital.  Even now, after more than 30 years at MSH, she

19  could return to her community and to her six children with the

20  right supports.  As Dr. Carol VanderZwaag put it, that is time

21  she can't get back.

22        Person 25 also has spent more than a decade in

23  Mississippi State Hospitals.  You heard from HB, person 25's

24  father, who fought for years so that she could access the

25  community-based treatment she is entitled to and for which she

1    is manifestly appropriate.  In September 2018, she finally was

2    discharged to the community.  By the State's own recounting,

3    she is now on the road to recovery.

4          There are others in Mississippi State Hospital, who,

5    like person 25, could be living in more integrated settings,

6    but they never get the chance because the state does not make

7    the needed services available.  That is not just a policy

8    failure.  It is a civil rights violation.

9          Sometimes, within a matter of weeks, people who are

10   discharged from state hospitals find themselves at serious risk

11   of reinstitutionalization, not only because of the paucity of

12   community-based services, but also because state hospital staff

13   failed to properly plan for and coordinate their transition.

14         The State acknowledges that effective discharge

15   planning, including coordination with family members and

16   community service providers, is essential to ensure that

17   clients connect to the services they need to avoid another

18   hospitalization.  But as you heard from the United States'

19   clinical review team, many people discharged from state

20   hospitals in Mississippi never make those critical connections,

21   even after repeated hospitalizations.  With little more than a

22   small supply of medication, if they get any at all, and

23   instructions to attend a follow-up appointment at their local

24   CMHC up to two weeks later, they return to their communities

25   and wait for the next crisis.

1    You heard about person 3 from Dr. Bell-Shambley.  He

2  is a 25-year old job corps graduate from Lowndes County.  He

3  likes to play basketball and once worked as a mechanic with his

4  father.  Between 2014 and 2016, he was admitted to East

5  Mississippi State Hospital three times, totaling nearly 11

6  months.  Based on his severe symptoms and history of

7  hospitalization, Dr. Bell-Shambley recommended person 3 for

8  PACT, a service he has never received and that is not available

9  in Lowndes County.  There are other less intensive services

10  offered through Region 7, CMHC that could have helped to

11  sustain him in the community, but he never got those either.

12    How does a young man like person 3, well-known to the

13  state after repeated hospitalizations, still fall through the

14  gaping holes in Mississippi's service system?

15  Dr. Bell-Shambley showed you how.

16    These are person 3's discharge recommendations for

17  each of his East Mississippi State Hospital admissions.  In all

18  material respects, they are identical.  State hospital staff

19  discharged person 3 to his family's home, told him to abstain

20  from drugs and alcohol, and encouraged him to attend a

21  follow-up appointment at the local mental health center.

22    Sheila Newbaker, the social services director for East

23  Mississippi State Hospital, testified in her deposition that

24  state hospitals have a responsibility not to set their patients

25  up for failure in the community.  But that is exactly what

1    happened to person 3.  After his second admission, rather than

2    proactively engaging him in intensive treatment and preparing

3    his family and community service providers to support his

4    transition, state hospital staff discharged him with an

5    appointment card and a guarded prognosis, somehow expecting a

6    different result.

7            When Dr. Bell-Shambley interviewed person 3, he was in

8    an acutely psychotic state, receiving no treatment and at the

9    mercy of his hallucinations.  His mother and father have tried,

10   without success, to access services for him in their community.

11   They told Dr. Bell-Shambley that they had nowhere left to turn.

12           Of the 122 people living in community settings at the

13   time of the clinical review, the United States' experts founds

14   that 103 were at serious risk of further institutionalization

15   because they were not receiving the services and supports they

16   need.  That corresponds to more than 85 percent of adults with

17   serious mental illness who received services in Mississippi

18   State hospitals over a two-year period.

19           Turning to the second element of a Title II violation,

20   the United States has shown that adults with serious mental

21   illness who are unnecessarily institutionalized in Mississippi

22   state hospitals do not oppose community-based services.  In

23   fact, most strongly prefer receiving services in the community

24   to institution-based care.

25           When forced to undergo treatment in locked, segregated

1   state hospitals, as Ms. Peet wrote in her report, people with

2   serious mental illness suffer profound harm.  At Mississippi

3   state hospitals, patients live in close quarters with other

4   individuals with disabilities.  Almost all aspects of daily

5   life are tightly controlled.  Meals, snacks, sleeping, waking,

6   TV watching and recreational activities are conducted according

7   to schedules that the hospitals create and impose unit-wide.

8   State hospital patients cannot choose that own roommates and

9   are permitted to receive visitors only at designated times, if

10   at all.  State hospital staff take patients' weddings rings on

11   admission, and patients can only earn them back through

12   compliance.

13       Dr. Bell-Shambley, who spent more than 30 years

14   working in or overseeing state-run psychiatric facilities,

15   testified that she has never met anyone who made an informed

16   choice to live in a hospital when other appropriate settings

17   were available.  It is not difficult to imagine why.

18       Individuals in the review population compared being in

19   the state hospital to jail.  They described feeling isolated

20   from their communities, friends, family and other social

21   connections during their state hospital stays.  You heard from

22   CR that her cousin, TM, during one of his state hospital

23   admissions, wrote to his mother, "I'm not sure when or if I'll

24   ever see you again."

25       One individual in the review, person 11, lost custody

1 of her children while in the state hospital.  Another, person

2 48, never made it out.  She died at the age of 43 during her

3 tenth admission to East Mississippi State Hospital.

4        Of the 150 sample participants alive at the time of

5 the review, the clinical review team found that all but one did

6 not oppose receiving community-based services.  Those who were

7 living in the community had no interest in returning to a state

8 hospital.  Many who were in the state hospital were desperate

9 to get out.

10        As Dr. VanderZwaag explained, "It is no life to be in

11 a hospital.  I mean, it is being alive, but that's different

12 than having a life."

13        Turning to the third element, the United States has

14 shown the state can reasonably modify its service system to

15 treat Mississippians with mental illness in the most integrated

16 setting appropriate to their needs.

17        As you heard from Ms. Peet, the services needed to

18 support adults with serious mental illness in their communities

19 already exist in patchwork fashion across Mississippi.  In

20 fact, some key services are on the state's Medicaid plan, which

21 means that the state must ensure their availability statewide

22 to Medicaid eligible individuals.  Extending existing services

23 to people who are confined in and cycling through the state

24 hospitals unnecessarily is a reasonable modification.

25        As Ms. Peet wrote in her expert report, "The cost to

1   the state of providing even the maximum allowed amount of the

2   most intensive community-based service to a Medicaid-eligible

3   individual for an entire year is less than what the state

4   spends on average on a single state hospital stay.  That is

5   because Mississippi receives the highest federal Medicaid match

6   in the country, more than 75 cents for every dollar spent on

7   community-based services for Medicaid enrolled individuals."

8          Kevin O'Brien, the United States' cost expert,

9   testified that on average, it is cheaper to provide

10  community-based services rather than treat people in state

11  hospitals.  Both state experts who opined on this subject

12  admitted that the cost of community-based care is comparable to

13  that of institution-based care.  However, the state cannot

14  fully leverage the vast resources available unless its

15  providers bill Medicaid wherever possible.  As Ms. Peet

16  explained, that is not happening in Mississippi.  Medicaid

17  resources are underutilized systemwide, leading to overreliance

18  on DMH grant dollars that could be used to expand services to

19  other regions.

20          Without having to expand Medicaid under the Affordable

21  Care Act, the state could increase access to community-based

22  mental health services by encouraging or requiring providers to

23  maximize Medicaid reimbursements and enroll all eligible

24  individuals in Medicaid.

25          You heard from Diana Mikula about a recent memorandum

1  of understanding between DMH and the state's Division of

2  Medicaid, but nothing about what impact, if any, that agreement

3  has had on Medicaid enrollment in Mississippi.

4      There are other federal funding services available to

5  the state to help fill the gaps in its adult mental health

6  service system.  Since at least 2016, the state has known that

7  it could expand supported employment services statewide by

8  implementing a federally funded 1915(i) Medicaid program, just

9  as it did for adults with intellectual and developmental

10  disabilities in Mississippi.

11      As of December, 2018, the state still had not taken

12  that step.  The process of actually making the necessary

13  modifications to its service system is not, as the State seems

14  to argue, an unsolvable mystery.

15      In her testimony, Ms. Peet laid out a road map for how

16  the state could fill the gaps in its community-based service

17  system so that state hospitals are used only as a last resort,

18  a goal that the state purports to share but has proven its

19  incapable of achieving without judicial intervention.

20      Step 1:  Develop baseline capacity in each CMHC

21  catchment area for the key community-based services, for PACT

22  and crisis stabilization services.  For example, that would

23  require at least one PACT team and one CSU of varying size in

24  each MSH region.  For mobile crisis and community support

25  services.  That means actually providing the services as they

1    are described in DMH's standards to people who need them to get

2    out and stay out of state hospitals.

3         Step 2 in Ms. Peet's road map:  Use data to identify

4    heavy utilizers of state hospitals and determine where to

5    target additional service capacity.

6         As you heard from Ms. Peet, between October 2015 and

7    October 2017, 30 percent of patients accounted for over

8    70 percent of total state hospital bed days.  These

9    approximately 1200 individuals were the heaviest utilizers of

10   the state hospitals.

11        During that same time frame, as noted, the data show

12   that over 700 people were admitted to state hospitals more than

13   once, a key demographic for PACT and other intensive

14   community-based services.  You heard no evidence from the State

15   that it had ever undertaken any meaningful effort to identify

16   these individuals and use the data to guide service

17   development.

18        Step 3:  Actively monitor community-based service

19   utilization and indicators of need so that at every point in

20   the system's development, the state knows where to add

21   services.

22        Finally, Step 4:  Provide meaningful oversight to

23   service providers throughout the system to ensure, among other

24   things, that the services available are actually received.

25   More than money, service providers need technical assistance,

1  support and to be held accountable.  That is DMH's role.

2  Steven Allen, deputy director of DMH, testified that oversight

3  is a strong word.  But as you heard from Melody Peet, that is a

4  key responsibility and function of the State Mental Health

5  Authority.

6       Your Honor, the State has failed to demonstrate that

7  the reasonable modifications the United States seeks in this

8  case, modifications that are in line with Mississippi's stated

9  goals would fundamentally alter its service system.  To prove

10  this defense, the State must first show that it has implemented

11  a comprehensive and effectively working plan to serve adults

12  with serious mental illness in their communities.  No plan

13  exists in Mississippi, let alone one that is comprehensive and

14  effectively working.  No version of the State's inconsistent

15  testimony on this issue shows otherwise.

16       Mr. Allen testified in his deposition that he has

17  never seen the state's *Olmstead* plan.  He testified at trial

18  that a formal plan would be useless.  By contrast, executive

19  director Diana Mikula testified that a collection of strategic

20  planning documents, including the 2001 Mississippi Access to

21  Care Plan, constitute the state's *Olmstead* plan.  But those

22  documents lack essential ingredients.  They do not include

23  specific measurable goals strategically tailored to make a

24  significant impact in the lives of individuals with

25  disabilities across the state, nor do they explain the

1  rationale for the metrics used and how those metrics will

2  reduce institutionalization over time.

3      What limited data the state collects, it does not use

4  to identify gaps in the community-based service system, target

5  services to the people who need them most, maximized use of

6  existing Medicaid resources and reduced reliance on state

7  grants.

8      Most importantly, to the extent that the state has a

9  plan, there is no evidence that the plan is working.

10  Mississippi is segregating roughly the same number of adults

11  with serious mental illness in state hospitals as it did five

12  years ago.  The full continuum of community-based care the

13  state claims to offer is, in fact, a poorly assembled

14  patchwork.  Even at capacity, it falls well short of the system

15  baseline, let alone the finish line.

16      Nearly ten years after the Department of Justice

17  opened an investigation into Mississippi's Adult Mental Health

18  Service System, the state is nowhere close to where it needs to

19  be.  Access to critical services and supports is still decided

20  by the luck of the draw.

21      The state's current strategic plan does not even get

22  to Mississippi to step one in Ms. Peet's road map.  PACT and

23  supported employment, still rare commodities in Mississippi,

24  must be expanded statewide.  The state has no plan for how it

25  will accomplish that.  Its target of increasing PACT enrollment

1    by 25 percent would not even bring the existing teams to full

2    capacity.

3            On supported employment, its goal is to serve just 75

4    more people.  On peer support, the state's plan is simply to

5    increase the number of service providers, but it sets forth no

6    metrics for assessing where and how often peer support services

7    are actually received, let alone their effectiveness.

8            On mobile crisis, the state collects data on the total

9    number of contacts but not the data it would need to monitor

10   whether the services are being provided in every county in a

11   manner consistent with DMH's standards.

12           On CHOICE, the state's goal is to increase enrollment.

13   By what number and by what means, it has not said.  Across the

14   board, the state has failed to meet the baseline need for the

15   community-based services that Mississippi needs, as estimated

16   not only by Ms. Peet, but also by the State's own expert based

17   on national average.

18           Your Honor, the United States has met its burden of

19   proof.  The State is unnecessarily segregating adults with

20   serious mental illness who are appropriate for and do not

21   oppose receiving services in more integrated settings.

22   Providing that treatment is a reasonable modification of

23   Mississippi's existing service system, and the State has failed

24   to prove otherwise.  Based on that showing, the court should

25   find that the state is violating the ADA.

1       The State would have us believe that because the

2  people admitted to state hospitals typically are court

3  committed, it is powerless to prevent their admissions, and

4  therefore should escape liability.  The State is wrong on the

5  facts and wrong on the law.

6       As Mr. Byrne wrote in his expert report and as he

7  explained in this court, for most individuals with mental

8  illness whose symptoms are worsening, there are multiple

9  opportunities for community-based services to rapidly react and

10  intensify services and stabilize.  For the 35 people he

11  reviewed, Mr. Byrne wrote, the necessary services were not

12  available, and those opportunities were lost.  These people

13  were admitted to the state hospitals because of those lost

14  opportunities.

15       Under the ADA, the state, through its component

16  agencies, is responsible for those lost opportunities.  It

17  funds, plans, regulates and administers Mississippi's public

18  mental health system, including the state hospitals and the

19  community mental health centers.  The manner in which it does

20  so results in thousands of unnecessary state hospital

21  admissions, a systemic civil rights violation for which the

22  state must be held accountable.

23       Your Honor, the state will not fix this problem on its

24  own.  The state's public commitment to ensuring that all

25  Mississippians have equal access to quality mental health care

1  services and supports is belied by more than a decade of

2  incrementalism and bureaucratic inertia.  Instead of the bold

3  and challenging transformation that the state promised in DMH's

4  initial strategic plan in 2009, it has delivered modest

5  scattered changes that in the end leave many people exactly

6  where they started, without the community-based services they

7  need to avoid hospitalization.

8       Ms. Worsham, the peer support specialist from south

9  Mississippi, said it best.  Testifying about DMH, she

10 explained, It's like they stop right at the point to do the

11 very thing that actually would make a difference.  They stop.

12 So there is a lot of talk, there is a lot of the planning, but

13 there is also a lot of people being hurt in the process.  And

14 it's frustrating because they are not enforcing their own

15 policies on the provider level.

16      The State asked for more time to finish a job that it

17 has only begun and that it has no reasonable prospect of

18 completing without a court order.  The clock started not in

19 2010, when Mississippi launch its first PACT team, or in 2014,

20 when Diana Mikula became executive director of DMH, but in

21 1999, with the Supreme Court's decision in *Olmstead*.  Two years

22 later, the state acknowledged its obligation to create an

23 individualized service and support system that enables

24 individuals with disabilities to live and work in the most

25 integrated setting of their choice.

1    Fast forward to 2008, when the peer committee issued a

2    report concluding that DMH had not aggressively sought plans

3    for reallocation of resources, allowing the development of

4    community-oriented programs to fall behind.

5    In 2010, as you heard from Angela Ladner, the

6    Mississippi Psychiatric Association entered the fray, imploring

7    DMH to expand critical community-based services like PACT

8    statewide.

9    In 2013, two years after the Department of Justice

10   released the findings of its investigation, the strategic

11   planning and best practices committee issued its own report,

12   recommending that the state make PACT and supported employment

13   core services, and in doing so, require CMHCs to offer them.

14   As you heard from Jake Hutchins and Diana Mikula, the

15   state has not acted on that recommendation.  For the next year,

16   in an effort to identify solutions and avoid litigation, the

17   state brought in the Technical Assistance Collaborative which,

18   like others before it, proposed changes to Mississippi's

19   service system, to help adults with serious mental illness stay

20   in their communities and out of the state hospitals.

21   The 2015 draft TAC report was never finalized and its

22   recommendation never fully implemented.

23   In August 2016, after years of stalled negotiations,

24   the United States filed this lawsuit seeking to vindicate the

25   rights of thousands of Mississippians.  Today, two decades

1    after the Supreme Court observed that unnecessary

2    institutionalization perpetuates unwarranted assumptions about

3    persons with disabilities, the state asked for more time.  But

4    the state has no plan, let alone an effectively working one,

5    for how it will use that additional time to bring its system

6    into compliance.

7          In the meantime, thousands of Mississippians and their

8    families continue to bear the terrible burden of the state's

9    discriminatory overreliance on institutional care.

10         In closing, Your Honor, I would like to revisit the

11   testimony of Robert Blair Duren.  In 2017, as you heard, Mr.

12   Duren was admitted to a state hospital three times within a

13   six-month period.  His life changed when he fully connected to

14   PACT, a service that happens to be available in Lee County

15   where Mr. Duren resides.  He has not been back to a state

16   hospital since.  Instead, he is living on his own and working

17   toward his recovery goals:  A GED, a driver's license, greater

18   independence and meaningful relationships.  He still

19   experiences symptoms of his mental illness, but now he has the

20   services and supports he needs to manage those symptoms in the

21   community.

22         In his own words, Mr. Duren described how PACT and

23   supported housing saved him from homelessness:  "Kim Sistrunk

24   and a couple of other ladies and men worked their butts off

25   just so I could get me my own apartment, and that's something

1    to be truly grateful for."  Beyond that, PACT has given Mr.

2    Duren something he did not have before, hope for the future.

3         All around the state, there are people just like him.

4    They have names, though we cannot say them here.  Their

5    stories, all intersecting at the point of needless

6    institutionalization, are still being written.  Mr. Duren

7    agreed to testify, at considerable risk to his own health and

8    recovery, so that they too might have access to the

9    community-based services for which they are appropriate, so

10   that they too might have hope for the future.

11        Your Honor, we ask that this court deliver on the

12   essential promise of *Olmstead* for these Mississippians, the

13   right to live and receive services in their communities to the

14   fullest extent possible.  They have waited far too long.  Thank

15   you.

16        THE COURT:  Thank you, Mr. Holkins.  We're going to

17   take a break for the court reporter.  You did fine with

18   diction, volume, and everything is perfect, I think.  For me,

19   it was.  But we're going to take a ten-minute break.

20        I'll let the government know, Mr. Holkins only used 45

21   minutes.  All right.  Thank you.  And when we return

22   Mr. Shelson, Mr. Anderson, you all can proceed in whichever way

23   you choose.

24        MR. SHELSON:  Thank you, Your Honor.

25        THE COURT:  All right.  Ten-minute recess.

1    (Recess)

2         THE COURT:  Is the State ready to proceed?

3         MR. ANDERSON:  Yes, Your Honor.

4         THE COURT:  All right.

5              CLOSING ARGUMENT FOR THE DEFENDANT

6         MR. ANDERSON:  For the record, Your Honor I'm Reuben

7    Anderson.  I represent the State of Mississippi.

8         In this cause number, Your Honor, No. 622-CWR, the

9    United States of America versus the State of Mississippi, the

10   richest and most powerful nation in history versus the State of

11   Mississippi, the evidence in this case has established that

12   Mississippi is the poorest, least educated and the most

13   unhealthiest state in our nation.  We have less than 3 million

14   people, and this state is 79 percent rural.

15        The United States of America has turned lose 21 young

16   and brilliant lawyers.  They have taken 49 depositions of the

17   defendants and their witnesses, and they've introduced 1,156

18   exhibits into evidence.  They have taken thousands of

19   documents, e-mails and minutes of all of the actions of the

20   Mississippi Department of Mental Health.

21        This seasoned lawyer has never seen the technology

22   that's been on display in this courtroom.  Instantaneous

23   transcripts, the ability to flash an exhibit up on the screen

24   in an instant.  You'll notice too, Your Honor, that the State

25   of Mississippi can't do that.  We are left with this Elmo

1 device, and I don't know how to operate it.  They've brought

2 technicians from far away to operate these devices.

3 　　　　But what I would say to Your Honor, on its surface, on

4 its face, this looks like an unfair legal struggle, but it's

5 not.  It's not because Mississippi is right.  In this cause,

6 622-CWR, the State of Mississippi is right.  Mississippi was

7 wrong last week, Your Honor, or two weeks ago.

8 　　　　And can I have this baby lawyer as my technical

9 assistant?

10 　　　　THE COURT:  Yes, you may.

11 　　　　MR. ANDERSON:  This is the *Flowers* case, Your Honor.

12 Ten days or so ago, the Mississippi -- the United States

13 Supreme Court told Mississippi that you can't discriminate

14 against black people in the selection of juries.  And

15 Mississippi was wrong.  And Mississippi will be wrong again,

16 Your Honor.  But in this case, they're right.

17 　　　　I would ask that Your Honor take judicial notice of a

18 case that I'm sure you've read in your legal career, Your

19 Honor, *Beatrice Alexander v. Holmes County*.  I only cite this

20 case, Your Honor, to show that Mississippi has been wrong.  We

21 were wrong when we had slavery.  We were wrong when we had

22 segregation.  But Mississippi is not the only person, the only

23 entity that can be wrong.

24 　　　　*Alexander versus Holmes* describes how the United

25 States of America, the Department of Justice, the Civil Rights

1   Division can be wrong.

2           In 1969, the State of Mississippi told the U.S.

3   Supreme Court that they wanted to keep their schools

4   segregated.  Standing next to the State of Mississippi in 1969

5   was the United States of America, the Department of Justice,

6   and the Civil Rights Division, asking the Supreme Court of the

7   United States to continue segregation in Mississippi.

8           I was in that courtroom in 1969, when A. F. Sumner,

9   John Satterfield, and Jeris Leonard argued veraciously for

10  segregation.  I can remember that from 50 years ago because

11  Beatrice Alexander was my client.  And when the United States

12  of America, the Department of Justice and the Civil Rights

13  Division tell your client that they're in favor of segregation,

14  you don't have a tendency to forget that.  So, Mississippi can

15  be wrong, America can be wrong.  But today in this case,

16  622-CWR, Mississippi is right.

17          This case commenced on June 4th.  We've called many a

18  witness.  I told Your Honor about how many exhibits have been

19  displayed on these various machines, but the case turns on what

20  the United States of America, Department of Justice, Civil

21  Right Division told Your Honor on May 29th.  And I'm going to

22  put it on this screen on this Elmo where you can see that, Your

23  Honor.

24          Mississippi has recognized that crisis services, PACT,

25  community support services, supported housing, supported

1  employment and peer support reduces reliance on state

2  hospitals.  Then the United States tells Your Honor the state

3  has provided these services, but not enough, not enough of each

4  to meet the needs of people with serious mental illness

5  throughout the state.

6        I've underlined, but not enough.  That's not a theory

7  that I've ever crossed over in my 52 years as a lawyer.  I

8  don't see any citations behind what enough is.  Is there any

9  jurisprudence anywhere that describes enough?  I would say to

10 Your Honor that that is no standard in law, fact or anything

11 else about enough.

12       I would ask Your Honor, would it be enough to put one

13 black juror in the pool when Mr. Flowers' case comes back up

14 for trial?  Would it be enough 50 years ago if the United

15 States and the Mississippi said, Why don't we put two black

16 kids in the public schools in Mississippi?  Would that have

17 been enough Your Honor?  I don't know.  I don't know what

18 enough is.  Would it be enough, Your Honor, to put a PACT team

19 and community-based services in Issaquena County?  Today,

20 Issaquena County has a total of 1401 people in that county.  Is

21 it enough that the State of Mississippi reached out and

22 provided services to seriously mentally ill Mississippians and

23 delivered help to 26,322 citizens?  Was that enough?

24       Is there any legal standard that enough is?  I can

25 tell Your Honor what enough is not.  It's not enough when we

1  can't send psychiatrists and nurses to our rural counties to

2  treat people with serious mental illnesses.  That's not enough.

3  It's not enough, Your Honor, when we can't pay the people who

4  take care of seriously ill mental patients.  We pay them

5  $17,500 a year, and they go to work every day with the

6  possibility of being punched in the face, kicked, and spit on.

7  17,500 is not enough.

8        My assistant's going to put on the screen here, Your

9  Honor, a statement by the man who directed this great

10 assessment that the United States of America is relying on.

11 He's a real expert, 600 books and articles, $300 million in

12 grants.  And this is what he said about states like

13 Mississippi.  "Because of smaller number of patients served,

14 rural area case management teams, especially a smaller, they

15 have less frequent meetings, have less crisis coverage than

16 their urban counterparts, social isolation, poverty, social

17 stigma and the lack of qualified mental health workers have all

18 been reported as particularly significant barriers in rural

19 areas.  In addition, rural patients may differ diagnostically

20 from urban patients."

21       This United States expert, who's written 600 books and

22 articles, know that Mississippi is different from Massachusetts

23 and Connecticut and New York.  Our challenges are different.

24       Our last day was last Thursday, Your Honor.  And it

25 was around 3:15 when our last witness was on the stand, and he

1  was our expert, and his name was Jeffrey Galliger.  And this is

2  how he described enough.  He told Your Honor that "The United

3  States Department of Justice is asking Mississippi to do

4  something that no other state has every accomplished, and I

5  don't see how that establishes what is reasonable or

6  expectable."  He recognizes that Mississippi's history is

7  different from anybody else's history.  And the challenges that

8  we face as the poorest state in this nation are things that

9  this court should take into consideration when you write your

10  opinion.

11       The United States of America put on eight expert

12  witnesses.  They were from Maine, they were Connecticut, they

13  were North Carolina, Illinois, all over.  And I think they

14  spent a total of maybe 12 days in Mississippi, but the

15  interesting thing about all of those experts, Your Honor, is

16  did you hear any of them say, Why don't you do what we're doing

17  in Massachusetts?  We've got it down.  We know what we're

18  doing.  Did anybody from Illinois say, We got this under

19  control?  We, in Illinois, know how to treat people with

20  serious mental illness.  You didn't hear any of that, Your

21  Honor.  But what you did hear is that three of those states are

22  under some kind of consent decree today.  One of them

23  completely stopped providing community-based services.

24       So the challenge that we face here in Mississippi is

25  facing every state in this nation.

1      The United States of America has said to Your Honor

2  that we've done a survey of 154 people who have serious mental

3  illnesses.  We conducted this survey by interviewing people

4  with our experts.  My partner, Mr. Shelson, is going to cover

5  this in much detail, but I just want to show you just a moment

6  of why this whole process is flawed, Your Honor.

7      I'll start at the top of the page, if this Elmo will

8  let me.  The first question was "Did the Department of Justice

9  staff accompany you on each of your interviews in Mississippi?

10     "Answer:  Yes, with the exception of telephone

11 interviews.

12     "Question:  Okay.  So the in-person interviews, the

13 Department of Justice staff accompanied you?

14     "Yes.

15     "Who were the individuals from the DHS -- who were the

16 individuals from the Department of Justice who accompanied you

17 on your interviews in Mississippi?

18     "They were Bobbie Molson, Regan Rush, Mary Bohan, Ryan

19 King, Linda Garcia, Gary -- I'm forgetting his last name, and

20 there may be another person.

21     "Ryan King?

22     "Ryan King, yes.

23     Go on up.  And the final question:

24     "Okay.  At times, did the Department of Justice staff

25 ask questions during your interview of individuals in

1    Mississippi?

2         "It happened a few times."

3         Your Honor, how can this assessment be fair when the

4    Department of Justice brings their lawyers to Mississippi, asks

5    questions of these witnesses.  And Your Honor knows that all of

6    these people were probably round up by the marshal's office,

7    but why they didn't ask even this baby lawyer to come sit down

8    with them?  Maybe he wanted to ask a question.

9         What kind of interview can be fair when the Department

10   of Justice has at least six lawyers in the interviewing process

11   and won't reach across the street to Mississippi lawyers to be

12   involved?

13        Your Honor, I know you've heard enough expert

14   testimony to do you a life time, but I have one more expert

15   that I need to ask you to listen to.  I'll describe him in this

16   form, Your Honor.  His credentials are impeccable.  He is the

17   director of the National Association of State Mental Health

18   Programs.  He has information on 7 million individuals and

19   collects data on more than $43 billion of state expenditures.

20   And what he's going to tell you, Your Honor, are things that

21   I've never heard about Mississippi, that we are number one in

22   areas.  I know about football and recently basketball, but he's

23   going to tell you that Mississippi ranks number one in a number

24   of areas when it comes to providing care to patients with

25   serious mental illnesses.

1    Your Honor, if you go over to -- if you go over to the

2    far right-hand column, Your Honor, it says "National rankings

3    and regional rankings."  Just take your time and go down that

4    column, Your Honor, and you'll see how many areas the State of

5    Mississippi is ranked number one.  Look at the regional areas.

6    They're number one.  They're the leader in the seven state

7    regions of the south.  I'll just read what they say.

8    "Individuals receiving services through the Department

9    of Mental Health are more satisfied with the quality of their

10   care.  Mississippi leads the nation in terms of overall

11   satisfaction and leads the south in the regions of domains of

12   access to quality and appropriateness."

13   He goes on to say, "Mississippi excels in the terms of

14   medium length of stay at hospitals."  And I could go on and on

15   of talking about the great accomplishments of Mississippi when

16   they are ranked by the people who rank hospitals who care for

17   patients with serious mental illnesses.

18   Your Honor, I'll just spend one or two moments talking

19   about this great survey and how impartial and fair it was, but

20   I will say to Your Honor that the Department of Justice

21   experts, and there were eight of them, came and spent from one

22   and a half to two hours with all 154 patients.  They spent a

23   total of 308 hours in Mississippi.  That amounts to 12 days.

24   And I'm going to ask my assistant if he would put on

25   the screen the people who have testified in this court, and

1  most of them are out in the audience now, Your Honor.  Ms.

2  Mikula, Mr. Allen, Mr. Chastain, Mr. Hutchins and Mr. Lewis.

3  The rookie on there has been there 17 years.  122 total years

4  they've spent taking care of people in Mississippi with serious

5  mental illnesses.

6          The United States of America tells Your Honor that you

7  ought to entrust this case to people who spent 12 days in

8  Mississippi taking care and assessing people with serious

9  mental illnesses.

10          Your Honor, the toughest job I ever had as a lawyer

11  was early on in this trial.  The United States of America put

12  on a witness who was seriously mentally ill, Mrs. Worsham, I

13  think is her name.  The only thing I could do was thank her for

14  coming.  She had been confined in hospitals in and around

15  Mississippi on six occasions.  And I took this writing that she

16  did and asked Your Honor would you read it.  And I think that

17  was the second day of our trial.  And we heard all

18  psychiatrists and experts, but Ms. Worsham described a serious

19  mental illness to me better than anybody.  And she said, When

20  you're a traveler and pull off the side of the road to fix a

21  flat tire, we don't consider that a failed trip.  You get back

22  on the road.

23          And she goes on to talk about the challenges of having

24  flats.  I grew up in the '40s and '50s in Mississippi, Your

25  Honor, and every time you got in a car, you thought about the

1  fact that you might have a flat.  But to go through life

2  thinking you're going to have a flat and pull off the road is a

3  huge challenge in life.  But I want my assistant to put this

4  exhibit back up of the people who have been fixing flats, Your

5  Honor.  These individuals have been fixing flats for 122 and a

6  half years.  The last two years they fixed flats with less

7  than -- their budget got cut $30 million.  That didn't stop

8  them from fixing flats.  They lost 601 people on their staff.

9          Your Honor, you can take judicial notice that if you

10  work for the State of Mississippi, it ain't about the money.

11  These people are dedicated.  They're there to take care of

12  people who can't take care of themselves.  They have told you,

13  Your Honor, they don't control their front doors.  They don't

14  solicit people.  Unless you are on a ventilator or got Stage IV

15  cancer, they're going to take care of you.

16          And as I wrap up here, Your Honor, and when you write

17  your opinion in this case, I would hope that you would tell the

18  people that fix flats to continue to fix those flats.  And you

19  need to tell the United States of America, the Department of

20  Justice, the Civil Rights Division, that the IMD rule, the one

21  you asked about on Thursday, that Mrs. Fox responded to you

22  it's a United States statute, she didn't go on to tell you that

23  it is a United States statute that discriminates against every

24  seriously mentally ill patient in America that is confined to a

25  state hospital.  That is discrimination.  And if the United

1   States and the Justice Department and the Civil Rights Division

2   don't correct that discrimination, it's shameful.  Thank you,

3   Your Honor.

4           THE COURT:  Thank you.  Mr. Shelson, you have one

5   hour.

6           MR. SHELSON:  Thank you, Your Honor.  May I approach?

7           THE COURT:  Yes, you may.

8           MS. RUSH:  Your Honor, may I proceed.

9           THE COURT:  Yes you may.

10          CONTINUED CLOSING ARGUMENT FOR THE DEFENDANT

11          MR. SHELSON:  Your Honor, much like its entire case,

12  DOJ's closing statement was both misleading and idealized.

13          We start here with this slide DOJ showed you.  Ms.

14  Peet's testimony that in her opinion, 15 hours of community

15  support service was insufficient to provide intensive case

16  management services.  She does not know.  She did not review a

17  single medical record in this case.  Ms. Peet has absolutely no

18  basis to draw any individualized opinions in this case

19  whatsoever about individuals, the 154 in the sample or

20  otherwise.

21          Ms. Peet here is making a gross generalization that

22  has no relationship to any individual's medical records in this

23  case.  Ms. Peet does not know what services individuals in this

24  case need because she did not make that review.

25          This slide 2, PX-045, is misleading.  It speaks to

1  Medicaid recipients only.  It does not speak to the countless

2  other individuals in Mississippi who received peer support

3  services.  It does not even acknowledge as a fact, and this is

4  a core problem here, DOJ is somehow incapable of giving

5  Mississippi credit for anything it does.  The undisputed

6  testimony, Your Honor, is that Mississippi has peer support

7  specialists at every CMHC, at every state hospital and on every

8  PACT team.  These services are delivered, and they're delivered

9  in a respectable manner, and that should be acknowledged.

10      They talked about Melody Worsham.  Melody Worsham is a

11  certified peer support specialist who received that training

12  from where?  The state of Mississippi.  Her employer is funded

13  by who?  The state of Mississippi.

14      Your Honor, they talk about Mississippi's discharge

15  planning not being to the standard of their hand-picked

16  experts.  The first problem here, Your Honor, is let's talk

17  about what happened to person 3.  Person 3 was sent by a

18  chancellor -- chancery court judge three times to a state

19  hospital, because in each instance, a chancellor in a hearing

20  found that person 3 was a danger to self and others.  In every

21  instance, the state hospital did its job.  It stabilized person

22  3, and it did exactly what DOJ says Mississippi should do,

23  which is return him to the community.  And they fought

24  Mississippi for that.

25      Time and again you heard, Your Honor, I went through

1   this with other experts, Daniel Byrne in particular, "What was

2   person so and so's symptomatology on admission?"

3           Over and over again, we heard "Danger to self and

4   others, suicidal, et cetera.

5           "What that person's symptomatology when you

6   interviewed them?

7           "They were stable.  They were not a danger to self or

8   others."

9           We submit, Your Honor, that if a patient is admitted

10  by a chancery court judge to a state hospital because, for

11  example, he is suicidal, and the state hospital stabilizes that

12  person, and that person is no longer suicidal and is able to

13  return to the community, that is undeniably a good thing that

14  Mississippi should receive credit for.

15          The broader problem with a focus on things such as

16  discharge planning is that it's an attack on the quality of

17  services.  Mississippi does do discharge planning.  That's

18  undisputed.  DOJ's position, it doesn't do it good enough.

19  That's not an *Olmstead* violation.

20          Footnote 14 of *Olmstead*, Your Honor, Justice Ginsburg,

21  "We do not in this opinion hold that the ADA imposes on the

22  states a standard of care for whatever medical services they

23  render or that the ADA requires states to provide a certain

24  level of benefits to individuals with disabilities."

25          We do not quite understand exactly what the court --

1    excuse me, what DOJ is asking the court to do regarding quality

2    of services.  On the one hand, DOJ insists they are not asking

3    the court to run Mississippi's mental health system.  On the

4    other hand, they offer no guidance to the court on how it

5    should manage things such as the sufficiency of discharge

6    planning.

7          This next slide, Your Honor, quotes, in red, the trial

8    testimony of Dr. Carol VanderZwaag.  This slide is at best

9    ironic.  The court may recall that Dr. VanderZwaag started her

10    career at a state hospital in North Carolina.  She then spent

11    18 years on a PACT team.  She left the PACT team to go to work

12    where, Your Honor?  At a state hospital.

13          So Dr. VanderZwaag voluntarily left the PACT team to

14    go work in a state hospital in North Carolina where people's

15    lives that she treats apparently have no meaning.  Your Honor,

16    that just doesn't add up.  It makes no sense.

17          Your Honor, DOJ likes to point out what Mississippi

18    hasn't done, when the focus should be on what it has done.

19    They popped up this slide about PACT utilization.  In 2018

20    alone, Mississippi added one PACT team and funded another that

21    is in the process of getting up and running.

22          They also left out -- well, it's on this one.  This is

23    the PACT team up here in northeast Mississippi that was added

24    in 2018.  Those are necessarily going to increase PACT

25    utilization in Mississippi, and that's undeniable.

1    It's the same thing with supported employment, talking

2    about expanding employment.  Your Honor, in 2018, with the

3    shift of funds from institutional care to community-based care,

4    Mississippi added supported employment to seven CMHC regions.

5    Mississippi is expanding community-based services, and we're

6    going to -- I'm going revisit that in a minute.

7    Your Honor, this next slide is puzzling because it

8    provides no road map at all.  Step 1:  Based on capacity,

9    Mississippi is nearly there.  I'm going return to that.

10   Step 2:  Use data.  Is DOJ really saying if

11   Mississippi allegedly is not using data appropriately, that's

12   an ADA violation?  That's not in *Olmstead*.

13   Step 3:  Actively monitor utilization.  Is DOJ really

14   saying that's an *Olmstead* violation?  Because there's nothing

15   about that in *Olmstead* either.

16   Step 4:  Provide meaningful oversight.  What does that

17   mean?  Regardless, that's not in *Olmstead* either.

18   Your Honor, whatever these things are, they're not in

19   *Olmstead*, and there's no suggestion here of what the court's

20   supposed to do about them.

21   This slide, Your Honor, I'll call this the strict

22   liability slide.  Apparently, at some random point in time

23   after the *Olmstead* decision in 1999, if a state isn't running

24   its public mental health system to the satisfaction of DOJ,

25   it's in violation, no matter how good its system is at this

1  point in time.  So I mean, if a state didn't have a good system

2  in 2005, but it does now, is DOJ suggesting that's an *Olmstead*

3  violation?  What is the point in time we're talking about here?

4       We submit the point in time that's relevant to this

5  lawsuit is the fact cut-off date of December 31st, 2018.

6  That's the date that this court should measure Mississippi's

7  public mental health system by, not by a 2008 PEER report that

8  talked about nothing, that may made no recommendation other

9  than strategic planning, mission statements and vision

10 statements.  I hope we're not really here about the sufficiency

11 of DMH's mission statement and vision statement.  I submit to

12 Your Honor that if the court reviews the peer support, there's

13 pages of suggested mission and vision statements, not

14 especially helpful.

15      This is a remarkable slide in DOJ's positions about

16 it.  They said -- Mr. Holkins said institutionalized numbers

17 have not really decreased in Mississippi.  That's just not

18 true, Your Honor.  Mississippi State Hospital continued treat

19 services reduced by 95.  Mississippi State Hospital, acute,

20 reduced by 585.  East Mississippi State Hospital, reduced by

21 171.  North Mississippi reduced by 67.  South Mississippi,

22 reduced by 175.  Those are real numbers, Your Honor.

23 Mississippi should get credit for them.  It doesn't.

24      The other point Mr. Holkins missed is

25 institutionalization alone is not the standard.  *Olmstead* could

1  not have been more clear on this.  Institution -- unnecessary

2  institutionalization is discrimination.  Necessary

3  institutionalization is not.

4          Mr. Holkins complained about the length of stay in

5  Mississippi's state hospitals.  Mr. Holkins left out the

6  forensic components of a lot of those long-stay patients.  Many

7  of the long-stay patients in Mississippi state hospitals have a

8  forensic history.  So if an individual started out in a mental

9  health system on the criminal side because, for example, the

10  individual murdered his brother and eventually, through the

11  process, that individual is now a civil commitment to

12  Mississippi State Hospital, that individual's probably going to

13  be there for a while.

14          At least two of DOJ's experts the court may remember.

15  I talked about them, discharge advisory committees, and do

16  forensic patients, in your experience, have to go through a

17  discharge advisory committee to get out because of their

18  forensic criminal history?  They said, Yes.  I said, Is that a

19  legitimate process?  They said, Yes.

20          The key takeaway, though, Your Honor, is this slide

21  that Ted Letterman testified about.  Medium length of stay,

22  adults state hospitals, residents more than one year.

23  Mississippi has the second lowest in the region.  They talk

24  about Alabama, and Dr. Beverly Bell-Shambley, one of their

25  experts, "Mississippi's length of stay for long-term patients

1    are lower than every state in the south except Arkansas."

2    Again, Mississippi gets no credit for that.

3          Mr. Holkins talked about HB.  He said, HB fought for

4    years for community-based services for his daughter.  That's

5    not quite true, Your Honor.  In reality, HB filed a lawsuit in

6    this court, and he sued Mississippi for discharging his

7    daughter from a state hospital.  He didn't sue Mississippi for

8    not providing community-based services.  It was just the

9    opposite, Your Honor.  He sued Mississippi because they let her

10   back into the community.

11         HB testified under oath that his daughter cannot live

12   independently in the community.  HB testified under oath that

13   he was satisfied with the placement that his daughter now has,

14   which was funded by the shift of funds from Mississippi's

15   institutional care to community-based care.

16         Your Honor, this next thing is a segueway into what

17   I'm about to talk to next.  Mr. Holkins talked about person

18   132.  Mr. Holkins said that person could have avoided or spent

19   less time in a hospital.  He also talked about a person,

20   Dr. Beverly Bell-Shambley talked about who spent 30 years in

21   state hospitals.  I didn't catch that person number, but

22   Mr. Holkins said she could have spent less time in a state

23   hospital.  Your Honor, could have doesn't cut it.

24         DOJ's -- the lynchpin of DOJ's case is the 154 persons

25   surveyed, surveys that DOJ's expert did.  That survey is

1 entitled to little or no weight because it is flawed.  It is

2 flawed for a number of reasons, and I'm going to talk about

3 each of these four reasons separately.

4        The first survey defect, Your Honor, is that no

5 opinion, no opinion of DOJ's clinical review team or CRT is

6 stated to any reasonable degree of medical, scientific or other

7 probability.  This is a serious problem, Your Honor.

8        If you look at the slides we saw over and over again

9 from DOJ's experts, they're all basically the same.  Judith

10 Baldwin, 100 percent would have avoided or spent less time.

11 86 percent at serious risk.  100 percent appropriate for and

12 would benefit.  They're all basically the same, except the at

13 serious risk number changes.  Katherine Burson, same thing.

14 Daniel Byrne, same thing.  Robert Drake, same thing.  Carol

15 VanderZwaag, same thing.

16        Your Honor, not one of them told you that they believe

17 any of these things to a reasonable degree of medical,

18 scientific or other probability.  These, I will show, Your

19 Honor, are nothing more -- are based on nothing more than hopes

20 and possibilities, and hopes and possibilities are not any

21 meaningful evidentiary standard.

22        Daniel Byrne, Your Honor, he was asked whether there

23 are community-based services that address a person's symptoms

24 before they become so severe that the person is committed.  He

25 said yes.  He was then asked for examples.  He gave a number,

1  including case management.  And then, Your Honor, he testified,

2  "If the situation or the person is beginning to deteriorate,

3  there are interventions that can be provided that would

4  hopefully stabilize the person, stabilize the crisis that

5  they're in, and hopefully prevent the hospitalization."  That's

6  not much to go on, Your Honor.  The court needs more than the

7  hope of DOJ's experts.

8          I could give the court countless examples of such

9  loose language in DOJ's expert's opinions.  The fact is, they

10  don't know how much or how likely any of this is to help the

11  individuals they testified about.

12          The last example I'll give, Your Honor, is from the

13  testimony of Dr. Beverly Bell-Shambley.

14          "Question:  Had she received more intensive services,

15  is it possible she could have avoided the state hospital

16  admission altogether?

17          "Answer:  It's certainly possible, yes.

18          Possible is not enough, Your Honor.  By not giving

19  this court any degree of reasonable probability to which they

20  allegedly hold these opinions, this court -- they have not

21  given this court a sufficient evidentiary basis to credit their

22  opinions, and so the court should give them little to no

23  weight.

24          The second flaw -- the second survey defect is related

25  to that.  DOJ's experts did not separate "avoided" from "less

1   time."  Here's what I mean by that, Your Honor.  Collectively,

2   DOJ's CRT concluded that 100 percent of the 154 individuals

3   they reviewed would have avoided hospitalization altogether, or

4   they would have went to the hospital but spent less time there

5   if they had received reasonable community-based services.  They

6   didn't separate the two, Your Honor.  Your Honor has no

7   evidentiary basis to know how many allegedly would have avoided

8   hospitalization altogether versus how many would have went to

9   the hospital but spent less time there.  That's a big and

10  crucial difference that DOJ has no answer for.

11          Your Honor, that's illustrated in the testimony of

12  DOJ's expert, Dr. Judith Baldwin.

13          "Question:  Did you arrive at a conclusion in your

14  report regarding whether person 90 would have avoided

15  hospitalization altogether or whether she would have went to

16  the state hospital but spent less time there?

17          "Answer:  I don't believe I separated it out in my

18  report.

19          "Question:  Did you separate it out in your report for

20  any of the individuals you reviewed in your report?

21          "Answer:  No, because it was mixed.  Some might have

22  spent less time, some might have avoided, or it might have been

23  earlier hospitalizations that they would have avoided or spent.

24  There was too many moving parts.  And because it was a

25  two-prong question, I answered it together."

1          Answering it together was -- is a fatal flaw.  DOJ's

2     expert needed to resolve the moving parts in a meaningful way.

3     They did not.  So when Dr. Baldwin testified some might have

4     spent less time, well, how many?  We don't know.  DOJ's experts

5     don't know.  Some might have avoided.  How many?  We don't

6     know.  DOJ's don't know.

7          This brings us, Your Honor, to this third survey

8     defect which we call the Mississippi bump.  And here's what we

9     mean by that.  It's illustrated by this table.  As the court

10    knows, Dr. Robert Drake, DOJ's lead clinical expert, put

11    together a survey of the literature, and Dr. Drake reviewed the

12    literature to determine how much each of the community-based

13    services are effective at reducing hospitalizations.

14         So the services on this table, Your Honor, are

15    lifted -- listed in the left-most column.  Dr. Drake's

16    conclusions are in the middle column.  So, for example,

17    Dr. Drake found that assert testify community treatment is

18    41 percent effective at reducing hospitalizations.  For a

19    number of other services, such as case management, Dr. Drake

20    found there was a lack of data.

21         And yet, in every instance in Mississippi, DOJ's

22    experts concluded that somehow these services are 100 percent

23    effective here when they're not even close to 100 percent

24    effective anywhere else, but somehow in Mississippi, somehow in

25    Mississippi, although, for example, ACT is only 41 percent

1  effective in reducing hospitalizations, they got to 100 percent

2  every time in Mississippi.  It's not -- it makes no sense, Your

3  Honor.  It has no validity, scientifically or otherwise.  It's

4  simply an impossibility that is unexplained by DOJ's expert.

5           Dr. Judith Baldwin testified that she knows of no

6  rates for community services reducing hospitalization other

7  than the rates in Dr. Drake's literature review, and based on

8  those rates, DOJ's experts' conclusions that those services

9  would be 100 percent effective in Mississippi is not -- it just

10  is not plausible and is entitled to no weight.

11           The fourth survey defect is DOJ's methodology is not a

12  basis for system design.  Here's what DOJ's experts did.  They

13  interviewed 150 living individuals, and for each one, they

14  concluded what services those individuals needed to stay in the

15  community.  And then they suggested to the court that the court

16  should use that as a guideline for finding Mississippi

17  deficient.  But as DOJ's own experts concede, no state has ever

18  used that methodology to design its public mental health

19  system, and this court should not do so either.

20           The next thing I want to talk about, Your Honor, is

21  unnecessary institutionalization versus at risk of

22  institutionalization.  *Olmstead* was decided in 1999.  As Your

23  Honor knows, it held that unnecessary institutionalization is

24  discrimination.

25           The *Olmstead* decision itself says nothing at all about

1    at risk of institutionalization.  That came 12 years later when

2    DOJ issued a statement.  This is the statement, Your Honor, and

3    it's DOJ's statement on the integration mandate.  And what it

4    says, Your Honor, is this.  It was issued on June 22, 2011, and

5    it says, "This guide catalogs and explains the position the

6    Department of Justice has taken in its *Olmstead* enforcement.

7    It reflects the views of the Department of Justice only."

8         And so what the Department of Justice did is it posed

9    a series of questions, and then it answered its own questions

10   itself.  And this one here, Your Honor:  Did the ADA in

11   *Olmstead* apply to persons at serious risk of

12   institutionalization or segregation?  DOJ answered its

13   question, Yes.  By doing so, by that one act, by posting this

14   statement on its website, DOJ substantially expanded the scope

15   of *Olmstead* from an unnecessary institutionalization case to

16   unnecessary institutionalization plus at serious risk.  Again,

17   Your Honor, that's just something that's not in *Olmstead*

18   itself.

19        But to tie it directly to this case, it raises this

20   question:  Who was unnecessarily institutionalized as of the

21   fact cut-off date in this case, December 31st, 2018?  There is

22   no evidence before this court that as of the fact cut-off date,

23   or really any other date, that anyone was unnecessarily

24   institutionalized in Mississippi.  This is strictly an at-risk

25   case.  It is not an unnecessary institutionalization case.

1          What's more, Your Honor, is DOJ had an opportunity to

2     test its hypothesis that individuals are at serious risk of

3     hospitalization.  The DOJ experts conducted their interviews of

4     the individuals in early 2018.  DOJ subsequently got medical

5     records on those individuals through the cut-off date of

6     December 31st, 2018.  DOJ had the opportunity to tell the court

7     which of those individuals, if any, were hospitalized in that

8     window between their interviews and the fact cut-off date, and

9     DOJ presented nothing to the court on that issue.

10          The next thing I want to talk about, Your Honor, is

11     compliance with *Olmstead*.  And I want to start off with what

12     clearly is not the standard.  No unmet needs, gaps and so on is

13     not the standard.  DOJ's experts themselves concede that is not

14     the standard.  Again, Daniel Byrne, who is from Washington,

15     D.C.:

16          "Question:  Are there adults in Washington D.C. with

17     SMI who have unmet mental health needs?

18          "Answer:  Yes.

19          "Question:  Do all states have unmet mental health

20     needs for adults with SMI?

21          "Answer:  Yes.

22          "Question:  Do you assess a state's mental health

23     system on whether there are adults with SMI who have unmet

24     mental health needs?

25          "Answer:  No.

1    No one does that, Your Honor, and Your Honor should

2 not do it here.

3    In opening statement, Your Honor, we said a state

4 complies with *Olmstead* if it has a reasonable continuum of

5 mental health services.  We stand by that, and Mississippi does

6 have a reasonable continuum of mental health services.  And

7 therefore, it is in compliance with *Olmstead*.

8    Your Honor, eight years after DOJ issued its findings

9 letter to Mississippi, three years after it filed this lawsuit,

10 we got down to DOJ's very last witness in this case, Melodie

11 Peet.  And at that time, we seemingly got DOJ's new standard

12 for compliance with *Olmstead*, and that's baseline.  And I'm

13 going to talk more about this in a minute, Your Honor, but

14 according to Ms. Peet, if a state has the key services in every

15 region, it's that baseline.

16    So what this case really is about, Your Honor, is the

17 pace of change.  And we think it's important in that regard to

18 compare Melodie Peet's five years as the commissioner of DMH in

19 Maine with the last five years in Mississippi.

20    Ms. Peet testified that, as I said, if a state

21 provides these key services in every region, then it's at

22 baseline.  She qualified that, though, and said there should

23 have been an "or" between PACT and intensive case management.

24 If a state provides one of those two services, with respect to

25 those two services, that's sufficient.

1          It's telling, Your Honor, that in Ms. Peet's five

2     years as the commissioner of Maine, she admitted that Maine did

3     not reach baseline.  It's also telling, Your Honor, that in her

4     five years as the commissioner in Maine, not one PACT team was

5     in Maine.  Instead, Ms. Peet had intensive case management

6     teams.  And on that point, she said, Well, you know, if you can

7     have PACT or intensive case management, you really should have

8     PACT if possible, a standard Ms. Peet never achieved in Maine.

9          We think, under those circumstances, this conclusion

10    from Ms. Peet is rich, Your Honor.  She testifies, "And it's

11    puzzling to think about why those individuals haven't been

12    directed to and accepted for service with the ACT programs."

13         Well, at least Mississippi has ACT programs,

14    something, again, Ms. Peet was not able to accomplish even one

15    time.  Not one PACT team in five years in Maine, and she comes

16    to Mississippi and criticizes Mississippi for the eight PACT

17    teams that it has.  Well, in terms of PACT teams, it was

18    Mississippi 8 and Ms. Peet zero in Maine.

19         Your Honor, this is DDX-12.  There's a lot going on on

20    this slide because it attempts to show the expansion in

21    community-based services in Mississippi from 2008 through 2019.

22    But really, the best way to illustrate that is through the next

23    two tables I'm going to show Your Honor.

24         Your Honor, this is DDX-13.  And Your Honor, it shows

25    the key community-based services by region as of December 31,

1   2013.  Wherever there's a check mark, the service existed.

2   Where there's not, it didn't exist.  Contrast that, Your Honor,

3   with DDX-14, which is the exact same slide, but five years

4   later, community-based services by region as of December 31st,

5   2018.  Everything shaded in yellow was added in those five

6   years.  An incredible achievement, Your Honor.  And we would

7   submit that in the five years Diana Mikula has been the

8   executive director of DMH, she got more done in terms of

9   community-based services in Mississippi than Melodie Peet got

10  done in Maine in five years.

11          DOJ is fond of sound bites, and they're especially

12  fond of sound bites from Steven Allen.  They've criticized

13  Mr. Allen in their opening statement, and they've come back to

14  criticizing Mr. Allen in their closing statement, which is

15  especially unfortunate because Mr. Allen was brought on board

16  as deputy executive director for the express purpose of

17  expanding community-based services, which he undeniably has

18  done.

19          Instead of talking about these kind of sound bites,

20  they don't talk about how during the time Mr. Allen's been

21  deputy executive director and the shift of funds from

22  institutional care to community-based care that he helped make

23  happen, that Mississippi has -- now has three more community

24  transition homes, seven more regions have supported employment,

25  two more PACT teams, seven more CSUs, and a transition work

1  group to address discharge planning.

2        So, Your Honor, a formal *Olmstead* plan was useless to

3  Mr. Allen because the strategic plan was sufficient for him to

4  make everything I just mentioned happen.  And magically, he was

5  able to do that without an *Olmstead* plan that happens to

6  satisfy DOJ.

7        Your Honor, consent decrees are not faster than what

8  Mississippi is doing now.  This is one of DOJ's slides.  They

9  keep referring to 2500 as the state estimate for the number of

10  housing slots that are needed in Mississippi.  That number

11  comes from Ben Mokry, who is with the Mississippi Home

12  Corporation.  That is his estimate, but DOJ knows it's

13  nonsense.  They show the national rate, but they won't show the

14  regional rate.

15        Your Honor, this is important because the court heard

16  testimony and received exhibits about North Carolina's

17  settlement with DOJ in an *Olmstead* case.  In 2012, North

18  Carolina and DOJ entered into a settlement agreement.  That

19  agreement required North Carolina to add 3,000 housing slots by

20  2020.  North Carolina wasn't getting there.  They modified the

21  agreement in 2017 to give North Carolina an extra year.  So

22  nine years, Your Honor, nine years for North Carolina to get

23  the 3,000 housing slots.

24        Another one, Your Honor.  Your Honor heard about

25  Williams and Colbert consent decrees in Illinois.  Your Honor

1   took judicial notice that the consent decree was entered in

2   2010.  That consent decree only concerned nursing homes, wasn't

3   a systemwide consent decree.  Seven years later, that consent

4   decree was still in place and was still not satisfied.  These

5   kinds of changes, even with just nursing home, take time.

6           Katherine Burson spent her entire career, one of DOJ's

7   experts, with the Illinois DMH.  She talked about how Illinois

8   was undergoing rebalancing.  The rebalancing was shifting from

9   institutional care to community-based care.  Question to

10  Ms. Burson:

11          "When you worked for the Illinois DMH from 1995 to

12  2017, did the Illinois mental health system undergo any

13  rebalancing?  Was the rebalancing ongoing when you left the

14  Illinois DMH in 2017?

15          "Answer:  Yes.

16          So 22 years, Your Honor, 22 years, and Illinois was

17  still in the process of rebalancing.

18          Your Honor, since we're talking about Illinois, we

19  think the court should recall what happened when Illinois DMH

20  took budget cuts versus what happened when Mississippi DMH took

21  budget cuts.  When the Illinois DMH took budget cuts, it

22  maintained institutional spending and cut community-based

23  spending.

24          You heard from Ms. Mikula and others that Mississippi

25  took budget cuts, DMH took budget cuts in fiscal years '17 and

1  '18, dramatic cut, $28 million total.  What did Mississippi do?

2  They did the opposite of what Ms. Burson in the Illinois DMH

3  did.  Mississippi cut institutional spending and maintained

4  community-based spending, the exact opposite of what DOJ's

5  expert, Ms. Burson, and the Illinois DMH did when they were

6  faced with the same circumstances.  And again, Mississippi gets

7  no credit for that.

8         Your Honor, U.S. DOJ's capacity theories for states

9  are utterly arbitrary.  There is no universal or other

10 standard.  It is best exemplified by a return to the 3,000

11 housing slot situation that we talked about earlier in North

12 Carolina.  North Carolina DOJ insists that they have 3,000

13 housing slots for a population of about 10.3 million people.

14 In this case, they insist that Mississippi have 2500 housing

15 slots for a population of roughly 3 million.  It's actually a

16 little less than that, but we'll call it 3 million.

17        So here's the thing, Your Honor.  North Carolina has

18 7.3 million more people than Mississippi, and DOJ wants

19 Mississippi to be within 500 housing slots of North Carolina.

20 That's arbitrary, Your Honor.  It makes no sense.  It's not a

21 standard this court can apply.  And it's not a standard this

22 court can apply because DOJ has not given this court any

23 meaningful standards other than baseline for system capacity.

24        DOJ showed this picture of Adams County jail.  Your

25 Honor, you heard from DMH witnesses over and over again that

1   their desire is no one waits for a bed in jail -- for a bed in

2   a state hospital to open.  They also testified that chancellors

3   have choices.  They have -- it's written into the law now that

4   a chancellor should consider other choices other than jail

5   before sending someone to jail.  They need to do that, Your

6   Honor.

7           But to put this into perspective, when DOJ did their

8   interviews of the 150 living individuals in Mississippi, at

9   that time one out of 150 was waiting in a jail for a hospital

10  bed, Your Honor.  That's less than one percent.

11          Your Honor, my time is running out, so I'm going to

12  try to cover the rest of this quickly.  The fundamental

13  alteration defense.  We'll brief this more thoroughly in

14  posttrial briefs, Your Honor, but no *Olmstead* plan is required.

15  That was created that *Olmstead* itself does not require an

16  *Olmstead* plan.

17          Going back to this statement that was published in

18  2011, DOJ wrote in that statement that you have to have an

19  *Olmstead* plan to assert the fundamental alteration defense.

20  *Olmstead* says no such thing.  Your Honor, what *Olmstead* says

21  is, for example -- they used it as an example -- if you have an

22  effectively working plan to move people off a waiting list and

23  into the community, then you necessarily satisfy the reasonable

24  accommodation standard, and you never even have to get to the

25  fundamental alteration defense.  So what *Olmstead* said, Your

1  Honor, is if you have a waiting list in a state hospital for

2  people to get in the community, and you have a plan to get them

3  out, you satisfy the reasonable modification standard.  DOJ's

4  conception of an *Olmstead* plan is nothing like that.  There's

5  no evidence before this court that there's a waiting list for

6  people to get out of a state hospital and into the community.

7          As *Olmstead* used the concept of an *Olmstead* plan, it

8  has no application in this case and is grossly different from

9  the conception of an *Olmstead* plan the court is inviting this

10  court to adopt.

11          Your Honor, if you find it necessary to apply the

12  fundamental alteration defense, that defense is easily

13  satisfied.  Melodie Peet testified that to get Mississippi the

14  2500 housing slots we talked about earlier, it would cost

15  $18.5 million a year just to do that.  It's undisputed, Your

16  Honor, that PACT teams in Mississippi get a grant every year

17  from DMH, $600,000.  DOJ's experts said that 66 percent of the

18  individuals they reviewed who are discharged from state

19  hospitals need PACT teams.  The state calculated that to mean

20  11 new PACT teams at $6.6 million.  DOJ calculated it at

21  $8.8 million -- excuse me, 8 new teams at $4.8 million.  Your

22  Honor, 4.8 million plus 18.5 million is north of $23 million

23  just for those two services to the scale DOJ is suggesting that

24  Mississippi must have.  And again, Your Honor, that is a

25  fundamental alteration.

1    There's more.  To the extent that DOJ wants more CSUs,

2   we know how much those cost.  For a four or eight-bed unit,

3   $800,000 a year.  For a 16-bed unit, 1.4 million.  We know how

4   much mobile crisis response teams cost annually, $300,000 on

5   average.  So the more and more of this DOJ allegedly wants, the

6   stronger the state's fundamental alteration defense.

7        I want to talk briefly, Your Honor, about mitigation.

8   I was going to talk about housing and benefits, but I'm out of

9   time, so I'm going to go straight to the IMD exclusion.

10       THE COURT:  You have about 13 -- you have about 13

11  minutes.

12       MR. SHELSON:  Thank you, Your Honor.  Ms. Peet

13  testified that the IMD exclusion, as Your Honor may recall,

14  generally prevents state hospitals from receiving Medicaid for

15  the treatment of adults with SMI in state hospitals.  Ms. Peet

16  testified that when she was commissioner in Maine, if Maine

17  would have received Medicaid dollars for the treatment of

18  adults in Maine state hospitals, then Maine could have shifted

19  the savings to community-based services.

20       Your Honor, we said in our opening statement that if

21  the federal government just did one thing, and that one thing

22  was to repeal the IMD exclusion, we probably wouldn't be here.

23  Your Honor, we were right.  If the federal government did just

24  that one thing, it would free up potentially up to $50 million,

25  $50 million a year, Your Honor, for Mississippi to shift to

1   community-based services.  And Your Honor, it's clear that

2   $50 million would buy a lot of community-based services.  And

3   that's what Mr. Anderson suggested DOJ go back and lobby to

4   have repealed.  They should do so, and they should do promptly,

5   and they should have done that instead of filed this lawsuit.

6          Your Honor, DOJ noted in its opening statement that

7   this is the 20th anniversary of *Olmstead*.  We submit that the

8   best way to honor *Olmstead* is by applying what it actually

9   says.  And among other things, what it says are these eight

10  things.  I've mentioned the first one, Your Honor, only

11  unnecessary institutionalization is discrimination.

12         Second, the ADA does not require states to phase out

13  institutions.

14         Third, the state's treatment professionals are

15  entitled to reasonable deference.  DOJ's CRT gives them none,

16  which is yet another flaw in that surveys.

17         Four, there's no mention whatsoever of at risk in the

18  *Olmstead* decision.

19         Five, the *Olmstead* decision does not require an

20  *Olmstead* plan.

21         Six, *Olmstead* rejected the exact kind of simple --

22  that's what it called it -- simple cost comparison that DOJ's

23  accounting expert, Kevin O'Brien, made in this case.  And for

24  that reason, this court should reject Mr. O'Brien's cost

25  comparison.

1          Seven, the fundamental alteration defense.  If the

2     court gets to it, there are three things the court should take

3     into consideration:  The resources available to the state, the

4     cost of expanded community-based services, and the range of

5     services the state must provide.  That range includes serving

6     individuals in the Mississippi state hospitals.

7          And eighth, Your Honor, *Olmstead* was expressed on this

8     point, a state's responsibility to provide community-based

9     services is not boundless.

10          As Your Honor will recall, LC was one of the

11     plaintiffs in *Olmstead.*  Your Honor, this is LC.  This

12     photograph was taken in 2011.  In this photograph, LC did a

13     painting of herself as a child, and she presented that painting

14     to President Obama in the Oval Office.  The nation and

15     Mississippi have come a long way since then in providing

16     community-based services for adults with SMI.  DMH and other

17     state leaders, including the Attorney General, fully recognize

18     and get the importance of *Olmstead*.  That is why, Your Honor,

19     in the last five years, Mississippi has turned -- has shifted

20     the hourglass in terms of providing community-based services.

21          This slide again, DDX-14, shows that progress

22     undeniably.  Your Honor, Mississippi is just five PACT teams

23     and three supported employment programs away from having the

24     key services available in every region.

25          The number of key services to be added is small, and

1  the time needed to add them is short.  The expansion of

2  Mississippi's community-based services, Your Honor, is

3  especially impressive given the circumstances that Mississippi

4  faces.  Dr. Jeffrey Geller, one of the State's experts, talked

5  about that and talked about why he put Mississippi in context

6  in his report.  And he testified, Your Honor, as follows:

7  "From my perspective, the Justice Department is asking

8  Mississippi to achieve a standard of care that no state that

9  I'm familiar with has ever achieved.  To ask the state with the

10  lowest per capita income to achieve things that states with the

11  highest per capita income have never achieved doesn't make any

12  sense.  I listed the ten states with the highest per capita

13  income, and I've had direct involvement with nine of those

14  states, and I can tell you that the parameters that are being

15  laid out for Mississippi are not met in any of those states."

16       Ms. Peet testified as follows, Your Honor:

17       "Question:  So based on your experience as an

18  administrator in state mental health system, is the way to

19  deinstitutionalize responsibly to downsize state hospitals as

20  you increase community-based services?

21       "Answer:  Yes."

22       Your Honor, Mississippi is doing exactly that.

23  Mississippi is downsizing responsibly.  Mississippi is

24  deinstitutionalizing responsibly.  It is downsizing its state

25  hospitals as it increases community-based services.

1        So in conclusion, Your Honor, we respectfully urge the

2   court to let Mississippi continue to downsize responsibly and

3   to let it have time to finish the job.  Thank you, Your Honor.

4        THE COURT:  Thank you.  Thank you, Mr. Shelson.  We're

5   going to take another brief recess for ten minutes before we

6   get the State -- the United States back for its final 45

7   minutes, I think I told you.  Okay.  So we'll take a ten-minute

8   recess.  We're in recess.

9   (Recess)

10        THE COURT:  Anything we need to take care of before

11  final statements?

12        MS. RUSH:  Not from the United States, Your Honor.

13        THE COURT:  All right.

14        MR. SHELSON:  No, Your Honor.

15        THE COURT:  All right.  Ms. Rush, your turn.

16        MS. RUSH:  Thank you, Your Honor.

17        THE COURT:  You may proceed.

18         REBUTTAL CLOSING ARGUMENT FOR THE PLAINTIFF

19        MS. RUSH:  Your Honor, in the face of overwhelming

20  unrebutted evidence of current and pervasive discrimination by

21  the State of Mississippi against thousands of its own citizens,

22  the state asks this court simply, trust us.  Trust may have

23  worked in 2008, when the state legislature's PEER committee

24  suggested a full system overhaul.  It may have worked when, in

25  2010, the Mississippi Psychiatric Association implored the

1    state to move to a community-based system.  It might even have

2    worked in 2011, when the Department of Justice issued its

3    letter of findings in this case.  But this is 2019, and the

4    state has still not implemented the critical community-based

5    services needed to avoid unnecessary institutionalization.

6         And these are the same services that the state has

7    obligated itself to provide back in 2012, through its own

8    Medicaid state plan.  In fact, this court heard two weeks of

9    testimony from the United States expert review of how these

10   services largely exist on paper but remain aspirational in

11   practice.  But that is why we have the Americans with

12   Disabilities Act and why Congress gave the Department of

13   Justice the authority to enforce it and this court the power to

14   uphold it because sometimes more than trust is needed.

15        When the state forces people to submit to unnecessary

16   institutionalization, the obligation to provide services in the

17   most integrated setting appropriate to their needs is not a

18   theory.  That is federal law.

19        We submit, Your Honor, that the time to leave the

20   state to its own devices has passed, and that accountability

21   must come now through oversight that only this court can

22   provide through injunctive relief.

23        In the State's closing arguments, it asserted that DOJ

24   doesn't give the State of Mississippi enough credit.  It

25   asserted in its opening argument the bold assertion that they

1    are closer to the finish line than to the starting line.  But

2    the trial testimony and evidence reveals that, in fact, it is

3    only approaching the first water station of this race.

4          Almost all of the significant advances that

5    Mr. Shelson and Mr. Anderson just talked about during their

6    closing occurred in the last year as the trial date in this

7    case bore down on the state.  The first true shift of funds

8    happened in 2018, almost ten years after the Department of

9    Mental Health's own goal of shifting funds and a single region

10    in the state started to do true discharge planning, just last

11    year.  A new PACT team to cover four more counties was added in

12    the final months before the fact cut-off in this case, yet it

13    is still unavailable in 62 more counties.  Moreover, it's not

14    enough to create these services on paper.  They must actually

15    be provided in order to be effective.

16          The United States -- the State of Mississippi will

17    only change if its forced to through litigation.  That is why

18    the United States filed suit and why we are seeking this

19    court's intervention.

20          Mr. Anderson discussed the state's high poverty rate

21    and its rural nature, effectively urging this court not to

22    enjoin the state from further discrimination because of those

23    particular challenges, but Mississippi's high poverty rate

24    correlate to the highest federal Medicaid match in the country.

25    Mississippi can leverage those federal Medicaid dollars that

1   it's currently leaving on the table when it invests in costly

2   institutional care.  The problem is not the amount overall the

3   state is spending on mental health services.  The problem is

4   the way the state is spending those dollars fails to prevent

5   unnecessary institutionalization.

6          The State also contended in its closing and throughout

7   this case that the rural nature of the state essentially

8   excuses it from compliance from the ADA, the standard that the

9   rest of the country is held to.  But you've heard testimony

10  that the services the United States seeks can be provided in

11  both rural and urban areas.  And, in fact, Mississippi already

12  provides some of these services in rural areas.  PACT is

13  currently provided in Warren and Yazoo Counties, which the

14  State agrees are rural counties.  Dr. Drake testified that ACT

15  has been modified for rural areas by modifying the number of

16  clinicians and the number of people served on the team, and he

17  testified that research in this area reveals that rural teams

18  often have the best outcomes.  Dr. Drake further testified in

19  his experience working in Vermont, also a very rural state,

20  they successfully modified these additional services.

21         The State, Your Honor, has also argued about since no

22  state -- since there is not one state where it can cut and

23  paste its system into this system in Mississippi, then no

24  editing is required.  At the same time, the State has argued

25  that Mississippi faces unique challenges and therefore requires

1    unique solutions, and we agree.  As you heard from Dr. Drake

2    and Ms. Peet, because each state has its own needs, there is no

3    one out of the box perfect model.  Instead, you pick and choose

4    from the various models out there to meet the unique needs of

5    the state.

6          Every expert from the United States and many of the

7    State's own witnesses told you what are the essential

8    ingredients of a functional mental health system.  Those

9    include services like PACT, mobile crisis, CSUs and discharge

10   planning that is effective in connecting people to those

11   critical services.

12         Ms. Peet testified that in fact other states have done

13   it.  She has seen it.  It can be done in Mississippi, and

14   Mississippi is obligated to do it.

15         Your Honor, Mr. Shelson argues that at risk appears

16   nowhere in the *Olmstead* case.  I'd like to address that for a

17   minute.  He put up this slide, and then he asserted that the

18   theory of at risk of institutionalization first arose in 2011

19   when the United States Department of Justice issued a statement

20   which declared that ADA applies to individuals at serious risk

21   of institutionalization.  But, Your Honor, what he neglected to

22   inform the court -- what he neglected to inform the court, Your

23   Honor, which was in 2003, the Tenth Circuit Court of Appeals in

24   the *Fisher versus Oklahoma Care Authority*, 33 F.3d 1175,

25   determined that in fact individuals need not wait until they

1    suffer the harm of institutionalization before they bring an

2    *Olmstead* claim.  In fact, the court said "We agree and conclude

3    that *Olmstead* does not imply the disabled persons who, by

4    reason of a change in state policy, stand imperiled with

5    segregation may not bring a challenge to that policy under the

6    ADA's integration regulation without first submitting to

7    institutionalization."

8         And the Tenth Circuit is not the only court, Your

9    Honor, that has found that individuals at risk of

10   institutionalization have an *Olmstead* claim.  In fact,

11   following the Tenth Circuit, the Fourth Circuit, the Ninth

12   Circuit, the Seventh Circuit and the Second Circuit have all

13   found that at risk of institutionalization is the law.  It is

14   more than a theory.  It is more than the Department of

15   Justice's theory.  In fact, there's no court that I'm aware of,

16   district court or otherwise, that has found, as Mr. Shelson

17   encourages this court today to find, that first, one must be in

18   an institution before bringing a claim.

19        And even in this case, Your Honor, the individuals at

20   issue have already been institutionalized repeatedly over and

21   over again.  When they leave the state hospital, the same lack

22   of services that precipitated their admission, many, the

23   evidence has shown, are at serious risk of being

24   reinstitutionalized.

25        Your Honor, the State also referred to the research

1  from Dr. Drake indicating the efficacy of the community-based

2  services that are sought in this case.  And essentially, the

3  State asked this court not to order it or to provide more PACT

4  services, for example, because PACT doesn't necessarily get

5  hospitalizations down to zero.  But the State ignores the

6  second part of Dr. Drake's testimony, that 41 percent is a

7  single-year reduction.  As people get farther and farther from

8  ACT enrollment, the risk continues to drop.

9       And, in fact, the state's own data, the state's own

10  success with PACT, the service model that the state has chosen

11  to implement in fact shows that people are readmitted from PACT

12  teams to a hospital less than ten percent of the time.  More

13  fundamentally, though, this restricts the state's

14  misunderstanding of what this case is about.  It's not about

15  perfection.  It's about putting services and processes in place

16  so that when the state hospital commitments do happen, it

17  happens as a last resort, not because there were no other

18  options available.

19       As HB testified, there was nothing else, no other

20  choice he had but to place his daughter in a state hospital.

21  And when facing the prospect of being -- of her being

22  discharged from the state hospital without appropriate

23  community-based services and supports, she -- he did what any

24  father would be expected to do, fight to try to keep her there,

25  because that was the only option the state made available.

1    Your Honor, the State also discussed the fundamental

2    alteration defense, and I'd like to address that as well.  The

3    State argues, first of all, that *Olmstead* does not require

4    an -- the *Olmstead* decision does not require an *Olmstead* plan,

5    and that, Your Honor, we agree.  In fact, if the State wishes

6    to avail itself of a fundamental alteration defense for which

7    it holds the burden of proof, then it can do so by showing that

8    it has an effectively working comprehensive plan to address the

9    discrimination.  But vague assurances, promised commitment,

10   strategic plans that are changing on an annual basis, this

11   is -- this is the sum certain of the evidence that the State

12   has put forward as part of its comprehensive effectively

13   working *Olmstead* plan, and it falls well short.

14          Subsequent cases have addressed the issue of what is

15   required to show the affirmative defense of a comprehensive

16   effectively working *Olmstead* plan.  The Third Circuit addressed

17   this issue back in 2005, in that *Frederick L.* case, 422 F.3d

18   1515.  And, in fact, the court considered strikingly similar

19   arguments by the State of Pennsylvania that the State of

20   Mississippi is now urging this court to adopt as a sufficient

21   comprehensive effectively working *Olmstead* plan.  In *Frederick*

22   *L.*,  the Third Circuit rejected arguments from the State of

23   Pennsylvania regarding these vague assurances, indicating that

24   they needed rather specific measurable terms to ensure

25   sufficient accountability for the goals that it has set.

1    The court went on to hold that the agency submissions

2    that contained promised commitment that there won't be a

3    reversal of the department's own proven commitment to

4    deinstitutionalization is insufficient because the agency

5    failed to demonstrate that it will reasonably -- measurable

6    terms how it will comply with that commitment.

7    The court went on to say that general assurances and

8    good faith intentions neither meet the federal law nor

9    patients' expectations because that implementation can change

10   with each administration, each secretary, regardless of how

11   genuine.  They are simply insufficient guarantors in light of

12   the hardship daily effected by patients through unnecessary and

13   indefinite institutionalization.

14   As a result, the Third Circuit held that

15   Pennsylvania -- that this situation placed the fundamental

16   alteration defense beyond Pennsylvania's reach.  And we'll

17   submit, Your Honor, the same is true in Mississippi.

18   Your Honor, the State also contends that the costs

19   associated with implementing the changes necessary to comply

20   with the ADA poses a fundamental alteration on the state

21   service system, but they also have not met this burden.  Kevin

22   O'Brien testified that it's cheaper to serve someone in the

23   community.  Melodie Peet, Jake Hutchins, Diana Mikula, all

24   testified about ways the state can leverage Medicaid dollars to

25   bring community costs down.

1    And the State put on two experts who addressed costs.

2  Both of them agreed that at the very worst, it's cost

3  comparable.  This evidence forecloses the state's burden to

4  prove that the requested relief would so -- would be so cost

5  prohibitive as to result in a fundamental alteration.

6    Your Honor, all through trial and the State's closing,

7  you heard from the State that it's doing everything it can, and

8  it just needs a little more time.  Time is certainly one thing

9  the state has already had plenty of, yet the state asks for

10  more.  But time is running out for the people at issue in this

11  case.  For person 3, who Dr. Bell-Shambley met in a deeply

12  psychotic state in his own parent's home because East

13  Mississippi State Hospital discharged him with only an

14  appointment card, not once, not twice, but three times.

15    Time is running out for Melodie Worsham, the peer

16  support specialist who calls mobile crisis for a mental health

17  response, yet gets a law enforcement response.  And for person

18  52 and her husband, who have struggled for years to manage the

19  devastating effects of mental illness, without any access to

20  intensive mobile crisis services, to help guide their recovery

21  and avoid another institution event.

22    And time ran out for person 70, who had at least six

23  trips to the state hospital, yet died by suicide in the

24  community after unsuccessfully seeking out community-based

25  services.

1          Justice Kennedy once referred to the Americans with

2     Disabilities Act as, quote, a milestone on the path to a more

3     decent, tolerant and progressive society.  We respectfully

4     request that this court enter an injunction that finally allows

5     those with serious mental illness in Mississippi to also walk

6     down that path.  Your Honor, unless there's further questions,

7     I have nothing further.

8          THE COURT:  Thank you.  I do have a couple of

9     questions, though.  And I guess to start with the United

10    States, as the court gets ready to start thinking about what it

11    ruled -- what its ruling might be, are there -- I think you

12    alluded to some cases now that might guide the court on some of

13    the various issues, but does the United States have two or

14    three or more of its best cases in support of its position so

15    that the court can start looking at them before you file your

16    proposed findings and conclusions?

17         You were mentioning the third -- the Tenth Circuit

18    case, for example, you mentioned that one, and you said that

19    there are at least four other circuits that have stated things

20    similarly, or held the same, Second, Fourth.  Sounds like

21    everyone but the Fifth Circuit.  But needless to say, I'm just

22    trying to start my road map a little bit earlier, because I'm

23    going to give you some time to file your proposed findings and

24    conclusions.  Do you have any best cases that you think I ought

25    to be looking at?

1  MS. RUSH:  Yes, Your Honor, I can give you a few more.

2  I will also mention that the Fifth Circuit hasn't had occasion

3  to consider this particular issue regarding at risk of

4  institutionalization, but -- and, Your Honor, of course, we'll

5  submit more argument, legal arguments in favor of or

6  conclusions of law.  But there are two additional ones.

7  Certainly the *Fisher* case and all of its progeny is relevant.

8  One of the most recent ones in that category, though, Your

9  Honor, is the Seventh Circuit case style *Stimel v. Wernert*, 823

10  F.3d 902, decided in 2006 out of the Seventh Circuit, which

11  also talks about the at risk of institutionalization issue, as

12  well as many other issues relevant to the case at bar.

13  And Your Honor, on the issue of an effectively working

14  *Olmstead* plan, mentioned *Frederick L.*  There's also an

15  additional case out -- I'm sorry for additional handwriting up

16  there -- there's an additional case, *Jensen v. Minnesota*

17  *Department of Human Services*.  It's a district court case out

18  of Minnesota, 138 F.Supp.3d 1068.  This court considers the

19  issue of what is required to establish an effectively working

20  *Olmstead* plan, and lays out a series of factors regarding

21  concrete measurable goals with corresponding timelines,

22  baseline data that are accompanied by concrete and reliable

23  deadlines, a rationale for each of the metrics used, why each

24  metric was chosen, and why ultimately Minnesota's plan complied

25  with those requirements.

1     Your Honor, another case that is relevant that we had

2  actually included in our letter about the page limit is the *DAI*

3  case out of New York, which is 598 F.Supp.2d 289, Eastern

4  District of New York, 2009.  And that is where the court, after

5  a several-week bench trial, found the State of New York out of

6  compliance with *Olmstead* regarding people with mental illness

7  as well and ordered remedies regarding permanent supported

8  housing primarily, and services as well, to meet those

9  individuals' needs in the community.

10     THE COURT:  In its closing, the State mentioned the

11  consent decree in North Carolina that required that the parties

12  agree to the 3,000 bed limits.  Could you tell me -- or the

13  aspirational goal, or whatever it was, that about 3,000 -- what

14  year was that consent decree?  Does the United States recall?

15  I know it's in the record.

16     MS. RUSH:  My recollection, Your Honor, was that it

17  was finalized in 2012, could have been 2011.  I should know

18  this.  It was either 2011 or 2012, of when that was finalized.

19     THE COURT:  Okay.  Is that consent decree still in

20  place?

21     MS. RUSH:  That consent decree is still in place.  And

22  Your Honor, I should mention that, of course, the negotiated

23  remedy that the United States and North Carolina agreed to

24  regarding the 3,000 slots was based on the needs of the

25  individuals at issue in that case.  It's not something that

1  we -- would be necessarily applicable to any other state.  And,

2  Your Honor, I'm sorry I neglected to mention this earlier.  I

3  even have prepared my own modified demonstrative that the 3,000

4  slots the state put out regarding North Carolina versus the

5  2500 slots for Mississippi, that number was actually generated

6  by Mississippi's own housing agency, not by the Department of

7  Justice.

8          THE COURT:  Okay.

9          MS. RUSH:  Your Honor, there are a couple of other

10  district courts -- while the Fifth Circuit Court of Appeals is

11  not considered the issue of at risk of institutionalization,

12  there are other cases in the -- out of the Fifth Circuit

13  district court level that have considered that.  One was *Pitts*

14  *v. Greenstein*.  That was a 2011 case in the Middle District of

15  Louisiana.  The site there is 2011 Westlaw 1897552.  That case

16  was about individuals living in the community who were placed

17  at serious risk of institutionalization by virtue of not having

18  sufficient personal care services in the community.

19          I believe, Your Honor, this court has also had the

20  occasion to consider this, although not directly in an opinion,

21  but an *Olmstead* case involving an individual who was in the

22  community at the time, and this court denied the State's motion

23  to dismiss regarding that.

24          THE COURT:  Okay.  Okay.  Thank you, Ms. Rush.  I do

25  have a couple of questions for you, Mr. Shelson.  If the State

1 has any specific cases that the State suggests that the court

2 ought to start looking at, you have that opportunity to tell

3 me.

4      MR. SHELSON:  Your Honor, can we get that list to the

5 court?  I was not as prepared as Ms. Rush.  I did not bring my

6 case law to the court today.

7      THE COURT:  Okay.  No problem.

8      MR. SHELSON:  Thank you, Your Honor.

9      THE COURT:  E-mail it to chambers.

10      MR. SHELSON:  Thank you, Your Honor.

11      THE COURT:  The other questions will focus on timing

12 and how much State -- how much time the State needs or should

13 get.  I guess I should ask this question first.  We're in the

14 political season now.  We will have a new governor.  We will

15 have a new lieutenant governor.  The new governor will have an

16 opportunity to appoint a new Division of Medicaid head.  I

17 don't know what the state plan might be.  I imagine the

18 Division of Medicaid can determine how it defines its state

19 plan, what services it will provide and all of that.  I just

20 imagine he does.

21      I don't know for sure, but I would think that the new

22 director of the Division of Medicaid will have a role in

23 defining the state plan.  And I assume there's no reason to

24 believe that the Medicaid Commission will be removed from under

25 the governor.  So that's one thing.

1          The -- will the new elections impact on who might

2     serve as the executive director of the Department of Mental

3     Health or any of those agencies that are a part of -- have been

4     principal in this lawsuit?  We've seen substantial progress.

5     If I accept the State's argument about what Ms. Mikula has done

6     in the last year or the last two years or whatever, is there

7     any guarantee that that same progress will be replicated in

8     2020 or 2021.  I mean, so I guess the first question is, does

9     the political process affect who might head the state agencies

10    that we're talking about here?

11          MR. SHELSON:  Well, Your Honor, I think there

12    primarily are two at issue.  Division of Medicaid, your Honor

13    has addressed that.  My understanding is that's under the

14    governor.

15          My understanding is that the executive director of DMH

16    is not a direct appointment of the governor, but that person is

17    selected by the board.

18          THE COURT:  And that board is -- and the board is

19    appointed my whom?

20          MR. SHELSON:  The governor.

21          THE COURT:  By the governor.  Will we have -- will the

22    makeup of that board change in the foreseeable future, that is,

23    the next 12 months, the next 18 months, the next 24 months or

24    anything of that nature?  Do we know?

25          MR. SHELSON:  My recollection, and can I confer --

1    recollection, Your Honor, is that board is staggered.  Can I

2    check on that, your Honor?

3         THE COURT:  All right.

4     (Short Pause)

5         MR. SHELSON:  Thank you, Your Honor.  The board

6    members, they are staggered appointments.  And I don't know the

7    exact various time frames, but they're not -- they're

8    staggered.

9         THE COURT:  And with respect to this timing thing, I

10   realize the parties have agreed that the court looks at what

11   has happened up through December 31st, 2018.  This lawsuit was

12   filed in 2016, based on what the United States believed to have

13   been not enough action taken up at least from the point of them

14   submitting their findings letter.  So the complaint was filed

15   looking back in time.  Discovery was done for the next couple

16   of years, and then you had what the State has demonstrated.

17   You have all the check marks filled out on DDX-14, which shows

18   something substantially different from DDX-13.  Did it take the

19   filing of the lawsuit for that work to get done, and should the

20   court -- could the court -- could the court look at that and

21   sort of support any findings that -- but for the lawsuit being

22   done, you know, I don't know when the state would have acted.

23   Is there anything in the record that -- well, I guess the

24   question to the state is should the -- how should the court

25   view that DDX-14 and the years that it finally came to checking

1  off all the -- checking off all the blocks in the chart when

2  those charts -- those same blocks were empty at the time of the

3  lawsuit being filed?

4          MR. SHELSON:  Your Honor, the important point is that

5  system transformation is a process.  I don't think any expert

6  on either side of this would disagree with that.  Melodie Peet,

7  five years, she got a lot done, but she didn't get the key

8  services in every region in Maine.  So it's a process, Your

9  Honor.

10         My understanding of the record, to directly answer

11  your question, is there's no direct evidence either way.

12  There's no evidence that the state only made changes because of

13  the lawsuit.  The state, on the other hand, didn't prove the

14  negative.  It didn't prove that it -- so if the court looks at

15  DDX-12, which is the timeline, the evolution towards

16  community-based services is a process.  It hasn't occurred in

17  just the last 18 months.

18         You know, there's no question, Your Honor, that the

19  $28 million in budget cuts did not help.  And what spurred the

20  18-month search, so to speak, was not the lawsuit but the fact

21  that Mississippi State Hospital got into a one-time position

22  where it could shift $8 million.  And that 8 million plus

23  another 900,000 largely funded that surge of services.

24         So it wasn't the lawsuit, Your Honor.  It was good

25  management.  And good management enabled those funds to be

1    shifted, and that was a good thing.

2          You know, Your Honor's question about what point in

3    time is relevant here, that's what I tried, I think was a

4    little inartful about it, tried to address in closing.  We

5    think the relevant time is the fact cut-off date of

6    December 31st, 2018, because among other reasons, it wouldn't

7    make sense for Your Honor to make rulings based on the system

8    at a point in time earlier, when that's not the system that's

9    really in place.  So, you know, if Your Honor ordered us to do

10   X and we had already done that, we just don't think that that

11   serves anybody's interest.

12          THE COURT:  And I appreciate that point.  It reminds

13   me of another type of cases that the court is faced with under

14   the Prison Litigation Reform Act, I think, what is current and

15   ongoing.  So, you know, if I credit what the State has argued

16   today and what the testimony the State says is a part of the

17   record, yes, the state has made progress, but that progress has

18   been long in making.  If you go back -- if you -- if you sort

19   of a credit DOJ's argument with respect to *Olmstead* coming down

20   in 1999, and everybody talking about all of these services, and

21   if I find that 20 years is not -- if I find that if it takes a

22   20-year period to get it done, to get to the point where we are

23   today, then seems to me another five, ten or 20 years in the

24   future, we'll be looking back to this point and might be saying

25   the state is really operating within the time frame that it

1  ought to be operating to get whatever else type of services

2  might be needed to comply with *Olmstead* or the ADA.  That

3  sounded circuitous, I know, but those are the things that I'm

4  thinking about as I consider these issues.  And I'll need you

5  all's help on that, with your proposed findings of fact and

6  conclusions of law, to just let you know the things I'm

7  grappling with right now.

8          MR. SHELSON:  Yes, sir.  A few things about that, Your

9  Honor.  I think, if nothing else, the State has tried to be

10  candid.  Where we were behind in a service, we admitted that,

11  and so on.  And, Your Honor, we acknowledge the state,

12  relatively speaking, got a late start.  But circling back, you

13  know, Your Honor, what is the measuring point in time, even

14  though the state got a late start, is the court just going to

15  declare that a violation?  If it did, we're not sure what -- we

16  don't mean this in any respectful way.  We're not sure what

17  purpose that would serve.

18          Again, the relevant point is where is the state now,

19  or at least as of -- I say now.  I mean the fact cut-off date.

20  And we think that should be the measuring stick.  And that's,

21  frankly, what we're going argue in our posttrial submission.

22          THE COURT:  All right.  Thank you, Mr. Shelson.

23  That's all I had.  Does the government wish to say anything

24  with respect to the question that the court asked?

25          MS. RUSH:  Your Honor, I do, because I have another

1    case for you.

2           THE COURT:  Okay.

3           MS. RUSH:  So the *Frederick L.* litigation actually

4    resulted in two circuit court decisions.  The one I quoted

5    earlier and gave the cite for is often referred to as

6    *Frederick 3*.  *Frederick 2*, though, which is 364 F.3d 487, 2004,

7    the court had its first -- the circuit court had its first

8    occasion to consider the arguments from Pennsylvania.  And

9    actually, Your Honor, again, the arguments from Pennsylvania

10   are very similar to what you just heard from the State of

11   Mississippi in that the appellants argued that past progress,

12   or the plaintiffs in that case argued that past progress is not

13   necessarily probative of future plans to continue

14   deinstitutionalization.  And the court also found in the end

15   that it was unrealistic or unduly optimistic to assume past

16   progress, in and of itself, is a reliable predictor of future

17   programs.  And one of our principal concerns is the absence of

18   anything that can be fairly considered a plan for the future.

19   And that is when the court imposed the obligation on the state

20   of Pennsylvania to provide a plan that was comprehensive and

21   effectively working with clear mind stones and measurable

22   commitments.

23          THE COURT:  All right.  Thank you.  I'd like to

24   commend both sides for the care and attention that you all have

25   given to this case and all the issues that have come before the

1    court.  I appreciate the diligence in which you've -- and the

2    efficiency.  I certainly appreciate the efficiency.  I mean,

3    when we started this case out, in setting it we expected it to

4    last a full six weeks, which would go beyond the 4th of July,

5    which would go probably to the end of next week, but the

6    parties heard the court's pleas, and I hope -- I hope no one

7    has used that as a basis to forego making the record that it

8    intended to make.  I think you got in all the evidence that you

9    desired to get in, and that was no way of trying to stop you

10   from putting on your particular case.

11          This is a huge issue.  This is one that the court will

12   take into -- will deliberate over, and we will get a decision

13   out as soon as practicable.  In that regard, I'm going to give

14   the parties until three weeks from today, which will be the

15   22nd of July.  We realize there's a holiday in between and, you

16   know, that gives you the full -- that gives you that last

17   weekend at least to get something done.  So 5:00 July -- I

18   guess by the end of the day -- you have until midnight.  I know

19   you're going to use it.  I know you are.  I didn't want to say

20   5:00 and then DOJ is sitting up there in Washington, and they

21   have to turn it in by 4:00.  So we'll -- but if it's midnight,

22   you've got to have it in by our 11:00.

23          But I do really appreciate the advocacy that the

24   parties have given.  I appreciate the parties listening to the

25   court.  I heard Ms. Rush say Yazoo today.  That was from the

1   very first day of trial.  She said it right.  I appreciate

2   that.  But know that I tried to keep you all somewhat relaxed.

3   That is not in any way an indication of not taking the case

4   serous because this is a serious case.  All cases are serious,

5   particularly to the parties, but these parties here have

6   institutional concerns with respect to the parties and the

7   people with whom they represent.  And I'm very cognizant of

8   that.  And so please don't think that in any way at any time

9   I've sort of indicated to either one of you that I've either

10  made a decision or that I don't respect the decisions and the

11  issues that you've brought to my attention.

12          Thank you, again, so very much.  And while you're

13  still here, spend as much money as you can in Jackson.  But

14  thank you all, the local people, for being here.  This ends --

15  this ends the court on this case for today.  So we are in

16  recess.

17      (Recess)

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

     I, CHERIE GALLASPY BOND, Official Court Reporter, United

States District Court, Southern District of Mississippi, do

hereby certify that the above and foregoing pages contain a

full, true and correct transcript of the proceedings had in the

aforenamed case at the time and place indicated, which

proceedings were recorded by me to the best of my skill and

ability.

     I certify that the transcript fees and format comply

with those prescribed by the Court and Judicial Conference of

the United States.


     This the 1st day of July, 2019.


                         s/ *Cherie G. Bond*
                         Cherie G. Bond
                         Court Reporter