# U.S. v. Mississippi

## First Report of the Court Monitor

## March 4, 2022

**Acknowledgement and dedication**: **Mississippi's mental health system and the people working in it have been stressed by financial challenges, problems in access to care, and litigation. Within the past two years the challenges of a global pandemic have made the stress even more acute, affecting people who rely on care, families and staff. This report comes at a time when we all hoped to be past the pandemic—but it continues. The monitoring team acknowledges these challenges, and the burden placed on people who depend on and provide care**. *We applaud the courage of those who struggle on, and we mourn those who have been lost. We hope the time ahead is marked by recovery for both individuals and a system of care*

Introduction

This is the first Report of the Court Monitor in this matter concerning Mississippi's adult mental health system, and its compliance with the "integration mandate" of the Americans with Disabilities Act (ADA). This requirement broadly means that if a state provides care for people with disabilities such as serious mental illness (SMI), that care must be provided in a manner that does not unnecessarily deprive these individuals of life in their community. In this case, the issue is whether Mississippi's mental health system for adults with serious mental illness--essentially, community mental health programs operated by Community Mental Health Centers (CMHC's) and inpatient care provided by State Hospitals (Hospitals)--operates to unnecessarily institutionalize these individuals in State Hospitals.

The matter has been active for over a decade. The U.S. Department of Justice (DOJ) launched an investigation into the system, leading to a "Findings Letter" demanding state action in 2011. Originally the investigation was focused on developmental disabilities services as well as adult and child mental health. After unsuccessful negotiations between DOJ and the State of Mississippi, DOJ filed a lawsuit focusing on adult mental health services in 2016, leading to a 2019 trial in the U.S. District Court of the Southern District of Mississippi before Judge Carlton Reeves. In September 2019 Judge Reeves issued an Opinion and Order finding that the Mississippi system for adults with serious mental illness was in violation of the ADA, and directing the parties to develop a Plan to resolve the problems.

In February 2020, with input from the State and DOJ, the Court appointed Dr. Michael Hogan, a long-time state mental health director, as Special Master to help develop that Plan. After negotiations lasting over a year, the State and DOJ, despite finding agreement on a number of issues, were unable to agree on a Plan. Judge Reeves then ordered the State to submit a Plan, with DOJ provided an opportunity to respond to the State's Plan with its own proposal. Following these submissions--which were not in agreement--Dr. Hogan recommended a Plan, incorporating elements of the State and DOJ proposals, Following a hearing in July of 2021,

which provided an opportunity for the parties to express their perspectives, Judge Reeves issued a Remedial Order (henceforth Order) on September 7, 2021. At that time, based on recommendations of the parties, Judge Reeves also appointed Dr. Hogan to serve as Court Monitor, to review the State's progress toward compliance with requirements of the Order. The Order of Appointment provides:

1. The Monitor shall assess compliance with each obligation in the Court's Remedial Order and shall provide the State with technical assistance as necessary to support the State in reaching compliance.
2. While conducting the Monitor's regular assessment, the Monitor shall review and validate data and information, speak with State officials, providers, and individuals receiving services, and participate in the annual Clinical Review required by the Remedial Order. When speaking with State officials, counsel for the State may be present.
3. The Monitor shall provide written reports on the State's compliance with the Remedial Order every six months. Each report shall describe the State's level of compliance (e.g., noncompliance, partial compliance, or substantial compliance) as to each obligation in the Remedial Order and include a summary of the data that led to the Monitor's assessment of compliance.
4. The written reports shall be filed on the Court's docket and the Court will hold a status conference following submission of each report. The Parties shall establish procedures for review and comment on draft reports by the State and the United States before the reports are filed with the Court.

<u>Focus of this initial Report.</u>

This is a "stage setting" report, including some early findings on compliance and, in an Appendix, providing background and context on mental health care in Mississippi. While future reports will focus more exclusively on compliance with the Order, at this point only limited conclusions can be made. The monitoring effort has just begun, there is uncertainty introduced by ongoing legal proceedings, and the infrastructure for measuring compliance is being developed. Given the early timing of this Report, and despite a number of efforts by the State to expand and improve care, it is not yet possible to make definitive determinations of compliance for many requirements of the Order. The Monitor's observations in the Appendix to this Report are offered to the Court, but also to officials and stakeholders, to encourage a common understanding of the challenges and accomplishments in Mississippi's system and in the spirit of technical assistance.

Reflecting the early nature of the monitoring effort and these "data points," the Report that follows is organized into sections:

- Activities of the Monitor during this reporting period including efforts to develop monitoring methods
- Preliminary observations and findings on Compliance
- Next steps in monitoring

An Appendix to the Report, titled <u>The Context of Care and Compliance in Mississippi</u> describes some of the major elements and forces at play in the mental health system. This section is included as a compliment to the main focus of the Report—assessing compliance with the Order. The Monitor hopes the information and perspectives are useful to stakeholders and officials.

<u>Activities of the Monitor during this reporting period</u>.

This reporting period, immediately following the Order, was punctuated by legal proceedings:

- Following issuance of the Order on Sept. 7, 2021, on Sept 27 the State filed a Motion for a Partial Stay, pending an Appeal to the Circuit Court of Appeals. The portions of the Order proposed to be stayed included items involving increased spending or potential program development (for more expansion of Supported Housing, and consideration of Peer Specialists at additional locations) and proposed State responsibility to develop an Implementation Plan, and a Clinical Review process. The DOJ did not oppose the State's proposed stay pending appeal, and those provisions are stayed.

  Other elements of the Order, and requirements of the Appointment (monitoring) Order remain in effect. However, elements of the agreed Stay do affect monitoring. Included in the (stayed) Implementation Plan was a recommended process, deferring considerably to the State, to clarify requirements for compliance. With these provisions stayed, the Monitor with both parties will need to clarify compliance thresholds.

- On October 18, the Monitor submitted a proposed Budget to the Court and the parties. On November 1, the State objected to parts of the proposed budget on the grounds that some monitoring activities were related to the (stayed) Clinical Review and should therefore also be stayed.
- On November 3, the Court approved the Budget as proposed.
- On January 10, the State filed an opening Brief with the Fifth Circuit Court of Appeals in its appeal of the District Court's Opinion, the Order, and the appointment of a Monitor.

Other activities of the Monitor during this reporting period included consulting with the parties (on recommendations for monitoring, and toward an agreement that the parties would receive draft Reports for review and comment five weeks before they are due to the Court). Staff consultants with experience in Mississippi's mental health system were sought, interviewed and engaged:

- Teri Brister, Ph.D. worked for many years in Mississippi CMHC's before serving briefly as Executive Director of the Mississippi chapter of the National Alliance on Mental Illness (NAMI). For over a decade, Dr. Brister has directed training and research efforts for NAMI at the national level, and also worked with the American Psychiatric Association's <u>SMI Adviser</u> initiative, a national technical assistance center designed to offer "researched, vetted and verified guidance to the best resources on SMI" (Serious Mental Illness) to providers across the country.
- Jacqueline Fleming, LCSW is a clinical social worker who worked briefly in Mississippi community mental health programs and then for many years at Mississippi State

Hospital, where her most recent position was Director of Social Services, with responsibility for assessment of individuals on admission and for planning discharge.

Both Dr. Brister and Ms. Fleming have experience with record reviews in addition to their broad experience in Mississippi's mental health system, and the Monitor acknowledges and appreciates their contributions to this Report.

In response to the Monitor's request, the DOJ and State have made substantive recommendations for monitoring and assessing compliance. Additional work is needed with the parties to determine how best to use these recommendations to shape the monitoring effort; this will be discussed and applied further in future Reports.

During this period, the Monitor made multiple visits to Mississippi:

- On Oct. 11-15, the Monitor met with advocates, State DMH leadership, leaders of the CMHC's, the President of the State Board of Mental Health, the Coordinator of Mental Health Accessibility (a new office created in the Department of Finance and Administration) and visited Mississippi State Hospital.
- On Nov 29-Dec 2, The Monitor met with (then potential) consultant staff to plan, and to visit Hinds Behavioral Health (Region 9) and met with DMH staff to discuss data collection. Other meetings during this visit were with the Office of the Coordinator of Mental Health Accessibility (OCMHA) and leadership in the Division of Medicaid. The Monitoring Team's planning efforts were focused on developing a schedule to visit State Hospitals and CMHC's, and a method to "trace" care received by people admitted to and potentially discharged from State Hospitals, related to the Order's requirements for Discharge Planning and Diversion from State Hospitals. This "tracer" record review was subsequently used to check on a sample of people admitted to State Hospitals, and admitted from/discharged to Regions 8, 9, 10, 11, 12 (including former Region 13) and 14.
- On Dec. 13-16, the Monitoring Team visited East Mississippi State Hospital (EMSH) to meet leadership staff, visit a unit, and review records of individuals from Regions 7 and 10 cared for at the Hospital. Then the Team visited Weems Behavioral Health (Region 10) to meet with leadership, get an overview of services, and review records of people from Region 10 admitted to and discharged from EMSH. The Team also reviewed and revised its draft record review materials.
- On January 3-6, the Monitoring Team conducted record reviews at Mississippi State Hospital and Region 9 and visited/conducted record reviews at South Mississippi State Hospital and Regions 8, 11, 12 (including former Region 13), and 14.

In preparation for this Report the monitoring team conducted several activities to understand the post-trial "new baseline" status of Mississippi's mental health system. These included:

- Recent data on the funding, capacity and utilization of CMHC and Hospital services during FY 20 and FY 21 was requested from the Department of Mental Health (DMH) and Division of Medicaid (DOM). Data was received from DMH, reviewed, and is reflected in the report. Data was received from DOM recently, and there has not been

sufficient time to fully review it for this report. The DMH data illuminates patterns of care, and how these have changed since the 2019 trial. The State has continued to make efforts to "rebalance" care from a pattern of institutional over-reliance toward community care, and has made funding available to the CMHC's for all the services required by the Order, save those where requirements have been stayed. (Some newly funded programs required by the Order are still being developed. Additionally, Mississippi's Legislature is considering recommendations to fund additional services.) The review confirms progress by the State but is not sufficient to determine whether people who are at serious risk of hospitalization are receiving the services needed to continue their recovery while avoiding institutionalization.

- Visits were scheduled to all Mississippi's Hospitals and CMHC's. Because of the accelerating rate of COVID infections, some visits (to North Mississippi State Hospital and Regions 1-4, 6, 7 and 15) were postponed. Nonetheless, we observed some patterns that we believe are relevant across the entire Mississippi system. These include the impact of the pandemic, with valiant efforts  by both hospital and community staff to provide care in a stressful environment marked by staff shortages and continued struggles with reimbursement and program management. It is a picture of both resilience and challenges.

- In addition, the Monitoring Team worked to develop a methodology for record reviews. The Court's Order of Appointment requires "written reports on the State's compliance" every six months, and specifies that "While conducting the Monitor's regular assessment, the Monitor shall review and validate data and information, speak with State officials, providers, and individuals receiving services..." We describe below these efforts to review data and clinical records.

As the Order implies, the State's own data, while central to the State's management of the Mississippi mental health system, is also a foundation for the Monitor's reviews. The data itself provides a general picture of whether the ADA's "integration mandate" is being addressed. By reviewing the State's data showing patterns of Hospital use by Region and County (e.g., admissions, discharges, overall census and patterns of long-stay use) and by reviewing patterns of community services as described in Paragraph 20 of the Remedial Order, the Monitor will be able to broadly assess the State's progress, Additionally, as the Appointment Order indicates, validation of the State's data is necessary to assure its adequacy and accuracy.

One crucial way to validate effectiveness of the State's efforts is to examine the clinical records—in State Hospitals and CMHC's -- of individuals admitted, discharged and cared for in the mental health system. By reviewing a sample of records—and in some cases talking to both staff involved in care and persons who received care—statewide patterns of care can be validated meaningfully in the experiences of, and care delivered to individuals. In this early phase of monitoring, record reviews are also particularly useful because much data to measure compliance is not yet available. Many provisions of the Order relating to data provide that it will be made available beginning at the end of FY 2022—after the first monitoring Report.

Reviewing information from a sample of records is a standard approach to monitoring, accreditation and program review. Therefore, record reviews were used during this period in a very focused way—to examine movement into and out of State Hospitals. This provided a preliminary picture of how Mississippi's efforts to date are working and allowed an early assessment of several important requirements of the Order: Paragraph 13 (Diversion from State Hospitals) and Paragraph 15 (Discharge Planning). As implementation and monitoring proceed, record reviews will be adapted to validate compliance with other requirements.

Approach to person-centered review. For the initial record review, the Monitor adapted concepts and approaches developed by The Joint Commission (TJC) to review the safety and quality of health care. The TJC's Tracer Methodology reviews care by "tracing" it over, or even across episodes. Medical records are reviewed at each stage, and staff and the person receiving care may be interviewed. The approach is well suited to this case because examining care received by individuals to determine if requirements of the Order were met goes to the heart of the matter.

In this initial phase, the tracer approach was developed and tested in early visits to East Mississippi State Hospital (EMSH) and Region 10. We found it useful in examining whether care was consistent with requirements of the Order. We also determined the record review could be implemented without an undue burden on staff. We traced care for several groups of individuals, beginning with those returning from hospital to community. For this group we focused on whether discharge planning requirements of the order were met, and whether continuity of care was provided appropriately following discharge. A sample of individuals was selected by Hospital staff in the days prior to a monitoring visit by the Court Monitor and/or staff. The sample included a small number of consecutive discharges during the previous quarter to each Region served by the Hospital. In reviewing Hospital records, we were able to get a general picture of how the admission was handled, of discharge planning, and of CMHC involvement in discharge planning. In our opinion, the method of selection (e.g., consecutive admissions) as well as the fact that staff did not know exactly what we would examine safeguarded against selection of only "good" records.

Following the Hospital visits, we visited Regions/CMHC's and examined records of the same individuals. These reviews added some perspectives on community care prior to admission and especially of care immediately after discharge.

The sample size for each hospital for which reviews were completed was nine for EMSH, twenty-four for Mississippi State Hospital (MSH) and twelve for South Mississippi State Hospital (SMSH). Chart reviews for North Mississippi State Hospital were not conducted during this period. The format for the chart review was a review of the record and using a checklist developed from the Remedial Order requirements for discharge planning and the "warm hand-off." These requirements can be found in Paragraph 15, a-h; Paragraph 16 and Paragraph 17:

- Discharge planning begins within 24 hours of admission to a State Hospital.
- Identify the person's strengths, preferences, needs and desired outcomes.
- Identify the specific community-based services the person should receive upon discharge

- Identify and connect the person to the provider (s) of the necessary supports and services
- Refer the person to PACT or ICORT when the person meets the criteria for PACT or ICORT in DMH's Operational Standards
- Prior to discharge, coordinate between the State Hospital and the community provider so that, upon discharge the person continues to receive prescribed medications in the community appropriate for the person's ongoing clinical needs.
- Identify resources for the person to access in the event of a crisis and educate the person about how to access those services
- Include an anticipated discharge date
- For discharge plans for persons who have previously been admitted to a State Hospital within a one-year period includes reviews of the prior discharge plans, the reasons for the readmission and adjustment of the new discharge plan that accounts for the history of prior hospitalizations.
- Prior to discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll persons in appropriate services
- Peer Bridgers at each State Hospital integrated in the discharge planning process.

The observations that follow are provided to support our initial compliance findings, and as constructive feedback/technical assistance.

Patterns of documentation: Discharge planning. We made some observations from the records review at each of the three State Hospitals we visited during this period, as well as overall patterns for the State Hospitals and six CMHC's we visited. (The samples are adequate in our view to support these judgements; we looked at a minimum of four records at each CMHC, and at four records per Region/CMHC served at each Hospital.) Though sufficient to assess patterns at each State Hospital reviewed, the smaller sample associated with each CMHC limits our ability to make any judgement on individual CMHC performance, although we discuss some observations from the CMHC record review below. Our judgements about sampling are based on experience; statistical sampling methods are not appropriate to this task.

State Hospital chart reviews: Data from reviews at each Hospital are provided in three charts at the end of this section. In an effort to improve discharge planning and facilitate "warm hand-offs" (a referral or hand-off with face-to-face contact) DMH organized a Discharge Transition Workgroup composed of representatives from the State Hospitals and the Community Mental Health Centers. This group developed a Discharge Transition Process and Form for use by all State Hospitals. This form is sent to the Community Mental Health Center within twenty-four hours of the person's discharge from the Hospital. Our review (see the charts at the end of this section documenting the patterns we found in Hospital records) finds that this effort has led to improvements in the discharge transition process, but that continued work is needed to achieve compliance with all related elements of the Order.

The review of the State Hospital records also revealed other challenges in the system. There were persons committed to State Hospitals who when assessed at the Hospital did not have SMI. Chart reviews indicated these individuals, when fully assessed, had primary diagnoses such as Dementia, Substance Use Disorders, Anti-Social Personality Disorders, and Intellectual and Developmental Disability. These are diagnoses that are included in the American Psychiatric Association's Diagnostic and Statistical Manual (DSM). Thus, they are psychiatric diagnoses, but these conditions are generally not considered serious mental illnesses, and generally psychiatric hospitals have only limited capability to treat them. Persons with such conditions may need treatment of some kind, but psychiatric inpatient care is generally not designed to treat these problems. Their admission to Hospitals is stressful for them, a challenge for staff, and their interactions with people with SMI may be problematic. We discuss this issue below.

We consistently saw Hospital assessments started promptly on admission leading to development of treatment plans to inform treatment and discharge planning. (This was done in a very timely way at SMSH and within about a week at MSH and EMSH.) While we observed prompt initiation of assessments and treatments, we did not see much documentation that discharge planning specifically starts within 24 hours of admission.

At SMSH, there was consistent evidence of documentation of the person's strengths, preferences, needs and desired outcomes. There were short term and long-term goals. The goals were person-centered. Strengths, needs, and desired outcomes were person centered. There was a regular review of the person's progress in treatment. The goals and discharge date were updated at each review. At EMSH and MSH, to the extent that strengths, needs and desired outcomes were documented, they were more generic.

It appears that Hospital social workers are aware of Core Services and the benefit they may offer. Therefore, they check relevant boxes on the Discharge Transition Record (e.g., for PACT, ICORT or ICSS). However, checking the box does not necessarily mean that eligibility has been established or that a referral for the service has been made. Enrollment in the Core Services is decided at the CMHC. We discuss this issue below. We did note that if the person was already a client of the CMHC and was known to be enrolled in one of the Core Services, their first appointment after discharge was generally made with that program.

We found that follow-up appointments at the CMHC were consistently arranged prior to discharge. These appointments were generally within a few days of the person's discharge from the State Hospital. We determined that the degree of follow-up if people missed these appointments was inconsistent.

Documentation of intakes to, or initiating treatment planning by the CMHC prior to the person's discharge from the State Hospitals was generally not evident throughout the Hospital chart reviews. Personnel in Region 12 described a model process of completing intakes or plan updates in conjunction with Hospital staff during the Hospital discharge but we did not see much evidence of this across the Regions where we reviewed charts.

Reviews at MSH and SMSH confirmed that, in cases where the reason for admission to the State Hospital was non-adherence with prescribed medications, the person was often prescribed a

long-acting injectable. Many experts believe this is a useful way to improve adherence to prescribed regimens, and thus to reduce symptoms and future admissions.

Each hospital has received funding for the Peer Bridger position. SMSH has their Peer Bridger in place and there was consistent evidence of the Peer Bridger collaborating with persons prior to discharge. EMSH has hired a Peer Bridger, but that person has not been integrated in the discharge planning process. MSH has not yet hired a Peer Bridger.

Additional collaboration led by DMH with State Hospital staff and CMHC's to address all discharge planning requirements of the Order could be beneficial. Each hospital has forms that could be helpful in showing evidence of documentation in the discharge planning and "warm hand-off" processes. Useful documents we reviewed included: at SMSH, the Trauma History Form, Family Collateral Intake Form, Social Services Documentation Record and Patient Choice List. At EMSH the Social Services Release Form and Social Services Checklist and at MSH, Page 2 of the Treatment Plan might be considered models.

<u>Hospital Specific Patterns of Compliance with Discharge Planning Requirements</u>. The charts on the following pages describe our summary judgements about compliance with the Discharge Planning requirements of the Order. We provide this detail primarily for DMH and Hospital quality improvement purposes and to illustrate how the chart review process allows us to assess how providers are doing in meeting requirements.







Observations about CMHC Chart Reviews. Monitoring visits to six of the thirteen community mental health centers (CMHCs) in Mississippi included interviews with staff and reviews of records. The record reviews also followed the "tracer" methodology which began with records being selected by Hospital staff from admissions and discharges within the prior three months. The records for these same individuals were reviewed during the visit to their CMHC to assess

the communication, documentation and continuity of care between the state hospital and CMHC. We used a record review guide based on the requirements of the Order related to discharge planning, and considered some issues related to Diversion from State Hospitals (Paragraph 13). We note that fully assessing Diversion will require a deeper review, considering both the ongoing care that people receive and also crisis care.

Our observations are based on CMHC samples that are relatively small and therefore we offer few conclusions about care at individual CMHC's. Many of our observations may be of interest for quality improvement, but some do not tie directly to specific requirements of the Order and may not therefore have immediate implications for compliance.

Our methodology meant that the records reviewed at each CMHC were selected in their relation to a completed involuntary hospitalization. We did not complete detailed reviews of services provided prior to the hospitalization—except perhaps in some instances CSU services in the context of Pre-Admission Screening. And we have not yet reviewed records of individuals who were diverted from hospitalizations during the pre-evaluation screening. Our experience tracing care from the Hospital through discharge makes it clear that evaluating care prior to admission means that we must start with a different sample. We will explore these issues in future monitoring visits. We also learned that calling people after their discharge to ask about their experience was generally not productive. We attempted to call several dozen people whose records we had reviewed, to seek their perspectives on the care they received. In the great majority of cases, people did not answer our calls; we will need to use other methods to have productive conversations with people in care.

Additionally, since only six of the CMHCs were visited, there were some charts reviewed at EMSH and MSH that do not yet have a corresponding record review at their CMHC. The CMHC records of any individuals whose Hospital records were reviewed will be checked when initial monitoring visits are completed later in March.

Reviewing the CMHC records proved challenging due to the wide variability in record keeping systems. Of the six regions visited, only two used the same electronic health record (EHR) system – Region 10 and Region 12 both use TIER. Three of the CMHCs (Regions 9, 10 and 11) had difficulty locating Discharge Transition Planning documents from the state hospital since scanned documents weren't consistently entered into the EHR. One of the CMHCs (Region 11) was in the process of converting EHR systems, moving from MIS to My Evolve. This meant they were using both systems plus an additional system for scanning external documents – including the pre-evaluation screening for commitment and discharge records from the state hospital. This made it hard to locate some information and presents a significant challenge for Region 11 staff.

Additionally, it should be noted that the Region 12 CMHC (Pine Belt) began providing services to individuals living within Region 13 in February, 2021. However, they did not receive information about services previously delivered by Gulf Coast Mental Health (the prior Region 13 CMHC) because of problems in the transition. Everyone being served in former Region 13 since February 2021 has therefore had a new intake and a new medical record has been created at

Pine Belt. The effort to reach out and engage people in care was substantial and commendable. Clearly the transition to a new CMHC in the former Region 13 was challenging, and despite best efforts there were almost certainly lapses in care. This suggests the need for improved processes within DMH to monitor, and assist or if necessary replace, potentially failing CMHC's.

<u>Patterns noted in CMHC records.</u> Records indicate that aftercare appointments at the CMHC's are being consistently scheduled prior to Hospital discharge. These appointments are scheduled within a few days (usually 2-3) following discharge. Documentation indicated variability as to how those appointments are made (i.e., phone calls, emails, visits with individuals while at the state hospital) although each CMHC described a process in place to assure this was happening. The consistent scheduling of timely appointments is a key step in improving continuity of care.

Each CMHC described a process for staff connecting with individuals from their region while they were hospitalized, but documentation of these visits was sparse and was only seen consistently in Region 12 and Region 14 records. Additionally, several regions were not able to produce the records from the State Hospitals (Discharge form) because they were received as either paper or scanned copies and had not yet been entered into the shared documents portion of the EHR. One CMHC's EHR didn't have the capacity for scanned documents so those are kept in another shared drive at the CMHC. For two of the four charts reviewed in Region 11, staff were not able to locate those scanned documents during the monitoring visit.

The newly initiated Discharge Transition Summary documents were available in records in all but two regions (Regions 10 and 11) and staff said that these new documents were helpful in efficiently transferring relevant information.

Documentation that individuals are assessed in the context of Pre-Admission Screening for specialty services that can help prevent the need for hospitalization (e.g., PACT, ICORT, ICSS) was often lacking, except in Regions 12 and 14.

In a substantial percentage of cases where information was available in the record regarding where people were held pending admissions, we found delays in access, and that a number of people were held in jails. The chart below illustrates this:

14

| Region | Days between Pre-Eval and Admission | Location Held |
|---|---|---|
| Region 8 | 7 | Jail |
| | 16 | Hospital |
| | 11 | Hospital |
| Region 9 | Unknown – Pre-evaluations not included in records | |
| Region 10 | Unknown | Hospital |
| | 30 | CSU |
| | Unknown | Unknown |
| | Unknown | CSU |
| | 13 | CSU |
| | 16 | CSU |
| | Unknown | CSU |
| Region 11 | 7 | CSU |
| | 15 | Unknown |
| | 6 | Unknown |
| | Unknown | Unknown |
| Region 12 | 14 | Jail |
| | 16 | Hospital |
| | 15 | Jail |
| | 18 | Jail |
| Region 13 | 15 | Jail |
| | 11 | CSU |
| | Unknown | CSU |
| | 8 | Jail |
| Region 14 | 3 | Jail |
| | 15 | Jail |
| | 10 | Jail |
| | 19 | Unknown |

These patterns appear to differ by Region (although the small samples make generalization unreliable), with a high proportion of people admitted from Regions 12, 13 and 14 held in jail. We do not know if statewide data on this is reviewed by DMH; the pattern needs attention.

Many of the individuals whose records were reviewed had experienced multiple admissions, although a majority of these readmissions were over a period of multiple years. (Generally, readmissions soon after discharge are considered problematic in health care; the Order focuses special attention on readmissions withing 12 months.) We did review records of several individuals who had been hospitalized within the previous 12 months, and two of individuals who had been readmitted within a two-month period. Both individuals had extensive legal

difficulties due to aggressive behavior in the community and there was pressure to "do something with them." As we noted in our discussion of hospital records, finding evidence that care was adjusted because of the problems leading to subsequent admissions was difficult.

Given the impact of hospitalization, we expected to see documentation of efforts to follow up with individuals who miss the first aftercare appointment, or if they drop out of treatment services shortly after discharge. Evidence was mixed. Generally, following up on missed appointments is a standard practice but sometimes follow-up can be just a phone call—which might not be answered. Regions 8 and 12 were the only regions in which the records consistently documented staff making not only routine follow-ups but taking more persistent steps such as tracking down an individual who was out of state temporarily and checking in with them by phone until they returned.

Of the 29 CMHC records reviewed, Hospital discharge diagnoses were captured on 25. Of those 25 individuals, 8 (32%) were discharged without a SMI diagnosis. Discharge diagnoses included dementia, substance use disorders, antisocial personality disorders, intellectual/developmental disabilities and malingering. The Table below identifies primary diagnoses in the charts we reviewed. We note the sample is too small to make definitive conclusions, but the large percentage of people admitted to State Hospitals without a primary psychiatric diagnosis does raise concerns about the appropriateness of their care, and contributes to delays in accessing hospital care for individuals with SMI.

| Primary Discharge Diagnoses (captured for 25 of the 29 individuals) | % | |
|---|---|---|
| Schizophrenia | 28% | 68% SMI |
| Bipolar Disorder | 20% | |
| Schizoaffective | 16% | |
| Major Depressive Disorder | 4% | |
| Antisocial Personality Disorder | 8% | 32% Not classified as serious mental illness |
| Personality Disorder NOS | 4% | |
| Malingering | 4% | |
| Intellectual Developmental Disability | 4% | |
| Dementia | 4% | |
| Major Neurocognitive Disorder | 4% | |
| Substance use disorder | 4% | |

In some of these cases, the CMHC had recommended against hospitalization because the person did not meet hospitalization criteria (since their difficulties were not the result of an SMI), but the court opted to commit the person nonetheless. In one situation, the individual was released from hospitalization after only 3 days with a note from the clinician "At baseline when first seen."

 Examples of commitment/admission processes and issues:  One individual with major neurocognitive disorder was evaluated for commitment 9-20-21 and determined by Region 14 to not meet the criteria for hospitalization. Another affidavit was filed and a second pre-eval was

completed on 1-11-21, when the court committed her. She was discharged on 10-27-21 and another affidavit was filed 11-29-21. This individual was still being held in the George County Jail at the time of the monitoring visit 1-6-22.

Another individual was committed to Substance Use treatment at EMSH 9-2-21, However, when presented at EMSH for admission the physician in the psychiatry service refused admission stating, "no services to address". He was sent back home, and the family filed a mental health commitment – diagnosis is Dementia and Substance Use Disorder.

These few examples illustrate problematic situations that may occur in mental health systems; individuals for whom psychiatric hospitalization is contraindicated are sent there because "something has to be done" and other options are not available. These individuals may not have a SMI and therefore the requirements of the Order do not directly address their care. But managing this care is a challenge for both CMHC's and Hospitals, to say nothing of the deeper challenges for the people involved and their families.

The collaborative discharge process that is in place between SMSH and Region 12 offered a useful model. There was clear evidence of communication before hospitalization (e.g., while an individual was being held in CSU) as well as during and after the hospitalization. Peer Bridgers were in place at SMSH and at Region 12, and were involved with supporting individuals while at the hospital and during the time of transition home. Both these organizations are operating within the same guidelines and funding mechanisms as the other hospitals and CMHCs—but on this issue they are making the system work the way it is intended. Examining these processes more closely as part of statewide efforts to improve discharge planning could be useful.

Overall impressions regarding discharge planning. As we have indicated above, we found some clear signals of improvement resulting from DMH efforts to improve discharge planning were observed. What is generally missing, from review of those State Hospital and CMHC records seen to date, is sharper individualization of the assessment, treatment and discharge planning procedures specifically to address reasons for community crises and hospital admissions or readmissions, The issues that should be considered here touch on both Hospital and CMHC processes of care, and involve such concerns as:

- For individuals with repeated readmissions (even if they are not recent), what community problems lead to frequently cited problem of "medication noncompliance?" Is the problem really nonadherence to a prescribed regimen, or is obtaining medications an issue, and if so, how can it be addressed? If the individual is not taking available medication, why? Can this be addressed through counseling or reminders? Would the individual benefit from an injectable, long-acting medication? (Increasing use of these treatments was noted at MSH and EMSH.) Are individuals with psychotic illnesses experiencing medication side effects while not getting sufficient relief of symptoms from the medications they are taking? Should they have the opportunity for a trial of clozapine?

17

- Assessment of the need for (more) intensive services, where this is needed to prevent readmission, generally needs improvement. Determining this need is very challenging for hospital staff who are not intimately familiar with community care models and individual CMHC practices. Planning for post hospital levels of care, while the individual is hospitalized, is probably best done by the CMHC in consultation with Hospital staff. However, this requires a protocol to be in place. We reviewed a record of an individual (L.C.) treated at EMSH and Region 7, who had multiple hospitalizations and several outpatient commitment orders. In reviewing the record and talking with his mother, we could find no evidence of PACT or ICORT services which may have been necessary. We observed an excellent approach to addressing this challenge at Region 12/SMSH, where CMHC staff work with SMSH staff prior to discharge to schedule an intake (if the individual is not already engaged in CMHC care) or to update treatment plans.

- We did note a variety of models and approaches for adjusting levels of service for individuals who are already engaged in community care. In some CMHC's, e.g., Region 8, a "primary therapist/care manager approach" (our term) emphasizes that assessing the need for all services rests with a therapist who is also a care manager. In other CMHC's team leaders seem to take the lead on planning for changes in levels of care. We note there is no single model which is the gold standard for this kind of planning and adjusting ongoing care delivery—but having a consistent approach is an essential component of good care.

- Paragraph 13 of the Order requires CMHC's, "During the pre-evaluation screening process (to) determine if a person meets the criteria for intensive community services…and arrange those services if appropriate". It seems logical to address this issue during screening for hospitalization but CMHC's and possibly the State will need to consider if addressing this need during a crisis is sufficient. We also note that the Order's requirement at Paragraph 2 (b) that indicates CMHC's are responsible for "screening individuals with serious mental illness during annual planning meetings to determine their need for the services required by this Plan" is necessary but also probably not sufficient. Good Effective care requires adjustment of the level of care an individual needs whenever it is necessary, and documenting this in the record. This will require continued attention, whether at the level of each CMHC or statewide. Alternative approaches (e.g., considering more intensive services if an individual has missed appointments, if there is a history of similar issues) may be in place in some CMHC's and should be considered for broader adoption.

- Many of the charts we reviewed had evidence strongly suggestive of trauma histories for the people involved. Where people have experienced substantial trauma, it is very likely to shape their lives and to be expressed in patterns of behaviors and challenges somewhat like those experienced by people with SMIs. Additionally, trauma may complicate recovery from serious mental illness, and research suggests that trauma experiences are very common among people with SMI. Where people are living with significant trauma histories or complex trauma, recovery overall is often dependent on addressing and resolving the problems associated with trauma. We note this depends on identifying trauma, and commend SMSH for including a trauma history assessment as a standard

element of intake assessments. Noting that this recommendation may go beyond our brief and thus be advisory, we suggest considering screening for trauma as a standard element of initial assessments at all Hospitals and CMHC's.

<u>Preliminary Observations and findings on compliance</u>

As noted above, the Order requires that "Each report shall describe the State's level of compliance (e.g., noncompliance, partial compliance, or substantial compliance) as to each obligation in the Remedial Order and include a summary of the data that led to the Monitor's assessment of compliance." In this first and preliminary Report, it is not yet possible to make definitive findings on most aspects of compliance. The State and DOJ have each made substantive recommendations on how to assess compliance, and in some cases on standards to judge compliance. These recommendations will be reflected in future monitoring Reports. (The Monitor notes that a process to define compliance criteria, giving considerable deference to the State's proposals, was included in the Order, but stayed. This was based on the State's Motion for a stay, the DOJ's concurrence and the Court's endorsement of the parties' agreement. The consequence is that the Monitor will need to suggest or determine compliance criteria, with input from the parties and subject to the Court's authority.)

Additionally, some of the data that is intended to be provided to facilitate compliance is not due to be posted on a regular basis until the end of FY22, and the State is currently developing its ability to produce the required reports.  In response to information requests consistent with the Court's Order Appointing a Monitor, DMH has recently provided some data on services delivered in FY 20 and FY21 to the Monitor.  This has informed our preliminary findings. Additionally, DOM provided initial data after this report was completed on Medicaid reimbursement for services.  Data from DOM will be integral in future reporting periods. Finally, visits to a number of key programs (North Mississippi State Hospital and the CMHC's in the Northern half of the state) were postponed due to the recent surge in COVID infections and the Monitor has had no direct interaction with or review of these programs.

For all of these reasons, the findings on compliance that follow are limited. In consultation with the State and DOJ, the Monitor has adopted a simple framework for assessing compliance. To determine compliance, for each element of the Order there should be:

- Evidence that action was taken to address the requirement (e.g., a program was funded or a policy or protocol such as a policy on discharge planning was issued);
- Evidence that the action is working as intended (e.g., the program is open, staffed and serving people, and where appliable the State has reviewed or inspected performance);
- Evidence that the action is reducing unnecessary hospitalization including validation by the Monitor of the State's efforts and data (e.g., by reviewing the State's own assessments of fidelity, by interviewing some people served by the program, and by assessing levels of institutionalization affected by the program. For example, the low levels of hospitalization among people served by PACT programs provide a simple validation that the program is working as intended).

The principal tools available to the Monitor for assessing compliance during this initial period were reviewing data provided by DMH and reviewing records of a sample of people who received care in State Hospitals and CMHC's. We discussed the methodology for the record review above.

The Table below provides the Monitor's limited assessment of compliance with requirements of the order at this time. The Table lists requirements by Paragraph of the Order and summarizes those findings we are able to make at this time. In some cases, we have not yet been able to consult with State officials on their approaches to manage and measure the requirement; our intention is wherever possible to rely on and validate the State's compliance monitoring efforts. In some cases, we have not had sufficient time, or sufficient data is not yet available, to make a responsible compliance determination and we have noted that our monitoring of the requirement is "incomplete."

The overall patterns of compliance are:

- The State has provided funds to CMHC's to support all the Core community services required by the Order, except those subject to the stay. However, not all the programs are yet operational, and the Monitor has not yet been able to review the State's oversight of these programs and whether they are functioning adequately. Therefore, compliance ratings for the Core Services generally find Partial Compliance (since funding has been provided), with monitoring to date Incomplete.
- The Monitor reviewed practices for continuity of care and discharge planning at most (but not all) State Hospitals, with about half the CMHC's. Therefore, we make detailed observations about Discharge Planning and to some extent about Diversion from State Hospitals, but a complete statewide rating of compliance is not yet possible.
- For most other requirements of the Order, monitoring is just beginning, and findings of compliance are generally Incomplete.

Compliance Findings in U.S. v. MS.

| PARA GRAPH | | DATA SOURCE EXAMPLES | COMPLIANCE STATUS Report #1 |
|---|---|---|---|
| 1 | Provides general frame: State must reduce unnecessary Hospital use via adequate and appropriate services. Note: Many other paragraphs can be "tested" by examining utilization patterns | Measures of State Hospital use (admissions, Average Census, Length of Stay> 180 days) by CMHC and county | All dimensions of State Hospital Use (admissions, census, people with long stay) have been significantly reduced. Some of this reduction is due to progress in the system and some may be due to effects of the pandemic. There is still considerable variability in use of Hospitals by Regions/CMHC's. Based on review of records for people discharged (6/13 CMHC's) basic care is almost invariably offered after discharge, but the need for more intensive care may not be adequately assessed. We have partially examined but not yet adequately assessed care provided prior to hospitalization.<br><br>PARTIAL COMPLIANCE |
| 2 | CMHC's …(are) "responsible for preventing unnecessary hospitalizations" A) ID individuals with Serious Mental Illness (SMI) who need services B) screen people with SMI in care for need of core services C) Coordinate care D) Divert from SH via care | A) To Be Determined B) DMH provide C) TBD D) people admitted to Hospitals who did not receive Core Svce care, ? | Core services funding has been released but compliance regarding program functioning including service levels and DMH fidelity reviews has not been assessed by the Monitor. Record reviews of people committed to Hospitals seem to indicate that diversion to alternatives is not always considered. Additionally, despite improvements in Crisis Stabilization, many people wait in jail for Hospital admissions in some Regions.<br><br>INCOMPLETE REVIEW/ NONCOMPLIANCE |
| 3 | State has adopted key Core Services. Statement of fact, no monitoring implications | NA | NA |

| 4 | Mobile teams:<br>A) defined, Op. Std. 19-19.4 cited<br>B) "1 team/region" (2 in 12)<br>C) maintain hotlines, assist w stabilization, help connect to care, work with law enforcement (LE), seek to coord 911<br>D) state monitors response time | B) funding, staffing data from DMH<br>C) TBD-<br>D) DMH—report on call handling and mobile response time | DMH has provided grants for Mobile Crisis to all regions, but data on staffing/functioning has not been reviewed. Crisis services are organized differently in different Regions, the results (e.g., admissions rates) are uneven. Recent data on Mobile Crisis utilization has not been made available yet. Changes at the national level (e.g., designation of "988" as a single national suicide prevention and mental health crisis line, with new federal funding) mean there may be dynamic changes in MS crisis care in the next few years.<br><br>The Mississippi Legislature is now considering additional funding for Mobile Crisis services.<br><br>The monitoring team will assess the DMH program review of Mobile Crisis in future reporting periods as part of its assessment of the service's effectiveness at preventing hospitalization.<br><br>INCOMPLETE REVIEW/PARTIAL COMPLIANCE |
| 5 | Crisis Stabilization Units<br>A) Defined, Op. Std. cited<br>B, C) To be funded in each Region (including 12 beds in Region 11 by end 2022) and sustained<br>D) Region 15 can use other CSU's<br>E) State monitors including diversion rates and admissions bypassing CSU's | B, C) funding, capacity. staffing? Service levels: # admitted, # denied, # with subsequent SH admit. ALOS<br>D) DMH report on CR access from 15.<br>E) DMH reports this data | DMH has provided grants for CSUs to all Regions except Region 15—a small Region with low levels of hospitalizations where the Order does not require a CSU. Region 11 has recently opened its 8 bed CSU. Recently DMH has awarded additional funding to many Regions to enhance security and/or clinical staffing to reduce the number of people denied admission because the CSU is not able to care for them. Additionally, the Mississippi Legislature is considering additional funding for CSU's.<br><br>Statewide, less than 15% of individuals admitted to a CSU are transferred to State Hospitals, which is a measure of success. However, most people admitted to Hospitals are not served at CSU's, which suggests an opportunity for improvement.<br><br>The interplay of Medicaid and DMH reimbursement for CSU's remains a challenge. Some CMHC's report that if their CSU |

| | | | functioned at 100% of capacity continuously, combined DMH and Medicaid revenues would be inadequate to cover program costs. A pattern of individuals committed/transferred to State Hospitals from private hospitals without access to CSU's is concerning.<br><br>INCOMPLETE REVIEW/PARTIAL COMPLIANCE |
|---|---|---|---|
| 6 | PACT. Defined. Op. Std. 32.1-32.8 cited<br>A) MS will sustain 10 teams (see Exhibit 1 of Order for regions/ counties served)<br>B) MS will conduct fidelity reviews, submit scale with Implementation Plan (STAYED) | A) funding. Staffing Service levels (individuals. Units, admit/discharge)<br>B) Monitor review scale, DMH reviews completed | PACT teams are now funded in all the Regions required in Order (detail in Attachment A). Utilization of PACT is improved since the time of trial, with the State reporting 674 individuals served in FY21, and 551 served in the first quarter of FY22. Assuming a caseload maximum of 80 individuals per team, total FY 21 utilization was about 69% of capacity.<br>DMH reports that 16 people being served by PACT teams were readmitted to State Hospitals, a strong indicator of the program's effectiveness. Fidelity reviews of PACT are being done by DMH but have not been reviewed/validated. There appear to be continued improvements in the operation and effectiveness of PACT teams. INCOMPLETE/PARTIAL COMPLIANCE |
| 7 | ICORT. Defined, Op. Std. 32.9-32.13 cited<br>A) 16 teams per Exhibit 1. Teams will meet 32.9-13<br>B) Fidelity scale, reviews | A) Funding. Staffing Service levels (# served, units). Reviews under Op. Standards<br>B) Monitor review scale and DMH monitoring | DMH has offered funding to support all the 16 ICORT teams identified in (Attachment 1) of the Order with 10 of the teams newly funded in FY21. The State reports that a total of 425 individuals were served by these teams in FY21; the total funded capacity of the 16 ICORT teams is 720. Some teams are still in development. Our interviews with CMHC's indicate that the staffing challenges driven by pandemic related changes in the economy have affected ICORT, especially since RN's are part of the core staffing and hiring nurses is extraordinarily difficult. DMH reports 23 people served by ICORTs were readmitted to State Hospitals in FY21.  This relatively low number of readmissions is a positive indication of effectiveness, but a higher |

| | | | rate of readmissions than those achieved by Mississippi's PACT teams.<br>DMH is conducting fidelity reviews of ICORTs, but these have not been reviewed. The monitoring team will assess DMH's reviews in a future monitoring period.<br>INCOMPLETE REVIEW/PARTIAL COMPLIANCE |
|---|---|---|---|
| 8 | Intensive Community Support Specialists. Defined. Op. Std. 32.18 cited<br>A) 35 ICSSs to be funded, sustained<br>B) Meet criteria of Op. Std. 32.18 | A) Funding, positions filled. Service levels: # served, units, admit/discharge<br>B) Monitor review DMH reviews | DMH has made available the funding to support all the Intensive Community Support Specialists identified in the Order. A reported 351 individuals were served in the first quarter of FY22 (full funded capacity is 700). DMH has conducted fidelity reviews of ICSS; the monitoring team will assess the DMH review of ICSS in future reporting periods as part of its assessment of the service's effectiveness at preventing hospitalization.<br>INCOMPLETE/PARTIAL COMPLIANCE |
| 9 | Supported Employment—IPS/VR. Defined, Op. Std. Cited<br>A) Each Region will provide SE by either Individual Placement and Support or Voc Rehab collaboration<br>B) IPS to be sustained or developed by end of FY 22 in Regions 2,4,7,8,9,10,12<br>C) IPS meets Op. Std. 24.4-6<br>D) In other Regions, SE offered by ES Specialists with an MOU with MS Div Rehab Svces<br>E-F) Fidelity to be measured | A) Funding. Staffing<br>B) Service levels: # served, units provided, Admit, Discharge. Employed?<br>C) Monitor review DMH reviews<br>D) Service levels: # served, units provided, Admit, Discharge. Employed?<br>E) Fidelity data--IPS<br>F) Fidelity data--VE SE<br>G) NA | DMH has provided funding to support Individual Placement and Support (IPS) services in 7 Regions, and to support a VR Supported Employment specialist in the other 6 Regions. A reported 195 individuals were served in the first quarter of FY22, or an average of 15 individuals per Region.<br>DMH has begun to conduct fidelity review of Supported Employment programs; the monitoring team will assess the DMH fidelity reviews of supported employment in future reporting periods.<br><br>INCOMPLETE REVIEW/PARTIAL COMPLIANCE |

| | | | |
|---|---|---|---|
| | G) State to submit scales with Implementation Plan--STAYED | | |
| 10 | Peer Support Services defined, Rule 42.1-3<br>  A) PSS at each CMHC main site<br>  B) Plan for satellite office coverage: STAYED<br>  C) Peer Bridgers at all Hospitals by end of FY22, integrated into discharge planning | A) Funding, Staffing Service levels. Are there DMH reviews?<br>B) plan to spread PSS (STAYED)<br>c) Peer Bridgers at each SH by 7/21 and integrate into discharge planning | Peer Support Specialist staffing, utilization and service levels have not been reviewed.<br>DMH has provided funding of $25k to help support a Peer Bridger position at each State Hospital and CMHC. Some individuals have been hired.<br>Participation of Peer Bridgers to support discharge planning and connections to community care while people are still in the hospital was noted at South Mississippi State Hospital and Region 12.<br><br><br>INCOMPLETE REVIEW/PARTIAL COMPLIANCE |
| 11 | Permanent Supported Housing<br>A) $150k to assess State Hospital and Crisis Stabilization discharges who: >90 days in SH, are/were homeless, lived in unlicensed boarding home prior to admission, or have another CSU/SH admission<br>B) addl capacity (STAYED) | A) review assessments, results | DMH has made the funding required by the Order available. No assessment of its utilization or results is yet possible. Chart reviews of people admitted to/discharged from State Hospitals show that in most cases people are not being held in the hospital because no housing is available. However, in many cases people are returning to environments that may have contributed to instability and admissions.<br>INCOMPLETE REVIEW/PARTIAL COMPLIANCE |

| 12 | Medication Access: $200k provided to CMHCs | Funds allocated. People receiving service | DMH has allocated the funds. Hospital record reviews frequently indicate that nonadherence with prescribed medication regimens is a reason for admissions and readmissions. However, records seldom reveal why use of medications was discontinued. We noted an increased use of long-acting injectable medications at some hospitals, especially MSH. We also noted that the antipsychotic medicine clozapine was only used in some Regions, apparently because many CMHC's have not arranged for the blood draws that are required to monitor for rare but deadly side effects of white blood cell depletion. With appropriate monitoring clozapine is the most effective antipsychotic for people who have not had symptom relief with other medicines. The State should examine this issue. PARTIAL COMPLIANCE |
| 13 | Diversion --during Pre-evaluation screening, consider if ICSS's are appropriate, offer if needed --during process, consider all civilly committed for Crisis Residential unless commitment has been ordered by court | Requires records review? Any DMH monitoring? | Interviews and record review indicated variable processes across CMHC's to assess the need for PACT, ICORT, or ICSS. Some indicate this is a standard process in their Center, but evidence was not found in all their records reviewed. The variability in whether Pre-evaluation screening addresses these issues suggests a need for a statewide protocol and Quality Improvement process like that which DMH has introduced for Discharge Planning, where initial results are clearly evident.  NONCOMPLIANCE |
| 14 | Connecting the 154 (Individuals whose care was reviewed by DOJ experts prior to trial) to care: --US info to MS --MS provide info to CMHC's with funding to: | --US provided info to MS --MS has provided info to CMHC's, will pay on completion (get report) with | DMH has provided information to CMHC's and will pay $100 per individual for completion of the work. Results not known yet. |

| | | | |
|---|---|---|---|
| | A) Outreach for engagement<br>B) Screen for Core services, document, offer as appropriate | A) outreach results<br>B) service results | INCOMPLETE REVIEW/PARTIAL COMPLIANCE |
| 15 | Discharge Planning to begin within 24 hours of admission and will:<br>A) Identify the person's strengths, preferences, needs and desired outcomes<br>B) Identify specific community-based services needed on discharge<br>C) Identify and connect the person to the providers<br>D) Refer the person to PACT or ICORT when criteria met<br>E) Include assistance if needed in securing or activating benefits<br>F) Coordinate before discharge so meds are continued as needed<br>G) Identify resources for crises and educate on accessing them<br>H) Include an anticipated discharge date | Policy/processes and QI efforts established? Yes, DMH protocol Does DMH review? Yes, statewide group Record review | The Hospital and CMHC records reviewed at Hospitals (MSH, EMSH, SMSH) and CMHC's (Regions 7,8,9,11, 12, 15) during this period allowed a careful assessment of progress made and needed on these requirements. Progress is evident. DMH has developed a Discharge Planning protocol and convenes Hospital and CMHC staff to work on the issue.<br>As a result of these efforts, there has been considerable progress on discharge planning, as we discuss earlier in this report. Appointments for continued care post discharge are arranged consistently and documented in Hospital and CMHC charts. People are discharged with a supply of medication (usually for 14 days, or a month) and a prescription. Hospital staff consistently report that "discharge planning begins at admission."<br>However, progress has not resolved all issues. Compliance findings:<br>A) PARTIAL COMPLIANCE. Record at SMSH explicitly asks for documentation of strengths, preferences, needs, and desired outcomes (and other requirements of the order). At MSH, EMSH, these issues are unevenly addressed.<br>B) PARTIAL COMPLIANCE. Therapist appointments are consistently scheduled within a few days of discharge, with the scheduling prior to discharge. However, some individuals may need other services, and this is not consistently addressed during discharge planning. To achieve full compliance, diffuse best practice in Region 12/EMSH of completing CMHC update to ISP or intake to CMHC care before discharge.<br>C) NEAR COMPLIANCE. Did not review records in Northern half of the state, but this was consistently done in Hospitals/CMHC's we reviewed (except Region 11, where fiscal/staffing |

crises plus EMR transition meant that some people are "lost" on discharge).

D) PARTIAL COMPLIANCE. At MSH and EMSH, records included a checklist of services desired for the person on discharge. Not the same thing as a referral. And hospital staff may not be in a position to assess this need. The SMSH/Region 12 discharge planning process is a good way to address this.

E) PARTIAL COMPLIANCE. Records reviewed indicated attention to the issue of benefits but inconsistent efforts to address them. People referenced SOAR (SSI/SSDI Outreach, Access and Recovery) trainings, but we could not see evidence SOAR is consistently applied.

F) NEAR COMPLIANCE. As with Item C above, lack of review in Northern MS means we can't be certain good practices we saw are statewide. We saw robust efforts especially at MSH to use long-acting injectable medications with people for whom non-adherence appears to be an issue. This is a good approach; we don't have an adequate sample to know if this is working for people. A related concern regarding medication treatment is that a number of CMHC's do not have protocols in place to comply with FDA requirements for blood monitoring of people taking clozapine. Therefore, many people with psychotic illnesses do not have access to the most effective medication for this condition.

G) NEAR COMPLIANCE. We consistently saw documentation (generally in the new DMH discharge summary document) that this information on handling crises was provided. We make this rating since we have not visited NMSH yet. We have not assessed the quality of Safety Planning in hospital or community, a state of the art approach to caring for people with suicidality (and not a requirement in the Order). We commend Hospital staff for use of evidence-based suicide screening and assessment protocols.

| | | | H) PARTIAL COMPLIANCE. In records reviewed, early forecasting of discharge dates was uneven and often pro forma (lengths of stay are projected at the hospital's average length of stay). Similarly, although Hospital staff consistently stated "discharge planning begins at admission" this was not consistently documented. We commend SMSH for building this into the standard intake/treatment planning forms. |
|---|---|---|---|
| 16 | Discharge planning for people readmitted addresses prior plan, readmission cause, adjustment | Policy/processed and QI efforts established? DMH review? | Our record review was limited and included an insufficient number of individuals with recent readmissions to assess compliance with this provision. Based on a small number of reviews, we did not see efforts to adjust care based on readmissions, except in the robust efforts at MSH and EMSH to start people on long-acting injectable medications when medication adherence was a cause of readmissions.<br><br>INCOMPLETE/NONCOMPLIANCE |
| 17 | Prior to discharge, CMHC staff meet with individual | Protocol in place? Being tracked? | In the records we reviewed there generally was not evidence this is being done. Thus, while post-discharge appointments are consistently scheduled, face-to face contact ("warm hand-offs") were generally missing. Efforts by SMSH Peer Bridgers to make connections were an exception.<br>NONCOMPLIANCE |
| 18 | DMH annual overview of services, alternatives to commitment to Chancery Courts | Report from DMH. | DMH has conducted briefings/trainings for Chancery Court Administrators, Judges and Clerks in the Fall of 2021. We have not yet reviewed these materials.<br>Our interviews with Hospital staff as well as record reviews and interviews with CMHC's reveal great unevenness in Chancery Court processes, suggesting that the trainings are not sufficient to achieve consistently appropriate performance of the Commitment process. |

| | | | PARTIAL COMPLIANCE |
|---|---|---|---|
| 19 | TA to providers: --competency based training, consultation, coaching --by people with experience implementing Core Services | Report from DMH | Performance on this requirement has not been assessed. INCOMPLETE REVIEW/PARTIAL COMPLIANCE |
| 20 | Data collection and review Items A-G | Website, when developed | This requirement is not yet effective. In the meantime, DMH has worked hard to provide most of the data requested by the Monitor to track changes in the system since the trial in this case. INCOMPLETE REVIEW |
| 21 | Monthly collection, review, analysis of person level and aggregate billing/utilization on DMH grants | TBD NB Medicaid issue also | DMH is working hard on improving CMHC data collection and reporting, with monthly meetings with CMHC's. The process is challenging. Linking reimbursement to submission of data on service provision (labelled as "Fee for Service") has improved data submission but increased financial and operational issues for some CMHC's. It will ultimately be very difficult to assess performance without the ability to check both Medicaid and DMH data for individuals. We have not yet reviewed data overall. INCOMPLETE REVIEW |
| 22 | Annual analysis of compliance and fidelity of all core services by CMHC | TBD | Not yet assessed. INCOMPLETE REVIEW |
| 23 | Clinical Review-- STAYED | On Hold | REQUIREMENT IS STAYED/NOT NOW IN EFFECT |
| 24 | MS to "post on agency websites and provide on an annual basis to DOJ and Monitor the data in para 19-21" | TBD | INCOMPLETE REVIEW |

| 25 | Implementation Plan STAYED | Not applicable | Not applicable |
|---|---|---|---|
| 26 | Imp. Plan timetables STAYED | Not applicable | Not applicable |
| 27 | Termination-- Requires substantial compliance for each para, sustained for a year Termination of oversight may be sought/achieved for individual section/paras | Provision is not subject to review. | Not applicable |
| 28 | Monitor to be appointed | Provision is not subject to review | Not applicable |
|  |  |  |  |

Next steps in monitoring.

The Order's requirement to assess compliance on each requirement every six months will continue to guide monitoring. Future reports will assess requirements more specifically as more data becomes available. By the next Report the Monitor and team will have completed introductory visits and some record reviews at all Hospitals and CMHC's. Record reviews in this cycle emphasized discharge planning; we may be able to evaluate hospital diversion activities in more depth in the next Report.

Additionally, we expect to begin to review the State's own oversight activities (for example, fidelity and program reviews of Core Services—PACT, ICORT, ICSS, Supported Employment, Crisis Services) during 2022, and to move more into an approach of reviewing/validating the State's processes. Finally, there will continue to be dialogue with the State and the DOJ about recommendations for monitoring.

<u>Appendix: The context of care and compliance in Mississippi.</u>

The observations that follow are intended to supplement the Report on compliance by identifying key issues in the development and operation of Mississippi's mental health system. They are offered to officials and stakeholders and the Court in the spirit of seeking common understanding and providing technical assistance. These are not monitoring observations, although the patterns we describe may affect future compliance. The observations are based on the substantial if preliminary data we have reviewed, conversations with officials and stakeholders and the visits described above. They reflect the Monitor's experience nationally and in multiple states.

As in all states, Mississippi's mental health system is complex, with its own history and dynamics. While this background is not legally central to the question of whether the State is in compliance with the Order, it is crucial to other important questions...how the State got to this place, how it might improve its system, and what are the major challenges in how Mississippi provides, pays for and regulates mental health care that will affect its ability to come into compliance with requirements of the Order?

Observers of mental health care often quip "If you've seen one state, you've seen one state" because there is great variability among states in how care is organized, delivered, and paid. Experts argue that one can predict a great deal about the quality of care in the United States by knowing the zip code it is delivered in. Additionally, the mental health system looks very different from different perspectives. Consumers and families find its complexity daunting, and simply want care to work. A father, meeting with the President's New Freedom Commission on Mental Health 20 years ago, made the poignant observation that "to you people it's a system, but to families it's like a limousine with tinted windows—it's opaque, and we can't see how it works." Advocates and local officials wish for coordinated state policies, e.g., between Medicaid and the Department of Mental Health. However, these agencies have disparate responsibilities and accountabilities; their rules and payment systems are designed for specific purposes, but extra effort is required for them to work smoothly together. For these reasons, the Monitor provides a brief and informal review of selected important elements of Mississippi's system and of current trends and pressures.

<u>Department of Mental Health.</u> The Mississippi DMH is the State's mental health authority and a central player in this case. However, it is not the major payer for community care; this responsibility rests with Medicaid. DMH is also responsible for other major programs: Intellectual and Developmental Disabilities (IDD) services, alcohol and drug addiction services, and children's mental health care. DMH regulates services provided by Community Mental Health Centers (CMHC's) and other providers based on detailed Operational Standards for these services. An operating certificate from DMH, based on DMH's assessment of compliance with these Standards, is required before providers can deliver a service and before providers can bill Medicaid. Although Medicaid is the main funder of community mental health care, DMH provides grant funding to CMHC's--generally to support specific services, including for the Core Services for individuals with Serious Mental Illness that are at heart of the Order.

For many years after the establishment of CMHC's under Mississippi law, it appears that community care and the CMHC's were not a central concern of DMH, which was focused on its state hospitals. Indeed, President Kennedy's 1963 Community Mental Health Services Act was flawed in similar ways. CMHC grants bypassed state agencies like DMH, provided only temporary funding, and never reached most communities. Indeed, during the Reagan Administration, the federal CMHC program was eliminated. In Mississippi, within the past decade or so, DMH has made community care much more of a priority, and provided funding for development of crisis services, intensive community support services, supported employment and supported housing, and Peer Specialists.

 *Possible policy and compliance implications.* Resolution of this case will turn in large measure on DMH's ability to manage and lead the changes that are required by the Order, in conjunction with the Division of Medicaid and the OCMHA, and with Legislative support. Structurally, much has been done, with Core Services funded and State Hospitals substantially reduced in capacity, staffing and funding. However, the Monitor's initial review of programs and services suggests that comparable improvements in service accessibility, quality and data-based quality improvement will be needed to prevent unnecessary hospitalizations. These changes are essential to translate programmatic change into effective community integration for individuals with SMI. Much of this work will rest with DMH but as the discussion that follows will make clear, success is also dependent on effective stewardship by the Division of Medicaid and its agents (e.g., managed care plans), and ultimately turns on effective State oversight of and coordination with the CMHCs.

Medicaid. Medicaid is now the dominant payer for care in Mississippi's mental health system. As with all states, Mississippi has turned to Medicaid to finance many of its mental health responsibilities, in large measure because the federal government provides, via its Federal Medical Assistance Percentage (FMAP), most of the funding for Medicaid. Because Mississippi is a low-income state, its current FMAP means that the federal government currently provides 84.51% of the funding for Medicaid services, the highest rate among all states. Medicaid's role is crucial, because—for individuals who are eligible—Medicaid pays for community mental health care provided mostly by the CMHC's, for inpatient care in general/private hospital psychiatric units, and for medications. (Medicaid also covers general medical care, and if needed, long term care in nursing homes and community long term care.) Medicaid coverage eligibility is complex. For adults, coverage is primarily available for individuals deemed disabled and receiving Supplemental Security Income (SSI) from the Social Security Administration and for very low-income parents of children. Many other low-income and uninsured individuals are not eligible for Medicaid, making the cost of their care challenging. State level eligibility and coverage decisions have affected mental health care. For example, Mississippi's 2006 waiver, driven by budget deficiencies, limited Medicaid coverage for people who were older and/or disabled and poor ("Poverty Level Aged and Disabled" or PLADs). The waiver shifted the health care for these individuals to Medicare, which is entirely financed at the federal level—helping to reduce a state budget deficit. This change has affected levels of care as well as revenues to CMHC's, since Medicare's benefits for mental health care are narrower than Medicaid's.

It is hard to overstate Medicaid's importance for people with mental illness in Mississippi, and in sustaining the State's mental health system. For disabled individuals, Medicaid's comprehensive benefits cover most key elements of treatment, except hospitalization in a state hospital. However, Medicaid is a public program covering many other healthcare services, and the largest item in many state budgets. It operates under complicated federal rules and is subject to the ongoing legislative scrutiny that its size and scope suggest. Medicaid also has constraints and limitations that affect the services it can cover. Chief among these challenges is the fact that many uninsured individuals with mental health challenges are not eligible for Medicaid's benefits. Coupled with the fact that DMH provides its funding largely for specific programs, this means that basic mental health care for a substantial number of Mississippians is not paid for by DMH or Medicaid. DMH rules do require CMHC's to provide equal access to services for individuals regardless of their ability to pay. This means that CMHC's face a challenge in balancing their budgets while providing needed care.

Medicaid's importance in this case derives from the fact that it is by far the dominant payer for mental health community care. State law established the safety net system of CMHC's but did not establish a way to pay for it, and Medicaid has helped to fill this gap. Data from the most recent Annual Report from Pine Belt Mental Health Resources (Region 12; Mississippi's largest CMHC) illustrates this (we do not at this time have a statewide picture of all mental health funding):



As the chart illustrates, about two-thirds of all Pine Belt revenue comes from Medicaid (this is for all services, not just for adults with SMI). Most of the rest comes from DMH, including federal funds that flow through DMH. Local funds cover only five per cent of costs. Fees from individuals, whether payments for care from their private insurance or direct payments for care, are minimal, signaling that CMHC's are really safety net providers, and many people receiving care are uninsured or have very limited health insurance benefits for mental health care.

*Possible policy and compliance implications.*  Mississippi Medicaid's eligibility criteria, benefits and rates are conservative, reflecting the State's efforts to balance the need to pay for care with prudent budgeting. Given its cornerstone role, actions by Medicaid (such as rates, and prior authorizations conducted by Managed Care Organizations for some care) are important to the functioning and effectiveness of CMHC's, and thereby, the State's ability to comply with the Order. These actions, along with and in synch with actions of the DMH and the OCMHA, will create the conditions for success or failure by the CMHC's.

<u>State hospitals.</u> Mississippi's state psychiatric hospitals are the oldest component of the system and for many years were essentially the entire public mental health system. Mississippi's oldest state hospitals (Mississippi State Hospital and East Mississippi State Hospital) date to the mid-19th century. As with such institutions around the nation, the early hope for brief restorative care when the hospitals were created proved elusive in the absence of effective treatments and of community care. As a result, many patients stayed for years; by 1926 over 2000 patients were institutionalized at Mississippi State Hospital. In response to changes in values, funding, laws, budget decisions, effective treatment and community services, state hospitals became smaller. In some states such as Mississippi their role shifted toward short term treatment of individuals who are civilly committed (and some care of individuals committed by criminal courts). This shift made their clinical role more like the role of general hospitals in the health care system—except that neither Medicaid nor Medicare pay for most state hospital services. A side effect of deinstitutionalization was that development of community services lagged behind hospital downsizing and was insufficient to meet community needs.

Late in the 20th century, the 50 bed North and South Mississippi State Hospitals were opened to increase access to briefer inpatient treatment. A continued trend toward briefer care within DMH facilities is reflected in statistics. According to DMH Annual Reports, in 2008 778 adults received longer term inpatient care, while there were 3296 admissions. In 2011 (when the Department of Justice issued its original "Findings Letter" in this matter), 186 adults received longer term hospital care while 3269 were admitted. In 2021, 72 adults received long term hospital care and there were 1925 admissions to the four state hospitals. It is important to note that the effects of the pandemic doubtless had an impact on reduced hospital admissions and capacity.

Looking simply at the numbers, a cynic might wonder about the continued salience of this case, because hospital care has been reduced. However, having less hospital care is only a small part of the story. Better community care should be the driver of less hospital care, not just hospital downsizing. In Mississippi, we do not yet know if people are still being admitted to State Hospitals after community care failed them, or without having the opportunity for adequate and timely community crisis care. We do not yet know if the people who have been in the hospital a long time are still benefiting from and require that level of care, or whether options for them to live in the community have been adequately considered. Put differently, it is clear that "over institutionalization" is less of a problem today, but this doesn't tell us if community care is adequate to ensure that people are not unnecessarily hospitalized. A counterbalancing concern is whether hospital care remains readily available for those people for whom it's the best option to

stabilize an illness that is temporarily out of control. Our preliminary review finds that some people still wait days or weeks for access to State Hospitals, often in jails. This is not acceptable.

*Possible policy and compliance issues.* With the evolution of Mississippi's mental health system, State Hospitals are reduced in scope but still provide intensive care for people at moments of great need. According to the DMH 2021 Annual Report, most of Mississippi's counties had less than 2 residents admitted to state hospitals per month in FY 2021; hospitalization has become a more infrequent event. Rates of hospital use by the Regions/CMHC's varies widely; the chart that follows illustrates State Hospital admission rates (expressed on a per capita basis to allow comparisons between larger and smaller Regions).



With hospital downsizing and via administrative consolidations, DMH has reallocated resources in recent years from Hospitals to support community care, especially the Core Services that are central resources and concerns in the Order. Therefore, the hospitals have a reduced but more appropriate, and still important role. Have they appropriately adjusted to this new role, and are hospital and community care seamlessly linked? Sustaining hospital access, efficiency, and quality/appropriateness of care remain important challenges.

Community Mental Health Centers (CMHC's). In response to recognition of America's overreliance on hospitals and the need for community mental health care, President Kennedy's 1963 Community Mental Health Act proposed a national system of CMHC's. However, the effort was limited in scope, funding was time-limited, and the program never achieved its vision. Tellingly, early CMHC grants bypassed state government, missing opportunities to realign care and secure sustained funding. Only about a third of the CMHC's that were needed were funded federally, and CMHC funding was only temporary, generally lasting seven years. In the early 1980's, funding for CMHC's was reduced and converted to a block grant under President Reagan. Thus, the national network of CMHC's that Kennedy envisioned is still not in place. (In

recent years, the Congress has created a "CMHC 2.0" program providing support for Certified Community Behavioral Health Clinics (CCBHC's) that are a modernized version of CMHC's with enhanced services and funding. Several CMHC's in Mississippi have obtained CCBHC funding recently; it is one of the most significant new developments in federal mental health policy. If the program is enhanced and sustained—although current grants are scheduled to last just two years—it could be very helpful.

Mississippi, like many states, adopted legislation (Regional Commission Act of 1972) following the logic of Kennedy's approach to advance the vision of community care. Mississippi's CMHC model created a framework for care by allowing county Commissions to join together to create CMHC's that would have nonprofit status. be locally governed (with county Boards of Supervisors each appointing a Commissioner for the governing Board), operate services certified by the State DMH, and receive state and local funding.

Compared with patterns throughout the country, strengths of Mississippi's approach included the creation of a statewide, locally governed and state regulated community care infrastructure. In many states, CMHC's exist purely as nonprofits but are not tied to local government; in others there is no consistent local mental health infrastructure. So, Mississippi's approach to organizing community care has some advantages. But there are also weaknesses and limitations in the system. CMHC's do not have any basic subsidy from the State, and have not been accountable for levels of hospitalizations at state hospitals. Mississippi's approach is subject to state/local tensions, and governance appears uneven based on the record of some CMHC's going out of business.

Based on the record in this case and the Monitoring Team's initial visit, it appears there is considerable variability in CMHC operations, a problem in a matter such as this where consistent performance statewide is necessary. The recent creation of the state OCMHA, charged with examining the functioning of the system, reflects some of these issues and tensions and may be a significant force in the future.

In practice, Mississippi's approach to funding community care is somewhat patchwork. Medicaid reimbursement—the major source of payment for community care—is only available for eligible beneficiaries and a reasonable but limited benefit.  Medicaid does not pay for housing, and using Medicaid to cover employment is quite complicated. Medicaid's benefit for rehabilitation services is also complex; Mississippi has used this benefit to fund some but not all of the services required under the Order.

Medicaid typically and in Mississippi pays for specific services to its beneficiaries on a fee-for-service basis, meaning that a claim for payment must be submitted for each service. This approach, common in health care, requires CMHC's to have billing expertise and an adequate infrastructure (e.g. information systems/electronic medical records) to handle reimbursement. The Medicaid reimbursement rates for mental health services in Mississippi in the opinion of the Monitor are reasonable but frugal. However, it appears that many rates have not been adjusted for inflation for some time. Service and financial challenges for CMHC's within this model include getting people to come in for service ("no shows" are obviously not reimbursed, may

occur for a third of scheduled appointments, and are even a bigger challenge during the pandemic). Some CMHC's respond by sending therapists to the person's home, a best practice that is challenging in rural areas because travel time is not reimbursed. Prior authorization of some services by Medicaid Managed Care Plans is reported by CMHC staff to be done variably and in some cases onerously by different plans creating uncertainty for consumers and CMHC's.

There is limited local government funding to CMHC's (described in the first report of the OCMHA). DMH funding is focused on a targeted set of services, and as described above Medicaid pays for a discrete package of services delivered to eligible, enrolled beneficiaries. Thus, there is a gap in funding for basic mental health services for lower income individuals who are not Medicaid eligible (sometimes described as "the working poor"). Several CMHC's have struggled with fiscal viability or gone out of business. The second report of the CMHA focuses on Region 11, described as "the most vulnerable regarding operational financial stability (and) reportedly operating month to month." Region 11 is not able to offer health insurance to its employees and is reported to be behind in required payments to the state's retirement system (PERS). According to the OCMHA report, Region 11 is being sustained via its successful application for several large but temporary federal grants, including a CCBHC grant. Our brief review of records in Region 11, although just a sample, suggested that financial challenges, staffing limitations and medical records changes were compromising care for some people discharged from State Hospitals. The Region's high State Hospital admission rate, illustrated on the Table above, reflects these challenges—although we note there was a substantial reduction in the past several years.

*Possible policy and compliance issues.* As we emphasize throughout this Report, compliance in this Order depends on the State's effective oversight of and coordination with the CMHC's. To achieve this, consistently effective governance as well as sound clinical and financial management will be needed. These pillars of success will need to be supported by DMH, Medicaid and the OCMHA.

It will be extraordinarily difficult to meet expectations of the Order and to avoid future financial failure of CMHC's, without well aligned state action that may involve DMH, the Mental Health Accessibility Coordinator, Division of Medicaid and possibly the Legislature. There are two systemic risks that are beyond the scope of the Order and the Monitor to resolve, but which are noted for consideration by state officials because of their significance. First is the financial liability that is created by the mandate on CMHC's to serve people regardless of their ability to pay, with no consistent source of financing for this care. It appears that some well managed CMHC's are able to thrive despite this liability, while access to care and even business failures challenge other communities. Second, the absence of formal mechanisms to assist or, in a worst case to replace failing CMHC's, means that efforts to stabilize low performing local systems can be late, messy, costly and contentious. Mississippi has created an approach to address challenges in low performing school districts.

Impact of the pandemic and changes in the economy. As noted at the beginning of this Report, the global COVID pandemic emerged just as negotiations in this case progressed and the Order was issued. The pandemic has had catastrophic implications for people relying on care, families,

provider organizations and staff. The pandemic affected the willingness and ability of people to come in, or be seen to receive care. It has now affected the staffing levels needed to deliver care because vacancy rates are high, and some staff are periodically out because of illness and quarantine expectations. Experts have also noted that levels of mental distress and thus the need for care—especially for children—have increased greatly as the pandemic persisted, although these concerns are beyond the scope of the Monitor's brief. The State took, and is commended for, a number of proactive steps to address challenges of the pandemic:

Medicaid "pivoted" to support care to its beneficiaries and the work of providers during the pandemic period defined as a Public Health Emergency (essentially, March-November 2020). Some of these steps included:

- Allowing and reimbursing services that normally require face-to-face contact (e.g., counseling) to be delivered via video or audio;

- Relaxing some credentialing requirements for staff, providing flexibility;

- Relaxing some periods for Prior Authorizations for certain services;

- Increased efforts to support outreach, care management, assistance with prescription refills, and transportation.

These steps, with the hard work and dedication of providers, appear to have mitigated the impact of the pandemic on Mississippi's mental health system. One possible indicator is levels of crucial services received by people in care. Mississippi Medicaid data indicate that the number of individuals who received a prescription for antipsychotic medications actually rose slightly from FY 20 (19,416 individuals) to FY 21 (20,343 individuals). This reveals resilience on the part of both people receiving care, and the prescribers and other staff who provide it. But the impact on community services was still substantial. Medicaid data show that total CMHC mental health revenues declined 20 per cent from FY 20 ($65.9M) to FY 21 ($52.8M). This was a substantial "hit" to community care.

The DMH also took significant actions to address the spread and impact of COVID, including:

- Supporting vaccination efforts for Hospital employees and offering assistance with CMHC staff vaccinations and securing rapid testing kits;

- Providing some flexibility in data reporting and Crisis Stabilization occupancy requirements (e.g., allowing single occupancy of rooms normally designated as double occupancy) by CMHC's;

- Securing and distributing additional State and federal funds to CMHC's to support COVID mitigation.

As the pandemic progressed, trends in the economy affecting the workforce developed. These trends are national in scope. The New York Times reported on January 8, 2022 that salaries for workers in the leisure and hospitality industries have increased by 19% since 2019 as businesses compete for employees. Average salaries for education and health care employees increased

16.5% during this period. These are industries competing with Mississippi's Hospitals and CMHC's for employees. (Indeed, the State increased the entry level wages for DMH Hospital direct care staff by 20% recently). There has been no corresponding effort to increase rates or wages for community care staff; it is not certain that this is necessary, clear what mechanism might be used to accomplish this or how it might be sustainably funded. There are current efforts in Mississippi to raise teacher pay, responding to the huge challenges the pandemic has placed on the schools. Ironically, the recent report of the OCMHA highlights the gap between current Mississippi teacher salaries and salaries in one CMHC (to the Monitor's knowledge, there is not statewide data on CMHC compensation). This analysis finds that salaries for BS and MS educated mental health staff are well below current salaries for BS and MS educated teachers.

Changes throughout the national economy may also play out differently in Mississippi. For example, shortages of health care personnel, especially nurses, have been noted nationally. But shortages of skilled health care workers such as physicians, nurses and therapists are long-standing in Mississippi, and the impact of recent changes in the workforce may be even more severe because of this. Anecdotes may illustrate this point. For example, leadership at South Mississippi State Hospital—based on initial inspection a modern, adequately staffed, well-functioning and Joint Commission accredited psychiatric hospital, report they have not had a single application for a vacant RN position in 15 months. Community care programs that rely on nurses (e.g., ICORT, Crisis Stabilization) are similarly challenged.

Visits to CMHC's conducted during this period find that all are struggling with staff recruitment and retention. As a result of overall financial stressors, Region 11 is not able to offer health insurance to its employees, making hiring very difficult. Region 12 reports raising its salaries for paraprofessionals 20% to $12/hour and competing with fast food jobs paying $15/hour. The Region (by far the largest in Mississippi) has about 700 budgeted positions; over 100 are vacant. About one third of Region 14's budgeted staff positions are vacant.

*Possible policy and compliance issues.* The Monitor is quick to acknowledge that these staffing issues are not directly addressed in the Order and are thus only indirectly our concern. However, if staff cannot be recruited and retained to deliver the services that are needed to sustain community living, levels of institutionalization and bad outcomes in community care will increase, and compliance will be affected. There have been commendable efforts to address workforce needs at the local level via collaboration with professional training programs. At the State level, a new Psychiatry Residency program at Mississippi State Hospital will have substantial benefits for the State. However, as in the economy generally, solutions will have to be developed that recognize and respond to a "new normal" for workers and employers.