**U.S. v. Mississippi**

**Second Report of the Court Monitor**

**Sept 7, 2022**

<u>Introduction</u>.

This is the second Report of the Court Monitor in this matter concerning Mississippi's adult mental health system, and its compliance with the "integration mandate" of the Americans with Disabilities Act (ADA). The central issue in this case is whether Mississippi's mental health system for adults with serious mental illness (SMI) including community mental health programs operated by Community Mental Health Centers (CMHCs) and inpatient care provided by State Hospitals (Hospitals)--operates to unnecessarily institutionalize individuals with SMI in State Hospitals—mostly by not providing adequate community care.

The matter has been active for over a decade, and the history of the case was discussed in the first Report. The essential background is that following a trial, U.S. District Court Judge Carlton Reeves issued an Opinion and Order in September 2019 finding that the Mississippi system for adults with serious mental illness was in violation of the ADA. Then, on September 7, 2021, following a period of negotiations toward a plan, Judge Reeves issued a Remedial Order (henceforth Order) and appointed Dr. Michael Hogan to serve as Court Monitor, to review the State's progress toward compliance with requirements of the Order. A related Order of Appointment details the Monitor's responsibilities and provides that the Monitor shall assess compliance with each obligation in the Court's Remedial Order in a written report to the Court each six months and shall provide the State with technical assistance. The Appointment Order also requires that, in assessing compliance, the Monitor shall review and validate data and information, speak with State officials, providers, and individuals receiving services. This is the Monitor's second Report.

<u>Legal proceedings</u> in the case have continued. The State requested a Stay of several elements of the Remedial Order, the DOJ did not object, and Judge Reeves approved a partial Stay. On January 10, 2022 the State filed an Appeal of Judge Reeves' Remedial and Monitoring orders with the Fifth Circuit Court of Appeals, seeking reversal of both. The DOJ filed its response on March 29, and the State responded on May 13. A hearing has been scheduled for October 3, 2022.

Thus, Judge Reeves' Orders are in place with several provisions stayed (development of Implementation and Clinical Review Plans, and expansion of Supported Housing and Peer Support Services). During the Appeal, the State is implementing the other requirements of the Order. Finally, the Monitor is reviewing progress on implementing the Order and reports here.

<u>Framework for assessing compliance</u>. The Monitor assesses compliance using a simple framework. For each Requirement of the Order, we use data and observations to assess:

1. Was action taken to address the Requirement (e.g., a program put in place, or a procedure implemented)?
2. Is that action working as intended (e.g., is the program serving people according to the State's standards)?
3. Is the action contributing to the goal of reducing unnecessary institutionalization in Hospitals?

The State takes those steps it chooses to achieve compliance and assesses whether these steps are working as intended. For example, DMH reviews Core Services provided by CMHCs to see if they are operating consistent with State standards. The Monitor's role is to review and validate that the State's implementation efforts are consistent with the Order and sufficient to reduce unnecessary institutionalization, rather than to dictate what State actions should be.

Understanding how implementation of the Order is proceeding puts the detailed compliance findings in this Report in context. As was true with the Monitor's initial (March, 2021) Report, much has been accomplished and there is much to be done. The State reports that all the required services have been funded. Simultaneously, the State is now beginning or continuing to implement other requirements, such as monitoring the services, data collection and reporting.

Many of the Order's requirement became effective when it was issued in September 2021. For example, requirements on Hospitals for Discharge Planning and on Community Mental Health Centers (CMHCs) for Diversion from Hospitals are ongoing, although some actions to implement the requirements take time.

Some of the Order's requirements are just now becoming effective. Some data needed to assess whether changes are working as intended is not available as this Report is written, making full determinations of compliance impossible at this date. The State has indicated the initial data will be finalized, and posted by the State, by October 1, 2022. Having public reporting of data on services is a significant benchmark for transparency and reform of mental health in Mississippi as well as for compliance with the Order. Therefore, the next Report will include and emphasize patterns of compliance that can be drawn in part from this data.

Implementing some requirements takes time. For example, the Core Services that have been funded by the State are implemented by the CMHCs, with hiring and training of staff and integrating new and existing programs. We expect that much of the work to operate the funded services has been initiated. However, until we can see that people are enrolled and receiving care, we cannot assure the Court that this work has been fully completed.

DMH is now conducting fidelity reviews of the programs required by the Order, with protocols developed and a schedule in place to review Core Services in all CMHCs during FY '23. In health care, "fidelity" means delivering care as it was intended. Where there is research on the effectiveness of services (e.g., Programs of Assertive Community Treatment-PACT, and Individual Placement with Supports-IPS), fidelity means consistency with characteristics of the

program that was proven effective. For other Core Services where the State assesses fidelity (Mobile Crisis and Intensive Community Oriented Community Recovery Teams or ICORT, and Intensive Community Support Services or ICSS), it uses standards developed by the State's professionals. Inspecting fidelity is required by the Order, where standards exist. Laudably, the State is engaging experts to train its own reviewers on some inspection protocols and will collaborate with the Monitor on the reviews which will be conducted during FY '23. This should improve quality and will help the Monitor assess that the reviews are adequate.

<u>An overview of trends in Mississippi's mental health system, and related national developments.</u> Mental health care is not standing still while compliance in this case is assessed. Therefore, we briefly describe broad trends in the Mississippi system and in national policies and funding.

First, levels of institutionalization in Hospitals have been reduced. The data show reductions on a statewide basis, and considerable variability among communities and within some Regions over time (we provide data and discuss this in more depth in the next section of this Report). The variability in use of Hospitals in Mississippi was noted in a recent report of the Office of the Coordinator of Mental Health Accessibility (OCMHA) at https://www.dfa.ms.gov/media/efuflncp/4th-quarter-report-final.pdf. Data in the OCMHA report reveals a 3.5/1 variance between the highest and lowest Regional commitment rates, with even greater variance in county level rates of commitment. The OCMHA data reveals that 10 counties had more than one commitment per 300 residents, while 11 had fewer than 1 commitment per 1500 residents. Since levels of serious mental illness do not vary this widely between counties, this variance reflect historical and local variability in patterns of care. There is no valid statistic for what the "right" commitment rate is. Rather, the crucial issue is whether Hospital care is necessary and appropriate for an individual, or group of individuals—or whether community care close to home should have been used to meet the needs that led to commitment.

Some of the reductions in levels of hospitalization are not attributable to improved community care but to bed closures related to COVID and staffing. These reductions do not indicate improved compliance with the Americans with Disabilities Act's requirements, and from a quality of care perspective, these are reductions that may not be desirable, because needed care— whether in community settings or Hospitals was not available. DMH monitors waiting times for Hospital admissions on a weekly basis and tracks denials at Crisis Stabilization Units—CSUs. During FY '22 based on this monitoring an average of 73 people were waiting for a Hospital bed on any given day, and during the year 1275 people were denied access to a CSU because staffed space was not available.

This is especially problematic for individuals (not charged with a crime) who are still held in jails in some counties while awaiting a bed in a Hospital. On average during FY '22, according to DMH, on any given day 25 individuals waited in a jail cell for a hospital bed, a clearly unacceptable pattern. Thus, the trends in inpatient use show both progress and work to be done.

Second, the State reports that all the Core Services required in the Order have now been funded. This is a substantial accomplishment by the State, although we cannot completely quantify this progress yet. Considerable effort by DMH and CMHCs has also been required to improve data

reporting (data is needed to determine if people are receiving the services), for the State to review fidelity. and for the Monitor to validate these reviews (to assure programs are working as intended). Therefore, we cannot yet determine full compliance. The Monitor expects to report on this more completely in the next (March 2023) Report.

Third, there have been substantial national changes in mental health care. And Mississippi is adapting proactively to these changes while working toward compliance with the Order. Effective July 16, 2022, a single 3-digit number (988) became available to access the National Suicide Prevention Lifeline. Leadership at the DMH has been working to align Mississippi's mental health crisis system with 988 and to take advantage of long overdue new federal resources to support this mission. We discuss these developments in crisis care in detail in this Report.

Additionally, recognizing flaws in mental health care as well as trends in suicide, overdose deaths and gun violence, there have been some national investments in mental health care. One of the developments that could benefit Mississippi is in recent federal legislation to make sure every state can develop Comprehensive Community Behavioral Health Clinics (CCBHC's). The potential of CCBHC's (a modernized program consistent with Mississippi's CMHC's) was also outlined in the recent OCMHA report. The Monitor notes that this program offers opportunities to use federal resources to better meet Mississippi's mental health goals and facilitate compliance with the Order in this case and encourages the State to explore these opportunities.

Organization of this Report.

The Report is organized into sections as follows:

- Activities of the Monitor during this reporting period
- Preliminary observations on compliance
- Compliance Findings
- Next steps in monitoring

Activities of the Monitor during this reporting period.

Prior to this reporting period, a budget for the Monitor was approved and two experienced Mississippi-based assistants (Teri Brister, Ph.D. and Jacqueline Fleming, LICSW) joined the monitoring team. The team developed a record review protocol based in the Tracer Methodology used in health care accreditation reviews by The Joint Commission. The methodology uses a structured review format to "trace" care within or across episodes based on what is documented in the medical record. The tracer approach is very useful because examining care received by individuals to determine if requirements of the Order were met provides tangible, person level accountability. As discussed in the first Report, the team applied this method to review Discharge Planning and Diversion from State Hospitals during preliminary visits to the Hospitals and CMHCs in the southern half of Mississippi. An additional wave of the COVID pandemic delayed other visits until this reporting period and we can now make a preliminary report on compliance with these provisions across all Hospitals and CMHCs.

During this period, on March 14-18 the monitoring team completed its initial visits-- including record reviews--to CMHCs in the northern part of the state and to North Mississippi State Hospital. These visits also included record reviews focused primarily on Paragraphs 2 (CMHC responsibilities), 13 (Diversion from State Hospitals) and 15 (Discharge Planning).

In consultation with the parties, the Monitoring Team determined to conduct a preliminary review of crisis programs in several Regions since these programs are central to community mental health care and the Order. Additionally, and as mentioned above, the State is making significant changes to crisis care in response to national legislation (the National Suicide Hotline Designation Act) which led to the single national 3-digit number (988) for mental health crisis calls and suicide prevention. During April 25-29, the Team visited and reviewed the crisis care programs in Regions 2, 8 and 9.

During the March 14-18 visit the Monitoring Team met with DMH leadership to discuss plans for: improving crisis care, ongoing efforts to refine data collection, a new office of Utilization Review that will focus among other activities on reviewing Diversion from State Hospitals and Discharge Planning, and the State's efforts to assess compliance of Core Services with its requirements and those of the Order. Members of the Monitoring Team have continued discussions with DMH staff to coordinate efforts. During FY 23 the Team will coordinate its review activities with the State's.

During the March and April visits the Monitor met with the Office of the Coordinator of Mental Health Accessibility as envisioned in the legislation creating that Office and met with mental health advocates.

During the April visit the Monitoring Team conducted a listening session with families and consumers of mental health care to learn of their experiences. The Monitor appreciates the efforts of the statewide advocacy organizations that organized this session: Disability Rights Mississippi, NAMI Mississippi and Mississippi Families as Allies. The feedback from families and individuals broadly validated the need for the Court's Order.

On April 4 the Court conducted a virtual, open to the public, Status Conference on the initial (March 2022) monitoring Report.

During the April visit, while in Region 2, the Monitoring Team conducted a dialogue and fact-finding session with Peer Specialists working in many different programs in this Region. We had observed a robust approach to utilizing Peer Specialists fully, and to supporting their roles, in our March visit to Region 2. During this session we learned a great deal about what it takes to fully utilize Peer Specialists in these different roles, about challenges and necessary supports in establishing effective Peer Specialist services, and about the additional benefits that these staff can deliver to compliment the work of other mental health professionals.

On June 16 Monitoring Team members attended and conducted a listening session for participants in the Mississippi Disability Megaconference, a cross-disability statewide advocacy conference.

Beginning in May Monitoring Team members began working with DMH staff to align the fidelity monitoring protocols of DMH and the Monitoring Team.

During the entire monitoring period, The Monitor was in regular contact with State and DOJ officials.

The Monitor engaged Tracy Plouck, a former Medicaid director, state mental health commissioner and budget analyst (Ohio) to assist with the data analysis required to assess compliance.

A draft of this Report was made available to the State and the DOJ for review and comment. As appropriate, suggestions of the parties have been accommodated in the final Report.

<u>Observations and Findings Related to Compliance</u>

In this section we discuss data and impressions related to compliance; in the subsequent section we present <u>Compliance Findings</u> based on these data and observations. We organize the observations in these sections according to Paragraphs of the Order. As noted above, the Monitor's approach to determining compliance considers evidence as follows:

1. Was action taken to address the Requirement (e.g., a program put in place, or a procedure implemented?
2. Is that action working as intended (e.g., is the program serving people according to the State's standards)?
3. Is the action contributing to the goal of reducing unnecessary institutionalization in Hospitals?

This approach was developed based on conversations with the parties and strikes a middle ground between their preferences and proposals for how to measure compliance. Our observations and findings follow organized by Paragraph of the Order. There are extended discussions of several issues we studied more closely, principally the requirements of Paragraphs 2 (coordination of care), 4 and 5 (Crisis services), 10 (Peer Support Services), 13 (Diversion from State Hospitals) and 15 Discharge Planning):

<u>Paragraph 1</u> summarizes the over-arching requirements of the Order.  The Table below provides population-adjusted admission rates to Hospitals by Region for FY '19 through FY '22



There are many patterns evident in this data:

- As noted in our initial report, the number of admissions statewide has declined in recent years as new services were developed. Some of this decline—we cannot say precisely how much—is also due to reductions in available Hospital beds, in part because of COVID and staffing challenges.
- There is considerable variability among Regions, and within many Regions over time. For example, high admission rates for Region 11 probably reflect fiscal and management problems which have affected the quality of care, but also show progress in recent years. Statewide variability may reflect many factors including history, proximity to State Hospitals, local differences such as the availability of community hospital inpatient care, and service effectiveness. Some Regions have sustained lower admission levels and some have seen reductions over time.
- In the view of the Monitor, gross numbers of admissions do not reveal much about whether these admissions could have been avoided. Indeed, where admissions to Hospitals or CSUs may have been appropriate but beds were not available, the *failure to admit* is a problem.
- As we discussed in our first Report, urgent issues related to acute care include the fact that people wait for care in jails (an average of 25 individuals on any given day in FY '22). There are also variable patterns of transfers to State Hospitals from other hospitals. The FY '22 DMH data on wait times to access a Hospital bed indicate that the largest number of people waiting (an average of 30 individuals on any given day) waited in private hospital beds. This pattern raises questions; for example, if people were in a private hospital psychiatric unit, why was the transfer to a State Hospital necessary? The State is reviewing these issues and the Monitor will assess the efforts.
- Some of the elements of the Order and also the developments in Mississippi's system that will help make patterns of Hospital use more appropriate are improvements in crisis care, where much is going on nationally and in Mississippi.

Paragraph 2 addresses the CMHCs that provide most of the services required by the Order. Although CMHCs are locally governed, they are established under State law, and their operations are certified by DMH. The Order notes: "Consistent with the State's operational Standards for mental health providers…each CMHC shall be the entity in its Region responsible for preventing unnecessary hospitalizations…" Care coordination is required by the Order in Paragraph 2 and is fundamental element of health and mental health care. Paragraph 2 provides that CMHCs are responsible for avoiding unnecessary hospitalizations by:

a. "Identifying individuals with serious mental illness in need of mental health services;
b. screening individuals with serious mental illness during annual planning meetings to determine their need for the services required by this Plan;
c. coordinating mental health care for individuals with serious mental illness; and
d. diverting individuals from unnecessary hospitalizations through the provision of appropriate mental health care."

As discussed in Report #1, for much of the period since CMHCs were created over 40 years ago, they operated with considerable autonomy and limited funding from DMH, which at the time was more focused on Hospitals and other state operated services. Locally governed and funded largely via Medicaid reimbursement for specific services to Medicaid eligible individuals, there is considerable variability among CMHCs. This is partly explained by regional differences (for example, regional populations range from under 60,000 in Warren-Yazoo [Region 15] to over 600,000 in Region 12 [Pine Belt], since it took responsibility for former Region 13). Additionally, the makeup of regions ranges from urban (Hinds County/Region 9), to many Regions with mixed suburban/small cities/rural areas, to very rural and poor Regions, e.g., in the Delta. However, differences in services organization and management also reflect the substantial autonomy in CMHC operations and may not in all cases reflect best practices in organizing care.

The requirements of the Order are focused on performance and do not dictate how services are organized. However, the Court Monitoring Team observed such substantial variation in some practices that we determined to probe more deeply into how the requirements of Paragraph 2 (generally, "care coordination") are being met. We explored this via interviews with the leadership of all CMHC's, examining patterns of care that can be seen in data and by tracing care received by people with SMI via record reviews. As we will discuss, there are care coordination issues that need attention.

Coordination of care is important in health care generally. And, as most people know from personal or family experiences, coordinating health care is challenging. The U.S. health care "system" is fragmented and not always user friendly. However, coordination of care is even more urgent and challenging for people with SMI because:

- Unlike care for most illnesses, such as heart disease, much care for individuals with SMI takes place in a separate, State managed and partly operated system. Despite national legislation, there is still not "parity" or equitable care for mental illness compared with care for other illnesses in private health insurance programs and even in Medicare. State mental health systems must compensate for these failings, when it comes to care of people with SMI for whom private insurance or private care has not been available. Sustaining good care in a State managed system and coordinating care between this system and the overall health system introduces greater challenges than exist for care of other major medical conditions.

- Serious Mental Illnesses are not short-term problems than can be cured, but long-term disorders where individual needs may vary greatly over time and where what works for one individual may not work for another. This means that care that is adequate at one time may need to change at another, and that having "continuity in caregivers" in CMHCs so that professionals understand the individual's needs over time is especially important.

- Care is often multi-faceted; it may include health, mental health, and substance misuse treatment; rehabilitation and housing supports, and accessing the benefits required to obtain these services. These services may be offered at different locations, by different organizations with different rules. Thus, CMHCs have a challenging community-wide role care coordination role for people with SMI.

- People in crisis or with very serious illness may have limitations in judgement and perception that makes it difficult for them to arrange their own care, making care management central to their well-being, and to preventing and managing crises that may lead to institutionalization.

Although care coordination is crucial, no explicit overall expectation for this function has been defined by DMH. A review of the DMH Operational Standards for Mental Health, Intellectual/Developmental /Disabilities and Substance Use Community Service Providers did not identify standards or guidelines sufficiently defining requirements for care coordination. Chapters 16-53 (pages 93 to 339) detail requirements for care within various treatment programs but do not provide explicit guidance for CMHCs more broadly on care coordination.

For example, the DMH Operational Standard for Assessment (16.8) requires a first appointment within 14 days for certain populations (e.g., people being discharged from hospitals or CSUs) but does not provide adequate guidance to assure timely access based on the urgency of clinical needs. Thus, State standards are essentially silent on the Order's requirements to "Identify individuals with serious mental illness in need of mental health services" and "screen individuals with serious mental illness during annual planning meetings to determine their need for the services required by this Plan." Thus, considering the distinct differences in local management and governance of CMHCs, there is no consistent, overall approach to managing care, and our review to date indicates that lapses in care coordination are contributing to potentially unnecessary hospitalizations. The Standards for Crisis Services (Chapter 19) and for Community Support Services (Chapter 20) provide useful guidance for care coordination (examples include: complete assessment of risk/acuity, follow up daily, verify appointments are completed, monitor effectiveness of interventions) but these requirements apply only to these specific services

In initial visits to the CMHCs we explored the expectations for care coordination and how those expectations are implemented in each Region. The table below provides a snapshot of what was reported to us and observed in each Region related to organization of care and care coordination. Because this information was gathered in preliminary visits as part of a general assessment, and has not been vetted for accuracy, we consider it to be useful for understanding Regional practices and care coordination, and sufficient for us to determine that there is a statewide need to address the problem, but insufficient to allow conclusions about any individual CMHC's practices. (We note that we do **not** advocate standardization in how local services are organized or managed, but rather for establishing a "floor" for how care coordination is conducted.) The Table illustrates our understanding of issues related to care coordination in the following areas:

A. The extent and nature of clinic services (generally, outpatient services including those by therapists and prescribers provided at a clinic location). These are not Core Services but which are the most common entry point for care and the most frequently used community service for people with SMI as well as other mental health conditions), In many Regions, clinics are both an entry point and a "hub" for organizing care, often on a county basis.
B. How clinic and Core Services are organized and coordinated.
C. CMHC protocols/expectations for care coordination, service tracking and treatment review adjustments.
D. Our understanding of the Region's monitoring processes related to care coordination.

**Table: The Organization of Care in Mississippi CMHC's**

| CMHC | Descriptions and Observations about Care Coordination |
|---|---|
| Region One | A. 4 counties, 3 clinics<br>B. Many services are organized out of the Clarksdale center, rather than having each clinic organize all care in the county<br>C. Staff indicated a commitment to care coordination but did not describe consistent practices to accomplish this were not provided. Examples of those statements include:<br>    • "We hope that providing ongoing care reduces crises"<br>    • "People receiving medication only treatment may be hard to engage…we do our best"<br>For people seeking care or without known intensive needs, 3 missed appointments and case is closed<br>D. No specific QA processes described or observed |
| Region 2 – Communicare | A. 6 counties, 6 clinics (1 in each county)<br>B. Each clinic has therapist, CSS, MD, RN and crisis services available in all 6 clinics 5 days/week. In the counties where PSR is not available arrangements are made to transport those individuals to programs in other counties.<br>C. Weekly treatment team meetings are held to discuss any clients who are experiencing difficulties, have experienced an emergency, etc.<br>All staff are expected to be on the "lookout" for outliers (missed appointments, length of time since last seen, missed appointments, etc.) on their caseloads at all times and to contact the person and/or the family to assess the situation and needed treatment plan adjustments<br>D. Clinical leadership receive regular caseload reports of services received by all clients in the region and monitor for outliers (e.g., people who have not been seen, have missed appointments, etc.) |
| Region 3 – Lifecore | A. 7 counties, 5 clinics (opening # 6 soon)<br>B. Each of the five clinics has therapist, CSS, MD, RN and crisis services available. Additionally, a primary care clinic is operational in Tupelo. Individuals residing in the 2 counties without clinics are served in the adjacent counties. Clinics serve as a focal point for most outpatient services, but intensive services are organized Regionally<br>C. "Our goal is coordinated care."<br>    • Masters level therapist is responsible for care coordination, but how this happens was not clear (e.g., whether each individual is assigned a specific therapist) |

| | |
|---|---|
| | • For people seeking care, without known SMI needs, there is a policy for case closure after 3 missed appointments<br>• The degree of follow up with "no shows" varies based on acuity level and treatment history/assessed risk<br>Of note, the pharmacists play an instrumental role in care management for individuals who are receiving medications and/or injections. They provide an extra layer of oversight and reporting of missed appointments, failures in picking up refills, etc.<br>D. No specific QA processes described or observed |
| Region 4 – Timber Hills | A. 5 counties, 5 clinics<br>B. Each clinic has therapist, CSS, MD, RN, crisis and PSR services available<br>C. Every person served is assigned to a Masters level therapist who coordinates their care<br>D. No specific QA processes described or observed |
| Region 5 & 6 – Life Help | A. 12 counties, 10 clinics (1 county [Issaquena] has no services provided in the county and 1 county has no actual physical building but services are provided in that county).<br>B. Each of the 10 clinics has therapist, CSS, MD, RN and crisis services available. Most services are also available in the county that has no building by meeting individuals in other locations, or by transporting them to services in adjacent counties.<br>C. Masters level therapist assigned to each individual and is the care coordinator for all services<br>• Each person with SMI is in contact with the therapist, the nurse and the targeted case manager at least once per month<br>• Additionally, nurses track injections and alert team if injections are missed<br>D. "Matrix Management" approach to care coordination and QA: County Administrator in each county is responsible for ensuring people don't fall through the cracks<br>"We have multiple safety nets" |
| Region 7 – Community Counseling | A. 7 counties, 7 clinics<br>B. Each clinic has therapist, CSS, MD, RN, crisis and PSR services available; 2 counties also have Senior PSR services<br>C. ICSS staff person is central point of coordination for all hospital discharges<br>• Treatment Team meetings are held twice/month for people experiencing a crisis or a change<br>D. Monthly data calls with DMH has prompted checking on people who haven't been seen in a long time, but no specific QA processes described or observed |

| Region 8 | A. 5 counties, 5 clinics <br> B. Region 8 is organized around clinics in each county <br> Each clinic has therapist, CSS, MD, RN, crisis and PSR services available <br> County-specific crisis teams in each of the 5 counties <br> C. The core principle in care coordination is that every client is assigned to a Masters level therapist, and that person is the care manager and determines which services they receive <br> D. Data reports are generated and reviewed by each County Clinic's Administrator and the Clinical Director |
|---|---|
| Region 9 – Hinds Behavioral | A. 1 county, 1 clinic <br> B. Region 9 is a single, large county with all programs available county-wide <br> C. Staff described a strong ethos of caring but it was not clear what the plan is for coordinating treatment other than in crisis procedures. Additionally, treatment records did not document consistent coordination of care and communication within the treatment team. <br> • Review of records showed an example of staff trying to locate a person at home since they were not coming in, but meanwhile another staff member had noted the individual been committed and was at MSH. <br> • Records were unorganized and incomplete making documentation of care coordination haphazard <br> D. No specific QA processes described or observed |
| Region 10 – Weems | A. Outpatient services in 9 counties, unclear if all counties have an actual building <br> B. Region 10 services are organized in/within county-based outpatient clinics that emphasize client contact and going to the person when needed <br> Each clinic has therapist, MD, RN, crisis and PSR services available. <br> C. No Region-wide processes were noted for care coordination <br> D. No specific QA processes described or observed |
| Region 11 – Southwest | A. 9 counties, unclear if there are actual physical clinics in all counties <br> B. Sites for care in Pike and Adams counties, with very limited care in other counties. <br> Residents of each county have some level of access to therapist, CSS, MD, RN, crisis and PSR services available in various locations <br> Region 11 fiscal crises casts a shadow over all aspects of care and care coordination. Much care being paid by grants so records of care based on billings were very limited |

| | |
|---|---|
| | C. No organized approach noted for care coordination except for an energetic CSS leader and team that are "hands-on" in meeting needs<br>D. No specific QA processes described or observed |
| Region 12 & 13 - Pine Belt | A. 13 counties, 13 clinics<br>With the assumption of responsibility for Region 13, this combined Region is by far the largest in Mississippi. Its size and the challenges of standing up new services in former Region 13—during the pandemic—are dominant<br>B. Each clinic has therapist, CSS, MD, RN, crisis and PSR services available<br>   • Clinics are generally the "front door" of care.<br>   • "Walk-in" services are available at all sites (this is commendable)<br>C. Decisions about the level of care are made at intake, including the need for more intensive services such as PACT, ICORT and ICSS<br>The organizational expectation is—and processes are in place—for a staff contact (either therapist, ICSS, PACT) with all people with SMI at least once per month<br>D. Regular caseload reports are in place to identify outliers (e.g., missed appointments, no contact in more than 30 days, missed injections, etc.)<br>Caseload reports are reviewed at three levels:<br>   • Staff responsible (e.g., therapist or case manager),<br>   • County Administrator,<br>   • and Clinical Director |
| Region 14 – Singing River | A. 2 counties, 2 clinics<br>B. Each clinic has therapist, CSS, MD, RN, crisis and PSR services available<br>C. County Administrator/Manager monitors care needs, no information provided about how this is monitored and if there is a single responsible clinical staff member for each client<br>D. No specific QA processes described or observed |
| Region 15 – Warren-Yazoo | A. 2 counties, 2 clinics<br>B. Each clinic has therapist, CSS, MD, RN, crisis and PSR services available<br>A "Community Crisis Enhancement" team funded by the DMH in lieu of Region 15 having a CSU sees everyone in crisis, and links to CSS and Peer Specialists<br>C. Warren-Yazoo is a very small Region with a very experienced leadership team. The limited size and long experience of staff means that many care coordination needs are managed informally |

| | An example; asked what would happen if someone in outpatient care stopped coming in, staff indicated "probably the nurse would catch it first, and follow up"<br>D.  No specific QA processes described or observed |
| --- | --- |

As the Table illustrates, CMHC's are not Regional centers at one location, but are complex Region-wide organizations coordinating care that is largely based in multiple clinics but includes other programs. They are systems of care. Because the reported ways to coordinate care varied widely, we examined data from the record reviews for people who had been committed to State Hospitals again, to identify care coordination issues in the treatment provided prior to their commitment. Since the primary focus of the initial record review was on care after discharge, data on patterns of care coordination prior to admission and related to hospital diversion were limited. We determined the data that we had reviewed was insufficient to make detailed judgements about care in individual Regions. However, the record review revealed three patterns, each representing about one third of admissions:

- People who had not been seen by or known to the CMHC prior to their commitment—meaning that the CMHC had not identified them as needing care,
- People who had previously been treated by the CMHC but where the dominant pattern of care prior to their commitment was that they were in and out of, or sporadically using care—suggesting that care coordination might be improved,
- People enrolled in intensive services (e.g., PACT) or who were well known to the CMHC and in some cases were receiving many contacts/services, including CSS and Mobile Crisis visits—suggesting that care coordination was taking place but that efforts to divert from hospitalization may need a closer look.

These patterns reveal a need for stronger protocols that focus better on needs of people with SMI who are not consistently engaged in care. The data also reveal potential weaknesses in methods to assure that CMHC's identify needed adjustments in care—for people who are engaged—on an ongoing "just in time" basis. As noted above, the DMH Standards for Crisis and CSS services provide good guidance for care coordination for people receiving these particular services, but requirements beyond these services are not sufficient. And the problem of care coordination is not just an issue for people receiving Core Services—in fact coordination is likely to be better for these individuals because it is "built into" the expectations for Crisis and Intensive services. As the Table above indicates, mental health clinics are the dominant approach to community care in Mississippi—as in other states. Clinic services such as counselling and medication treatments are used by far more people—including people with SMI—than are Core Services. Therefore, the requirements of Paragraph 2, especially regarding identifying people with SMI, screening them, and coordinating care, lean heavily on clinic personnel. The DMH Standards do not adequately reflect this.

Conversations with advocates and family members, revealed that many of the most urgent challenges they experience relate to inadequate coordination of care. For example, we talked with a father whose daughter has received care in the Mississippi mental health system for years and has been hospitalized many times. He indicates she has been discharged from Hospitals

multiple times, without substantial regional coordination, to various personal care homes.  These homes, the father says, "seem to exist to rip off people's Social Security," and are not in his view adequately regulated by the State or by Social Security. "They have nothing to do with 'personal' or 'care'." He states his daughter has been "dumped" out of several of these homes after her check came in and was then placed by home operators, without coordination, into substandard living arrangements without adequate supervision. Reasonable care coordination would make the Region responsible to participate in all Hospital discharge arrangements, and for coordinating post discharge care to avoid these problems. The anecdotes we heard illustrate the need for care coordination by the responsible CMHC that goes beyond coordinating care in specific programs like crisis care or CSS.

We did observe a number of useful strategies for care coordination in many Regions but did not observe a CMHC-wide approach that we would suggest as a solution to be deployed statewide. Elements of good care coordination that were observed and could be considered in a comprehensive strategy included:

- A number of Regions have requirements to ensure that people seeking care can access it in a timely fashion. This is a useful strategy to address the Order's requirement in Paragraph 2 (a) to identify individuals with SMI needing care. For example, Region 4 described their message to the community as "just come in…you might have to wait just a bit but *someone will see you*"; and Region 12 promotes "walk-in access" at all clinics which is a best practice in clinic care.
- A second useful strategy for care coordination used in some Regions is that everyone in care has a clearly identified clinical professional e.g., a qualified mental health therapist who is responsible for coordination of that person's mental health care (for example Region 8 uses this approach, as do other Regions to a greater or lesser degree). This strategy could be a primary way to meet the Order's requirement in subparagraph (c.) to coordinate care. To be effective, this approach also requires explicit protocols such as:
  - How missed appointments are handled,
  - How service levels are adjusted based on the individual's needs and preferences,
  - How to monitor and engage individuals with SMI who have not received a service, or been contacted by anyone at the CMHC for a period of time,
  - Quality review/improvement provisions to monitor that these protocols are followed (e.g., clinical reports generated from the medical record system, utilization reviews, etc.).
- For individuals transitioning from acute care (State Hospitals, private Hospitals, CSUs) a viable approach used by some Regions is designating ICSS staff as "care managers" for these transitions. The approach used in these Regions is similar to those described in DMH Operational Standards for crisis programs, requiring coordination until individuals experiencing a crisis are through the crisis and engaged in care. Not every region uses ICSS in this manner, and we offer it as one viable approach, not a solution that should be imposed statewide.
- In some Regions, we learned about "County Administrators" (usually the manager of the clinic in the County) serving in a lead role for care coordination in that County. Region 3 and other Regions balance this local responsibility for outpatient care with the region-

wide responsibility of more intensive regional services e.g., Crisis. This approach provides a good foundation for managing care if standards and quality monitoring processes are in place.

Effective care coordination is based on an expectation that each person with SMI is unique and may require a variety of clinical and support services, adjusted as needed to achieve and maintain recovery in the community. Additionally, there must be the expectation that treatment of people with SMI must not only be responsive to crises or well-coordinated for people in certain services (e.g., CSS), but must also be a proactive and ongoing expectation. It can't be assumed that if someone is not coming in for services it means that all is going well.

This requires structured processes to ensure that everyone involved in the person's treatment is communicating with each other on every relevant aspect of the treatment/care plans. There must be protocols and a management system—usually built into an electronic record—to minimize gaps in treatment (e.g., missed appointments, missed prescription refills, missed injections, no contact for extended periods of time or crises), which for people with SMI frequently lead to worsening of symptoms, psychiatric emergencies and hospitalization.

These processes require a health care record system that makes it easy for any clinical staff member involved in care to be able to track what services the individual has – and has not – been receiving. The difficulty that the Court Monitoring Team had in tracking care in some CMHC record systems suggests that staff might experience similar challenges in monitoring wellness and arranging care. We note that Mississippi has committed substantial resources to upgrade CMHC electronic records. This important and challenging effort will be a major opportunity to improve care coordination—if improved systems are designed and implemented with care coordination in mind.

Care coordination is essential across treatment settings; CMHCs cannot provide adequate care without having mechanisms to coordinate the services available through multiple staff in multiple locations. During the visits to the thirteen regional CMHCs, we asked "how do you track people with SMI who miss appointments, or haven't been seen for 30 days, 6 weeks, etc.?" Responses varied, ranged from "three strikes you're out" (the case is closed after three missed appointments) to "we go look for them, and if they aren't home, we keep looking." We note that many Regions offered informal policies to titrate or adjust these responses, including some consideration of risk.

We conclude that care coordination in Mississippi CMHC's—necessary to meet requirements of Paragraph 2 of the Order--is so variable that we cannot find compliance with these requirements. We cannot determine that there are sufficient requirements established by DMH that would assure compliance. We recommend the State establish and enforce such standards.

One model for care coordination that the DMH could consider was developed by the Substance Abuse Mental Health Services Administration (SAMHSA) outlining requirements for Certified Community Behavioral Health Clinics (CCBHCs). Three CMHCs in Mississippi have received CCBHC grants from SAMHSA to date; Regions 2, 11 and 14. The CCBHC model is an updated, modernized version of a CMHC. Importantly, and recent federal legislation makes grants to develop CCBHC's available to all states. Therefore, the SAMHSA guidelines may represent a

useful model for the State to consider. The SAMHSA document is available at:
https://www.samhsa.gov/sites/default/files/programs_campaigns/ccbhc-criteria.pdf. It describes
expectations for care coordination on pages 22-32 and pages 33-45.

Paragraphs 3-11: Core Services. These paragraphs identify the Core Services established by
DMH and define compliance criteria for them. For each Core Service, the Order defines the level
of services required in each Region. Second, for most Core Services (Mobile Crisis Services (4),
Programs of Assertive Community Treatment or PACT (5), Intensive Community Outreach and
Recovery Teams or ICORT (6), Intensive Community Support Specialists or ICSS (7) and
Supported Employment (9) DMH has established Fidelity requirements that define adequate
performance and is conducting yearly reviews of performance against these requirements.  For
other Core Services (Crisis Residential Services {5}, Peer Support Services {10} and Permanent
Supported Housing [11], the requirements for performance are defined in DMH Operational
Standards or in contract expectations. Thus, the Monitor can determine compliance by first
verifying that programs have been established and are serving people, and second by verifying
the adequacy of DMH monitoring to assure that programs are operating as intended and via
records review. Assessing whether CMHC programs are functioning to reduce unnecessary
hospitalization depends on review of hospital and CMHC utilization levels and of factors
specific to each program.

Based on data provided by DMH and provided in the paragraphs that follow the Monitor
determines that all the Core Services have been funded at, and in some cases above the levels
required by the Order, meeting the first threshold for compliance.

Determining whether the Core Services are operating as intended cannot fully be determined at
this time. This will be done by reviewing data that DMH will provide by October '22 on levels
of FY '22 services by Hospital and CMHC, by chart reviews that document care that specific
people received, and via fidelity assessments that are now being conducted by DMH for most
Core Services. The Court Monitoring Team is also working with DMH to determine whether
these reviews are adequate to assure the programs are working as intended.

Given this background and the need to review services data and DMH reviews, our discussion of
Core Services in this Report focuses largely on programs where we conducted more detailed
observations during this period: Crisis Services and Peer Support Services.

Crisis Services. Crisis care is central to mental health care and to the Order. The Order addresses
requirements for crisis care in multiple paragraphs including: 2 (CMHC functions), 3 (Core
Services), 4 (Mobile Crisis Teams), 5 (Crisis Residential Services), and 13 (Diversion from State
Hospitals).

From the perspective of people receiving care and their families, crisis services are particularly
important in that they are needed and used when people are in their time of greatest need, and
sometimes in no position to coordinate care for themselves. This role gives crisis services a two-
part mission: 1) work to resolve the immediate crisis, and 2) once the crisis is resolved, stay
involved and provide support until people are connected with appropriate ongoing care.

Crisis services across the United States are undergoing significant change that also affects the operation of these programs in Mississippi. Effective July 16, 2022, mental health crisis calls and calls to prevent suicide from anywhere in the U.S. can be made to a single national 3-digit number (988). Sometimes described as "911 for the brain," this new number has been programmed by all wireless carriers and other phone and text systems to direct calls and texts, beginning July 16, 2022, to the National Suicide Prevention Lifeline (NSPL). The NSPL has existed since 2004 and consists of a national network of mostly locally/state funded crisis call centers, including two in Mississippi (CONTACT The Crisis Line in Jackson, and CONTACT Helpline in Columbus). Callers to the NSPL who identify as veterans are directed to the Veteran's Administration's Veterans Crisis Line—VCL. In the future, specialized call centers will also be available for other specific populations e.g., LGBT youth. Importantly, the NSPL until now has been minimally funded, and has functioned primarily for suicide prevention. It has only indirectly served as a mental health crisis resolution service. The legislation enabling the new 988 system adds the mission of handling mental health crisis calls nationally—and introduces complexity when states like Mississippi operate local crisis lines.

Since the new 988 system will be a new national approach integrating with state and local crisis systems, Mississippi is planning to strengthen its current suicide prevention call centers and better integrate them with the local crisis numbers operated by CMHCs. The Monitor endorses this approach. This will also require coordination with the "hands-on" crisis services (mobile crisis teams and crisis stabilization units) that are defined as Core Services in Mississippi and provided in every Region. These improvements, enabling any caller to connect to telephonic support or face to face crisis care anywhere in the state, are consistent with the aims of the Order.

Mississippi continues to improve its crisis services to take advantage of these national developments. On paper, Mississippi's current approach to crisis care is superior to that of some states given the statewide presence of mobile crisis teams and CSUs. The Substance Abuse and Mental Health Services Administration (SAMHSA) has defined three essential ingredients of crisis systems:

- Having **Someone To Talk To**
- Having **Someone To Respond** during a crisis, and
- **A Place To Go** if you need a higher level of care

In Mississippi, these elements are in place in each Region (although their performance, such as reach to all counties, and timeliness of visits, was not adequate at the time of trial and has not yet been reliably assessed for improvement). Local crisis lines provide someone to talk to, mobile crisis teams provide someone to come see you, and CSUs provide a place that you can go in crisis. Because of the opportunity to improve crisis services presented by 988, and because of problems in access to care, DMH continues to develop and expand crisis services across Mississippi. With recent actions of the Legislature, additional federal and State funds have been provided to expand many smaller CSUs in Mississippi to 16 bed capacity, to develop several additional CSUs, and to expand or improve mobile crisis services in each Region. DMH reports that crisis services are funded in FY '23 as the Table below illustrates. The funding level is congruent with the service levels in the Order although not all required services are operating at

their intended capacity and problems in access to care still exist (e.g., people waiting in jails for a Hospital bed). The State is continuing to work on this and we will assess this further in our next Report(s).

Table: FY '23 DMH Crisis Funding Distributed to Regions

| CMHC | MOBILE CRISIS | CSU | CSU Enhancement | CSU Peer Bridger |
|---|---|---|---|---|
| Region 1 | 370000 | 800000 | 400000 | 35000 |
| Region 2 | 316844 | 1450000 | 400000 | 35000 |
| Region 3 | 385674 | 1450000 | 400000 | 35000 |
| Region 4 | 400000 | 2450000 | 400000 | 35000 |
| Region 6 | 575000 | 2900000 | 800000 | 70000 |
| Region 7 | 341564 | 1200000 | 400000 | 35000 |
| Region 8 | 450000 | 2900000 | 400000 | 35000 |
| Region 9 | 358879 | 2900000 | 400000 | 35000 |
| Region 10 | 447427 | 1450000 | 400000 | 35000 |
| Region 11 | 374041 | 1200000 | 400000 | 35000 |
| Region 12 | 880982 | 5619000 | 400000 | 70000 |
| Region 14 | 191099 | 1450000 | 400000 | 35000 |
| Region 15 | 300000 | | | |

DMH describes funding increases for Mobile Crisis programs and CSU's as follows:

Regarding Mobile Crisis services: "In the second half of FY21 and again in FY22, DMH increased the MCeRT budget statewide by $600,000. In the second half of FY21, of the $600,000 budget, $542,798 was divided among seven CMHCs in need of increased funding due to their population size and number of counties served…In July 2022, DMH was appropriated $1.4 million in ARPA funds per year for the next 4.5 years by the Mississippi Legislature to increase the budget of each Mobile Crisis Team by $100,000 beginning with the FY23 grant."

Regarding CSU services: "The current funded capacity is 184 beds. DMH provided funding to Region 11 to open eight beds in October 2021, funding is available for 12 beds; however, only eight were opened in FY22 due to staffing challenges. The remaining four beds will be opened in FY23. In July 2022, DMH was appropriated $6.5 million per year for the next 4.5 years to add 60 additional beds. In July 2022, DMH shifted the operation of the Batesville CSU from Region 4 to Region 2 and provided a grant to Region 4 to fund a 12-bed CSU in DeSoto County. When the additional 60 beds and the additional 12-bed CSU in DeSoto County is operational, this will take the State's funded capacity to 256 beds. Due to pandemic related staffing challenges in FY22, the operational capacity was decreased throughout the year."

Pilot review of Crisis Services in selected Regions. To consider the status and development of crisis services in Mississippi given this dynamic environment, the monitoring team conducted a pilot review of several regional crisis systems. This was accomplished during visits by the

monitoring team, with DMH staff, to crisis programs in Regions 2, 8, and 9. These visits took place the week of April 24, and included interviews with CMHC leadership, crisis program staff, record reviews, and visits to CSU's in Regions 8 and 9. At the time of the visit, Region 2 did not operate a CSU. Responsibility for the Batesville CSU, formerly managed by Region 4, was transferred to Region 2 in July 2022. DMH has made funds available to Region 4 to open a 12 beds CSU in DeSoto County, in the Western part of Region 4.

Given the pilot nature of this review, the dynamic environment for crisis program development, and the fact that data systems to measure crisis care are not yet fully in place, definitive compliance findings with respect to crisis programs across Mississippi cannot yet be made. However, our review of the generally good crisis programs in these three Regions, coupled with the monitoring team's earlier visits to all other Regions, allows us to make some preliminary findings regarding best practices in crisis care that should be considered across Mississippi. We also have identified stress points and problems in crisis care that need attention.

The first key element of crisis systems (generally, and in the Order at Paragraph 4) is access to timely and competent telephone handling of crisis calls. Timely access is obviously essential in a crisis. Competence of call answering is important to assess if more urgent care (e.g., a visit) is needed and because many problems that seem urgent to the caller can be resolved in a conversation with well-trained crisis counselors. For example, research on the NSPL where protocols to assess and manage suicidality have been put in place, has demonstrated that about 75% of callers who are suicidal feel better and safe after their call.

Adequacy of crisis call responses depend first on people knowing the number to call (988 also requires crisis text and chat capabilities; these are not requirements of the Order). DMH reports that total of 34,483 CMHC crisis line calls were made in 2021. Data from Regions in Mississippi show very different levels of crisis calls to different CMHC crisis lines, and evidence at trial shows that call handling was uneven. The chart below shows the number of crisis calls by Region for the first six months of FY22, based on reporting to DMH. The data has not been validated but is useful to illustrate patterns.



In addition to calls to regional numbers, crisis calls in Mississippi may go to the NSPL (12,570 such calls were made in 2021). This is fewer than the total calls to regional crisis lines, however

a strength of Mississippi's NSPL participation is that almost all Mississippi calls are answered in-state rather than by national "backup centers." While resolving many crises telephonically, the CONTACT NSPL centers in Mississippi may connect callers to CMHC crisis programs if for example a mobile crisis visit is judged necessary. However, these connections until now have not been consistently made or adequately monitored.

Additionally, many thousands of mental health crisis calls are made to 911. The volume of these calls in Mississippi is unknown, but nationally there are at least as many mental health crisis calls to 911 as to all other local crisis lines. Nationally, best estimates are that more than 10 per cent of all 911 calls involve a mental health crisis. Mississippi has dozens of 911 call centers (Public Safety Answering Points or PSAPs) operated by law enforcement and emergency services agencies. The protocols used by PSAPs are largely locally driven rather than consistent nationally. The degree of coordination between 911 and mental health nationally and in Mississippi is quite variable.  Finally, in Mississippi DMH also receives crisis calls directly to its DMH Helpline at 1-877-210-8513 (8014 calls were received in FY 2021).

We learned about some good ways to manage crisis calls in our visits to Regions 2, 8 and 9. Perhaps because of a long-standing emphasis on crisis care in Region 8, it has with Region 2 the highest per capita volume of crisis calls. The calls are handled by the mobile crisis program; Region 8 has a crisis care leader and a dedicated mobile team in each of its 5 counties. This is one ideal way to organize mobile crisis response, but it is not feasible in regions with many rural counties with small populations.

In Region 9, there has been a robust effort to collaborate with law enforcement via Crisis Intervention Team (CIT) training of officers and coordination between mental health and law enforcement. CIT, sometimes labelled "the Memphis model" of law enforcement/mental health collaboration, is an approach that emphasizes training for officers who respond to mental health crises, coupled with commitments from the mental health system to assist and provide support and acceptance into care for people in crisis. In Region 9, this approach has included a modified program of CIT training to 911 dispatchers. This is a valuable way to begin to address and relieve the burden of mental health crisis response that has been placed on law enforcement and to provide a mental health response that does not always require law enforcement. In the absence of such coordination and of law enforcement collaboration, 911 responses nationally—without the benefit of mental health support—have led to unnecessary arrest and incarceration of individuals with serious mental illness, undue burden on law enforcement, and tragic instances of violence and even death in police encounters.

As mentioned above, Mississippi's approach to implementing 988 will first lead to improved staffing at the two CONTACT NSPL centers, and then to improved connections between these centers and the CMHCs. 988 implementation will also require better measurement of call handling (e.g., time-to-answer rates) as well as the ability of call centers to handle texts and chat communications that may be preferred by some users e.g., young people. Having these metrics, which may not be available for some time, will also aid in evaluation of Mississippi's crisis response program.

For the foreseeable future, while 988 calls will be routed to the NSPL network, all current crisis call numbers (e.g., the NSPL's 1-800-273-TALK, Mississippi's Helpline, 911 and all local crisis lines) will remain in service. There will be promotion of 988, just as 911 and the current NSPL number have been promoted, with the hope that calls for mental health support will increasingly be made to 988, rather than 911 for example. But these shifts in the public's behavior will take time.

To enable better support for crises that require a visit, Mississippi will need to develop call handling and mobile team dispatching protocols between the Lifeline and all CMHC's. This will also require improved data and accountability; current data on mobile team dispatch (such as the crucial issue of how long it takes for a mobile team to get to someone in need of assistance) are unreliable and inadequate. This is an important accountability in DMH's Operational Standards and in the Order. Achieving success will require improvements in the CONTACT centers' staffing, improved call handling and routing between these centers and the CMHCs, implementation of a new national data system by the NSPL, and new, reliable data reporting on Mississippi's mobile crisis teams. These developments are important, and involve a complex mix of federal, state and Court requirements. Thus, full implementation—delivering improved accountable service and compliance with the Order—will require hard work and collaboration among many organizations and may take some time. We believe the State is working effectively on these challenges.

Paragraph 4: Mobile crisis teams. The second key element of crisis response is Mobile Crisis Teams, also addressed in Paragraph 4 of the Order. Mobile Crisis Teams are also referred to as MCeRTs. These teams are organized and deployed somewhat differently across Mississippi; the differences are partly an appropriate response to regional differences in population and geography and may partly reflect inconsistent implementation and monitoring. DMH has recently begun evaluation visits to assess fidelity of MCeRTs to the expected model and we will assess the adequacy of this monitoring during FY23.

As described above, the "expected" MCeRT model is a dedicated team of a Masters level clinician, a paraprofessional crisis worker and a Peer Support Specialist. We note that MCeRT grants include a single Peer Services Specialist. Given that teams cover 27/7, Peer Support Specialists are likely to not be available for most crisis visits unless staffing is augmented at the Regional level. The team functions on a 24/7 basis, handling calls to the CMHC crisis number, and completing mobile visits to people in crisis. During crisis visits, the person in crisis is supported and assessed. If possible, the crisis is resolved via counseling and support, with connections made as needed to follow-up care such as an appointment for additional counseling or medication treatment. If a higher level of care is needed, the team arranges it. An episode of crisis care continues until the crisis is resolved and arrangements for ongoing care have been completed.

A challenge in mobile crisis care is that crises are unpredictable and may occur at any time in any part of the Region. Having a dedicated team on duty across three shifts seven days a week is resource intensive. Depending on geographic and population size, a team may be idle at some times and insufficient at others when multiple crises occur. Therefore, most MCeRT teams are

staffed after hours on an on-call basis, while some staff may be full-time on the crisis team. Crisis team staffing has also been affected by overall post-pandemic hiring and retention issues. Levels of MCeRT face to face interventions, as illustrated below, are quite variable. However, this data has not been fully validated; more accurate data is expected from the new reporting process DMH will introduce in FY23.



In the three Regions in which we visited crisis programs, we learned about strong MCeRT programs that vary somewhat in organization. We also note the high levels of mobile crisis response in Regions 6 and 15, in addition to Region 8, that are illustrated in the data above. We believe these patterns may be reflective of strengths in how services are organized in those Regions; Region 15 is a small two county Region where mobile crisis services have been a priority (the Region does not have a CSU but has received additional funds to expand its Mobile Crisis services) and Region 6 makes a strong effort to organize services at the county level, including Crisis Services, across a large, very rural area.

Region 2 has three sets of staff that rotate weeks on and off duty, with each staff team having one member living in the northern three counties of the Region, and one in the southern three counties to enable response to calls across the Region. In Region 2 the team which was on duty the previous week handles crisis follow-up work the next week. In Region 2 we also observed strong efforts to collaborate with law enforcement via CIT and a robust Peer Specialist component of the team. A Peer Specialist team member described how he was able to establish rapport with individuals who were in crisis but also mistrustful of professionals or law enforcement by emphasizing his lived experience and how "I've been in your shoes." Leadership staff described the peer role as essential to success of the team.

Region 8's approach to mobile crisis services involves dedicated crisis staff in each of the Region's five counties—in effect five teams, each with a full-time crisis coordinator aided by on

call staff. In Region 9—covering only Hinds County, the most populous county in the state, crisis services are staffed and organized as a regional team.

Given the variability in how MCeRT's are organized and staffed, adequately assessing compliance with requirements of Paragraph 4 will require more detailed data that DMH will begin collecting in FY23, in addition to validation of DMH's approach to measuring MCeRT fidelity.

Paragraph 5: Crisis Residential Services.  These programs, also known as Crisis Stabilization Units (CSUs) are the most intensive community-based service in Mississippi. Created to provide an alternative to hospitalization, CSUs have design and staffing reminiscent of psychiatric inpatient units but within a free-standing 8-16 bed facility. They are intended to provide community-based care to stabilize people in crisis. Requirements of the Order specifically related to CSUs are listed in Paragraph 5. At the end of FY 22, the funded capacity of CSUs in Mississippi was 184 beds, slightly higher than the capacity required in the Order.

DMH statistics indicate that most people (about 85%) admitted to CSUs are discharged to community care, meaning that hospitalization is usually avoided. This is a strength. On the other hand, the great majority of people who are admitted to State Hospitals do not get a chance at CSU care before they are admitted (1236 admissions of a total of 1431 in the last 10 months of FY '22, or 86%). This is a weakness. The reasons why hospitalized people do not get CSU care first are complex. Some are judged to have needs too intense or complex, although as discussed below, these are subjective clinical decisions; Mississippi does not utilize a standardized level of care instrument or methodology.

Additionally, a significant portion of people admitted to State Hospitals are transferred from community hospitals—usually from psychiatric units in these hospitals. These "same level of care" admissions (451 of 1684 admissions in FY '22, or 27% of all Hospital admissions) may be ordered via court commitments that bypass CSU's or may be planned "holds" until a Hospital bed is available. This is a complex and problematic pattern. It is certainly better to wait in a hospital than a jail. However, it is not clear why a transfer—expensive and inconvenient for the patient and family—should be necessary if the individual is already being treated in the same level of care, closer to home. It was also suggested to us that some transfers from private hospitals are primarily administrative—Medicaid reimbursement has ended, or there is a desire by the hospital's staff to avoid the challenges of discharge planning for people with complex needs. Neither rationale is very good.

A second set of reasons for admissions to a State Hospital rather than a CSU has to do with people denied CSU care for various reasons. DMH data show that in the first half of FY22, 1275 individuals were denied admission to a CSU. Many (370; 29%) of these denials were because no bed was available. Staffing limitations have contributed to some CSUs operating below their funded capacity at times. Unavailability of a CSU bed also contributes to the unfortunate practice of holding some committed individuals in jails awaiting a CSU or State Hospital bed.

We talked to a family member who had relocated to Mississippi with her husband, who periodically experiences crises related to bipolar disorder. She described him as "subjected to treatment that should not happen in a civilized society." In an initial crisis he was committed very briefly to a hospital, where the stay was "too brief to any good" and led soon to a relapse. When his condition deteriorated, he was held in jail where he was not given his

medication and deteriorated further awaiting a State Hospital bed. In a later episode he was taken to crisis center, where staff called police who once again took him to jail awaiting State Hospital placement. After another year post discharge, with another episode, wife took him again to CSU where, she reports, a staff member said, "you can't come in here because of how you behaved last time." Once again, he was taken to jail, but this time the wife with the CMHC was able to convince a private hospital to take him until the State Hospital bed was available. The wife believes that her husband's care has improved over the years because she has been a fierce advocate. She feels that such levels of advocacy should not have been necessary to get good care, and wonders about those who may not have strong family support.

Some denials of CSU admission are because people were judged potentially too violent to be cared for in a CSU or required a higher level of care (258; 20% of denials), because they had another medical condition that the CSU could not manage (148; 12 % of denials) or had a primary substance misuse problem (167; 13% of denials). To help address these problems, in FY22 DMH allocated an additional $400,000 to each CSU to bolster staffing and/or security. In our visit to the Hinds County CSU, staff indicated that adding security staffing had a calming effect in the CSU and allowed safe admission of some individuals who previously would have been denied access. These additional investments seem useful, but we are not aware if the impact has been evaluated.

The fact that CSU admissions decisions are somewhat subjective may indirectly encourage some unwanted variability and possibly contribute to denials of admission. For example, DMH data for the first half of FY 22 shows the number of admissions denied because people were deemed "too violent" ranged from 1 (Brookhaven) to 35 (Corinth), While admissions decisions are inherently clinical in nature, and must be made by qualified professionals—and/or court order— the lack of a consistent, structured protocol to assist in decision making is somewhat problematic.  To most efficiently use valuable resources, and to improve the objectivity of intensive services placement decisions, the DMH should consider adopting a structured, validated instrument to aid clinical professionals in making placement recommendations and decisions. While some managed care companies rely on such guidelines, they are often proprietary, not transparent, and therefore may not be independently validated. Perhaps the best known and most widely used system is the Level Of Care Utilization Survey (LOCUS), which is used in a number of states to assist in rationalizing placement decisions.

Other issues related to CSU functioning include managed care authorizations for payment that limit the number of days that will be paid by Medicaid managed care plans. The chart below was shared by a CMHC representative from testimony to the Joint Medicaid Committee, illustrating how Managed Care Organizations (MCO's) approve and therefore pay for only some of the time that individuals spend in CSUs. There is also considerable variability in the number of days approved by the different MCO's. We note there is no reliable national data on what length of stay in a CSU is appropriate. Models of residential crisis care vary significantly across the country. The denial of reimbursement by MCO's is ironic in that CSUs are designed as a less restrictive/less expensive alternative than inpatient care, and because the denials end up costing the State more money when care is delivered beyond the MCO approved level and is billed to DMH. (Over 80% of Medicaid paid care is covered by the federal government, while DMH paid

care is 100% state funds, at the same daily rate.) The State should consider requiring MCO's to use a consistent and preferably transparent approach authorizing CSU care; use of a standardized scale would help with this.



**Average Days Paid**

Chart shared by Phaedre Cole from presentation to Medicaid Joint Committee

Avg Across all Admissions · FFS · MCO A · MCO B · MCO C

Paragraphs 6-9 (Intensive Services): PACT (Paragraph 6), ICORT (Paragraph 7) and ICSS (Paragraph 8) and Supported Employment Services (Paragraph 9). Funding data provided by DMH and listed below confirms that funds have been distributed for all the services required in Paragraphs 6-9. Attachment 1 of the Order, also appended to this Report as Attachment 1, lists the intensive services (PACT, ICORT, ICSS) required in each county, based on the best "fit" of services considering Regional and County characteristics.

FY '23 DMH Funding Distributed by Region for Intensive Services, Supported Employment

| CMHC | PACT | ICORT | ICSS | Total Intensive | Supported Employment |
|---|---|---|---|---|---|
| Region 1 | | 250000 | 37786 | 287786 | 40000 |
| Region 2 | | 500000 | 41500 | 541500 | 100000 |
| Region 3 | 600000 | | 126595 | 726595 | 40000 |
| Region 4 | 1000000 | | 94304 | 1094304 | 100000 |
| Region 6 | 471098 | 186890 | 162486 | 820474 | 40000 |
| Region 7 | | 500000 | 41500 | 541500 | 100000 |
| Region 8 | 560000 | 250000 | 62250 | 872250 | 100000 |
| Region 9 | 600000 | 250000 | 131500 | 981500 | 100000 |
| Region 10 | 600000 | 650000 | 152250 | 1402250 | 100000 |
| Region 11 | | 500000 | 221499 | 721499 | 40000 |
| Region 12 | 1199980 | 750000 | 103500 | 2053480 | 140000 |
| Region 14 | | 250000 | 37707 | 287707 | 40000 |
| Region 15 | 600000 | | 38855 | 638855 | 40000 |

Beyond funding, compliance with the Order relates to whether the programs are operational and serving people as intended, thereby reducing unnecessary institutionalization. The Monitor will assess that services are in place by reviewing data that will soon be available. Then we will review the annual inspections of fidelity that DMH conducts for all these programs. These inspections compare program functioning with national, research-based guidelines where they are available (PACT, and IPS Supported Employment). DMH has developed its own fidelity measures for ICORT (these are based on PACT standards), for ICSS (also based in part on PACT and in part on DMH's CSS standards) and for Supported Employment delivered in partnership with Vocational Rehabilitation (based in part on the IPS Supported Employment standards).

As this Report is written, we can confirm that DMH is conducting these inspections. However, the Monitor is not yet able to validate that the DMH fidelity reviews are adequate to determine that programs are working as intended. The work to assess this is now going on in partnership with DMH. We expect to be able to discuss this more fully this in our next report.

Peer Support Services (Paragraph 10), Peer Support Services are defined and requirements for Peer Support Services are listed in Paragraph 10 of the Order. This paragraph requires peer services to be provided at the primary CMHC office in each Region. The order also requires that by the end of FY 2022, Peer Bridgers (a specialized type of peer support, emphasizing successful transitions between services) will be in place in each state hospital. Additionally, Peer Support Specialists are required to be part of the staff for several team services identified in the order: mobile crisis teams, PACT teams and ICORT teams. Recently, although not required by the Order but based on the need to improve Discharge Planning and the early effectiveness of Peer Bridgers at Hospitals, DMH has provided funds to each Region to support a Peer Bridger in each CSU, and on a regional basis to assist with Hospital discharge planning.

The role and value of peer services was described in Judi Chamberlin's book: On our own: Patient controlled alternatives to the mental health system (1978). Chamberlin described her experiences with involuntary hospitalization and mental health alternatives developed in the 1970's. The book stimulated activity by many peer leaders and state and local officials, leading to growth of peer services in the 1980's and 1990's. The first Surgeon General's Report on mental health services (DHHS, 1999) reviewed the literature emerging from these efforts and established the effectiveness of consumer operated and provided services, creating a scientific and policy foundation for these alternatives. In 1999, Georgia became the first state to establish Medicaid reimbursement for Peer Support as a statewide mental health Rehabilitation Option service.  In 2019, Georgia reported there were approximately 3000 trained and certified peers in the state.

The 2003 Report of the President's New Freedom Commission on Mental Health built on this foundation, stating "Consumers who work as providers help expand the range and availability of services and supports that professional offer. Studies show that consumer run services and consumer providers can …engage more people with a psychiatric diagnosis. Because of their

experiences, consumer providers bring different attitudes, motivations, insights, and behavioral qualities to the treatment encounter." (New Freedom Commission on Mental Health, 2003, p. 37). The "lived experience" of people in recovery from mental illness is now understood as a distinct capability and qualification that should be present in mental health services. This principle is even more strongly established in addiction recovery. People with the *qualification of lived experience* can validate the experiences of those living with mental illness, catalyze hope by example and encourage engagement. Peers in valued roles also help reduce the stigma of mental illness and assist treatment professionals in understanding recovery.

Despite the rapid development and wide use of peers, there is wide variance across the country and in Mississippi on how effectively they are engaged in mental health care. In some settings, peers are valued and seen as the core of the emerging mental health workforce. This view holds that peers can be very effective and cost effective, because their pay is below that of other mental health professionals. Indeed, some leaders forecast that peers will make up the bulk of the mental health workforce for these reasons, seeing peers as one solution to workforce challenges.  In other settings, peers are not as valued, seen as second-class providers to licensed professionals, not integrated into teams and essentially seen as "paraprofessionals, with issues."

In Mississippi, by the end of FY 2022, funds for all the Peer Support Specialist positions required by the Order (and additional funds, not required by the Order, for Peer Bridgers at each CMHC and CSU to assist with Discharge Planning) have been provided by DMH. In addition, DMH has funded Peer Bridgers in the State Hospitals, as the Order requires, and includes Peer Support Specialists on team-based services. Thus, the State has taken steps to address the requirements of this Paragraph. We have not yet been able to determine that Peer Support Specialists have been hired or deployed effectively.

In our introductory visits to CMHCs and to State Hospitals across Mississippi, and in our April visits to review Crisis programs in Regions 2, 8, and 9, we saw tremendous variability in utilization of Peer Support Specialists and the degree they are integrated with other staff. We review these observations below.

To evaluate approaches to successful recruitment and use of Peer Support Specialists, we explored the issue in depth with leadership staff and Peer Support Specialists in Region 2, where we had observed a strong commitment to Peer Support Services. We observed some best practice approaches to peer services in this Region and discuss these below. During a dialogue with Region 2 Peer Support Specialists, we heard recommendations for success that are best expressed by simply repeating what they said.

In response to our question ("What is working?") Region 2 Peer Support Specialists indicated:

1. We share the lived experience that clients have, which opens up communication at all levels, allows and facilitates trust with each other, with other staff members, with supervisors.
2. Open communication within the units (e.g., Crisis Services, PSR, etc.) and between the teams is essential.

3. The ability of peers to engage with supervisors on any topic – about a client or about ourselves is necessary for us to do our best.
4. Regular reviews of individuals being served allows for good communication and support.
5. Being treated as an equal member of the team is crucial – having an equal role with other staff.
6. The Crisis team finds that peers can engage with people who are not opening up to professionals.
7. Peer Support Specialists sometimes accompany the client to appointments. This requires acceptance by professional staff. We can "hold their hand" and at times speak up for them when they might not feel able to speak up themselves.
8. Peer Support Specialists accompany and transport clients to outside appointments for other services…for example providing transportation to chemo and sitting with the person, who had no family, during treatment. This might have been necessary to get the individual to accept care.
9. Peer Support Specialists can serve as the "voice of the client," sharing information with physician, nurse or therapist about the person's quality of life (this provides more information than just are they medication compliant or keeping their journal as requested in therapy).

Effective Peer Support services compliment what clinical mental health professionals can do. Region 2 Peer Support Specialists emphasized that their direct interactions with consumers reduce fear, build trust and engender hope. Particularly in crisis situations or when consumers are stressed and apprehensive, understanding that they are talking to someone who "has been there" helps to break through fears of not being heard or understood.

We also discovered strong utilization of Peer Support Specialists in Region 3. We uncovered Region 3's strong utilization of peers by reviewing billing reports produced by the Division of Medicaid, which track Medicaid utilization of the Core Services monthly. Data from such a report (March, 2022) is illustrated in the chart below:



The data reveal a pattern of substantial Peer Support Specialist service delivery in Region 3 compared with the rest of the State. During this month, Region 3 was reimbursed for about half of all the Medicaid paid Peer Support Specialist services delivered in Mississippi. Dialogue with leadership in Region 3 revealed several reasons for this success. While we did not explore the organization and functioning of Region 3 Peer Support Services, it is clear the Region has a robust approach:

- Peer Support Specialists are seen as *essential members of the team in each county clinic*, along with therapists and Community Support Specialists. (Like other Regions, Region 3 has challenges with Peer Support Specialist recruitment and retention, but a peer in each clinic office is part of standard staffing.)
- Region 3 utilizes Peer Support Specialists as *key staff in group-oriented settings* (Psychosocial Rehabilitation [PSR] and addiction recovery programs) and they play a prominent role in both settings. The Monitor observes that the role of peers in "modeling recovery" in these services can add significant value to these services—and the use of Peer Support Specialists in these services also supports efficient billing for their work.

An emphasis on modelling recovery and providing support in treatment was evident in Region 2, where Peer Support Specialists discussed their role in supporting consumers by participating in their medication management, therapy and crisis visits. By accompanying the consumer, they can provide support to individuals who might be fearful of disclosing or discussing symptoms with a prescriber or intimidated to ask questions about medication use and side effects. Region 2 Peer Support Specialists indicated that their presence in these clinical encounters facilitates adherence to prescribed medication regimens. It can also lead to clinical staff having better information on side effects and the effectiveness of medication regimens that consumers experience, leading to more timely adjustments in treatment that isn't working well, and care that is better tolerated and thus more effective.

In the past, participation in clinical visits by Peer Support Specialists may have been seen as "a violation of confidentiality" since Peer Support Specialists are not "clinical professionals." However, Region 2 Peer Support Specialists and leadership clinical staff indicated these practices—always involving the consent of the person in care--have been valuable in improving understanding and adherence to treatment. We note that achieving this benefit that Peer Support Specialists can provide requires a shift in perspective by other clinical staff including therapists and physicians. Given that many staff have not learned about these issues in their clinical training, leadership and culture change are essential to achieve the benefits of this "new profession."

For Peer Support Specialists to be effectively utilized, they must be fully accepted, embraced and supported by the CMHC, its leadership and especially by treatment professionals. Understanding that the role and value of Peer Support Specialists are complementary, adding distinct value to treatment, is essential. We asked Region 2 Peer Support Specialists what it takes for them to be a

successful part of the treatment team, and once again their responses clearly identify "critical success factors" that should be considered in other mental health organizations:

1. Peer Support Specialists need support themselves in how to deal with the stress of the job. These include availability of their supervisor, attention to and conversations about their wellness, and an environment that emphasizes self-care. It must be ok to say, "I need a mental health day."
2. Treatment of Peer Support Specialists should be equitable with other MH Staff (benefits, respect, inclusion and engagement in activities, etc.). We note that Region 2 leadership staff indicated that they appreciated the feedback about an equitable approach, but from their perspective support for Peer Support Specialists often must go beyond what other staff—who do not have disabilities—may need.

These observations suggest that to achieve the benefits of Peer Support Specialists and to take full advantage of the State's investment in training, credentialing and funding, leadership is required. Although peer roles are recognized as valuable nationally, having Peer Support Specialists recognized as an essential element of mental health care is a relatively new phenomenon. Leadership steps—statewide and in CMHCs—to develop and support the role are needed. For example, the very low level of Medicaid billed Peer Support Services in Region 8 may indicate insufficient leadership attention to defining and supporting viable roles for Peer Support Specialists. We acknowledge that a single month's sample is not adequate to make definitive judgements, but we offer this perspective to illustrate that having good clinical services doesn't mean that peer services are adequate. We note Region 8 services have a generally good reputation and based on our initial review the Region appears to have clinically sound outpatient and crisis programs. It may be that this professionally driven organization has simply not yet made sufficient steps to understand and support complimentary Peer Support Services. This may be true in other Regions as well.

Additional statewide support may be needed in part because most mental health professionals receive limited training in how to function as part of a team including peers. The stigma that still attaches to mental illness affects how Peer Support Specialists are perceived. Some staff may question whether peer's judgement is clouded rather than enhanced by their own experiences. Many Peer Support Specialists work on intensive (PACT, ICORT), high-acuity (Mobile Crisis) teams—or at the complex cusp of hospital and community care (Peer Bridgers). This work is challenging and stress levels can be high. This is doubly true because of the COVID pandemic and its effect on staffing levels and turnover.

In our review of data provided by DMH on training and technical assistance delivered during FY '22, we noted more training sessions focused on Peer Support Specialists and Peer Bridgers than on any other Core Service. We have only limited data on participation in these sessions, but the robust training effort is a strong signal of DMH commitment. We did note that almost all the sessions were focused, appropriately, on peer staff themselves, and we observe that improving the utilization and effectiveness of peer services may depend on additional encouragement to CMHC managers. Thus, we conclude that some additional statewide leadership directed to

CMHC leaders on the roles and functioning of Peer Support Specialists and of how to support them best could be useful.

At the CMHC and Hospital level, one key leadership task to make the work of Peer Specialists/Peer Bridgers viable is culture change—defining the need for the role and examining and changing policies as necessary for it to be effective. One example of a contentious issue that may emerge is that some peers may have non-violent criminal records because of actions while they were ill. The undue reliance on law enforcement to handle mental health crises that has resulted in the "criminalization" of mental illness has exacerbated this problem. Examining agency hiring policies so that employee qualifications are evaluated fairly on a case-by-case basis and criminal history records are evaluated carefully rather than leading to blanket disqualification may be indicated. We emphasize this does not suggest any hiring actions that are prohibited under current law or would expose consumers to untoward risk. It does suggest a closer, case-by-case evaluation of the risks and benefits of hiring individuals with criminal records that are not disqualifying. Creating an agency culture in which the distinct contributions of Peer Specialists are valued—like the distinct capabilities of nurses, counselors or physicians—is a necessary foundation for the success of Peer Specialists within the agency.

Considering human resources practices to support Peer Specialist success may also be necessary. Special attention to recruitment, training, support, and retention may be needed--just as it may be for other professionals. In addition, examining human resource practices for Peer Specialists may be helpful. Policies and practices should recognize that a condition of Peer Specialists' employment is that they are in recovery from, and in many cases living with, a serious illness. Even effective treatment does not often result in a "cure."  Employers should therefore consider human resources policies that will support the individual's well-being and best functioning on the job. Key issues to consider may include a living wage, since people in recovery are needed to do the work but may not have the capacity or energy to work multiple jobs. In addition, providing adequate medical and mental health care benefits and assistance in managing benefits such as Social Security may be very helpful. Considering flexibility in working hours where this is necessary and appropriate can be very helpful. These adjustments should not be viewed as lowering the standard of employment but making appropriate adjustments to enable productive employment by individuals with special qualifications and needs.

We recommend that the State continue its strong training efforts for Peer Support Specialists and consider ways to promote best practices in Peer Support Services, potentially by encouraging other Regions to consider the best practice approaches that we observed for Peer Support Services in Regions 2 and 3.

Paragraph 11: Permanent Supported Housing. This paragraph defines supported housing and requires the State to continue current investments. DMH reports that it provided $150,000 in additional funding to CHOICE Providers ($100,000 for MUTEH and $50,000 for Open Doors) as required by the Order. The Monitor has not yet reviewed data on Supported Housing utilization or reviewed the adequacy or functioning of Supported Housing to determine if the program is working as intended. Subparagraph (b) requiring additional investments has been stayed.

Paragraph 12: Medication Access: This paragraph requires an annual allocation of $200,000 for a medication assistance fund. The underlying principle is that since medication treatment is usually essential to manage Serious Mental Illness, access to medications is essential. DMH reports it has distributed $200,000 to the Regions for FY '22 and FY '23. The DMH report indicates that the funds were distributed, but that less than 25 per cent were expended by the end of FY '22. DMH reports that Region 6 has much more substantial DMH funding (about $137,0000) to purchase medications, and that all these funds were expended. We will confer with Region 6 to determine how that program works. We have identified two other issues related to medication treatment; one is a problem and one is an innovation/solution:

- As we noted in our first Report, clozapine is the most effective medication treatment for serious psychotic illness, with evidence that it is more effective than other antipsychotic medications in reducing hospitalization and rates of suicide among people with psychotic disorders. Blood monitoring is required for people who take clozapine. Probably for this reason (the inconvenience of blood draws and lab tests), clozapine is prescribed infrequently in Mississippi and very little in some Regions. Based on review of Medicaid data and interviews and observations at all the CMHCs and State Hospitals we believe there is insufficient access to clozapine in Mississippi. There also appears to be great variation in its availability in different Regions. DMH and DOM should consider this issue.

- The innovation or solution that we observed in a number of Regions was making pharmacy services available in the CMHC. We believe this is beneficial for people receiving care in several ways. First, it makes picking up prescriptions much easier, and is likely to reduce unplanned medication discontinuation. Several of the pharmacies in CMHCs provide not just psychiatric medications but other classes of medications, a great convenience for patients. Second, having a pharmacy on site means that pharmacists are available to answer questions, and educate and counsel on how to use medications. An onsite pharmacy can make it much more convenient to use clozapine and Long Acting Injectables (LAI), effective and underused treatments.

To learn more about patterns of pharmacy services we conducted a brief survey of the CMHCs; results are in the table below:

| Region | Name | Pharmacy | Type |
|--------|------|----------|------|
| 1 | Region 1 | Yes | Genoa |
| 2 | Communicare | No | Lifecore |
| 3 | Lifecore | Yes | In-house |
| 4 | Timber Hills | Yes | In-house |
| 5 & 6 | Life Help | Yes | In-house |
| 7 | Community Counseling | Yes | Genoa |
| 8 | Region 8 | No | No |
| 9 | Hinds Behavioral Health | Yes | Genoa |
| 10 | Weems | Yes | In-house |
| 11 | Southwest MS MH | Yes | Genoa |
| 12 & 13 | Pine Belt | Yes | In-house |
| 14 | Singing River | No | No |
| 15 | Warren Yazoo | Yes | Lifecore |

We explored the operation of and benefits from in-house pharmacy services with staff at Region 3 (Lifecore), which has a very active pharmacy program. The director, a licensed pharmacist, described a service comprised of 4 pharmacists, 6 pharmacy technicians and additional staff who provide service coordination and courier services. Lifecore pharmacy also provides pharmacy services to Region 2 (Lifecore), and Region (15 Warren-Yazoo Mental Health Services). A component of the Region 3 approach that impressed us was clinical coordination provided by the pharmacy staff. The director made the statement "no one falls through the cracks" and went on to describe a person-centered approach to medication treatment. The services provided by the pharmacy team include:

- Patient medication education and counseling
- Prior authorizations
- Helping people manage patient medication assistance programs
- Charge accounts
- Medicaid coordination of prescriptions
- Complete medication management (including clozapine and long acting injectables)
- CSU meds for Institutional Emergency Medication Kit
- Unit doses for Chemical Dependency Services, CSU, and group home
- Medication grant management
- Daily delivery to all clinics

In addition, the director described a practice that she calls "active pharmacy" that includes the pharmacy team proactively working with the rest of the clinical team to ensure that no one goes without medications. This includes notifying patients and staff when refills are coming due, contacting the clinical staff member who is the primary point of contact for the person (therapist, community support specialist, PACT staff, etc.) when the person fails to pick up their refills or new medications. Many of these "active pharmacy" services are not reimbursable but the pharmacy team believes it is their responsibility to have a system in place to minimize the

number of people who go without their medications which is one of the major sources of worsening mental health conditions, crises and rehospitalization.

Although there is no requirement in the Order to do so, we commend the CMHCs that are providing or contracting for pharmacy services, The five CMHCs who provide in-house pharmacy services reported having at least one full time pharmacist and at least two full time pharmacy technicians. Several reported also employing patient care coordinators, couriers, pharmacy interns and clerical staff as part of the pharmacy team. One CMHC reported that their pharmacy coordinated the lab work related to clozapine, and two CMHCs reported administering long acting injectable (LAI) medications as part of their services. As we have noted, these treatments have value in helping people avoid hospitalization and gain stability. Having this service provided at the CMHC is a vital component in the continuum of care necessary to effectively treat the mental illness and allow the person to remain in their community. A limited review of fiscal information also suggests that, in the CMHCs directly operating pharmacy services, they make a modest positive contribution to the financial bottom line.

Paragraph 13: Diversion from State Hospitals. While Paragraph 2 defines overall CMHC responsibility to avoid unnecessary hospitalizations via appropriate mental health care, this paragraph identifies specific actions to be taken by CMHCs during preadmission screening for hospitalization: 1) determining if individuals meet criteria for intensive services (PACT, ICORT, ICSS) and arranging these services as appropriate, 2) considering if a CSU placement in lieu of hospitalization is appropriate (unless Hospital commitment has been ordered).

As we have indicated in our discussion above of compliance related to Paragraph 2, there are inconsistencies and weaknesses in how CMHCs handle Diversion. We conducted a limited review of Diversion in our visit to CMHCs in the northern half of the state. The review was primarily focused on CMHC care of individuals recently discharged from Hospitals and is discussed under Discharge Planning below. Going forward, DMH will conduct reviews, through its Utilization Review office, of how Diversion from Hospitals is carried out by the CMHCs. The Court Monitoring Team will advise DMH on the design and implementation of this effort, to help assure that the DMH monitoring effort is sufficient to inform compliance. As the effort is implemented, we will assess its effectiveness.

Paragraph 14: Connecting individuals with serious mental illness to care. This paragraph refers to a specific group of 154 individuals whose care was reviewed by DOJ experts earlier in the case. DOJ has shared the identity of these individuals with DMH, which has charged the CMHCs to reach out to them and engage them, if willing, in appropriate care. We do not yet have data on this project; the State indicates it will be provided in September.

Paragraphs 2, 15, 16, 17 Discharge Planning. Discharge Planning requirements of the Order are specified in Paragraph 15; and other related requirements are specified in Paragraph 2 (CMHC's), 16 (Readmissions) and 17 (warm hand-offs--connecting people with their CMHC prior to discharge). Discharge planning from an inpatient stay in a State Hospital to an outpatient treatment setting in the community is an important aspect of care. Discharge planning is effective when it ensures that the person with a serious mental illness can transition from an inpatient

treatment setting to an outpatient treatment setting with the services and resources to enable them to live a meaningful life and avoid readmissions. Effective discharge planning is evidenced by the completion of the following as specified in Paragraph 15, a-h, Paragraph 16, and Paragraph 17 of the Remedial Order:

- Discharge planning begins within 24 hours of admission to a State Hospital.
- Identify the person's strengths, preferences, needs and desired outcomes.
- Identify resources for the person to access in the event of a crisis and educate the person about how to access those services
- Identify the specific community-based services the person should receive upon discharge
- Prior to discharge, coordinate between the State Hospital and the community provider so that, upon discharge the person continues to receive prescribed medications in the community appropriate for the person's ongoing clinical needs.
- Records include an anticipated discharge date
- For discharge plans for persons who have previously been admitted to a State Hospital within a one-year period, include reviews of the prior discharge plans, the reasons for the readmission and adjustment of the new discharge plan to account for the history of prior hospitalizations.
- Prior to discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll persons in appropriate services
- Peer Bridgers at each State Hospital are integrated in the discharge planning process

As in the previous record reviews, we used a checklist developed from the Remedial Order requirements (Paragraph 15, a-h; Paragraph 16 and Paragraph 17) for discharge planning and the "warm hand-off" to trace care from the inpatient treatment setting to the community. In this second monitoring period, we completed record reviews of the fourth State Hospital, North Mississippi State Hospital (NMSH) in Tupelo, Mississippi and the three (3) Community Mental Health Centers served by NMSH (Regions 2, 3 and 4). Additionally, we completed record reviews of the CMHCs associated with the State Hospitals we reviewed previously. We completed record reviews in Regions 1, 6 and 15 (served by Mississippi State Hospital-MSH) and for Region 7, served by East Mississippi State Hospital (EMSH).

Patterns of Documentation. Discharge Planning from State Hospitals. In the first monitoring period, observations were made from the records review of three of the State Hospitals (MSH, SMSH and EMSH) and reported in the first monitoring report. From our previous records review we were able to review patterns of discharge planning and make general assessments about the patterns. In this second monitoring report, we describe patterns of documentation of discharge planning from North Mississippi State Hospital and additionally summarize the overall patterns of documentation of discharge planning from all State Hospitals combined.

Hospital specific (NMSH) patterns of compliance with Discharge Planning requirements. North Mississippi State Hospital hosts weekly meetings between their social services staff and the CMHC staff from regions 2,3, and 4. We learned of the same type of weekly meetings between the State Hospital staff and the CMHC staff at SMSH. We believe this is an excellent way to

improve discharge planning. This meeting may include the social work staff, the hospital Peer Bridger, the CMHC Peer Bridgers, the CMHC PACT coordinator, ICORT coordinator and ICSS staff. During these meetings, the status of each person in the hospital is reviewed. Referrals for PACT, ICORT, and ICSS are discussed in this meeting. Applications are completed if there is agreement the person is eligible. The CMHC staff have an in-person meeting with the person prior to discharge. If a person participated in PACT or ICORT services prior to admission to the State Hospital, the PACT team or ICORT team arranged to visit the person at home on the day of discharge or within a few days of discharge. This process can address the Order's requirement that all persons are evaluated for these core services prior to discharge (15 (d)). We note that a single weekly meeting like this may not be feasible for MSH or EMSH because of the number of regions served and the distance of some CMHCs from the Hospitals.

In record reviews at NMSH, we saw consistent documentation that persons are provided with an aftercare appointment at their CMHC. Aftercare appointments are routinely made for persons prior to their leaving the state hospital and occur within 2-5 days of the discharge from the state hospital. Additionally, we found evidence that CMHC intakes are completed prior to discharge by all three regions from the state hospital. (We also observed during the first reporting period at the other three State Hospitals—MSH, EMSH, and SMSH that an aftercare appointments were consistently documented. But intakes, to more fully assess needs, were not as uniformly completed.

As indicated above, persons discharged from NMSH are connected to a provider for an aftercare CMHC appointment but there is not consistent documentation that persons are connected to other providers or agencies for other necessary supports and services such as housing or financial benefits. This is a requirement of the Remedial Order (Paragraph 15, d) that needs further attention.

As with the other three State Hospitals (MSH, EMSH, SMSH), NMSH did not have clear documentation to indicate that discharge planning begins within 24 hours of admission to the hospital. As mentioned in the first monitoring report, there does not appear to be a standard for documenting discharge planning within 24 hours of admission to the State Hospital. We offered a suggestion to the newly formed DMH Utilization Review office that the development of a preliminary treatment plan with a discharge planning goal might meet this aspect of the requirement as specified in the Remedial Order, Paragraph 15 (a). As with the other State Hospitals, we did see evidence that staff completed assessments and treatment plans upon admission.

We did not consistently see evidence of documentation of the person's strengths, preferences, needs and desired outcomes at NMSH or at MSH and EMSH. While documentation of strengths, preferences, needs, and desired outcomes is standard on the treatment plan, we observed these statements to be general, often standardized and therefore not person centered. As indicated in the first report, at SMSH there was consistent evidence of documentation of person's strengths, preferences, needs and desired outcomes (Paragraph 15, (b)). DMH has since worked to improve Discharge Planning at all Hospitals, but these efforts were not implemented in time to be reflected in this Report.

At NMSH, as well as at the other three State Hospitals (MSH, EMSH, SMSH) we consistently saw evidence that upon discharge, persons were given medications as well as prescriptions for medications, and they were provided with contact information for who they should contact in the case of a crisis. This information is listed on the DMH Discharge Transition Record and the person signs the form to acknowledge receipt and their understanding.

We found that an anticipated discharge date is not consistently documented in the health record. When documented it varies from "thirty days from admission/today," or "one month." We are not aware of a standard of care defining when during the episode of care this should be done; discharge planning should begin at admission but not enough may be known about an individual's strengths and needs to accurately specify an anticipated targeted, individualized discharge date. This can be reasonably done as part of an initial treatment plan.

<u>Paragraph 16</u> of the Remedial Order specifies that discharge planning for persons who have previously been admitted to a State Hospital within the prior one-year period includes review of the prior discharge plans, the reasons for the readmission, and adjustment of the new discharge plan that accounts for the history of prior hospitalization. In this NMSH chart review sample only two persons had been readmitted to the state hospital within one year. There were no indications that there was a review of the person's prior treatment history and an adjustment made to the new discharge plan.

NMSH has two Certified Peer Support Specialists working as Peer Bridgers. Their roles may need to be clarified; most of their documentation in the chart is documentation of clinical group work. They document the A&D group note and the WRAP/recovery plan/individual personal outcomes and participate in treatment team meetings and the weekly meetings with the CMHC staff. These are appropriate activities for Peer Support Specialists but it is not clear if the peer Bridger duties are also being completed, because we did not see documentation in the records of their involvement in the discharge planning process. We believe this may be a documentation issue rather than a performance problem. In the first reporting period, SMSH was the only State Hospital we visited with Peer Bridgers. MSH and EMSH were in the process of hiring CPSS for Peer Bridgers.

In summary, in record reviews at all State Hospitals, we saw evidence of documentation of the following requirements of the Remedial Order as specified in Paragraph 15, d, f, g:
- Identify and connect persons to providers of necessary supports and services (15 (d))
- Prior to discharge, provide for continuation of medications (15 (f))
- Identify resource persons and telephone numbers for crisis/emergency situations. (15 (g))
However, we did not see consistent evidence of documentation to show compliance of the following requirements of the Remedial Order as specified in Paragraph 15, a-h:
- Discharge planning begins within 24 hours of admission to the state hospital. (15 (a)).
- Identify the person's strengths, preferences, needs and desired outcomes (15 (b))
- Identify the specific community-based services the person should receive upon discharge (15 (c)).

- Refer the person to PACT or ICORT when the person meets the criteria for PACT or ICORT in accordance with DMH standards (15 (e)).
- Include an anticipated discharge date (15 (h)).
- For discharge plans for persons who have previously been admitted to a State Hospital within a one-year period includes reviews of the prior discharge plans, the reasons for readmission and adjustment of the new discharge plan that accounts for the history of prior hospitalizations. (16).
- Peer Bridger at state hospital integrated into discharge process (15 (k)).
- Staff of the CMHC meet with the person face to face or via video prior to discharge to engage and enroll them in appropriate services (17).

Following the recommendations in the first monitoring report, the DMH has established an Office of Utilization Review. The Office in their initial efforts has worked with SMSH to develop and standardize forms in line with the specific requirements of the Remedial Order for statewide use. Additionally, the SMSH staff have provided training to the Social Services Directors of MSH, EMSH and NMSH on discharge planning processes.

The charts below provide observations about compliance with the Remedial Order requirements for Discharge Planning. The first chart is based on the record reviews at NMSH, and the second chart is based on the record reviews of all State Hospitals combined.



NMSH CHART REVIEWS--DISCHARGE PLANNING
PERFORMANCE ELEMENT
Discharge planning begins within 24 hours of admission to a State Hospital
9
3
Identify the person's strengths, preferences, needs and desired outcomes
7
5
Identify the specific community-based services the person should receive upon discharge
9
3
Identify and connect the person to the provider(s) of the necessary supports and services
6
6
Refer the person to PACT or ICORT when the person meets the criteria for PACT or ICORT in DMH's Operational Standards
9
2
Prior to discharge, coordinate between the State Hospital and the community provider so that, upon discharge the person continues to receive prescribed medications in the community appropriate for the…
0
12
Identify resources for the person to access in the event of a crisis and educate the person about how to access those servicese
0
12
Include an anticipated discharge date
8
4
For discharge plans for persons who have previously been admitted to a State Hospital within the prior one-year period includes review of the prior discharge plans the reasons for the readmission and adjustment…
2
0
Prior to discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and…
11
1
Peer Bridgers at each State Hospital integrated into the discharge planning process
1
11
0
2
4
6
8
10
12
14
DOCUMENTATION PRESENT IN CHART?
NO
YES



In our initial Report, we found that a substantial minority of patients admitted to other State Hospitals did not have a SMI diagnosis (as determined by hospital physicians). We did not see this problem at NMSH. As the chart below indicates, in the sample of records reviewed, almost all had a SMI diagnosis. One individual had a diagnosis of "Amphetamine induced psychosis." Although the root cause of this problem may have been substance misuse, admission to a hospital was probably an appropriate step to provide care and determine more about what led to the psychotic symptoms. This may suggest that the Regions admitting to NMSH (2, 3, 4) are effectively managing the Pre Admission Screening process.

**NMSH Record Review: Hospital admission diagnoses**:

| Admission Diagnosis | Number |
|---|---|
| Bipolar Disorder | 1 |
| Schizophrenia | 2 |
| Bipolar Spectrum, mixed with alcohol use DO, Cannabis use DO, depression | 3 |
| | |
| Schizophrenia, Poly substance abuse | 3 |
| Major Depressive DO, severe, Borderline Personality DO | 1 |
| Amphetamines induced psychosis | 1 |
| Unknown | 1 |

We will outline compliance Findings on the requirements of Paragraph 15 in the next section. The data make it clear that Mississippi has achieved compliance with Requirements 15 (f) on continuity of medication treatment and 15 (g) on identifying resources to contact in crisis. Performance on 15 (c) on connecting people with the provider(s) of the necessary supports and services is good in that we consistently found that appointments for aftercare had been made. However, we do not yet find full compliance because coordination to identify *which* services people need still requires work.

Based on our discussion of these issues in Report 1, DMH has taken several actions to improve performance on other discharge planning issues. First, efforts have been renewed to standardize and implement consistent methods in all the Hospitals. Second, DMH has created a new Office of Utilization Review which will be charged with inspecting Hospital performance on Discharge Planning (and CMHC performance on Diversion, and documentation of Core Services delivery). The Court Monitoring Team is working with DMH staff to align record review protocols that we hope will be used both in DMH Utilization Review efforts and by the Monitor. These are substantive efforts that will, if implemented well, assist in achieving compliance.

CMHC chart reviews and observations related to Discharge Planning. As in our earlier visits, four (4) charts of individuals recently discharged from Hospitals were reviewed at each of the CMHC's we visited during this monitoring period. A total of twenty-eight (28) charts were reviewed. We believe this sample is sufficient to make preliminary and general observations about some statewide patterns of care, related to the transition from Hospital to community care, such as:

- when the person was seen after discharge,
- who they were seen by,
- where they were seen,
- if arrangements were started for ongoing clinical care and
- ancillary issues in discharge/reentry such as transportation, frequent visits, and flexibility in meeting needs.

Paragraph 17 specifies that prior to the person's discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll the person in appropriate services. Our review also suggests that examining the CMHC actions to support Discharge Planning may be important in future DMH Utilization Review efforts. There are few explicit requirements for this in the Order, but CMHC efforts to effectively transition people into care back home are clearly essential.

Regions 2, 3, and 4 are served by North Mississippi State Hospital. We found a pattern of persons in these Regions receiving treatment in other public and private facilities in the area. Persons may have their pre-evaluation completed by the CMHC, have an inpatient stay at the state hospital but seek aftercare treatment from a private facility. One person was discharged from the hospital and self-referred to an aftercare treatment facility in Memphis. Several other persons were discharged with aftercare treatment was at a private facility. People obviously have

the right to seek care where they wish, but it does become more difficult for the CMHC's to coordinate care. The CMHC may not see the person again until they are in crisis, need commitment or have been committed.

 Our record reviews at Region 2 revealed that individuals were seen within one day of their discharge by the Certified Peer Support Specialist, and received services. One person had a home visit, one person was assisted with obtaining lab work for medications and one person was evaluated for one of the core services but was not eligible, and was enrolled in intensive therapy. In this case, the mother of the individual was fully engaged in the treatment process. Based on our review, Region 2 is well focused on the transition from the Hospital care to the outpatient treatment setting. And their approach is person centered. These positives are in large measure due to the active use of Certified Peer Support Specialists who participate in discharge planning meetings at the state hospital and follow the person upon discharge. They provide transportation to appointments for therapies and labs—a valuable service that is not Medicaid reimbursed. The Region also emphasizes family education and family training to help the person and family adjust. Region 2 did not have a CSU at the time of our visit but has a small crisis intervention center based on the "living room" model—a peer staffed respite approach. Region 2 acquired control of the CSU in Batesville in July. The Crisis Intervention Center has provided an identifiable point of entry, especially in the Oxford area, and may assist in diverting patients from hospitalization. We were impressed that our record review confirmed strong, staff efforts to provide needed services to clients post discharge during the Christmas holiday season.

Record reviews at Region 3 revealed challenges in coordinating care with private providers. In one case, an individual who was committed had been receiving services from a private provider. We judged this individual could have benefited from PACT but it was not available in the city of commitment. Since discharge, the person had received no services from the Regional system since January. In another case, the person was only seen by the CMHC for commitments. There had been no other contact before commitment or after commitment. In two cases, the persons came to the CMHC for medication management, seeing only the Nurse Practitioner. One was on an injectable medication.

In the records reviewed at Region 4, there was evidence that appointments were made for individuals prior to discharge and that intakes were completed prior to discharge via Zoom. In one case, the person was enrolled in Psychosocial Rehabilitation and is seen by the nurse for medication management. One person was in PACT prior to admission to the hospital but refused intensive services at discharge.

Regions 1, 6 and 15 are served by Mississippi State Hospital. Our record reviews in these regions happened to involve individuals with long-standing histories with the CMHC. In Region 1, we observed that individuals were enrolled in an intensive service, had an aftercare appointment prior to discharge and that following discharge they received services that could have an impact on their continued stay in the community. In one case, the person was in ICORT; the ICORT team followed the person from the beginning of the admission at the state hospital to the date of discharge. The therapist in this case assisted in the management of the person's finances. In

another case, the person had a series of "no shows." When the person's mother died, they were enrolled in ICORT and had since been seen regularly by ICORT. In another case, the person is seen in ICSS regularly and in one case, the person is not enrolled in an intensive service but is seen at the CMHC for outpatient therapy and medication management. These were good examples of Diversion and care coordination that linked people to services they needed and would accept.

In the record reviews of Region 6, we observed that individuals had aftercare appointment prior to discharge and that intakes were completed while the person was at the State Hospital. In one case, the person was seen by MCeRT prior to the scheduled post discharge appointment and was seen by a nurse for injections. In another case, the person missed the scheduled post discharge appointment and had been off medications and refused to answer phone calls from CMHC staff. The county administrator reached out to the person's brother to assist in getting the person in treatment. We observed in another case where the person had failed post discharge appointments and the CMHC ICSS staff as well as the county administrator and the medical records clerk have attempted to contact the person to arrange services. In documentation of the fourth case, we observed that the person had an emergency contact and was seen by the nurse for an injection. The person was still followed by MCeRT and seen for medication management. These were also positive examples of care coordination and Diversion,

As with Region 6, the records we reviewed for most individuals in Region 15 had long time involvement with the CMHC. One was new to the system and required an intake and the other three persons had open cases and an intake was not required. One person had been a client of the CMHC since 1997 and when discharged from the State Hospital failed to complete his aftercare appointment. The person was coming to the CMHC for medication checks/injections only and declining intensive services such as PACT, ICORT, or ICSS. Another person declined case management services and is also seen each month for an injection and individual therapy. In the final case, the person is enrolled in PACT and comes to CMHC for medication management. These examples suggest appropriate care coordination efforts to engage people in care that they will accept.

Region 7 is served by EMSH. We observed that individuals whose records we reviewed had an intake completed via Zoom prior to discharge and aftercare appointments were scheduled within one day of discharge. In one case, the person was enrolled and admitted to ICSS. In another case the person had been in ICORT since August 2020 and upon discharge was followed by ICORT and Peer Support. Observations in another case were of a person who had an appointment with ICSS at discharge but was transferred to outpatient therapy immediately after discharge. With this person there was documentation of many missed appointments.

Paragraph 16 specifies that discharge planning for persons who have previously been admitted to a State Hospital within the prior one-year period should include review of the prior discharge plans, the reasons for the readmission, and adjustment of the new discharge plan that accounts for the history of prior hospitalization. While these requirements focus on the Hospitals, they also pertain to CMHCs and to both Care Coordination and Diversion from Hospitals. In the Table below we

summarize admission/readmission patterns from a small sample of records reviewed at NMSH. We note that most of the readmissions are after long periods out of the Hospital.

**NMSH: Admission/Readmission Patterns Among 12 Individuals Whose Records We Reviewed**

| | |
|---|---|
| First admission | 5 |
| 2 -10 admissions | 6 |
| Over 10 admissions | 1 (20 admissions) |
| Two (2) of the persons with multiple admissions were admitted within one year of their discharge from the previous admission. | |

We observed that most individuals who were readmitted had been out of the Hospital for more than a year. The Order requires attention to reviewing and adjusting discharge plans for individuals readmitted within a year. We note that Mississippi has a relatively low readmission rate compared with national patterns, and that readmissions after >1 year are much more likely to reflect challenges in community support rather than in Hospital care. The Order's requirement to examine what led to readmissions implies but does not explicitly require efforts to review and improve community care and care management by considering what happened in the community prior to admission, not just care in the prior hospitalization. To be productive, this would focus primarily on patterns in community care in the months prior to the readmission. Reviewing these patterns as part of Utilization Review by looking at community care prior to a readmission would be useful. Such reviews could consider patterns such as: whether the person was engaged in care, were they experiencing stresses such as housing or family instability that might have suggested interventions, were there issues in medication adherence, and should a higher level of care e.g. PACT/ICORT/ICSS have been considered.

Paragraph 17 specifies that prior to the person's discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll the person in appropriate services.  Meeting these requirements will be facilitated by having Peer Bridgers in Hospitals and CMHCs and would be aided if they were based on an understanding of the person's treatment prior to the hospitalization, what social determinants had an impact on the readmission to the hospital such as family support, housing, transportation, and what services or supports might improve discharge outcomes.

Paragraph 18: Technical assistance to Chancery Courts: This paragraph requires the State to provide chancery courts in each county with an annual overview of available mental health services, including alternatives to civil commitment to State Hospitals. These courts play a critical role in commitments and admissions; they must be aware of services in their communities including newer Core Services that are available and potentially able to assist individuals and their families without Hospital admissions. The State has recently provided a summary of training and information provided to the courts. The summary indicates that training sessions in the Fall of 2021 generally had uneven attendance; while sessions in the Spring of 2022 were attended by personnel from most of the counties.

We do not yet know how to reasonably assess whether the trainings are working as intended. Anecdotal reports suggest that the role of chancery courts in commitment processes is quite variable and in a few cases commitments have been ordered for people who do not have SMI, or where community care was recommended by professionals. This pattern is not surprising given that judges are elected locally and have great autonomy, but may expose people with SMI in some counties to greater risks of institutionalization. To address this issues, DMH leaders are also engaged in conversations about these issues with chancery court leaders.

Paragraph 19: Technical assistance and training to providers: This paragraph requires the State to provide technical assistance and training to providers, with these activities carried out by individuals with substantial experience in implementing Core Services. The State has recently provided a list of training and technical assistance efforts during FY '22. The information documents that many trainings (about 100) were conducted during the year. The data indicate:

- There was a substantial training agenda (about 30 sessions) for Peer Support Specialists and/or Peer Bridgers. While we cannot assess the substance of these efforts, this is a robust effort to develop the peer workforce. Few sessions were targeted at the CMHC leaders who may need to provide additional leadership to enable peer services to be successful.
- Many trainings (about 30 sessions) were informational sessions about DMH data and reporting requirements.
- There was a modest menu of trainings designed to improve clinical/program skills:
  - About five offerings seemed to offer content that could improve knowledge or skills of staff in many settings who work with people with SMI. However, we did not see effort this was a planful approach; some of these sessions were conference presentations. Others focused on suicide prevention and motivational interviewing. This does not appear to be a robust, statewide skills development effort.
  - About nine sessions were focused on specific Core Services, mostly on Crisis Services—where the sessions appear oriented to children and adolescents—and Supported Employment. We did not see evidence of a robust training effort during FY '22 for staff of all Core Services.
- Staff conducted several formal "consultation" sessions for community staff working in specific Core Services (e.g. PACT, CSUs). We believe these sessions could be quite valuable for staff in these settings, but we do not know the content, breadth of participation or if the sessions were evaluated.
- The great majority of trainings were conducted by DMH personnel, except that the peer trainings relied heavily on Mississippi peer support leaders.

We are not able to assess the sufficiency of the training effort, though the data confirm that much was done and suggest that the peer effort was substantial. We are also aware that evaluating such a training effort can be complex; enough must be done to sufficiently support staff but meeting every potentially desired outcome is impossible. We do not know the extent to which CMHC's provide training to their staff that would support competence of their workforce. Many CMHC's

nationally have access to distance learning systems that could be deployed to address training needs. The Monitor will confer with the parties on how to reasonably assess this issue.

Paragraphs 20 and 21: Data collection and review: These paragraphs require monthly collection, review and analysis by the State of detailed data on crisis services, civil commitments to and long term stays in State Hospitals, and service levels by county and region for both DMH and Medicaid. Most reporting responsibilities rest with DMH, which has designated staff to carry out these duties and worked with the CMHCs on data collection during FY 22. DMH reports that initially there was great variability in the accuracy of CMHC data, but that there have been substantial improvements. The State has indicated this data will be posted and provided to the Monitor by October. It will be essential to monitoring compliance (for example, are Core Services operating at planned capacity and available to people with SMI across Mississippi). The timing of this data submission means it was could not be adequately reviewed by the Monitor for this Report. Therefore data analysis will be a focus during the next monitoring period.

The Division of Medicaid has been producing reports on the Core Services it has reimbursed and providing them to the Monitor. We have referenced some patterns that are revealed in the data (e.g. levels of Peer Support Services billed to Medicaid). However, many SMI individuals are not eligible for Medicaid. Some Medicaid covered services may be delivered by CMHCs but not billed to Medicaid. It is not evident yet whether the State can combine data on individuals who receive both Medicaid and DMH paid services. We will explore these issues with State officials. Additionally, as described in our first Report, Mississippi limited Medicaid coverage for "Poverty Level Aged and Disabled" individuals, meaning that some of these services would be reimbursed by Medicare, which has a limited mental health benefit. Nationally, a substantial number of aged and disabled Medicare eligible individuals have SMI, but many are also eligible for Medicaid and rely on Medicaid mental health benefits. We do not have data on these patterns in Mississippi, including how many SMI individuals are involved, what services they receive and whether they are institutionalized in State Hospitals.

Paragraph 22: CMHC compliance on Standards and Fidelity: This paragraph requires an annual review by the State of CMHC performance on compliance with DMH Operational Standards and on fidelity with DMH expectations (for Core Services where fidelity is measured). State officials indicate this assessment is being done, but the Monitor has not yet been apprised of results.

Paragraph 23: Clinical Review (stayed by Order of the Court)

Paragraph 24: Website posting of information and data for Paragraphs 19-21: This paragraph, outlined above, requires the posting of the data described in these Paragraphs on agency websites (and provided to the DOJ and Monitor). As described above, these activities are being carried out as this Report is being written, and will be assessed beginning in the next monitoring period.

Paragraphs 25 and 26: Implementation Plan (stayed by Order of the Court)

Paragraphs 27 and 28: Termination and Monitoring: Monitoring requirements were laid out in a separate Order of the Court; Termination of the Court's oversight is dependent on compliance with the Paragraphs above.

Compliance Findings in U.S. v. MS. Here we outline the compliance status of the State for each requirement of the Order, based on the observations in the prior section of this Report.

| Paragraph Key Issues | Summary of Compliance Findings |
|---|---|
| 1--State must **reduce unnecessary Hospital use via adequate and appropriate services.** | All dimensions of State Hospital use (admissions, census, people with long stays) have been reduced, however some of the reductions are due to the pandemic and to staffing challenges rather than improved care. There are still delays in accessing CSU's and Hospitals. Some people (who have not been charged with a crime) wait in jails for hospital beds in some Regions.<br><br>DMH has released funding for all of the services listed in the Order, including funds for some Core Services (Mobile Crisis, CSUs) that go beyond levels required in the Order. Some of these services are still in development including some newly funded in FY 2023.<br><br>Compliance regarding program functioning including staffing and service levels and fidelity reviews conducted by DMH to determine if programs are working as intended have not yet been assessed by the Monitor, meaning that we cannot yet validate that services are working as intended.<br><br>PARTIAL COMPLIANCE |
| 2--**CMHC'** …(are) "responsible for preventing unnecessary hospitalizations" A) ID individuals with Serious Mental Illness (SMI) who need services B) screen people with SMI in care for need of core services C) Coordinate care D) Divert from SH via care | There is a great deal of variability among CMHCs. Some of this variability reflects local adaptation to different regional characteristics (e.g., rurality, poverty). However, some of the variability affects the availability and adequacy of services.<br><br>Record reviews of people committed to Hospitals indicate that alternatives to hospitalization are not always considered and that some people wait in jail for hospital beds.<br><br>Statewide, care of people being discharged from hospitals appears to be improving (e.g., people are regularly discharged with medications and with a follow-up appointment). However, there are still problems and inconsistencies. For example, very few individuals have face to face or video meetings with CMHC staff prior to discharge. Some people who miss scheduled post-hospital appointments get good follow-up outreach and are re-engaged in care, while others may be "lost to care."<br><br>Coordination of care for people with SMI in communities across Mississippi is quite variable, and there is no statewide expectation or requirement for care coordination to ensure that people get the care they need to avoid hospitalization.<br><br>PARTIAL COMPLIANCE |
| 3--State has adopted **Core Services.** Statement of fact. | Compliance on this issue is primarily being addressed by examining Paragraphs 4-11. DMH has provided funding for all required Core Services. Where required, DMH is conducting reviews of fidelity. A remarkable number of programs reviewed in FY '22 (61 programs out of 63 reviews) "passed" these reviews. The adequacy of reviews has not been assessed by the Monitor and this will be a focus of activity in FY '23. |

| | |
|---|---|
| **4--Mobile teams**: A) defined, Op. Std. 19-19.4 cited B) "1 team/region" (2 in 12) C) maintain hotlines, assist w stabilization, help connect to care, work with law enforcement, seek to coordinate with 911 D) state monitors response time | DMH has provided grants for Mobile Crisis to all Regions and has awarded additional funding totaling $1.3M in FY '23. Data on crisis response has been inadequate; DMH is implementing new data reports during FY '23. Therefore, the staffing and functioning of Mobile Crisis services cannot yet be reviewed to determine their adequacy. During this period (effective 7/16/2022) a single new national 3-digit number for mental health crisis and suicide prevention (988) was introduced, and for the first time substantial federal resources to support crisis care have been provided. Mississippi has worked to build in-state capacity to handle 988 calls and to collaborate with stakeholders including law enforcement and 911 system operators on improving crisis care. Next phases will emphasize integrating statewide 988 call services with the regional crisis services identified in the Order. During this period the Court Monitoring Team visited Mobile Crisis services in Regions 2, 8 and 9. We reviewed examples of good crisis care and saw—even among relatively well-functioning crisis programs—considerable variability in organization and functioning. Preliminary data and initial conversations make it clear that this variability is even more pronounced in more rural areas. DMH has developed a preliminary framework for measuring performance (fidelity) of Mobile Crisis services, and has conducted fidelity reviews in several Regions. The Monitor has not yet observed these reviews in action and so cannot validate their effectiveness. We will do this in FY 23. Given additional funding that will be invested in FY2023, as well as the timing of fidelity reviews and improved DMH data collection on Mobile Crisis services we will be in a much better position to assess statewide compliance by the end of 2023. PARTIAL COMPLIANCE |
| **5--Crisis Stabilization Units** A) Defined, Op. Std. cited B, C) To be funded in each Region (including 12 beds in Region 11 by end 2022) and sustained D) Region 15 can use other CSU's E) State monitors diversion rates and admissions bypassing CSU's | DMH has provided grants for CSUs to all Regions except Region 15—a small Region with low levels of hospitalizations where the Order does not require a CSU. Region 11 opened its 12 bed CSU in 2022 but through the end of FY '22 was operating it at only 8 beds. Also during FY2022 DMH awarded additional funding to many Regions to enhance security and/or clinical staffing to reduce the number of people denied admission because the CSU is not able to care for them. Some CMHC staff report this funding was useful, but we are not aware that its impact has been evaluated. In 2022 the Mississippi Legislature approved the use of substantial federal resources (6.4M annually for the next 4 years) to provide additional funding for CSUs. DMH is awarding this funding to a number of Regions with smaller (8 or 12 bed) CSUs, to increase capacity up to 12 or 16 beds, and to open additional 16 bed CSUs in Regions 8 and 9 and a 12 bed CSU in DeSoto County (Region 4). The length of stay in CSU's is higher than in similar facilities in other states; the longer people stay the fewer admissions are feasible. But there are no measurable national guidelines on what appropriate lengths of stay should be. CSUs, along with other services, are struggling to recover from the COVID pandemic, especially from staffing problems that began during the pandemic but have continued. |

| | |
|---|---|
| | Some CSU's are still not able to operate at capacity because of these challenges, especially regarding RN staffing that is required 24/7 in CSU's

Statewide, less than 15% of individuals admitted to a CSU are transferred to State Hospitals, which is a marker of success. Compliance concerns include: 1) most people admitted to Hospitals are not served at CSUs, including individuals committed/transferred to State Hospitals from private hospitals without access to CSUs; 2) people in some Regions are being held in jails awaiting a State Hospital bed. It is not clear whether the limited number of people admitted to Hospitals who first got CSU care is due to reduced capacity because of staffing, lack of clarity on who needs CSU vs. Hospital care, relatively long lengths for CSU admissions or finally due to the number of CSU beds that are available.

Medicaid Managed Care reimbursement for CSU's creates challenges for CSU's. Medicaid Managed Care plans conduct Prior Authorization reviews of CSU services. This is somewhat ironic in that CSU's are designed to provide less intensive and less costly care than hospitals., Medicaid and its health plans are liable for approved care of eligible people in CSU's, but not for care of most SMI people in State Hospitals, creating a possible perverse incentive. Prior authorization requires CSU staff to provide data to reviewers, and then cope with the costs of care that are not reimbursed. Data we were provided suggests that for Medicaid eligible patients not in a Managed Care plan, about 13 days of CSU care were authorized on average for these patients by independent reviewers. However, for patients enrolled in Managed Care plans, the reviewers employed by the plans approved on average only 7-9 days of care. It is not clear, since no consistent level of care instrument is used, whether the discrepancy is due to patient differences, differing methodologies or cost-shifting by the plans to the State.

PARTIAL COMPLIANCE |
| 6--**PACT**. Defined. Op. Std. 32.1-32.8 cited A) MS will sustain 10 teams (see Exhibit 1 of Order for regions/ counties served) B) MS will conduct fidelity reviews, submit scale with Implementation Plan (STAYED) | PACT teams are now funded in all the Regions required in Order (detail in Exhibit 1 of the Order, also attached to this Report as Exhibit 1). Utilization of PACT is improved since the time of trial, with the State reporting 674 individuals served in FY21. Complete data for FY 22 were not available as this Report was written. Assuming a caseload maximum of 80 individuals per team, total FY 21 utilization was about 69% of funded capacity, (although the number of individuals served is a total for the year, not the average enrollment).

DMH reports that 16 people being served by PACT teams were readmitted to State Hospitals in FY21, a marker of the program's effectiveness.

Fidelity reviews of PACT programs are conducted by DMH and DMH is obtaining expert consultation on conducting reviews; the Court Monitoring Team will participate in some of these reviews to validate adequacy of monitoring.

PARTIAL COMPLIANCE |
| 7==**ICORT**. Defined, Op. Std. 32.9-32.13 cited | DMH has provided funding to support all the 16 ICORT teams identified in Attachment 1 of the Order with 10 of the teams newly funded in FY21.  The Region 8 ICORT team was |

| | |
|---|---|
| A) 16 teams per Exhibit 1. Teams will meet 32.9-13 B) Fidelity scale, reviews | not operational in FY '22 because of staffing problems. The teams served 425 people in FY '21; the fully operational capacity of 16 teams is 720 people. DMH reports 23 people served by ICORTs were readmitted to State Hospitals in FY21. This relatively low number of readmissions is a positive indication of effectiveness, but a higher rate of readmissions than those achieved by Mississippi's PACT teams. DMH is conducting fidelity reviews of ICORTs and expert consultation on PACT reviews may be useful for ICORT review. The adequacy of these reviews has not yet been assessed. The Court Monitoring Team will participate in some of these reviews to assess their adequacy in 2023 . PARTIAL COMPLIANCE |
| 8--Intensive Community Support Specialists. Defined. Op. Std. 32.18 cited A) 35 ICSSs to be funded, sustained B) Meet criteria of Op. Std. 32.18 | DMH has made available the funding to support all the Intensive Community Support Specialists identified in the Order. A reported 938 individuals were served in FY '21. The full caseload of 35 ICSS's is 720 individuals; these staff provide transitional/shorter term services in some Regions so the number of people served over time is greater than the caseload. DMH is conducting fidelity reviews of ICSS; the Court Monitoring Team will participate in some DMH ICSS reviews in 2023 to assess the service's effectiveness at preventing hospitalization. PARTIAL COMPLIANCE |
| 9--Supported Employment— IPS/VR. Defined, Op. Std. Cited A) Each Region will provide SE by either IPS or VR collaboration B) IPS to be sustained or developed by end of FY 22 in Regions 2,4,7,8,9,10,12 C) IPS meets Op. Std. 24.4-6 D) In other Regions, SE offered by ES Specialists with an MOU with MS Div. Rehab Svces | DMH has provided funding to support Individual Placement and Support (IPS) services in 7 Regions, and to support a VR Supported Employment specialist in the other 6 Regions. FY22 data on Supported Employment were not available as this report was written. DMH is conducting fidelity reviews of Supported Employment programs and obtaining expert consultation on conducting reviews; the Court Monitoring Team will assess the DMH fidelity reviews of supported employment in 2023. PARTIAL COMPLIANCE |

| | |
|---|---|
| E-F) Fidelity to be measured<br>G) State to submit scales with Implementation Plan--STAYED | |
| **10--Peer Support Services** (PSS)<br>A) State to sustain PSS at the primary CMHC office in each Region<br>B) Plan to implement PSS at other offices (stayed)<br>C) Peer Bridgers at all Hospitals | DMH has provided funding for the Peer Support Service positions identified in the Order and has provided additional funding to each Region to support a CMHC Peer Bridger position focused on transitions from acute care (e.g., Hospitals) to community care, and Peer Bridgers for each CSU.<br><br>Through visits to all Regions and Hospitals and conversations with leadership staff, the Monitor observed significant variability in how the role of Peer Support Specialist was defined, in effectiveness of filling these positions and how peers are utilized and integrated into programs. Views of the role varied from seeing Peer Support Specialists as vital team members representing a different and complimentary expertise, to a view of peers as paraprofessionals with very limited expertise. These views appeared to affect success in recruitment and utilization of these staff.<br><br>In the prior section of this Report, we describe a deeper exploration of Peer Support Services in Regions 2 and 3, which we observed as having a good understanding and use of peers. This review leads us to suggest that some additional statewide leadership is needed to enable adequate use of Peer Support Specialists in all Regions<br><br>PARTIAL COMPLIANCE |
| **11--Permanent Supported Housing**<br>A) $150k to assess State Hospital and Crisis Stabilization discharges who: >90 days in SH, are/were homeless, lived in unlicensed boarding home prior to admission, or have another CSU/SH admission<br>B) addl capacity (STAYED) | DMH has made the funding required by the Order available. Chart reviews of people admitted to/discharged from State Hospitals show that in most cases people are not being held in the hospital because no housing is available. However, in many cases people are returning to environments that may have contributed to instability and admissions, and conversations with families and advocates suggest that placements in adult homes are problematic.<br><br>The Monitor has not yet reviewed the adequacy of Permanent Supported Housing Services,<br><br>PARTIAL COMPLIANCE |
| **12--Medication Access**: $200k provided to CMHCs | DMH has allocated the funds.<br>The Monitoring Team noted various issues and successes with respect to Medication Access. Hospital record reviews frequently indicate that nonadherence with prescribed medication regimens is a reason for admissions and readmissions. However, records |

| | seldom reveal why use of medications was discontinued, and what the implications are for further treatment.. There is increased use of long acting, injectable (LAI) antipsychotics, widely believed to increase stability and reduce Hospital readmissions. A number of Regions have on-site pharmacy services (operated directly or contracted) which increases access and convenience for individuals receiving care. |
|---|---|
| | There is insufficient access to clozapine statewide, with considerable variability across Regions. This is problematic since it the most effective antipsychotic medication. |
| | DMH has provided data on FY '22 use of the Medication Access funds; only about 21% of the funding was expended by CMHCs  by the end of the year. |
| | PARTIAL COMPLIANCE |
| 13—**Diversion from State Hospitals** <br> --during Pre-evaluation screening, consider if ICSS's are appropriate, offer if needed <br> --during process, consider all civilly committed for Crisis Residential unless commitment has been ordered by court | Interviews and record review indicated variable processes across CMHC's to assess the need for PACT, ICORT, or ICSS. The Order calls for consideration of these intensive services to avoid unnecessary institutionalization (e.g., during Pre-evaluation Screening). Some CMHS's indicate that considering the need for intense services is a standard part of Pre-evaluation Screening in their Center. However, evidence of this was not consistently found in records that were reviewed. |
| | Additionally, Paragraph 2 of the Order requires coordination of care as needed. While considering the need for intensive services at commitment is useful,  it may be more effective to consider intensive services earlier, before a Hospital commitment might be needed. If an individual's mental well-being has deteriorated to the point where hospitalization is being considered, enrollment in ongoing intensive services might be too late. |
| | The variability in whether ongoing care coordination and Pre-evaluation screening address these issues suggests a need for a statewide protocol defining CMHC responsibilities to coordinate care, and Quality Improvement processes like that which DMH has introduced for Discharge Planning, where some initial results are evident. |
| | DMH is developing a compliance assessment process that will include reviews of CMHC Diversion activities, to be assessed via record review.  The Court Monitor Team will assist with and then review adequacy of these efforts. |
| | PARTIAL COMPLIANCE |
| 14--**Connecting** the 154 (Individuals whose care was reviewed by DOJ experts prior to trial) to care: <br> --US info to MS | DMH has provided information to CMHC's and will pay $100 per individual for completion of the work. The State has indicated data on this outreach and engagement effort will be provided by October 2022. |

| --MS provide info to CMHC's with funding to:<br>A) Outreach for engagement<br>B) Screen for Core services, document, offer as appropriate | PARTIAL COMPLIANCE |
|---|---|
| 15--**Discharge Planning** to begin within 24 hours of admission and will:<br>A) Identify the person's strengths, preferences, needs and desired outcomes<br>B) Identify specific community-based services needed on discharge<br>C) Identify and connect the person to the providers<br>D) Refer the person to PACT or ICORT when criteria met<br>E) Include assistance if needed in securing or activating benefits<br>F) Coordinate before discharge so meds are continued as needed<br>G) Identify resources for crises and educate on accessing them | The Hospital and CMHC records reviewed at Hospitals and CMHC's during FY 2022 allowed a careful assessment of progress made and needed on these requirements. Progress is evident. DMH developed a Discharge Planning protocol and convened Hospital and CMHC staff to work on the issue. As a result of these efforts, there has been some progress on discharge planning. Appointments for continued care post discharge are arranged consistently and documented in Hospital and CMHC charts. People are discharged with a supply of medication (usually for 14 days, or a month) and a prescription. Hospital staff often report that "discharge planning begins at admission" but—except at SMSH—this is usually not evident in the records. However, progress is incomplete: for example, the timeliness of efforts to initiate discharge planning and documentation of patients' strengths, needs and preferences is uneven. DMH is making further efforts to improve  Discharge Planning based in part on recommendations made in our earlier report..<br><br>Improving connections to post hospital care via "warm handoffs" that include face-to-face or video meetings with community staff is essential. Peer Bridgers can facilitate these connections and were just being hired in Hospitals and CMHC's as we visited. Where Peer Bridgers were involved in discharge planning, especially where they were present both at the Hospital and at CMHC's, we saw improvements. There is a need to improve identification of which specific services people will need to succeed on discharge. improvements in<br><br>DMH has created an Office of Utilization Review which will inspect Hospital performance on Discharge Planning (and CMHC performance on Diversion). The Court Monitoring Team is working with DMH staff to align record review protocols that we hope will be used both in DMH Utilization Review efforts and by the Monitor. These efforts, if implemented well, will assist in achieving compliance.<br><br>Since visits including record reviews related to Discharge Planning have now been completed at all Hospitals, we are now able to provide compliance findings. See the narrative and data provided in the prior section of this report.<br><br>Compliance Findings are provided below by *subparagraphs of the Order*:<br>:<br>Discharge Planning to begin within 24 hours of admission and will:<br>*Identify the person's strengths, preferences, needs and desired outcomes*<br>Staff do indicate that "discharge planning begins at admission" but as noted in our first Report (and now extended via observations at NMSH) there is often no documentation of |

| | |
|---|---|
| H) Include an anticipated discharge date | how this is being done. This issue is now being addressed by DMH and we expect to see improvement soon.

In our first Report we evaluated this Requirement based as Partial Compliance. However, our completed review of 57 charts from all hospitals during FY '22 found evidence of compliance in only 3.

NONCOMPLIANCE

*Identify specific community-based services needed on discharge*

As discussed above, the identification of needed services post-hospitalization is often pro-forma and not individualized.  This issue is now being addressed by DMH and we expect to see improvement soon.

In our first Report we evaluated this Requirement based as Partial Compliance. However, our review of 57 charts from all hospitals found evidence of compliance in only 9.

NONCOMPLIANCE
*Identify and connect the person to the providers*

Although identification of which services are needed post discharge may not be sufficiently individualized, Hospital staff consistently arrange for post discharge care including scheduling initial appointments.

COMPLIANCE

*Refer the person to PACT or ICORT when criteria met*

As discussion above indicates, these decisions are not yet sufficiently timely or individualized.  This issue is now being addressed by DMH and we expect to see improvement soon.

In our first Report we evaluated this Requirement as Partial Compliance. However, our review of 57 charts from all hospitals found evidence of compliance in only 10 and we conclude the earlier rating was too generous.

NONCOMPLIANCE

*Include assistance if needed in securing or activating benefits*

Assistance in securing benefits is required by the Order and is of undeniable importance. However, given the short hospital stays that most people experience, there is usually not enough time to complete these processes (e.g. applications for Social Security Disability can take months or even years). A strengthened, consistent process of assisting with benefits in CMHCs that is coordinated with what the hospitals can de should be considered. |

<table>
<tr><td></td><td>

PARTIAL COMPLIANCE

*Coordinate before discharge so meds are continued as needed*

Our record reviews confirmed that continuity of medication treatment was consistently addressed at discharge planning by Hospitals, by providing a supply of medications and a prescription.  Qualitative improvements, such as coordination between Hospital medical staff and CMHC's providers when medications are changed, are possible. However, this requirement is being met.

COMPLIANCE

*Identify resources for crises and educate on accessing them*

Documentation of this requirement has been made a standard part of discharge planning, and our reviews found consistent evidence it was in place (e.g. people sign the relevant discharge planning form).

We have not assessed the adequacy of Safety Planning to manage suicide risk, or education for self management in crises, but assess this requirement to be met.

COMPLIANCE

H)  *Include an anticipated discharge date*

As with requirements for timely initiating discharge planning, and in the context of shortened lengths of stay, there has been initial progress toward meeting this requirement. But the evidence is not yet consistently found in charts reviewed.

PARTIAL COMPLIANCE
</td></tr>
</table>

| 16--**Discharge planning for people readmitted** addresses prior plan, readmission cause, adjustment | Our record review included a modest number of individuals with recent readmissions. A substantial proportion of people admitted to Hospitals have prior admissions that were earlier than the one year requirement for this provision.

Where readmissions were involved we did not see consistent efforts to adjust care based on readmissions. We do note increased, robust efforts to start people with psychotic disorders on long-acting injectable medications when medication adherence was a cause of readmissions.

DMH is initiating a project within its Utilization Review office to regularly assess Hospital performance on Discharge Planning requirements. This effort will include a specific focus on readmissions requirements and will include more adequate samples to assess hospital performance. The Court Monitor Team will advise on and review the adequacy of these Utilization Review efforts |

| | |
|---|---|
| | PARTIAL COMPLIANCE |
| 17--Prior to discharge, **CMHC staff meet with individual** | Communication between CMHC staff and people hospitalized from their area is uneven. While not the only way to meet this requirement, we observed that where Peer Bridgers at the Hospital AND at the CMHC take on this responsibility it is often effectively done. Challenges in hiring Peer Bridgers and unevenness in how peer staff are integrated into CMHC's and Hospitals affect compliance. While our record reviews did not show adequate performance on this issue, we believe that having Peer Bridgers in place will assist greatly, and we commend the State for providing grants for Peer Bridgers in all the CMHCs.<br><br>PARTIAL COMPLIANCE |
| 18--**DMH annual overview of services, alternatives to commitment to Chancery Courts** | DMH has conducted briefings/trainings with Chancery Court staff. Our interviews with Hospital staff as well as record reviews and interviews with CMHCs reveal great unevenness in Chancery Court processes, suggesting that the trainings are not yet sufficient to achieve consistently appropriate performance of the Commitment process. In recognition of this problem, and to improve collaboration with Courts and law enforcement, DMH has provided funds to a number of Regions for Liaison staff to work with these systems to improve collaboration and care. DMH also has initiated dialogue with statewide leaders in the Court system.<br><br>PARTIAL COMPLIANCE |
| 19--**TA to providers**:<br>--competency based training, consultation, coaching<br>--by people with experience implementing Core Services | The Monitor has recently received a spreadsheet showing summary data on provider training and technical assistance for FY 22. The data show many trainings were conducted and suggest a good program for training and support to Peer Support Specialists and Peer Bridgers is in place. We do not have data on how many staff were trained, on how trainings were evaluated, and whether other training (e.g. by CMHC's) was sufficient to meet needs. We are thus not yet able to adequately evaluate the training and technical assistance effort for compliance.<br><br>PARTIAL COMPLIANCE |
| 20--**Data Collection and Review**. On a monthly basis, the State will collect, review, and analyze person level and aggregate data capturing:<br><br>And Paragraph 24: | This requirement became effective at the end of FY '22. Recognizing problems in the consistency and accuracy of data, and problems documented at trial in data based management, DMH has worked hard with all CMHCs during FY '22 to improve data accuracy. Efforts have included regular meetings with each to reconcile data sources and reports. As this Report is written, the FY '22 data has been collected by DMH and is being reviewed for posting; so DMH FY '22 data has not been received and reviewed by the Monitor. Medicaid data on Core Services utilization has been submitted monthly by the Division of Medicaid to the Monitor during 2022, but as this Report is written, has not been posted. State posting of the FY22 DMH and DOM data is expected early in FY 23.<br><br>Specific requirements:<br>a. *Admissions to Residential Crisis Services locations, by location broken down by CMHC region and by county, and admissions to State Hospitals from Residential Crisis Services and where Residential Crisis Services were not provided;* |

| | |
|---|---|
| Beginning at the end of FY22, and until the case is terminated, Mississippi will post on agency websites and provide on an annual basis to the DOJ and Monitor the data described in Paragraphs 19-21, not to include individual identifiable data. | Some of this information has been provided to the Monitor and is reflected in this Report but has not yet been posted.<br><br>b. *Calls to Mobile Crisis Teams, with the number of calls leading to a mobile team visit, the average time from call to visit, the number of calls where the time to visit exceeded limits in the DMH Operational Standard 19.3, E, 1, and disposition of the call and/or Mobile Team visit.*<br><br>This information requires implementation of a new reporting system during FY '23.<br><br>c. *Civil commitments to State Hospitals by CMHC region and by county.*<br><br>This information has been provided to the Monitor and is reflected in this Report but has not yet been posted.<br><br>d. *Jail placements pending State Hospital admission by CMHC region and county, including length of placement (Mississippi will collect this data, as to each person, when a State Hospital receives the commitment order for the person).*<br><br>Not yet provided.<br><br>*Individuals who remain hospitalized in State Hospitals for over 180 days:*<br><br>Not yet provided.<br><br>*Persons receiving each Core Service by CMHC region and by county.*<br><br>Not yet provided.<br><br>g. *Number of units of each Core Service reimbursed through Medicaid by CMHC region and by county.*<br><br>This data (g) has been regularly provided to the Monitor since early in 2022; the Monitor has not yet discussed with Medicaid how the data will be reviewed, analyzed and posted.<br><br>PARTIAL COMPLIANCE |
| 21--**Monthly collection, review, analysis** of person level and aggregate billing/utilization on DMH grants<br><br>And Paragraph 24: | DMH is working on improving CMHC data collection and reporting, and staff now meet regularly with CMHC's to review data. The process to improve data reporting is challenging, and the State has made substantial progress. Linking DMH reimbursement to specific data on service provision (labelled as "Fee for Service") has improved data submission.<br><br>It will be very difficult to assess performance without the ability to check both Medicaid and DMH data for individuals. If people received both DOM- and DMH- paid services, being able to identify total services for individuals is essential. |

| | |
|---|---|
| Beginning at the end of FY22, and until the case is terminated, Mississippi will post on agency websites and provide on an annual basis to the DOJ and Monitor the data described in Paragraphs 19-21, not to include individual identifiable data. | PARTIAL COMPLIANCE |
| 22--**Annual analysis** of compliance and fidelity of all core services by CMHC | DMH has made substantial efforts to develop measures of program fidelity (is the program working as intended) or to adopt/adapt national measures where they exist for many of the Core Services: PACT, ICORT, ICSS, Supported Employment (both Individual Placement with Support—IPS—and collaborative programs with Vocational Rehabilitation), and Mobile Crisis. No fidelity measures exist for Peer Support Services, Permanent Supported Housing, or CSUs, although the latter are subject to detailed Operational Standards.<br><br>For the past several years, and beginning in FY 22 for Mobile Crisis, DMH has conducted annual on-site fidelity reviews of those programs with national (PACT, IPS) or State-developed fidelity measures (ICORT, ICSS, Mobile Crisis, VR Supported Employment). Therefore, the basic infrastructure of compliance with this Paragraph has been established for these services. To help assure compliance, the Monitor will review these DMH fidelity efforts by participating in some of the monitoring visits.<br><br>PARTIAL COMPLIANCE |
| 23--**Clinical Review**--STAYED | REQUIREMENT IS STAYED/NOT NOW IN EFFECT |
| 24--MS to **"post on agency websites** and provide on an annual basis to DOJ and Monitor the data in para 19-21"** | Covered in discussion of Paragraphs 19-22 above. The State has indicated the data will be provided/posted by October '22 and a review of compliance will then be possible. |
| 25--**Implementation Plan** STAYED | Not applicable |

| 26--Imp. Plan timetables STAYED | Not applicable |
|---|---|
| 27--**Termination--** Requires substantial compliance for each para, sustained for a year 28--Termination of oversight may be sought/achieved for individual section/paras | Not applicable |
| 29--**Monitor** to be appointed | Not applicable |

Recommendations and next steps.

The Monitor's core responsibility is assessing compliance with the Order, as we have done in this Report. The leadership on improving care and on determining how to achieve compliance rests with State officials. However, the Monitoring Team will at times have different information available to us and based on this and our experience will occasionally make advisory recommendations to the State that in our judgement will assist in achieving compliance. Here, we summarize those recommendations made in this Report.

1. The State (primarily DMH) should establish standards for care coordination to improve access to and quality of care, and to facilitate compliance with Paragraph 2 of the Order (see pages 8-17).
2. DMH, working with the OCMHA, should use the opportunity of improving CMHC EMR's to address the need for better and more consistent care coordination (page 17).
3. DMH (and potentially DOM) should consider adopting a structured, validated instrument to improve the reliability of crisis level of care decisions (page 25-26). Relatedly, DOM should require its managed care contractors to use a consistent, transparent approach for crisis care preauthorization (page 26).
4. The State has provided a robust training program for Peer Support Specialists and Peer Bridgers, but should consider how to further encourage the best utilization of these staff within CMHC's . Considering the best practices that exist in Regions 2 and 3 may help. Relatedly, CMHC and Hospital leadership should consider how best to support Peer Support Specialists within their organizations (page 32).
5. DMH and DOM should consider how to encourage better and more consistent statewide access to clozapine (page 33-34).

Next steps in monitoring. The next phase of monitoring will be important for several reasons. First, all requirements of the Order are now in effect. While it was useful to know services were funded by DMH, until statewide data on their use and well-done quality reviews were in place, whether the services are reducing unnecessary institutionalization could not be assessed. Therefore, reviewing data and validating DMH reviews of Core Services will be priorities during FY23.

We will also spend time looking at changes and improvements DMH is making to determine if they are also addressing the issues in compliance with ADA requirements. Examples include better coordination between the new 988 call system and CMHC's, improvements and expansion of Crisis Stabilization Units, and efforts to improve Discharge Planning in Hospitals and Diversion and care coordination in CMHCS. Since the Order requires assessing compliance on every requirement in every Report, we will continue to assess progress across the full range of issues addressed in the Order.