**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                             **PLAINTIFF**

**V.**                                          **CIVIL ACTION NO.: 3:16-CV-00622-CWR-FKB**

**THE STATE OF MISSISSIPPI**                                             **DEFENDANT**

**THE STATE OF MISSISSIPPI'S OBJECTIONS**
**TO SECOND REPORT OF THE COURT MONITOR**

The State of Mississippi objects to the Second Report of the Court Monitor (ECF 344) (Second Report) as follows:

**Overview**

The Order of Appointment (ECF 279 at ¶ 1) provides that the Monitor shall assess compliance with each "obligation" in the Court's Remedial Order.  This puts the Monitor in an untenable position because the Remedial Order (ECF 278) does not contain recognized, objective criteria for determining what constitutes compliance with each of its "obligations."  Nevertheless, the State is concerned that the volume of general commentary, discussion in the nature of perceived best practices, and recommendations in the Second Report, coupled with the Monitor's 3-part framework for assessing compliance, is resulting in mission creep – *i.e.*, the incremental expansion of the Remedial Order well beyond its terms.  Moreover, because neither parts 2 and 3 of the Monitor's 3-part framework nor the Remedial Order itself (except where it makes reference to fidelity) are tied to any recognized, objective criteria, compliance with the vast majority of the paragraphs of the Remedial Order depends on the "professional judgment" of a monitor.  The State's compliance with the Remedial Order should be assessed based on recognized, objective criteria, not "professional judgment."  Finally, on information and belief, the Monitor recognizes that the vast majority of the provisions of the Remedial Order do not lend themselves to assessment

for compliance by recognized, objective criteria.  Where that is so, the Court should recognize that a noncompliance/partial compliance/substantial compliance analysis does not work or apply.  A summary of the State's concerns follows.

1.    The Monitor previously sent a draft of his Second Report to the Parties for comments.

2.    The State sent its comments to the Monitor, but those comments were largely rejected.

3.    The Monitor's Second Report was filed on September 2, 2022 (ECF 344).

4.    The first 47 pages of the Second Report contain much in the way of the history of mental health services generally, commentary, and discussion in the nature of perceived best practices that exceed the scope of the report the Monitor is charged with generating.  In addition, the suggestions and the recommendations included in the Second Report exceed the requirements of the Remedial Order.

5.    The Order of Appointment charges the Monitor with providing "written reports on the State's compliance with the Remedial Order every six months" (ECF 279 at ¶ 3). The reports are to describe the level of the State's compliance and a summary of the data that led to the Monitor's assessment of compliance.  The first 47 pages of the Second Report exceed the scope of the reports that the Monitor is to file with the Court.

6.    The Monitor claims to assess compliance using the following framework:

1.    Was action taken to address the Requirement (e.g., a program put in place, or a procedure implemented)?
2.    Is that action working as intended (e.g., is the program serving people according to the State's standards)?
3.    Is the action contributing to the goal of reducing unnecessary institutionalization in Hospitals?[1]

---

[1] ECF 344, Second Report at 2.

7.      This framework is problematic for several reasons.  First, it does not exist in the Remedial Order.  Second, parts 2 and 3 of the framework are not tied to any objective criteria (for example, parts 2 and 3 do not identify how it is to be determined whether an action is working as intended or whether the action is contributing to the goal of reducing unnecessary institutionalization in Hospitals).  Third, because parts 2 and 3 of the framework are not tied to any recognized, objective criteria, compliance with the vast majority of the paragraphs of the Remedial Order depends on the "professional judgment" of a monitor.  To be clear, this is not intended to negatively reflect on Dr. Hogan's judgment.  Rather, the State's compliance with the Remedial Order should be assessed based on recognized, objective criteria, as opposed to the professional judgment of a monitor without regard to who is serving as the monitor.

8.      In his testimony during the hearing on the remedy, the Monitor testified that his job was to call balls and strikes.  The Monitor cannot call balls and strikes without an objectively defined strike zone.  The Remedial Order does not provide an objectively defined strike zone for the vast majority of its provisions.  The rules for balls and strikes are not dependent on the professional judgment of the umpire.  Likewise, compliance with the Remedial Order should not be dependent on the professional judgment of a monitor.

9.      The Monitoring team has reportedly developed a record review protocol based in the Tracer Methodology.[2]  The Tracer Methodology was not discussed at trial, is outside the record, and should not be used to assess compliance.

10.     The Second Report includes an extended discussion of "care coordination."[3]  The trial record consists of 30 volumes of 2,538 pages.  The words "care coordination" are not in the trial record, nor are they in the Remedial Order.  The Monitor's comments regarding care

---

[2] ECF 344, Second Report at 5.
[3] ECF 344, Second Report at 9-18, 45, 49, 54, 62.

coordination are in the nature of best practices, and do not reflect requirements of the Remedial Order.

11.     The Remedial Order provides that "each CMHC shall be the entity in its region responsible for preventing unnecessary hospitalizations," but this provision cannot be used to make best practices or technical assistance, or anything else that arguably prevents unnecessary hospitalizations, terms of the Order.   If anything that arguably prevents unnecessary hospitalizations is deemed to be within the scope of the Order, then the Order is inappropriately boundless.

12.     The Remedial Order notes that the State has adopted "key services" which the Order enumerates as the "Core Services."  To the extent that the Second Report suggests that the services required by the Order are any services other than the Core Services,[4] it is mistaken.

13.     The Second Report states that "Mississippi does not utilize a standardized level of care instrument or methodology."[5]  The Remedial Order does not require the State to do so.

14.     The Second Report states that "[w]e have not yet been able to effectively determine that Peer Support Specialists [PSS] have been hired or deployed effectively."[6] The State does not agree that the Monitor does not have sufficient information to determine whether PSS have been hired.  No recognized standard exists for determining whether PSS are "deployed effectively," no such standard is addressed in the trial record, and the Second Report does not suggest one. "Deployed effectively" should not be subject to "professional judgment," and any such assessment exceeds the scope of the Remedial Order.  In its discussion of PSS, the Second Report mentions "culture change," "[e]xamining agency hiring practices," "[c]onsidering human resources

---

[4] ECF 344, Second Report at 15.
[5] ECF 344, Second Report at 25.
[6] ECF 344, Second Report at 29.

practices," and "best practices approaches."[7]   That discussion exceeds the requirements of the Remedial Order (ECF 278).

15.     The Second Report states that "[t]he Monitor has not yet reviewed data on Supported Housing utilization …."[8]  No housing data is included in paragraph 20 of the Remedial Order, which is the paragraph that enumerates the data the State is required to collect.   To date, no data on Supported Housing utilization has been requested.  Regardless, the Remedial Order contains no on-going requirements regarding Supported Housing other than the funding of vouchers.

16.       In discussing paragraph 12 of the Remedial Order, the Second Report states that "we believe there is insufficient access to clozapine in Mississippi."[9]  This conclusion exceeds the requirements of paragraph 12, and the scope of the Monitor's duties under the Order.  Incidentally, one of the United States' experts faulted the State at trial for discharging a person on clozapine from a state hospital.  The expert testified that clozapine "has more risks than some others," the person on clozapine must be seeing a provider who is familiar with the medicine and knows how to use it, and a pharmacy cannot dispense clozapine unless it is registered with the clozapine REMS program, but not all pharmacies are so registered.

17.     The Second Report appears to suggest that pharmacy services should be available in each CMHC.[10]  However, the Second Report also recognizes that "there is no requirement in the Order to do so."[11]  Having pharmacy services available in each CMHC is not a requirement of the Order.

---

[7] ECF 344, Second Report at 33.
[8] ECF 344, Second Report at 33.
[9] ECF 344, Second Report at 34.
[10] ECF 344, Second Report at 35-36.
[11] ECF 344, Second Report at 35-36.

18.     With respect to paragraph 18 of the Remedial Order, technical assistance to Chancery Courts, the Second Report states that "[w]e do not yet know how to reasonably assess whether the trainings are working as intended."[12]  The Remedial Order does not charge the Monitor with assessing "whether the trainings are working as intended."  He should not undertake to do so. In the final analysis, a court is not bound by the technical assistance training it receives.

19.     With respect to paragraph 19 of the Remedial Order, technical assistance and training to providers, the Second Report states that "[w]e are not able to assess the sufficiency of the training effort, though the data confirm that much was done and suggest peer effort was substantial."[13]  The Remedial Order does not charge the Monitor with assessing "the sufficiency of the training effort."  He should not undertake to do so.

20.     With respect to the Summary of Compliance Findings, several findings of partial compliance in the First Report have been changed to noncompliance in the Second Report.[14]  These findings concern discharge planning under paragraph 15 of the Remedial Order.  The Second Report states that "we conclude the earlier rating was too generous."[15]  The evidence does not support this conclusion.

Dated:  September 22, 2022.

Respectfully submitted,

PHELPS DUNBAR LLP

BY:   */s/ James W. Shelson*
   Reuben V. Anderson, MB 1587
   W. Thomas Siler, MB 6791
   James W. Shelson, MB 9693
   Nash E. Gilmore, MB 105554
   4270 I-55 North
   Jackson, Mississippi 39211-6391

---

[12] ECF 344, Second Report at 47.
[13] ECF 344, Second Report at 47.
[14] ECF 344, Second Report at 56.
[15] ECF 344, Second Report at 56.

Post Office Box 16114
Jackson, Mississippi 39236-6114
Telephone: 601-352-2300
Email: reuben.anderson@phelps.com
      tommy.siler@phelps.com
      jim.shelson@phelps.com
      nash.gilmore@phelps.com

Douglas T. Miracle, MB 9648
Assistant Attorney General
General Civil Division
Walter Sillers Building
550 High Street
Jackson, MS 39201
Telephone:  601-359-5654
Email:  doug.miracle@ago.ms.gov

Attorneys for the State of Mississippi

## CERTIFICATE OF SERVICE

I certify that on September 22, 2022, I electronically filed this document with the Clerk of the Court using the ECF system, which sent notification of such filing to all ECF counsel of record in this action.  A copy was also emailed to the Monitor.

*/s/ James W. Shelson*
JAMES W. SHELSON