**U.S. v. Mississippi**

**Third Report of the Court Monitor**

**March 7, 2023**

Introduction and Executive Summary.

This is the third Report of the Court Monitor in this matter concerning Mississippi's adult mental health system, and its compliance with the "integration mandate" of the Americans with Disabilities Act (ADA). The central issue is whether Mississippi's mental health system for adults with serious mental illness (SMI) including community mental health programs operated by Community Mental Health Centers (CMHCs) and inpatient care provided by State Hospitals (Hospitals)--operates to unnecessarily institutionalize individuals with SMI in State Hospitals— mostly by not providing adequate community care.

The matter has been active for over a decade, and discussed in the first and second Reports which are posted at: https://www.dmh.ms.gov/news/olmstead/  U.S. District Court Judge Carlton Reeves issued an Opinion and Order in September 2019 finding that the Mississippi system for adults with serious mental illness was in violation of the ADA. On September 7, 2021, following negotiations toward a plan, Judge Reeves issued a Remedial Order (henceforth Order) and appointed Dr. Michael Hogan to serve as Court Monitor. An Order of Appointment provides that the Monitor shall assess compliance with each obligation in the Court's Remedial Order in a written report to the Court each six months and shall provide the State with technical assistance. The Appointment Order also provides that, in assessing compliance, the Monitor shall review and validate data and information, speak with State officials, providers, and individuals receiving services. This is the Monitor's third Report, covering the period from September 2022 to February 2023.

Legal proceedings in the case have continued. On January 10, 2022 the State filed an Appeal of Judge Reeves' Remedial and Monitoring orders with the Fifth Circuit Court of Appeals, seeking reversal of both. The Circuit Court held a hearing on the Appeal on October 5. As this Report is written, an Opinion has not yet been issued. During the legal process, the Order remains in effect: the State is implementing its requirements and the Monitor is reviewing progress.

Activities and developments in the mental health system create a context for understanding how implementation of the Order is proceeding and some of the challenges that Mississippi faces. Much has been accomplished. The State reports that all the required services have been funded by FY '22 and remain funded in FY '23. The Tables below list FY '23 funding information as provided by DMH. Table 1 lists funding for Crisis services, and Table 2 lists funding for other/continuing Core Services.

Table 1: FY '23 DMH Funding for Mobile Crisis and Crisis Stabilization

| Region | Mobile Crisis | Mobile Crisis ARPA* | CSU | CSU ARPA** | CSU- E*** |
|---|---|---|---|---|---|
| 1 | $270,000 | $100,000 | $800,000 | | $400,000 |
| 2 | $316,844 | $100,000 | $1,450,000 | | $400,000 |
| 3 | $385,674 | $100,000 | $800,000 | $650,000 | $400,000 |
| 4 | $400,000 | $100,000 | $2,450,000 | | $400,000 |
| 6 | $575,000 | $100,000 | $2,656,313 | | $800,000 |
| 7 | $341,564 | $100,000 | $800,000 | $400,000 | $400,000 |
| 8 | $450,000 | $100,000 | $1,450,000 | $1,450,000 | $400,000 |
| 9 | $358,879 | $100,000 | $1,450,000 | $1,450,450 | $400,000 |
| 10 | $447,427 | $100,000 | $1,450,000 | | $400,000 |
| 11 | $374,041 | $100,000 | $1,200,000 | | $400,000 |
| 12 | $880,982 | $200,000 | $2,519,000 | $1,900,000 | $400,000 |
| 14 | $191,099 | $100,000 | $800,000 | $650,000 | $400,000 |
| 15 | $300,000 | $100,000 | | | |
| Total | $5,287,470 | $1,400,000 | $17,825,313 | $6,500,000 | $5,200,000 |

Notes: *Mobile Crisis ARPA is federal funds to be released in FY '23 to enhance MCeRT  services

**CSU ARPA are new funds to be added in FY '23 to increase CSU capacity

***CSU-E funds were allocated first in FY '22 to enhance CSU staffing, and were used primarily to enhance direct care and security staffing

Table 2: FY '23 Funding for Intensive Services, CSS and Supported Employment

| REGION | PACT | ICORT | ICSS | CSS | SE |
|---|---|---|---|---|---|
| 1 | | $250,000 | $37,786 | $38,165 | $ 40,000 |
| 2 | | $500,000 | $41,500 | $35,000 | $100,000 |
| 3 | $600,000 | | $126,595 | $38,827 | $ 40,000 |
| 4 | $1,000,000 | | $94,304 | $61,140 | $100,000 |
| 6 | $471,098 | $186,891 | $162,396 | $89,423 | $ 40,000 |
| 7 | | $500,000 | $41,500 | $35,910 | $100,000 |
| 8 | $560,000 | $250,000 | $62,250 | $54,664 | $100,000 |
| 9 | $600,000 | $250,000 | $131,500 | $31,738 | $100,000 |
| 10 | $600,000 | $650,000 | $152,250 | $37,795 | $100,000 |
| 11 | | $500,000 | $221,500 | | $ 40,000 |
| 12 | $1,199,980 | $750,000 | $103,500 | $33,217 | $140,000 |
| 14 | | $250,000 | $37,786 | $40,498 | $40,000 |
| 15 | $600,000 | | $38,855 | $40,021 | $40,000 |
| Total | $5,631,078 | $4,086,891 | $1,251, 733 | $536,390 | $980,000 |

In addition to this funding for the Core Services required by the Order, DMH has received funds through both State appropriations and the Legislature's allocation of federal pandemic-related funds (ARPA—the American Rescue Plan Act). These funds will increase services in areas related to but not required by the Order, or in some case increase required services beyond the minimum levels required by the Order. A State plan for use of the ARPA funding is now being reviewed and finalized; funds for adult mental health for FY '23 (in addition to the Crisis funding described above) include:

- Support for 988 crisis calls $3,000,000
- Peer Support Services $1,500,000
- Court/Law Enforcement/Hospital Liaisons $1,080,000 (related to Diversion from Hospitals, discussed at Paragraph 18 below)
- Intensive Community Support Specialists $315,000
- Intellectual and Developmental Disabilities (IDD) Crisis Services & Supports $3,200,000 (not dedicated to individuals with SMI, but many individuals with IDD are committed to Hospitals and this community approach should provide better care and reduce inappropriate hospitalization).

These investments should assist the State in improving care and achieving compliance. Sustaining federally funded services when ARPA funding runs out in FY '27 is a concern.

During FY '23 the State has continued to monitor the fidelity of Core Services and took efforts to improve this monitoring by consulting with national experts in PACT (Program of Assertive Community Treatment) and IPS (Individual Placement and Support—Supported Employment) to improve fidelity monitoring. This should improve the quality of the reviews and facilitate compliance by improving the State's ability to make sure programs are working as intended. The consulting efforts did delay somewhat the ability of the Monitor to validate the State's fidelity reviews of these services but we consider the effort well worthwhile.

During FY 22 DMH spent considerable time and energy working with the CMHC's on data collection. Previously, data on local service delivery was variable and unreliable and insufficient for accountability. DMH worked intensively with each CMHC on data quality and began to post additional data on its website (see https://www.dmh.ms.gov/fy22-remedial-order-data-report-now-available/ ). We will discuss progress and challenges on use of data for management below at Paragraphs 20-21.

Like many other sectors, mental health care in both Hospitals and CMHCs has been affected by pandemic related challenges including staffing. Late in 2022, DMH re-opened a 30-bed unit at East Mississippi State Hospital (EMSH) that had been closed for some time because it could not be staffed; a closed 20 bed unit at Mississippi State Hospital (MSH) was reopened in January. The closure of these units affected access to care and contributed to the problem of people who had not been charged with a crime being held in local jails waiting for a hospital bed. Most of the Hospital capacity reduced during the pandemic has been re-opened. Another unit that had been closed at MSH will not be opened because DMH judges it not necessary; funds have been reallocated to community care.

These restorations of capacity will improve access to care although they emphasize Hospital services. Going forward, improving access while also reducing unnecessary institutionalization will require more attention and remains a challenge that we discuss throughout this report.

Services in some CMHCs—as throughout healthcare and the economy—have also been affected by staffing challenges. We discuss this problem below (see Paragraph 10–Peer Support Services).

Organization of this Report.

The Report is organized into sections as follows:

- Activities of the Monitor during this reporting period
- Observations on Compliance
- Compliance Findings
- Conclusion and next steps

Activities of the Monitor during this reporting period.

The monitoring team continued to use its Tracer Methodology record review protocol to assess the adequacy of care. During this period, the team conducted monitoring visits on September 12-16, Nov 14-18 and December 12-15, visiting all the Hospitals and CMHCs. Additionally, Jackie Fleming LCSW with Dr. Teri Brister assisted DMH staff in developing a Hospital record review protocol that DMH is now using to assess Discharge Planning; Ms. Fleming accompanied DMH staff on monitoring visits to the Hospitals. During these visits, at each Hospital Ms. Fleming also reviewed a sample of about 8 Hospital records of individuals who had been admitted to Hospitals from each Region. The Hospital record review focused on Discharge Planning; the team later reviewed CMHC records of care to the same individuals before and after their hospitalization.

During the September visit the team spent time at Mississippi State Hospital (MSH) conducting a review of individuals who had been hospitalized under a civil commitment for very long periods (over 180 days). The team reviewed the Hospital records for all 44 individuals with this status and discussed their situation with the clinical staff caring for them. A similar review was conducted December 12 at East Mississippi State Hospital (EMSH) for the 21 very long stay individuals at that hospital. The primary purpose of these reviews was to consider community care needs of these individuals--who have not yet sufficiently benefited from services that have been put in place. An advisory report addressing the needs of these individuals was shared with the parties in January. During the September visit the Monitor met with leadership at DMH, the Department of Medicaid (DOM), and the Office of the Coordinator of Mental Health Accessibility.

During the November visit the monitoring team observed a Fidelity Review conducted by DMH staff of Mobile Crisis (MCeRT) services in Region 6. In our view the Fidelity Review was done well. We discuss this under Paragraph 5 below. Fidelity Reviews assess the performance of CMHC Core Service Programs; they are a principal means for assuring that programs are functioning as intended. For Assertive Community Treatment—PACT, and Individual Placement and Support—IPS, Fidelity criteria have been established through research and are used nationally. In other cases (Intensive Community Oriented Recovery Teams—ICORT, Intensive Community Support Services—ICSS, Supported Employment partnership programs and Mobile Crisis Response Teams--MCERT) no consensus national standard of  quality exists because these programs have not been rigorously studied and Mississippi has adapted relevant national standards to create monitoring tools.

During the November visit the Monitoring Team also reviewed CMHC records at Regions 9, 6 and 15, to track care of individuals who had been admitted to and discharged from Hospitals.

During the week of December 12-16, members of the Monitoring Team visited and conducted record reviews at Regions 1,2,3,4,7,8,10, 11, 12 and 14 in addition to reviewing status of long stay individuals at EMSH. The Monitor met with DMH Executive Director Wendy Bailey on this trip.

As this Report was being finalized, on February 27-28 the Monitoring Team accompanied DMH fidelity reviewers examining PACT, ICSS and Supported Employment services in Region 3; we will discuss the results of this visit in our next Report. The Monitor also met with Director Bailey during this visit.

<u>Observations and Findings Related to Compliance</u>

The Monitor assesses compliance for each Requirement of the Order using a simple framework:

1. Was action taken to address the Requirement (e.g., a program put in place, or a procedure implemented)?
2. Is that action working as intended (e.g., is the program serving people according to the State's standards)?
3. Is the action contributing to the goal of reducing unnecessary institutionalization in Hospitals?

In this section we discuss data and observations related to compliance; in the subsequent section we present Compliance Findings. We organize observations according to Paragraphs of the Order.

<u>Paragraph 1</u> summarizes the over-arching requirements of the Order.

As noted in our previous reports, the number of admissions to Hospitals statewide has declined in recent years as new services were developed and beds closed because of the pandemic. As we have emphasized previously, there is no expert consensus on what numerical level of admissions are appropriate; people who cannot be safely stabilized in community settings and require a Hospital level of care should get it in a timely fashion, although community care if available is less intrusive and costly. Thus, levels of needed Hospital care depend on the adequacy of community alternatives. There have not been dramatic changes in admissions patterns since our September 2022 Report. We will report on FY '23 data in our September 2023 Report.

As we discussed in our first two Reports, urgent issues related to acute care include the fact that too many people who have not been charged with a crime but have been committed to a Hospital wait for care in jails (an average of 25 individuals on any given day in FY '22). There are also variable patterns of transfers to State Hospitals from other hospitals, where the rationale for admitting the individual to a State Hospital after private hospitalization may not be clear. The FY '22 DMH data on wait times to access a Hospital bed indicate that the largest number of people waiting (an average of 30 individuals on any given day) waited in private hospital beds. DMH has increased monitoring of these issues (discussed at Paragraph 18 below) and we will review the impact of this work in the future.

As noted above, DMH has reopened a 30-bed inpatient unit at EMSH and a 20 bed unit at MSH. DMH officials report that wait time for Hospital admissions and jail holds have recently been reduced. In the first Quarter of FY '23, an average of 72 individuals waited daily for access to a Hospital bed; 24 of them waited in jail. These numbers are similar to those for FY '22. However, from the beginning of December 2022 until the middle of January (the most recent data available) the average number of people waiting was 23, with 8 of these waiting in jail. This is substantial progress.

<u>Paragraph 2</u> addresses the CMHCs that provide most of the services required by the Order. CMHCs are locally governed by regional commissions appointed by county boards of supervisors. These arrangements are established under State law: CMHC operations are certified

by DMH and most funding is provided through the State's Medicaid and DMH programs. The Order notes: "Consistent with the State's Operational Standards for mental health providers…each CMHC shall be the entity in its Region responsible for preventing unnecessary hospitalizations…" Paragraph 2 provides that CMHCs are responsible for avoiding unnecessary hospitalizations by:

    a. Identifying individuals with serious mental illness in need of mental health services;
    b. screening individuals with serious mental illness during annual planning meetings to determine their need for the services required by this Plan;
    c. coordinating mental health care for individuals with serious mental illness; and
    d. diverting individuals from unnecessary hospitalizations through the provision of appropriate mental health care."

In our March 2022 report, we discussed issues related to these CMHC responsibilities to organize and coordinate care broadly, based on visits to all the Regions and some record reviews. We found that DMH has not provided uniform guidance to the CMHC's on their care coordination responsibilities, and that practices related to the requirements of Paragraph 2 vary widely.

These practices are crucially important to people receiving care, to families and the public. Most problems that people with SMI experience are because of lapses in care and treatment, not because people are in care and there are problems with it. Accessing needed care when someone is not getting it is also a frequent "pain point" for individuals and families. During prior monitoring periods we did not closely examine performance on these requirements closely. Therefore, during this period we reviewed records at all the CMHC's to assess performance more carefully.

As discussed above, we first selected a number of records at Hospitals representing consecutive admissions from each Region. Our primary methodology for reviewing CMHC performance was review of records of the care individuals received before their admission to a Hospital, during the commitment process, and after their discharge. (We also assessed compliance with the Discharge Planning requirements of the Order that mostly are the responsibility of Hospitals. We discuss this below at Paragraphs 15-17.)

To assess performance of CMHC's, we examined whether specific actions were taken:

- Paragraph 17 of the Order requires that "Prior to the person's discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll the person in appropriate services." We assessed whether these meetings were held.
- We examined whether individuals completed their initial CMHC visits after discharge, to see if care had been effectively coordinated and if individuals received the "provision of

appropriate mental health care" that had been scheduled for them. The continuity of care following Hospital discharge is urgently important.

- We checked to see whether subsequent, continuing care was provided.
- If initial visits or continuing care were not completed, we examined whether appropriate steps were taken to engage people and provide the care. A wide range of actions can be taken to encourage and secure participation in ongoing care. For individuals whose SMI is so severe that hospitalization has been required, actions might include:
  - o CMHC staff stablishing a relationship with the individual starting with the in-Hospital meetings required by Paragraph 17.
  - o Additionally, if individuals are willing, having the staff who they have met while hospitalized participate with them in the first post-hospital visit can be helpful. This is a valuable task that peers can often perform effectively.
  - o Arranging transportation as needed for initial visits can assist with engagement . This may not be feasible from a cost perspective for or every visit but it is especially useful to assist with engagement.
  - o Some Regions provide therapy via home visits when people are not able or willing to come to a clinic, even though travel time is not reimbursed by Medicaid. This is a commendable practice which we urge other CMHCs to consider. Examining Medicaid reimbursement for travel for some services would be helpful in closing gaps in care.
  - o Reminders of upcoming appointments are now standard in healthcare. For people with SMI, especially those who have been hospitalized, reminders that involve personal contact are most successful.
  - o If appointments are missed, follow-up phone calls and/or home visits should be made to motivate participation and set another appointment. Assessing and assisting with removing barriers to participation (e.g., transportation) may be necessary for some individuals.
  - o Working with families to identify and reduce barriers to care including reminders and assistance with transportation can encourage adherence to recommended care.
  - o If individuals cannot be reached by phone, home visits may be necessary to follow up on missed appointments for individuals who have been recently discharged and are thus at risk of re-institutionalization.
  - o If individuals need care but are not willing to participate after persistent engagement efforts, other steps that go beyond purely voluntary means are possible, such as conservatorships and outpatient commitment orders. Wherever possible, voluntary engagement efforts are preferable, but sometimes these other steps may be necessary to avoid the trauma and cost of repeated hospitalizations.

For individuals with SMI discharged from Hospitals, follow-up care is almost always necessary to prevent relapse and re-admission, since inpatient treatment can help stabilize SMI but does not cure it. Contact before people are discharged is essential to encourage participation in services following discharge. If initial aftercare visits are not completed, follow-up phone calls (documented in the record) and a (similarly documented) home visit are, at a minimum, necessary to provide adequate care and to show compliance with Requirements 2 (c) and (d)

("coordinating mental health care for individuals with serious mental illness; and diverting individuals from unnecessary hospitalizations through the provision of appropriate mental health care." Most CMHC leaders that we have talked to indicate that their practice is to conduct such follow-ups, but we did not see consistent evidence of these efforts in the records.

We discuss results from the CMHC record reviews below. In general, we reviewed 8-12 records from each Region for individuals who had been admitted to and then discharged from Hospitals. Because CMHCs use different health record systems, maintain records in different locations, and because some records are kept on paper or scanned into records we may not have located completely accurate information in every visit. However, in our judgement the methodology was sufficient to identify appropriate care, and gaps in care. As accreditation surveyors note "if it's not in the record, it didn't happen." In several instances we sampled fewer records than planned because there were fewer admissions from that Region. In our view, the total number of records reviewed (over 100 Hospital and CMHC records) is sufficient to make judgements about statewide compliance. However, the numbers are too small to make compliance judgements about individual Regions, although we do comment below where Regions appeared to be doing a good job.

Before discussing results of reviews in the Regions, we note that several factors beyond the control of CMHC's contribute to problems in continuity of care. We found a number of individuals who were discharged to private providers, not CMHC's. This may of course be a personal choice of individuals, but it makes care coordination more difficult. The exercise of choice by individuals does not mean that care coordination is impossible and does not absolve DMH and CMHCs of responsibility for care coordination.

In some instances, these individuals were unknown to the CMHCs until a crisis occurred and Preadmission Screening was ordered to be conducted by CMHC staff. In other instances, CMHCs only learned of these individuals after their Hospital admission. Another pattern making care coordination more difficult involves individuals discharged by Hospitals to Personal Care Homes in Regions far from their home, especially where their mental health care in the new location is provided by private providers, not the CMHC.

Sometimes, the CMHCs do provide care to Personal Care Home residents, putting them in a clear position to also provide crisis care and coordinate commitment issues should they arise. In other cases, the Personal Care Homes to which people are discharged also operate clinical services (e.g., clinics, Psycho Social Rehabilitation centers) that are licensed by DMH but have no accountability or connection to the Region/CMHC. This pattern may work well when routine care is sufficient but can complicate care coordination should intensive care be required. DMH should consider conditions under which Hospitals should discharge individuals to Regions that are not where they live and take steps to assist with care coordination when individuals are referred to private care in other Regions.

Our CMHC record reviews found that CMHCs made contact with their hospitalized clients, while in the Hospital, in 51 of 113 instances (45%) where we found documentation. Regions 2, 4, 12 and 14 completed these contacts at least 75% of the time. When we commended Region 4

leadership on this, they acknowledged the efforts of their Peer Bridger who was responsible for the good results in the prior quarter but noted this individual had just resigned to take a better paying job.

On a statewide basis, these results do not achieve compliance. This pattern is true for most of the issues related to Paragraph 2 that follow. In reviewing the data that follow, readers will note different denominators (total number of charts reviewed) for different measures. This is partly because not every issue applies to every individual (e.g., some individuals have not been readmitted) and partly because some documentation may have been missing from some charts or we simply were not able to locate it.

The lukewarm success in establishing relationships while people are still hospitalized has an impact on whether people complete their first visit after discharge. Our review found that initial visits were completed in 59 of 89 (66%) instances where we found documentation. Regions 2, 4, 7, 9 and 12 had initial visits completed at least 75% of the time.

We also looked at documented patterns of care after discharge, to assess whether CMHCs were adequately coordinating and delivering care to prevent future readmissions. To make this judgement measurable, we examined whether follow-up calls and at least one follow-up home visit were made if there were gaps in care. We determined follow-up/engagement efforts were adequate in 56 of 87 (64%)  of instances where we found documentation. Regions 9, 10, 12 and 14 completed appropriate follow-ups at least 75% of the time.

In sum, the record review related to care after discharge including outreach to people while they are hospitalized shows incomplete progress. Some Regions do a good job on some elements and all do a good job some of the time. But consistency is lacking. Based on what we have observed, having Peer Bridgers (and/or other CMHC staff who rigorously track and connect with people who are hospitalized) is an important initial step. However, a stronger focus on continuity of care is needed across the State.

Reviewing records to determine if efforts to prevent hospitalization are adequate. Efforts to prevent unnecessary institutionalization are addressed in several Requirements of the Order, principally in 2 (c) and (d), discussed above, and Paragraph 13. We attempted to review performance on these Requirements in our record reviews in several ways. First, we sought to examine actions taken during the Preadmission Screening and Commitment processes. In Preadmission Screening, clinicians review individuals who have been referred to Chancery Courts for commitment. Based on these results, the Courts may proceed to order commitment assessments, and issue orders for commitment based on these assessments.

The uneven and inconsistent nature of CMHC record systems made an adequate review of the commitment process based on records infeasible. We were able to locate Preadmission Screening forms in 63 of 103 records (61%). For Regions 4, 6, 8, 12, 14 and 15 we found Preadmission Screening forms in at least 75% of the records we reviewed. There were various reasons why we could not locate these forms in different Regions. In some cases, courts do not consistently provide them to the CMHC's. In others, the forms have to be scanned into the record and this was not always completed. Region 1 relies on a paper record, making navigating and locating

information difficult. In the end, we determined that evaluating Preadmission Screening records to assess Diversion from Hospitals would not be a reliable methodology on a statewide basis. DMH efforts to improve management of the commitment process (See Paragraph 18 below) will help us assess this issue better in the future. Additionally, the Legislature has provided funding to DMH for a project to review and upgrade CMHC health records. This complex undertaking should improve consistency of documentation and also improve the utility of health records.

We next reviewed whether or not individuals admitted to Hospitals had been enrolled in and received CMHC care during the 90 days prior to their admission to the Hospital. Generally, people with SMI should be continuously engaged in care to experience recovery and avoid crises. However, our record review indicated that only 38 of 102 individuals (37%) where we found documentation were enrolled in care and receiving it prior to the crisis resulting in their hospitalization. Most of these individuals had previous hospitalizations. Some had received services in the past but were not kept engaged in care. Some had been discharged from CMHC care because they were not engaged.

The Order (Paragraph 16) explicitly requires attention to examining and adjusting care of people readmitted within one year of discharge; we discuss compliance with this requirement in our discussion of Paragraph 16 below. Generally, most individuals who are readmitted to Hospitals were not readmitted within a year (about 60% of the individuals in our sample who were readmitted had been out of the hospital for more than a year—although they may have been admitted to other facilities), and we saw little consistent evidence that their CMHC care plans were adjusted when they had been readmitted. Where adjustments in treatment were made at Hospitals, they often involved use of Long Acting Injectable (LAI) medications, but seldom involved coordinating with CMHC's to improve/change post-hospital care.

As we will discuss below, adjusting care for people who have been readmitted is thus an area in need of attention. But this problem is not just an issue for people with a recent readmission. If people with an SMI have been previously admitted to a hospital, it is an indication of the seriousness of their illness. It is a suggestion that continuous care must be the goal. Instead, people drift in and out of care. If they do not come in, efforts to engage them range from heroic to desultory. In our review, 65 of 107 people (61%) for whom we found documentation had prior Hospital admissions; this high percentage is almost certainly an underestimate because people may have admissions to multiple Hospitals and private psychiatric units. It is not a surprise because serious mental illnesses are often characterized as long-term and relapsing, but it underscores the need for continuous monitoring and for adjusting care when needed.

Given these issues we evaluated the adequacy of efforts to engage people known to the system in care in the period prior to their admission. We used the same simple metric described above to assess care after discharge: was there evidence of at least phone calls and home visits to make contact and secure participation in care prior to their crisis leading to a Hospital admission? We judged outreach and engagement efforts to be adequate only about half the time (21 of 41 cases or 41% where we found documentation). In other words, most individuals with previous hospitalizations were not engaged in care prior to the crisis that led to their hospitalization, and

in only about half the cases where they were in contact with the CMHC did we judge engagement efforts to be adequate.

<u>Commentary.</u> These results of record reviews of the care received by individuals who had been admitted to and discharged from Hospitals are problematic. The patterns found in chart reviews confirm that our impressions of inadequate care coordination discussed in our September 2022 Report—impressions largely drawn from discussions with advocates and CMHC leaders—are real, and not yet resolved. We did find instances of persistent, affirmative outreach and engagement in nearly all the CMHCs. But we also found lapses in many cases.

Another vehicle for examining care coordination, and patterns of compliance with the requirements of Paragraph 2, emerged in examining the State's efforts carried out in response to Paragraph 14 (Connecting individuals with serious mental illness to care). This Paragraph required DMH to work with CMHCs to attempt to locate the 154 individuals with SMI that DOJ experts had interviewed and assessed prior to trial. Where individuals were located, CMHCs were to "conduct assertive outreach, as appropriate, to engage persons in treatment…and offer them Core Services which are appropriate and for which they are eligible."

The results broadly reinforce concerns about performance on Paragraph 2: identifying individuals with SMI in need of services, coordinating their mental health services, and "diverting individuals from unnecessary hospitalizations through the provision of appropriate mental health care." Based on data provided to DMH by the CMHC's:

- Of the 154 individuals, a dozen were deceased. This is a substantial number. Sadly, it reflects the national pattern of premature mortality for individuals with SMI, often estimated as 25 years on average of premature life lost.
- Of the 142 remaining, the largest number (49) were engaged in some community care. Most were receiving traditional outpatient services such as medications and counseling. Fewer (about 10) were receiving the Intensive Core Services discussed in the Order although these services should generally be focused on this population.
- About 15 were in Hospitals when they were located, suggesting whatever community care they received was inadequate to prevent readmission. Some individuals were in other institutions (e.g., nursing homes) or had moved out of state.
- About 36 of the 142 surviving individuals were not able to be located at all, and there was limited information about 29 additional individuals (for example, the CMHC noted the individual missed appointments and was discharged without an expectation of follow-up, or that the individual was in another Region).

Engaging individuals with SMI in care is often difficult. They move around. They may not believe they have an illness, may feel that prior care was unsatisfactory or that the side effects of treatment outweigh the benefits. And ultimately, some people decline even the best offers of care. Resource limits (e.g., the fact that travel time and mileage costs for clinical staff to conduct a home visit or a crisis response are not reimbursed) make the work of engagement challenging. However, based on our record reviews as well as the project to connect individuals with care— and building on interviews we conducted about how care is coordinated, we conclude that

patterns of care coordination are too inconsistent. Consistent outreach and engagement efforts are not a standard expectation. For individuals with serious and disabling conditions that can result in multiple hospitalizations, encounters with law enforcement and contribute to premature death, more must be done. The Monitor recommends that the State—DMH and Medicaid—work with the CMHCs to take the steps needed to make care coordination more appropriate and consistent, and to enable compliance with the requirements of Paragraph 2. DMH has begun to do a good job on a similar issue—improving Hospital Discharge Planning. Additionally. the steps that DMH has taken to improve coordination of care for individuals involved in civil commitment (see Paragraph 18 below) will be helpful but will not wholly address the problems we identify here.

Paragraphs 3-11: Core Services. These paragraphs identify the Core Services established by DMH and define compliance criteria. The State (DMH) has taken steps to achieve compliance:

- Funding for the Core Services required by the Order has been provided to the CMHCs, as summarized above. Funding the services is the first essential step toward compliance.
- Performance standards ("Fidelity measures") have been developed for most Core Services and DMH is surveying performance for each service in each Region annually. Reviewing fidelity helps ensure the services are working as intended.
- Efforts to collect and analyze data on services utilization have been improved. Previously the State did not have accurate data on the number of people served or the levels of services they received, making objective judgements about the adequacy of care impossible. Through diligent efforts with the CMHCs during FY '22, DMH can now provide validated data on the numbers of people served and is working to achieve consistent reporting of levels of services delivered. Medicaid previously had the capacity to report service levels that it paid for and was providing this information to the Monitor. A FY '23 change in data systems/contractors has derailed Medicaid data reporting; the State expected this to be resolved during 2022 but has experienced delays.

Thus, the State has made progress toward compliance. Funding has been provided. The number of individuals served via DMH funding is now being reported. Having data on performance is essential for accountability and improvement; this has been a weakness of the system. DMH has improved data collection on the number of people served, a crucial first step in assessing whether services are accessible. Levels of service that individuals received—needed to assure the adequacy of care—were recently reported to the Monitor for the first and second quarters of FY '23. This is a milestone in accountability. Below, we will review data from the first quarter of FY '23 to illustrate how reviewing data is essential to improving access and quality of care.

Reporting of data on the levels of each service received by individuals on a county-by-county basis, is a work in progress for both DMH and Medicaid, with complete reporting expected during FY '23. When we have statewide data on service provision from both agencies we will be in a better position to determine that services are functioning as intended. More importantly, the agencies will be able to assess if people needing care can access it, and whether the services individuals receive are sufficient to achieve their goals.

DMH is now conducting fidelity reviews of the Core Services for which measures exist (all services except Peer Supports and Crisis Stabilization Units) and undertook efforts during FY '22 to review and improve the quality of fidelity monitoring of Intensive Services (PACT, ICORT) and Supported Employment. These efforts improved the quality of the reviews, but we have just begun to observe and validate the monitoring effort. Reviewing fidelity of services that are based on research evidence of effectiveness shows if the programs are in line with what was proven effective. Research shows there is a direct relationship between the degree of fidelity and the outcomes achieved; a program that calls itself Supported Employment but does not follow the well researched practices that make it effective will not work well.

We can say the State has begun to take all the necessary steps to achieve compliance with these Paragraphs. We will be able to determine full compliance when we can review data on the adequacy of services delivered and assess the adequacy of fidelity monitoring.

In the section that follows, we make some observations derived from data on Core Service provision for the first Quarter of FY '23. We offer these preliminary analyses to facilitate review of service patterns by CMHCs and DMH. We explore data on the number of individuals served by Core Services in each county to see if there is sufficient access to these important services.

Quarter 1 Core Services Data. An unduplicated count of individuals receiving each of the Core Services was reported by month for July, August and September 2022 from each CMHC's respective Electronic Health Record to the State's Data Warehouse. DMH worked with the CMHC's to validate the data then aggregated it to produce totals for SFY 2023 Quarter 1, with both monthly and quarterly data supplied to the Monitoring Team on December 1, 2022.

As noted earlier in this Monitoring Report, the State has made notable progress to obtain more detailed reporting information from CMHCs. The data analyses that follow are focused on counts of individuals served. Recently DMH has also provided data for the first and second Quarters of FY '23 on the units of services that individuals received (generally, a service unit is either an intervention such as a counseling session, or a period of time during which treatment was provided). In the future, we will be able to consider the specific number of service units received by individuals (e.g., are service levels sufficient to achieve service goals).

For the numbers of individuals served there is improved confidence in accuracy. We note that DMH has never had accurate data before on these services. Numbers have been reconciled between sources, and CMHC executives have personally vouched for the accuracy of their data. DMH has noted some variance between Regions on how units of service are reported and is working with CMHCs to address this.

We used the data on the numbers of individuals served by Region and county to consider several simple but important questions. The first was to determine if Intensive Services were provided in all counties. Under the State's plan and also the Order, each county in Mississippi is served by an Intensive Service. These programs (PACT, ICORT and ICSS) have small caseloads and are designed to provide intensive, mobile care for individuals who are most at risk of relapse and rehospitalization. The assignment of Intensive Services is based on the "fit" of the different services with County needs and characteristics.

- PACT teams have a mix of therapists, case managers, nurses, peers and a prescriber. They cover 7 days a week with a caseload of not more than 10 individuals being served per staff member. There are 10 PACT teams, serving areas with larger populations (a total of 20 Counties). This means that, in the Table below, most counties will not show PACT services because most counties are served by the other Intensive Services.
- ICORT teams are sometimes called "mini-PACT teams" including a registered nurse, case managers and a Peer Specialist. Like PACT, the caseload if limited to 10 individuals per staff member. There are 16 ICORT teams serving a total of 45 counties. As with PACT, the ICORT data will include some individuals from counties that do no have an ICORT team, who were served by a team from a neighboring county. This is appropriate.
- ICSS's (Intensive Community Support Specialists) are licensed solo mental health professionals who provide mobile, home-based care, generally with a maximum caseload of 20, in smaller, rural counties. ICSS's serve all the counties that are not served by a PACT or ICORT team. In some Regions, ICSS's also provide care in counties where PACT or ICORT teams need assistance.

The focus of our exploratory analysis was whether people in every county received an Intensive Service. We know and have previously reported that these programs are now funded. In some cases we know they are just getting started (e.g. an ICORT in Region 8 was not operational until Fall of 2022, so Region 8 data will not show ICORT data for the first quarter). In other cases, there may be vacancies. In some cases, there may still be missing data; this is our first Report that is able to review the still-developing data systems. The analysis explores the data to illustrate issues the State and the Regions should use to improve access to care.

To provide an indication of the need for Intensive Services, the Table includes the number of commitments to Hospitals from each county in FY'22, and the number of individuals in crisis who received Crisis Stabilization services in the first quarter of FY '23. Crisis and Hospital services are for people whose illness has gotten out of control, so levels of admissions to these programs hint at whether adequate Intensive Services are available to help people achieve stability without using acute care services.

In the Table below, counties that reported fewer than 3 individuals receiving Intensive Services (n=20)  are *italicized.* We note that these are mostly small counties. It is possible that no one in these counties required Intensive Services during this period. However, given that there were Hospital admissions in the prior year and (in most cases) Crisis Stabilization admissions during this period, the need was probably there and Intensive Services should have been provided.

The second preliminary analysis we conducted examined whether people in each county received Supported Employment services. This is relevant because having work leads to stability, and evidence based Supported Employment reduces hospitalization. In the Table below, counties where no one was reported to receive Supported Employment (n-46) in the first quarter of FY '23 are noted with an asterisk*. We discuss these results briefly below. Generally, we conclude that continued work is required to achieve the levels of access that Mississippians with SMI require.

Table 3 lists, by Region and county, the number of Hospital commitments in FY '22 and the unduplicated count of individuals admitted to CSU's and receiving DMH-funded Intensive Services (PACT, ICORT, and ICSS) as well as Supported Employment during July-Sept 2022.

**TABLE 3: Number of Individuals With First Quarter FY '23  Intensive Services and Supported Employment Compared to FY'22 Hospital Commitments**

| | FY '22 Hospital Commitments | CSU | ICORT | ICSS | PACT | SE |
|---|---|---|---|---|---|---|
| **Region 1** | **56** | **27** | **19** | **37** | **0** | **19** |
| Coahoma | 26 | 17 | 13 | 26 | 0 | 9 |
| Quitman | 11 | 3 | 2 | 1 | 0 | 1 |
| Tallahatchie | 9 | 3 | 4 | 6 | 0 | 6 |
| Tunica | 10 | 4 | 0 | 4 | 0 | 3 |
| **Region 2** | **198** | **69** | **22** | **24** | **2** | **33** |
| Calhoun | 33 | 8 | 1 | 8 | 0 | 1 |
| Lafayette | 45 | 17 | 5 | 8 | 0 | 28 |
| Marshall | 33 | 9 | 4 | 3 | 0 | 2 |
| Panola* | 63 | 22 | 4 | 1 | 1 | 0 |
| Tate | 10 | 6 | 3 | 3 | 0 | 1 |
| Yalobusha | 14 | 7 | 5 | 1 | 1 | 1 |
| **Region 3** | **198** | **54** | **0** | **46** | **65** | **13** |
| *Benton** | 8 | 2 | 0 | 2 | 0 | 0 |
| Chickasaw* | 50 | 6 | 0 | 16 | 0 | 0 |
| Itawamba* | 16 | 10 | 0 | 0 | 3 | 0 |
| Lee | 80 | 18 | 0 | 16 | 56 | 12 |
| Monroe | 11 | 2 | 0 | 1 | 2 | 1 |
| Pontotoc* | 26 | 11 | 0 | 11 | 4 | 0 |
| *Union** | 5 | 5 | 0 | 0 | 0 | 0 |
| **Region 4** | **247** | **74** | **0** | **14** | **66** | **3** |
| *Alcorn** | 42 | 14 | 0 | 2 | 0 | 0 |
| DeSoto | 150 | 27 | 0 | 0 | 37 | 3 |
| Prentiss* | 30 | 15 | 0 | 3 | 11 | 0 |
| Tippah* | 8 | 12 | 0 | 8 | 7 | 0 |
| Tishomingo* | 17 | 6 | 0 | 1 | 11 | 0 |
| **Region 6** | **144** | **137** | **28** | **0** | **70** | **25** |
| *Attala** | 8 | 6 | 1 | 0 | 0 | 0 |
| Bolivar | 25 | 29 | 7 | 0 | 0 | 6 |
| *Carrol** | 3 | 6 | 0 | 0 | 0 | 0 |
| Grenada* | 7 | 10 | 0 | 0 | 11 | 0 |
| Holmes* | 14 | 18 | 0 | 0 | 12 | 0 |
| *Humphreys* | 8 | 3 | 0 | 0 | 0 | 1 |
| *Issaquena** | 1 | 0 | 0 | 0 | 0 | 0 |
| Leflore | 33 | 26 | 0 | 0 | 47 | 2 |
| *Montgomery** | 6 | 5 | 0 | 0 | 0 | 0 |
| *Sharkey** | 2 | 2 | 0 | 0 | 0 | 0 |
| *Sunflower* | 19 | 7 | 0 | 0 | 0 | 1 |
| Washington | 18 | 25 | 20 | 0 | 0 | 15 |
| **Region 7** | **61** | **30** | **55** | **0** | **0** | **19** |
| *Choctaw* | 8 | 1 | 1 | 0 | 0 | 2 |
| Clay | 10 | 13 | 13 | 0 | 0 | 1 |
| Lowndes | 9 | 2 | 12 | 0 | 0 | 7 |
| Noxubee | 8 | 4 | 3 | 0 | 0 | 1 |
| Oktibbeha | 8 | 3 | 20 | 0 | 0 | 7 |
| *Webster* | 7 | 3 | 2 | 0 | 0 | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Winston* | 11 | 4 | 4 | 0 | 0 | 0 |
| **Region 8** | **180** | **87** | **0** | **8** | **53** | **68** |
| *Copiah*\* | 32 | 10 | 0 | 0 | 0 | 0 |
| *Lincoln* | 16 | 39 | 0 | 0 | 0 | 7 |
| Madison | 8 | 2 | 0 | 0 | 16 | 10 |
| Rankin | 86 | 24 | 0 | 8 | 37 | 33 |
| *Simpson* | 38 | 12 | 0 | 0 | 0 | 18 |
| **Region 9** | **236** | **21** | **34** | **18** | **82** | **47** |
| Hinds | 236 | 21 | 34 | 18 | 82 | 47 |
| **Region 10** | **347** | **76** | **62** | **35** | **37** | **17** |
| Clarke | 17 | 2 | 14 | 0 | 1 | 1 |
| Jasper* | 28 | 2 | 0 | 7 | 0 | 0 |
| Kemper* | 5 | 2 | 0 | 7 | 1 | 0 |
| Lauderdale | 135 | 23 | 3 | 17 | 34 | 16 |
| Leake* | 32 | 6 | 12 | 0 | 0 | 0 |
| *Neshoba*\* | 12 | 6 | 0 | 2 | 0 | 0 |
| Newton* | 34 | 12 | 9 | 2 | 0 | 0 |
| Scott* | 49 | 17 | 19 | 0 | 0 | 0 |
| Smith* | 35 | 6 | 5 | 0 | 1 | 0 |
| **Region 11** | **238** | **10** | **51** | **61** | **14** | **2** |
| Adams* | 57 | 2 | 11 | 18 | 13 | 0 |
| Amite* | 15 | 0 | 10 | 3 | 0 | 0 |
| Claiborne* | 12 | 0 | 3 | 0 | 0 | 0 |
| *Franklin*\* | 9 | 1 | 1 | 1 | 0 | 0 |
| *Jefferson*\* | 15 | 0 | 0 | 1 | 0 | 0 |
| Lawrence* | 41 | 4 | 2 | 6 | 0 | 0 |
| Pike | 57 | 3 | 18 | 20 | 1 | 2 |
| Walthall* | 15 | 0 | 2 | 10 | 0 | 0 |
| Wilkinson* | 17 | 0 | 4 | 2 | 0 | 0 |
| **Region 12** | **613** | **7** | **74** | **1** | **101** | **32** |
| Covington* | 29 | 1 | 5 | 0 | 0 | 0 |
| Forrest | 89 | 0 | 6 | 0 | 47 | 3 |
| *Greene*\* | 5 | 0 | 0 | 0 | 0 | 0 |
| *Hancock*\* | 37 | 1 | 0 | 0 | 4 | 0 |
| Harrison | 240 | 2 | 1 | 0 | 38 | 14 |
| Jeff. Davis* | 7 | 0 | 7 | 0 | 1 | 0 |
| Jones | 50 | 1 | 26 | 0 | 3 | 15 |
| Lamar* | 53 | 1 | 11 | 0 | 5 | 0 |
| Marion* | 29 | 0 | 12 | 1 | 0 | 0 |
| Pearl River* | 48 | 0 | 6 | 0 | 0 | 0 |
| Perry* | 7 | 0 | 0 | 0 | 3 | 0 |
| Stone* | 4 | 0 | 0 | 0 | 0 | 0 |
| Wayne* | 15 | 1 | 0 | 0 | 0 | 0 |
| **Region 14** | **120** | **41** | **43** | **18** | **6** | **16** |
| George* | 17 | 2 | 1 | 0 | 0 | 0 |
| Jackson | 103 | 39 | 42 | 18 | 6 | 16 |
| **Region 15** | **43** | **2** | **0** | **24** | **61** | **19** |
| Warren | 28 | 0 | 0 | 13 | 28 | 19 |
| Yazoo* | 15 | 2 | 0 | 11 | 33 | 0 |

***County in Italics* means < 3 individuals received Intensive Services (PACT, ICORT, ICSS) in quarter. Total of 20 counties**

**County with asterisk\* (n=46) indicates no residents received Supported Employment during quarter**

<u>Comment on services data.</u> As we indicated above, these analyses are exploratory, and we do not draw compliance conclusions about the levels of service access that they illustrate. The State has reported that there are still data issues being worked out, meaning that there are some missing data (e.g., Region 12 had a data mapping problem, so there are missing data for CSU admissions). The review does confirm that having CMHC individual and service units data for all Core Services in all counties will be an important step in the State's ability to compare information between and across Mississippi's counties and Regions.  Some gaps exist. Data available in future quarters will help show whether progress is being made.

Several Regions show good performance on this data:

- Despite its rural nature and fiscal challenges, Region I (merged with Region 6 in 2023) served people in every county with both Intensive Services and Supported Employment.
- Regions 2, 14 and 15 provided Intensive Services to at least one individual in each of their counties. Regions 4 and 10 provided Intensive Services to at least one individual in all but one of their counties.

This review also reinforces our concerns related to the important CMHC roles related to coordinating care discussed under Paragraph 2. While good services are essential, managing the local system of care to assure that people get the *right* services is also essential. This requires use of data, as illustrated above, and also having mechanisms in place to adjust the level of care that people need. The data hint at challenges related to staffing. We know that turnover among individuals serving as ICSS's has reduced access to care in some Regions.

In the section that follows, we make observations about additional developments related to compliance during this monitoring period for each Core Service.

<u>Paragraph 4: Mobile Crisis Teams</u>. Mobile Crisis Teams are also referred to as MCeRTs. DMH has provided all the funding for these services required by the Order. These teams are organized and deployed differently across Mississippi; the differences are partly an appropriate response to regional differences in population and geography and may partly reflect staffing problems, inconsistent implementation and need for monitoring. Each Region receives grant funding and Medicaid reimbursement for its Mobile Crisis services. Within a Region, some staff are dedicated to Mobile Crisis work, and some mobile visits—especially after hours—may be handled by on-call staff who also work in other programs. As noted above, federal ARPA funding ($100,000 per Region) will be awarded during FY '23 to stabilize and enhance MCeRT programs.

A second aspect of compliance is whether the programs are serving individuals as intended, e.g., in all counties and within the time parameters defined in DMH Operational Standards. While DMH has made strides in data collection generally, the data requirements for Mobile Crisis Services are more demanding and are not yet fully in place. During FY '23 DMH is working with the CMHC's on data reporting specific to these services. For example, tracking the time from when a crisis call is made to when a mobile crisis visit is made—when such a visit is deemed necessary—is a key aspect of quality and compliance and measurement of timeliness is being addressed during FY '23.

A third aspect of compliance for MCeRT's is the adequacy of DMH fidelity reviews. In the absence of an agreed national standard for Mobile Crisis services, DMH designed a fidelity monitoring program for MCeRTs and has been inspecting them annually. During FY '23, DMH made improvements to the monitoring protocol. During November, the Monitor and staff participated in a fidelity review of the Region 6 MCeRT to begin to assess this oversight. We were impressed by the thoughtfulness of the approach, the thoroughness of the DMH team, and the collaborative approach to monitoring.

One strength of the State's monitoring team was that it involved more than one reviewer allowing impressions to be compared to determine an overall rating following the review. Both team members previously worked in MCeRT services, so the team was appropriately experienced. Another strength was the multiple methods involved in the review including interviews with all MCERT Team members, cold calls performed before the visit to check telephone response, and cross walking information from submitted reports to client records.

The Monitoring Team  completed its own scoring of fidelity and compared results with the DMH team's scoring. The results were comparable, with a DMH consensus score of 43 (on a scale of 5-50) and the Monitoring Team score of 42. There was only one rating with a significant difference; the Monitoring Team scored staffing as 1, and DMH as a 3. A score below 3 requires a corrective plan from the CMHC, so the difference is substantial. But the underlying issue is the serious staffing challenges faced by Region 6, a problem that may be too big for the Region to handle on its own, especially given a planned merger with Region 1—another Delta Region with few resources and staffing challenges.

To make a full assessment of compliance for Mobile Crisis Services, the Monitor will need to further assess the DMH fidelity review process (we will join a MCeRT fidelity review in Region 12 in March) and review the data on these services that is now being collected for the first time. We hope to be in a position to make a better assessment of compliance during 2023.

Paragraph 5: Crisis Residential Services.  These programs, also known as Crisis Stabilization Units (CSU's) are the most intensive community-based service in Mississippi. Created to provide an alternative to hospitalization, CSU's have internal design and staffing reminiscent of psychiatric inpatient units but are free-standing 8-16 bed facilities. They are intended to provide community-based care to stabilize people in crisis. Requirements of the Order specifically related to CSU's are listed in Paragraph 5.

During FY '22 DMH allocated an additional $400,000 to each CSU to improve/stabilize staffing. Via federal ARPA funds ($5.6m) to be available in FY '23 (Regional allocations are listed earlier), DMH plans to increase CSU capacity by about 65 beds via expansion of smaller CSU's in several Regions and opening of new CSU's in Regions 4, 8, 9, and 12.

DMH statistics indicate that most people (about 85%) admitted to CSU's are discharged to community care, meaning that hospitalization is usually avoided. For FY '22, DMH reports that only 195 of 3108 (6%) people admitted to CSU's were transferred to Hospitals. This is positive. On the other hand, the great majority of people who are admitted to State Hospitals do not get a chance at CSU care before they are admitted. The DMH FY '22 data show that 1236 of 1491

Hospital admissions (83%) were of people who had not first received CSU care. This is a weakness and a problem that requires attention. The reasons why hospitalized people do not get CSU care first are complex. Some are judged to have needs too intense or complex, although these are subjective clinical decisions. Challenges in the commitment process also affect these results.

Paragraphs 6-9 (Intensive Services): PACT (Paragraph 6), ICORT (Paragraph 7), ICSS (Paragraph 8) and Supported Employment Services (Paragraph 9). Funding data provided by DMH and listed earlier indicates that funds have been distributed for all the services required in Paragraphs 6-9. Exhibit 1 of the Order, also appended to this Report as Attachment 1, lists the intensive services (PACT, ICORT, ICSS) required in each county, based on the best "fit" of services considering Regional and County characteristics. The funding requirements of the Order have been met.

A second element of compliance is performance, assessed via DMH fidelity reviews for these services. There are national standards for PACT fidelity, which Mississippi has adopted. There are no national fidelity standards for ICORT: Mississippi has adapted national PACT standards to assess ICORT programs. In the opinion of the Monitor, this is a credible approach, but we have not yet observed/inspected how these reviews are conducted. We will observe DMH fidelity reviews of PACT, ICORT and ICSS this Spring. There are no national standards for ICSS; the DMH Operational Standards serve as the quality guidance for these programs.

During the first half of FY '23, DMH engaged national experts on PACT and Supported Employment fidelity to train the State's fidelity reviewers and conduct reviews with State staff. The Monitor views this as a useful initiative. The training process has delayed the timing of the Monitor's own review of DMH fidelity monitoring, but we are confident that the effort to improve the DMH reviews will bear fruit.

Paragraph 10--Peer Support Services. Peer Support Services are defined and requirements for Peer Support Services are listed in Paragraph 10 of the Order. This Paragraph requires these services to be provided at the primary CMHC office in each Region. The Order also requires that by the end of FY 2022, Peer Bridgers (a specialized type of peer support, supporting successful transitions between services) will be in place in each Hospital. These CMHC and Hospital positions have all been funded by DMH, however our observations suggest that many are not filled. Additionally, Peer Support Specialists are required to be part of the staff for several team services identified in the order: mobile crisis teams, PACT teams and ICORT teams.

Recently, although not required by the Order but based on the early effectiveness of Peer Bridgers at Hospitals, DMH has provided funds to each Region to support a Peer Bridger in each CSU, and on a Regional basis to assist with Hospital discharge planning. These are very positive developments and we commend DMH for going beyond the minimum requirements of the Order in supporting Peer Bridgers. Our observations during this monitoring period show that Peer Bridgers make a difference in connecting people to care, both at Hospital and CSU discharge/transition periods and when they may become disconnected from ongoing community care.

In our September 2022 Report we discussed Peer Services in some detail. The observations and guidance in that Report still apply. During this period, the records and data we reviewed reinforce the value of peer roles. They also confirm our impression that, while the value of peers is increasingly recognized across the Mississippi mental health system, there is great variability in how leaders in different Hospitals and CMHC's value and support peers. This needs attention in some CMHC's.

In discussions with CMHC leaders, we heard great concern about staffing challenges in community mental health. Therefore, we conducted a survey of staffing among all the CMHC's. The results did confirm that staffing has emerged as a major challenge in mental health—as it has across healthcare and indeed the U.S. economy. We also learned that through exceptionally hard work at recruitment and retention, most CMHC's have been able to sustain sufficient staffing to keep services open. However, our visits and discussions with CMHC leaders make it clear that staff turnover and recruitment and retention issues are affecting access to and the quality of care. In many cases, CMHC's are able to fill positions when someone leaves, but there can be lapses in care when positions are vacant, and the time that new people need to get "up to speed" affects the quality of care.

The one area where progress has been insufficient is in Peer Services, including both Peer Support Specialists and Peer Bridgers. The Table below includes the vacancy rates for selected key categories of CMHC staff: prescribers (physicians, and mostly nurse practitioners), nurses (registered nurses are essential staff in Crisis Stabilization Units and play key roles in other services, credentialled therapists trained at a Master's level or above who are the core of the CMHC workforce, and peers:



The data show that on a statewide basis—with considerable variability between CMHC's—the vacancy rate for peers is higher than for other categories of essential staff. In several Regions, efforts to reduce peer vacancy rates have been relatively successful with vacancy rates below

20% (Regions 1, 6, 7, and 15). We acknowledge that a higher proportion of peer roles compared to other positions are newly funded and thus may be in a period of initial recruitment.

There are many challenges in building and sustaining staffing and the problem cuts across the economy. However, we believe DMH and many Regions should specifically examine and address these challenges regarding Peer Services. Success on key tasks where peer staff are most useful (such as engaging people in services and motivating engagement in treatment) requires the systematic attention to recruiting and retaining peers that is helping most CMHC's "hold their own" with respect to other mental health professionals. In our September 2022 Report we discussed one key factor, which is CMHC leadership support of peer roles. It is likely the other key factor is economic. We estimate the average compensation based on the (increased) DMH grant level of $35,000 per position, after fringe benefit costs, is $12-15/hour. This places peer compensation at or below levels now being paid for fast food and other service industry work. Additionally, the Medicaid rate for Peer Services is less than $8/unit of service. As one CMHC leader said, "at that rate, the more peers work, the more money we lose." The State as well as individual CMHC's should consider these issues and take steps to address peer recruitment and retention.

Paragraph 11: Permanent Supported Housing. This paragraph defines supported housing and requires the State to continue current investments. DMH reports that it provided $150,000 in additional funding to CHOICE Providers ($100,000 for Mississippians United To End Homelessness (MUTEH) and $50,000 for Open Doors) as required by the Order. For FY '23, funding levels for PSH are $258,745 for MUTEH and $50,000 for Open Doors. In FY '22 a total of 239 individuals received Supported Housing Services.

The release of funding and provision of vouchers meet the minimal and literal expectations of the Order. However, in addition to the need to connect people with SMI to Supported Housing, other substantial housing challenges still exist, including:

- The limited availability of Supported Housing coupled with challenges in finding suitable apartments means that placement generally moves too slowly to become available during brief CSU or Hospital stays.

- Our review of people hospitalized on a long-term basis (over 180 days) found that a lack of appropriately supervised housing was a major impediment to discharge for a number of the 65 very long stay individuals whose care we reviewed. Many of these individuals will require, at least on discharge, a small, staffed residential program, and most of these individuals have IDD or comparable cognitive impairments.

- Many individuals with SMI in Mississippi live or are placed in Personal Care Homes that are neither licensed nor funded by DMH. Some of the licensed facilities (licensure by the Department of Health) are reported to provide good care. The Health regulations require at least one staff member per 15 residents and provide that the home shall assist residents to get mental health care. There are also unlicensed, unauthorized homes that reportedly often provide inadequate care. Hospitals sometimes place individuals with SMI in licensed Personal Care Homes; sometimes these facilities are located in distant regions

from where individuals live. There appear to be quality of care and coordination of care issues with these homes.

Paragraph 12: Medication Access: This paragraph requires an annual allocation of $200,000 for a medication assistance fund to assist people with SMI who cannot afford or otherwise access medication needed to prevent hospitalization. The underlying principle is that since medication treatment is usually essential to manage SMI, access to medications is essential. DMH reports it has distributed $200,000 to the Regions for FY '22 and FY '23. However, the funds have generally been poorly accessed by the CMHC's. Only about half of the CMHC's have utilized any of the FY '23 funding mid-way through the year, and only Region 6 (which has additional resources allocated to it for medications) and Region 10 have expended all of their FY '22 allocation. Billing and documentation challenges can be significant for small, new allocations, and the Regions generally receive only $16,667 each for the medication assistance program. However, the needs of people receiving care are great and these issues must be resolved.

Paragraph 13: Diversion from State Hospitals. While Paragraph 2 defines overall CMHC responsibility to avoid unnecessary hospitalizations via appropriate mental health care, this paragraph identifies specific actions to be taken by CMHC's during preadmission screening for hospitalization: 1) determining if individuals meet criteria for intensive services (PACT, ICORT, ICSS) and arranging these services as appropriate, 2) considering if a CSU placement in lieu of hospitalization is appropriate, unless Hospital commitment has already been ordered.

As we have indicated in our discussion above of compliance related to Paragraph 2, there are inconsistencies and weaknesses in how CMHC's manage these issues. During this period, our record reviews began to examine these issues, but were insufficient to achieve a full review of compliance. As we discussed earlier with respect to Paragraph 2, a number of CMHC record systems did not reliably contain information on commitment processes (e.g., having a copy of the Preadmission Screening report in the record). We found copies of these forms in only about half the records we reviewed, and this was insufficient to evaluate if alternatives to commitment were considered. In some cases, this was because records are at multiple locations such as the CSU, while we were visiting administrative offices. In some cases, Courts do not reliably provide commitment records to the CMHC's.

In prior reports we noted that a substantial number of people admitted to Hospitals did not have diagnoses typically considered as Serious Mental Illness (SMI). This included substantial numbers of individuals with other brain/behavioral conditions that are generally not amenable to psychiatric treatment in Hospitals. Most such "non-SMI" diagnoses were Intellectual and Developmental Disabilities (IDD), Substance Use Disorders (where the individual did not also have an SMI) and Dementia/Neurocognitive disorders (without an SMI).

Based on this pattern, we looked at diagnoses of all individuals admitted to Hospitals in our sample during this period and present the data below.



During this period, the number of individuals without an SMI (for whom a Hospital admission was likely problematic, both for themselves and because they were using care that SMI people need) was not as high as in our earlier reviews, but was still too high. Additionally, we observed:

- Most of the admissions of individuals with SUD were to MSH, while most admissions of individuals with cannabis use disorder were to South Mississippi State Hospital (SMSH). There is a terrible shortage of treatment resources nationally for individuals with alcohol or drug abuse problems but admission to Hospital psychiatric units for individuals without SUD but not SMI is not a good solution. (There are substance abuse treatment units at MSH and EMSH but in this review we were examining psychiatric unit admissions.)
- There were fewer individuals with IDD or neurocognitive disorders/dementia admitted to Hospitals in this period. This is a good thing, because psychiatric hospitalizations are generally not useful and often long-lasting for these individuals.

DMH and the CMHCs in areas where people without SMI are being admitted should continue to work to prioritize use of Hospital resources for individuals with SMI, and to educate Chancery Courts about appropriate admissions.

Paragraph 14: Connecting individuals with serious mental illness to care. This paragraph refers to a specific group of 154 individuals whose care was reviewed by DOJ experts earlier in the case. This Paragraph required DMH to work with CMHCs to attempt to locate the 154 individuals with SMI that DOJ experts had interviewed and assessed prior to trial. Where individuals were located, CMHCs were to "conduct assertive outreach, as appropriate, to engage persons in treatment…and offer them Core Services which are appropriate and for which they are eligible." We discussed this effort in our discussion of Paragraph 2 above.

The State has carried out the activities required under Paragraph 14; however the results are not very good. The Monitor sees the underlying weaknesses in care coordination as the problem here, not the specific efforts that were carried out in response to this Paragraph.

<u>Paragraphs 15, 16, 17 Discharge Planning.</u> Paragraphs 15, a-h; Paragraph 16 and Paragraph 17 provide the key performance elements for discharge planning.  Effective discharge planning is evidenced by these requirements:

- Discharge planning begins within 24 hours of admission to a State Hospital.
- Identify the person's strengths, preferences, needs and desired outcomes.
- Identify resources for the person to access in the event of a crisis and educate them about how to access those services
- Identify the specific community-based services the person should receive upon discharge
- Prior to discharge, coordinate between the State Hospital and the community provider so that, upon discharge the person continues to receive prescribed medications in the community appropriate for the person's ongoing clinical needs.
- Records include an anticipated discharge date.
- For discharge plans for persons who have previously been admitted to a State Hospital within a one-year period, include reviews of the prior discharge plans, the reasons for the readmission and adjustment of the new discharge plan to account for the history of prior hospitalizations.
- Prior to discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll persons in appropriate services
- Peer Bridgers at each State Hospital are integrated in the discharge planning process

The Department of Mental Health has made efforts to standardize the discharge planning process in Hospitals and to make some improved connections with CMHCs as discussed in our previous Reports. During FY '22 DMH established an Office of Utilization Review to improve discharge planning process and monitor performance in Hospitals. The Office of Utilization Review provided training for each Hospital Social Services Director in June 2022 at SMSH,  In a previous Report, we noted good documentation of Discharge Planning at SMSH as well as treatment planning that was person-centered and recovery oriented.  The DMH training included an observation of the SMSH discharge planning process including:

- admission assessment and initiation of the treatment plan process
- family intake/collateral information process
- the weekly treatment team meeting and patient participation
- Transition Coordinator and CMHC intake
- Peer Bridger/patient contact with CMHC "warm hand-off"

The DMH Office of Utilization Review reviewed forms used by each Hospital and suggested standardized revisions to improve discharge planning and compliance.  The new forms were recommended for implementation for August 1, 2022.  The Office of Utilization Review has set up a quarterly schedule of each state hospital for compliance monitoring of the Hospitals, a first. The Court Monitoring Team attended reviews at each Hospital to assist and evaluate performance.

During this monitoring period the Monitoring Team also conducted its own review. The sample size reviewed at each Hospital was usually eight records of persons discharged in the previous

quarter to each of the CMHCs in their area. The checklist developed from the Remedial Order requirements for discharge planning was used for the health record review.   A total of 115 health records were reviewed this quarter (MSH -50; EMSH – 16; NMSH – 27 and SMSH – 22).  The number of charts varied by Hospital because we were reviewing charts of people served by each Region from which people are admitted to that facility. We present results of the chart reviews for each Hospital below:

Mississippi State Hospital Reviews (N=50)



**Mississippi State Hospital Discharge Planning Results.** Chart reviews at MSH occurred in September.  Fifty health records were reviewed, eight of persons discharged to Region 1, eight of persons discharged to Region 6, eight of persons discharged to Region 8, eight of persons discharged to Region 9, eight of persons discharged to Region 11 and two of persons discharged to Region 15.  At the time of the review, MSH had not implemented the new form revisions recommended by the Office of Utilization Review.   In 41 of the health records, the documentation did reflect the person's strengths but was weak in identifying the person's preferences, needs and outcomes.  There was consistent documentation in the health record to reflect that persons received medications and prescriptions for medications that could be continued in the community and that persons were given information on resources to access in the event of a crisis.  In 8 of the health records reviewed where the persons were previously

admitted to a state hospital within one year period the documentation did not reflect that there was an adjustment in the new discharge plan that accounted for the history of prior hospitalizations. Documentations in the health records in 49 of the 50 cases did not reflect that prior to discharge from the state hospital, staff of the CMHC that will be serving the person upon discharge met with the person, either in person or via video conference, to conduct assertive engagement and enroll persons in appropriate services. Referrals to specialized PACT and ICORT services were not provided consistently when appropriate. Peer Bridgers were not present/integrated into the discharge planning process.

East Mississippi State Hospital Reviews.



East Mississippi State Hospital Discharge Planning Results.

Chart reviews at EMSH occurred in November.  Sixteen health records were reviewed, eight of persons discharged to Region 7 and eight of persons discharged to Region 10. At the time of the review, EMSH had not fully implemented the new forms scheduled for implementation August 1, 2022.  EMSH has a new Social Services Director who is getting acclimated to the duties of the position .  In 10 of the 18 cases, the documentation did not reflect that discharge planning began within 24 hours of admission.  The documentation in the health record identified the person's strengths but was weak in identifying preferences, needs and outcomes. Identification of the specific services individuals would need on discharge was inconsistent.

North Mississippi State Hospital Reviews.



**NMSH CHART REVIEWS**

North Mississippi State Hospital Discharge Planning Results

Chart reviews at NMSH occurred in November. Twenty-seven health records were reviewed, eleven of persons discharged to Region 2, eight of persons discharged to Region 3 and eight of persons discharged to Region 4. NMSH had new health records staff who were getting acclimated to their role and who had limited knowledge of the Remedial Order. At the time of the review, NMSH had not fully implemented the new forms scheduled for implementation August 1, 2022.  One of the new forms present in the health record, the Social Services Documentation Record, was not completed by the Social Worker.  The form was incomplete except for the part completed by the Peer Bridger who operates under the Psychology Department and is responsible for assisting with Wellness Recovery Action Plan (WRAP) and A&D counseling.  This person does attend meetings with the CMHC representatives and in two health records reviewed, there was documentation that the Peer Bridger did post discharge telephone calls to check on the status of the discharged person.  The documentation of the involvement of the Peer Bridger involved in discharge planning reflected the involvement of the Peer Bridger from the CMHC and not that of the Peer Bridger of the Hospital.  There was documentation of the person's strengths however the documentation was weak in identifying preferences, needs and outcomes.  Referral to needed PACT or ICORT services was weak.

South Mississippi State Hospital Reviews



South Mississippi State Hospital Discharge Planning Results

Chart reviews at SMSH occurred in November.  Twenty-two health records were reviewed, nine of persons discharged to Region 14 and thirteen of persons discharged to Region 12/13. As in previous reviews of the health records of persons discharged from SMSH the documentation in the health records consistently reflect compliance with the key performance elements in the Remedial Order.  The documentation reflected a person-centered and individualized treatment approach and reflects involvement of all the stakeholders (patient, family, hospital staff, CMHC) in the discharge planning process. Referrals to ICORT or PACT services were limited, but this may be because of the relatively high rate of people admitted to SMSH with SUD, for whom these intensive mental health services are not targeted.

Combined results of State Hospital Discharge Planning Reviews



The improved forms and processed developed by the Utilization Review Office and used by the clinical staff at the Hospitals has led to improved compliance with some Requirements for Discharge Planning in Paragraphs 15, a-h, Paragraph 16 and Paragraph 17 compared with the results we reported in our prior Reports. We observed improved compliance with the following expectations of the Remedial Order:

- Discharge planning begins within 24 hours of admission to the State Hospital. Documented in 80 of 115 records.
- Identify the person's strengths and weaknesses, preferences, needs and desired outcomes. Documented in 96 of 115 records although the identification may be pro forma and not tuned into individuals' preferences.
- Identify the specific community-based services the person should receive upon discharge. Documented in 86 of 115 records, although the identification of services may not be sufficiently tied to needs and preferences.
- Identify and connect the person to the provider of the necessary supports and services. Documented in 110 of 115 records.

- Refer the person to PACT or ICORT when the person meets the criteria for PACT or ICORT in DMH's Operational Standards. Documented in 65 of 114 records. In one case the person did not have a SMI diagnosis. Since these services are specifically designed for individuals with SMI and substantial needs, more attention to appropriate referrals for intensive services is needed.
- Identify resources for the person to access in the event of a crisis and educate the person about how to access those services. Documented in 112 of 115 cases.
- Include an anticipated discharge date. Documented in 88 of 115 cases. The anticipated discharge date is not specific, but most are documented "within 30 days".
- Discharge plans for persons who have previously been admitted to a State Hospital within a one-year period include reviews of the prior discharge plans, the reasons for the readmission and adjustment of the new discharge plan. Documented in 21 of 33 records. This indicator was only applicable in 33 of 115 records.

The compliance in the following Discharge Planning Requirements of the Remedial Order was not improved yet, and showed compliance in less than half of the 115 records reviewed:

- Prior to discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via video conference to conduct assertive engagement and enroll persons in appropriate services. Documented in 47 of 115 records.
- Peer Bridges at each State Hospital integrated in the discharge planning process. Documented in 52 of 115 records.

While our review finds significant progress overall in Discharge Planning, these two key performance indicators may have the biggest impact on the transition of the person from the inpatient hospital stay to a successful life in the community and reducing the readmission of the person to the Hospital.

Commentary. We observed improvement in documentation for Discharge Planning in the Remedial Order because of changes in the forms and processes recommended by the Office of Utilization Review, and the training and monitoring efforts that followed. At the time of our recent record reviews not all hospitals had fully implemented the changes, so we expect to see continued progress in the future. The improvements may be sustained by the addition of policy in the DMH Operational Standards for the changes recommended and implemented for Discharge Planning as well as continued training for clinical staff and continued monitoring by the Office of Utilization Review.

We note that the success of this effort (a structured DMH effort, with dedicated staff, training, new protocols and inspection of results) may suggest comparable approaches to improve CMHC performance in areas such as Discharge Planning and care coordination.

At all the Hospitals, additional factors that affect the discharge planning process are:

- Persons who are admitted to the state hospitals without a major psychiatric diagnosis.

- Persons who are discharged out of state and persons who are discharged to different Regions than their home, or to private providers.  These persons do not receive services from the CMHCs, and it may be appropriate for the State to consider feasible approaches to improve care coordination.

The Office of Utilization Review has demonstrated utility in increasing and maintaining compliance with the Remedial Order. The recommended revisions of the medical record forms made by the Office of Utilization Review will standardize forms across all Hospitals. Additionally, the recommended revisions will increase compliance with the Remedial Order and improve treatment and discharge planning as they direct staff to consider preferences, needs and outcomes for the person and develop person-centered, individualized plans.  If improvements continue this should increase community tenure and reduce readmissions.

Paragraph 18: Technical assistance to Chancery Courts: This paragraph requires the State to provide chancery courts in each county with an annual overview of available mental health services, including alternatives to civil commitment to Hospitals. The State has provided training and information to the chancery courts.

Given the decentralized role and diversity of chancery court operations and relationships with CMHCs, increasing the consistency of court commitment activities in Mississippi is challenging. The training and information sharing requirements of Paragraph 19 of the Order take a step in this direction. However, despite increased education efforts, achieving the goals of Hospital Diversion has been challenging. Thus, the State has moved toward compliance with the requirements of this Paragraph, but improvements in Hospital Diversion remain necessary. Alternatives to Hospitals are not uniformly secured, and people not charged with crimes wait in jails for access to Hospital beds or are transferred from private hospitals to Hospitals.

To begin to address these problems, in July 2022 DMH launched a pilot program not required by but completely consistent with the Remedial Order, establishing positions of Court Liaisons who would work directly with the chancery court judges and staff to help educate the staff and the families seeking involuntary mental health treatment about available alternatives in the community. Court Liaisons are Master's level clinicians who not only provide pre-evaluation screenings for involuntary commitment but also serve as an advocate for families and individuals. They work to identify options for treatment within the community through the CSUs or other outpatient options. A benefit of the role is that the Court Liaisons bridge between CMHCs and courts. They can educate court staff on community treatment options and reinforce the effectiveness of community treatment to stabilize symptoms and promote recovery.

These positions were based on a model initially proposed by Region 12. As of January 2023, Court Liaisons are funded in Regions 2, 3, 4, 7, 9, 10 and 12. DMH is adding 18 more Court Liaisons in 2023 with ARPA funding.

Additionally, funding for Diversion Coordinators in each Region was made available in July 2022. These are Bachelors' level positions that provide follow-up services to individuals who are evaluated for involuntary commitment – whether that individual is court ordered to a state

hospital or enrolled in community services. As of January 2023 these staff in place with the exception of Regions 7 and 8.

To monitor, assess and coordinate these activities DMH has created and filled a statewide role of Clinical Diversion Coordinator (CDC). In addition to supporting the new Court Liaisons and Diversion Coordinators, the CDC is also monitoring Crisis Stabilization Unit (CSU) census, people being held in jails awaiting hospitalization and the waiting lists for each of the state hospitals.

In the view of the Monitor, these efforts will facilitate achieving compliance with requirements for Diversion from Hospitals and Training for chancery courts, and the underlying goals of increasing community tenure, improving connections to care and avoiding unnecessary institutionalization.

Paragraph 19: Technical assistance and training to providers: This Paragraph requires the State to provide technical assistance and training to providers, with these activities carried out by individuals with substantial experience in implementing Core Services.  In our September 2022 Report we reviewed the extensive but incomplete training that DMH provided in FY '22. In our view, those efforts adequately addressed training for Peer Specialists, but training for other staff was uneven.

During this monitoring period we reviewed other DMH training efforts and requirements. DMH has developed a robust, credible credentialing process for mental health therapists that has been used as a model by the Mississippi Board of Examiners for Licensed Professional Counselors. The credentialing process was developed and is implemented by the Division of Professional Licensure and Certification (PLACE) and is governed by the PLACE Board. The PLACE Board, representing each clinical discipline, is appointed by the DMH Executive Director and meets ten times each year to review applications as well as recommendations for credentialing. The following credentials are administered by PLACE:

1. Mental Health Therapist

2. IDD Therapist

3. Community Support Specialists

4. Addictions Therapists

5. Licensed Administrator

Credentialing for Peer Support Specialists is a sixth credentialing effort. The application review and approval process is overseen by PLACE, but the process itself is managed by the DMH Division of Peer Recovery and Support. We previously found the Peer Support Specialist training effort to be thorough.

For staff in other disciplines (including Physicians, Nurse Practitioners, Nurses, Clinical Social Workers, and Licensed Professional Counselors) DMH facilities and CMHCs accept professional credentials issued by State or National credentialling entities and their continuing

education requirements. There is currently no credentialing process for mental health direct care staff (as there is for IDD direct care personnel). These individuals interact on a regular, often daily, basis with people with SMI in settings such as CSUs and group homes.

Regarding other staff and training requirements, the DMH Operational Standards include expectations for CMHC hiring and training requirements, delegating much training responsibility to CMHCs. Reviewing these expectations, we found that:

- Each CMHC is required to develop an Employee Training Plan (Rule 12.2 and 12.4), but there is no requirement that the plan include a focus on interventions for individuals with SMI or address evidence-based practices (EBP).
- The standards related to Continuing Education Plans (Rule 12.3) do not include any required competencies or continuing education requirements for direct services providers of mental health services. Only IDD direct service providers are required to be included in the Continuing Education Plan.
- Standards related to General Qualifications (Rule 11.3) for CMHC employees includes a section (R) for all direct support personnel (i.e., aides, house managers, on-site community living managers and direct support workers) but only lists the requirement of a GED, no credentialing or specific training requirement is listed.

Additionally DMH offers professionally developed trainings virtually for continuing education for DMH Staff and DMH Certified Providers.  Each month one training is provided in: Behavioral Health, IDD and Substance Abuse. They are offered through Relias Healthcare Training and Performance Solutions, a nationally recognized training provider. A review of the DMH website found that the latest posting for a Relias training was March of 2022, however DMH indicates that information about these trainings is now disseminated electronically to all DMH certified providers.

Our additional review has found that DMH training is quite comprehensive for those clinicians covered under PLACE including Peer Support Specialists. Some training is also offered statewide through the monthly Relias programs. There is some training provided periodically regarding Evidence Based Programs and Core Services but the approach does not appear systematic.

It might be useful if coverage of the Relias offerings and/or content of the CMHC trainings included a more specific focus on caring for people with SMI. Sadly, pre-service education by graduate clinical training programs are often deficient in preparing clinicians to provide effective treatment and support of people with SMI and it falls on the CMHC's to provide "on the job training." There are resources available to assist. The Substance Abuse and Mental Health Services Administration (SAMHSA) offers training and technical assistance (TA) opportunities through SMI Adviser and regional Technology Transfer Centers.

<u>Paragraphs 20 and 21: Data collection and review</u>: These paragraphs require monthly collection, review and analysis by the State of detailed data on crisis services, civil commitments to and long term stays in State Hospitals, and Core Service levels by county and region for both DMH and Medicaid. Most of these responsibilities rest with DMH, which has designated staff to carry

out these duties and devoted considerable efforts to working with the CMHCs on data collection during FY 22. Paragraph 24 (below) requires posting of this data on agency websites beginning at the end of FY22.

We briefly discussed the substantial but incomplete efforts on improving data collection and review above. To summarize:

- During FY 22 DMH spent considerable time and energy working with the CMHC's on data collection. Previously, data on local service delivery was variable and unreliable and insufficient for accountability. DMH worked intensively with each CMHC on data quality and began to post additional data on its website (see https://www.dmh.ms.gov/fy22-remedial-order-data-report-now-available/ ).

- The DMH efforts and the report listed above provide consistent information on the number of people served in each Region and County in each Core Service. As we indicated in our review of data, it reveals issues needing attention. However, also crucial to understanding service effectiveness is data on what levels of care were received. If individuals are enrolled in PACT, the most intensive community service, but only received a single service in a month, the service isn't working as intended. And this is a salient issue because, as our review of Paragraph 2 notes, SMI individuals who should receive continuous care move in and out of services frequently and are often "lost to care."

- Given these issues, Paragraph 21 of the Order requires "By the end of FY22, Mississippi will begin collecting, reviewing, and analyzing — on a monthly basis — person-level and aggregate data capturing the number of units of each Covered Core Service reimbursed under DMH grants, excluding Purchase of Service grants." DMH began working on this requirement in FY '22 but has faced challenges. The Monitor conducted a conference with DMH to explore the issues. Context and challenges include:

  o A root cause of the problem is inconsistent and, in some cases, outdated Electronic Medical Records (EMR's) and billing systems in CMHC's.  This is a major problem that affects quality of care as well as efficiency of operations. In FY '22 the Office of the Coordinator of Mental Health Accessibility with DMH secured an appropriation to improve CMHC EMR's. The project is being reviewed by Information Technology and procurement staff in Mississippi government. Once it proceeds, it will be a complex and challenging multi-year effort, affected by the complexity of interagency and State-Local relationships, the diversity of CMHC operations, and the fragmented nature of the marketplace for CMHC EMR's, where customer service can be problematic, vendors come and go and there is no unquestioned best firm.

  o Given these timelines and challenges, the State must work on day-to-day management of the system and achieving compliance with Requirements of the Order before the "EMR problem" will be solved. Relatedly, there are limits and challenges in the resources available to DMH and the CMHC's. According to DMH staff, changes in billing requirements made during FY '23 to relieve administrative burden on CMHCs mean that reimbursement for the DMH grants

supporting Core Services is no longer handled on a "unit cost reimbursement" basis. However, CMHC staff are required to report the units of service delivered for each program to DMH. This reporting is inclusive of all services in each Core Service program, including those paid by Medicaid. So, the approach does not align perfectly with the requirement to report services just paid by DMH grants. However, in the opinion of the Monitor it is a satisfactory approach. We are ultimately interested in performance of the programs and this approach is consistent with that goal. When DOM resumes reporting Medicaid payments, it will be possible to subtract Medicaid payment from total program payments to determine DMH contributions.

o   The Division of Medicaid in FY '22 began producing monthly reports on the Core Services it reimbursed and providing these to the Monitor. However, DOM has switched to a new data provider and has not yet been able to provide these required reports to the Monitor during FY '23. DOM officials had anticipated the reports would be made available beginning December 2022 but we understand they will not be available until late in FY '23.

o   The Monitor discussed these issues with DOM and DMH. We agreed that all of this reporting would be done on a quarterly basis and that DOM would provide reports on all services reimbursed in CMHCs rather than just Core Services. This approach allows for more consistent and regular analysis and comparison. DMH agreed to begin submitting the reports required by Paragraph 21 in December 2022, and has submitted the report for the first quarter of FY '23. The Monitor is awaiting the first report from DOM.

Paragraph 22: CMHC compliance on Standards and Fidelity: This paragraph requires an annual review by the State of CMHC performance on compliance with DMH Operational Standards and on fidelity with DMH expectations (for Core Services where fidelity is measured).

Paragraph 23: Clinical Review (stayed by Order of the Court)

Paragraph 24: Website posting of information and data for Paragraphs 19-21: This paragraph, requires the posting of the data described in these Paragraphs on agency websites (and provided to the DOJ and Monitor). As noted above, DMH posted most information on its website. See: https://www.dmh.ms.gov/news/olmstead/ Information on Paragraph 21 was posted in February 2023. The Monitor is not aware that DOM is posting mental health services information.

Paragraphs 25 and 26: Implementation Plan (stayed by Order of the Court)

Paragraphs 27 and 28: Termination and Monitoring: Monitoring requirements were laid out in a separate Order of the Court; Termination of the Court's oversight is dependent on compliance with the Paragraphs above.

Compliance Findings in U.S. v. MS. Here we outline the compliance status of the State for each requirement of the Order, based on the observations in the prior section of this Report.

| Paragraph, Key Issues | Summary of Compliance Findings |
|---|---|
| 1--**State must reduce unnecessary Hospital use via adequate and appropriate services.** | All dimensions of State Hospital use (admissions, census, people with long stays) have been reduced, however some of the reductions are due to the pandemic and to staffing challenges. To improve access the State plans a substantial expansion of beds—in CSU's and via reopened units at East Mississippi State Hospital and Mississippi State Hospital). There are still delays in accessing CSU's and Hospitals but December 2022 data suggests delays have been substantially reduced. Some people (who have not been charged with a crime) wait in jails for hospital beds in some Regions. Recent data also suggest significant progress on this issue.

DMH has released funding for all of the services listed in the Order, including funds for some Core Services (Mobile Crisis, CSU's) that go beyond levels required in the Order. Some of these services are still in development including some newly funded in FY 2023. There has also been expansion, beyond the levels required by the Order, of CMHC staff to assist with diverting people from criminal justice and Hospital settings, and of Peer Bridgers.

Establishing Core Services as required accomplishes the first element of compliance. A second is data showing that people are being served as intended. Here, data collection has been improved but the Monitor does not yet have all the needed data from DOM and only recently has the data from DMH.

Vetting DMH reviews of the adequacy (fidelity) of Core Services is a final compliance threshold. DMH is conducting reviews and has worked to improve quality but the review process has not yet been vetted; this should happen within the next year.

PARTIAL COMPLIANCE |
| 2--**CMHC's** …(are) "responsible for preventing unnecessary hospitalizations" A) ID individuals with Serious Mental Illness (SMI) who need services B) screen people with SMI in care for need of core services | There is a great deal of variability among CMHC's. Some of this variability reflects local adaptation to different regional characteristics (e.g., rurality, poverty). However, some of the variability affects the availability and adequacy of services.

Record reviews of people committed to Hospitals indicate that people are often disconnected from care before being readmitted, alternatives to hospitalization are not always considered and that some people wait in jail for hospital beds.

Statewide, care of people being discharged from hospitals appears to be improving (e.g., people are regularly discharged with medications and with a follow-up appointment). However, there are still problems and inconsistencies. For example, many of the individuals who are hospitalized do not get a (face to face or video conference) visit from their CMHC before they are discharged. Some people who miss scheduled post-hospital appointments get good follow-up outreach and are re-engaged in care, while others may be "lost to care" after inadequate follow-up. Our records reviews, discussed above, found |

| C) Coordinate care<br>D) Divert from SH<br>via care | that compliance metrics—such as CMHCs making contact with hospitalized clients, clients completing initial visits after discharge, and CMHCs providing adequate follow-up/engagement efforts—were met, in general, about half of the time.<br><br>Coordination of care for people with SMI in communities across Mississippi is quite variable, and there is no statewide expectation or requirement for care coordination to ensure that people get the care they need to avoid hospitalization. Our records review found that only 38 of 102 individuals (37%) were enrolled in care and receiving it prior to the crisis resulting in their hospitalization, although most had previous hospitalizations<br><br><br>PARTIAL COMPLIANCE |
|---|---|
| 3--State has adopted **Core Services.** Statement of fact. | Not a Compliance requirement. |
| 4--**Mobile teams**:<br>A) defined, Op. Std. 19-19.4 cited<br>B) "1 team/region" (2 in 12)<br>C) maintain hotlines, assist w stabilization, help connect to care, work with law enforcement, seek to coordinate with 911<br>D) state monitors response time | DMH has provided grants for Mobile Crisis services to all Regions and will award an additional $1.4M in federal funds in FY '23.  DMH is implementing a new Mobile Crisis reporting system during FY '23, until this is in place data on crisis response will be uneven and Mobile Crisis services functioning cannot be adequately assessed.<br><br>During FY '23 (effective 7/16/2022) a single new national 3-digit number for mental health crisis and suicide prevention (988) was introduced, and for the first time substantial federal resources to support crisis care have been provided. Mississippi has worked to build in-state capacity to handle 988 calls and to collaborate with stakeholders including law enforcement and 911 system operators on improving crisis care. The State is now working to better connect 988 call services with the regional crisis services identified in the Order.<br><br>DMH has developed and tested a framework for measuring performance (fidelity) of Mobile Crisis services, and has begun to systematically conduct Fidelity Reviews–all Regions will be visited in FY '23. During this period the Monitor observed a DMH Fidelity Review inspection of Mobile Crisis services in Region 6. We observed the Review to be carefully and collaboratively conducted. For example, as part of the Review, to test responsiveness, the reviewers made test calls to the posted Region 6 number to assess timeliness of response. The Fidelity ratings produced by the DMH team were generally consistent with those made by the Monitor. Given some additional vetting of Fidelity Reviews and improved DMH data collection on Mobile Crisis services we will be in a much better position to assess statewide compliance by the end of FY '23.<br><br>PARTIAL COMPLIANCE |
| 5--**Crisis Stabilization Units** | DMH has provided grants for CSUs to all Regions except Region 15—a small Region with low levels of hospitalizations where the Order does not require a CSU. Region 11 opened its 12 bed CSU in 2022 but has struggled to reach capacity. Also during FY2022 DMH awarded $400,000 in additional funding to each CSU to enhance security and/or |

| | |
|---|---|
| A) Defined, Op. Std. cited<br>B, C) To be funded in each Region (including 12 beds in Region 11 by end 2022) and sustained.<br>D) Region 15 can use other CSU's<br>E) State monitors including diversion rates and admissions bypassing CSU's | clinical staffing. The State is still finalizing release of $6.4M annually for the next 4 years in federal resources approved by the Mississippi Legislature to expand CSU's. DMH is awarding this funding to a number of Regions with smaller (8 or 12 bed) CSU's, to increase capacity up to 12 or 16 beds, and to open additional 16 bed CSU's in Regions 8 and 9 and a 12 bed CSU in DeSoto County (Region 4).<br><br>Statewide, less than 15% of individuals admitted to a CSU are transferred to State Hospitals, which is a marker of success. Compliance concerns include: 1) most people admitted to Hospitals are not served at CSU's, including individuals committed/transferred to State Hospitals from private hospitals without access to CSU's; 2) people not charged with crimes are being held in jails awaiting a Hospital bed.<br><br>PARTIAL COMPLIANCE |
| 6--PACT.<br>Defined. Op. Std. 32.1-32.8 cited.<br>A) MS will sustain 10 teams (see Exhibit 1 of Order for regions/ counties served)<br>B) MS will conduct fidelity reviews, submit scale with Implementation Plan (STAYED) | PACT teams are now funded in all the Regions required in the Order (detail in Attachment 1 of the Order, also attached to this Report as Exhibit 1). Utilization of PACT is improved since the time of trial, with the State reporting 674 individuals served in FY21 and 740 served in FY '22. Assuming a caseload maximum of 80 individuals per team, total FY 22 utilization was about 93% of capacity. However, a better measure of utilization is individuals enrolled at any one time. During the first Quarter of FY '23 561 individuals were served, about 70% of capacity. Improving referrals to PACT from Hospitals is possible.<br><br>DMH reports that 16 people being served by PACT teams were readmitted to State Hospitals in FY21, and 31 in FY'22, a marker of the program's effectiveness.<br><br>Fidelity reviews of PACT programs are conducted by DMH. During this period DMH obtained expert consultation on conducting reviews; the Court Monitoring Team will participate in some of these reviews in the next monitoring period to validate adequacy of monitoring.<br><br>PARTIAL COMPLIANCE |
| 7==ICORT.<br>Defined, Op. Std. 32.9-32.13 cited.<br>A) 16 teams per Exhibit 1. Teams will meet 32.9-13<br>B) Fidelity scale, reviews | DMH has provided funding to support all the 16 ICORT teams identified in Attachment 1 of the Order with 10 of the teams newly funded in FY21. All teams are reported operational as of Fall 2023 except Region 8's program. In FY '22 ICORTs served a total of 610 individuals; in the first Quarter of FY'23 392 individuals were served, or about 75% of capacity for the 15 operational programs<br><br>DMH reports 23 people served by ICORTs were readmitted to State Hospitals in FY21, and 39 in FY '22; the increase may be related to more people being served.  This relatively low number of readmissions is a positive indication of effectiveness, but a higher rate of readmissions than those achieved by Mississippi's PACT teams.<br><br>DMH is conducting fidelity reviews of ICORTs and used the expert consultation on conducting PACT reviews obtained in the Fall of 2022 to consider improvements in the |

| | |
|---|---|
| | ICORT Review process. The Court Monitoring Team will participate in some of these reviews to assess their adequacy in 2023<br>.<br>PARTIAL COMPLIANCE |
| **8--Intensive Community Support Specialists.** Defined. Op. Std. 32.18 cited.<br>A) 35 ICSSs to be funded, sustained<br>B) Meet criteria of Op. Std. 32.18 | DMH has made available the funding to support all the Intensive Community Support Specialists identified in the Order. A reported 938 individuals were served in FY '21 and 1054 in FY '22. Of these individuals, 79 (7.5%) were readmitted to Hospitals. This is a higher readmission rate than for people served by PACT or ICORT, but there are no benchmarks for readmissions from this service.<br><br>DMH is conducting fidelity reviews of ICSS. The Court Monitoring Team will participate in some DMH ICSS reviews in 2023 to assess the service's effectiveness at preventing hospitalization.<br><br>PARTIAL COMPLIANCE |
| **9--Supported Employment**— IPS/VR. Defined, Op. Std. Cited<br>A) Each Region will provide SE by either IPS or VR collaboration<br>B) IPS to be sustained or developed by end of FY 22 in Regions 2,4,7,8,9,10,12<br>C) IPS meets Op. Std. 24.4-6<br>D) In other Regions, SE offered by ES Specialists with an MOU with MS Div. Rehab Svces<br>E-F) Fidelity to be measured.<br>G) State to submit scales with Implementation Plan--STAYED | DMH has provided funding to support Individual Placement and Support (IPS) services in 7 Regions, and to support a VR Supported Employment specialist in the other 6 Regions.<br><br>During FY '22, 533 individuals received Supported Employment services. This is less than 1% of the clients who received Core Services<br><br>DMH is conducting fidelity reviews of Supported Employment programs and obtaining expert consultation on conducting reviews; the Court Monitoring Team will assess the DMH fidelity reviews of supported employment in 2023.<br><br>PARTIAL COMPLIANCE |
| **10--Peer Support Services** (PSS) | DMH has provided funding for the Peer Support Service positions identified in the Order and has provided additional funding to each Region to support a CMHC Peer Bridger |

| | |
|---|---|
| A) State to sustain PSS at the primary CMHC office in each Region<br>B) Plan to implement PSS at other offices (stayed)<br>C) Peer Bridgers at all Hospitals | position and CSU Peer Bridgers to focus on transitions from acute care (Hospitals, CSU's) to community care.<br><br>Through visits to all Regions and Hospitals and conversations with leadership staff, the Monitor observed significant variability in how the role of Peer Support Specialist was defined, in effectiveness of filling these positions and how peers are utilized and integrated into programs. Views of the role varied from seeing Peer Support Specialists as vital team members representing a different and complimentary expertise, to a view of peers as paraprofessionals with very limited expertise. These views appeared to affect success in recruitment and utilization of these staff. During this monitoring period we reviewed staffing vacancy rates in all of the CMHCs for key roles, and we found vacancy rates much high for peer positions than for clinicians, nurses and prescribers.<br><br>In our September 2022 Report, we described a limited study of Peer Support Services in Regions 2 and 3, which we observed as having a better understanding and commitment to peers than some other Regions. This review coupled with the staffing data leads us to conclude that additional efforts are needed statewide and in some CMHCs to enable adequate use of peers.<br><br>PARTIAL COMPLIANCE |
| 11--**Permanent Supported Housing**<br>A) $150k to assess State Hospital and Crisis Stabilization discharges who: >90 days in SH, are/were homeless, lived in unlicensed boarding home prior to admission, or have another CSU/SH admission<br>B) addl capacity (STAYED) | DMH has made the funding required by the Order available. Chart reviews of people admitted to/discharged from State Hospitals show that in most cases people are not being held in the hospital because no housing is available. However, the number of referrals to Supported Housing is limited. A review conducted during this monitoring period of people with very long hospital stays did indicate that a lack of intensively staffed housing is a factor keeping many of these individuals in Hospitals. In particular, individuals with IDD are often detained in Hospitals for very long stays because of a lack of adequately structured community living programs that can meet their needs.<br><br>In FY '22 a total of 239 individuals received Supported Housing Services; this is about .1% of all individuals receiving Core Services.<br><br><br><br>PARTIAL COMPLIANCE |
| 12--**Medication Access**: $200k provided to CMHCs | DMH has allocated the funds in FY '22 and FY '23. CMHC utilization of the funds has been uneven.<br>.<br>The Monitoring Team noted various issues and successes with respect to Medication Access. Hospital record reviews during this period continued to find that nonadherence with prescribed medication regimens is a reason for admissions and readmissions. However, records seldom reveal why use of medications was discontinued, and what the implications are for further treatment. We did not examine use of clozapine during this monitoring period as data from DOM was not available. Our Hospital record reviews did note significant use of long acting, injectable (LAI) antipsychotics, widely believed to |

| | |
|---|---|
| | increase stability and reduce Hospital readmissions. As we noted previously, a number of Regions have on-site pharmacy services (operated directly or contracted) which increases access and convenience for individuals receiving care.<br><br>FY '23 Medication Access resources have not been utilized by many Regions.<br><br>PARTIAL COMPLIANCE |
| 13—**Diversion from State Hospitals**<br>--during Pre-evaluation screening, consider if ICSS's are appropriate, offer if needed<br>--during process, consider all civilly committed for Crisis Residential unless commitment has been ordered by court | Interviews and record review indicated variable processes across CMHC's to assess the need for PACT, ICORT, or ICSS. The Order calls for consideration of these intensive services to avoid unnecessary institutionalization (e.g., during Pre-evaluation Screening—although considering mobile and more intensive services when people are not engaged in care may be necessary). Some CMHS's indicate that considering the need for intense services is a standard part of Pre-evaluation Screening in their Center. However, evidence of this was not consistently found in records that were reviewed.<br><br>Additionally, Paragraph 2 of the Order requires coordination of care as needed; it may be more effective to consider intensive services earlier, before a Hospital commitment might be needed. If an individual's mental well-being has deteriorated to the point where hospitalization is being considered, it may be too late.<br><br>The variability in whether ongoing care coordination and Pre-evaluation screening address these issues suggests a need for a statewide protocol defining CMHC responsibilities to coordinate care, and monitoring/Quality Improvement processes like that which DMH has introduced for Discharge Planning.<br><br>PARTIAL COMPLIANCE |
| 14--**Connecting the 154**<br>(Individuals whose care was reviewed by DOJ experts prior to trial) to care:<br>--US info to MS<br>--MS provide info to CMHC's with funding to:<br>A) Outreach for engagement<br>B) Screen for Core services, document, offer as appropriate | DMH has provided information to CMHC's and paid $100 for completion of the work. The work was done by CMHCs and summarized by DMH. While the project was completed, the results were not encouraging. Many individuals were lost to care and few were receiving the intensive services developed in recent years. As noted in our discussion regarding Paragraph 2/Care Coordination:<br><br>• Of the 154 individuals, a dozen were deceased. This is a substantial number, reflecting the national pattern of premature mortality for individuals with SMI.<br>• Of the 142 remaining, the largest number (49) were engaged in some care. Most were receiving traditional outpatient services such as medications and counseling. Fewer (about 10) were receiving the Intensive Core Services discussed in the Order.<br>• About 15 were in Hospitals when they were located, suggesting whatever community care they received was inadequate to prevent readmission.<br>• About 36 of the 142 surviving individuals were not able to be located at all, and for about 29 additional individuals their status is simply unclear (for example, the Region noted the individual missed appointments and was discharged without an expectation of follow-up,  or that the individual was in another Region).<br><br>In the opinion of the Monitor, these challenges are best understood in the larger context of challenges with care coordination, and issues of engaging people with SMI in care, as |

| | |
|---|---|
| | opposed to this limited project. The results reveal problems which must be addressed in each CMHC and across Mississippi's system of care.<br><br>COMPLIANCE |
| 15--**Discharge Planning** to begin within 24 hours of admission and will:<br>A) Identify the person's strengths, preferences, needs and desired outcomes<br>B) Identify specific community-based services needed on discharge<br>C) Identify and connect the person to the providers<br>D) Refer the person to PACT or ICORT when criteria met<br>E) Include assistance if needed in securing or activating benefits<br>F) Coordinate before discharge so meds are continued as needed<br>G) Identify resources for crises and educate on accessing them<br>H) Include an anticipated discharge date | The Hospital and CMHC records reviewed at Hospitals and CMHCs during FY '2022 allowed a careful assessment of progress made and needed on these requirements. Progress is evident. DMH developed a Discharge Planning protocol and convened Hospital and CMHC staff to work on the issue. As a result of these efforts, there has been some improvement. As we discussed in our first Report, appointments for continued care post discharge were arranged consistently and documented in Hospital and CMHC charts by FY '22. People are discharged with a supply of medication (usually for 14 days, or a month) and a prescription.<br><br>Our review during this period finds significant improvements across Hospitals although not yet to a level of consistent compliance.<br><br>Improving connections to post hospital care via "warm handoffs" that include face-to-face or video meetings with community staff is essential. Our review during this period found that most people who are hospitalized did not have a personal contact from their CMHC while hospitalized. As we found in our September 2022 Report, about 1/3 of discharged individuals did not make their first appointment for continuing care after their hospitalizations, and many were subsequently lost to care and are at greater risk of decompensation and rehospitalization.<br><br>Peer Bridgers where they are in place are facilitating these connections and we commend DMH for providing additional funds to hire them in CMHCs and CSUs. Challenges in building and sustaining the peer workforce, will limit the impact of these individuals. Where Peer Bridgers were involved in discharge planning, especially where they were present both at the Hospital and at CMHCs, we saw improvements.<br><br>There is a need to improve identification of which specific services people will need to succeed on discharge. Based on the DMH task force including representatives of all Hospitals to continue improvements in Discharge Planning, and efforts by the Utilization Review Office to review implementation of more consistent, responsive approaches, we expect to see substantial improvements during 2023.<br><br>Compliance Findings are provided below by subparagraphs of the Order: The Monitor applies scoring thresholds requiring at least 85% of observations in compliance, with no Hospitals below 75%, to achieve an overall rating of compliance: |

*Discharge Planning to begin within 24 hours of admission and will:*

*Identify the person's strengths, preferences, needs and desired outcomes*

Performance on this requirement has been improved with a majority of charts noting that discharge planning is commenced in a timely way. Patient strengths are often noted, but their preferences are usually not considered.

PARTIAL COMPLIANCE

*Identify specific community-based services needed on discharge*

There has been significant improvement on this issue with most charts showing identification of needed community services. However, translating this into referrals and adjustments in the actual "aftercare" remain loose. The referrals/connections to community care are not close/personal or "warm" enough.

PARTIAL COMPLIANCE

*Identify and connect the person to the providers*

Although identification of needed services may not be sufficiently individualized, Hospital staff consistently arrange for post discharge services including scheduling initial appointments. We found continued good performance on making sure initial appointments were scheduled and people were informed about them in discharge materials. Improvements in getting people to the appointments or meeting them where they are still needed.

COMPLIANCE

*Refer the person to PACT or ICORT when criteria met*

Performance on this issue is improved; we found evidence of referrals for care in a majority of charts, but nearly half did not have the referrals to Core Services that are likely to prevent readmissions. Joint Hospital/CMHC planning is more likely to be effective, especially when people have been readmitted.

PARTIAL COMPLIANCE

*Include assistance if needed in securing or activating benefits*

Assistance in securing benefits is required by the Order and is of undeniable importance. However, given the short hospital stays that most people experience, there is usually not enough time to complete these processes (e.g., applications for Social Security Disability can take months or even years). A strengthened, consistent process of assisting with benefits in CMHC's that is coordinated with what the hospitals can de should be considered.

|  | PARTIAL COMPLIANCE |
|---|---|
|  | ***Coordinate before discharge so meds are continued as needed.*** |
|  | Our record reviews confirmed that continuity of medication treatment was consistently addressed at discharge planning by Hospitals, by providing a supply of medications and a prescription. Qualitative improvements, such as coordination between Hospital medical staff and CMHC's providers when medications are changed, are possible. However, this requirement is being met. |
|  | COMPLIANCE |
|  | ***Identify resources for crises and educate on accessing them.*** |
|  | Documentation of this requirement is now a standard part of discharge planning, and our reviews found consistent evidence it was in place (e.g., people sign the relevant discharge planning form). We assess this requirement to be met although qualitative aspects of crisis planning can be improved. |
|  | COMPLIANCE |
|  | ***Include an anticipated discharge date*** |
|  | We found evidence of continued improvement on this issue. The number of charts where an anticipated discharge date is recorded approaches our compliance threshold, but we believe improvements in treatment planning to use time in hospital well are needed. |
|  | PARTIAL COMPLIANCE |
| 16--**Discharge planning for people readmitted** addresses prior plan, readmission cause, adjustment | Again, our record review included a modest number of individuals with recent readmissions, but a high proportion of people with prior admissions that were earlier than one year. The need to adjust their care is comparable. This goes to the need to better individualize treatment plans—in the Hospitals but especially in CMHCs—to improve stability and reduce readmissions.<br><br>We did not see consistent efforts to adjust care based on readmissions. We do note increased, robust efforts to start people with psychotic disorders on long-acting injectable medications when medication adherence was a cause of readmissions.<br><br>PARTIAL COMPLIANCE |
| 17--Prior to discharge, **CMHC staff meet with individual** | Communication between CMHC staff and people hospitalized from their area is uneven; this communication took place less than half the time for people whose records we reviewed in the Fall of 2023. As noted above, we have observed that where Peer Bridgers at the Hospital AND at the CMHC take on this responsibility it is often effectively done. |

| | |
|---|---|
| | Challenges in hiring Peer Bridgers and unevenness in how peer staff are integrated into CMHC's and Hospitals affect compliance.<br><br>PARTIAL COMPLIANCE |
| 18--**DMH annual overview of services, alternatives to commitment to Chancery Courts** | DMH has conducted briefings/trainings with Chancery Court staff and reported on these efforts to the Monitor.<br><br>Because of local differences in Chancery Court processes, conducting the trainings may not be sufficient to achieve consistently appropriate performance of the Commitment process. In recognition of this problem, and to improve collaboration with Courts and law enforcement, DMH has provided funds to a number of Regions for Liaison staff to work with these systems to improve collaboration and care. DMH also has initiated dialogue with statewide leaders in the Court system.<br><br>The Monitor considers DMH to have achieved an initial period of compliance on this requirement, which will need to be sustained. Additionally, extending procedural improvements such as better communication and coordination into services that divert unnecessary hospitalizations (see Requirements 2, 13) requires more work.<br><br>COMPLIANCE |
| 19--**TA to providers**:<br>--competency based training, consultation, coaching<br>--by people with experience implementing Core Services | In posted information on the DMH web page ( https://www.dmh.ms.gov/news/olmstead/ --See Remedial Order Paragraph 24 Data Report) DMH summarizes an extensive menu of training and presentations for mental health staff. During this period the Court Monitor Team explored these efforts in more detail. DMH operates a commendable statewide credentialing system for some CMHC staff including Mental Health Counselors, Community Support staff and Peer Support Specialists. Beyond this, DMH requires CMHCs to have a training plan.<br><br>We find that DMH training is quite comprehensive for these identified clinicians and Peer Support Specialists who together are the bulk of the CMHC workforce. Some training is offered through the monthly Relias programs. There is some training provided periodically regarding Evidence Based Programs and Core Services.<br><br>However, we believe some additional training effort is needed to support the workforce on interventions for people with SMI and on Evidence Based Practices relevant to Core Services. As DMH works on this, securing trainers with the requisite experience will remain important.<br><br>PARTIAL COMPLIANCE |
| 20--**Data Collection and Review**. On a monthly basis, the State will collect, review, and | This requirement became effective at the end of FY '22. Recognizing problems in the consistency and accuracy of data, DMH has worked hard with all CMHC's during FY '22 to improve data accuracy. Efforts have included regular meetings to reconcile data sources and reports. Medicaid data on Core Services utilization was submitted monthly by the Division of Medicaid to the Monitor during 2022, but as this Report is written, has not been submitted for FY '23. The FY22 DMH data has been posted to the DMH |

| | |
|---|---|
| analyze person level and aggregate data capturing:<br><br>And Paragraph 24:<br><br>Beginning at the end of FY22, and until the case is terminated, Mississippi will post on agency websites and provide on an annual basis to the DOJ and Monitor the data described in Paragraphs 19-21, not to include individual identifiable data. | Olmstead page; DOM expects to provide data to the Monitor by the end of FY 23 but has not indicated when or how it will post data.<br><br>Specific requirements:<br>a. *Admissions to Residential Crisis Services locations, by location broken down by CMHC region and by county, and admissions to State Hospitals from Residential Crisis Services and where Residential Crisis Services were not provided;*<br><br>This information has been provided to the Monitor and is reflected in this Report and was posted on the DMH Olmstead page.<br><br>b. *Calls to Mobile Crisis Teams, with the number of calls leading to a mobile team visit, the average time from call to visit, the number of calls where the time to visit exceeded limits in the DMH Operational Standard 19.3, E, 1, and disposition of the call and/or Mobile Team visit.*<br><br>This information requires implementation of a new reporting system during FY '23.<br><br>c. *Civil commitments to State Hospitals by CMHC region and by county.*<br><br>This information has been provided to the Monitor and has been posted on the DMH Olmstead page.<br><br>d. *Jail placements pending State Hospital admission by CMHC region and county, including length of placement (Mississippi will collect this data, as to each person, when a State Hospital receives the commitment order for the person).*<br><br>Information has been provided and posted.<br><br>*Individuals who remain hospitalized in State Hospitals for over 180 days:*<br><br>The number of individuals with long stays in each Fiscal Year has been provided and posted.<br><br>*Persons receiving each Core Service by CMHC region and by county.*<br><br>This information has been provided and posted.<br><br>g. *Number of units of each Core Service reimbursed through Medicaid by CMHC region and by county.*<br><br>This data (g) was regularly provided to the Monitor until DOM changed data vendors in FY '23.  DOM has not yet resumed providing this information  or indicated how the data will be reviewed, analyzed and posted. |

| | |
|---|---|
| | PARTIAL COMPLIANCE |
| 21--**Monthly collection, review, analysis** of person level and aggregate billing/utilization on DMH grants 24--Beginning at the end of FY22, and until the case is terminated, Mississippi will post on agency websites and provide on an annual basis to the DOJ and Monitor the data described in Paragraphs 19-21 | DMH is working on improving CMHC data collection and reporting, and staff now meet regularly with CMHC's to review data. The process is challenging, and the State has made substantial progress. Linking reimbursement to submission of data on service provision (labelled as "Fee for Service") improved data submission in FY '22 but increased financial and operational issues for some CMHC's. As a result, reimbursement methods were changed and person level service utilization is being reported separately. DMH provided an initial report to the Monitor in December 2023. We have begun to review that information but will not have time to assess it thoroughly until our next report.   It will be very difficult to assess performance without the ability to check both Medicaid and DMH data for individuals.<br><br>PARTIAL COMPLIANCE |
| 22--**Annual analysis** of compliance and fidelity of all core services by CMHC | DMH has made substantial efforts to develop measures of program fidelity (is the program working as intended) or adopt/adapt national measures where they exist for many of the Core Services: PACT, ICORT, ICSS, Supported Employment (both Individual Placement with Support—IPS—and collaborative programs with Vocational Rehabilitation), and Mobile Crisis. No fidelity measures have been developed for Peer Support Services, Permanent Supported Housing, or CSUs, although the latter are subject to detailed Operational Standards.<br><br>For the past several years, and beginning in FY 22 for Mobile Crisis, DMH has conducted annual on-site reviews of these programs. Therefore, the basic infrastructure of compliance with this Paragraph has been established. To assure compliance, the Monitor will review the DMH fidelity efforts by participating in some of the monitoring visits.<br><br>PARTIAL COMPLIANCE |
| 23--**Clinical Review**--STAYED | REQUIREMENT IS STAYED/NOT NOW IN EFFECT |
| 24--MS to **"post on agency websites** and provide on an annual basis to DOJ and Monitor | Covered in discussion of Paragraphs 19-22 above |

| | |
|---|---|
| the data in para 19-21" | |
| 25--**Implementation Plan** STAYED | Not applicable |
| 26--Imp. Plan timetables STAYED | Not applicable |
| 27--**Termination**--Requires substantial compliance for each para, sustained for a year<br>28--Termination of oversight may be sought/achieved for individual section/paras | Not applicable |
| 29--**Monitor** to be appointed | Not applicable |

<u>Conclusion and next steps.</u>

The third Monitoring Report in this case comes 11 years after DOJ issued a Findings Letter raising concerns about deficits in Mississippi's mental health system leading to unnecessary institutionalization, 30 months after Judge Reeves' Remedial Order, and 6 months after the Fifth Circuit conducted a hearing on the State's appeal of that Order. It is perhaps timely to summarize changes in Mississippi's mental health system over that period, to illustrate what has been accomplished and the challenges that remain.

The following summary is drawn largely from DMH Annual Reports as well as the monitoring efforts of the past two years. It may inform awareness of the need for change that existed, the progress that has been made by the State, and the additional work that should be done.

In 2011, Mississippi's State Hospitals served 4,464 individuals in acute care (shorter stay) units and 533 in longer term beds; crisis care was provided in 8 CSU's. CMHCs provided mostly clinic-based services (e.g. counseling, medication management) and case management but not intensive services; one PACT team had been started in 2010 in Greenwood but other Regions did not have PACT, ICORT or ICSS services. No Peer Support program is referenced in the Annual Report. DMH Annual Reports did summarize funding for community mental health services. In 2014, when funding for community mental health was identified in the Annual Report for the first time, $19.3m in State funding was provided to the CMHCs. The Mississippi system could fairly be described as the most unbalanced state system in terms of preferences for institutional care in the country.

As this Report is being written, a decade of attention means this imbalance in care has been substantially addressed. Affected somewhat by pandemic-driven bed closures, in FY '22 Hospitals served 1966 individuals in acute care (a 56% reduction from 2011) and 70 in the MSH Continued Treatment Service (a substantial reduction in very long stay hospitalized people). Intensive Community Services have been expanded from the single PACT Team in the Greenwood area to some availability in every county. We also note that our review of data shows that people with SMI are not yet receiving these services in all counties. However, the basic infrastructure of care is more nearly in place, with funding of:

- 10 PACT teams
- 16 ICORT teams
- 35 Intensive Community Support Specialists

The next step is assuring that these programs are actually available to serve people across Mississippi. Additionally, as we enter 2023, MCeRT Mobile Crisis Teams cover every Region, responding to over 30,000 calls annually. Some level of Supported Employment is available in each Region—if not in each county—and Peer Bridgers are in place or being hired at every Hospital and CSU. In FY '22 DMH received $51.4m in State funding for community services, more than doubling the amount available in 2014 after inflation.

The scope of progress is substantial. But the work is not complete, and some conditions remain that should satisfy no one. These challenges include:

- In FY '22, on an average day 73 individuals waited somewhere for access to a Hospital; 25 of these were being held in jail for an average of over a week, without having been charged with a crime. This is not acceptable. The DMH has noted recent, promising improvements on these problems, suggesting that with continued effort incarceration awaiting care can be eliminated.
- While over 30,000 individuals in crisis were served in FY '21, only 541 received an employment service that could help them achieve stability and increase their productivity and 239 received Supported Housing services which also helps to reduce crises.
- Of 154 individuals with SMI who had been interviewed by DOJ experts just a few years earlier, a recent survey by all the CMHCs found only 49 engaged in care, while a larger number of individuals were not even located. In a recent study by the Monitor, of 102 individuals recently admitted to Hospitals, only 39 had been engaged in community care prior to the crisis resulting in hospitalization. Community care has been expanded but better efforts to engage needy people in care are needed.
- Many individuals with SMI were housed in unlicensed care homes, some to be discharged after their Social Security check was cashed by the operator.
- Data on the mental health system's performance was recently posted by DMH, but using this data to improve performance remains a work in progress.

In short, while this matter has proceeded, Mississippi has made substantial progress in improving care. In the context of the case and ongoing monitoring, State officials are working well to make improvements. However, challenges remain and will require sustained attention.

Next steps in monitoring. All requirements of the Order are now in effect and progress can be assessed, so the next phase of monitoring is important to allow a full assessment of progress. While it is useful to know services were funded by DMH, until statewide data on their use and well-done quality reviews were in place, the impact on unnecessary institutionalization could not be assessed. Reviewing data to assess adequacy of services and validating DMH reviews of Core Services will be priorities during 2023.

## Exhibit 1: Intensive Community Support Services to be Offered by Region, County

| Region | Current Status | Proposed Expansion | FY19 State Hospital Acute Psych Admissions | Comments |
|---|---|---|---|---|
| 1 | 1 ICORT; 1 ICSS | ____ | 49 | Existing ICORT serves all counties - Coahoma, Quitman, Tallahatchie, and Tunica. Number of commitments do not require additional intensive community supports. |
| 2 | 1 ICORT; 1 ICSS | 1 ICORT | 142 | Existing ICORT serves all counties – Tate, Marshall, Penola, Lafayette, Yalobusha, and Calhoun. Number of commitments require an additional ICORT to assist in coverage of counties. |
| 3 | 1 PACT Team; 1 ICSS | 2 ICSSs | 114 | Existing PACT serves Lee county. Number of commitments require 2 additional ICSSs to serve Benton, Union, Pontotoc, Monroe, and Chickasaw. Existing PACT will begin serving Itawamba. |
| 4 | 2 PACT Teams; 3 ICSSs | ____ | 148 | One existing PACT serves DeSoto county and 1 PACT serves Tippah, Alcorn, Prentiss, and Tishomingo. Number of commitments do not require additional intensive community supports. |
| 6 | 1 PACT Team; 1 ICORT; 2 ICSSs | 2 ICSSs | 119 | Existing PACT serves Leflore, Grenada and Holmes. Existing ICORT serves Bolivar and Washington. Number of commitments require 2 additional ICSSs to serve remaining counties – Issaquena, Sharkey, Humphreys, Sunflower, Carroll, Montgomery, and Attala. |
| 7 | 1 ICORT; 2 ICSSs | 1 ICORT | 147 | Existing ICORT serves all counties – Webster, Clay, Choctaw, Oktibbeha, Lowndes, Noxubee, and Winston. Number of commitments require an additional ICORT to assist in coverage of counties. |
| 8 | 1 PACT Team; 1 ICSS | 1 ICORT | 145 | Existing PACT serves Rankin and Madison. Number of commitments require an ICORT to serve Copiah, Lincoln and Simpson. |
| 9 | 1 PACT Team; 1 ICSS | 1 ICORT and 2 ICSSs | 291 | Only includes Hinds county. Number of commitments require an ICORT and 2 additional ICSSs. |
| 10 | 1 PACT Team; 1.5 ICSS | 2 ICORTs and 2 ICSSs | 289 | Existing PACT serves Lauderdale. Number of commitments requires 2 additional ICORTs to serve Leake, Scott, Newton, Smith and Clarke and 2 ICSSs for Neshoba, Jasper, and Kemper. |
| 11 | 1 ICORT; 1 ICSS | 1 ICORT and 4 ICSSs | 250 | Existing ICORT serves all counties (not operational yet) – Pike, Amite, Lawrence, Walthall, Franklin, Adam, Wilkinson, Claiborne, and Jefferson. Number of commitments require an additional ICORT and 4 additional ICSSs to assist in coverage of counties. |
| 12 | 1 PACT Team; 1 ICSS | 3 ICORTs | 273 | Existing PACT serves Forrest and Perry counties. Number of commitments require 3 additional ICORTs to cover Lamar, Pearl River, Marion, Jefferson Davis, Covington, and Jones. Existing ICSS staff will cover Greene and Wayne. Region 12 operates an additional PACT in Region 13 that serves Hancock and Harrison. |
| 13 | 1 PACT Team, 5 ICSSs | | 141 | Existing PACT operated by Region 12 serves Hancock and Harrison. An ICSS will serve Stone. In the previous year, Region 13 added 4 ICSSs. |
| 14 | 1 ICORT; 1 ICSS | ____ | 66 | Existing ICORT serves George and Jackson counties. Number of commitments do not require additional intensive community supports. |
| 15 | 1 PACT; 2 ICSS | ____ | 34 | Existing PACT serves Warren and Yazoo counties. Number of commitments do not require additional intensive community supports. |

**Types of Intensive Community Supports**

Program of Assertive Community Treatment Team (PACT) – Caseload is 80
Intensive Community Outreach and Recovery Team (ICORT) – Caseload is 45
Intensive Case Management (ICSS) – Caseload will be 20 as of July 1, 2020