**U.S. v. Mississippi**

**Fourth Report of the Court Monitor**

**September 7, 2023**

Introduction and Executive Summary.

This is the fourth Report of the Court Monitor in this matter concerning Mississippi's adult mental health system, and its compliance with the "integration mandate" of the Americans with Disabilities Act (ADA). The focus is whether Mississippi's mental health system for adults with serious mental illness (SMI) including community mental health programs operated by Community Mental Health Centers (CMHCs) and inpatient care provided by State Hospitals (Hospitals)--operates to unnecessarily institutionalize individuals with SMI in Hospitals—by not providing adequate community care.

The matter has been active for over a decade, and discussed in previous Reports which are posted at: https://www.dmh.ms.gov/news/olmstead/ U.S. District Court Judge Carlton Reeves issued an Opinion and Order in September 2019 finding that the Mississippi system for adults with serious mental illness was in violation of the ADA. On September 7, 2021, following negotiations toward a plan, Judge Reeves issued a Remedial Order (henceforth Order) and appointed Dr. Michael Hogan to serve as Court Monitor. An Order of Appointment provides that the Monitor shall assess compliance with each obligation in the Order in a written report to the Court every six months and shall provide the State with technical assistance. The Appointment Order also provides that, in assessing compliance, the Monitor shall review and validate data and information, speak with State officials, providers, and individuals receiving services. This is the Monitor's fourth Report, covering the period from March 2023 to August 2023.

Legal proceedings in the case have continued. On January 10, 2022, the State filed an Appeal of Judge Reeves' Remedial and Monitoring orders with the Fifth Circuit Court of Appeals, seeking reversal of both. The Circuit Court held a hearing on the Appeal on October 5. As this Report is written, an Opinion has not yet been issued. During the legal process, the Order remains in effect: the State is implementing its requirements and the Monitor is reviewing progress.

Organization of this Report.

The Report is organized into sections as follows:

- Developments in the mental health system
- Activities of the Monitor during this reporting period
- Observations on Compliance
- Compliance Findings
- Conclusion and next steps

Developments in the mental health system

This section provides context for understanding how implementation of the Order is proceeding. We provide this background for the benefit of interested parties. In the two years since the Court's Order much has been accomplished and there have been changes in mental health in Mississippi and nationally. We therefore take this opportunity to describe progress and challenges for the benefit of stakeholders.

All the services required by the Order were funded by the end of FY '22 and remain funded. All the required services have now been launched by CMHCs although some do not function at their funded capacity, mostly because of staffing challenges.

In addition to funding the Core Services required by the Order (Mobile Crisis Teams, Crisis Stabilization Units, Programs of Assertive Community Treatment, Intensive Community Outreach and Recovery Teams, Intensive Community Support Specialists, Permanent Supported Housing, Supported Employment, Peer Support, and Community Support Services), the Department of Mental Health (DMH) has received additional funds through State appropriations as well as the Legislature's allocation of federal pandemic-related funds from ARPA—the American Rescue Plan Act. These funds will increase services in areas related to but not required by the Order, or in other cases increase required services (e.g., Crisis Stabilization Units—CSUs) beyond the minimum levels required by the Order. A State plan for use of the ARPA funding is leading to FY '24 contract awards.

The DMH has also received increased federal funding from the Substance Abuse and Mental Health Services Administration (SAMHSA). Significant resources were targeted to implementing the national 988 crisis and suicide prevention program that launched in 2022. In Mississippi, most of these funds have been dedicated to two CONTACT centers that answer 988 calls, texts and chats and connect callers to local crisis services if required. Finally, SAMHSA funding  has been received for both discretionary/competitive grants and for the Community Mental Health Block Grant, which supports community services for adults with SMI and children/youth with serious emotional disturbances.

Renewed federal support for mental health. The federal government's support for mental health services has long been uneven and limited. This stance dates to President Franklin Pierce's veto of land grant legislation to build asylums in the mid-19[th] century. When President Kennedy's Community Mental Health Center (CMHC) legislation was enacted in 1963, Kennedy's broad message about the need for CMHCs ran into this historical reluctance to fund mental health care; the significance of the need and the urgency of Kennedy's message were not matched by the funding provided. Over the next two decades, only about 750 CMHC's received support (over 2000 were needed across the country), and funding was limited to "start-up" grants provided for seven years. Then, in 1981, President Reagan's first budget eliminated the CMHC program by converting it into a block grant, removing references to CMHC services from federal legislation and reducing overall funding by 35%. For the last 40 years, dedicated federal support for Mississippi mental health was limited to this modest block grant and discretionary/competitive grants. The mantle of leadership in mental health passed to the states, with funding provided by state legislatures and via Medicaid. In Mississippi, 1972 legislation followed the Kennedy

approach, allowing counties to create Regional Commissions to govern CMHC services, without providing much funding or programmatic direction.

<u>Certified Community Behavioral Health Clinics.</u> The past three federal Administrations have increased federal support for mental health. The national 988 system was created during the Trump Administration and funding for 988 was significantly expanded during the Biden Administration. In addition to the Affordable Care Act, which included provisions to improve mental health care—mostly in health insurance programs--the other recent federal mental health initiative is creation and expansion of the Certified Community Behavioral Health Clinic (CCBHC) program.

The effort was launched by Congress in 2014 as part of the Protecting Access to Medicare Act. In 2022, as part of the Bipartisan Safer Communities Act (enacted in response to gun violence) Congress expanded the program to provide planning grants until all states have had the opportunity to create CCBHCs. In 2023, Mississippi was awarded a state planning grant. (Several CMHCs in Mississippi have also received local, 2-year CCBHC grants.)  There are now over 500 CCBHCs nationally.

The CCBHC program has two main features. The first is programmatic. CCBHCs are modernized CMHCs, updating the Kennedy CMHC model. The national requirements now require timely access to care and include improved primary care and crisis response. The second main CCBHC feature has to do with funding. States can improve their utilization of Medicaid reimbursement to fund a more sustainable approach to mental health care via CCBHCs.

Medicaid has become the major funder of community mental health services nationally and in Mississippi, with total spending exceeding both state general funds and federal funds for mental health. However, in most states—as in Mississippi—Medicaid's benefit reimburses specific services for eligible individuals but does not provide a consistent and reliable infrastructure for mental health care, especially for low-income individuals sometimes described as "working poor" who do not have insurance and are not Medicaid eligible under current Mississippi rules. Meanwhile, DMH funding supports Core Services for all who need them but does not cover the basic services that most people without insurance coverage rely on (e.g., counselling, medications). DMH also requires CMHC's to provide care regardless of ability to pay but only pays for this care in Core Services. The gap between the two programs leads to gaps in care and to the CMHCs providing care that is not reimbursed—a gap estimated at $30M annually by the Mississippi Association of Community Mental Health Centers.

The statewide CCBHC grant provides Mississippi with an opportunity to address these problems by designing an affordable, sustainable CCBHC effort during 2023-24. This would require agreement by both DMH and the Division of Medicaid (DOM)—and ultimately the Legislature—with substantial input and involvement of stakeholders. Importantly, the CCBHC program must serve children, youth, and families as well as adults, including those with SMI. Establishing a statewide CCBHC system may also provide an opportunity to strengthen the role of CMHCs to manage the system of care, making them more accountable—as well as

responsible—for managing Hospital utilization and for eliminating the unfortunate practice of holding individuals not charged with a crime in jail until treatment is available.

The Monitor observes that current inconsistencies in funding and insufficient coordination of benefits between DMH and DOM makes operation of successful CMHC's and achieving adequate mental health care statewide challenging. The CCBHC effort could provide a way to better integrate funding and care, and to leverage current state funds as Medicaid match to achieve improved, efficient care. This is a needed but challenging effort that demands much from both DMH and DOM. A modest approach to repackage currently low Medicaid rates into a slightly different payment approach will not achieve an adequate, sustainable model.

Coordinator of Mental Health Accessibility and Regional Mergers. In early 2023 the Office of the Coordinator of Mental Health Accessibility released their sixth quarterly report (see www.dfa.ms.gov/sites/default/files/Legislative%20Info%20Home/Office%20of%20the%20Coordinator%20of%20Mental%20Health%20Accessibility%20-%20Quarterly%20Report/4th%20Quarter%20Report.Final.pdf.)

This office was created by the Mississippi Legislature in 2020 as the Order in this case was released, and in response to ongoing fiscal/management challenges in several CMHC's. The failure of regional CMHCs is a long-standing problem; over time Regions 5, 1, 13 and now 11 have been absorbed by other Regions following financial difficulties. The consolidation strategy accomplished mergers of faltering Regions but has not, to the Monitor's knowledge, identified changes that might be necessary to achieve sustainability in CMHC operations.

Since its creation in 2020, the Accessibility Coordinator has been largely focused on Regions with financial problems. In 2022, because of these efforts, Region 1 was absorbed by Region 6 (which had previously absorbed the former Region 5 counties in 2013). These consolidations mean that 16 of Mississippi's poorest counties in the Delta are now combined in a single Region, stretching almost 160 miles along the Mississippi River. The limited resources and infrastructure in the area, the difficulty of attracting staff and the threat of rural hospital closures make the operating environment difficult. The mergers have expanded the scale of the operation and capitalized on the management capabilities of Region 6 leadership without addressing systemic financial sustainability issues.

Following the Accessibility Coordinator's robust multi-year effort to bolster care in Region 11, this Region was dissolved effective July 1, 2023. Five of Region 11's counties (Amite, Franklin, Lawrence, Pike, Walthall) were absorbed by Region 12—the largest Region in the state, which had absorbed the former Region 13 in 2021—and the other four counties (Adams, Claiborne, Jefferson, and Wilkinson) were absorbed by Region 15—the smallest Region.

The regional consolidations mean that the failure of services in the absorbed Regions was avoided. This is a significant accomplishment. The consolidations were also stressful; despite the intense efforts of staff to provide continuity of care, there is little doubt that some people are lost in the shuffle and that services are significantly disrupted. For example, the CSU in Natchez was temporarily closed because of staffing and transition issues and the CSU in Marks was closed

and will potentially be reopened at a different location. A number of staff have left for private sector opportunities.

Going forward, the new mergers (completing the assimilation of Region 1 into Region 6, and the absorption of Region 11 services into Regions 12 and 15) will take time and support to work. There are potential problems to identify and avoid. As noted earlier, Region 12 is already much larger than any other Regions, with a combined population of over 600,000 in 13 counties. The Accessibility Coordinator has pointed out that very small Regions may not have an adequate population base to sustain services. However, it is also true that Regions incorporating multiple counties must work with more county and local officials including courts, sheriffs, and jails, as well as more school districts, hospitals, and other facilities—increasing management demands. There are upper limits as well as lower limits to efficiency.

With the absorption of former Region 11 counties, Region 12 will be more than twice the population size of the next largest Region (8) in Mississippi, with a combined population of about 750,000 and including 17 counties. The driving distance from one end of the Region to the other is about 175 miles. The management tasks associated with absorbing Region 11, where staff have been working with inadequate benefits and multiple record systems, will be substantial, and Region 12 is still recovering from challenges associated with absorbing Region 13 several years ago. Because the newly accountable CMHCs are different organizations with different record systems, existing clients must be manually enrolled in the new system; no protocol exists to seamlessly continue their enrollment. The legislation establishing the Accessibility Coordinator provided an effective process for transitioning Regional governance, but to date has not yielded a road map for operating success.

The challenges that will be faced in the absorption of Region 11 counties into Region 15 will be different but are also substantial. Region 15 is small and geographically coherent. There is an experienced management team which has run this small two-county system for many years. Absorbing services that have not functioned very well into a small neighboring Region will be challenging. Post consolidation, the combined Region will be much larger and thus potentially have a more adequate resource base. But the challenges of working with many additional jurisdictions are substantial. The fact that the transition takes place just as Merit Health is relocating its 50-bed inpatient psychiatric service from Vicksburg to Jackson adds to the degree of difficulty.

Recently the Accessibility Coordinator released a report summarizing actions that were taken to try and make Region 11 viable as well as steps taken to dissolve the Region, once a determination was made that this was necessary. See: https://www.dfa.ms.gov/sites/default/files/Legislative%20Info%20Home/Office%20of%20the%20Coordinator%20of%20Mental%20Health%20Accessibility%20-%20Quarterly%20Report/1st.2nd%20Qtr%202023%20Status%20Report.pdf

Both efforts are documented well and the outcomes are summarized as necessary and sufficient. However there has not yet been sufficient attention to the sustainability of the reorganized system. The Monitor recommends that the State evaluate the factors and resources that will be

needed for CMHCs to achieve success. The statute establishing the Office of the Accessibility Coordinator (Miss Code 41-20-5) defines this task is as one responsibility of the Office: "(g) To determine whether each community mental health center has sufficient funds to provide the required services."

It may be that the strategy of consolidation has gone as far as is useful. The Regional consolidations addressed material management problems and resource limits associated with small regional size—in an environment of limited State and local funding. Given the costs, challenges and stresses associated with mergers, further use of the strategy may not address possible systematic challenges that have caused 4 of 15 CMHCs to fail.

<u>Data collection and analysis.</u> During FY '22 and FY '23 DMH spent considerable time and energy working with the CMHCs on data collection. Previously, data on local service delivery was variable, unreliable, and insufficient for accountability. DMH is now regularly reporting data to the Monitor on individuals served in Core Services and in Hospitals, posting this data annually on its website and taking management steps suggested by the data.

During FY '23 the State has continued to monitor the fidelity of Core Services and took efforts to improve this monitoring by consulting with national experts in Program of Assertive Community Treatment (PACT) and Individual Placement and Support—Supported Employment (IPS) to improve fidelity monitoring. This improved the quality of the reviews and facilitates compliance by improving the State's ability to make sure programs are working as intended. During this reporting period the Monitor participated in a number of fidelity reviews and found that the State's approach was solid. We discuss this in our review regarding Paragraphs 3-11.

During FY '23 DMH implemented a medical record audit process to evaluate Hospital discharge planning. This effort has yielded some improvements that we cover in our discussion of Paragraphs 15-17 below.

<u>State Hospital capacity.</u> Late in 2022, DMH re-opened a 30-bed unit at East Mississippi State Hospital (EMSH) that had been closed for some time because it could not be staffed; a closed 20 bed unit at Mississippi State Hospital (MSH) was reopened in January. The closure of these units affected access to care and contributed to the longstanding problem of people who had not been charged with a crime being held in local jails waiting for a hospital bed, which we discussed in our March 2023 Report. Most of the Hospital capacity reduced during the pandemic has now been re-opened. The addition of 50 Hospital beds has reduced the time that people who have been committed wait in jail for a Hospital bed but has not resolved the problem completely. In addition, because priority is given to people held in jails pending state hospital admission it may create an incentive to place people in jail to secure Hospital admission.

Another unit that had been closed at MSH will not be re-opened because DMH judges it not necessary; funds were reallocated to community care. The restorations of inpatient capacity have improved access to Hospital care. Going forward, improving access while also reducing unnecessary institutionalization will require more attention and will remain a challenge.

CMHC services continue to be affected by staffing challenges. In a previous Report, we discussed this problem. CMHCs are working hard to recruit and retain staff. Across the system, staff vacancy rates by type of position are closely related to compensation, with the highest vacancy rates for lower paid Peer Support Specialists, moderate vacancy rates for therapists and the lowest vacancy rates for higher paid prescribers. Vacancy rates for therapists are reportedly related to the extent to which there is a regional private market for therapists, who often train in CMHCs and then often leave for private practice opportunities, where pay may be greater and additional responsibilities such as on-call service are reduced.

Health care market failures. Recent events serve as a reminder that people with SMI rely not only on the CMHCs and Hospitals but on care provided in other settings including private hospitals—both free-standing psychiatric facilities and mental health units in general/community hospitals. In several parts of Mississippi, private sector acute care for individuals in psychiatric crisis—often paid for by Medicaid—is a major element of the system of care. (Medicaid pays for psychiatric care in general hospital units but generally does not pay for care in free standing psychiatric hospitals.) Data from DOM indicates that in the third quarter of FY '23 (January-March 2023) there were 2,557 Medicaid paid admissions to inpatient psychiatric care which was more admissions than to CSU's and State Hospitals combined. There is great variability in regional use of Medicaid paid inpatient care on a per capita basis, driven in part by the proportion of the population that is Medicaid eligible and even more by proximity to hospitals with psychiatric units. Per capita Medicaid paid admission rates for this period varied from 19/10k population (Region 4) to 285/10k population (Region 9), a 15-fold variation.

In June, St. Dominic Health Services in Jackson announced the abrupt closure of its psychiatric inpatient services with the reduction of over 150 staff positions and over 75 licensed beds. According to DOM data, St. Dominic's inpatient program handled 472 Medicaid paid admissions during the third quarter of FY '23, about 18% of all admissions statewide. The full impact of the closure is still unfolding with concerns voiced by the Hinds County Sheriff and Jackson's Police Chief. Both officials expressed concern about increased criminalization of mental illness, with SMI individuals detained in jail rather than engaged in treatment. The creation of additional Crisis Stabilization Units (CSUs) in Hinds County and in Region 8—both initially supported with federal pandemic related ARPA funds—may help reduce the impact. We note that, even without Medicaid paid admissions to St. Dominic, Region 9 would still have the highest Medicaid inpatient admission rates in the State, so there may be an opportunity to rebalance the system toward community care.

Legislative action. Continued challenges in communities at the interface of law enforcement and mental health also led the Legislature to conduct a hearing on the issue in its most recent session. Then the Legislature enacted the Mississippi Collaborative Response to Mental Health Act (HB 1222), which was signed by Governor Reeves and became effective July 1, 2023. The Act requires improved mental health training for law enforcement and expansion of the Crisis Intervention Team model of specially trained officers working in collaboration with mental health programs. It also signaled an intent to expand Court Liaisons (new positions established to bridge CMHCs with courts and law enforcement) to additional counties (eventually the FY '24 DMH budget included funding for an additional 8 positions related to HB 1222). We discuss the

Court Liaison initiative in more detail in our review of developments related to Paragraph 13. The legislation also updated the terms of members of the State Board of Mental Health, imposed record keeping/reporting requirements for Chancery Courts and added accounting/audit requirements for Regional Commissions.

The Legislature's interest and increased engagement in mental health is welcome and essential to resolving long-standing challenges in Mississippi's mental health system.

<u>Activities of the Monitor during this reporting period.</u>

The Court Monitoring Team emphasized completing the review of DMH's fidelity assessments of Core Services (leading to an informal report on fidelity reviews that is incorporated in this Report); and conducting a data review of Intensive Services use (leading to a finding that Intensive Services in some CMHC's are not sufficiently intensive, discussed in another informal paper that was shared with the parties and has also been incorporated in this Report). We consulted with staff at DMH on fidelity assessments and discharge planning, worked with DMH on its review of discharge planning and evaluated these reviews; and assisted with a DMH effort to consider an audit process for CMHC commitment activities.  We did not conduct tracer reviews of care in Hospitals and CMHC's to evaluate care coordination during this period, although some care coordination problems were uncovered via data review.

During this period, the Monitor made visits to Mississippi on March 8-10,  March 27—April 1, May 14-20 and July 16-22. During the May and July visits the Monitor met with the Coordinator of Mental Health Accessibility. The team conducted a listening session with advocates at the Mississippi National Alliance on Mental Illness (NAMI) conference in May.

Observations and Findings Related to Compliance

The Monitor assesses compliance for each Requirement of the Order using a simple framework:

1. Has action been taken to address the Requirement (e.g., a program put in place, or a procedure implemented)?
2. Is that action working as intended (e.g., is the program serving people according to the State's standards)?
3. If relevant, is the action contributing to the goal of reducing unnecessary institutionalization in Hospitals?

In this section we discuss data and observations related to compliance; in the subsequent section we present Compliance Findings. We organize observations according to Paragraphs of the Order.

Paragraph 1 summarizes the over-arching requirements of the Order, noting that "the State of Mississippi must develop and implement effective measures to prevent unnecessary institutionalization in State Hospitals."

As noted in our previous reports, the number of admissions to Hospitals statewide declined in recent years as new services were developed and beds closed because of the pandemic. There have not been dramatic changes in hospitalization patterns since our September 2022 Report, although Hospital admissions have increased recently because of the re-opened units at MSH and EMSH. As we have emphasized previously, there is no expert consensus on what numerical level of admissions are appropriate; people who cannot be safely stabilized in community settings and require a Hospital level of care should get it in a timely fashion, although community care if available is less intrusive and costly. Thus, levels of needed Hospital care depend on the adequacy of community alternatives.

As we discussed in previous Reports, people who have not been charged with a crime but have been committed to a Hospital wait for care in jails. There is no justification for holding people in jails awaiting hospitalization, especially when they have not been charged with any crime, are in a stressful institutional environment, and are not getting treatment—meaning their condition can deteriorate further. In FY '22, an average of 25 individuals on any given day were waiting on average for over a week. By the end of FY '23, the number of people waiting on any given day was reduced to 2 or 3, with time spent in jail significantly reduced, to about 2.5 days on average. Recent Mississippi Today/ProPublica coverage has put a spotlight on this issue.

The reduction in the length of time that people were held in jail is primarily because DMH has reopened 50 inpatient beds, while prioritizing admissions of people held in jails. The increase in Hospital capacity coupled with the priority on jail admissions has reduced the wait time for people held in jail while perhaps creating an incentive to hold people in jail to secure Hospital access.  While treatment in Hospitals is preferable to custody in jail, it is a costly and restrictive solution. It also does not appear that crisis services are significantly affecting this problem; generally, the people held in jails have been committed specifically to a Hospital and it is not clear that alternatives to Hospitals are considered in these commitments.

There are many transfers to State Hospitals from other hospitals. The beds occupied by people who have been transferred act to "block" other admissions, contributing to the jail hold problem. DMH reports that for the first half of calendar 2023, 51% of all admissions to Mississippi State Hospital (MSH) were individuals transferred from other hospitals—where they were already receiving care. This means that about half of MSH's beds are occupied by people who were already getting hospital level care elsewhere, blocking access to these beds for other people needing treatment but not getting it.

It may be that people are transferred in the belief they "need more time" in a hospital, and the transferring hospital is unwilling to provide this care. There is a perception in some quarters that longer hospital stays may help some people achieve stability, but there are no controlled research studies demonstrating better outcomes from long inpatient stays. The pattern of shorter hospital stays has changed across health care, not just in mental health. Today, hospital stays after birth or major surgery are often just a day or two. Across all illnesses, the hospital is where complex procedures requiring specialized teams and a controlled environment are completed. Recovery and rehabilitation are conducted on an outpatient basis.

This is also true in mental health—when people are connected to community care on discharge. Most acute psychiatric hospital stays today in the United States last a week or less, even though the time from initiating medication treatment with antidepressant or antipsychotic medications to a favorable initial response (not full symptom relief) takes longer—generally several weeks. Treatment starts in the hospital, but as with other conditions rehabilitation and recovery take place after discharge. This makes good care after discharge essential. But it means there is a very limited justification for transfers following treatment in private hospital psychiatric units to Hospitals in terms of benefit to individuals.

The Hospitals provide the same level of care that general hospital psychiatric units or private psychiatric hospitals are licensed to provide. The State's facilities are not like regional Neonatal Intensive Care Units, cancer centers or trauma care facilities that provide more intense or specialized care. Perhaps some transfers occur because insurance payments for hospital care cover only a few days, and the transfer is simply a shift of financial liability. Apparently inpatient lengths of stay for members of Medicaid managed care plans are shorter than Medicaid fee-for-service visits, although we have not verified this pattern. If it is true, it means these plans paid for by the State are shifting liability back to the State, albeit to a different agency.

Same level of care transfers lead to increased State expense, since care of eligible individuals in general hospital psychiatric units is covered by Medicaid, meaning that the federal government picks up over 80% of that cost—while Hospital care is not covered by Medicaid and is 100% a State cost. Staff report that some transfers occur because treating physicians in private hospitals are worried about the difficulty of arranging aftercare, or the potential liability of a "bad discharge." A transfer to a Hospital under these circumstances is essentially a transfer of liability to the Hospital at cost to the State and inconvenience for the patient and their family.

These rationales are hard to justify given that individuals in private hospitals are already receiving care, and the transfers "block" Hospital beds needed by people who are waiting for

admission in locations (jail or home) where they are not receiving treatment. The State should examine this pattern and address it, to improve both access and the appropriateness and efficiency of care. However, the problem cannot be resolved by DMH alone, and DOM and the Mississippi State Department of Health may need to play a role.

Paragraph 2 addresses responsibilities of the CMHCs that provide most of the services required by the Order, noting that "each CMHC shall be the entity in its region responsible for preventing unnecessary hospitalizations." CMHCs are not simply clinics providing elective counseling and medication treatment, but comprehensive providers established under State law to serve a Region with a wide range of services. They are locally governed by regional commissions appointed by county boards of supervisors. CMHC programs must be certified by DMH and most funding is provided through the State's Medicaid and DMH programs. Paragraph 2 provides that CMHCs are responsible for avoiding unnecessary hospitalizations by:

   a.  Identifying individuals with serious mental illness in need of mental health services;
   b.  screening individuals with serious mental illness during annual planning meetings to determine their need for the services required by this Plan;
   c.  coordinating mental health care for individuals with serious mental illness; and
   d.  diverting individuals from unnecessary hospitalizations through the provision of appropriate mental health care."

The responsibility of the CMHCs to orchestrate care and to manage the use of hospitalization is not sufficiently understood. This responsibility goes beyond the operation of programs that are alternatives to hospitalization and requires care coordination for people in the Region. Within this approach, the functions described in Paragraph 2 are crucially important to people receiving care, to families and the public. Coordination of care is most important for individuals with more complex needs, such as SMI. Their recovery often depends not just on medications or counseling, but on rehabilitation, home visits, and support that is provided where people live or work.

Experience and data suggest that most problems that people with SMI experience resulting in hospitalization are because of gaps in care and treatment, not because people are in care and there are problems with it. Trying to access needed care when someone is not getting it is also a frequent "pain point" for individuals and families.

In our March 2022 report, we discussed issues related to these CMHC responsibilities to organize and coordinate care, based on visits to all the Regions and some record reviews. We found CMHCs are not sufficiently accountable for  their care coordination responsibilities, and that practices related to the requirements of Paragraph 2 vary widely.

In subsequent Reports we discussed this problem in more detail based on record reviews at all the CMHCs. We found problems, most notably including failure to meet with clients in the State Hospital prior to their discharge, conduct assertive engagement, and enroll the person in appropriate services as required under Paragraph 17 of the Order.  We also found substantial

variability in CMHC efforts to engage (or reengage) people when initial or continuing care visits were not completed.

During this monitoring period, we did not conduct CMHC care coordination record reviews. It is an intensive effort and we concluded that allowing a bit more time for improvements prior to additional record reviews would be appropriate. We have discussed these issues with DMH and are encouraged that DMH is considering additional approaches to monitor CMHC performance. We encourage these efforts and suggest that approaches to improve care coordination should include data review and record reviews.

We have found that reviewing data on patterns of care can uncover both good practices and those needing improvement. For example, in our March 2023 Report, we indicated that in 46 counties where people had been committed to Hospitals, no residents had received Supported Employment services, which can reduce hospitalization. In 20 counties with Hospital commitments, fewer than 3 individuals had received the Intensive Services (PACT, ICORT, ICSS) that are specifically designed to reduce hospitalizations. Per the Order, Intensive Services are funded in a fashion that is designed to ensure that at least one of these services is available in each County, so that access to intensive, mobile services are available statewide. Generally, PACT teams serve larger population counties, or several counties that are geographically compact. ICORT teams serve mid-sized counties or population centers; ICSS staff are deployed in smaller areas or sometimes are deployed to complement the team services. Thus, Intensive Services should be considered for all individuals at risk of rehospitalization.

During the current monitoring period we conducted additional data review on Intensive Services, examining "unit of service" data that DMH is now collecting. We examined data on the levels of enrollment in, and quantities of services provided by Intensive Services (PACT, ICORT, ICSS) for the second Quarter of FY '23 (September—December 2022). The data showed considerable variability across Regions in the use of these services. Ideally, enrollment in these services would approach the funded capacity of the program, so that the valuable care they provide is used efficiently.

We found that enrollment (the number of people who received any services from the program) in PACT and ICORT services was below 50% of funded capacity in multiple Regions (for PACT, Regions 4 and 10, for ICORT Regions 1, 2, 8, and 11 and for ICSS Regions 4, 8 and 9). We do not know whether the low enrollment is due to staffing problems or a failure to enroll people in the program, e.g., when they leave the State Hospital or a CSU. Levels of hospitalizations, and patterns of discharge referrals generally suggest that there are more individuals who could benefit from the services than are receiving them.

We are not aware if Mississippi has established minimum standard for enrollment, but we consider less than 50% enrollment to be clearly insufficient. The average enrollment (counting anyone who received a service during the quarter as "enrolled") finds that statewide PACT enrollment in all other Regions was about 80% of funded capacity, which we believe is reasonably efficient.

Low enrollment illustrates weaknesses in Care Coordination, since managing referrals to the programs is a care coordination function led by the CMHCs. DMH and the CMHCs should review utilization data for accountability and performance improvement as a needed complement to the solid DMH fidelity review program. During FY '23, DMH paid for Core Services on a cost reimbursement basis, which is a viable way to pay for care when utilization is adequate. For FY '24, when utilization of services remains far below the contracted capacity, DMH will consider a fee for service payment to incentivize improved enrollment.

We conclude this discussion of Paragraph 2 compliance by reiterating findings from our March 2023 Report: engaging individuals with SMI in care is often difficult. They move around. They may not believe they have an illness, may feel that prior care was unsatisfactory or that the side effects of treatment outweigh the benefits. And ultimately, some people decline even the best offers of care. Resource limits (e.g., the fact that travel time and mileage costs for clinical staff to conduct a home visit or a crisis response are not reimbursed) make the work of engagement challenging. But it is central to good care.

For individuals with mental health conditions that—especially when untreated—can result in multiple hospitalizations, encounters with law enforcement and being jailed, better care coordination is essential. The Monitor recommends that the State—DMH and Medicaid— continue to work with the CMHCs to improve care coordination and to enable compliance with the requirements of Paragraph 2. DMH has begun to do a good job on a similar issue— improving State Hospital Discharge Planning. Additionally, the steps that DMH has taken to improve coordination of care for individuals involved in civil commitment (see Paragraph 18 below) will be helpful but will not wholly address the problems we identify here.

Paragraphs 3-11: Core Services (Overview). At the heart of Mississippi's plan to strengthen its community mental health services, and as required by the Remedial Order, Core Services are provided by every CMHC. The Core Services are specialized programs for individuals with SMI who may require more than traditional office-based care. Office-based care in mental health clinics provides medications and counseling to individuals who can monitor their health and who are willing and able to come in for treatment. (Some CMHC's, commendably, provide these services via home visits.) In addition to office-based care in all Regions and most counties, Community Support Services (mobile paraprofessionals who work out of clinics but provide most of their services in the community) are provided by all CMHC's and represent the first Core Service.

Crisis services are Core Services provided and coordinated by Mobile Crisis Teams of therapists, paraprofessionals, and Peer Specialists who can be reached on a 24/7 basis in each Region or accessed via the new national "988" crisis line. CMHCs also operate Core Service Crisis Residential Services known as Crisis Stabilization Units (CSUs). CSUs were provided in all Regions except Region 15; with its absorption of 4 counties formerly part of Region 11, the Natchez CSU is now in Region 15. CSUs provide brief, medically supervised community residential care as an alternative to hospitalization.

Ongoing Intensive Services programs are also Core Services. These programs provide mobile or home-based treatment available in all counties, with the type of service varying by geography. The final Core Services are supportive services: Supported Employment, Peer Support Services, and Permanent Supported Housing.

The State (DMH) has taken substantial steps to achieve compliance:

- Funding the required services is the first essential step. Funding for the Core Services required by the Order has been provided to the CMHCs. By this Report, all the required services have been put in place, although staff shortages continue to affect some programs,
- Performance standards ("Fidelity measures") have been developed for the Core Services where applicable and DMH is surveying performance for each service in each Region annually. Reviewing fidelity helps ensure the services are working as intended. In this Report we discuss our inspection of the DMH fidelity efforts, finding them to be competent.
- Efforts to collect and analyze data on services utilization have been improved. Previously the State did not have accurate data on the number of people served or the levels of services they received, making objective judgements about the adequacy of care impossible. Through diligent efforts with the CMHCs during FY '22-'23, DMH can now provide data on the numbers of people served and levels of services delivered. Medicaid previously reported service levels that it paid for. A FY '23 change in data systems/contractors derailed Medicaid data reporting, which has recently begun again. The Monitor has conducted preliminary analyses with DMH data that we discuss in this Report. The analyses reveal substantial progress, .with significant challenges remaining in some programs in some Regions.

- In FY '23, DMH notified CMHC's that it would tighten performance requirements for several programs. Based on performance in FY '23, reimbursement for the programs could switch from "cost reimbursement" (under which program costs are paid) to "fee for service" (under which units of services are paid for, like most health insurance). This development is related to patterns in reported services that we discuss later in this Report.

<u>Fidelity of Core Services.</u> DMH inspects all services periodically for compliance with its Operational Standards. Additionally, DMH has developed a rigorous program of inspecting most of the Core Services and assessing their fidelity to national evidence-based (research proven) standards. These national standards exist for PACT and Individual Placement and Support (IPS) Supported Employment programs. For these services, DMH has consulted with national experts to ensure that their fidelity assessments are adequate. DMH has also developed fidelity standards for the other Intensive Services (ICORT and ICSS), using relevant PACT standards, and for Supported Employment/Vocational Rehabilitation partnership programs, using relevant IPS standards. Finally, DMH has developed fidelity standards for Mobile Crisis/MCeRT programs. The Monitor has reviewed all these fidelity standards. They are consistent with available research and recommended best practices.

During the second half of FY '23 (March-June 2023) the Monitoring Team participated in about a dozen DMH fidelity reviews, covering all the services mentioned above as provided in four different Regions. We wanted to assess if the DMH fidelity reviews are conducted in a fashion that provides an assurance that the services are functioning as intended. (We note that reviewing data on performance is the other element of our assessment and discuss data review issues later in this Report.)

Following our review of fidelity assessments, we developed an informal report and shared it with the parties. The discussion that follows provides the highlights of this review for the Court and for other interested parties.

Mississippi's approach to defining and monitoring fidelity is solid. While ongoing assessment and quality improvement are necessary, we report here on the adequacy of fidelity monitoring. To assess this, we reviewed the Fidelity Scales and then participated in and observed reviews in multiple Regions:

> • On Dec. 15-18 2022 we observed the review of Mobile Crisis (MCeRT) services in Region 6.

> • On Feb. 27-28 we observed reviews of PACT, ICSS and Supported Employment (Expansion) in Region 3.

> • On March 9-10 we observed the review of Mobile Crisis (MCeRT) services in Region 12 (Coastal area).

> • On March 14-17 we observed reviews of PACT and ICSS in Region 4.

> • On March 28-31 we observed reviews of ICORT (3 programs), ICSS (2 programs) and Supported Employment (IPS and Expansion programs) in Region 12

Via these visits we observed at least two reviews of each program type and visited four Regions including both the Hattiesburg and Gulfport areas of Region 12.

The DMH reviews are rigorous and conducted annually for each program; since the Regions each operate 4-10 Core Service programs the review process is demanding for both DMH and the CMHCs. The review processes vary somewhat by program; generally, each review includes activities before the on-site visit (e.g., reviewing data on the program, and completing/reviewing pre-visit questionnaires). The on-site visits include structured interviews with the CMHC leadership team, program staff, staff who work with them, and individuals receiving services. The interviews address how the program functions and may explore specific issues such as how an episode of hospitalization was handled. Each review focuses on a single program and requires 1-2 days on-site. Administrative records including staff qualifications, training and experience are examined.

A number of clinical records of people receiving care in the program are reviewed to assess actual service delivery. For example, in the case of MCeRT reviews, prior to the visit the DMH staff have selected 10 specific episodes of crisis care to individuals from various counties in the Region and at various times of the day from the CMHC's reports, and during the visit they

examine the clinical records for these encounters. This is a good preliminary way to assess whether MCeRTs are doing their job. DMH is now collecting more comprehensive data; in FY '24 we will evaluate the adequacy of after-hours care, and whether MCeRT's really do serve all counties.

Near the end of the fidelity review visit, the DMH review team conducts preliminary scoring of fidelity, and provides a preliminary debriefing of results, highlighting areas of concern. Following the site visit, the team reviews its scoring in detail to achieve a consensus score and produces a detailed written report for the CMHC. If aspects of fidelity are scored below an acceptable level (usually a 3 on a 1-5 scale), the CMHC must develop a Corrective Action Plan, and another fidelity review is conducted six months later.

<u>Observations about program fidelity and the DMH monitoring effort.</u> Based on the sample of reviews we observed we conclude that the DMH fidelity monitoring effort is solid. Staff are qualified, diligent, courteous, and professional. The reviews are rigorous and examine each program through multiple lenses (interviews of staff, leadership and clients, reviews of administrative and clinical records). We observed CMHC staff to be open to the reviews, and appreciative of feedback. Currently, DMH is making modest improvements in the review process that will be implemented in FY '24—for example, consolidating leadership interviews for the different programs to make the process more efficient.

Generally, we observed the programs to be functioning with an acceptable level of fidelity. Most staff know what the program is supposed to do and are doing it. We believe the major challenge impacting fidelity/quality is staff recruitment and retention. Vacancies impact the delivery of care, and turnover is stressful and creates orientation and training demands for the organization. As an example, we found typical challenges in the Mobile Crisis MCeRT program in Region 12 (Coastal area). This program, serving former Region 13, was staffed with two full-time employees (a single clinician and Peer Specialist) plus the full-time supervisor and on-call after hours staff. The program had several vacancies, so it was functioning with about 50% of the planned full-time staff. Nonetheless, the program was doing its job. People in crisis were being seen in a timely way. Crisis care continued until the crisis episode was over. Due to dedication and teamwork, adequate care was being provided. But we do not believe this level of effort and quality can be sustained without recruitment for the vacant positions.

Another example also illustrates this challenge. In a Supported Employment program in another Region, a newly recruited Supported Employment Specialist was working hard but was unable to perform her duties adequately. She was periodically pulled off her employment work to cover other responsibilities. As a result, individuals needing help with work did not get it. The CMHC leaders felt the reassignments were necessary to cover functions like checking people in for therapy appointments, suggesting a view that this  administrative duty was more important than helping people get jobs. In this case, the program was not functioning as intended and fidelity was rated as poor.

The staffing challenge faced by Core Services exists throughout Mississippi's mental health system and affects service delivery in systematic ways. We discussed this in our March 2023

Report. In some instances, mental health clinics are operating with a 50% vacancy rate for therapists. Obviously, this compromises access to and quality of care.

Overview of compliance issues for all Core Services. The State has now funded all the Core Services required by the Order, and our review of data confirms that the services are operational. There are some programs that are not adequately utilized, and there are many staffing vacancies, but the State has met the first test of compliance: creating the needed services.

Meeting the second test (are the programs functioning as intended) has two components: assessing their functioning and examining data on their use. As we discussed above, for most of the Core Services, DMH conducts regular reviews of quality/fidelity. Data on program enrollment and services are now collected regularly. These are milestones of accountability and compliance. The data do reveal performance problems with Core Services in different Regions. Some of these problems are robust (e.g., programs operating at less than 50% of funded capacity), but the work to remedy them and achieve compliance is manageable compared to the investments and efforts made to date.

The Monitor will review the performance of other Core Services in 2024. We discussed Peer Support Services in earlier reports; we observed there is an adequate training program to prepare Peer Specialists but variable understanding and uneven use of Peer Specialists in different CMHCs. There are persistent issues in Peer Support Service recruitment and retention, driven by compensation and job satisfaction. With regard to Supported Employment, we have observed that fidelity reviews are competent—the good news—and that Supported Employment services are not delivered in many counties—the bad news. We have described some challenges regarding Permanent Supported Housing but have not yet assessed it.

Paragraph 4: Mobile Crisis Teams. Mobile Crisis Teams are also referred to as MCeRTs. DMH has provided all the funding for these services required by the Order. These teams are organized and deployed differently across Mississippi; the differences are partly an appropriate response to regional differences in population and geography and may partly reflect staffing problems, inconsistent implementation and need for monitoring. Each Region receives grant funding and can seek Medicaid reimbursement for its Mobile Crisis services. Within a Region, some staff are dedicated to Mobile Crisis work, and some mobile visits—especially after hours—may be conducted by on-call staff who also work in other programs. Federal ARPA funding ($100,000 per Region) is being awarded during FY '24 to stabilize and enhance MCeRT programs

A second aspect of compliance for MCeRTs is the adequacy of DMH fidelity reviews. In the absence of an agreed national standard for Mobile Crisis services, DMH designed a fidelity monitoring program for MCeRTs and has been inspecting them annually. During FY '23, DMH made improvements to the monitoring protocol. During November, the Monitor and staff participated in fidelity reviews of Region 6 and Region 12 MCeRTs to assess this oversight. We were impressed by the thoughtfulness of the approach, the thoroughness of the DMH team, and the collaborative approach to monitoring.

A final aspect of compliance is whether the programs are serving individuals as intended, e.g., in all counties and within the time parameters defined in DMH Operational Standards. During FY '23 DMH worked with the CMHC's on data reporting specific to these services. For example, tracking the time from when a crisis call is made to when a mobile crisis visit is made—when such a visit is deemed necessary—is a key aspect of quality and compliance. Similarly, ensuring that MCeRT visits are made as needed to all counties and all days of the week/hours of the day is essential. This is sampled in fidelity reviews but must be validated via program data. These issues can be measured via data now being collected. We will be able to assess performance on these issues in FY '24. Therefore, a finding of full compliance for this Paragraph will turn on review of the data that DMH began to collect during FY '23.

<u>Paragraph 5: Crisis Residential Services</u>. These programs, also known as Crisis Stabilization Units (CSUs) are the most intensive community-based service in Mississippi. Created to provide an alternative to hospitalization, CSUs have internal design and staffing reminiscent of psychiatric inpatient units but are free-standing 8-16 bed residential facilities to stabilize people in crisis. All the funding required by the Order has now been provided for CSUs. The CSU in Natchez, formerly in Region 11, will now be operated by Region 15. This CSU closed briefly in July of 2023 as part of the transition of former Region 11 counties to Regions 12 and 15. The CSU in Marks (Region 1) was closed as part of the merger with Region 6 and may be opened elsewhere.

During FY '22 DMH allocated an additional $400,000 to each CSU to improve/stabilize staffing and to reduce denials of admissions due to behavioral or health challenges. Additionally, via federal ARPA funds ($5.6m) to be available in FY '24 DMH plans to increase CSU capacity by about 65 beds via expansion of smaller CSUs in several Regions and opening of new CSUs in Regions 8, 9, and 12. A DMH funded CSU is also planned for DeSoto County (Region 4).

DMH statistics indicate that most people admitted to CSU's are discharged to community care, meaning that hospitalization is usually avoided. For the last 10 months of FY '22, DMH reports that only 195 of 3108 (6%) people admitted to CSU's were transferred to State Hospitals. This is positive. (Full FY '23 data was not available as this Report was drafted.) On the other hand, most people who are admitted to State Hospitals including most admitted from jails do not get a chance at CSU care before they are admitted. The DMH FY '22 data also show that 83% of Hospital admissions were of people who had not first received CSU care. These are weaknesses that require attention.

A number of people referred for CSU care are not admitted. The biggest reason is that some beds are closed due to staffing problems. Other reported denials are because individuals are judged by CSU staff to be too violent, or need substance abuse care that the CSU does not provide. These are subjective clinical decisions, made with great variability. DMH reports there were 1290 denials of admission to CSUs in FY '23. Only 13 denials were reported for Region 8's CSU while over 200 were reported for Region 9's CSU. DMH is now addressing these challenges of denials and diversion effectiveness by imposing requirements on CMHCs for FY '24 that CSU's do not exceed acceptable levels of service denials while maintaining diversion rates above 85%.

<u>Paragraphs 6-9: PACT (Paragraph 6), ICORT (Paragraph 7), ICSS (Paragraph 8) and Supported Employment Services (Paragraph 9).</u> Funds have been distributed for all the services required in Paragraphs 6-9 of the Order. As of FY '23 all the services have been developed and are operational. There are periodically staff vacancies in these programs. Generally, the team programs (PACT, ICORT and IPS) can work around staff vacancies and provide services if a staff position is vacant. This is more challenging for ICSS and VR Partnership Supported Employment, which rely on solo staff working within the CMHC.

A second element of compliance is quality/fidelity. We have determined that the DMH fidelity review process covering all these programs is adequately and professionally managed. Second, a review of data confirms whether the programs are serving people with SMI appropriately—is there access where it is needed, and are individuals receiving sufficient services to benefit? DMH now collects data on the levels of Core Services received by individuals. We reviewed this data for the second quarter of FY '23 to make a preliminary assessment of whether the programs are serving people as intended and discuss the results below regarding each of these services. For PACT and ICORT, DMH is imposing performance expectations for FY '24 including maintaining at least 70% enrollment.

<u>Observations about sufficiency (frequency) of Intensive Services.</u> For these services to work well and cost-effectively, good Regional care management is essential to ensure the people with the highest needs are enrolled, and good program management is needed for daily oversight of care. We discussed data related to enrollment/care coordination above related to Paragraph 2. Here, we focus on the sufficiency of services.

PACT and ICORT services are delivered by teams, so that individuals can receive medical/nursing, psychosocial, peer support and (in the case of PACT) employment and substance use support from the team. This allows teams to do whatever is needed to provide support and treatment in community settings. These Intensive Services are mental health analogues to the home visits and rehabilitation care that are provided in the medical health system to individuals immediately after hospitalization for surgery.

In addition to having varied staff capabilities, all Intensive Services can provide frequent, intensive care that can come to the individual. Providing frequent-enough care is one of the elements of fidelity for all these programs. For PACT and ICSS, an *average* of 2 to 3 visits/week leads to a Level 3 rating (essentially a passing grade) on this criteria. The Level 3 "passing" score for frequency of ICORT visits is an average of about 2 to 2 ½ visits per week. (High fidelity PACT teams see individuals 4+ times per week for a total of 2+ hours; high fidelity ICORT teams provide 3+ visits for 2+ hours and high fidelity ICSS provides 4+ contacts totaling 2+ hours per week.)

For PACT, ICORT and ICSS services, we reviewed the frequency of services use (second quarter, FY '23) and what it revealed about the sufficiency of care. (We did not examine closely the intensity or total amount of care time that individuals received. Intensity of care is closely related to frequency of visits but some visits may include multiple services. We believe

examining the frequency of visits is a sound way to assess the adequacy of contacts.) We discuss these results below, specific to each type of Core Service.

Paragraph 6: Programs of Assertive Community Treatment. PACT teams are full clinical teams including prescribers, nurses, therapists, paraprofessional community support workers, and a Peer Support Specialist, providing mobile services. PACT is the most intensive non-residential service in the Mississippi mental health system. There are 10 teams in Mississippi, serving larger counties or small groups of counties that together are large enough to justify the service. All PACT teams have existed for several years at this point, and all have received several fidelity reviews.

We discussed enrollment in PACT services regarding Paragraph 2 since enrollment in Intensive Services is subject to CMHC care coordination practices such as internal referrals to teams. In Table 1 below we also consider the frequency of services that individuals received:

Table 1: PACT Service Enrollment and Intensity (Average Units/Week)

Average Units of Service/week (Second Quarter FY '23)

| Region | # Served/cap | <3 | 3-5 | 6+ |
|--------|--------------|------|------|------|
| 3 | 61/80 | 23 | 19 | 19 |
| 4 | 76/160* | 9 | 18 | 49 |
| 6 | 68/80 | 22 | 35 | 11 |
| 8 | 53/80 | 24 | 16 | 13 |
| 9 | 89/80 | 89** | 0 | 0 |
| 10 | 36/80* | 13 | 22 | 1 |
| 12 | 125/160 | 39 | 47 | 39 |
| 15 | 58/80 | 56** | 2 | 0 |
| Total | 566/800 | 275 | 159 | 132 |

*Enrollment < 50% of funded Capacity (Average enrollment is 71% of funded capacity)

**Only low-frequency services (2 or fewer contacts/week on average)

The data show that most PACT teams are functioning as intended; they are serving reasonable numbers of people and providing reasonably frequent services. While continued improvement is possible, the data coupled with the adequacy of statewide fidelity reviews shows the emerging maturity of PACT services and their essential role in providing community care to individuals who are very needy and require this intensive support to avoid crises and State Hospital

readmissions. The low rate of readmissions for people served by PACT teams (4.1% in FY '22) affirms this.

Of 566 individuals enrolled in PACT services in the period we reviewed, about half received less than two services on average per week. This is less than optimal. PACT teams are expected to adjust the frequency and intensity of services to individuals on an ongoing basis, but delivering less than two visits per week on average is a low frequency of service. In Regions 3, 4, 6, 8, 10, and 12, a majority of people enrolled in PACT received an average of three or more services per week. This is positive. On the other hand, in Regions 9 and 15, almost no one enrolled in PACT received three or more services per week on average. These PACT teams are not delivering frequent services, but appear to be functioning like crisis teams, delivering limited services that may not provide the full benefit that PACT is intended to achieve. These Regions with DMH should consider how to address this.

Paragraph 7: Intensive Community Outreach and Recovery Teams. ICORTs have been described as "mini-PACT" teams including a therapist/clinician, Registered Nurse, Peer Support Specialist, and part time Community Support Specialist. The fidelity standards for ICORT are based on the PACT standards. The full caseload for an ICORT is 45 individuals. As with PACT, ICORT teams deliver most services in communities (medication prescribing is done at clinics). ICORTs are the most intensive non-residential service in mid-sized counties or groups of counties; there are 16 teams in Mississippi.

As we have previously indicated, all the ICORT teams are funded and operational, and the fidelity review process for ICORTs is thorough. We found that low enrollment was a bit more of a challenge for ICORTs than for PACT teams, with enrollment below 50% in Regions 1, 2, 8, and 11. Data on ICORT enrollment and frequency of service use (second quarter FY '23) is in Table 2 below:

Table 2: ICORT Enrollment and Service Intensity (Units/Week)

Average Units of Service/week (Second Quarter FY '23)

| Region | # Served/cap | <3 | 3-5 | 6+ |
|---|---|---|---|---|
| 1 | 19/45* | 12 | 7 | 0 |
| 2 | 24/90* | 3 | 7 | 14 |
| 6 | 28/45 | 27** | 1 | 0 |
| 7 | 52/90 | 24 | 26 | 2 |
| 8 | 17/45* | 17** | 0 | 0 |
| 9 | 32/45 | 32** | 0 | 0 |
| 10 | 59/90 | 59** | 0 | 0 |
| 11 | 43/90* | 43** | 0 | 0 |
| 12 | 83/135 | 27 | 22 | 34 |

| 14 | 41/45 | 22 | 8 | 11 |
| Total | 398/720 (55%) | 266 | 71 | 61 |

\*Enrollment <50% of Funded Capacity

\*\*Low frequency of services

We found that about two thirds of the people receiving ICORT services had, on average, two or fewer services per week. On a statewide basis, this is not sufficient. In Regions 2, 7, 12 and 14 more than half of the people receiving ICORT services commendably received 3 or more services per week. In Regions 6 and 9 combined, only one individual received 3 or more services on average. In FY '22 the readmission rate to Hospitals for people receiving ICORT services was 6.4%. This is about 50% higher than the readmission rate for PACT; some ICORT teams are relatively new and monitoring readmission trends is suggested for the future.

Paragraph 8: Intensive Community Support Specialists (ICSS).

Individual ICSS staff work with a small caseload (capped at 20), so they can provide intensive support for some people on their caseload at any time but must juggle the level of support that people need on an ongoing basis. The DMH fidelity scale defines 2-2.99 contacts per week as Level 3 compliance—essentially a passing grade on the item "Frequency of contact." We examined individual level service data for ICSS for this quarter; the results are in Table 3 below:

Table 3: ICSS Enrollment and Service Intensity Units/Week

Average Units of Service/week (Second Quarter FY '23)

| Region | # Served/cap | <1 | 1--3 | 4+ |
|---|---|---|---|---|
| 1 | 44/20 | 32** | 12 | 0 |
| 2 | 22/20 | 8 | 12 | 2 |
| 3 | 61/60 | 7 | 29 | 25 |
| 4 | 15/60* | 1 | 5 | 9 |
| 6 | Region 6 ICSS data missing from this quarterly report | | | |
| 8 | 5/20* | 0 | 5 | 0 |
| 9 | 22/60* | 1**4 | 8 | 0l |
| 10 | 47/70 | 18 | 28 | 1 |
| 11 | 77/100 | 46** | 31 | 0 |
| 12 | 86/120 | 46** | 31 | 9 |
| 14 | 20/20 | 1 | 13 | 6 |
| 15 | 28/20 | 17** | 11 | 0 |
| Total: | 427/570 (72%) | 190 | 185 | 52 |

*Enrollment is <50% of funded capacity

**A majority of individuals received <1 service/week

As the data indicate, almost half of the 427 individuals receiving ICSS services in this quarter had on average less than one contact per week—a level of support that may not be adequate for a number of people receiving this service. ICSS programs delivered on average more intensive services in Regions 2, 3, 4, 10, and 14. It may be that low levels of frequent service are due to staff vacancies; however, this pattern needs attention to reach compliance. The lower frequency of staff contacts with people receiving ICSS services may explain why readmissions to Hospitals from people enrolled in ICSS are higher (7.5% in FY '22) than from PACT (4.1%) or ICORT (6.4%).

Paragraph 10--Peer Support Services. Peer Support Services are defined and requirements for Peer Support Services are listed in Paragraph 10 of the Order. This Paragraph requires these services to be provided at the primary CMHC office in each Region. The Order also requires that by the end of FY 2022, Peer Bridgers (a specialized type of peer support, supporting successful transitions between services) will be in place in each State Hospital. These CMHC and State Hospital positions have all been funded by DMH, but our observations indicate that vacancy rates are high. Additionally, Peer Support Specialists are part of the staff for several team services identified in the order: MCeRT, PACT and ICORT teams.

DMH has also provided funds to each Region to support a Peer Bridger in each CSU, and on a Regional basis to assist with State Hospital discharge planning. These are positive developments and we commend DMH for going beyond the minimum requirements of the Order in supporting Peer Bridgers. Our observations show that Peer Bridgers make a difference in connecting people to care, both at State Hospital and CSU discharge/transition periods and when they may become disconnected from ongoing community care.

In our September 2022 Report we discussed Peer Services in some detail. The observations and guidance in that Report still apply. We did not review Peer Support Services closely during this period. However, we received feedback from Peer Support Specialists in a listening session we conducted at NAMI Mississippi's conference in May. These individuals all voiced concern about what they perceived as inadequate support for their work; dimensions of poor support in their views included salaries that are insufficient for recruitment and retention, and limitations on the work they could perform (in their view the limits imposed by supervisors were below their qualifications and compromised their effectiveness).

These concerns were voiced by a small sample of individuals, but they were consistent with what we previously reported: across the Mississippi mental health system, there is great variability in how leaders in different State Hospitals and CMHC's value and support Peer Support Specialists. This needs review and attention by DMH.

Paragraph 11: Permanent Supported Housing (PSH). This paragraph defines supported housing and requires the State to continue current investments. For FY '24, PSH funding of $300,000 was allocated to Open Doors. In FY '22 a total of 239 individuals received Supported Housing Services. The State (DMH and the Mississippi Home Corporation) has also designated about 400

housing vouchers funded via tax credits for individuals with SMI via the "Mississippi Affirmative Olmstead Initiative."

The funding levels and provision of vouchers meet the minimal expectations of the Order. We have discussed other housing challenges in previous Reports.

Paragraph 12: Medication Access: This paragraph requires an annual allocation of $200,000 for a medication assistance fund to assist people with SMI who cannot afford or otherwise access medication needed to prevent hospitalization. The underlying principle is that since medication treatment is usually essential to manage SMI, access to medications is essential. DMH reports it has distributed $200,000 for FY '22, FY'23 and FY '24. The use of the funds is improving but remains uneven.

Paragraph 13: Diversion from State Hospitals. This paragraph identifies specific actions to be taken by CMHC's during preadmission screening for hospitalization: 1) determining if individuals meet criteria for intensive services (PACT, ICORT, ICSS) and arranging these services as appropriate, 2) considering if a CSU placement in lieu of hospitalization is appropriate, unless State Hospital commitment has already been ordered.

We have noted challenges regarding diversion from Hospitals including weaknesses in CMHC care coordination and the variable practices of Chancery Courts. The results include people being committed to Hospitals without the opportunity to receive Intensive Services or a CSU placement, people being transferred to Hospitals after already being treated in private hospitals, and people being held in jails awaiting beds.

Concern about commitment related issues led to the creation of a position of Court Liaison in Region 12 to bridge the relationship between courts and the mental health system. Based on this, DMH provided funds for 7 Court Liaison positions in FY '23 and set aside federal (ARPA) funds for 18 additional positions (just released in FY '24). Funding related to House Bill 1222, which we discuss under Paragraph 19, will provide 8 additional positions in FY '24. Considering all funding sources, 33 positions will be funded in all Regions, generally serving larger counties. The goals are to make the mental health system more navigable, to connect people with community-based services and to decrease commitments to Hospitals.

The Court Liaisons will focus on individuals who interact with the court system involuntarily and with law enforcement. They will facilitate access to services that can prevent unnecessary institutionalization (e.g., PACT, ICORT and ICSS) and should improve collaboration between CMHCs, their crisis systems, law enforcement agencies and courts. They will educate staff and families seeking mental health treatment about services. DMH created a statewide Clinical Diversion Coordinator position to support and coordinate these activities.

DMH provided the data below for the FY '23 results of this program in the initial 7 Regions:

| FY '23 Measures for Initial (7) Court Liaison Positions | Total Reported |
|---|---|
| Referrals from Chancery Court | 997 |
| People served by Court Liaison | 1,363 |
| Assessment interviews conducted with affiants | 732 |
| Contacts with law enforcement personnel | 638 |
| People diverted from placement under a writ or involuntary commitment process | 880 |
| Referrals to CSUs | 467 |
| Referrals to PACT | 31 |
| Referrals to ICORT | 31 |
| Referrals to ICSS | 7 |
| Individuals waiting for admission to the Forensic Unit at MSH | 25 |
| Number admitted to Forensic Unit at MSH | 2 |
| Jail Administrators contacted | 341 |

The initial results are promising and align with the requirements of the Order. As the effort is implemented more broadly it should lead to better coordination of the commitment process and use of Hospital alternatives, as well as to better data collection that will allow improved monitoring of diversion from Hospitals and of the commitment process. The impact on Hospital commitments and jail holds remains to be seen, and the Monitoring Team will evaluate this as the program is more fully implemented.

Paragraph 14: Connecting individuals with serious mental illness to care. This paragraph refers to a specific group of 154 individuals whose care was reviewed by DOJ experts prior to trial in this case. DMH worked with CMHCs to attempt to locate the 154 individuals with SMI that DOJ experts had interviewed and assessed prior to trial. Where individuals were located, CMHCs were to "conduct assertive outreach, as appropriate, to engage persons in treatment…and offer them Core Services which are appropriate and for which they are eligible."

As we reported in March, the State has conducted the activities required under Paragraph 14. The project revealed weaknesses in care coordination, but it was completed.

Paragraphs 15, 16, 17 Discharge Planning. Paragraphs 15, a-h; Paragraph 16 and Paragraph 17 provide the performance elements for discharge planning:

- Discharge planning begins within 24 hours of admission to a State Hospital, and will:
- Identify the person's strengths, preferences, needs and desired outcomes.
- Identify the specific community-based services the person should receive upon discharge
- Identify and connect the person to the provider(s) of the necessary supports and services
- Refer the person to PACT or ICORT when eligible
- Include, where applicable and appropriate, assistance to the person in securing or re-activating public benefits

- Prior to discharge, coordinate between the State Hospital and the community provider so that, upon discharge, the person continues to receive prescribed medications in the community appropriate for the person's ongoing clinical needs.
- Identify resources for the person to access in the event of a crisis and educate them about how to access those services
- Records include an anticipated discharge date.
- For discharge plans for persons who have previously been admitted to a State Hospital within a one-year period, review the prior discharge plans, the reasons for the readmission and adjust the new discharge plan to account for the history of prior hospitalizations.
- Prior to discharge from the State Hospital, staff of the CMHC that will be serving the person upon discharge will meet with the person, either in person or via videoconference, to conduct assertive engagement and enroll persons in appropriate services.
- Peer Bridgers at each State Hospital are integrated in the discharge planning process.

In FY '23, DMH established a Department of Utilization Review (DUR) to perform chart audits at Hospitals to monitor their discharge planning. The DUR director has compliance and survey experience and the office now has two additional staff, one with Hospital experience and one with community mental health experience. As we described in our March '23 Report the DUR provided in-service training to the Hospitals on the discharge planning requirements of the Order. Additionally, they promoted use of the discharge planning forms used at South Mississippi State Hospital (SMSH) which that Hospital had developed based on the Order. Then the DUR developed a checklist based on requirements of the Order and began to use the form to conduct audits.

These reviews are now completed quarterly at each Hospital. The DUR requests lists of individuals who have been discharged within the previous quarter, and of individuals readmitted within one year of their discharge. A sample of 5% of the individuals discharged in the prior quarter and all individuals readmitted is selected for review in an on-site inspection of records. Upon completion of the quarterly audit, the DUR prepares an Audit Feedback Review for each State Hospital. This review provides the results of the audit, a comparison to the prior quarter and an indication of whether the performance remains the same, increased or decreased. This information is shared with the State Hospital Director and other designated staff.

In this monitoring period, the Court Monitor Team observed the DUR audits conducted at the Hospitals (except for EMSH, where the review was being conducted as this Report is written). Based on our review, the DUR approach is a useful way to assess discharge planning and measure compliance. We observed that expectations for discharge planning and the forms used to record it are more uniform. We did observe that use of standardized forms without additional training leads to some mechanical recording of information (e.g., of individuals' strengths, preferences and needs or whether they need PACT or ICORT services) that is not individualized and therefore not especially useful in treatment and discharge planning.

We have made some recommendations for the DUR team, including some improvements in sampling, and that they consider use of the "tracer methodology" to follow up on CMHC care of people discharged--especially of individuals who were readmitted. As the Order notes, treatment

and support for people who are readmitted should be evaluated and adjusted if needed. However, it is often the community care that needs to be changed to keep individuals engaged in care, rather than just changed treatment during the Hospital stay followed by care after discharge that fails to keep people engaged.

In our visits to the Hospitals to observe the DUR process, we conducted our own chart reviews of discharge planning and found them consistent with the DUR team's results. We were able to see patterns of discharge planning and make general observations about the patterns. The primary purpose of our visits was to review the DUR process itself, and we did not review enough records to make definitive compliance findings. But we do see improved performance that will, with continued efforts, result in compliance with discharge planning requirements and better outcomes for people in care.

<u>Mississippi State Hospital.</u> We reviewed ten records of persons discharged from MSH during the third quarter (April, May, June). Based on our review of the records, we noted improvement in discharge planning, summarized below;

- Discharge planning begins within 24 hours as evidenced by Social Services Notes documenting contact with the Community Mental Health Center and the family on the day of admission.
- The person's strengths, preferences and needs are documented more consistently. However, they are not sufficiently person-centered, or related to the person's condition, treatment, and recovery.
- In most records appointments for specific community-based services have been identified.
- In most records checklists indicate that persons were referred to PACT, ICORT or ICSS however intakes for these services and appointments for follow-up visits may not have been identified.
- In most cases there was evidence that the Community Mental Health Center met with the individual prior to discharge in person or virtually but this did not necessarily include a completed intake or active engagement in needed follow-up services.
- In all cases individuals were given contact information for places and people to contact if they experienced a crisis.
- In most cases there was an anticipated discharge date. The discharge date was a range of time and not a specific date.
- In two records of individuals who were readmitted there was no evidence of a review of the prior discharge plan and changes in treatment.
- For most records from the female receiving service there was evidence that the Peer Bridger participated in the discharge planning process. There was not a Peer Bridger on the male receiving service.



<u>North Mississippi State Hospital.</u> Six records of persons discharged from North Mississippi State Hospital during the third quarter (April, May, June) were reviewed. Based on our review of the records, there is some improvement in meeting the discharge planning performance requirements as shown in the following observations and the chart below.

- Discharge planning begins within 24 hours as evidenced by Social Services Notes documenting contact with the Community Mental Health Center and the family on the day of admission.
- In most cases there was no documentation of the strengths, preferences and needs of the individual. In some cases, the documentation was "none noted" or staff observations, not the patient's. As NMSH staff begin to ask for and include this information, they should gather it in a fashion that facilitates improved treatment, better adherence to treatment recommendations, and better connections with post-hospital care.
- In most records there was evidence that appointments for specific community-based services were identified for the individual on discharge.
- In most records there was evidence that persons were referred to PACT, ICORT or ICSS. The rationale for identifying the needed Intensive Services was not always clear, and the services recommended on discharge were not always consistent with these recommendations.

- In most cases there was some evidence that the Community Mental Health Center met with the individual prior to discharge in person. At NMSH, case managers and Peer Bridgers (if there is one on staff at the CMHC) come to the hospital to meet with the Social Services Staff weekly. Usually, the case manager and Peer Bridger will visit with the individual on the unit during this visit. However, these visits and contacts were not always noted in the medical record, so we cannot tell if people were engaged in needed services or if intakes were completed to facilitate continuity of care.
- In all cases individuals were given contact information for places and people to contact if they experienced a crisis.
- In most cases there was an anticipated discharge date. The discharge date was a range of time and not a specific date.
- We reviewed one record of an individual who was readmitted; there was no evidence of a review of the prior discharge plan and a change in the current treatment or discharge plan.
- In most cases there was evidence that Peer Bridger was present at the hospital. The Peer Bridger works under the Psychology department and conducts A&D groups and works with individuals to complete a Wellness Recovery Action Plan (WRAP). This is a valuable effort; WRAP is known to facilitate recovery. However, the efforts of the Peer Bridgers and the WRAP itself are not adequately integrated into treatment planning and the medical record.



South Mississippi State Hospital Seven records of persons discharged from SMSH during the third quarter (April, May, June) were reviewed. Based on our review of the records, SMSH remains consistent in meeting the discharge planning performance requirements as shown in the following observations and the chart below.

- Discharge planning begins within 24 hours as evidenced by Social Services Notes documenting contact with the Community Mental Health Center and the family on the day of admission.
- The person's strengths, preferences and needs are documented consistently. They are person-centered and individualized.
- In all cases there was evidence of appointments for specific community-based services identified for the individual to receive after discharge.
- In most cases checklists indicate that persons were referred to PACT, ICORT or ICSS although intakes for these services may not have been completed. A high percentage of individuals admitted to South Mississippi State Hospital have a substance use disorder. Referrals are made for substance use disorder treatment.
- In all cases there was evidence that the CMHC staff met with the individual prior to discharge in person or virtually.

- In all cases individuals were given contact information for places and people to contact if they experienced a crisis.
- In all cases there was an anticipated discharge date.
- In two records of people who had been readmitted, the documentation did show evidence of a change in the discharge plan because of the review of the prior discharge.
- In all cases there was evidence that Peer Bridger was integrated in the discharge planning process.



At the end of each audit, the Court Monitor Team and the DUR staff discussed findings and found consensus on patterns of compliance. We noted the use of the recommended forms by staff at MSH, contributing to improved performance. At MSH and NMSH, the discharge planning information was not completed in some records. For MSH and NMSH as  we noted above, the documentation of individual's strengths, preferences and needs was pro forma and not utilized in the treatment plan which is therefore not sufficiently person centered.

We will summarize our compliance observations in the next section of this Report. We did not review a sufficient number of records, or records at EMSH, to allow definitive compliance findings. However, the observations we made indicate the Hospitals are beginning to achieve compliance  with most requirements of the Order for discharge planning. The requirements where more improvement is needed to achieve compliance include:

- Identification of individuals' strengths, preferences and needs (to inform and personalize treatment planning; SMSH does this well).
- Referral for Intensive Services (PACT, ICORT, ICSS), and connecting individuals to these services where recommended on discharge. Ideally, complete CMHC intake during the hospitalization to smooth the transition to community care.
- Review of care for people who were readmitted (to include a review of CMHC care after the prior discharge) and adjustments in the discharge plan if needed.
- Personal contact of people while hospitalized by CMHC staff to make a personal connection and engage people in needed services.

The improvements in discharge planning are commendable. We note that the areas listed above, where continued improvements are needed, are among the most consequential requirements for good Hospital care, effective discharge planning and increased community tenure.

Paragraph 18: Technical assistance to Chancery Courts: This paragraph requires the State to provide Chancery Courts in each county with an annual overview of available mental health services, including alternatives to civil commitment to Hospitals. DMH staff held meetings with Chancery Courts to provide information about the community treatment services available through the CMHC in their Region to individuals with SMI. Meetings were held in 17 of the 20 Districts.

As we noted previously, given the decentralized role and diversity of chancery court operations and relationships with CMHCs, increasing the consistency of court commitment activities in Mississippi is challenging. The requirements of this paragraph provide a necessary but insufficient framework for this. Court Liaison staff will help individuals and families as they navigate commitment and make these processes more transparent and consistent. Additionally, House Bill 1222 strengthened data keeping and reporting requirements for Chancery Courts via the following provisions:

- When admission to a treatment facility is ordered by the court, the chancery clerk shall make a record of the admission. Each chancery clerk shall maintain a record of the number of persons ordered by the court to be admitted to a treatment facility, the number of hearings held by the court to determine whether a person should be admitted to a treatment facility and the number of affidavits filed to admit a person to a treatment facility under Section 41-21-61.

- The chancery clerk shall maintain a record each time such clerk receives a denial for admission to a community mental health center crisis stabilization bed, the reason provided to the clerk for such denial, and the subsequent action taken by the clerk upon receiving the denial.

- Each chancery clerk shall provide the records required by paragraphs (a) and (b) of this subsection (2) to the Department of Mental Health within thirty (30) days of the end of each calendar quarter. Within sixty (60) days of receipt of the chancery clerk records, the Department of Mental Health shall provide a summary to the Chairpersons of the Appropriations, Public Health and Judiciary A and B Committees for the Mississippi House

of Representatives and the Mississippi Senate, the Coordinator of Mental Health, and the President of the Mississippi Association of Community Mental Health Centers.

These requirements, the data collection and reporting and the resources dedicated to improving commitment processes will allow improved oversight of hospital diversion and commitments.

Paragraph 19: Technical assistance and training to providers: This Paragraph requires the State to provide technical assistance and training to providers, with an emphasis on activities conducted by individuals with experience in implementing Core Services. In our September 2022 Report we reviewed the extensive but incomplete training that DMH provided in FY '22. In our view, those efforts adequately addressed training for Peer Specialists, but training for other staff was uneven. In March 2023 we reported on other DMH training efforts and requirements including the DMH credentialing process for mental health therapists. This is a solid general program for the positions it covers:

- Mental Health Therapist
- IDD Therapist
- Community Support Specialists
- Addictions Therapists
- Licensed Administrator

For staff in other disciplines (including Physicians, Nurse Practitioners, Nurses, Clinical Social Workers, and Licensed Professional Counselors) DMH facilities and CMHCs simply accept professional credentials issued by State or National credentialling entities, as well as evidence of compliance with their continuing education requirements. These credentials do not consistently provide competence in working with people with SMI, or knowledge of evidence-based and Core Services, There is currently no credentialing process for mental health direct care staff (as there is for IDD direct care personnel). These individuals interact on a regular, often daily, basis with people with SMI in settings such as CSUs and group homes.

DMH has managed training requirements largely by delegating responsibility to CMHCs and subscribing to a national mental health training system (Relias). Each CMHC is required to develop an Employee Training Plan (Rule 12.2 and 12.4). In the past there was no requirement that the plan include a focus on interventions for individuals with SMI or address evidence-based practices (EBP). To respond better to requirements of the Order, DMH developed several courses specific to PACT and ICORT and reviewed training materials available nationally from SMI Advisor, a SAMHSA funded on-line training program developed by the American Psychiatric Association. In March, 2023, DMH notified each CMHC Executive Director of new staff training requirements to be met during FY '23.  The requirements include the PACT and ICORT trainings developed and provided by DMH, and a range of other training courses from SMI Adviser.

The CMHCs reported a total of 685 course completions by CMHC employees (some staff take more than one course), summarized below:

| CMHC Employee Core Services Course Completion - FY 2023 | | |
|---|---|---|
| **Core Service** | **Course Name** | **Total Participants** |
| Mobile Crisis Teams | Peer Support Engagement Skills on Mobile Crisis Teams - SMI Adviser | 99 |
| Crisis Residential Services (CSU) | Expanding the Evidence Base for the Crisis Care Continuum: Call Centers, Mobile Teams, and Stabilization Units-SMI Adviser | 170 |
| PACT/ICORT | PACT/ICORT and Mississippi's System of Care-DMH | 85 |
| Intensive Community Support Services/ Specialists (ICSS) | Care Transition Interventions That Facilitate Connections with Community Providers and Decrease Hospital Readmissions-SMI Adviser | 48 |
| Permanent Supported Housing | Supportive Housing for Homeless Adults with Serious Mental Illness: How Does It Work?-SMI Adviser | 31 |
| Supported Employment | IPS Supported Employment: Impact of the COVID-19 Pandemic on Implementation and Outcomes, and Implications for the Post-COVID Era-SMI Adviser | 33 |
| Peer Support Services | Implementation of Peer Support Specialists in Mental Health Centers-SMI Adviser | 79 |
| Community Support Services (CSS) | Continuity of Care in Coordinated Specialty Care (CSC): Federal and Programmatic Perspectives-SMI Adviser | 140 |
| **Total** | | **685** |

Additionally, DMH reports that, during FY '23,

- 115 individuals were awarded the DMH Certified Mental Health Therapist (CMHT) credential. The certification examination includes 2 courses in the adult mental health core service areas of peer support and crisis response.

- 46 individuals were awarded the DMH Certified Community Support Specialist (CCSS) credential. The web-based exam/training component includes courses on the adult mental health core service areas of community support, crisis response, and assertive community treatment.

These developments show progress toward meeting the requirements of Paragraph 19. The training delivered through SMI Advisor is responsive to the requirement for training delivered by individuals with experience in Core Services. However, the reports of courses completed, while a substantial improvement, do not identify the proportion of people providing Core Services who received training and therefore does not allow us to assess impact or assign a finding of full compliance. The adequacy of technical assistance to supplement training (e.g., to assure that leadership staff are familiar with the requirements of Core Services) is not clear, and we will attempt to assess this further.

Paragraphs 20 and 21: Data collection and review: These paragraphs require monthly collection, review, and analysis by the State of detailed data on crisis services, civil commitments to and long term stays in State Hospitals, and Core Service levels by county and region for both DMH and Medicaid. Most of these responsibilities rest with DMH, which has devoted considerable efforts to working with the CMHCs on data collection during FY '22 and FY '23. Paragraph 24 (below) requires posting of this data on agency websites beginning at the end of FY22.

DMH has made substantial efforts to improve data collection:

- During FY '22 and FY '23 DMH spent considerable time and energy working with the CMHC's on data collection. Previously, data on local service delivery was variable and unreliable and insufficient for accountability. DMH worked intensively with each CMHC on data quality and began to post additional data on the Olmstead page of its website (see https://www.dmh.ms.gov/news/olmstead/ ).
- These DMH efforts and the report listed above provide information on the number of people served in each Region and County in each Core Service.
- Paragraph 21 of the Order requires "By the end of FY22, Mississippi will begin collecting, reviewing, and analyzing — on a monthly basis — person-level and aggregate data capturing the number of units of each Covered Core Service reimbursed under DMH grants, excluding Purchase of Service grants." During FY '23 DMH began reporting this information to the Monitor; it was used to evaluate the frequency of Intensive Services discussed earlier in this Report. The information is comprehensive. The parties conducted a joint conference in August to review this data collection.

Data collection and analysis to improve performance has been significantly improved but remains challenging. Inconsistent and, in some cases, outdated Electronic Medical Records (EMR's) and billing systems in CMHCs are still problematic, affecting quality of care and efficiency of operations. In FY '22 the Office of the Coordinator of Mental Health Accessibility with DMH secured an appropriation to improve CMHC EMR's. The project is still being reviewed by Information Technology and procurement staff in Mississippi government. Once it proceeds, it will be a complex and challenging multi-year effort, affected by the complexity of

interagency and State-Local relationships, the diversity of CMHC operations, and the fragmented nature of the marketplace for CMHC EMR's.

The Division of Medicaid in FY '22 began producing and sharing monthly reports on the Core Services it reimbursed. A DOM switch to a new data provider meant it could not provide these required reports to the Monitor during most of FY '23. However, DOM has now resumed providing the required and requested reports.

Paragraph 22: CMHC compliance on Standards and Fidelity: This paragraph requires an annual review by the State of CMHC performance on compliance with DMH Operational Standards and on fidelity with DMH expectations (for Core Services where fidelity is measured). DMH has conducted the necessary reviews and provided this data to the Monitor.

Paragraph 23: Clinical Review (stayed by Order of the Court)

Paragraph 24: Website posting of information and data for Paragraphs 19-21: This paragraph requires the posting of the data described in these Paragraphs on agency websites (and provided to the DOJ and Monitor). As noted above, DMH posted most information on its website. See: https://www.dmh.ms.gov/news/olmstead/ Information on Paragraph 21 was posted in February 2023. The Monitor is not aware that DOM is posting mental health services information.

Paragraphs 25 and 26: Implementation Plan (stayed by Order of the Court)

Paragraphs 27 and 28: Termination and Monitoring: Monitoring requirements were laid out in a separate Order of the Court; Termination of the Court's oversight is dependent on compliance with the Paragraphs above.

<u>Compliance Findings in U.S. v. MS.</u>

Here we outline the compliance status of the State for each requirement of the Order, based on the observations in the prior section of this Report.

| Paragraph, Key Issues | Summary of Compliance Findings |
|---|---|
| | |
| 1--**State must reduce unnecessary Hospital use via adequate and appropriate services.** | Paragraph 1 provides an overarching statement of expectations in the Order. Regarding these expectations, we observe:<br><br>State Hospital use (admissions, census, people with long stays) has been reduced over time. Some reductions were due to the pandemic and to staffing challenges. Now, to improve access the State is conducting a substantial expansion of beds— via reopened units at East Mississippi State Hospital and Mississippi State Hospital and in CSU's. The reopened units have resulted in increased admissions over the second half of FY '23. There are still delays in accessing CSUs and State Hospitals but FY '23 data suggests delays have been reduced. Some people (who have not been charged with a crime) wait in jails for State Hospital beds that are frequently occupied by people who were committed and transferred from private hospitals where they were already receiving care. Recent data also suggest some progress on reducing jail holds; people are still held in jails but for shorter periods.<br><br>The system is not yet functioning efficiently to determine who could be stabilized in community care and who needs Hospital care. The transfers from other hospitals and priority on admitting people from jails means these individuals very seldom get CSU care. Investments in Court Liaisons and data collection mandated by House Bill 1222 should help improve matters.<br><br>DMH has released funding for all the services listed in the Order, including funds for some Core Services (Mobile Crisis, CSU's) that go beyond levels required in the Order. There has also been expansion, beyond the levels required by the Order, of CMHC staff to assist with diverting people from criminal justice and State Hospital settings, and of Peer Bridgers.<br><br>Access to acute care is also dependent on private facilities; more people are hospitalized in general hospital psychiatric units and private psychiatric hospitals than in State facilities. During this period, there were significant reductions in private hospital beds when St Dominic closed its psychiatric unit in Jackson, which was licensed for about 75 beds. Regional dislocations also have occurred, e.g., a decision by Merit Health to move a 50-bed psychiatric facility from Vicksburg to Jackson, which may reduce access to care for people in Region 15.<br><br>Establishing Core Services as required accomplishes the first element of compliance; this has been done. Verifying the quality of those services is accomplished via reviews of their fidelity to national or State standards. We indicate in this Report that DMH does a good job with this. Finally, data review to show that people are being served as intended |

| | |
|---|---|
| | is a final crucial element. In this Report, we studied data on important Core Services (PACT, ICORT, ICSS) providing intensive community care, finding a mixed picture. Some services are functioning well in some Regions, but in others enrollment is low or services are not intensive. Addressing these patterns will allow compliance to be achieved for these services. For crisis services, data will be available and we will examine it in FY '24.<br><br>To summarize, many elements of needed care have been put in place. Now the challenge is to make it work.<br><br>PARTIAL COMPLIANCE |
| 2--**CMHC's** …(are) "responsible for preventing unnecessary hospitalizations" A) ID individuals with Serious Mental Illness (SMI) who need services B) screen people with SMI in care for need of core services C) Coordinate care D) Divert from SH via care | There is a great deal of variability among CMHC's. Some of this variability reflects local adaptation to different regional characteristics (e.g., rurality, poverty). However, some of the variability affects the availability and adequacy of services. In previous Reports, we found that people are often readmitted after becoming disconnected from care and not re-engaged, that alternatives to hospitalization are not always considered and that some people wait in jail for State Hospital beds.<br><br>The State established procedures for the Coordinator of Mental Health Accessibility (housed in the Department of Administration and Finance) to evaluate, and if needed to dissolve/merge financially troubled Regions. This was done in the past year with former Region 1 merged with Region 6, and former Region 11 dissolved, with 5 counties added to Region 12 and 4 counties added to Region 15. Provisions to assess the ongoing financial viability and overall functioning of CMHC's are not as clear. The mergers averted the overall failure of services in the Regions that were consolidated/dissolved but also impose significant local management challenges.<br><br>Statewide, care of people on discharge from State Hospitals has improved (e.g., people are regularly discharged with medications and with a follow-up appointment). However, there are still problems and inconsistencies. For example, many of the individuals who are hospitalized do not get a (face to face or video conference) visit from their CMHC before they are discharged. Some people who miss scheduled post-hospital appointments get good follow-up outreach and are re-engaged in care, while others may be "lost to care" after inadequate follow-up. In previous Reports, we described how key compliance metrics—such as CMHCs contacting hospitalized clients, clients completing initial visits after discharge, and CMHCs providing adequate follow-up/engagement efforts—were met about half of the time.<br><br>In this Report, our study of data on Intensive Services found that a number of programs in various Regions had enrollment less than 50% of funded capacity. Improved use of Intensive Services via better management of referrals to these programs is needed.<br><br>PARTIAL COMPLIANCE |
| 3--State has adopted **Core Services.** | Statement of fact, not a Compliance requirement. |

| | |
|---|---|
| **4--Mobile teams**: A) defined, Op. Std. 19-19.4 cited B) "1 team/region" (2 in 12) C) maintain hotlines, assist w stabilization, help connect to care, work with law enforcement, seek to coordinate with 911 D) state monitors response time | DMH has provided grants for Mobile Crisis services to all Regions and has now awarded an additional $1.4M in federal funds to help stabilize staffing; we previously found elevated levels of staff vacancies in some Mobile Crisis programs. DMH implemented a new Mobile Crisis reporting system during FY '23 and we look forward to reviewing results.

During FY '23 (effective 7/16/2022) a single new national 3-digit number for mental health crisis and suicide prevention (988) was introduced, and for the first time substantial federal resources to support crisis call centers has been provided. Mississippi has worked to build in-state capacity to manage 988 calls (over 95% of calls are answered in the state which is superior performance) and collaborated with stakeholders including law enforcement and 911 system operators. The data DMH is now collecting should show how effectively 988 call services are connected to regional crisis services.

DMH has developed and implemented a sound framework for measuring performance (fidelity) of Mobile Crisis services and has conducted Fidelity Reviews in all Regions. During this period, the Monitor observed these reviews in Regions 6 and 12; they were carefully and collaboratively conducted. Given improved DMH data collection on Mobile Crisis services we will be in a much better position to assess statewide compliance during FY '24.  We do not yet know if the improvements have addressed weak points in crisis response (e.g., mobile visits after hours and services to outlying areas) are improved.

PARTIAL COMPLIANCE |
| **5--Crisis Stabilization Units** A) Defined, Op. Std. cited B, C) To be funded in each Region (including 12 beds in Region 11 by end 2022) and sustained. D) Region 15 can use other CSU's E) State monitors including diversion rates and admissions bypassing CSU's | DMH has provided grants for CSUs to all Regions except Region 15. Effective July 2023 Region 15 absorbed four counties from Region 11, including its 12 bed CSU—where services were temporarily curtailed in July 2023 due to transition challenges. During FY2022 DMH awarded $400,000 in additional funding to each CSU to enhance security and/or clinical staffing, with the aim of reducing denials of access. The State is now finalizing release of $6.4M annually for the next 4 years in federal resources approved by the Mississippi Legislature to expand CSU's. DMH is awarding this funding to several Regions with smaller (8 or 12 bed) CSU's, to increase capacity up to 12 or 16 beds, and to open additional 16 bed CSU's in Regions 8 and 9. Resources to support a 12 bed CSU funded with DMH general fund resources are available to DeSoto County (Region 4).

Statewide data has previously shown that less than 10% of individuals admitted to a CSU are transferred to State Hospitals, which is a marker of success. However, there are delays or denials of admissions to CSU's, most people admitted to State Hospitals are not served at CSU's (including individuals committed/transferred to State Hospitals from private hospitals and jails) and people not charged with crimes are still being held in jails awaiting treatment. DMH has put some relevant performance metrics for CSU's in place in FY '24.

PARTIAL COMPLIANCE |
| 6-PACT. Defined. Op. Std. 32.1-32.8 cited. | PACT teams are now funded in all the Regions required in the Order. DMH reports that 16 people being served by PACT teams were readmitted to State Hospitals in FY21,and |

| | |
|---|---|
| A) MS will sustain 10 teams (see Exhibit 1 of Order for regions/ counties served) B) MS will conduct fidelity reviews, submit scale with Implementation Plan (STAYED) | 31 in FY'22 (we do not at this time have FY '23 data). This is a marker of the program's effectiveness.<br><br>Fidelity reviews of PACT programs are conducted by DMH. DMH obtained expert consultation on conducting reviews and continues to improve its monitoring. The Court Monitoring Team participated in reviews of several PACT teams during this monitoring period; the reviews were competently done and the programs functioning adequately.<br><br>Utilization of PACT has improved since the time of trial, with the State reporting 674 individuals served in FY21 and 740 served in FY '22. Our review of PACT team data for this Report found adequate enrollment in most Regions, but very low (<50% enrollment) in several Regions. Additionally, teams in several Regions were not delivering sufficiently intensive services. Achieving acceptable levels of enrollment and service is necessary to achieve compliance.<br><br><br>PARTIAL COMPLIANCE |
| 7==ICORT. Defined, Op. Std. 32.9-32.13 cited. A) 16 teams per Exhibit 1. Teams will meet 32.9-13 B) Fidelity scale, reviews | DMH has provided funding to support all the 16 ICORT teams identified in Attachment 1 of the Order. All teams are now operational. DMH reports 23 people served by ICORTs were readmitted to State Hospitals in FY21, and 39 in FY '22, This small number of readmissions is a positive indication of effectiveness.<br><br>DMH is conducting fidelity reviews of ICORTs and used the expert consultation on conducting PACT reviews obtained in the Fall of 2022 to make improvements in the ICORT Review process. The Court Monitoring Team participated in fidelity reviews during this reporting period; they were conducted professionally and effectively.<br><br>The monitoring team reviewed data on ICORT services from the second Quarter of FY '23 to assess if teams are serving individuals as intended. Teams in several Regions were providing services for fewer than 50% of the funded capacity, and in a number of Regions the ICORT teams were not delivering sufficiently intensive services. Addressing these issues is necessary to achieve compliance for ICORT services.<br>.<br>PARTIAL COMPLIANCE |
| 8--Intensive Community Support Specialists. Defined. Op. Std. 32.18 cited. A) 35 ICSSs to be funded, sustained B) Meet criteria of Op. Std. 32.18 | DMH has made available the funding to support all the Intensive Community Support Specialists identified in the Order. A reported 938 individuals were served in FY '21 and 1054 in FY '22.<br><br>DMH is conducting fidelity reviews of ICSS. The Court Monitoring Team participated in several DMH ICSS reviews in 2023 to assess the service's effectiveness at preventing hospitalization. We found that the reviews were conducted professionally and effectively.<br><br>For people who received ICSS services  in FY '22, 79 (7.5%) were readmitted to State Hospitals. This is a higher readmission rate than for people served by PACT or ICORT. When we reviewed data on individuals served by ICSS we found that programs in some Regions were serving fewer than 50% of the individuals of their funded capacity. We also found that many individuals were receiving less than one contact per week; an average |

| | |
|---|---|
| | service level of 2-3 contact per individual per week is deemed to be an acceptable performance.<br><br>Addressing these issues is needed to achieve compliance for ICSS services.<br><br>PARTIAL COMPLIANCE |
| 9--**Supported Employment**— IPS/VR. Defined, Op. Std. Cited<br>A) Each Region will provide SE by either IPS or VR collaboration<br>B) IPS to be sustained or developed by end of FY 22 in Regions 2,4,7,8,9,10,12<br>C) IPS meets Op. Std. 24.4-6<br>D) In other Regions, SE offered by ES Specialists with an MOU with MS Div. Rehab Svces<br>E-F) Fidelity to be measured.<br>G) State to submit scales with Implementation Plan--STAYED | DMH has provided funding to support Individual Placement and Support (IPS) services in 7 Regions, and to support a VR Supported Employment specialist in the other Regions.<br><br>DMH is conducting fidelity reviews of Supported Employment programs and obtaining expert consultation on conducting reviews; the Court Monitoring Team assessed the DMH fidelity reviews in FY '23 and found them to be conducted professionally and effectively.<br><br>During FY '22, 533 individuals received Supported Employment services. In reviewing the number of individuals receiving services by county, we found that in over half of Mississippi's counties, no one received Supported Employment. Improving access is needed to achieve compliance with Supported Employment services.<br><br>DMH has applied for federal funding to upgrade non-IPS Supported Employment sites to IPS which would improve access and quality.<br><br><br><br><br><br>PARTIAL COMPLIANCE |
| 10--**Peer Support Services** (PSS)<br>A) State to sustain PSS at the primary CMHC office in each Region<br>B) Plan to implement PSS at other offices (stayed)<br>C) Peer Bridgers at all Hospitals | DMH has provided funding for the Peer Support Service positions identified in the Order and has provided additional funding to each Region to support a CMHC Peer Bridger position and CSU Peer Bridgers to focus on transitions from acute care (State Hospitals, CSU's) to community care.<br><br>In our September 2022 Report, we described a limited study of Peer Support Services in Regions 2 and 3, which we observed as having a good understanding and commitment to Peer Support Services. We observe variability in how Peer Support Specialist positions are filled and how peers are utilized. Feedback from some Peer Specialists indicates that there are persistent challenges including  compensation, and in some CMHC's a failure to allow Peer Specialists to fully utilize their skills and experience. We conclude additional |

| | |
|---|---|
| | efforts (leadership, technical assistance) are needed statewide and in some CMHCs to enable adequate use of peers and will review this in FY '24.<br><br>PARTIAL COMPLIANCE |
| 11--**Permanent Supported Housing**<br>A) $150k to assess State Hospital and Crisis Stabilization discharges who: >90 days in SH, are/were homeless, lived in unlicensed boarding home prior to admission, or have another CSU/SH admission<br>B) addl capacity (STAYED) | DMH has made the funding required by the Order available. Chart reviews we conducted in prior periods of people admitted to/discharged from State Hospitals show that in most cases people are not being held in the Hospitals because no housing is available—but on the other hand we observed discharges to housing arrangements that were suboptimal (e.g., back to families where conflict may have precipitated prior admissions, or to Personal Care Homes in distant Regions). We have found that individuals with IDD and others with complex needs are often detained Hospitals for long stays because of a lack of adequately structured community living programs that can meet their needs.<br><br>Statewide, the number of referrals to Supported Housing is limited because the capacity is limited. DMH has recently made significant attempts to improve access to Supported Housing by working to secure better access to 400 additional vouchers funded by tax credits.<br><br>In FY '22 a total of 239 individuals received Supported Housing Services; this is about .1% of all individuals receiving Core Services. As this Report is written, we do not have final FY '23 data.<br><br>PARTIAL COMPLIANCE |
| 12--**Medication Access**: $200k provided to CMHCs | DMH has allocated the funds in FY '22 and FY '23. CMHC utilization of the funds continues to be uneven.<br>.<br>The Monitoring Team noted various issues and successes with respect to Medication Access. We did not examine use of clozapine—the most effective antipsychotic—during this monitoring period as data from DOM was not available. Previously, we found that some CMHC's do not make clozapine available.<br><br>Our previous Hospital record reviews did note significant use of long acting, injectable (LAI) antipsychotics, widely believed to increase stability and reduce readmissions. care.<br><br>FY '23 Medication Access resources were not utilized fully by many Regions.<br><br>PARTIAL COMPLIANCE |
| 13—**Diversion from State Hospitals**<br>--during Pre-evaluation screening, consider if ICSS's are appropriate, offer if needed | Data we reviewed this period, and interviews and record reviews conducted previously indicated variable processes across CMHC's to assess the need for PACT, ICORT, or ICSS and to connect people to these services. The Order calls for consideration of these intensive services to avoid unnecessary institutionalization (e.g., during Pre-evaluation Screening—although considering mobile and more intensive services earlier when people are not engaged in care may be necessary).<br><br>The variability in whether ongoing care coordination and Pre-evaluation screening address these issues suggests a need for a protocol defining CMHC responsibilities to |

| | |
|---|---|
| --during process, consider all civilly committed for Crisis Residential unless commitment has been ordered by court | coordinate care, and monitoring processes like that which DMH has introduced for Discharge Planning.<br><br>DMH is addressing these issues through funding of Court Liaison positions; Legislative action in House Bill 1222 has also tightened Chancery Court reporting of commitment processes.<br><br>PARTIAL COMPLIANCE |
| 14--**Connecting the 154** (Individuals whose care was reviewed by DOJ experts prior to trial) to care:<br>--US info to MS<br>--MS provide info to CMHC's with funding to:<br>A) Outreach for engagement<br>B) Screen for Core services, document, offer as appropriate | As we indicated in our March 2023 Report, DMH worked with CMHCs to complete this project. We summarized the results as follows:<br><br>    • Of the 154 individuals, a dozen were deceased. This is a substantial number, reflecting the national pattern of premature mortality for individuals with SMI.<br>    • Of the 142 remaining, the largest number (49) were engaged in care. Most were receiving traditional outpatient services such as medications and counseling. Fewer (about 10) were receiving the Intensive Core Services discussed in the Order.<br>    • About 15 were in Hospitals when they were located, suggesting whatever community care they received was inadequate to prevent readmission.<br>    • About 36 of the 142 surviving individuals were not able to be located at all, and for about 29 additional individuals their status is simply unclear (for example, the Region noted the individual missed appointments and was discharged without an expectation of follow-up,  or that the individual was in another Region).<br><br>The project was completed. However, it revealed substantial problems with care coordination, and engagement of people with SMI in care.<br><br>COMPLIANCE |
| 15--**Discharge Planning** to begin within 24 hours of admission and will:<br>A) Identify the person's strengths, preferences, needs and desired outcomes<br>B) Identify specific community-based services needed on discharge<br>C) Identify and connect the person to the providers | The State Hospital and CMHC records reviewed at State Hospitals and CMHCs during FY '22 showed progress and revealed continued challenges. DMH developed a new Discharge Planning protocol and convened State Hospital and CMHC staff to work on the issue.<br><br>During FY '23, DMH's Office of Utilization Review (OUR) developed an audit protocol to assess Hospital performance and began conducting quarterly reviews of discharge planning at each Hospital. During this monitoring period, the Court Monitoring Team participated in 3 of these reviews.<br><br>Compliance Findings are provided below by subparagraphs of the Order: Typically, the Monitor applies scoring thresholds requiring at least 85% of observations in compliance, with no State Hospitals below 75%, to achieve an overall rating of compliance. During this period, we focused our review on supporting and assessing the DMH OUR audits. and did not review enough charts to reach definitive compliance conclusions. However, we offer these observations to illustrate progress and needs: |

| | |
|---|---|
| D) Refer the person to PACT or ICORT when criteria met<br>E) Include assistance if needed in securing or activating benefits<br>F) Coordinate before discharge so meds are continued as needed<br>G) Identify resources for crises and educate on accessing them<br>H) Include an anticipated discharge date | ***Discharge Planning to begin within 24 hours of admission:***<br><br>COMPLIANCE<br><br>***Identify the person's strengths, preferences, needs and desired outcomes***<br><br>Performance on this requirement has been improved with most charts indicating that discharge planning is commenced in a timely way. Patient strengths, preferences and needs are often assessed generically rather than with reference to mental health treatment, recovery, and support. The intent of determining strengths, preferences and needs is not to list vague personal preferences but to use the "voice of the patient" to improve treatment planning. For example, in one chart we saw documentation that an individual was very focused on obtaining a job to afford a car. This motivation could be a foundation of a treatment plan emphasizing adherence to provide the stability needed for ownership of a vehicle and Supported Employment to help with a job to afford the car, but sadly there was no evidence in the treatment plan of either.<br><br>  PARTIAL COMPLIANCE<br><br>***Identify specific community-based services needed on discharge***<br><br>There has been significant improvement on this issue with most charts showing some identification of needed community services. However, translating this into referrals and adjustments in the services arranged after discharge remain loose; some charts indicate via a checked box that a referral to PACT was made, but the aftercare appointments are with clinic personnel. The referrals/connections to community care are not close/personal or "warm" enough, perhaps because personal contacts by CMHC staff were not made while the individual was hospitalized. Sometimes multiple appointments are scheduled for individuals on discharge, e.g., appointments with a therapist, a nurse and a prescriber on different days. This will impede engagement in care.<br><br>  PARTIAL COMPLIANCE<br><br>***Identify and connect the person to the providers***<br><br>State Hospital staff consistently arrange for post discharge services including scheduling initial appointments. However, the scheduled appointments are often with clinic personnel, even when checklists indicate there has been a referral to Intensive Services. Best practices would be to complete the intake for CMHC services at the Hospital and then schedule a first visit with these programs so care can begin immediately rather than starting with an intake that emphasizes paperwork. We found continued good performance on making sure initial appointments were scheduled and people were informed about them in discharge materials, although scheduling and assistance in getting people to important initial visits could be improved.<br><br>  COMPLIANCE |

*Refer the person to PACT or ICORT when criteria met*

Performance on this issue is improved; we found evidence of referrals for care in a majority of charts although as noted above often the scheduled visits post discharge were with staff in other programs. Sometimes referrals to Intensive Services were noted but all the appointments on discharge were with clinic personnel. CMHCs sometimes indicate an intake at the CMHC office is needed prior to e.g., a PACT visit. However, if intakes are completed while people are hospitalized, care on discharge could be more convenient.

Joint State Hospital/CMHC discharge planning is more likely to be effective, especially when people have been readmitted.

PARTIAL COMPLIANCE

*Include assistance if needed in securing or activating benefits*

Assistance in securing benefits is required by the Order and is of undeniable importance. However, given the short hospital stays that most people experience, there is usually not enough time to complete these processes (e.g., applications for Social Security Disability can take months or even years).

A strengthened, consistent process of assisting with benefits in CMHC's should be considered.

PARTIAL COMPLIANCE

*Coordinate before discharge so meds are continued as needed.*

Our record reviews confirmed that continuity of medication treatment was consistently addressed at discharge planning by State Hospitals, by providing a supply of medications and a prescription. Better coordination between State Hospital medical staff and CMHC's providers when medications are changed is necessary. However, this requirement is being met.

COMPLIANCE

*Identify resources for crises and educate on accessing them.*

Documentation of this requirement is now a standard part of discharge planning, and our reviews found consistent evidence it was in place (e.g., people sign the relevant discharge planning form). We assess this requirement to be met although qualitative aspects of crisis planning can be improved.

COMPLIANCE

| | |
|---|---|
| | *Include an anticipated discharge date*<br><br>We found evidence of continued improvement on this issue. The number of charts where an anticipated discharge date is recorded approaches our compliance threshold, but we believe improvements in treatment planning to use time in State Hospital well are needed.<br><br>COMPLIANCE |
| 16--**Discharge planning for people readmitted** addresses prior plan, readmission cause, adjustment | DMH OUR audits are examining this issue closely, a first step toward improvement. We see some changes in Hospital treatment such as increased use of injectable medications, but often this appears to be driven by policy rather than by an assessment of individual needs and an assessment of what happened to warrant readmission.<br><br>As we have noted previously, readmission rates in Mississippi are low, but most individuals who are admitted have prior inpatient care. Record reviews suggest that many readmissions could be prevented by better care.<br><br>Many readmissions are after months or even years of community living, suggesting that the issue leading to readmission was not failed Hospital treatment but the need to improve community care, especially engagement in treatment. To make fundamental improvements in reducing readmissions therefore it is primarily community treatment and support that needs improvement, with a focus on assertive engagement that can begin in the Hospital.<br><br>PARTIAL COMPLIANCE |
| 17--Prior to discharge, **CMHC staff meet with individual and assertively engage the individual in appropriate services** | As discussed throughout this Report, performance on this requirement is still uneven. When Peer Bridgers at the State Hospital AND at the CMHC take on this responsibility it is often effectively done. Challenges in hiring Peer Bridgers and unevenness in how peer staff are integrated into CMHC's and State Hospitals affect compliance.<br><br>PARTIAL COMPLIANCE |
| 18--**DMH annual overview of services, alternatives to commitment to Chancery Courts** | DMH has conducted briefings/trainings with Chancery Court staff and reported on these efforts to the Monitor. Changes in the collecting and reporting of data from Chancery Courts, introduced by House Bill 1222, should lead to more consistency in commitment processes.<br><br>COMPLIANCE |
| 19--**TA to providers**:<br>--competency based training, | DMH has made continued progress on this issue. We previously noted strengths with respect to training for Peer Specialists and for some clinicians and indicated a need for improvements especially in training relative to working with individuals with SMI and in Core Services programs.  Sadly, pre-service professional training programs often do not address these competencies. During this period, DMH developed some training programs |

| | |
|---|---|
| consultation, coaching --by people with experience implementing Core Services | and identified others available through SMI Advisor, and required CMHCs to have staff complete these trainings. This is good progress. We do not yet have evidence of its coverage and effectiveness. Complementing the training efforts with technical assistance would increase their effectiveness.<br><br>PARTIAL COMPLIANCE |
| **20--Data Collection and Review**. On a monthly basis, the State will collect, review, and analyze person level and aggregate data capturing:<br><br>And Paragraph 24:<br><br>Beginning at the end of FY22, and until the case is terminated, Mississippi will post on agency websites and provide on an annual basis to the DOJ and Monitor the data described in Paragraphs 19-21, not to include individual identifiable data. | This requirement became effective at the end of FY '22. Recognizing problems in the consistency and accuracy of data, DMH has worked hard with all CMHC's during FY '22 and FY '23 to improve data accuracy. Medicaid data on Core Services utilization was submitted monthly by the Division of Medicaid to the Monitor during 2022, but there were delays in DOM reporting during FY '23. DOM data has begun to be reported again as this Report is written.<br><br>UPDATE BELOW<br><br>Specific requirements:<br>a. *Admissions to Residential Crisis Services locations, by location broken down by CMHC region and by county, and admissions to State Hospitals from Residential Crisis Services and where Residential Crisis Services were not provided;*<br><br>      This information is being provided to the Monitor and is being posted/<br><br> b. *Calls to Mobile Crisis Teams, with the number of calls leading to a mobile team visit, the average time from call to visit, the number of calls where the time to visit exceeded limits in the DMH Operational Standard 19.3, E, 1, and disposition of the call and/or Mobile Team visit.*<br><br>      This information required implementation of a new reporting system during FY '23. The system has been implemented and we will work with DMH to evaluate the data during FY '24.<br><br>c. *Civil commitments to State Hospitals by CMHC region and by county.*<br><br>      This information is being provided to the Monitor and posted on the DMH Olmstead page.<br><br> d. *Jail placements pending State Hospital admission by CMHC region and county, including length of placement (Mississippi will collect this data, as to each person, when a State Hospital receives the commitment order for the person).*<br><br>      Information has been provided and posted. |

| | |
|---|---|
| | *Individuals who remain hospitalized in State Hospitals for over 180 days:*<br><br>The number of individuals with long stays in each Fiscal Year has been provided and posted.<br><br>*Persons receiving each Core Service by CMHC region and by county.*<br><br>This information has been provided and posted.<br><br>g. *Number of units of each Core Service reimbursed through Medicaid by CMHC region and county.*<br><br>This data (g) was regularly provided to the Monitor until DOM changed data vendors in FY '23. DOM has resumed providing this information but not indicated how the data will be reviewed, analyzed, and posted.<br><br>DMH IS NEAR COMPLIANCE, DOM NEEDS TO POST AND CONSISTENTLY PROVIDE DATA |
| 21--**Monthly collection, review, analysis** of person level and aggregate billing/utilization on DMH grants 24--Beginning at the end of FY22, and until the case is terminated, Mississippi will post on agency websites and provide on an annual basis to the DOJ and Monitor the data described in Paragraphs 19-21 | DMH has improved CMHC data collection and reporting and the State has made substantial progress. Linking reimbursement to submission of data on service provision (labelled as "Fee for Service") was challenging for some CMHC's but led to improved data submission in FY.<br><br>Person level service utilization is now being reported. DMH provided an initial report on services delivered in the first Quarter of FY '23 to the Monitor. We relied on that data to evaluate enrollment in and intensity of Intensive Services for this Report. The data was sufficient to conduct such analyses and revealed challenges that can be addressed to move these services toward compliance.<br><br>The Court Monitoring Team will work with DMH in FY '24 to improve the review and analysis, and use of data.<br><br>DMH APPROACHING COMPLIANCE, DOM MUST POST DATA |
| 22--**Annual analysis** of compliance and fidelity of all core services by CMHC | DMH periodically reviews all services for compliance with its Operational Standards and has made substantial efforts to implement national standards for program fidelity (is the program working as intended) for Core Services where these standards exist.  This is the case for PACT and Supported Employment (Individual Placement with Support). DMH has developed its own fidelity standards for ICORT, ICSS, Mobile Crisis and Supported Employment partnership programs with Vocational Rehabilitation. DMH has conducted annual on-site reviews of these programs for several years and made a number of |

| | |
|---|---|
| | improvements for FY '23 and FY '24. The Court Monitor Team reviewed the DMH fidelity efforts by participating in about a dozen of the monitoring visits, covering all the services that have a fidelity model. We found the reviews to be conducted professionally and effectively.<br><br>DMH has provided a summary of compliance and fidelity status of Core Services for all Regions to the Monitor<br><br>COMPLIANCE |
| 23--**Clinical Review**--STAYED | REQUIREMENT IS STAYED/NOT NOW IN EFFECT |
| 24--MS to **"post on agency websites** and provide on an annual basis to DOJ and Monitor the data in para 19-21" | Covered in discussion of Paragraphs 19-22 above |
| 25-- **Implementation Plan** STAYED | Not applicable |
| 26--Imp. Plan timetables STAYED | Not applicable |
| 27--**Termination**--Requires substantial compliance for each para, sustained for a year<br>28--Termination of oversight may be sought/achieved for individual section/paras | Not applicable |
| 29--**Monitor** to be appointed | Not applicable |

Conclusion and next steps.

The fourth Monitoring Report in this case comes 11+ years after DOJ issued a Findings Letter raising concerns about deficits in Mississippi's mental health system leading to unnecessary institutionalization, and 3 years after Judge Reeves' Remedial Order. An appeal to the Fifth Circuit is still pending. Meanwhile efforts to achieve compliance continue and substantial progress in a number of areas has been made.

There have also been related developments nationally and in Mississippi that affect the system and people in it. An archaic practice of holding people in jails while they await a Hospital bed was made worse due to reductions in capacity during the pandemic. Wait times have been reduced during the past year but the problems persist. Other challenges at the intersection of law enforcement and mental health have continued despite innovations like Crisis Intervention Teams; the Mississippi Legislature evaluated these issues and began to respond via House Bill 1222, which launched changes including training, expansion of Crisis Intervention Teams, some funding for liaison personnel to work at this intersection, and data reporting requirements for Chancery Courts. Several CMHC Regions were consolidated, preventing cessation of services in struggling Regions but introducing big management challenges for the CMHC's that took over these operations. National developments included the launch of the first national crisis and suicide hot line (988) and expansion of the Certified Community Behavioral Health Clinic (CCBHC) program, for which Mississippi obtained a federal grant to explore statewide implementation.

Our review during this period of compliance with the requirements of the Order finds improvement, with many foundational elements in place (e.g., services funded, quality reviews being done and data reporting initiated). On the other hand, progress is still required on a number of issues that have a great impact on people receiving care such as being held in jail while awaiting treatment, being connected with the right care at the right time or having access to employment or housing supports. To generalize, the structural aspects of change have been addressed, but the system is not yet working for all people the way it should. Mississippi has made substantial progress in improving care. However, challenges remain and require sustained attention.

Next steps in monitoring. All requirements of the Order are now in effect and data systems are in place, allowing a full assessment of progress. While it is useful to know services were funded by DMH, until statewide data on their use and well-done quality reviews were in place, the impact on unnecessary institutionalization could not be assessed. Reviewing data to assess adequacy of services and DMH efforts to improve care will be priorities during 2024.